**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. 5:25-cv-222**

| | |
|---|---|
| Jennifer Sloan Rachmuth, | |
| *Plaintiff*, | |
| v. | **COMPLAINT** |
| Elliott Warren, Benjamin Marino, and Edgar Hernandez, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

### INTRODUCTION

1. On November 3, 2024, Plaintiff Sloan Rachmuth was enjoying a quiet Sunday morning with her husband and two children, preparing to celebrate her seventeenth wedding anniversary.

2. Suddenly, three officers with the Holly Springs Police Department ("Holly Springs PD")—Defendants Elliott Warren, Benjamin Marino, and Edgar Hernandez—pounded on her door. When she answered, Defendants arrested Mrs. Rachmuth, handcuffed her, paraded her through her neighborhood, and shoved her into a squad car. Her husband could only look on, helpless and horrified. Her children were terrified. Her neighbors watched in shock. Mrs. Rachmuth was not permitted to get properly dressed or make herself presentable before being forced from her home and into a public spectacle.

3. Mrs. Rachmuth, a law-abiding citizen, could not imagine why she was being arrested in her home. In her panic and paranoia, she feared that she had been framed for murder. Defendants, however, told Mrs. Rachmuth that she had been charged with cyberstalking for

Case 5:25-cv-00222-BO-RJ   Document 1   Filed 04/29/25   Page 1 of 30

making an employee at a local Harris Teeter feel harassed. It was then she realized that her arrest was triggered by First Amendment-protected activities she had engaged in days earlier.

4. Three days earlier, Mrs. Rachmuth, a Jewish woman, political consultant, and independent journalist focused on Middle East and Jewish public affairs, was shopping at the Holly Springs Harris Teeter when she was shocked to see an employee wearing a keffiyeh. A keffiyeh is a head scarf with a specific black and white fishnet pattern that has become a symbol of support for Hamas in the wake the massacre and sexual violence that the terrorist group committed against Israeli civilians, including women and children, on October 7, 2023. Accordingly, the keffiyeh is an extremely offensive symbol to Mrs. Rachmuth and many Jews around the globe, among others.

5. Mrs. Rachmuth took a few pictures of the employee and approached her to ask why she was wearing the keffiyeh. The employee noted it was "for free Palestine."

6. After the store manager refused to answer Mrs. Rachmuth's questions about why the store was not enforcing Harris Teeter's corporate policy prohibiting employees from wearing political paraphernalia, Mrs. Rachmuth was asked to leave.

7. After she left the store, Mrs. Rachmuth decided to post the pictures she took of the employee on X (formerly Twitter), tagging Harris Teeter's corporate account. She did so to (1) engage in political speech, (2) publish newsworthy content as a journalist focused on antisemitism in her community, and (3) to alert Harris Teeter to violations of its corporate policies, all speech and activity that is clearly protected by the First Amendment.

8. Nevertheless, within three days, Defendants had obtained a warrant and arrested Mrs. Rachmuth solely for exercising her First Amendment rights to political speech and journalistic activity. Defendants' swift action against Mrs. Rachmuth lies in stark contrast to the

Holly Springs PD's refusal to take action against similar, non-Jewish offenders Mrs. Rachmuth previously reported for similar cyberstalking and harassment based on her Jewish identity.

9.      But because Mrs. Rachmuth's conduct plainly did not fall under North Carolina's cyberstalking statute and was plainly protected by the First Amendment, Defendants lacked probable cause to arrest Mrs. Rachmuth. The District Attorney admitted as much when she dismissed the charge one day after Mrs. Rachmuth's arrest, noting that the "described conduct does not meet the elements of the offense."

10.     But the damage had already been done. News of Mrs. Rachmuth's arrest quickly spread online. Mrs. Rachmuth's reputation was destroyed, her job prospects dwindled, she was forced to seek therapy for exacerbated post-traumatic stress disorder and panic attacks, and her daughter was crippled with anxiety from her mother's arrest.

11.     All of this because Mrs. Rachmuth dared to speak online about a perceived act of antisemitism in her community.

12.     All of this because Mrs. Rachmuth dared to exercise her right to publish newsworthy content online as an independent journalist.

13.     Accordingly, Mrs. Rachmuth brings this Complaint to vindicate her rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and for damages resulting from Defendants' violations of those rights and their malicious prosecution, false arrest, and intentional infliction of emotional distress.

**PARTIES**

14.     Plaintiff Sloan Rachmuth is an investigative journalist and commentator, as well as a political consultant. Since 2014, Mrs. Rachmuth has been a Middle East and Jewish public affairs writer published in various news outlets, including Law Enforcement Today and the Federalist.

3

She is a subject matter expert on extremist groups and terror recruitment. Mrs. Rachmuth is Jewish and a resident of Holly Springs, North Carolina.

15. Defendant Elliott Warren is an Officer with the Holly Springs PD. On November 3, 2024, Warren arrested Mrs. Rachmuth on her front porch for purported cyberstalking, paraded her through her neighborhood, and stuffed her into a police car as her family and neighbors watched. Warren is listed as the Complainant on the warrant for Mrs. Rachmuth's arrest, and he filed the November 4 incident report accusing Mrs. Rachmuth of an "ANTI_ISLAMIC (MUSLIM)" hate crime based solely on her protected speech.

16. Defendant Benjamin Marino is an Officer with the Holly Springs PD. He assisted Defendant Warren in arresting Mrs. Rachmuth on November 3, 2024.

17. Defendant Edgar Hernandez is an Officer with the Holly Springs PD. He assisted Defendant Warren in arresting Mrs. Rachmuth on November 3, 2024.

**JURISDICTION AND VENUE**

18. This Court has jurisdiction over Mrs. Rachmuth's 42 U.S.C. § 1983 claims under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Mrs. Rachmuth's state common law tort claims under 28 U.S.C. § 1367.

19. Venue is proper in this District because the events that give rise to Mrs. Rachmuth's claims occurred within this District. 28 U.S.C. § 1391(b)(2).

**STATEMENT OF FACTS**

I. **Mrs. Rachmuth is an Investigative Journalist Covering the Rise of Antisemitism and Anti-Israel Sentiment in North Carolina.**

20. Mrs. Rachmuth is an investigative journalist and political commentator. Since 2014, she has been a Middle East and Jewish public affairs writer published in various news

outlets, including Law Enforcement Today and the Federalist. Mrs. Rachmuth is a subject matter expert in extremist groups and terror recruitment, mainly on college campuses.

21. Mrs. Rachmuth also works as a political consultant. She advises candidates for local and statewide office on a variety of issues in North Carolina politics and runs their campaigns.

22. As an independent journalist, Mrs. Rachmuth uses a variety of methods to disseminate newsworthy content to the public, most notably through social media, including her X account, where she is a paid influencer.

23. Mrs. Rachmuth also produces her own podcast, writes her own blog covering North Carolina politics, and writes articles that have appeared in outlets such as the Washington Times, Daily Wire, and the Federalist.

24. Since November 2023, Mrs. Rachmuth has been on paid assignment to document the rising antisemitism and anti-Israel sentiment following the terrorist organization, Hamas's, October 7, 2023, attack on Israel. Pursuant to her journalistic mission, Mrs. Rachmuth has routinely photographed antisemitic and anti-Israel events, protests, and incidents across North Carolina for more than a year. Mrs. Rachmuth often posts these pictures on social media along with newsworthy commentary or political analysis.

25. Many of these pictures are of individuals wearing keffiyehs in apparent solidarity with Hamas. A keffiyeh is a scarf with a specific black and white fishnet pattern. It was first popularized by the Palestine Liberation Organization ("PLO") leader Yassar Arafat. The United States has declared the PLO a foreign terrorist organization. 22 U.S.C. § 5201(b).

26. The black and white keffiyeh has since become the uniform of Hamas terrorists, another U.S.-designated terrorist organization.[1] Hamas's stated objectives are to destroy the State

---

[1] *Foreign Terrorist Organizations*, U.S. DEP'T OF STATE, https://www.state.gov/foreign-terrorist-organizations/ (last visited Apr. 28, 2025).

of Israel and eliminate the Jewish people around the globe.[2] The keffiyeh has thus increasingly become a political statement and symbol that is highly offensive to the Jewish community, a symbol that denotes support for Hamas and intimidation of Jews. And a keffiyeh—an avowedly political garment—is wholly distinct from a hijab, the headdress worn by some followers of the Muslim faith.

27.     In the wake of October 7, the keffiyeh has become a symbol of support of Hamas and has routinely been used to mask wearers' identities and terrorize Jews during protests, particularly on college campuses. Indeed, Jewish groups have sought to ban keffiyehs in schools and on college campuses.

28.     Mrs. Rachmuth is Jewish. Her husband is Israeli-American. Seeing members of her community repeatedly wearing the symbol of a terrorist organization dedicated to eradicating people like her and her husband from the earth is deeply upsetting and offensive. And because of the intense political debate that has erupted across the country in the wake of October 7, particularly on American college campuses, documenting and reporting instances where keffiyehs are worn and displayed in her community has become an integral part of Mrs. Rachmuth's journalism and political speech.

**II.     Mrs. Rachmuth Posts a Picture of a Harris Teeter Employee Wearing a Keffiyeh.**

29.     On October 31, 2024, Mrs. Rachmuth was shopping in the same Holly Springs Harris Teeter she has been a customer of for over six years.

30.     As she was checking out, Mrs. Rachmuth was shocked to see an employee wearing a keffiyeh.

---

[2] *See generally* HAMAS, THE COVENANT OF THE ISLAMIC RESISTANCE MOVEMENT (Aug. 19, 1988), https://avalon.law.yale.edu/20th_century/Hamas.asp.

31.     Knowing that Harris Teeter's corporate policy generally prohibits employees from wearing political paraphernalia on the job, Mrs. Rachmuth took pictures of the employee to send to Harris Teeter corporate.

32.     Mrs. Rachmuth then approached the employee to ask why she was wearing the keffiyeh. Given that it was Halloween, Mrs. Rachmuth asked if the employee was wearing it as a costume. The employee replied, "No, it's for free Palestine," and noted that she "got it from Shein," a popular online clothing store.

33.     After speaking with the employee, Mrs. Rachmuth asked to speak with the store manager, who was not present during Mrs. Rachmuth's initial encounter with the employee. Mrs. Rachmuth told the manager that, as a Jewish person, she felt uncomfortable in a store where employees were permitted to wear keffiyehs. She further emphasized that the store would lose her business if it continued permitting employees to do so.

34.     The store manager simply told Mrs. Rachmuth, "Like it, or leave!"

35.     When she returned home, Mrs. Rachmuth called the Harris Teeter to again attempt to speak with the manager. The manager refused to listen to Mrs. Rachmuth's pleas and refused to provide her with information to contact Harris Teeter corporate.

36.     Mrs. Rachmuth next called Harris Teeter's 1-800 customer service number. An agent told her they would follow up in a few days.

37.     Mrs. Rachmuth then decided to post the pictures she took of the employee on X. She did so because (1) she wanted to engage in political discourse about members of her community publicly wearing a symbol for a terrorist group, (2) the incident aligned with her journalistic mission to document and report acts of antisemitism in her community, and (3) Harris Teeter is known to respond more quickly to customer complaints posted to social media.

38. Mrs. Rachmuth posted three pictures of the employee in a single post noting, "When I asked her why she was wearing a keffiyeh, the store manager told me to leave!!" She also tagged Harris Teeter's corporate X account.

39. The single post appeared as follows:



40. The pictures did not clearly show the employee's face, nor did Mrs. Rachmuth mention the employee by name.

41. In the comments to her post, Mrs. Rachmuth continued to engage in political speech and provide commentary based on her expertise as a Middle East correspondent. For example, she discussed the significance of the keffiyeh, the difference between the keffiyeh and the hijab, the fact that the keffiyeh is political speech, and the fact that the Harris Teeter employee handbook prohibits employees from wearing political paraphernalia on the job.

42. Mrs. Rachmuth did not post any other pictures of or references to the employee.

### III. Defendant Warren Obtains a Warrant to Arrest Mrs. Rachmuth for Cyberstalking Despite a Clear Lack of Probable Cause.

43. On November 2, 2024, a warrant was issued for Mrs. Rachmuth's arrest, with Defendant Warren as the Complainant. The warrant listed the Harris Teeter manager—not the employee—who was not present when Mrs. Rachmuth first approached the employee as the sole witness. Ex. 1.

44. The warrant was for a single charge of cyberstalking under North Carolina General Statutes § 14-196.3. The sole basis for the charge was as follows:

> On or about the date of offense shown and in the county named above the defendant unlawfully and willfully did did [sic] knowingly permit an electronic communication device, CELLPHONE, under the defendant's control to be used for a purpose prohibited by G.S. 14-196.3. TO TAKE PICTURES AT HARRIS TEETER AND ELECTRONICALLY COMMUNICATE ON SOCIAL MEDIA, FOR THE PURPOSE OF TERRIFYING HARASSING, OR EMBARASSING HER.

Ex. 1.

45. On November 3, Defendant Warren prepared an Incident/Investigation Report. Ex. 2. The Report again listed only the Harris Teeter manager—who was not present when Mrs. Rachmuth first approached the employee—as a witness. The Report simply concluded, "A victim was harassed at her work place by the offender. Offender took pictures and called the victim a terrorist." *Id.* The Report labeled the incident as a suspected "ANTI_ISLAMIC (MUSLIM)" hate or bias-motivated crime. *Id.* Mrs. Rachmuth vigorously denies the allegation that she called the employee a terrorist.

46. But the warrant and Report are based on incomplete and misleading information. They omit important facts that would have alerted a magistrate that Defendants lacked probable cause to arrest Mrs. Rachmuth. For example, neither the warrant nor the report explains that the basis for the charge was a single social media post. Further, neither the warrant nor the report

9

explains the clear context in which the post was made, commentary on a major political issue of the day.

47. Regardless, the face of the warrant and Report clearly demonstrate that Defendants lacked probable cause to arrest Mrs. Rachmuth from the beginning.

48. The applicable section of the cyberstalking statute makes it unlawful to "[e]lectronically mail or electronically communicate to another repeatedly, whether or not conversation ensues, for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person." N.C. Gen. Stat. § 14-196.3(b)(2).

49. But Mrs. Rachmuth did not electronically communicate "repeatedly." *See id.* She made only a single social media post and never electronically communicated with the employee directly.

50. Further, as the content and context of Mrs. Rachmuth's post makes clear, Mrs. Rachmuth's purpose was to speak and report on an antisemitic symbol in her community and Harris Teeter's failure to enforce its own policies prohibiting wearing political paraphernalia. Her purpose was plainly not to terrify, harass, or embarrass the employee. Indeed, Mrs. Rachmuth did not even include the alleged victim's name or face, as one might expect her to do if her purpose was really to terrify, harass, or embarrass the employee.

51. Moreover, First Amendment-protected political speech and journalism is expressly excluded from the reach of the cyberstalking statute:

> This section does not apply to any peaceable, nonviolent, or nonthreatening activity intended to express political views or to provide lawful information to others. This section shall not be construed to impair any constitutionally protected activity, including speech, protest, or assembly.

N.C. Gen. Stat. § 14-196.3(e).

52. And, even if this First Amendment carveout did not exist, Mrs. Rachmuth would still clearly have had a First Amendment defense to any criminal charge based solely on her First Amendment activity. Any reasonably well-trained officer or person of "ordinary prudence and intelligence" would have recognized that the circumstances described in the warrant and Report did not amount to a violation of the cyberstalking statute and thus did not demonstrate probable cause.

53. Nevertheless, Defendants sought to punish Mrs. Rachmuth's First Amendment-protected activity by swiftly moving forward with arresting Mrs. Rachmuth based solely on her First Amendment-protected political speech and journalism.

54. What is worse is that Defendants did not even have to seek an arrest warrant. They could have simply issued a criminal citation and served a criminal summons on Mrs. Rachmuth. *See* N.C. Gen. Stat. § 15A-301(b). Indeed, according to the Holly Springs PD's 2024 Annual Report, only 2% of enforcement actions resulted in arrest, while 28% resulted in citations.[3] That would have at least saved Mrs. Rachmuth from the spectacle that ensued below. Yet Defendants chose to use the method of criminal process reserved for the vilest criminals, all because Mrs. Rachmuth dared to exercise her First Amendment rights.

## IV. Defendants Arrest Mrs. Rachmuth Without Probable Cause Solely for Exercising Protected Political Speech and Journalism.

55. At approximately 10:00 a.m. on November 3, 2024, Defendants arrived at Mrs. Rachmuth's home and began pounding on her door.

56. As she approached the front door, Mrs. Rachmuth was surprised and confused to see three Holly Springs police officers on her porch. Without asking any questions, Defendant

---

[3] Town of Holly Springs Police Department, 2024 Annual Report 19 (2024), https://www.hollyspringsnc.gov/DocumentCenter/View/52312/HSPD-Annual-Report-2024.

Warrant immediately began handcuffing her. Mrs. Rachmuth was shocked and terrified. Since she knew she had committed no crime that could justify this show of force, her mind raced with paranoia and thought that someone must have framed her for a terrible crime like murder.

57. When Mrs. Rachmuth asked the reason for her arrest, however, Defendant Marino replied that something Mrs. Rachmuth posted to social media made someone feel harassed.

58. It was Mrs. Rachmuth's and her husband's seventeenth wedding anniversary. They were preparing a celebratory brunch with their two children. Mrs. Rachmuth had not even had time to put on her makeup for the day as she was not planning to leave the house or see anyone besides her immediate family.

59. As Defendants arrested her, Mrs. Rachmuth's concerned husband watched helplessly. Her children, who were inside the house and aware of what was happening, were terrified. The family's protective German Shepherd continuously barked as Defendants handcuffed Mrs. Rachmuth and led her away. Mrs. Rachmuth was not permitted to get properly dressed or make herself presentable before being forced from her home.

60. As her husband and neighbors looked on, Defendants paraded Mrs. Rachmuth through her neighborhood to the squad car parked three houses down. Defendant Warren chuckled at Mrs. Rachmuth's expense. Mrs. Rachmuth felt humiliated. There was no apparent reason for Defendants to park so far away other than to further humiliate Mrs. Rachmuth in front of her family and neighbors.

61. Defendants stuffed Mrs. Rachmuth into the squad car. On the way to the station, Mrs. Rachmuth had a panic attack. She felt like she was choking. She begged Defendants for a drink of water, but Defendants refused to give her water while in the squad car.

**62.** Mrs. Rachmuth was taken to the Wake County jail, where she was held for three to four hours in a cell. She was then released on a $1,000 bond.

**V.    While the Charges Against Mr. Rachmuth Are Dropped, Mrs. Rachmuth and Her Family Suffer Continued Mental, Emotional, and Reputational Harm.**

63.    On November 4, the day after Mrs. Rachmuth's arrest, the Wake County District Attorney, Lorrin Freeman, dismissed the charge. The dismissal noted that the "described conduct does not meet the elements of the offense." Ex. 3.

64.    But the damage had already been done.

65.    Media outlets quickly circulated news of Mrs. Rachmuth's arrest, and anti-Israel activists spread her mugshot and charge sheet online. Outlets did not even attempt to reach out to her for comment. Many outlets specifically identified her as a previous campaign manager for a candidate for state superintendent.[4] Some of the comments on social media rose to threats against her and her family.

66.    The media blitz about her arrest left Mrs. Rachmuth humiliated and terrified. The mental and emotional toil forced her to take two months off work. Mrs. Rachmuth previously had close relationships with many of her neighbors; now most of them no longer speak to her.

67.    In addition to the panic attack Mrs. Rachmuth suffered in the back of Defendants' squad car, the arrest itself exacerbated her pre-existing post-traumatic stress disorder. Mrs. Rachmuth sought therapy to cope with the additional stress and anxiety.

68.    The hit to her reputation also significantly impacted Mrs. Rachmuth's political consulting work. Candidates generally do not take on the risk of hiring someone with a criminal record, particularly one as well-publicized as Mrs. Rachmuth's. Similarly, political candidates are

---

[4] *E.g.*, Noa Halff, *Aspiring GOP Lawmaker Hit by Scandal Over Female Aide's Strange Supermarket Antics*, DAILY MAIL (Nov. 5, 2024, 11:20 A.M.), https://www.dailymail.co.uk/news/article-14043741/gop-michele-morrow-scandal-female-aide-supermarket.html.

extremely cautious about associating with anyone who has been accused of bias or hate crimes out of fear that their political opponents will use the association to accuse the political candidate of sharing the alleged basis or hate. While Mrs. Rachmuth planned to work on five campaigns for sheriff candidates in the 2025 election cycle, she has yet to secure a client after her arrest.

69. Defendants exacerbated this reputational harm by reporting the incident underlying Mrs. Rachmuth's arrest to the National Incident-Based Reporting System ("NIBRS"). The NIBRS is a nationwide crime reporting database approved by the FBI and used by numerous law enforcement agencies across the country. Unlike other crime statistics databases, the NIBRS "collects more detailed information," including "victim types."[5] Mrs. Rachmuth has thus been forever marked in a national crime statistics database as having committed an "ANTI_ISLAMIC (MUSLIM)" hate crime based solely on her plainly First Amendment-protected speech and journalistic activity.

70. Mrs. Rachmuth's arrest also directly harmed her family. Her teenaged daughter has suffered severe anxiety that has required routine therapy visits. Her anxiety is exacerbated each time the family dog barks, bringing her back to the day her mother was placed in handcuffs on the front porch.

**VI.** **Defendants' Swift Arrest of a Jewish Woman for Allegedly Cyberstalking a Non-Jewish Individual Stands in Stark Contrast to the Holly Springs PD's Handling of Similar Cases Involving Non-Jewish Perpetrators and Jewish Victims.**

71. It is not lost on Mrs. Rachmuth that Defendants swiftly arrested her—a known Jewish woman—for allegedly cyberstalking a non-Jewish individual for wearing a symbol that is offensive to many Jews, while the Holly Springs PD largely rebuffed her own reports of cyberstalking and anti-Jewish harassment perpetrated by non-Jewish individuals against her.

---

[5] *National Incident-Based Reporting System (NIBRS)*, FBI, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/ucr/nibrs (last visited Apr. 28, 2025).

72. For example, on November 29, 2021, Mrs. Rachmuth filed a police report against a local resident for antisemitic targeting of Mrs. Rachmuth and antisemitic social media posts. The Holly Springs PD refused to investigate.

73. In June 2022, Mrs. Rachmuth filed a police report against a member of a neo-Nazi group who repeatedly sent antisemitic propaganda to her and her family and distributed it to her colleagues. The individual continued to send her antisemitic communications despite Mrs. Rachmuth repeatedly telling him to stop.

74. For months, the Holly Springs PD failed to meaningfully investigate Mrs. Rachmuth's complaint. Finally, in November 2022, Mrs. Rachmuth met with Holly Springs PD Chief Paul Liquorie to discuss her case. He asked her to share evidence she had gathered, which she promptly shared, and promised to personally investigate the matter. Throughout her interactions with Chief Liquorie, he assured her that the Holly Springs PD would need to seek the District Attorney's input before charging any cyberstalking or hate crimes.

75. In December 2022, Chief Liquorie emailed Mrs. Rachmuth to provide an update on her case. He stated that he understood her frustration and fear and assured her that Holly Springs PD was working on her case. He stated that the Holly Springs PD was carefully considering which North Carolina General Statutes applied to the reported conduct and recognized the perpetrator's conduct was escalating.

76. In January 2023, after receiving more unwanted, antisemitic communications from the same individual, Mrs. Rachmuth sent several emails to Chief Liquorie asking for an update, which largely went unanswered.

77. Finally, on January 9, Chief Liquorie emailed Mrs. Rachmuth to inform her that the Holly Springs PD would not move forward with her complaint. He stated that, while he

"recognize[d] the frustration, intimidation and fear you and your family are experiencing," the Holly Springs PD's "diligent[]" investigation "concluded that no criminal North Carolina General Statutes have been violated." He assured Mrs. Rachmuth that the Holly Springs PD engaged in "an extensive evaluation" of her case, in coordination with the North Carolina State Bureau of Investigation. Importantly, Chief Liquorie stated that charges could not be pursued because the reported conduct fell "under First Amendment protected speech."

78.     Threats against Mrs. Rachmuth, which upon information and belief were based on her Jewish identity, did not stop.

79.     On July 4, 2023, Mrs. Rachmuth received a credible death threat through her website while she was out of town. The FBI directed Holly Springs PD to monitor Mrs. Rachmuth's house while she was gone and to sweep her house when she returned. While Chief Liquorie assured her that the Holly Springs PD would investigate the death threat, Mrs. Rachmuth never heard back.

80.     In November 2023, Mrs. Rachmuth submitted a public records request to the Holly Springs PD for documents and information related to the Holly Springs PD's handling of her complaints, as well as other complaints involving antisemitic harassment. The Holly Springs PD did not provide the information responsive to this request until the day after Mrs. Rachmuth was arrested—over one year later.

81.     The Holly Springs PD's handling of Mrs. Rachmuth's repeated complaints of antisemitic threats, harassment, and cyberstalking stand in stark contrast to Defendants' handling of the single cyberstalking complaint against her.

82.     When Mrs. Rachmuth, a Jewish woman, complained of antisemitic threats, harassment, and cyberstalking by non-Jewish individuals, the Holly Springs PD either flatly

refused to investigate or spent months supposedly engaging in "an extensive evaluation" of her case only to conclude that First Amendment concerns prohibited moving forward.

83. However, when Defendants received a report that Mrs. Rachmuth allegedly harassed a non-Jewish woman, Defendants swiftly responded and arrested her within a few days.

84. Unlike with Mrs. Rachmuth's reports, Defendants did not seek the District Attorney's approval before charging her with cyberstalking.

85. Unlike with Mrs. Rachmuth's reports, Defendants did not conduct "an extensive evaluation" of the allegations against her.

86. Upon information and belief, the Town of Holly Springs maintains, and at all relevant times maintained, liability insurance affording coverage to this action.

**COUNT I**
**(42 U.S.C. § 1983 – Malicious Prosecution and Unreasonable Seizure in Violation of the Fourth Amendment to the U.S. Constitution)**

87. Mrs. Rachmuth realleges and reincorporates paragraphs 1–86 as if fully alleged herein.

88. The Civil Rights Act imposes civil liability for a deprivation, under color of state law, of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983.

89. As Holly Springs PD police officers, Defendants acted under the color of state law when they arrested Mrs. Rachmuth for alleged cyberstalking.

90. Defendants deprived Mrs. Rachmuth of clearly established rights guaranteed by the Fourth Amendment to the U.S. Constitution of which an objectively reasonable officer would have been aware, namely the right to be free from malicious prosecution as recognized in *Thompson v. Clark*, 596 U.S. 36 (2022), and *Manuel v. Joliet*, 580 U.S. 357 (2017). This claim is also

17

"sometimes referred to as a claim for unreasonable seizure pursuant to legal process." *Thompson*, 596 U.S. at 42.

91.     Defendants initiated criminal proceedings against Mrs. Rachmuth when they caused her to be charged with cyberstalking, in violation of North Carolina General Statutes § 14-196.3, and seized her pursuant to legal process (i.e., an arrest warrant).

92.     Mrs. Rachmuth's arrest and prosecution was unsupported by probable cause. The cyberstalking statute under which Mrs. Rachmuth was charged requires "repeated[]" communications to constitute a violation, N.C. Gen. Stat. § 14-196.3(b)(2), and expressly does not extend to protected First Amendment activity. *Id.* § 14-196.3(e). And Mrs. Rachmuth clearly had a First Amendment defense to any charge arising from her X post. Any reasonably well-trained officer or person of ordinary prudence would have recognized that Mrs. Rachmuth's single social media post related to her political speech and journalism did not amount to a violation of the cyberstalking statute and thus did not demonstrate probable cause for her arrest.

93.     Further, given the ongoing national political debate following Hamas's October 7 attack on Israel, and the fact that Mrs. Rachmuth is a well-known Jewish journalist in the community, any reasonably well-trained officer or person of ordinary prudence would have recognized that the First Amendment flatly bars any prosecution of Mrs. Rachmuth for her protected political speech and journalistic activities.

94.     And it was unreasonable for Defendants to rely on a warrant obtained based on misleading and incomplete information.

95.     The prosecution and proceedings against Mrs. Rachmuth were terminated in her favor when the District Attorney dismissed the charge because "the described conduct does not

18

meet the elements of the offense." The District Attorney's reason for dismissal further supports the lack of probable cause.

96. Defendants acted with reckless disregard for Mrs. Rachmuth's rights by arresting her without probable cause based solely on her protected speech and journalistic activity.

97. At all relevant times, Defendants acted with malice,[6] which can be inferred from the obvious lack of probable cause justifying Mrs. Rachmuth's arrest, how Defendants treated Mrs. Rachmuth's allegations that she was cyberstalked, threatened, and harassed, Defendants' decision to arrest Mrs. Rachmuth rather than issuing a citation and summons, and the other facts alleged in this Complaint. Defendants further acted with malice by arresting Mrs. Rachmuth without probable cause based solely on her protected speech and journalistic activity, acting with reckless and wanton disregard for Mrs. Rachmuth's First Amendment rights.

98. As a direct and proximate result of and but for Defendants' malicious prosecution and unreasonable seizure pursuant to legal process, Mrs. Rachmuth and her family have suffered and continue to suffer severe physical, mental, and emotional distress, reputational harm, and harm to their careers and employment prospects, among other damages.

99. Accordingly, Defendants maliciously prosecuted Mrs. Rachmuth in violation of the Fourth Amendment and are liable to her for damages pursuant to 42 U.S.C. § 1983.

---

[6] Mrs. Rachmuth does not concede that malice is a necessary element of a Fourth Amendment malicious prosecution claim. *See Thompson*, 596 U.S. at 44 n.3. *But see Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir. 2005) ("Although malice is required to state a claim for malicious prosecution at common law, the reasonableness of a seizure under the Fourth Amendment should be analyzed objectively.").

## COUNT II
### (42 U.S.C. § 1983 – Retaliation in Violation of the First Amendment to the U.S. Constitution)

100. Mrs. Rachmuth realleges and reincorporates paragraphs 1–86 as if fully alleged herein.

101. The Civil Rights Act imposes civil liability for a deprivation, under color of state law, of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983.

102. As Holly Springs PD police officers, Defendants acted under the color of state law when they arrested Mrs. Rachmuth for alleged cyberstalking.

103. Defendants deprived Mrs. Rachmuth of clearly established rights guaranteed by the First Amendment to the U.S. Constitution of which an objectively reasonable officer would have been aware, namely the right to be free from retaliation for engaging in protected political speech and journalistic activity.

104. Mrs. Rachmuth engaged in protected political speech by posting a picture of a Harris Teeter employee wearing a keffiyeh—a political garment increasingly viewed as a symbol of support for Hamas and highly offensive to Jews—to social media, and by including a caption designed to draw attention to Harris Teeter's failure to enforce its dress code and failure to combat symbols of antisemitism.

105. Mrs. Rachmuth engaged in protected journalistic activity by posting a picture of a Harris Teeter employee wearing a keffiyeh to her social media account, where she regularly reports on and documents antisemitic incidents in her community as an independent journalist and Middle East and Jewish affairs correspondent.

106. Defendants' arrest of Mrs. Rachmuth without probable cause—solely based on her protected First Amendment speech and activity—adversely affected Mrs. Rachmuth's First

Amendment rights. Namely, Defendants retaliated against Mrs. Rachmuth for her protected speech and activity, threatening to chill her future speech and journalistic activity.

107. There was a causal connection between Mrs. Rachmuth's protected activity and her arrest by Defendants. Indeed, her social media post was the sole basis for the Incident Report and warrant, and the sole basis Defendants gave for Mrs. Rachmuth's arrest.

108. Defendants acted with reckless disregard for Mrs. Rachmuth's rights by retaliating against her and arresting her without probable cause based solely on her protected speech and journalistic activity.

109. At all relevant times, Defendants acted with malice, which can be inferred from the obvious lack of probable cause justifying Mrs. Rachmuth's arrest, how Defendants treated Mrs. Rachmuth's allegations that she was cyberstalked, threatened, and harassed, Defendants' decision to arrest Mrs. Rachmuth rather than issuing a citation and summons, and the other facts alleged in this Complaint. Defendants further acted with malice by arresting Mrs. Rachmuth without probable cause based solely on her protected speech and journalistic activity, acting with reckless and wanton disregard for Mrs. Rachmuth's First Amendment rights.

110. As a direct and proximate result of and but for Defendants' retaliation, Mrs. Rachmuth and her family have suffered and continue to suffer severe physical, mental, and emotional distress, reputational harm, and harm to their employment prospects, among other harm.

111. Accordingly, Defendants retaliated against Mrs. Rachmuth in violation of the First Amendment and are liable to her for damages pursuant to 42 U.S.C. § 1983.

112. Mrs. Rachmuth realleges and reincorporates paragraphs 1–86 as if fully alleged herein.

113. The Civil Rights Act imposes civil liability for a deprivation, under color of state law, of rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983.

114. As Holly Springs PD police officers, Defendants acted under the color of state law when they arrested Mrs. Rachmuth for alleged cyberstalking.

115. Defendants deprived Mrs. Rachmuth of clearly established rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution of which an objectively reasonable officer would have been aware, namely the right to be free from selective prosecution based on her Jewish identity.

116. Mrs. Rachmuth's arrest had a discriminatory effect. Defendants arrested Mrs. Rachmuth, a Jewish woman, on a thinly supported claim of cyberstalking, while the Holly Springs PD refused to take action against non-Jewish individuals Mrs. Rachmuth repeatedly reported for cyberstalking and antisemitic harassment.

117. When Mrs. Rachmuth, a Jewish woman, complained of antisemitic threats, harassment, and cyberstalking by non-Jewish individuals, the Holly Springs PD either flatly refused to investigate or spent months supposedly engaging in "an extensive evaluation" of her case only to conclude that First Amendment concerns prohibited moving forward.

118. However, when Defendants received a report that Mrs. Rachmuth allegedly harassed a non-Jewish woman, Defendants swiftly responded and arrested her within a few days.

119. Mrs. Rachmuth's arrest had a discriminatory purpose, as Defendants' clearly chose to treat alleged incidents of "ANTI_ISLAMIC (MUSLIM)" bias (that were, in fact, clearly First Amendment-protected speech) more harshly than actual incidents of antisemitism.

120. Defendants acted with reckless disregard for Mrs. Rachmuth's rights by discriminatorily arresting her without probable cause based on her protected speech and journalistic activity.

121. At all relevant times, Defendants acted with malice, which can be inferred from the obvious lack of probable cause justifying Mrs. Rachmuth's arrest, how Defendants treated Mrs. Rachmuth's allegations that she was cyberstalked, threatened, and harassed, Defendants' decision to arrest Mrs. Rachmuth rather than issuing a citation and summons, and the other facts alleged in this Complaint. Defendants further acted with malice by arresting Mrs. Rachmuth without probable cause based solely on her protected speech and journalistic activity, acting with reckless and wanton disregard for Mrs. Rachmuth's First Amendment rights.

122. As a direct and proximate result of and but for Defendants' selective prosecution, Mrs. Rachmuth and her family have suffered and continue to suffer severe physical, mental, and emotional distress, reputational harm, and harm to their employment prospects, among other harm.

123. Accordingly, Defendants selectively prosecuted Mrs. Rachmuth in violation of the Fourteenth Amendment and are liable to her for damages pursuant to 42 U.S.C. § 1983.

### COUNT IV
### (Common Law Malicious Prosecution)

124. Mrs. Rachmuth realleges and reincorporates paragraphs 1–86 as if fully alleged herein.

125. Defendant Warren instituted a criminal proceeding against Mrs. Rachmuth by completing an Incident Report and applying for an arrest warrant.

126. Defendants further instituted a criminal proceeding against Mrs. Rachmuth by arresting her.

127. Mrs. Rachmuth's arrest was unsupported by probable cause. The cyberstalking statute under which Mrs. Rachmuth was charged requires "repeated[]" communications to constitute a violation, N.C. Gen. Stat. § 14-196.3(b)(2), and expressly does not extend to protected First Amendment activity. *Id.* § 14-196.3(e). Any reasonably well-trained officer or person of ordinary prudence would have recognized that Mrs. Rachmuth's single social media post related to her political speech and journalism did not amount to a violation of the cyberstalking statute and thus did not demonstrate probable cause for her arrest.

128. Further, given the ongoing national political debate following Hamas's October 7 attack on Israel, and the fact that Mrs. Rachmuth is a well-known Jewish journalist in the community, any reasonably well-trained officer or person of ordinary prudence would have recognized that the First Amendment flatly bars any prosecution of Mrs. Rachmuth for her protected political speech and journalistic activities.

129. And it was unreasonable for Defendants to rely on a warrant obtained based on misleading and incomplete information.

130. Defendants acted with malice, which can be inferred from the obvious lack of probable cause justifying Mrs. Rachmuth's arrest, how Defendants treated Mrs. Rachmuth's allegations that she was cyberstalked, threatened, and harassed, Defendants' decision to arrest Mrs. Rachmuth rather than issuing a citation and summons, and the other facts alleged in this Complaint. Malice can also be inferred from the fact that Defendants arrested Mrs. Rachmuth without probable cause based solely on her protected speech and journalistic activity, acting with reckless and wanton disregard for Mrs. Rachmuth's First Amendment rights.

131. The proceedings terminated in Mrs. Rachmuth's favor when the District Attorney dismissed the charge because "the described conduct does not meet the elements of the offense." The District Attorney's reason for dismissal further supports the lack of probable cause.

132. Defendants acted with conscious and intentional disregard of and indifference to Mrs. Rachmuth's rights by arresting her without probable cause based on her protected speech and journalistic activity. Defendants wantonly arrested Mrs. Rachmuth for plainly First Amendment-protected speech and activity, which an officer of reasonable intelligence would know to be contrary to his duty. Further, Defendants knew or should have known that their disregard of and indifference to Mrs. Rachmuth's rights was reasonably likely to result in the alleged damages.

133. As a direct and proximate result of and but for Defendants' malicious prosecution, Mrs. Rachmuth and her family have suffered and continue to suffer severe physical, mental, and emotional distress, reputational harm, and harm to their employment prospects, among other harm.

134. Accordingly, Defendants maliciously prosecuted Mrs. Rachmuth and are liable to her for damages.

## COUNT V
### (Common Law False Arrest)

135. Mrs. Rachmuth realleges and reincorporates paragraphs 1–86 as if fully alleged herein.

136. Defendants arrested Mrs. Rachmuth by handcuffing her and transporting her to the Wake County jail in their squad car.

137. Defendants lacked legal authority to arrest Mrs. Rachmuth because they lacked probable cause. The cyberstalking statute under which Mrs. Rachmuth was charged requires "repeated[]" communications to constitute a violation, N.C. Gen. Stat. § 14-196.3(b)(2), and expressly does not extend to protected First Amendment activity. *Id.* § 14-196.3(e). Any reasonably

well-trained officer or person of ordinary prudence would have recognized that Mrs. Rachmuth's single social media post related to her political speech and journalism did not amount to a violation of the cyberstalking statute and thus did not demonstrate probable cause for her arrest. And it was unreasonable for Defendants to rely on a warrant obtained based on misleading and incomplete information.

138. Further, given the ongoing national political debate following Hamas's October 7 attack on Israel, and the fact that Mrs. Rachmuth is a well-known Jewish journalist in the community, any reasonably well-trained officer or person of ordinary prudence would have recognized that the First Amendment flatly bars any prosecution of Mrs. Rachmuth for her protected political speech and journalistic activities.

139. Defendants acted with malice, which can be inferred from the obvious lack of probable cause justifying Mrs. Rachmuth's arrest, how Defendants treated Mrs. Rachmuth's allegations that she was cyberstalked, threatened, and harassed, Defendants' decision to arrest Mrs. Rachmuth rather than issuing a citation and summons, and the other facts alleged in this Complaint. Malice can also be inferred from the fact that Defendants arrested Mrs. Rachmuth without probable cause based solely on her protected speech and journalistic activity, acting with reckless and wanton disregard for Mrs. Rachmuth's First Amendment rights.

140. Defendants acted with conscious and intentional disregard of and indifference to Mrs. Rachmuth's rights by arresting her without probable cause based on her protected speech and journalistic activity. Defendants wantonly arrested Mrs. Rachmuth for plainly First Amendment-protected speech and activity, which an officer of reasonable intelligence would know to be contrary to his duty. Further, Defendants knew or should have known that their disregard of and indifference to Mrs. Rachmuth's rights was reasonably likely to result in the alleged damages.

141. As a direct and proximate result of and but for Defendants' false arrest, Mrs. Rachmuth and her family have suffered and continue to suffer severe physical, mental, and emotional distress, reputational harm, and harm to their employment prospects, among other harm.

142. Accordingly, Defendants falsely arrested Mrs. Rachmuth and are liable to her for damages.

## COUNT VI
### (Intentional Infliction of Emotional Distress)

143. Mrs. Rachmuth realleges and reincorporates paragraphs 1–86 as if fully alleged herein.

144. Defendants engaged in extreme and outrageous conduct when they arrested Mrs. Rachmuth without probable cause solely for her First Amendment protected speech and activity.

145. Defendants engaged in extreme and outrageous conduct when they paraded Mrs. Rachmuth through her neighborhood in handcuffs while her family and neighbors watched on.

146. Defendants engaged in extreme and outrageous conduct when they refused to provide Mrs. Rachmuth with water while she was having a panic attack in the back of their squad car induced by her unlawful arrest.

147. Defendants intended to cause Mrs. Rachmuth severe emotional distress. Defendants arrested Mrs. Rachmuth even though they knew they lacked probable cause to do so. Defendants intentionally parked three houses away from Mrs. Rachmuth's house so that they would have to walk her through the neighborhood in front of her family and neighbors. Defendants refused to provide Mrs. Rachmuth with water even though she clearly stated she was having a panic attack and felt that she was choking.

148. Defendants' extreme and outrageous conduct directly and proximately caused Mrs. Rachmuth severe emotional distress. Mrs. Rachmuth suffered a panic attack while in the back of

27

Defendants' squad car. Mrs. Rachmuth's arrest exacerbated her pre-existing post-traumatic stress disorder and forced her to seek therapy for stress and anxiety.

149. Defendants acted with malice, which can be inferred from the obvious lack of probable cause justifying Mrs. Rachmuth's arrest, how Defendants treated Mrs. Rachmuth's allegations that she was cyberstalked, threatened, and harassed, Defendants' decision to arrest Mrs. Rachmuth rather than issuing a citation and summons, and the other facts alleged in this Complaint. Malice can also be inferred from the fact that Defendants arrested Mrs. Rachmuth without probable cause based solely on her protected speech and journalistic activity, acting with reckless and wanton disregard for Mrs. Rachmuth's First Amendment rights.

150. Defendants acted with conscious and intentional disregard of and indifference to Mrs. Rachmuth's rights by arresting her without probable cause based on her protected speech and journalistic activity. Defendants wantonly arrested Mrs. Rachmuth for plainly First Amendment-protected speech and activity, which an officer of reasonable intelligence would know to be contrary to his duty. Further, Defendants knew or should have known that their disregard of and indifference to Mrs. Rachmuth's rights was reasonably likely to result in the alleged damages.

151. As a direct and proximate result of and but for Defendants' intentional infliction of emotional distress, Mrs. Rachmuth and her family have suffered and continue to suffer severe physical, mental, and emotional distress, reputational harm, and harm to their employment prospects, among other harm.

152. Accordingly, Defendants are liable to Mrs. Rachmuth for damages caused by their intentional infliction of emotional distress.

**Prayer for Relief**

153. Accordingly, Mrs. Rachmuth respectfully requests the Court grant the following relief:

A. Declaration that Defendants violated Mrs. Rachmuth's rights protected by the First, Fourth, and Fourteenth Amendments;

B. Declaration that Defendants are liable for their violations of Mrs. Rachmuth's constitutional rights under 42 U.S.C. § 1983;

C. Declaration that Defendants maliciously prosecuted, falsely arrested, and intentionally inflicted emotional distress on Mrs. Rachmuth;

D. Judgment jointly and severally against Defendants;

E. Compensatory damages in an amount to be determined at trial;

F. Punitive damages sufficient to punish and deter Defendants' conduct in an amount to be determined at trial;

G. Permanent injunction under 42 U.S.C. § 1983 requiring Defendants to expunge any report regarding the incident underlying Mrs. Rachmuth's arrest made to the National Incident-Based Reporting System or any other database;

H. Attorneys' fees as permitted by 42 U.S.C. § 1988;

I. Pre-judgment and post-judgment interest to the extent permitted by law; and

J. Such additional relief as this Court deems just, necessary, and appropriate.

29

Dated: April 29, 2025

Respectfully submitted,

/s/ James T. Johnson
James T. Johnson
DEMENT ASKEW JOHNSON & MARSHALL
333 Fayetteville Street, Suite 1513
Raleigh, NC 27601
Phone: (919) 833-5555
Fax: (919) 832-8287
jjohnson@dementaskew.com
N.C. Bar No. 19087
Local Civil Rule 83.1 Attorney for Plaintiff

Kellen S. Dwyer*
HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK, PLLC
2300 N Street NW, Suite 643
Washington, D.C. 20037
Phone: (202) 737-8808
Fax: (202) 737-8809
kdwyer@holtzmanvogel.com
D.C. Bar No. 1008151

Daniel A. Bruce*
HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: (540) 341-8808
Fax: (540) 341-8809
dbruce@holtzmanvogel.com
V.A. Bar No. 98120

*Counsel for Plaintiff*

*\*Notice of Special Appearance forthcoming*