**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Civil Action No. 5:25-cv-222-BO-RJ**

JENNIFER SLOAN RACHMUTH,

 *Plaintiff,*

v.

ELLIOTT WARREN, ET AL.,

 *Defendants*.

**LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff respectfully submits the following Statement of Material Facts in support of her Motion for Partial Summary Judgment:

## I. Mrs. Rachmuth, an Investigative Journalist Covering Rising Antisemitism, Posts About a Local Harris Teeter Employee Wearing a Keffiyeh

1. Mrs. Rachmuth is an investigative journalist and political commentator. Ex. 1, Rachmuth Decl. ¶ 4. She is a Middle East and Jewish public affairs writer published in various news outlets, including Law Enforcement Today and the Federalist. *Id.* Through her experience, research, and reporting, she has developed extensive knowledge and insight about extremist groups and terror recruitment, particularly on college campuses. *Id.* ¶ 5.

2. As an independent journalist, Mrs. Rachmuth uses a variety of methods to disseminate newsworthy content to the public, most notably through social media, including her X account. *Id.* ¶ 6.

1

3. Mrs. Rachmuth also produces her own podcast, writes her own blog covering North Carolina politics, and writes articles that have appeared in outlets such as the Washington Times, Daily Wire, and the Federalist. *Id.* ¶ 7.

4. Since November 2023, Mrs. Rachmuth has documented rising antisemitism and anti-Israel sentiment following the terrorist organization, Hamas's, October 7, 2023, attack on Israel. *Id.* ¶ 8. Pursuant to her journalistic mission, Mrs. Rachmuth has routinely photographed antisemitic and anti-Israel events, protests, and incidents across North Carolina. *Id.* Mrs. Rachmuth often posts these pictures on social media along with newsworthy commentary or political analysis. *Id.*

5. Many of these pictures are of individuals wearing keffiyehs in apparent solidarity with Hamas. *Id.* ¶ 9. A keffiyeh is a scarf with a specific black and white fishnet pattern. *Id.* It was first popularized by the Palestine Liberation Organization ("PLO") leader Yassar Arafat. *Id.* The United States has designated the PLO a foreign terrorist organization. *Id.*; *see also* 22 U.S.C. § 5201(b).

6. The black and white keffiyeh has since become the uniform of Hamas terrorists, another U.S.-designated terrorist organization. Rachmuth Decl. ¶ 10. Hamas's stated objectives are to destroy the State of Israel and eliminate the Jewish people around the globe. *Id.* The keffiyeh has thus increasingly become a political statement and symbol that is highly offensive to the Jewish community, a symbol that denotes support for Hamas and intimidation of Jews. *Id.* And a keffiyeh—an avowedly political garment—is wholly distinct from a hijab, the headdress worn by some followers of the Muslim faith. *Id.*

7. In the wake of October 7, the keffiyeh has become a symbol of support of Hamas and has routinely been used to mask wearers' identities and terrorize Jews during protests, particularly on college campuses. *Id.* ¶ 11. Indeed, Jewish groups have sought to ban keffiyehs in schools and on college campuses. *Id.*

8. Mrs. Rachmuth is Jewish. *Id.* ¶ 12. Her husband is Israeli-American. *Id.* Seeing members of her community repeatedly wearing the symbol of a terrorist organization dedicated to eradicating people like her and her husband from the earth is deeply upsetting and offensive. *Id.* And because of the intense political debate that has erupted across the country in the wake of October 7, particularly on American college campuses, documenting and reporting instances where keffiyehs are worn and displayed in her community has become an integral part of Mrs. Rachmuth's journalism and political speech. *Id.*

9. On October 31, 2024, Mrs. Rachmuth was shopping in the same Holly Springs Harris Teeter she had been a customer of for over six years. *Id.* ¶ 13.

10. As she was checking out, Mrs. Rachmuth was shocked to see an employee wearing a keffiyeh. *Id.* ¶ 14.

11. Knowing that Harris Teeter's corporate policy generally prohibits employees from wearing political paraphernalia on the job, Mrs. Rachmuth took pictures of the employee to send to Harris Teeter corporate. *Id.* ¶ 15.

12. Mrs. Rachmuth approached the employee and asked why she was wearing the keffiyeh. *Id.* ¶ 16. The employee told her it was for "Free Palestine" and that she purchased it on the online clothing store Shein. *Id.*

3

13. After speaking with both the employee and the manager, the manager told her to "like it or leave." *Id.* ¶ 16. Mrs. Rachmuth left the store and never returned. *Id.*

14. Mrs. Rachmuth later decided to post the pictures she took on X. *Id.* ¶ 17. She did so because: (1) she wanted to engage in political discourse about Harris Teeter allowing its employees to publicly wear a symbol in support of a terrorist group that had recently conducted the largest mass-murder of Jews since the Holocaust, despite its policy of otherwise prohibiting employees from wearing political attire at work; (2) the incident aligned with her journalistic mission to document and report acts of antisemitism in her community; and (3) Harris Teeter is known to respond more quickly to customer complaints posted to social media. *Id.*

15. At no point did Mrs. Rachmuth intend to abuse, annoy, threaten, terrify, harass, or embarrass the employee. *Id.* ¶ 18. And she did not intend others to abuse, annoy, threaten, terrify, harass, or embarrass the employee. *Id.*

16. Mrs. Rachmuth posted three pictures of the employee in a single post (the "Harris Teeter Post") noting, "When I asked her why she was wearing a keffiyeh, the store manager told me to leave!!" Ex. 2; *see also* Rachmuth Decl. ¶ 19. She also tagged Harris Teeter's corporate X account. Ex. 2.

17. In the comments to the Harris Teeter Post, Mrs. Rachmuth continued to engage in political speech and provide commentary based on her expertise as a Middle East correspondent. Rachmuth Decl. ¶ 20. For example, she discussed the significance of the keffiyeh, the difference between the keffiyeh and the hijab, the fact

that the keffiyeh is political speech, and the fact that the Harris Teeter employee handbook prohibits employees from wearing political paraphernalia on the job. *Id.* ¶¶ 20–21; *see also* Exs. 3, 4, 5.

18.     The pictures do not clearly show the employee's face. Ex. 2. Mrs. Rachmuth did not post any other pictures of the employee. Rachmuth Decl. ¶ 22. She never posted the employee's name, telephone number, home address, or email address. *Id.* She never contacted the employee directly by phone, email, text, or social media messaging. *Id.* ¶ 23.

## II.     Officers Warren and Marino Obtain a Warrant to Arrest Mrs. Rachmuth for Cyberstalking for a Single Social Media Post

19.     Two days later, on November 2, 2024, Officer Warren received a call for service about "possible harassment" that had occurred at Harris Teeter. Ex. 6, Warren Dep. Tr. ("Warren Tr.") 80:21–23, 81:12–15; Ex. 7, Marino Dep. Tr. ("Marino Tr.") 38:14–23.

20.     Officer Warren was hired as a patrol officer by the Holly Springs Police Department ("Holly Springs PD") in September 2024. Warren Tr. 11:20–22, 12:16–18. At the time, Officer Warren was still in field training and was supervised by a Field Training Officer ("FTO"). Warren Tr. 60:4–11. His primary FTO was Officer Hernandez. Warren Tr. 60:7–8. But because Officer Hernandez was absent from work on November 2, Officer Marino served as Officer Warren's FTO that day. Warren Tr. 60:11, 125:12–14; Marino Tr. 34:11–12.

21.     An FTO's job is to "teach" and "guide" officers-in-training on proper procedures and duties and to "show[] them how to perform their job." Marino Tr.

35:10–19; Ex. 8, Hernandez Dep. Tr. ("Hernandez Tr.") 12:13–18. FTOs are required to review their officer-in-training's Incident Reports to "make sure they're on the . . . right track." Warren Tr. 61:3–6; Marino Tr. 35:20–23; Hernandez Tr. 13:4–11. FTOs are also required to review their officer-in-training's warrant application to ensure they are "filling out everything properly." Marino Tr. 37:7–15; Hernandez Tr. 13:18–21. FTOs also review case law with their officer-in-training. Hernandez Tr. 16:21–17:12.

22. In addition, part of an FTO's role is to determine whether an officer they are training has enough evidence to support probable cause before going to the magistrate. Hernandez Tr. 16:14–20.

23. Officers Warren and Marino responded to the call for service and drove to the Harris Teeter. Warren Tr. 81:20–82:1. When they arrived, Officer Warren called the Harris Teeter employee on the phone, because she did not return to work that day. Warren Tr. 82:5–16. The employee gave her account of the incident in Harris Teeter, stated that she was aware of a social media post about the incident, stated that she had not returned to work for several days, and stated that she had taken her kids out of school. Warren Tr. 82:19–83:20, 87:5–22; Marino Tr. 44:25–45:9.

24. Officer Warren could not recall whether, on the phone, the employee specifically referred to the head scarf she was wearing as a hijab. Warren Tr. 84:24–85:9. At first, Officer Warren "thought it was possibly a [keffiyeh]." Warren Tr. 85:10.

25. During the phone interview, the employee did not say that Mrs. Rachmuth assaulted or threatened her in the store. Warren Tr. 87:24–88:1, 88:2–5;

Marino Tr. 45:23–25. She did not say that she had any reason to believe that Mrs. Rachmuth knew her by name. Warren Tr. 88:6–8; Marino Tr. 46:17–19. She did not say that Mrs. Rachmuth had ever contacted her by phone, email, or social media messaging. Warren Tr. 88:12–21; Marino Tr. 46:1–13. She did not say that Mrs. Rachmuth had come to her home or that she had any reason to believe Mrs. Rachmuth knew her home address. Warren Tr. 88:9–11, 88:22–24; Marino Tr. 46:14–16, 46:20–22.

26.     Officer Warren did not obtain a written statement from the employee. Warren Tr. 92:3–13. Even though Officer Warren's standard practice is to record "exactly what [a victim or witness] said" in the Incident Report rather than summarize it, Warren Tr. 58:8–9, he did not record the employee's statement that she feared for her life and took her children out of school in the Incident Report. Warren Tr. 89:25–90:5; *see also* Ex. 9.

27.     After speaking with the employee, Officer Warren spoke with the Harris Teeter manager. Warren Tr. 93:11–20. The manager told Officer Warren that she overheard a "verbal dispute" between Mrs. Rachmuth and the employee and eventually asked Mrs. Rachmuth to leave the store. Warren Tr. 94:4, 94:18. Mrs. Rachmuth left the store on request and has never returned. Warren Tr. 97:9–14; Marino Tr. 40:7–8; Rachmuth Decl. ¶ 16.

28.     The manager did not say that she herself feared for her safety. Warren Tr. 95:11–13. She did not say that Mrs. Rachmuth threatened any violence in the store. Warren Tr. 95:19–21; Marino Tr. 40:15–17. She did not say that Mrs.

Rachmuth assaulted the employee. Warren Tr. 95:22–24; Marino Tr. 40:18–20. She did not say that she had any reason to believe Mrs. Rachmuth knew the employee's name. Warren Tr. 95:25–96:3; Marino Tr. 40:25–41:3. She did not say that she had any reason to believe Mrs. Rachmuth knew the employee's address. Warren Tr. 96:4–7; Marino Tr. 41:4–7. She did not say that she had reason to believe Mrs. Rachmuth contacted the employee by phone, email, or social media messaging. Warren Tr. 96:8–20; Marino Tr. 41:8–18. She did not say that Mrs. Rachmuth had ever gone to the employee's house. Warren Tr. 96:21–23; Marino Tr. 42:10–12.

29. Neither Officer Warren nor Officer Marino contacted Mrs. Rachmuth during the investigation. Warren Tr. 140:1–3; Marino Tr. 61:20–23, 86:5–8.

30. The manager also provided Officer Warren with a link to the Harris Teeter Post. Warren Tr. 98:12–18. Officer Warren did not have an X account at the time, so at first, he was only able to view the post itself, not comments to the post or other posts by Mrs. Rachmuth. Warren Tr. 99:12–100:15.

31. Officer Warren confirmed that the screenshot included in the Appendix as Exhibit 1 reflects the same post he was given by the manager and reviewed in the course of the investigation. Warren Tr. 102:10–17.

32. Officer Warren admitted that the post does not mention the employee's name or home address. Warren Tr. 106:13–19, 144:20–22. He also admitted that the post does not threaten the employee or ask anyone to contact the employee or Harris Teeter. Warren Tr. 106:20–107:3.

33. Officers Warren and Marino did not have any evidence that Mrs. Rachmuth would harm the employee, confront the employee again, return to the Harris Teeter, or go to the employee's house. Marino Tr. 56:5–24.

34. Eventually, Lieutenant Melissa Ottoway, who had access to an X account, helped Officers Warren and Marino view the comments to the post. Warren Tr. 100:15–101:19; Marino Tr. 58:5–7.

35. However, Officer Warren could not recall the substance of any comment he reviewed. Warren Tr. 117:19–21, 118:17–20. While Officer Warren vaguely remembered a comment referring to the "sunset" Harris Teeter location, he did not recall seeing any comment that revealed the employee's home address. Warren Tr. 131:25–132:11. He did not mention any comments in his Incident Report narrative, and he did not screenshot and attach any copies of comments to his Incident Report. Warren Tr. 117:22–24, 118:8–16; Marino Tr. 120:11–13.

36. Regardless, none of the comments, or Mrs. Rachmuth's responses to the comments, were made to the employee directly. Marino Tr. 120:8–10.

37. Officer Warren could not recall whether he reviewed Mrs. Rachmuth's responses to the comments depicted in Exhibits 3–5 during his investigation. Warren Tr. 108:10–11, 113:7–9, 115:20–22. However, he admitted that, if those responses reflect "her understanding [between] the hibaj [*sic*] and the keffiyeh, then . . . that would be . . . her political speech." Warren Tr. 114:14–19.

9

38. The Harris Teeter Post was the only post Officers Warren and Marino reviewed about the Harris Teeter employee. Warren Tr. 120:20–23; Marino Tr. 51:11–13 ("I just saw the one post.").

39. During the course of his investigation, Officer Warren prepared an Incident Report. Warren Tr. 166:7–25; Marino Tr. 65:7–13; Ex. 9.

40. In the narrative section of the report, after describing the incident in Harris Teeter, Officer Warren stated that the employee "later learned that pictures of her had been posted on the social media platform 'X'," and that the manager "provided me with Ms. Rachmuth's information and showed me the post on 'X' featuring" the employee. Ex. 9 at 5–6. The report also states that the employee informed Officer Warren "that she felt threatened, terrified, harassed, and embarrassed about returning to work." Ex. 9 at 6.

41. Even though it is important for the Incident Report to contain all of the evidence an officer relies on for probable cause, Marino Tr. 66:25–67:6, Officer Warren's report did not mention any comments to the post, calls made to the store by third parties, or whether the employee took her children out of school. Warren Tr. 89:25–90:5, 223:17–224:25; Marino Tr. 68:3–16; Ex. 9 at 5–6. According to Officer Marino, the Incident Report accurately describes all the evidence that he and Officer Warren had at the time they decided to pursue a cyberstalking charge. Marino Tr. 68:17–22.

42. The Incident Report also designated the incident as a "Suspect Hate / Bias Motivated: *ANTI_ISLAMIC (MUSLIM)*" crime. Ex. 9 at 4. Officer Warren did

not recall making that designation in the report, and none of the Defendants could explain how it got there or the basis for the designation. Warren Tr. 169:17–170:15; Marino Tr. 69:3–14, 71:3–24; Hernandez Tr. 62:1–8, 62:24–63:1.

43. After collecting information from the employee and manager and reviewing the Harris Teeter Post, Officer Warren was "uncertain" about what charge to bring. Warren Tr. 121:6–7. Officer Marino was also "iffy" as to whether cyberstalking was the correct charge. Warren Tr. 126:1–4. According to Officer Marino, "[W]e were both questioning . . . what type of charge, if there was any." Marino Tr. 49:16–17; *see also* Marino Tr. 54:23–25 ("I was just questioning what we had already, if that would have been -- if that would have been an element.").

44. However, Officer Warren was not aware that cyberstalking requires repeated communications. Warren Tr. 135:1–5, 136:3–5. Rather, his primary understanding of the cyberstalking statute was that it criminalized any online speech that makes someone "feel[] harassed." Warren Tr. 49:4–18. According to Officer Warren, "The effect of it . . . was my main thing." Warren Tr. 136:9–18; *see also* Warren Tr. 129:11–16 ("Q: And besides the social media post, what evidence did you have that Ms. Rachmuth violated the cyberstalking statute? A: Well, it's more so how the victim -- you have to take it as what the victim feels at that time frame."). Like Officer Warren, Officer Marino primarily understood the cyberstalking statute to be concerned with instances of a victim "feeling terrified, harassed, embarrassed, along those lines." Marino Tr. 50:22–23.

45.    According to Officer Warren, basic law enforcement training included understanding the "elements of certain crimes." Warren Tr. 14:14. But Officer Warren could not recall receiving training on the elements of cyberstalking or any other harassment-related crime. Warren Tr. 18:13–16, 18:23–19:1, 48:17–22. Officers Marino and Hernandez likewise had not received any official training on the cyberstalking statute. Marino Tr. 19:5–12; Hernandez Tr. 22:17–20.

46.    Neither Officer Warren nor Officer Marino was aware that the cyberstalking statute expressly excludes "any peaceable, nonviolent, or non-threatening activity intended to express political views or to provide lawful information to others" and provides that the statute "shall not be construed to impair any constitutionally protected activity, including speech, protest, or assembly." Warren Tr. 53:12–22, 137:25–138:4; Marino Tr. 63:5–11. Neither Officer ever considered whether the Harris Teeter Post amounted to political speech or fell under this exception. Warren Tr. 139:10–22; Marino Tr. 62:25–63:4.

47.    Officers Warren and Marino testified that they had received at least some training on the First Amendment. Warren Tr. 13:9, 15:6–8; Marino Tr. 14:2–4, 15:25–16:3. But Officer Warren could not recall receiving any training about what speech is protected under the First Amendment, including whether political speech, religious speech, or journalism are protected. Warren Tr. 15:16–16:15. Officer Warren also could not recall receiving any training about what speech may be considered in charging a crime. Warren Tr. 16:23–17:1. Officer Marino likewise could not recall the details of that training or whether it included what speech may be considered in

charging a crime. Marino Tr. 14:2–4, 15:25–16:3. And while one of an FTO's responsibilities is reviewing case law with their officer-in-training, Officer Hernandez could not recall reviewing any First Amendment case law with Officer Warren. Hernandez Tr. 16:21–17:16.

48. Officers Warren and Marino were still "unclear" and "not quite sure for that charge," so they decided to consult their supervisors, Lieutenant Bock and Lieutenant Ottoway. Warren Tr. 63:7, 126:25–127:10, 128:14.

49. Lieutenant Ottoway was equally unsure whether cyberstalking was the appropriate charge. Warren Tr. 62:20–63:2. According to Officer Warren, "I wouldn't necessarily say that she said that was a yes, but that was a let's verify with the magistrate to see if that is the best charge to go forward with." Warren Tr. 65:4–7.; *see also* Marino Tr. 50:2–6 (stating Ottoway had "not approved" the charge but "understood where we were coming from").

50. Neither Officer Warren nor Officer Marino consulted the District Attorney's office prior to seeking the warrant, even though Officer Marino stated that he has done so before "[i]f it was something I was very unclear on, or maybe something that I haven't charged before and just had some questions." Marino Tr. 31:18–32:1.

51. Despite being "unclear", "not quite sure", and "iffy", Officers Warren and Marino proceeded to seek a warrant to arrest Mrs. Rachmuth for cyberstalking. Warren Tr. 146:5–8.

52. Before speaking with the magistrate, officers complete an online warrant application that is then reviewed by the magistrate. Marino Tr. 26:14–16,

27:6–8. The form requires the location, date, and time of the offense, the offender's information, and the officer's information. Marino Tr. 27:9–15. For some charges, the form may require an officer to provide a brief description of the offense in a fill-in-the-blank section, but for others, the form automatically populates a description. Marino Tr. 27:16–28:2. While there is an option to upload supporting files, Officer Marino stated that he has never uploaded evidence to attach to the form. Marino Tr. 28:5–15.

53.     The online warrant application is the only written form or document submitted to the magistrate to obtain an arrest warrant for a misdemeanor. Marino Tr. 28:16–22. Officers do not present the magistrate with the Incident Report. Marino Tr. 30:13–15.

54.     Officer Warren spoke with the magistrate on a video call. Warren Tr. 153:1–4; Marino Tr. 77:5–7. Officer Marino was in the room but did not participate in the conversation. Marino Tr. 77:8–15.

55.     Officer Warren could not specifically recall what he told the magistrate to support probable cause for Mrs. Rachmuth's arrest, other than that "the victim feared for her life after the situation." Warren Tr. 153:1–5, 159:19–24. He could not recall what specific conduct of Mrs. Rachmuth's he told the magistrate violated the cyberstalking statute. Warren Tr. 159:25–160:3.

56.     Officer Warren did not show the magistrate the Harris Teeter Post or any of the comments to the magistrate. Marino Tr. 78:10–12; Warren Tr. 153:19–21,

162:18–23. The magistrate did not have access to Officer Warren's Incident Report. Marino Tr. 77:2–4.

57. Neither Officer Warren nor Officer Marino presented any written evidence in support of the warrant application other than the standard warrant application form. Warren Tr. 151:22–152:16; Marino Tr. 76:22–77:4, 80:4–7; Ex. 10.

58. Officer Warren did not tell the magistrate that Mrs. Rachmuth contacted the employee. Warren Tr. 162:24–163:4; Marino Tr. 79:8–12. He did not provide the magistrate with any text messages or emails between Mrs. Rachmuth and the employee, and indeed, he did not have any evidence of communications between Mrs. Rachmuth and the employee. Warren Tr. 163:3–21; Marino Tr. 79:13–20. Officer Warren did not present any evidence to the magistrate that Mrs. Rachmuth had threatened violence against the employee or that she had returned to the Harris Teeter. Marino Tr. 79:21–3.

59. A warrant for Mrs. Rachmuth's arrest was issued on November 2, 2024. Ex. 10; Marino Tr. 81:10–12.

## III. Defendants Arrest Mrs. Rachmuth in Front of Her Family and Neighbors

60. The next day, November 3, 2024, Defendants arrested Mrs. Rachmuth for cyberstalking. Warren Tr. 180:10–12.

61. Officer Hernandez had returned to work that day and to his role as Officer Warren's FTO. Warren Tr. 181:1–7; Marino Tr. 89:14–16. Because Officer Hernandez was Officer Warren's FTO that day, Officer Warren could not conduct an arrest without Officer Hernandez present. Hernandez Tr. 65:12–21.

15

62. Officers Warren and Hernandez drove to Mrs. Rachmuth's house to execute the warrant. Warren Tr. 180:25–181:1. Because he had been involved in the investigation and Officer Warren needed a second certified officer to respond to the call, Officer Marino followed in his own patrol car. Warren Tr. 181:15–183:5.

63. Once Mrs. Rachmuth opened the door and came out on the porch, Officer Hernandez explained why they were there. Hernandez Tr. 70:13–20. Mrs. Rachmuth was "shocked" and "confused." Warren Tr. 186:8–12; Hernandez Tr. 68:16–20.

64. Officer Warren placed Mrs. Rachmuth in handcuffs. Warren Tr. 185:24–25, 186:23–24.

65. Officer Marino then approached and began further explaining the reason for Mrs. Rachmuth's arrest. Marino Tr. 97:10–16. He specifically mentioned the post and that the employee felt threatened, but he did not mention any comments to the post. Marino Tr. 97:20–98:1.

66. During the arrest, Mrs. Rachmuth reminded Defendants that the cyberstalking statute contained a carve out for protected speech. Warren Tr. 187:1–5. She also explained that the employee was wearing a keffiyeh, which is different from a hijab and is a political statement. Marino Tr. 98:12–18. Defendants "understood that" and were "not saying she was wrong in reference to that" but continued to arrest Mrs. Rachmuth anyway. Warren Tr. 187:4–5; *see also* Marino Tr. 98:12–18.

67. Officers Warren and Hernandez walked Mrs. Rachmuth to the patrol car, while Officer Marino stayed behind to discuss the charge with Mrs. Rachmuth's husband. Warren Tr. 203:17–20.

68. Officers Warren and Hernandez then transported Mrs. Rachmuth to the Wake County Detention Center. Warren Tr. 206:23–25.

69. Defendants acted under the color of state law when they arrested Mrs. Rachmuth. Answer ¶ 89.

70. The next day, November 4, 2024, Wake County District Attorney Lorrin Freeman dismissed the charge against Mrs. Rachmuth. Ex. 11; Rachmuth Decl. ¶ 24. The dismissal noted that the "described conduct does not meet the elements of the offense." Ex. 11; *see also* Marino Tr. 103:25–104:3. Officer Hernandez found it "not very common" for a charge to be dismissed so quickly. Hernandez 82:10–15.

71. This was the first and only time Officers Warren and Marino had charged someone with cyberstalking. Warren Tr. 52:8–53:6; Marino Tr. 54:11–12. This was the first and only time Officer Warren has sought an arrest warrant. Warren Tr. 164:15–165:3. This was the second time Officer Hernandez had executed an arrest warrant for cyberstalking. Hernandez Tr. 92:8–11. That charge, like this one, was dismissed. *Id.*

Dated: August 3, 2026

Respectfully submitted,

*/s/ Daniel A. Bruce*
Kellen S. Dwyer
Holtzman Vogel Baran Torchinsky &
Josefiak, PLLC

17

2300 N Street NW, Suite 643
Washington, D.C. 20037
Phone: (202) 737-8808
Fax: (202) 737-8809
kdwyer@holtzmanvogel.com
D.C. Bar No. 1008151
Attorney for Plaintiff

Daniel A. Bruce
Holtzman Vogel Baran Torchinsky &
Josefiak, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: (540) 341-8808
Fax: (540) 341-8809
dbruce@holtzmanvogel.com
V.A. Bar No. 98120
Attorney for Plaintiff

James T. Johnson
DeMent Askew Johnson & Marshall
333 Fayetteville Street, Suite 1513
Raleigh, NC 27601
Phone: (919) 833-5555
Fax: (919) 832-8287
jjohnson@dementaskew.com
N.C. Bar No. 19087
Local Civil Rule 83.1 Attorney for
Plaintiff

*Counsel for Plaintiff*

## <u>Certificate of Service</u>

   I hereby certify that on August 3, 2026, I electronically filed the foregoing using the Court's CM/ECF system, which will serve all registered users.

*/s/ Daniel A. Bruce*
Daniel A. Bruce
*Counsel for Plaintiff*

Case 5:25-cv-00222-BO-RJ   Document 24   Filed 08/03/26   Page 19 of 19