# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### Civil Action No. 5:25-cv-222-BO-RJ

| | |
|---|---|
| JENNIFER SLOAN RACHMUTH, <br><br> *Plaintiff,* <br><br> v. <br><br> ELLIOTT WARREN, ET AL., <br><br> *Defendants.* | **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

This case presents a clear-cut violation of the First and Fourth Amendments. Plaintiff Jennifer Sloan Rachmuth is a journalist and political commentator who documented a grocery store employee wearing a keffiyeh—a political symbol inextricably linked to Hamas and its terrorist atrocities—and posted her observations to social media to spark public debate about Harris Teeter's permissive policies. For that constitutionally protected speech, Defendants charged her with cyberstalking, designated the charge as a suspected hate crime, and arrested her in front of her husband and children while she was not even fully dressed. But Mrs. Rachmuth did not cyberstalk anyone. She made a single social media post about a matter of undeniable public concern, directed to the public at large—not to any individual. The post contained no threats, disclosed no private information, identified no person by name, and did not "tag" any particular person. This is core political speech and does not constitute "cyberstalking" or "harassment" under North Carolina law or any other plausible definition.

Because the undisputed facts establish that Mrs. Rachmuth engaged in protected speech, that Defendants lacked probable cause to arrest her, and that Defendants are not entitled to qualified or public official immunity, the Court should grant summary judgment on liability on Counts I, II, IV, and V.

## STATEMENT OF THE CASE

In this action, Mrs. Rachmuth seeks to hold Defendants liable for damages under 42 U.S.C. § 1983 for violating her rights under the First and Fourth Amendments and under state tort law. Mrs. Rachmuth is entitled to summary judgment in her favor on liability on Count I (Malicious Prosecution in Violation of the Fourth Amendment), Count II (Retaliation in Violation of the First Amendment), Count IV (Common Law Malicious Prosecution), and Count V (Common Law False Arrest) because Mrs. Rachmuth's Harris Teeter Post was plainly protected speech, Defendants arrested Mrs. Rachmuth without probable cause, and Defendants are not entitled to qualified immunity or public official immunity. As demonstrated below, there are genuine issues of material fact, and Plaintiff is entitled to judgment as a matter of law.

## SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023) (quoting *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In reviewing a summary judgment motion, "the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party." *Id.* at 283–84. "If it appears on the motion for summary judgment that there is no triable issue with respect to a portion of the claim," a court "may enter a partial summary judgment." *Gadsden v. Fripp*, 330 F.2d 545, 547 (4th Cir. 1964).

## ARGUMENT

### I.      Mrs. Rachmuth's Harris Teeter Post Was Plainly Protected Speech

The First Amendment prohibits state actors from making or enforcing any law "abridging the freedom of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. 1). The First Amendment "embodies our profound national commitment to the free exchange of ideas" and "means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (cleaned up). Because Mrs. Rachmuth's Harris Teeter Post was political speech on a matter of public concern, was not directed to the employee, and did not amount to traditionally unprotected speech, it was plainly protected by the First Amendment.

#### A. The Harris Teeter Post was political speech on a matter of public concern

Speech on "matters of public concern" lies "at the heart of the First Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (citation omitted). And political speech "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). "Speech

3

deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (cleaned up).

Speech does not lose First Amendment protection merely because it occurs on social media. "Posting information on the Internet—whatever the subject matter—can constitute speech as surely as stapling flyers to bulletin boards or distributing pamphlets to passersby—activities long protected by the First Amendment." *State v. Bishop*, 368 N.C. 869, 873, 787 S.E.2d 814, 817 (2016). Indeed, "the protections of the First Amendment extend in full not just to the Internet, but to all new media and forms of communication that progress might make available." *Id.* at 874, 787 S.E.2d at 818 (citation omitted).

Mrs. Rachmuth's Harris Teeter post was plainly political speech on a matter of public concern. Mrs. Rachmuth is a journalist and political commentator who routinely uses social media to express her views on matters of public concern and disseminate newsworthy content to the public. Statement of Material Facts ("SOF") ¶¶ 1–3. After Hamas's October 7, 2023, terrorist attack, her particular focus has been on documenting rising antisemitism and anti-Israel sentiment across North Carolina. SOF ¶ 4, 8. When she saw that Harris Teeter was permitting one of its employees to wear a keffiyeh, which is, at best, a political symbol that is highly offensive to herself and many members of the community, Mrs. Rachmuth documented Harris Teeter's decision and posted pictures to social media—the modern-day bulletin board or

4

pamphlet—to engage in political discourse about Harris Teeter's policy on a controversial matter of public concern. SOF ¶¶ 5–7, 9–11, 14, 16. Officer Warren initially recognized that the post showed the employee wearing a keffiyeh, not a hijab, SOF ¶ 24, underscoring the obvious political nature of the Harris Teeter Post.

Mrs. Rachmuth continued that discourse in the comment section, in response to other X users who indicated a desire to debate the issues, by discussing the significance of the keffiyeh, the difference between the keffiyeh and the hijab, the fact that the keffiyeh is political speech, and the fact that the Harris Teeter employee handbook prohibits employees from wearing political paraphernalia on the job. SOF ¶ 17. While Officer Warren could not recall whether he reviewed Mrs. Rachmuth's responses to those comments during his investigation, he admitted that if those responses reflect "her understanding [between] the hibaj [*sic*] and the keffiyeh, then . . . that would be . . . her political speech." SOF ¶ 37. Given the keffiyeh's connections to Hamas and its October 7, 2023, terrorist attack, SOF ¶¶ 5–7, Mrs. Rachmuth's speech about such a divisive symbol was plainly speech on a matter of public concern.

Mrs. Rachmuth did not intrude into the employee's home or other private space. Rather, the employee chose to wear what is, at best, a highly controversial political symbol to her job at a grocery store, where the symbol would be seen by hundreds of citizens going about their day. Indeed, the point of wearing such a symbol is to be seen and publicly promote a message. The employee herself told Mrs. Rachmuth that she was wearing the symbol for "Free Palestine." SOF ¶ 12. And

Harris Teeter chose to allow their employee to display that, at best, political message while working a job that involved interacting with many members of the community. Mrs. Rachmuth documented that public decision and spoke out about it on social media. Her speech on a matter of such public concern "lies "at the heart of the First Amendment's protection." *Snyder*, 562 U.S. at 451–52.

### B. The Harris Teeter Post was not directed *to* the employee and did not amount to a true threat or other traditionally unprotected speech

Speech does not lose First Amendment protection merely because some may find it offensive. Instead, the First Amendment protects "even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 461. As then-judge Alito observed: "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001). While "non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause," even "deeply offensive" speech is not. *Id.* at 206 (emphasis added).

Only speech that amounts to one of the historic and traditional categories of expression found to be outside the First Amendment's reach, such as true threats, fighting words, incitement, or defamation, may be punished. *United States v. Alvarez*, 567 U.S. 709, 717 (2012). Outside of those categories, the First Amendment clearly protects the right to criticize a fellow citizen publicly. *See United States v. Stevens*, 559 U.S. 460, 471–72 (2010) (holding that courts have no "freewheeling authority to

declare new categories of speech outside the scope of the First Amendment" beyond the traditional exceptions already recognized).

Accordingly, "broad harassment laws that punish offensive speech steer into the territory of the First Amendment." *United States v. Yung*, 37 F.4th 70, 78 (3d Cir. 2022) (cleaned up). Courts have routinely struck them down and invalidated convictions based solely on speech. *Id.* at 78–79 (collecting cases); *see also United States v. Cassidy*, 814 F. Supp. 2d 574, 588 (D. Md. 2011). In doing so, courts have recognized that speech sought to be punished as harassing, threatening, and the like must, at a minimum, be directed *to* a particular person rather than be merely *about* that person to be stripped of First Amendment protection.

For example, in *State v. Shackelford*, the North Carolina Court of Appeals vacated convictions for stalking under N.C. Gen. Stat. § 14-277.3A. 264 N.C. App. 542, 560, 825 S.E.2d 689, 701 (2018). The stalking statute prohibited engaging in a "course of conduct," defined as two or more acts in which the stalker "communicates to or about a person," that would cause a reasonable person to "[s]uffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment." *Id.* at 556, 825 S.E.2d at 698 (quoting N.C. Gen. Stat. § 14-277.3A). The defendant was convicted based on at least *five* Google Plus posts he made about the victim, some of which directly referred to the victim's initials or variations of the victim's name. *Id.* at 543–49, 825 S.E.2d at 692–94. But because the convictions were based on posts the defendant "wrote *about* [the victim] but did not send directly *to* her (or, for that matter, to anyone else)," his convictions "directly implicated" the First

Amendment. *Id.* at 556, 825 S.E.2d at 698. Indeed, "his speech itself was the crime," and "applying the statute to him under these circumstances amounts to a content-based restriction on his speech that fails to satisfy strict scrutiny." *Id.* at 556, 560, 825 S.E. 2d at 698, 701.

Similarly, in *State v. Bishop*, the North Carolina Supreme Court struck down the State's cyberbullying statute as unconstitutional under the First Amendment. 368 N.C. at 869, 787 S.E.2d at 815. That statute made it a crime "'for any person to use a computer or computer network to . . . [p]ost or encourage others to post on the Internet private, personal, or sexual information pertaining to a minor' '[w]ith the intent to intimidate or torment a minor.'" *Id.* at 878, 787 S.E.2d at 820 (quoting N.C. Gen. Stat. § 14-458.1(a)(1)(d)) (alterations in original). Because the statute made it "impossible to determine whether the accused has committed a crime without examining the content of his communication" and "would essentially criminalize posting *any* information about *any* specific minor if done with the requisite intent," the statute violated the First Amendment. *Id.* at 876, 879, 787 S.E.2d at 819, 821.

Numerous federal courts have similarly narrowly interpreted the federal cyberstalking statute to avoid infringing on protected speech. That statute criminalizes certain communications made with the intent to "harass" or "intimidate" and that place a person in reasonable fear of death or serious bodily injury. 18 U.S.C. § 2261A(2)(A). The Fourth Circuit has noted that "harass" and "intimidate" are readily understood to mean "to disturb persistently; torment, as with troubles or cares; bother continually; pester; persecute" and "to make timid; fill with fear." *United*

*States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012) (quoting *Random House Dictionary of the English Language* 870, 1000 (2d ed. 1987)). The First, Third, and Fifth Circuits have narrowly defined "harass" and "intimidate" to only criminalize speech that constitutes a "true threat" or that is "integral to proscribable criminal conduct" to "ensure that protected speech largely escapes the law's net." *Yung*, 37 F.4th at 80; *see also United States v. Ackell*, 907 F.3d 67, 76 (1st Cir. 2018); *United States v. Jubert*, 139 F.4th 484, 495 (5th Cir. 2025). And at least one court in the Fourth Circuit has dismissed a federal cyberstalking indictment based solely on social media and blog posts containing political and religious speech. *Cassidy*, 814 F. Supp. 2d at 583, 588. *Cassidy* observed, "Twitter and Blogs are today's equivalent of a bulletin board that one is free to disregard, in contrast, for example, to e-mails or phone calls *directed to a victim*." *Id.* at 585–86 (emphasis added).

Mrs. Rachmuth's Harris Teeter Post was not directed *to* any individual, let alone the employee. Mrs. Rachmuth did not tag the employee or send the post directly to the employee. SOF ¶ 16. If anything, the post was directed to Harris Teeter. *Id.* Mrs. Rachmuth's responses in the comments were likewise not directed to the employee but made in response to separate individuals who chose to engage in their own protected speech about the matter of public concern that the post identified. SOF ¶¶ 17, 32. Neither the Harris Teeter Post nor the comments threatened any harm against the employee. SOF ¶ 32. Mrs. Rachmuth did not mention the employee by name or disclose the employee's contact information, and the employee's face is not clearly visible in the post. SOF ¶ 18. Accordingly, the Harris Teeter Post plainly did

not "disturb" the employee, or anyone for that matter, much less "persistently" or "bother" anyone "continually." *See Shrader*, 675 F.3d at 310. And it certainly did not amount to a "true threat" or any other proscribable speech. *See Yung*, 37 F.4th at 80. Even if the Harris Teeter Post could be construed by some as offensive, and even if the employee was offended or felt harassed by the post, the First Amendment still protects that speech. *See Saxe*, 240 F.3d at 204.

## II. Defendants Lacked Probable Cause to Arrest Mrs. Rachmuth for Cyberstalking Based on Her Protected Speech

Mrs. Rachmuth's malicious prosecution, false arrest, and retaliation claims (Counts I, II, IV, and V) largely hinge on whether Defendants had probable cause to arrest her for cyberstalking. They did not.

"Probable cause is determined by a 'totality of the circumstances' approach." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)). It is an objective standard that asks whether the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed" a crime. *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992) (quoting *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979)); *see also Moore v. Evans*, 124 N.C. App. 35, 43, 476 S.E.2d 415, 422 (1996) (describing test as "whether the facts and circumstances, known at the time, were such as to induce a *reasonable* police officer to arrest, imprison, and/or prosecute another"). In other words, the test for determining whether an officer lacked probable cause "is whether a man of ordinary prudence and intelligence under the circumstances would have

10

known that the charge had no reasonable foundation." *Allison v. Food Lion, Inc.*, 84 N.C. App. 251, 254, 352 S.E.2d 256, 257 (1987).

"If the facts are admitted or established," the existence or nonexistence of probable cause "is a question of law for the court." *Moore*, 124 N.C. at 43, 476 S.E.2d at 422 (citation omitted). The inquiry turns on two factors: (1) "the suspect's conduct as known to the officer"; and (2) "the contours of the offense thought to be committed by that conduct." *Pritchett*, 973 F.3d at 314. "Probable cause therefore could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." *Id.*

## A. Defendants had no evidence of repeated communications to another person for the purpose of harassing the employee

North Carolina's cyberstalking statute makes it unlawful for any person to "[e]mail or electronically communicate *to another repeatedly*, whether or not conversation ensues, for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person." N.C. Gen. Stat. § 14-196.3(b)(2) (emphasis added). Properly construed, the statute's text tracks the First Amendment principles outlined above and reflects the common understanding of harassment. It requires communications directed "*to* another" person (i.e., the alleged victim), not merely communications *about* the alleged victim. Those communications must be "repeated"—one-off comments do not do the trick. Even if the statute leaves room for the communication to be directed to a person besides the victim, the plain language indicates that the communication must, at the very least, be directed to the *same person* repeatedly. And to leave no doubt that the statute does not criminalize

11

protected speech, it states: "This section does not apply to any peaceable, nonviolent, or nonthreatening activity intended to express political views or to provide lawful information to others. This section shall not be construed to impair any constitutionally protected activity, including speech, protest, or assembly." *Id.* § 14-196.3(e). These are the "contours of the offense" that guide the probable cause inquiry. *See Pritchett*, 973 F.3d at 314.

Defendants had no evidence that Mrs. Rachmuth repeatedly communicated *to* the employee, or any other person, for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing the employee. As discussed above, the Harris Teeter Post was not directed *to* the employee, or anyone for that matter. Rather, it was equivalent to a post on "a bulletin board that one is free to disregard." *See Cassidy*, 814 F. Supp. 2d at 585–86. And even if the post was directed to a specific individual, Defendants did not have evidence that Mrs. Rachmuth communicated "repeatedly." They had one social media post. SOF ¶¶ 30–31, 38.

While Defendants claim to have viewed Mrs. Rachmuth's responses to the comments made to the Harris Teeter Post and considered those to constitute repeated communications, SOF ¶¶ 30, 34, their testimony suggests that this comments theory is simply an after-the-fact rationalization of probable cause. Defendants made no mention of the comments or what comment(s) they relied on to support probable cause in the Incident Report, even though it is important that the Incident Report include all the facts an officer is relying on for probable cause. SOF ¶¶ 35, 39–41. When Officer Marino explained the nature of the charge to Mrs. Rachmuth as she was being

arrested, he only mentioned the Harris Teeter Post and that the employee felt threatened; he did not mention comments to the post. SOF ¶ 65. Indeed, Defendants were not even aware at the time that the cyberstalking statute required repeated communications. SOF ¶ 44. So, while it is undisputed that Defendants viewed the comments, it is very much disputed whether Defendants relied on any comments in making their probable cause determination.

But, regardless, Mrs. Rachmuth's responses to the comments on her post were not communications "to another repeatedly." Consistent with the normal understanding of harassment, communications "to another repeatedly" contemplate repeated unwanted communications directed at the same person. *Cf. Shrader*, 675 F.3d at 310 ("Most people would readily understand ['harass'] to mean 'to disturb persistently; torment, as with troubles or cares; bother continually; pester; persecute.'" (quoting *Random House Dictionary of the English Language* 870 (2d ed. 1987))). Here, Mrs. Rachmuth made single responses to a host of individuals who chose to comment on her post, thereby indicating an openness to engage in discussion on the post's topics. *See* SOF ¶ 17. None of the comments were directed to the employee, and Mrs. Rachmuth never threatened any harm to the employee or revealed her name or contact information. SOF ¶¶ 18, 25, 28, 33, 36.

Defendants also had no evidence that Mrs. Rachmuth made the Harris Teeter Post "for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person." N.C. Gen. Stat. § 14-196.3(b)(2). Mrs. Rachmuth did not intend to do so or intend others to do so. SOF ¶ 15. The only evidence Defendants had

of Mrs. Rachmuth's purpose was how the employee reportedly felt after viewing the single social media post. SOF ¶¶ 23, 29. They did not even attempt to interview Mrs. Rachmuth to determine her purpose in making the post. SOF ¶ 29. The post itself, as well as the comments, plainly demonstrate that Mrs. Rachmuth's purpose was to discuss and hold Harris Teeter accountable for permitting employees to wear political paraphernalia associated with a terrorist organization. SOF ¶¶ 16–18. Neither the employee nor the manager told Defendants that Mrs. Rachmuth had threatened, contacted, or attempted to contact the employee in any way. SOF ¶¶ 25, 27–28, 33. And Mrs. Rachmuth never returned to the store. SOF ¶ 13. Defendants simply had no evidence that Mrs. Rachmuth "disturb[ed]" the victim "continually," "torment[ed]" her, "bother[ed]" her "continually" or "pester[ed]" or "persecute[ed]" her. *See Shrader*, 675 F.3d at 310.

More fundamentally, however, the Harris Teeter Post plainly amounted to protected speech. As discussed above, the post included Mrs. Rachmuth's written words discussing a matter of public concern. The post was primarily about Harris Teeter's failure to follow its own policies and how it was permitting an employee to wear political paraphernalia associated with a terrorist organization. Such speech on "matters of public concern" lies "at the heart of the First Amendment's protection," *Snyder*, 562 U.S. at 451 (citation omitted).

The Harris Teeter Post had no hallmarks of speech that fell outside of First Amendment protection. While the post was marginally *about* the employee, it was not directed *to* her. SOF ¶¶ 16, 32; *see also Shackelford*, 264 N.C. App. at 556, 825

S.E.2d at 698; *Bishop*, 368 N.C. at 879, 787 S.E.2d at 821. The post did not directly threaten physical or any other harm to the employee, disclose the employee's name or contact information, or include any other content that would rise to the level of a true threat or speech integral to criminal conduct and foreclose First Amendment protection. SOF ¶¶ 16, 18; *see also Yung*, 37 F.4th at 80. Even the comments—to the extent the Defendants actually relied on them to determine probable cause—likewise were not directed to the employee and did not threaten the employee or disclose the employee's name or contact information. SOF ¶ 18, 36. Defendants simply had no evidence that Mrs. Rachmuth did anything other than engage in protected speech

At best, Defendants grossly misunderstood the cyberstalking statute. Officers Warren and Marino apparently understood the cyberstalking statute to criminalize any online speech that made someone "feel[] harassed." SOF ¶ 44. Neither Officer was aware that the statute requires repeated communications or expressly excludes protected speech. SOF ¶¶ 44–47. And neither Officer received formal training on the elements of cyberstalking or what speech can be considered when charging a crime. *Id.* Perhaps that is why this is the first and only time Officers Warren and Marino have charged someone with cyberstalking and Officer Hernandez's only other cyberstalking charge was similarly dismissed. *See* SOF ¶ 71. But even if Defendants misunderstood the elements of cyberstalking, a "legal misunderstanding" can still give rise to a lack of probable cause and violation of Mrs. Rachmuth's rights. *See Pritchett*, 973 F.3d at 314.

15

At bottom, because Defendants lacked evidence that Mrs. Rachmuth engaged in repeated communications for an unlawful purpose that were directed *to* the employee or included any hallmarks of unprotected speech, no reasonable officer could have determined, based on the facts and circumstances known at the time, that Mrs. Rachmuth violated the cyberstalking statute. *See Pritchett*, 973 F.2d at 314; *Moore*, 124 N.C. App. at 43, 476 S.E.2d at 422.

### B. The warrant does not shield Defendants from liability

The fact that Defendants convinced a magistrate to issue a warrant does not shield them from liability. An officer's "reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable." *United States v. Leon*, 468 U.S. 897, 922 (1984). And it is clear that, in some circumstances, an officer "will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23. This includes circumstances in which "an officer provides misleading information" to the magistrate or "where probable cause is plainly lacking." *Hupp v. Cook*, 931 F.3d 307, 324 (4th Cir. 2019) (internal quotations omitted); *see also Beeson v. Polumbo*, 220 N.C. App. 274, 279, 727 S.E.2d 343, 347 (2012) (probable cause for a warrant invalid if supported by "deliberate falsehood" or "reckless disregard for the truth"). Ultimately, "[t]he fact that a magistrate erroneously issues a warrant based on a constitutionally deficient affidavit does not protect the [officer] where a reasonably well-trained [officer] would have recognized that the affidavit did not demonstrate probable cause." *Daniczek v.*

*Spencer*, 156 F. Supp. 3d 739, 749 (E.D. Va. 2016). In other words, an officer must make an independent determination that probable cause exists.

As discussed above, based on the facts and circumstances available to Defendants during their investigation, probable cause was plainly lacking. Defendants knew this. They were "unclear", "not quite sure", and "iffy", about the charge. SOF ¶¶ 43, 48, 51. Yet, even though neither Officer Warren nor Officer Marino nor their supervisor, Lieutenant Ottoway, was confident that cyberstalking was an appropriate charge, they pushed forward anyway and sought an arrest warrant. SOF ¶¶ 48–51. They did not consult the District Attorney, even though Officer Marino had done so before when he was unclear about a charge. SOF ¶ 50. And the information Officers Warren and Marino presented to the magistrate was misleading, or at best, incomplete. They did not provide the magistrate with a copy of the Harris Teeter Post or any of the comments they purportedly relied on, and the magistrate did not have access to the Incident Report or case file. SOF ¶¶ 52–58. Accordingly, the magistrate had none of the key evidence necessary to evaluate probable cause. It was thus unreasonable for Defendants to rely on an arrest warrant issued based on incomplete information and plainly lacking probable cause.

### III. Mrs. Rachmuth Is Entitled to Summary Judgment on Liability on Counts I, II, IV, and V

#### A. Counts I, IV, and V: Malicious Prosecution and False Arrest

Count I (Fourth Amendment Malicious Prosecution), Count IV (Common Law Malicious Prosecution), and Count V (Common Law False Arrest) all involve

materially similar elements. The undisputed facts demonstrate that Mrs. Rachmuth is entitled to summary judgment on liability for each of those claims.

To prove a 42 U.S.C. § 1983 malicious prosecution claim, "a plaintiff must show 'that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'" *Hupp*, 931 F.3d at 324 (quoting *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)). A plaintiff must also prove the defendant acted under color of state law. 42 U.S.C. § 1983. It is undisputed that Defendants investigated Mrs. Rachmuth for cyberstalking, caused a warrant to be issued for her arrest for cyberstalking, and arrested her for cyberstalking. SOF ¶¶ 19–22, 54, 59, 60–65, 67–69. It is also undisputed that the criminal proceedings terminated in Mrs. Rachmuth's favor when the District Attorney dismissed the charge the following day. SOF ¶ 70. As discussed above, the undisputed facts demonstrate that Defendants lacked probable cause to arrest Mrs. Rachmuth for cyberstalking based on her single social media post containing protected speech. And Defendants admit that they acted under color of state law in arresting Mrs. Rachmuth. SOF ¶ 69. Accordingly, Mrs. Rachmuth is entitled to summary judgment on liability on Count I.

Similarly, to prove a common law malicious prosecution claim, North Carolina law requires a plaintiff to "show that the defendant instituted or caused to be instituted against him a criminal proceeding, with malice and without probable cause and that such proceeding was terminated in the plaintiff's favor." *Allison*, 84 N.C. App. at 254, 352 S.E.2d at 257 (quoting *Hitchcock v. Cullerton*, 82 N.C. App. 296, 297,

346 S.E.2d 215, 217 (1986)). The only difference between a common law malicious prosecution claim and the Fourth Amendment claim is malice. *See Burrell v. Virginia*, 395 F.3d 508, 514 n.5 (4th Cir. 2005) ("Although malice is required to state a claim for malicious prosecution at common law, the reasonableness of a seizure under the Fourth Amendment should be analyzed objectively."). But "[m]alice may be inferred from the lack of probable cause." *Allison*, 84 N.C. App. at 254, S.E.3d at 258. Accordingly, Mrs. Rachmuth is entitled to summary judgment on liability on Count IV for the same reasons she is entitled to summary judgment on Count I.

Common law false arrest likewise requires a plaintiff to prove (1) a restraint against the plaintiff's will and (2) that the restraint was without legal authority. *Marlowe v. Piner*, 119 N.C. App. 125, 129, 458 S.E.2d 220, 223 (1995). It is undisputed that Defendants arrested Mrs. Rachmuth and therefore restrained her against her will. SOF ¶¶ 60–65, 67–69. Under North Carolina law, "[a]n officer having a warrant for arrest in his possession may arrest the person named or described therein at any time and at any place within the officer's territorial jurisdiction." N.C. Stat. § 15A-401(a)(1). But "[a] judicial official may issue a warrant for arrest only when . . . there is probable cause to believe that a crime has been committed and that the person to be arrested committed it." N.C. Gen. Stat. § 15A-304(d). So if probable cause was plainly lacking, the warrant was invalid and Defendants lacked legal authority for the arrest. *See Daniczek*, 156 F. Supp. 3d at 749 (erroneous warrant does not protect an officer "where a reasonably well-trained affiant would have recognized that the affidavit did not demonstrate probable cause"). Because, as discussed above,

Defendants lacked probable cause to arrest Mrs. Rachmuth based on her single social media post containing protected speech, Mrs. Rachmuth is entitled to summary judgment on liability on Count V as well.

### B. Count II: Retaliation

Mrs. Rachmuth is likewise entitled to summary judgment on Count II for retaliation in violation of the First Amendment. To prove a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must show that "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (cleaned up). A plaintiff suffers adverse action "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Jones v. Solomon*, 90 F.4th 198, 214 (4th Cir. 2024) (quoting *Martin*, 858 F.3d at 249). And a causal relationship exists when an officer lacks probable cause for the arrest and retaliation was a substantial and motivating factor behind the arrest. *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019). A plaintiff must also prove the defendant acted under color of state law. 42 U.S.C. § 1983.

Mrs. Rachmuth engaged in First Amendment protected activity by posting protected speech on social media, as discussed above. Defendants took action that adversely affected Mrs. Rachmuth's First Amendment rights by charging her with cyberstalking, designating that charge as a hate or bias motivated crime, and

arresting her, all for engaging in protected speech. SOF ¶¶ 42, 52–65, 67–69. Being arrested for engaging in protected speech is the quintessential retaliatory conduct likely to deter a person from exercising their First Amendment rights. *See Iannacone v. Ellison*, 776 F. Supp. 3d 388, 401 (S.D. W. Va. 2025) (holding that if "'the threat of an arrest is likely to deter a person of ordinary firmness from the exercise of First Amendment rights[,]' [a]ctually arresting a person for their protected speech would certainly chill further exercise of that speech" (cleaned up) (quoting *Nazario v. Gutierrez*, 103 F.4th 213, 237 (4th Cir. 2024))). As discussed above, Defendants lacked probable cause for the arrest. Despite lacking probable cause, Defendants manufactured a bogus cyberstalking charge that they knew was "iffy" and designated that charge as a suspected "*ANTI_ISAMIC (MUSLIM)*" hate or bias motivated crime to punish Mrs. Rachmuth for her protected speech. *See* SOF ¶¶ 42–43. Retaliation was thus a substantial and motivating factor behind the arrest. And Defendants admit that they acted under color of state law in arresting Mrs. Rachmuth. SOF ¶ 69. Mrs. Rachmuth is entitled to summary judgment on liability on Count II.

### IV. Defendants Are Not Entitled to Qualified or Public Official Immunity

Defendants have asserted qualified and public official immunity as affirmative defenses. Answer at 13. But neither doctrine saves them from liability here. Qualified immunity protects a government official from civil liability only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019) (citation omitted). The Fourth Circuit applies a split burden of proof for

qualified immunity. *See Stanton v. Elliot*, 25 F.4th 227, 233 (4th Cir. 2022). Under this test, while the plaintiff bears the burden of proving whether the facts, viewed in the plaintiff's favor, make out a constitutional violation, the defendant officer bears the burden to prove that this right was not "clearly established" at the time of the constitutional violation. *Id.* Public official immunity under North Carolina law is "functionally identical" to qualified immunity under federal law. *Allen v. City of Dunn*, 708 F. Supp. 3d 743, 757 (E.D.N.C. 2023). Thus, Mrs. Rachmuth can pierce this immunity for her state-law claims by likewise establishing that the Defendants violated her clearly established rights. *See Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003).

Mrs. Rachmuth has shown, for the reasons discussed above, that Defendants violated her First and Fourth Amendment rights when they arrested her without probable cause for her protected speech on a matter of public concern. Accordingly, Defendants must now demonstrate that these rights were not clearly established at the time of Mrs. Rachmuth's arrest. They cannot do so.

A right is clearly established if it is grounded in controlling authority or a "consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation omitted). While courts generally identify the specific right at issue with a "high level of particularity," *Atkinson v. Godfrey*, 100 F.4th 498, 505 (4th Cir. 2024) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir. 1999)), a general constitutional rule can apply with "obvious clarity" even when particular conduct has not previously been held unlawful. *Thompson v.*

*Commonwealth*, 878 F.3d 89, 98 (4th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Ultimately, officers need only have "fair notice" that their conduct is unconstitutional. *Somers v. Devine*, 132 F.4th 689, 695–96 (4th Cir. 2025).

Defendants were on fair notice that arresting Mrs. Rachmuth for her Harris Teeter Post was blatantly unconstitutional. It was clearly established that Mrs. Rachmuth's Harris Teeter Post, which was not directed *to* the employee and did not amount to a true threat or any other category of unprotected speech, was plainly protected speech on a matter of public concern. *See, e.g.*, *Snyder*, 562 U.S. at 451; *Shackelford*, 264 N.C. App. at 556, 825 S.E.2d at 698; *Bishop*, 368 N.C. at 879, 787 S.E.2d at 821. Even if Defendants were not aware that the cyberstalking statute did not apply to protected speech, Mrs. Rachmuth notified them that it did as Defendants were arresting her. SOF ¶ 66. She also explained the political purpose of the Harris Teeter Post. *Id.* Defendants "understood that" but arrested her anyway. *Id.*

It was also clearly established that Mrs. Rachmuth had a right to be free from arrest without probable cause. *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001). And it was clearly established that probable cause is lacking when the plain language of a statute does not encompass the arrestee's conduct. *Id.* at 291, 293. For the reasons discussed above, it was clearly established, based on the plain text of the statute, as well as controlling First Amendment precedent and the consensus of persuasive authority, that cyberstalking requires repeated communications to (not about) the alleged victim (or, at least, another specific person) for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing the alleged victim. *See,*

*e.g.*, N.C. Gen. Stat. § 14-196.3; *Shackelford*, 264 N.C. App. at 556, 825 S.E.2d at 698; *Bishop*, 368 N.C. at 879, 787 S.E.2d at 821.

Likewise, it was clearly established that Mrs. Rachmuth had the right to be free from retaliation for her protected speech through an unlawful arrest. *See, e.g.*, *Nieves*, 587 U.S. at 404; *Martin*, 858 F.3d at 249; *Tobey v. Jones*, 706 F.3d 379, 392 (4th Cir. 2013). Indeed, "[e]very reasonable officer in the United States is aware that retaliation for First Amendment speech is a violation of a person's constitutional rights." *Iannacone*, 776 F. Supp. 3d at 402. Accordingly, because Defendants violated Mrs. Rachmuth's First and Fourth Amendment rights to be free from retaliation for her protected speech and from arrest without probable cause and those rights were clearly established at the time of her arrest, Defendants are not entitled to qualified or public official immunity.

## CONCLUSION

For the foregoing reasons, Mrs. Rachmuth respectfully requests that the Court grant summary judgment against Defendants on liability on Counts I, II, IV, and V.

Dated: August 3, 2026

> Respectfully submitted,
>
> */s/ Daniel A. Bruce*
> Kellen S. Dwyer
> Holtzman Vogel Baran Torchinsky &
> Josefiak, PLLC
> 2300 N Street NW, Suite 643
> Washington, D.C. 20037
> Phone: (202) 737-8808
> Fax: (202) 737-8809
> kdwyer@holtzmanvogel.com

24

D.C. Bar No. 1008151
Attorney for Plaintiff

Daniel A. Bruce
Holtzman Vogel Baran Torchinsky &
Josefiak, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: (540) 341-8808
Fax: (540) 341-8809
dbruce@holtzmanvogel.com
V.A. Bar No. 98120
Attorney for Plaintiff

James T. Johnson
DeMent Askew Johnson & Marshall
333 Fayetteville Street, Suite 1513
Raleigh, NC 27601
Phone: (919) 833-5555
Fax: (919) 832-8287
jjohnson@dementaskew.com
N.C. Bar No. 19087
Local Civil Rule 83.1 Attorney for
Plaintiff

*Counsel for Plaintiff*

## Certificate of Compliance

I hereby certify that the foregoing complies with the word limit requirements of Local Rule 7.2(f)(3) because it contains 6,460 words.

*/s/ Daniel A. Bruce*
Daniel A. Bruce
*Counsel for Plaintiff*


## Certificate of Service

I hereby certify that on August 3, 2026, I electronically filed the foregoing using the Court's CM/ECF system, which will serve all registered users.

*/s/ Daniel A. Bruce*
Daniel A. Bruce
*Counsel for Plaintiff*