# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### Civil Action No. 5:25-cv-222-BO-RJ

|  |  |
|---|---|
| JENNIFER SLOAN RACHMUTH, <br><br> *Plaintiff,* <br><br> v. <br><br> ELLIOTT WARREN, ET AL., <br><br> *Defendants.* | **PLAINTIFF'S APPENDIX TO LOCAL CIVIL RULE 56.1 STATEMENT OF FACTS** |

| Exhibit No. | Description | Bates No. / Deposition Exhibit No. (if applicable) |
|---|---|---|
| 1 | Rachmuth Declaration | |
| 2 | Harris Teeter Post | DEF000001 <br> Warren Dep. Ex. No. 4 |
| 3 | Response to 2024.10.31 Comment from @LarryCo33418590 | JSR000134 <br> Warren Dep. Ex. No. 6 |
| 4 | Response to 2024.10.31 Comment from @RachelRMonroe | JSR000137 <br> Warren Dep. Ex. No. 5 |
| 5 | Response to 2024.10.31 Comment from @GideonSbre | JSR000143 <br> Warren Dep. Ex. No. 7 |
| 6 | Deposition Transcript of Elliott Louis Warren, Jr. (May 26, 2026) | |
| 7 | Deposition Transcript of Benjamin Allen Marino (May 27, 2026) | |
| 8 | Deposition Transcript of Edgar Hernandez (May 29, 2026) | |
| 9 | Incident/Investigation Report (REDACTED)[1] | DEF000027-DEF000034 |

---

[1] Although the Incident/Investigation Report is designated "Confidential", counsel for Plaintiff conferred with counsel for Defendants prior to filing, and Defendants do not object to Plaintiff filing the Incident/Investigation Report with all personal identifying information, as defined by Fed. R. Civ.

| | | Warren Dep. Ex. No. 8 Marino Dep. Ex. No. 8 Hernandez Dep. Ex. No. 8 |
|---|---|---|
| 10 | Warrant for Arrest | Warren Dep. Ex. No. 9 Marino Dep. Ex. No. 9 |
| 11 | Dismissal | JSR006661 |

P. 5.2 and N.C. Gen. Stat. § 14-113.20, redacted. Plaintiff has redacted that information in the filed version.

Dated: August 3, 2026

Respectfully submitted,

*/s/ Daniel A. Bruce*
Kellen S. Dwyer
Holtzman Vogel Baran Torchinsky &
Josefiak, PLLC
2300 N Street NW, Suite 643
Washington, D.C. 20037
Phone: (202) 737-8808
Fax: (202) 737-8809
kdwyer@holtzmanvogel.com
D.C. Bar No. 1008151
Attorney for Plaintiff

Daniel A. Bruce
Holtzman Vogel Baran Torchinsky &
Josefiak, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: (540) 341-8808
Fax: (540) 341-8809
dbruce@holtzmanvogel.com
V.A. Bar No. 98120
Attorney for Plaintiff

James T. Johnson
DeMent Askew Johnson & Marshall
333 Fayetteville Street, Suite 1513
Raleigh, NC 27601
Phone: (919) 833-5555
Fax: (919) 832-8287
jjohnson@dementaskew.com
N.C. Bar No. 19087
Local Civil Rule 83.1 Attorney for
Plaintiff

*Counsel for Plaintiff*

## Certificate of Service

I hereby certify that on August 3, 2026, I electronically filed the foregoing using the Court's CM/ECF system, which will serve all registered users.

*/s/ Daniel A. Bruce*
Daniel A. Bruce
*Counsel for Plaintiff*

# Exhibit 1

Docusign Envelope ID: 39F5616D-0CD3-8BAE-81B0-8BF41C207CAB

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Civil Action No. 5:25-cv-222-BO-RJ**

JENNIFER SLOAN RACHMUTH,

 *Plaintiff,*

v.

ELLIOTT WARREN, ET AL.,

 *Defendants.*

**DECLARATION OF PLAINTIFF**
**JENNIFER SLOAN RACHMUTH**

I, Jennifer Sloan Rachmuth, make the following declaration under 28 U.S.C. § 1746:

1. I am the Plaintiff in the above-captioned matter.

2. I am over 18 years of age and am competent to testify in this matter.

3. I make this declaration on personal knowledge and belief.

4. I am an investigative journalist and political commentator. I am a Middle East and Jewish public affairs writer published in various news outlets, including Law Enforcement Today and the Federalist.

5. Through my experience, research, and reporting, I have developed extensive knowledge and insight about extremist groups and terror recruitment, particularly on college campuses.

6. As an independent journalist, I use a variety of methods to disseminate newsworthy content to the public, most notably through social media, including my X account.

Docusign Envelope ID: 39F5616D-0CD3-8BAE-81B0-8BF41C207CAB

7. I also produce my own podcast, write my own blog covering North Carolina politics, and write articles that have appeared in outlets such as the Washington Times, Daily Wire, and the Federalist.

8. Since November 2023, I have documented rising antisemitism and anti-Israel sentiment following the terrorist organization, Hamas's, October 7, 2023, attack on Israel. Pursuant to my journalistic mission, I have routinely photographed antisemitic and anti-Israel events, protests, and incidents across North Carolina. I often post these pictures on social media along with newsworthy commentary or political analysis.

9. Many of these pictures are of individuals wearing keffiyehs in apparent solidarity with Hamas. A keffiyeh is a scarf with a specific black and white fishnet pattern. It was first popularized by the Palestine Liberation Organization ("PLO") leader Yassar Arafat. The United States has designated the PLO a foreign terrorist organization.

10. The black and white keffiyeh has since become the uniform of Hamas terrorists, another U.S.-designated terrorist organization. Hamas's stated objectives are to destroy the State of Israel and eliminate the Jewish people around the globe. The keffiyeh has thus increasingly become a political statement and symbol that is highly offensive to the Jewish community, a symbol that denotes support for Hamas and intimidation of Jews. And a keffiyeh—an avowedly political garment—is wholly distinct from a hijab, the headdress worn by some followers of the Muslim faith.

Docusign Envelope ID: 39F5616D-0CD3-8BAE-81B0-8BF41C207CAB

11. In the wake of October 7, the keffiyeh has become a symbol of support of Hamas and has routinely been used to mask wearers' identities and terrorize Jews during protests, particularly on college campuses. Indeed, Jewish groups have sought to ban keffiyehs in schools and on college campuses.

12. I am Jewish. My husband is Israeli-American. Seeing members of my community repeatedly wearing the symbol of a terrorist organization dedicated to eradicating people like me and my husband from the earth is deeply upsetting and offensive. And because of the intense political debate that has erupted across the country in the wake of October 7, particularly on American college campuses, documenting and reporting instances where keffiyehs are worn and displayed in my community has become an integral part of my journalism and political speech.

13. On October 31, 2024, I was shopping in the same Holly Springs Harris Teeter I have been a customer of for over six years.

14. As I was checking out, I was shocked to see an employee wearing a keffiyeh.

15. Knowing that Harris Teeter's corporate policy generally prohibits employees from wearing political paraphernalia on the job, I took pictures of the employee to send to Harris Teeter corporate.

16. I approached the employee and asked why she was wearing the keffiyeh. She told me that it was for "Free Palestine" and that she purchased it on the popular online clothing store Shein. After speaking with both the employee and the manager, the manager told me I could "like it or leave." I left the store and have never returned.

3

Docusign Envelope ID: 39F5616D-0CD3-8BAE-81B0-8BF41C207CAB

17. I later decided to post the pictures I took on X. I did so because (1) I wanted to engage in political discourse about Harris Teeter allowing its employees to publicly wear a symbol in support of a terrorist group that had recently conducted the largest mass-murder of Jews since the Holocaust, despite its policy of otherwise prohibiting employees from wearing political attire at work, (2) the incident aligned with my journalistic mission to document and report acts of antisemitism in my community, and (3) Harris Teeter is known to respond more quickly to customer complaints posted to social media.

18. At no point did I intend to abuse, annoy, threaten, terrify, harass, or embarrass the employee. And I did not intend others to abuse, annoy, threaten, terrify, harass, or embarrass the employee.

19. The screenshot reproduced in the Plaintiff's Appendix to Local Civil Rule 56.1 Statement of Material Facts (the "Appendix") and Bates labeled DEF000001 is a true and correct copy of my October 31, 2026, post on X.

20. In the comments to the post, I continued to engage in political speech and provide commentary based on my expertise as a Middle East correspondent. For example, I discussed the significance of the keffiyeh, the difference between the keffiyeh and the hijab, the fact that the keffiyeh is political speech, and the fact that the Harris Teeter employee handbook prohibits employees from wearing political paraphernalia on the job.

4

21. The screenshots reproduced in the Appendix and Bates labeled JSR000134, JSR000137, and JSR000143 are true and correct copies of responses I made to comments to my October 31, 2026, post on X.

22. I did not post any other pictures of the employee. I never posted the employee's name, telephone number, home address, or email address.

23. I never contacted the employee directly by phone, email, text, or social media messaging.

24. The Dismissal reproduced in the Appendix as Exhibit 11 and Bates labeled JSR006661 is a true and correct copy of the dismissal I received from the Clerk of the Wake County Superior Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 3, 2026

Signed by:

Sloan Rachmuth

3308A0EA0C47474...

Jennifer Sloan Rachmuth

5

# Exhibit 2

## Sloan Rachmuth ✓
@SloanRachmuth

Subscribe

Went to @HarrisTeeter in Holly Springs and saw this Hamas sympathizer.

When I asked her why she was wearing a keffiyeh, the store manager told me to leave!!

9:54 AM · Oct 31, 2024 · **280.1K** Views



Exhibit #

04

05/26/26 - AM

# Exhibit 3

Show replies



**Tired Old Man** @LarryCo33418590 · Oct 31, 2024   ···

Correct me if I am wrong, but isn't she an employee there ? The price gun was what drew me to that conclusion.  If she is an employee and the head gear is part of her religious freedom, it would be no different than wearing a Yamica . I am NO terrorist organization supporter.

💬 4          🔁          ♥ 9          ‖ 2.3K          🔖 ↥



**Sloan Rachmuth** ✔ @SloanRachmuth · Oct 31, 2024   ···

WRONG. It's a religious right to wear a hijab – not a keffiyeh AS a hijab. There is a difference.

Employees cannot engage in politics, according to @HarrisTeeter handbook.

💬 2          🔁 6          ♥ 67          ‖ 1.9K          🔖 ↥

JSR000134

**Exhibit #**

**06**

05/26/26 - AM

# Exhibit 4

♡ 3          ‖ 648

**Rachel Monroe** 🇺🇸 @RachelRMonroe · Oct 31, 2024

It is actually protected as religious freedom under Federal Law. I agree and will stick to Village Walk.

💬 1          ↻          ♡ 4          ‖ 2.3K

**Sloan Rachmuth** ✓ @SloanRachmuth · Oct 31, 2024

hijabs are protected, as they should be. But I'm sure that wearing this is a form of political speech.

💬 1          ↻ 2          ♡ 32          ‖ 2.1K

Show replies

JSR000137

Exhibit #

05

05/26/26 - AM

exhibitsticker.com

# Exhibit 5

 **Patriot Steve**     @GideonSbre · Oct 31, 2024  ···

Showing support for a Terrorist group by wearing a keffiyeh is abhorrent, we don't support the deliberate slaughter of civilians and we certainly don't celebrate it.
See what happens if you simply wear the star of David.

💬 12          ⟲ 26          ♡ 284          📊 14K

 **Sloan Rachmuth** ✔ @SloanRachmuth · Oct 31, 2024  ···

It's a political statement, at minimum. I'm sure they wouldn't let a cashier wear a MAGA hat!

💬 13          ⟲ 35          ♡ 466          📊 11K

JSR000143


Exhibit #

07

05/26/26 - AM

# Exhibit 6



# Transcript of Elliott Louis Warren, Jr.

**Date:** May 26, 2026
**Case:** Rachmuth -v- Warren, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

- - - - - - - - - - - - - -x

JENNIFER SLOAN          :

RACHMUTH,               :

          Plaintiff,   :   Civil Action No.

     v.                 :   5:25-cv-222-BO-RJ

ELLIOTT WARREN, ET  :

AL.,                    :

          Defendants.  :

- - - - - - - - - - - - - -x

Videotaped deposition of

ELLIOTT LOUIS WARREN, JR.

Tuesday, May 26, 2026

3:03 p.m.

Job No.: 633890

Pages: 1 - 228

Transcribed By: Roanna L. Ossege

Deposition of Elliott Louis Warren, Jr., held remotely with all parties attending via videoconference.

Pursuant to notice, before Certified Electronic Reporter Micah Hardin, Notary Public in and for the State of Indiana.

```
            A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

    DANIEL A. BRUCE, ESQUIRE

    KELLEN S. DWYER, ESQUIRE

    HOLTZMAN VOGEL BARAN TORCHINSKY &

    JOSEFIAK

    2300 N Street, Northwest

    Suite 643

    Washington, D.C. 20037

    (540) 341-8808

    Dbruce@holtzmanvogel.com

    Kdwyer@holtzmanvogel.com


ON BEHALF OF DEFENDANTS ELLIOTT WARREN,

EDGAR HERNANDEZ AND BENJAMIN MARINO:

    KATHERINE M. BARBER-JONES, ESQUIRE

    HARTZOG LAW GROUP

    2626 Glenwood Avenue

    Suite 305

    Raleigh, North Carolina 27608

    (919) 424-0091

    Kbarber-jones@hartzoglawgroup.com
```

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF THE TOWN OF HOLLY SPRINGS:

     JOHN SCHIFANO, ESQUIRE

     128 South Main Street

     Holly Springs, North Carolina

     (919) 557-2917

  ALSO PRESENT:

     Andrew Matthews, Planet Depos Technician

     Miles Tag, Videographer

     Sloan Rachmuth, Plaintiff

C O N T E N T S

EXAMINATION BY:                              PAGE

  Mr. Bruce                                    8


E X H I B I T S

  (Exhibits are included with the transcript)

WARREN DEPOSITION EXHIBITS:                  PAGE

Exhibit 2  Written directive                   43

Exhibit 1  Cyberstalking statute               49

Exhibit 4  Twitter feed                       102

Exhibit 5  Twitter comment-Rachel Monroe      107

Exhibit 6  Twitter comment-Tired old man      111

Exhibit 7  Twitter comment-Patriot Steve      115

Exhibit 9  Warrant for arrest                 148

Exhibit 8  Police report                      166

Exhibit 3  Written directive                  173

Exhibit 10 Video                              194

P R O C E E D I N G S

(On the record at 3:02 p.m.)

THE COURT REPORTER:  Here begins Media Number 1 in the videotaped deposition of Elliott Warren, in the matter of Rachmuth vs. Warren, et al., in the United States District Court, Eastern District of North Carolina, Western Division, Case Number 5:25-cv-222-BO-RJ.

Today's date is May 26, 2026.  The time on the video monitor is 3:03 p.m.

The videographer for today is Miles Tag, representing Planet Depos, headquartered at 451 Hungerford Drive, Suite 400, Rockville, Maryland 20850.

All parties of this deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent?

MR. BRUCE:  Daniel Bruce, counsel for the plaintiff, Ms. Rachmuth.

MS. BARBER-JONES:  Katie Barber-Jones counsel for defendant, Elliott Warren.

MR. SCHIFANO:  Jon Schifano, town of Holly Springs.

MR. DWYER:  And Kellen Dwyer, also for

Ms. Rachmuth.

THE VIDEOGRAPHER:  The court reporter today is Micah Hardin, also representing Planet Depos.  The witness will now be sworn, and then we may proceed.

THE COURT REPORTER:  I am a notary authorized to administer oaths, and this deposition will be recorded by electronic means.

All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable procedural and evidentiary rules and laws and shall constitute written stipulation.

The parties stipulate to the use and certification of this testimony consistent with applicable law of such.  Hearing no objection, I will now swear in the witness.

(The witness was duly sworn by the Court Reporter.)

THE COURT REPORTER:  Counsel, you may proceed.

MR. BRUCE:  Thank you, everybody.

WHEREUPON,

ELLIOTT LOUIS WARREN, JR.,

called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRUCE:

Q. Officer Warren, my name is Daniel Bruce. As I stated earlier, I'm a lawyer for Ms. Rachmuth from the law firm of Holtzman Vogel.

I appreciate you being here today, especially later in the afternoon. I'll do my best to walk us through this quickly so that we're not here too late, but we are planning on a full deposition today. But appreciate your time today.

A. Beautiful.

Q. Have you ever been deposed before?

A. No.

Q. Okay. Have you ever testified in court?

A. Yes.

Q. How many times have you testified in court?

A. About a handful. About two or three times.

Q. Okay. And were those cases -- or were those for cases that you worked on as a police

officer for other matters?

A. As I was working as the investigating officer.

Q. Okay. So I just want to go over a few procedures for depositions. It's a lot like testifying in court. One of the main differences is that we don't have a judge present. That means that for situations where your counsel may object to a question I ask, the objection is just for the record. But we don't have a judge here to rule on the objection, so it will be preserved for the record. But you should still answer that question. Unless she tells you not to answer, in which case we'll move on from there. But that's the big difference between testifying in court and in a deposition.

A few other procedures. Please speak up and answer orally since we're on Zoom and we have a court reporter. It just helps to make sure your answers get on the record, not with any head nods or anything like that.

Does that make sense?

A. Yes.

Q. When I'm asking a question, please wait

for me to fully ask the question, even if you think you know the answer.  Again, this is just to make sure the court reporter can get both the question and your answer down, and we have a clean record.  Does that make sense?

A.  Yes.

Q.  Okay.  If any time my question isn't clear, just let me know.  I'm happy to clarify, restate it, rephrase it.  If you answer the question, I'll assume you understood the question.

And let me know if you need to take a break.  I'll plan to take a break about every hour.  If we're still here at, you know, around 6:00 p.m., we'll probably take a dinner break for everybody.  But if you ever need a break before then, just let me know.  I'm happy to accommodate that.

The only caveat is if a question is pending, I'll ask that you finish answering the question before we take a break.

Do you understand that?

A.  Yes.

Q.  Okay.  Officer Warren, can you please state your full name?

A. Elliott Louis Warren, Jr.

Q. And you're -- where are you testifying from today?

A. Holly Springs Police Department.

Q. Okay. And I believe there are a few people in the room with you.

Who's in the room with you?

A. I have Miss Katie, and then I have Mr. Jon.

Q. Is there anyone else?

A. No.

Q. Okay. Are you under the influence of any medications, drugs, or alcohol that would impair your ability to answer my questions today?

A. No.

Q. And you're currently an officer with the Holly Springs Police Department; is that right?

A. Yes.

Q. When were you hired with the Holly Springs Police Department?

A. Mid-September of 2024.

Q. Okay, September of 2024.

So you've been serving for about two and a half years now?

A.  I'll be two years in September.

Q.  Correct.  Yeah, math.

What is your current rank with the Holly Springs Police Department?

A.  Just patrol officer.

Q.  Okay.  Is that what you started out as well?

A.  Correct.

Q.  Okay.  Are you currently in on any particular assignment or have any particular specified duties as a patrol officer?

A.  Not nothing specific.  Just whatever calls for service that needs to be answered --

Q.  Okay.

A.  -- I --

Q.  So you were a patrol officer in November of 2024; is that right?

A.  Correct.

Q.  Can you describe what training you've received as a Holly Springs' patrol officer?

A.  I went through BLET.  So BLET at the beginning of 2024 'till graduation of July 2024. I've went through CID -- excuse me -- CIT.  What is the -- DCI.  A drug class.  Modern combatives class.  That's it to my knowledge right now.

Q. Okay. So you mentioned -- I'm going to go through and just clarify a couple of those acronyms.

So you mentioned BLET. Is that basic law enforcement training?

A. Correct.

Q. Okay. What did that training include?

A. An abundance of stuff from trying to understand constitutional law elements, first aid, firearms, driving techniques, just the basic stuff to be an officer.

Q. Okay. And who conducted that training?

A. I mean, it was several instructors, but the individuals that were -- overall led over it were Lieutenant Bright and Lieutenant Finney; and that was at Wake Tech.

Q. Okay. You said it's Lieutenant Bright, and who was the other person?

A. Lieutenant Finney.

Q. Finney, okay.

And is that -- are they lieutenants at the Holly Springs Police Department?

A. No. They run the academy at Wake Tech.

Q. Okay, okay. And when did you say you took that basic law enforcement training?

A.   January of 2024 to July 2024.

Q.   Okay.  And so was that before you started as a patrol officer?

A.   Correct.

Q.   You mentioned that basic law enforcement training included understanding basic principles of constitutional law; is that right?

A.   Correct.

Q.   What were some of those constitutional law principles that you learned about?

A.   More so, of course, understanding the -- or trying to understand the difference of a civil matter.  And, of course, when I said the elements of certain crimes, we don't have necessarily like all day for those classes, as well.  They're scheduled a timeframe.

So I believe, like, constitutional law might have been, if I'm not mistaken, 24 hours. Elements might have been 12 hours.  It just depends on each category of what you're learning for that segment until they've met the time criteria that the state feels is needed for that officer to understand or learn it.

Q.   Okay.  Is that training in person? Online?  A little bit of both?

A.   In person.

Q.   Okay.  So, in total, you had roughly 24 hours of constitutional law training in basic law enforcement training?

A.   Correct.

Q.   Did that constitutional law training include the training on the First Amendment?

A.   Yes.

Q.   What type of training did you get on the First Amendment?

A.   Just briefing us about the First Amendment.  I mean, when I say briefed, they briefed us through all -- not all, excuse me, but from my understanding, the key points, I'll say, for each amendment to understand.

Q.   Did you receive any training about what speech is protected under the First Amendment?

A.   If so, I do not recall at this time.

Q.   Do you have any understanding about what type of speech is protected by the First Amendment?

A.   Bits and pieces.

Q.   What are those bits and pieces?

A.   From my understanding, freedom of speech, of course, but not to where it endangers

or fearful of, I guess, another person.  Of
course, to speak your mind about the situation,
but nothing to, what I said, to be fearful or in
danger for the person or issue that you may have
going on at that time.

Q.  Okay.  Did you receive any training
about whether political speech is protected
under the First Amendment?

A.  I do not recall.

Q.  What about religious speech?

A.  If so, I do not recall.

Q.  Did you receive any training about
whether journalism is protected under the First
Amendment?

A.  I do not recall.

Q.  Did your First Amendment training
include whether certain speech could be used
when you're considering whether to charge a
crime?

A.  Yeah, I apologize.  Can you repeat that
again?

Q.  Of course.

Did your training include whether you
can consider certain speech when you're deciding
whether to charge a crime?

A.   If so, I can't remember at this time.

Q.   Does the Holly Springs Police Department have any policies that require you to consider First Amendment implications before you charge someone with a crime?

A.   If so, I can't remember at this time in reference to that.

Q.   Okay.  What about when charging someone specifically with cyberstalking?

A.   Are you asking for a Holly Springs policy, or are you asking overall?

Q.   We'll start with Holly Springs.

A.   No, not that I could think of.

Q.   Okay.  Is there an overall policy by the state or whoever?

A.   From my understanding, according to the elements, there's several parts of it, but from my understanding of it, was if you post/tag to be harassing, harmful, threatening in your post. If I'm not mistaken.

Q.   Okay, I got you.  Okay.

Yeah, that's a good segue to -- you mentioned training on the elements of certain crimes; is that right?

A.   Yes.

Q. And that was a part of the training you received at your basic law enforcement training?

A. I won't necessarily say that it was for that specifically, but just me reviewing the cyberstalking elements before going any further.

Q. I guess backing up to the training you received though, you mentioned that for basic law enforcement training, you had con law classes, and then you had, I think you mentioned classes about elements of certain crimes; is that right?

A. Correct.

Q. Okay. Was cyberstalking one of those crimes you received training on in basic law enforcement training?

A. I can't recall.

Q. What other crimes did you receive training on during that time?

A. Assault, arson, larcenies, B&E, first degree murder, second degree murder. There's a couple more, I just can't remember right now.

Q. Understood.

Were there any other harassment crimes besides cyberstalking that you learned about in that training?

A.   I can't recall right now.

Q.   Is there any other training that was encompassed in basic law enforcement training that we haven't talked about?

A.   No, sir.

Q.   I think you mentioned first aid training.  Was that part of basic law enforcement --

A.   Well, yeah, that was part of basic law enforcement.  Yes, sir.

Q.   What did you learn in first aid training?

A.   How to utilize a tourniquet. Difference, I guess, between a -- there's a color code for code black, code red, code yellow, code green.  Basically, the stages of -- depending on the victim's injuries, how it should be dealt accordingly with nursing or hospital staffing.

What is the new technique of -- instead of necessarily using mouth to mouth, they have a new for -- a new technique with chest compressions.  And I can't remember the other instrument that they had to help the victim or whatnot breathe.  Within those guidelines,

though.

Q. Okay. So it sounds like you received some training on physical injuries.

Did you receive any training on mental or emotional types of injuries or issues?

A. Mentally, it would be more so CIT training, which is crisis intervention training, if I'm understanding that correctly from you.

Q. Did you receive any medical training about how to handle if someone is having a panic attack or something like that?

A. Yes, but that was more so kind of pushed towards CIT as well.

Q. Okay. Let's go to CIT, then.

You said CIT is crisis intervention training?

A. Yes.

Q. And describe that more generally. What is crisis intervention training?

A. My understanding of it is for an individual that is not in the right mind capacity or possibly worried about their mind capacity, how they need to move forward, how they need assistance. That's from mental, ongoing life situations to where they might need

assistance with residential or job care, family issues, therapists, things like that.

Q. Okay. And you mentioned as part of that training, you received training about how to deal with panic attacks; is that right?

A. Yes.

Q. Can you describe what training about panic attacks you received?

A. More so, you have to be able to reach that victim or that person that you're speaking of at a heart to heart level and understand -- let them understand that it's not just a job for you, because at the end of the day their safety matters if it's physically, mentally, whatever the case may be, that you want to see them in the best physical shape or mental shape possible.

Q. Did that training apply to suspects that you might bring into your custody?

A. Sometimes, yes.

Q. How might that apply if you're bringing a suspect into custody?

A. Depends on the situation.

Q. Are you under any obligation when you're bringing a suspect into custody to consider

those mental health issues that you learned about in CIT training?

MS. BARBER-JONES:  Objection to form.

You can answer.

THE WITNESS:  If you could repeat that for me, please.

MR. BRUCE:  Yeah, I can probably ask it a better way.

BY MR. BRUCE:

Q.  Based on the training you received in your CIT training --

A.  Uh-huh.

Q.  -- what are you supposed to do if someone displays symptoms of a panic attack?

A.  Of a panic attack?  Try to calm -- try to calm them down, see what the issue is, to where -- if it's something that's workable at the time, then of course try to meet their needs.  But if the time is not there on your side essentially to meet their needs, then you got to work around it as best as possible.

Q.  Okay.  And did you receive any training about whether a person can experience something like a panic attack without outward symptoms?

A.  If so, I don't recall.

Q.   That training you mentioned, does it also apply if you're bringing a suspect into custody?

A.   More so if it's a -- if they're mentally not stable, to where I might have to possibly take them to a mental hospital, something like that.

Q.   Okay.  So if you're bringing a suspect into custody and the suspect begins to experience something like a panic attack, what are you trained to do?

A.   Well, before -- before I leave or get them into my vehicle, I ask them would they need EMS or any medical assistance.  And that's when I'll give them a chance to say yes or no.

Once I see their actions afterwards, just to verify, I'll sometimes ask, not all the time.  But sometimes I'll ask depending on their body languages and things like that, I'll re-ask again just for reassurance.  If they say no, then no. Sometimes they might think about it, change their mind.  We -- well, I'll call EMS or medical.

Q.   Okay.  If someone notifies you that they have a medical condition prior to bringing them

into custody, have you received any training about what you're supposed to do once you've been notified they have a medical condition?

A. I would see what the issue is in reference to it and then try to deviate from it. It's best to just call EMS, have them calmed down, or if maybe EMS may need to take them and have an officer ride in the back with EMS and have another officer follow. It just depends.

So that's something on a standby basis I might have to call for.

Q. Is there any situation where you, yourself, would intervene without calling EMS?

A. If it's something that is not involving medicine. Certain things mentally I may be able to assist, but certain things I'm not able to. So it just depends on the situation.

Q. So, I guess, for example, if a suspect were to indicate they had diabetes and that their blood sugar is running low while they're in your custody, have you received any training about what you're supposed to do in that situation?

A. I mean, if so, like I said before, having them in my vehicle, I would ask them to

verify, like, are you all right or do you need EMS? Once they say yes or no -- which they have the right to say yes or no, I will proceed from there on.

Now, if I'm close to a hospital facility or medical facility, then on the way I will stop by to see if there's someone medically that could check on them and then go back to proceeding where I need to go to.

Q. Okay. And in that situation about someone with diabetes, if they just needed some -- you know, a candy bar or something to help their blood sugar, would you be required to give that to them while they're in your custody?

A. I won't necessarily say required. But if I know your situation, I would try to assist you as best as possible. So if you're just asking for, do you mind if I bring a mint by chance? And if I might need that mint for later because of my diabetes, okay, then I will give you that mint.

Q. Okay. And was that all included in the medical first aid training you received in basic law enforcement training?

MS. BARBER-JONES: Objection.

You can answer.

THE WITNESS:  I don't recall.

BY MR. BRUCE:

Q.  So where do some of those -- do those come from Holly Springs Police Department policies on, you know, how to treat those types of situations?

A.  Somewhat, but kind of just as an officer, as you can kind of see, depending on people's background situations, your life situations that you might have encountered. Like I said, certain things.

If you're -- like I said, if you're -- like your example was if you have diabetes and you're asking, do you mind if I bring a candy with me?  I don't necessarily have to, but I also know your situation.  And if you feel for yourself -- because you would know your body more than I do.  So if you feel yourself like, okay, I know if I take a mint, I'll be pretty much fine, then I'll bring that mint with you.

Now, if the mint does not work, then as I said before, then I will -- if I'm close to a medical facility, then I will stop by to see if someone can evaluate that person.

Q.  You also mentioned, I believe it was DCI training; is that right?

A.  Yes.

Q.  What does DCI stand for?

A.  I can't remember at the time for DCI. But DCI is basically kind of like -- like a CJLEADS, but a little more in depth, for out-of-state information.  So certain things I can receive in-state from CJLEADS versus certain things I can't receive through DCI.

So that'll just help me in reference to, say, you're a current resident in Washington State, certain things I cannot look up plate wise or if your tags are up to par, if your driver's license is up to par.  I cannot look at that through CJLEADS.  Only North Carolina.

Q.  Okay.  And what is CJLEADS?

A.  CJLEADS is -- basically gives you the background of that individual that you're looking for from driver's license, insurance, license plate, if they've been to jail, do they have any pending cases, charges, probations.

Sometimes it'll get in detail depending on what things that have -- what charges, excuse me, have happened in the past time frame, what

agency was the arresting agency, things like that, court dates.

Q. Okay. So DCI is basically what data you can and can't access on certain individuals?

A. Correct.

Q. You also mentioned a drug class training that you received; is that right?

A. Yes.

Q. What did that training cover?

A. Your drugs like cocaine, crack, methamphetamine, marijuana, hemp. And it just basically tells you how, like -- like, what you should look for if you're on a call from a traffic stop to a household environment, things like that.

Q. Okay. And I think the other training you mentioned was combatives; is that right?

A. Correct.

Q. What did you learn in combatives training?

A. Combatives is another tool in, I would say, an officer's toolbox for better safety for him or herself, especially if people are not quite physically prepared to protect themselves, make sure that, you know, they're able to go

home in a decent manner.

Q. Okay. So besides basic law enforcement training, CIT, DCI, drug training, and combatives, have you received any other training as a patrol officer at Holly Springs?

A. I said if so, I can't remember at this time.

Q. Okay, understood.

Have you received any training about how to conduct an arrest?

A. Yes.

Q. Would that have been part of basic law enforcement training?

A. Yes.

Q. Okay. And describe generally, how have you been trained to conduct an arrest.

A. Well, I would -- I would speak with the possible suspect, try to see what's going on from their end or from their side. Well, it depends on the situation as well, depends on the victim, and depends on the witnesses and whatever extra information I have prior to verifying before going to the house or seeing that individual. But I will go to that individual and let them know, you know, the

situation, which is, you know, I'm here for -- to arrest or arrest warrant, whatever the case may be for this situation.

Once doing that, I would place them in handcuffs just to let them know, like, you know, we're going to explain the situation, but there is cause or cases to where some individuals may not want to go to jail, so they could possibly run from you. So just letting them know the situation. I said -- once being cuffed, any questions, concerns afterwards, I can address it to the best of my abilities. If not, I'll try to find a way to address it, that question.

And I will place them in the car once -- excuse me. Before entering the car, I will do a pat down just to make sure there's nothing harmful for themselves, myself, or others, especially going to the jail with contraband that already enters there.

Once they're clear from that, I place them in my vehicle. I will seatbelt them, make sure the seatbelt is tight, and transport them to the next location.

Q. Have you received any training about where you should park your patrol vehicle if

you're arresting someone in a physical location
like a building?

    A.   Correct.

    Q.   What training have you received?

    A.   Training would be through BLET, also
through field training.

         That training is more so for officer
safety, because sometimes when you go to a
suspect's house or the place that they might be
at currently, they can still possibly see you
before you see them.  That's from a -- if I'm
a -- if I'm at your front house and say
hypothetically you don't like law enforcement,
certain people might react or retaliate a
certain way just because I'm approaching their
property.

         So for an officer standpoint, it's best
to park maybe about -- depending on the area,
maybe like a house or two away, and then just
walk to the current residence where the suspect
may or may not be, and then, once done speaking
with that suspect, if you're arresting them,
then you bring them back to your car.

         Yeah, that's it.

    Q.   Okay.  So you said it's generally best

to park a house or two away or a building or two away.

A. Depends on the situation.

Q. What type of situation might it be best to park further away?

A. I mean, if you're working downtown, hypothetically, Raleigh, there's more big buildings, so you might have to park a street over, possibly a block over. That depends on those policies and what the agencies feel for them.

If you're in a residential area, like I said, it could be nighttime, daytime, regardless. Some people sit on the back porch, front porch, and see that you park your car wherever you park if you park in front of the residence. So if they see that, they might get spooked, feel some type of way.

Then once they see you approaching their household, once again, some people don't like law enforcement. So it could go another way. But for officer safety, just to make sure that we approach with precaution and safety on our ends, that's the best practice for us.

Q. Does the decision on where to park

depend on what evidence you have about the suspect, whether they're dangerous, likely to be harmful to officers, or anything like that?

A.   Not necessarily.

Q.   And you mentioned it's a best practice. Is that a written policy of Holly Springs Police Department somewhere?

A.   Not that I can recall.  Well, I said, just for -- well, I said -- for example, like my house is literally like where we are in front of each other, you can see me to where if you have, depending on your crimes or background where you're not friendly with officers or you have a lot of -- like I said, it just depends on your background, what you may or may not have going on to where you don't -- are not fond of officers, it might be best just to park, like I said, to that house or two behind, or wherever the case may be, if it's downtown, a block away, street over.  It just depends.

Q.   When you say it depends on my background, I assume you mean you're talking about the suspect's background; is that right?

A.   Yeah.  Correct.

Q.   And does that mean your knowledge about

the suspect at the time when you're arresting them?

A. Not necessarily. Sometimes it can be on the spot and you just have to go. Sometimes you might have time to prioritize. It all depends on the particular situation.

Q. In what situation might it be more appropriate to park closer to a building where a suspect is located?

A. If I'm parking close, it would be like someone is in immediate danger, a reference to possibly killing, threatening, you know, suicide. That's when I'm trying to respond as -- a quicker -- a quicker pace as possible.

Q. Okay. And is that all based on training you've received as a Holly Springs police officer?

A. Yes, sir.

Q. Have you received any training about when to seek an arrest warrant versus a summons for someone's arrest?

A. I can't recall. I can't say -- since I've been here, I have not done necessarily a summons. Most of the time, it's either a citation or an arrest warrant.

Q. Okay. What's the difference between a citation and an arrest warrant?

A. Citation will be I cite you for whatever crime that -- or excuse me -- what alleged crime that you've done. I'll set a date possibly to help that person's situation. Because, I mean, of course, you can't do it in the same month. So I'll try to prioritize it about two months or so out, so it gives that person time to collect or do what they need to do on their end as well as mine. And then they'll speak with the judge from that.

And then the rest of the warrant depends on the offense. If it's an arrestable offense, then I'll proceed to see, of course, to check with the elements to verify.

Once going through with that, I'll verify with higher ups. And then once speaking with higher ups, that seems fine on their end, I'll speak with the magistrate.

Once speaking with the magistrate, once they grant me -- if they grant or do not grant, that's when they'll let me know. And then I can go accordingly from there.

Q. So you mentioned citations. What kind

of crimes can you issue a citation for?

A. I've issued -- I've issued for larcenies that were less than 200, $50, $13. It just depends on what that store may or may not want to do. Some people just might be fine with trespassing. Some people may be no, we want them to go to court. It just depends.

Vehicle -- more so for car crashes. Of course, people not paying attention, being negligent while on the roads, being on their phone, stuff like that, or halfway asleep, whatever the case may be.

Trespass. That's all I can -- what is it -- what is possible? Domestic violence protective order. Depends on what's said and done on that.

If there's paperwork where they're able to show me or provide me, especially like a CR number, so I can verify on my end or contact dispatch to verify, as well, to see if it's accurate. If it's not accurate, then I can just let them know, okay, I know the range of your situation, but this needs to go this way or that way.

Q. Is cyberstalking a crime that you can

seek a citation for instead of an arrest warrant?

A. At the time, I was unaware. So I was a field training officer at the time. Just because I came out of BLET doesn't necessarily mean you'll know everything. BLET is literally the keyword basic. So you'll know just the basic fundamentals of a lot of things until you go through certain trainings or done.

And even when you're done through FTO training, sometimes you're still not going to know everything. So it might be a time to where you need to speak to your, you know, FTO at the time, or someone that you may feel comfortable that's good in that particular law, or a higher up that might have better experience for that.

Q. Fair enough. I'm not too far out of law school, so I feel the same way.

But just zooming out of not specifically talking about this situation and this cyberstalking charge against Ms. Rachmuth, but just in general, are you able to issue someone a citation for cyberstalking rather than seeking an arrest warrant?

A. Now, yes. Now -- after knowing now,

yes, you could.

Q. So you're saying you did --

A. You could do that criminal summons as you were speaking of, or you could do an arrest warrant. Like I said, at the time, like I said, I was in field training, so --

Q. Okay. But cyberstalking is something that you can do a summons or a citation for; is that right?

A. A summons. I'm not quite sure for a citation.

Q. Okay. Are there any factors you're supposed to consider when deciding whether to issue a citation or seek a summons versus getting an arrest warrant?

A. I think it depends on the severity of the situation. If a person, to me, feels harmful, fearful, or threatened -- and that depends on what they've got going on in their lifestyle -- then I would say possibly an arrest warrant, especially if it's changing that person's possible lifestyle or ways to go about, like, their normal everyday living.

Q. Okay. So one factor would be whether someone feels threatened; is that right?

A. Correct.

Q. One would be whether it changes their everyday living. Is that fair to say?

A. I'm saying if it could change their -- so if it's harm -- once again, harmful, threatening, harassing, it just all depends.

Q. Does it depend at all on whether the suspect is known to be dangerous?

A. If the suspect is known to be dangerous? Not necessarily. Like I said, based off the elements, no.

Q. When you say based off the elements, what do you mean?

A. The elements of cyberstalking.

Q. Okay. But just zooming out from cyberstalking, just in general, whether it's for any crime that you might be deciding whether or not you're going to issue a citation or seek a summons versus an arrest warrant, is it primarily whether the person feels threatened, harmed, or harassed, or could it depend on other factors?

A. It depends on other factors. Like I said, if it's a larceny and if you steal about, like 200 worth of stuff, then I will cite you

for that.  Now, if it's something like that's about -- me personally, if it's about 400, 500, then I will take you to jail for it.

Q.  Okay.  And so, in general, whether the suspect is known to be dangerous, would that be a factor that you could consider?

A.  I'd have to consider what's going on.  I mean, you can look at the stuff prior to the call, but sometimes -- mostly you won't necessarily have that time to review or see, like, what his or her background is.  So you have to base certain things off of what's going on at that current timeframe.

So if they weren't being in a threatening manner at that timeframe, I can't necessarily -- this is if I have time to look at prior to.  But if I don't have the time to look prior to, if they haven't done anything threatening to where the victim or business, or whatever the case may be, may feel they want to pursue certain charges like that to where it's to the point they go to jail, I have to stay within that guideline.

So, if they just literally -- hypothetically, if you just stole and you made

no issue about it and they're satisfied with just you going to court, then I'm going to put paperwork where you're cited so you can go to court.

But if it's something where they're just, okay, we're fine with trespassing him, no paperwork, he can't come back for like -- he or she can't come back for like six months, okay, fine.  We'll trespass them on my end.  Well, first I'll have that business or whatever the case may be, trespass them from their end.  And then once they do that in front of me, I'll verify with them so they understand in the system, and I'll put in there has been a trespass and take it from there.

And then I let them know if they do return, of course, you could go back to jail, as well.  Well, could go to jail, excuse me.

Q.  Okay.  So in some situations, it depends on whether the victim or whoever wants to press charges; is that right?

A.  Correct.

Q.  Okay.  Does it depend on whether the suspect is a flight risk?

MS. BARBER-JONES:  Object to form.

You can answer.

THE WITNESS:  Like I say, I can't necessarily say that because, once again, on every call, we're not going to have that background information for an individual.  So I have to go based off of what I'm dealing with currently.

Now, if it's someone that I'm dealing with on an everyday occurrence, then that's something different where I can understand and be like, okay, this, that, and the third.  Say this, that, and the third, and move accordingly from there.

But if they're a fight risk for court, I can't necessarily stop them from not going to court or going to court.  That's something they would have to do.  I could just do what I can on my part to make sure that I met the service of that victim.

BY MR. BRUCE:

Q.  Are there any other factors you might consider when deciding whether to seek an arrest warrant or just issue a citation or get a summons?

A.  No.  Like I said, it just depends.

Every situation is a depend-on-the-basis type of thing, so --

Q. Okay. Have you received any training on Holly Springs Police Department's written directive system?

MS. BARBER-JONES: Object to form.

You can answer.

THE WITNESS: If so, I can't recall right now.

BY MR. BRUCE:

Q. Do you know what the written directive system is?

A. If you could elaborate on that.

MR. BRUCE: Let's see, let's pull up -- can we pull up Tab 2?

(Exhibit 2 was marked for identification and is included with the transcript.)

THE TECHNICIAN: Stand by.

MR. BRUCE: Can we zoom in just a bit?

Okay. Officer Warren, can you see this document on the screen?

THE WITNESS: I'm going to be honest, it's real tiny, so I --

MR. BRUCE: Can we zoom in some more?

THE WITNESS: Yeah, because I'm

nearsighted, so I can't see it.

MR. BRUCE:  Not a problem.  Small for me, too.  Is that better?  Should we keep going?

Let's just zoom into the top, the little heading there.

THE WITNESS:  Okay.  That's fine.

BY MR. BRUCE:

Q.  Okay.  So this document says Holly Springs Police Department written directive.  It says Chapter 800 Operations, Directive 840.01 Criminal Investigations.

Do you see that?

A.  Okay, yep.

Q.  Do you recognize this document at all?

A.  I've probably seen it, but we have -- we have several policies.

Q.  Okay.  So you mentioned you have seven policies -- several policies.  That's what I was getting at with the written directive system. It might not be the--

A.  Gotcha.

Q.  -- proper term there.

But have you received any training about these written directives?

A.  We have -- we have received them, the

policies.  Certain trainings they do do, but I can't recall for this one and so --

Q.  Okay.  Have you ever reviewed this document about criminal investigations?

A.  Yeah, I possibly have.  I can't recall right now.

MR. BRUCE:  Okay.  We can go ahead and take that down.  We might come back to it.

BY MR. BRUCE:

Q.  Have you received any training on identifying or classifying hate or bias motivated crimes?

A.  If so, I don't recall right now.

Q.  Okay.  Have you received any informal training like, you know, forwarded emails or pamphlets about bias motivated crimes?

A.  If so, I can't recall right now.

Q.  Have you received any sort of training or guidance about how to identify an anti-Muslim hate crime?

A.  If so, I can't recall right now.

Q.  What about an anti-Jewish hate crime?

A.  If so, I can't recall right now.

Q.  Have you received any training put on by an organization called the Anti-Defamation

League?

A. Never heard of that.

Q. Okay. Have you received any training about identifying hate or extremist groups?

A. If so, I can't recall right now.

Q. Do you know if anyone else in the Holly Springs Police Department has received that type of training?

A. I'm not -- I can't be responsible for anybody else. I don't know.

Q. Understood. I just didn't know if you heard word around the street.

Have you received any training on implicit biases?

A. It sounds familiar, but I can't remember right now.

Q. Have you had any training through something called the Holly Springs Police Department's Cohort Program, C-O-H-O-R-T?

A. If so, I can't recall right now.

Q. Okay. Do you know generally what implicit biases are?

A. If you could elaborate on that.

Q. I'm just asking you do you have an understanding of what that means?

A. More so -- re-ask the question. I apologize.

Q. Do you have an understanding of what an implicit bias might be in -- with respect to policing?

A. Yes.

Q. What might that be?

A. I guess, depending on, I guess, what the person's belief is, I guess, in that certain group setting, not crime-wise but they might have different -- I'll say more of a different belief system with certain things.

Q. Okay. So you understand an implicit bias to be someone or a group with a different belief system?

A. Possibly.

Q. Okay.

A. Or a different outlook on things.

Q. Okay. How might implicit biases affect your job as a patrol officer?

A. I mean, everyone's going to have their likes or dislikes, but at the end of the day, I'm not here for -- I'm the middleman. I'm trying to set things straight. Regardless of their beliefs towards police or against police

or any other group or situation, I'm just trying to settle the situation.  Like I said, once again, just be that middleman to clear the air, have some type of understanding.

Q.  Have you received any training about identifying implicit biases related to Muslim individuals?

A.  If so, I can't recall.

Q.  Have you received any training about identifying implicit biases related to Jewish individuals?

A.  If so, I can't recall.

Q.  What about Asian individuals?

A.  If so, I can't recall.

Q.  Or African American individuals?

A.  If so, I can't recall.

Q.  Okay.  Have you received any -- and forgive me if I've asked this question, have you received any specific training about the elements of North Carolina's cyberstalking statute?

A.  If so, I can't recall.

Q.  Have you reviewed the elements of the cyberstalking statute?

A.  I have.

Q.  You have reviewed the elements of the cyberstalking --

A.  I have.

Q.  Okay.  What is your understanding of what the cyberstalking statute criminalizes?

A.  I don't remember it all for detail -- detail because there was a lot of elements within it.  Like I said, the element that I remember looking for was it being said on radio or, like, post on a -- some type of platform to where -- to where that victim or whoever that is being spoken on feels harassed, threatened -- harassed, threatened, in danger.  Yeah, harass, threatened, danger.  There's one more thing I can't remember.

But within those guidelines of they don't feel like they can operate at their normal everyday capacity.

(Exhibit 1 was marked for identification and is included with the transcript.)

MR. BRUCE:  Okay.  Can we pull up -- I don't mean to pop quiz you.  So let's pull up tab one.

THE TECHNICIAN:  Stand by.

THE COURT REPORTER:  Counsel, are you

marking these tabs as exhibits?

MR. BRUCE:  Yes.  So this will be Exhibit 1.

THE COURT REPORTER:  Okay.  Thank you. And just to confirm, the last tab, 2, is Exhibit 2?

MR. BRUCE:  Yes.

THE COURT REPORTER:  Thank you.

MR. BRUCE:  I'll try to be more clear about that.  Thank you.

Okay.  Let's zoom in to just kind of the first half of this so we can see it because it's a lot.

BY MR. BRUCE:

Q.  Okay.  Officer Warren, so this -- if you see this at the top, it says G.S. 14-196.3 and then the heading says cyberstalking.

Do you recognize -- do you recognize this statute?

A.  I remember seeing it.  That -- I can't remember the exact number for the statute, but cyberstalking, yes.

Q.  Okay.  So does this reflect the cyberstalking statute that you've reviewed before?

THE WITNESS:  If you don't mind to make it larger for me.

MR. BRUCE:  Yeah.

THE WITNESS:  If you can scroll down.

MR. BRUCE:  Yep.  If we can scroll down to B, that's the main section.

THE WITNESS:  There's another -- (witness reads sotto voce.)  No.  If you can scroll -- I wish I could look from my phone.

BY MR. BRUCE:

Q.  I guess, let me -- let me point you to Section (b)(2).  That is what it sounded to me you were indicating earlier, and correct me if I'm wrong.  But (b)(2) says email or electronically communicate to another repeatedly whether or not conversation ensues for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person?

Is that the part of the cyberstalking statute you were referencing earlier?

A.  Around that part, yes.  Like I said, I can't remember from me looking at my original form -- that I've seen it or glanced at it from, but around that, yes.

Q. Fair enough.

And just to be clear, when you said reviewed the cyberstalking statute before, was that in the context of the complaint against Mrs. Rachmuth?

A. Correct. Yes. We had looked at the elements book, if I'm not mistaken.

Q. Okay. And have you ever looked at the elements of cyberstalking outside of the context of the complaint against Mrs. Rachmuth?

A. No. That was the first time, the situation where I had to ever look up cyberstalking.

Q. Okay. And have you ever had to look at it since then?

A. I've glanced at it from time to time, but it's more so just that part where we just expressed on B Section 2 --

Q. Okay.

A. -- where I can remember more so.

Q. So have you charged any cyberstalking crimes since you -- since Ms. Rachmuth?

A. No. We don't normally get calls like that, from my understanding, so -- like I said, that was my first time cyberstalking, period

while in FBL.

Q. Okay. So you haven't charged anyone else besides Ms. Rachmuth with cyberstalking?

A. Well, I said that's the first call that I received with cyberstalking. So that's the only time I can recall.

MR. BRUCE: Okay. Can we scroll down to, I believe it's the last section. Sorry. Yep, the last section down at the bottom of this page, Section E -- subsection E.

BY MR. BRUCE:

Q. It says this section does not apply to any peaceable, nonviolent, or non threatening activity intended to express political views or to provide lawful information to others. This section shall not be construed to impair any constitutionally protected activity, including speech, protest, or assembly.

Did you review that portion of the cyberstalking statute when you were investigating Ms. Rachmuth's case?

A. If so, I can't recall right now.

Q. Were you aware that it carved out protected activity, including speech, protest, or assembly at the time?

A.  If so, I can't recall right now.

MR. BRUCE:  Okay.  Okay.  We can take that down.  I think we can go for another maybe 10 or 15 minutes and then take a break, if that's good with you, Officer Warren?

THE WITNESS:  That's fine.

BY MR. BRUCE:

Q.  Okay.  So based on your training that you received, can you describe the steps an officer is supposed to take when a crime is reported?

A.  Once getting or -- once getting the call for service, we'll see what the victim or possibly complaint of the issue may be for.

Once doing so, we'll get their side, try to verify if they have any evidence on their end, which is witnesses or camera footage or pictures, whatever the case may be.

Once they're able to provide us with that information, then I'll try to touch bases with -- well, if they have the evidence, they can send that evidence to me.  If not, I'll try to get in contact with the witnesses.  And if the witnesses -- to get what the witnesses may have to say for that situation.

Once getting that information from them, I'll try to see what evidence they may have or if they're willing to do a written statement. Some people are willing to, some people aren't.

Once getting the witnesses' information and evidence or video from them, then I will go speak with or attempt to speak with the victim -- I mean, the suspect, but it all depends depending on what information I have evidence-wise.

If the evidence is pretty clear to show what he or she may have done or posted or whatever the case may be, I'll evaluate and check to see what's the best scenario for that, especially with me being a new officer still.

Depending on what's said from those guidelines, I'll move accordingly. So it might be something that's -- depending on the situation, it might be worthy of like a talking about just to let them know the situation and what could not happen if a person decides they want to press charges. Then it may be to where I have to cite you or to where an arrest warrant comes. So it just depends on that.

Q. Okay. So I think I heard kind of four

steps.  So step one would be you receive a call for service; is that right?

A.  Correct.

Q.  And then step two would be you respond to that call and you would try to get the victim's side of what happened; is that --

A.  Correct.  Victim side and evidence if they have it.

Q.  Okay.  Including any witnesses, right?

A.  Correct.

Q.  When you get the victim's side of the story, do they write any sort of written statement?

A.  Sometimes they're willing to, sometimes they're not.

Q.  If they're not willing to write a statement themselves, do you put down what they've told you in writing?

A.  Yes.

Q.  Okay.  And how do you do that?  Is there a form that you do that on?

A.  Not necessarily a form, just in my report I'll -- now, younger me, younger officers just coming in, possibly did not do it with certain calls, but now, if you feel you do not

want to put your name or make a statement because you don't want to necessarily be brought up in court where the case may be or concerns may be, I'll just let it be known that I did ask for a witness statement from this person.  They refused, but body camera was on.  Well, I said that's now versus me starting out.

Q.  Okay.  So if you get an oral statement from a victim but they don't want to put it down in writing, there would be some notation somewhere, you know, that they refuse to provide a written statement.  Is that what you were saying?

A.  So I'm saying at the time, then, with me just coming into law enforcement.  Because I didn't know, like, necessarily, like, procedures, how certain things you do.

If you didn't want to give a written statement, I will just write your name.  Well, not your name, but I will say, like, Mr. Daniel said this -- stated this, that, and the third, and continue with whatever that you stated throughout my report.

Now, there's some people I said that are willing to make a statement form.  That's fine.

And if so, I'll get that statement form from them and put that towards my investigation.

Q. Okay. When you write -- when you summarize what a witness might have said, where do you do that? Is it in a specific form or a file? Where does that -- where does your writing of that go?

A. Well, I won't summarize it. I'll say exactly what they said. But like I say, it would literally be the type of reporting style that we originally had was just, you know, type it through Word what you need to say report-wise. And before sending off your report, have your FTO supervisor verify certain things. And if they feel that that's fine, then they'll tell you to send it to the supervisor or upload it in the system so it could be in as a report.

Q. Okay. So it would be attached to the incident report; is that right?

A. It would if I had a written statement.

Q. Right.

Okay. You mentioned going to your supervisor. When might during this process would you need to get your supervisor's approval

or review on something?

A. Well, currently, while you're in FTO phase, your supervisor is your FTO. So, I would -- your FTO is going to always be with you. Regardless if it's an FTO for the day or your primary FTO, they're usually with you to where you could do so. So, I would, you know, like I said, give my FTO or let my FTO see my report, see what was said. If he thinks it's fine, then he'll send it back to me so I can send it back to my sergeant of patrol.

So then once I send it to my sergeant, if he feels that it's fine, I can upload it. If not, then I need to correct whatever that needs to be corrected or add what needs to be added about the situation.

Q. You mentioned FTO. And just forgive my ignorance, what does FTO stand for?

A. Field training officer. So they're the officers that -- for basically the rookies or new individuals, they teach them or help them to -- they won't learn you -- necessarily learn everything during that field training timeframe, but it's a basic step or guideline for you to say -- or for them to say, we feel comfortable

with letting this officer be by himself at a patrol level.

Q. Gotcha.

So in November of 2024, were you supervised by a field training officer?

A. I was.

Q. And who was your field training officer?

A. My primary was Officer Hernandez.

Q. Okay. You said he was your primary. Did you have others?

A. What is it? Officer Marino. I mean, you'll have a lot of --

Q. Okay.

A. -- field training officers. So, I mean -- and then even if so, I can't remember the timeframe to where I could say that I was with this person at that timeframe --

Q. Okay.

A. -- maybe.

Q. I understand.

Are you -- do you still have a field training officer?

A. No, sir.

Q. Okay. And when did you stop having a field training officer?

A. I stopped around sometime beginning of 2025, about February-ish timeframe.

Q. Okay. And so you said that your field training officer would review your reports; is that right?

A. Yes.

Q. And then after your field training officer reviewed your reports, did your report have to go to anybody else for review?

A. I can't recall detail for detail, but we did have to speak with, like I said, a Sergeant, of course, and a -- excuse me -- a lieutenant to verify because -- well, like I said, we don't really necessarily get a lot of like cyberstalking calls out here in Holly Springs, so --

Q. Okay. So would you have to speak with a sergeant, lieutenant every time you filled out a report, or are you just saying for this specific?

A. I'm just saying for that specific. For a report period, it would be -- if I am through FTO phase, you'll send it to your FTO, which is field training officer. Once he or she confirms that your report is fine or decent, they'll send

it back to you.  So then I will send it back
to -- excuse me, not send it back.

Then once they send it back to me, then
I will send it to my sergeant of patrol.  If he
feels comfortable, then I can upload it into the
system.

Q.  Okay.  So routinely while you're in FTO,
your report -- you fill out a report, you send
it to your FTO, they might send it back.  And
once it's good, you send it to the sergeant and
then it gets uploaded.  That's the general
progression.

A.  (No verbal response).

Q.  Okay.  But in this case, you said you
spoke to both the sergeant and the lieutenant
for this cyberstalking report?

A.  Well, I don't remember speaking
necessarily to the sergeant, but, like I said,
for protocol, we do have to send our reports to
the sergeant.  But the situation caused it where
we had to speak with the lieutenant in reference
to get some understanding or clarity on our end,
like I said, because we don't necessarily get
cyberstalking calls out here for that.

Q.  Okay.  What lieutenant did you speak

with?

A. Lieutenant Ottaway.

Q. Ottaway?

A. Yes, sir.

Q. Okay. And why did you have to speak with Lieutenant Ottaway?

A. Well, I said we were unclear with certain things. And like I said, we don't normally get calls like that for service out here in Holly Springs. Maybe, like I said, harassing calls, but not necessarily a cyberstalking call.

And like I said, that was my first time, so I wasn't -- I wasn't clear or understanding at the time. So I wanted clarity from a higher -- higher supervisor before proceeding or some type of guidance on how I might need to maneuver on.

Q. Okay. So you said you were unclear about certain things. What certain things were you unclear about?

A. Well, like I said, looking at the elements -- I mean, you could look at the -- for me, looking at the elements of that 2 -- that was Section 2(5) that we were looking at, that

was my understanding that the suspect had met

for it.  I thought it was after reviewing, well,

I said my elements book.  My FTO might have

thought the same way to where we had to ask our

higher-ups to where it got pushed to a

lieutenant to verify.

After speaking with the lieutenant and

looking at the elements book and reviewing like,

what evidence that I had at the time, I felt --

I can't speak for anybody else, but I felt

through that element portion that it was within

guidelines.

Q.  Okay.  And you said you felt that way.
Did Lieutenant Ottaway also feel that way?

A.  I can't speak for anybody else.  I said
I only -- for me looking at the elements book,
my understanding, I felt what evidence that I
did have that that was the best charge, I guess,
or it did meet the elements of that criteria for
that section to me.

Q.  Okay.  And you said you sought
Lieutenant Ottaway for guidance.  Did he confirm
that your understanding of the cyberstalking
statute was correct in that situation?

A.  She did look at it.  And looking at the

evidence that I had at the time, she felt that that was the best practice, I'll say, or the best charge to proceed with.

I won't necessarily say that she said that was a yes, but that was a let's verify with the magistrate to see if that is the best charge to go forward with.

Q. Okay. Was there anything else that you sought guidance from Lieutenant Ottaway about?

A. Not necessarily. Just like I said, we showed the evidence that we had from receiving it from the witnesses in the business.

Once that was provided, you are able to look at it or whatever through, I think, on X, which is known as Twitter, or was known as Twitter. And then you can see that the post was still present of what was stated.

Q. Okay. So you just sought Lieutenant Ottaway's guidance about whether the evidence you had met the elements of cyberstalking; is that right?

A. Correct.

Q. Okay. I think we got a little ahead of ourselves. So I want to go back to just talking generally about what steps you're supposed to

take when a crime is reported.

So we were talking about --

MS. BARBER-JONES:  I'm sorry to interrupt, but I just wanted to remind you that we were going to take a break around now.  And whenever we're at the end of a logical sort of part of your questioning, that would be a good thing to do.

MR. BRUCE:  Yeah, I appreciate the reminder.  I'm hoping we can finish this one up and it'd be a nice logical break.  Hopefully, not more than five minutes.

But thank you, certainly, for the reminder.  Is that good with everybody?

THE WITNESS:  Yeah, that's fine.

MR. BRUCE:  Okay.  Sorry for the extended time here.

BY MR. BRUCE:

Q.  So, we talked about you go for a call for service, you get the victim's side of the story and every -- evidence.  The next step you said was to contact witnesses and collect evidence from witnesses, right?

A.  Correct.

Q.  Okay.  If a witness wants to give a

written statement, does that follow the same procedure if a victim wants to give a written statement?

A. It would. So if they don't want -- if they don't want to give one, they don't have to.

Q. Okay. And in that case, would you just write what they say in your report?

A. Correct.

Q. Okay. And then you mentioned the next step would be to speak with the suspect; is that right?

A. It is. I did say that.

Q. Okay. And so -- and so generally, after you collect evidence from the victim and witness, you would speak with the suspect?

A. I said, depending on the situation. So depending on the evidence that I've received and depending on how the victim may feel about the situation, depends on how I may need to go.

Well, I said, that was younger, when I was just starting out. So the process for that is, like I said, was different from my process now of thinking.

But I said, from my understanding at the time or thinking, with me having that evidence

of her stating what she said on Twitter and to where the witness was able to confirm what the victim was saying, as well, I didn't have much at that time besides, like I said, the evidence that I did have to verify with the witness and victim story aligning from what they were saying.

And then reviewing that Twitter post kind of confirmed my understanding of it after looking, like I said, after looking at the elements.  I felt it kind of confirmed what met for that element to proceed.

Like I said, at that time, could I have reached out to Ms. Rachmuth?  Yes, but I was unsure, I think at the time of my investigation where she lives and where she was at, because I know she has an Apex address.

So my understanding at that time was if -- of course, if you have an Apex address, I would think that your jurisdiction will be Apex.  But a certain jurisdiction -- after being in law enforcement and seeing that you could still have -- that Apex address would still be within a Holly Springs jurisdiction, which was the next day of finding out, then you can move a certain

way from there.  But at that timeframe, like I said, I can't say what I was thinking in reference to that.

But with all the evidence, witnesses, the witness, what she stated to align with that victim and with the evidence that was said, I didn't think there was much more to say.

Q.  Okay.  But backing up from the specific situation with Ms. Rachmuth, in what situations would you decide to contact the suspect versus not contact the suspect?

A.  It depends.  Like, if it's a possible -- if I've had a possible hit and run to where the individual, she continued going because she had two kids, one was a newborn and one was maybe like a younger age, to where she seen that the other driver was acting very irate and didn't feel comfortable with the setting that she was in if she had pulled over, so she pulled over -- well, she pulled over, but it was a little bit further past where the individual had gotten hit from.

So when she -- when I -- the original call for service was a hit and run.  So the person that the -- one of the individuals saying

was acting irate stayed within Holly Springs jurisdiction, but then, literally minutes later, that individual called the police department and let them know I was involved with the car accident, this, that, and the third on their end, explaining.

And then, once I speak with the individual that was within Holly Springs jurisdiction, I would tell them to give me one moment so I could try to reach out to the other individual after being verified through dispatch that that other individual did call.

Once I spoke with that individual, I verified, like what was your reasoning for not stopping at that timeframe?  What made you feel that you need to continue?  That's when that individual let me know that they were fearful and, like I said, that they had a newborn and a kid.  It was a female, she felt fearful and threatened with the individual like throwing his hands up and pointing, saying this, that, and the third, you need to pull over, whatever the case may have been, then I would investigate that from both ends.

Q.  Okay.  So in that situation, the suspect

affirmatively reached out to the police department.

A.  Correct.

Q.  So that's a situation where you might decide to speak with the suspect?

A.  That's when I'd be like, let me call, yeah.  Because especially if they're calling the police department saying, like, I know I was in a car accident, I know I left the scene, but I didn't feel comfortable with how he or she was acting irate or a certain way to where they didn't feel comfortable being in that setting where they were located.

Q.  Okay.  So besides when someone affirmatively reaches out, what other situations might you decide to speak with a suspect before moving forward?

A.  Well, if I have their information and contact information, I will reach out.  But if I don't have that contact information to reach out, then there's only so much I can do until I go in person.

Some people they -- that I encounter with doing calls for service, they either already know the person to where they're able to

provide me that information.  If it's email, phone call, or work number that they might have, you know, previously had communications with, then I'll try to reach out from that form.

If not, like I said, on my end, I can only do so much until I get in contact with that possible offender.

Well, like, I said for the individual, I didn't think that she was within jurisdiction. So I thought there was a process before going out of town to try to speak, especially if I don't have her email or contact information, that I might have to possibly call the next agency over, which would have possibly been Apex, and then -- to assist me with speaking about the situation.

Q.  Okay.  So affirmatively -- a situation where the suspect affirmatively reaches out or you have their contact information, you might reach out to the suspect first.

Are there any other situations?

A.  I will reach out to the suspect if I have their information.

Q.  Okay.  Any other situations where you might reach out to them first?

A.  Well, like I said, if I -- if it's within town limits, I'll go to the house if I have an address.  Or like I said, if that victim may know the suspect's address, I'll go to that address just to see if they do live there.  If they don't, then there's only so much I can do until I get further information on my end.

MR. BRUCE:  Okay.  That's probably a good time for a break.  Do you want to take -- is ten minutes okay?  Do we need 15?

MS. BARBER-JONES:  I think ten should be fine.

MR. BRUCE:  All right.  Ten minutes.

THE VIDEOGRAPHER:  We are going off the record.  The time on the video monitor is 4:22 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time on the video monitor is 4:33 p.m.

BY MR. BRUCE:

Q.  All right.  Officer Warren, I hope you had a good break.  I just have a couple more

general questions about what we were talking about earlier, and then we'll get into more specifics about your investigation into Ms. Rachmuth.

Are officers supposed to consult with anyone before obtaining a warrant or a summons?

A. Consult with our -- are you saying like from a supervisor standpoint?

Q. Anybody. Are you supposed to consult with a supervisor before you do so?

A. Yes, we'll let them know like this is our thoughts or concerns for. Which was also another reason why we spoke with the lieutenant at the time to see what was her thoughts before proceeding.

Q. Okay. And does your supervisor determine whether or not you can seek the warrant?

A. They'll see what we have on our end, evidence-wise, and what the call for service was, of course. What evidence we do have, and what were we thinking of charging with, if so.

Once seeing what we thought, and after explaining what -- or how we feel for that situation and why we were going to charge for

that, they'll review or check on their end to see if that was, like I said, possibly the best charge.  If there's possibly another charge, they might advise you, like, well, maybe look at, instead of -- hypothetically, instead of cyberstalking, look at harassment, and then take it from there.

But if they feel like that might be the best charge for that predicament, they will either agree and let you know, like you can proceed and see what the magistrate says, or tell you maybe we might need to try a lesser charge or another charge if it doesn't seem to them that it met the elements or that's the right charge for that.

Q.  Okay.  And is there anyone else besides your supervisor that you're supposed to consult with before you seek a warrant?

A.  What are the -- yeah, I mean, at the time, like I said, I had to speak to my FTO. After that, I said more than likely I had to speak to a sergeant.  Well, I said it did get -- the situation did get pushed to where we had to speak to the lieutenant.

After speaking to the lieutenant, I know

there's certain paperwork that you do have to send, what is it, like, to the magistrate prior to just to let them know basically the bit -- background information so it's on a paper form. Then, as well as let the magistrate know what you're calling for and what's your PC for. Once you explain everything that happened at a call for service, that's when they can let you know.

Once they review on their end, they'll let you know, you know, like I said, if it is granted or not granted, and then that'll be that.

Q. Okay. Are you supposed to consult with the district attorney's office at all before you seek a warrant?

A. Not from my understanding. I can't recall. If so, I can't recall.

Q. Okay. Are you supposed to consult with the town attorney's office at all before you seek a warrant?

A. Not that I can recall.

Q. Officer Warren, when did you first become aware of who Ms. Rachmuth is?

MS. BARBER-JONES: Object to form.

You can answer.

THE WITNESS:  That day of the call of service.

BY MR. BRUCE:

Q.  Okay.  Did you know who she was before the call of service?

A.  Never heard of her.

Q.  Do you know if anyone at Holly Springs Police Department knew who she was?

MS. BARBER-JONES:  Object to form.

You can answer.

THE WITNESS:  Not that I can recall.

BY MR. BRUCE:

Q.  Did you overhear anyone in the police department talking about Ms. Rachmuth before the call for service?

A.  Not that I can recall, no.

Q.  So, before the call of service, were you aware that she was a longtime resident of North Carolina?

A.  No.

Q.  Were you aware that she has a family in North Carolina?

A.  No.

Q.  Were you aware that she's an independent journalist?

A.   No.

Q.   Were you aware that she's Jewish?

A.   No.

Q.   Were you aware that Ms. Rachmuth had previously made complaints to the Holly Springs Police Department regarding harassment?

A.   No.

Q.   Did you work on investigating any of those complaints?

A.   No.

Q.   Okay.  Do you know anyone who has investigated complaints that Ms. Rachmuth filed with the police department?

A.   No.

Q.   So how did you first become involved in -- well, I'll restate.

So you mentioned the first time you knew anything about Ms. Rachmuth was when you got the call for service; is that right?

A.   Correct.

Q.   What was that call for service?

A.   I can't remember right now what the call for service was, the exact title at the timeframe.  But the call came out as if it was currently at Harris Teeter at that time.

Once receiving that information, I went to Harris Teeter. I didn't want to go in to make a scene after the information that was, like, briefly said, kind of on -- from dispatch. I can't remember for -- detail for detail, but clearly I knew that some type of situation happened to occur for the victim to call and want to reach out to law enforcement about the situation.

I know I said that she was, at the time, from my understanding, that she was currently working at that Harris Teeter. So I wanted to go there to see if I could speak with her in person. But I wanted her to come outside to where she could speak with me versus everybody being in her face or around her surroundings and talk about the situation that occurred.

Once calling the victim, come to find out she was not at work and she hasn't been to work for several days because of certain situations that occurred with the post, as well as certain calls that were made to her job to where she didn't feel -- she felt harassed and threatened to where she didn't feel comfortable going back to work.

Q.  Okay.  So where were you when you received the call for service?

A.  I can't remember where --

Q.  Were you on a patrol?  Were you at the police station?

A.  I mean, I was patrolling.  Like I said, that was two years ago, so I can't recall --

Q.  That's fine.

A.  -- exactly where I was.

Q.  Understood.

A.  I was --

Q.  You were on your patrol at that time.

A.  Yeah.

MS. BARBER-JONES:  Sorry, can you let him finish his answer?

MR. BRUCE:  Yes.  My apologies.

THE WITNESS:  Yeah, I can't recall where I was at exactly, but I was en route to it once I did receive that call for service.

BY MR. BRUCE:

Q.  And do you remember what day you received the call for service?

A.  It should be 11/2, so November 2nd.

Q.  Okay.  Do you remember what time it was?

A.  I do not.

Q.  And what did the call for service say?

A.  I can't recall exactly what it said for detail.

Q.  What information -- do you recall anything that it said about what had happened?

A.  Well, like I said previous.  All I know is that I can't remember exact detail for detail what the call said or what the original call came out as.  If -- maybe harassment.  Like I said, I don't remember, so I don't want to tell you incorrectly.

But I did -- like I said, I did respond to the call after receiving it about a situation that had occurred at Harris Teeter about possible harassment.

Q.  Did they give any details about what specific harassment had occurred?

A.  I mean, it possibly did, but like I said, I don't recall this.

Q.  Okay.  And then what did you do -- you said you responded to the call for service.  What did you do when you responded?

A.  Just go to the -- the call came out as if the victim was still currently at Harris Teeter.

Q.  Okay.  So did you go to Harris Teeter?

A.  I did.

Q.  Okay.  And what did you do when you got to Harris Teeter?

A.  That's when I stated I had pulled over to see if I can give that victim a call to come outside to speak to me versus speaking inside while she was working.

Q.  Okay.  And you said she was not there that day?

A.  She was not.  She hasn't been there for several days.

Q.  Okay.  So what did you do after you found out she was not there?

A.  I mean, I still spoke to her on the phone.

Q.  Okay.  So when you spoke with her on the phone, what did she say?

A.  That's when she stated that she was working, doing her normal routine for work, putting items up on the shelves, to where some lady had approached her in reference to her -- I don't want to say the wrong wording -- the hibaj (ph).

Q.  The hijab.

A.  Hijab, excuse me.  About her hijab. Like I said, she said she never met the lady, never knew the lady.  So for the lady to come to her how she did, she was a little off balance about it.  Conversations were said to where that Ms. Sloan, I guess, felt that that hibaj was a different meaning.  The victim stated, well, that was just her religion.

Once proceeding, I guess the interaction had got a little louder than needed, to where she stated the victim stated that her manager, which was the -- excuse me, which was the witness, had to intervene to try to calm Ms. Sloan down.  And she also told her employee to, like, go to another area so she can calm down, as well, and get away from Ms. Sloan while she was taking pictures and recording.  Once -- that was from the victim's end, once she left.

Once I got done speaking with the victim --

Q.  Before you move on from your call with the victim, I just want to make sure that we get everything from that call down, if that's all right.

So you said, first of all, when you

spoke with her on the phone, were you still --
was that when you were still parked outside of
Harris Teeter?

A. Correct.

Q. Okay. So this is the same day you
responded to the call for service is when you --

A. Yeah.

Q. -- spoke with her.

Okay. How did you have her phone
number?

A. She called the police department.

Q. Okay.

A. So that -- when you call the police
department for us to get back in contact with
you, you leave your first, last name, or your
whole name, and you'll give us a best way to
reach or -- reach or get in contact with you,
which is more so the form.

Q. Okay. So you mentioned that the victim
specifically referenced a hijab; is that right?

A. If it's not a hijab, whatever other term
that might have been used for her scarf that was
over her head.

Q. Okay. Did she use the term "hijab" on
the phone?

A.  I can't recall, so I don't want to tell you incorrect.

Q.  Is it possible she said keffiyeh instead of hijab?

A.  I can't -- I don't want to say incorrect, so I don't know for that part.

Q.  So you don't know whether she said hijab or keffiyeh on the phone?

A.  I know what it's called now, a hijab. At first, I thought it was possibly a kufi (ph), but then once I started knowing certain things, I was like, okay, well, it's a hijab from her understanding.  But like I said, from that call, I don't remember if she said it was a hijab or the other term that you just said.

Q.  Okay.  Did she mention the -- so you mentioned that she said that a lady approached her in Harris Teeter; is that right?

A.  Correct.

Q.  And that a conversation got heated; is that right?

A.  Yeah.

Q.  And that the manager intervened?

A.  Correct.

Q.  Did she ever mention any social media

posts by Ms. Rachmuth?

A.  Not at that time.  That was before the social media post.

Q.  Okay.  This is all on November 2nd, right?

A.  From my understanding, the information I received.

Q.  But you spoke with her on November 2nd?

A.  On November 2nd.  Yeah, I spoke with her on November 2nd.

Q.  Did she mention Ms. Rachmuth by name at all on the phone?

A.  If she did, I can't remember.  And if possible, because of her seeing the social media post on Twitter.  Well, excuse me, X.

Q.  So I'm sorry.  I don't know if I caught the -- can you just repeat the answer?

A.  You said if she had said Ms. Sloan's name by name, correct?

Q.  Right, yes.

A.  And I said, not to my understanding now. And I say, if so, it was possibly because of that post.

Q.  Okay.  But on the phone, she did not mention Ms. Rachmuth by name?

A.  I don't recall.

Q.  Okay.  Did she express fear for her safety at all on the phone?

A.  She did.

Q.  What did she say?

A.  Her and her manager, which was also the witness, stated that she has not returned back to work for several days and that there were complaints that were called to the business of Harris Teeter about them hiring terrorists to where she didn't feel safe.  I don't remember the exact amount of calls that they received, but it was quite -- between -- I say between three to five, but like I said, I don't remember the exact call number from that.

The victim also took her kids out of school after the post situation because she didn't want her kids to be involved with that situation or interacted or judged based off that situation.

Q.  Did she mention the kids on the phone --

A.  She did.

Q.  -- or was that later?

Okay.  Did she say that Ms. Rachmuth threatened violence against her in the store?

A.   I don't recall.

Q.   Did she say whether Ms. Rachmuth assaulted her in the store?

A.   No.  She didn't say anything about assault, no.

Q.   Did she say whether she had any reason to believe Ms. Rachmuth knew her name?

A.   Not that I know of.

Q.   Did she say whether she had any reason to believe Ms. Rachmuth knew her home address?

A.   Not that I know of.

Q.   Did she say whether Ms. Rachmuth ever contacted her by phone?

A.   No, she never said she contacted by phone.

Q.   Did she say whether Ms. Rachmuth ever contacted her by email?

A.   No.

Q.   Did she say whether Ms. Rachmuth ever contacted her by social media messaging?

A.   Not that I know of, no.

Q.   Did she say whether Ms. Rachmuth ever came to her house?

A.   No.

Q.   Did she say anything else when you spoke

with her on the phone that day?

A. Yes, she said she did want to return back to work because, of course, at the timeframe, I don't necessarily know if Harris Teeter had trespassed her. I don't believe that they had trespassed her. But she did not feel comfortable with returning back to work because of that situation.

Q. Did she say whether she had any reason to believe Ms. Rachmuth had come back to the Harris Teeter at any point?

A. She couldn't if she didn't return back to work. I think the victim's thing was if she goes back to work and she encounters Ms. Sloan again, then what would be the issue or how things will go again would probably be the same occurrence.

Q. Did you memorialize this phone conversation with the victim in writing at all?

A. You said, did I who now?

Q. Sorry, I can use a -- did you put this conversation you had with the victim in writing at all?

A. For my report purpose, yes.

Q. Okay. And was that in the incident

report?

A. I don't believe I put the part of that she might have feared for her life or the kids coming, her taking the kids out of school. I didn't put that part in the report.

Q. Why didn't you put that part in the report?

A. I can't say right now. I don't know what I was thinking at the time frame. The main thing for me was -- well, I said from her, from the victim's understanding, her main thing was that she worried about her image and things of being -- of herself and possibly her family to be put on social media to where she didn't feel comfortable with returning back to work or to have her kids go back to school, I guess, until things die down or whenever she feels that was best to return back to work or return her kids back to school.

Q. Okay. But at this point, you said she didn't mention -- specifically mention the social media post in that phone conversation yet; is that right?

A. No. So she -- so at the time -- you were asking me at the timeframe what she had

told me.  So later on -- well, at the same time of that call that she did call me, that she did say that she -- as well as the calls that were coming from the business, she did state that, I don't know if it was employees or family and friends that had seen the post, but it was to the point that management and, I guess, the little security team of management of Harris Teeter had informed her about a post that was being made.  I don't know how she was informed necessarily, so I can't say.

But after, like I said, her seeing that post and being notified, she did not feel comfortable with returning back to work.

Q.  Okay.  So -- and she told you that on the phone call with her on November 2nd; is that right?

A.  Correct.

Q.  Okay.  So she did mention that she was aware of the social media post when you spoke with her on the phone on November 2nd?

A.  Speaking in chronological order, excuse me, at first she didn't, but towards the ending she did.  So when I was explaining my story, I was telling you how, like, I received it from

her.  But overall, yes, she did tell me November 2nd.

Q.  Okay.  Did she offer or did she want to make a written statement at all?

A.  She didn't.  No, she didn't, from my understanding.

Q.  Did you ask her to make a written statement?

A.  I can't recall.

Q.  Wouldn't it be standard practice to have a victim's statement like this reduced to writing?

A.  Yes, for sure.  But once again, I was in the FTO process, so I was in the beginning phases trying to figure my way out as an officer, as well.

But once again, there's some individuals don't want their information or anything they say to be said because sometimes things like that do get leaked out or said to where now later on it gets reverted back to them and their name being posted and things like that.  She was already having an issue with her name being or pictures being put up on social media as is.

Q.  Okay.  But you don't remember if she

ever specifically said she did not want to make a written statement?

A. I can't recall right now.

Q. After you spoke with the -- well, before we go there, did you know the victim at all before this incident?

A. No.

Q. Had you ever personally gone and shopped at this Harris Teeter?

A. No.

Q. Okay. After you spoke with the victim on the phone, what did you do next?

A. After speaking with the victim, she said that her manager, which is a witness, might have been there at the time and might be currently at work. So I did go into the business establishment to see if that manager was there.

Q. Okay. Did you speak with the manager when you went inside?

A. I did.

Q. And what did she tell you?

A. Her story was she was in her office to where she heard some type of, I won't say -- I'll say a disturbance, some type of disturbance to where she wanted to see what was going on.

Of course, she's the manager, so she runs the store. She has to make sure things was fine.

Once seeing Ms. Sloan and that victim have their verbal dispute, like I said, she tried to intervene because it was to the point where other customers were looking and, you know, whispering and having things to say about the situation, to where she tried to deviate the situation by getting in between both, of course, but having her employee leave to -- I can't remember if she went to her office or just told her to leave and go to like another section and come back later. Because, of course, she was a little overwhelmed and shocked of Ms. Sloan approaching her the way she did, I guess.

And the management was trying to -- well, was letting Ms. Sloan know that she needs to leave the establishment, especially with her taking pictures and recording. Because the management did inform me -- which there was a sign posted right in front of the store, as well, that you're not able to photograph or videograph anything within the building unless given permission. From my understanding, Ms. Sloan was not given permission to videograph or

take photos while in the store.

Q. You didn't charge Ms. Rachmuth with trespassing, right?

A. Because they never trespassed, no.

Q. So Harris Teeter never trespassed her?

A. From my understanding, no.

Q. And you never charged her or sought a trespassing charge against her?

A. No, sir, because they never said anything about trespassing.

Q. Did the manager ever say she -- did she ever express fear for her safety?

A. Not that I could recall. She was just more so worried about her employee.

Q. Did she say whether the employee feared for her safety?

A. Yes, because she said the employee said she was not coming back to work.

Q. Did she say whether Ms. Rachmuth threatened any violence in the store?

A. Not that I could recall.

Q. Did she say whether Ms. Rachmuth assaulted the employee?

A. Not that I recall.

Q. Did she say whether she had any reason

to believe Ms. Rachmuth knew the employee's name?

A. Not that I could recall.

Q. Did she say whether she had any reason to believe Ms. Rachmuth knew the employee's address?

A. Not that I can recall.

Q. Did she say whether she had any reason to believe Ms. Rachmuth had contacted the employee by phone?

A. Not that I know of, no.

Q. Did she say whether she had reason to believe Ms. Rachmuth contacted the employee by email?

A. Not that I know of, no.

Q. Did she say she had reason to believe whether the employee -- whether Ms. Rachmuth contacted the employee by social media messaging?

A. Not that I know of, no.

Q. Did she say whether Ms. Rachmuth had ever come to the employee's house?

A. No. Not that I know of.

Q. Did she say whether Ms. Rachmuth left the Harris Teeter when she asked her to?

A.  She left, but she was very passionate about what claims that she had on the victim, whatever claims that she had on the victim.  So she didn't -- it wasn't necessarily a, I need you to leave and she left, right then and there. It was more so kind of like, all right, time to go.  Like, you know, direct you this way type of deal.

Q.  But she did say she left the store; is that right?

A.  She left, yes.

Q.  Did the manager ever say whether Ms. Rachmuth returned to the store?

A.  Not that I can recall, no.

Q.  Did the manager provide a written statement?

A.  No.

Q.  Did you ask her to provide a written statement?

A.  Not that I can recall.

Q.  Did you record the statement in writing?

A.  Not that I can recall.

Q.  So did you include any of the manager's comments in your report?

A.  I did.

Q. Okay. Was it word for word, or a summary?

A. Word for word.

Q. Okay. So you recorded the manager's statements to you in your incident report?

A. Correct. I thought you meant for body camera purposes.

Q. Okay. Understood.

Did you know the manager at all before the incident?

A. No.

Q. Did she say anything else to you when you spoke with her in the store?

A. She did provide me with the post from Ms. Sloan's X account. I can't exactly remember what was said, detail for detail, in the post, but I did put that picture of what was said in my report.

Q. Do you know how she received the post?

A. I do not.

Q. Okay. And did you -- was it just a screenshot of the post that she showed you?

A. I have the email of it. So --

Q. Okay.

A. --- you can -- you can, of course,

forward a post from somebody -- somebody's profile. You can forward that post or share it, excuse me. It was shared, or either she has X -- I don't know how she received it, but I received it as a shared to where if I click the link, it'll bring me straight directly to Ms. Sloan's page and it'll have that same exact post.

Q. Okay. When she sent it to you, did you click the link and visit Ms. Sloan's profile?

A. Yes.

Q. Okay. What did you see when you visited her profile?

A. Literally the same thing as the picture provided because I don't have a Twitter account.

Q. Understood.

A. Like I said earlier.

Q. Sorry, go ahead.

A. I was saying earlier -- like I said earlier, if I don't have -- if I don't have access to, like, certain accounts, it'll limit you to what you can see. So literally, the same post that she sent me was the same thing that I seen, which was, like, I believe it was two or three pictures of the young lady while she was

putting up items on the shelf and stated whatever she stated in the post.

Q. So did you view any other posts from Mrs. Rachmuth's social media accounts?

A. There were several other posts, not necessarily for this situation, but for whatever, you know, that she felt was offending her or some type of thing that might have been harmful to her religion. I don't exactly remember everything, detail for detail.

Q. And did you view those during the course of your investigation?

A. I was -- I would -- at the time, at first, no, because once again, I don't have Twitter. Later on, I believe someone had access to a Twitter -- her -- to Twitter, to where they were able to look at comments. I can't remember right now, honestly, who did not have access to that Twitter information. But like I said, I don't have Twitter, so I was only able to look up so much.

Q. Okay. You said later on someone had access to Twitter. How much later? Was it still while you were investigating the case?

A. Yeah, while I was investigating.

Q.   Okay.

A.   On November 2nd.

Q.   Okay.  Did you ever ask anyone who did have a Twitter account to look at more posts on Ms. Rachmuth's social media profile?

A.   I can't recall.  Like I said, I know that day we did look at it.  I don't -- I don't remember who exactly might have had access to it, so I don't want to tell you incorrectly.  But we were able to access the comments with certain things of that original post that I was called for service for, as well as others.

Q.   So you were able to access the comments underneath the post, for lack of a better phrase?

A.   Yes.  But once again, I don't have Twitter, so someone else had to.  I just can't remember who might have been at the time because, like I said, it's been a while.

Q.   Understood.

But you were able -- were you able to personally review those once that person accessed them?

A.   Correct.

MR. BRUCE:  Let's pull up Tab 4, which

will be --

THE REMOTE TECHNICIAN:  Stand by.

MR. BRUCE:  And this will be marked as Exhibit 4.

(Exhibit 4 was marked for identification and is included with the transcript.)

BY MR. BRUCE:

Q.  Can you see that okay, Officer Warren?

A.  Yes.

Q.  Okay.  Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  That was the evidence given to me from the management staff at Harris Teeter.

Q.  Okay.  So this is the X post that she provided you a link to; is that right?

A.  Correct.

Q.  Okay.  And you mentioned you included the post in your report.  How did you do that? Did you take a screenshot of it or capture it somehow?

A.  You were able to -- I can't remember exactly how I did it, but it was able to, where you're able to -- just that post right there by itself.  I don't know what is exactly below

because certain things is below the bar, but just mainly from the picture on above to her name, I was able to get picture wise and just make a copy of that to put in my report.

Q. Okay. So the post, if we look at the bottom here, it says it was posted on 9:54 a.m. October 31st, 2024; is that right?

A. You said November 2024? I see October 31st. Oh, you said October, or did you say November? I apologize.

Q. Sorry, October 31st.

A. Okay. Yes.

Q. Is that when you understood the incident to occur?

MS. BARBER-JONES: Object to form.

You can answer.

THE WITNESS: I can't recall. Like I said, she gave me the information. I know it happened sometime prior to 'till I said, where she also stated, as well as the management says, she hasn't been there for days. But I can't recall the timeframe exactly when it was posted. So I can't say for that one.

Q. Okay. But you spoke with the employee and the manager on November 2nd; is that right?

A. Correct.

Q. Okay. And was it -- at that time, was it your understanding that the -- what was your understanding of when the incident actually occurred?

A. My understanding, I -- at the time, like I said getting, receiving that call, I thought it was that day. So that's why I didn't want to -- as I said earlier, I didn't want to go into the business and speak to her after I -- from my understanding, if the call was made November 2nd, I don't want to make it any more clouded in the business establishment after that situation had occurred. So that's why I wanted to speak with her afterwards.

But like I said, I can't remember for word for word exactly the timeframe for it. But like I said, I know that she did not feel comfortable with returning to work for those three or four days for me speaking with her.

Q. Okay. But after you spoke with them, was it your understanding that the incident had occurred some day prior to November 2nd?

A. Correct, yes.

Q. Okay. When you viewed this post that

the manager showed you, what stood out to you?

A.  I can't think at the time frame, honestly, what necessarily stood out.  I mean, possibly the pictures, possibly her tagging Harris Teeter.  You know, I really can't say, honestly.

Q.  Did you recognize what the employee was wearing when you looked at the post?

MS. BARBER-JONES:  Object to form.

You can answer.

THE WITNESS:  No, I did not.  As I stated earlier, I thought it was another term, but now I know, sir it's the hibaj.

BY MR. BRUCE:

Q.  How did you become aware of whether it was a hijab?

A.  I can't recall, honestly.  Possibly like looking up, trying to have an understanding of possibly why Ms. Sloan might have felt, you know, that was something that she didn't feel was in her beliefs.  I can't really say at the time frame.

Q.  Prior to your investigation, did you have any understanding of what a keffiyeh is?

A.  No.

Q.   Had you seen any news reports about keffiyehs being worn by members of Hamas?

A.   I don't recall, no.

Q.   Did you see any reporting after -- well, let me back up.

Are you aware of the events happening in the Middle East after October 7th, 2023?

A.   Not really.  Not too, too much.

Q.   Okay.  Had you seen pictures of any sort of headdress like the one in this picture in news reporting or anything like that?

A.   I don't recall, if so.

Q.   In this post, does Ms. Rachmuth ever say the employee's name?

A.   In the post, I can -- I don't see that, no.

Q.   Okay.  Does she disclose the employee's home address?

A.   Not in the post, no.

Q.   Does she threaten the employee in the post?

A.   Not in that post, no, not actually.

Q.   Does she ask anyone to contact the employee in the post?

A.   In the post, no, not actually.

Q. Does she ask anyone to contact Harris Teeter in the post?

A. Not actually, no.

Q. So you mentioned you reviewed some -- you were eventually able to review some of the comments to this post; is that right?

A. Yes.

MR. BRUCE: Okay. Can we take down this exhibit? And can we pull up Tab 5? And we'll mark that as Exhibit 5.

(Exhibit 5 was marked for identification and is included with the transcript.)

THE REMOTE TECHNICIAN: Stand by.

BY MR. BRUCE:

Q. Officer Warren, do you recognize this comment and reply at all?

A. I do not.

Q. Okay. I'm just going to read the comment, the first comment, from someone named Rachel Monroe that says it was posted October 31st, 2024. And that's the same date we saw on the original post; is that right?

A. Same date, yes, sir.

Q. Okay. This person says, it is actually protected as religious freedom under federal

law.  I agree and will stick to Village Walk.

And do you see, Ms. Rachmuth's reply below?

A.  Yeah, I see that now.

Q.  And she says, hijabs are protected as they should be, but I'm sure that wearing this is a form of political speech.

Do you see that?

A.  Yep.

Q.  Do you recall reviewing this comment?

A.  No, I do not.

Q.  Do you recall reviewing any comment where Ms. Rachmuth mentions -- refers to what the employee was wearing as political speech?

A.  I do not.

Q.  Had you reviewed this comment at the time, would you have still thought the post was intended -- was talking about Ms. Fattah's religion?

A.  I cannot say, because you would have to ask me at that time frame, my thinking.  Like I said, me being a newer officer at that time frame, certain things were, you know, does this meet criteria, whatever the case may be, versus now certain things I might do slightly or a tad

bit different from investigation purposes.

Q. So you can't say whether, had you reviewed this post, you would have thought it -- the post was not talking about anything having to do with your religion?

A. Yeah, you said at the time, so I can't speak for me at the time. I can speak for now and what I've learned from that time frame on to now to how I would have a better understanding or investigate a little more deeper if so, in that reference.

Q. Okay. As you sit here today and you read this comment, do you think the post had anything to do with the employee's religion?

A. I don't know. Like I said, because I mean, for Ms. Sloan to tag the establishment and for her to say something about something sympathizer, I can't remember.

If you move the post back up, I could possibly. But like I said, for her to tag the business and sympathizer and whatever else she might have said, possibly in the second sentence -- I don't remember exactly right now, but I don't think necessarily it had to be tagged to make that point or get that point

across.

But by all means if, you know, she felt some type of way against it, she can, you know, as long as she's not threatening or harassing, you know, that victim to feel that harmful to where they don't want to come back to work or things like that.

Q. At the time, did you ever consider whether the post was protected political speech?

A. I can't say, honestly. I really can't say.

Q. Why can't you say?

A. I don't know if it was or was not political speech. That's Ms. Sloan who made that post. Once again, like I said, everybody handles things differently. You can get your point across, but you don't necessarily have to tag the business.

Or, you know, if there might be comments further on throughout, you know, this post that you're showing me to where she may have later on found out who that individual was, I can't recall right now, so that's why I can't necessarily say.

MR. BRUCE: Okay. Let's take this

exhibit down.  We can pull up Tab 6 and mark that as Exhibit 6.

(Exhibit 6 was marked for identification and is included with the transcript.)

THE REMOTE TECHNICIAN:  Stand by.

MS. BARBER-JONES:  Daniel, will you be sharing these documents at some point during or after the deposition?

MR. BRUCE:  Yes.  I'm pretty sure they've all been produced in discovery.  They all have Bates numbers.  I can point those out. But you should be able to access them from Planet Depos, I believe.  They can correct me if I'm wrong.  And I'm happy to email them to you if you can't.

For the Planet Depos people, do y'all do the -- do y'all share the exhibits after the deposition or do we have to wait until they're in the transcript?

THE COURT REPORTER:  So we don't share the same upload or download link that you have access to, to the opposing counsel.

MR. BRUCE:  Okay.

THE COURT REPORTER:  But we do add it to the transcript in the end if you ask.

MR. BRUCE: Okay. Yeah, so Katie, I can email them to you after the deposition.

MS. BARBER-JONES: Thanks. That sounds great.

MR. BRUCE: Thanks.

BY MR. BRUCE:

Q. Okay. So this is -- do you recognize this exchange at all --

A. I do not. My apologies. No, I do not.

Q. We see the date on these is October 31st, 2024, again; is that right?

A. Correct.

Q. And again, that's the same date as the original post; is that right?

A. Correct.

Q. Somebody named Tired Old Man says, correct me if I'm wrong, but isn't she an employee there? The price gun was what drew me to that conclusion. If she is an employee and the headgear is part of her religious freedom, it would be no different than wearing a yarmulke. I am no terrorist organization supporter.

And then we see Ms. Rachmuth responds, wrong. It's a religious right to wear a hijab,

not a keffiyeh as a hijab.  There is a
difference.  Employees cannot engage in
politics, according to -- she tags Harris
Tweeter -- sorry, Harris Teeter handbook.

Did I read that right?

A.  Yes.

Q.  Okay.  Did you review this comment at
all during your investigation?

A.  I don't recall.

Q.  Had you reviewed this comment, would you
still think the post was about the victim's
religion?

A.  I can't say if it was religion.  Like I
say, it could be just her personal beliefs at
the time.  If it was religion or not, that might
have been something specific to Ms. Sloan, what
she likes or dislikes, or what she may have
perceived certain information from her end
versus what the victim thought, you know, from
her end of just it being her religious belief or
why she wore it.  So I'm not able to say.

Q.  You're not able to say whether you would
have perceived the post as directed to the
employee's religion had you read this comment at
the time?  Is that -- is that your testimony?

A.  I'm saying I can't say because if -- if it was for the individual, what was the need for the Harris Teeter tag for the handbook policy? I don't necessarily know it, so I can't speak for what is or is not in it.  I don't know if the victim knows what is or isn't in it.

Like I said, there's certain things I'm not able to say because I don't know, like, the -- necessarily backgrounds from that situation or the handbook, things like that.

Q.  Had you reviewed this comment, would you have considered whether the post was protected political speech?

A.  I mean, if that was for her understanding, if that's what she felt -- excuse me, if that's what Ms. Sloan felt from her understanding for the hibaj and the keffiyeh, then I mean, that would be, yes, her political speech.

Q.  So you agree that if Ms. Rachmuth -- Ms. Rachmuth's understanding was what -- that what the employee was wearing was a keffiyeh and not a hijab, the post is political speech?

MS. BARBER-JONES:  Objection.

You can answer.

THE WITNESS: Once again, I don't know what she was thinking in reference to it because her mind frame was clearly different from the victim's to where, like I said, an issue had occurred to where a disturbance came into Harris Teeter and for the management to intervene to try to get Ms. Sloan out of the way -- excuse me, out of the building. So I'm not able to say for that.

MR. BRUCE: Okay. We can take down this exhibit. Let's do one more. Can we pull up Tab 7 and mark this as Exhibit 7?

(Exhibit 7 was marked for identification and is included with the transcript.)

THE REMOTE TECHNICIAN: Stand by.

BY MR. BRUCE:

Q. Do you recognize this document at all, Officer Warren?

A. I do not.

Q. Did you review these comments in the course of your investigation?

A. If I did, I don't recall.

Q. And we see they're dated October 31st, 2024, again; is that right?

A. Correct.

Q.  Someone named Patriot Steve says,
showing support for a terrorist group by wearing
a keffiyeh is abhorrent.  We don't support the
deliberate slaughter of civilians and we
certainly don't celebrate it.  See what happens
if you simply wear the Star of David.

Do you see that?

A.  Yes.

Q.  And Ms. Rachmuth responds, it's a
political statement at minimum.  I'm sure they
wouldn't let a cashier wear a MAGA hat.

Do you see that?

A.  Yes.

Q.  Are you familiar with what a MAGA hat
is?

A.  What -- Make America Great Again?

Q.  Do you know what that phrase refers to?

A.  I really don't.  I just know that was a
little thing at the time frame.

Q.  Do you know whether it's a political
statement?

A.  No, I do not.  No.

Q.  Had you reviewed this comment from
Ms. Rachmuth, would you have considered whether
her original post was protected political

speech?

A. I mean, like I said, if that's what she felt at heart was politically right or correct for her end, by all means. But like I said, I don't know, like, where her thought process was with certain things with this, like I said, because her and the victim had different understandings with certain things.

MR. BRUCE: All right. If we can take this down.

BY MR. BRUCE:

Q. So you mentioned that you did -- you were able to review comments to Ms. Rachmuth's post; is that right?

A. Yes.

Q. But you didn't review either of the three comments we just looked at, right?

A. If I did, I don't recall.

Q. Okay. Do you recall the substance of any of the comments you reviewed at the time?

A. I do not.

Q. Did you include any of those in your report?

A. I did not. That didn't have nothing to do necessarily with the -- it was a part of the

report, but not the initial report for the victim, what she was calling for concerns.  Her calling -- her call and concerns were for that -- the pictures of her being posted and her being -- her job -- where her work site was for where she worked at, where she didn't want to come back.  So that was her main thing.

Q.  Okay.  But at some point during your investigation, did you screenshot any comments -- any of the comments that you reviewed and save those?

A.  I don't have -- no.  I don't have Twitter, so I couldn't screenshot it.

Q.  Did the person who could access Twitter save those and put them in the file or anything?

A.  Not that I know of.

Q.  Okay.  And you don't remember the substance of any of the other comments you reviewed?

A.  I do not.

Q.  How many social media posts did you review from Ms. Rachmuth about this incident?

A.  I just know of the current victim now. I believe she posted another one about somebody that, I guess, was a student or something on the

campus of UNC Chapel Hill.  And there was another post, but I don't remember, like I said the severity or detail of it, so I'm not able to say for that one.

Q.  Okay.  So you mentioned a post about a student at Chapel Hill; is that right?

A.  Yes.

Q.  When did you become aware of that post?

A.  That day of my investigation.

Q.  Okay.  How did you become aware of that post?

A.  When reviewing her Twitter page.  Well, excuse me, her X page.

Q.  Okay.  So during your investigation, you were able to review other posts on her X page; is that right?

A.  Yes, but I didn't have access to it.

Q.  So who did review the post -- other posts on her X page?

A.  That's why I -- my apologies.

Q.  No, go ahead.  If you didn't have access, how did you see the post for the -- about the student at UNC Chapel Hill?

A.  Someone had access to their own Twitter account where they were able to access.  Now,

who exactly, I don't remember because, like I said, that was some time ago.  But someone was able to have access to that.

Q.  Was it another officer?

A.  I -- I really can't recall, so I don't want to say incorrectly.

Q.  Okay.  And did -- that post about a student from UNC Chapel Hill, did it have anything to do with the Harris Teeter employee?

A.  Huh-uh.

Q.  Okay.  Did it threaten violence against the Harris Teeter employee?

A.  No.

Q.  And you mentioned there was a third post, but you couldn't recall what it was about?

A.  Correct.

Q.  Okay.  Did it have anything to do with the Harris Teeter employee?

A.  No.

Q.  Okay.  So there was -- there was only one post that you reviewed about the Harris Teeter employee; is that right?

A.  Correct.

Q.  Okay.  So after you spoke with the employee and the store manager and reviewed the

post, what did you do?

A. Collected that information, let my FTO know exactly what was going on with the phone call and what was said with the witness, slash, management, what's coming back -- well, I said we were uncertain, excuse me, about what that would be charge wise. So we came back to the police department to investigate.

Like I said, I brought my elements book just to see what would possibly be on those guidelines for this certain call. Like I said, for me, reviewing my elements book, I felt that cyberstalking was the best one charge wise for that call.

Once reviewing it for myself, asking an FTO for his assistance or guidance from that, he also felt that was the best charge for it. You know, I said that's where it became to where we wanted to ask the -- our supervisors about it.

Q. So when you went and consulted your elements book, what evidence did you have at that time that led you to believe that cyberstalking was the best charge?

A. One, she had tagged the business of where she works or located, which was Harris

Teeter in Holly Springs. Not necessarily saying it's a specific location, but there's only two Harris Teeters in Holly Springs.

Like I said, after speaking with the victim, to where I said she did -- she did not, as well as the witness, which was management, said she did not return back to work for several days because she was fearful from certain calls that were made to the business establishment about hiring possible terrorists and how they hire people and things like that, of course. And then about the victim, of course, after seeing the post.

So she felt it was best that she did not return back to work until, I'm guessing, either things died down or things happened a certain way legally. I don't know exactly. That's something the victim will have to answer for that part, I guess.

Q. Okay. So you had that -- at that time when you were consulting your elements book, you had that Ms. Rachmuth tagged Holly -- or tagged the Harris Teeter in the post, the victim did not return to work, and the victim was afraid of calls that were made to Harris Teeter.

Anything else?

A.  As well as taking her kids out.  She said that they knew where she worked, so that was the tag with Holly Springs and with the tag of Harris Teeter.  She didn't want to return to work for fear for -- for fear or harassment for herself.

From her understanding and my understanding, no trespass has been done for Ms. Sloan.  So at any time, Ms. Sloan could easily walk back in to where a scene could have taken place.

And like I said, if individuals were calling her job, she was more so worried about her kids, as well, to where she pulled her kids out of school until the situation died down or certain legal stipulations were to take place.

Yeah, that's it.

Q.  You said that's it?

A.  Yeah, that's it.

Q.  And at that time, you only had the one social media post from Ms. Rachmuth, right?

A.  Social media posts and the witness and the victim.

MR. BRUCE:  Okay.  I guess now's a good

time for another break, and then maybe we can go another hour and eat dinner. I don't know what everybody's schedule looks like, but does that work?

MS. BARBER-JONES: Daniel, do you think that you have like several -- like, three hours left?

MR. BRUCE: I hope not three, but I have a bit more.

MS. BARBER-JONES: I guess I think it's our preference to sort of continue going through without the longer break if that's possible for everybody. I know some people, you know, may need to eat.

MR. BRUCE: Well, that's fine for me. I might need to eat at some point, but we can keep going and just see how much we can get done if that works.

MS. BARBER-JONES: Sure.

MR. BRUCE: But let's take ten minutes and then we'll come back.

MS. BARBER-JONES: Sounds good. Thanks.

THE VIDEOGRAPHER: We are going off the record. The time on the video monitor is 5:33 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time on the video monitor is 5:45 p.m.

BY MR. BRUCE:

Q.  All right.  Officer Warren, you mentioned that after you consulted your elements book and determined that cyberstalking was the best charge, you brought it to your FTO; is that right?

A.  Correct.

Q.  Who was your FTO at that time?

A.  At that time, for that day, was Officer Marino.

Q.  Okay.  And do you recall what day that was?

A.  That he was my FTO?

Q.  That you were determining whether to -- whether cyberstalking was the correct charge?

A.  November 2nd.

Q.  Okay.  So this is the same day you spoke with the employee and the manager?

A.  Correct.

Q.  And what did Officer Marino say when you presented him with cyberstalking as the charge?

A.  I can't remember detail for detail what exactly he said.  After looking at that portion that I remember distinctively, he kind of felt that it was, but he was iffy because, once again, we don't normally get calls like that in Holly Springs.  So he wanted to make sure before pursuing with supervisors if that would be the best in their decision.

Q.  Okay.  You said he was iffy.  Did he tell you what part of the charge he was iffy about?

A.  I don't recall.

Q.  Did you or Officer Marino consider whether a different charge would be appropriate?

A.  I mean, I can't remember at the time, honestly.  Like I said, maybe harassment.  I can't remember if there was another -- another charge, like not necessarily cyberstalking, but something else.  Like I said, I really can't remember.

Q.  Okay.  So the only charge you possibly considered that you can remember is harassment; is that right?

A.  If so, harassment, yeah.

Q.  Okay.  And after you discussed the

charge with Officer Marino, did you consult anyone else?

A. Like I said, supervisors.

Q. Who were those supervisors?

A. I don't remember word for word with our -- at the time was sergeant, but now that is Lieutenant Bock. And our lieutenant at the time, which was Lieutenant Ottaway.

Q. Okay. So you said you don't remember who the sergeant was at the time; is that right?

A. No. I said at the time it was -- which is now current Lieutenant Bock. But --

Q. Oh, okay.

A. -- yeah, but we spoke with Lieutenant Ottaway.

Q. Okay. And can you spell the sergeant's name again? I'm sorry, I just couldn't catch it.

A. Bock, B-O-C-K.

Q. Okay, Bock.

So you spoke with Sergeant Bock and Lieutenant Ottaway at the time; is that right?

A. I can't remember last -- I can't remember exactly the conversation with Lieutenant Bock, but whatever it was, it was

referred for us to speak with the lieutenant of patrol, which was Lieutenant Ottaway.

Q. Okay. Did Sergeant Bock tell you to speak with Lieutenant Ottaway?

A. Yes.

Q. Okay. And what did Lieutenant Ottaway tell you when you spoke with her?

A. Just what did I have evidence wise, or what was said from the victim and the witness? Once looking at that picture that was sent from the management staff, I showed her that same picture, as well.

We -- me and Marino, like I said, we were not quite sure for that charge, so we wanted verification or better understanding through Lieutenant Ottaway to see if that was probably the best fit charge wise for that. She felt that was the best fit from her understanding. Like I said, we don't normally get calls for cyberstalking or anything like that here in Holly Springs.

But looking -- after looking, like I said, looking at the elements book, that's what we felt was the best charge possible.

Q. Okay. So you said she asked about what

evidence you had; is that right?

A. Correct.

Q. And what did you -- what evidence did you tell her you had?

A. The victim, the witness, which was the management, that her story aligned with the victim, and that post.

Q. Okay. Did you tell her it was just the one social media post?

A. Correct.

Q. And besides the social media post, what evidence did you have that Ms. Rachmuth violated the cyberstalking statute?

A. Well, it's more so how the victim -- you have to take it as what the victim feels at that time frame. So if the victim felt harmful, harassed, threatened, whatever the case may be, to where they have to once again change their everyday lifestyle or to change things for their family to do their everyday lifestyle, that's a hindrance for them. That's a part of my understanding, I would think, that is a part of that element that 2 -- was it 2(b)(5) or whatever the case, or (b)(5), whatever the case may be.

Like I said, she -- the victim and the witness, which was her management, said that she has not returned to work at that time frame for several days and said she wasn't returning until she felt comfortable or legal, you know, actions took place.

And as well as her taking her kids out from school. I don't know what her thought process was for that. It could have been possibly the same way unknown individuals called Harris Teeter.

What if out of random, somehow information was leaked or said about where her kids go to school at or where she possibly lives at? Now she has to think and take accountability for her kids' actions or what actions could be done to her kids as well, to where she might have felt like the best thing right now is to take them out of school until things die down or whatever the case may be, whenever she feels comfortable with sending them back. That's something I don't know. I can't really say. That's something the victim would have to say for that part.

Q. Okay. So other than the single X post,

did you have any other conduct from Ms. Rachmuth that you believe violated the cyberstalking statute?

A.  I can't necessarily say.  Like I said, I don't remember detail for detail what her posts were.  But for you to post -- like I said earlier, if you can post it's a Harris Teeter and then it's in Holly Springs, it's only put so much -- you know, people can do or reach out to for if they agree or disagree with whatever Ms. Sloan may or may not feel with the situation.

I can't remember now detail for detail because of the comments.  It might have been something in reference to, you know, she's at this location or certain things to be said to where these unknown individuals that called might have feel -- or felt that they needed to call to confirm or confront that Harris Teeter in Holly Springs.  That's -- I really can't say for that.

But for that -- like I said, for that post, like I said, there's only two Harris Teeters in Holly Springs.

Q.  So do you recall reviewing any comment

where Ms. Rachmuth revealed the location of the employee?

A. Something about a sunset. I can't remember exactly detail for detail. But later on, I think there was something about a sunset. I just remember sunset right now. So we only have one location in Holly Springs with that location.

Q. Do you recall seeing any comment that revealed the employee's home address?

A. No.

Q. Okay. Did you have any other evidence of Ms. Rachmuth's conduct that you thought meant that she violated the cyberstalking statute?

A. Well, I said for the management to feel that she had to intervene after that whole situation of her taking pictures or recording and then letting me know that, once again, that the building does have that sign in front of it that says no photographs, no videos, unless authorized.

Now, what Harris Teeter may have done on their end, regardless if they trespassed her or not, I can't help what they did or did not want to do on their end. But for -- like I said,

once again, for her -- for -- excuse me, for Sloan to post that -- that post to where that -- and it got back to the victim to where she felt not comfortable to go back to work, go back to -- to have her kids go back to school, that's a tough situation, especially if that's their only way of, you know, possibly earnings or whatever the case may be, and now you got to take your kids out from school.

Q. With respect to what the sign at the store said about whether photography was allowed, you didn't charge Ms. Rachmuth with trespassing or didn't think trespassing was an appropriate charge, correct?

A. Correct, because Harris Teeter had nothing to say about trespassing her.

Q. Okay. And did you have any evidence that she threatened anyone in the store?

A. No.

Q. Did you have any evidence that she was bothering anyone else in the store?

A. No.

Q. Did you ever investigate the people who made calls separately to the Harris Teeter?

A. Well, they didn't know who made the

calls, so I wouldn't have been able to know who made the calls.

Q. Did you have any other evidence at the time you were speaking to Lieutenant Ottaway that led you to believe Ms. Rachmuth violated the cyberstalking statute?

A. No.

Q. After you -- did Lieutenant Ottaway ever mention anything about Ms. Rachmuth?

A. No.

Q. Do you know if she knew Ms. Rachmuth beforehand?

A. Not to my knowledge, no.

Q. Did she say anything besides that she thought cyberstalking was a good fit?

A. Correct. Like I said, we just checked the elements book. I said, from my understanding of that portion of the elements, I felt that that was the best choice. My FTO was unsure, but he felt also, you know, that possibly was the best choice. We wanted further understanding or oversight to make sure that was the best choice, or if maybe we might have needed to handle it a different way, charge wise, whatever the case may be.

Q.  Okay.  So you mentioned the elements of the cyberstalking statute.  Were you aware at the time that the cyberstalking statute requires repeated electronic communications?

A.  No.

MR. BRUCE:  Okay.  Can we pull up Tab 1 again?

THE REMOTE TECHNICIAN:  Stand by.

BY MR. BRUCE:

Q.  Okay.  Officer Warren, so this would be the text of the cyberstalking statute we looked at earlier, correct?

A.  Yes, sir.

Q.  Okay.  And we specifically looked at (b)(2) earlier.

MR. BRUCE:  Can we scroll down a bit?

BY MR. BRUCE:

Q.  Okay.  And Section (b)(2) says:  Email or electronically communicate to another repeatedly whether or not conversation ensues for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person.

So do you see that that requires repeated communications?

A.  Okay, yeah, I see the repeated part. Yes, sir.

Q.  Did you understand at the time that it required repeated communications?

A.  No.  My understanding was more so just the portion of where it says abuse, annoying, threatening, terrifying, harassing, embarrassing any person.

Q.  So your understanding was just it was the effect of whatever communication?

A.  The effect of it.  So with her putting that post up and then whatever her comments were afterwards of her beliefs or disbeliefs from the situation.  And like I said, to where the main thing was for me, whatever, if the victim felt fearful or threatened or whatever for her everyday lifestyle or whatever the case may be, that that was my main thing.

Q.  So at the time, did you believe that a single social media post could constitute a violation of the cyberstalking statute?

MS. BARBER-JONES:  Object to form.

You can answer.

THE WITNESS:  I'm quite unsure, actually.  Like I said, I don't know at the

time, so I cannot say.  I mean, even to where I was also posted by Ms. Sloan on her Twitter, as well, with certain things.  And my -- certain business of mine was posted, as well, on her Twitter.  I guess her -- I don't know, I'm trying to think of the word.  I don't know if it was trying to discredit me or whatever the case may be.

But like I said, even to where I received a random Facebook notification, some older gentleman was trying to add me on Facebook.  So, I mean, I don't know.

Q.  Okay.  But I guess going back to my original question, at the time -- well, never mind.  I'll move on.

MR. BRUCE:  Can we go back down to the bottom of this document and look at subsection E?

BY MR. BRUCE:

Q.  Officer Warren, we read subsection E earlier.  It says -- the second sentence says, this section shall not be construed to impair any constitutionally protected activity, including speech, protest, or assembly.

At the time, were you aware that there

was this carve out for protected activity,
including speech, protest, or assembly in the
cyberstalking statute?

A.   No, I don't recall.

Q.   Was that listed in your elements book?

A.   Possibly.  I'd have to relook in my
elements book.

Q.   Can you describe what the elements book
is?

A.   The elements book is for all crimes
to -- what is the criteria to meet that crime?
Just depending on the crime, it breaks it down.
Like, this person has to do this, the victim
might have felt like this, or this has to have
been done.  It just depends on what the crime
may be.

Q.   Okay.  And do you know, does it just
copy and paste the statute like we're looking at
here, or does it break it down more simply?

A.   I can't remember detail for detail.
Like I said, I mean, the document you're showing
me could be a whole different thing from what
I've looked at from my book.  That's something I
would have to look at and review.

Q.   Do you know if that elements book is

publicly available?

A.  If you go through Basic Law Enforcement Training academy, from my understanding, yes, because you have to have that book to go through class.  But outside of that, I don't know if it is.

Q.  Okay.  Is it specific to Holly Springs or is it a statewide type of book?

A.  Statewide.

Q.  Did you ever consider whether Ms. Rachmuth's post fell under this exception to the cyberstalking statute?

A.  Are you asking for the section of E or the section that I was telling you that I referred to?

Q.  The section E, the protected speech section.

A.  I can't recall, honestly.

Q.  Did Officer Marino or Lieutenant Ottaway ever mention whether it fell under that protected speech exception?

A.  I don't recall.

MR. BRUCE:  Okay.  We can take this down.

BY MR. BRUCE:

Q. Did you ever attempt to interview Ms. Rachmuth during your investigation?

A. No, sir. Like I said earlier, from my understanding, once able to receive information, her address was an Apex address. So I was thinking that we were probably going to have to contact Apex to assist us with going out there to speak or to arrest her, depending on how things went.

Q. Okay. So you mentioned earlier that if you had the suspect's contact information, that would tend to be a situation where you would contact them; is that right?

A. If I have their number, yes, sir.

Q. Did you have her phone number?

A. No, sir.

Q. What information about her did you have?

A. The only thing I had -- the only reason why I knew her name was because of when the witness was able to give me that shared link of her Twitter post, excuse me, her X which had her name in it. So I tried to see if I could look her up that way. After looking her up that way, that's when I seen that her address was within Apex.

Q.　Okay.　So you had her home address?

A.　Correct.

Q.　Had her home address clearly been within Holly Springs, would you have gone to her house and spoken with her?

A.　I can't say, honestly, because I don't remember the time of day it was.　I don't even think I was able to finish my report that same day.　I had to make sure I was slightly bit early to make sure I could try to finish my narrative for that report and, like, background stuff.

I think the main thing that day was to try to figure out if it was -- what was the best charge and was it an arrestable offense.

And like I said, with the evidence that I felt that I had at the time, I felt that -- after speaking with FTO and supervisors and looking at that element, that specific part of the element, excuse me, I felt that it was within guidelines for that.

So I can't necessarily say that I would have, because I mean, I might have been able to get the arrest warrant that day.　And depending on the timeframe, I might have been able to talk

to her about the situation, or even if it was for the arrest warrant purposes, to take her to jail.  I can't really say for that timeframe, though.

Q.  Okay.  In other situations where you have the suspect's address and it's clearly within Holly Springs, would you go and speak to that suspect before seeking an arrest warrant?

A.  Are you asking from then or now standpoint?

Q.  Start with then.

A.  Then, it depends on what the FTO may say or guide me for further instructions.  Because once again, I've never been involved with a cyberstalking crime and I'm new to policing.  So that is the timeframe for his guidance to kind of oversee me and allow me to make my guidance of how I need to pursue further on.

Q.  Okay.  Did you ever ask your FTO whether you should go interview Ms. Rachmuth?

A.  I don't recall, honestly.

Q.  And you mentioned then or now.  Now, if you had a suspect's address and it was clearly within Holly Springs, would you have gone and interviewed them?

A. Yes. Like I said, at the time, I didn't know that -- like I said, me being new, I'm thinking if your address is Apex, I would think that you're within Apex jurisdiction, regardless how close you are to the jurisdiction or I would have just thought it was that -- the case.

But after me being in policing and seeing, like, you know, yes, our main jurisdiction is Holly Springs, but certain bits and pieces can be county, certain bits and pieces could be Fuquay, certain bits and pieces can be Apex. It just depends.

But, like I said, me starting out, I didn't know that. But now I would have went to see -- I would have -- now, I would have went to see her address [sic]. Like, you know, what was your, you know, reasoning to feel that you needed to post her? I mean, like I said, not violating her, maybe not freedom of speech, but, you know, you can still speak whatever you need to, but not necessarily -- you don't necessarily have to have that individual in your post. You can still make your voice be known without certain criteria, extra stuff to take place.

Q. But her post never referenced the

employee, right, by name?

A. Well, if the posting of the employee is the person individual -- well, first, it addressed that Harris Teeter. Once again, there's only two Harris Teeters in the town. Like I said, I can't remember by now -- I meant right now, but I think sometime in the comments there was something said about Sunset Lake, so that would dumb that down another step. So now they wouldn't go to the Village Walk Harris Teeter.

Like I say, if you have the pictures of the individual, even if they didn't know if it was Sunset Lake or Village Walk, what if they decide to go to the one at Village Walk shop today, and then later that evening or the next day, they decide to go to the one on Sunset Lake and they still happen to see her? That's still posting where she necessarily works at.

Q. Okay. But it didn't specifically say her name in the post, correct?

A. No, not that I can remember.

Q. After you spoke with your FTO, Sergeant Bock, Lieutenant Ottaway, was there anyone else you consulted with during the course of the

investigation?

A. So the next day, because Hernandez was my primary -- it my primary -- was my primary FTO, excuse me, but he was absent that day for whatever reason. So that's why I was placed with Officer Marino at the time for him to be my secondary FTO.

So the next day on November 3rd is when I went back to Officer Hernandez. He kind of asked how the day went and what exactly was going on with the situation that I had going on. I told him I still had to report to finish and things like that and then check to see if the arrest warrant was granted or not.

Once -- that next day, he asked if I knew by chance who the suspect was, and I let him know the address. And I think once he checked to see if the -- he was showing me to see if the access was granted for that arrest warrant, he was able to say, well, that is in our jurisdiction. But that was the next day after, like I said, I didn't know, and I don't think Officer Marino knew that was necessarily our jurisdiction at the time.

Q. Okay. So you spoke with Officer

Hernandez on November 3rd, and was that after you sought the arrest warrant?

A. Correct, because he was off November 2nd.

Q. Okay. So after you spoke with Lieutenant Ottaway, is that when you sought the arrest warrant?

A. Correct.

Q. Okay. And how did you go about seeking the arrest warrant?

A. We have a back room. I didn't go in person. We have a back room to where you're able to access the magistrate from through the computer. Of course, you know, enter your login information.

Once you give a call through the video chat section, a magistrate will come on screen and, you know, ask, you know, certain things. Of course, who I am, what's the means of the situation, and then what -- I guess, ultimately, like what charges were I trying to pursue from that.

Q. Okay. Did you create any written documentation that you submitted to the magistrate?

A.  I can't recall right now, honestly.

Q.  In general, when you're applying for an arrest warrant, is there any sort of form or documentation you're supposed to fill out?

A.  Yes.  There will be a form that I would fill out.  I just can't remember exactly when or how I did it, but there would be.

Q.  Okay.  Do you create an affidavit or is it just the form?

A.  It's a form from my understanding.

Q.  What is usually included on that form?

A.  The form is just a brief synopsis of your narrative, essentially.  So it'll be the -- of course, the reporting officer, who's the victim, who's the suspect, what is the alleged crime?  Like I said, that brief synopsis of why you're on that video call with the magistrate in reference to that.

Like I said, you can go detail for detail, but I mean, that'll be a long, long sheet.  So it's more so try to keep it like within a sheet time -- well, not timeframe -- paragraph or so or sheet lengthy-worth to send to the magistrate.

Q.  Okay.  And do you send that form before

or after you get on the video chat with the magistrate?

A.   Best practice is to send it before, but I guess depending on the severity of what's going on, you might be able to, you know, send it after.  Which you just have to make sure you do send it that day of, or that -- like, literally right after you're getting off the phone with them -- well, video chat, excuse me, with them.

Q.   Okay.  And did you fill out a form that you sent to the magistrate for Ms. Rachmuth's arrest warrant?

A.   I can't recall right now.

MR. BRUCE:  Okay.  Can we pull up -- give me one second.  Can we pull up Tab 9, please?

(Exhibit 9 was marked for identification and is included with the transcript.)

THE REMOTE TECHNICIAN:  Stand by.

BY MR. BRUCE:

Q.   Okay.  Do you recognize this document, Officer Warren?

A.   Yes, sir.

Q.   Okay.  What are we looking at?

A. A warrant for arrest.

Q. So this is the actual warrant for the arrest; is that right?

A. Yes.

MR. BRUCE: Okay, can we scroll down to the next page? Let's see. I think that's the last page. Can we do the second page?

BY MR. BRUCE:

Q. Okay. Do you recognize what this page is? The warrant would be?

MS. BARBER-JONES: Can you zoom in further, please?

MR. BRUCE: Yeah, can we zoom in a bit?

THE WITNESS: Okay. Yes.

BY MR. BRUCE:

Q. So, what is this page?

A. This is the page of certifying the defendant and what, like, act -- what alleged crime that I was saying that she had did, once that was granted. It'll let me know or let you know the date and time that I had came or spoke with the magistrate with, of course, my signature and police department that I work for.

MR. BRUCE: Okay. Can we go to the next page?

BY MR. BRUCE:

Q. Do you recognize this page?

A. Yes.

Q. What is this page?

A. That is the information of the suspect, my information, me being the reporting -- well, excuse me, the arresting officer from that situation, and the charge that I went for, which was cyberstalking.

Q. Okay. So is this the form that you submitted to the magistrate in order to get the arrest warrant?

A. I don't recall that form. I think there was another form that I might have seen. I can't recall that form.

Q. You can't recall this specific form right here?

A. (Indecipherable) say, yeah, this specific form from that day.

MR. BRUCE: Okay. And can we just scroll down to the last page?

BY MR. BRUCE:

Q. Do you recognize what this page is?

A. Yes. This describes what the situation -- like, that brief synopsis of what

happened in reference to that cyberstalking crime.

MR. BRUCE: Okay. Can we scroll down to the bottom just to make sure we're not missing anything? Okay.

BY MR. BRUCE:

Q. So, are -- those last two pages, is that typically the form that's filled out and presented to the magistrate to get a warrant?

A. Not the form that I'm thinking of. I can't remember the exact naming of it, but it's more of a type out form. It's more of a setting of, like I said, whoever the reporting officer and arresting officer is -- excuse me, the reporting officer is, the individuals involved in that situation, and the charge that you're looking to allegedly go further with.

And then, like I said, it's literally like it gives you that narrative section to be like that brief synopsis of the overall kind of what took place or what happened.

Q. Okay. So did you fill out this page that we're looking at?

A. I can't recall right now, honestly. But I mean, clearly I had to with my signature.

Q. Okay. So on the second page, that was your signature, correct?

A. Yes, sir.

Q. Okay. So in this section where it says offense cyberstalking, on or about the date of offense shown and in the county named above, the defendant unlawfully and willfully did knowingly permit an electronic communication device, cellphone, under the defendant's control to be used for a purpose prohibited by the statute to take pictures at Harris Teeter and electronically communicate on social media for the purpose of terrifying, harassing, or embarrassing her, would that be the summary that was presented to the magistrate?

A. I don't recall.

Q. So you don't recall if you typed this section or not?

A. I'm saying you asked me, was that the thing that I wrote for if -- that form that I was explaining to you, you asked if that was the exact same thing that I said for that form to get sent to the magistrate. I'm saying that I don't recall if that was or was not sent to the magistrate.

Q. Okay. So while you were on video with the magistrate, what did you tell the magistrate in support of your request for a warrant?

A. Like I said, I don't remember detail for detail exactly the conversation for it, but more than likely along the lines of the same I'm explaining it to you, what the victim -- the victim called, the call of service; the victim, their side of it; the witness, which was management, their evidence that they were able to give me from Harris Teeter; letting them know I did verify that it was her X page.

What is it? I more than likely said exactly what the post said and to -- about the individual and to where the standing of that victim, how she felt in reference to not going back to work and taking her kids out from school.

Q. Did you provide the post to the magistrate?

A. I can't recall right now at this time.

Q. Would it be standard practice to submit something like that, evidence like that, to a magistrate?

A. You could let them know more so that you

had that information, and then they'll be able to access that incident report, which is basically just a simple report from Holly Springs if you reach out or speak to our front desk attendants. But I won't necessarily say it's a, you have to show it right then and there.

Now, if they ask, if, you know, you give me a moment of time, let me pull it up if you want to see the access of what I've seen so I can show you exactly what I've seen or how I was looking at from my standpoint, then I could show you. But I won't necessarily say it's a right then and there, you have to show it right then and there.

Q. Okay. So you mentioned they have access to the incident report. Is that something that they're supposed to -- do you routinely present the incident report to them?

A. Well, I wasn't -- I wasn't done with my -- I wasn't done with my incident report.

So, with that, it's -- that form that I was explaining to you earlier, that basically gives them that brief synopsis of what your narrative or report will say once you send that

to them.  I don't know their protocol for certain things, so I can't say what is or was not for their protocol for us -- I mean, for them, excuse me.  But for me, I can only do the -- that form, which is letting them know I'm the officer that's, you know, of course, putting in those charges, letting them know the people that were involved and, like I said, that brief synopsis.

Now, if they need anything further outside of legal actions or if they need to refer to something, I'm quite sure they have the means to access that report number.  If they need that report number from me, I can provide that to you.

And then, however, that process works from, I'm guessing, the magistrates or lawyers to where our front desk attendants -- I don't know necessarily how that works, but if within reason, they'll be able to give it to you or give whatever they're able to give to you.

Q.  Okay.  But at the time you went to the magistrate, had you completed your incident report?

A.  I did not.  I think I was -- maybe,

like, a fraction of the incident.

Q. Okay. When did you complete your incident report?

A. Like I said earlier, November 3rd.

MR. BRUCE: Okay. And can we scroll up to the first page? Sorry, I'm just trying to find what I'm looking for. Can we scroll down? Sorry, there we go.

BY MR. BRUCE:

Q. So on kind of the bottom third after the bold text, there's a box that says date issued.

Do you see that?

A. Issued, yes.

Q. Okay. And that says it was issued on November 2nd, 2024, right?

A. Correct.

Q. So does that mean the warrant was issued on November 2nd?

A. Correct.

Q. So at the time, the magistrate would not have been able to view your incident report because it wasn't complete, right?

A. Correct.

Q. Okay. And this is the same day you had spoken with the Harris Teeter employee and

manager, correct?

A. Correct. Well, I do apologize. I do retract one thing. Because I did have to make a supplement for me doing that arrest warrant and me taking her to jail. So I do retract that statement.

Q. Okay. You retract what statement exactly?

A. The part where I said that it was done -- maybe the overall process was done by November 3rd. But I know from my end, certain things had to be put in at a certain timeframe. So I can't remember. If I had the case file. I would be able to pull it. But probably November 2nd, I was able to finish it, or not finish it the correct way or proper way how it needed to be done, but I wanted to make sure that it's in the system.

Then when I come back November 3rd, whatever I didn't finish properly or have correct, I can finish that November 3rd. And then, like I said, I did put a supplement in for me pursuing those -- that arrest warrant and me taking her to jail.

Q. Okay. So just to tease that out some,

so on November 2nd, is your report in the system
and accessible by the magistrate?

A. And that's why I just said, if you give
me a moment, I could check the time frame. I
cannot recall right now. But I do have it to
where one section was submitted one day, and I
do believe another section, which was that
supplement of me taking her to jail, was
submitted the following day, because everything
didn't happen just in one day.

Q. Okay. And just when you say submit,
like, just so I know, does that mean it's like
in a system where it now could be accessed by
the magistrate if they needed to?

A. I don't know how that process works. I
don't want to tell you incorrect. But it was in
the system where I had to put it in Holly
Springs reporting system before I leave.

Q. Okay. And then on November 3rd, you
said you went back and supplemented it?

A. Yes.

Q. What did your supplement include?

A. Once again, I don't remember word for
word. That's why I said I'd have to see it, but
it was in reference to me taking her to jail.

Q.  Did you go back and change anything that you had written the day before?

A.  Not that I can recall, no.

Q.  Most of that was done.  It's just if I'm still being the officer investigating that case, anything that you do in reference to that case, your original document, you can't alter, so you'll have to make a supplement, which will be that second one that I made the next day, which was me taking her to jail.

MR. BRUCE:  Okay.  We can go ahead and take this document down, I think.

BY MR. BRUCE:

Q.  So when you spoke with the magistrate, did you tell the magistrate that there was only one social media post involved.

A.  I can't remember the whole conversation detail for detail.

Q.  Did you tell the magistrate whether the employee had said, you know, that Ms. Rachmuth had threatened her in any way?

A.  I didn't say threatened, no.  I just said that the victim feared for her life after the situation.

Q.  And what conduct of Ms. Rachmuth's did

you tell the magistrate you believed violated the cyberstalking statute?

A. I can't recall at this time.

Q. Was it anything other than the post on X?

A. I really can't recall. Like I said, I only go based off of the evidence and the witness that I had.

Q. And the evidence you had at the time was the post on X and the two witnesses?

A. One witness. That was the -- that was the manager that intervened. And then the --

Q. Sorry -- yes, yeah. So the witness and the victim and the post?

A. Correct.

Q. And neither the witness -- did the witness or the victim say there was any other post involved?

A. Not for my knowledge, no.

Q. And you don't recall if you submitted any written information to the magistrate, do you?

A. I don't recall right now, no, sir.

Q. Why did you choose to seek an arrest warrant rather than a summons or a citation?

A.  Once again, I was in the FTO process, so me doing certain things is new.  Like I said, one, I think that was actually a first time for me to actually have to go to jail, take someone, with me doing my own investigation.

Two, like I said I haven't really heard much of a -- of doing a criminal summons.  It's either more so something as a, you know, I cite you or a -- or I take you to jail type of thing.

It's not necessarily been brought up much about a criminal summons from my knowledge or since I've been going -- since I've been here, excuse me, at Holly Springs.  So I can't necessarily say where my thoughts were for that.

I just wanted to make sure whatever I was doing was the appropriate actions, and that it was -- if it was the charge, if it was an arrestable offense.

Q.  Did you ever speak with Officer Marino or Lieutenant Ottaway about whether you should issue a citation rather than seek a warrant?

A.  We did discuss, like I said, once again, to see if it was an arrestable offense.  I don't really remember the citation portion, honestly.

Q.  Okay.  But you did search to see if it

was an arrestable offense?

A. Correct.

MR. BRUCE: Okay. Now might be a good time for another break.

THE VIDEOGRAPHER: We are going off the record. The time on the video monitor is 6:30 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 6:41 p.m.

MR. BRUCE: Okay. Hope everybody had a good break.

BY MR. BRUCE:

Q. I have a few more questions about your investigation and seeking the arrest warrant, and then we'll go to the arrest itself.

Just to go back to the evidence you presented to the magistrate in order to get the arrest warrant, did you ever -- did you present any of the comments to the social media post that you said you reviewed to the magistrate?

A. I don't recall.

Q. Did you ever tell the magistrate whether you had evidence that Ms. Rachmuth affirmatively

contacted the victim?

A.   No.  Not to contact the victim, no.

Q.   So did you give the magistrate any text messages between Ms. Rachmuth and the victim?

A.   No.

Q.   Did you give the magistrate any emails between Ms. Rachmuth and the victim?

A.   No.

Q.   Did you have any evidence of text messages or emails between Ms. Rachmuth and the victim?

A.   Not text message or emails.

Q.   Did you have any other -- did you have any other evidence of communications between Ms. Rachmuth and the victim?

A.   No, besides the victim and the witness stating, of course, that day that the whole incident occurred.  But outside of that, no.

Q.   And that incident was the incident in person?

A.   Correct.

Q.   What written documents did you prepare in the course of your investigation?

A.   What written?

Q.   Yeah, what written documents did you,

yourself, prepare?

A. I didn't have anything written. Like I said, I was doing my narrative for my report. But that -- like I said, that wasn't complete. Like I said, I remember something possibly about, like I said, that form where you can send something in; but I think, like I said, I think that's like something for felonies. What is it? FIR, felony incident report. I could have swore, but, like I said, I might be thinking of it wrong.

But outside of that, nothing, because like I said, I wasn't fully even done with my report before speaking with the magistrate.

Q. Okay. And going back to -- was that the first time you had sought an arrest warrant in your time?

A. Yep.

Q. Okay.

A. Yes.

Q. Have you sought any arrest warrants since then?

A. No. I've served arrest warrants, but not to actually put one in place.

Q. Okay. So this is the only arrest

warrant you've sought and obtained as an officer?

A. Correct.

Q. So you mentioned you created your incident report. Did you exchange any emails between anyone and the office about the investigation?

A. No, there's no exchange of emails. Like I said, the only people I spoke to were the original, my FTOs, and the supervisors, and that was it.

Q. Okay.

A. And then --

Q. Sorry, go ahead.

A. No, so that was just, like I said earlier, Lieutenant Ottaway, now-Lieutenant Bock, Officer Marino, and Officer Hernandez.

Q. Okay. And were all those conversations in person?

A. Yes.

Q. Okay. So did you exchange any text messages about Ms. Rachmuth or the investigation?

A. No. We did everything in person.

Q. So the only written document that you

prepared that you know of is the incident report; is that right?

A. Correct.

MR. BRUCE: Can we pull up Tab 8, please?

THE REMOTE TECHNICIAN: Stand by.

MR. BRUCE: Okay. This will be marked as Exhibit 8.

(Exhibit 8 was marked for identification and is included with the transcript.)

BY MR. BRUCE:

Q. Do you recognize this document, Officer Warren?

A. Somewhat. That's not the original form. I probably see it from my computer side, but --

Q. Okay.

A. Yes.

MR. BRUCE: Let's scroll down to the second page. This might just be a cover page.

BY MR. BRUCE:

Q. Do you recognize that part of the document?

A. Yes.

Q. Okay. What is this?

A. That's the incident report.

Q.  Okay.  Is there a way to see, looking at the incident report, what portions of it were completed on November 2nd and what portions you completed on November 3rd?

THE WITNESS:  If you scroll down. Probably going to have to go all the way down. Information wise, that was most likely put in that same day.  It's the written narrative portion, is where it will say -- so, like, right around there?

MR. BRUCE:  Uh-huh.

THE WITNESS:  So let's see, if you could slide up.  Okay.  So yes, November 2nd is when I initially did it.  So then if you scoot down. Well, scroll up.  Oh, my apologies, scroll down. I said it wrong way.

So that will be all under the first -- you can keep scrolling.  That will be under the first one.  Okay.  Yes.  So that'll be under the first section of the report.  Then, if you scroll down a little bit more, is when the supplement was put in.

You can keep scrolling.  There.

So then, on November 3rd, at that timeframe, is when I served that warrant.  And

that's when we were informed that the warrant was granted.

BY MR. BRUCE:

Q. Okay. So right here, after the narrative section, there's a parenthetical that says 11/3/2024 1442, is that the time that you entered that information into the form?

A. Correct.

MR. BRUCE: Okay. So can we scroll back up to the other narrative section? Okay. Pause.

BY MR. BRUCE:

Q. So here it says, a warrant was obtained for Ms. Rachmuth for cyberstalking, nothing further. And then it says 11/3/24 6:29.

Does that mean that you completed that section on November 3rd?

A. That morning, yes. Because like I said, I started on the 2nd, but I didn't finish. So you have to -- there are certain things -- like, there are certain things in the reporting process that have to be at least in the system to generate a report. Once that's done, like the initial stuff, once the finalized stuff of that original report is put in, then that

timestamp of how it is at that 6:29, which was me being here doing the report at 6:29 in the morning, is when it was finalized.

Q. Okay. So the narrative section of the report wasn't finalized till 6:29 a.m. on November 3rd; is that right?

A. Correct.

MR. BRUCE: Okay. Can we scroll to Page 4 of the report? I'm not sure where we are.

BY MR. BRUCE:

Q. Okay. In the middle of this page, there's a label for suspect hate, slash, bias motivated, and it says anti Islamic, parentheses, Muslim.

Do you see that?

A. Yes, I do.

Q. Is that a designation that you provided in the report?

A. I don't recall that, no.

Q. Was there anyone else working on the report that could have input that designation?

A. Possibly supervisors. They have access. But like I said, from my knowledge, no.

Q. Okay. But you don't specifically recall designating this an anti-Islamic, parentheses,

Muslim?

A.  Correct.

Q.  Do you know if they're -- if the Holly Springs Police Department has a standard definition of what a suspect hate, slash, bias motivated incident might be?

A.  Possibly, but I do not know at this time.

Q.  Okay.  Do you know what the basis for designating this incident anti-Islamic, Muslim, was?

A.  You said what were the basics?

Q.  What was the basis for that anti-Islamic Muslim designation?

A.  No, I do not know the basis.

Q.  Are incidents that are labeled suspect hate/bias motivated treated any differently than normal incidents and investigations?

A.  Oh, no. You still be -- we still treat it as if you were a regular citizen, like nothing that occurred.  Like I said, we'll try to -- our job is to figure out what the issue was from one party's side and also see what the issue is depending on the situation from the next party's side.  And if it's something past

our range, that's when we'll leave that to the investigators for that.

Q. Okay. You said that's when you would leave it to the investigators. What do you mean by that?

A. So if all leads are exhausted, that's when we would -- for an officer standpoint, because we can only do so much from officers -- or, excuse me, from a patrol standpoint. We only do so much from a patrol standpoint because, once again, we're also receiving other incoming calls for service that we also have to answer, as well.

So we could do what we're able to do on our end, as much information that we could provide, and then that's when we will forward that information to investigations.

Q. Did you ever forward any of this information about Ms. Rachmuth's case to investigations?

A. No.

Q. Why not?

A. Once again, as I stated earlier, with the victim stating what she said and the witness, which was the management of the victim

and what she said, both stories had aligned to where -- as well as the evidence that I received that I felt -- once reading the elements for that, I felt were within a patrol level standpoint.

Like I said, it was clear as day that the post was from Ms. Sloan or her Twitter page. There wasn't anything else outside of that for me to do if it came directly from her page.

Q.   Are you required to send a case to investigations at any point?

A.   If you're not -- once again, if you're not able to handle it from a patrol standpoint, then yes.  So if I didn't have, like, enough time frame to do so.  But like with me in FTO training, they try to expose you as much as you can, especially if it's calls that you don't normally get, so if you do have it by chance later on down in your career, you'll kind of have at least an idea or a reference to do it or how to maneuver from that situation on forward.

So like I said, that was being our -- my first, like, one with having to do an arrest warrant and things like that.

Q.   Okay.  Are you familiar with Holly

Springs' written directive regarding follow-up investigative notifications and responsibilities?

A. Bits and pieces. I can't recall everything right now, honestly.

MR. BRUCE: Okay. Can we pull up Tab 3? And we can take this one down.

THE REMOTE TECHNICIAN: Stand by.

MR. BRUCE: Yeah, let's zoom into the top there. This will be Exhibit 3.

(Exhibit 3 was marked for identification and is included with the transcript.)

BY MR. BRUCE:

Q. So the top says, Holly Springs Police Department written directive, Chapter 800 operations, Directive 840.01 follow-up investigative notifications and responsibilities.

Do you recognize this document?

A. At the time, possibly not, because I was still new to FTO training. And then, like I said, there's a lot of policies we got to refer and review. So I can't remember exactly detail for detail.

Q. Understood.

Do you recognize the document as you sit here today?

A. Yes.

MR. BRUCE: Okay. Let's go to -- give me one moment. Can you scroll down and see what the Bates number at the bottom of this page is? Okay. Can we go to 592, please? Okay. Let's scroll up to the start of this section. So scroll up to the next page, sorry. Okay. Pause there. Wait. Can you go to the bottom of this page?

BY MR. BRUCE:

Q. All right. So this says Criminal investigations section, responsibilities, notifications, and responses.

What is the criminal investigation section?

A. Your investigation of your case or incident.

Q. Okay. I guess, is it a separate section of investigators or are all officers in the criminal investigation section?

A. No. So there's another section. Like I said, from a patrol standpoint, we do have a weekend to investigate the report. After, if

we're unable to retrieve any information, which we'll say -- leads are exhausted or along those lines, that's when we will forward that information to an investigator upstairs so they'll be able to, I guess, look deeper into the situation.

Q. Okay. So as a patrol officer, you were not a member of the criminal investigation section; is that right?

A. I'm not a part of the investigators upstairs. As a patrol, you can investigate.

Q. Right.

A. But what I'm explaining is, to a certain degree, information wise or evidence that I have, I can use that still for my report, even though I'm not necessarily the title of an investigator. But I can still receive whatever information I have and report it in my report.

Now, certain things, depending on the case-by-case basis, I might not be able to have that time to pursue and look deeper into and do certain things for. So that's when we'll have to forward that to the investigators, to where that's their sole -- their sole thing is to investigate, you know, what you weren't able to

receive or get on your end.

Q. Okay. And when you say forward that to the investigators, are those the members of where it says under Section A, the General Investigations Unit?

A. Correct.

Q. Okay. So under (A)(1), it says the responsibilities of the General Investigations Unit. The unit -- the General Investigations Unit will be notified of and is responsible for investigating the following crimes.

Do you see that?

A. Yes.

Q. Okay. And then there's a list. And we're going to go down to the next page.

A. Okay.

MR. BRUCE: And pause there.

BY MR. BRUCE:

Q. At J, it says ethnic intimidation or hate crimes. Do you see that?

A. Okay.

Q. When you designate in an incident report that is an incident as a suspect bias or hate motivated crime, like we saw in the incident report, is that what triggers this notification

to the General Investigations Unit?

A. It could. But same token, with information I had, it was very limited, so I can't necessarily say. Because like I said, all I'm going is based off of that post. Like I said, she has her right to say whatever she, you know, of course, feels, whatever Ms. Sloan feels in reference to that situation.

Q. But in the incident report, the incident involving Ms. Rachmuth was designated a suspect hate bias motivated incident. Is that -- that was right, correct?

A. Cyberstalking.

Q. Right, but we saw on the incident report -- and let me know if you want to go back and look at it -- but it said suspect hate/bias motivated anti-Islamic, Muslim, that we saw earlier. Was that right?

A. That's correct, but you also asked me if. I recall putting that down in the report. And I also stated I do not recall that portion.

Q. Right. But do you acknowledge it was in the report that we saw?

A. Yeah. It was in the report.

Q. Do you have any reason to believe that

copy of the report was incorrect?

A. Like I said, I don't know what her -- Ms. Sloan's beliefs were for that. It might not have been religion. It might not have been a hate crime. I don't know. But it was into where it felt it touched a nerve for her to post that on social media and tag, you know, like I said, the business and wherever the business was.

Q. Understood.

My question here is, just did the fact that the incident was labeled in the incident report anti-Islamic Muslim bias motivated incident, under this policy, would that mean that it was supposed to have been referred to the General Investigations Unit?

A. If you could scroll up.

MR. BRUCE: Yeah, go ahead and scroll up.

THE WITNESS: Okay. Yeah. Based off of policy, yes. Well, that section of Section 1, responsibilities.

BY MR. BRUCE:

Q. And was Ms. Rachmuth's case ever referred to the General Investigations Unit?

A.   No, I did not send it to General Investigations for investigators.

Q.   Was that in violation of this policy?

A.   Not necessarily.

Q.   Because, like I said, depending on what information -- like I said, we didn't know it was necessarily a hate crime, whatever.  That portion that you're -- you keep bringing up about the Muslim, the anti crime, like I said, I don't recall putting that in there, so I can't necessarily say, yes, it is in there, but I don't necessarily remember me putting that into the report.  So I can't tell you for that reference.

        MR. BRUCE:  Okay.  Let's take this one down.

BY MR. BRUCE:

Q.   So after you obtained the arrest warrant, what did you do next?

A.   Due to the timeframe -- as I said before, it was towards the end of the day timeframe-ish, so I wasn't, like I say, able to see if that was granted or not 'till the next day.  And I wasn't able to finish my report until the next day.

Like I said, I started originally on the 2nd, but for it to be submitted in the system, it wasn't until the 3rd.

So, I might have probably, if so, did like whatever touch up things that I felt I needed to do before leaving to try to give me a reminder before leaving or a leave point to finish off for the next day. But I can't necessarily say that time frame.

Q. Okay. So when did you go to arrest Ms. Rachmuth?

A. November 3rd.

Q. Okay. And was that after you finished your report that morning?

A. After, yes, sir.

Q. What time did you arrive at Ms. Rachmuth's home?

A. I don't remember the time frame.

Q. Do you remember if it was morning, afternoon?

A. Between 9:00 and 11:00-ish.

Q. Okay. Do you recall what day of the week it was?

A. I can't.

Q. Who else accompanied you?

A. Officer Marino, Officer Hernandez.

Q. And what were their roles in accompanying you?

A. Hernandez is my primary FTO. As I said before, he was off the day before, so that's why I was with Officer Marino, which was my secondary FTO.

Q. Okay. So did he have to join you as your FTO?

A. Who? Hernandez or --

Q. Sorry, Hernandez. Sorry.

A. Yes, because he was back the next day. So he's my primary. So if he's your primary, that's your main FTO throughout your whole process.

Q. Okay. And why did Officer Marino join?

A. He knew a bit of the investigation in the background since he was with me FTO wise the day before and assisted me with that guidance and was with me, as well, when we spoke with supervisors.

Q. Okay. Was there any other reason to bring three officers to the arrest besides they were just one was familiar and one was your FTO for the day?

A.   Well, technically, I'm not necessarily -- I'm an officer, but while you're in FTO phase, like you're not necessarily a certified officer, so you have to respond with your FTO.  So that's going to be your two -- your two officers at all times in a vehicle.  It will never be just FTO in a separate vehicle and a -- his training in another.  It doesn't work like that.

Now, operations of the vehicle, I mean, yes, I will be driving and further things in the vehicle, but my FTO will also be with me and the passenger everywhere I go from call to call, whatever it is.  So he -- that is a must.  He won't be leaving, FTO purposes.

Like I said, Marino was the second officer, second certified officer.  That's not, of course, in FTO training to go.  So technically, with certain calls, we're supposed to respond with two people.

Like I said, with me being in training, I'm not technically able to be by myself yet with certain things because certain things I haven't encountered or ran by quite yet in my career.  So we always have two officers

wherever, for the most part, wherever we go.

Q. And how many patrol cars did you bring?

A. Two, myself and Officer Hernandez, the primary FTO was in one vehicle, and Officer Marino was in his vehicle.

Q. And where did you park when you arrived to Ms. Rachmuth's home?

A. If I'm not mistaken, about -- her house, her backyard -- about a house or two back from her residence.

Q. Okay. And why did you decide to park a house or two away from her residence?

A. As we spoke earlier, for officer safety, if you just approach into the front of somebody's house at random, there's people that do like the police, that don't like the police. If they know possibly they might have a warrant, you know, they might run. It just depends on different scenarios.

At the end of the day, it's still officer survival just to make sure you make that approach as peaceful and calmly as possible and not to where that possible suspect is -- if they are there and they're like, you know, they know that they have, like I said, that situation

where they have a warrant or whatever the case may be and they try to run, that's another situation, you know.  So just try to deviate that, anything to go further from there.

Q.  Do you have any evidence at the time that Ms. Rachmuth would be a danger to officers?

A.  I did not know.

Q.  Did you have any reason to believe she didn't like the police?

A.  I never met her, so I cannot say that.

Q.  Okay.  Well, what kind of neighborhood were you in?  Was it a residential neighborhood, a downtown neighborhood?

A.  Residential.

Q.  Okay.  And why not park in her driveway or right in front of her house?

A.  Once again, I don't -- I don't know what her thought process is.  So officer safety. Some people may like officers.  The same may not.  Like I said, when some officers, we approach certain calls, individuals may try to flee.

Even if they don't try to flee -- if I'm not mistaken, she wasn't even outside when we approached, but to where before I even took a

step on her porch, she had already opened the door and seen me. So clearly she had already seen us approaching, or if not, had already parked to where she was able to approach the door before I even rung the doorbell or knock on the door. So that's just like a few things for officer safety we have to look at.

Q. After you arrived, what did you do?

A. Once we arrived, I just asked her, you know, is Ms. Jennifer -- or Sloan -- I believe that I asked if she was present. She's like, yes, that's me. She came outside, closed the door, and just -- I just let her know that we had an arrest warrant for her. She was a little shocked.

Then moments later, I know her husband had opened the door and came outside, as well.

After that, more so at the speaking time, Officer Marino, Officer Hernandez kind of jumped in and helped me with that because I've never been in that situation. So I didn't really do too, too much talking in reference to about the details of the arrest warrant, what this, that, and the third was. My presence was more so when I had put her in cuffs. And like I

said, I escorted her to the car, just gave her a quick pat down, made sure she had nothing harmful for herself, myself, or others. And then, like I said, to escort her to the jail.

Q. Okay. When you were on -- you know, you said there was a point where Officer Hernandez and Marino were conversing with her.

What, if anything, did Ms. Rachmuth say to the three of you before she was arrested?

A. She just seemed very shocked. I can't remember exactly details of exactly what she said. She just seemed pretty shocked about it. I know we did give her like a couple -- I know she was a little shocked, so that's probably why she probably heard us, but certain things didn't necessarily register. But Officer Hernandez did give several directives for her to turn around so I could apply the cuffs.

But what is it? I know she was trying to -- I don't know, she didn't want to necessarily say too much in front of her husband at the time.

Once he went in, she allowed me to cuff her, and she was saying she knows the law in reference to general stuff, period. But she was

allowing us or letting us know, information wise, that there's a segment in cyberstalking to where she's able to have her speech -- public speech, which we understood that, not saying she was wrong in reference to that, but whatever probable cause that we had for the magistrate, for them to grant that arrest warrant and proceed, seemed enough for us to get the arrest warrant and go further.  So that's what the officers were trying to let her know in reference to that.

She asked if we could -- if she was allowed to get more clothes because she wasn't fully dressed.  I guess she was in night clothes or lounge wear, whatever the case may be.  So we did allow her husband to get her clothes and shoes.  I think she might have asked for a phone, wallet.

She did ask, I guess, certain questions about if the magistrate would be there.  Would she be able to bond out?  Officer Hernandez did allow her -- tell her the process.  I can't remember exactly what he said, but he did tell her the process of how that would work after seeing the magistrate.

Afterwards, we did ask her if we could go cut through her yard because we wasn't necessarily trying to make a scene about the situation versus walking down her driveway, then come all the way back around. We just cut through her yard so we can get to the cars quicker.

I took her to my vehicle, let her know that before entering, I do have to check her just to make sure she didn't have any weapons to injure myself, any others. After that, she had nothing sharp on her. I placed the seatbelt on once she got in the vehicle.

She asked if she was able to do something where her -- an itch. I think itch her face or nose or something, about her glasses. I asked her how she would be able to do so, and she said in a jokingly manner, like, oh, I'd use my knee, and then she used her knee to either fix her glasses or itch her nose, and that was that.

Q. Okay. At any point during the arrest, did She threaten officers?

A. No.

Q. Did she cooperate with your instructions

during the arrest?

A. Like I said, when Officer Hernandez asked her several times to turn around so I could put the cuffs on, she didn't want to. I won't necessarily say she didn't want to. I guess I said she was shocked because we were there and trying to get an understanding for it.

But as I'm not mistaken, Officer Marino said, you know, just, you know, allow us to cuff you so we can explain the situation further, and then anything else after that is what will have to be discussed with the magistrate or wherever direction she may need to go from there.

Q. You mentioned she asked for a change of clothes; is that right?

A. Yes. She asked if she can get a change of clothes.

Q. Did you let her put a different shirt on or anything before you handcuffed her and walked her to the car?

A. Well, like I said before earlier, she asked. And Officer Hernandez asked if her husband could get her items for her.

Q. Okay. But did you let her change clothes before you left her house?

A.   That was up to her once her husband brought the items back to put certain things on. Like I said, I know she had shoes on.  I can't really recall about the shirt, if she did the shirt or not, or if they did or did not find the shirt, but we did allow the husband to retrieve those items for her.

Q.   Okay.  Were you wearing a body worn camera during the arrest?

A.   Yes, sir.

Q.   Was it activated during the time?

A.   Yes, sir.

Q.   Your discovery responses indicated that the footage had been destroyed pursuant to an expunction order that Ms. Rachmuth obtained; is that right?

A.   Correct.  I was trying to get the original documentation, because we worked through an RMS system at the time.  We're now through Axon.  So, certain information, of course, at the time, we're not able to access as a patrol level.

Now, if you're maybe like a supervisor or higher and above that, possibly a records attendant or a captain, lieutenant, some of that

nature, where they're able to access it, maybe, but no one was able to access it because it was expunged.

Q. Okay. Who's in charge of deleting materials after the expunction?

A. I don't know how that process works, so I cannot tell you.

Q. Okay. Are you involved in that process at all?

A. No, sir.

Q. But last week you did produce body cam footage; is that right?

A. The agency was able to provide the body cam footage. My login information was not accessible at the time.

Q. Okay. So who ultimately was able to obtain the body cam footage?

A. I don't know who was able to obtain the body cam footage.

Q. Okay. But it wasn't you?

A. No, it wasn't me, because like I said, my account I just had to reset to get it up to par.

Q. So someone else at the police department was able to obtain it; is that right?

A.   Correct.

Q.   Okay.  Do you know if there are any other documents related to the incident and the investigation that might be located somewhere you haven't searched?

A.   Of my incident?

Q.   Yes, your incident.

A.   No.  The only -- like I said, the only recording system that we know was through RMS. RMS is no longer with us.  They've deleted that. I know certain files were transferred to Axon, but that was not found in Axon.

And like I said, due to that expungement, our records keeper was not able to find anything or have anything.

Q.   Do you know why the body cam footage that was produced last week was not destroyed pursuant to the expunction?

A.   I do not know.  Like I said, I didn't provide the body camera footage, so I have nothing to do with that.

Q.   Okay.  So when I looked through the body cam footage that was produced, there's a bunch of different types of file formats, and maybe you have experience looking through this.  There

were three .mp4 files that appear to contain body cam footage from you, Officer Marino, and Officer Hernandez, and there was a dash cam video that appears to be you going to the detention center after the arrest. So that would be four videos.

Are there any other dash cam or body worn camera videos that would have been recorded?

A. No, those were the only individuals around for that situation. So, no.

MR. BRUCE: Okay. Can we -- I'd like just to watch some of your body cam footage. I don't want to belabor the point here, but I think it just helps walk through some of this.

So, can we pull up Tab 10, please? And this is a video. So, whatever you can do.

THE REMOTE TECHNICIAN: Stand by. So currently, I'm having some difficulty with opening the file. It seems I'm getting an error message in regards to it. Any chance, do you have it on your computer that you can share?

MR. BRUCE: I do. We'll see if I'm technically proficient enough to do that. Give me one second.

THE REMOTE TECHNICIAN:  And when you do share, it's going to ask on the side, share, I believe it's computer sound, and just make sure that clicked.

MR. BRUCE:  Okay.  Give me one second. Okay.  Can we see this?

THE WITNESS:  Yes.

MR. BRUCE:  Okay.  There's that.  What'd you say about the sound?  I didn't get a pop up or anything.

THE REMOTE TECHNICIAN:  Try playing it and see if it does it automatically.  You're good.

MR. BRUCE:  Okay.  So we're going to watch the first minute or so of this, and I'm going to ask you some questions about it, Officer Warren.

(Exhibit 10 was marked for identification and is included with the transcript.)

(A video identified as Exhibit 10 was played over the videoconference.)

MS. BARBER-JONES:  I'm sorry to interrupt, but I don't think that the audio is coming through.

MR. BRUCE:  Sorry, what was that?

MS. BARBER-JONES:  Oh, I suspect the audio may not be coming through, but if you can --

MR. BRUCE:  Yeah.

THE REMOTE TECHNICIAN:  Yeah, so if you go to -- if you click share on your Zoom, it should have an option.  It says share computer sound.

MR. BRUCE:  Got it.

THE REMOTE TECHNICIAN:  Do you see it?

MR. BRUCE:  I see that.  Should I do mono or stereo?  Does it matter?

THE REMOTE TECHNICIAN:  Do stereo.

MR. BRUCE:  Okay.  Let's try this again.  Does that work?

(A video identified as Exhibit 10 resumed playing over the videoconference.)

BY MR. BRUCE:

    Q.  Okay.  So this point you walked up from the patrol car to her house, correct?

    A.  Yes.

    Q.  About how long do you think it took you to make that walk up to her front porch?

    A.  I don't know.  I didn't keep time.

Q. Okay. We saw her ask to put on a shirt; is that right?

A. Yes.

Q. Okay. And did you ever let her put on that shirt before you left her house?

A. I don't recall right now. If not, we brought the shirt so we could make sure that she could change into it while at the jail.

Q. Okay. But not necessarily as you were walking her back to the patrol car?

A. No, because then I wouldn't have -- I wouldn't have control of her. Because if something happened to her, then I'm held responsible or liable in case she falls, fall injury, or somebody, you know, decides to come out and attack her or anything like that.

Q. Why would -- why would that matter as to whether she could wear a shirt back to the patrol car?

A. Well, you asked if I allowed her to put the shirt on while escorting her back to my vehicle. So, once we were going down the hill, that's one thing. If I don't have control of her, she's not balanced or whatever the case. She might have been -- or what if she was

drinking by chance like wine or something in the morning? I don't know that stuff. So, while she walks down the hill, I have to make sure of her safety that she's fine for that first.

And then, like I said as well, with where we parked at, which is about, I said, that house or two back, I don't know if she's necessarily -- have friends or have good residents where they have good standings.

So at that time, for me, her safety is more important to make sure she gets to the car safe as possible.

Q. Okay. You hold me to my words, so I appreciate that.

But I guess my question was before you -- before you left her front porch, you did not give her an opportunity to put the shirt on; is that right?

A. I said, yeah, I don't recall. And if so, I did receive the clothes to make sure she put them on before entering the jail.

Q. Okay. At this point, has she given any indication that she is not cooperative?

A. Well, to me, with several directives from Officer Hernandez -- like I said, it's kind

of like in the middle, like not necessarily antsy, but she's in the middle, like I do, but I don't. So we don't know how to take that as an officer standpoint if we're asking you more than like two or three times to do so.

Q. Okay. But she hasn't said she won't -- you know, she won't comply, correct?

A. Yeah, she didn't say she wouldn't, but she didn't comply neither.

MR. BRUCE: Okay. Let's watch the next minute or so.

(A video identified as Exhibit 10 resumed playing over the videoconference.)

MR. BRUCE: Okay. We'll pause there.

BY MR. BRUCE:

Q. At the time you were on her front porch, were you aware that her children were home?

A. No. I didn't hear or see any children. I just heard the dog and her husband.

Q. Okay. So at this point, you have handcuffed Ms. Rachmuth, and officers Hernandez and Marino are discussing the charge with her, correct?

A. Correct.

Q. And I believe it was Officer Marino, but

correct me if I'm wrong, but he mentions that the basis for the charge is the post about the Harris Teeter employee on X; is that right?

A.   Correct.

Q.   Okay.  At this point, has anyone read Ms. Rachmuth's Miranda rights?

A.   No.  Not at this point, no.

Q.   Why not?

A.   I can't say for that time, honestly.

Q.   But you handcuffed her, right?

A.   I did, yes, sir.

Q.   Okay.  When did you or one of the other officers read her Miranda rights?

A.   I don't recall, honestly.

Q.   Did you ever?

A.   I know -- I just said I didn't, honestly.

Q.   She informed you that she experiences panic attacks in that video; is that right?

A.   She did.

Q.   Once she notified you that she experiences a panic attack, were -- based on your training, were you under any obligation to respond in any way?

A.   Respond when?  If she had a panic

attack, to say what was done or said about it, or are you saying at that time when she had let us know about her having them?

Q. Yes, at that time, were you required to respond in any way to prepare in case she had a panic attack?

A. I mean, she didn't say she had one. So if she says she had one or she felt she was about to have one, then that's when I would have called. We would have had EMS come before even taking her. But she was just -- from that interaction, was just letting us know that she does have them and they could happen upon her escort to jail.

So that's when she had asked about the water if we could make sure -- no, if we had water for her to access or she could bring one. That's when Officer Hernandez had said, you know, you can bring a water bottle as long as the seal is closed.

Q. Okay. And you all let her bring that water bottle in the car, correct?

A. Correct.

Q. Did you ever have access to that water while she was in the car?

A.  I did not, no, sir.

Q.  Did you hand the water bottle to her at any time?

A.  I don't recall.

Q.  Did you leave it in the back seat with her?

A.  Possibly the back seat, but like I said, I don't recall.

Q.  Would she been -- would she have been able to drink the water bottle in the back seat?

A.  She would have -- if she needed one of our assistance, we could have opened the water bottle and gave it to her if she felt comfortable.  But some people may or may not feel.  And then some people may want to get out of cuffs, and we cannot take you out of cuffs, especially if we're not at the original site of arresting.  Or like we're on the side of a highway, I just can't necessarily stop right in there, depending on the situation, to where I can just stop to give you water.

Q.  Okay.  But I'm saying, like you said, if she asked and you were able to give it to her, you would have?  Is that --

A.  If she felt comfortable with me opening

her water bottle and allowing her to drink.  I
would have given it to her if she felt
comfortable.

Q.  And during the car ride there, did she
ever ask for water?

A.  I know -- did she ask for water?  I
can't remember if she asked about cuffs, her
handcuffs, or water, so I don't want to tell you
incorrectly.

Q.  Okay.

A.  But she didn't state that she had a
panic attack.

Q.  She didn't say she had a panic attack?

A.  Not -- no, not in the vehicle.  If that
was the case, like I said, then that would have
been another situation to where I'd try to drive
to a medical or hospital to get her further
evaluated.

But just to ask for water is not saying
that you're having a panic attack.

Q.  Given that she notified you that she had
panic attacks and wanted to bring water for that
purpose, would it have been reasonable to
conclude that if she asked for water, she was
having a panic attack?

A.  I don't --

MS. BARBER-JONES:  Object to form.

You can answer.

THE WITNESS:  I can't assume.  I can only go based off the information that she provides me.  So if she asks me for water, then I can give her that water.  But if she doesn't say, I need water, I'm about to have a panic attack, I can only go so far within my realm.

MR. BRUCE:  Okay, I'm going to skip ahead a bit to 4:32.  We'll watch the next minute.

(A video identified as Exhibit 10 resumed playing over the videoconference.)

MR. BRUCE:

Q.  Okay.  We'll pause there.

So at this point, you walk her from her house through a yard and down the street, correct?

A.  Correct.  I cut through the house, down her front yard of that hill, and walked her down to the street to my vehicle.

Q.  Do you know how many houses were kind of in the vicinity of where you walked through to your parked vehicle?

A.  I do not.

Q.  Would it be safe to say, based on the video, there were maybe six in that area?

A.  Possibly.  I didn't verify to check how many houses there were.

Q.  Okay.  Did you see -- she referenced one neighbor that was a nosy neighbor.  Do you remember that?

A.  Yes.

Q.  Did you see that neighbor outside?

A.  It was one of the houses to the right hand side of the video.

Q.  Okay.  Was that neighbor outside --

A.  On the porch.

Q.  -- during -- were there any other neighbors outside?

A.  No.

Q.  Did you see any neighbors peeking through the windows or anything like that?

A.  No.

Q.  Was that something you were looking out for?

A.  Once again, her safety is in my hands while she's cuffed.  So I will keep my head on a swivel and then look and surveillance the area.

So when she stated that, oh, this is going to be on Facebook, and then she said something in reference to the neighbors, you'll hear me respond, oh, to the right? And she said, Yes. So then that's when I had verified -- because, like you just said, there is several houses around her. But to verify where that neighbor is, because I said, I don't know if they have -- they're on good terms, good understanding. I don't know that.

But I just -- like I said, at that timeframe, her safety is my main concern.

Q. Is it possible there were other neighbors in the houses or on a porch that you didn't see during this time?

MS. BARBER-JONES: Object to form.

You can answer.

THE WITNESS: I don't recall.

BY MR. BRUCE:

Q. You don't recall seeing any others?

A. No, I do not recall seeing any others. The only one that I did, like I said, see was the one that she did acknowledge. Like I said, my head was on a swivel. But the one that she said that was -- that we both stated that was

outside somewhere to the right of those houses.

Q.   Okay.  But it's possible others could have been out there and you just didn't see them?

MS. BARBER-JONES:  Objection.

You can answer.

THE WITNESS:  If so, they would have been on the yard or they would have been on the porch to where we've seen something.  Same way that she's seen that president -- or excuse me, her neighbor on the porch, I'm quite sure she would have said the same thing for the other neighbors if they were on their lawn or on their porch.

But as I said before, I didn't see any. I only seen the one to the right hand side of that video while walking her back to the vehicle.

MR. BRUCE:  Okay.  I am going to stop this share.  And just for the Planet Depos people, that video will be Exhibit 10.

BY MR. BRUCE:

Q.   Where did you transport Ms. Rachmuth after you arrested her at her home?

A.   Wake County Detention Center.

Q. Did you communicate with anyone at the Wake County Detention Center before her arrest about her?

A. No.

Q. Did you communicate with anyone at the Wake County Detention Center -- after her arrest -- about Ms. Rachmuth?

A. Me bringing her, yes. Of course, there's paperwork that we have to do before they accept any suspects or offenders to come in. So, of course, you're going to have to say what's the CR number for the arrest warrant, your reason, time of arrest, were they compliant, who's the officer that's bringing them in? So there are certain processes that you're going to have to do. You just can't go walk straight through the jail and then drop her off.

Q. Okay. Do you tell them any of the underlying conduct about the charge?

A. No.

Q. Okay. You said you have to tell them whether they're compliant; is that right?

A. There's a sheet that I don't remember exactly. But most of the time it's like, is this a domestic? Yes or no? Was there, like,

possible use of force used?  Yes or no?

There's other questions that it might ask.  It's just a yes or no question, but I can't remember them all at once right now.

Q.  Okay.  Is one of those questions whether the suspect was compliant with the arrest?

A.  Possibly.

Q.  Do you remember what your answer to that question was?

A.  If she was compliant?

Q.  Uh-huh.  Yes.

A.  Yes.  Yeah, we didn't use force or anything like that, so --

Q.  Okay.  Did you tell them anything else about Ms. Rachmuth?

A.  No.  I didn't know her.

Q.  Okay.  After you drop Ms. Rachmuth off at the Wake County Detention Center, what else did you do with respect to this case?

A.  Like I said, that was case closed from my end, from that standpoint.  Like I said, the arrest warrant was met.  And like I said, I did that supplement, that was later on done that day.  I forgot the timeframe, but I did put that supplement in for me doing the arrest warrant.

Outside of that, that was it.

Q.  Okay.  So besides the supplement, was there any other paperwork you had to fill out?

A.  No, because the narrative was done before I even went to serve the arrest warrant.

Q.  Were you -- or did you have any involvement in Ms. Rachmuth's bail determination?

A.  No.

Q.  Were you ever asked by the magistrate or the district attorney's office to present facts in support of a bail determination?

A.  No.

Q.  Do you know why Ms. Rachmuth's bail was set for the amount at which it was set?

A.  I don't even know where her amount was.

Q.  How are you doing, Officer?  Do you need a break or do -- we can keep going for a few more minutes?

A.  How much more are we going?

Q.  I'd like to push through.  If we push through, I probably have less than an hour.

A.  When would be the next break if you're trying to push through?

Q.  We could probably do one in 10 or 15.

Or you want to break now and then just try to finish it up?

A. We can push through, yeah. As long as it's 10 or 15, yeah, I have no problem with that.

Q. Well, I don't want to hold -- you know, don't hold me to it, but let's do a little bit longer, and if we hit -- if, you know, we hit 7:50, we'll take a break.

Okay. So are you aware that the District attorney dismissed the cyberstalking charge the day after the arrest?

A. Not necessarily the day after. I've heard about it, but I don't think it was, like, the day after when I heard about it.

Q. When did you hear about it?

A. I don't recall. It wasn't the day after, though.

Q. Are you aware that the district attorney stated the reason for dismissing the charge was that the described conduct does not meet the elements of the offense?

A. I don't recall.

Q. Did you ever review the order of dismissal?

A.   No.   I was informed about it, but like I said, I was through the FTO process, so I wasn't solely focused on just that case.  I had other things I had going on, as well.

Q.   You said you heard about it.  Who told you about the case being dismissed?

A.   I can't recall.

Q.   Okay.  Did they give any reason why it was dismissed?

A.   Not in my understanding, no.

Q.   Okay.  What was your reaction when you learned the charge was dismissed?

A.   No certain reaction.  I mean, I did what I could with -- on my end.  If it was felt that otherwise, I -- that's something I allowed the magistrate or the judge to figure out or the lawyers to figure out.

Like I said, for me to put my arrest warrant in and for the magistrate to grant it, clearly there was something that was said or seen on her end or his end to say yes or no, you know, we will grant you this.

But I'm -- it's not nothing like, oh, yes or oh, no, like she's out.  Nothing like that.  I don't know her.  I don't know the

victim.  I don't know the witnesses.  Like I said, I'm just here to, you know, keep the peace.

Q.  Do you think you kept the peace by arresting Ms. Rachmuth that day?

A.  I felt I did, yes.

Q.  Why do you feel that?

A.  As I said earlier before, to where the victim did not return back to work for several days.  The management saying, you know, she didn't return back several days.  I'm quite sure they probably were trying to talk to her and see if she was willing to.  But, you know, if the victim is not there mentally for it, then the victim is not there mentally for it.

As well as, like I said, for her to have to take her kids out of school.  That's a big one.

Because, like I said before to where calls were already made to the Holly Springs Harris Teeter, granted anything could happen, to where what if that call was made to the school or the person find out wherever the kids hang out, whatever the case may be?  You don't know those situations until it happens.

So to prevent it on my end as an officer with the victim feeling that she was harassed, threatened, and harmed to where she didn't even want to return back to her only job, that's pretty big to me.

Q. Did anyone at Holly Springs Police Department conduct any review or investigation into why the charge was dismissed?

A. Not that I know. There might have been, but not to my knowledge.

Q. Were you subject to any investigation or follow up after the charge was dismissed?

A. No, sir.

Q. Did any of your supervisors question you about the charge after it was dismissed?

A. No, sir.

Q. Were you subject to any disciplinary action after the charge was dismissed?

A. No, sir.

Q. Are you aware that Ms. Rachmuth filed multiple complaints with the Holly Springs Police Department between 2021 and 2023 about anti-Semitic cyberstalking?

A. No. I don't know her, didn't know her prior to. And I didn't join Holly Springs 'till

2024, so I was still brand new.

Q. Okay. So you said this was the only cyberstalking charge that you have pursued in your time at Holly Springs Police Department; is that right?

A. Yes, to where it's pushed out like this now. I've dealt with harassment, but for myself, yeah, this is the only cyberstalking charge I've done.

Q. What kind of harassment cases have you dealt with?

A. More so DVPO situations.

Q. What's DVPO?

A. Domestic violence protective order, excuse me.

Q. Okay. And you said this is the only case in which you sought an arrest warrant; is that right?

A. For my knowledge, yes, this is the only one. From my knowledge, I've never -- I've served arrest warrants, but from my knowledge right now, that's the only one I can think of.

Q. How many other incidents have you served as the investigating officer on since you started with Holly Springs PD?

A.  I don't keep numbers.  There's a lot of calls we receive, so --

Q.  Is it more than ten?

A.  Yeah.  That was the lead investigator, yes, sir.

Q.  Okay.  More than 20?

A.  I -- possibly, yes.  Been here for about almost two years, so --

Q.  Okay.  Did any of those incidents involve other incidents that were designated a suspected hate or bias incident?

A.  No.

Q.  So this is the only incident you've investigated that was designated as a suspected hate or bias incident?

A.  Yeah.  Everything is more so, like I said, domestic violence stuff, perhaps.  More so, like, you know, they were in a relationship where they were married and certain things civilly they want to do, child custody, certain things.

But nothing, like I said, with this. Even he say, she say, maybe through social media and they use that as evidence, but it wasn't posted, like, oh, this person here said, you

know, this date and time, this, that, and the third wherever allegations made a claim.

This was, like I said, the first time I did the cyberstalking, so --

Q. Were you aware that Ms. Rachmuth's mugshot was widely disseminated on social media after her arrest?

A. No.

Q. Were you aware that it was disseminated in newspapers after her arrest?

A. No.

Q. Did you see any public reporting about her arrest after the incident?

A. No.

Q. Did you or anyone at Holly Springs Police Department take steps to reduce any harm to Ms. Rachmuth after her mugshot was published?

MS. BARBER-JONES: Objection.

You can answer.

THE WITNESS: Nothing was said to me, from my understanding. So, no complaints or calls of service that I know of in reference to her mugshot being placed. I've never heard that, no.

BY MR. BRUCE:

Q. Have you worked on any incidents involving Ms. Rachmuth since her arrest?

A. No.

Q. Are you aware that Ms. Rachmuth has been diagnosed with exacerbated PTSD and required therapy as a result of her arrest?

A. No.

MS. BARBER-JONES: Objection.

You can answer.

THE WITNESS: No, I don't know her, so I don't know her situation.

BY MR. BRUCE:

Q. What's your reaction to learning that information?

A. What's my reaction? What now? Or were you saying from the time frame if I knew that?

Q. Just now, from learning that she suffers from exacerbated PTSD.

MS. BARBER-JONES: Objection.

You can answer.

THE WITNESS: I mean, everybody is going through something in life. Hopefully, she's just taking the proper procedures to get better or help her situation. But I mean, we're still all human at the end of the day.

BY MR. BRUCE:

Q. Have you communicated with anybody inside Holly Springs Police Department about Ms. Rachmuth after her arrest?

MS. BARBER-JONES: Objection just to the extent that it refers to privileged conversations.

But you can go ahead.

MR. BRUCE: Understood. I'll rephrase.

BY MR. BRUCE:

Q. Have you communicated with anybody besides counsel for you or the city about Ms. Rachmuth after her arrest?

A. I did speak to PBA.

Q. What's PBA?

A. What is it? The Police Bureau Association, if I'm not mistaken.

MS. BARBER-JONES: And so, if you talked -- any conversations with the PBA attorney would also not be included.

THE WITNESS: Oh, yeah, yeah, no.

MS. BARBER-JONES: Okay.

BY MR. BRUCE:

Q. Okay. I guess, did you talk with any other officers about Ms. Rachmuth after the

arrest?

A. Just the officers that were involved in the situation.

Q. Okay. And were those conversations in person or through emails or texts?

A. No, in person.

Q. Okay. And do you have a -- have separate electronic devices for work and personal use?

A. No.

Q. Okay. So do you use the same cellphone for your personal stuff as you use for work stuff?

A. Yes.

Q. Okay. And do you have a laptop you use for work?

A. Yes.

Q. Okay. Is that also a personal laptop?

A. No, it's a work laptop.

Q. Okay. Did you search your cellphone for documents and information regarding Ms. Rachmuth and your investigation into her case?

A. I can't recall. Like I said, I might have received -- because I have my email set to where I can receive work emails. So I might

have been able to look at it right on scene.  If not, I might have looked at it from a computer, so I'm unable to say for that one.

Q.  Okay.  Did you send any emails or text messages about Ms. Rachmuth and your investigation on your cellphone?

A.  No.

Q.  Okay.  Do you have any pictures or recordings relating to the arrest on your cellphone?

A.  I did have -- what is it -- the post later on that she had posted about me, Officer Hernandez, Officer Marino.  I have -- I've sent that in.  What else was it?  She also made another post, like I said, about me separately. I guess, like I said, trying to discredit me or whatever the case may have been.

You know, sometimes she called me by my name.  Sometimes I'd be the black officer.  It just, I guess, depended on how she felt at that time with her responses.

Like I said earlier, she did post my information Facebook wise and my actual page on her X account to where I received an unknown random friend request from an older gentleman

with white hair and he was bald.  But I blocked
him, and I also blocked Ms. Sloan and her
husband because, like I said, I don't know where
that came from.  And like I said, for people to
message me and say, like, you know, she's saying
this about you on social media, I don't know
where it's coming from.

So to try to deviate the situation, the
sources would be either Ms. Sloan, her husband,
or whomever else that got that information for
them.  I don't know.

Q.  Okay.  Other than those posts after the
arrest, did you have any pictures or anything
related to your investigation on your cellphone?

A.  There was someone, I guess, that was
trying to look me up that was -- had informed me
about she has another website that she posts her
stuff.

But like I said, this was after -- way
after the investigation.  Like, this was like
maybe this year type of deal.  That she had
looked me up and seen some -- I can't remember
other little posts or websites she has, but she
broke it down.  I guess I'm in her, like, legal
terms or however she felt legally about what

happened that day. And I guess how she was going to go further on from that situation.

Q. Okay. But was there anything on your phone from during the investigation that you collected and stored on your cell phone?

A. No. Like I said, I had made that copy of the picture from the email that the management was able to send to me.

Q. Okay. Did you produce the other thing, the other posts and stuff you referenced about that you collected on your phone in discovery?

MS. BARBER-JONES: Yeah, we will supplement the posts that Ms. Rachmuth made about the officers to the extent that we haven't produced those already. We were pretty sure she was aware she posted that information online.

And we will double check to make sure that there aren't any emails or other documents that we haven't produced yet.

MR. BRUCE: Understood. Thanks, Katie. I mean, I'm not as concerned about the post, just double checking about anything else that could be on a cellphone, but I appreciate it.

Okay. Let me -- let's take a quick break and let me go through my notes, but

that's -- that should be just about all I have
for you.  But give me ten more minutes and let
me double check everything.

THE WITNESS:  Okay.

MR. BRUCE:  Thank you.

THE VIDEOGRAPHER:  We are going off the
record.  The time on the video monitor is 7:54
p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the
record.  The time on the video monitor is 8:05
p.m.

BY MR. BRUCE:

Q.  All right.  I just have a couple more
questions, Officer Warren, and then we'll be
done for the night.

You mentioned that the calls to Harris
Teeter was something that you considered in
making your decision to charge cyberstalking; is
that correct?

A.  I won't say it was the main, but it was
a contributing factor.

Q.  Was it something that you considered,
though, when you were determining whether
cyberstalking was an appropriate charge?

A.  It was a contributing factor for the victim to not want to come back.  So you could say yes.

Q.  Okay.  Did you document the fact that those calls were occurring anywhere in writing at the time?

A.  I don't recall if I put that in my narrative right now.  I can't.

Q.  Okay.  Did you -- you also mentioned that the employee not wanting to put her children in school was something you considered; is that right?

A.  Yes, because she said she feared if individuals are already calling her workplace, she feared that if some type of information or whatever was leaked to where they knew her children stayed at, then that will put her kids as well as herself and family in a situation.

Q.  Okay.  Did she tell you that on the November 2nd phone call you had with her?

A.  Yes.

Q.  Did you document that in writing anywhere?

A.  I don't recall putting that in my narrative, no.

MR. BRUCE:  Okay.  That's all the questions I have.  I appreciate your time.  I will pass it to Ms. Barber-Jones if she has any questions.

MS. BARBER-JONES:  I don't have any questions.  Thank you so much.

MR. BRUCE:  All right.  Thank you, all.  I really appreciate it.

I wish you the best, Officer Warren.

THE WITNESS:  Thank you.

MS. BARBER-JONES:  Good night.

THE COURT REPORTER:  Counsel, would you like exhibits attached?

MR. BRUCE:  Yes.  Yes, please.

THE VIDEOGRAPHER:  This marks the end in the videotaped deposition of Elliott Warren.  We were going off the record at 8:07 p.m.

(Off the video record at 8:07 p.m.)

MS. BARBER-JONES:  And we would like to read and sign.

THE COURT REPORTER:  Okay.  Do you want a copy of the transcript, a regular copy?

MS. BARBER-JONES:  Does regular copy just mean an e-tran?  What does that mean?

THE COURT REPORTER:  Yeah, yeah, e-tran.

MS. BARBER-JONES:  Okay.  I don't want a physical copy, but I would like an electronic transcript with exhibits, please.

THE COURT REPORTER:  Okay.  Mr. Bruce?

MR. BRUCE:  We'll take the same.

(Off the record at 8:08 p.m.)

CERTIFICATE OF COURT REPORTER-NOTARY PUBLIC

I, Micah Hardin, the officer before whom the foregoing proceedings were taken, do hereby certify that said proceedings were electronically recorded by me; that the foregoing transcript, to the best of my ability, knowledge, and belief, is a true and accurate record of the proceedings; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

_____

MICAH HARDIN, NOTARY PUBLIC FOR

THE STATE OF INDIANA

                    CERTIFICATE OF TRANSCRIBER

            I, Roanna Ossege, do hereby certify
that the foregoing pages, to the best of my
ability, are a true and correct transcription
from the official electronic sound recording and
annotations of the proceeding taken on May 26,
2026, in the above-entitled matter; and that I
am neither counsel for, related to, nor employed
by any of the parties to the case and have no
interest, financial or otherwise, in its
outcome.


_Roanna S. Ossege_


_____

ROANNA OSSEGE
June 1, 2026

**A**

**a)(1**
176:7
**abhorrent**
116:3
**abilities**
30:12
**ability**
11:14, 227:6,
228:4
**able**
21:9, 24:15,
24:16, 28:25,
36:17, 37:22,
54:19, 65:13,
68:2, 71:25,
94:22, 100:17,
100:20, 101:10,
101:13, 101:21,
102:22, 102:23,
102:24, 103:3,
107:5, 111:12,
113:21, 113:22,
114:8, 115:8,
117:13, 119:3,
119:15, 119:25,
120:3, 134:1,
140:4, 140:20,
141:8, 141:23,
141:25, 145:20,
146:13, 148:5,
153:10, 154:1,
155:20, 155:21,
156:21, 157:14,
157:15, 171:14,
172:13, 175:5,
175:20, 175:25,
179:22, 179:24,
182:22, 185:4,
187:3, 187:21,
188:14, 188:17,
190:21, 191:1,
191:2, 191:13,
191:16, 191:18,
191:25, 192:14,
201:10, 201:23,
220:1, 222:8

**above**
103:2, 152:6,
190:24
**above-entitled**
228:7
**absent**
145:4
**abundance**
13:8
**abuse**
136:6
**abusing**
51:17, 135:21
**academy**
13:23, 139:3
**accept**
207:10
**access**
28:4, 99:21,
100:15, 100:18,
100:23, 101:8,
101:10, 101:13,
111:12, 111:22,
118:14, 119:17,
119:22, 119:24,
119:25, 120:3,
145:19, 146:13,
154:2, 154:10,
154:16, 155:13,
169:22, 190:21,
191:1, 191:2,
200:17, 200:24
**accessed**
101:23, 158:13
**accessible**
158:2, 191:15
**accident**
70:5, 71:9
**accommodate**
10:18
**accompanied**
180:25
**accompanying**
181:3
**according**
17:16, 113:3
**accordingly**
19:18, 35:24,

42:12, 55:17
**account**
98:15, 99:15,
101:4, 119:25,
191:22, 220:24
**accountability**
130:16
**accounts**
99:21, 100:4
**accurate**
36:21, 227:7
**acknowledge**
177:22, 205:23
**acronyms**
13:3
**across**
110:1, 110:17
**act**
149:18
**acting**
69:17, 70:1,
71:11
**action**
1:7, 213:18
**actions**
23:16, 130:5,
130:16, 130:17,
155:11, 161:16
**activated**
190:11
**activity**
53:14, 53:17,
53:24, 137:23,
138:1
**actual**
149:2, 220:23
**actually**
104:4, 106:22,
106:25, 107:3,
107:24, 136:25,
161:3, 161:4,
164:24
**add**
59:15, 111:24,
137:11
**added**
59:15
**address**
30:11, 30:13,

68:17, 68:19,
68:23, 73:3,
73:4, 73:5,
88:10, 96:6,
106:18, 132:10,
140:5, 140:24,
141:1, 141:3,
142:6, 142:23,
143:3, 143:16,
145:17
**addressed**
144:4
**administer**
7:7
**advise**
75:4
**affect**
47:19
**affidavit**
147:8
**affirmatively**
71:1, 71:15,
72:17, 72:18,
162:25
**afraid**
122:24
**african**
48:15
**after**
37:25, 61:7,
64:2, 64:7,
67:13, 68:9,
68:10, 68:21,
70:11, 74:23,
75:21, 75:25,
79:3, 81:13,
82:13, 87:17,
91:12, 93:4,
93:11, 93:13,
104:10, 104:13,
104:21, 106:4,
106:7, 111:8,
111:17, 112:2,
120:24, 122:4,
122:12, 125:7,
126:2, 126:25,
128:22, 132:16,
134:8, 140:23,

141:18, 143:7,
144:23, 145:22,
146:1, 146:5,
148:1, 148:6,
148:8, 156:10,
159:23, 168:4,
174:25, 179:18,
180:13, 180:15,
185:8, 185:18,
187:24, 188:11,
189:11, 191:5,
193:5, 206:24,
207:6, 208:17,
210:12, 210:13,
210:15, 210:18,
213:12, 213:15,
213:18, 216:7,
216:10, 216:13,
216:17, 218:4,
218:13, 218:25,
221:12, 221:19,
221:20
**afternoon**
8:10, 180:20
**afterwards**
23:16, 30:11,
104:15, 136:13,
188:1
**again**
10:2, 16:21,
23:20, 32:20,
39:5, 42:3,
48:3, 89:15,
89:16, 92:13,
92:17, 100:14,
101:16, 110:15,
112:11, 112:13,
115:1, 115:24,
116:16, 126:5,
127:17, 129:18,
132:18, 133:1,
135:7, 142:14,
144:4, 158:23,
161:1, 161:22,
171:11, 171:23,
172:12, 184:17,
195:15, 204:23
**against**
37:21, 47:25,

52:4, 52:10,
87:25, 95:8,
110:3, 120:11
**age**
69:16
**agencies**
32:10
**agency**
28:1, 72:14,
191:13
**ago**
80:7, 120:2
**agree**
7:9, 75:10,
108:1, 114:20,
131:10
**ahead**
45:7, 65:23,
99:18, 119:21,
159:11, 165:14,
178:18, 203:11,
218:8
**aid**
13:10, 19:6,
19:11, 25:23
**air**
48:3
**al**
1:10, 6:6
**alcohol**
11:13
**align**
69:5
**aligned**
129:6, 172:1
**aligning**
68:6
**all**
2:2, 6:15, 7:9,
7:11, 14:15,
15:13, 23:17,
25:1, 25:22,
34:5, 34:15,
36:13, 39:6,
39:7, 44:14,
49:6, 55:8,
69:4, 73:15,
73:24, 76:14,

76:19, 81:6,
83:23, 83:25,
86:4, 86:12,
87:3, 89:19,
89:23, 92:4,
93:5, 97:6,
98:9, 107:16,
110:2, 111:10,
111:11, 112:8,
113:8, 115:17,
117:4, 117:9,
125:6, 138:10,
165:18, 167:6,
167:17, 171:6,
174:13, 174:21,
177:4, 182:6,
188:5, 191:9,
200:21, 208:4,
217:25, 223:1,
223:14, 225:1,
225:7
**allegations**
216:2
**alleged**
35:4, 147:15,
149:18
**allegedly**
151:17
**allow**
142:17, 187:16,
187:22, 189:9,
190:6
**allowed**
133:12, 186:23,
187:13, 196:20,
211:15
**allowing**
187:1, 202:1
**almost**
215:8
**along**
153:6, 175:2
**already**
30:19, 71:25,
92:23, 185:1,
185:2, 185:3,
212:20, 222:15,
224:14

**also**
4:17, 6:25,
7:3, 23:2,
26:17, 27:1,
28:6, 31:5,
64:14, 74:12,
83:14, 87:6,
87:16, 103:20,
121:17, 134:20,
137:2, 170:23,
171:11, 171:12,
177:19, 177:21,
182:12, 218:20,
219:18, 220:14,
221:2, 224:9
**alter**
159:7
**always**
59:4, 182:25
**amendment**
15:7, 15:10,
15:12, 15:15,
15:17, 15:21,
16:8, 16:14,
16:16, 17:4
**america**
116:16
**american**
48:15
**amount**
87:12, 209:15,
209:16
**andrew**
4:18
**annotations**
228:6
**annoying**
51:17, 135:21,
136:6
**another**
16:1, 24:9,
28:21, 32:21,
51:7, 51:15,
54:3, 74:13,
75:3, 75:13,
83:15, 94:12,
105:12, 118:24,
119:2, 120:4,

**124:1, 124:2,
126:17, 135:19,
144:9, 150:14,
158:7, 162:4,
174:23, 182:8,
184:2, 202:16,
220:15, 221:17
answer
9:13, 9:14,
9:19, 10:2,
10:4, 10:9,
11:14, 22:4,
26:1, 42:1,
43:7, 76:25,
77:10, 80:15,
86:17, 103:16,
105:10, 114:25,
122:18, 136:23,
171:13, 203:3,
205:17, 206:6,
208:8, 216:19,
217:9, 217:20
answered
12:13
answering
10:20
answers
9:21
anti
169:13, 179:9
anti-defamation
45:25
anti-islamic
169:25, 170:10,
170:13, 177:17,
178:13
anti-jewish
45:22
anti-muslim
45:19
anti-semitic
213:23
antsy
198:2
anybody
46:10, 61:9,
64:10, 64:15,
74:9, 218:2,**

**218:11
anyone
11:10, 46:6,
53:2, 74:6,
75:16, 77:7,
77:13, 78:11,
101:3, 106:23,
107:1, 127:2,
133:18, 133:21,
144:24, 165:6,
169:20, 199:5,
207:1, 207:5,
213:6, 216:15
anything
9:22, 33:3,
40:18, 65:8,
78:18, 81:5,
88:4, 88:25,
92:18, 94:23,
95:10, 98:12,
106:11, 109:4,
109:14, 118:15,
120:9, 120:17,
123:1, 128:20,
134:9, 134:14,
151:5, 155:10,
159:1, 159:6,
160:4, 164:2,
172:8, 184:4,
186:8, 189:11,
189:19, 192:15,
194:10, 196:16,
204:19, 208:13,
208:14, 212:21,
221:13, 222:3,
222:22
anywhere
224:5, 224:23
apex
68:17, 68:19,
68:20, 68:23,
72:15, 140:5,
140:7, 140:25,
143:3, 143:4,
143:12
apologies
80:16, 112:9,
119:20, 167:15**

**apologize
16:20, 47:2,
103:10, 157:2
appear
193:1
appears
193:4
applicable
7:12, 7:17
apply
21:18, 21:21,
23:2, 53:12,
186:18
applying
147:2
appreciate
8:9, 8:13,
66:9, 197:14,
222:23, 225:2,
225:8
approach
32:23, 183:14,
183:22, 184:21,
185:4
approached
82:22, 85:17,
184:25
approaching
31:15, 32:19,
94:15, 185:3
appropriate
34:8, 126:14,
133:14, 161:16,
223:25
approval
58:25
area
31:18, 32:12,
83:15, 204:3,
204:25
aren't
55:4, 222:18
around
10:14, 22:21,
46:12, 51:22,
51:25, 61:1,
66:5, 79:16,
167:10, 186:17,**

**188:5, 189:3,
193:11, 205:7
arrest
5:17, 29:10,
29:16, 30:2,
34:20, 34:21,
34:25, 35:2,
37:1, 37:24,
38:4, 38:15,
38:20, 39:19,
42:22, 55:23,
140:8, 141:24,
142:2, 142:8,
145:14, 145:19,
146:2, 146:7,
146:10, 147:3,
148:13, 149:1,
149:3, 150:12,
157:4, 157:23,
160:24, 162:16,
162:17, 162:20,
164:16, 164:21,
164:23, 164:25,
172:23, 179:18,
180:10, 181:23,
185:14, 185:23,
187:7, 187:8,
188:22, 189:1,
190:9, 193:5,
207:2, 207:7,
207:12, 207:13,
208:6, 208:22,
208:25, 209:5,
210:12, 211:18,
214:17, 214:21,
216:7, 216:10,
216:13, 217:2,
217:6, 218:4,
218:13, 219:1,
220:9, 221:13
arrestable
35:14, 141:15,
161:18, 161:23,
162:1
arrested
186:9, 206:24
arresting
28:1, 31:1,**

**arrive**
180:16
**arrived**
183:6, 185:8,
185:9
**arson**
18:19
**asian**
48:13
**asked**
48:18, 96:25,
128:25, 145:10,
145:15, 152:19,
152:21, 177:19,
185:9, 185:11,
187:12, 187:17,
188:14, 188:17,
189:3, 189:14,
189:16, 189:22,
196:20, 200:15,
201:23, 202:7,
202:24, 209:10
**asking**
9:25, 17:10,
17:11, 25:18,
26:15, 46:24,
90:25, 121:15,
139:13, 142:9,
198:4
**asks**
203:6
**asleep**
36:11
**assault**
18:19, 88:5
**assaulted**
88:3, 95:23
**assembly**
53:18, 53:25,
137:24, 138:2
**assignment**
12:10
**assist**
24:16, 25:16,
72:15, 140:7

**assistance**
20:24, 21:1,
23:14, 121:16,
201:12
**assisted**
181:19
**association**
218:17
**assume**
10:10, 33:22,
203:4
**attached**
58:19, 225:13
**attack**
20:11, 22:14,
22:15, 22:24,
23:10, 196:16,
199:22, 200:1,
200:6, 202:12,
202:13, 202:20,
202:25, 203:9
**attacks**
21:5, 21:8,
199:19, 202:22
**attempt**
55:7, 140:1
**attendant**
190:25
**attendants**
154:5, 155:18
**attending**
2:2, 6:16
**attention**
36:9
**attorney**
210:11, 210:19,
218:20
**attorney's**
76:14, 76:19,
209:11
**audio**
194:24, 195:3
**authorized**
7:7, 132:21
**automatically**
194:12
**available**
139:1

**avenue**
3:18
**aware**
53:23, 76:23,
77:18, 77:21,
77:24, 78:2,
78:4, 91:20,
105:15, 106:6,
119:8, 119:10,
135:2, 137:25,
198:17, 210:10,
210:19, 213:20,
216:5, 216:9,
217:4, 222:16
**away**
31:19, 32:1,
32:2, 32:5,
33:19, 83:16,
183:12
**axon**
190:20, 192:11,
192:12

**B**

**b&e**
18:19
**b) (2**
51:12, 51:14,
135:15, 135:18
**b) (5**
129:24
**b-o-c-k**
127:19
**back**
24:8, 25:8,
31:23, 32:14,
41:7, 41:8,
41:17, 45:8,
59:10, 59:11,
62:1, 62:2,
62:3, 62:9,
65:24, 73:20,
79:25, 84:14,
87:7, 89:3,
89:7, 89:10,
89:12, 89:14,
90:15, 90:16,
90:18, 90:19,

91:14, 92:21,
94:13, 95:18,
106:5, 109:19,
110:6, 118:7,
121:5, 121:7,
122:7, 122:15,
123:11, 124:21,
125:2, 130:22,
133:3, 133:4,
133:5, 137:13,
137:16, 145:9,
146:11, 146:12,
153:17, 157:19,
158:20, 159:1,
162:9, 162:18,
164:15, 168:9,
177:15, 181:12,
183:9, 188:5,
190:2, 196:10,
196:18, 196:21,
197:7, 201:5,
201:7, 201:10,
206:17, 212:9,
212:11, 213:4,
223:10, 224:2
**background**
26:10, 27:19,
33:12, 33:15,
33:22, 33:23,
40:11, 42:5,
76:4, 141:11,
181:18
**backgrounds**
114:9
**backing**
18:6, 69:8
**backyard**
183:9
**bail**
209:7, 209:12,
209:14
**balance**
83:4
**balanced**
196:24
**bald**
221:1
**bar**
25:12, 103:1

**baran**
3:5
**barber-jones**
3:16, 6:21,
22:3, 25:25,
41:25, 43:6,
66:3, 73:13,
76:24, 77:9,
80:14, 103:15,
105:9, 111:6,
112:3, 114:24,
124:5, 124:10,
124:19, 124:22,
136:22, 149:11,
194:23, 195:2,
203:2, 205:16,
206:5, 216:18,
217:8, 217:19,
218:5, 218:18,
218:22, 222:12,
225:3, 225:5,
225:11, 225:19,
225:23, 226:1
**base**
40:12
**based**
22:10, 34:15,
39:10, 39:12,
42:6, 54:8,
87:19, 160:7,
177:5, 178:20,
199:22, 203:5,
204:2
**bases**
54:20
**basic**
13:4, 13:11,
13:25, 14:5,
14:6, 15:3,
18:2, 18:7,
18:14, 19:3,
19:7, 19:9,
25:23, 29:2,
29:12, 37:7,
37:8, 59:24,
139:2
**basically**
19:16, 27:6,

27:18, 28:3,
28:12, 59:20,
76:3, 154:3,
154:23
**basics**
170:12
**basis**
24:10, 170:9,
170:13, 170:15,
175:20, 199:2
**bates**
111:11, 174:6
**beautiful**
8:15
**became**
121:18
**because**
21:13, 25:20,
26:18, 31:8,
31:15, 35:6,
37:5, 42:3,
43:25, 49:7,
50:12, 57:2,
57:15, 61:13,
62:23, 68:16,
69:14, 71:7,
79:20, 86:14,
86:22, 87:17,
89:3, 89:7,
92:19, 94:5,
94:13, 94:19,
95:4, 95:9,
95:17, 99:15,
100:14, 101:19,
103:1, 108:20,
109:15, 114:1,
114:8, 115:2,
117:7, 120:1,
122:8, 126:4,
131:14, 133:15,
139:4, 140:19,
141:6, 141:23,
142:13, 145:2,
146:3, 156:22,
157:3, 158:9,
164:12, 168:18,
171:8, 171:11,
173:20, 177:4,

179:5, 181:12,
182:23, 185:20,
187:13, 188:2,
189:6, 190:18,
191:2, 191:21,
196:11, 196:12,
205:6, 205:8,
209:4, 212:19,
219:24, 221:3,
224:13
**become**
76:23, 78:15,
105:15, 119:8,
119:10
**been**
8:1, 8:16,
11:24, 14:18,
14:19, 24:3,
27:21, 29:12,
29:16, 34:23,
41:14, 70:23,
72:14, 79:19,
82:11, 84:22,
93:15, 100:8,
101:18, 101:19,
103:21, 111:10,
113:16, 123:9,
130:9, 131:14,
134:1, 138:15,
141:3, 141:23,
141:25, 142:14,
156:21, 161:10,
161:12, 178:4,
178:15, 185:21,
190:14, 193:8,
196:25, 201:9,
202:16, 202:23,
206:3, 206:8,
213:9, 215:7,
217:4, 220:1,
220:17
**before**
2:11, 8:16,
10:17, 10:21,
14:2, 17:4,
18:5, 23:12,
24:24, 26:23,
29:23, 30:15,

31:11, 50:25,
52:3, 58:13,
63:16, 71:16,
72:10, 74:6,
74:10, 74:14,
75:18, 76:14,
76:19, 77:4,
77:14, 77:17,
83:21, 86:2,
93:4, 93:6,
98:9, 126:6,
142:8, 147:25,
148:3, 158:18,
159:2, 164:14,
179:21, 180:6,
180:7, 181:5,
181:19, 184:25,
185:5, 186:9,
188:9, 189:19,
189:21, 189:25,
196:5, 197:15,
197:16, 197:21,
200:10, 206:15,
207:2, 207:9,
209:5, 212:8,
212:19, 227:2
**beforehand**
134:12
**beginning**
12:22, 61:1,
92:14
**begins**
6:3, 23:9
**behalf**
3:2, 3:14, 4:2
**behind**
33:18
**being**
8:9, 30:10,
36:9, 36:10,
40:14, 49:9,
49:12, 55:15,
68:21, 70:11,
71:12, 79:16,
90:13, 91:10,
91:13, 92:22,
92:23, 92:24,
106:2, 108:22,

113:20, 118:4,
118:5, 143:2,
143:7, 150:6,
159:5, 169:2,
172:22, 182:21,
211:6, 216:23
**belabor**
193:14
**belief**
47:9, 47:12,
47:15, 113:20,
227:7
**beliefs**
47:25, 105:21,
113:14, 136:13,
178:3
**believe**
11:5, 14:17,
27:1, 53:8,
88:7, 88:10,
89:5, 89:10,
90:2, 96:1,
96:5, 96:9,
96:13, 96:16,
99:24, 100:15,
111:13, 118:24,
121:22, 131:2,
134:5, 136:19,
158:7, 177:25,
184:8, 185:10,
194:3, 198:25
**believed**
160:1
**below**
102:25, 103:1,
108:3
**benjamin**
3:15
**besides**
18:24, 29:2,
53:3, 68:4,
71:14, 75:16,
129:11, 134:14,
163:16, 181:23,
209:2, 218:12
**best**
8:11, 21:16,
22:21, 24:6,

25:17, 30:12,
31:17, 31:25,
32:4, 32:24,
33:5, 33:17,
55:14, 64:18,
65:2, 65:3,
65:6, 75:2,
75:9, 84:16,
90:18, 121:13,
121:17, 121:23,
122:14, 125:9,
126:8, 128:17,
128:18, 128:24,
130:18, 134:19,
134:21, 134:23,
141:14, 148:3,
225:9, 227:6,
228:3
**better**
22:8, 28:22,
37:16, 44:3,
101:14, 109:9,
128:15, 217:23
**between**
9:16, 19:14,
35:1, 87:13,
94:9, 163:4,
163:7, 163:10,
163:14, 165:6,
180:21, 213:22
**bias**
45:11, 45:16,
47:4, 47:14,
169:12, 170:5,
170:17, 176:23,
177:11, 177:16,
178:13, 215:11,
215:15
**biases**
46:14, 46:22,
47:19, 48:6,
48:10
**big**
9:15, 32:7,
212:17, 213:5
**bit**
14:25, 43:19,
69:20, 76:3,

109:1, 124:9,
135:16, 141:9,
149:13, 167:21,
181:17, 203:11,
210:7
**bits**
15:22, 15:23,
143:9, 143:10,
143:11, 173:4
**black**
19:15, 220:19
**blet**
12:21, 13:4,
31:5, 37:5, 37:6
**block**
32:9, 33:19
**blocked**
221:1, 221:2
**blood**
24:20, 25:13
**bock**
127:7, 127:12,
127:19, 127:20,
127:21, 127:25,
128:3, 144:24,
165:17
**body**
23:19, 26:18,
57:6, 98:6,
190:8, 191:11,
191:13, 191:17,
191:19, 192:16,
192:20, 192:22,
193:2, 193:7,
193:13
**bold**
156:11
**bond**
187:21
**book**
52:7, 64:3,
64:8, 64:16,
121:9, 121:12,
121:21, 122:21,
125:8, 128:23,
134:17, 138:5,
138:7, 138:8,
138:10, 138:23,

138:25, 139:4,
139:8
**both**
10:3, 14:25,
62:15, 70:24,
94:9, 172:1,
205:25
**bothering**
133:21
**bottle**
200:19, 200:22,
201:2, 201:10,
201:13, 202:1
**bottom**
53:9, 103:6,
137:17, 151:4,
156:10, 174:6,
174:10
**box**
156:11
**brand**
214:1
**break**
10:13, 10:15,
10:16, 10:21,
54:4, 66:5,
66:11, 73:11,
73:25, 124:1,
124:12, 138:19,
162:4, 162:13,
209:18, 209:23,
210:1, 210:9,
222:25
**breaks**
138:12
**breathe**
19:25
**brief**
147:12, 147:16,
150:25, 151:20,
154:24, 155:8
**briefed**
15:12, 15:13
**briefing**
15:11
**briefly**
79:4
**bright**
13:15, 13:17

**bring**
21:19, 25:18, 26:15, 26:21, 31:23, 99:6, 181:23, 183:2, 200:17, 200:19, 200:21, 202:22
**bringing**
21:21, 21:25, 23:2, 23:8, 23:25, 179:8, 207:8, 207:14
**broke**
221:24
**brought**
57:2, 121:9, 125:9, 161:10, 190:2, 196:7
**building**
31:2, 32:1, 34:8, 94:23, 115:8, 132:19
**buildings**
32:8
**bunch**
192:23
**bureau**
218:16
**business**
40:19, 41:10, 65:12, 87:9, 91:4, 93:16, 104:10, 104:13, 109:21, 110:18, 121:24, 122:9, 137:4, 178:8

**C**

**c-o-h-o-r-t**
46:19
**call**
23:22, 24:6, 24:11, 28:13, 40:9, 42:4, 53:4, 54:12, 56:1, 56:5, 63:12, 66:19, 69:24, 70:12,

71:6, 72:2, 72:13, 74:20, 76:7, 77:1, 77:5, 77:15, 77:17, 78:19, 78:21, 78:22, 78:24, 79:7, 80:2, 80:19, 80:22, 81:1, 81:8, 81:13, 81:21, 81:23, 82:6, 83:21, 83:23, 84:6, 84:13, 85:13, 87:15, 91:2, 91:16, 104:7, 104:11, 118:3, 121:4, 121:11, 121:14, 131:19, 146:16, 147:17, 153:8, 182:13, 212:22, 224:20
**called**
8:1, 45:25, 46:18, 70:3, 84:11, 85:9, 87:9, 101:12, 130:10, 131:17, 153:8, 200:10, 220:18
**calling**
24:13, 71:7, 76:6, 79:18, 118:2, 118:3, 123:14, 224:14
**calls**
12:13, 52:23, 56:25, 61:15, 62:24, 63:9, 63:11, 71:24, 79:22, 87:12, 91:3, 122:8, 122:25, 126:5, 128:20, 133:24, 134:1, 134:2, 171:12, 172:17, 182:19, 184:21, 212:20, 215:2,

216:22, 223:17, 224:5
**calm**
22:15, 22:16, 83:13, 83:15
**calmed**
24:6
**calmly**
183:22
**cam**
191:11, 191:14, 191:17, 191:19, 192:16, 192:23, 193:2, 193:3, 193:7, 193:13
**came**
37:5, 78:24, 81:9, 81:23, 88:23, 115:5, 121:7, 149:21, 172:9, 185:12, 185:17, 221:4
**camera**
54:17, 57:6, 98:7, 190:9, 192:20, 193:8
**campus**
119:1
**candy**
25:12, 26:15
**cannot**
27:13, 27:15, 108:20, 113:2, 137:1, 158:5, 184:10, 191:7, 201:16
**capacity**
20:22, 20:23, 49:18
**captain**
190:25
**capture**
102:20
**car**
30:14, 30:15, 31:23, 32:15, 36:8, 70:4, 71:9, 186:1,

189:20, 195:21, 196:10, 196:19, 197:11, 200:22, 200:25, 202:4
**care**
21:1
**career**
172:19, 182:25
**carolina**
1:2, 3:20, 4:5, 6:7, 27:16, 77:19, 77:22
**carolina's**
48:20
**cars**
183:2, 188:6
**carve**
138:1
**carved**
53:23
**case**
6:8, 9:14, 21:15, 30:2, 33:19, 36:12, 40:20, 41:11, 53:21, 54:18, 55:13, 57:3, 62:14, 67:6, 70:23, 100:24, 108:24, 129:17, 129:24, 130:20, 133:8, 134:25, 136:17, 137:7, 143:6, 157:13, 159:5, 159:6, 171:19, 172:10, 174:18, 178:24, 184:1, 187:15, 196:14, 196:24, 200:5, 202:15, 208:19, 208:20, 211:3, 211:6, 212:24, 214:17, 219:22, 220:17, 227:10, 228:9
**case-by-case**
175:20
**cases**
8:24, 8:25,

**cashier**
116:11
**catch**
127:17
**category**
14:20
**caught**
86:16
**cause**
30:7, 187:6
**caused**
62:20
**caveat**
10:19
**celebrate**
116:5
**cell**
222:5
**cellphone**
152:9, 219:11,
219:20, 220:6,
220:10, 221:14,
222:23
**center**
193:5, 206:25,
207:2, 207:6,
208:18
**certain**
14:14, 16:17,
16:24, 17:23,
18:10, 24:15,
24:16, 26:12,
27:8, 27:9,
27:13, 28:4,
31:14, 31:15,
37:9, 40:12,
40:21, 45:1,
47:9, 47:12,
56:25, 57:17,
58:14, 63:8,
63:20, 68:21,
68:25, 71:11,
76:1, 79:20,
79:22, 85:11,
99:21, 101:11,
103:1, 108:23,

108:25, 113:18,
114:7, 117:6,
117:8, 121:11,
122:8, 122:16,
123:17, 131:16,
137:3, 143:9,
143:10, 143:11,
143:24, 146:18,
155:2, 157:11,
157:12, 161:2,
168:20, 168:21,
175:13, 175:19,
175:22, 182:19,
182:23, 184:21,
186:15, 187:19,
190:2, 190:20,
192:11, 207:15,
211:13, 215:19,
215:20
**certainly**
66:13, 116:5
**certificate**
227:1, 228:1
**certification**
7:16
**certified**
2:11, 7:10,
182:4, 182:17
**certify**
227:4, 228:2
**certifying**
149:17
**chance**
23:15, 25:19,
145:16, 172:18,
193:21, 197:1
**change**
23:22, 39:4,
129:18, 129:19,
159:1, 189:14,
189:16, 189:24,
196:8
**changes**
39:2
**changing**
38:21
**chapel**
119:1, 119:6,

119:23, 120:8
**chapter**
44:10, 173:15
**charge**
16:18, 16:25,
17:4, 37:21,
64:18, 65:3,
65:6, 74:25,
75:3, 75:9,
75:13, 75:15,
95:2, 95:8,
121:7, 121:13,
121:17, 121:23,
125:9, 125:19,
125:25, 126:10,
126:14, 126:18,
126:21, 127:1,
128:14, 128:17,
128:24, 133:12,
133:14, 134:24,
141:15, 150:8,
151:16, 161:17,
191:4, 198:22,
199:2, 207:19,
210:12, 210:20,
211:12, 213:8,
213:12, 213:15,
213:18, 214:3,
214:9, 223:19,
223:25
**charged**
52:21, 53:2,
95:7
**charges**
27:22, 27:24,
40:21, 41:21,
55:22, 146:21,
155:7
**charging**
17:8, 74:22
**chat**
146:17, 148:1,
148:9
**check**
25:8, 35:15,
55:14, 75:1,
145:13, 158:4,
188:9, 204:4,

222:17, 223:3
**checked**
134:16, 145:18
**checking**
222:22
**chest**
19:22
**child**
215:20
**children**
198:17, 198:18,
224:11, 224:17
**choice**
134:19, 134:21,
134:23
**choose**
160:24
**chronological**
91:22
**cid**
12:23
**cit**
12:23, 20:6,
20:13, 20:14,
20:15, 22:2,
22:11, 29:3
**citation**
34:25, 35:2,
35:3, 36:1,
37:1, 37:23,
38:8, 38:11,
38:14, 39:18,
42:23, 160:25,
161:21, 161:24
**citations**
35:25
**cite**
35:3, 39:25,
55:23, 161:8
**cited**
41:3
**citizen**
170:20
**city**
218:12
**civil**
1:7, 14:13
**civilians**
116:4

27:22, 30:7,
214:10

**civilly**
215:20
**cjleads**
27:7, 27:9,
27:16, 27:17,
27:18
**claim**
216:2
**claims**
97:2, 97:3
**clarify**
10:8, 13:2
**clarity**
62:22, 63:15
**class**
12:24, 12:25,
28:6, 139:5
**classes**
14:15, 18:9,
18:10
**classifying**
45:11
**clean**
10:5
**clear**
10:8, 30:20,
48:3, 50:9,
52:2, 55:11,
63:14, 172:6
**clearly**
79:6, 115:3,
141:3, 142:6,
142:23, 151:25,
185:2, 211:20
**click**
99:5, 99:10,
195:7
**clicked**
194:4
**close**
25:5, 26:23,
34:10, 143:5
**closed**
185:12, 200:20,
208:20
**closer**
34:8
**clothes**
187:13, 187:14,

187:16, 189:15,
189:17, 189:25,
197:20
**clouded**
104:13
**cocaine**
28:10
**code**
19:15, 19:16
**cohort**
46:19
**collect**
35:9, 66:22,
67:14
**collected**
121:2, 222:5,
222:11
**color**
19:15
**com**
3:11, 3:12,
3:22
**combatives**
12:24, 28:17,
28:19, 28:21,
29:4
**come**
26:5, 41:7,
41:8, 45:8,
79:14, 79:18,
82:6, 83:3,
89:10, 94:13,
96:22, 110:6,
118:7, 124:21,
146:17, 157:19,
188:5, 196:15,
200:10, 207:10,
224:2
**comes**
55:24
**comfortable**
37:14, 59:25,
62:5, 69:18,
71:10, 71:12,
79:24, 89:7,
90:15, 91:14,
104:19, 130:5,
130:21, 133:4,

201:14, 201:25,
202:3
**coming**
56:24, 57:15,
90:4, 91:4,
95:18, 121:5,
194:25, 195:3,
221:7
**comment**
107:16, 107:19,
108:10, 108:12,
108:16, 109:13,
113:7, 113:10,
113:24, 114:11,
116:23, 131:25,
132:9
**comment-patriot**
5:16
**comment-rachel**
5:14
**comment-tired**
5:15
**comments**
97:24, 100:17,
101:10, 101:13,
107:6, 110:19,
115:20, 117:13,
117:17, 117:20,
118:10, 118:18,
131:14, 136:12,
144:7, 162:21
**communicate**
51:15, 135:19,
152:12, 207:1,
207:5
**communicated**
218:2, 218:11
**communication**
136:10, 152:8
**communications**
72:3, 135:4,
135:25, 136:4,
163:14
**complaint**
52:4, 52:10,
54:14
**complaints**
78:5, 78:9,

78:12, 87:9,
213:21, 216:21
**complete**
156:2, 156:22,
164:4
**completed**
155:23, 167:3,
167:4, 168:16
**compliant**
207:13, 207:22,
208:6, 208:10
**comply**
198:7, 198:9
**compressions**
19:23
**computer**
146:14, 166:15,
193:22, 194:3,
195:8, 220:2
**con**
18:8
**concern**
205:12
**concerned**
222:21
**concerns**
30:11, 57:3,
74:12, 118:2,
118:3
**conclude**
202:24
**conclusion**
112:19
**condition**
23:25, 24:3
**conduct**
29:10, 29:16,
131:1, 132:13,
159:25, 207:19,
210:21, 213:7
**conducted**
13:12
**confirm**
50:5, 64:22,
68:2, 131:19
**confirmed**
68:9, 68:11
**confirms**
61:24

**confront**
131:19
**consider**
16:24, 17:3,
21:25, 38:13,
40:6, 40:7,
42:22, 110:8,
126:13, 139:10
**considered**
114:12, 116:24,
126:22, 223:18,
223:23, 224:11
**considering**
16:18
**consistent**
7:16
**constitute**
7:13, 136:20
**constitutional**
13:9, 14:7,
14:9, 14:17,
15:3, 15:6
**constitutionally**
53:17, 137:23
**construed**
53:16, 137:22
**consult**
74:5, 74:7,
74:9, 75:17,
76:13, 76:18,
127:1
**consulted**
121:20, 125:7,
144:25
**consulting**
122:21
**contact**
36:19, 54:23,
66:22, 69:10,
69:11, 71:19,
71:20, 72:6,
72:12, 72:19,
84:14, 84:17,
106:23, 107:1,
140:7, 140:11,
140:13, 163:2
**contacted**
88:13, 88:14,

88:17, 88:20,
96:9, 96:13,
96:18, 163:1
**contain**
193:1
**context**
52:4, 52:9
**continue**
57:22, 70:16,
124:11
**continued**
69:14
**contraband**
30:18
**contributing**
223:22, 224:1
**control**
152:9, 196:12,
196:23
**conversation**
51:16, 85:20,
89:19, 89:22,
90:22, 127:24,
135:20, 153:5,
159:17
**conversations**
83:5, 165:18,
218:7, 218:19,
219:4
**conversing**
186:7
**cooperate**
188:25
**cooperative**
197:23
**copy**
103:4, 138:18,
178:1, 222:6,
225:22, 225:23,
226:2
**correct**
12:2, 12:8,
12:18, 13:6,
14:4, 14:8,
15:5, 18:12,
28:5, 28:18,
31:3, 33:24,
39:1, 41:22,

51:13, 52:6,
56:3, 56:7,
56:10, 59:14,
64:24, 65:22,
66:24, 67:8,
71:3, 78:20,
84:4, 85:19,
85:24, 86:19,
91:18, 98:6,
101:24, 102:17,
104:1, 104:24,
111:13, 112:12,
112:15, 112:17,
115:25, 117:3,
120:16, 120:23,
125:11, 125:19,
125:23, 129:2,
129:10, 133:14,
133:15, 134:16,
135:12, 141:2,
144:21, 146:3,
146:8, 152:2,
156:16, 156:19,
156:23, 157:1,
157:2, 157:16,
157:21, 160:15,
162:2, 163:21,
165:3, 166:3,
168:8, 169:7,
170:2, 176:6,
177:12, 177:19,
190:17, 192:1,
195:21, 198:7,
198:23, 198:24,
199:1, 199:4,
200:22, 200:23,
203:19, 203:20,
223:20, 228:4
**corrected**
59:15
**correctly**
20:8
**could**
16:17, 17:13,
22:5, 25:8,
30:8, 32:13,
32:21, 38:1,
38:3, 38:4,

39:4, 39:21,
40:6, 41:17,
41:18, 42:17,
43:13, 46:23,
51:9, 55:21,
58:17, 59:7,
60:16, 63:23,
68:13, 68:22,
70:10, 79:13,
79:15, 95:13,
95:21, 96:3,
109:19, 113:14,
118:14, 123:10,
123:11, 130:9,
130:17, 136:20,
138:22, 140:22,
141:10, 143:11,
153:25, 154:12,
158:4, 158:13,
164:9, 167:12,
169:21, 171:14,
171:15, 177:2,
178:17, 186:18,
187:12, 188:1,
189:4, 189:23,
196:7, 196:8,
196:18, 200:13,
200:16, 200:17,
201:12, 206:2,
209:25, 211:14,
212:21, 222:23,
224:2
**couldn't**
89:12, 118:13,
120:15, 127:17
**counsel**
6:17, 6:19,
6:22, 7:21, 8:3,
9:9, 49:25,
111:22, 218:12,
225:12, 227:9,
228:8
**county**
143:10, 152:6,
206:25, 207:2,
207:6, 208:18
**couple**
13:2, 18:21,

73:25, 186:13,
223:14
**course**
14:11, 14:13,
15:25, 16:2,
16:22, 22:18,
35:7, 35:15,
36:9, 41:17,
61:12, 68:19,
74:21, 89:3,
94:1, 94:9,
94:13, 98:25,
100:11, 115:21,
122:11, 122:12,
144:25, 146:14,
146:19, 147:14,
149:22, 155:6,
163:17, 163:23,
177:7, 182:18,
190:21, 207:8,
207:11
**court**
1:1, 6:3, 6:6,
7:2, 7:6, 7:19,
7:21, 8:18,
8:21, 9:6, 9:16,
9:20, 10:3,
28:2, 36:7,
41:2, 41:4,
42:14, 42:16,
49:25, 50:4,
50:8, 57:3,
111:20, 111:24,
225:12, 225:21,
225:25, 226:4,
227:1
**cover**
28:9, 166:19
**cr**
36:18, 207:12
**crack**
28:10
**crashes**
36:8
**create**
146:23, 147:8
**created**
165:4

**crime**
16:19, 16:25,
17:5, 35:4,
36:25, 39:17,
45:20, 45:22,
54:10, 66:1,
138:11, 138:12,
138:15, 142:15,
147:16, 149:19,
151:2, 176:24,
178:5, 179:7,
179:9
**crime-wise**
47:10
**crimes**
14:14, 17:24,
18:10, 18:14,
18:17, 18:23,
33:12, 36:1,
45:12, 45:16,
52:22, 138:10,
176:11, 176:20
**criminal**
38:3, 44:11,
45:4, 161:7,
161:11, 174:13,
174:16, 174:22,
175:8
**criminalizes**
49:5
**crisis**
20:7, 20:15,
20:19
**criteria**
14:22, 64:19,
108:24, 138:11,
143:24
**cuff**
186:23, 189:9
**cuffed**
30:10, 204:24
**cuffs**
185:25, 186:18,
189:4, 201:16,
202:7
**current**
12:3, 27:12,
31:20, 40:13,

118:23, 127:12
**currently**
11:17, 12:9,
31:10, 42:7,
59:2, 78:25,
79:11, 81:24,
93:15, 193:19
**custody**
21:19, 21:22,
21:25, 23:3,
23:9, 24:1,
24:21, 25:14,
215:20
**customers**
94:6
**cut**
188:2, 188:5,
203:20
**cyberstalking**
5:12, 17:9,
18:5, 18:13,
18:24, 36:25,
37:21, 37:23,
38:7, 39:14,
39:16, 48:20,
48:24, 49:2,
49:5, 50:17,
50:22, 50:24,
51:20, 52:3,
52:9, 52:13,
52:21, 52:25,
53:3, 53:5,
53:20, 61:15,
62:16, 62:24,
63:12, 64:23,
65:20, 75:6,
121:13, 121:23,
125:8, 125:19,
125:25, 126:18,
128:20, 129:13,
131:2, 132:14,
134:6, 134:15,
135:2, 135:3,
135:11, 136:21,
138:3, 139:12,
142:15, 150:9,
151:1, 152:5,
160:2, 168:14,

177:13, 187:2,
210:11, 213:23,
214:3, 214:8,
216:4, 223:19,
223:25

**D**

**danger**
16:4, 34:11,
49:13, 49:14,
184:6
**dangerous**
33:2, 39:8,
39:9, 40:5
**daniel**
3:3, 6:19, 8:5,
57:20, 111:6,
124:5
**dash**
193:3, 193:7
**data**
28:3
**date**
6:9, 35:5,
107:21, 107:23,
112:10, 112:13,
149:21, 152:5,
156:11, 216:1
**dated**
115:23
**dates**
28:2
**david**
116:6
**day**
14:15, 21:13,
47:22, 59:5,
68:25, 77:1,
80:21, 82:10,
84:5, 89:1,
101:7, 104:8,
104:23, 119:9,
125:13, 125:15,
125:21, 141:7,
141:9, 141:13,
141:24, 144:17,
145:2, 145:4,
145:8, 145:10,

145:15, 145:21,
148:7, 150:19,
156:24, 158:6,
158:9, 158:10,
159:2, 159:9,
163:17, 167:8,
172:6, 179:21,
179:24, 179:25,
180:8, 180:22,
181:5, 181:12,
181:19, 181:25,
183:20, 208:24,
210:12, 210:13,
210:15, 210:17,
212:5, 217:25,
222:1

**days**
79:20, 82:12,
87:8, 103:21,
104:20, 122:8,
130:4, 212:10,
212:11

**daytime**
32:13

**dbruce@holtzmanv-
ogel**
3:11

**dci**
12:24, 27:1,
27:4, 27:5,
27:6, 27:10,
28:3, 29:3

**deal**
21:5, 97:8,
221:21

**dealing**
42:6, 42:8

**dealt**
19:18, 214:7,
214:11

**decent**
29:1, 61:25

**decide**
69:10, 71:5,
71:16, 144:15,
144:17, 183:11

**decides**
55:21, 196:15

**deciding**
16:24, 38:13,
39:17, 42:22

**decision**
32:25, 126:8,
223:19

**deeper**
109:10, 175:5,
175:21

**defendant**
6:22, 149:18,
152:7

**defendant's**
152:9

**defendants**
1:11, 3:14

**definition**
170:5

**degree**
18:20, 175:14

**deleted**
192:10

**deleting**
191:4

**deliberate**
116:4

**department**
11:4, 11:18,
11:21, 12:4,
13:22, 17:2,
26:5, 33:7,
44:9, 46:7,
70:3, 71:2,
71:8, 77:8,
77:14, 78:6,
78:13, 84:11,
84:14, 121:8,
149:23, 170:4,
173:15, 191:24,
213:7, 213:22,
214:4, 216:16,
218:3

**department's**
43:4, 46:19

**depend**
33:1, 39:7,
39:21, 41:23

**depend-on-the-ba-
sis**
43:1

**depended**
220:20

**depending**
19:17, 23:18,
26:9, 27:23,
31:18, 33:12,
47:8, 55:9,
55:16, 55:18,
67:16, 67:17,
67:18, 138:12,
140:8, 141:24,
148:4, 170:24,
175:19, 179:5,
201:20

**depends**
14:20, 21:23,
24:9, 24:17,
29:20, 29:21,
32:3, 32:9,
33:14, 33:20,
33:21, 34:5,
35:13, 36:4,
36:7, 36:15,
38:16, 38:19,
39:6, 39:23,
41:19, 42:25,
55:9, 55:24,
67:19, 69:12,
138:15, 142:12,
143:12, 183:18

**depos**
4:18, 6:12,
7:4, 111:13,
111:16, 206:20

**deposed**
8:16

**deposition**
1:15, 2:1,
5:10, 6:4, 6:15,
7:8, 8:13, 9:17,
111:8, 111:18,
112:2, 225:16

**depositions**
9:5

**depth**
27:7

**describe**
12:19, 20:18,

21:7, 29:15,
54:9, 138:8

**described**
210:21

**describes**
150:24

**designate**
176:22

**designated**
177:10, 215:10,
215:14

**designating**
169:25, 170:10

**designation**
169:17, 169:21,
170:14

**desk**
154:5, 155:18

**destroyed**
190:14, 192:17

**detail**
27:23, 49:6,
49:7, 61:10,
79:5, 81:3,
81:7, 98:16,
100:10, 119:3,
126:1, 131:5,
131:13, 132:4,
138:20, 147:19,
147:20, 153:4,
153:5, 159:18,
173:23, 173:24

**details**
81:16, 185:23,
186:11

**detention**
193:5, 206:25,
207:2, 207:6,
208:18

**determination**
209:8, 209:12

**determine**
74:17

**determined**
125:8

**determining**
125:18, 223:24

**deviate**
24:5, 94:8,

184:3, 221:8
**device**
152:8
**devices**
219:8
**diabetes**
24:19, 25:11,
25:20, 26:14
**diagnosed**
217:5
**die**
90:17, 130:20
**died**
122:16, 123:16
**difference**
9:16, 14:12,
19:14, 35:1,
113:2
**differences**
9:7
**different**
42:10, 47:11,
47:14, 47:18,
67:22, 83:7,
109:1, 112:21,
115:3, 117:7,
126:14, 134:24,
138:22, 183:19,
189:18, 192:24
**differently**
110:16, 170:17
**difficulty**
193:19
**dinner**
10:15, 124:2
**direct**
97:7
**directed**
113:23
**direction**
189:13
**directive**
5:11, 5:19,
43:5, 43:11,
44:9, 44:10,
44:19, 173:1,
173:15, 173:16
**directives**
44:24, 186:17,

197:24
**directly**
99:6, 172:9
**disagree**
131:10
**disbeliefs**
136:13
**disciplinary**
213:17
**disclose**
106:17
**discovery**
111:10, 190:13,
222:11
**discredit**
137:7, 220:16
**discuss**
161:22
**discussed**
126:25, 189:12
**discussing**
198:22
**dislikes**
47:22, 113:17
**dismissal**
210:25
**dismissed**
210:11, 211:6,
211:9, 211:12,
213:8, 213:12,
213:15, 213:18
**dismissing**
210:20
**dispatch**
36:20, 70:11,
79:4
**displays**
22:14
**dispute**
94:4
**disseminated**
216:6, 216:9
**distinctively**
126:3
**district**
1:1, 1:2, 6:6,
6:7, 76:14,
209:11, 210:11,

210:19
**disturbance**
93:24, 115:5
**division**
1:3, 6:8
**document**
43:21, 44:8,
44:14, 45:4,
102:10, 115:17,
137:17, 138:21,
148:22, 159:7,
159:12, 165:25,
166:12, 166:22,
173:19, 174:1,
224:4, 224:22
**documentation**
146:24, 147:4,
190:18
**documents**
111:7, 163:22,
163:25, 192:3,
219:21, 222:18
**dog**
198:19
**doing**
30:4, 54:15,
71:24, 82:20,
157:4, 161:2,
161:5, 161:7,
161:16, 164:3,
169:2, 208:25,
209:17
**domestic**
36:14, 207:25,
214:14, 215:17
**done**
31:21, 34:23,
35:5, 36:16,
37:9, 37:10,
40:18, 55:12,
83:19, 123:9,
124:17, 130:17,
132:22, 138:15,
154:20, 154:21,
157:10, 157:17,
159:4, 164:13,
168:23, 200:1,
208:23, 209:4,

214:9, 223:16
**door**
185:2, 185:5,
185:6, 185:13,
185:17
**doorbell**
185:5
**double**
222:17, 222:22,
223:3
**down**
10:4, 22:16,
24:7, 30:16,
45:8, 51:4,
51:5, 53:7,
53:9, 54:3,
56:17, 57:9,
83:14, 83:16,
83:23, 90:17,
107:8, 111:1,
115:10, 117:10,
122:16, 123:16,
130:20, 135:16,
137:16, 138:12,
138:19, 139:24,
144:9, 149:5,
150:21, 151:3,
156:7, 159:12,
166:18, 167:5,
167:6, 167:14,
167:15, 167:21,
172:19, 173:7,
174:5, 176:15,
177:20, 179:16,
186:2, 188:4,
196:22, 197:3,
203:18, 203:20,
203:21, 221:24
**download**
111:21
**downtown**
32:6, 33:19,
184:13
**dressed**
187:14
**drew**
112:18
**drink**
201:10, 202:1

**drinking**
197:1
**drive**
6:13, 202:16
**driver**
69:17
**driver's**
27:15, 27:20
**driveway**
184:15, 188:4
**driving**
13:10, 182:11
**drop**
207:17, 208:17
**drug**
12:24, 28:6,
29:3
**drugs**
11:13, 28:10
**due**
179:20, 192:13
**duly**
7:19, 8:1
**dumb**
144:9
**during**
18:18, 58:24,
59:23, 100:11,
111:7, 113:8,
118:8, 119:14,
140:2, 144:25,
188:22, 189:1,
190:9, 190:11,
202:4, 204:15,
205:15, 222:4
**duties**
12:11
**dvpo**
214:12, 214:13
**dwyer**
3:4, 6:25

**E**

**e-tran**
225:24, 225:25
**each**
14:20, 15:15,
33:11

**earlier**
8:6, 51:13,
51:21, 74:2,
99:17, 99:19,
99:20, 104:9,
105:12, 131:7,
135:12, 135:15,
137:21, 140:3,
140:10, 154:23,
156:4, 165:16,
171:23, 177:18,
183:13, 189:21,
212:8, 220:22
**early**
141:10
**earnings**
133:7
**easily**
123:11
**east**
106:7
**eastern**
1:2, 6:7
**eat**
124:2, 124:14,
124:16
**edgar**
3:15
**effect**
136:10, 136:11
**either**
34:24, 71:24,
75:10, 99:3,
117:16, 122:15,
161:8, 188:20,
221:9
**elaborate**
43:13, 46:23
**electronic**
2:12, 7:8,
135:4, 152:8,
219:8, 226:2,
228:5
**electronically**
51:15, 135:19,
152:12, 227:5
**element**
49:8, 64:11,

68:12, 129:23,
141:19, 141:20
**elements**
13:9, 14:14,
14:19, 17:17,
17:23, 18:5,
18:10, 35:16,
39:11, 39:12,
39:14, 48:20,
48:23, 49:1,
49:7, 52:7,
52:9, 63:23,
63:24, 64:3,
64:8, 64:16,
64:19, 65:20,
68:11, 75:14,
121:9, 121:12,
121:21, 122:21,
125:7, 128:23,
134:17, 134:18,
135:1, 138:5,
138:7, 138:8,
138:10, 138:25,
172:3, 210:22
**elliott**
1:9, 1:16, 2:1,
3:14, 6:4, 6:22,
7:25, 11:1,
225:16
**else**
11:10, 46:6,
46:10, 53:3,
61:9, 64:10,
64:15, 65:8,
75:16, 88:25,
98:12, 101:17,
109:21, 123:1,
126:19, 127:2,
133:21, 144:24,
169:20, 172:8,
180:25, 189:11,
191:24, 208:14,
208:18, 220:14,
221:10, 222:22
**email**
51:14, 72:1,
72:12, 88:17,
96:14, 98:23,

111:14, 112:2,
135:18, 219:24,
222:7
**emails**
45:15, 163:6,
163:10, 163:12,
165:5, 165:8,
219:5, 219:25,
220:4, 222:18
**embarrassing**
51:18, 135:23,
136:7, 152:14
**emotional**
20:5
**employed**
227:9, 228:8
**employee**
83:14, 94:10,
95:14, 95:15,
95:17, 95:23,
96:10, 96:13,
96:17, 96:18,
103:24, 105:7,
106:20, 106:24,
108:14, 112:18,
112:19, 114:22,
120:9, 120:12,
120:18, 120:22,
120:25, 125:22,
132:2, 144:1,
144:2, 156:25,
159:20, 199:3,
224:10
**employee's**
96:1, 96:5,
96:22, 106:14,
106:17, 109:14,
113:24, 132:10
**employees**
91:5, 113:2
**ems**
23:14, 23:22,
24:6, 24:7,
24:8, 24:13,
25:2, 200:10
**en**
80:18
**encompassed**
19:3

| | | | |
|---|---|---|---|
| **encounter** 71:23 | **ensues** 51:16, 135:20 | 137:9, 141:7, 142:1, 144:13, 164:13, 175:15, 184:23, 184:24, 184:25, 185:5, 200:10, 209:5, 209:16, 213:3, 215:23 | 129:19, 129:20, 136:17 |
| **encountered** 26:11, 182:24 | **enter** 146:14 | | **everyone's** 47:21 |
| **encounters** 89:14 | **entered** 168:7 | | **everything** 37:6, 37:12, 59:23, 76:7, 83:23, 100:10, 158:9, 165:24, 173:5, 215:16, 223:3 |
| **end** 21:13, 29:19, 35:10, 35:19, 36:19, 41:9, 41:11, 47:22, 54:17, 62:22, 66:6, 70:6, 72:5, 73:7, 74:19, 75:1, 76:9, 83:18, 111:25, 113:18, 113:20, 117:4, 132:23, 132:25, 157:11, 171:15, 176:1, 179:21, 183:20, 208:21, 211:14, 211:21, 213:1, 217:25, 225:15 | **entering** 30:15, 188:9, 197:21 | **evening** 144:16 | |
| | **enters** 30:19 | **events** 106:6 | **everywhere** 182:13 |
| | **environment** 28:14 | **eventually** 107:5 | **evidence** 33:1, 54:16, 54:21, 54:22, 55:2, 55:6, 55:11, 56:7, 64:9, 64:17, 65:1, 65:11, 65:19, 66:21, 66:23, 67:14, 67:17, 67:25, 68:4, 69:4, 69:6, 74:21, 102:13, 121:21, 128:8, 129:1, 129:3, 129:12, 132:12, 133:17, 133:20, 134:3, 141:16, 153:10, 153:23, 160:7, 160:9, 162:18, 162:25, 163:9, 163:14, 172:2, 175:14, 184:5, 215:24 |
| | **error** 193:20 | **ever** 8:16, 8:18, 10:16, 45:3, 52:8, 52:12, 52:14, 85:25, 88:12, 88:16, 88:19, 88:22, 93:1, 93:8, 95:11, 95:12, 96:22, 97:12, 101:3, 106:13, 110:8, 133:23, 134:8, 139:10, 139:20, 140:1, 142:19, 161:19, 162:20, 162:24, 171:18, 178:24, 196:4, 199:15, 200:24, 202:5, 209:10, 210:24 | |
| | **escort** 186:4, 200:14 | | |
| | **escorted** 186:1 | | |
| | **escorting** 196:21 | | |
| **endangers** 15:25 | **especially** 8:10, 28:23, 30:18, 36:18, 38:21, 55:15, 71:7, 72:11, 94:18, 133:6, 172:17, 201:17 | | |
| **ending** 91:23 | | | |
| **ends** 32:24, 70:24 | **esquire** 3:3, 3:4, 3:16, 4:3 | **every** 10:13, 42:4, 43:1, 61:18, 66:21 | |
| **enforcement** 13:5, 13:25, 14:5, 15:4, 18:2, 18:8, 18:15, 19:3, 19:8, 19:10, 25:24, 29:2, 29:13, 31:13, 32:21, 57:15, 68:22, 79:8, 139:2 | **essentially** 22:20, 147:13 | | **evidence-wise** 55:10, 74:20 |
| | **establishment** 93:17, 94:18, 104:13, 109:16, 122:9 | **everybody** 7:23, 10:16, 66:14, 79:15, 110:15, 124:13, 162:12, 217:21 | **evidentiary** 7:13 |
| | **et** 1:9, 6:5 | | **exacerbated** 217:5, 217:18 |
| | **ethnic** 176:19 | **everybody's** 124:3 | **exact** 50:21, 78:23, 81:7, 87:12, 87:15, 99:7, 151:11, 152:22 |
| **engage** 113:2 | **evaluate** 26:25, 55:13 | | |
| **enough** 37:17, 52:1, 172:14, 187:8, 193:24 | **evaluated** 202:18 | **everyday** 38:23, 39:3, 42:9, 49:18, | |
| | **even** 10:1, 37:10, 60:15, 137:1, | | |

**exactly**
58:9, 80:9, 80:18, 81:2, 98:15, 100:9, 101:8, 102:23, 102:25, 103:22, 104:17, 109:23, 120:1, 121:3, 122:17, 126:2, 127:24, 132:4, 145:10, 147:6, 153:5, 153:14, 154:11, 157:8, 173:23, 186:11, 187:23, 207:24

**examination**
5:2, 8:3

**examined**
8:2

**example**
24:18, 26:14, 33:9

**exception**
139:11, 139:21

**exchange**
112:8, 165:5, 165:8, 165:21

**excuse**
12:23, 15:13, 27:24, 30:15, 35:4, 41:18, 61:12, 62:2, 83:1, 83:12, 86:15, 91:22, 99:3, 114:15, 115:7, 119:13, 121:6, 133:1, 140:21, 141:20, 145:4, 148:9, 150:7, 151:14, 155:4, 161:13, 171:9, 206:10, 214:15

**exhausted**
171:6, 175:2

**exhibit**
5:11, 5:12, 5:13, 5:14,

5:15, 5:16, 5:17, 5:18, 5:19, 5:20, 43:16, 49:19, 50:3, 50:5, 102:4, 102:5, 107:9, 107:10, 107:11, 111:1, 111:2, 111:3, 115:11, 115:12, 115:13, 148:18, 166:8, 166:9, 173:10, 173:11, 194:18, 194:21, 195:17, 198:12, 203:13, 206:21

**exhibits**
5:9, 5:10, 50:1, 111:17, 225:13, 226:3

**experience**
22:23, 23:10, 37:16, 192:25

**experiences**
199:18, 199:22

**explain**
30:6, 76:7, 189:10

**explaining**
70:6, 74:24, 91:24, 152:21, 153:7, 154:23, 175:13

**expose**
172:16

**express**
53:14, 87:2, 95:12

**expressed**
52:18

**expunction**
190:15, 191:5, 192:18

**expunged**
191:3

**expungement**
192:14

**extended**
66:17

**extent**
218:6, 222:14

**extra**
29:22, 143:24

**extremist**
46:4

### F

**face**
79:16, 188:16

**facebook**
137:10, 137:12, 205:2, 220:23

**facility**
25:5, 25:6, 26:24

**fact**
178:11, 224:4

**factor**
38:24, 40:6, 223:22, 224:1

**factors**
38:12, 39:22, 39:23, 42:21

**facts**
209:11

**fair**
37:17, 39:3, 52:1

**fall**
196:14

**falls**
196:14

**familiar**
46:15, 116:14, 172:25, 181:24

**family**
21:1, 77:21, 90:13, 91:5, 129:20, 224:18

**far**
37:17, 203:9

**fattah's**
108:18

**fbl**
53:1

**fear**
87:2, 95:12,

123:6

**feared**
90:3, 95:15, 159:23, 224:13, 224:15

**fearful**
16:1, 16:3, 38:18, 70:17, 70:19, 122:8, 136:16

**february-ish**
61:2

**federal**
107:25

**feed**
5:13

**feel**
26:17, 26:19, 32:10, 32:18, 37:14, 37:18, 40:20, 49:17, 56:25, 58:15, 59:25, 64:14, 67:18, 69:18, 70:15, 71:10, 71:12, 74:24, 75:8, 79:23, 79:24, 87:11, 89:6, 90:14, 91:13, 104:18, 105:20, 110:5, 131:11, 131:18, 132:15, 143:17, 201:15, 212:7

**feeling**
213:2

**feels**
14:22, 38:17, 38:25, 39:20, 49:12, 59:13, 62:5, 90:17, 129:15, 130:21, 177:7

**fell**
139:11, 139:20

**felonies**
164:8

**felony**
164:9

**felt**
64:9, 64:10,
64:13, 64:17,
65:1, 68:11,
70:19, 79:23,
83:6, 100:7,
105:19, 110:2,
114:15, 114:16,
117:3, 121:12,
121:17, 122:14,
126:3, 128:18,
128:24, 129:16,
130:5, 130:18,
131:18, 133:3,
134:19, 134:20,
136:15, 138:14,
141:17, 141:20,
153:16, 172:3,
172:4, 178:6,
180:5, 200:8,
201:13, 201:25,
202:2, 211:14,
212:6, 220:20,
221:25
**female**
70:19
**few**
9:4, 9:18,
11:5, 162:15,
185:6, 209:18
**field**
31:6, 37:4,
38:6, 59:19,
59:23, 60:5,
60:7, 60:14,
60:21, 60:25,
61:3, 61:7,
61:24
**fight**
42:14
**figure**
92:15, 141:14,
170:22, 211:16,
211:17
**file**
58:6, 118:15,
157:13, 192:24,
193:20

**filed**
78:12, 213:20
**files**
192:11, 193:1
**fill**
62:8, 147:4,
147:6, 148:11,
151:22, 209:3
**filled**
61:18, 151:8
**finalized**
168:24, 169:3,
169:5
**financial**
227:11, 228:10
**find**
30:13, 79:18,
156:7, 190:5,
192:15, 212:23
**finding**
68:25
**fine**
26:21, 35:19,
36:5, 41:6,
41:9, 44:6,
54:6, 57:25,
58:15, 59:10,
59:13, 61:25,
66:15, 73:14,
80:8, 94:2,
124:15, 197:4
**finish**
10:20, 66:10,
80:15, 141:8,
141:10, 145:12,
157:15, 157:20,
157:21, 168:19,
179:24, 180:8,
210:2
**finished**
180:13
**finney**
13:15, 13:19,
13:20
**fir**
164:9
**firearms**
13:10

**firm**
8:7
**first**
8:1, 13:9,
15:7, 15:10,
15:11, 15:17,
15:20, 16:8,
16:13, 16:16,
17:4, 18:19,
19:6, 19:11,
25:23, 41:10,
50:12, 52:11,
52:25, 53:4,
63:13, 72:20,
72:25, 76:22,
78:15, 78:17,
83:25, 84:15,
85:10, 91:23,
100:14, 107:19,
144:3, 156:6,
161:3, 164:16,
167:17, 167:19,
167:20, 172:23,
194:15, 197:4,
216:3
**fit**
128:17, 128:18,
134:15
**five**
66:12, 87:14
**fix**
188:20
**flee**
184:22, 184:23
**flight**
41:24
**focused**
211:3
**follow**
24:9, 67:1,
213:12
**follow-up**
173:1, 173:16
**following**
158:9, 176:11
**follows**
8:2
**fond**
33:16

**footage**
54:17, 190:14,
191:12, 191:14,
191:17, 191:19,
192:16, 192:20,
192:23, 193:2,
193:13
**force**
208:1, 208:12
**foregoing**
227:3, 227:6,
228:3
**forgive**
48:18, 59:17
**forgot**
208:24
**form**
22:3, 41:25,
43:6, 51:24,
56:21, 56:22,
57:25, 58:1,
58:5, 72:4,
76:4, 76:24,
77:9, 84:18,
103:15, 105:9,
108:7, 136:22,
147:3, 147:5,
147:9, 147:10,
147:11, 147:12,
147:25, 148:11,
150:10, 150:13,
150:14, 150:15,
150:16, 150:19,
151:8, 151:10,
151:12, 152:20,
152:22, 154:22,
155:5, 164:6,
166:14, 168:7,
203:2, 205:16
**formats**
192:24
**forward**
20:23, 65:7,
71:17, 99:1,
99:2, 171:16,
171:18, 172:21,
175:3, 175:23,
176:2

**forwarded**
45:15
**found**
82:14, 110:22,
192:12
**four**
55:25, 104:20,
193:6
**fraction**
156:1
**frame**
27:25, 90:9,
105:2, 105:22,
108:21, 108:23,
109:8, 115:3,
116:19, 129:16,
130:3, 158:4,
172:15, 180:9,
180:18, 217:16
**freedom**
15:24, 107:25,
112:20, 143:19
**friend**
220:25
**friendly**
33:13
**friends**
91:6, 197:8
**front**
31:12, 32:15,
32:16, 33:10,
41:12, 94:21,
132:19, 154:4,
155:18, 183:14,
184:16, 186:21,
195:24, 197:16,
198:16, 203:21
**fto**
37:10, 37:13,
58:14, 59:2,
59:3, 59:4,
59:5, 59:6,
59:8, 59:17,
59:18, 61:23,
62:7, 62:9,
64:3, 75:20,
92:14, 121:2,
121:16, 125:9,

125:12, 125:17,
134:19, 141:18,
142:12, 142:19,
144:23, 145:4,
145:7, 161:1,
172:15, 173:21,
181:4, 181:7,
181:9, 181:14,
181:18, 181:24,
182:3, 182:5,
182:7, 182:12,
182:15, 182:18,
183:4, 211:2
**ftos**
165:10
**full**
8:13, 10:25
**fully**
10:1, 164:13,
187:14
**fundamentals**
37:8
**fuquay**
143:11
**further**
18:5, 32:5,
69:21, 73:7,
110:20, 134:21,
142:13, 142:18,
149:12, 151:17,
155:10, 168:15,
182:11, 184:4,
187:9, 189:10,
202:17, 222:2

### G

**gave**
103:18, 186:1,
201:13
**general**
37:22, 39:16,
40:4, 62:11,
74:1, 147:2,
176:4, 176:8,
176:9, 177:1,
178:16, 178:25,
179:1, 186:25
**generally**
20:18, 29:15,

31:25, 46:21,
65:25, 67:13
**generate**
168:23
**gentleman**
137:11, 220:25
**getting**
38:15, 44:19,
54:12, 55:1,
55:5, 94:9,
104:7, 148:8,
193:20
**give**
23:15, 25:14,
25:20, 57:18,
59:8, 66:25,
67:2, 67:5,
70:9, 81:16,
82:6, 84:16,
140:20, 146:16,
148:16, 153:11,
154:8, 155:20,
155:21, 158:3,
163:3, 163:6,
174:4, 180:6,
186:13, 186:17,
193:24, 194:5,
197:17, 201:21,
201:23, 203:7,
211:8, 223:2
**given**
94:24, 94:25,
102:13, 197:22,
202:2, 202:21
**gives**
27:18, 35:9,
151:19, 154:24
**glanced**
51:24, 52:16
**glasses**
188:17, 188:20
**glenwood**
3:18
**go**
9:4, 13:2,
20:14, 25:8,
25:9, 28:25,
29:24, 30:8,

31:8, 32:21,
34:4, 35:24,
36:7, 36:23,
37:9, 38:22,
40:22, 41:3,
41:17, 41:18,
42:6, 45:7,
54:3, 55:6,
58:7, 61:9,
65:7, 65:24,
66:19, 67:19,
71:22, 73:2,
73:4, 79:2,
79:13, 81:23,
82:1, 83:15,
89:16, 90:16,
93:5, 93:16,
94:12, 97:7,
99:18, 104:9,
119:21, 124:1,
130:14, 133:4,
133:5, 137:16,
139:2, 139:4,
142:7, 142:20,
144:10, 144:15,
144:17, 146:9,
146:11, 147:19,
149:24, 151:17,
156:8, 159:1,
159:11, 160:7,
161:4, 162:17,
162:18, 165:14,
167:6, 174:4,
174:7, 174:10,
176:15, 177:15,
178:18, 180:10,
182:13, 182:18,
183:1, 184:4,
187:9, 188:2,
189:13, 195:7,
203:5, 203:9,
207:16, 218:8,
222:2, 222:25
**goes**
89:14
**going**
13:1, 16:5,
18:5, 29:18,

| | | | |
|---|---|---|---|
| 29:23, 30:6, 30:18, 33:15, 35:17, 37:11, 38:19, 39:18, 40:7, 40:12, 41:2, 42:4, 42:15, 42:16, 43:22, 44:3, 47:21, 58:23, 59:4, 66:5, 69:14, 72:10, 73:16, 74:25, 79:25, 93:25, 107:18, 121:3, 124:11, 124:17, 124:23, 137:13, 140:6, 140:7, 145:11, 148:5, 153:16, 161:12, 162:5, 164:15, 167:6, 176:15, 177:5, 182:5, 193:4, 194:2, 194:14, 194:16, 196:22, 203:10, 205:2, 206:19, 207:11, 207:15, 209:18, 209:20, 211:4, 217:21, 222:2, 223:6, 225:17 **gone** 93:8, 141:4, 142:24 **good** 17:22, 37:15, 54:5, 62:10, 66:7, 66:14, 73:11, 73:25, 123:25, 124:22, 134:15, 162:3, 162:13, 194:13, 197:8, 197:9, 205:9, 225:11 **gotcha** 44:21, 60:3 **gotten** 69:21 | **graduation** 12:22 **grant** 35:22, 187:7, 211:19, 211:22 **granted** 76:11, 145:14, 145:19, 149:20, 168:2, 179:23, 212:21 **great** 112:4, 116:16 **green** 19:16 **group** 3:17, 47:10, 47:14, 48:1, 116:2 **groups** 46:4 **guess** 16:1, 18:6, 19:14, 24:18, 47:8, 47:9, 51:11, 64:18, 83:6, 83:9, 90:16, 91:7, 94:15, 118:25, 122:19, 123:25, 124:10, 137:5, 137:13, 146:20, 148:4, 174:20, 175:5, 187:14, 187:19, 189:6, 197:15, 218:24, 220:16, 220:20, 221:15, 221:24, 222:1 **guessing** 122:15, 155:17 **guidance** 45:19, 63:17, 64:22, 65:9, 65:19, 121:16, 142:16, 142:17, 181:19 **guide** 142:13 | **guideline** 40:23, 59:24 **guidelines** 19:25, 49:16, 55:17, 64:12, 121:11, 141:21 **gun** 112:18 **H** **hair** 221:1 **half** 11:25, 50:12 **halfway** 36:11 **hamas** 106:2 **hand** 201:2, 204:12, 206:16 **handbook** 113:4, 114:3, 114:10 **handcuffed** 189:19, 198:21, 199:10 **handcuffs** 30:5, 202:8 **handful** 8:22 **handle** 20:10, 134:24, 172:13 **handles** 110:16 **hands** 70:21, 204:23 **hang** 212:23 **happen** 55:21, 144:18, 158:10, 200:13, 212:21 **happened** 27:25, 56:6, 76:7, 79:7, 81:5, 103:19, | 122:16, 151:1, 151:21, 196:13, 222:1 **happening** 106:6 **happens** 116:5, 212:25 **happy** 10:8, 10:17, 111:14 **harass** 49:13 **harassed** 39:21, 49:12, 49:13, 79:23, 129:17, 213:2 **harassing** 17:19, 39:6, 51:18, 63:11, 110:4, 135:22, 136:7, 152:13 **harassment** 18:23, 75:6, 78:6, 81:9, 81:15, 81:17, 123:6, 126:16, 126:22, 126:24, 214:7, 214:10 **hardin** 2:12, 7:3, 227:2, 227:16 **harm** 39:5, 216:16 **harmed** 39:21, 213:3 **harmful** 17:19, 30:17, 33:3, 38:18, 39:5, 100:9, 110:5, 129:16, 186:3 **harris** 78:25, 79:2, 79:12, 81:14, 81:24, 82:1, 82:4, 84:3, 85:18, 87:10, 89:4, 89:11, |

91:8, 93:9,
95:5, 96:25,
102:14, 105:5,
107:1, 113:3,
113:4, 114:3,
115:5, 120:9,
120:12, 120:18,
120:21, 121:25,
122:3, 122:23,
122:25, 123:5,
130:11, 131:7,
131:19, 131:23,
132:22, 133:15,
133:24, 144:4,
144:5, 144:10,
152:11, 153:11,
156:25, 199:3,
212:21, 223:17

**hartzog**
3:17

**hat**
116:11, 116:14

**hate**
45:11, 45:20,
45:22, 46:4,
169:12, 170:5,
170:17, 176:20,
176:23, 177:11,
177:16, 178:5,
179:7, 215:11,
215:15

**he'll**
59:10

**head**
9:22, 84:23,
204:24, 205:24

**headdress**
106:10

**headgear**
112:20

**heading**
44:5, 50:17

**headquartered**
6:12

**health**
22:1

**hear**
198:18, 205:4,

210:16

**heard**
46:2, 46:12,
55:25, 77:6,
93:23, 161:6,
186:15, 198:19,
210:14, 210:15,
211:5, 216:23

**hearing**
7:17

**heart**
21:11, 117:3

**heated**
85:20

**held**
2:2, 196:13

**help**
19:24, 25:13,
27:11, 35:6,
59:21, 132:24,
217:24

**helped**
185:20

**helps**
9:20, 193:15

**hemp**
28:11

**here**
6:3, 8:9, 8:12,
9:11, 10:14,
30:1, 34:23,
47:23, 61:15,
62:24, 63:10,
66:17, 103:6,
109:12, 128:21,
138:19, 150:17,
161:13, 168:4,
168:13, 169:2,
174:2, 178:11,
193:14, 212:2,
215:7, 215:25

**hereby**
227:3, 228:2

**hernandez**
3:15, 60:8,
145:2, 145:9,
146:1, 165:17,
181:1, 181:4,

181:10, 181:11,
183:3, 185:19,
186:6, 186:16,
187:21, 189:2,
189:22, 193:3,
197:25, 198:21,
200:18, 220:13

**herself**
28:23, 90:13,
123:7, 186:3,
224:18

**hibaj**
82:23, 83:6,
105:13, 114:17

**higher**
35:18, 35:19,
37:15, 63:16,
190:24

**higher-ups**
64:5

**highway**
201:19

**hijab**
82:25, 83:1,
84:20, 84:21,
84:24, 85:4,
85:7, 85:9,
85:12, 85:14,
105:16, 112:25,
113:1, 114:23

**hijabs**
108:5

**hill**
119:1, 119:6,
119:23, 120:8,
196:22, 197:3,
203:21

**himself**
60:1

**hindrance**
129:21

**hire**
122:11

**hired**
11:20

**hiring**
87:10, 122:10

**hit**
69:13, 69:21,

69:24, 210:8

**hold**
197:13, 210:6,
210:7

**holly**
4:2, 4:5, 6:24,
11:4, 11:18,
11:20, 12:3,
12:20, 13:22,
17:2, 17:10,
17:12, 26:5,
29:5, 33:6,
34:16, 43:4,
44:8, 46:6,
46:18, 61:15,
63:10, 68:24,
70:1, 70:8,
77:7, 78:5,
122:1, 122:3,
122:22, 123:4,
126:6, 128:21,
131:8, 131:20,
131:24, 132:7,
139:7, 141:4,
142:7, 142:24,
143:9, 154:3,
158:17, 161:13,
170:3, 172:25,
173:14, 212:20,
213:6, 213:21,
213:25, 214:4,
214:25, 216:15,
218:3

**holtzman**
3:5, 8:7

**home**
29:1, 88:10,
106:18, 132:10,
141:1, 141:3,
180:17, 183:7,
198:17, 206:24

**honest**
43:22

**honestly**
100:18, 105:3,
105:6, 105:17,
110:10, 126:16,
139:18, 141:6,

142:21, 147:1,
151:24, 161:24,
173:5, 199:9,
199:14, 199:17
**hope**
73:24, 124:8,
162:12
**hopefully**
66:11, 217:22
**hoping**
66:10
**hospital**
19:19, 23:6,
25:5, 202:17
**hour**
10:14, 124:2,
209:22
**hours**
14:18, 14:19,
15:3, 124:6
**house**
29:23, 31:9,
31:12, 31:19,
32:1, 33:10,
33:18, 73:2,
88:23, 96:22,
141:4, 183:8,
183:9, 183:12,
183:15, 184:16,
189:25, 195:21,
196:5, 197:7,
203:18, 203:20
**household**
28:14, 32:20
**houses**
203:23, 204:5,
204:11, 205:7,
205:14, 206:1
**however**
155:16, 221:25
**huh-uh**
120:10
**human**
217:25
**hungerford**
6:13
**husband**
185:16, 186:21,

187:16, 189:23,
190:1, 190:6,
198:19, 221:3,
221:9
**hypothetically**
31:13, 32:7,
40:25, 75:5

**I**

**idea**
172:20
**identification**
43:16, 49:19,
102:5, 107:11,
111:3, 115:13,
148:18, 166:9,
173:11, 194:19
**identified**
194:21, 195:17,
198:12, 203:13
**identify**
6:17, 45:19
**identifying**
45:11, 46:4,
48:6, 48:10
**iffy**
126:4, 126:9,
126:10
**ignorance**
59:18
**image**
90:12
**immediate**
34:11
**impair**
11:14, 53:16,
137:22
**implications**
17:4
**implicit**
46:14, 46:22,
47:4, 47:13,
47:19, 48:6,
48:10
**important**
197:11
**in-state**
27:9

**incident**
58:20, 89:25,
93:6, 98:5,
98:10, 103:13,
104:4, 104:22,
118:22, 154:2,
154:17, 154:19,
154:21, 155:23,
156:1, 156:3,
156:21, 163:18,
163:19, 164:9,
165:5, 166:1,
166:25, 167:2,
170:6, 170:10,
174:19, 176:22,
176:23, 176:24,
177:9, 177:11,
177:14, 178:12,
178:14, 192:3,
192:6, 192:7,
215:11, 215:13,
215:15, 216:13
**incidents**
170:16, 170:18,
214:23, 215:9,
215:10, 217:1
**include**
13:7, 15:7,
16:17, 16:23,
97:23, 117:22,
158:22
**included**
5:9, 14:6,
25:22, 43:17,
49:20, 102:6,
102:18, 107:12,
111:4, 115:14,
147:11, 148:19,
166:10, 173:12,
194:19, 218:20
**including**
53:17, 53:24,
56:9, 137:24,
138:2
**incoming**
171:12
**incorrect**
85:2, 85:6,

158:16, 178:1
**incorrectly**
81:11, 101:9,
120:6, 202:9
**indecipherable**
150:18
**independent**
77:24
**indiana**
2:13, 227:17
**indicate**
24:19
**indicated**
190:13
**indicating**
51:13
**indication**
197:23
**individual**
20:21, 27:19,
29:24, 29:25,
42:5, 69:14,
69:21, 70:3,
70:8, 70:11,
70:12, 70:13,
70:17, 70:20,
72:8, 110:22,
114:2, 143:22,
144:3, 144:13,
153:15
**individuals**
13:14, 28:4,
30:7, 48:7,
48:11, 48:13,
48:15, 59:21,
69:25, 92:17,
123:13, 130:10,
131:17, 151:15,
184:21, 193:10,
224:14
**influence**
11:12
**inform**
94:20
**informal**
45:14
**information**
27:8, 29:22,

42:5, 53:15, 54:20, 55:1, 55:5, 55:9, 71:18, 71:19, 71:20, 72:1, 72:12, 72:19, 72:23, 73:7, 73:9, 76:4, 79:1, 79:3, 81:4, 86:6, 92:18, 100:19, 103:18, 113:18, 121:2, 130:13, 140:4, 140:11, 140:17, 146:15, 150:5, 150:6, 154:1, 160:21, 167:7, 168:7, 171:15, 171:17, 171:19, 175:1, 175:4, 175:14, 175:18, 177:3, 179:6, 187:1, 190:20, 191:14, 203:5, 217:14, 219:21, 220:23, 221:10, 222:16, 224:15

**informed**
91:9, 91:10, 168:1, 199:18, 211:1, 221:16

**initial**
118:1, 168:24

**initially**
167:14

**injure**
188:11

**injuries**
19:17, 20:3, 20:5

**injury**
196:15

**input**
169:21

**inside**
82:7, 93:19, 218:3

**instead**
19:20, 37:1, 75:5, 85:3

**instructions**
142:13, 188:25

**instructors**
13:13

**instrument**
19:24

**insurance**
27:20

**intended**
7:11, 53:14, 108:18

**interacted**
87:19

**interaction**
83:9, 200:12

**interest**
227:10, 228:10

**interrupt**
66:4, 194:24

**intervene**
24:13, 83:13, 94:5, 115:6, 132:16

**intervened**
85:23, 160:12

**intervention**
20:7, 20:15, 20:19

**interview**
140:1, 142:20

**interviewed**
142:25

**intimidation**
176:19

**investigate**
70:23, 109:10, 121:8, 133:23, 174:25, 175:11, 175:25

**investigated**
78:12, 215:14

**investigating**
9:2, 53:21, 78:8, 100:24, 100:25, 159:5,

176:11, 214:24

**investigation**
58:2, 68:15, 74:3, 100:12, 105:23, 109:1, 113:8, 115:21, 118:9, 119:9, 119:14, 140:2, 145:1, 161:5, 162:16, 163:23, 165:7, 165:23, 174:16, 174:18, 174:22, 175:8, 181:17, 192:4, 213:7, 213:11, 219:22, 220:6, 221:14, 221:20, 222:4

**investigations**
44:11, 45:4, 170:18, 171:17, 171:20, 172:11, 174:14, 176:5, 176:8, 176:9, 177:1, 178:16, 178:25, 179:2

**investigative**
173:2, 173:17

**investigator**
175:4, 175:17, 215:4

**investigators**
73:9, 171:2, 171:4, 174:21, 175:10, 175:23, 176:3, 179:2

**involve**
215:10

**involved**
70:4, 78:15, 87:18, 142:14, 151:15, 155:8, 159:16, 160:18, 191:8, 219:2

**involvement**
209:7

**involving**
24:14, 177:10,

217:2

**irate**
69:17, 70:1, 71:11

**ish**
180:21

**islamic**
169:13

**issue**
16:4, 22:16, 24:4, 36:1, 37:22, 38:14, 39:18, 41:1, 42:23, 54:14, 89:15, 92:23, 115:4, 161:21, 170:22, 170:24

**issued**
36:2, 156:11, 156:13, 156:14, 156:17

**issues**
20:5, 21:2, 22:1

**it'd**
66:11

**it'll**
27:23, 99:6, 99:7, 99:21, 147:13, 149:20

**itch**
188:15, 188:20

**items**
82:21, 100:1, 189:23, 190:2, 190:7

**itself**
102:25, 162:17

---
**J**
---

**jail**
27:21, 30:8, 30:18, 40:3, 40:22, 41:17, 41:18, 142:3, 157:5, 157:24, 158:8, 158:25, 159:10, 161:4,

161:9, 186:4,
196:8, 197:21,
200:14, 207:17
**january**
14:1
**jennifer**
1:5, 185:10
**jewish**
48:10, 78:2
**job**
1:23, 21:1,
21:12, 47:20,
79:22, 118:5,
123:14, 170:22,
213:4
**john**
4:3
**join**
181:8, 181:16,
213:25
**jokingly**
188:18
**jon**
6:23, 11:9
**josefiak**
3:6
**journalism**
16:13
**journalist**
77:25
**jr**
1:16, 2:1,
7:25, 11:1
**judge**
9:7, 9:11,
35:11, 211:16
**judged**
87:19
**july**
12:22, 14:1
**jumped**
185:20
**june**
228:17
**jurisdiction**
68:20, 68:21,
68:24, 70:2,
70:9, 72:9,

143:4, 143:5,
143:9, 145:21,
145:24

### K

**katherine**
3:16
**katie**
6:21, 11:8,
112:1, 222:20
**kbarber-jones@ha-
rtzoglawgroup**
3:22
**kdwyer@holtzmanv-
ogel**
3:12
**keep**
44:3, 124:16,
147:21, 167:18,
167:23, 179:8,
195:25, 204:24,
209:18, 212:2,
215:1
**keeper**
192:14
**keffiyeh**
85:3, 85:8,
105:24, 113:1,
114:17, 114:22,
116:3
**keffiyehs**
106:2
**kellen**
3:4, 6:25
**kept**
212:4
**key**
15:14
**keyword**
37:7
**kid**
70:19
**kids**
69:15, 87:16,
87:18, 87:21,
90:3, 90:4,
90:16, 90:18,
123:2, 123:15,

130:7, 130:14,
130:16, 130:17,
133:5, 133:9,
153:17, 212:17,
212:23, 224:17
**killing**
34:12
**kind**
20:12, 26:8,
26:9, 27:6,
35:25, 50:11,
55:25, 68:9,
68:11, 79:4,
97:6, 126:3,
142:16, 145:9,
151:20, 156:10,
172:19, 184:11,
185:19, 197:25,
203:23, 214:10
**knee**
188:19
**knew**
77:8, 78:17,
79:6, 83:3,
88:7, 88:10,
96:1, 96:5,
123:3, 134:11,
140:19, 145:16,
145:23, 181:17,
217:16, 224:16
**knock**
185:5
**knowing**
37:25, 85:11
**knowingly**
152:7
**knowledge**
12:25, 33:25,
134:13, 160:19,
161:11, 169:23,
213:10, 214:19,
214:20, 214:21,
227:7
**known**
39:8, 39:9,
40:5, 57:4,
65:15, 143:23
**knows**
114:6, 186:24

**kufi**
85:10

### L

**label**
169:12
**labeled**
170:16, 178:12
**lack**
101:14
**lady**
82:22, 83:2,
83:3, 85:17,
99:25
**lake**
144:8, 144:14,
144:17
**languages**
23:19
**laptop**
219:15, 219:18,
219:19
**larcenies**
18:19, 36:2
**larceny**
39:24
**larger**
51:2
**last**
50:5, 53:8,
53:9, 84:15,
127:23, 149:7,
150:21, 151:7,
191:11, 192:17
**late**
8:12
**later**
8:10, 25:19,
70:2, 87:23,
91:1, 92:21,
94:13, 100:15,
100:22, 100:23,
110:21, 132:4,
144:16, 172:19,
185:16, 208:23,
220:12
**law**
3:17, 7:17,

8:7, 13:5, 13:9, 13:25, 14:5, 14:7, 14:10, 14:17, 15:3, 15:4, 15:6, 18:2, 18:8, 18:14, 19:3, 19:7, 19:9, 25:24, 29:2, 29:12, 31:13, 32:21, 37:15, 37:17, 57:15, 68:21, 79:8, 108:1, 139:2, 186:24

**lawful**
53:15

**lawn**
206:13

**laws**
7:13

**lawyer**
8:6

**lawyers**
155:17, 211:17

**lead**
215:4

**leads**
171:6, 175:2

**league**
46:1

**leaked**
92:20, 130:13, 224:16

**learn**
14:23, 19:11, 28:19, 59:22

**learned**
14:10, 18:24, 22:1, 109:8, 211:12

**learning**
14:20, 217:13, 217:17

**least**
168:22, 172:20

**leave**
23:12, 84:15,

94:10, 94:12, 94:18, 97:5, 158:18, 171:1, 171:4, 180:7, 201:5

**leaving**
180:6, 180:7, 182:15

**led**
13:14, 121:22, 134:5

**left**
71:9, 83:18, 96:24, 97:1, 97:5, 97:9, 97:11, 124:7, 189:25, 196:5, 197:16

**legal**
123:17, 130:5, 155:11, 221:24

**legally**
122:17, 221:25

**lengthy-worth**
147:23

**less**
36:3, 209:22

**lesser**
75:12

**let's**
20:14, 43:14, 44:4, 49:22, 50:11, 65:5, 101:25, 110:25, 115:11, 124:20, 149:6, 166:18, 167:12, 173:9, 174:4, 174:7, 179:15, 195:15, 198:10, 210:7, 222:24

**letting**
30:9, 60:1, 94:17, 132:18, 153:11, 155:5, 155:7, 187:1, 200:12

**level**
21:11, 60:2,

172:4, 190:22

**liable**
196:14

**license**
27:15, 27:20, 27:21

**lieutenant**
13:15, 13:17, 13:19, 61:12, 61:18, 62:15, 62:21, 62:25, 63:2, 63:6, 64:6, 64:7, 64:14, 64:22, 65:9, 65:18, 74:13, 75:24, 75:25, 127:7, 127:8, 127:12, 127:14, 127:22, 127:25, 128:1, 128:2, 128:4, 128:6, 128:16, 134:4, 134:8, 139:19, 144:24, 146:6, 161:20, 165:16, 190:25

**lieutenants**
13:21

**life**
20:25, 26:10, 90:3, 159:23, 217:22

**lifestyle**
38:20, 38:22, 129:19, 129:20, 136:17

**likely**
33:2, 75:21, 153:6, 153:13, 167:7

**likes**
47:22, 113:17

**limit**
99:21

**limited**
177:3

**limits**
73:2

**lines**
153:6, 175:3

**link**
99:6, 99:10, 102:16, 111:21, 140:20

**list**
176:14

**listed**
138:5

**literally**
33:10, 37:6, 40:24, 58:10, 70:2, 99:14, 99:22, 148:8, 151:18

**little**
14:25, 27:7, 44:4, 65:23, 69:20, 83:4, 83:10, 91:8, 94:14, 109:10, 116:19, 167:21, 185:14, 186:14, 210:7, 221:23

**live**
73:5

**lives**
68:16, 130:14

**living**
38:23, 39:3

**located**
34:9, 71:13, 121:25, 192:4

**location**
30:23, 31:1, 122:2, 131:16, 132:1, 132:7, 132:8

**logical**
66:6, 66:11

**login**
146:14, 191:14

**long**
110:4, 147:20, 195:23, 200:19, 210:3

**longer**
124:12, 192:10,

210:8

**longtime**
77:18

**look**
27:13, 27:15,
28:13, 40:8,
40:16, 40:17,
51:9, 52:12,
52:14, 63:23,
64:25, 65:14,
100:17, 100:20,
101:4, 101:7,
103:5, 137:17,
138:24, 140:22,
175:5, 175:21,
177:16, 185:7,
204:25, 220:1,
221:16

**looked**
52:6, 52:8,
105:8, 117:17,
135:11, 135:14,
138:23, 192:22,
220:2, 221:22

**looking**
27:20, 49:9,
51:23, 63:22,
63:24, 63:25,
64:8, 64:16,
64:25, 68:10,
94:6, 105:18,
126:2, 128:10,
128:22, 128:23,
138:18, 140:23,
141:19, 148:25,
151:17, 151:23,
154:12, 156:7,
167:1, 192:25,
204:21

**looks**
124:3

**lot**
9:5, 33:14,
37:8, 49:7,
50:13, 60:12,
61:14, 173:22,
215:1

**louder**
83:10

**louis**
1:16, 2:1,
7:25, 11:1

**lounge**
187:15

**low**
24:20

**M**

**made**
40:25, 70:15,
78:5, 79:22,
91:10, 104:11,
110:14, 122:9,
122:25, 133:24,
133:25, 134:2,
159:9, 186:2,
212:20, 212:22,
216:2, 220:14,
222:6, 222:13

**maga**
116:11, 116:14

**magistrate**
35:20, 35:21,
65:6, 75:11,
76:2, 76:5,
146:13, 146:17,
146:25, 147:17,
147:24, 148:2,
148:12, 149:22,
150:11, 151:9,
152:15, 152:23,
152:25, 153:2,
153:20, 153:24,
155:23, 156:20,
158:2, 158:14,
159:14, 159:15,
159:19, 160:1,
160:21, 162:19,
162:22, 162:24,
163:3, 163:6,
164:14, 187:6,
187:20, 187:25,
189:12, 209:10,
211:16, 211:19

**magistrates**
155:17

**main**
4:4, 9:6, 51:6,
90:9, 90:11,
118:7, 136:14,
136:18, 141:13,
143:8, 181:14,
205:12, 223:21

**mainly**
103:2

**make**
9:20, 9:23,
10:3, 10:5,
28:25, 30:16,
30:21, 32:22,
42:18, 51:1,
57:1, 57:25,
79:3, 83:22,
92:4, 92:7,
93:1, 94:2,
103:4, 104:12,
109:25, 116:16,
126:6, 134:22,
141:9, 141:10,
142:17, 143:23,
148:6, 151:4,
157:3, 157:17,
159:8, 161:15,
183:21, 188:3,
188:10, 194:3,
195:24, 196:7,
197:3, 197:11,
197:20, 200:16,
222:17

**making**
223:19

**man**
5:15, 112:16

**management**
91:7, 91:8,
94:16, 94:20,
102:14, 103:20,
115:6, 121:5,
122:6, 128:11,
129:6, 130:2,
132:15, 153:10,
171:25, 212:10,
222:8

**manager**
83:11, 85:23,

87:6, 93:14,
93:17, 93:18,
94:1, 95:11,
97:12, 97:15,
98:9, 103:25,
105:1, 120:25,
125:22, 157:1,
160:12

**manager's**
97:23, 98:4

**maneuver**
63:18, 172:21

**manner**
29:1, 40:15,
188:18

**many**
8:20, 118:21,
183:2, 203:23,
204:5, 214:23

**marijuana**
28:11

**marino**
3:15, 60:11,
125:14, 125:24,
126:13, 127:1,
128:13, 139:19,
145:6, 145:23,
161:19, 165:17,
181:1, 181:6,
181:16, 182:16,
183:5, 185:19,
186:7, 189:8,
193:2, 198:22,
198:25, 220:13

**mark**
107:10, 111:1,
115:12

**marked**
43:16, 49:19,
102:3, 102:5,
107:11, 111:3,
115:13, 148:18,
166:7, 166:9,
173:11, 194:18

**marking**
50:1

**marks**
225:15

**married**
215:19
**maryland**
6:13
**materials**
191:5
**math**
12:2
**matter**
6:5, 14:13,
195:13, 196:17,
228:7
**matters**
9:1, 21:14
**matthews**
4:18
**maybe**
24:7, 31:18,
31:19, 54:3,
60:19, 63:10,
69:15, 75:4,
75:12, 81:9,
124:1, 126:16,
134:23, 143:19,
155:25, 157:10,
190:23, 191:1,
192:24, 204:3,
215:23, 221:21
**mean**
13:13, 15:12,
24:24, 32:6,
33:22, 33:25,
35:6, 37:6,
39:13, 40:8,
47:21, 49:22,
55:8, 60:11,
60:15, 63:23,
75:19, 80:6,
81:18, 82:15,
105:3, 109:16,
114:14, 114:18,
117:2, 126:15,
137:1, 137:12,
138:21, 141:23,
143:18, 147:20,
151:25, 155:3,
156:17, 158:12,
168:16, 171:4,

178:14, 182:10,
200:7, 211:13,
217:21, 217:24,
222:21, 225:24
**meaning**
83:7
**means**
7:8, 9:8,
46:25, 110:2,
117:4, 146:19,
155:13
**meant**
98:6, 132:13,
144:6
**media**
6:3, 85:25,
86:3, 86:14,
88:20, 90:14,
90:22, 91:20,
92:24, 96:18,
100:4, 101:5,
118:21, 123:22,
123:23, 129:9,
129:11, 136:20,
152:12, 159:16,
162:21, 178:7,
215:23, 216:6,
221:6
**medical**
20:9, 23:14,
23:23, 23:25,
24:3, 25:6,
25:23, 26:24,
202:17
**medically**
25:7
**medications**
11:13
**medicine**
24:15
**meet**
22:18, 22:20,
64:19, 108:24,
138:11, 210:21
**member**
175:8
**members**
106:2, 176:3

**memorialize**
89:18
**mental**
20:4, 20:24,
21:16, 22:1,
23:6
**mentally**
20:6, 21:14,
23:4, 24:15,
212:14, 212:15
**mention**
85:16, 85:25,
86:11, 86:25,
87:21, 90:21,
91:19, 134:9,
139:20
**mentioned**
13:1, 13:4,
14:5, 17:23,
18:7, 18:9,
19:6, 21:3,
23:1, 27:1,
28:6, 28:17,
33:5, 35:25,
44:17, 58:23,
59:17, 67:9,
78:17, 84:19,
85:17, 102:18,
107:4, 117:12,
119:5, 120:14,
125:7, 135:1,
140:10, 142:22,
154:16, 165:4,
189:14, 223:17,
224:9
**mentions**
108:13, 199:1
**message**
163:12, 193:21,
221:5
**messages**
163:4, 163:10,
165:22, 220:5
**messaging**
88:20, 96:19
**met**
14:21, 42:18,
64:1, 65:20,

68:11, 75:14,
83:2, 184:10,
208:22
**methamphetamine**
28:11
**micah**
2:12, 7:3,
227:2, 227:16
**mid-september**
11:22
**middle**
106:7, 169:11,
198:1, 198:2
**middleman**
47:23, 48:3
**might**
14:18, 14:19,
20:25, 21:19,
21:21, 23:5,
23:21, 24:11,
25:19, 26:11,
31:9, 31:14,
32:4, 32:8,
32:17, 33:17,
34:5, 34:7,
36:5, 37:12,
37:16, 39:17,
42:21, 44:20,
45:8, 47:4,
47:7, 47:10,
47:19, 55:17,
55:19, 58:4,
58:24, 62:9,
63:17, 64:3,
71:4, 71:16,
72:2, 72:13,
72:19, 72:25,
75:4, 75:8,
75:12, 84:22,
90:3, 93:14,
93:15, 100:8,
101:8, 101:18,
105:19, 108:25,
109:22, 110:19,
113:15, 124:16,
130:18, 131:14,
131:18, 134:23,
138:14, 141:23,

141:25, 148:5, 150:14, 162:3, 164:10, 166:19, 170:6, 175:20, 178:3, 178:4, 180:4, 183:17, 183:18, 187:17, 192:4, 196:25, 208:2, 213:9, 219:23, 219:25, 220:2

**miles**
4:19, 6:11

**mind**
16:2, 20:21, 20:22, 23:22, 25:18, 26:15, 51:1, 115:3, 137:15

**mine**
35:11, 137:4

**minimum**
116:10

**mint**
25:18, 25:19, 25:21, 26:20, 26:21, 26:22

**minute**
194:15, 198:11, 203:12

**minutes**
54:4, 66:12, 70:2, 73:12, 73:15, 124:20, 209:19, 223:2

**miranda**
199:6, 199:13

**miss**
11:8

**missing**
151:4

**mistaken**
14:18, 17:20, 52:7, 183:8, 184:24, 189:8, 218:17

**modern**
12:24

**moment**
70:10, 154:9, 158:4, 174:5

**moments**
185:16

**monitor**
6:10, 73:17, 73:21, 124:24, 125:3, 162:6, 162:10, 223:7, 223:11

**mono**
195:13

**monroe**
5:14, 107:20

**month**
35:7

**months**
35:8, 41:8

**more**
14:11, 18:21, 20:6, 20:12, 20:18, 21:9, 23:4, 26:19, 27:7, 31:7, 32:7, 34:7, 36:8, 43:24, 47:1, 47:11, 49:14, 50:9, 52:17, 52:20, 66:12, 69:7, 73:25, 74:2, 75:21, 84:18, 95:14, 97:6, 101:4, 104:12, 109:10, 115:11, 123:14, 124:9, 129:14, 136:5, 138:19, 147:21, 151:12, 153:5, 153:13, 153:25, 161:8, 162:15, 167:21, 185:18, 185:25, 187:13, 197:11, 198:4, 209:19, 209:20, 214:12, 215:3, 215:6, 215:16,

215:17, 223:2, 223:14

**morning**
168:18, 169:3, 180:14, 180:19, 197:2

**most**
34:24, 159:4, 167:7, 183:1, 207:24

**mostly**
40:9

**motivated**
45:12, 45:16, 169:13, 170:6, 170:17, 176:24, 177:11, 177:17, 178:13

**mouth**
19:21

**move**
9:15, 20:23, 42:12, 55:17, 68:25, 83:21, 109:19, 137:15

**moving**
71:17

**mp4**
193:1

**much**
26:21, 68:3, 69:7, 71:21, 72:6, 73:6, 100:21, 100:23, 106:8, 124:17, 131:9, 161:7, 161:11, 171:8, 171:10, 171:15, 172:16, 185:22, 186:21, 209:20, 225:6

**mugshot**
216:6, 216:17, 216:23

**multiple**
213:21

**murder**
18:20

**muslim**
48:6, 169:14, 170:1, 170:10, 170:14, 177:17, 178:13, 179:9

**must**
182:14

**myself**
30:17, 121:15, 182:22, 183:3, 186:3, 188:11, 214:8

**N**

**name**
8:5, 10:25, 57:1, 57:19, 57:20, 84:15, 84:16, 86:11, 86:19, 86:25, 88:7, 92:22, 92:23, 96:2, 103:3, 106:14, 127:17, 140:19, 140:22, 144:1, 144:21, 220:19

**named**
107:19, 112:16, 116:1, 152:6

**naming**
151:11

**narrative**
141:11, 147:13, 151:19, 154:25, 164:3, 167:8, 168:5, 168:10, 169:4, 209:4, 224:8, 224:25

**nature**
191:1

**nearsighted**
44:1

**necessarily**
14:15, 18:3, 19:21, 25:15, 26:16, 33:4, 34:3, 34:23, 37:5, 39:10,

40:10, 40:16,
42:3, 42:15,
56:22, 57:2,
57:16, 59:22,
61:14, 62:18,
62:23, 63:11,
65:4, 65:10,
89:4, 91:11,
97:4, 100:6,
105:3, 109:24,
110:17, 110:24,
114:4, 114:9,
117:25, 122:1,
126:18, 131:4,
141:22, 143:21,
144:19, 145:23,
154:5, 154:13,
155:19, 161:10,
161:14, 175:16,
177:4, 179:4,
179:7, 179:11,
179:12, 180:9,
182:2, 182:3,
186:16, 186:21,
188:3, 189:5,
196:9, 197:8,
198:1, 201:19,
210:13

**need**
10:12, 10:16,
20:23, 20:24,
20:25, 23:13,
24:7, 25:1,
25:9, 25:19,
35:10, 37:13,
58:12, 58:25,
59:14, 63:17,
67:19, 70:16,
70:22, 73:12,
75:12, 97:4,
114:2, 124:14,
124:16, 142:18,
143:20, 155:10,
155:11, 155:14,
189:13, 203:8,
209:17

**needed**
14:22, 25:11,

83:10, 131:18,
134:24, 143:18,
157:16, 158:14,
180:6, 201:11

**needs**
12:13, 22:19,
22:20, 36:23,
59:14, 59:15,
94:17

**negligent**
36:10

**neighbor**
204:7, 204:10,
204:13, 205:8,
206:11

**neighborhood**
184:11, 184:12,
184:13

**neighbors**
204:16, 204:18,
205:3, 205:14,
206:13

**neither**
160:16, 198:9,
227:8, 228:8

**nerve**
178:6

**never**
46:2, 77:6,
83:2, 83:3,
88:14, 95:4,
95:5, 95:7,
95:9, 137:14,
142:14, 143:25,
182:7, 184:10,
185:21, 214:20,
216:23

**new**
19:20, 19:22,
55:15, 59:21,
142:15, 143:2,
161:2, 173:21,
214:1

**newborn**
69:15, 70:18

**newer**
108:22

**news**
106:1, 106:11

**newspapers**
216:10

**next**
30:23, 66:21,
67:9, 68:24,
72:13, 93:12,
144:16, 145:2,
145:8, 145:15,
145:21, 149:6,
149:24, 159:9,
170:25, 174:9,
176:15, 179:19,
179:23, 179:25,
180:8, 181:12,
198:10, 203:11,
209:23

**nice**
66:11

**night**
187:14, 223:16,
225:11

**nighttime**
32:13

**nods**
9:22

**non**
53:13

**nonviolent**
53:13

**normal**
38:23, 49:17,
82:20, 170:18

**normally**
52:23, 63:9,
126:5, 128:19,
172:18

**north**
1:2, 3:20, 4:5,
6:7, 27:16,
48:20, 77:18,
77:22

**northwest**
3:7

**nose**
188:16, 188:20

**nosy**
204:7

**notary**
2:12, 7:6,

227:16

**notation**
57:10

**notes**
222:25

**nothing**
12:12, 16:3,
30:16, 117:24,
133:16, 164:12,
168:14, 170:21,
186:2, 188:12,
192:21, 211:23,
211:24, 215:22,
216:20

**notice**
2:11

**notification**
137:10, 176:25

**notifications**
173:2, 173:17,
174:15

**notified**
24:3, 91:13,
176:10, 199:21,
202:21

**notifies**
23:24

**november**
12:16, 60:4,
80:23, 86:4,
86:8, 86:9,
86:10, 91:16,
91:21, 92:1,
101:2, 103:8,
103:10, 103:25,
104:12, 104:23,
125:20, 145:8,
146:1, 146:3,
156:4, 156:15,
156:18, 157:11,
157:14, 157:19,
157:21, 158:1,
158:19, 167:3,
167:4, 167:13,
167:24, 168:17,
169:6, 180:12,
224:20

**now's**
123:25

**now-lieutenant**
165:16
**number**
6:4, 6:8,
36:19, 50:21,
72:2, 84:10,
87:15, 140:14,
140:15, 155:13,
155:14, 174:6,
207:12
**numbers**
111:11, 215:1
**nursing**
19:18

**O**

**oaths**
7:7
**object**
9:9, 41:25,
43:6, 76:24,
77:9, 103:15,
105:9, 136:22,
203:2, 205:16
**objection**
7:17, 9:10,
9:11, 22:3,
25:25, 114:24,
206:5, 216:18,
217:8, 217:19,
218:5
**obligation**
21:24, 199:23
**obtain**
191:17, 191:18,
191:25
**obtained**
165:1, 168:13,
179:18, 190:15
**obtaining**
74:6
**occur**
79:7, 103:14
**occurred**
79:17, 79:21,
81:14, 81:17,
104:5, 104:14,
104:23, 115:5,

163:18, 170:21
**occurrence**
42:9, 89:17
**occurring**
224:5
**october**
103:7, 103:8,
103:9, 103:11,
106:7, 107:20,
112:10, 115:23
**offender**
72:7
**offenders**
207:10
**offending**
100:7
**offense**
35:14, 141:15,
152:5, 152:6,
161:18, 161:23,
162:1, 210:22
**offer**
92:3
**office**
76:14, 76:19,
93:22, 94:11,
165:6, 209:11
**officer's**
28:22
**officers**
33:3, 33:13,
33:17, 56:23,
59:20, 60:14,
74:5, 171:8,
174:21, 181:23,
182:6, 182:25,
184:6, 184:19,
184:20, 187:10,
188:23, 198:21,
199:13, 218:25,
219:2, 222:14
**official**
228:5
**oh**
103:9, 127:13,
167:15, 170:19,
188:19, 195:2,
205:1, 205:4,

211:23, 211:24,
215:25, 218:21
**old**
5:15, 112:16
**older**
137:11, 220:25
**once**
23:16, 24:2,
25:2, 30:4,
30:10, 30:14,
30:20, 31:21,
32:19, 32:20,
35:17, 35:18,
35:21, 39:5,
41:12, 42:3,
48:2, 54:12,
54:15, 54:19,
55:1, 55:5,
59:12, 61:24,
62:3, 62:10,
65:13, 70:7,
70:13, 74:23,
76:6, 76:9,
79:1, 79:18,
80:18, 83:9,
83:17, 83:18,
83:19, 85:11,
92:13, 92:17,
94:3, 100:14,
101:16, 101:22,
110:15, 115:1,
121:15, 126:4,
128:10, 129:18,
132:18, 133:1,
140:4, 142:14,
144:4, 145:15,
145:17, 146:16,
149:19, 154:25,
158:23, 161:1,
161:22, 168:23,
168:24, 171:11,
171:23, 172:3,
172:12, 184:17,
185:9, 186:23,
188:13, 190:1,
196:22, 199:21,
204:23, 208:4
**one**
9:6, 18:13,

38:24, 39:2,
45:2, 49:14,
49:23, 56:1,
66:10, 67:5,
69:15, 69:25,
70:9, 103:23,
106:10, 115:11,
118:24, 119:4,
120:21, 121:13,
121:24, 123:21,
129:9, 132:7,
144:15, 144:17,
148:16, 157:3,
158:6, 158:10,
159:9, 159:16,
160:11, 161:3,
164:24, 167:19,
170:23, 172:23,
173:7, 174:5,
179:15, 181:24,
183:4, 191:2,
193:25, 194:5,
196:23, 199:12,
200:7, 200:8,
200:9, 200:17,
201:11, 204:6,
204:11, 205:22,
205:23, 205:24,
206:16, 208:5,
209:25, 212:18,
214:20, 214:22,
220:3
**ongoing**
20:25
**online**
14:25, 222:16
**only**
10:19, 27:16,
53:6, 64:16,
71:21, 72:6,
73:6, 100:20,
120:20, 122:2,
123:21, 126:21,
131:8, 131:23,
132:6, 133:7,
140:18, 144:5,
155:4, 159:15,
160:7, 164:25,

165:9, 165:25,
171:8, 171:10,
192:8, 193:10,
203:5, 203:9,
205:22, 206:16,
213:4, 214:2,
214:8, 214:16,
214:19, 214:22,
215:13

**opened**
185:1, 185:17,
201:12

**opening**
193:20, 201:25

**operate**
49:17

**operations**
44:10, 173:16,
182:10

**opportunity**
197:17

**opposing**
111:22

**option**
195:8

**oral**
57:8

**orally**
9:19

**order**
36:15, 91:22,
150:11, 162:19,
190:15, 210:24,
214:14

**organization**
45:25, 112:22

**original**
51:23, 69:23,
81:8, 101:11,
107:22, 112:14,
116:25, 137:14,
159:7, 165:10,
166:14, 168:25,
190:18, 201:17

**originally**
58:11, 180:1

**ossege**
1:25, 228:2,

228:16

**other**
9:1, 9:18,
13:18, 18:17,
18:23, 19:2,
19:23, 28:16,
29:4, 33:11,
39:21, 39:23,
42:21, 48:1,
69:17, 70:10,
70:12, 71:15,
72:21, 72:24,
84:21, 85:15,
94:6, 100:3,
100:5, 118:18,
119:15, 119:18,
130:25, 131:1,
132:12, 134:3,
142:5, 160:4,
160:17, 163:13,
163:14, 168:10,
171:11, 181:22,
192:3, 193:7,
199:12, 204:15,
205:13, 206:12,
208:2, 209:3,
211:3, 214:23,
215:10, 218:25,
221:12, 221:23,
222:9, 222:10,
222:18

**others**
30:17, 53:15,
60:10, 101:12,
186:3, 188:11,
205:20, 205:21,
206:2

**otherwise**
211:15, 227:11,
228:10

**ottaway**
63:2, 63:3,
63:6, 64:14,
64:22, 65:9,
127:8, 127:15,
127:22, 128:2,
128:4, 128:6,
128:16, 134:4,

134:8, 139:19,
144:24, 146:6,
161:20, 165:16

**ottaway's**
65:19

**ourselves**
65:24

**out**
12:6, 35:9,
37:5, 37:17,
37:19, 39:15,
53:23, 57:7,
61:15, 61:18,
62:8, 62:24,
63:9, 67:21,
68:14, 68:25,
70:10, 71:1,
71:15, 71:19,
71:21, 72:4,
72:11, 72:18,
72:20, 72:22,
72:25, 78:24,
79:8, 79:19,
81:9, 81:23,
82:14, 87:16,
90:4, 92:15,
92:20, 105:1,
105:3, 110:22,
111:11, 115:7,
115:8, 123:2,
123:16, 130:7,
130:12, 130:19,
131:9, 133:9,
138:1, 140:7,
141:14, 143:13,
147:4, 147:6,
148:11, 151:8,
151:12, 151:22,
153:17, 154:4,
157:25, 170:22,
187:21, 196:16,
201:15, 201:16,
204:21, 206:3,
209:3, 211:16,
211:17, 211:24,
212:17, 212:23,
212:24, 214:6

**out-of-state**
27:8

**outcome**
227:11, 228:11

**outlook**
47:18

**outside**
52:9, 79:14,
82:7, 84:2,
139:5, 155:11,
163:18, 164:12,
172:8, 184:24,
185:12, 185:17,
204:10, 204:13,
204:16, 206:1,
209:1

**outward**
22:24

**over**
9:4, 13:14,
32:9, 33:20,
69:19, 69:20,
70:22, 72:14,
82:5, 84:23,
194:22, 195:18,
198:13, 203:14

**overall**
13:14, 17:11,
17:14, 92:1,
151:20, 157:10

**overhear**
77:13

**oversee**
142:17

**oversight**
134:22

**overwhelmed**
94:14

**own**
119:24, 161:5

**P**

**pace**
34:14

**page**
5:2, 5:10,
53:10, 99:7,
119:12, 119:13,
119:15, 119:19,
149:6, 149:7,

149:9, 149:16, 149:17, 149:25, 150:2, 150:4, 150:21, 150:23, 151:22, 152:1, 153:12, 156:6, 166:19, 169:8, 169:11, 172:7, 172:9, 174:6, 174:9, 174:11, 176:15, 220:23

**pages**
1:24, 151:7, 228:3

**pamphlets**
45:16

**panic**
20:10, 21:5, 21:8, 22:14, 22:15, 22:24, 23:10, 199:19, 199:22, 199:25, 200:6, 202:12, 202:13, 202:20, 202:22, 202:25, 203:8

**paper**
76:4

**paperwork**
36:17, 41:3, 41:7, 76:1, 207:9, 209:3

**par**
27:14, 27:15, 191:23

**paragraph**
147:23

**parentheses**
169:14, 169:25

**parenthetical**
168:5

**park**
30:25, 31:18, 32:1, 32:5, 32:8, 32:15, 32:16, 32:25, 33:17, 34:8, 183:6, 183:11,

184:15

**parked**
84:2, 185:4, 197:6, 203:25

**parking**
34:10

**part**
18:1, 19:7, 19:9, 21:3, 29:12, 42:18, 51:20, 51:22, 52:17, 66:7, 85:6, 90:2, 90:5, 90:6, 112:20, 117:25, 122:19, 126:10, 129:21, 129:22, 130:24, 136:1, 141:19, 157:9, 166:21, 175:10, 183:1

**particular**
12:10, 34:6, 37:15

**parties**
2:2, 6:15, 7:9, 7:15, 227:10, 228:9

**parts**
17:17

**party's**
170:23, 170:25

**pass**
73:8, 225:3

**passenger**
182:13

**passionate**
97:1

**past**
27:25, 69:21, 170:25

**paste**
138:18

**pat**
30:16, 186:2

**patriot**
116:1

**patrol**
12:5, 12:11,

12:16, 12:20, 14:3, 29:5, 30:25, 47:20, 59:11, 60:2, 62:4, 80:4, 80:12, 128:2, 171:9, 171:10, 172:4, 172:13, 174:24, 175:7, 175:11, 183:2, 190:22, 195:21, 196:10, 196:19

**patrolling**
80:6

**pause**
168:11, 174:9, 176:17, 198:14, 203:16

**paying**
36:9

**pba**
218:14, 218:15, 218:19

**pc**
76:6

**pd**
214:25

**peace**
212:3, 212:4

**peaceable**
53:13

**peaceful**
183:22

**peeking**
204:18

**pending**
10:20, 27:22

**people**
11:6, 28:23, 31:14, 32:14, 32:20, 36:5, 36:6, 36:9, 55:4, 57:24, 71:23, 111:16, 122:11, 124:13, 131:9, 133:23, 155:7, 165:9, 182:20, 183:15,

184:19, 201:14, 201:15, 206:21, 221:4

**people's**
26:10

**perceived**
113:18, 113:23

**perhaps**
215:17

**period**
52:25, 61:22, 186:25

**permission**
94:24, 94:25

**permit**
152:8

**permitted**
7:12

**person**
13:18, 14:24, 15:1, 16:1, 16:4, 21:10, 22:23, 26:25, 35:9, 38:17, 39:20, 51:19, 55:21, 57:5, 60:17, 69:25, 71:22, 71:25, 79:14, 101:22, 107:24, 118:14, 135:23, 136:8, 138:13, 144:3, 146:12, 163:20, 165:19, 165:24, 212:23, 215:25, 219:5, 219:6

**person's**
35:6, 38:22, 47:9

**personal**
113:14, 219:9, 219:12, 219:18

**personally**
40:2, 93:8, 101:22

**ph**
82:24, 85:10

**phase**
59:3, 61:23,

182:3
**phases**
92:15
**phone**
36:11, 51:9,
72:2, 82:16,
82:18, 84:1,
84:9, 84:25,
85:8, 86:12,
86:24, 87:3,
87:21, 88:13,
88:15, 89:1,
89:18, 90:22,
91:16, 91:21,
93:12, 96:10,
121:3, 140:15,
148:9, 187:18,
222:4, 222:5,
222:11, 224:20
**photograph**
94:22
**photographs**
132:20
**photography**
133:11
**photos**
95:1
**phrase**
101:15, 116:17
**physical**
20:3, 21:16,
31:1, 226:2
**physically**
21:14, 28:24
**picture**
98:17, 99:14,
103:2, 103:3,
106:10, 128:10,
128:12, 222:7
**pictures**
54:18, 83:17,
92:24, 94:19,
99:25, 105:4,
106:9, 118:4,
132:17, 144:12,
152:11, 220:8,
221:13
**pieces**
15:22, 15:23,

143:10, 143:11,
173:4
**place**
30:4, 30:14,
30:20, 31:9,
123:12, 123:17,
130:6, 143:24,
151:21, 164:24
**placed**
145:5, 188:12,
216:23
**plaintiff**
1:7, 3:2, 4:20,
6:20, 8:3
**plan**
10:13
**planet**
4:18, 6:12,
7:3, 111:13,
111:16, 206:20
**planning**
8:12
**plate**
27:13, 27:21
**platform**
49:10
**played**
194:22
**playing**
194:11, 195:18,
198:13, 203:14
**please**
6:17, 9:18,
9:25, 10:24,
22:6, 148:17,
149:12, 166:5,
174:7, 193:16,
225:14, 226:3
**point**
40:22, 51:11,
89:11, 90:20,
91:7, 94:5,
109:25, 110:17,
111:7, 111:11,
118:8, 124:16,
172:11, 180:7,
186:6, 188:22,
193:14, 195:20,

197:22, 198:20,
199:5, 199:7,
203:17
**pointing**
70:21
**points**
15:14
**police**
5:18, 8:25,
11:4, 11:18,
11:21, 12:4,
13:22, 17:2,
26:5, 33:6,
34:16, 43:4,
44:9, 46:7,
46:18, 47:25,
70:3, 71:1,
71:8, 77:8,
77:13, 78:6,
78:13, 80:5,
84:11, 84:13,
121:8, 149:23,
170:4, 173:14,
183:16, 184:9,
191:24, 213:6,
213:22, 214:4,
216:16, 218:3,
218:16
**policies**
17:3, 26:6,
32:10, 44:16,
44:18, 45:1,
173:22
**policing**
47:5, 142:15,
143:7
**policy**
17:11, 17:14,
33:6, 114:3,
178:14, 178:21,
179:3
**political**
16:7, 53:14,
108:7, 108:14,
110:9, 110:14,
114:13, 114:18,
114:23, 116:10,
116:20, 116:25

**politically**
117:3
**politics**
113:3
**pop**
49:22, 194:9
**porch**
32:14, 32:15,
185:1, 195:24,
197:16, 198:16,
204:14, 205:14,
206:9, 206:11,
206:14
**portion**
53:19, 64:11,
126:2, 134:18,
136:6, 161:24,
167:9, 177:21,
179:8
**portions**
167:2, 167:3
**possible**
21:17, 22:21,
25:17, 29:18,
34:14, 36:14,
38:22, 69:12,
69:13, 72:7,
81:15, 85:3,
86:14, 122:10,
124:12, 128:24,
183:22, 183:23,
197:12, 205:13,
206:2, 208:1
**possibly**
20:22, 23:5,
30:8, 31:10,
32:9, 34:12,
35:5, 38:20,
45:5, 47:16,
54:14, 56:24,
72:13, 72:14,
75:2, 75:3,
81:18, 85:10,
86:22, 90:13,
105:4, 105:17,
105:19, 109:20,
109:22, 121:10,
126:21, 130:10,

130:14, 133:7, 134:21, 138:6, 164:5, 169:22, 170:7, 173:20, 183:17, 190:24, 201:7, 204:4, 208:7, 215:7

**posted**
55:12, 92:22, 94:21, 103:6, 103:22, 107:20, 118:4, 118:24, 137:2, 137:4, 215:25, 220:12, 222:16

**posting**
144:2, 144:19

**posts**
86:1, 100:3, 100:5, 101:4, 118:21, 119:15, 119:19, 123:23, 131:5, 221:12, 221:17, 221:23, 222:10, 222:13

**practice**
32:24, 33:5, 65:2, 92:10, 148:3, 153:22

**precaution**
32:23

**predicament**
75:9

**preference**
124:11

**prepare**
163:22, 164:1, 200:5

**prepared**
28:24, 166:1

**presence**
185:24

**present**
4:17, 9:8, 65:17, 154:18, 162:20, 185:11, 209:11

**presented**
125:25, 151:9,

152:15, 162:19

**preserved**
9:12

**president**
206:10

**press**
41:20, 55:22

**pretty**
26:20, 55:11, 111:9, 186:12, 213:5, 222:15

**prevent**
213:1

**previous**
81:6

**previously**
72:3, 78:5

**price**
112:18

**primarily**
39:20

**primary**
59:6, 60:8, 60:9, 145:3, 181:4, 181:13, 183:4

**principles**
14:6, 14:10

**prior**
23:25, 29:22, 40:8, 40:17, 40:18, 76:2, 103:19, 104:23, 105:23, 213:25

**prioritize**
34:5, 35:8

**privileged**
218:6

**probable**
187:6

**probably**
10:15, 22:7, 44:15, 73:10, 89:16, 128:17, 140:6, 157:14, 166:15, 167:6, 180:4, 186:14, 186:15, 209:22,

209:25, 212:12

**probations**
27:22

**problem**
44:2, 210:4

**procedural**
7:12

**procedure**
67:2

**procedures**
9:5, 9:18, 57:17, 217:23

**proceed**
7:5, 7:22, 25:3, 35:15, 65:3, 68:12, 75:11, 187:8

**proceeding**
7:11, 25:9, 63:16, 74:15, 83:9, 228:6

**proceedings**
227:3, 227:4, 227:8

**process**
58:24, 67:21, 67:22, 72:10, 92:14, 117:5, 130:9, 155:16, 157:10, 158:15, 161:1, 168:22, 181:15, 184:18, 187:22, 187:24, 191:6, 191:8, 211:2

**processes**
207:15

**produce**
191:11, 222:9

**produced**
7:10, 111:10, 192:17, 192:23, 222:15, 222:19

**proficient**
193:24

**profile**
99:2, 99:10, 99:13, 101:5

**program**
46:19

**progression**
62:12

**prohibited**
152:10

**proper**
44:22, 157:16, 217:23

**properly**
157:20

**property**
31:16

**protect**
28:24

**protected**
15:17, 15:20, 16:7, 16:13, 53:17, 53:24, 107:25, 108:5, 110:9, 114:12, 116:25, 137:23, 138:1, 139:16, 139:21

**protective**
36:15, 214:14

**protest**
53:18, 53:24, 137:24, 138:2

**protocol**
62:19, 155:1, 155:3

**provide**
36:18, 53:15, 54:19, 57:11, 72:1, 97:15, 97:18, 98:14, 153:19, 155:14, 171:16, 191:13, 192:20

**provided**
65:13, 99:15, 102:16, 169:17

**provides**
203:6

**ptsd**
217:5, 217:18

**public**
2:12, 187:3,

216:12, 227:1, 227:16

**publicly**
139:1

**published**
216:17

**pull**
43:14, 43:15, 49:21, 49:22, 70:22, 101:25, 107:9, 111:1, 115:11, 135:6, 148:15, 148:16, 154:9, 157:14, 166:4, 173:6, 193:16

**pulled**
69:19, 69:20, 82:5, 123:15

**purpose**
51:17, 89:24, 135:21, 152:10, 152:13, 202:23

**purposes**
98:7, 109:1, 142:2, 182:15

**pursuant**
2:11, 190:14, 192:18

**pursue**
40:21, 142:18, 146:21, 175:21

**pursued**
214:3

**pursuing**
126:7, 157:23

**push**
209:21, 209:24, 210:3

**pushed**
20:12, 64:5, 75:23, 214:6

**put**
41:2, 41:14, 45:24, 56:17, 57:1, 57:9, 58:2, 89:21, 90:2, 90:5,

90:6, 90:14, 92:24, 98:17, 103:4, 118:15, 131:8, 157:12, 157:22, 158:17, 164:24, 167:7, 167:22, 168:25, 185:25, 189:4, 189:18, 190:2, 196:1, 196:4, 196:20, 197:17, 197:21, 208:24, 211:18, 224:7, 224:10, 224:17

**putting**
82:21, 100:1, 136:11, 155:6, 177:20, 179:10, 179:12, 224:24

**Q**

**question**
9:9, 9:13, 9:25, 10:1, 10:4, 10:7, 10:10, 10:11, 10:19, 10:21, 30:13, 47:1, 48:18, 137:14, 178:11, 197:15, 208:3, 208:9, 213:14

**questioning**
66:7

**questions**
11:14, 30:11, 74:1, 162:15, 187:19, 194:16, 208:2, 208:5, 223:15, 225:2, 225:4, 225:6

**quick**
186:2, 222:24

**quicker**
34:14, 188:7

**quickly**
8:11

**quite**
28:24, 38:10,

87:13, 128:14, 136:24, 155:12, 182:24, 206:11, 212:11

**quiz**
49:22

**R**

**rachel**
107:20

**rachmuth**
1:6, 4:20, 6:5, 6:20, 7:1, 8:7, 37:21, 52:5, 52:10, 52:22, 53:3, 68:14, 69:9, 74:4, 76:23, 77:14, 78:4, 78:12, 78:18, 86:1, 86:11, 86:25, 87:24, 88:2, 88:7, 88:10, 88:12, 88:16, 88:19, 88:22, 89:10, 95:2, 95:19, 95:22, 96:1, 96:5, 96:9, 96:13, 96:17, 96:21, 96:24, 97:13, 106:13, 108:13, 112:24, 114:20, 116:9, 116:24, 118:22, 122:22, 123:22, 129:12, 131:1, 132:1, 133:12, 134:5, 134:9, 134:11, 140:2, 142:20, 159:20, 162:25, 163:4, 163:7, 163:10, 163:15, 165:22, 168:14, 177:10, 180:11, 184:6, 186:8, 190:15, 198:21, 206:23, 207:7,

208:15, 208:17, 212:5, 213:20, 216:17, 217:2, 217:4, 218:4, 218:13, 218:25, 219:21, 220:5, 222:13

**rachmuth's**
53:21, 100:4, 101:5, 108:2, 114:21, 117:13, 132:13, 139:11, 148:12, 159:25, 171:19, 178:24, 180:17, 183:7, 199:6, 209:7, 209:14, 216:5

**radio**
49:9

**raleigh**
3:20, 32:7

**ran**
182:24

**random**
130:12, 137:10, 183:15, 220:25

**range**
36:22, 171:1

**rank**
12:3

**rather**
37:23, 160:25, 161:21

**re-ask**
23:19, 47:1

**reach**
21:9, 70:10, 71:19, 71:20, 72:4, 72:20, 72:22, 72:25, 79:8, 84:17, 131:9, 154:4

**reached**
68:14, 71:1

**reaches**
71:15, 72:18

**react**
31:14

**reaction**
211:11, 211:13,
217:13, 217:15
**read**
107:18, 109:13,
113:5, 113:24,
137:20, 199:5,
199:13, 225:20
**reading**
172:3
**reads**
51:8
**real**
43:23
**really**
61:14, 105:5,
105:21, 106:8,
110:10, 116:18,
120:5, 126:19,
130:23, 131:20,
142:3, 160:6,
161:6, 161:24,
185:22, 190:4,
225:8
**realm**
203:9
**reason**
74:13, 88:6,
88:9, 89:9,
95:25, 96:4,
96:8, 96:12,
96:16, 140:18,
145:5, 155:20,
177:25, 181:22,
184:8, 207:13,
210:20, 211:8
**reasonable**
202:23
**reasoning**
70:14, 143:17
**reassurance**
23:20
**receive**
15:16, 16:6,
16:12, 18:17,
20:4, 20:9,
22:22, 27:9,
27:10, 56:1,

80:19, 140:4,
175:17, 176:1,
197:20, 215:2,
219:25
**received**
12:20, 18:2,
18:7, 18:14,
20:2, 21:4,
21:8, 22:10,
24:1, 24:21,
25:23, 28:7,
29:4, 29:9,
30:24, 31:4,
34:16, 34:19,
43:3, 44:23,
44:25, 45:10,
45:14, 45:18,
45:24, 46:3,
46:7, 46:13,
48:5, 48:9,
48:17, 48:19,
53:5, 54:9,
67:17, 80:2,
80:22, 86:7,
87:12, 91:25,
98:19, 99:4,
99:5, 137:10,
172:2, 219:24,
220:24
**receiving**
65:11, 79:1,
81:13, 104:7,
171:11
**recognize**
44:14, 50:18,
102:10, 105:7,
107:15, 112:7,
115:17, 148:22,
149:9, 150:2,
150:23, 166:12,
166:21, 173:19,
174:1
**record**
6:2, 9:10,
9:12, 9:21,
10:5, 73:17,
73:19, 73:21,
97:21, 124:24,

125:1, 125:3,
162:6, 162:8,
162:10, 223:7,
223:9, 223:11,
225:17, 225:18,
226:6, 227:8
**recorded**
7:8, 98:4,
193:9, 227:5
**recording**
7:11, 83:17,
94:19, 132:17,
192:9, 228:5
**recordings**
220:9
**records**
190:24, 192:14
**red**
19:15
**reduce**
216:16
**reduced**
92:11
**refer**
155:12, 173:22
**reference**
17:7, 24:5,
27:11, 34:11,
62:21, 69:3,
82:22, 109:11,
115:2, 131:15,
147:18, 151:1,
153:16, 158:25,
159:6, 172:20,
177:8, 179:14,
185:22, 186:25,
187:5, 187:11,
205:3, 216:22
**referenced**
84:20, 143:25,
204:6, 222:10
**referencing**
51:21
**referred**
128:1, 139:15,
178:15, 178:25
**refers**
108:13, 116:17,

218:6
**reflect**
50:23
**refuse**
57:11
**refused**
57:6
**regarding**
78:6, 173:1,
219:21
**regardless**
32:14, 47:24,
59:5, 132:23,
143:4
**regards**
193:21
**register**
186:16
**regular**
170:20, 225:22,
225:23
**related**
48:6, 48:10,
192:3, 221:14,
227:9, 228:8
**relating**
220:9
**relationship**
215:18
**religion**
83:8, 100:9,
108:19, 109:5,
109:14, 113:12,
113:13, 113:15,
113:24, 178:4
**religious**
16:10, 107:25,
112:20, 112:25,
113:20
**relook**
138:6
**remember**
17:1, 17:6,
18:21, 19:23,
27:5, 29:6,
46:15, 49:6,
49:9, 49:15,
50:20, 50:21,

51:23, 52:20, 60:15, 62:17, 78:22, 79:5, 80:3, 80:21, 80:24, 81:7, 81:10, 85:14, 86:13, 87:11, 87:14, 92:25, 94:11, 98:15, 100:10, 100:17, 101:8, 101:18, 102:22, 104:16, 109:18, 109:23, 118:17, 119:2, 120:1, 126:1, 126:3, 126:15, 126:17, 126:20, 126:22, 127:5, 127:9, 127:23, 127:24, 131:5, 131:13, 132:4, 132:6, 138:20, 141:7, 144:6, 144:22, 147:6, 151:11, 153:4, 157:13, 158:23, 159:17, 161:24, 164:5, 173:23, 179:12, 180:18, 180:19, 186:11, 187:23, 202:7, 204:8, 207:23, 208:4, 208:8, 221:22

**remind**
66:4
**reminder**
66:10, 66:14, 180:7
**remote**
102:2, 107:13, 111:5, 115:15, 135:8, 148:20, 166:6, 173:8, 193:18, 194:1, 194:11, 195:6, 195:11, 195:14
**remotely**
2:2, 6:16

**repeat**
16:20, 22:5, 86:17
**repeated**
135:4, 135:25, 136:1, 136:4
**repeatedly**
51:15, 135:20
**rephrase**
10:9, 218:9
**reply**
107:16, 108:2
**report**
5:18, 56:23, 57:23, 58:14, 58:18, 58:20, 59:9, 61:8, 61:19, 61:22, 61:25, 62:8, 62:16, 67:7, 89:24, 90:1, 90:5, 90:7, 97:24, 98:5, 98:18, 102:19, 103:4, 117:23, 118:1, 141:8, 141:11, 145:12, 154:2, 154:3, 154:17, 154:19, 154:21, 154:25, 155:13, 155:14, 155:24, 156:3, 156:21, 158:1, 164:3, 164:9, 164:14, 165:5, 166:2, 166:25, 167:2, 167:20, 168:23, 168:25, 169:2, 169:5, 169:9, 169:18, 169:21, 174:25, 175:15, 175:18, 176:22, 176:25, 177:9, 177:15, 177:20, 177:23, 177:24, 178:1, 178:13, 179:13, 179:24, 180:14

**report-wise**
58:13
**reported**
54:11, 66:1
**reporter**
2:12, 6:3, 7:2, 7:6, 7:20, 7:21, 9:20, 10:3, 49:25, 50:4, 50:8, 111:20, 111:24, 225:12, 225:21, 225:25, 226:4
**reporter-notary**
227:1
**reporting**
58:10, 106:4, 106:11, 147:14, 150:6, 151:13, 151:15, 158:18, 168:21, 216:12
**reports**
61:4, 61:8, 62:19, 106:1
**represent**
6:18
**representing**
6:12, 7:3
**request**
153:3, 220:25
**require**
17:3
**required**
25:13, 25:15, 136:4, 172:10, 200:4, 217:5
**requires**
135:3, 135:24
**reset**
191:22
**residence**
31:20, 32:17, 183:10, 183:12
**resident**
27:12, 77:18
**residential**
21:1, 32:12, 184:12, 184:14

**residents**
197:9
**respect**
47:4, 133:10, 208:19
**respond**
34:13, 56:4, 81:12, 182:4, 182:20, 199:24, 199:25, 200:5, 205:4
**responded**
81:21, 81:22, 84:6
**responds**
112:24, 116:9
**response**
62:13
**responses**
174:15, 190:13, 220:21
**responsibilities**
173:3, 173:18, 174:14, 176:8, 178:22
**responsible**
46:9, 176:10, 196:14
**rest**
35:13
**restate**
10:9, 78:16
**result**
217:6
**resumed**
195:18, 198:13, 203:14
**retaliate**
31:14
**retract**
157:3, 157:5, 157:7
**retrieve**
175:1, 190:6
**return**
41:17, 89:2, 89:12, 90:18, 122:7, 122:15,

122:24, 123:5,
212:9, 212:11,
213:4
**returned**
87:7, 97:13,
130:3
**returning**
89:7, 90:15,
91:14, 104:19,
130:4
**revealed**
132:1, 132:10
**reverted**
92:21
**review**
40:10, 53:19,
59:1, 61:4,
61:9, 75:1,
76:9, 101:22,
107:5, 113:7,
115:20, 117:13,
117:16, 118:22,
119:15, 119:18,
138:24, 173:23,
210:24, 213:7
**reviewed**
45:3, 48:23,
49:1, 50:24,
52:3, 61:8,
107:4, 108:16,
109:3, 113:10,
114:11, 116:23,
117:20, 118:11,
118:19, 120:21,
120:25, 162:22
**reviewing**
18:4, 64:2,
64:8, 68:8,
108:10, 108:12,
119:12, 121:12,
121:15, 131:25
**ride**
24:8, 202:4
**rights**
199:6, 199:13
**risk**
41:24, 42:14
**rms**
190:19, 192:9,

192:10
**roads**
36:10
**roanna**
1:25, 228:2,
228:16
**rockville**
6:13
**roles**
181:2
**rookies**
59:20
**room**
11:6, 11:7,
146:11, 146:12
**roughly**
15:2
**route**
80:18
**routine**
82:20
**routinely**
62:7, 154:18
**rule**
9:11
**rules**
7:13
**run**
13:23, 30:9,
69:13, 69:24,
183:18, 184:2
**rung**
185:5
**running**
24:20
**runs**
94:1

---
**S**
---

**safe**
87:11, 197:12,
204:2
**safety**
21:13, 28:22,
31:8, 32:22,
32:23, 87:3,
95:12, 95:16,
183:13, 184:18,

185:7, 197:4,
197:10, 204:23,
205:12
**same**
35:7, 37:18,
64:4, 67:1,
84:5, 89:16,
91:1, 99:7,
99:14, 99:22,
99:23, 107:21,
107:23, 111:21,
112:13, 125:21,
128:11, 130:10,
141:8, 152:22,
153:6, 156:24,
167:8, 177:2,
184:19, 206:9,
206:12, 219:11,
226:5
**satisfied**
41:1
**save**
118:11, 118:15
**saw**
107:21, 176:24,
177:14, 177:17,
177:23, 196:1
**saying**
38:2, 39:4,
57:13, 57:14,
61:19, 61:21,
68:3, 68:7,
69:25, 70:21,
71:8, 74:7,
99:19, 114:1,
122:1, 149:19,
152:19, 152:23,
186:24, 187:4,
200:2, 201:22,
202:19, 212:10,
217:16, 221:5
**says**
44:8, 44:10,
50:16, 50:17,
51:14, 53:12,
75:11, 103:6,
103:20, 107:20,
107:24, 108:5,

112:16, 116:1,
132:20, 135:18,
136:6, 137:21,
152:4, 156:11,
156:14, 168:6,
168:13, 168:15,
169:13, 173:14,
174:13, 176:4,
176:7, 176:19,
195:8, 200:8
**scarf**
84:22
**scenario**
55:14
**scenarios**
183:19
**scene**
71:9, 79:3,
123:11, 188:3,
220:1
**schedule**
124:3
**scheduled**
14:16
**schifano**
4:3, 6:23
**school**
37:18, 87:17,
90:4, 90:16,
90:19, 123:16,
130:8, 130:14,
130:19, 133:5,
133:9, 153:18,
212:17, 212:22,
224:11
**scoot**
167:14
**screen**
43:21, 146:17
**screenshot**
98:22, 102:20,
118:9, 118:13
**scroll**
51:4, 51:5,
51:9, 53:7,
135:16, 149:5,
150:21, 151:3,
156:5, 156:7,

166:18, 167:5,
167:15, 167:21,
168:9, 169:8,
174:5, 174:8,
174:9, 178:17,
178:18
**scrolling**
167:18, 167:23
**seal**
200:20
**search**
161:25, 219:20
**searched**
192:5
**seat**
201:5, 201:7,
201:10
**seatbelt**
30:21, 30:22,
188:12
**second**
18:20, 109:22,
137:21, 148:16,
149:7, 152:1,
159:9, 166:19,
182:16, 182:17,
193:25, 194:5
**secondary**
145:7, 181:7
**section**
51:6, 51:12,
52:18, 53:8,
53:9, 53:10,
53:12, 53:16,
63:25, 64:20,
94:12, 135:18,
137:22, 139:13,
139:14, 139:16,
139:17, 146:17,
151:19, 152:4,
152:18, 158:6,
158:7, 167:20,
168:5, 168:10,
168:17, 169:4,
174:8, 174:14,
174:17, 174:20,
174:22, 174:23,
175:9, 176:4,

178:21
**security**
91:8
**see**
21:15, 22:16,
23:16, 24:4,
25:7, 26:9,
26:24, 29:18,
31:10, 31:11,
32:15, 32:17,
32:19, 33:11,
35:15, 36:20,
40:10, 43:14,
43:20, 44:1,
44:12, 50:12,
50:16, 54:13,
55:2, 55:14,
59:8, 59:9,
65:6, 65:16,
73:5, 74:14,
74:19, 75:2,
75:11, 79:13,
82:6, 93:17,
93:25, 99:12,
99:22, 102:8,
103:8, 106:4,
106:15, 108:2,
108:4, 108:8,
112:10, 112:24,
115:23, 116:5,
116:7, 116:12,
119:22, 121:10,
124:17, 128:16,
135:24, 136:1,
140:22, 143:15,
143:16, 144:18,
145:13, 145:18,
145:19, 149:6,
154:10, 156:12,
158:24, 161:23,
161:25, 166:15,
167:1, 167:12,
169:15, 170:23,
174:5, 176:12,
176:20, 179:23,
193:23, 194:6,
194:12, 195:11,
195:12, 198:18,

204:6, 204:10,
204:18, 205:15,
205:22, 206:3,
206:15, 212:12,
216:12
**seeing**
29:23, 50:20,
68:22, 74:23,
86:14, 91:12,
94:3, 122:13,
132:9, 143:8,
187:25, 205:20,
205:21
**seek**
34:20, 37:1,
38:14, 39:18,
42:22, 74:17,
75:18, 76:15,
76:20, 160:24,
161:21
**seeking**
37:23, 142:8,
146:9, 162:16
**seem**
75:13
**seemed**
186:10, 186:12,
187:8
**seems**
35:19, 193:20
**seen**
44:15, 51:24,
69:16, 91:6,
99:24, 106:1,
106:9, 140:24,
150:14, 154:10,
154:11, 185:2,
185:3, 206:9,
206:10, 206:16,
211:21, 221:22
**segment**
14:21, 187:2
**segue**
17:22
**send**
54:22, 58:16,
59:10, 59:11,
59:12, 61:23,

61:25, 62:1,
62:2, 62:3,
62:4, 62:8,
62:9, 62:10,
62:19, 76:2,
147:23, 147:25,
148:3, 148:5,
148:7, 154:25,
164:6, 172:10,
179:1, 220:4,
222:8
**sending**
58:13, 130:21
**sense**
9:23, 10:5
**sent**
99:9, 99:23,
128:10, 148:12,
152:23, 152:24,
220:13
**sentence**
109:23, 137:21
**separate**
174:20, 182:7,
219:8
**separately**
133:24, 220:15
**september**
11:23, 12:1
**sergeant**
59:11, 59:12,
61:11, 61:18,
62:4, 62:10,
62:15, 62:18,
62:20, 75:22,
127:6, 127:10,
127:21, 128:3,
144:23
**sergeant's**
127:16
**serve**
209:5
**served**
164:23, 167:25,
214:21, 214:23
**service**
12:13, 42:18,
54:13, 56:2,

63:9, 66:20, 69:24, 71:24, 74:20, 76:8, 77:2, 77:5, 77:15, 77:17, 78:19, 78:21, 78:23, 80:2, 80:19, 80:22, 81:1, 81:21, 84:6, 101:12, 153:8, 171:12, 216:22

**serving**
11:24

**set**
35:5, 47:24, 209:15, 219:24

**setting**
47:10, 69:18, 71:12, 151:12

**settle**
48:2

**seven**
44:17

**several**
13:13, 17:17, 44:16, 44:18, 79:20, 82:12, 87:8, 100:5, 122:7, 124:6, 130:4, 186:17, 189:3, 197:24, 205:7, 212:9, 212:11

**severity**
38:16, 119:3, 148:4

**shall**
7:13, 53:16, 137:22

**shape**
21:16

**share**
99:2, 111:17, 111:20, 193:22, 194:2, 195:7, 195:8, 206:20

**shared**
99:3, 99:5,

140:20

**sharing**
111:7

**sharp**
188:12

**sheet**
147:21, 147:22, 147:23, 207:23

**shelf**
100:1

**shelves**
82:21

**shirt**
189:18, 190:4, 190:5, 190:6, 196:1, 196:5, 196:7, 196:18, 196:21, 197:17

**shocked**
94:14, 185:15, 186:10, 186:12, 186:14, 189:6

**shoes**
187:17, 190:3

**shop**
144:15

**shopped**
93:8

**should**
9:13, 19:18, 28:13, 30:25, 44:3, 73:13, 80:23, 108:6, 111:12, 142:20, 161:20, 195:8, 195:12, 223:1

**show**
36:18, 55:11, 154:6, 154:11, 154:12, 154:14

**showed**
65:11, 98:22, 105:1, 128:11

**showing**
110:21, 116:2, 138:21, 145:18

**shown**
152:6

**sic**
143:16

**side**
22:20, 29:19, 54:15, 56:6, 56:7, 56:11, 66:20, 153:9, 166:15, 170:23, 170:25, 194:2, 201:18, 204:12, 206:16

**sign**
94:21, 132:19, 133:10, 225:20

**signature**
149:23, 151:25, 152:2

**signature-d2yvl**
228:13

**signature-onxrw**
227:14

**simple**
154:3

**simply**
116:6, 138:19

**since**
9:19, 34:22, 52:15, 52:22, 161:12, 164:22, 181:18, 214:24, 217:2

**single**
130:25, 136:20

**sir**
19:5, 19:10, 34:18, 60:23, 63:4, 95:9, 105:13, 107:23, 135:13, 136:2, 140:3, 140:14, 140:16, 148:24, 152:3, 160:23, 180:15, 190:10, 190:12, 191:10, 199:11, 201:1, 213:13, 213:16, 213:19, 215:5

**sit**
32:14, 109:12,

174:1

**site**
118:5, 201:17

**situation**
16:2, 21:23, 24:12, 24:17, 24:23, 25:10, 25:16, 26:17, 29:20, 30:1, 30:3, 30:6, 30:10, 32:3, 32:4, 34:6, 34:7, 35:6, 36:23, 37:20, 38:17, 43:1, 48:1, 48:2, 52:12, 54:25, 55:19, 55:20, 59:16, 62:20, 64:24, 67:16, 67:19, 69:9, 70:25, 71:4, 72:16, 72:17, 74:25, 75:23, 79:6, 79:9, 79:17, 81:13, 87:17, 87:19, 87:20, 89:8, 94:8, 94:9, 100:6, 104:14, 114:10, 123:16, 131:12, 132:17, 133:6, 136:14, 140:12, 142:1, 145:11, 146:20, 150:8, 150:25, 151:16, 159:24, 170:24, 172:21, 175:6, 177:8, 183:25, 184:3, 185:21, 188:4, 189:10, 193:11, 201:20, 202:16, 217:11, 217:24, 219:3, 221:8, 222:2, 224:18

**situations**
9:8, 20:25,

26:7, 26:10, 26:11, 41:19, 69:9, 71:15, 72:21, 72:24, 79:21, 142:5, 212:25, 214:12

**six**
41:8, 204:3

**skip**
203:10

**slash**
121:4, 169:12, 170:5

**slaughter**
116:4

**slide**
167:13

**slightly**
108:25, 141:9

**sloan**
1:5, 4:20, 83:6, 83:14, 83:16, 89:14, 94:3, 94:14, 94:17, 94:25, 105:19, 109:16, 110:14, 113:16, 114:16, 115:7, 123:10, 131:11, 133:2, 137:2, 172:7, 177:7, 185:10, 221:2, 221:9

**sloan's**
86:18, 98:15, 99:7, 99:10, 178:3

**small**
44:2

**social**
85:25, 86:3, 86:14, 88:20, 90:14, 90:22, 91:20, 92:24, 96:18, 100:4, 101:5, 118:21, 123:22, 123:23, 129:9, 129:11,

136:20, 152:12, 159:16, 162:21, 178:7, 215:23, 216:6, 221:6

**sole**
175:24

**solely**
211:3

**some**
14:9, 20:3, 25:12, 26:4, 30:7, 32:14, 32:18, 32:20, 36:5, 36:6, 41:19, 43:24, 48:4, 49:10, 55:4, 57:10, 57:24, 62:22, 63:17, 71:23, 79:6, 82:21, 92:17, 93:23, 93:24, 100:8, 104:23, 107:4, 107:5, 110:3, 111:7, 118:8, 120:2, 124:13, 124:16, 137:10, 157:25, 184:19, 184:20, 190:25, 193:13, 193:15, 193:19, 194:16, 201:14, 201:15, 221:22, 224:15

**somebody**
99:1, 112:16, 118:24, 196:15

**somebody's**
99:1, 183:15

**somehow**
102:21, 130:12

**someone**
17:5, 17:8, 20:10, 22:14, 23:24, 25:7, 25:11, 26:25, 31:1, 34:11, 37:14, 37:22, 38:25, 42:8,

47:14, 71:14, 100:15, 100:22, 101:17, 107:19, 116:1, 119:24, 120:2, 161:4, 191:24, 221:15

**someone's**
34:21

**something**
20:11, 22:17, 22:23, 23:6, 23:10, 24:10, 24:14, 25:12, 38:7, 40:1, 41:5, 42:10, 42:16, 46:18, 55:18, 59:1, 105:20, 109:17, 113:16, 118:25, 122:18, 126:19, 130:22, 130:23, 131:15, 132:3, 132:5, 138:23, 144:8, 153:23, 154:17, 155:12, 161:8, 164:5, 164:7, 164:8, 170:25, 188:15, 188:16, 196:13, 197:1, 204:21, 205:3, 206:9, 211:15, 211:20, 217:22, 223:18, 223:23, 224:11

**sometime**
61:1, 103:19, 144:7

**sometimes**
21:20, 23:17, 23:18, 23:21, 27:23, 31:8, 34:3, 34:4, 37:11, 40:9, 56:14, 92:19, 220:18, 220:19

**somewhat**
26:8, 166:14

**somewhere**
33:7, 57:11,

192:4, 206:1

**sorry**
53:8, 66:3, 66:16, 80:14, 86:16, 89:21, 99:18, 103:11, 113:4, 127:17, 156:6, 156:8, 160:13, 165:14, 174:9, 181:11, 194:23, 195:1

**sort**
45:18, 56:12, 66:6, 106:9, 124:11, 147:3

**sotto**
51:8

**sought**
64:21, 65:9, 65:18, 95:7, 146:2, 146:6, 164:16, 164:21, 165:1, 214:17

**sound**
194:3, 194:9, 195:9, 228:5

**sounded**
51:12

**sounds**
20:2, 46:15, 112:3, 124:22

**sources**
221:9

**south**
4:4

**speak**
9:18, 16:2, 29:17, 35:11, 35:20, 37:13, 55:7, 61:11, 61:17, 62:21, 62:25, 63:5, 64:10, 64:15, 67:10, 67:15, 70:7, 71:5, 71:16, 72:11, 75:20, 75:22, 75:24, 79:13,

79:15, 82:7, 93:18, 104:10, 104:15, 109:7, 114:4, 128:1, 128:4, 140:8, 142:7, 143:20, 154:4, 161:19, 218:14

**speaking**
21:10, 31:21, 35:18, 35:21, 38:4, 62:17, 64:7, 72:15, 75:25, 82:7, 83:19, 91:22, 93:13, 104:20, 122:4, 134:4, 141:18, 164:14, 185:18

**specific**
12:12, 48:19, 58:5, 61:20, 61:21, 69:8, 81:17, 113:16, 122:2, 139:7, 141:19, 150:16, 150:19

**specifically**
17:9, 18:4, 37:19, 84:20, 90:21, 93:1, 135:14, 144:20, 169:24

**specifics**
74:3

**specified**
12:11

**speech**
15:17, 15:20, 15:25, 16:7, 16:10, 16:17, 16:24, 53:18, 53:24, 108:7, 108:14, 110:9, 110:14, 114:13, 114:19, 114:23, 117:1, 137:24, 138:2, 139:16,

139:21, 143:19, 187:3, 187:4

**spell**
127:16

**spoke**
62:15, 70:13, 74:13, 82:15, 82:17, 84:1, 84:8, 86:8, 86:9, 88:25, 91:20, 93:4, 93:11, 98:13, 103:24, 104:21, 120:24, 125:21, 127:14, 127:21, 128:7, 144:23, 145:25, 146:5, 149:21, 159:14, 165:9, 181:20, 183:13

**spoken**
49:12, 141:5, 156:25

**spooked**
32:18

**spot**
34:4

**springs**
4:2, 4:5, 6:24, 11:4, 11:18, 11:21, 12:4, 12:20, 13:22, 17:2, 17:10, 17:12, 26:5, 29:5, 33:6, 34:16, 43:4, 44:9, 46:7, 46:18, 61:15, 63:10, 68:24, 70:1, 70:8, 77:7, 78:5, 122:1, 122:3, 123:4, 126:6, 128:21, 131:8, 131:20, 131:24, 132:7, 139:7, 141:4, 142:7, 142:24, 143:9,

154:4, 158:18, 161:13, 170:4, 173:1, 173:14, 212:20, 213:6, 213:21, 213:25, 214:4, 214:25, 216:15, 218:3

**st**
103:7, 103:9, 103:11, 107:21, 112:11, 115:23

**stable**
23:5

**staff**
102:14, 128:11

**staffing**
19:19

**stages**
19:16

**stand**
27:4, 43:18, 49:24, 59:18, 102:2, 107:13, 111:5, 115:15, 135:8, 148:20, 166:6, 173:8, 193:18

**standard**
92:10, 153:22, 170:4

**standby**
24:10

**standing**
153:15

**standings**
197:9

**standpoint**
31:17, 74:8, 142:10, 154:12, 171:7, 171:9, 171:10, 172:5, 172:13, 174:24, 198:4, 208:21

**star**
116:6

**start**
17:12, 142:11, 174:8

**started**
12:6, 14:3, 85:11, 168:19, 180:1, 214:25

**starting**
57:7, 67:21, 143:13

**state**
2:13, 6:18, 10:25, 14:22, 17:15, 27:13, 91:4, 202:11, 227:17

**stated**
8:6, 57:21, 57:22, 65:17, 69:5, 82:5, 82:19, 83:7, 83:11, 87:7, 100:1, 100:2, 103:20, 105:12, 171:23, 177:21, 205:1, 205:25, 210:20

**statement**
55:3, 56:13, 56:17, 57:1, 57:5, 57:8, 57:12, 57:19, 57:25, 58:1, 58:21, 67:1, 67:3, 92:4, 92:8, 92:11, 93:2, 97:16, 97:19, 97:21, 116:10, 116:21, 157:6, 157:7

**statements**
98:5

**states**
1:1, 6:6

**statewide**
139:8, 139:9

**stating**
68:1, 163:17, 171:24

**station**
80:5

**statute**
5:12, 48:21, 48:24, 49:5, 50:19, 50:21, 50:24, 51:21, 52:3, 53:20, 64:24, 129:13, 131:3, 132:14, 134:6, 135:2, 135:3, 135:11, 136:21, 138:3, 138:18, 139:12, 152:10, 160:2
**stay**
40:22
**stayed**
70:1, 224:17
**steal**
39:24
**step**
56:1, 56:4, 59:24, 66:21, 67:10, 144:9, 185:1
**steps**
54:9, 56:1, 65:25, 216:16
**stereo**
195:13, 195:14
**steve**
5:16, 116:1
**stick**
108:1
**still**
9:13, 10:14, 31:10, 37:11, 55:15, 60:21, 65:17, 68:22, 68:23, 81:24, 82:15, 84:1, 84:2, 100:24, 108:17, 113:11, 143:20, 143:23, 144:18, 145:12, 159:5, 170:19, 173:21, 175:15, 175:17, 183:20, 214:1, 217:24

**stipulate**
7:15
**stipulation**
7:14
**stipulations**
123:17
**stole**
40:25
**stood**
105:1, 105:3
**stop**
25:6, 26:24, 28:14, 42:15, 60:24, 201:19, 201:21, 206:19
**stopped**
61:1
**stopping**
70:15
**store**
36:4, 87:25, 88:3, 94:2, 94:21, 95:1, 95:20, 97:9, 97:13, 98:13, 120:25, 133:11, 133:18, 133:21
**stored**
222:5
**stories**
172:1
**story**
56:12, 66:21, 68:6, 91:24, 93:22, 129:6
**straight**
47:24, 99:6, 207:16
**street**
3:7, 4:4, 32:8, 33:20, 46:12, 203:18, 203:22
**student**
118:25, 119:6, 119:23, 120:8
**stuff**
13:8, 13:11, 36:11, 39:25,

40:8, 141:12, 143:24, 168:24, 186:25, 197:2, 215:17, 219:12, 219:13, 221:18, 222:10
**style**
58:10
**subject**
213:11, 213:17
**submit**
153:22, 158:11
**submitted**
146:24, 150:11, 158:6, 158:9, 160:20, 180:2
**subsection**
53:10, 137:17, 137:20
**substance**
117:19, 118:18
**suffers**
217:17
**sugar**
24:20, 25:13
**suicide**
34:13
**suite**
3:8, 3:19, 6:13
**summarize**
58:4, 58:8
**summary**
98:2, 152:14
**summons**
34:20, 34:24, 38:3, 38:8, 38:10, 38:14, 39:19, 42:24, 74:6, 160:25, 161:7, 161:11
**sunset**
132:3, 132:5, 132:6, 144:8, 144:14, 144:17
**supervised**
60:5
**supervisor**
58:14, 58:16,

58:24, 59:3, 63:16, 74:8, 74:10, 74:16, 75:17, 190:23
**supervisor's**
58:25
**supervisors**
121:19, 126:7, 127:3, 127:4, 141:18, 165:10, 169:22, 181:21, 213:14
**supplement**
157:4, 157:22, 158:8, 158:22, 159:8, 167:22, 208:23, 208:25, 209:2, 222:13
**supplemented**
158:20
**support**
116:2, 116:3, 153:3, 209:12
**supporter**
112:23
**supposed**
22:13, 24:2, 24:22, 38:13, 54:10, 65:25, 74:5, 74:9, 75:17, 76:13, 76:18, 147:4, 154:18, 178:15, 182:19
**sure**
9:21, 10:3, 28:25, 30:16, 30:22, 32:22, 38:10, 42:18, 83:22, 92:13, 94:2, 108:6, 111:9, 116:10, 124:19, 126:6, 128:14, 134:22, 141:9, 141:10, 148:6, 151:4, 155:12, 157:17, 161:15, 169:9,

183:21, 186:2,
188:10, 194:3,
196:7, 197:3,
197:11, 197:20,
200:16, 206:11,
212:11, 222:15,
222:17
**surroundings**
79:16
**surveillance**
204:25
**survival**
183:21
**suspect**
21:22, 21:25,
23:2, 23:8,
23:9, 24:18,
29:18, 31:20,
31:22, 33:2,
34:1, 34:9,
39:8, 39:9,
40:5, 41:24,
55:8, 64:1,
67:10, 67:15,
69:10, 69:11,
70:25, 71:5,
71:16, 72:18,
72:20, 72:22,
142:8, 145:16,
147:15, 150:5,
169:12, 170:5,
170:16, 176:23,
177:10, 177:16,
183:23, 195:2,
208:6
**suspect's**
31:9, 33:23,
73:4, 140:11,
142:6, 142:23
**suspected**
215:11, 215:14
**suspects**
21:18, 207:10
**swear**
7:18
**swivel**
204:25, 205:24
**swore**
164:10

**sworn**
7:4, 7:19, 8:2
**sympathizer**
109:18, 109:21
**symptoms**
22:14, 22:24
**synopsis**
147:12, 147:16,
150:25, 151:20,
154:24, 155:9
**system**
41:14, 43:5,
43:12, 44:19,
47:12, 47:15,
58:17, 62:6,
157:18, 158:1,
158:13, 158:17,
158:18, 168:22,
180:2, 190:19,
192:9

### T

**tab**
43:15, 49:23,
50:5, 101:25,
107:9, 111:1,
115:11, 135:6,
148:16, 166:4,
173:6, 193:16
**tabs**
50:1
**tad**
108:25
**tag**
4:19, 6:11,
17:18, 109:16,
109:20, 110:18,
114:3, 123:4,
178:7
**tagged**
109:25, 121:24,
122:22
**tagging**
105:4
**tags**
27:14, 113:3
**take**
10:12, 10:13,

10:15, 10:21,
23:6, 24:7,
26:20, 40:3,
41:15, 45:8,
54:2, 54:4,
54:10, 66:1,
66:5, 73:11,
75:6, 95:1,
102:20, 107:8,
110:25, 115:10,
117:9, 123:17,
124:20, 129:15,
130:15, 130:19,
133:9, 139:23,
142:2, 143:24,
152:11, 159:12,
161:4, 161:9,
173:7, 179:15,
198:3, 201:16,
210:9, 212:17,
216:16, 222:24,
226:5
**taken**
123:12, 227:3,
228:6
**taking**
83:17, 90:4,
94:19, 123:2,
130:7, 132:17,
153:17, 157:5,
157:24, 158:8,
158:25, 159:10,
200:11, 217:23
**talk**
79:17, 141:25,
212:12, 218:24
**talked**
19:4, 66:19,
218:19
**talking**
33:22, 37:20,
55:19, 65:24,
66:2, 74:1,
77:14, 108:18,
109:4, 185:22
**teach**
59:21
**team**
91:8

**tease**
157:25
**tech**
13:16, 13:23
**technically**
182:1, 182:19,
182:22, 193:24
**technician**
4:18, 43:18,
49:24, 102:2,
107:13, 111:5,
115:15, 135:8,
148:20, 166:6,
173:8, 193:18,
194:1, 194:11,
195:6, 195:11,
195:14
**technique**
19:20, 19:22
**techniques**
13:10
**teeter**
78:25, 79:2,
79:12, 81:14,
81:25, 82:1,
82:4, 84:3,
85:18, 87:10,
89:5, 89:11,
91:9, 93:9,
95:5, 96:25,
102:14, 105:5,
107:2, 113:4,
114:3, 115:6,
120:9, 120:12,
120:18, 120:22,
122:1, 122:23,
122:25, 123:5,
130:11, 131:7,
131:19, 132:22,
133:15, 133:24,
144:4, 144:11,
152:11, 153:11,
156:25, 199:3,
212:21, 223:18
**teeters**
122:3, 131:24,
144:5
**tell**
58:16, 70:9,

75:12, 81:10,
85:1, 92:1,
93:21, 101:9,
126:10, 128:3,
128:7, 129:4,
129:8, 153:2,
158:16, 159:15,
159:19, 160:1,
162:24, 179:13,
187:22, 187:23,
191:7, 202:8,
207:18, 207:21,
208:14, 224:19
**telling**
91:25, 139:14
**tells**
9:14, 28:12
**ten**
73:12, 73:13,
73:15, 124:20,
215:3, 223:2
**tend**
140:12
**term**
44:22, 84:21,
84:24, 85:15,
105:12
**terms**
205:9, 221:25
**terrifying**
51:18, 135:22,
136:7, 152:13
**terrorist**
112:22, 116:2
**terrorists**
87:10, 122:10
**testified**
8:2, 8:18, 8:20
**testifying**
9:6, 9:16, 11:2
**testimony**
7:16, 113:25
**text**
135:11, 156:11,
163:3, 163:9,
163:12, 165:21,
220:4
**texts**
219:5

**thank**
7:23, 50:4,
50:8, 50:10,
66:13, 223:5,
225:6, 225:7,
225:10
**thanks**
112:3, 112:5,
124:22, 222:20
**the-**
44:20
**themselves**
6:18, 28:24,
30:17, 56:17
**therapists**
21:2
**therapy**
217:6
**thing**
43:2, 49:14,
66:8, 89:13,
90:10, 90:11,
99:14, 99:23,
100:8, 116:19,
118:7, 130:18,
136:15, 136:18,
138:22, 140:18,
141:13, 152:20,
152:22, 157:3,
161:9, 175:24,
196:23, 206:12,
222:9
**things**
21:2, 23:19,
24:15, 24:16,
26:12, 27:8,
27:10, 27:13,
27:24, 28:1,
28:14, 37:8,
40:12, 47:12,
47:18, 47:24,
57:17, 58:15,
63:8, 63:20,
85:11, 89:16,
90:12, 90:17,
92:19, 92:22,
94:2, 94:7,
101:11, 103:1,

108:23, 108:25,
110:7, 110:16,
114:7, 114:10,
117:6, 117:8,
122:11, 122:16,
129:19, 130:20,
131:16, 137:3,
140:9, 145:13,
146:18, 155:2,
157:12, 161:2,
168:20, 168:21,
172:24, 175:19,
175:22, 180:5,
182:11, 182:23,
185:6, 186:15,
190:2, 211:4,
215:19, 215:21
**think**
10:2, 17:13,
18:9, 19:6,
23:21, 28:16,
38:16, 54:3,
55:25, 65:14,
65:23, 68:15,
68:20, 69:7,
72:9, 73:13,
89:13, 105:2,
109:13, 109:24,
113:11, 124:5,
124:10, 129:22,
130:15, 132:5,
133:13, 137:6,
141:8, 141:13,
143:3, 144:7,
145:17, 145:23,
149:6, 150:13,
155:25, 159:12,
161:3, 164:7,
187:17, 188:15,
193:15, 194:24,
195:23, 210:14,
212:4, 214:22
**thinking**
67:23, 67:25,
69:2, 74:22,
90:9, 108:21,
115:2, 140:6,
143:3, 151:10,

164:10
**thinks**
59:9
**third**
42:11, 42:12,
57:21, 70:5,
70:22, 120:14,
156:10, 185:24,
216:2
**thought**
64:2, 64:4,
72:10, 74:23,
85:10, 98:6,
104:7, 105:12,
108:17, 109:3,
113:19, 117:5,
130:8, 132:13,
134:15, 143:6,
184:18
**thoughts**
74:12, 74:14,
161:14
**threaten**
106:20, 120:11,
188:23
**threatened**
38:18, 38:25,
39:20, 49:12,
49:13, 49:14,
70:20, 79:24,
87:25, 95:20,
129:17, 133:18,
136:16, 159:21,
159:22, 213:3
**threatening**
17:19, 34:12,
39:6, 40:15,
40:19, 51:17,
53:13, 110:4,
135:22, 136:7
**three**
8:22, 87:14,
99:25, 104:20,
117:17, 124:6,
124:8, 181:23,
186:9, 193:1,
198:5
**through**
8:11, 12:21,

12:23, 13:2,
15:13, 27:10,
27:16, 31:5,
31:6, 35:17,
37:9, 37:10,
46:17, 58:12,
61:22, 64:11,
65:14, 70:11,
124:11, 128:16,
139:2, 139:4,
146:13, 146:16,
188:2, 188:6,
190:19, 190:20,
192:9, 192:22,
192:25, 193:15,
194:25, 195:3,
203:18, 203:20,
203:24, 204:19,
207:17, 209:21,
209:22, 209:24,
210:3, 211:2,
215:23, 217:22,
219:5, 222:25
**throughout**
57:23, 110:20,
181:14
**throwing**
70:20
**tight**
30:22
**till**
12:22, 103:19,
169:5, 179:23,
213:25
**timeframe**
14:16, 40:13,
40:15, 59:23,
60:16, 60:17,
61:2, 69:1,
70:15, 78:24,
89:4, 90:25,
103:22, 104:17,
141:25, 142:3,
142:16, 147:22,
157:12, 167:25,
179:20, 205:12,
208:24
**timeframe-ish**
179:22

**times**
8:20, 8:23,
182:6, 189:3,
198:5
**timestamp**
169:1
**tiny**
43:23
**tired**
112:16
**title**
78:23, 175:16
**today**
6:11, 7:3, 8:9,
8:13, 8:14,
11:3, 11:15,
109:12, 144:16,
174:2
**today's**
6:9
**token**
177:2
**told**
56:18, 83:14,
91:1, 91:15,
94:11, 145:12,
211:5
**took**
13:25, 87:16,
130:6, 151:21,
184:25, 188:8,
195:23
**tool**
28:21
**toolbox**
28:22
**top**
44:4, 50:16,
173:10, 173:14
**torchinsky**
3:5
**total**
15:2
**touch**
54:20, 180:5
**touched**
178:6
**tough**
133:6

**tourniquet**
19:13
**towards**
20:13, 47:25,
58:2, 91:23,
179:21
**town**
4:2, 6:23,
72:11, 73:2,
76:19, 144:5
**traffic**
28:14
**trained**
23:11, 29:16
**training**
12:19, 13:5,
13:7, 13:12,
13:25, 14:6,
14:24, 15:3,
15:4, 15:6,
15:7, 15:9,
15:16, 16:6,
16:12, 16:16,
16:23, 17:23,
18:1, 18:2,
18:6, 18:8,
18:14, 18:15,
18:18, 18:25,
19:2, 19:3,
19:7, 19:12,
20:3, 20:4,
20:7, 20:9,
20:16, 20:19,
21:4, 21:7,
21:18, 22:2,
22:10, 22:11,
22:22, 23:1,
24:1, 24:21,
25:23, 25:24,
27:2, 28:6,
28:9, 28:16,
28:20, 29:3,
29:4, 29:9,
29:13, 30:24,
31:4, 31:5,
31:6, 31:7,
34:15, 34:19,
37:4, 37:11,

38:6, 43:3,
44:23, 45:10,
45:15, 45:18,
45:24, 46:3,
46:8, 46:13,
46:17, 48:5,
48:9, 48:19,
54:8, 59:19,
59:23, 60:5,
60:7, 60:14,
60:22, 60:25,
61:4, 61:7,
61:24, 139:3,
172:16, 173:21,
182:8, 182:18,
182:21, 199:23
**trainings**
37:9, 45:1
**transcribed**
1:25
**transcriber**
228:1
**transcript**
5:9, 7:10,
43:17, 49:20,
102:6, 107:12,
111:4, 111:19,
111:25, 115:14,
148:19, 166:10,
173:12, 194:20,
225:22, 226:3,
227:6
**transcription**
228:4
**transferred**
192:11
**transport**
30:22, 206:23
**treat**
26:6, 170:19
**treated**
170:17
**trespass**
36:13, 41:9,
41:11, 41:15,
123:9
**trespassed**
89:5, 89:6,

95:4, 95:5,
132:23
**trespassing**
36:6, 41:6,
95:3, 95:8,
95:10, 133:13,
133:16
**tried**
94:5, 94:8,
140:22
**triggers**
176:25
**true**
227:7, 228:4
**try**
22:15, 22:18,
24:5, 25:16,
29:18, 30:12,
35:8, 50:9,
54:15, 54:20,
54:22, 55:2,
56:5, 70:10,
72:4, 72:11,
75:12, 83:13,
115:7, 141:10,
141:14, 147:21,
170:21, 172:16,
180:6, 184:2,
184:3, 184:21,
184:23, 194:11,
195:15, 202:16,
210:1, 221:8
**trying**
13:8, 14:12,
34:13, 47:24,
48:1, 92:15,
94:16, 105:18,
137:6, 137:7,
137:11, 146:21,
156:6, 186:19,
187:10, 188:3,
189:7, 190:17,
209:24, 212:12,
220:16, 221:16
**tuesday**
1:17
**turn**
186:17, 189:3

**tweeter**
113:4
**twitter**
5:13, 5:14,
5:15, 5:16,
65:15, 65:16,
68:1, 68:8,
86:15, 99:15,
100:15, 100:16,
100:19, 100:20,
100:23, 101:4,
101:17, 118:13,
118:14, 119:12,
119:24, 137:2,
137:5, 140:21,
172:7
**two**
8:22, 11:24,
12:1, 31:19,
32:1, 33:18,
35:8, 56:4,
69:15, 80:7,
99:24, 122:2,
131:23, 144:5,
151:7, 160:10,
161:6, 182:5,
182:6, 182:20,
182:25, 183:3,
183:9, 183:12,
197:7, 198:5,
215:8
**type**
15:9, 15:20,
32:4, 32:18,
43:1, 46:7,
48:4, 49:10,
58:10, 58:11,
63:17, 79:6,
93:23, 93:24,
97:7, 100:8,
110:3, 139:8,
151:12, 161:9,
221:21, 224:15
**typed**
152:17
**types**
20:5, 26:6,
192:24

**typically**
151:8

**U**

**uh-huh**
22:12, 167:11,
208:11
**ultimately**
146:20, 191:16
**unable**
175:1, 220:3
**unaware**
37:3
**unc**
119:1, 119:23,
120:8
**uncertain**
121:6
**unclear**
63:7, 63:19,
63:21
**under**
7:12, 11:12,
15:17, 16:8,
16:13, 21:24,
107:25, 139:11,
139:20, 152:9,
167:17, 167:18,
167:19, 176:4,
176:7, 178:14,
199:23
**underlying**
207:19
**underneath**
101:14
**understand**
7:9, 10:22,
13:9, 14:12,
14:23, 15:15,
21:11, 21:12,
41:13, 42:10,
47:13, 60:20,
136:3
**understanding**
14:6, 14:11,
15:14, 15:19,
15:24, 17:16,
17:18, 20:8,

20:20, 46:25,
47:3, 48:4,
49:4, 52:24,
62:22, 63:14,
64:1, 64:17,
64:23, 67:24,
68:9, 68:18,
76:16, 79:11,
85:13, 86:6,
86:21, 90:11,
92:6, 94:24,
95:6, 104:3,
104:4, 104:6,
104:11, 104:22,
105:18, 105:24,
109:9, 114:15,
114:17, 114:21,
123:8, 123:9,
128:15, 128:19,
129:22, 134:18,
134:22, 136:5,
136:9, 139:3,
140:4, 147:10,
189:7, 205:10,
211:10, 216:21
**understandings**
117:8
**understood**
10:10, 18:22,
29:8, 46:11,
80:10, 98:8,
99:16, 101:20,
103:13, 173:25,
178:10, 187:4,
218:9, 222:20
**unit**
176:5, 176:9,
176:10, 177:1,
178:16, 178:25
**united**
1:1, 6:6
**unknown**
130:10, 131:17,
220:24
**unlawfully**
152:7
**unless**
9:13, 94:23,

132:20
**unsure**
68:15, 134:20, 136:24
**until**
14:21, 37:8, 71:21, 72:6, 73:7, 90:16, 111:18, 122:15, 123:16, 130:4, 130:19, 179:25, 180:3, 212:25
**upload**
58:17, 59:13, 62:5, 111:21
**uploaded**
62:11
**ups**
35:18, 35:19
**upstairs**
73:9, 175:4, 175:11
**use**
7:15, 84:24, 89:21, 175:15, 188:19, 208:1, 208:12, 215:24, 219:9, 219:11, 219:12, 219:15
**uses**
7:12
**using**
19:21
**usually**
59:6, 147:11
**utilize**
19:13

**V**

**vehicle**
23:13, 24:25, 30:21, 30:25, 36:8, 182:6, 182:7, 182:10, 182:12, 183:4, 183:5, 188:8, 188:13, 196:22, 202:14, 203:22,

203:25, 206:18
**verbal**
62:13, 94:4
**verification**
128:15
**verified**
70:11, 70:14, 205:6
**verify**
23:17, 25:1, 35:16, 35:18, 36:19, 36:20, 41:13, 54:16, 58:14, 61:13, 64:6, 65:5, 68:5, 153:12, 204:4, 205:7
**verifying**
29:23
**versus**
27:9, 34:20, 38:14, 39:19, 57:7, 69:10, 79:15, 82:7, 108:24, 113:19, 188:4
**via**
2:2
**vicinity**
203:24
**victim**
19:24, 21:10, 29:21, 40:19, 41:20, 42:19, 49:11, 54:13, 55:8, 56:7, 57:9, 67:2, 67:14, 67:18, 68:3, 68:6, 69:6, 73:3, 79:7, 79:18, 81:24, 82:6, 83:7, 83:11, 83:20, 83:22, 84:19, 87:16, 89:19, 89:22, 93:5, 93:11, 93:13, 94:3,

97:2, 97:3, 110:5, 113:19, 114:6, 117:7, 118:2, 118:23, 122:5, 122:12, 122:18, 122:23, 122:24, 123:24, 128:9, 129:5, 129:7, 129:14, 129:15, 129:16, 130:1, 130:23, 133:3, 136:15, 138:13, 147:15, 153:7, 153:8, 153:16, 159:23, 160:14, 160:17, 163:1, 163:2, 163:4, 163:7, 163:11, 163:15, 163:16, 171:24, 171:25, 212:1, 212:9, 212:14, 212:15, 213:2, 224:2
**victim's**
19:17, 56:6, 56:11, 66:20, 83:18, 89:13, 90:11, 92:11, 113:11, 115:4
**video**
5:20, 6:10, 55:6, 73:17, 73:21, 124:24, 125:3, 146:16, 147:17, 148:1, 148:9, 153:1, 162:6, 162:10, 193:4, 193:17, 194:21, 195:17, 198:12, 199:19, 203:13, 204:3, 204:12, 206:17, 206:21, 223:7, 223:11, 225:18
**videoconference**
2:3, 194:22, 195:18, 198:13,

203:14
**videograph**
94:23, 94:25
**videographer**
4:19, 6:11, 7:2, 73:16, 73:20, 124:23, 125:2, 162:5, 162:9, 223:6, 223:10, 225:15
**videos**
132:20, 193:6, 193:8
**videotaped**
1:15, 6:4, 225:16
**view**
100:3, 100:11, 156:21
**viewed**
104:25
**views**
53:14
**village**
108:1, 144:10, 144:14, 144:15
**violated**
129:12, 131:2, 132:14, 134:5, 160:1
**violating**
143:19
**violation**
136:21, 179:3
**violence**
36:14, 87:25, 95:20, 120:11, 214:14, 215:17
**visit**
99:10
**visited**
99:12
**voce**
51:8
**vogel**
3:5, 8:8
**voice**
6:17, 143:23

| | | | |
|---|---|---|---|
| **vs** | 177:15, 186:20, | 187:9, 207:12, | 122:17, 130:10, |
| 6:5 | 189:4, 189:5, | 208:22, 208:25, | 133:7, 134:24, |
| **W** | 193:14, 201:15, | 209:5, 211:19, | 140:23, 157:16, |
| **wait** | 202:8, 210:1, | 214:17 | 159:21, 167:1, |
| 9:25, 111:18, | 210:6, 213:4, | **warrants** | 167:6, 167:16, |
| 174:10 | 215:20, 224:2, | 164:21, 164:23, | 188:5, 199:24, |
| **wake** | 225:21, 226:1 | 214:21 | 200:5, 206:9, |
| 13:16, 13:23, | **wanted** | **warren** | 221:19 |
| 206:25, 207:2, | 63:15, 66:4, | 1:9, 1:16, 2:1, | **ways** |
| 207:6, 208:18 | 79:12, 79:14, | 3:14, 5:10, 6:5, | 38:22 |
| **walk** | 93:25, 104:14, | 6:22, 7:25, 8:5, | **we'll** |
| 8:11, 31:20, | 121:19, 126:6, | 10:24, 11:1, | 9:14, 10:15, |
| 108:1, 123:11, | 128:15, 134:21, | 43:20, 50:15, | 17:12, 41:9, |
| 144:10, 144:14, | 157:17, 161:15, | 54:5, 73:24, | 54:13, 54:15, |
| 144:15, 193:15, | 202:22 | 76:22, 102:8, | 74:2, 74:11, |
| 195:24, 203:17, | **wanting** | 107:15, 115:18, | 107:9, 124:21, |
| 207:16 | 224:10 | 125:6, 135:10, | 162:17, 170:21, |
| **walked** | **wants** | 137:20, 148:23, | 171:1, 175:2, |
| 189:19, 195:20, | 41:20, 66:25, | 166:13, 194:17, | 175:22, 193:23, |
| 203:21, 203:24 | 67:2 | 223:15, 225:9, | 198:14, 203:11, |
| **walking** | **warrant** | 225:16 | 203:16, 210:9, |
| 188:4, 196:10, | 5:17, 30:2, | **washington** | 223:15, 226:5 |
| 206:17 | 34:20, 34:25, | 3:9, 27:12 | **we're** |
| **walks** | 35:2, 35:13, | **watch** | 8:12, 9:19, |
| 197:3 | 37:2, 37:24, | 193:13, 194:15, | 10:14, 30:6, |
| **wallet** | 38:5, 38:15, | 198:10, 203:11 | 41:6, 42:4, |
| 187:18 | 38:21, 39:19, | **water** | 66:6, 138:18, |
| **want** | 42:23, 55:23, | 200:16, 200:17, | 151:4, 151:23, |
| 9:4, 21:15, | 74:6, 74:18, | 200:19, 200:22, | 171:11, 171:14, |
| 30:8, 36:4, | 75:18, 76:15, | 200:24, 201:2, | 175:1, 176:15, |
| 36:6, 40:20, | 76:20, 141:24, | 201:10, 201:12, | 182:19, 190:19, |
| 55:22, 57:1, | 142:2, 142:8, | 201:21, 202:1, | 190:21, 194:14, |
| 57:2, 57:9, | 145:14, 145:20, | 202:5, 202:6, | 198:4, 201:17, |
| 57:18, 65:24, | 146:2, 146:7, | 202:8, 202:19, | 201:18, 217:24 |
| 67:4, 67:5, | 146:10, 147:3, | 202:22, 202:24, | **we've** |
| 73:11, 79:2, | 148:13, 149:1, | 203:6, 203:7, | 206:9 |
| 79:8, 81:10, | 149:2, 149:10, | 203:8 | **weapons** |
| 82:23, 83:22, | 150:12, 151:9, | **way** | 188:10 |
| 85:1, 85:5, | 153:3, 156:17, | 22:8, 25:6, | **wear** |
| 87:18, 89:2, | 157:4, 157:23, | 30:13, 31:15, | 112:25, 116:6, |
| 92:3, 92:18, | 160:25, 161:21, | 32:18, 32:21, | 116:11, 187:15, |
| 93:1, 101:9, | 162:16, 162:20, | 36:23, 36:24, | 196:18 |
| 104:8, 104:9, | 164:16, 165:1, | 37:18, 64:4, | **wearing** |
| 104:12, 110:6, | 167:25, 168:1, | 64:13, 64:14, | 105:8, 108:6, |
| 118:6, 120:6, | 168:13, 172:24, | 69:1, 71:11, | 108:14, 112:21, |
| 123:5, 132:24, | 179:19, 183:17, | 84:16, 92:15, | 114:22, 116:2, |
| 154:10, 158:16, | 184:1, 185:14, | 94:15, 97:7, | 190:8 |
| | 185:23, 187:7, | 110:3, 115:7, | **website** |
| | | | 221:17 |

**websites**
221:23
**week**
180:23, 191:11, 192:17
**weekend**
174:25
**went**
12:21, 12:23, 79:1, 93:19, 94:11, 121:20, 140:9, 143:14, 143:15, 145:9, 145:10, 150:8, 155:22, 158:20, 186:23, 209:5
**weren't**
40:14, 175:25
**western**
1:3, 6:7
**what'd**
194:8
**whatever**
12:12, 21:14, 29:22, 30:2, 35:3, 36:12, 40:20, 41:10, 54:18, 55:13, 57:22, 59:14, 65:14, 70:22, 84:21, 97:3, 100:2, 100:7, 108:24, 109:21, 127:25, 129:17, 129:24, 130:20, 131:10, 133:8, 134:25, 136:10, 136:12, 136:15, 136:16, 136:17, 137:7, 143:20, 145:5, 155:21, 157:20, 161:15, 175:17, 177:6, 177:7, 179:7, 180:5, 182:14, 184:1, 187:5, 187:15, 193:17, 196:24, 212:24,

220:17, 224:16
**whatnot**
19:25
**whenever**
66:6, 90:17, 130:21
**whereupon**
7:24
**wherever**
32:16, 33:18, 178:8, 183:1, 189:12, 212:23, 216:2
**whether**
16:7, 16:13, 16:17, 16:18, 16:23, 16:25, 22:23, 33:2, 38:13, 38:24, 39:2, 39:7, 39:16, 39:17, 39:20, 40:4, 41:20, 41:23, 42:22, 51:16, 65:19, 74:17, 85:7, 88:2, 88:6, 88:9, 88:12, 88:16, 88:19, 88:22, 89:9, 95:15, 95:19, 95:22, 95:25, 96:4, 96:8, 96:12, 96:17, 96:21, 96:24, 97:12, 105:15, 109:2, 110:9, 113:22, 114:12, 116:20, 116:24, 125:18, 125:19, 126:14, 133:11, 135:20, 139:10, 139:20, 142:19, 159:19, 161:20, 162:24, 196:18, 207:22, 208:5, 223:24
**whispering**
94:7

**white**
221:1
**whoever**
17:15, 41:20, 49:11, 151:13
**whole**
84:16, 132:16, 138:22, 159:17, 163:17, 181:14
**whomever**
221:10
**widely**
216:6
**willfully**
152:7
**willing**
55:3, 55:4, 56:14, 56:16, 57:25, 212:13
**windows**
204:19
**wine**
197:1
**wise**
27:14, 103:3, 121:7, 121:13, 128:8, 128:17, 134:25, 167:7, 175:14, 181:18, 187:2, 220:23
**wish**
51:9, 225:9
**within**
19:25, 40:23, 49:8, 49:16, 64:11, 68:23, 70:1, 70:8, 72:9, 73:2, 94:23, 140:24, 141:3, 141:21, 142:7, 142:24, 143:4, 147:22, 155:19, 172:4, 203:9
**without**
22:24, 24:13, 124:12, 143:23
**witness**
7:4, 7:18,

7:19, 8:1, 22:5, 26:2, 42:2, 43:8, 43:22, 43:25, 44:6, 51:1, 51:4, 51:7, 51:8, 54:6, 57:5, 58:4, 66:15, 66:25, 67:15, 68:2, 68:5, 69:5, 77:1, 77:11, 80:17, 83:13, 87:7, 93:14, 103:17, 105:11, 115:1, 121:4, 122:6, 123:23, 128:9, 129:5, 130:2, 136:24, 140:20, 149:14, 153:9, 160:8, 160:11, 160:13, 160:16, 160:17, 163:16, 167:5, 167:12, 171:25, 178:20, 194:7, 203:4, 205:18, 206:7, 216:20, 217:10, 217:21, 218:21, 223:4, 225:10
**witnesses**
29:21, 54:17, 54:23, 54:24, 55:5, 56:9, 65:12, 66:22, 66:23, 69:4, 160:10, 212:1
**word**
46:12, 58:12, 98:1, 98:3, 104:17, 127:5, 137:6, 158:23, 158:24
**wording**
82:23
**words**
197:13
**wore**
113:21

**work**
22:21, 26:22,
72:2, 78:8,
79:19, 79:20,
79:25, 82:20,
87:8, 89:3,
89:7, 89:13,
89:14, 90:15,
90:18, 91:14,
93:16, 95:18,
104:19, 110:6,
118:5, 122:7,
122:15, 122:24,
123:6, 124:4,
130:3, 133:4,
149:23, 153:17,
182:8, 187:24,
195:16, 212:9,
219:8, 219:12,
219:16, 219:19,
219:25
**workable**
22:17
**worked**
8:25, 118:6,
123:3, 190:18,
217:1
**working**
9:2, 32:6,
79:12, 82:8,
82:20, 169:20
**workplace**
224:14
**works**
121:25, 124:18,
144:19, 155:16,
155:19, 158:15,
191:6
**worn**
106:2, 190:8,
193:8
**worried**
20:22, 90:12,
95:14, 123:14
**worth**
39:25
**worthy**
55:19

**wouldn't**
92:10, 116:11,
134:1, 144:10,
196:11, 196:12,
198:8
**write**
56:12, 56:16,
57:19, 58:3,
67:7
**writing**
56:18, 57:10,
58:7, 89:19,
89:22, 92:12,
97:21, 224:5,
224:22
**written**
5:11, 5:19,
7:14, 33:6,
43:4, 43:11,
44:9, 44:19,
44:24, 55:3,
56:12, 57:12,
57:18, 58:21,
67:1, 67:2,
92:4, 92:7,
93:2, 97:15,
97:18, 146:23,
159:2, 160:21,
163:22, 163:24,
163:25, 164:2,
165:25, 167:8,
173:1, 173:15
**wrong**
51:14, 82:23,
111:14, 112:17,
112:25, 164:11,
167:16, 187:5,
199:1
**wrote**
152:20

**X**

**x**
1:4, 1:12,
199:3

**Y**

**y'all**
111:16, 111:17

**yard**
188:2, 188:6,
203:18, 203:21,
206:8
**yarmulke**
112:22
**yeah**
12:2, 16:20,
17:22, 19:9,
22:7, 31:24,
33:24, 43:25,
45:5, 49:13,
51:3, 66:9,
66:15, 71:7,
75:19, 80:13,
80:17, 84:7,
85:22, 86:9,
100:25, 108:4,
109:6, 112:1,
123:18, 123:20,
126:24, 127:14,
136:1, 149:13,
150:18, 160:13,
163:25, 173:9,
177:24, 178:18,
178:20, 195:5,
195:6, 197:19,
198:8, 208:12,
210:3, 210:4,
214:8, 215:4,
215:16, 218:21,
222:12, 225:25
**year**
221:21
**years**
11:25, 12:1,
80:7, 215:8
**yellow**
19:16
**yep**
44:13, 51:5,
53:9, 108:9,
164:18
**young**
99:25
**younger**
56:23, 67:20,
69:16

**yourself**
24:13, 26:18,
26:19, 164:1

**Z**

**zoom**
9:19, 43:19,
43:24, 44:4,
50:11, 149:11,
149:13, 173:9,
195:7
**zooming**
37:19, 39:15

**$**

**$13**
36:3
**$50**
36:3

**0**

**00**
10:15, 180:21
**0091**
3:21
**02**
6:2
**03**
1:18, 6:10
**05**
223:11
**07**
225:17, 225:18
**08**
226:6

**1**

**1/3/2024**
168:6
**1/3/24**
168:15
**10**
5:20, 54:4,
193:16, 194:18,
194:21, 195:17,
198:12, 203:13,
206:21, 209:25,
210:4

**102**
5:13
**107**
5:14
**11**
80:23, 180:21
**111**
5:15
**115**
5:16
**12**
14:19
**128**
4:4
**14**
50:16
**1442**
168:6
**148**
5:17
**15**
54:4, 73:12,
209:25, 210:4
**166**
5:18
**173**
5:19
**194**
5:20
**196.3**
50:16

**2**

**2 (5**
63:25
**2 (b) (5**
129:23
**20**
1:17, 6:9,
215:6
**200**
36:3, 39:25
**20037**
3:9
**2021**
213:22
**2023**
106:7, 213:22

**2024**
11:22, 11:23,
12:17, 12:22,
14:1, 60:4,
103:7, 103:8,
107:21, 112:11,
115:24, 156:15,
214:1
**2025**
61:2
**2026**
1:17, 6:9,
228:7, 228:17
**20850**
6:14
**22**
73:17
**222**
1:8, 6:8
**228**
1:24
**2300**
3:7
**24**
14:18, 15:2
**25**
1:8, 6:8
**26**
1:17, 6:9,
228:6
**2626**
3:18
**27608**
3:20
**29**
168:15, 169:1,
169:2, 169:5
**2917**
4:6
**2nd**
80:23, 86:4,
86:8, 86:9,
86:10, 91:16,
91:21, 92:2,
101:2, 103:25,
104:12, 104:23,
125:20, 146:4,
156:15, 156:18,

157:15, 158:1,
167:3, 167:13,
168:19, 180:2,
224:20

**3**

**3**
1:18, 6:2, 6:10
**30**
162:6
**305**
3:19
**31**
103:7, 103:9,
103:11, 107:21,
112:11, 115:23
**32**
203:11
**33**
73:21, 124:24
**341**
3:10
**3rd**
145:8, 146:1,
156:4, 157:11,
157:19, 157:21,
158:19, 167:4,
167:24, 168:17,
169:6, 180:3,
180:12

**4**

**4**
73:17, 73:21,
203:11
**400**
6:13, 40:2
**41**
162:10
**424**
3:21
**43**
5:11
**45**
125:3
**451**
6:12
**49**
5:12

**5**

**5**
124:24, 125:3
**50**
210:9
**500**
40:2
**54**
103:6, 223:7
**540**
3:10
**557**
4:6
**592**
174:7
**5:-cv--bo-rj**
1:8, 6:8

**6**

**6**
10:15, 162:6,
162:10, 168:15,
169:1, 169:2,
169:5
**633890**
1:23
**643**
3:8

**7**

**7**
210:9, 223:7
**7th**
106:7

**8**

**8**
223:11, 225:17,
225:18, 226:6
**800**
44:10, 173:15
**840.01**
44:10, 173:16
**8808**
3:10

**9**

**9**
103:6, 180:21

# Exhibit 7



# Transcript of Benjamin Allen Marino

**Date:** May 27, 2026
**Case:** Rachmuth -v- Warren, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

--------------------------------x

JENNIFER SLOAN RACHMUTH,                :

                    Plaintiff,    : Case No.:

   v.                             : 5:25-CV-222-BO-RJ

ELLIOTT WARREN, et al.,                 :

                    Defendants.   :

--------------------------------x


  VIDEOTAPED DEPOSITION OF BENJAMIN ALLEN MARINO

               Conducted Virtually

             Wednesday, May 27, 2026

                  3:10 p.m. ET


Job No.: 633893

Pages: 1 - 123

Recorded By: Micah Hardin

Deposition of BENJAMIN ALLEN MARINO, conducted virtually.

Pursuant to Notice, before Micah Hardin, Notary Public in and for the State of Indiana.

                    A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFF:
      DANIEL BRUCE, ESQUIRE
      KELLEN DWYER, ESQUIRE
      HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK
      2300 N Street, Suite 643A
      Washington, D.C. 20002
      (540) 341-8808


ON BEHALF OF THE DEFENDANTS:
      DAN HARTZOG, ESQUIRE
      HARTZOG LAW GROUP
      2626 Glenwood Avenue, Suite 305
      Raleigh, NC 27608
      (919) 424-0091


ALSO PRESENT:
      TRAVIS PERRY; VIDEOGRAPHER
      OMAR MARROQUIN; TECHNICIAN TRAINEE
      BRIAN KRIEGER; TECHNICIAN
      JENNIFER SLOAN RACHMUTH; PLAINTIFF
      JOHN SCHIFANO, ESQUIRE; TOWN ATTORNEY FOR
      HOLLY SPRINGS

                        C O N T E N T S

EXAMINATION OF BENJAMIN ALLEN MARINO          PAGE

        By Mr. Bruce                          6, 119

        By Mr. Hartzog                        118




                        E X H I B I T S

                (Attached to transcript)

DEPOSITION EXHIBIT                            PAGE

 Exhibit 3   Written Directive                 72

 Exhibit 8   Incident/Investigation Report     64

 Exhibit 9   Warrant for Arrest                80

 Exhibit 10  Video of Arrest                   94

 Exhibit 11  12/8/2022 Emails                 106

 Exhibit 12  1/9/2023 Emails                  110

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins media number one in the videotaped deposition of Benjamin Marino in the matter of Rachmuth versus Warren et al., in the United States District Court of North Carolina, Western Division, Case Number 5:25-CV-222-BO-RJ.

Today's date is May 27, 2026. The time on the video monitor is 1511. The videographer today is Travis Perry, representing Planet Depos, headquartered at 451 Hungerford Drive, Rockville, Maryland. All parties of the video deposition are attending remotely.

Would counsel please voice identify themselves and state who they represent?

MR. BRUCE: Daniel Bruce. I represent the plaintiff, Ms. Sloan Rachmuth. I'm here with my colleague, Kellen Dwyer.

MR. HARTZOG: Dan Herzog, Jr., on behalf of the defendants.

THE VIDEOGRAPHER: The court reporter today is Micah Hardin, representing Planet Depos, and the witness will now be sworn.

THE REPORTER: I am a notary authorized to administer oaths, and this deposition will be

recorded by electronic means. All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable, procedural, and evidentiary rules and laws and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with applicable law of such.

Hearing no objection, I will now swear in the witness.

Whereupon,

BENJAMIN ALLEN MARINO,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Counsel, you may proceed.

MR. BRUCE: Thank you.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BRUCE:

Q    Good afternoon, Officer Marino. Thank you for being here today for -- and for bearing with us as we worked out those technical difficulties. Just some procedural stuff up front. Yesterday, our deposition went to about 8:00 p.m. I expect this one to -- to go a similar length, although

hopefully shorter. Don't want to make any promises.

Yesterday, we just went straight through, and we didn't take a break for dinner or anything. Is that your preference today? Do we want to plan to take a dinner break? I'll leave that up to you all.

A    Yeah. I mean, I'm okay going all the way through.

Q    Okay. Sounds good. Well, that's what we'll plan to do. I'll take a break about every hour, but if you ever need to take a break at all, just -- just let me know. Happy to do so. The only thing I would ask is that if there's a question pending, that you would answer the question before we -- we take a break. But other than that, just let me know.

Have you -- have you ever been deposed before, Officer Marino?

A    No, sir.

Q    Have you ever testified in court?

A    Yes, sir.

Q    How many times about have you testified in court?

A    Probably over 15 to 20.

Q    Were those all for situations involving

your duties as an officer?

A    Yes, sir.

Q    Okay. Well, deposition is similar to testifying in court. The main difference here is that we don't have a judge present. That means that there may be times where your lawyer objects to a question I ask, but that objection is just for the record, so that it gets down on paper.

We don't have a judge here to rule on it, so in most situations, you'll still need to answer the question. There might be a situation where your lawyer instructs you not to answer, and then you should, you know, follow that advice of your counsel. But that's kind of the difference there.

Just a few more procedural things. Since we're on Zoom and we have a court reporter today, just please speak up and answer all the questions orally, not with any head nods or head shakes, just to make sure that we can get everything down on the record and hear each other through Zoom. Does that make sense?

A    Yes, sir.

Q    And then wait for me to fully ask a question before you answer, even if you think you know the answer or anticipate it. Again, that's

just so that we make sure that -- that it gets on the record, and that both the question and the answer are fully recorded. Does that make sense?

A    Yes, sir.

Q    And if at any time one of my questions isn't clear, just let me know. I can -- I can explain it or rephrase it. If you answer the question, I'll assume you understood the question. Does that make sense?

A    Yes, sir.

Q    All right. Could you please state your full name, please?

A    Yes. Benjamin Allen Marino.

Q    And where are you testifying from today?

A    The Holly Springs Police Department.

Q    Is there anybody else in the room with you?

A    Yes, sir.

Q    Who's in the room?

A    I have Dan, and I have John.

Q    Okay. Anybody else?

A    No, sir.

Q    All right. Are you under the influence of any medications, drugs, or alcohol that would impair your ability to answer questions today?

A    No, sir.

Q    And you're currently an officer with the Holly Springs Police Department; is that right?

A    Yes, sir.

Q    When were you hired with the Holly Springs Police Department?

A    It was February of 2020.

Q    2020, right before COVID?

A    Yeah, yeah.

Q    It was a crazy time. What rank did you start out as when you were first hired?

A    I was just an officer.

Q    Okay. And what rank do you hold now?

A    I'm a corporal.

Q    Okay. Have you held any other ranks in between those?

A    I held a senior officer, but that's specifically not a rank.

Q    Okay. And what was your rank in November of 2024?

A    Senior officer.

Q    Okay. Do your job responsibilities differ between officer and senior officer?

A    No, sir. They don't.

Q    Okay. What about between senior officer

and corporal?

A    Yes, sir. They do.

Q    How do they differ now as a corporal?

A    You are a -- put in a supervisory position. So now, you are a supervisor amongst -- for the other officers. So you have supervisory responsibility as far as approving reports, coming up with training, making sure the officers are doing what they need to, and following within policy on the road.

Q    Okay. Is there anything else you do as a corporal?

A    Other than supervisor responsibilities, no, sir.

Q    Do you supervise at warrant applications?

A    Warrant applications?

Q    Yes.

A    I do not review them, no.

Q    Okay. Are you currently on any particular assignment with the Holly Springs Police Department?

A    Do you mean specialized unit?

Q    Yeah. Are you assigned to a specific unit or anything?

A    Just patrol and a member of the SWAT

team.

Q    Okay. Were you assigned to a specific unit in November of 2024?

A    2024, I was on patrol and also a member of the SWAT team.

Q    Can you describe what training you've received as an officer with the Holly Springs Police Department?

A    Yes. I have a list that's actually -- actually on our, I guess, our town P drive that has all my qualifications and all my classes listed. I don't recall the whole list to extent, but all that is written down with the dates and number of hours that we have per class.

Q    Okay. Fair enough. Can you just go through some of the things you remember off the top of your head?

A    Sure. I took standard field sobriety tests. I took officer survival I, officer survival II, numerous different SWAT classes, a lot that are part of the NCTOA. I am a crisis intervention officer. I went through CIT class. On the top of my head, that's all I can remember.

Q    Okay. Did you go through basic law enforcement training?

A    Yes, sir. I did.

Q    What did basic law enforcement training include?

A    They went over how to become an officer. BLET is the -- what you need prior to becoming an officer, so before you're getting your certificate, you need to go through a huge amount of training, going over case law, also going over -- making sure you're passing your test. There's also a physical -- physical training portion of it as well. So that's what BLET intends.

Q    Okay. When did you go through that training?

A    That was in 2019.

Q    You mentioned that -- that training included discussing case law; is that right?

A    Yes, sir.

Q    What kind of case law did you review in that training?

A    You go over the North Carolina case law.

Q    That -- I'm sorry?

A    You go over case law in North Carolina laws.

Q    Okay. Did that include constitutional law?

A    It did, yes.

Q    Did it include any training about the First Amendment?

A    Yes, sir.

Q    What training did you receive about the First Amendment?

MR. HARTZOG: That's a pretty broad question. Are you asking if he took specific classes or --

BY MR. BRUCE:

Q    Just during basic law enforcement training, what training did you receive about the First Amendment?

A    Pretty much reviewing and making sure you understand.

Q    Okay. Based on that training, what is your understanding of the First Amendment?

MR. HARTZOG: Objection. You're asking a legal question.

MR. BRUCE: Just asking -- asking his understanding.

BY MR. BRUCE:

Q    But what -- based on your training you received during basic law enforcement training, what is your understanding of the First Amendment?

MR. HARTZOG: Same objection. You can answer if you know.

THE WITNESS: Do I go ahead and answer?

MR. HARTZOG: Yeah, you can answer.

THE WITNESS: Yeah. I mean, I don't know the full amendment to its entirety, but I do know that you have the right to, you know, your speech, religion, press, assembly, gathering. But I don't know the, you know, word-for-word, verbatim.

BY MR. BRUCE:

Q    Fair enough. Did you receive any training about what specific speech is protected under the First Amendment?

MR. HARTZOG: Again, same objection. These are legal questions. If you want to ask factual questions, you can ask, but these are legal questions.

MR. DWYER: Go ahead and answer. You don't have to respond to the objection. Your objection is noted. Thank you.

MR. HARTZOG: Thank you. Answer if you know.

THE WITNESS: I don't know.

BY MR. BRUCE:

Q    Did your training include whether any

types of speech can be considered in charging a crime?

A    I don't recall.

Q    Okay. And who conducted your basic law enforcement training?

A    It was hosted at Wake Tech, Wake Tech public safety campus.

Q    Were officers from Holly Springs Police Department the ones who put on the training?

A    No, sir.

Q    Was it just somebody with Wake Tech?

A    It was from the state, yes.

Q    Have you received -- well, you mentioned CIT training; is that right?

A    Yes, sir.

Q    What did CIT training cover?

A    Covered going over, you know, how to handle situations and with certain individuals that are going through a mental crisis.

Q    What kind of mental crises did you cover?

A    If it is something that they're diagnosed with, or something that they're just going through at the -- in the moment, where they're not in reality. It goes over certain trainings and techniques on how to encounter those individuals

safely and -- and to communicate with them.

Q    Did it include how to communicate safely with people who may be experiencing panic attacks?

A    I don't remember.

Q    Have you received -- have you received any training about identifying or classifying bias-motivated crimes?

A    Other than yearly -- yearly training, I have not taken any outside training on that.

Q    You said other than yearly training. Do you have a yearly training on identifying bias-motivated crimes?

A    It's within a certain topic. It's part of our in-service in Holly Springs.

Q    Okay. What training have you received on identifying those types of crimes?

A    That training only included video -- video calls and then questions regarding -- regarding it.

Q    Okay. Were you ever trained on what factors you should consider, and whether to designate a crime as bias-motivated?

A    I'm sorry. Can you re-ask that?

Q    Did that training include any factors on what you should consider when determining whether a

crime may be bias -- motivated by bias?

A    No, I don't remember.

Q    Okay. Do you remember anything about the content of that training?

A    I don't.

Q    Okay. Fair enough. Have you received any training on identifying hate or extremist groups?

A    No, sir.

Q    Okay. Have you received any training on implicit biases?

A    Implicit bias, yeah. That is also included in our yearly in-service.

Q    Okay. And what does that training include?

A    Same thing. It includes the video -- videos that you watch and -- and sign-offs and questions.

Q    Okay. And do you remember any of the substance of that training related to implicit biases?

A    No, I do not.

Q    Do you remember if it included how to identify implicit biases related to Jewish individuals?

A    No, sir.

Q    When did you receive that implicit bias training?

A    I don't recall the exact date, but I do know it is written down on my training log.

Q    Okay. Have you received any training specifically about the North Carolina cyberstalking statute?

A    Other than reading it -- reading it, not all into detail, no.

Q    Okay. But no official training, a seminar, or anything like that?

A    No. No, sir.

Q    And have you received any training on the Holly Springs Police Department's written directives?

A    Yes, sir.

Q    Okay. What kind of training have you received on the written directives?

A    Their policies. So we look over them, understand them, and then we sign off on them, saying that we acknowledge and have read them.

Q    Okay. So you just have to read them and then acknowledge that you've done so?

A    Yes, sir.

Q    Okay. Do you have any classes or seminars

you go to specifically about the directives?

A    No, sir. I've not attended any.

Q    Okay. So based on all the training you've received, can you describe the steps an officer is supposed to take once a crime is reported?

A    Sure. Yes. So whenever someone calls into the 911 call center, Holly Springs dispatch will dispatch a unit out to -- to the call. An officer goes to the call. They assess the situation. They get the size of the stories from the victim, the witness, the offender, and any parties involved. Gather information on who they are.

All that information on who they are is ran from or ran by our dispatch unit. If it is a report, then we generate a report number. We'll give it to the -- all the parties involved, and then we will document that in a report. If it is a crime and an arrest needs to be made, then an arrest is also made.

Q    Okay. So I want to pack a little bit of that. So you mentioned, so once a call comes in, an officer may be dispatched to -- to answer the call; is that right?

A    Yes.

Q    Okay. And when you -- and you said when

the officer gets there, they would gather information about all the parties involved; is that right?

A    Yes, sir.

Q    Would that generally include the suspect or the offender?

A    Or a witness, yes.

Q    Okay. How do they collect that information? Do they -- do they write it down?

A    Typically, yes. It's written down, yeah.

Q    Is there a specific form they're supposed to use?

A    No. We just have little notepads that we use.

Q    Okay. And how are they generally assessing that information? Sorry, that's -- I'll rephrase. How are they -- how are they generally collecting that information?

A    Usually verbal, either face-to-face or over the phone.

Q    Okay. And when they collect it verbally, do -- does an officer document that conversation?

MR. HARTZOG: Objection. Are you asking practice, training?

BY MR. BRUCE:

Q    Based on your training that you have
received, when an officer obtains oral information,
do they document that in writing anywhere?

A    Typically, yes. It would be on a notepad.

Q    Okay. Are officers trained to write that
information down word for word or summarize it?

A    It's usually summarized.

Q    Is there any situation where you might
obtain a written -- a written statement from the
witness?

A    Yes, sir.

Q    What situations would those be?

A    If a witness, I guess, saw the -- the
incident occur, you know, that would be something
that we would get a witness statement form, and
have them write it or sign it, and kind of tell us
their side of the story. It is optional. They don't
have to do it. But yes, that would be the time that
we would do, like, a witness statement form.

Q    Okay. If -- you said it's optional; they
don't have to do it. If they choose not to do it,
is there a -- a standard best practice for how you
record that information without a written statement
from the witness?

A    No. If -- if they decide not to do it,

then we would just -- that a form is just not filled out for it, so it wouldn't be put into a case file.

Q    Okay. And does that also apply if you're -- you're getting a statement from the victim of the crime?

A    No. There's also forms as well. However, in majority of the -- almost in all the incidents that I -- I've responded to, usually there's not a form filled out. It's just a vocal, you know, understanding of the situation of what happened between the officer and the victim.

Q    Okay. And you said in those situations, an officer tends to write -- write down that information on a notepad, right?

A    We make notes on a notepad, yes.

Q    And do you ever take those notes from the notepad and put them onto another form or anything?

A    No. They would -- I mean, sometimes. Currently, now, with our new -- new report writing system, they can be scanned in and added to our files tab. However, back then, a case file would be created where we would print the report, put all our documents, all our evidence from our paperwork inside that case file, and then give it to the

clerk -- I'm sorry -- to our records clerk here to hold until, you know, the court date.

Q   Okay. Is it standard practice to interview the suspect when responding to -- to a crime that's reported?

A   Yeah. Yeah, it's common practice.

Q   Okay. Do you -- is it common practice to get a written statement from the suspect?

A   No, that's not common practice.

Q   Okay. In what situations might you not interview the suspect?

MR. HARTZOG: Objection. You can answer.

THE WITNESS: If you can prove that a crime occurred, and you have the evidence and the articulable facts pointing that that was a suspect that committed the crime, and you have identified them. Then if a crime occurred, there was no need to interview the suspect.

BY MR. BRUCE:

Q   Okay. And if you don't have evidence the crime occurred, what would you do in that situation?

MR. HARTZOG: Objection. You can answer.

THE WITNESS: If we don't have evidence, then it's just a documentation in a report.

BY MR. BRUCE:

Q    Would you reach out to the suspect in that situation?

A    If I felt necessary.

Q    Does whether you reach out to the suspect depend on whether you have any evidence that they're dangerous?

A    Yes. Yeah. If not reaching out, yes, I agree.

Q    Whether you reach out to the suspect have any -- well, is whether you reach out to the suspect have -- depend on whether you have any evidence that they're a flight risk?

A    Yes.

Q    Are there situations in which a -- based on your training, in which a crime may be designated a suspected bias or hate crime?

A    I'm sorry. Can you re-ask that question?

Q    Based on your training that you received at the Holly Springs Police Department, are there situations where a crime may be designated a suspected bias or hate crime?

A    I don't know.

Q    Do you know if Holly Springs has any -- any policies about designating bias or hate crimes?

A     I don't recall.

Q     Can you explain how the process for obtaining a warrant generally works?

A     Yes. So when you have the evidence, and a crime has been committed, and you have both parties identified or the suspect information, you can go ahead and fill out a warrant for their arrest. When you have that warrant for their arrest that -- filled out, you go in front of a magistrate. You present your probable cause. She will grant you the warrant if she finds there to be probable cause, and then the warrant is active.

Q     Okay. You said -- you mentioned you fill out the warrant. Is there a specific form you're required to fill out?

A     Yeah, it's on eWarrants.

Q     Okay. What is -- what is eWarrants?

A     It's a online website that you fill out the -- the warrant on.

Q     Okay. And does that -- does that create any sort of, like -- like, PDF file or -- or printed file that -- that is what is -- what becomes the warrant?

A     When it's -- I don't -- I don't think it becomes a PDF file, but it's -- it's on the -- the

website.

Q    Okay. Do you know what -- where the information goes once you put it into the eWarrant's website?

A    Goes to the court.

Q    Okay. So is that the information that's reviewed by the magistrate?

A    It is, yes.

Q    What do you -- when you fill out that form, what information do you put into that form?

A    You put the location, the date, the time. You put the offender's information. You put yourself as a complainant. You put the offense. That's -- those are primarily what you put in there.

Q    Okay. Do you put any description of -- of the underlying conduct?

A    If it requires.

Q    When might it require?

A    It honestly just depends on the charge. Sometimes it's written language. It's already -- it's a click, and it puts itself in there. And sometimes it tries to have you go into an elaboration. If it's an assault, like an assault, they would want to know what kind of assault and

what was used or any injuries. But sometimes it's just fill-in-the-blank.

Q    Okay. Do you attach any evidence you've collected to that form anywhere?

A    There's a -- I believe there is a spot for, like, files or -- or something. I've never put any evidence in there, but I do believe there is a spot for it.

Q    Okay. So there's a spot where you can upload a file or an attachment or something to the form?

A    I believe so. I believe, yeah.

Q    But you've never uploaded evidence in that way?

A    No, sir.

Q    Okay. Is there any other written form or document that you submit to the magistrate to obtain the arrest warrant?

A    Only if there -- if it's a felony, then you have to fill out a felony investigation report that you have to give to the magistrate as well. But misdemeanors, it would just be the warrant.

Q    Okay. And then you said you go to the magistrate. What's -- what's the process of going to the magistrate like?

A    You can either show up in person, or you -- or here at the Holly Springs Police Department, we have the privilege where we have a computer that will do a FaceTime, like we are now. And that is what -- we will give them a -- the CR number or the file number for it. They will be able to pull it up on their end, and they pretty much ask you what happened. So what's your probable cause? And that is when you explain what happened, and they would either grant it or deny it.

Q    Okay. Do you fill out the warrant form before or after you meet with the magistrate?

A    It's before.

Q    And how long does the -- the meeting with the magistrate tend to last?

A    Typically, like, five minutes. It's real short.

Q    And what -- what's the standard practice for how much information you give the magistrate at that point?

MR. HARTZOG: Objection. It's very broad. You can answer.

THE WITNESS: You present the facts that you obtain on the call, and that is what the magistrate -- the ones to see if it meets an

element or the element that you're charging.

BY MR. BRUCE:

Q    Okay. How many arrest warrants have you personally sought in your time at Holly Springs?

A    I don't know the exact number.

Q    Is it around 10?

A    It's more. It's -- it's more than 10.

Q    Okay. More than 20?

A    Yes, sir.

Q    Okay. Have you ever been denied an arrest warrant?

A    I have not.

Q    Do you present the magistrate with the incident report that -- that you fill out?

A    No, sir.

Q    Do you know if they have access to the incident report?

A    No, sir. Not at the time, given the probable cause.

Q    So sorry. Just to clarify. You don't -- you don't know if they have access, or do they not have access?

A    I don't know if they have the access. Usually, when you're filling out the warrant, it's prior to doing the incident report.

Q    Okay. Are officers supposed to seek anyone's advice before they seek a warrant or a summons?

A    If they need a better understanding or have a question, then seeking advice isn't a bad option. It's using their resources.

Q    Is it up to -- up to them to decide whether they're supposed to -- whether they should seek advice from someone?

A    Yes.

Q    And who might you seek advice from as an officer?

MR. HARTZOG: Objection.

THE WITNESS: A more senior officer or someone in -- a supervisor is a good resource as well to use.

BY MR. BRUCE:

Q    Okay. Would you ever go to the District Attorney's Office for advice before seeking a warrant?

A    I have before, yes.

Q    Okay. In what situations have you done that?

A    If it was something I was very unclear on, or maybe something that I haven't charged

before and just had some questions. I have contacted the -- the DA before.

Q    Before you contacted the DA in those situations, did you also seek the advice of a supervisor?

A    More than likely. I don't recall exactly. However, I probably was referred to the -- to them from my supervisor, but -- but I don't remember exactly who I went to first.

Q    Okay. How many times have you sought the District Attorney's advice before applying for a warrant?

A    I don't know the exact number, but it wasn't many times.

Q    Was it less than five?

A    Probably. Yes, sir.

Q    Okay. And you said those were in cases where you were unclear about the charge, or you hadn't charged it before; is that right?

A    Either that, or talking to my supervisor, and they referred me to talk to the -- talk to them.

Q    Okay. Are there any other situations where you might go to the DA before you seek a warrant?

A    Not to my knowledge.

Q    Are officers are supposed to go to the Town Attorney's Office before obtaining a warrant?

A    No, sir.

Q    Okay. Have you ever gone to the Town Attorney's Office to get their advice before seeking a warrant?

A    No. No, sir.

Q    Okay. Officer Marino, when did you first become aware of who Ms. Rachmuth is?

A    The day of the arrest.

Q    Okay. Had you heard about Ms. Rachmuth before the day of the arrest?

A    No, sir.

Q    Were you aware that she had previously made complaints to the Holly Springs Police Department about cyberstalking and harassment?

A    Not to my knowledge. No, sir.

Q    Okay. Did you hear anybody in the office talking about Ms. Rachmuth before the arrest?

A    No, sir.

Q    Were you aware that she had a family in North Carolina before the arrest?

A    No, sir.

Q    Were you aware that she is Jewish before

the arrest?

A    No, sir.

Q    How did you first become involved in the investigation of the complaint involving Ms. Rachmuth?

A    Are you -- are you asking based off the call that we got dispatched to?

Q    Yes. How did -- how did you personally first become involved in -- in the investigation about the incident at issue here?

A    Oh, I was field training Officer Warren at the time. Officer Warren got dispatched out to the call, and I was -- as his field training officer, I am with him, so that is how I got involved.

Q    Okay. So you said you were his field training officer?

A    I was a secondary field training officer for him.

Q    Okay. What does secondary field training officer mean?

A    Just kind of like a fill-in if the primary is usually out. Sometimes if the officer is not responding well to the primary field training officer, they can put him with the secondary field

training officer to get a different viewpoint and different opinion on things, and maybe they respond a little bit better with the secondary.

Q    Okay. So why were you Officer Warren's field -- secondary field training officer that day?

A    Officer Hernandez was not -- Officer Hernandez was his primary, and he was not there that day.

Q    Okay. As a field training officer, what are your -- what are your responsibilities as a field training officer?

A    To teach them. It's teach them officer safety, kind of guide them. Give them a lot of resources. Teach them about our softwares [sic] and our databases that we use. Make sure they understand the procedures of filling out the reports, or just kind of, I guess, you know, police duties. It's an ongoing active list that we just check off on.

Q    Okay. Are you required to review any investigation that the officer you're serving as the field training officer for conducts?

A    Yes, sir. You are.

Q    Okay. In what way are you required to review that?

A    You review the report, review any -- make sure that they're actually within -- you know, if they're charging, or if they need to come up with an offense, make sure they're on the right page, the right -- the right track. So that's kind of primarily why you're there. Depending on what phase he's in -- in the FTO program, it's how involved you are. So it just kind of depends where they are in that field training program.

Q    Okay. And was this the first time you had served as Officer Warren's field training officer?

A    I don't know if it's the first time. So I don't remember if it was the first time or if it -- if I've been with them in the past.

Q    Was it -- how far along in his -- in his field training was he at this point?

A    I don't think very long, but I don't remember exactly what phase or how many days he's been here.

Q    Okay. Were there -- were there other times you served as his field training officer?

A    Later on, yeah. Yeah, later on, when he was closer to the end, that is when I became his field training officer again.

Q    Okay. Were you ever his primary field

training officer?

A    No. Officer Hernandez was the primary.

Q    Okay. So you mentioned that the field training officer reviews the report and helps them come up with the right offense; is that right?

A    Yes, sir.

Q    All right. Is there anything else the field training officer has to review with respect to an investigation?

A    Just depends how -- you know, in this situation, the warrant, yes. The -- you're making sure he's filling out everything properly.

Q    Okay. So you also review the warrant application?

A    I do, yes.

Q    Do you have to sign off on the report or the warrant application?

A    Not physically, no. The supervisors will sign off on it, but you will, like, look at it visually and, you know, approve it or tell them to fix something.

Q    Okay. So you mentioned that you were with Officer Warren when he responded to the call that came in about Ms. Rachmuth; is that right?

A    Yes, sir.

Q    So what did you all do when you responded to that call?

A    So we drove to the -- the location, which was Harris Teeter off Sunset Lake Road. We ended up getting there. We spoke to the manager that was on scene. Kind of figured out exactly what -- what occurred, what the -- the complaint was. We got information from the manager.

We ended up contacting the victim in this case over the cell phone. Officer Warren talked to the victim over the phone, gathered her information, and then we just kind of went from there.

Q    Okay. And to just to back up a little bit before you get to the -- the Harris Teeter, what was the substance of the call that came in?

A    It came out as a harassment.

Q    Okay. And what does that mean? Is there a specific code for harassment or --

A    No, no. It's plain talk, so it just came out as harassment.

Q    Okay. Do you recall what day this was?

A    It was November 2nd.

Q    Did you get any other information from dispatch other than just harassment when -- when

the call came in?

A    There was some type of call notes for it, but I don't recall exactly what the call note said.

Q    Okay. When you say call notes, is that something you receive verbally from dispatch, or do you get something written that are call notes?

A    It's written into the call, and then dispatch will relay it over to you, just kind of depending on what it is. And they just say, refer to your MDT, which is our database here for calls, or they will say it over the radio.

Q    Okay. So you said -- you mentioned that you spoke to the Harris Teeter manager once you arrived to Harris Teeter; is that right?

A    Yes, sir.

Q    Did you speak to her, or did Officer Warren?

A    Officer Warren did.

Q    Okay. Did you ever ask any questions of the manager?

A    I don't remember if I asked her anything.

Q    What -- were you present when she was talking to Officer Warren?

A    I was within the same room, yeah.

Q    Okay. What did she say to Officer Warren?

A    I don't know the full extent of what was said verbatim. I do know that it was mentioned that a customer walked in and began to take pictures of one of her employees. I know that she did overhear her say that the customer called her a terrorist and was raising her voice at her. From there, I know that she ended up asking the customer to leave, and she left. She left.

Q    Okay. Did she ever identify Ms. Rachmuth by name?

A    I don't remember.

Q    Did she ever express fear for the employee's safety?

A    I don't recall either.

Q    Did she say whether Ms. Rachmuth threatened violence in the store?

A    I don't remember.

Q    Did she say whether Ms. Rachmuth assaulted the employee?

A    No, sir. She did not assault.

Q    Did she say whether she had any reason to believe Ms. Rachmuth knew the employee's name?

A    I'm sorry. Can you say that one more time?

Q    Did the manager say whether she had any

reason to believe that Ms. Rachmuth knew the employee's name?

A    No. No, sir.

Q    Did the manager say whether she had any reason to believe that Ms. Rachmuth knew the employee's home address?

A    No, sir.

Q    Did the manager say whether Ms. Rachmuth had contacted the employee by phone?

A    I don't remember.

Q    Did the manager say whether Ms. Rachmuth had ever contacted the employee by email?

A    I do not believe so.

Q    Did the manager say whether Ms. Rachmuth had ever contacted the employee by social media messaging?

A    I do recall that it wasn't contacted, like, to her, but she was -- I do believe that the manager informed us that it was -- it was posted, that there was a post about the employee on social media.

Q    Okay. So at that time, the manager informed you about the social media post; is that right?

A    I believe so, yes.

Q    Did she give you -- did she give you the post, a screenshot of the post, or anything at that time?

A    I don't remember. I don't think she gave us a physical copy of it.

Q    Okay. Did she email it to you or text it to you or anything?

A    I don't remember if it was. It wasn't emailed to me.

Q    Okay. Did the manager ever say whether Ms. Rachmuth came to the employee's house?

A    No, sir.

Q    And you mentioned that the -- the manager said she had asked Ms. Rachmuth to leave at some point during the incident; is that right?

A    That's correct.

Q    Did she ever say whether Ms. Rachmuth returned to the Harris Teeter?

A    I do not believe -- that day?

Q    Yes, that day.

A    No, sir.

Q    And did she say whether Ms. Rachmuth left when she was asked to leave?

A    Yes, sir. She left.

Q    So you mentioned that the manager said

that there was a customer who took pictures of the employee, called the employee a terrorist. The manager asked the customer to leave. The customer left. And then you mentioned that she mentioned the social media post. Is there anything else the manager mentioned during that conversation?

A   I don't recall everything that was mentioned.

Q   Okay. And was that conversation memorialized in writing at all?

A   No, sir. Everything was just vocal.

Q   Okay. So did the manager prepare a witness statement?

A   No. No, sir.

Q   Okay. Did Officer Warren memorialize it in writing anywhere that you know of?

A   Not that -- I don't know. I don't recall.

Q   And did you take notes on a notepad or anything during -- during the conversation?

A   I did not. No, sir.

Q   Did Officer Warren?

A   I don't -- I don't remember if he did.

Q   And did you know the manager before the incident?

A   No, sir.

Q    Had you ever shopped at that Harris Teeter before?

A    Yes, sir.

Q    Have you -- had you ever met or spoken to the manager while you were shopping there?

A    No. No, sir.

Q    Did you ever -- sorry. Go ahead.

A    I just said no, sir.

Q    Okay. Had you ever met the employee while you were shopping there?

A    No, sir.

Q    So you mentioned that that day, Officer Warren also spoke with the employee on the phone; is that right?

A    That's correct.

Q    Did -- were you also on the phone with him when he was having that conversation?

A    I was in the same vehicle as him, yes.

Q    Okay. Did you overhear any of that conversation?

A    I believe so, yes. I think it was on speaker, so I did overhear.

Q    Okay. Describe what the employee told Officer Warren while she was on speakerphone.

A    Again, I don't remember to the full

extent what was said. I do know that she -- she is aware that there was a social media post that was posted online. It was on Twitter or X. And she sounded very distraught over the cell phone. I know she did say that she was terrified and in fear, and she has not returned back to work, and very embarrassed about the situation. But I don't recall the exact, you know, what was -- what actually was said over the cell phone.

Q    Okay. Did she mention any of the conduct that occurred in the store?

A    I believe -- well -- well, yes. I just don't know exactly what was said.

Q    Okay. You said she mentioned a social media post; is that right?

A    That's correct.

Q    Did she mention whether there was one post, two posts, or more than one post?

A    I believe she just said a post.

Q    So just one post?

A    I don't know if she said one or two or more.

Q    Did she say whether Ms. Rachmuth ever threatened her in the store?

A    I don't recall.

Q    Did she say whether Ms. Rachmuth ever threatened her over the phone?

A    I do not believe so. No, sir.

Q    Did she say whether Ms. Rachmuth had ever tried to contact her over the phone?

A    No, sir.

Q    Did she say whether Ms. Rachmuth ever contacted her by email?

A    No, sir.

Q    Did she say whether Ms. Rachmuth ever contacted her by any sort of messaging app?

A    No. No, sir. Not -- not -- that I don't -- I don't know.

Q    Did she say whether Ms. Rachmuth ever came to her home?

A    No, sir. She did not.

Q    Did she say whether she had any reason to believe that Ms. Rachmuth knew her name?

A    I don't know.

Q    Did she say whether she had any reason to believe Ms. Rachmuth knew her home address?

A    I also don't recall.

Q    Do you remember anything else that she said during that phone conversation?

A    I do not. With this case being over two

years, I do not remember the extent of every word that was said.

Q    Understood. Was that phone conversation memorialized in writing at all?

A    I don't remember.

Q    Was it recorded in any way?

A    I do not believe it was recorded, no. I know it wasn't documented on my end because when I tried to pull up any bodycam footage of that incident, it's not -- that phone conversation is not there.

Q    Did the employee complete any sort of witness or victim statement?

A    She didn't -- she did not write anything out, no.

Q    Okay. Did Officer Warren ask her to complete a witness statement?

A    I don't remember.

Q    Based on your training and based -- as his -- his FTO, should he have asked her to complete a witness statement?

A    Well, she's -- are we still talking about the manager, or are we talking about the victim?

Q    The -- the employee, or the victim.

A    The employee? No. A form does not need to

be filled out.

Q    Did Officer Warren ever ask the manager to fill out a statement?

A    I do not believe so.

Q    Based on your training and as his FTO, should he have asked the manager to fill out a statement?

A    It would have been -- it would have been -- would have helped for a witness statement, yes.

Q    And why is that?

A    Just whenever if -- whenever this went to court, if it did, then we at least have a witness testimony of exactly what was said verbatim on that form.

Q    When you respond to -- to incidents like this, do you typically -- typically ask a witness to complete a written statement?

A    Not every single time, no.

Q    Okay. But it helps to have the witness statement; is that right?

A    It does, yes.

Q    But you said that the -- the victim didn't necessarily need to fill out a statement; is that right?

A    The victim didn't necessarily need to?

I'm sorry.

Q    So you said it helps to have a statement from the witness. Would it also help to have a written statement from the victim?

A    In some situations, yes.

Q    Is it standard practice to get a written statement from the victim?

A    It's not standard practice.

Q    Okay. So after you spoke with the manager and spoke with the employee on the phone, what did you and Officer Warren do next?

A    I believe we discussed it amongst ourselves to see if there was any charges or anything that -- or what kind of documentation we need to go from that point forward. I do remember that it was -- we were both questioning, you know, what type of charge, if there was any.

And I know we looked at the -- the crimes book and looked online, and what we gathered was cyberstalking would have been the most appropriate. And I know we discussed this with our supervisor, both Sergeant Bock, and I know Sergeant Bock referred us to Lieutenant Ottoway, which, they were both standing right next to each other at the time, so we ended up talking to Lieutenant Ottoway about

the cyberstalking charge.

And, you know, she said that we -- we -- we had it, and she would have -- she approved it. Well, not approved, but just was on the same side, and understood where we were coming from. So that's where -- that was the next steps that we took.

Q    Okay. Did all of that occur on the same day that you spoke with the manager and the employee?

A    Yes.

Q    Okay. What evidence did you have at that time that made you believe cyberstalking was the appropriate charge?

A    It was -- it was what the victim told us, and then it was also looking at the statute.

Q    What part of the statute led you to believe that cyberstalking was the appropriate charge here?

A    I don't remember verbatim what the statute actually said. I do know there is a -- what it does say in there. It's pretty much what we put into the report. I know about feeling terrified, harassed, embarrassed, along those lines. I just don't know verbatim exactly what it was.

Q    Okay. So you mentioned you had the

witness statement -- or, sorry -- the witness --
excuse me. You had the victim's statement at that
point. What other evidence did you have that made
you believe cyberstalking was an appropriate
charge?

A    Well, we had the -- the post that was
posted, and we had also the witness statement that
matched along with what the victim said. So with it
being -- the post is what made us think of
cyberstalking, with it being online.

Q    How many posts did you have when you were
considering whether to bring cyberstalking?

A    Well, I just saw the one post.

Q    Do you review any comments made to the
post?

A    I did. I looked at the comments.

Q    What did you see in the comments?

A    I don't remember exactly what was said. I
do know there was numerous comments, and then there
was also numerous responses to those comments. But
I don't know verbatim exactly what was said.

Q    Okay. So besides the post and the victim
statement, did you have any other evidence that led
you to believe cyberstalking was the appropriate
charge?

A     Other than the post, the victim statement, and the witness statement, and then that is the evidence that we had.

Q     I think you mentioned you consulted some materials to determine what the appropriate charge would be. What materials did you consult?

A     We used the -- the North Carolina crimes book, and then also using our resources by discussing with our supervisors.

Q     Okay. And which supervisors did you discuss with again?

A     It was Sergeant Bock at the time, who was a sergeant, and then Lieutenant Ottoway.

Q     Again, what did -- what did you tell Sergeant Bock when you sought his advice?

A     I told him everything that -- all the information that we had, so I relayed that over to him. And I know he referred us to the Blue Book, where we looked at the Blue Book. And that is when Ottoway, like I said, was standing right next to her -- or, next to Sergeant Bock, so we ended up discussing it more in detail with her. I don't know where Sergeant Bock went off to at that time, but I know it was just me, Warren, and Lieutenant Ottoway. And that is where, you know, we discussed

it a little bit further in depth.

Q    Okay. You mentioned the Blue Book. Is that the North Carolina crimes book?

A    Yes, sir.

Q    Okay. You said you -- you -- you spoke more in depth with -- with Lieutenant Ottoway. What did she say when you asked for her advice?

A    I don't recall exactly what was said. I do know we all looked at the crimes, the elements, but I don't remember exactly what she said.

Q    Did she say whether she had heard of Ms. Rachmuth before this incident?

A    I don't remember.

Q    Did she say whether she knew Ms. Rachmuth at all?

A    I don't think so. I don't remember.

Q    So did she ultimately agree that cyberstalking was the appropriate charge?

A    Yeah. She -- yeah. I don't think -- I don't know if I've ever charged cyberstalking before, so it was a little bit new to me. So that -- that is why -- and with Officer Warrant being new as well, we were both kind of on the same page of discussing it a little bit further and seeing -- getting another viewpoint of it, and that's why we

ended up talking to Lieutenant Ottoway.

Q    Why did you think you needed another viewpoint?

A    Just to confirm our decision, pretty much.

Q    I think earlier, you mentioned that -- that you and Officer Warren were both questioning the type of charge; is that -- is that right?

A    Yeah. Yeah, we were questioning it.

Q    Why were you questioning it?

A    Because, again, I've never charged cyberstalking before. And the way that the victim felt, and the testimony that we received from the witness, instead of just a documentation, I've -- obviously, we always look into to see if there -- you know, we can -- there's more for us to do. So, I mean, I was just questioning if, you know, a charge was related to the -- the offense and the crime that we responded to.

Q    Were you questioning whether you had enough evidence to bring a cyberstalking charge?

A    I don't know if I was questioning the evidence. I was just questioning what we had already, if that would have been -- if that would have been an element, or if that was an element in

a crime.

Q    Okay. But by what you had already, you mean the -- the post and the victim statement and the witness's statement; is that right?

A    Yes.

MR. BRUCE: We've been going for about an hour. That might be a good time to take a breather, if that's all right with you, Officer Marino?

THE WITNESS: Yeah. Of course, that's fine.

MR. BRUCE: We can take a 10-minute break and be back here around 4:22?

THE WITNESS: Okay. Sounds good.

THE VIDEOGRAPHER: Off the record now at 1612.

(OFF THE RECORD)

THE VIDEOGRAPHER: We're back on the record at 1623.

BY MR. BRUCE:

Q    All right. Officer Marino, I hope you had a good break.

A few more questions about the investigation that you and Officer Warren conducted. At any point, did you or Officer Warren have any reason to believe that Ms. Rachmuth was

going to enact any physical harm on the Harris Teeter employee?

A    No, sir. I don't think -- at the time, no.

Q    You said at the time. Did you have any reason to believe at any other time that she would harm the Harris Teeter employee?

A    No, sir. Not -- not at all.

Q    Did you have any reason to believe that Ms. Rachmuth was going to confront the Harris Teeter employee again?

A    That, I do not know.

Q    Did you have any reason to believe that Ms. Rachmuth would return to the Harris Teeter store?

A    I don't know if she would return or not.

Q    Did you have any reason to believe that she would go to the employee's house?

A    I also do not -- do not know.

Q    Did you collect any evidence during your investigation that would suggest any of those things?

A    No. No, we didn't collect anything that would suggest that.

Q    So before we went on the break, we were -

- we were discussing when you and Officer Warren were deciding whether to charge cyberstalking, you sought the advice of Sergeant Bock and Lieutenant Ottoway. At any point in those conversations, did -- did you or Officer Warren consider bringing a charge besides cyberstalking?

A     Well, originally, we got dispatched out there for harassment, so I know harassment was discussed. And then when it went online, we tried to look in the online realm, so that's where we came across on cyberstalking.

Q     Okay. So why did you decide not to charge harassment?

A     I believe we looked at the elements, and cyberstalking had a -- it met the elements more for cyberstalking than it did on harassment.

Q     Okay. Do you recall what elements of harassment the evidence didn't meet?

A     I don't recall.

Q     Were there any other charges besides harassment that you considered charging?

A     I don't remember if there was or not.

Q     Did Sergeant Bock or Sergeant Ottoway suggest charging any other crimes besides harassment or cyberstalking?

A    I also don't remember.

Q    Did you ever view Ms. Rachmuth's Twitter account during the course of your investigation?

A    Yes, sir.

Q    Okay. And how did you do that?

A    Lieutenant -- Lieutenant Ottoway actually pulled it up on Twitter.

Q    Okay. And so did Lieutenant Ottoway have a Twitter account?

A    I don't know if it was her personal. I don't know whose Twitter it was, but she had access to Twitter.

Q    Okay. Did you have access to Twitter?

A    No, sir.

Q    Did Officer Warren?

A    I don't know if he did.

Q    And when Lieutenant Ottoway pulled up Ms. Rachmuth's Twitter account, what -- what did you view on that account?

A    We viewed -- we viewed the post. So we looked at the post, and then we scrolled down and read some of the comments.

Q    Did you review any other posts on her Twitter account?

A    I did not scroll through her Twitter.

Q    Okay. Did Lieutenant Ottoway scroll through her Twitter in the course of the investigation?

A    Not -- no, sir. Not while we were there.

Q    Did -- did you, Officer Warren, or Lieutenant Ottoway view her -- her bio in her -- her Twitter account?

A    No, I didn't -- I didn't view it. I don't know if Officer Warren or Lieutenant Ottoway read it, but I did not.

Q    Okay. So besides the post and the comments below the post, did you review any other portion of Ms. Rachmuth's Twitter account?

A    Viewed, obviously, the name and make sure, and the face, but -- make sure we were -- it was actually her. But other than that, I think maybe her following count, but, you know, it was just -- it's right next to her name, so that's really all.

Q    When you viewed those portions of her account, did you ever become aware that she was Jewish?

A    No, I don't remember seeing anything about her being Jewish.

Q    Did you ever become aware that she was an

independent journalist?

A    No, sir. Not an independent journalist.

Q    Did you become aware that she was active on social media?

A    Yes, sir.

Q    At any other time, besides when you were reviewing her account, did you become aware that she was an independent journalist?

A    Yes, sir. After the fact, you know, I guess after things got dismissed and dropped, that's when I kind of learned a little bit on the reasons why, I learned who she was.

Q    Okay. And how did you learn about who she was?

A    More or less just discussing. I believe it was brought to Lieutenant Ottoway about the charge being dropped. So since she was involved in the decision-making as well, you know, I let her know. And I think that's when we re-looked at the post to kind of figure out why ,and looked a little bit more into her Twitter on who she was.

Q    Okay. So you said that it was brought to Lieutenant Ottoway that the charge was dropped?

A    Yeah, she was made aware.

Q    Okay. And is that how you learned that

the charge was dropped, was through Lieutenant Ottoway?

A    I don't remember how I learned how the charge was dropped. I just remember hearing and knowing that it was -- it was dropped.

Q    Okay. And was it Lieutenant Ottoway that -- that told you that Ms. Rachmuth was an independent journalist?

A    I don't know if she ever told me that she was an independent journalist or not. I still today would -- wouldn't tell you that I knew that she was an independent journalist. I just know that she posted political views on -- on Twitter.

Q    Okay. Did Lieutenant Ottoway at that time tell you that -- that she was Jewish?

A    No, sir. I don't remember.

Q    What did Lieutenant Ottoway tell you at that time about Ms. Rachmuth?

A    I don't recall the conversation.

Q    At any point in the investigation, did you or Officer Warren attempt to interview Ms. Rachmuth?

A    No, sir. There was no interviewing.

Q    Why did you not interview Ms. Rachmuth?

A    We had the evidence at hand, and there

was no need to go ahead and get her side.

Q    You mentioned that you were unsure about the cyberstalking charge, though; is that right?

A    Yes, sir.

Q    So if you were unsure, is that not a situation where you might reach out to the suspect for an interview?

MR. HARTZOG: Objection.

THE WITNESS: Well, we had the -- well, we had the evidence already in post. It wasn't a he said/she said situation. The evidence was posted online, which, we -- reading the element, that -- that's -- like, it was there. It wasn't a he said/she said situation, so there was no need to interview Ms. Rachmuth.

BY MR. BRUCE:

Q    Even to get her side of the story about why she posted the post?

A    No, sir.

Q    Was the reason for her posting the post important to your decision of whether to pursue a cyberstalking charge?

A    With it being online, that is the point of the cyber portion of it.

Q    I guess, did you ever consider what Ms.

Rachmuth's reason for making the post might have been when you were investigating the cyberstalking charge?

A    No.

Q    Did you ever consider whether the post amounted to political speech?

A    No.

Q    Were you aware that the North Carolina cyberstalking statute excludes political speech from the statue?

A    I was not aware.

Q    Did you ever consider whether -- whether Ms. Rachmuth's post might have been an act of journalism?

MR. HARTZOG: Objection.

THE WITNESS: I did not consider.

THE REPORTER: I'm sorry to interrupt, Mr. Hartzog, I just cannot hear your objection, so please speak up.

MR. HARTZOG: I apologize. I'll try to move a little closer and speak louder.

BY MR. BRUCE:

Q    You mentioned that one of your -- your duties as Officer Warren's FTO was to review his incident report; is that right?

A    Yes, sir.

Q    When did you review his incident report?

A    After he completed typing it in, writing it, or typing it.

Q    Okay. Was that before or after the arrest?

A    That was before.

MR. BRUCE: Can we pull up -- give me one second -- tab 8, please?

THE TECHNICIAN: Yes. One moment. One more second here. And the exhibit's on screen.

MR. BRUCE: All right. So this will be -- let's see -- Exhibit 1 [sic]. Can we zoom in to the top there?

(Exhibit 8 marked)

BY MR. BRUCE:

Q    Do you recognize this document, Officer Marino?

A    Yes, sir.

Q    What is it?

A    It's a -- it's a case file, or it's a -- it's a report.

Q    Okay. Let's scroll down to the next page because I think this is just a cover page.

A    It is.

Q    Do you recognize what specific incident
report this is?

A    Yes, sir. I do.

Q    Okay. What report is it?

A    This is the report we're discussing
today.

Q    Okay. Is this the report that Officer
Warren completed for the cyberstalking charge or
investigation of Ms. Rachmuth?

A    Yes, sir. It is.

Q    Okay. And is this the report that you
reviewed?

A    Yes, sir. It was.

Q    You said you reviewed it before the
arrest. Was that before the -- but was that before
you sought an arrest warrant or after you thought
the arrest warrant?

A    I don't recall.

Q    Did you review it multiple times or just
once?

A    For -- before it got submitted to my
supervisor, just one time.

Q    Okay. Did you review it after you
submitted it to your supervisor?

A    In preparation for this, yes.

Q    Okay. Understood.

MR. BRUCE: Can we scroll to -- a couple pages down, there's a narrative section. Let's find that. I think it's the next page. Okay. We can stop there.

BY MR. BRUCE:

What are we looking at on this page of the incident report, Officer Marino?

A    Well, this is the actual report. So this has -- a little bit above from here, it has the offender, the victim, the witness, incident location, and then it has pretty much in detail the actual what occurred in this paragraph there.

Q    Okay. How much detail is an officer, based on your training, supposed to put in an incident report like this?

A    A good amount of training. Obviously -- I'm sorry. Not a good amount of training. A good amount of detail. Obviously, the who, what, where, when, and why, and the reasons why we're there, and, you know, both -- both if we had testimony, put the testimony in there and the reasons why. If there was a charge taken out, why we -- why we did that charge.

Q    Okay. Is it important to put all the

facts that you're relying on to establish probable cause into this incident report?

A     It is, yes.

Q     Okay. Why is that important?

A     So if it ever goes to court, we can prove the reasons why we took out a charge.

Q     Okay. Are you required to put every fact that you're relying on to establish probable cause in the incident report?

A     I wouldn't say required, but you should. As an officer, it's a good practice and good court preparation to -- to put that in there.

Q     Okay. Can you just take a minute to -- to review the narrative on this page and just let me know when you're done?

A     Okay. Okay.

Q     Okay. I want to ask you some questions about it, but I see the narrative continues to the next page, so let's go to the next page so you can see that first. Okay. Can you finish reviewing and let me know?

A     Okay. Okay. I'm done reading.

Q     Okay. So does this narrative mention -- well, how many social media posts does this narrative mention?

A    It said -- she said that she -- she learned about a post being posted online.

Q    Okay. Did -- did the narrative mention any comments that were made to that post?

A    No, sir.

Q    Did it mention any other social media posts by Ms. Rachmuth?

A    No, sir.

Q    Did the narrative say anything about whether third parties called the Harris Teeter store after the post was made online?

A    The narrative did not say that.

Q    Did the narrative say anything about the employee taking her kids out of -- out of school in response to the incident?

A    No, sir. The report doesn't say it.

Q    Based on your recollection, does this report accurately describe all the evidence you had at the time when you decided to -- to pursue a cyberstalking charge?

MR. HARTZOG: Objection.

THE WITNESS: Yes, sir. At the time.

MR. BRUCE: Can we scroll up to -- I believe it's the second page of the report. Scroll down some. Sorry. Maybe the next page. Keep

scrolling. Sorry. Okay. Right here.

BY MR. BRUCE:

Q    Officer Marino, do you see in about the middle of this page, under the -- the blank box there, it says suspect hate/bias-motivated: anti-Islamic (Muslim), do you see that?

A    Yes, sir. I do.

Q    What does that designation mean?

A    I mean, it -- honestly, I don't know.

Q    Is it a routine practice to include a suspect hate/bias-motivated designation in an incident report?

A    I wouldn't say it's common practice. I've never filled out the bias-motivated.

Q    Because you personally have never put a bias-motivated designation in a report?

A    No, sir- I don't -- I don't think so.

Q    Okay. Do you know if there are any written policies or guidelines for when an officer should put that type of designation in a report?

A    I do not know.

Q    Does that have any impact on -- does this designation have any impact on how the investigation is handled?

A    It shouldn't.

Q    Are there different units that investigate suspected hate- or bias-motivated crimes?

A    It's possible that it could be sent out to our investigative unit, but if we can handle everything on a patrol level, then -- then we'll handle it on a patrol level, and it doesn't need to go to investigations.

Q    Okay. What -- in what situations might it need to go to investigations?

A    If we need further, you know, somebody being identified that we can't -- that we don't have the proper software to do, or if we work on night shift, and we can't go out and, you know, collect, you know, more evidence related to a case, then it would go up to investigations because they have multiple people that are able to be designated a case and go out there and -- and do it.

Q    Okay. Any other reasons why a case might go to investigations?

A    No. Other than just if -- just if we can't solve it on a patrol level, then it would be sent out to investigations.

Q    Does anyone have to approve the suspect hate/bias-motivated designation to your knowledge?

A    No, sir. Not to my knowledge. Not to my knowledge.

Q    Okay. When you reviewed this report, did you raise with Officer Warren why that designation was listed?

A    No, sir. I don't -- I don't even remember looking at that when approving the report.

Q    Do you know if Officer Warren is the one who input this designation in the report?

A    I don't know.

Q    Is there anyone else who would have had access to edit the report and input that designation?

A    The report could be reopened by an investigative unit, but I don't know if anyone had access or did.

Q    Okay. Is there a way to tell on the report if it had been reopened?

A    With this old report writing system, I don't recall if there was a way. I'm only more familiar with our new report writing system now.

Q    Okay. Do you know what the basis for this anti-Islamic, Muslim designation in the report was?

A    No, sir.

MR. BRUCE: Okay. We can take this exhibit

down. And let's pull up tab 3.

THE TECHNICIAN: One moment here. And the exhibit's now on screen.

MR. BRUCE: Okay. Let's zoom in to the caption at the top right here.

BY MR. BRUCE:

Q    Officer Marino, are you familiar with this document?

(Exhibit 3 marked)

A    Not -- not verbatim.

Q    Are you familiar with the Holly Springs written directives?

A    Yes, I am.

Q    Have you ever reviewed this specific written directive that says it's entitled follow-up investigative notifications and responsibilities?

A    Yes, sir. We have to sign off on them, and I signed off on them.

Q    Okay. So you've -- you've reviewed this document at some point while you've been at the Holly Springs Police Department?

A    Yes, sir.

MR. BRUCE: Okay. Can we scroll to -- I have the -- the Bates number is 592. Let's actually start at the bottom of 591.

BY MR. BRUCE:

Q    Okay. So you see at the bottom here, it says section 840.1.5, criminal investigation section, and then under that, we have general investigations unit? Do you see where it says that?

A    Yes, sir.

Q    Is the general investigations unit the -- the unit that you were talking about when we were talking about investigations earlier?

A    Yes, sir.

Q    Okay. And under that, it says responsibilities, the general investigations unit will be notified of and is responsible for investigating the following crimes. Do you see that?

A    Yes, sir.

Q    There's a list -- there's a list there. Let's scroll down. I believe it is J. So section J there is ethnic intimidation or hate crimes. Do you see that?

A    Yes, sir. I do.

Q    Based on your training, do you know whether the suspected hate or bias designation in an incident report, does that mean that the incident is an ethnic intimidation or hate crime?

A    I don't know if selecting that would mean that that would go up to investigation, so I'm not sure.

Q    Based on this directive, should Ms. Rachmuth's case have been investigated by the general investigations unit?

MR. HARTZOG: Objection.

THE WITNESS: No, sir. Not -- that's why we -- it wasn't sent out.

BY MR. BRUCE:

Q    Why wasn't it sent up?

A    Because we didn't believe it to be -- follow under anything in this policy.

Q    Okay. Does this directive give officers the discretion to determine when -- when to send something up to general investigations if it falls under this list of crimes?

A    If it falls under this list, then -- then no, it would be sent up.

Q    Okay. Is it your opinion that Ms. Rachmuth's case did not amount to an ethnic intimidation or hate crime?

A    Yes, sir. It was my opinion.

Q    Despite the suspected bias or hate-motivated designation in the incident report?

A    Yes, sir. Again, I don't remember seeing that in the report when looking over it.

Q    Do you remember discussing with anyone whether this was a bias or hate-motivated crime?

A    No, sir. I don't remember.

MR. BRUCE: Okay. We can take this down.

BY MR. BRUCE:

Q    So after you and Officer Warren consulted with Sergeant Bock and Lieutenant Holloway or Ottaway, what did you do next?

A    We ended up filling out the warrant, and talked to the magistrate, and presented our facts to the magistrate.

Q    Did you assist Officer Warren in filling out the -- the warrant?

A    I wouldn't say assist as far as filling in for him. However, I was making sure all the boxes were, you know, appropriately filled out for what the magistrate needs to see.

Q    Okay. I guess, who filled out the actual form?

A    Officer Warren.

Q    Okay. And were you next to him, standing next to him, while he was doing that?

A    Yeah, I was with him.

Q    Okay. What did you include on that form?

A    Well, I -- I didn't include anything on the form. It was -- Officer Warren did.

Q    Okay. What information did -- did you observe Officer Warren include on that form?

A    Well, I saw him put the -- I know that the offender was filled out, the location was filled out, and then the charge. And -- and I don't know if we specified in there, you know, in the charge, if the -- if there was a dropdown arrow or fill-in-the-blank or what the case might have been for, you know, selecting cyberstalking, but --

Q    Okay. You mentioned there is some -- there is an option to upload a document or a file in support in that form; is that right?

A    Yes, sir. I will say, in -- in 2024, I know we had two different -- I know originally it was -- now it's eWarrants. Back in the day, it was NCAWARE. I'm not sure if we were on NCAWARE at the time. I would just need a date to confirm that, but --

Q    Okay. I appreciate that. Did -- did you or Officer Warren upload any file to the form you filled out, whether it was on the eWarrant system or the other system?

A    No, sir. There was not.

Q    And did you upload the incident report or anything like that?

A    No, sir.

Q    And after you filled out the form, what did you do next?

A    We did a video call with the magistrate.

Q    Okay. Were you both you and Officer Warren on that call?

A    Present in front of the magistrate? Officer Warren was present. I believe I was in the room.

Q    Okay. When you say present, do you mean, like, you were off camera, but he was --

A    Off camera, yes.

Q    Okay. What did Officer Warren present to the magistrate during that conversation?

A    I don't remember verbatim what he had said.

Q    Do you remember anything that he said in that conversation?

A    What -- whatever was on that warrant is what he's -- what he told the magistrate.

Q    So what specific facts did he present to the magistrate on that call in support of obtaining

the warrant?

A    I don't recall exactly what was said to the magistrate.

Q    Okay. Was he reading off of the -- the warrant form that you had previously filled out?

A    I don't remember. Honestly, I don't -- I don't know if he was looking at the computer or the warrant, or he was just presenting the facts based off what he knew.

Q    Okay. Did he show the magistrate the social media post?

A    No, sir. No, he did not.

Q    Did he mention the social media post?

A    Yes, sir. That was mentioned.

Q    Did he mention any other social media posts?

A    No, not that I recall.

MR. HARTZOG: Objection.

THE WITNESS: Just not that I -- no, sir. I don't know.

BY MR. BRUCE:

Q    Did he inform the magistrate that the basis for the charge was a single social media post?

MR. HARTZOG: Objection.

THE WITNESS: I also don't know.

BY MR. BRUCE:

Q    Did you present any evidence to the magistrate that Ms. Rachmuth had affirmatively contacted the victim over the phone?

A    That Ms. Rachmuth -- can you repeat the question, please?

Q    Yes. Did you -- did you or Officer Warren present any evidence to the magistrate that Ms. Rachmuth had affirmatively contacted the victim over the phone?

A    Contacted the victim? No, sir.

Q    Did you or Officer Warren present any evidence to the magistrate that MMs. Rachmuth affirmatively contacted the victim by text?

A    No, sir. We did not present anything.

Q    Did you or Officer Warren present any evidence to the magistrate that Ms. Rachmuth affirmatively contacted the victim by email?

A    No, sir.

Q    Did you or Officer Warren present any evidence to the magistrate that Ms. Rachmuth had threatened violence against the employee?

A    No, sir.

Q    Did you or Officer Warren present any

evidence to the magistrate that Ms. Rachmuth had returned to the Harris Teeter store?

A    No, sir. We did not present anything.

Q    Did you present any other written documentation to the magistrate other than the -- the form you filled out beforehand?

A    Other than the warrant, no, sir.

MR. BRUCE: Let's pull up tab 9.

THE TECHNICIAN: One moment, please. And the exhibit's on screen.

MR. BRUCE: Thank you. So this will be Exhibit 3. Can we -- can you see this document, Officer Marino? Do we need to zoom in at all?

(Exhibit 9 marked)

THE WITNESS: Yeah, if you don't mind just zooming in a little bit?

MR. BRUCE: Yeah, let's zoom into the top section there.

THE REPORTER: I'm sorry, counsel. This is tab 9. I believe we've already marked Exhibit 3, so this should be Exhibit 9, correct?

MR. BRUCE: Yes. I'm fine just marking them with the tab numbers. I thought you all had started doing them sequentially, but yeah, let's do Exhibit 9. Let's follow the tab numbers.

THE TECHNICIAN: I will fix that afterwards.

THE WITNESS: Thank you.

BY MR. BRUCE:

Q   Officer Marino, do you recognize this document?

A   Yes, sir.

Q   What are we looking at?

A   This is a warrant for arrest.

Q   Okay. And is this the warrant for Ms. Rachmuth's arrest?

A   Yes, sir. It is.

Q   Okay. Can you just explain what -- what this page is? Is this the part of the page that -- or part of the warrant that the magistrate completes?

A   No, sir. I think it's the next. I don't -- I don't know exactly what page. This initial is just a front page of explaining what the offense is. And as you're reading it, it tells you what county, and who it's for, and who took out the warrant, and what police department did.

Q   Okay. Is this information on here populated when you fill out the -- the form through eWarrants?

A    Yes, sir. This is.

Q    Okay. So when you were -- you and Officer Warren were filling out the form and providing the offender information and stuff, that's -- this is the -- the piece of paper, for lack of a better term, that it was being entered in?

A    Essentially. It -- it's filled out differently on the form, and when you hit submit, it will put it into this format.

Q    Okay. Let's scroll down some. Well, before we do that -- sorry, scroll back up a bit. So what offense does this warrant indicate the warrant was taken out for?

A    This is a misdemeanor cyberstalking charge.

Q    Is that the only charge?

A    Yes, sir. That is.

Q    Where it says witness information, it says Sheronda Michelle Irick. Do you know who that is?

A    After reading the report, I know it's a manager.

Q    Okay. Why doesn't this also include the victim under witness information?

A    Why doesn't this include her name in

there? We don't include -- I'm sorry. Just so I can get an understanding of what you're asking, can you repeat the question?

Q    Yeah, absolutely. So the -- under witness information, you said it lists the store manager. Why doesn't it also list the employee who presumably was also a witness to the offense?

A    The employee is not a witness.

Q    Does this form treat the victim differently than a witness?

A    Well, there is no form to -- or, there's no section to put in the victim.

Q    Okay. So a warrant application generally doesn't include the victim's information in it?

A    Unless it's in the charging language, depending on the charge, and it's a fill-in-the-blank.

Q    Okay. Got it. I'm not an expert on how these are filled out, so I'm just trying to get -- get a better idea, so I appreciate -- appreciate the patience. Let's scroll down -- down a bit to the bottom of this page. Sorry. That's the next page. Let's go up. I just want to look at this. So there we go.

So under complainant name, it says

Elliott Warren. That's indicating that Officer Warren filled out the warrant; is that right?

A    Yes, sir. That's correct.

Q    Okay. And it says -- what date was this issued on?

A    The -- you would have to -- oh, I'm sorry. The 2nd of November 2024.

Q    Was that the same day you and Officer Warren spoke to the manager and the employee?

A    I don't recall. Based off the report, it says 11/02. I don't know. That's what I'm going off, is the report.

Q    Okay. So your understanding was the report said that you spoke with them on November 2nd; is that right?

A    Yes, sir. That's correct.

Q    Okay. And so this warrant was issued that same day; is that right?

A    Yes, sir.

Q    Let's scroll down, I think, two pages. Let's go one more. What is -- what is this page?

A    So that -- when you select the charge, it will come -- either have some dropdowns or fill-in-the-blank for -- for the charge. So this is the charging language for that charge.

Q     Okay. Is there a way to see in this form what part of the charging language was a dropdown and what part was fill-in-the-blank?

A     Not specifically. The all caps would be the fill-in-the-blank.

Q     Okay. So the all caps would be where your officer Warren wrote that language; is that right?

A     That's correct.

Q     Okay. So your Officer Warren wrote to take pictures at Harris Teeter and electronically communicate on social media for the purpose of terrifying, harassing, or embarrassing her; is that right?

A     Correct.

Q     What evidence did you have at the time you filled this out that Ms. Rachmuth electronically communicated on social media?

A     We had the posts on Twitter or on X.

Q     How many posts did you have?

A     We had that single initial post along with the comments.

Q     What evidence did you have that the post was for the purpose of terrifying, harassing, or embarrassing her?

A     Based off the way that the victim felt.

She specifically explained to us that she was terrified to return back to work. She was embarrassed and also felt harassed about the incident being posted online.

Q    But you never interviewed Ms. Rachmuth to determine what her purpose in posting the post was, correct?

A    That's correct.

MR. BRUCE: Okay. We can take that down.

BY MR. BRUCE:

Why did you decide to seek an arrest warrant rather than seeking a citation or a summons?

A    The arrest warrant, well, I've never actually filled out a criminal summons personally. So based off the facts that we had, and with Ms. Rachmuth not being there at the time of the scene, with the evidence that we had, we presented that, and we obtained a warrant for her arrest.

Q    Could you have sought a citation instead of a warrant?

A    You could do a citation for all -- for any misdemeanor.

Q    So can you do a citation for misdemeanor cyberstalking?

A     You could.

Q     Did you or Officer Warren consider issuing a citation rather than seeking a warrant?

A     No, sir.

Q     And did Sergeant Bock or Lieutenant Ottoway suggest that you issue a citation rather than seeking an arrest warrant?

A     No, sir.

Q     Why didn't you consider a citation instead of a warrant?

A     Well, it is officer discretion. And based off the severity and how the employee felt, we believe that the warrant was the most appropriate action.

Q     So your decision was based off of how the employee felt?

A     And the severity of --  of it, yes.

Q     You say severity. What -- the severity of what?

A     Of the charge. It's a little different from a misdemeanor larceny, where you can do a citation for. And that's more of a common thing, would be a citation for that charge. However, for cyberstalking, we believe that the severity was a little bit higher than issuing a citation.

Q    Okay. Why is the severity higher? They're both -- aren't they both misdemeanors?

A    They are. Yes, sir. I don't have an exact -- I can't give you an answer on why.

Q    Does it -- does it have anything to do with the specific conduct in a particular case, or is it just the fact that you think of cyberstalking as more serious than larceny?

A    I would say both. Plus, with -- with Ms. Rachmuth not being there on scene, instead of filling out the citation, and plus, we believed that at the time that her address came back to an Apex address, so it was outside of our jurisdiction, so we decided to warrant due to that fact.

Q    Okay. But was her address actually outside of your jurisdiction?

A    No, sir. It was within.

Q    When did you find that out?

A    I think once actually looking it up to see where she was located.

Q    And when did you look that up? Before or after you obtained the warrant?

A    It was after.

Q    So can you describe what happened after

you and Officer Warren obtained the warrant?

A    Yes. I believe the next day or the next shift that we were working, we served the warrant.

Q    Okay. So it was the day after you got the warrant is when you went to arrest Ms. Rachmuth?

A    Yes, sir. Per the report, it was the day after.

Q    Okay. Were you still serving as Officer Warren's FTO that day?

A    No, sir.

Q    Okay. But you went with him to serve the warrant?

A    Yes, sir.

Q    Who else was with you and Officer Warren?

A    It was his primary FTO, which was Officer Hernandez.

Q    Okay. So what role were you playing now that Officer Hernandez was -- or, sorry -- playing's a bad word. What role did you have now that Officer Hernandez was his primary FTO?

A    I was just a checking officer.

Q    Okay. How many cars did you bring to the arrest?

A    There was two.

Q    Who was in what car?

A    I was in my patrol vehicle, and Officer Warren and Officer Hernandez was in Officer Warren's patrol vehicle.

Q    Okay. Once you arrived to Ms. Rachmuth's house, where did you park?

A    We parked on the street about a house down from a residence.

Q    Okay. Who -- who made the decision to park in that location?

A    Ultimately, it was Officer Warren's decision. It's common officer safety practice to not park in front of the residence, but park away.

Q    Can you explain that more? Why -- why would you decide to park away from the residence instead of in front?

A    Yeah. So it's more of an element of surprise, parking away from the residence. So if somebody does not like law enforcement, or somebody is aware that we are approaching, and it was someone that did not want to go to jail or wanted to fight, and wanted to prepare for us to walk up on their front porch, if we parked in front of the residence, and they would -- the element of surprise is gone.

So from a tactical standpoint, we park

away from the residence and approach. So if we needed to retreat, we can retreat away to our patrol vehicles instead of retreating away to them that are parked right in front of our house or somebody's house.

Q    Did you have any evidence or reason to believe at the time that -- that Ms. Rachmuth didn't like the police?

A    No, sir.

Q    Did you have any reason to believe that she would be hostile or violent towards the police?

A    No, sir.

Q    Did you have any reason to believe that she would try to escape or not be cooperative?

A    No.

Q    So do you always park away from a residence when you serve an arrest warrant?

A    Yes, sir. I always park away.

Q    Okay. Have you ever parked closer to the residence?

A    If the street or traffic dictates otherwise, but that's the only time. There's not a specific distance away that you need to park that the way we practice and are trained, but it obviously dictates on the environment that you're

in and where you're at.

Q   And so after you all parked away from a residence, what did you do next?

A   We approached her residence from the side of the house onto the front porch.

Q   Okay. And then what happened?

A   Ms. Rachmuth opened the door and greeted us prior to us even knocking on the door, ringing the doorbell.

Q   Okay. What, if anything, did she say to you when she greeted you?

A   I don't recall exactly.

Q   Do you recall what -- what you or any of the other officers said to her?

A   I do know that she was informed that she had a warrant for her arrest, and to turn around so she can be placed into custody. I do know that I walked up and started talking to her and explaining the reason why we were there and why she had a warrant for her arrest.

Q   Were you aware that her children were at home at the time?

A   No, sir. I didn't see any children.

Q   Were you aware that --

MR. HARTZOG: I'm sorry. I was going to

say, when you get to a point, can we take a break?

MR. BRUCE: Yeah. Let me do one more question, then.

MR. HARTZOG: Yeah.

BY MR. BRUCE:

Q    Were you aware that her husband was at home at the time?

A    No, sir. Not until we came outside.

MR. BRUCE: Yeah, let's take a break there, and we'll -- we'll pick back up.

THE VIDEOGRAPHER: Off the record now at 1713.

(OFF THE RECORD)

THE VIDEOGRAPHER: We're back on the record now at 1723.

BY MR. BRUCE:

Q    All right. Hope you had a good break, Officer Marino.

During the arrest, were you wearing a body-worn camera?

A    Yes, sir.

Q    Was it activated?

A    Yes, sir.

Q    In your discovery responses in this litigation, you initially -- initially indicated

that the footage had been destroyed pursuant to an expunction order; is that right?

MR. HARTZOG: He may not know exactly what the objections were or the responses, but --

MR. BRUCE: Okay.

MR. HARTZOG: (Crosstalk) --

BY MR. BRUCE:

Q    Okay. Were you aware of any expunction order entered in -- in Ms. Rachmuth's case?

A    No, sir. I was not.

Q    Okay. Were you involved in searching for responsive documents to discovery requests in this case?

A    No, sir.

Q    Okay. I'm going to pull up what's marked as tab 10, but it's the video, and I can just pull it up on my computer and share my screen, if I can get it to work. Okay. Can you see that?

(Exhibit 10 marked)

A    Yes, I can.

Q    All right. Just making sure I'm sharing sound. Okay. We're going to -- can you tell from what you're looking at right now whether this is -- this is your body-worn camera footage, or would you like me to play a few seconds of it?

A    I recall that it's mine.

Q    Okay. So let's start at 30 seconds. I think there's a portion here where you wait to turn on the sound, so we'll start here.

(Video recording was played)

Okay. We'll stop there. So at the beginning of the video, it seemed like you were hanging about back a bit, and then you -- you slowly started to approach; is that right?

A    Yes, sir.

Q    Okay. And then as you were, it seemed to be kind of on the stairs of the porch, we heard Ms. Rachmuth ask if she could put a shirt on. Do you recall her asking that?

A    Yes, sir.

Q    Did you or any of the other officers ever let her change clothes before you took her to the patrol car?

A    No, sir. We did not let her go back inside.

Q    And did you let her put a shirt on outside at all?

A    No, sir.

Q    Why not?

A    By the time her husband came out with the

shirt, she was already in handcuffs.

Q    Was there any intention to let her put on a shirt after he went inside to get one?

A    I don't recall. I know that he brought his shirt out, but on scene, she did not put on a shirt.

Q    Okay. And at this point, had Ms. Rachmuth given any indication that she wasn't cooperative?

A    No. After -- after a few times of telling her to turn around, she eventually cooperated and did.

Q    Okay. Did she threaten officers in any way?

A    No, sir.

Q    Okay. And at this point, Officer Warren has put her in handcuffs; is that right?

A    That's correct.

Q    Has anyone read her her Miranda rights at this point?

A    No, sir.

Q    Why not?

A    Because we weren't asking her any questions regarding the -- the crime, so there was no need to read her her Miranda rights.

Q    Okay. You were having a conversation with

her, though, right?

A     Yeah, we were.

Q     Did you or any of the other officers ever read her her Miranda rights?

A     No, sir. I did not read her any Miranda rights.

Q     Okay. So at some point, you approached and began talking to Ms. Rachmuth. Why did you decide to step in at that point?

A     Well, I saw the conversation between when Hernandez was telling her to turn around, so when I saw her not cooperating after being told numerous times, I decided to step up and chime in, and I -- you know, that's when I let her know. I let her know what the situation is, but I just need her to cooperate and turn around, and that's what she did.

Q     Okay. She did cooperate at that point, right?

A     Yes, sir.

Q     And you said you explained what was going on. I believe you mentioned the post and that the employee felt threatened; is that right?

A     That's right.

Q     Did you mention any -- any comments to the post to Ms. Rachmuth?

A    No, sir.

Q    Okay. Did you mention any conduct that occurred in the store to Ms. Rachmuth?

A    No, sir.

Q    Did you mention that she had directly communicated with the employee in any way?

A    No, sir.

Q    Did you mention anything else in the video besides the post and that the employee felt threatened?

A    No, sir.

Q    And then we heard towards the end of the video that Ms. Rachmuth says that the employee was wearing a keffiyeh, and that it was different from a hijab, and that it's a political statement, and I believe you responded, I get that. Do you recall that?

A    I do, yes.

Q    At the time you arrested Ms. Rachmuth, were you aware of the difference between a keffiyeh and a hijab?

A    No, sir. I did not.

Q    Okay. So why did you respond, I get that, when she explained it?

A    They were more just filler words. It

wasn't -- I don't know why I responded that way, but I didn't know the difference.

Q    Are you aware of a -- of what a keffiyeh is?

A    No, sir. I'm not.

Q    Okay. Have you seen any reporting about the keffiyeh and with respect to the events of October 7, 2023?

MR. HARTZOG: Objection.

THE WITNESS: No, sir.

BY MR. BRUCE:

Q    Okay. We're going to watch a little bit more of the video. I'm going to skip a few minutes or a few seconds.

(Video recording was played)

Okay. So in that portion of the video, Ms. Rachmuth informs you that she experiences panic attacks; is that right?

A    Yes, sir.

Q    What was your response to her informing you that she experiences panic attacks?

A    It didn't sound like I responded at all.

Q    Are you -- based on your training, are you required to respond in any way if a suspect mentions that they experience panic attacks or --

or any sort of other health issue?

A    If we see signs, then yes.

Q    Okay. And how are you supposed to respond?

A    We can call for medical attention, so EMS.

Q    Okay. She specifically asked to bring water in the car in case she experiences a panic attack; is that right?

A    Yes, sir. She did.

Q    And did you all let her bring water in the car?

A    Yes, sir. That water bottle that's sitting on the chair did go with her, or I believe -- I'm sorry. Retract that. I believe her husband went in to get another water bottle for her.

Q    Okay. And was she able to bring that water bottle in the car?

A    I don't recall because I did not ride in the car with her.

Q    Okay. Do you know if she was ever given access to that water while she was in the car?

A    I do not know.

Q    I'm going to skip to the end of this video when you're returning to your car. Oh, well,

my apologies. Let's try to fix that. Okay. Can you see that?

A    Yes, sir. I can.

Q    Okay. And let me know. The audio should work, but chime in if it doesn't.

(Video recording was played)

Okay. So I just wanted to show that clip to -- to show where you all parked your car. Is that your patrol car sitting on the street right there?

A    Yes, sir.

Q    Okay. And about how far away from Ms. Rachmuth's residence was that?

A    For an estimate, probably around -- maybe 25 yards from her property line or up until the back of her yard.

Q    Okay. Is it standard practice to park about 25 yards away from the residence?

A    There's no set limit on how far away to park away from a residence.

Q    Is there any reason why you all parked at the end of what appears to be a cul-de-sac in front of other houses?

A    No, sir. No, we were just trying to park out of view, and with those trees as concealment,

we used those trees.

Q    Is there any danger in parking in front of other houses?

A    I mean, there's always danger.

Q    Was there a location in the neighborhood with fewer houses in front of it that you could have parked in front of?

A    Not that I recall. I believe all the way up until her -- it's a neighborhood, so all the way up into her house, there's -- there's houses just like you see in the background there.

Q    Okay. If you had parked a little bit further up right here on the side where all these leaves are, would that have been far enough away from our house for -- from an officer safety standpoint?

A    No, sir. Because that's the side of her house where she had windows on, so she could see us approaching.

Q    Okay. How many other houses were at the end of that cul-de-sac, if you recall?

A    It looks to be about six, just counting what's on the body cam.

Q    Okay. Did you see any neighbors standing outside when you all pulled up?

A    I did not, no.

Q    See any neighbors peeking through the windows?

A    No, sir.

Q    Is it possible there were some outside that you didn't see?

A    It's always possible someone's outside.

Q    We'll be done with the video. After you left Ms. Rachmuth's house, what else did you do with respect to -- to this case?

A    After I left the house?

Q    Yes.

A    Nothing in -- nothing in respect to the case. I just went back on patrol.

Q    Okay. Did you follow Officer Warren to the detention center at all?

A    No, sir.

Q    Did you have any other paperwork to complete after -- after her arrest?

A    No, sir.

Q    And are you aware that -- that the district attorney dismissed the charge the day after the arrest?

A    Yes, sir.

Q    And are you aware that the reason the

district attorney gave was that the described conduct does not meet the elements of the offense?

A    Yes, sir.

Q    Okay. And how did you become aware of the -- the charge was dismissed?

A    I was notified, but I don't remember how I was notified or who told me.

Q    Do you know when you were notified?

A    Not exact date. No, sir.

Q    What was your reaction when you heard that the charge was dismissed because the described conduct does not meet the elements of the offense?

A    I -- I guess just more of a question. I was questioning myself, and trying to get an understanding of what exactly did not meet the elements.

Q    Okay. Why were you questioning yourself?

A    Because in my opinion, we had the probable cause. We had the evidence that met the element. So when it said that it did not meet the element, of course, you're going to question why.

Q    So as you sit here today, do you believe the cyberstalking charge was appropriate?

A    Yes, sir.

Q    Why?

A     Because I believe it still met the -- it still meets the element.

Q     Even though the district attorney disagreed?

A     Yes, sir.

Q     Did anyone at Holly Springs Police Department conduct any review or investigation into why the charge was dismissed?

A     Not that I recall.

Q     Were you ever subject to any investigation or disciplinary action because of the charge?

A     No, sir.

Q     Are you aware that Ms. Rachmuth filed multiple complaints with the Holly Springs Police Department regarding anti-Semitic cyberstalking, harassment, and other threats against her?

A     No, sir.

Q     Were you involved in any of those investigations?

A     No, sir.

Q     Have you been involved in any other investigations involving anti-Semitic harassment?

A     No, sir.

          MR. BRUCE: I'm going to pull up what's

marked as tab 11. Can we pull up tab 11? Perfect.

Sorry.

BY MR. BRUCE:

    Q    Okay. Officer Marino, do you recognize
this document at all?

        (Exhibit 11 marked)

    A    No, sir. I do not.

    Q    Okay. I didn't think so. Can we zoom in
to the top here? Do you see it's an email from
Sloan Rachmuth to paul.liquorie@hollyspringsnc.gov?

    A    Yes, sir.

    Q    Who's Paul Liquorie?

    A    That's my chief.

    Q    Okay. He's the chief of the Holly Springs
Police Department?

    A    Yes, sir.

    Q    Okay. Let's scroll down. Well, I guess
the subject line says, question about case number
22-002832. Are you familiar with that case number
at all?

    A    No. No, sir. Not the number, no.

    Q    Okay. Does that look like a standard case
number that is assigned to a Holly Springs case?

    A    Yes, sir.

    Q    Okay. Let's scroll down to Ms. Rachmuth's

original email. Okay. Right here. Okay. So you see -- can we scroll up to where the -- the to and from line is?

Okay. So do you see that this is an email from Ms. Rachmuth to Chief Liquorie in December of 2022?

A     Yes, sir. I do.

Q     Were you working at Holly Springs Police Department in December of 2022?

A     Yes, sir.

Q     Okay. And Ms. Rachmuth says, Chief Liquorie, in my opinion, members of the NCC4CR group committed ethnic intimidation by emailing me and hundreds of others anti-Semitic material, as well as sharing my home address via video and email repeatedly.

Do you see that?

A     Yes, sir.

Q     Are you familiar at all with the NCC4CR group?

A     No, sir. I'm not.

Q     Okay. Do you see that Ms. Rachmuth references emails to her and hundreds of others about anti-Semitic material?

A     Yes, I do.

Q    Would you agree that that that appears to be a report about repeated communications?

A    With it being repeated in hundreds, those would go hand in hand, yes.

Q    With respect to your investigation against Ms. Rachmuth, did you have any -- any evidence that she had sent hundreds of communications to the Harris Teeter employee?

A    No, sir.

Q    She also says, as well as sharing my home address via video and email repeatedly. Do you see that?

A    Yes, sir. I do.

Q    Do you have any evidence in Ms. Rachmuth's case that she had shared the employee's home address via video or email?

A    No, sir. There's no evidence in that -- for that.

Q    Okay. Can we scroll back up so we can see Chief Liquorie's response? On December 8, 2022, at 4:45 p.m., Chief Liquorie says, Ms. Rachmuth, thank you for forwarding the information about the dismissal of the charges in Polk County. Having worked cases against security threat groups throughout my career, I can understand your

frustration and fear.

We are actively working on your case. Due to the multiple jurisdictions involved and other complexities, we are consulting with our other law enforcement partners to ensure we methodically go through all the materials you have provided us, and are carefully considering the North Carolina general statutes as they may apply. I also realize this course of conduct has occurred over a long period of time and appears to be escalating, but please be patient as we conduct the investigation.

Do you see that?

A    Yes, sir. I do.

Q    Did you consult with other law enforcement partners when conducting your investigation into the complaint about Ms. Rachmuth?

A    No, sir.

Q    Why not?

A    Because this happened within jurisdiction, so there was no need to talk to any other agencies.

Q    At the time, didn't you say you thought it was outside of your jurisdiction?

A    Her address, not where the incident

occurred.

MR. BRUCE: Okay. We can take this down. And we -- let's pull up tab 12, mark it as Exhibit 12.

(Exhibit 12 marked)

THE TECHNICIAN: And the exhibit's on screen.

MR. BRUCE: Thank you. Can we scroll -- can we just zoom into the top of the document?

BY MR. BRUCE:

Q    Do you recognize this document, Officer Marino?

A    No, sir. I do not.

Q    Okay. Do you see that it appears to be an email from Ms. Rachmuth to Chief Liquorie on January 9, 2023?

A    Yes, sir.

Q    Okay. And if we scroll down to Chief Liquorie's email on January 9, 2023, at 2:37 p.m., do you see that?

A    Yes, sir. I do.

Q    Okay. We'll read that.

Chief Liquorie says, Dear Ms. Rachmuth, I understand you and your family are now experiencing frustration, apprehension, and fear, and I

personally am sorry you feel that way. Holly Springs Police Department investigators have diligently been sorting and analyzing the substantial amount of documentation you have provided in their investigation.

They also have consulted with the North Carolina State Bureau of Investigation, NCSBI. After an extensive evaluation of the information you have presented by our department in consultation with state officials, it has been concluded that no criminal North Carolina general statutes have been violated.

Although upsetting, the materials examined fall under First Amendment-protected speech to include postings of public records. Other postings do not meet the necessary statutory elements to be presented for judicial review, for criminal charges, and/or lack direct legal standing.

Do you see that?

A    Yes, sir.

Q    So Chief Liquorie acknowledges that Ms. Rachmuth and her family are experiencing frustration, apprehension, and fear. Do you see that?

A    I do, yes.

Q    Did the Harris Teeter employee similarly describe experiencing frustration, apprehension, and fear?

A    Yes, sir. They were similar.

Q    Chief Liquorie says that Holly Springs investigators have consulted with the North Carolina State Bureau of Investigation. Did you see that?

A    Yes, sir. I did.

Q    Did -- did you or Officer Warren consult with the North Carolina State Bureau of Investigation when investigating the complaint about Ms. Rachmuth?

A    No, sir.

Q    Why not?

A    There was no need for the SBI to get involved.

Q    Do you know why Holly Springs investigators consulted with NCSBI with Ms. Rachmuth's complaint?

A    No, sir. I'm not familiar with the complaint.

Q    Okay. And then at the end, he says, although upsetting, the materials examined fall

under First Amendment-protected speech to include postings of public records. Do you see that?

A    Yes, sir. I do.

Q    And did you or Officer Warren ever consider whether Ms. Rachmuth's post and conduct fall under -- fell under First Amendment-protected speech?

A    I don't remember. I do think it was brought up in conversation.

Q    Do you recall who brought it up in conversation?

A    No, sir.

Q    Okay. Was it Officer Warren?

A    I don't know.

Q    Was it Lieutenant Ottoway?

A    I don't know. I don't know who it was.

Q    Okay. So you don't recall anyone specifically evaluating whether Ms. Rachmuth's post and conduct fell under First Amendment-protected speech?

A    That's correct. I don't recall.

MR. BRUCE: We can take that one down.

BY MR. BRUCE:

Q    Before November 2024, had you conducted any cyberstalking investigations?

A    I don't know if I have or not. It's --
it's -- I guess it would be a rare gall in Holly
Springs, but I don't know if I investigated one
myself.

Q    Okay. Before November 2024, had you
sought an arrest warrant on a cyberstalking charge?

A    No, sir.

Q    Since November 2024, have you
investigated any more cyberstalking incidents?

A    No, sir.

Q    Okay. So have you sought an arrest
warrant for any cyberstalking charges since
November 2024?

A    No, sir.

Q    Before November 2024, had you
investigated any incidents that you suspected to be
hate- or bias-motivated crimes?

A    No, sir.

Q    Okay. Since November 2024, have you
investigated any incidents that you suspected to be
hate- or bias-motivated crimes?

A    No, sir.

Q    Were you aware that MMs. Rachmuth's
mugshot was widely disseminated on social media and
in newspapers following her arrest?

A     No, sir. Not on social media.

Q     Okay. Did you see any newspapers containing your mugshot after the arrest?

A     No, sir.

Q     Are you aware that Ms. Rachmuth has been diagnosed with exacerbated PTSD as a result of her arrest?

A     No, sir.

Q     What's your reaction to learning that she -- she has been diagnosed with exacerbated PTSD?

MR. HARTZOG: Objection. That's not a fair question.

MR. BRUCE: You can go ahead and answer.

MR. HARTZOG: You can answer if you know.

THE WITNESS: I don't have a specific reaction for that.

BY MR. BRUCE:

Q     Do you have any separate electronic devices -- or, do you use a separate cell phone for work and personal use?

A     Once I became corporal, I got a work phone.

Q     Okay. So at the time, in November of 2024, did you just have one phone that you used for both work and personal use?

A    Yes, sir.

Q    Okay. Did you have any documents or information on that phone about Ms. Rachmuth's -- your investigation into the complaint about Ms. Rachmuth?

A    No. No, sir. No, not that I recall.

Q    DID you have any pictures that you took on the phone during the investigation?

A    No pictures that I'd taken, no.

Q    Did you communicate with anyone about Ms. Rachmuth or the investigation on that cell phone?

A    Other than the people that were involved within the case. Not on -- not on the cell phone.

Q    Okay. Did you communicate with those people by text message on the phone or phone call?

A    Yes, phone call.

Q    Okay. Did you send any emails on the phone about Ms. Rachmuth and the investigation?

A    Not to individual officers, unless if it was to my town attorney.

Q    Have you communicated -- besides with your attorneys, have you communicated with anyone about Ms. Rachmuth by text message since her arrest?

A    I don't recall. Not back in 2024.

Q    Okay. Did you communicate with anyone about Ms. Rachmuth besides your attorneys by email since her arrest?

A    No, sir.

Q    Do you have any notes or other documents relating to Ms. Rachmuth or the arrest on any of your personal electronic devices?

A    No, sir.

MR. BRUCE: Let's take a quick break there. I'm going to go through my notes and see if there's anything else we need to cover.

THE VIDEOGRAPHER: Off the record, 1754.

(OFF THE RECORD)

THE VIDEOGRAPHER: We're back on the record now at 1800.

MR. BRUCE: All right. That's all the questions I have, Officer Marino. I appreciate your time and for being here today, and I will turn it over to Mr. Hartzog if he has any questions for you.

THE WITNESS: Yes, sir.

MR. HARTZOG: Just a couple of brief. Can everybody hear me okay?

MR. BRUCE: I can hear you. I'll defer to the reporter, though.

THE REPORTER: It's a little -- it's a little muted. The closer you can get to the witness, I think, the better.

MR. HARTZOG: Let me try to slide closer here. How's this? Is that better? Yes. Okay. Great. All right. Just a couple of follow-up questions.

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. HARTZOG:

Q    When you went to -- or, you were -- you were present when the discussion with the magistrate took place on the -- on the arrest warrant, correct?

A    Yes, sir.

Q    Okay. At that time, did you have -- did you feel like you had evidence that Ms. Rachmuth had electronically communicated to another person?

A    Yes, sir.

Q    And did you have evidence that that communication was done repeatedly through comments on the Facebook post?

A    Yes, sir. That's correct.

Q    Okay. Was that communicated to the magistrate to your knowledge?

A    Yes, sir.

Q    Okay. Did conversation ensue in the

comments on the post?

A    Yes, sir. Ms. Rachmuth has responded back to those comments that we saw.

Q    And did the employee whose picture was posted feel either abused, annoyed, threatened, terrified, harassed, or embarrassed?

A    Yes, sir. And we documented it in the report.

Q    And was that communicated to the magistrate?

A    Yes, sir.

Q    And the magistrate, hearing the evidence that you had collected, determined that probable cause existed for the charge of cyberstalking, correct?

A    That's correct.

Q    And issued the arrest warrant, correct?

A    Yes, sir.

MR. HARTZOG: No further questions.

MR. BRUCE: Just a couple follow-up questions to that.

RE-EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BRUCE:

Q    You said you had evidence of an electronic communication to another person; is that

right?

A    Yes, sir.

Q    What evidence of an electronic communication to another person did you have?

A    It was the comments that were posted on -- on her original post, that she responded back to whoever made that comment.

Q    Okay. So were the communications to the Harris Teeter employee?

A    Not to the employee. No, sir.

Q    Okay. Did you document those comments to the social media report in the incident report?

A    No, sir. It's not documented.

Q    And you testified earlier that it's important to document all the facts you have for probable cause in that incident report; is that right?

A    That's correct.

MR. BRUCE: All right. No further questions.

MR. HARTZOG: I don't have anything else.

THE VIDEOGRAPHER: All right. Stand by. This concludes the deposition of Benjamin Marino. We're going off the record now at 1803.

(OFF THE VIDEO RECORD)

THE REPORTER: And before we go off the written record, could I please have transcript orders?

MR. BRUCE: We'll order the transcript and the video.

MR. HARTZOG: E-tran for now for us.

THE REPORTER: Okay. Do you need exhibits attached?

MR. HARTZOG: Yes, please.

MR. BRUCE: Yes, please.

THE REPORTER: Okay. Stand by.

(OFF THE RECORD AT 6:03 P.M.)

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Micah Hardin, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

_____

MICAH HARDIN,

NOTARY PUBLIC FOR THE STATE OF INDIANA

6/2/2026

CERTIFICATE OF TRANSCRIBER

I, Brandi McLean, CET, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

*Brandi McLean*

_____

BRANDI MCLEAN, CET

PLANET DEPOS, LLC

6/2/2026

| A | | | |
|---|---|---|---|
| **ability** | 30:22, 30:23, | 109:25 | **ahead** |
| 9:25, 122:11, | 58:11, 58:13, | **administer** | 15:3, 15:18, |
| 123:8 | 71:12, 71:16, | 5:25 | 26:7, 44:7, |
| **able** | 100:22 | **advice** | 62:1, 115:13 |
| 29:6, 70:17, | **account** | 8:13, 31:2, | **al** |
| 100:17 | 58:3, 58:9, | 31:5, 31:9, | 1:8, 5:5 |
| **about** | 58:18, 58:19, | 31:11, 31:19, | **alcohol** |
| 6:24, 7:10, | 58:24, 59:7, | 32:4, 32:11, | 9:24 |
| 7:22, 10:25, | 59:13, 59:21, | 33:6, 52:15, | **all** |
| 14:2, 14:5, | 60:7 | 53:7, 57:3 | 5:12, 6:1, 6:4, |
| 14:12, 15:12, | **accurate** | **affirmatively** | 7:6, 7:7, 7:11, |
| 17:6, 18:3, | 122:10, 123:7 | 79:4, 79:10, | 7:25, 8:17, |
| 19:6, 20:1, | **accurately** | 79:15, 79:19 | 9:11, 9:23, |
| 21:2, 25:25, | 68:18 | **affirmed** | 12:11, 12:12, |
| 32:18, 33:12, | **acknowledge** | 6:13 | 12:23, 19:9, |
| 33:17, 33:20, | 19:21, 19:23 | **after** | 20:3, 20:13, |
| 34:10, 35:14, | **acknowledges** | 29:12, 49:9, | 20:16, 21:2, |
| 37:24, 41:20, | 111:22 | 60:9, 60:10, | 23:8, 23:23, |
| 41:23, 45:7, | **across** | 64:3, 64:5, | 23:24, 37:7, |
| 47:22, 47:23, | 57:11 | 65:16, 65:23, | 38:1, 43:10, |
| 49:25, 50:22, | **act** | 68:11, 75:8, | 47:4, 50:7, |
| 55:6, 55:22, | 63:13 | 77:5, 82:21, | 52:16, 53:9, |
| 59:24, 60:13, | **action** | 88:23, 88:24, | 53:15, 55:8, |
| 60:16, 61:18, | 87:14, 105:11 | 88:25, 89:4, | 55:20, 56:8, |
| 62:2, 62:17, | **activated** | 89:7, 92:2, | 59:19, 64:12, |
| 67:18, 68:2, | 93:22 | 96:3, 96:9, | 66:25, 68:18, |
| 68:9, 68:13, | **active** | 97:12, 103:8, | 75:17, 80:13, |
| 69:3, 73:8, | 26:12, 35:18, | 103:11, 103:19, | 80:23, 85:4, |
| 73:9, 86:3, | 60:3 | 103:23, 111:8, | 85:6, 86:22, |
| 90:6, 95:8, | **actively** | 115:3 | 92:2, 93:17, |
| 99:6, 101:12, | 109:2 | **afternoon** | 94:21, 95:22, |
| 101:18, 102:22, | **actual** | 6:20 | 99:22, 100:11, |
| 106:18, 107:24, | 66:9, 66:13, | **afterwards** | 101:8, 101:21, |
| 108:2, 108:22, | 75:20 | 81:2 | 102:8, 102:9, |
| 109:16, 112:14, | **actually** | **again** | 102:13, 102:25, |
| 116:3, 116:4, | 12:9, 12:10, | 8:25, 15:14, | 103:16, 106:5, |
| 116:10, 116:18, | 36:2, 45:8, | 36:24, 44:25, | 106:20, 107:19, |
| 116:23, 117:2 | 50:20, 58:6, | 52:11, 52:14, | 109:6, 117:16, |
| **above** | 59:16, 72:24, | 54:11, 56:11, | 118:6, 120:15, |
| 66:10 | 86:15, 88:16, | 75:1 | 120:19, 120:22 |
| **absolutely** | 88:20 | **against** | **allen** |
| 83:4 | **added** | 79:23, 105:17, | 1:12, 2:1, 4:2, |
| **abused** | 23:21 | 108:6, 108:24 | 6:12, 9:13 |
| 119:5 | **address** | **agencies** | **almost** |
| **access** | 41:6, 46:21, | 109:22 | 23:8 |
| 30:16, 30:21, | 88:12, 88:13, | **agree** | **along** |
| | 88:16, 107:15, | 6:2, 25:9, | 36:15, 50:23, |
| | 108:11, 108:16, | 53:17, 108:1 | 51:8, 85:20 |

**already**
27:21, 54:24,
55:2, 62:10,
80:20, 96:1
**also**
3:18, 12:4,
13:8, 13:9,
18:11, 20:19,
23:4, 23:7,
32:4, 37:13,
44:13, 44:16,
46:22, 49:3,
50:15, 51:7,
51:20, 52:8,
56:19, 58:1,
79:1, 82:23,
83:6, 83:7,
86:3, 108:10,
109:8, 111:6
**although**
6:25, 111:13,
112:25
**always**
54:15, 91:16,
91:18, 102:4,
103:7
**amendment**
14:3, 14:6,
14:13, 14:17,
14:25, 15:6,
15:13
**amendment-protec-
ted**
111:14, 113:1,
113:6, 113:19
**amongst**
11:5, 49:12
**amount**
13:7, 66:17,
66:18, 66:19,
74:21, 111:4
**amounted**
63:6
**analyzing**
111:3
**annoyed**
119:5
**another**
23:18, 53:25,

54:2, 100:16,
118:16, 119:25,
120:4
**answer**
7:14, 8:10,
8:12, 8:17,
8:24, 8:25, 9:3,
9:7, 9:25, 15:2,
15:3, 15:4,
15:18, 15:21,
20:22, 24:12,
24:23, 29:22,
88:4, 115:13,
115:14
**anti**
69:5
**anti-islamic**
71:23
**anti-semitic**
105:16, 105:23,
107:14, 107:24
**anticipate**
8:25
**anybody**
9:16, 9:21,
33:19
**anyone**
70:24, 71:11,
71:15, 75:3,
96:18, 105:6,
113:17, 116:10,
116:22, 117:1
**anyone's**
31:2
**anything**
7:3, 11:11,
11:24, 18:3,
19:11, 23:18,
37:7, 39:21,
42:2, 42:7,
43:5, 43:19,
46:23, 47:14,
49:14, 56:23,
59:23, 68:9,
68:13, 74:13,
76:2, 77:3,
77:20, 79:16,
80:3, 88:5,

92:10, 98:8,
117:11, 120:21
**anywhere**
22:3, 28:4,
43:16
**apex**
88:13
**apologies**
101:1
**apologize**
63:20
**app**
46:11
**appears**
101:22, 108:1,
109:10, 110:14
**applicable**
6:4, 6:8
**application**
37:14, 37:17,
83:13
**applications**
11:15, 11:16
**apply**
23:4, 109:8
**applying**
32:11
**appreciate**
76:22, 83:20,
117:17
**apprehension**
110:25, 111:24,
112:3
**approach**
91:1, 95:9
**approached**
92:4, 97:7
**approaching**
90:19, 102:19
**appropriate**
49:20, 50:13,
50:17, 51:4,
51:24, 52:5,
53:18, 87:13,
104:23
**appropriately**
75:18
**approve**
37:20, 70:24

**approved**
50:3, 50:4
**approving**
11:7, 71:7
**aren't**
88:2
**around**
30:6, 55:12,
92:16, 96:10,
97:11, 97:16,
101:14
**arrest**
4:12, 4:13,
20:18, 20:19,
26:7, 26:8,
28:18, 30:3,
30:10, 33:11,
33:13, 33:20,
33:23, 34:1,
64:6, 65:15,
65:16, 65:17,
81:9, 81:11,
86:11, 86:14,
86:19, 87:7,
89:5, 89:23,
91:17, 92:16,
92:20, 93:19,
103:19, 103:23,
114:6, 114:11,
114:25, 115:3,
115:7, 116:24,
117:3, 117:6,
118:11, 119:17
**arrested**
98:19
**arrived**
39:14, 90:4
**arrow**
76:10
**articulable**
24:15
**asked**
39:21, 42:14,
42:23, 43:3,
47:20, 48:6,
53:7, 100:7
**asking**
14:8, 14:18,

14:20, 21:23,
34:6, 40:7,
83:2, 95:14,
96:22
**assault**
27:24, 27:25,
40:20
**assaulted**
40:19
**assembly**
15:8
**assess**
20:9
**assessing**
21:16
**assigned**
11:23, 12:2,
106:23
**assignment**
11:20
**assist**
75:14, 75:16
**assume**
9:8
**attach**
28:3
**attached**
4:8, 121:8
**attachment**
28:10
**attack**
100:9
**attacks**
17:3, 99:18,
99:21, 99:25
**attempt**
61:21
**attended**
20:2
**attending**
5:13
**attention**
100:5
**attorney**
3:23, 103:22,
104:1, 105:3,
116:20
**attorney's**
31:19, 32:11,

33:3, 33:6
**attorneys**
116:22, 117:2
**audio**
101:4, 122:9,
123:4
**authorized**
5:24
**avenue**
3:14
**aware**
33:10, 33:15,
33:22, 33:25,
45:2, 59:21,
59:25, 60:3,
60:7, 60:24,
63:8, 63:11,
90:19, 92:21,
92:24, 93:6,
94:8, 98:20,
99:3, 103:21,
103:25, 104:4,
105:14, 114:23,
115:5
**away**
90:12, 90:14,
90:17, 91:1,
91:2, 91:3,
91:16, 91:18,
91:23, 92:2,
101:12, 101:18,
101:19, 101:20,
102:14

**B**

**back**
23:22, 38:14,
45:6, 55:12,
55:17, 76:18,
82:11, 86:2,
88:12, 93:10,
93:14, 95:8,
95:19, 101:16,
103:14, 108:19,
116:25, 117:14,
119:2, 120:6
**background**
102:11

**bad**
31:5, 89:19
**baran**
3:6
**based**
14:16, 14:23,
20:3, 22:1,
25:15, 25:19,
34:6, 47:19,
48:5, 66:15,
68:17, 73:22,
74:4, 78:8,
84:10, 85:25,
86:16, 87:11,
87:15, 99:23
**basic**
12:24, 13:2,
14:11, 14:24,
16:4
**basis**
71:22, 78:23
**bates**
72:24
**bearing**
6:21
**became**
36:23, 115:21
**because**
47:8, 54:11,
64:24, 69:15,
70:16, 74:12,
96:22, 100:19,
102:17, 104:11,
104:18, 105:1,
105:11, 109:20
**become**
13:4, 33:10,
34:3, 34:9,
59:21, 59:25,
60:3, 60:7,
104:4
**becomes**
26:23, 26:25
**becoming**
13:5
**been**
7:17, 26:5,
30:10, 36:14,

36:19, 48:8,
49:20, 54:24,
54:25, 55:6,
63:2, 63:13,
71:18, 72:20,
74:5, 76:11,
94:1, 102:14,
105:22, 111:3,
111:10, 111:12,
115:5, 115:10
**before**
2:12, 7:14,
7:18, 8:24,
10:8, 13:6,
29:12, 29:13,
31:2, 31:19,
31:21, 32:1,
32:2, 32:3,
32:11, 32:19,
32:24, 33:3,
33:6, 33:13,
33:20, 33:23,
33:25, 38:15,
43:23, 44:2,
53:12, 53:21,
54:12, 56:25,
64:5, 64:7,
65:14, 65:15,
65:21, 82:11,
88:22, 95:17,
113:24, 114:5,
114:15, 121:1,
122:3
**beforehand**
80:6
**began**
40:3, 97:8
**beginning**
95:7
**begins**
5:2
**behalf**
3:3, 3:11, 5:19
**being**
6:13, 6:21,
46:25, 51:9,
51:10, 53:22,
59:24, 60:17,

62:23, 68:2, 70:12, 82:6, 86:4, 86:17, 88:10, 97:12, 108:3, 117:18

**believe**
28:5, 28:7, 28:12, 40:22, 41:1, 41:5, 41:13, 41:18, 41:25, 42:19, 44:21, 45:12, 45:19, 46:3, 46:18, 46:21, 47:7, 48:4, 49:12, 50:12, 50:17, 51:4, 51:24, 55:25, 56:6, 56:9, 56:13, 56:17, 57:14, 60:15, 68:24, 73:18, 74:12, 77:11, 80:20, 87:13, 87:24, 89:2, 91:7, 91:10, 91:13, 97:21, 98:16, 100:14, 100:15, 102:8, 104:22, 105:1

**believed**
88:11

**below**
59:12

**benjamin**
1:12, 2:1, 4:2, 5:3, 6:12, 9:13, 120:23

**besides**
51:22, 57:6, 57:20, 57:24, 59:11, 60:6, 98:9, 116:21, 117:2

**best**
22:22, 122:10, 123:7

**better**
31:4, 35:3,

82:5, 83:20, 118:3, 118:5

**between**
10:16, 10:23, 10:25, 23:12, 97:10, 98:20

**bias**
17:6, 17:11, 18:1, 18:11, 19:1, 25:17, 25:22, 25:25, 73:23, 74:24, 75:4

**bias-motivated**
17:22, 69:5, 69:11, 69:14, 69:16, 70:2, 70:25, 114:17, 114:21

**biases**
18:10, 18:20, 18:23

**bio**
59:6

**bit**
20:20, 35:3, 38:14, 53:1, 53:21, 53:24, 60:11, 60:21, 66:10, 80:16, 82:11, 83:21, 87:25, 95:8, 99:12, 102:12

**blank**
69:4, 83:17

**blet**
13:5, 13:11

**blue**
52:18, 52:19, 53:2

**bo-rj**
5:7

**bock**
49:22, 52:12, 52:15, 52:21, 52:23, 57:3, 57:23, 75:9, 87:5

**body**
102:23

**body-worn**
93:20, 94:24

**bodycam**
47:9

**book**
49:19, 52:8, 52:18, 52:19, 53:2, 53:3

**both**
9:2, 26:5, 49:16, 49:22, 49:24, 53:23, 54:7, 66:21, 77:8, 88:2, 88:9, 115:25

**bottle**
100:13, 100:16, 100:18

**bottom**
72:25, 73:2, 83:22

**box**
69:4

**boxes**
75:18

**brandi**
123:2, 123:15

**break**
7:3, 7:5, 7:10, 7:11, 7:15, 55:11, 55:21, 56:25, 93:1, 93:9, 93:17, 117:9

**breather**
55:7

**brian**
3:21

**brief**
117:22

**bring**
51:12, 54:21, 89:22, 100:7, 100:11, 100:17

**bringing**
57:5

**broad**
14:7, 29:21

**brought**
60:16, 60:22, 96:4, 113:9, 113:10

**bruce**
3:4, 4:3, 5:16, 6:17, 6:19, 14:10, 14:20, 14:22, 15:10, 15:24, 21:25, 24:19, 25:1, 30:2, 31:17, 55:6, 55:11, 55:19, 62:16, 63:22, 64:8, 64:12, 64:16, 66:2, 66:6, 68:23, 69:2, 71:25, 72:4, 72:6, 72:23, 73:1, 74:10, 75:6, 75:7, 78:21, 79:2, 80:8, 80:11, 80:17, 80:22, 81:4, 86:9, 86:10, 93:2, 93:5, 93:9, 93:16, 94:5, 94:7, 99:11, 105:25, 106:3, 110:2, 110:8, 110:10, 113:22, 113:23, 115:13, 115:17, 117:9, 117:16, 117:24, 119:20, 119:23, 120:19, 121:4, 121:10

**bureau**
111:7, 112:8, 112:12

**C**

**call**
20:7, 20:8,

**called**
40:5, 43:2,
68:10
**calls**
17:18, 20:6,
39:10
**cam**
102:23
**came**
37:24, 38:16,
38:17, 38:20,
39:1, 42:11,
46:15, 57:11,
88:12, 93:8,
95:25
**camera**
77:14, 77:15,
93:20, 94:24
**campus**
16:7
**can't**
70:12, 70:14,
70:22, 88:4
**cannot**
63:18
**caps**
85:4, 85:6
**caption**
72:5
**car**
89:25, 95:18,
100:8, 100:12,
100:18, 100:20,
100:22, 100:25,
101:8, 101:9
**career**
108:25

**carefully**
109:7
**carolina**
1:2, 5:6,
13:20, 13:22,
19:6, 33:23,
52:7, 53:3,
63:8, 109:7,
111:7, 111:11,
112:8, 112:12
**cars**
89:22
**case**
1:6, 5:6, 13:8,
13:16, 13:18,
13:20, 13:22,
23:3, 23:22,
23:25, 38:10,
46:25, 64:21,
70:15, 70:18,
70:19, 74:5,
74:21, 76:11,
88:6, 94:9,
94:13, 100:8,
103:10, 103:14,
106:18, 106:19,
106:22, 106:23,
108:15, 109:2,
116:13, 122:13,
123:10
**cases**
32:17, 108:24
**cause**
26:10, 26:11,
29:8, 30:19,
67:2, 67:8,
104:19, 119:14,
120:16
**cell**
38:10, 45:4,
45:9, 115:19,
116:11, 116:13
**center**
20:7, 103:16
**certain**
16:18, 16:24,
17:13
**certificate**
13:6, 122:1,

123:1
**certification**
6:7
**certified**
6:2
**certify**
122:4, 123:2
**cet**
123:2, 123:15
**chair**
100:14
**change**
95:17
**charge**
27:20, 32:18,
49:17, 50:1,
50:13, 50:18,
51:5, 51:25,
52:5, 53:18,
54:8, 54:18,
54:21, 57:2,
57:6, 57:12,
60:17, 60:23,
61:1, 61:4,
62:3, 62:22,
63:3, 65:8,
66:23, 66:24,
67:6, 68:20,
76:8, 76:10,
78:23, 82:15,
82:16, 83:16,
84:22, 84:24,
84:25, 87:20,
87:23, 103:22,
104:5, 104:11,
104:23, 105:8,
105:12, 114:6,
119:14
**charged**
31:25, 32:19,
53:20, 54:11
**charges**
49:13, 57:20,
108:23, 111:18,
114:12
**charging**
16:1, 30:1,
36:3, 57:21,

57:24, 83:15,
84:25, 85:2
**check**
35:19
**checking**
89:21
**chief**
106:13, 106:14,
107:5, 107:11,
108:20, 108:21,
110:15, 110:18,
110:23, 111:22,
112:6
**children**
92:21, 92:23
**chime**
97:13, 101:5
**choose**
22:21
**cit**
12:22, 16:14,
16:16
**citation**
86:12, 86:20,
86:22, 86:24,
87:3, 87:6,
87:9, 87:22,
87:23, 87:25,
88:11
**clarify**
30:20
**class**
12:14, 12:22
**classes**
12:11, 12:20,
14:9, 19:25
**classifying**
17:6
**clear**
9:6
**clerk**
24:1
**click**
27:22
**clip**
101:7
**closer**
36:23, 63:21,

91:19, 118:2,
118:4
**clothes**
95:17
**code**
38:19
**colleague**
5:18
**collect**
21:8, 21:21,
56:20, 56:23,
70:15
**collected**
28:4, 119:13
**collecting**
21:18
**come**
36:3, 37:5,
84:23
**comes**
20:21
**coming**
11:7, 50:5
**comment**
120:7
**comments**
51:14, 51:16,
51:17, 51:19,
51:20, 58:22,
59:12, 68:4,
85:21, 97:24,
118:19, 119:1,
119:3, 120:5,
120:11
**committed**
24:16, 26:5,
107:13
**common**
24:6, 24:7,
24:9, 69:13,
87:22, 90:11
**communicate**
17:1, 17:2,
85:11, 116:10,
116:14, 117:1
**communicated**
85:17, 98:6,
116:21, 116:22,

118:16, 118:22,
119:9
**communication**
118:19, 119:25,
120:4
**communications**
108:2, 108:8,
120:8
**complainant**
27:13, 83:25
**complaint**
34:4, 38:7,
109:16, 112:13,
112:21, 112:23,
116:4
**complaints**
33:16, 105:15
**complete**
47:12, 47:17,
47:21, 48:17,
103:19
**completed**
64:3, 65:8
**completes**
81:16
**complexities**
109:4
**computer**
29:3, 78:7,
94:17
**concealment**
101:25
**concluded**
111:11
**concludes**
120:23
**conduct**
27:17, 45:10,
88:6, 98:2,
104:2, 104:12,
105:7, 109:9,
109:11, 113:5,
113:19
**conducted**
1:13, 2:1,
16:4, 55:24,
113:24
**conducting**
109:15

**conducts**
35:22
**confirm**
54:4, 76:20
**confront**
56:10
**consider**
17:21, 17:25,
57:5, 62:25,
63:5, 63:12,
63:16, 87:2,
87:9, 113:5
**considered**
16:1, 57:21
**considering**
51:12, 109:7
**consistent**
6:8
**constitute**
6:6
**constitutional**
13:24
**consult**
52:6, 109:14,
112:11
**consultation**
111:10
**consulted**
52:4, 75:8,
111:6, 112:7,
112:20
**consulting**
109:4
**contact**
46:5
**contacted**
32:2, 32:3,
41:9, 41:12,
41:15, 41:17,
46:8, 46:11,
79:5, 79:10,
79:12, 79:15,
79:19
**contacting**
38:9
**containing**
115:3
**content**
18:4

**continues**
67:18
**conversation**
21:22, 43:6,
43:9, 43:19,
44:17, 44:20,
46:24, 47:3,
47:10, 61:19,
77:17, 77:21,
96:25, 97:10,
113:9, 113:11,
118:25
**conversations**
57:4
**cooperate**
97:16, 97:17
**cooperated**
96:10
**cooperating**
97:12
**cooperative**
91:14, 96:8
**copy**
42:5
**corporal**
10:14, 11:1,
11:3, 11:12,
115:21
**correct**
42:16, 44:15,
45:16, 80:21,
84:3, 84:16,
85:8, 85:14,
86:7, 86:8,
96:17, 113:21,
118:12, 118:21,
119:15, 119:16,
119:17, 120:18
**could**
9:11, 70:4,
71:14, 86:20,
86:22, 87:1,
95:13, 102:6,
102:18, 121:2
**counsel**
5:14, 6:16,
6:18, 8:14,
80:19, 118:7,

119:22, 122:12, 123:9

**count**
59:17

**counting**
102:22

**county**
81:21, 108:23

**couple**
66:2, 117:22, 118:6, 119:20

**course**
55:9, 58:3, 59:2, 104:21, 109:9

**court**
1:1, 5:5, 5:21, 7:20, 7:23, 8:4, 8:16, 24:2, 27:5, 48:12, 67:5, 67:11, 122:1

**cover**
16:16, 16:20, 64:24, 117:11

**covered**
16:17

**covid**
10:8

**cr**
29:5

**crazy**
10:10

**create**
26:20

**created**
23:23

**crime**
16:2, 17:22, 18:1, 20:5, 20:18, 23:6, 24:5, 24:14, 24:16, 24:17, 24:21, 25:16, 25:17, 25:21, 25:22, 26:5, 54:19, 55:1, 73:25, 74:22,

75:4, 96:23

**crimes**
17:7, 17:12, 17:16, 25:25, 49:18, 52:7, 53:3, 53:9, 57:24, 70:3, 73:14, 73:19, 74:17, 114:17, 114:21

**criminal**
73:3, 86:15, 111:11, 111:18

**crises**
16:20

**crisis**
12:21, 16:19

**crosstalk**
94:6

**cul-de-sac**
101:22, 102:21

**currently**
10:2, 11:19, 23:20

**custody**
92:17

**customer**
40:3, 40:5, 40:7, 43:1, 43:3

**cyber**
62:24

**cyberstalking**
19:6, 33:17, 49:20, 50:1, 50:12, 50:17, 51:4, 51:10, 51:12, 51:24, 53:18, 53:20, 54:12, 54:21, 57:2, 57:6, 57:11, 57:15, 57:16, 57:25, 62:3, 62:22, 63:2, 63:9, 65:8, 68:20, 76:12, 82:14, 86:25, 87:24, 88:7, 104:23,

105:16, 113:25, 114:6, 114:9, 114:12, 119:14

**D**

**da**
32:2, 32:3, 32:24

**dan**
3:12, 5:19, 9:20

**danger**
102:2, 102:4

**dangerous**
25:7

**daniel**
3:4, 5:16

**database**
39:10

**databases**
35:15

**date**
5:8, 19:3, 24:2, 27:11, 76:20, 84:4, 104:9

**dates**
12:13

**day**
33:11, 33:13, 35:5, 35:8, 38:22, 42:19, 42:20, 44:12, 50:8, 76:18, 84:8, 84:18, 89:2, 89:4, 89:6, 89:9, 103:22

**days**
36:18

**dear**
110:23

**december**
107:5, 107:9, 108:20

**decide**
22:25, 31:7, 57:12, 86:11,

90:14, 97:9

**decided**
68:19, 88:14, 97:13

**deciding**
57:2

**decision**
54:4, 62:21, 87:15, 90:8, 90:11

**decision-making**
60:18

**defendants**
1:9, 3:11, 5:20, 118:7

**defer**
117:24

**denied**
30:10

**deny**
29:10

**department**
9:15, 10:3, 10:6, 11:21, 12:8, 16:9, 25:20, 29:2, 33:17, 72:21, 81:22, 105:7, 105:16, 106:15, 107:9, 111:2, 111:9

**department's**
19:14

**depend**
25:6, 25:12

**depending**
36:6, 39:9, 83:16

**depends**
27:20, 36:8, 37:10

**depos**
5:10, 5:22, 123:16

**deposed**
7:17

**deposition**
1:12, 2:1, 4:9,

5:3, 5:12, 5:25,
6:24, 8:3,
120:23
**depth**
53:1, 53:6
**describe**
12:6, 20:4,
44:23, 68:18,
88:25, 112:3
**described**
104:1, 104:11
**description**
27:16
**designate**
17:22
**designated**
25:17, 25:21,
70:17
**designating**
25:25
**designation**
69:8, 69:11,
69:16, 69:20,
69:23, 70:25,
71:4, 71:9,
71:13, 71:23,
73:23, 74:25
**despite**
74:24
**destroyed**
94:1
**detail**
19:9, 52:22,
66:12, 66:14,
66:19
**detention**
103:16
**determine**
52:5, 74:15,
86:6
**determined**
119:13
**determining**
17:25
**devices**
115:19, 117:7
**diagnosed**
16:21, 115:6,

115:10
**dictates**
91:21, 91:25
**differ**
10:22, 11:3
**difference**
8:4, 8:14,
98:20, 99:2
**different**
12:20, 35:1,
35:2, 70:1,
76:17, 87:20,
98:14
**differently**
82:8, 83:10
**difficulties**
6:22
**digital**
122:8, 123:3
**diligently**
111:3
**dinner**
7:3, 7:5
**direct**
111:18
**directive**
4:10, 72:15,
74:4, 74:14
**directives**
19:15, 19:18,
20:1, 72:12
**directly**
98:5
**disagreed**
105:4
**disciplinary**
105:11
**discovery**
93:24, 94:12
**discretion**
74:15, 87:11
**discuss**
52:11
**discussed**
49:12, 49:21,
52:25, 57:9
**discussing**
13:16, 52:9,

52:22, 53:24,
57:1, 60:15,
65:5, 75:3
**discussion**
118:10
**dismissal**
108:23
**dismissed**
60:10, 103:22,
104:5, 104:11,
105:8
**dispatch**
20:7, 20:8,
20:14, 38:25,
39:5, 39:8
**dispatched**
20:22, 34:7,
34:12, 57:7
**disseminated**
114:24
**distance**
91:23
**distraught**
45:4
**district**
1:1, 1:2, 5:5,
31:18, 32:11,
103:22, 104:1,
105:3
**division**
1:3, 5:6
**document**
20:17, 21:22,
22:3, 28:17,
64:17, 72:8,
72:20, 76:14,
80:12, 81:6,
106:5, 110:9,
110:11, 120:11,
120:15
**documentation**
24:25, 49:14,
54:14, 80:5,
111:4
**documented**
47:8, 119:7,
120:13
**documents**
23:24, 94:12,

116:2, 117:5
**doing**
11:9, 30:25,
75:24, 80:24
**done**
19:23, 31:22,
67:15, 67:22,
103:8, 118:19
**door**
92:7, 92:8
**doorbell**
92:9
**down**
8:8, 8:19,
12:13, 19:4,
21:9, 21:10,
22:6, 23:14,
58:21, 64:23,
66:3, 68:25,
72:1, 73:18,
75:6, 82:10,
83:21, 84:20,
86:9, 90:7,
106:17, 106:25,
110:2, 110:18,
113:22
**drive**
5:11, 12:10
**dropdown**
76:10, 85:2
**dropdowns**
84:23
**dropped**
60:10, 60:17,
60:23, 61:1,
61:4, 61:5
**drove**
38:3
**drugs**
9:24
**due**
88:14, 109:2
**duly**
6:13
**during**
14:11, 14:24,
42:15, 43:6,
43:19, 46:24,

56:20, 58:3,
77:17, 93:19,
116:8
**duties**
8:1, 35:18,
63:24
**dwyer**
3:5, 5:18,
15:18

**E**

**e-tran**
121:6
**each**
8:20, 49:24
**earlier**
54:6, 73:9,
120:14
**eastern**
1:2
**edit**
71:12
**either**
21:19, 29:1,
29:10, 32:20,
40:14, 84:23,
119:5
**elaboration**
27:24
**electronic**
6:1, 115:18,
117:7, 119:25,
120:3
**electronically**
85:10, 85:17,
118:16
**element**
30:1, 54:25,
62:12, 90:16,
90:23, 104:20,
104:21, 105:2
**elements**
53:9, 57:14,
57:15, 57:17,
104:2, 104:12,
104:16, 111:17
**elliott**
1:8, 84:1

**else**
9:16, 9:21,
11:11, 37:7,
43:5, 46:23,
71:11, 89:14,
98:8, 103:9,
117:11, 120:21
**email**
41:12, 42:6,
46:8, 79:19,
106:9, 107:1,
107:4, 107:15,
108:11, 108:16,
110:15, 110:19,
117:2
**emailed**
42:9
**emailing**
107:13
**emails**
4:14, 4:15,
107:23, 116:17
**embarrassed**
45:7, 50:23,
86:3, 119:6
**embarrassing**
85:12, 85:24
**employed**
122:12, 123:9
**employee**
40:19, 41:9,
41:12, 41:15,
41:20, 43:2,
44:9, 44:13,
44:23, 47:12,
47:24, 47:25,
49:10, 50:9,
56:2, 56:7,
56:11, 68:14,
79:23, 83:6,
83:8, 84:9,
87:12, 87:16,
97:22, 98:6,
98:9, 98:13,
108:8, 112:2,
119:4, 120:9,
120:10
**employee's**
40:13, 40:22,

41:2, 41:6,
42:11, 56:18,
108:15
**employees**
40:4
**ems**
100:6
**enact**
56:1
**encounter**
16:25
**end**
29:7, 36:23,
47:8, 98:12,
100:24, 101:22,
102:21, 112:24
**ended**
38:4, 38:9,
40:7, 49:25,
52:21, 54:1,
75:11
**enforcement**
12:25, 13:2,
14:11, 14:24,
16:5, 90:18,
109:5, 109:15
**enough**
12:15, 15:11,
18:6, 54:21,
102:14
**ensue**
118:25
**ensure**
109:5
**entered**
82:6, 94:9
**entirety**
15:6
**entitled**
72:15
**environment**
91:25
**escalating**
109:10
**escape**
91:14
**esquire**
3:4, 3:5, 3:12,

3:23
**essentially**
82:7
**establish**
67:1, 67:8
**estimate**
101:14
**et**
1:8, 1:15, 5:4
**ethnic**
73:19, 73:25,
74:21, 107:13
**evaluating**
113:18
**evaluation**
111:8
**even**
8:24, 62:17,
71:6, 92:8,
105:3
**events**
99:7
**eventually**
96:10
**ever**
7:11, 7:17,
7:20, 17:20,
23:17, 30:10,
31:18, 33:5,
36:25, 39:19,
40:9, 40:12,
41:12, 41:15,
42:10, 42:17,
44:1, 44:4,
44:7, 44:9,
45:23, 46:1,
46:4, 46:7,
46:10, 46:14,
48:2, 53:20,
58:2, 59:21,
59:25, 61:9,
62:25, 63:5,
63:12, 67:5,
72:14, 91:19,
95:16, 97:3,
100:21, 105:10,
113:4
**every**
7:10, 47:1,

48:18, 67:7
**everybody**
117:23
**everything**
8:19, 37:12,
43:7, 43:11,
52:16, 70:6
**evidence**
23:24, 24:14,
24:20, 24:24,
25:6, 25:13,
26:4, 28:3,
28:7, 28:13,
50:11, 51:3,
51:23, 52:3,
54:21, 54:23,
56:20, 57:18,
61:25, 62:10,
62:11, 68:18,
70:15, 79:3,
79:9, 79:14,
79:18, 79:22,
80:1, 85:15,
85:22, 86:18,
91:6, 104:19,
108:7, 108:14,
108:17, 118:15,
118:18, 119:12,
119:24, 120:3
**evidentiary**
6:5
**ewarrant**
76:24
**ewarrant's**
27:4
**ewarrants**
26:16, 26:17,
76:18, 81:25
**exacerbated**
115:6, 115:10
**exact**
19:3, 30:5,
32:13, 45:8,
88:3, 104:9
**exactly**
32:6, 32:9,
36:18, 38:6,
39:3, 45:13,

48:13, 50:24,
51:18, 51:21,
53:8, 53:10,
78:2, 81:18,
92:12, 94:3,
104:15
**examination**
4:2, 6:18,
118:7
**examined**
6:15, 111:14,
112:25
**excludes**
63:9
**excuse**
51:2
**exhibit**
4:9, 4:10,
4:11, 4:12,
4:13, 4:14,
4:15, 64:13,
64:15, 71:25,
72:9, 80:12,
80:14, 80:20,
80:21, 80:25,
94:19, 106:6,
110:3, 110:5
**exhibit's**
64:11, 72:3,
80:10, 110:6
**exhibits**
121:7
**existed**
119:14
**expect**
6:24
**experience**
99:25
**experiences**
99:17, 99:21,
100:8
**experiencing**
17:3, 110:24,
111:23, 112:3
**expert**
83:18
**explain**
9:7, 26:2,

29:9, 81:13,
90:13
**explained**
86:1, 97:20,
98:24
**explaining**
81:19, 92:18
**express**
40:12
**expunction**
94:2, 94:8
**extensive**
111:8
**extent**
12:12, 40:1,
45:1, 47:1
**extremist**
18:7

**F**

**face**
59:15
**face-to-face**
21:19
**facebook**
118:20
**facetime**
29:4
**fact**
60:9, 67:7,
88:7, 88:15
**factors**
17:21, 17:24
**facts**
24:15, 29:23,
67:1, 75:12,
77:24, 78:8,
86:16, 120:15
**factual**
15:15
**fair**
12:15, 15:11,
18:6, 115:11
**fall**
111:14, 112:25,
113:6
**falls**
74:16, 74:18

**familiar**
71:21, 72:7,
72:11, 106:19,
107:19, 112:22
**family**
33:22, 110:24,
111:23
**far**
11:7, 36:15,
75:16, 101:12,
101:19, 102:14
**fear**
40:12, 45:5,
109:1, 110:25,
111:24, 112:4
**february**
10:7
**feel**
111:1, 118:15,
119:5
**feeling**
50:22
**fell**
113:6, 113:19
**felony**
28:19, 28:20
**felt**
25:4, 54:13,
85:25, 86:3,
87:12, 87:16,
97:22, 98:9
**few**
8:15, 55:22,
94:25, 96:9,
99:13, 99:14
**fewer**
102:6
**field**
12:18, 34:11,
34:13, 34:16,
34:18, 34:20,
34:24, 34:25,
35:5, 35:9,
35:11, 35:22,
36:9, 36:11,
36:16, 36:21,
36:24, 36:25,
37:3, 37:8

| | | | |
|---|---|---|---|
| **fight** | **financial** | 23:10, 23:18, | **gather** |
| 90:21 | 122:14, 123:11 | 26:14, 27:10, | 20:12, 21:1 |
| **figure** | **find** | 28:4, 28:11, | **gathered** |
| 60:20 | 66:3, 88:19 | 28:16, 29:11, | 38:11, 49:19 |
| **figured** | **finds** | 47:25, 48:14, | **gathering** |
| 38:6 | 26:11 | 75:21, 76:1, | 15:8 |
| **file** | **fine** | 76:3, 76:5, | **gave** |
| 23:3, 23:22, | 55:10, 80:22 | 76:15, 76:23, | 42:4, 104:1 |
| 23:25, 26:21, | **finish** | 77:5, 78:5, | **general** |
| 26:22, 26:25, | 67:20 | 80:6, 81:24, | 73:4, 73:7, |
| 28:10, 29:6, | **first** | 82:3, 82:8, | 73:12, 74:6, |
| 64:21, 76:14, | 6:13, 10:11, | 83:9, 83:11, | 74:16, 109:8, |
| 76:23 | 14:3, 14:6, | 85:1 | 111:11 |
| **filed** | 14:13, 14:17, | **format** | **generally** |
| 105:14 | 14:25, 15:13, | 82:9 | 21:5, 21:15, |
| **files** | 32:9, 33:9, | **forms** | 21:17, 26:3, |
| 23:22, 28:6 | 34:3, 34:9, | 23:7 | 83:13 |
| **fill** | 36:10, 36:12, | **forward** | **generate** |
| 26:7, 26:13, | 36:13, 67:20, | 49:15 | 20:15 |
| 26:15, 26:18, | 111:14, 113:1, | **forwarding** | **getting** |
| 27:9, 28:20, | 113:6, 113:19 | 108:22 | 13:6, 23:5, |
| 29:11, 30:14, | **five** | **front** | 38:5, 53:25 |
| 48:3, 48:6, | 29:16, 32:15 | 6:23, 26:9, | **give** |
| 48:23, 81:24 | **fix** | 77:10, 81:19, | 20:16, 23:25, |
| **fill-in** | 37:21, 81:1, | 90:12, 90:15, | 28:21, 29:5, |
| 34:22, 84:23 | 101:1 | 90:22, 91:4, | 29:19, 35:13, |
| **fill-in-the** | **flight** | 92:5, 101:22, | 42:1, 64:8, |
| 83:16 | 25:13 | 102:2, 102:6, | 74:14, 88:4 |
| **fill-in-the-blank** | **follow** | 102:7 | **given** |
| 28:2, 76:11, | 8:13, 74:13, | **frustration** | 30:18, 96:8, |
| 85:3, 85:5 | 80:25, 103:15 | 109:1, 110:25, | 100:21 |
| **filled** | **follow-up** | 111:24, 112:3 | **glenwood** |
| 23:2, 23:10, | 72:15, 118:6, | **fto** | 3:14 |
| 26:9, 48:1, | 119:20 | 36:7, 47:20, | **go** |
| 69:14, 75:18, | **following** | 48:5, 63:24, | 6:25, 12:15, |
| 75:20, 76:7, | 11:9, 59:17, | 89:9, 89:15, | 12:24, 13:7, |
| 76:8, 76:24, | 73:14, 114:25 | 89:20 | 13:12, 13:20, |
| 77:5, 78:5, | **follows** | **full** | 13:22, 15:3, |
| 80:6, 82:7, | 6:15 | 9:12, 15:6, | 15:18, 20:1, |
| 83:19, 84:2, | **footage** | 40:1, 44:25 | 26:6, 26:9, |
| 85:16, 86:15 | 47:9, 94:1, | **fully** | 27:23, 28:23, |
| **filler** | 94:24 | 8:23, 9:3, | 31:18, 32:24, |
| 98:25 | **foregoing** | 122:5 | 33:2, 44:7, |
| **filling** | 122:3, 122:5, | **further** | 49:15, 56:18, |
| 30:24, 35:16, | 123:4 | 53:1, 53:24, | 62:1, 67:19, |
| 37:12, 75:11, | **form** | 70:11, 102:13, | 70:8, 70:10, |
| 75:14, 75:16, | 21:11, 22:15, | 119:19, 120:19 | 70:14, 70:16, |
| 82:3, 88:11 | 22:19, 23:1, | **G** | 70:18, 70:20, |
| | | **gall** | |
| | | 114:2 | |

74:2, 83:23,
83:24, 84:21,
90:20, 95:19,
100:14, 108:4,
109:5, 115:13,
117:10, 121:1

**goes**
16:24, 20:9,
27:3, 27:5, 67:5

**going**
7:7, 13:8,
16:17, 16:19,
16:22, 28:24,
55:6, 56:1,
56:10, 84:11,
92:25, 94:15,
94:22, 97:20,
99:12, 99:13,
100:24, 104:21,
105:25, 117:10,
120:24

**gone**
33:5, 90:24

**good**
6:20, 7:9,
31:15, 55:7,
55:13, 55:21,
66:17, 66:18,
67:11, 93:17

**gov**
106:10

**grant**
26:10, 29:10

**great**
118:5

**greeted**
92:7, 92:11

**group**
3:13, 107:13,
107:20

**groups**
18:7, 108:24

**guess**
12:10, 22:13,
35:17, 60:10,
62:25, 75:20,
104:13, 106:17,
114:2

**guide**
35:13

**guidelines**
69:19

**H**

**hand**
61:25, 108:4

**handcuffs**
96:1, 96:16

**handle**
16:18, 70:5,
70:7

**handled**
69:24

**hanging**
95:8

**happened**
23:11, 29:8,
29:9, 88:25,
92:6, 109:20

**happy**
7:12

**harassed**
50:23, 86:3,
119:6

**harassing**
85:12, 85:23

**harassment**
33:17, 38:17,
38:19, 38:21,
38:25, 57:8,
57:13, 57:16,
57:18, 57:21,
57:25, 105:17,
105:23

**hardin**
1:25, 2:12,
5:22, 122:2,
122:19

**harm**
56:1, 56:7

**harris**
38:4, 38:15,
39:13, 39:14,
42:18, 44:1,
56:1, 56:7,
56:10, 56:14,

68:10, 80:2,
85:10, 108:8,
112:2, 120:9

**hartzog**
3:12, 3:13,
4:4, 5:19, 14:7,
14:18, 15:1,
15:4, 15:14,
15:21, 21:23,
24:12, 24:23,
29:21, 31:13,
62:8, 63:15,
63:18, 63:20,
68:21, 74:7,
78:18, 78:25,
92:25, 93:4,
94:3, 94:6,
99:9, 115:11,
115:14, 117:19,
117:22, 118:4,
118:8, 119:19,
120:21, 121:6,
121:9

**hate**
18:7, 25:17,
25:22, 25:25,
69:5, 69:11,
70:2, 70:25,
73:19, 73:23,
73:25, 74:22,
74:24, 114:17,
114:21

**hate-motivated**
75:4

**head**
8:18, 12:17,
12:23

**headquartered**
5:11

**health**
100:1

**hear**
8:20, 33:19,
63:18, 117:23,
117:24

**heard**
33:12, 53:11,
95:12, 98:12,

104:10

**hearing**
6:9, 61:4,
119:12

**held**
10:15, 10:17

**help**
49:3

**helped**
48:9

**helps**
37:4, 48:19,
49:2

**here**
5:2, 5:17,
6:21, 8:4, 8:9,
24:1, 29:2,
34:10, 36:19,
39:10, 50:18,
55:12, 64:11,
66:10, 69:1,
72:2, 72:5,
73:2, 81:23,
95:3, 95:4,
102:13, 104:22,
106:9, 107:1,
117:18, 118:5

**hereby**
122:4, 123:2

**hernandez**
35:6, 35:7,
37:2, 89:16,
89:18, 89:20,
90:2, 97:11

**herzog**
5:19

**higher**
87:25, 88:1

**hijab**
98:15, 98:21

**hired**
10:5, 10:11

**hit**
82:8

**hold**
10:13, 24:2

**holloway**
75:9

**holly**
3:24, 9:15, 10:3, 10:5, 11:20, 12:7, 16:8, 17:14, 19:14, 20:7, 25:20, 25:24, 29:2, 30:4, 33:16, 72:11, 72:21, 105:6, 105:15, 106:14, 106:23, 107:8, 111:1, 112:6, 112:19, 114:2
**holtzman**
3:6
**home**
41:6, 46:15, 46:21, 92:22, 93:7, 107:15, 108:10, 108:16
**honestly**
27:20, 69:9, 78:6
**hope**
55:20, 93:17
**hopefully**
7:1
**hosted**
16:6
**hostile**
91:11
**hour**
7:11, 55:7
**hours**
12:13
**house**
42:11, 56:18, 90:5, 90:6, 91:4, 91:5, 92:5, 102:10, 102:15, 102:18, 103:9, 103:11
**houses**
101:23, 102:3, 102:6, 102:10, 102:20
**how's**
118:5

**however**
23:7, 23:22, 32:7, 75:17, 87:23
**huge**
13:7
**hundreds**
107:14, 107:23, 108:3, 108:7
**hungerford**
5:11
**husband**
93:6, 95:25, 100:15

_____ I _____

**idea**
83:20
**identified**
24:16, 26:6, 70:12
**identify**
5:14, 18:23, 40:9
**identifying**
17:6, 17:11, 17:16, 18:7
**ii**
12:20
**impact**
69:22, 69:23
**impair**
9:25
**implicit**
18:10, 18:11, 18:19, 18:23, 19:1
**important**
62:21, 66:25, 67:4, 120:15
**in-service**
17:14, 18:12
**incident**
4:11, 22:14, 30:14, 30:17, 30:25, 34:10, 42:15, 43:24, 47:10, 53:12,

63:25, 64:2, 65:1, 66:8, 66:11, 66:16, 67:2, 67:9, 68:15, 69:12, 73:24, 73:25, 74:25, 77:2, 86:4, 109:25, 120:12, 120:16
**incidents**
23:8, 48:15, 114:9, 114:16, 114:20
**include**
13:3, 13:24, 14:2, 15:25, 17:2, 17:24, 18:14, 21:5, 69:10, 76:1, 76:2, 76:5, 82:23, 82:25, 83:1, 83:14, 111:15, 113:1
**included**
13:16, 17:17, 18:12, 18:22
**includes**
18:15
**independent**
60:1, 60:2, 60:8, 61:8, 61:10, 61:12
**indiana**
2:13, 122:20
**indicate**
82:12
**indicated**
93:25
**indicating**
84:1
**indication**
96:8
**individual**
116:19
**individuals**
16:18, 16:25, 18:24
**influence**
9:23

**inform**
78:22
**information**
20:12, 20:13, 21:2, 21:9, 21:16, 21:18, 22:2, 22:6, 22:23, 23:15, 26:6, 27:3, 27:6, 27:10, 27:12, 29:19, 38:8, 38:12, 38:24, 52:17, 76:4, 81:23, 82:4, 82:18, 82:24, 83:5, 83:14, 108:22, 111:8, 116:3
**informed**
41:19, 41:23, 92:15
**informing**
99:20
**informs**
99:17
**initial**
81:18, 85:20
**initially**
93:25
**injuries**
28:1
**input**
71:9, 71:12
**inside**
23:25, 95:20, 96:3
**instead**
54:14, 86:20, 87:10, 88:10, 90:15, 91:3
**instructs**
8:12
**intended**
6:4
**intends**
13:11
**intention**
96:2

| | | | |
|---|---|---|---|
| **interest** 122:14, 123:11 | 74:16, 105:20, 105:23, 113:25 | **josefiak** 3:6 | **knowing** 61:5 |
| **interrupt** 63:17 | **investigative** 70:5, 71:15, 72:16 | **journalism** 63:14 | **knowledge** 33:1, 33:18, 70:25, 71:1, 71:2, 118:23, 122:11, 123:8 |
| **intervention** 12:21 | **investigators** 111:2, 112:7, 112:20 | **journalist** 60:1, 60:2, 60:8, 61:8, 61:10, 61:12 | **krieger** 3:21 |
| **interview** 24:4, 24:11, 24:18, 61:21, 61:24, 62:7, 62:15 | **involved** 20:11, 20:16, 21:2, 34:3, 34:9, 34:15, 36:7, 60:17, 94:11, 105:19, 105:22, 109:3, 112:18, 116:12 | **jr** 5:19 | **L** |
| **interviewed** 86:5 | | **judge** 8:5, 8:9 | **lack** 82:5, 111:18 |
| **interviewing** 61:23 | | **judicial** 111:17 | **lake** 38:4 |
| **intimidation** 73:19, 73:25, 74:22, 107:13 | **involving** 7:25, 34:4, 105:23 | **jurisdiction** 88:14, 88:17, 109:21, 109:24 | **language** 27:21, 83:15, 84:25, 85:2, 85:7 |
| **investigate** 70:2 | **irick** 82:19 | **jurisdictions** 109:3 | **larceny** 87:21, 88:8 |
| **investigated** 74:5, 114:3, 114:9, 114:16, 114:20 | **islamic** 69:6 | **K** | **last** 29:15 |
| | **issue** 34:10, 87:6, 100:1 | **keep** 68:25 | **later** 36:22 |
| **investigating** 63:2, 73:14, 112:13 | **issued** 84:5, 84:17, 119:17 | **keffiyeh** 98:14, 98:20, 99:3, 99:7 | **law** 3:13, 6:8, 12:24, 13:2, 13:8, 13:16, 13:18, 13:20, 13:22, 13:25, 14:11, 14:24, 16:4, 90:18, 109:4, 109:14 |
| **investigation** 4:11, 28:20, 34:4, 34:9, 35:21, 37:9, 55:23, 56:21, 58:3, 59:3, 61:20, 65:9, 69:24, 73:3, 74:2, 105:7, 105:11, 108:5, 109:11, 109:16, 111:5, 111:7, 112:8, 112:13, 116:4, 116:8, 116:11, 116:18 | **issuing** 87:3, 87:25 | **kellen** 3:5, 5:18 | |
| | **itself** 27:22 | **kids** 68:14 | |
| | **J** | **kind** 8:14, 13:18, 16:20, 19:17, 22:16, 27:25, 34:22, 35:13, 35:17, 36:5, 36:8, 38:6, 38:12, 39:8, 49:14, 53:23, 60:11, 60:20, 95:12 | **laws** 6:5, 13:23 |
| | **jail** 90:20 | | **lawyer** 8:6, 8:12 |
| | **january** 110:16, 110:19 | | **learn** 60:13 |
| | **jennifer** 1:5, 3:22 | | **learned** 60:11, 60:12, 60:25, 61:3, 68:2 |
| | **jewish** 18:23, 33:25, 59:22, 59:24, 61:15 | **knew** 40:22, 41:1, 41:5, 46:18, 46:21, 53:14, 61:11, 78:9 | **learning** 115:9 |
| **investigations** 70:8, 70:10, 70:16, 70:20, 70:23, 73:5, 73:7, 73:9, 73:12, 74:6, | **job** 1:23, 10:22 | **knocking** 92:8 | **least** 48:12 |
| | **john** 3:23, 9:20 | | |

**leave**
7:5, 40:8,
42:14, 42:23,
43:3
**leaves**
102:14
**led**
50:16, 51:23
**left**
40:8, 42:22,
42:24, 43:4,
103:9, 103:11
**legal**
14:19, 15:15,
15:16, 111:18
**length**
6:25
**less**
32:15, 60:15
**let's**
64:13, 64:23,
66:3, 67:19,
72:1, 72:4,
72:24, 73:18,
80:8, 80:17,
80:24, 80:25,
82:10, 83:21,
83:23, 84:20,
84:21, 93:9,
95:2, 101:1,
106:17, 106:25,
110:3, 117:9
**level**
70:6, 70:7,
70:22
**lieutenant**
49:23, 49:25,
52:13, 52:24,
53:6, 54:1,
57:3, 58:6,
58:8, 58:17,
59:1, 59:6,
59:9, 60:16,
60:23, 61:1,
61:6, 61:14,
61:17, 75:9,
87:5, 113:15
**likely**
32:6

**limit**
101:19
**line**
101:15, 106:18,
107:3
**lines**
50:23
**liquorie**
106:12, 107:5,
107:12, 108:21,
110:15, 110:23,
111:22, 112:6
**liquorie's**
108:20, 110:19
**liquorie@hollysp-
ringsnc**
106:10
**list**
12:9, 12:12,
35:18, 73:17,
74:17, 74:18,
83:6
**listed**
12:11, 71:5
**lists**
83:5
**litigation**
93:25
**little**
20:20, 21:13,
35:3, 38:14,
53:1, 53:21,
53:24, 60:11,
60:20, 63:21,
66:10, 80:16,
87:20, 87:25,
99:12, 102:12,
118:1, 118:2
**llc**
123:16
**located**
88:21
**location**
27:11, 38:3,
66:12, 76:7,
90:9, 102:5
**log**
19:4

**long**
29:14, 36:17,
109:9
**look**
19:19, 37:19,
54:15, 57:10,
83:23, 88:22,
106:22
**looked**
49:18, 49:19,
51:16, 52:19,
53:9, 57:14,
58:21, 60:20
**looking**
50:15, 66:7,
71:7, 75:2,
78:7, 81:8,
88:20, 94:23
**looks**
102:22
**lot**
12:20, 35:13
**louder**
63:21

**M**

**made**
20:18, 20:19,
33:16, 50:12,
51:3, 51:9,
51:14, 60:24,
68:4, 68:11,
90:8, 120:7
**magistrate**
26:9, 27:7,
28:17, 28:21,
28:24, 28:25,
29:12, 29:15,
29:19, 29:25,
30:13, 75:12,
75:13, 75:19,
77:7, 77:10,
77:17, 77:23,
77:25, 78:3,
78:10, 78:22,
79:4, 79:9,
79:14, 79:18,
79:22, 80:1,

80:5, 81:15,
118:11, 118:23,
119:10, 119:12
**main**
8:4
**majority**
23:8
**make**
7:1, 8:19,
8:21, 9:1, 9:3,
9:9, 23:16,
35:15, 36:1,
36:4, 59:14,
59:15
**making**
11:8, 13:8,
14:14, 37:11,
63:1, 75:17,
94:21
**manager**
38:5, 38:8,
39:13, 39:20,
40:25, 41:4,
41:8, 41:11,
41:14, 41:19,
41:22, 42:10,
42:13, 42:25,
43:3, 43:6,
43:12, 43:23,
44:5, 47:23,
48:2, 48:6,
49:9, 50:8,
82:22, 83:5,
84:9
**many**
7:22, 30:3,
32:10, 32:14,
36:18, 51:11,
67:24, 85:19,
89:22, 102:20
**marino**
1:12, 2:1, 4:2,
5:4, 6:12, 6:20,
7:18, 9:13,
33:9, 55:8,
55:20, 64:18,
66:8, 69:3,
72:7, 80:13,

81:5, 93:18,
106:4, 110:12,
117:17, 120:23
**mark**
110:3
**marked**
64:15, 72:9,
80:14, 80:20,
94:15, 94:19,
106:1, 106:6,
110:5
**marking**
80:22
**marroquin**
3:20
**maryland**
5:12
**matched**
51:8
**material**
107:14, 107:24
**materials**
52:5, 52:6,
109:6, 111:13,
112:25
**matter**
5:4
**maybe**
31:25, 35:2,
59:17, 68:25,
101:14
**mclean**
123:2, 123:15
**mdt**
39:10
**mean**
7:7, 11:22,
15:5, 23:19,
34:21, 38:18,
54:17, 55:3,
69:8, 69:9,
73:24, 74:1,
77:13, 102:4
**means**
6:1, 8:5
**media**
5:2, 41:15,
41:21, 41:23,

43:5, 45:2,
45:15, 60:4,
67:24, 68:6,
78:11, 78:13,
78:15, 78:23,
85:11, 85:17,
114:24, 115:1,
120:12
**medical**
100:5
**medications**
9:24
**meet**
29:12, 57:18,
104:2, 104:12,
104:15, 104:20,
111:16
**meeting**
29:14
**meets**
29:25, 105:2
**member**
11:25, 12:4
**members**
107:12
**memorialize**
43:15
**memorialized**
43:10, 47:4
**mental**
16:19, 16:20
**mention**
45:10, 45:17,
67:23, 67:25,
68:3, 68:6,
78:13, 78:15,
97:24, 98:2,
98:5, 98:8
**mentioned**
13:15, 16:13,
20:21, 26:13,
37:3, 37:22,
39:12, 40:2,
42:13, 42:25,
43:4, 43:6,
43:8, 44:12,
45:14, 50:25,
52:4, 53:2,

54:6, 62:2,
63:23, 76:13,
78:14, 97:21
**mentions**
99:25
**message**
116:15, 116:23
**messaging**
41:16, 46:11
**met**
44:4, 44:9,
57:15, 104:19,
105:1
**methodically**
109:5
**micah**
1:25, 2:12,
5:22, 122:2,
122:19
**michelle**
82:19
**middle**
69:4
**might**
8:11, 22:8,
24:10, 27:19,
31:11, 32:24,
55:7, 62:6,
63:1, 63:13,
70:9, 70:19,
76:11
**mind**
80:15
**mine**
95:1
**minute**
55:11, 67:13
**minutes**
29:16, 99:13
**miranda**
96:18, 96:24,
97:4, 97:5
**misdemeanor**
82:14, 86:23,
86:24, 87:21
**misdemeanors**
28:22, 88:2
**mms**
79:14, 114:23

**moment**
16:23, 64:10,
72:2, 80:9
**monitor**
5:9
**more**
8:15, 30:7,
30:8, 31:14,
32:6, 40:23,
45:18, 45:22,
52:22, 53:6,
54:16, 55:22,
57:15, 60:15,
60:21, 64:10,
70:15, 71:20,
84:21, 87:22,
88:8, 90:13,
90:16, 93:2,
98:25, 99:13,
104:13, 114:9
**most**
8:10, 49:20,
87:13
**motivated**
17:7, 17:12,
18:1, 74:25
**move**
63:21
**much**
14:14, 29:7,
29:19, 50:21,
54:5, 66:12,
66:14
**mugshot**
114:24, 115:3
**multiple**
65:19, 70:17,
105:15, 109:3
**muslim**
69:6, 71:23
**muted**
118:2
**myself**
104:14, 114:4

**N**

**name**
9:12, 40:10,

40:22, 41:2,
46:18, 59:14,
59:18, 82:25,
83:25
**narrative**
66:3, 67:14,
67:18, 67:23,
67:25, 68:3,
68:9, 68:12,
68:13
**nc**
3:15
**ncaware**
76:19
**ncc4cr**
107:12, 107:19
**ncsbi**
111:7, 112:20
**nctoa**
12:21
**necessarily**
48:23, 48:25
**necessary**
25:4, 111:16
**need**
7:11, 8:10,
11:9, 13:5,
13:7, 24:17,
31:4, 36:3,
47:25, 48:23,
48:25, 49:15,
62:1, 62:14,
70:7, 70:10,
70:11, 76:20,
80:13, 91:23,
96:24, 97:15,
109:21, 112:17,
117:11, 121:7
**needed**
54:2, 91:2
**needs**
20:18, 75:19
**neighborhood**
102:5, 102:9
**neighbors**
102:24, 103:2
**neither**
122:12, 123:9

**never**
28:6, 28:13,
54:11, 69:14,
69:15, 86:5,
86:14
**new**
23:20, 53:21,
53:22, 71:21
**newspapers**
114:25, 115:2
**next**
49:11, 49:24,
50:6, 52:20,
52:21, 59:18,
64:23, 66:4,
67:19, 68:25,
75:10, 75:23,
75:24, 77:6,
81:17, 83:22,
89:2, 92:3
**night**
70:14
**nods**
8:18
**north**
1:2, 5:5,
13:20, 13:22,
19:6, 33:23,
52:7, 53:3,
63:8, 109:7,
111:6, 111:11,
112:7, 112:12
**notary**
2:13, 5:24,
122:1, 122:20
**note**
39:3
**noted**
15:20
**notepad**
22:4, 23:15,
23:16, 23:18,
43:18
**notepads**
21:13
**notes**
23:16, 23:17,
39:2, 39:4,

39:6, 43:18,
117:5, 117:10
**nothing**
6:14, 103:13
**notice**
2:12
**notifications**
72:16
**notified**
73:13, 104:6,
104:7, 104:8
**november**
10:19, 12:3,
38:23, 84:7,
84:14, 113:24,
114:5, 114:8,
114:13, 114:15,
114:19, 115:23
**number**
5:3, 5:6,
12:13, 20:15,
29:5, 29:6,
30:5, 32:13,
72:24, 106:18,
106:19, 106:21,
106:23
**numbers**
80:23, 80:25
**numerous**
12:20, 51:19,
51:20, 97:12

--- O ---

**oaths**
5:25
**objection**
6:9, 8:7,
14:18, 15:1,
15:14, 15:19,
21:23, 24:12,
24:23, 29:21,
31:13, 62:8,
63:15, 63:18,
68:21, 74:7,
78:18, 78:25,
99:9, 115:11
**objections**
94:4

**objects**
8:6
**observe**
76:5
**obtain**
22:9, 28:18,
29:24
**obtained**
86:19, 88:23,
89:1
**obtaining**
26:3, 33:3,
77:25
**obtains**
22:2
**obviously**
54:15, 59:14,
66:17, 66:19,
91:25
**occur**
22:14, 50:7
**occurred**
24:14, 24:17,
24:21, 38:7,
45:11, 66:13,
98:3, 109:9,
110:1
**october**
99:8
**offender**
20:11, 21:6,
66:11, 76:7,
82:4
**offender's**
27:12
**offense**
27:13, 36:4,
37:5, 54:18,
81:19, 82:12,
83:7, 104:2,
104:12
**office**
31:19, 33:3,
33:6, 33:19
**officers**
11:6, 11:8,
16:8, 22:5,
31:1, 33:2,

74:14, 92:14,
95:16, 96:12,
97:3, 116:19
**official**
19:10
**officials**
111:10
**oh**
34:11, 84:6,
100:25
**old**
71:19
**omar**
3:20
**once**
20:5, 20:21,
27:3, 39:13,
65:20, 88:20,
90:4, 115:21
**one**
5:3, 6:25, 9:5,
40:4, 40:23,
45:17, 45:18,
45:20, 45:21,
51:13, 63:23,
64:8, 64:10,
65:22, 71:8,
72:2, 80:9,
84:21, 93:2,
96:3, 113:22,
114:3, 115:24
**ones**
16:9, 29:25
**ongoing**
35:18
**online**
26:18, 45:3,
49:19, 51:10,
57:9, 57:10,
62:12, 62:23,
68:2, 68:11,
86:4
**only**
7:12, 17:17,
28:19, 71:20,
82:16, 91:22
**opened**
92:7

**opinion**
35:2, 74:20,
74:23, 104:18,
107:12
**option**
31:6, 76:14
**optional**
22:17, 22:20
**oral**
22:2
**orally**
8:18
**order**
94:2, 94:9,
121:4
**orders**
121:3
**original**
107:1, 120:6
**originally**
57:7, 76:17
**other**
7:15, 8:20,
10:15, 11:6,
11:13, 17:8,
17:10, 19:8,
28:16, 32:23,
36:20, 38:24,
38:25, 49:24,
51:3, 51:23,
52:1, 56:6,
57:20, 57:24,
58:23, 59:12,
59:16, 60:6,
68:6, 70:19,
70:21, 76:25,
78:15, 80:4,
80:5, 80:7,
92:14, 95:16,
97:3, 100:1,
101:23, 102:3,
102:20, 103:18,
105:17, 105:22,
109:3, 109:4,
109:14, 109:22,
111:15, 116:12,
117:5
**others**
107:14, 107:23

**otherwise**
91:22, 122:14,
123:11
**ottaway**
75:10
**ottoway**
49:23, 49:25,
52:13, 52:20,
52:25, 53:6,
54:1, 57:4,
57:23, 58:6,
58:8, 58:17,
59:1, 59:6,
59:9, 60:16,
60:23, 61:2,
61:6, 61:14,
61:17, 87:6,
113:15
**ourselves**
49:13
**out**
6:22, 10:11,
20:8, 23:2,
23:10, 25:2,
25:5, 25:8,
25:10, 25:11,
26:7, 26:9,
26:14, 26:15,
26:18, 27:9,
28:20, 29:11,
30:14, 30:24,
34:12, 34:23,
35:16, 37:12,
38:6, 38:17,
38:21, 47:15,
48:1, 48:3,
48:6, 48:23,
57:7, 60:20,
62:6, 66:23,
67:6, 68:14,
69:14, 70:4,
70:14, 70:18,
70:23, 74:9,
75:11, 75:15,
75:18, 75:20,
76:7, 76:8,
76:24, 77:5,
78:5, 80:6,

81:21, 81:24,
82:3, 82:7,
82:13, 83:19,
84:2, 85:16,
86:15, 88:11,
88:19, 95:25,
96:5, 101:25
**outcome**
122:15, 123:11
**outside**
17:9, 88:13,
88:17, 93:8,
95:22, 102:25,
103:5, 103:7,
109:24
**over**
7:24, 13:4,
13:8, 13:20,
13:22, 16:17,
16:24, 19:19,
21:20, 38:10,
38:11, 39:8,
39:11, 45:4,
45:9, 46:2,
46:5, 46:25,
52:17, 75:2,
79:5, 79:11,
109:9, 117:19
**overhear**
40:4, 44:19,
44:22

**P**

**pack**
20:20
**page**
4:2, 4:9, 36:4,
53:23, 64:23,
64:24, 66:4,
66:7, 67:14,
67:19, 68:24,
68:25, 69:4,
81:14, 81:18,
81:19, 83:22,
83:23, 84:21
**pages**
1:24, 66:3,
84:20

| | | | |
|---|---|---|---|
| **panic**<br>17:3, 99:17,<br>99:21, 99:25,<br>100:8 | **patrol**<br>11:25, 12:4,<br>70:6, 70:7,<br>70:22, 90:1, | 115:24, 116:3,<br>116:8, 116:11,<br>116:13, 116:15,<br>116:16, 116:18 | 109:11, 121:2,<br>121:9, 121:10 |
| **paper**<br>8:8, 82:5 | 90:3, 91:3,<br>95:18, 101:9,<br>103:14 | **physical**<br>13:9, 13:10,<br>42:5, 56:1 | **plus**<br>88:9, 88:11 |
| **paperwork**<br>23:24, 103:18 | **paul**<br>106:10, 106:12 | **physically**<br>37:18 | **point**<br>29:20, 36:16,<br>42:15, 49:15,<br>51:3, 55:24, |
| **paragraph**<br>66:13 | **pdf**<br>26:21, 26:25 | **pick**<br>93:10 | 57:4, 61:20,<br>62:23, 72:20, |
| **park**<br>90:5, 90:9,<br>90:12, 90:14,<br>90:25, 91:16, | **peeking**<br>103:2 | **picture**<br>119:4 | 93:1, 96:7,<br>96:15, 96:19,<br>97:7, 97:9,<br>97:17 |
| 91:18, 91:23,<br>101:17, 101:20,<br>101:24 | **pending**<br>7:14 | **pictures**<br>40:3, 43:1,<br>85:10, 116:7,<br>116:9 | **pointing**<br>24:15 |
| **parked**<br>90:6, 90:22,<br>91:4, 91:19, | **people**<br>17:3, 70:17,<br>116:12, 116:15 | **piece**<br>82:5 | **police**<br>9:15, 10:3,<br>10:6, 11:20, |
| 92:2, 101:8,<br>101:21, 102:7,<br>102:12 | **perfect**<br>106:1 | **place**<br>118:11 | 12:8, 16:8,<br>19:14, 25:20,<br>29:2, 33:16, |
| **parking**<br>90:17, 102:2 | **period**<br>109:10 | **placed**<br>92:17 | 35:17, 72:21,<br>81:22, 91:8,<br>91:11, 105:6, |
| **part**<br>12:21, 17:13,<br>50:16, 81:14, | **permitted**<br>6:4 | **plain**<br>38:20 | 105:15, 106:15,<br>107:8, 111:2 |
| 81:15, 85:2,<br>85:3 | **perry**<br>3:19, 5:10 | **plaintiff**<br>1:6, 3:3, 3:22,<br>5:17, 6:18, | **policies**<br>19:19, 25:25,<br>69:19 |
| **particular**<br>11:19, 88:6 | **person**<br>29:1, 118:16,<br>119:25, 120:4 | 119:22 | **policy**<br>11:10, 74:13 |
| **parties**<br>5:12, 6:1, 6:6,<br>20:11, 20:16, | **personal**<br>58:10, 115:20,<br>115:25, 117:7 | **plan**<br>7:4, 7:10 | **political**<br>61:13, 63:6,<br>63:9, 98:15 |
| 21:2, 26:5,<br>68:10, 122:13,<br>123:10 | **personally**<br>30:4, 34:8,<br>69:15, 86:15, | **planet**<br>5:10, 5:22,<br>123:16 | **polk**<br>108:23 |
| **partners**<br>109:5, 109:15 | 111:1 | **play**<br>94:25 | **populated**<br>81:24 |
| **passing**<br>13:9 | **phase**<br>36:6, 36:18 | **played**<br>95:5, 99:15,<br>101:6 | **porch**<br>90:22, 92:5,<br>95:12 |
| **past**<br>36:14 | **phone**<br>21:20, 38:10,<br>38:11, 41:9,<br>44:13, 44:16, | **playing**<br>89:17 | **portion**<br>13:10, 59:13,<br>62:24, 95:3, |
| **patience**<br>83:21 | 45:4, 45:9,<br>46:2, 46:5,<br>46:24, 47:3, | **playing's**<br>89:19 | 99:16 |
| **patient**<br>109:11 | 47:10, 49:10,<br>79:5, 79:11,<br>115:19, 115:22, | **please**<br>5:14, 8:17,<br>9:11, 9:12,<br>63:19, 64:9,<br>79:7, 80:9, | **portions**<br>59:20 |

| | | | |
|---|---|---|---|
| **position**<br>11:5<br>**possible**<br>70:4, 103:5,<br>103:7<br>**post**<br>41:20, 41:23,<br>42:2, 43:5,<br>45:2, 45:15,<br>45:18, 45:19,<br>45:20, 51:6,<br>51:9, 51:13,<br>51:15, 51:22,<br>52:1, 55:3,<br>58:20, 58:21,<br>59:11, 59:12,<br>60:20, 62:10,<br>62:18, 62:20,<br>63:1, 63:5,<br>63:13, 68:2,<br>68:4, 68:11,<br>78:11, 78:13,<br>78:24, 85:20,<br>85:22, 86:6,<br>97:21, 97:25,<br>98:9, 113:5,<br>113:18, 118:20,<br>119:1, 120:6<br>**posted**<br>41:19, 45:3,<br>51:7, 61:13,<br>62:11, 62:18,<br>68:2, 86:4,<br>119:5, 120:5<br>**posting**<br>62:20, 86:6<br>**postings**<br>111:15, 111:16,<br>113:2<br>**posts**<br>45:18, 51:11,<br>58:23, 67:24,<br>68:7, 78:16,<br>85:18, 85:19<br>**practice**<br>21:24, 22:22,<br>24:3, 24:6,<br>24:7, 24:9, | 29:18, 49:6,<br>49:8, 67:11,<br>69:10, 69:13,<br>90:11, 91:24,<br>101:17<br>**preference**<br>7:4<br>**preparation**<br>65:25, 67:12<br>**prepare**<br>43:12, 90:21<br>**prepared**<br>123:3<br>**present**<br>3:18, 8:5,<br>26:10, 29:23,<br>30:13, 39:22,<br>77:10, 77:11,<br>77:13, 77:16,<br>77:24, 79:3,<br>79:9, 79:13,<br>79:16, 79:17,<br>79:21, 79:25,<br>80:3, 80:4,<br>118:10<br>**presented**<br>75:12, 86:18,<br>111:9, 111:17<br>**presenting**<br>78:8<br>**press**<br>15:8<br>**presumably**<br>83:7<br>**pretty**<br>14:7, 14:14,<br>29:7, 50:21,<br>54:4, 66:12<br>**previously**<br>33:15, 78:5<br>**primarily**<br>27:14, 36:6<br>**primary**<br>34:23, 34:24,<br>35:7, 36:25,<br>37:2, 89:15,<br>89:20<br>**print**<br>23:23 | **printed**<br>26:22<br>**prior**<br>13:5, 30:25,<br>92:8<br>**privilege**<br>29:3<br>**probable**<br>26:10, 26:11,<br>29:8, 30:19,<br>67:1, 67:8,<br>104:19, 119:13,<br>120:16<br>**probably**<br>7:24, 32:7,<br>32:16, 101:14<br>**procedural**<br>6:5, 6:23, 8:15<br>**procedures**<br>35:16<br>**proceed**<br>6:16<br>**proceeding**<br>6:3, 123:4<br>**proceedings**<br>122:3, 122:5,<br>122:6, 122:9,<br>123:5, 123:7<br>**process**<br>26:2, 28:24<br>**produced**<br>6:3<br>**program**<br>36:7, 36:9<br>**promises**<br>7:1<br>**proper**<br>70:13<br>**properly**<br>37:12<br>**property**<br>101:15<br>**protected**<br>15:12<br>**prove**<br>24:13, 67:5<br>**provided**<br>109:6, 111:5 | **providing**<br>82:3<br>**ptsd**<br>115:6, 115:10<br>**public**<br>2:13, 16:7,<br>111:15, 113:2,<br>122:1, 122:20<br>**pull**<br>29:6, 47:9,<br>64:8, 72:1,<br>80:8, 94:15,<br>94:16, 105:25,<br>106:1, 110:3<br>**pulled**<br>58:7, 58:17,<br>102:25<br>**purpose**<br>85:11, 85:23,<br>86:6<br>**pursuant**<br>2:12, 94:1<br>**pursue**<br>62:21, 68:19<br>**put**<br>11:4, 16:9,<br>23:2, 23:18,<br>23:23, 27:3,<br>27:10, 27:11,<br>27:12, 27:13,<br>27:14, 27:16,<br>28:6, 34:25,<br>50:21, 66:15,<br>66:22, 66:25,<br>67:7, 67:12,<br>69:15, 69:20,<br>76:6, 82:9,<br>83:12, 95:13,<br>95:21, 96:2,<br>96:5, 96:16<br>**puts**<br>27:22<br><br>**Q**<br>**qualifications**<br>12:11<br>**qualified**<br>122:8 |

**question**
7:13, 7:14,
8:7, 8:11, 8:24,
9:2, 9:8, 14:8,
14:19, 25:18,
31:5, 79:7,
83:3, 93:3,
104:13, 104:21,
106:18, 115:12
**questioning**
49:16, 54:7,
54:9, 54:10,
54:17, 54:20,
54:22, 54:23,
104:14, 104:17
**questions**
8:17, 9:5,
9:25, 15:15,
15:16, 15:17,
17:18, 18:17,
32:1, 39:19,
55:22, 67:17,
96:23, 117:17,
117:19, 118:6,
119:19, 119:21,
120:20
**quick**
117:9

**R**

**rachmuth**
1:5, 3:22, 5:4,
5:17, 33:10,
33:12, 33:20,
34:5, 37:24,
40:9, 40:15,
40:18, 40:22,
41:1, 41:5,
41:8, 41:11,
41:14, 42:11,
42:14, 42:17,
42:22, 45:23,
46:1, 46:4,
46:7, 46:10,
46:14, 46:18,
46:21, 53:12,
53:14, 55:25,
56:10, 56:14,

61:7, 61:18,
61:22, 61:24,
62:15, 65:9,
68:7, 79:4,
79:6, 79:10,
79:14, 79:18,
79:22, 80:1,
85:16, 86:5,
86:17, 88:10,
89:5, 91:7,
92:7, 95:13,
96:7, 97:8,
97:25, 98:3,
98:13, 98:19,
99:17, 105:14,
106:10, 107:5,
107:11, 107:22,
108:6, 108:21,
109:17, 110:15,
110:23, 111:23,
112:14, 115:5,
116:5, 116:11,
116:18, 116:23,
117:2, 117:6,
118:15, 119:2
**rachmuth's**
58:2, 58:18,
59:13, 63:1,
63:13, 74:5,
74:21, 81:11,
90:4, 94:9,
101:13, 103:9,
106:25, 108:15,
112:21, 113:5,
113:18, 114:23,
116:3
**radio**
39:11
**raise**
71:4
**raising**
40:6
**raleigh**
3:15
**ran**
20:14
**rank**
10:10, 10:13,

10:18, 10:19
**ranks**
10:15
**rare**
114:2
**rather**
86:12, 87:3,
87:6
**re-ask**
17:23, 25:18
**re-examination**
119:22
**re-looked**
60:19
**reach**
25:2, 25:5,
25:10, 25:11,
62:6
**reaching**
25:8
**reaction**
104:10, 115:9,
115:16
**read**
19:21, 19:22,
58:22, 59:9,
96:18, 96:24,
97:4, 97:5,
110:22
**reading**
19:8, 62:12,
67:22, 78:4,
81:20, 82:21
**real**
29:16
**reality**
16:24
**realize**
109:8
**really**
59:19
**realm**
57:10
**reason**
40:21, 41:1,
41:5, 46:17,
46:20, 55:25,
56:6, 56:9,

56:13, 56:17,
62:20, 63:1,
91:6, 91:10,
91:13, 92:19,
101:21, 103:25
**reasons**
60:12, 66:20,
66:22, 67:6,
70:19
**recall**
12:12, 16:3,
19:3, 26:1,
32:6, 38:22,
39:3, 40:14,
41:17, 43:7,
43:17, 45:7,
45:25, 46:22,
53:8, 57:17,
57:19, 61:19,
65:18, 71:20,
78:2, 78:17,
84:10, 92:12,
92:13, 95:1,
95:14, 96:4,
98:16, 100:19,
102:8, 102:21,
105:9, 113:10,
113:17, 113:21,
116:6, 116:25
**receive**
14:5, 14:12,
15:11, 19:1,
39:5
**received**
12:7, 14:24,
16:13, 17:5,
17:15, 18:6,
18:9, 19:5,
19:13, 19:18,
20:4, 22:2,
25:19, 54:13
**recognize**
64:17, 65:1,
81:5, 106:4,
110:11
**recollection**
68:17
**record**
8:8, 8:20, 9:2,

22:23, 55:14,
55:16, 55:18,
93:11, 93:13,
93:15, 117:12,
117:13, 117:15,
120:24, 120:25,
121:2, 121:12,
122:10, 123:7

**recorded**
1:25, 6:1, 9:3,
47:6, 47:7,
122:6

**recording**
6:3, 95:5,
99:15, 101:6,
122:9, 123:4

**records**
24:1, 111:15,
113:2

**reduced**
122:7, 123:5

**refer**
39:9

**references**
107:23

**referred**
32:7, 32:21,
49:23, 52:18

**regarding**
17:18, 17:19,
96:23, 105:16

**related**
18:19, 18:23,
54:18, 70:15,
122:12, 123:9

**relating**
117:6

**relay**
39:8

**relayed**
52:17

**religion**
15:8

**relying**
67:1, 67:8

**remember**
12:16, 12:23,
17:4, 18:2,

18:3, 18:18,
18:22, 32:8,
36:13, 36:18,
39:21, 40:11,
40:17, 41:10,
42:4, 42:8,
43:22, 44:25,
46:23, 47:1,
47:5, 47:18,
49:15, 50:19,
51:18, 53:10,
53:13, 53:16,
57:22, 58:1,
59:23, 61:3,
61:4, 61:16,
71:6, 75:1,
75:3, 75:5,
77:18, 77:20,
78:6, 104:6,
113:8

**remotely**
5:13

**reopened**
71:14, 71:18

**repeat**
79:6, 83:3

**repeated**
108:2, 108:3

**repeatedly**
107:16, 108:11,
118:19

**rephrase**
9:7, 21:17

**report**
4:11, 20:15,
20:17, 23:20,
23:23, 24:25,
28:20, 30:14,
30:17, 30:25,
36:1, 37:4,
37:16, 50:22,
63:25, 64:2,
64:22, 65:2,
65:4, 65:5,
65:7, 65:11,
66:8, 66:9,
66:16, 67:2,
67:9, 68:16,

68:18, 68:24,
69:12, 69:16,
69:20, 71:3,
71:7, 71:9,
71:12, 71:14,
71:18, 71:19,
71:21, 71:23,
73:24, 74:25,
75:2, 77:2,
82:21, 84:10,
84:12, 84:14,
89:6, 108:2,
119:8, 120:12,
120:16

**reported**
20:5, 24:5

**reporter**
5:21, 5:24,
6:16, 8:16,
63:17, 80:19,
117:25, 118:1,
121:1, 121:7,
121:11, 122:1

**reporting**
99:6

**reports**
11:7, 35:17

**represent**
5:15, 5:16

**representing**
5:10, 5:22

**requests**
94:12

**require**
27:19

**required**
26:15, 35:20,
35:24, 67:7,
67:10, 99:24

**requires**
27:18

**residence**
90:7, 90:12,
90:14, 90:17,
90:23, 91:1,
91:17, 91:20,
92:3, 92:4,
101:13, 101:18,

101:20

**resource**
31:15

**resources**
31:6, 35:14,
52:8

**respect**
37:8, 99:7,
103:10, 103:13,
108:5

**respond**
15:19, 35:2,
48:15, 98:23,
99:24, 100:4

**responded**
23:9, 37:23,
38:1, 54:19,
98:16, 99:1,
99:22, 119:2,
120:6

**responding**
24:4, 34:24

**response**
68:15, 99:20,
108:20

**responses**
51:20, 93:24,
94:4

**responsibilities**
10:22, 11:13,
35:10, 72:16,
73:12

**responsibility**
11:7

**responsible**
73:13

**responsive**
94:12

**result**
115:6

**retract**
100:15

**retreat**
91:2

**retreating**
91:3

**return**
56:14, 56:16,

86:2

**returned**
42:18, 45:6,
80:2

**returning**
100:25

**review**
11:18, 13:18,
35:20, 35:25,
36:1, 37:8,
37:13, 51:14,
58:23, 59:12,
63:24, 64:2,
65:19, 65:23,
67:14, 105:7,
111:17

**reviewed**
27:7, 65:12,
65:14, 71:3,
72:14, 72:19

**reviewing**
14:14, 60:7,
67:20

**reviews**
37:4

**ride**
100:19

**right**
9:11, 9:23,
10:3, 10:8,
13:16, 15:7,
16:14, 20:23,
21:3, 23:15,
32:19, 36:4,
36:5, 37:5,
37:7, 37:24,
39:14, 41:24,
42:15, 44:14,
45:15, 48:20,
48:24, 49:24,
52:20, 54:8,
55:4, 55:8,
55:20, 59:18,
62:3, 63:25,
64:12, 69:1,
72:5, 76:15,
84:2, 84:15,
84:18, 85:7,

85:13, 91:4,
93:17, 94:2,
94:21, 94:23,
95:9, 96:16,
97:1, 97:18,
97:22, 97:23,
99:18, 100:9,
101:9, 102:13,
107:1, 117:16,
118:6, 120:1,
120:17, 120:19,
120:22

**rights**
96:18, 96:24,
97:4, 97:6

**ringing**
92:8

**risk**
25:13

**road**
11:10, 38:4

**rockville**
5:11

**role**
89:17, 89:19

**room**
9:16, 9:19,
39:24, 77:12

**routine**
69:10

**rule**
8:9

**rules**
6:5

S

**safely**
17:1, 17:2

**safety**
16:7, 35:13,
40:13, 90:11,
102:15

**said**
17:10, 20:25,
22:20, 23:13,
26:13, 28:23,
32:17, 34:16,
39:3, 39:12,

40:2, 42:14,
42:25, 44:8,
45:1, 45:9,
45:13, 45:14,
45:19, 45:21,
46:24, 47:2,
48:13, 48:22,
49:2, 50:2,
50:20, 51:8,
51:18, 51:21,
52:20, 53:5,
53:8, 53:10,
56:5, 60:22,
62:11, 62:14,
65:14, 68:1,
77:19, 77:20,
78:2, 83:5,
84:14, 92:14,
97:20, 104:20,
119:24, 122:8,
122:9, 123:5,
123:6

**same**
15:1, 15:14,
18:15, 39:24,
44:18, 50:4,
50:7, 53:23,
84:8, 84:18

**saw**
22:13, 51:13,
76:6, 97:10,
97:12, 119:3

**say**
39:4, 39:9,
39:11, 39:25,
40:5, 40:15,
40:18, 40:21,
40:23, 40:25,
41:4, 41:8,
41:11, 41:14,
42:10, 42:17,
42:22, 45:5,
45:23, 46:1,
46:4, 46:7,
46:10, 46:14,
46:17, 46:20,
50:21, 53:7,
53:11, 53:14,

67:10, 68:9,
68:12, 68:13,
68:16, 69:13,
75:16, 76:16,
77:13, 87:18,
88:9, 92:10,
93:1, 109:23

**saying**
19:21

**says**
69:5, 72:15,
73:3, 73:5,
73:11, 82:18,
82:19, 83:25,
84:4, 84:11,
98:13, 106:18,
107:11, 108:10,
108:21, 110:23,
112:6, 112:24

**sbi**
112:17

**scanned**
23:21

**scene**
38:6, 86:17,
88:10, 96:5

**schifano**
3:23

**school**
68:14

**screen**
64:11, 72:3,
80:10, 94:17,
110:7

**screenshot**
42:2

**scroll**
58:25, 59:1,
64:23, 66:2,
68:23, 68:24,
72:23, 73:18,
82:10, 82:11,
83:21, 84:20,
106:17, 106:25,
107:2, 108:19,
110:8, 110:18

**scrolled**
58:21

| | | | |
|---|---|---|---|
| **scrolling** | 32:4, 32:24, | **set** | 62:1, 62:17, |
| 69:1 | 86:11 | 101:19 | 92:4, 102:13, |
| **searching** | **seeking** | **severity** | 102:17 |
| 94:11 | 31:5, 31:19, | 87:12, 87:17, | **sign** |
| **second** | 33:7, 86:12, | 87:18, 87:24, | 19:20, 22:16, |
| 64:9, 64:11, | 87:3, 87:7 | 88:1 | 37:16, 37:19, |
| 68:24 | **seemed** | **shakes** | 72:17 |
| **secondary** | 95:7, 95:11 | 8:18 | **sign-offs** |
| 34:18, 34:20, | **seen** | **shall** | 18:16 |
| 34:25, 35:3, | 99:6 | 6:6 | **signature-1apgj** |
| 35:5 | **select** | **share** | 122:17 |
| **seconds** | 84:22 | 94:17 | **signature-sc3** |
| 94:25, 95:2, | **selecting** | **shared** | 123:12 |
| 99:14 | 74:1, 76:12 | 108:15 | **signed** |
| **section** | **seminar** | **sharing** | 72:18 |
| 66:3, 73:3, | 19:11 | 94:21, 107:15, | **signs** |
| 73:4, 73:18, | **seminars** | 108:10 | 100:2 |
| 80:18, 83:12 | 19:25 | **sheronda** | **similar** |
| **security** | **send** | 82:19 | 6:25, 8:3, |
| 108:24 | 74:15, 116:17 | **shift** | 112:5 |
| **see** | **senior** | 70:14, 89:3 | **similarly** |
| 29:25, 49:13, | 10:17, 10:21, | **shirt** | 112:2 |
| 51:17, 54:15, | 10:23, 10:25, | 95:13, 95:21, | **since** |
| 64:13, 67:18, | 31:14 | 96:1, 96:3, | 8:15, 60:17, |
| 67:20, 69:3, | **sense** | 96:5, 96:6 | 114:8, 114:12, |
| 69:6, 73:2, | 8:21, 9:3, 9:9 | **shopped** | 114:19, 116:23, |
| 73:5, 73:14, | **sent** | 44:1 | 117:3 |
| 73:20, 75:19, | 70:4, 70:23, | **shopping** | **single** |
| 80:12, 85:1, | 74:9, 74:11, | 44:5, 44:10 | 48:18, 78:23, |
| 88:21, 92:23, | 74:19, 108:7 | **short** | 85:20 |
| 94:18, 100:2, | **separate** | 29:17 | **sit** |
| 101:2, 102:11, | 115:18, 115:19 | **shorter** | 104:22 |
| 102:18, 102:24, | **sequentially** | 7:1 | **sitting** |
| 103:2, 103:6, | 80:24 | **should** | 100:14, 101:9 |
| 106:9, 107:1, | **sergeant** | 8:13, 17:21, | **situation** |
| 107:4, 107:17, | 49:22, 52:12, | 17:25, 31:8, | 8:11, 20:9, |
| 107:22, 108:11, | 52:13, 52:15, | 47:20, 48:6, | 22:8, 23:11, |
| 108:19, 109:12, | 52:21, 52:23, | 67:10, 69:20, | 24:22, 25:3, |
| 110:14, 110:20, | 57:3, 57:23, | 74:4, 80:21, | 37:11, 45:7, |
| 111:20, 111:24, | 75:9, 87:5 | 101:4 | 62:6, 62:11, |
| 112:8, 113:2, | **serious** | **shouldn't** | 62:14, 97:15 |
| 115:2, 117:10 | 88:8 | 69:25 | **situations** |
| **seeing** | **serve** | **show** | 7:25, 8:10, |
| 53:24, 59:23, | 89:11, 91:17 | 29:1, 78:10, | 16:18, 22:12, |
| 75:1 | **served** | 101:7, 101:8 | 23:13, 24:10, |
| **seek** | 36:11, 36:21, | **sic** | 25:15, 25:21, |
| 31:1, 31:2, | 89:3 | 35:14, 64:13 | 31:22, 32:4, |
| 31:9, 31:11, | **serving** | **side** | 32:23, 49:5, |
| | 35:21, 89:8 | 22:17, 50:4, | |

70:9
**six**
102:22
**size**
20:10
**skills**
122:11, 123:8
**skip**
99:13, 100:24
**slide**
118:4
**sloan**
1:5, 3:22,
5:17, 106:10
**slowly**
95:9
**sobriety**
12:18
**social**
41:15, 41:20,
41:23, 43:5,
45:2, 45:14,
60:4, 67:24,
68:6, 78:11,
78:13, 78:15,
78:23, 85:11,
85:17, 114:24,
115:1, 120:12
**software**
70:13
**softwares**
35:14
**solve**
70:22
**some**
6:23, 12:16,
32:1, 39:2,
42:14, 49:5,
52:4, 58:22,
67:17, 68:25,
72:20, 76:13,
82:10, 84:23,
97:7, 103:5
**somebody**
16:11, 70:11,
90:18
**somebody's**
91:5

**someone**
20:6, 31:9,
31:15, 90:20
**someone's**
103:7
**something**
16:21, 16:22,
22:14, 28:6,
28:10, 31:24,
31:25, 37:21,
39:5, 39:6,
74:16
**sometimes**
23:19, 27:21,
27:23, 28:1,
34:23
**sorry**
13:21, 17:23,
21:16, 24:1,
25:18, 30:20,
40:23, 44:7,
49:1, 51:1,
63:17, 66:18,
68:25, 69:1,
80:19, 82:11,
83:1, 83:22,
84:7, 89:18,
92:25, 100:15,
106:2, 111:1
**sort**
26:21, 46:11,
47:12, 100:1
**sorting**
111:3
**sought**
30:4, 32:10,
52:15, 57:3,
65:16, 86:20,
114:6, 114:11
**sound**
94:22, 95:4,
99:22
**sounded**
45:4
**sounds**
7:9, 55:13
**speak**
8:17, 39:16,

63:19, 63:21
**speaker**
44:22
**speakerphone**
44:24
**specialized**
11:22
**specific**
11:23, 12:2,
14:8, 15:12,
21:11, 26:14,
38:19, 65:1,
72:14, 77:24,
88:6, 91:23,
115:15
**specifically**
10:18, 19:6,
20:1, 85:4,
86:1, 100:7,
113:18
**specified**
76:9
**speech**
15:7, 15:12,
16:1, 63:6,
63:9, 111:15,
113:1, 113:7,
113:20
**spoke**
38:5, 39:13,
44:13, 49:9,
49:10, 50:8,
53:5, 84:9,
84:14
**spoken**
44:4
**spot**
28:5, 28:8,
28:9
**springs**
3:24, 9:15,
10:3, 10:6,
11:20, 12:7,
16:8, 17:14,
19:14, 20:7,
25:20, 25:24,
29:2, 30:4,
33:16, 72:11,

72:21, 105:6,
105:15, 106:14,
106:23, 107:8,
111:2, 112:6,
112:19, 114:3
**stairs**
95:12
**stand**
120:22, 121:11
**standard**
12:18, 22:22,
24:3, 29:18,
49:6, 49:8,
101:17, 106:22
**standing**
49:24, 52:20,
75:23, 102:24,
111:19
**standpoint**
90:25, 102:16
**start**
10:11, 72:25,
95:2, 95:4
**started**
80:24, 92:18,
95:9
**state**
2:13, 5:15,
9:11, 16:12,
111:7, 111:10,
112:8, 112:12,
122:20
**statement**
22:9, 22:15,
22:19, 22:23,
23:5, 24:8,
43:13, 47:13,
47:17, 47:21,
48:3, 48:7,
48:9, 48:17,
48:20, 48:23,
49:2, 49:4,
49:7, 51:1,
51:2, 51:7,
51:23, 52:2,
55:3, 55:4,
98:15
**states**
1:1, 5:5

| | | | |
|---|---|---|---|
| **statue**<br>63:10<br>**statute**<br>19:7, 50:15,<br>50:16, 50:20,<br>63:9<br>**statutes**<br>109:8, 111:12<br>**statutory**<br>111:16<br>**step**<br>97:9, 97:13<br>**steps**<br>20:4, 50:6<br>**still**<br>8:10, 47:22,<br>61:10, 89:8,<br>105:1, 105:2<br>**stipulate**<br>6:7<br>**stipulation**<br>6:6<br>**stop**<br>66:4, 95:6<br>**store**<br>40:16, 45:11,<br>45:24, 56:15,<br>68:11, 80:2,<br>83:5, 98:3<br>**stories**<br>20:10<br>**story**<br>22:17, 62:17<br>**straight**<br>7:2<br>**street**<br>3:7, 90:6,<br>91:21, 101:9<br>**stuff**<br>6:23, 82:4<br>**subject**<br>105:10, 106:18<br>**submit**<br>28:17, 82:8<br>**submitted**<br>65:21, 65:24<br>**substance**<br>18:19, 38:16 | **substantial**<br>111:4<br>**suggest**<br>56:21, 56:24,<br>57:24, 87:6<br>**suite**<br>3:7, 3:14<br>**summarize**<br>22:6<br>**summarized**<br>22:7<br>**summons**<br>31:3, 86:13,<br>86:15<br>**sunset**<br>38:4<br>**supervise**<br>11:15<br>**supervision**<br>123:6<br>**supervisor**<br>11:5, 11:13,<br>31:15, 32:5,<br>32:8, 32:20,<br>49:21, 65:22,<br>65:24<br>**supervisors**<br>37:18, 52:9,<br>52:10<br>**supervisory**<br>11:4, 11:6<br>**support**<br>76:15, 77:25<br>**supposed**<br>20:5, 21:11,<br>31:1, 31:8,<br>33:2, 66:15,<br>100:3<br>**sure**<br>8:19, 9:1,<br>11:8, 12:18,<br>13:8, 14:14,<br>20:6, 35:15,<br>36:2, 36:4,<br>37:12, 59:15,<br>74:3, 75:17,<br>76:19, 94:21<br>**surprise**<br>90:17, 90:24 | **survival**<br>12:19<br>**suspect**<br>21:5, 24:4,<br>24:8, 24:11,<br>24:15, 24:18,<br>25:2, 25:5,<br>25:10, 25:12,<br>26:6, 62:6,<br>69:5, 69:11,<br>70:24, 99:24<br>**suspected**<br>25:17, 25:22,<br>70:2, 73:23,<br>74:24, 114:16,<br>114:20<br>**swat**<br>11:25, 12:5,<br>12:20<br>**swear**<br>6:9<br>**sworn**<br>5:23, 6:13,<br>122:5<br>**system**<br>23:21, 71:19,<br>71:21, 76:24,<br>76:25<br><br>**T**<br><br>**tab**<br>23:22, 64:9,<br>72:1, 80:8,<br>80:20, 80:23,<br>80:25, 94:16,<br>106:1, 110:3<br>**tactical**<br>90:25<br>**take**<br>7:3, 7:5, 7:10,<br>7:11, 7:15,<br>20:5, 23:17,<br>40:3, 43:18,<br>55:7, 55:11,<br>67:13, 71:25,<br>75:6, 85:10,<br>86:9, 93:1,<br>93:9, 110:2, | 113:22, 117:9<br>**taken**<br>17:9, 66:23,<br>82:13, 116:9,<br>122:4<br>**taking**<br>68:14<br>**talk**<br>32:21, 38:20,<br>109:21<br>**talked**<br>38:10, 75:12<br>**talking**<br>32:20, 33:20,<br>39:23, 47:22,<br>47:23, 49:25,<br>54:1, 73:8,<br>73:9, 92:18,<br>97:8<br>**teach**<br>35:12, 35:14<br>**team**<br>12:1, 12:5<br>**tech**<br>16:6, 16:11<br>**technical**<br>6:22<br>**technician**<br>3:20, 3:21,<br>64:10, 72:2,<br>80:9, 81:1,<br>110:6<br>**techniques**<br>16:25<br>**teeter**<br>38:4, 38:15,<br>39:13, 39:14,<br>42:18, 44:2,<br>56:2, 56:7,<br>56:11, 56:14,<br>68:10, 80:2,<br>85:10, 108:8,<br>112:2, 120:9<br>**tell**<br>22:16, 37:20,<br>52:14, 61:11,<br>61:15, 61:17,<br>71:17, 94:22 |

telling
96:9, 97:11
tells
81:20
tend
29:15
tends
23:14
term
82:6
terrified
45:5, 50:22,
86:2, 119:6
terrifying
85:12, 85:23
terrorist
40:5, 43:2
test
13:9
testified
6:15, 7:20,
7:22, 120:14
testify
6:13
testifying
8:4, 9:14
testimony
6:8, 48:13,
54:13, 66:21,
66:22
tests
12:19
text
42:6, 79:15,
116:15, 116:23
thank
6:17, 6:20,
15:20, 15:21,
80:11, 81:3,
108:21, 110:8
the-blank
84:24
themselves
5:15
thereafter
122:7
thing
7:13, 18:15,

87:22
things
8:15, 12:16,
35:2, 56:22,
60:10
think
8:24, 26:24,
36:17, 42:4,
44:21, 51:9,
52:4, 53:16,
53:19, 54:2,
54:6, 56:3,
59:16, 60:19,
64:24, 66:4,
69:17, 81:17,
84:20, 88:7,
88:20, 95:3,
106:8, 113:8,
118:3
third
68:10
thought
65:16, 80:23,
109:23
threat
108:24
threaten
96:12
threatened
40:16, 45:24,
46:2, 79:23,
97:22, 98:10,
119:5
threats
105:17
through
7:2, 7:8, 8:20,
12:16, 12:22,
12:24, 13:7,
13:12, 16:19,
16:22, 58:25,
59:2, 61:1,
81:24, 103:2,
109:6, 117:10,
118:19
throughout
108:25
time
5:8, 9:5,

10:10, 22:18,
27:11, 30:4,
30:18, 34:12,
36:10, 36:12,
36:13, 40:24,
41:22, 42:3,
48:18, 49:24,
50:12, 52:12,
52:23, 55:7,
56:3, 56:5,
56:6, 60:6,
61:14, 61:18,
65:22, 68:19,
68:22, 76:20,
85:15, 86:17,
88:12, 91:7,
91:22, 92:22,
93:7, 95:25,
98:19, 109:10,
109:23, 115:23,
117:18, 118:14
times
7:22, 8:6,
32:10, 32:14,
36:21, 65:19,
96:9, 97:13
today
5:9, 5:22,
6:21, 7:4, 8:16,
9:14, 9:25,
61:10, 65:6,
104:22, 117:18
today's
5:8
told
44:23, 50:14,
52:16, 61:7,
61:9, 77:23,
97:12, 104:7
took
12:18, 12:19,
14:8, 43:1,
50:6, 67:6,
81:21, 95:17,
116:7, 118:11
top
12:16, 12:22,
64:14, 72:5,

80:17, 106:9,
110:9
topic
17:13
torchinsky
3:6
towards
91:11, 98:12
town
3:23, 12:10,
33:3, 33:5,
116:20
track
36:5
traffic
91:21
trained
17:20, 22:5,
91:24
trainee
3:20
training
11:8, 12:6,
12:25, 13:2,
13:7, 13:10,
13:13, 13:15,
13:19, 14:2,
14:5, 14:12,
14:16, 14:23,
14:24, 15:11,
15:25, 16:5,
16:9, 16:14,
16:16, 17:6,
17:8, 17:9,
17:10, 17:11,
17:15, 17:17,
17:24, 18:4,
18:7, 18:9,
18:13, 18:19,
19:2, 19:4,
19:5, 19:10,
19:13, 19:17,
20:3, 21:24,
22:1, 25:16,
25:19, 34:11,
34:13, 34:17,
34:18, 34:20,
34:24, 35:1,

35:5, 35:9,
35:11, 35:22,
36:9, 36:11,
36:16, 36:21,
36:24, 37:1,
37:4, 37:8,
47:19, 48:5,
66:15, 66:17,
66:18, 73:22,
99:23
**trainings**
16:24
**transcriber**
123:1
**transcript**
4:8, 6:2,
121:2, 121:4,
123:3, 123:6
**transcriptionist**
122:8
**travis**
3:19, 5:10
**treat**
83:9
**trees**
101:25, 102:1
**tried**
46:5, 47:9,
57:9
**tries**
27:23
**true**
122:10, 123:6
**truth**
6:14, 6:15
**try**
63:20, 91:14,
101:1, 118:4
**trying**
83:19, 101:24,
104:14
**turn**
92:16, 95:3,
96:10, 97:11,
97:16, 117:18
**twitter**
45:3, 58:2,
58:7, 58:9,

58:11, 58:12,
58:13, 58:18,
58:24, 58:25,
59:2, 59:7,
59:13, 60:21,
61:13, 85:18
**two**
45:18, 45:21,
46:25, 76:17,
84:20, 89:24
**type**
39:2, 49:17,
54:8, 69:20
**types**
16:1, 17:16
**typewriting**
122:7, 123:5
**typically**
21:10, 22:4,
29:16, 48:16
**typing**
64:3, 64:4

**U**

**ultimately**
53:17, 90:10
**unclear**
31:24, 32:18
**under**
6:4, 9:23,
15:12, 69:4,
73:4, 73:11,
74:13, 74:17,
74:18, 82:24,
83:4, 83:25,
111:14, 113:1,
113:6, 113:19,
123:5
**underlying**
27:17
**understand**
6:2, 14:15,
19:20, 35:16,
108:25, 110:24
**understanding**
14:17, 14:21,
14:25, 23:11,
31:4, 83:2,

84:13, 104:15
**understood**
9:8, 47:3,
50:5, 66:1
**unit**
11:22, 11:23,
12:3, 20:8,
20:14, 70:5,
71:15, 73:5,
73:7, 73:8,
73:12, 74:6
**united**
1:1, 5:5
**units**
70:1
**unless**
83:15, 116:19
**unsure**
62:2, 62:5
**until**
24:2, 93:8,
101:15, 102:9
**upload**
28:10, 76:14,
76:23, 77:2
**uploaded**
28:13
**upsetting**
111:13, 112:25
**use**
6:7, 21:12,
21:14, 31:16,
35:15, 115:19,
115:20, 115:25
**uses**
6:4
**using**
31:6, 52:8
**usually**
21:19, 22:7,
23:9, 30:24,
34:23

**V**

**vehicle**
44:18, 90:1,
90:3
**vehicles**
91:3

**verbal**
21:19
**verbally**
21:21, 39:5
**verbatim**
15:9, 40:2,
48:13, 50:19,
50:24, 51:21,
72:10, 77:18
**versus**
5:4
**via**
107:15, 108:11,
108:16
**victim**
20:10, 23:5,
23:12, 38:9,
38:11, 47:13,
47:23, 47:24,
48:22, 48:25,
49:4, 49:7,
50:14, 51:8,
51:22, 52:1,
54:12, 55:3,
66:11, 79:5,
79:10, 79:12,
79:15, 79:19,
82:24, 83:9,
83:12, 85:25
**victim's**
51:2, 83:14
**video**
4:13, 5:9,
5:12, 17:17,
17:18, 18:15,
77:7, 94:16,
95:5, 95:7,
98:9, 98:13,
99:13, 99:15,
99:16, 100:25,
101:6, 103:8,
107:15, 108:11,
108:16, 120:25,
121:5
**videographer**
3:19, 5:2, 5:9,
5:21, 55:14,
55:17, 93:11,

93:14, 117:12,
117:14, 120:22
**videos**
18:16
**videotaped**
1:12, 5:3
**view**
58:2, 58:19,
59:6, 59:8,
101:25
**viewed**
58:20, 59:14,
59:20
**viewpoint**
35:1, 53:25,
54:3
**views**
61:13
**violated**
111:12
**violence**
40:16, 79:23
**violent**
91:11
**virtually**
1:13, 2:2
**visually**
37:20
**vocal**
23:10, 43:11
**vogel**
3:6
**voice**
5:14, 40:6

**W**

**wait**
8:23, 95:3
**wake**
16:6, 16:11
**walk**
90:21
**walked**
40:3, 92:18
**want**
7:1, 7:4,
15:15, 20:20,
27:25, 67:17,

83:23, 90:20
**wanted**
90:20, 90:21,
101:7
**warrant**
4:12, 11:15,
11:16, 26:3,
26:7, 26:8,
26:11, 26:12,
26:14, 26:19,
26:23, 28:18,
28:22, 29:11,
30:11, 30:24,
31:2, 31:20,
32:12, 32:25,
33:3, 33:7,
37:11, 37:13,
37:17, 53:22,
65:16, 65:17,
75:11, 75:15,
77:22, 78:1,
78:5, 78:8,
80:7, 81:9,
81:10, 81:15,
81:22, 82:12,
82:13, 83:13,
84:2, 84:17,
86:12, 86:14,
86:19, 86:21,
87:3, 87:7,
87:10, 87:13,
88:14, 88:23,
89:1, 89:3,
89:5, 89:12,
91:17, 92:16,
92:20, 114:6,
114:12, 118:12,
119:17
**warrants**
30:3
**warren**
1:8, 5:4,
34:11, 34:12,
37:23, 38:10,
39:17, 39:18,
39:23, 39:25,
43:15, 43:21,
44:13, 44:24,

47:16, 48:2,
49:11, 52:24,
54:7, 55:23,
55:24, 57:1,
57:5, 58:15,
59:5, 59:9,
61:21, 65:8,
71:4, 71:8,
75:8, 75:14,
75:22, 76:3,
76:5, 76:23,
77:9, 77:11,
77:16, 79:8,
79:13, 79:17,
79:21, 79:25,
82:3, 84:1,
84:2, 84:9,
85:7, 85:9,
87:2, 89:1,
89:14, 90:2,
96:15, 103:15,
112:11, 113:4,
113:13
**warren's**
35:4, 36:11,
63:24, 89:9,
90:3, 90:10
**washington**
3:8
**watch**
18:16, 99:12
**water**
100:8, 100:11,
100:13, 100:16,
100:18, 100:22
**way**
7:7, 28:14,
35:24, 47:6,
54:12, 71:17,
71:20, 85:1,
85:25, 91:24,
96:13, 98:6,
99:1, 99:24,
102:8, 102:9,
111:1
**we'll**
7:10, 20:15,
70:6, 93:10,

95:4, 95:6,
103:8, 110:22,
121:4
**we're**
8:16, 55:17,
65:5, 66:20,
93:14, 94:22,
99:12, 117:14,
120:24
**we've**
55:6, 80:20
**wearing**
93:19, 98:14
**website**
26:18, 27:1,
27:4
**wednesday**
1:14
**went**
6:24, 7:2,
12:22, 13:4,
32:9, 38:12,
48:11, 52:23,
56:25, 57:9,
89:5, 89:11,
96:3, 100:16,
103:14, 118:9
**weren't**
96:22
**western**
1:3, 5:6
**whatever**
77:22
**whenever**
20:6, 48:11
**whereupon**
6:11
**whether**
15:25, 17:21,
17:25, 25:5,
25:6, 25:10,
25:11, 25:12,
31:8, 40:15,
40:18, 40:21,
40:25, 41:4,
41:8, 41:11,
41:14, 42:10,
42:17, 42:22,

45:17, 45:23,
46:1, 46:4,
46:7, 46:10,
46:14, 46:17,
46:20, 51:12,
53:11, 53:14,
54:20, 57:2,
62:21, 63:5,
63:12, 68:10,
73:23, 75:4,
76:24, 94:23,
113:5, 113:18
**whoever**
120:7
**whole**
6:14, 12:12
**widely**
114:24
**windows**
102:18, 103:3
**within**
11:9, 17:13,
36:2, 39:24,
88:18, 109:20,
116:13
**without**
22:23
**witness**
5:23, 6:10,
15:3, 15:5,
15:23, 20:11,
21:7, 22:10,
22:13, 22:15,
22:19, 22:24,
24:13, 24:24,
29:23, 31:14,
43:13, 47:13,
47:17, 47:21,
48:9, 48:12,
48:16, 48:19,
49:3, 51:1,
51:7, 52:2,
54:14, 55:9,
55:13, 62:9,
63:16, 66:11,
68:22, 74:8,
78:19, 79:1,
80:15, 81:3,

82:18, 82:24,
83:4, 83:7,
83:8, 83:10,
99:10, 115:15,
117:21, 118:3
**witness's**
55:4
**witness(es**
122:4
**word**
22:6, 47:1,
89:19
**word-for-word**
15:9
**words**
98:25
**work**
45:6, 70:13,
86:2, 94:18,
101:5, 115:20,
115:21, 115:25
**worked**
6:22, 108:24
**working**
89:3, 107:8,
109:2
**works**
26:3
**wouldn't**
23:2, 61:11,
67:10, 69:13,
75:16
**write**
21:9, 22:5,
22:16, 23:14,
47:14
**writing**
22:3, 23:20,
43:10, 43:16,
47:4, 64:3,
71:19, 71:21
**written**
4:10, 6:6,
12:13, 19:4,
19:14, 19:18,
21:10, 22:9,
22:23, 24:8,
27:21, 28:16,

39:6, 39:7,
48:17, 49:4,
49:6, 69:19,
72:12, 72:15,
80:4, 121:2
**wrote**
85:7, 85:9

### Y
**yard**
101:16
**yards**
101:15, 101:18
**yeah**
7:7, 10:9,
11:23, 15:4,
15:5, 18:11,
21:10, 24:6,
25:8, 26:16,
28:12, 36:22,
39:24, 53:19,
54:9, 55:9,
60:24, 75:25,
80:15, 80:17,
80:24, 83:4,
90:16, 93:2,
93:4, 93:9, 97:2
**yearly**
17:8, 17:10,
17:11, 18:12
**years**
47:1
**yesterday**
6:23, 7:2
**yourself**
27:13, 104:17

### Z
**zoom**
8:16, 8:20,
64:13, 72:4,
80:13, 80:17,
106:8, 110:9
**zooming**
80:16

### .
**.5**
73:3

### 0
**00**
6:24
**002832**
106:19
**0091**
3:16
**02**
84:11
**03**
121:12

### 1
**1/9/2023**
4:15
**10**
1:15, 4:13,
30:6, 30:7,
55:11, 94:16,
94:19
**106**
4:14
**11**
4:14, 84:11,
106:1, 106:6
**110**
4:15
**118**
4:4
**119**
4:3
**12**
4:15, 110:3,
110:4, 110:5
**123**
1:24
**15**
7:24
**1511**
5:9
**1612**
55:15
**1623**
55:18
**1713**
93:12
**1723**
93:15

**1754**
117:12
**1800**
117:15
**1803**
120:24

**2**

**2**
110:19
**2/8/2022**
4:14
**20**
7:24, 30:8
**20002**
3:8
**2019**
13:14
**2020**
10:7, 10:8
**2022**
107:6, 107:9,
108:20
**2023**
99:8, 110:16,
110:19
**2024**
10:20, 12:3,
12:4, 76:16,
84:7, 113:24,
114:5, 114:8,
114:13, 114:15,
114:19, 115:24,
116:25
**2026**
1:14, 5:8
**22**
55:12, 106:19
**222**
1:7, 5:7
**2300**
3:7
**25**
1:7, 5:6,
101:15, 101:18
**2626**
3:14
**27**
1:14, 5:8

**27608**
3:15
**2nd**
38:23, 84:7,
84:15

**3**

**3**
1:15
**30**
95:2
**305**
3:14
**341**
3:9
**37**
110:19

**4**

**4**
55:12, 108:21
**424**
3:16
**45**
108:21
**451**
5:11

**5**

**540**
3:9
**591**
72:25
**592**
72:24
**5:-cv**
5:6
**5:-cv--bo-rj**
1:7

**6**

**6**
121:12
**6/2/2026**
122:21, 123:17
**633893**
1:23
**64**
4:11

**643**
3:7

**7**

**72**
4:10

**8**

**8**
6:24
**80**
4:12
**840.1**
73:3
**8808**
3:9

**9**

**911**
20:7
**919**
3:16
**92**
123:12
**94**
4:13

# Exhibit 8



# Transcript of Edgar Hernandez

**Date:** May 29, 2026
**Case:** Rachmuth -v- Warren, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

-------------------------------x

JENNIFER SLOAN RACHMUTH,           :

                    PLAINTIFF,    :

     v.                           : Civil Action No.:

ELLIOTT WARREN, ET AL,            : 5:25-CV-222-BO-RJ

                    DEFENDANTS.   :

-------------------------------x

DEPOSITION OF EDGAR HERNANDEZ

Conducted virtually

Friday, May 29, 2026

3:03 p.m.

Job No.: 633894

Pages: 1 - 103

Recorded By: Spencer Motamedy

Deposition of EDGAR HERNANDEZ, conducted virtually.

Pursuant to agreement, before Spencer Motamedy, Notary Public in and for the Commonwealth of Virginia.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF, JENNIFER SLOAN

RACHMUTH:

    DANIEL A BRUCE, ESQUIRE

    KELLEN S DWYER, ESQUIRE

    HOLTZMAN VOGEL BARAN TORCHINSKY &

    JOSEFIAK, PLLC

    15405 John Marshall Highway

    Haymarket,, VA 20169

    (540) 341-8808


ON BEHALF OF THE DEFENDANTS, ELLIOTT WARREN, ET

AL:

    KATHERINE M BARBER-JONES, ESQUIRE

    JESSE GUSTEIN, ESQUIRE

    HARTZOG LAW GROUP

    2626 Glenwood Ave., Suite 305

    Raleigh, NC 27608

    (919) 670-0338




ALSO PRESENT:

    Jennifer Sloan Rachmuth  - Plaintiff

    Frantz Clervil - Videographer

    Jack Dunn - Videographer Shadow

A P P E A R A N C E S (CONTINUED)

Wes Peterson - PD Tech

David Andre - Pd tech Support

                    C O N T E N T S

EXAMINATION OF EDGAR HERNANDEZ                    PAGE

     By Mr. Bruce                                    7

                    E X H I B I T S

                 (Attached to transcript)

DEPOSITION EXHIBIT                               PAGE

Exhibit 08  Tab 8 investigation report           59

Exhibit 10  Video of Arrest                      69

Exhibit 11  Email from Paul (tab 11)             84

Exhibit 12  Follow up information request         88

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins media number one in the videotaped deposition of Edgar Hernandez in the matter of Jennifer Sloan Rachmuth v. Elliott Warren et al., in the United States District Court, Eastern District of North Carolina, Western Division. Case Number 5:25-CV-222-BO-RJ.

Today's date is May 29, 2026. The time on the video monitor is 3:04 p.m. The videographer today is Frantz Clervil, representing Planet Depos, headquartered at 451 Hungerford Drive, Suite 400, in Rockville, Maryland 20850. All parties of this deposition are attending remotely.

Would counsel please voice identify themselves and state who they represent?

MR. BRUCE: My name is Daniel Bruce of the law firm Holtzman Vogel. I represent the plaintiff, Ms. Rachmuth, and I'm here with my colleague, Kellen Dwyer.

MS. BARBER-JONES: My name is Katherine Barber Jones from Hartzog Law Group. I represent the defendants, including Officer Edgar Hernandez. And I am here with Jesse Gutstein, my colleague.

THE VIDEOGRAPHER: Thank you. The court reporter today is Spencer Motamedy, representing

Planet Depos. The witness will now be sworn in, and then we may proceed.

THE REPORTER: I'm a notary authorized to administer oaths, and this deposition will be recorded by electronic means. All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable procedural and evidentiary rules and laws and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with applicable law of such.

Hearing no objection, I will now swear in the witness. Please raise your right hand. Whereupon,

EDGAR HERNANDEZ, being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BRUCE:

Q     Good afternoon, Officer Hernandez. Thank you for being here this afternoon again. My name is Daniel Bruce, and I'm a lawyer from the plaintiff, and I'll be asking you a few questions today.

A     Okay.

Q     Have you ever been deposed before, Officer Hernandez?

A     No.

Q     Have you ever testified in court?

A     Yes.

Q     Okay. About how many times have you testified in court?

A     I couldn't tell you off the top of my head. Not pretty sure. A lot of DWI trials.

Q     Are those all in your capacity as an officer with the Holly Springs Police Department?

A     Yes.

Q     Okay. So a deposition is a lot like testifying in court. The main difference is we don't have a judge present, so there may be situations where your lawyer objects to one of my questions. Those objections are for the record, so that we can get them on paper, but there's not a judge here to rule on those objections.

So if your lawyer does object, you should still answer the question unless she instructs you not to. Do you understand that?

A     Okay.

Q     A few other housekeeping things. We're on

Zoom, and we have a court reporter here, so please speak up and answer orally. Not with any head nods or vocal fillers, so just so that the court reporter can take down your answers properly, and that we can hear everybody on the Zoom. Does that make sense?

A    Yes.

Q    And then please wait for me to fully ask a question before you answer, even if you think you know the answer or can anticipate the question. This is just to make sure the court reporter can get both the question and the answer down fully, and that we have a clean record. Does that make sense?

A    Yes.

Q    If at any time my question is not clear, just let me know. I'm happy to rephrase. If you answer the question, I'll assume you understood the question. Do you understand?

A    Yes, sir.

Q    And then finally, just let me know if you ever need to take a break, and I'm happy to -- to do so. My plan is for us to go about every hour, take a 15 -- 10- to 15-minute break, but if you need a break before then, just let me know.

The only thing I would ask is that if a question is pending, that you answer the question before we go on a break. Does that make sense?

A    Okay. Thank you.

Q    All right. Can you please state your full name?

A    My name is Edgar Hernandez.

Q    Okay. Where are you testifying from, Officer Hernandez?

A    The Holly Springs Police Department.

Q    Okay. Is there anyone else in the room with you?

A    Just the counsel.

Q    Okay. Anyone else?

A    No.

Q    Okay. Are you under the influence of any medications, drugs, or alcohol that would impair your ability to answer questions today?

A    No.

Q    And you're currently an officer with the Holly Springs Police Department, correct?

A    Yes.

Q    When were you hired with the Holly Springs Police Department?

A    Early 2020.

Q    Okay. So you've been there about six years?

A    Yes.

Q    Okay. What's your current rank with the police department?

A    Just a police officer on patrol.

Q    Okay. Are you currently on any particular assignment or assigned to any unit?

A    The patrol division.

Q    And did you have that same rank in November of 2024?

A    Yes.

Q    Can you describe what training you've received as a Holly Springs police officer?

A    Yes. I received trainings such as the basic law enforcement training. That grants me a certification to become a police officer here in North Carolina.

Q    Okay. So basic law enforcement training. Any other training you've received?

A    Yeah. I mean, throughout the time being here, I've received multiple training: field training officer, CIT officer, chem analyst, different trainings.

Q    Okay. So you mentioned field training

officer; is that right?

A    Correct.

Q    Do you have a particular -- particular training you have to complete to be a field training officer?

A    Yes, sir.

Q    Okay. What did that training include?

A    There was a 40-hour class at -- they're all in different places, but a 40-hour class basically telling you how to become a field training officer and how to handle being a field training officer.

Q    Okay. What are your duties as a field training officer?

A    To train the new generation of law enforcement officers coming either straight from the academy or from a different agency, kind of showing them how to perform their job.

Q    What are some ways you're supposed to show them how to perform their job?

A    I'm showing them around town, showing them the streets, showing them how to conduct traffic stops, how to write reports, how to investigate crimes, different situations like that.

Q    Okay. Do you serve as a supervisor to the

person you're -- you're serving as their field training officer?

A     Correct.

Q     Do you have to approve any of their reports or work?

A     Yes.

Q     What things do you have to approve?

A     Just to make sure that, you know, reports are done thoroughly, and that the forms are filled out correctly. There's certain situations like that.

Q     And what type of forms do you have to review?

A     Different forms. Report writing forms, traffic crash investigation forms, voluntary statement forms, CIT forms. Just, there's a lot of things that go into law enforcement.

Q     Does that include any forms that are submitted in support of an application for an arrest warrant?

A     Correct, sir.

Q     Any other forms that you can think of?

A     I mean, there's just so many. I can't really think of any off the top of my head.

Q     Is there any other -- besides things like

forms and reports, is there anything else you have to approve when you're serving as an officer's field training officer?

A    Just, you know, I guess, approve of the officer himself. Make sure that he's conducting well. Officer safety. That he's learning from the training that we were providing him, whether it's just going over case laws or going over how to handle certain types of calls.

Sometimes we might not get certain calls here in Holly Springs that we expect an officer to know how to handle. So just different things like that. We kind of approve to see, you know, throughout the day, to see how well the officer is doing.

Q    Okay. If a -- if an officer that you're serving as their field training officer wants to conduct an arrest, do you have to approve that decision?

A    Do you mean, like, do I have to -- I'm sorry, can you repeat the question for me?

Q    If an officer who you're serving as their field training officer wants to conduct an arrest, do you have to sign off on that decision before they -- they can do that?

A     No. It just kind of -- it depends on the situation. Obviously, when it comes to certain things, like if I believe they have the probable cause to tell me whether they have it or not, and we can talk about what, you know, what we have in front of us, or if it's something that's a warrant, then obviously I can't really make that decision for that officer when it comes to making an arrest.

Q     Okay. So you mentioned probable cause. Is one of the things you have to sign off on for those officers is whether they have probable cause to -- to seek an arrest warrant?

A     Well, that's --

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: That's up to the magistrate to see if we have probable cause for the warrant.

BY MR. BRUCE:

Q     Do you review whether the officer has probable cause before he presents that to the magistrate?

A     No. That's up to the magistrate to figure out if that's what we have.

Q     Does your --

MR. DWYER: You don't think that you have

to make a determination of whether there's probable

cause before going to a magistrate?

MS. BARBER-JONES: I'm sorry. Who's taking

the deposition here? Are you both taking it?

MR. BRUCE: I can ask the question.

MR. DWYER: Oh, sorry. Daniel can ask.

BY MR. BRUCE:

Q    Do you think that you have to make a

independent determination of whether there's

probable cause before you go before a magistrate to

get an arrest warrant?

A    Well, isn't that the point of having the

magistrate determine if probable cause is there?

Q    I'm just asking you if, as a field

training officer, is your role -- is part of your

role determining whether an officer you're

supervising has enough evidence to support probable

cause before going to a magistrate?

A    I guess I would argue that, yeah, it is

my role to figure that out.

Q    Okay. I believe you mentioned that one of

the things you -- you do when assisting as an FTO

is helping the officer you're supervising review

case laws; is that right?

A    Correct.

Q    What -- what do you mean by case laws?

A    Just different case laws that we -- that obviously law enforcement have to go by. You know, Tennessee v. Garner and different things like that.

Q    So do you mean like -- like court decisions and opinions?

A    Correct. That help us perform our jobs, and lets us know if we're within our legal means of operating.

Q    Okay. Do those include decisions by both federal and North Carolina state courts?

A    Correct.

Q    Okay. Does it include any decisions about the First Amendment?

A    I cannot recall going over things whether the First Amendment with Officer Warren.

Q    Can you recall going over anything related to the First Amendment with any other officer you've served as an FTO for?

A    No, because I've only field trained three other officers, and I'm currently field training one officer, and the second officer I field trained was already further along in this FTO process.

Q    Okay. And so how many -- how many total officers have you served as an FTO for?

A    Three.

Q    Three, including Officer Warren?

A    Correct.

Q    Have you received -- in your time at the Holly Springs -- Holly Springs Police Department, have you received any training on the First Amendment?

A    I don't recall ever doing a training on the First Amendment.

Q    Have you received any training on -- on what crimes can be -- well, I'll -- I'll retract that question. Sorry.

So as we sit here today, you can't remember receiving any training on the First Amendment in your time at the Holly Springs Police Department?

A    Correct.

Q    Okay. You mentioned basic law enforcement training; is that right?

A    Yes.

Q    What did that training include?

A    That training included different things from patrol techniques, case law, motor vehicle law, traffic crash investigations, different operations of the patrol division.

Q    Did it include how to conduct an arrest?

A    Yes.

Q    And what did you learn in your training on how to conduct an arrest?

A    I learned how to conduct an arrest, learning about probable cause, reasonable suspicion, and what is needed.

Q    And what were you trained on what is needed to have probable cause to conduct an arrest?

A    Basically, that a crime has occurred, and it's probable fact that that person has committed the crime or was going to commit the crime.

Q    Did you receive any training on -- on how much evidence you -- you need in order to have probable cause to conduct an arrest?

A    Yes.

Q    And how much evidence do you need to have probable cause?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: So with probable cause, it's kind of the totality of the circumstances that are there, whether it's, you know, just video evidence, or if I see someone that was accused of an assault, and I see evidence of an assault. You know, just

different totality of circumstances that allow me to make that judgment of the probable cause.

BY MR. BRUCE:

Q    When you say that allow you to make that judgment, did you receive any training about whether you are supposed to make an independent judgment of whether you have probable cause before seeking an arrest?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: I'm sorry. Can you repeat that question for me again?

BY MR. BRUCE:

Q    Did you receive any training about whether you yourself, as an officer, are to make an independent judgment about whether there is probable cause before you go to a magistrate to seek an arrest warrant?

A    Yes. I mean, that's kind of what we give the magistrate, and then they make that probable cause decision.

Q    Did your basic law enforcement training include any training about when to seek an arrest warrant versus an arrest summons or to issue a citation?

A    Not that I recall.

Q    Have you received any other training outside of basic law enforcement training about when to conduct an arrest or issue a citation?

A    No. Other than kind of just, obviously, when we're arresting someone, well, it's easier to give a citation once that person's present, but if that person is no longer on the scene or present, then, you know, we typically seek out an arrest warrant.

Q    So is one of -- one of the factors to consider when you're determining whether to issue a citation is whether the suspect's present at the scene of the crime still?

A    Correct.

Q    Okay. Are there any other factors that you would consider?

A    I mean, just kind of depends on the totality of the circumstances again.

Q    Would the dangerousness of the suspect be a factor to consider?

A    Correct.

Q    Would whether the suspect's a flight risk be a factor to consider?

A    Correct.

Q    Any other factors that -- that you can think of?

A    No, I can't think of any right now.

Q    Have you received any training on the Holly Springs Police Department's written directives?

A    As in just reviewing policy?

Q    I guess, have you reviewed -- reviewed the Holly Springs Police Department's written directives?

A    Yes.

Q    Okay. And are you required to do that every so often or on a regular basis?

A    Whenever new policies come out. We've had a plethora of new policies come out, and we're told to sign off on the policies after they're read.

Q    Have you received any specific training on the North Carolina cyberstalking statute?

A    Specific training for the charge itself, no.

Q    Okay. Have you received any specific training on harassment or other types of stalking charges?

A    No.

Q    Have you received any training on

identifying or classifying hate- or bias-motivated crimes?

A    Not that I recall.

Q    Have you received any training that was put on by -- by an organization called the Anti-Defamation League?

A    No, not that I recall.

Q    Have you received any training on identifying hate or extremist groups?

A    Yes.

Q    What training was that?

A    I wasn't -- though I do remember doing that in basic law enforcement training, but I don't remember taking anything outside of that.

Q    Okay. And what was the substance of that training? What were you taught about identifying hate or extremist groups?

A    Basically, I mean, they were just kind of telling us about, you know, different types of hate groups out there, whether it's, you know, things that happen here within our nation or things that are happening in Europe. Just, I mean, they didn't go into specific -- specifics about every group or anything of that nature, but just kind of general ideas of them.

Q    Did it include identifying anti-Jewish hate groups?

A    Not that I recall.

Q    So as we sit here today, you can't recall receiving any training about identifying anti-Jewish hate or extremist groups?

A    Correct.

Q    Have you received any training about identifying implicit biases?

A    Yes.

Q    And what was that training?

A    We had a gentleman come to the Holly Springs Police Department who put on kind of a training day, just, you know, giving -- educating us officers on implicit biases and ones that someone might not even realize they have.

Q    When did that training occur?

A    Honestly, I'm not too sure on the exact date. I want to say probably around 2022 or 2021.

Q    Was it before November of 2024?

A    Yes.

Q    And do you recall the name of the person who gave that training?

A    I do not.

Q    Was it someone with the Holly Springs

Police Department?

A    As an officer of Holly Springs Police Department? Is that what you're asking me?

Q    Well, sure. Was it an officer at the Holly Springs --

A    No, it was a third party.

Q    And what did that -- what was the substance of that training?

A    Honestly, it was kind of just kind of understanding what implicit bias is, and basically things that you might not realize what might be considered implicit bias.

Q    And based on that training, what is your understanding of what an implicit bias is?

A    Basically, from -- honestly, what -- I can't really remember too much from the training other than when bias that, I guess, people say that they might have and not realize is just kind of, you know, going to a hardware store and you see -- you try to picture a plumber in your head, and then you have a specific picture of what a plumber might look like.

But then you see this, like, older woman there. I'm like, well, maybe she's a plumber. You don't know. But you have this kind of ideology of

what a plumber might look like. Just kind of things like that, yeah.

Q    Did the training include identifying any biases related to Muslim individuals?

A    Not that I remember.

Q    Did the training include any -- identifying any biases related to Jewish individuals?

A    Not that I remember.

Q    Have you received any medical or first aid training?

A    Yes.

Q    And when did you receive that training?

A    In basic law enforcement, and also throughout my years as a law enforcement officer, we'll recertify on CPR training.

Q    So you mentioned you had CPR training; is that right?

A    Yes, sir.

Q    What other types of medical and first aid training have you received?

A    Well, the stop-the-bleed training.

Q    Okay. Any other types of training?

A    That's kind of really it.

Q    Have you received any training that

includes how to identify when an individual may be having a panic attack?

A     I received a CIT training as well.

Q     Okay. What is CIT training?

A     Crisis intervention team.

Q     Okay. And what did you learn in crisis intervention training?

A     Basically, different resources. The Wake County here has offered when it comes to people that are having a crisis.

Q     Okay. And --

A     And things they might experience.

Q     What do you mean by a person having a crisis?

A     Basically, people who have mental health issues and are essentially, you know, they are in crisis. They aren't having the best mental health day. They're having issues, whether -- it's whatever's going on in their life, and they're just kind of in crisis. I don't know the best way to explain it.

Q     Did any of those crises include suffering from panic attacks?

A     Not that I recall.

Q     And does that training also apply to

individuals you may be bringing into your custody as a suspect?

A     Kind of. It's -- they -- what they refer to during that training is more of the fact of people that basically, during their crisis, they might have certain circumstances that maybe they might -- kind of -- it kind of lets our judgment as an officer to decide whether -- how things are handled in the sense of do we need to -- do we feel as an arrest needs to be made, or do we feel as a mental health evaluation might be needed instead? So it kind of just varies on the situation.

Q     Okay. And in what circumstances might a mental health evaluation be more appropriate than making an arrest?

A     So sometimes we deal with people who have autism, and they might be violent. They might assault a family member. However, due to their severe autism, we know that sometimes they can't help it from lashing out in certain ways, that we prefer that we go the mental health route instead of just making an arrest and just making it worse for everybody.

Q     Okay. Have you received any other specialized or -- or specialized training that we

haven't talked about today?

A    No.

Q    Based on your training that we discussed, can you describe the steps that an officer is supposed to take when -- when a crime is reported?

A    When a crime's reported, I guess we -- we talked -- respond to the call, talk to the victim, gather as much information as you can get, and see -- where -- where it can go from there. Sometimes, we might send it upstairs to have them investigate more. Sometimes, if it's something we can handle, we will finish it out and close it out ourselves as the patrol.

Q    Okay. So I just want to break down a few of those things. So you said the first step would be responding to a call; is that right?

A    Correct.

Q    How does a call typically come in to a patrol officer?

A    It is dispatched to us through the Holly Springs Police Department dispatch.

Q    Okay. And then you said one of the things you might do would be talk to the victim; is that right?

A    Yeah. Talk to the caller, and -- well,

first arrive on scene, talk to the caller, kind of gather what you have there.

Q    Is there anyone else you might talk to?

A    Depending on what you have in front of you. You might be able to reach out to -- if it's, you know, an assault, there's two people there, one offender, one victim, you can talk to the offender there as well.

Q    And when you're speaking to -- to these individuals, how do you -- how do you record or keep track of the information that you're collecting?

A    You write a report.

Q    Okay. Do you write that report contemporaneously as they're talking, or do you do it later at the station?

A    Usually, if I'm -- if I'm handling the call, I'll write notes down on my notebook, and just kind of recollect what they're saying as I'm writing my report.

Q    Okay. Is there any situation where you would ask the victim or the offender to -- to write a written statement?

A    You can. And that's not always something we do, but you definitely can.

Q    Are there specific situations where you would be more likely to get a written statement than others?

A    You know, the times that I can recall doing that, if I wanted to get it done, were on violent felonies.

Q    Okay. Why on violent felonies?

A    Just because me personally, I believe that, you know, it's something much more, something that I want to make sure is investigated thoroughly.

Q    Okay. You mentioned that you might -- in certain situations, you might talk to the offender or the suspect; is that right?

A    Correct, if they're on the scene.

Q    Are there any other situations besides if they're on scene where you might talk with them?

A    I mean, if you're able to get a hold of them.

Q    Okay. How might you be able to get a hold of the offender?

A    By somehow finding contact information on that individual.

Q    Okay. What are -- what are ways you tend to use to find contact information on the offender?

A     See if they're -- if it's someone that we've dealt with. Maybe it's -- you can put them in our report writing system. They might have their own contact information in there. That's the way we can do it. Using the DMV. Usually, phone numbers are tied to the DMV driver's license.

Q     You mentioned someone you've dealt with. What do you mean by that?

A     I mean, somebody in the sense of that's -- I mean, like, as in the Holly Springs Department, as a -- either interacted with, whether it's just them coming in, talking to us, or interacting with if they reported a crime or been a victim of a crime, wherever may have, they usually are in our report writing system, involved some way or form, and their information would be in there.

Q     Okay. So if somebody has made a report or reported a crime to the Holly Springs Police Department, their information would -- would be in the report writing system?

A     Correct.

Q     Okay. And that's something you could access if their name comes up later as a -- as a suspect or an offender?

A     Correct.

Q    Are there any other situations besides if the suspect's on scene, or if you have their contact information, that you might choose to -- to talk to the suspect while investigating?

A    I mean, I can't really think of another situation like that besides those two.

Q    Okay. You mentioned that after you conduct that part of the investigation, you said you might -- would send it upstairs; is that right?

A    Correct. If I -- if I can't make -- if I can't close a case myself, maybe send it upstairs. Or if there's -- if I -- if I need to get that -- how do I say this? If I -- If I can't figure it out myself, usually I just send it upstairs if I can't close it out myself.

Q    Okay. And what do you mean by send it upstairs? Who's upstairs?

A    Oh, I'm sorry. CID. I apologize. Our police department, the second floor is the investigations unit. I apologize.

Q    Okay. No -- no problem. Just -- just wanted to clarify. So if you can't close the case yourself, you might send it to the investigations unit?

A    Correct.

Q    Are there -- are there situations where you're required to send a case to the investigations unit?

A    Yes. They are, but honestly, I can't really remember them off the top of my head.

Q    Do you remember any of those situations?

A    For some reason, the word arson sticks out to me a lot, and I don't know why.

Q    Okay. Any besides arson?

A    I think those violent felonies come to play as well, and a certain amount of drug amount, I believe.

Q    Okay. Are -- are crimes that might be considered hate crimes or bias-motivated crimes referred to the investigations unit?

A    I do not recall.

Q    Is it standard practice to memorialize interviews with -- with a witness or a victim in writing?

A    Do you mean as in write down when -- when they're speaking to me, or -- I'm sorry, I don't understand the question.

Q    Is it standard practice to write down the content of what a witness or a victim says to you while you're talking to them in writing somewhere?

A    I mean, there's -- I mean, different officers take just field notes when they're being spoken to by the victim, and they will put it in their report if it's a direct quote. A lot of times, people, you know, put it in quotations.

Q    Okay. You mentioned you would collect field notes and then put it in the report. Is it standard practice to transcribe those notes into the official incident report?

A    Correct.

Q    We talked a little bit about collecting information on an offender, and you mentioned that their information could be in the system if it's someone you've -- you've dealt with before at the police department; is that right?

A    Mm-hmm.

Q    And when you said system, what -- what system do you use to -- to look up that information?

A    So actually, we've had used a couple different report writing systems throughout my time being here. So currently, we use Axon. During that time, we used RMS. So it's just -- and during that time, RMS actually had a lot of technical issues, and it was just a whole cluster during that time of

when this report was written.

Q    Okay. Explain a little bit more about the technical issues RMS had during that time.

A    So it was kind of known that our system was backed up with Apex Police Department system, and they had a software attack on their system that actually affected our -- our report writing system here in Holly Springs. Fortunately enough, our reports were -- were able to be all recovered. However, the software itself was not usable at the time.

Q    Okay. So you said, fortunately enough, they were -- they were able to be recovered. Did something happen to the reports at some point?

A    So we weren't able to log into the software at all. However, our -- our crime analyst was able to back up their reports before this software attack even happened. But so back when we were writing this report, our software was back up, but it wasn't -- how do I explain this? It wasn't as user-friendly as it was prior to the incident.

Q    Okay. Did that affect any of the information you could -- you could get from the report writing system that was already stored in it?

A    Honestly, I don't remember. We've been using Axon for a year and a half now, so it's kind of -- it's weird how easy Axon is compared to our new -- or, old report right system.

Q    It's always good to have better technology.

A    Yep.

Q    Can you explain how the process for obtaining a warrant works?

A    You gather the information that you have from the scene. See if the crime meets the elements, and you see if you have enough probable cause to swear an arrest warrant by speaking to the magistrate.

Q    When you said, see if the crime meets the elements, what -- what do you -- how do you determine if it meets the elements?

A    Just the totality of the circumstances. You know, we -- if the elements are met on the crime, we are able to seek probable cause with the magistrate.

Q    Do you -- do you have any resources or people you consult with to -- when you're determining whether a crime meets the elements?

A    Yeah. So we have these books here at the

Holly Springs Police Department. If it's for a charge that maybe some of us are not very familiar with, we determine whether -- with those books, they're able to help us. They have the list of elements in their list of crimes that they have. And usually, if we're still not sure, we have supervisors here that we talk to and kind of get clarification from them as well.

Q    Okay. So you mentioned there -- there's -- a book that contains the elements of -- of the crimes that you might consult; is that right?

A    Correct.

Q    Do you know -- do you know what that book is called?

A    North Carolina Crime. That's the only title I remember seeing on it.

Q    Okay. Fair enough.

A    It has the elements on it.

Q    And then you said if you're still not sure, you would consult the supervisor; is that right?

A    Correct.

Q    What supervisors would you consult?

A    Usually, my direct supervisor, so whether that's a corporal sergeant or if the lieutenant's

possible, patrol lieutenant, is there, then that'd be great.

Q    Is there -- is there anyone else you would consult when determining if -- if the crime meets the elements?

A    No. Well, the magistrate. I'm sorry.

Q    Understood. Would you ever go to the District Attorney's Office to get the District Attorney's advice before?

A    I personally never have.

Q    Do you know any other officers who have?

A    No. I would imagine you could, but I've never heard of someone doing that.

Q    Are you supposed to consult the Town Attorney's Office before or when you're determining if a crime meets the element?

A    No.

Q    So then you mentioned after you determine whether it meets the elements, that's when you go speak to the magistrate; is that right?

A    Correct.

Q    And how do you go about doing that?

A    There's different ways you can do it. Normally, we have a Zoom kind of call to the magistrate in the back of our police department,

where we can have kind of essentially, you know, a Zoom call, and we give our probable cause, and they either approve the warrant or they don't. Or we can go drive down to the Wake County Detention Center and speak to a magistrate there.

Q    Okay. When you have those Zoom calls with the magistrate, are those calls recorded?

A    I don't think so.

Q    Do you know for sure whether they're recorded?

A    I'm not -- I have no idea. I've never asked.

Q    Understood. How long do those calls typically take?

A    It can vary. Sometimes, I've had -- shorter calls is probably two minutes, and I've had other calls that have been 10 minutes.

Q    Do you submit any written information to the magistrate in support of your probable cause?

A    For warrants or just arrest in general?

Q    To -- to get the arrest warrant from the magistrate, do you submit any written information?

A    Of -- of -- it's a felony warrant, we send a felony information report. A felony investigation report, I apologize.

Q    Do you send any written information for misdemeanors?

A    No.

Q    Is there a written application you have to fill out before you speak with the magistrate to let them know you have a warrant or what's coming?

A    Just the warrant application on our eWarrants website.

Q    Okay. And what information do you put in that warrant application on the eWarrants website?

A    Information that's related to the case, you know, case number, case file, who you are, what department you work for, the defendant, and the charges.

Q    Do you put any description of the underlying conduct?

A    As in the conduct of the charges itself?

Q    I'll restate it. Do you -- do you describe what evidence you have in support of probable cause in that form anywhere?

A    On the wording of the charges we fill in, it's because it's kind of a fill-in-the-blank kind of situation where they list the -- the charging language, and you put in what you have that meets those elements.

Q    Okay. Do you put any other written description of the evidence in that form at all?

A    It depends on the charges.

Q    Do you upload any documents in support of the -- of the warrant application to that form?

A    Again, it depends on the charges.

Q    And what charges might you upload something in support of them?

A    Like a DWI.

Q    Okay. What would you need to upload for DWI?

A    You can upload the forms that we use for Intoxilyzer, the affidavit needed for bringing the individual into the Intoxilyzer room for them to provide a breath sample. There's different forms of that nature.

Q    Do you have any written evidence that you're using to support probable cause, like an email or a text message or something? Is that something you would upload?

A    No. Usually, that is put into a case file.

Q    Okay. Does the magistrate have access to the case file?

A    No.

Q    Is there any other information you would submit to the magistrate in writing in support of an application for an arrest warrant?

A    No.

Q    Okay. What happens after the magistrate issues the warrant?

A    Normally, you are given a -- what's -- what's called the CR number, and it's basically the number for the warrant. The warrant has been approved, and from there, you can either try to attempt to serve yourself, or if it's in -- let's say the person lives in a different town or agency, notify that agency. Like, hey, let them know I just got a warrant for this individual, and maybe they might get served. Or you just kind of wait for it to get served on its own.

Q    Okay. So you mentioned you get a CR number. I assume that's a case number for the warrant?

A    Correct.

Q    How do you receive that CR number?

A    The magistrate will tell you that. Or you can look up at eWarrants, if the warrant's been approved.

Q    So does that happen relatively

immediately after the warrant's approved?

A    Correct.

Q    And you mentioned you can try to serve it yourself; is that right?

A    Correct.

Q    Or you said wait for it, or just wait for it to be served?

A    Correct.

Q    So how might it be served if you don't do it yourself? Like, how do you wait for it to be served?

A    Let's say someone's driving down the street. They're speeding, get pulled over. Police run them. Hey, you have a warrant. That's kind of, in some way, it can get served.

Q    Okay. Is there a time limit you have in which you're supposed to serve the warrant?

A    No.

Q    Okay. When might you choose not to immediately serve a warrant?

A    I'm not too sure. I guess it just kind of depends on what information you have, I guess, whether they're close by, they live in our jurisdiction. They might, you know, not serve it immediately. Whether -- or maybe if it's someone

who has a violent past, and who has threatened law enforcement, and threatened to barricade themselves, you might not want to serve that warrant immediately without maybe getting information on the house or getting possible the SWAT team involved somehow.

Q    Okay. So on the first example, you said, did you say a situation where you might not serve it immediately is if the person lives close by?

A    Yeah, maybe if they don't live in your jurisdiction, you might not -- may not be able to serve it immediately.

Q    Okay. But if the person does live in your jurisdiction, is that a situation where you might serve it immediately?

A    Yeah.

Q    Is -- is a situation where you might not serve the warrant immediately if you're unsure about the charge?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: I'm sorry. Can you repeat that one more time?

BY MR. BRUCE:

Q    Is a situation in which you might wait to

serve the warrant at a later date -- let me restate it. If you're unsure about the charge, is that a situation where you might wait to serve the warrant?

A    If the charge -- the warrant has been approved, then we just serve the warrant. That doesn't really -- that -- what you -- the question you had doesn't really correlate with that.

Q    Okay. Is there any situation where you might choose to interview the suspect even after a warrant has been issued?

A    I've never have done that. I guess you technically could, but I've never done that.

Q    Okay. So you technically could, instead of arrest the person, interview them even though there's a warrant that's been issued?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: Were you saying that instead of arresting them, just interview them? That's what -- I was kind of confused on that. I apologize.

BY MR. BRUCE:

Q    Yes. Instead of arresting them pursuant to the arrest warrant, interview them and ask them questions about -- about the underlying charge. Is

that an option?

A    And then arresting them, or just skipping
the arrest completely and then going to
questioning?

Q    I guess it might depend on what you learn
in the questioning, but questioning -- questioning
them before arresting them.

A    Usually, if it's a warrant that's been
served, I just kind of handle the warrant right
then and there.

Q    Okay. Interesting. How many times have
you personally sought an arrest warrant?

A    Me personally?

Q    Yes.

A    I couldn't give you a number off the top
of my head.

Q    Is it more than 10?

A    Yes.

Q    More than 20?

A    Yes.

Q    Okay. Have you ever been denied an arrest
warrant?

A    Yes.

Q    Do you know why you were denied the
arrest warrant?

A     They believed that an arrest warrant wasn't appropriate. And they believe that -- or, pardon me. They believed that the charges I had weren't appropriate, and they think I should try to seek different charges instead of the charges I was seeking.

Q     And when you say they, was that the magistrate?

A     Correct.

Q     Okay. How many times has that happened?

A     That I recall, just only one time.

Q     What type of charge were you seeking?

A     It was a worthless check.

Q     Okay. And the magistrate told you to seek a different charge?

A     Correct.

Q     And did you go back and -- and seek that charge that the magistrate suggested?

A     Correct. But I can't remember the outcome of the charges.

Q     Understood. And when did you first become aware of who Ms. Rachmuth is?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: The day of the arrest.

BY MR. BRUCE:

Q    Okay. At that time, were you aware she was a long-time resident of North Carolina?

A    No.

Q    Were you aware she had a family in North Carolina?

A    No.

Q    Were you aware that she is an independent journalist?

A    No.

Q    Were you aware that she is Jewish?

A    No.

Q    Were you aware that she had previously made complaints to the Holly Springs Police Department regarding cyberstalking and anti-Semitic harassment?

A    No.

Q    Had you looked up her -- her name in the -- in the reporting system at that time?

A    No.

Q    Before this incident, did you ever hear anyone at Holly Springs Police Department discuss Ms. Rachmuth?

A    No.

MR. BRUCE: That might be a good place to

take a quick break before we get into more
substantive stuff.

MS. BARBER-JONES: That would be welcome.

THE VIDEOGRAPHER: Okay. The time now is
3:54 p.m. We are now off the video record.

(A recess was taken)

THE VIDEOGRAPHER: We are back on the
video record. The time now is 4:02 p.m. Counsel,
you may proceed.

MR. BRUCE: Thank you, everybody. Hope you
had a good break.

BY MR. BRUCE:

Q    Just one follow-up on what we were
discussing before we went on break, Officer
Hernandez. You said that you were not aware that
Ms. Rachmuth had submitted complaints to the Holly
Springs Police Department prior to this incident;
is that correct?

A    Correct.

Q    If she had, though, is that something
that would be included in the reporting system that
you discussed earlier in your testimony?

A    No. When it comes to complaints, that's
all handled internally through a different report
system that I don't even have access to.

Q    Okay. So what types -- you did mention that reports to the police department were included in that system, right?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: Reports in the sense of reports that we generate and that we write, not necessarily reports of complaints or even traffic complaints, anything by that nature.

BY MR. BRUCE:

Q    I got you. So if someone just -- just reaches out to report a crime, but it's not investigated and written up a report, is that information included in the reporting system?

A    If a report number is generated, then it would be. I'm not too sure if -- so if someone were to come in and report something that a case number does not generate for, then no.

Q    Okay. So -- and if -- and if someone -- and if an officer does generate a report number and begins investigating a reported crime, is that information then stored in the reporting system?

A    Correct. But -- yeah.

Q    Okay. You mentioned that you did not become aware of who Ms. Rachmuth was until the day

of the arrest; is that right?

A    Correct.

Q    So were you involved in the investigation of the underlying incident at all?

A    No.

Q    And why not?

A    I was not there. I was not at work that day.

Q    Okay. Were you at all aware that there was an investigation going on that day?

A    No.

Q    When did you first become aware of the investigation?

A    The next morning at work, when I returned back to work, I was made aware. I asked what Officer Warren did yesterday, and Officer Marino, Officer Warren explained to me that they took out a warrant on an individual. At the time, they didn't give me clarification on who it was. And when I saw the copy of the warrant, I saw the address, and I was like, oh, that's -- that's our jurisdiction.

Q    Okay. So I want to follow up on a little bit of that. So Officer Warren and Officer Marino described what happened the day before when you came to work that morning?

A    Vaguely described what happened, other than just like, yeah, hey, what did you all do today? Oh, we didn't do much. We had this call. We took out a warrant on this woman over here. And that's kind of where it was left at.

Q    Okay. Did they describe their investigation any further?

A    They gave me a brief synopsis of what happened. They didn't really give me full detail of their entire investigation.

Q    Okay. And when they gave you that brief synopsis, what did they tell you?

A    Honestly, I couldn't remember exactly what the full -- the -- what it was that they told me. I just know they didn't go into great detail about what was said.

Q    Did they mention anything about an incident at Harris Teeter?

A    They -- they -- I believe they did mention something about an incident occurring at Harris Teeter. But like I said, I don't remember the full details of what was said.

Q    Did they describe what any of the witnesses they had, if any, they had spoken to said?

A    I don't remember.

Q    Did they mention anything about a post on social media?

A    They did mention a post on social media.

Q    Did you review that post?

A    No.

Q    Did you ask to review that post?

A    No.

Q    Why not?

A    Because like I said, it was -- they already had obtained an arrest warrant, and I was fully confident in Marino's abilities in being an FTO -- an FTO warrant for a day that I wasn't there.

Q    Did they mention any comments to the post?

A    I don't remember.

Q    Did you review any comments to the post?

A    No.

Q    So as we sit here today, you don't remember them mentioning any -- any comments to a social media post that they had discovered in their investigation?

A    Not that I remember, no, other than the original post that I -- that I saw.

Q    Okay. And you said you -- you didn't ask to review the social media post because you were confident in Officers Warren and Marino?

A    Correct.

Q    Did you believe you needed to make an independent determination of whether there was probable cause to conduct the arrest at that point?

A    No, because Officer Marino was the FTO for Warren yesterday, the day prior.

Q    Who was Officer Warren's FTO on -- on that day, on the arrest?

A    Day of the arrest, I was.

Q    Okay. So were you -- were you in charge of supervising Officer Warren in conducting the arrest that day?

A    Correct.

Q    Okay. As his FTO, was it your responsibility to ensure there was probable cause to -- or there was enough evidence to support probable cause to conduct that arrest that day?

A    The warrant was already sworn out, and that's all we needed for the arrest.

Q    Were you ever consulted about whether cyberstalking was the appropriate charge to bring?

A    No.

Q    Did you review any part of the warrant application?

A    No.

Q    Did Officer Warren or Officer Marino describe what evidence they presented to the magistrate in order to obtain the warrant to you?

A    No.

Q    Once they gave you that brief synopsis, did you believe cyberstalking was the appropriate charge?

A    I -- I believe so, yeah.

Q    Why did you believe so?

A    Because he also informed me that they were looking into the correct charges. They said -- they advised me they reviewed the elements handbook that we have at the police department. And they also spoke to a supervisor during that time, in which they were able to come to the conclusion that cyberstalking was indeed the correct charge.

Q    So Officers Warren and Marino, when they were giving you a brief synopsis on what happened, they -- they stated they had reviewed the elements book; is that right?

A    Correct.

Q    And they mentioned that they consulted

supervisors?

A    Correct.

Q    Did they say what supervisors they consulted?

A    I know they spoke to Lieutenant Ottoway, who at that time was over our patrol division. And I'm not too sure if they did speak to our sergeant at the time, which was Sergeant Bock, I believe.

Q    Did they mention anybody else that they spoke to?

A    Oh, magistrate.

Q    So that -- they mentioned that they spoke to Lieutenant Ottoway, maybe Sergeant Bock, and the magistrate?

A    Correct.

Q    Did they give you any other information that morning about the charge before you all went to conduct the arrest?

A    No.

Q    Did you review the incident report that morning before you went to conduct the arrest?

A    No, I did not.

Q    Did you ever review the incident report?

A    No, I did not.

Q    Were you required to as Officer Warren's

FTO?

A     Since that report was completed on a day that I was not there and not his primary FTO that day, I did not deem it to be necessary at that time.

Q     Okay. Did you -- did you review any other materials Officer Warren prepared in the course of the investigation?

A     During this investigation, no. Other than the arrest report. I apologize.

Q     I'm sorry. What -- can you --

A     The -- the -- the supplement to his initial report, which was the -- the arrest report, I did review that, because I was there with Officer Warren that day.

Q     Okay. So you did review the supplement to the incident report?

A     Correct.

Q     And when you reviewed the supplement, is that -- is that a separate document, or is it part of the incident report?

A     It's part of the incident report in the sense of, like, it obviously is related in the same case number. However, it's just added information, just stating that the defendant was arrested at

that time and date.

Q    Okay. Did you -- when you reviewed the supplement, did you review any other information in the incident report that was written the day before?

A    No.

MR. BRUCE: Can we pull up tab 8, please?

THE REMOTE TECH: Stand by.

BY MR. BRUCE:

Q    Okay. So this will be marked as Exhibit 8. Do you recognize this document at all, Officer Hernandez?

(Exhibit 8 marked)

A    I believe this is going to be the case number for that incident.

MR. BRUCE: Okay. Let's scroll down to the next page, see if we can get a better look.

THE VIDEOGRAPHER: And counsel, I can give him control if you need me to.

MR. BRUCE: I think we can just keep control for now. I can walk us through it, but I can -- it would be helpful down the road.

THE VIDEOGRAPHER: Certainly.

BY MR. BRUCE:

Q    Do you recognize this page of the

document?

A    I mean, yeah, that's -- I mean, that's kind of our -- our template for our reports, but, I mean, I don't really remember ever really looking at this document specifically.

Q    Okay. But this is what a normal incident report looks like?

A    Right.

Q    Okay. And can you tell whether this is the -- the incident report created for the complaint against Ms. Rachmuth?

A    I guess. I mean, I -- I -- honestly, I'm not even familiar with the -- yeah, it's the correct one.

Q    Okay. Where would the -- you mentioned you reviewed the supplement or the arrest report. Where would that be included in -- in this incident report?

A    So during this time, like I said, we had a different operating report writing system, so it should be just added under a another report. So if you scroll down towards the narrative, I believe there might be another attached narrative to it.

MR. BRUCE: Okay. So let's scroll down until we get to the narrative section. Okay. Is

this -- let's stay on that other page. Can we scroll down a bit?

BY MR. BRUCE:

Q    Is this the narrative section you're talking about?

A    Correct. That is going to be the initial narrative section.

MR. BRUCE: Okay. And so can we scroll to the next page?

BY MR. BRUCE:

Q    Is this still the initial narrative section?

A    Yes.

MR. BRUCE: Okay. Can we keep scrolling? Keep scrolling.

BY MR. BRUCE:

Q    Because it says case supplemental report. Is this the supplement that you reviewed?

A    Correct.

Q    Okay. Did you review any other portion of the incident report?

A    I didn't -- I did not.

MR. BRUCE: Can we scroll back up to -- I think it's the third page. Let's go to the fourth.

BY MR. BRUCE:

Q    Officer Hernandez, do you see in the middle of the page here, under the -- the empty box, it says suspect hate/bias-motivated, anti-Islamic, Muslim. Do you see that?

A    Yes.

Q    Do you know what that means?

A    That means it was flagging NIBRS for a possible hate crime.

Q    And are there any standards and officers supposed to use when they decide whether to flag something as a possible hate crime?

A    Honestly not -- I'm not too familiar because it's not something that I deal with a whole lot.

Q    Have you personally ever -- ever flagged an incident as a hate crime?

A    No. Actually, I -- that's why I'm not very familiar with it, because I've never actually dealt with something that could -- would consider that.

Q    Okay. And you said you didn't review this part of the report, right?

A    Correct.

Q    Do you know who would have put that designation in this report?

A    I'm not too sure.

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: I'm not too sure. Possibly Officer Marino.

BY MR. BRUCE:

Q    Okay. So possibly Officer Marino?

A    Possibly Officer Warren. I don't know.

Q    Was there anyone else who would have had access to input information into the report?

A    Not to my knowledge.

MR. BRUCE: Okay. We can take that down.

BY MR. BRUCE:

Q    So after you were read into what happened the day before when you got to work that morning, what happened next?

A    I saw that the defendant lived in -- in town, and I advised them, hey, like I know the address may say Apex, but that is our jurisdiction, so we can go serve this warrant and close off the case like that.

Q    Okay. And how did you know that it was in your jurisdiction, even though it said Apex?

A    Because I'm familiar. I've worked in this town for X amount of years. I'm familiar with where

our neighborhoods are that might have an Apex
address, but are still Holly Springs Police
Department's jurisdiction.

Q    Okay. Were Officers Warren and Marino
also familiar with whether the address was in your
jurisdiction?

A    They weren't familiar with the address at
the time. I responded to a call in that
neighborhood before, but so they probably weren't
familiar with the street name.

Q    Okay. You said you responded to a call in
that neighborhood before. Was it at Ms. Rachmuth's
house?

A    No.

Q    So after you determined it was in your
jurisdiction, what did you do next?

A    I suggested we go serve the warrant, and
we made our way towards Ms. Rachmuth's

Q    Okay. So you suggested that the three of
you should go serve the warrant?

A    Correct.

Q    Did you ever discuss whether you should
interview Ms. Rachmuth before serving the warrant?

A    No.

Q    Why not?

A    Because we already had the warrant in our hands, so we went ahead and just handled the warrant that we needed to handle.

Q    At that time, did you believe cyberstalking was an appropriate charge?

A    Oh, yes.

Q    What was your role in serving the warrant or conducting the arrest?

A    I stood there as Officer Warren placed Ms. Rachmuth in handcuffs. I just was observing to Warren as his FTO.

Q    Is -- would Officer Warren be able to conduct an arrest or serve a warrant without you present as his FTO?

A    As long as another FTO is in -- in -- that he's riding with another FTO. Doesn't necessarily have to be me. It could be another FTO field training for that day.

Q    But he has to have another FTO present at that point?

A    Correct.

Q    And why did Officer Marino join?

A    Because, so normally when serving a warrant, we consider having at least two officers. Obviously, I know Officer Warren and I were

together. However, with field training purposes, we only considered that as one unit compared to having two units since it's me and him riding in the car together, and he's being trained. So Officer Marino was considered that second unit.

Q Okay. Do you remember what time you arrived at Ms. Rachmuth's home?

A No, I don't remember the time.

Q Do you know what day of the week it was?

A It was a Sunday morning.

Q Okay. Is it normal to serve an arrest warrant on a Sunday morning?

A Yeah. I mean, it's pretty normal to serve a warrant on any time.

Q How many patrol cars did you bring?

A Two.

Q Okay. And who was riding where?

A I was driving with Officer Warren in the passenger seat. Officer Warren was driving, and Marino was in his own vehicle.

Q And was there anybody else with you?

A No.

Q And where did you park when you got to Ms. Rachmuth's house?

A We parked in a cul-de-sac further down

from her house.

Q    Why did you park in a cul-de-sac further down from her house?

A    Because we believe that was the best strategic, tactical standpoint from the residence. We never park in front of a house when serving a warrant. And if I remember correctly, I remember the tree line was perfectly blocking the -- our view from the house and her view -- well, of the house's view from our vehicles.

Q    And why was choosing a location where the tree line blocked her view from your vehicles important?

A    It's just basic law enforcement training when it comes to officer safety and officer safety techniques. When it comes to serving warrants, we just want to have the best tactical advantage.

Q    At that time, did you have any evidence that Ms. Rachmuth was dangerous?

A    No, but this is basic law enforcement training.

Q    Did you have any evidence that she would try to escape if you approached?

A    No.

Q    What door did you approach her house

from?

A    The front door.

Q    Why not approach from the back door?

A    Because the front doors are typically where we kind of meet contact with people.

Q    After you approached from the front door, what happened?

A    As we approached from the front door, the defendant walked out of the house, and we explained to her that she had a warrant.

Q    Okay. Did you explain to her anything else?

A    I did not. Officer Marino did. He explained a little bit more of -- more information of the incident.

Q    Was Ms. Rachmuth cooperative?

A    At first, she was -- I would say yes. You know, I would say yes. I don't think she -- at first, she was kind of more confused and startled more than than being uncooperative.

Q    At any point during the arrest, did you have any reason to believe she would harm officers?

A    No.

Q    Did you have any reason to believe she was dangerous?

A    No.

Q    Were you aware at that time that Ms. Rachmuth's children were in the home?

A    No.

Q    Were you aware that her husband was home?

A    Yes.

Q    How'd you become aware of that?

A    He stepped out as well.

Q    At any point during the arrest, did Ms. Rachmuth threaten officers?

A    No.

Q    Were you wearing a body-worn camera during the arrest?

A    Yes.

Q    Was it activated?

A    Yes.

Q    We're going to pull up -- this is going to be marked as Exhibit 10, but it's the video, so I'm going to pull it up on -- on my screen. Give me one second. Can you see that, Officer Hernandez?

         (Exhibit 10 marked)

A    Yes.

Q    Can you tell from just looking at this still screen what we're looking at?

A    Yeah. I am currently just peeking into

the vehicle to make sure that nobody's sitting inside of the car before we go serve this warrant.

Q   Okay. So is this the footage from your body-worn camera?

A   Correct.

Q   I'm going to start us at about 30 seconds, just because I think it takes some time for the sound to turn on.

A   Yeah, I believe it does.

Q   Okay. We're going to watch the first couple minutes here.

(A recording was played)

Okay. We're going to pause there. So at the start of the video, you were explaining why you all were there and what was going on to Ms. Rachmuth; is that right?

A   Correct.

Q   Why were you explaining and not Officer Warren?

A   I just wanted to. Officer Warren was a newer officer, that I just wanted to try to explain as much as I possibly could for him.

Q   Okay. At this point, had Ms. Rachmuth given any indication she wouldn't cooperate?

A   At this point, I'm seeing from the body

camera footage that I had told her many times to place her hands behind her back, and she wouldn't. I mean, other than that, I don't see anything else.

Q    And you testified earlier that she seemed, you know, more confused than uncooperative; is that right?

A    Correct.

Q    She asked you all to put a shirt on; is that correct?

A    She asked -- I don't remember exactly what she just referred to putting on, but I -- if I think I remember, I think she wasn't wearing any shoes when she first stepped outside, and I thought that's what she was referring to when -- when she went to ask for clothes. And usually, we don't allow people to enter back into the homes.

Q    Okay. So when she asked for clothes, you thought she was requesting shoes?

A    Correct. Because I -- I mean, I could be mistaken that she was not wearing any shoes during the time she opened the door.

Q    Okay. Did you ever let her put on a shirt or different clothing?

A    Once we actually arrived in the parking lot of the -- of the detention center. And she was

able to put shoes on at the front porch of the house.

Q   Okay. But you didn't let her put on a new shirt or new clothes before you -- you walked her down back to the patrol vehicles; is that right?

A   No.

Q   I'm going to skip ahead a few seconds. Right here.

(A recording was played)

Okay. So there in this portion of the video, she informs you that she experiences panic attacks; is that right?

A   Correct.

Q   Based on your training, once she notified you that she experiences panic attacks, did you have any obligation to act in any sort of way?

A   I just had to monitor her and make sure that, you know, nothing changed her demeanor or -- and, you know, if something were to change, I would handle it accordingly.

Q   Okay. Did you monitor her?

A   Yeah, I kept an eye on her, and I did not observe anything that made me believe that she was indeed having a panic attack.

Q   Okay. And you said you would handle it

accordingly. What do you mean by that?

A    Make sure that she's had -- that -- that she was okay, and she was cognizant enough for me to call EMS to then get there and do whatever they determine is necessary.

Q    She specifically asked to bring water in the car in case she experiences a panic attack; is that right?

A    Correct.

Q    And did you let her bring water in the car?

A    I did.

Q    Did you ever give her access to that water while she was in the car?

A    I wasn't able to. No, sir.

Q    Why weren't you able to?

A    Because she was handcuffed behind her -- behind her back, and I had the bottle of water in my possession.

Q    Okay. So did you ever intend to give her access to the water in the car?

A    I intend bringing the water with her and giving it to her when she needed it at the facility, but -- and there's no possible way for me to give her that water at that moment.

Q    Okay. But she asked if she could have water in the car; is that right?

A    Correct. And she had the water in the car.

Q    But she didn't get to drink the water in the car?

A    Unfortunately, no.

Q    Let's skip ahead a few more seconds.

MS. BARBER-JONES: Do you guys mind if we take a 30-second break here? I'm just having a technical difficulty.

MR. BRUCE: Sure. Is it -- is it anything with me?

MS. BARBER-JONES: No, no. It's the battery on my laptop.

THE VIDEOGRAPHER: Not a problem. The time now is 4:30 p.m. We are now off the video record.

(A recess was taken)

THE VIDEOGRAPHER: The time now is 4:33 p.m. Counsel, you may proceed.

BY MR. BRUCE:

Q    Okay. Let me share my screen again so we can get back to the video. Can you see that okay, Officer Hernandez?

A    Yes, I can.

Q    All right. I'm going to make sure we're at the right time mark. Okay. We'll play it from here.

(A recording was played)

Okay. So here, you're walking back to the patrol car; is that right?

A    Correct.

Q    And are those your cars parked down the street a bit?

A    Yes.

Q    You mentioned that you parked far away for officer safety; is that right?

A    Correct.

Q    But why park directly in front of another house?

A    I mean, that was just a parking spot that Officer Warren decided to park. I didn't think it was an issue.

Q    Is -- is there any potential for danger for parking in front of another house where you're not serving a warrant?

A    I mean, it's -- we just decide not to park in front of necessarily the house that we're serving the warrant on. There's really no indicators that we believe that the house that is

not the house that we're serving a warrant on would be an issue.

Q    How many other houses were at the end of this cul-de-sac?

A    I don't remember. I guess that I can see in the photo at least four.

Q    Okay. Did you see any neighbors outside when you were parking or walking back to the car?

A    No.

Q    Did you see any neighbors peering through the windows?

A    No.

Q    I'm going to skip ahead another few seconds.

(A recording was played)

Okay. So we saw when you got in the car, you had the water bottle with you; is that right?

A    Correct.

Q    Where did you put the water bottle?

A    I can't remember. I guess in the dashboard. I might have held it in my hand the entire time or -- I mean, I don't remember.

Q    Okay. Did you ever give it to Ms. Rachmuth?

A    No.

Q    Did you ever intend to let her have the water in the vehicle?

A    In the vehicle, I wasn't able to provide that for her.

Q    Why weren't you able to provide that for her?

A    Because she was handcuffed with her hands behind her back, and we're driving in a motor vehicle with a partition between us two.

Q    And you knew that she would be handcuffed in the back seat when you brought the water with you to the car, right?

A    Correct.

Q    I'm going to skip ahead further as you all are traveling down the road. I will say that some of the audio here is hard to hear, so I just want to ask you questions about it, and, you know, we'll -- we'll -- we'll do our best.

A    Okay.

(A recording was played)

Q    Okay. So I realize that it's difficult to hear what Ms. Rachmuth was saying in the back, but do you recall what Ms. Rachmuth asked you here?

A    No, I do not.

Q    Did she ask you for water?

A    I do --

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I do not remember.

BY MR. BRUCE:

Q    Did you ever give her water?

A    At the Wake County Detention Center, I did give her water when I was able to.

Q    Did she indicate she was having a panic attack?

A    I do not remember.

Q    Is it possible she indicated she had a panic attack, and you couldn't hear her?

A    I don't remember.

Q    So as we sit here today, you don't remember whether she asked for -- or, she stated whether she was having a panic attack in the car?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I do not remember if she was having a panic attack in the car.

BY MR. BRUCE:

Q    And you can't say whether she did not say she was having a panic attack in the car?

MS. BARBER-JONES: Objection. You can

answer.

THE WITNESS: Can you repeat that question for me again?

MR. BRUCE: I'll move on.

BY MR. BRUCE:

Q    I'm going to skip to when you get to the detention center.

(A recording was played)

Okay. So that is the end of your body-worn camera footage. There was a portion there where something was covering up the camera. What was covering up the camera there?

A    Her sweatshirt.

Q    Okay. Is it appropriate to cover up the camera while it's activated?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I believe I -- was a complete mistake. I probably had her camera -- I mean, the sweatshirt probably leaning against my shirt as I was pouring water on, --helping her drink water.

BY MR. BRUCE:

Q    Understood. And -- and at that point, you finally give her a sip of water; is that right?

A    Correct.

Q    And just based off of what I was looking at on the timestamps there, that's about 18 minutes after she first asked for water at her home. Does that sound about right?

A    I guess so.

Q    Okay. We'll take this down. Did you communicate with the detention center staff at any point before Ms. Rachmuth's arrest about --

A    No.

Q    Did you communicate with the detention center staff after her arrest about Ms. Rachmuth?

A    No.

Q    And after you dropped Ms. Rachmuth off at the detention center, what did you do next?

A    Went back to the police department to -- to write the arrest report -- well, for Warren to write the report.

Q    Okay. Did you -- did you help him write the arrest report?

A    Other than sitting down next to him as he wrote it himself, I just looked it over.

Q    Okay. Did you do anything else with respect to this case after you looked over the arrest report?

A    No.

Q    Okay. Are you aware that the District Attorney dismissed the charge the day after the arrest?

A    I was aware they dismissed the charge. I don't remember when I was made aware of them.

Q    Okay. Who made you aware that they dismissed the charge?

A    Lieutenant Ottoway.

Q    What did Lieutenant Ottoway tell you?

A    She just told me that the charges were dismissed against Ms. Rachmuth. I don't remember verbatim what she said, but it was in person.

Q    Did she give any -- did she say anything else about Ms.Rachmuth besides the charge was dismissed?

A    No, no.

Q    Are you aware that the reason the District Attorney gave for the charge being dismissed was that the described conduct does not meet the elements of the offense?

A    Yes.

Q    And when did you become aware of that?

A    Probably about a month ago.

Q    Okay. So not -- not at the time you were

told?

A    No. Not at the time I was told, no.

Q    What was your reaction when you learned the charge was dismissed?

A    I was surprised, more confused. But at the same time, it was kind of one of those things where, like, all right, well, let's go on about our day. It was not something I wanted to really dwell on or anything.

Q    Why were you surprised and confused?

A    Because I've never had a charge like that just dismissed within 48 hours, 72 hours of it being taken out. Not very common for me to hear about that happening or for it to be happening with us.

Q    Did you think that because the charge was dismissed so quickly, that cyberstalking may not have been the appropriate charge?

A    That did not come to my mind, no.

Q    As you sit here today, do you still believe cyberstalking was the appropriate charge?

A    Yes.

Q    Why?

A    Because I felt like during that time, the officers made a great decision, and reviewing

everything from the elements, I feel like it still fits criteria.

Q   Even based on the brief synopsis you said they gave you earlier?

A   I had more -- it was more of the judgment that I believe these officers were capable of doing their job and made the right decision.

Q   Okay. Did anyone at Holly Springs Police Department conduct any review or investigation into why the charge was dismissed so quickly?

A   I -- that I know of, no.

Q   Were you ever subject to any internal investigation or disciplinary action with respect to the charge?

A   No.

MR. BRUCE: Katie, I've got maybe 20 or 30 minutes. Do you want to take a break and -- and finish up, or just push through?

MS. BARBER-JONES: I think we're fine to push through.

MR. BRUCE: That sounds good. We'll do that, and we'll get out of here.

BY MR. BRUCE:

Q   Officer Hernandez, are you aware that Ms. Rachmuth filed multiple complaints with the Holly

Springs Police Department between 2021 and 2023 regarding anti-Semitic harassment?

A    No.

Q    So were you personally involved in any investigations about those complaints?

A    No.

MR. BRUCE: Can we pull up tab 11, please?

(Exhibit 11 marked.)

THE REMOTE TECH: Stand by.

BY MR. BRUCE:

Q    Officer Hernandez, do you recognize this document at all?

A    No. I mean, it's an email from chief, I think. Or, no. From Sloan to chief -- chief.

Q    Okay. Have you ever reviewed this document at all?

A    No.

Q    Okay. So yes, you mentioned that it says it's an email from Ms. Rachmuth to Paul Liquorie at Holly Springs, NC.Gov, and you said that's the Holly Springs police chief; is that right?

A    Correct.

Q    And you see, it's dated Thursday, December 8, 2022, at 7:56 p.m.; is that right?

A    Yep.

Q    And actually want to go down to the email before, which is December 8th, earlier in the day, from Chief Liquorie. And do you see that where he says, Ms. Rachmuth, thank you for forwarding the information about this.

Actually, before we read that, let's go down since we -- we went to that page anyway, the next page. Okay. Do you see this email says it's from Sloan Rachmuth, dated Thursday, December 8, 2022, to Paul Liquorie. Do you see that?

A    Yeah.

Q    Okay. She says, Chief Liquorie, in my opinion, members of the NCC4CR group committed ethnic intimidation by emailing me and hundreds of others anti-semitic material, as well as sharing my home address via video and email repeatedly. Do you see that?

A    Yep.

Q    You mentioned you had training about hate groups. Do you know anything about NCC4CR group?

A    Nope.

Q    Okay. You see -- and you see that Ms. Rachmuth says that that group is emailing me and hundreds of others anti-Semitic material. You see that?

A     Yes.

Q     When Officers Warren and Officers Marino filled you in on -- on their investigation, did they mention having hundreds of emails about -- from Ms. Rachmuth?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: No.

BY MR. BRUCE:

Q     I mean, she also says, as well as sharing my home address via video and email repeatedly. Do you see that?

A     Yes.

Q     When officers Warren and Marino filled you in on their investigation, did they mention what -- whether Ms. Rachmuth had shared the victim's home address at all?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: No.

BY MR. BRUCE:

Q     Okay. Now, let's scroll back up to the -- the email we just read earlier. Okay. So this is Chief Liquorie's response. Ms. Rachmuth, thank you for forwarding the information about the dismissal

of the charges in Polk County.

Having worked cases against security threat groups throughout my career, I can understand your frustration and fear. We are actively working on your case. Due to the multiple jurisdictions involved and other complexities, we are consulting with our other law enforcement partners to ensure we methodically go through all the materials you have provided us, and are carefully considering the North Carolina general statutes, as they may apply.

I also realize this course of conduct has occurred over a long period of time and appears to be escalating, but please be patient as we conduct the investigation.

Do you see that?

A     Yep.

Q     When Officers Warren and Officer Marino filled you in on their investigation before, did they mention whether the victim felt frustration or fear?

A     Yes.

Q     They said she did feel frustration and fear?

A     She felt fear.

Q     Okay. Did Officers Warren or Marino, to your knowledge, ever consult with other law enforcement partners in the course of their investigation?

A     Not that I'm aware of.

Q     And did officers Warren or Marino ever indicate whether they had evidence that any harassment against the victim was escalating?

A     I'm not too sure.

Q     Okay. So you're not sure whether they had evidence that any harassment was escalating?

A     Not that I'm aware of, no.

MR. BRUCE: We can take that down. And can we pull up tab 12?

(Exhibit 12 marked.)

THE REMOTE TECH: Stand by.

BY MR. BRUCE:

Q     Officer Hernandez, do you recognize this document at all?

A     It's another email, but I've never seen it before.

Q     Okay. And we see that it says it's from Sloan Rachmuth to Paul Liquorie at Holly Springs, NC.Gov. Is that Chief Liquorie again?

A     Yep.

Q    Okay. And it says it's dated Monday, January 9, 2023; is that right?

A    Yep.

MR. BRUCE: Okay. Let's scroll down to Chief Liquorie's initial email at the bottom of this page. Sorry. Back to the first page. And if you scroll to the bottom? Yeah, a little bit further.

BY MR. BRUCE:

Okay. So at the bottom here, we see on January 9, 2023, at 2:37 p.m., Chief Liquorie wrote, Dear Ms. Rachmuth, I understand you and your family are now experiencing frustration, apprehension, and fear, and I personally am sorry you feel that way.

Holly Springs Police Department investigators have diligently been sorting and analyzing the substantial amount of documentation you provided in their investigation. They also have consulted with the North Carolina State Bureau of Investigation, NCSBI. After an extensive evaluation of the information you have presented by our department in consultation with state officials, it has been concluded that no criminal North Carolina general statutes have been violated.

Although upsetting, the materials examined fall under First Amendment-protected speech to include postings of public records. Other postings do not meet the necessary statutory elements to be presented for a judicial review for criminal charges and/or lack direct legal standing.

Do you see that?

A    Oh, yeah.

Q    When Officer Warren and Officer Marino filled you in on their investigation, did they say whether they ever consulted with NCSBI?

A    No.

Q    We saw that Chief Liquorie stated that, in his opinion, the materials examined fall under First Amendment-protected speech. Do you see that?

A    Yes.

Q    Did Officer Warren or Officer Marino ever consider whether Ms. Rachmuth's conduct fell under First Amendment-protected speech?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I'm not sure.

BY MR. BRUCE:

Q    Did they tell you whether they evaluated whether it fell under First Amendment-protected

speech?

A    No.

MR. BRUCE: Okay. We can take this down.

BY MR. BRUCE:

Q    Officer Hernandez, prior to November 2024, how many cyberstalking investigations had you personally conducted?

A    Maybe one other one.

Q    Do you recall what conduct was at issue there?

A    Honestly, I don't remember. It was when I was in field training myself.

Q    Okay. Do you remember the case number at all?

A    No, I do not.

Q    And since November 2024, how many cyber stalking investigations have you personally conducted?

A    None.

Q    Okay. Did the cyber stalking investigation you conducted while you were in field training, did that involve a hate- or bias- motivated crime?

A    No.

Q    In that case, did you seek an arrest

warrant?

A     Yes.

Q     Did you execute that arrest warrant?

A     Yes.

Q     Do you know whether that charge was dismissed or not?

A     I believe it might have been dismissed.

Q     So the two times you've executed an arrest warrant for cyberstalking, they've both been dismissed; is that right?

A     Yes.

Q     Are you aware that Ms. Rachmuth's mug shot was widely disseminated on social media following her arrest?

A     No.

Q     Are you aware that Ms. Rachmuth has been diagnosed with exacerbated PTSD and required therapy as a result of her arrest?

A     No.

Q     What's your reaction to learning that information?

A     I'm sorry that she feels that way.

Q     Officer Hernandez, do you have a separate cell phone that you use for work and personal use?

A     No.

Q    Okay. So you use the same cell phone for both work and personal use?

A    Correct.

Q    Did you search that cell phone for documents or information relating to Ms. Rachmuth or her arrest?

A    What do you mean?

Q    In response to a discovery request that we sent in this case, have you searched that cell phone that you use for work for any pictures or messages that might have to do with Ms. Rachmuth or her arrest?

A    No.

Q    Okay. Do you have any pictures or messages on that phone?

A    No.

Q    About her, about Ms. Rachmuth?

A    No.

Q    Do you have any pictures or messages on that phone about Ms. Rachmuth's arrest?

A    No.

Q    Have you communicated with anyone on that cell phone via text or email about Ms. Rachmuth after her arrest?

A    No, other than the other two officers

involved.

Q    Okay, so you've communicated with the two officers about Ms. Rachmuth since her arrest?

A    Correct.

Q    Using your cell phone?

A    Yeah, probably. I mean, I -- you know, I'm not too sure.

Q    Okay. Do you know how many times you've communicated about her since her arrest on that cell phone?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I don't know. Probably a couple of times, just trying to figure out what's going on.

BY MR. BRUCE:

Q    Do you recall what you said in those messages?

A    No.

Q    Do you have any pictures or recordings relating to Ms. Rachmuth or the arrest on -- on that cell phone?

A    No.

Q    Do you have any field notes or any other documents relating to the arrest on that cell

phone?

A    No.

MR. BRUCE: Okay. I'm going to take a quick break just to review my notes, but -- and we'll come back and should be wrapping up.

THE VIDEOGRAPHER: Okay. The time now is 4:58 p.m. We are off the video record.

(A recess was taken)

THE VIDEOGRAPHER: We are back on the video record. The time now is 5:06 p.m. Counsel, you may proceed.

BY MR. BRUCE:

Q    Okay. Officer Hernandez, I just have a few questions to follow up with on what we were just discussing, and then -- and then we'll be all done.

A    Okay.

Q    Do you understand that you're under an obligation to search all your phones and -- and devices for information that may be responsive to discovery requests in this case?

A    I am now, I guess.

Q    Have you searched those devices for -- for any information about Ms. Rachmuth or the arrest?

A    Oh, so when it comes to, I guess, the phone text messages, it had nothing to do with the actual arrest itself. It was more of actually the posting that she made on X about us and other fellow officers. It was -- had nothing to do with the actual arrest.

Q    Okay. But it had to do with Ms. Rachmuth, correct?

A    And the postings about pictures of myself and other officers, yes.

Q    Okay. And so you mentioned you have some messages between the other officers about Ms. Rachmuth on your phone; is that right?

A    I believe I did. However, that was -- I've had two phones since that incident occurred.

Q    Okay. Are those messages still on your phone?

A    No.

Q    Are they backed up to the cloud anywhere?

A    No.

Q    When -- when was the phone that those messages were on destroyed, or when did you get a new phone?

A    November 2024 and February 2026.

Q    Okay. Since February 2026, have you

exchanged any messages with the other officers
about Ms. Rachmuth?

A    No.

Q    Do you have any emails between the other
officers -- officers about Ms. Rachmuth?

A    No.

Q    What messages did -- did you use to
communicate -- sorry. What -- what messaging apps
did you use to communicate on your old phone about
Ms. Rachmuth?

A    Maybe just a quick link on the texting
app, just like, hey, here's -- my buddy sent me
this photo of the post from X.

Q    Okay. Did you use any, like, social media
messaging apps to communicate?

A    No, no.

Q    It was just the built-in text message
feature?

A    Correct.

Q    Do you have any communications on your
cell phone with anyone else besides the three
officers or your legal counsel about Ms. Rachmuth?

A    No.

Q    Have you deleted any messages that you've
sent on your device about Ms. Rachmuth?

A    No.

Q    So do you currently have any messages between the other officers or anyone else on a personal cell phone or laptop about Ms. Rachmuth?

A    No.

MS. BARBER-JONES: Object to form.

THE WITNESS: Oh, sorry. No.

BY MS. BRUCE:

Q    Have you had any oral communications with the other officers without counsel present about Ms. Rachmuth?

A    Just when the incident first occurred, saying, you know, talking about the incident, seeing if this were going to go anywhere. Other than that, no.

Q    When you say when the incident first occurred, what do you mean?

A    I guess once we first were made aware that this was going to be taken to court.

Q    Okay. So when the lawsuit was filed; is that -- is that correct?

A    Yes.

Q    Okay. And what did you say to the other officers?

A    I don't remember. It was just verbal

conversations.

Q    You mentioned you had messages on your old phone about other posts that Ms. Rachmuth had posted since -- since the arrest?

A    Correct.

Q    Did you have verbal conversations about those posts at all with the other officers?

A    Maybe. I can't remember.

Q    And what did -- what did you or the other officers say in those conversations?

A    We just talked about how people in the comments were making fun of us and stating things about us.

Q    Okay. Anything else?

A    That's kind of about it.

Q    What did you do with the -- the -- the first phone that you said you -- you got rid of in November of 2024?

A    I traded it in. I don't remember where it went to.

Q    Okay. And what about the -- the second phone?

A    Same thing. Traded it in.

Q    Okay. Did you ever back up the data on those phones at all?

A    No.

Q    Okay. Do you -- do you use, like, iCloud
or any other sort of backup thing?

A    No, not for -- the only thing I save is
photos, and that's the only thing I save. I don't
save text messages or anything like that.

Q    Okay. And did you have any screenshots of
posts saved in your photos that you saved?

A    No. Sorry.

MS. BARBER-JONES: Let him finish asking
his question.

MR. BRUCE: That's all the questions I
have.

MS. BARBER-JONES: I do not have any
questions. Thank you.

THE VIDEOGRAPHER: Okay. Stand by. This
marks the end of the videotaped deposition of Mr.
Edgar Hernandez. The time now is 5:11 p.m.

Counsel, can I have any video orders?

MR. BRUCE: We'll order the transcript and
the video.

THE VIDEOGRAPHER: Thank you. And Ms.
Jones, Counsel Jones?

MS. BARBER-JONES: Sorry. We will offer --
order the e-trans with exhibits. And I am not sure

about the video just yet.

THE VIDEOGRAPHER: Okay. Thank you.

THE REPORTER: All right. Excellent.
Please stand by. Taking us off the record.

(Off the record at 5:12 p.m.)

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Spencer Motamedy, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Notary Registration No.: 00386791

My Commission Expires: 02/28/2029

*Spencer Motamedy*

_____

SPENCER MOTAMEDY, NOTARY PUBLIC,

FOR THE COMMONWEALTH OF VIRGINIA

June 5, 2026

CERTIFICATE OF TRANSCRIBER

I, Marti Schreiber, do hereby certify That this transcript was prepared from the digital Audio recording of the foregoing proceeding; that Said proceedings were reduced to typewriting under My supervision; that said transcript is a true and Accurate record of the proceedings to the best of My knowledge, skills, and ability; and that I am Neither counsel for, related to, nor employed by Any of the parties to the case and have no interest, financial or otherwise, in its outcome.

*Marti Schreiber*

_____

MARTI SCHREIBER

PLANET DEPOS, LLC

June 5, 2026

**A**

**abilities**
54:12
**ability**
10:18, 102:11,
103:8
**able**
30:5, 31:18,
31:20, 36:9,
36:13, 36:15,
36:17, 37:20,
38:4, 45:11,
56:18, 65:12,
72:1, 73:15,
73:16, 77:3,
77:5, 78:8
**about**
8:7, 9:23,
11:1, 15:5,
17:13, 19:6,
20:5, 20:14,
20:16, 20:23,
21:3, 23:16,
23:19, 23:23,
24:5, 24:8,
29:1, 35:11,
36:2, 39:22,
45:19, 46:2,
46:25, 53:16,
53:17, 53:20,
54:2, 55:23,
57:17, 61:5,
70:6, 77:17,
80:3, 80:5,
80:9, 80:12,
81:15, 81:24,
82:7, 82:14,
84:5, 85:5,
85:19, 85:20,
86:4, 86:25,
93:17, 93:20,
93:23, 94:3,
94:9, 95:24,
96:4, 96:9,
96:12, 97:2,
97:5, 97:9,
97:22, 97:25,

98:4, 98:10,
98:13, 99:3,
99:6, 99:11,
99:13, 99:15,
99:21, 101:1
**academy**
12:17
**access**
32:23, 42:23,
50:25, 63:10,
73:13, 73:21
**accordingly**
72:20, 73:1
**accurate**
102:10, 103:7
**accused**
19:24
**act**
72:16
**action**
1:7, 83:13
**activated**
69:15, 79:15
**actively**
87:5
**actual**
96:3, 96:6
**actually**
35:20, 35:24,
36:7, 62:17,
62:18, 71:24,
85:1, 85:6, 96:3
**added**
58:24, 60:21
**address**
52:20, 63:19,
64:2, 64:5,
64:7, 85:16,
86:11, 86:17
**administer**
7:4
**advantage**
67:17
**advice**
39:9
**advised**
56:15, 63:18
**affect**
36:22

**affected**
36:7
**affidavit**
42:13
**affirmed**
7:17
**after**
22:16, 33:7,
39:18, 43:5,
44:1, 46:10,
63:14, 64:15,
68:6, 80:4,
80:12, 80:14,
80:24, 81:3,
89:21, 93:24
**afternoon**
7:22, 7:23
**again**
7:23, 20:12,
21:19, 42:6,
74:22, 79:3,
88:24
**against**
60:11, 79:20,
81:12, 87:2,
88:8
**agency**
12:17, 43:12,
43:13
**ago**
81:24
**agree**
7:6
**agreement**
2:13
**ahead**
65:2, 72:7,
74:8, 76:13,
77:14
**aid**
26:11, 26:20
**al**
1:8, 3:13, 6:5
**alcohol**
10:17
**all**
6:12, 7:5, 7:8,
8:11, 10:5,

12:9, 36:9,
36:16, 42:2,
50:24, 52:4,
52:9, 53:2,
55:22, 57:17,
59:11, 70:15,
71:8, 75:1,
77:15, 82:7,
84:12, 84:16,
86:17, 87:8,
88:19, 91:14,
95:15, 95:19,
99:7, 99:25,
100:12, 101:3
**allow**
20:1, 20:4,
71:16
**along**
17:23
**already**
17:23, 36:24,
54:11, 55:21,
65:1
**also**
3:22, 26:14,
27:25, 56:13,
56:17, 64:5,
86:10, 87:12,
89:19
**although**
90:1
**always**
30:24, 37:5
**amendment**
17:14, 17:16,
17:18, 18:7,
18:9, 18:15
**amendment-protec-
ted**
90:2, 90:15,
90:19, 90:25
**amount**
34:11, 63:25,
89:18
**analyst**
11:23, 36:16
**analyzing**
89:18

| | | | |
|---|---|---|---|
| **andre** | 74:12, 80:23, | 44:1, 46:6 | **arresting** |
| 4:3 | 81:14, 82:9, | **apps** | 21:6, 46:20, |
| **another** | 85:20, 99:14, | 97:8, 97:15 | 46:23, 47:2, |
| 33:5, 60:21, | 100:6 | **aren't** | 47:7 |
| 60:23, 65:15, | **anyway** | 27:17 | **arrive** |
| 65:16, 65:17, | 85:7 | **argue** | 30:1 |
| 65:19, 75:14, | **anywhere** | 16:19 | **arrived** |
| 75:20, 76:13, | 41:20, 96:19, | **around** | 66:7, 71:24 |
| 88:20 | 98:14 | 12:21, 24:19 | **arson** |
| **answer** | **apex** | **arrest** | 34:7, 34:9 |
| 8:22, 9:2, 9:9, | 36:5, 63:19, | 5:10, 13:20, | **asked** |
| 9:10, 9:12, | 63:23, 64:1 | 14:18, 14:23, | 40:12, 52:15, |
| 9:18, 10:2, | **apologize** | 15:8, 15:12, | 71:8, 71:10, |
| 10:18, 15:15, | 33:18, 33:20, | 16:11, 19:1, | 71:17, 73:6, |
| 19:20, 20:10, | 40:25, 46:21, | 19:4, 19:5, | 74:1, 77:23, |
| 45:21, 46:18, | 58:10 | 19:9, 19:15, | 78:16, 80:4 |
| 48:24, 51:5, | **app** | 20:8, 20:18, | **asking** |
| 63:3, 78:3, | 97:12 | 20:23, 20:24, | 7:25, 16:14, |
| 78:19, 79:1, | **appears** | 21:4, 21:9, | 25:3, 100:10 |
| 79:17, 86:7, | 87:13 | 28:10, 28:15, | **assault** |
| 86:19, 90:21, | **applicable** | 28:22, 37:13, | 19:24, 19:25, |
| 94:12 | 7:8, 7:12 | 40:20, 40:21, | 28:18, 30:6 |
| **answers** | **application** | 43:3, 46:15, | **assigned** |
| 9:4 | 13:19, 41:4, | 46:24, 47:3, | 11:8 |
| **anti** | 41:7, 41:10, | 47:12, 47:21, | **assignment** |
| 23:5, 24:5, | 42:5, 43:3, 56:2 | 47:25, 48:1, | 11:8 |
| 62:3 | **apply** | 48:25, 52:1, | **assisting** |
| **anti-jewish** | 27:25, 87:11 | 54:11, 55:7, | 16:22 |
| 24:1 | **apprehension** | 55:11, 55:12, | **assume** |
| **anti-semitic** | 89:14 | 55:15, 55:20, | 9:18, 43:18 |
| 49:15, 84:2, | **approach** | 55:22, 57:18, | **attached** |
| 85:15, 85:24 | 67:25, 68:3 | 57:21, 58:10, | 5:7, 60:23 |
| **anticipate** | **approached** | 58:13, 60:16, | **attack** |
| 9:10 | 67:23, 68:6, | 65:8, 65:13, | 27:2, 36:6, |
| **anybody** | 68:8 | 66:11, 68:21, | 36:18, 72:24, |
| 57:9, 66:21 | **appropriate** | 69:9, 69:13, | 73:7, 78:10, |
| **anyone** | 28:14, 48:2, | 80:9, 80:12, | 78:13, 78:17, |
| 10:11, 10:14, | 48:4, 55:24, | 80:17, 80:20, | 78:21, 78:24 |
| 30:3, 39:3, | 56:9, 65:5, | 80:25, 81:4, | **attacks** |
| 49:22, 63:9, | 79:14, 82:18, | 91:25, 92:3, | 27:23, 72:12, |
| 83:8, 93:22, | 82:21 | 92:9, 92:14, | 72:15 |
| 97:21, 98:3 | **approve** | 92:18, 93:6, | **attempt** |
| **anything** | 13:4, 13:7, | 93:12, 93:20, | 43:11 |
| 14:1, 17:17, | 14:2, 14:4, | 93:24, 94:3, | **attending** |
| 23:14, 23:24, | 14:13, 14:18, | 94:9, 94:21, | 6:13 |
| 51:9, 53:17, | 40:3 | 94:25, 95:25, | **attorney** |
| 54:2, 68:11, | **approved** | 96:3, 96:6, 99:4 | 81:3, 81:19 |
| 71:3, 72:23, | 43:10, 43:24, | **arrested** | **attorney's** |
| | | 58:25 | 39:8, 39:9, |

**39:15**

**audio**
77:16, 102:9, 103:4

**authorized**
7:3

**autism**
28:17, 28:19

**ave**
3:17

**aware**
48:22, 49:2, 49:5, 49:8, 49:11, 49:13, 50:15, 51:25, 52:9, 52:12, 52:15, 69:2, 69:5, 69:7, 81:2, 81:5, 81:6, 81:7, 81:18, 81:23, 83:24, 88:5, 88:12, 92:12, 92:16, 98:18

**away**
75:11

**axon**
35:22, 37:2, 37:3

**B**

**back**
36:17, 36:18, 36:19, 39:25, 48:17, 50:7, 52:15, 61:23, 68:3, 71:2, 71:16, 72:5, 73:18, 74:23, 75:5, 76:8, 77:8, 77:11, 77:22, 80:16, 86:22, 89:6, 95:5, 95:9, 99:24

**backed**
36:5, 96:19

**backup**
100:3

**baran**
3:6

**barber**
6:21

**barber-jones**
3:14, 6:20, 15:14, 16:3, 19:19, 20:9, 45:20, 46:17, 48:23, 50:3, 51:4, 63:2, 74:9, 74:14, 78:2, 78:18, 78:25, 79:16, 83:19, 86:6, 86:18, 90:20, 94:11, 98:6, 100:10, 100:14, 100:24

**barricade**
45:2

**based**
25:13, 29:3, 72:14, 80:2, 83:3

**basic**
11:16, 11:19, 18:18, 20:22, 21:3, 23:13, 26:14, 67:14, 67:20

**basically**
12:10, 19:10, 23:18, 25:10, 25:15, 27:8, 27:15, 28:5, 43:8

**basis**
22:13

**battery**
74:15

**because**
17:20, 31:8, 41:22, 54:10, 55:2, 55:8, 56:13, 58:14, 61:17, 62:13, 62:18, 63:24,

65:1, 65:23, 67:4, 68:4, 70:7, 71:19, 73:17, 77:7, 82:11, 82:16, 82:24

**become**
11:17, 12:10, 48:21, 51:25, 52:12, 69:7, 81:23

**been**
8:2, 11:1, 32:13, 37:1, 40:17, 43:9, 43:23, 46:5, 46:11, 46:16, 47:8, 47:21, 82:18, 89:17, 89:24, 89:25, 92:7, 92:9, 92:16

**before**
2:13, 8:2, 9:9, 9:25, 10:3, 14:24, 15:20, 16:2, 16:10, 16:18, 20:7, 20:17, 24:20, 35:14, 36:17, 39:9, 39:15, 41:5, 47:7, 49:21, 50:1, 50:14, 52:24, 57:17, 57:21, 59:5, 63:15, 64:9, 64:12, 64:23, 70:2, 72:4, 80:9, 85:2, 85:6, 87:19, 88:21, 102:3

**begins**
6:2, 51:21

**behalf**
3:2, 3:12

**behind**
71:2, 73:17,

73:18, 77:8

**being**
7:17, 7:23, 11:21, 12:11, 35:2, 35:22, 54:12, 66:4, 68:20, 81:19, 82:13

**believe**
15:3, 16:21, 31:8, 34:12, 48:2, 53:19, 55:5, 56:9, 56:11, 56:12, 57:8, 59:14, 60:22, 65:4, 67:4, 68:22, 68:24, 70:9, 72:23, 75:25, 79:18, 82:21, 83:6, 92:7, 96:14

**believed**
48:1, 48:3

**besides**
13:25, 31:16, 33:1, 33:6, 34:9, 81:15, 97:21

**best**
27:17, 27:20, 67:4, 67:17, 77:18, 102:10, 103:7

**better**
37:5, 59:17

**between**
77:9, 84:1, 96:12, 97:4, 98:3

**bias**
25:10, 25:12, 25:14, 25:17, 91:22

**bias-motivated**
23:1, 34:14, 62:3

**biases**
24:9, 24:15,

26:4, 26:7
**bit**
35:11, 36:2,
52:23, 61:2,
68:14, 75:9,
89:7
**blocked**
67:12
**blocking**
67:8
**bock**
57:8, 57:13
**body**
70:25, 79:9
**body-worn**
69:12, 70:4
**book**
38:10, 38:13,
56:23
**books**
37:25, 38:3
**both**
9:12, 16:4,
17:10, 92:9,
93:2
**bottle**
73:18, 76:17,
76:19
**bottom**
89:5, 89:7,
89:10
**box**
62:3
**break**
9:22, 9:24,
9:25, 10:3,
29:14, 50:1,
50:11, 50:14,
74:10, 83:17,
95:4
**breath**
42:15
**brief**
53:8, 53:11,
56:8, 56:21,
83:3
**bring**
55:24, 66:15,

73:6, 73:10
**bringing**
28:1, 42:13,
73:22
**brought**
77:11
**bruce**
3:4, 5:3, 6:16,
7:21, 7:24,
15:18, 16:5,
16:7, 20:3,
20:13, 45:24,
46:22, 49:1,
49:25, 50:10,
50:12, 51:10,
59:7, 59:9,
59:16, 59:20,
59:24, 60:24,
61:3, 61:8,
61:10, 61:14,
61:16, 61:23,
61:25, 63:6,
63:12, 63:13,
74:12, 74:21,
78:5, 78:22,
79:4, 79:5,
79:23, 83:16,
83:21, 83:23,
84:7, 84:10,
86:9, 86:21,
88:13, 88:17,
89:4, 89:9,
90:23, 91:3,
91:4, 94:16,
95:3, 95:12,
98:8, 100:12,
100:20
**buddy**
97:12
**built-in**
97:17
**bureau**
89:20

---
### C
---
**call**
29:7, 29:16,
29:18, 30:18,

39:24, 40:2,
53:3, 64:8,
64:11, 73:4
**called**
23:5, 38:14,
43:8
**caller**
29:25, 30:1
**calls**
14:9, 14:10,
40:6, 40:7,
40:13, 40:16,
40:17
**came**
52:25
**camera**
69:12, 70:4,
71:1, 79:10,
79:11, 79:12,
79:15, 79:19
**can't**
13:23, 15:7,
18:13, 22:3,
24:4, 25:16,
28:19, 33:5,
33:10, 33:11,
33:13, 33:14,
33:22, 34:4,
48:19, 76:20,
78:23, 99:8
**cannot**
17:15
**capable**
83:6
**capacity**
8:11
**car**
66:3, 70:2,
73:7, 73:11,
73:14, 73:21,
74:2, 74:4,
74:6, 75:6,
76:8, 76:16,
77:12, 78:17,
78:21, 78:24
**career**
87:3
**carefully**
87:10

**carolina**
1:2, 6:6,
11:18, 17:11,
22:18, 38:15,
49:3, 49:6,
87:10, 89:20,
89:24
**cars**
66:15, 75:8
**case**
6:7, 14:8,
16:24, 17:1,
17:2, 18:23,
33:11, 33:22,
34:2, 41:11,
41:12, 42:21,
42:24, 43:18,
51:17, 58:24,
59:14, 61:17,
63:21, 73:7,
80:24, 87:5,
91:13, 91:25,
93:9, 95:21,
102:13, 103:10
**cases**
87:2
**cause**
15:4, 15:9,
15:11, 15:17,
15:20, 16:2,
16:10, 16:13,
16:18, 19:6,
19:9, 19:15,
19:18, 19:21,
20:2, 20:7,
20:17, 20:21,
37:13, 37:20,
40:2, 40:19,
41:20, 42:18,
55:7, 55:18,
55:20
**cell**
92:24, 93:1,
93:4, 93:9,
93:23, 94:5,
94:10, 94:22,
94:25, 97:21,
98:4

center
40:4, 71:25,
78:7, 79:7,
80:8, 80:12,
80:15
certain
13:10, 14:9,
14:10, 15:2,
28:6, 28:20,
31:13, 34:11
certainly
59:23
certificate
102:1, 103:1
certification
7:11, 11:17
certified
7:6
certify
102:4, 103:2
change
72:19
changed
72:18
charge
22:19, 38:2,
45:19, 46:2,
46:5, 46:25,
48:12, 48:15,
48:18, 55:13,
55:24, 56:10,
56:19, 57:17,
65:5, 81:3,
81:5, 81:8,
81:15, 81:19,
82:4, 82:11,
82:16, 82:18,
82:21, 83:10,
83:14, 92:5
charges
22:23, 41:14,
41:17, 41:21,
42:3, 42:6,
42:7, 48:3,
48:5, 48:20,
56:14, 81:11,
87:1, 90:6
charging
41:23

check
48:13
chem
11:23
chief
84:13, 84:14,
84:21, 85:3,
85:12, 86:24,
88:24, 89:5,
89:11, 90:13
children
69:3
choose
33:3, 44:19,
46:10
choosing
67:11
cid
33:18
circumstances
19:22, 20:1,
21:19, 28:6,
28:13, 37:18
cit
11:23, 13:16,
27:3, 27:4
citation
20:25, 21:4,
21:7, 21:13
civil
1:7
clarification
38:8, 52:19
clarify
33:22
class
12:8, 12:9
classifying
23:1
clean
9:13
clear
9:16
clervil
3:24, 6:10
close
29:12, 33:11,
33:15, 33:22,

44:23, 45:9,
63:20
clothes
71:15, 71:17,
72:4
clothing
71:23
cloud
96:19
cluster
35:25
cognizant
73:3
colleague
6:18, 6:23
collect
35:6
collecting
30:12, 35:11
come
22:14, 22:15,
24:12, 29:18,
34:10, 51:17,
56:18, 82:19,
95:5
comes
15:2, 15:8,
27:9, 32:23,
50:23, 67:15,
67:16, 96:1
coming
12:16, 32:12,
41:6
comments
54:15, 54:18,
54:21, 99:12
commission
102:18
commit
19:12
committed
19:11, 85:13
common
82:13
commonwealth
2:14, 102:22
communicate
80:8, 80:11,

97:8, 97:9,
97:15
communicated
93:22, 94:2,
94:9
communications
97:20, 98:9
compared
37:3, 66:2
complaint
60:11
complaints
49:14, 50:16,
50:23, 51:8,
51:9, 83:25,
84:5
complete
12:4, 79:19
completed
58:2
completely
47:3
complexities
87:6
concluded
89:24
conclusion
56:18
conduct
12:22, 14:18,
14:23, 19:1,
19:4, 19:5,
19:9, 19:15,
21:4, 33:8,
41:16, 41:17,
55:7, 55:20,
57:18, 57:21,
65:13, 81:20,
83:9, 87:12,
87:14, 90:18,
91:9
conducted
1:13, 2:1,
91:7, 91:18,
91:21
conducting
14:5, 55:14,
65:8

confident
54:12, 55:3
confused
46:21, 68:19,
71:5, 82:5,
82:10
consider
21:12, 21:17,
21:21, 21:24,
62:19, 65:24,
90:18
considered
25:12, 34:14,
66:2, 66:5
considering
87:10
consistent
7:12
constitute
7:10
consult
37:23, 38:11,
38:20, 38:23,
39:4, 39:14,
88:2
consultation
89:23
consulted
55:23, 56:25,
57:4, 89:20,
90:11
consulting
87:7
contact
31:22, 31:25,
32:4, 33:3, 68:5
contains
38:10
contemporaneously
30:15
content
34:24
continued
4:1
control
59:19, 59:21
conversations
99:1, 99:6,

99:10
cooperate
70:24
cooperative
68:16
copy
52:20
corporal
38:25
correct
10:21, 12:2,
13:3, 13:21,
16:25, 17:7,
17:12, 18:3,
18:17, 21:15,
21:22, 21:25,
24:7, 29:17,
31:15, 32:21,
32:25, 33:10,
33:25, 35:10,
38:12, 38:22,
39:21, 43:20,
44:2, 44:5,
44:8, 48:9,
48:16, 48:19,
50:18, 50:19,
51:23, 52:2,
55:4, 55:16,
56:14, 56:19,
56:24, 57:2,
57:15, 58:18,
60:14, 61:6,
61:19, 62:23,
64:21, 65:21,
70:5, 70:17,
71:7, 71:9,
71:19, 72:13,
73:9, 74:3,
75:7, 75:13,
76:18, 77:13,
80:1, 84:22,
93:3, 94:4,
96:8, 97:19,
98:21, 99:5
correctly
13:10, 67:7
correlate
46:8

could
32:22, 35:13,
36:23, 39:12,
46:13, 46:14,
62:19, 65:17,
70:22, 71:19,
74:1
couldn't
8:9, 47:15,
53:13, 78:13
counsel
6:14, 7:20,
10:13, 50:8,
59:18, 74:20,
95:10, 97:22,
98:10, 100:19,
100:23, 102:12,
103:9
county
27:9, 40:4,
78:7, 87:1
couple
35:20, 70:11,
94:14
course
58:7, 87:12,
88:3
court
1:1, 6:6, 6:24,
8:5, 8:8, 8:15,
9:1, 9:3, 9:11,
17:5, 98:19,
102:1
courts
17:11
cover
79:14
covering
79:11, 79:12
cpr
26:16, 26:17
cr
43:8, 43:17,
43:21
crash
13:15, 18:24
created
60:10

crime
19:10, 19:12,
21:14, 29:5,
32:13, 32:14,
32:18, 36:16,
37:11, 37:15,
37:20, 37:24,
38:15, 39:4,
39:16, 51:12,
51:21, 62:8,
62:11, 62:16,
91:23
crime's
29:6
crimes
12:24, 18:11,
23:2, 34:13,
34:14, 38:5,
38:11
criminal
89:24, 90:6
crises
27:22
crisis
27:5, 27:6,
27:10, 27:14,
27:17, 27:20,
28:5
criteria
83:2
cul-de-sac
66:25, 67:2,
76:4
current
11:4
currently
10:20, 11:7,
17:21, 35:22,
69:25, 98:2
custody
28:1
cyber
91:16, 91:20
cyberstalking
22:18, 49:15,
55:24, 56:9,
56:19, 65:5,
82:17, 82:21,

91:6, 92:9

**D**

**danger**
75:19
**dangerous**
67:19, 68:25
**dangerousness**
21:20
**daniel**
3:4, 6:16,
7:24, 16:6
**dashboard**
76:21
**data**
99:24
**date**
6:8, 24:19,
46:1, 59:1
**dated**
84:23, 85:9,
89:1
**david**
4:3
**day**
14:14, 24:14,
27:18, 48:25,
51:25, 52:8,
52:10, 52:24,
54:13, 55:9,
55:11, 55:12,
55:15, 55:20,
58:2, 58:4,
58:15, 59:4,
63:15, 65:18,
66:9, 81:3,
82:8, 85:2
**deal**
28:16, 62:13
**dealt**
32:2, 32:7,
35:14, 62:19
**dear**
89:12
**december**
84:24, 85:2,
85:9
**decide**
28:8, 62:10,

75:22
**decided**
75:17
**decision**
14:19, 14:24,
15:7, 20:21,
82:25, 83:7
**decisions**
17:6, 17:10,
17:13
**deem**
58:4
**defamation**
23:6
**defendant**
41:13, 58:25,
63:17, 68:9
**defendants**
1:9, 3:12, 6:22
**definitely**
30:25
**deleted**
97:24
**demeanor**
72:18
**denied**
47:21, 47:24
**department**
8:12, 10:10,
10:21, 10:24,
11:5, 18:5,
18:16, 24:13,
25:1, 25:3,
29:21, 32:10,
32:19, 33:19,
35:15, 36:5,
38:1, 39:25,
41:13, 49:15,
49:22, 50:17,
51:2, 56:16,
80:16, 83:9,
84:1, 89:16,
89:23
**department's**
22:5, 22:9,
64:3
**depend**
47:5

**depending**
30:4
**depends**
15:1, 21:18,
42:3, 42:6,
44:22
**depos**
6:10, 7:1,
103:16
**deposed**
8:2
**deposition**
1:12, 2:1, 5:8,
6:3, 6:13, 7:4,
8:14, 16:4,
100:17
**describe**
11:13, 29:4,
41:19, 53:6,
53:23, 56:5
**described**
52:24, 53:1,
81:20
**description**
41:15, 42:2
**designation**
62:25
**destroyed**
96:22
**detail**
53:9, 53:15
**details**
53:22
**detention**
40:4, 71:25,
78:7, 79:7,
80:8, 80:11,
80:15
**determination**
16:1, 16:9,
55:6
**determine**
16:13, 37:17,
38:3, 39:18,
73:5
**determined**
64:15
**determining**
16:16, 21:12,

37:24, 39:4,
39:15
**device**
97:25
**devices**
95:20, 95:23
**diagnosed**
92:17
**difference**
8:15
**different**
11:24, 12:9,
12:17, 12:24,
13:14, 14:12,
17:2, 17:4,
18:22, 18:24,
20:1, 23:19,
27:8, 35:1,
35:21, 39:23,
42:15, 43:12,
48:5, 48:15,
50:24, 60:20,
71:23
**difficult**
77:21
**difficulty**
74:11
**digital**
102:8, 103:3
**diligently**
89:17
**direct**
35:4, 38:24,
90:6
**directives**
22:6, 22:10
**directly**
75:14
**disciplinary**
83:13
**discovered**
54:22
**discovery**
93:8, 95:21
**discuss**
49:22, 64:22
**discussed**
29:3, 50:22

**discussing**
50:14, 95:15
**dismissal**
86:25
**dismissed**
81:3, 81:5,
81:8, 81:12,
81:16, 81:20,
82:4, 82:12,
82:17, 83:10,
92:6, 92:7,
92:10
**dispatch**
29:21
**dispatched**
29:20
**disseminated**
92:13
**district**
1:1, 1:2, 6:6,
39:8, 81:2,
81:19
**division**
1:3, 6:7, 11:9,
18:25, 57:6
**dmv**
32:5, 32:6
**document**
58:20, 59:11,
60:1, 60:5,
84:12, 84:16,
88:19
**documentation**
89:18
**documents**
42:4, 93:5,
94:25
**doing**
14:15, 18:8,
23:12, 31:5,
39:13, 39:22,
83:6
**done**
13:9, 31:5,
46:12, 46:13,
95:16
**door**
67:25, 68:2,

68:3, 68:6,
68:8, 71:21
**doors**
68:4
**down**
9:4, 9:12,
29:14, 30:18,
34:20, 34:23,
40:4, 44:12,
59:16, 59:22,
60:22, 60:24,
61:2, 63:12,
66:25, 67:3,
72:5, 75:8,
77:15, 80:7,
80:21, 85:1,
85:7, 88:13,
89:4, 91:3
**drink**
74:5, 79:22
**drive**
6:11, 40:4
**driver's**
32:6
**driving**
44:12, 66:18,
66:19, 77:8
**dropped**
80:14
**drug**
34:11
**drugs**
10:17
**due**
28:18, 87:5
**duly**
7:17
**dunn**
3:25
**during**
28:4, 28:5,
35:22, 35:23,
35:25, 36:3,
56:17, 58:9,
60:19, 68:21,
69:9, 69:13,
71:20, 82:24
**duties**
12:13

**dwell**
82:8
**dwi**
8:10, 42:9,
42:11
**dwyer**
3:5, 6:19,
15:25, 16:6

**E**

**e-trans**
100:25
**earlier**
50:22, 71:4,
83:4, 85:2,
86:23
**early**
10:25
**easier**
21:6
**eastern**
1:2, 6:6
**easy**
37:3
**edgar**
1:12, 2:1, 5:2,
6:3, 6:22, 7:16,
10:7, 100:18
**educating**
24:14
**either**
12:16, 32:11,
40:3, 43:10
**electronic**
7:5
**element**
39:16
**elements**
37:12, 37:16,
37:17, 37:19,
37:24, 38:5,
38:10, 38:18,
39:5, 39:19,
41:25, 56:15,
56:22, 81:21,
83:1, 90:5
**elliott**
1:8, 3:12, 6:5

**else**
10:11, 10:14,
14:1, 30:3,
39:3, 57:9,
63:9, 66:21,
68:12, 71:3,
80:23, 81:15,
97:21, 98:3,
99:14
**email**
5:11, 42:19,
84:13, 84:19,
85:1, 85:8,
85:16, 86:11,
86:23, 88:20,
89:5, 93:23
**emailing**
85:14, 85:23
**emails**
86:4, 97:4
**employed**
102:12, 103:9
**empty**
62:2
**ems**
73:4
**end**
76:3, 79:9,
100:17
**enforcement**
11:16, 11:19,
12:16, 13:17,
17:3, 18:18,
20:22, 21:3,
23:13, 26:14,
26:15, 45:2,
67:14, 67:20,
87:7, 88:3
**enough**
16:17, 36:8,
36:12, 37:12,
38:17, 55:19,
73:3
**ensure**
55:18, 87:8
**enter**
71:16
**entire**
53:10, 76:22

**escalating**
87:14, 88:8, 88:11
**escape**
67:23
**esquire**
3:4, 3:5, 3:14, 3:15
**essentially**
27:16, 40:1
**et**
1:8, 3:12, 6:5
**ethnic**
85:14
**europe**
23:22
**evaluated**
90:24
**evaluation**
28:11, 28:14, 89:21
**even**
9:9, 24:16, 36:18, 46:10, 46:15, 50:25, 51:8, 60:13, 63:23, 83:3
**ever**
8:2, 8:5, 9:22, 18:8, 39:7, 47:21, 49:21, 55:23, 57:23, 60:4, 62:15, 64:22, 71:22, 73:13, 73:20, 76:23, 77:1, 78:6, 83:12, 84:15, 88:2, 88:6, 90:11, 90:17, 99:24
**every**
9:23, 22:13, 23:23
**everybody**
9:5, 28:23, 50:10
**everything**
83:1

**evidence**
16:17, 19:14, 19:17, 19:23, 19:25, 41:19, 42:2, 42:17, 55:19, 56:5, 67:18, 67:22, 88:7, 88:11
**evidentiary**
7:9
**ewarrants**
41:8, 41:10, 43:23
**exacerbated**
92:17
**exact**
24:18
**exactly**
53:13, 71:10
**examination**
5:2, 7:20
**examined**
7:19, 90:2, 90:14
**example**
45:7
**excellent**
101:3
**exchanged**
97:1
**execute**
92:3
**executed**
92:8
**exhibit**
5:8, 5:9, 5:10, 5:11, 5:12, 59:10, 59:13, 69:18, 69:21, 84:8, 88:15
**exhibits**
100:25
**expect**
14:11
**experience**
27:12
**experiences**
72:11, 72:15,

73:7
**experiencing**
89:13
**expires**
102:18
**explain**
27:21, 36:2, 36:20, 37:8, 68:11, 70:21
**explained**
52:17, 68:9, 68:14
**explaining**
70:14, 70:18
**extensive**
89:21
**extremist**
23:9, 23:17, 24:6
**eye**
72:22

---

**F**

**facility**
73:24
**fact**
19:11, 28:4
**factor**
21:21, 21:24
**factors**
21:11, 21:16, 22:1
**fair**
38:17
**fall**
90:2, 90:14
**familiar**
38:2, 60:13, 62:12, 62:18, 63:24, 63:25, 64:5, 64:7, 64:10
**family**
28:18, 49:5, 89:13
**far**
75:11
**fear**
87:4, 87:21,

87:24, 87:25, 89:14
**feature**
97:18
**february**
96:24, 96:25
**federal**
17:11
**feel**
28:9, 28:10, 83:1, 87:23, 89:15
**feels**
92:22
**fell**
90:18, 90:25
**fellow**
96:5
**felonies**
31:6, 31:7, 34:10
**felony**
40:23, 40:24
**felt**
82:24, 87:20, 87:25
**few**
7:25, 8:25, 29:14, 72:7, 74:8, 76:13, 95:14
**field**
11:22, 11:25, 12:4, 12:10, 12:11, 12:13, 13:1, 14:3, 14:17, 14:23, 16:14, 17:20, 17:21, 17:22, 35:2, 35:7, 65:18, 66:1, 91:12, 91:21, 94:24
**figure**
15:22, 16:20, 33:13, 94:14
**file**
41:12, 42:22,

42:24
**filed**
83:25, 98:20
**fill**
41:5, 41:21
**fill-in-the-blank**
41:22
**filled**
13:9, 86:3,
86:14, 87:19,
90:10
**fillers**
9:3
**finally**
9:21, 79:25
**financial**
102:14, 103:11
**find**
31:25
**finding**
31:22
**fine**
83:19
**finish**
29:12, 83:18,
100:10
**firm**
6:17
**first**
7:17, 17:14,
17:16, 17:18,
18:6, 18:9,
18:14, 26:10,
26:20, 29:15,
30:1, 45:7,
48:21, 52:12,
68:17, 68:19,
70:10, 71:13,
80:4, 89:6,
90:2, 90:15,
90:19, 90:25,
98:12, 98:16,
98:18, 99:17
**fits**
83:2
**flag**
62:10
**flagged**
62:15

**flagging**
62:7
**flight**
21:23
**floor**
33:19
**follow**
5:12, 52:22,
95:14
**follow-up**
50:13
**following**
92:14
**follows**
7:19
**footage**
70:3, 71:1,
79:10
**foregoing**
102:3, 102:5,
103:4
**form**
15:14, 19:19,
20:9, 32:15,
41:20, 42:2,
42:5, 45:20,
46:17, 48:23,
51:4, 63:2, 98:6
**forms**
13:9, 13:12,
13:14, 13:15,
13:16, 13:18,
13:22, 14:1,
42:12, 42:15
**fortunately**
36:8, 36:12
**forwarding**
85:4, 86:25
**four**
76:6
**fourth**
61:24
**frantz**
3:24, 6:10
**friday**
1:14
**front**
15:6, 30:4,

67:6, 68:2,
68:4, 68:6,
68:8, 72:1,
75:14, 75:20,
75:23
**frustration**
87:4, 87:20,
87:23, 89:13
**fto**
16:22, 17:19,
17:23, 17:25,
54:13, 55:8,
55:10, 55:17,
58:1, 58:3,
65:11, 65:14,
65:15, 65:16,
65:17, 65:19
**full**
10:5, 53:9,
53:14, 53:22
**fully**
9:8, 9:12,
54:12, 102:5
**fun**
99:12
**further**
17:23, 53:7,
66:25, 67:2,
77:14, 89:8

**G**

**garner**
17:4
**gather**
29:8, 30:2,
37:10
**gave**
24:23, 53:8,
53:11, 56:8,
81:19, 83:4
**general**
23:24, 40:20,
87:10, 89:25
**generate**
51:7, 51:18,
51:20
**generated**
51:15

**generation**
12:15
**gentleman**
24:12
**getting**
45:4, 45:5
**give**
20:19, 21:7,
40:2, 47:15,
52:19, 53:9,
57:16, 59:18,
69:19, 73:13,
73:20, 73:25,
76:23, 78:6,
78:8, 79:25,
81:14
**given**
43:7, 70:24
**giving**
24:14, 56:21,
73:23
**glenwood**
3:17
**go**
9:23, 10:3,
13:17, 16:10,
17:3, 20:17,
23:23, 28:21,
29:9, 39:7,
39:19, 39:22,
40:4, 48:17,
53:15, 61:24,
63:20, 64:17,
64:20, 70:2,
82:7, 85:1,
85:6, 87:8,
98:14
**going**
14:8, 16:2,
16:18, 17:15,
17:17, 19:12,
25:19, 27:19,
47:3, 52:10,
59:14, 61:6,
69:17, 69:19,
70:6, 70:10,
70:13, 70:15,
72:7, 75:1,

**good**
7:22, 37:5, 49:25, 50:11, 83:21

**gov**
84:20, 88:24

**grants**
11:16

**great**
39:2, 53:15, 82:25

**group**
3:16, 6:21, 23:23, 85:13, 85:20, 85:23

**groups**
23:9, 23:17, 23:20, 24:2, 24:6, 85:20, 87:3

**guess**
14:4, 16:19, 22:8, 25:17, 29:6, 44:21, 44:22, 46:12, 47:5, 60:12, 76:5, 76:20, 80:6, 95:22, 96:1, 98:18

**gustein**
3:15

**gutstein**
6:23

**guys**
74:9

**H**

**half**
37:2

**hand**
7:14, 76:21

**handbook**
56:15

**handcuffed**
73:17, 77:7,

76:13, 77:14, 79:6, 94:15, 95:3, 98:14, 98:19

77:10

**handcuffs**
65:10

**handle**
12:11, 14:9, 14:12, 29:11, 47:9, 65:3, 72:20, 72:25

**handled**
28:9, 50:24, 65:2

**handling**
30:17

**hands**
65:2, 71:2, 77:7

**happen**
23:21, 36:14, 43:25

**happened**
36:18, 48:10, 52:24, 53:1, 53:9, 56:21, 63:14, 63:16, 68:7

**happening**
23:22, 82:14

**happens**
43:5

**happy**
9:17, 9:22

**harassment**
22:22, 49:16, 84:2, 88:8, 88:11

**hard**
77:16

**hardware**
25:19

**harm**
68:22

**harris**
53:18, 53:21

**hartzog**
3:16, 6:21

**hate**
23:1, 23:9, 23:17, 23:19,

24:2, 24:6, 34:14, 62:3, 62:8, 62:11, 62:16, 85:19, 91:22

**haymarket**
3:9

**head**
8:10, 9:2, 13:24, 25:20, 34:5, 47:16

**headquartered**
6:11

**health**
27:15, 27:17, 28:11, 28:14, 28:21

**hear**
9:5, 49:21, 77:16, 77:22, 78:13, 82:13

**heard**
39:13

**hearing**
7:13

**held**
76:21

**help**
17:7, 28:20, 38:4, 80:19

**helpful**
59:22

**helping**
16:23

**here**
6:2, 6:18, 6:23, 7:23, 8:20, 9:1, 11:17, 11:22, 14:11, 16:4, 18:13, 23:21, 24:4, 27:9, 35:22, 36:8, 37:25, 38:7, 53:4, 54:20, 62:2, 70:11, 72:8, 74:10, 75:3, 75:5,

77:16, 77:23, 78:15, 82:20, 83:22, 89:10

**here's**
97:12

**hereby**
102:4, 103:2

**hernandez**
1:12, 2:1, 5:2, 6:4, 6:22, 7:16, 7:22, 8:3, 10:7, 10:9, 50:15, 59:12, 62:1, 69:20, 74:24, 83:24, 84:11, 88:18, 91:5, 92:23, 95:13, 100:18

**hey**
43:13, 44:14, 53:2, 63:18, 97:12

**highway**
3:8

**himself**
14:5, 80:22

**hired**
10:23

**hold**
31:18, 31:20

**holly**
8:12, 10:10, 10:21, 10:23, 11:14, 14:11, 18:5, 18:15, 22:5, 22:9, 24:12, 24:25, 25:2, 25:5, 29:20, 32:10, 32:18, 36:8, 38:1, 49:14, 49:22, 50:16, 64:2, 83:8, 83:25, 84:20, 84:21, 88:23, 89:16

**holtzman**
3:6, 6:17

**home**
66:7, 69:3,
69:5, 80:4,
85:16, 86:11,
86:17
**homes**
71:16
**honestly**
24:18, 25:9,
25:15, 34:4,
37:1, 53:13,
60:12, 62:12,
91:11
**hope**
50:10
**hour**
9:23, 12:8,
12:9
**hours**
82:12
**house**
45:5, 64:13,
66:24, 67:1,
67:3, 67:6,
67:9, 67:25,
68:9, 72:2,
75:15, 75:20,
75:23, 75:25,
76:1
**house's**
67:10
**housekeeping**
8:25
**houses**
76:3
**how'd**
69:7
**however**
28:18, 36:10,
36:16, 58:24,
66:1, 96:14
**hundreds**
85:14, 85:24,
86:4
**hungerford**
6:11
**husband**
69:5

---

**I**

**icloud**
100:2
**idea**
40:11
**ideas**
23:25
**identify**
6:14, 27:1
**identifying**
23:1, 23:9,
23:16, 24:1,
24:5, 24:9,
26:3, 26:7
**ideology**
25:25
**imagine**
39:12
**immediately**
44:1, 44:20,
44:25, 45:4,
45:9, 45:12,
45:15, 45:18
**impair**
10:17
**implicit**
24:9, 24:15,
25:10, 25:12,
25:14
**important**
67:13
**incident**
35:9, 36:21,
49:21, 50:17,
52:4, 53:18,
53:20, 57:20,
57:23, 58:17,
58:21, 58:22,
59:4, 59:15,
60:6, 60:10,
60:17, 61:21,
62:16, 68:15,
96:15, 98:12,
98:13, 98:16
**include**
12:7, 13:18,
17:10, 17:13,

18:21, 19:1,
20:23, 24:1,
26:3, 26:6,
27:22, 90:3
**included**
18:22, 50:21,
51:2, 51:14,
60:17
**includes**
27:1
**including**
6:22, 18:2
**indeed**
56:19, 72:24
**independent**
16:9, 20:6,
20:16, 49:8,
55:6
**indicate**
78:9, 88:7
**indicated**
78:12
**indication**
70:24
**indicators**
75:25
**individual**
27:1, 31:23,
42:14, 43:14,
52:18
**individuals**
26:4, 26:8,
28:1, 30:10
**influence**
10:16
**information**
5:12, 29:8,
30:11, 31:22,
31:25, 32:4,
32:16, 32:19,
33:3, 35:12,
35:13, 35:19,
36:23, 37:10,
40:18, 40:22,
40:24, 41:1,
41:9, 41:11,
43:1, 44:22,
45:5, 51:14,

51:22, 57:16,
58:24, 59:3,
63:10, 68:14,
85:5, 86:25,
89:22, 92:21,
93:5, 95:20,
95:24
**informed**
56:13
**informs**
72:11
**initial**
58:13, 61:6,
61:11, 89:5
**input**
63:10
**inside**
70:2
**instead**
28:11, 28:21,
46:14, 46:19,
46:23, 48:5
**instructs**
8:22
**intend**
73:20, 73:22,
77:1
**intended**
7:8
**interacted**
32:11
**interacting**
32:12
**interest**
102:14, 103:11
**interesting**
47:11
**internal**
83:12
**internally**
50:24
**intervention**
27:5, 27:7
**interview**
46:10, 46:15,
46:20, 46:24,
64:23
**interviews**
34:18

| | | | |
|---|---|---|---|
| **intimidation** 85:14 **intoxilyzer** 42:13, 42:14 **investigate** 12:24, 29:10 **investigated** 31:10, 51:13 **investigating** 33:4, 51:21 **investigation** 5:9, 13:15, 33:8, 40:25, 52:3, 52:10, 52:13, 53:7, 53:10, 54:23, 58:8, 58:9, 83:9, 83:13, 86:3, 86:15, 87:15, 87:19, 88:4, 89:19, 89:21, 90:10, 91:21 **investigations** 18:24, 33:20, 33:23, 34:3, 34:15, 84:5, 91:6, 91:17 **investigators** 89:17 **involve** 91:22 **involved** 32:15, 45:6, 52:3, 84:4, 87:6, 94:1 **islamic** 62:4 **issue** 20:24, 21:4, 21:12, 75:18, 76:2, 91:9 **issued** 46:11, 46:16 **issues** 27:16, 27:18, 35:24, 36:3, 43:6 | **itself** 22:19, 36:10, 41:17, 96:3 **J** **jack** 3:25 **january** 89:2, 89:11 **jennifer** 1:5, 3:2, 3:23, 6:4 **jesse** 3:15, 6:23 **jewish** 24:6, 26:7, 49:11 **job** 1:23, 12:18, 12:20, 83:7 **jobs** 17:7 **john** 3:8 **join** 65:22 **jones** 6:21, 100:23 **josefiak** 3:7 **journalist** 49:9 **judge** 8:16, 8:20 **judgment** 20:2, 20:5, 20:7, 20:16, 28:7, 83:5 **judicial** 90:5 **june** 102:23, 103:17 **jurisdiction** 44:24, 45:11, 45:14, 52:21, 63:19, 63:23, 64:3, 64:6, 64:16 | **jurisdictions** 87:6 **K** **katherine** 3:14, 6:20 **katie** 83:16 **keep** 30:11, 59:20, 61:14, 61:15 **kellen** 3:5, 6:19 **kept** 72:22 **kind** 12:17, 14:13, 15:1, 19:22, 20:19, 21:5, 21:18, 23:18, 23:24, 24:13, 25:9, 25:18, 25:25, 26:1, 26:24, 27:20, 28:3, 28:7, 28:12, 30:1, 30:19, 36:4, 37:2, 38:7, 39:24, 40:1, 41:22, 43:15, 44:14, 44:21, 46:21, 47:9, 53:5, 60:3, 68:5, 68:19, 82:6, 99:15 **knew** 77:10 **know** 9:10, 9:17, 9:21, 9:25, 13:8, 14:4, 14:12, 14:13, 15:5, 17:3, 17:8, 19:23, 19:25, 21:9, 23:19, 23:20, 24:14, 25:19, 25:25, 27:16, | 27:20, 28:19, 30:6, 31:4, 31:9, 34:8, 35:5, 37:19, 38:13, 39:11, 40:1, 40:9, 41:6, 41:12, 43:13, 44:24, 47:24, 53:15, 57:5, 62:6, 62:24, 63:8, 63:18, 63:22, 65:25, 66:9, 68:18, 71:5, 72:18, 72:19, 77:17, 83:11, 85:20, 92:5, 94:6, 94:8, 94:13, 98:13 **knowledge** 63:11, 88:2, 102:11, 103:8 **known** 36:4 **L** **lack** 90:6 **language** 41:24 **laptop** 74:15, 98:4 **lashing** 28:20 **later** 30:16, 32:23, 46:1 **law** 3:16, 6:17, 6:21, 7:12, 11:16, 11:19, 12:15, 13:17, 17:3, 18:18, 18:23, 18:24, 20:22, 21:3, 23:13, 26:14, 26:15, 45:1, 67:14, 67:20, |

87:7, 88:2
**laws**
7:9, 14:8,
16:24, 17:1,
17:2
**lawsuit**
98:20
**lawyer**
7:24, 8:17,
8:21
**league**
23:6
**leaning**
79:20
**learn**
19:3, 27:6,
47:5
**learned**
19:5, 82:3
**learning**
14:6, 19:6,
92:20
**least**
65:24, 76:6
**left**
53:5
**legal**
17:8, 90:6,
97:22
**let's**
43:11, 44:12,
59:16, 60:24,
61:1, 61:24,
74:8, 82:7,
85:6, 86:22,
89:4
**license**
32:6
**lieutenant**
39:1, 57:5,
57:13, 81:9,
81:10
**lieutenant's**
38:25
**life**
27:19
**likely**
31:2

**limit**
44:16
**line**
67:8, 67:12
**link**
97:11
**liquorie**
84:19, 85:3,
85:10, 85:12,
88:23, 88:24,
89:11, 90:13
**liquorie's**
86:24, 89:5
**list**
38:4, 38:5,
41:23
**little**
35:11, 36:2,
52:22, 68:14,
89:7
**live**
44:23, 45:10,
45:13
**lived**
63:17
**lives**
43:12, 45:9
**llc**
103:16
**location**
67:11
**log**
36:15
**long**
40:13, 65:15,
87:13
**long-time**
49:3
**longer**
21:8
**look**
25:22, 26:1,
35:18, 43:23,
59:17
**looked**
49:18, 80:22,
80:24
**looking**
56:14, 60:4,

69:23, 69:24,
80:2
**looks**
60:7
**lot**
8:10, 8:14,
13:16, 34:8,
35:4, 35:24,
62:14, 71:25

**M**

**made**
28:10, 32:17,
49:14, 52:15,
64:18, 72:23,
81:6, 81:7,
82:25, 83:7,
96:4, 98:18
**magistrate**
15:16, 15:21,
15:22, 16:2,
16:10, 16:13,
16:18, 20:17,
20:20, 37:14,
37:21, 39:6,
39:20, 39:25,
40:5, 40:7,
40:19, 40:22,
41:5, 42:23,
43:2, 43:5,
43:22, 48:8,
48:14, 48:18,
56:6, 57:11,
57:14
**main**
8:15
**make**
9:6, 9:11,
9:13, 10:3,
13:8, 14:5,
15:7, 16:1,
16:8, 20:2,
20:4, 20:6,
20:15, 20:20,
31:10, 33:10,
55:5, 70:1,
72:17, 73:2,
75:1

**making**
15:8, 28:15,
28:22, 99:12
**many**
8:7, 13:23,
17:24, 47:11,
48:10, 66:15,
71:1, 76:3,
91:6, 91:16,
94:8
**marino**
52:16, 52:23,
55:3, 55:8,
56:4, 56:20,
63:5, 63:7,
64:4, 65:22,
66:4, 66:20,
68:13, 86:2,
86:14, 87:18,
88:1, 88:6,
90:9, 90:17
**marino's**
54:12
**mark**
75:2
**marked**
59:10, 59:13,
69:18, 69:21,
84:8, 88:15
**marks**
100:17
**marshall**
3:8
**marti**
103:2, 103:15
**maryland**
6:12
**material**
85:15, 85:24
**materials**
58:7, 87:9,
90:1, 90:14
**matter**
6:4
**maybe**
25:24, 28:6,
32:2, 33:11,
38:2, 43:14,

**mean** 44:25, 45:4, 45:10, 57:13, 83:16, 91:8, 97:11, 99:8

**mean** 11:21, 13:23, 14:20, 17:1, 17:5, 20:19, 21:18, 23:18, 23:22, 27:13, 31:18, 32:8, 32:9, 32:10, 33:5, 33:16, 34:20, 35:1, 60:2, 60:4, 60:12, 66:13, 71:3, 71:19, 73:1, 75:16, 75:22, 76:22, 79:20, 84:13, 86:10, 93:7, 94:6, 98:17

**means** 7:5, 17:8, 62:6, 62:7

**media** 6:2, 54:3, 54:4, 54:22, 55:2, 92:13, 97:14

**medical** 26:10, 26:20

**medications** 10:17

**meet** 68:5, 81:21, 90:4

**meets** 37:11, 37:15, 37:17, 37:24, 39:5, 39:16, 39:19, 41:24

**member** 28:18

**members** 85:13

**memorialize** 34:17

**mental** 27:15, 27:17, 28:11, 28:14, 28:21

**mention** 51:1, 53:17, 53:20, 54:2, 54:4, 54:15, 57:9, 86:4, 86:15, 87:20

**mentioned** 11:25, 15:9, 16:21, 18:18, 26:17, 31:12, 32:7, 33:7, 35:6, 35:12, 38:9, 39:18, 43:17, 44:3, 51:24, 56:25, 57:12, 60:15, 75:11, 84:18, 85:19, 96:11, 99:2

**mentioning** 54:21

**message** 42:19, 97:17

**messages** 93:11, 93:15, 93:19, 94:18, 96:2, 96:12, 96:16, 96:22, 97:1, 97:7, 97:24, 98:2, 99:2, 100:6

**messaging** 97:8, 97:15

**met** 37:19

**methodically** 87:8

**middle** 62:2

**might** 14:10, 24:16, 25:11, 25:18, 25:21, 26:1, 27:12, 28:6,

28:7, 28:11, 28:13, 28:17, 29:10, 29:23, 30:3, 30:5, 31:12, 31:13, 31:17, 31:20, 32:3, 33:3, 33:9, 33:23, 34:13, 38:11, 42:7, 43:15, 44:9, 44:19, 44:24, 45:3, 45:8, 45:11, 45:14, 45:17, 45:25, 46:3, 46:10, 47:5, 49:25, 60:23, 64:1, 76:21, 92:7, 93:11

**mind** 74:9, 82:19

**minute** 9:24

**minutes** 40:16, 40:17, 70:11, 80:3, 83:17

**misdemeanors** 41:2

**mistake** 79:19

**mistaken** 71:20

**mm-hmm** 35:16

**moment** 73:25

**monday** 89:1

**monitor** 6:9, 72:17, 72:21

**month** 81:24

**more** 28:4, 28:14, 29:11, 31:2, 31:9, 36:2,

45:23, 47:17, 47:19, 50:1, 68:14, 68:19, 68:20, 71:5, 74:8, 82:5, 83:5, 96:3

**morning** 52:14, 52:25, 57:17, 57:21, 63:15, 66:10, 66:12

**motamedy** 1:25, 2:13, 6:25, 102:2, 102:21

**motivated** 91:23

**motor** 18:23, 77:8

**move** 79:4

**much** 19:14, 19:17, 25:16, 29:8, 31:9, 53:3, 70:22

**mug** 92:12

**multiple** 11:22, 83:25, 87:5

**muslim** 26:4, 62:4

**myself** 33:11, 33:14, 33:15, 91:12, 96:9

**N**

**name** 6:16, 6:20, 7:23, 10:6, 10:7, 24:22, 32:23, 49:18, 64:10

**narrative** 60:22, 60:23, 60:25, 61:4,

61:7, 61:11

**nation**
23:21

**nature**
23:24, 42:16,
51:9

**nc**
3:18, 84:20,
88:24

**ncc4cr**
85:13, 85:20

**ncsbi**
89:21, 90:11

**necessarily**
51:8, 65:17,
75:23

**necessary**
58:4, 73:5,
90:4

**need**
9:22, 9:25,
19:14, 19:17,
28:9, 33:12,
42:10, 59:19

**needed**
19:7, 19:9,
28:11, 42:13,
55:5, 55:22,
65:3, 73:23

**needs**
28:10

**neighborhood**
64:9, 64:12

**neighborhoods**
64:1

**neighbors**
76:7, 76:10

**neither**
102:12, 103:9

**never**
39:10, 39:13,
40:11, 46:12,
46:13, 62:18,
67:6, 82:11,
88:20

**new**
12:15, 22:14,
22:15, 37:4,

72:3, 72:4,
96:23

**newer**
70:21

**next**
52:14, 59:17,
61:9, 63:16,
64:16, 80:15,
80:21, 85:8

**nibrs**
62:7

**nobody's**
70:1

**nods**
9:2

**none**
91:19

**nope**
85:21

**normal**
60:6, 66:11,
66:13

**normally**
39:24, 43:7,
65:23

**north**
1:2, 6:6,
11:18, 17:11,
22:18, 38:15,
49:3, 49:5,
87:10, 89:20,
89:24

**notary**
2:14, 7:3,
102:1, 102:17,
102:21

**notebook**
30:18

**notes**
30:18, 35:2,
35:7, 35:8,
94:24, 95:4

**nothing**
7:18, 72:18,
96:2, 96:5

**notified**
72:14

**notify**
43:13

**november**
11:11, 24:20,
91:5, 91:16,
96:24, 99:18

**number**
6:3, 6:7,
41:12, 43:8,
43:9, 43:18,
43:21, 47:15,
51:15, 51:17,
51:20, 58:24,
59:15, 91:13

**numbers**
32:5

O

**oaths**
7:4

**object**
8:21, 15:14,
19:19, 20:9,
45:20, 46:17,
48:23, 51:4,
63:2, 98:6

**objection**
7:13, 78:2,
78:18, 78:25,
79:16, 86:6,
86:18, 90:20,
94:11

**objections**
8:18, 8:20

**objects**
8:17

**obligation**
72:16, 95:19

**observe**
72:23

**observing**
65:10

**obtain**
56:6

**obtained**
54:11

**obtaining**
37:9

**obviously**
15:2, 15:7,

17:3, 21:5,
58:23, 65:25

**occur**
24:17

**occurred**
19:10, 87:13,
96:15, 98:12,
98:17

**occurring**
53:20

**offender**
30:7, 30:22,
31:13, 31:21,
31:25, 32:24,
35:12

**offense**
81:21

**offer**
100:24

**offered**
27:9

**office**
39:8, 39:15

**officer**
6:22, 7:22,
8:3, 8:12, 10:9,
10:20, 11:6,
11:14, 11:17,
11:23, 12:1,
12:5, 12:11,
12:12, 12:14,
13:2, 14:3,
14:5, 14:6,
14:11, 14:14,
14:16, 14:17,
14:22, 14:23,
15:8, 15:19,
16:15, 16:16,
16:23, 17:16,
17:19, 17:22,
18:2, 20:15,
25:2, 25:4,
26:15, 28:8,
29:4, 29:19,
50:14, 51:20,
52:16, 52:17,
52:23, 55:8,
55:10, 55:14,

56:4, 57:25,
58:7, 58:14,
59:11, 62:1,
63:5, 63:7,
63:8, 65:9,
65:12, 65:22,
65:25, 66:4,
66:18, 66:19,
67:15, 68:13,
69:20, 70:18,
70:20, 70:21,
74:24, 75:12,
75:17, 83:24,
84:11, 87:18,
88:18, 90:9,
90:17, 91:5,
92:23, 95:13,
102:2

**officer's**
14:2

**officers**
12:16, 15:11,
17:21, 17:25,
24:15, 35:2,
39:11, 55:3,
56:20, 62:9,
64:4, 65:24,
68:22, 69:10,
82:25, 83:6,
86:2, 86:14,
87:18, 88:1,
88:6, 93:25,
94:3, 96:5,
96:10, 96:12,
97:1, 97:5,
97:22, 98:3,
98:10, 98:24,
99:7, 99:10

**official**
35:9

**officials**
89:23

**often**
22:13

**oh**
16:6, 33:18,
52:21, 53:3,
57:11, 65:6,

90:8, 96:1, 98:7

**old**
37:4, 97:9,
99:3

**older**
25:23

**once**
21:7, 56:8,
71:24, 72:14,
98:18

**one**
6:3, 8:17,
15:10, 16:21,
17:22, 21:11,
29:22, 30:6,
30:7, 45:23,
48:11, 50:13,
60:14, 66:2,
69:20, 82:6,
91:8

**ones**
24:15

**only**
10:1, 17:20,
38:15, 48:11,
66:2, 100:4,
100:5

**opened**
71:21

**operating**
17:9, 60:20

**operations**
18:25

**opinion**
85:13, 90:14

**opinions**
17:6

**option**
47:1

**oral**
98:9

**orally**
9:2

**order**
19:14, 56:6,
100:20, 100:25

**orders**
100:19

**organization**
23:5

**original**
54:25

**other**
8:25, 11:20,
13:22, 13:25,
17:18, 17:21,
21:2, 21:5,
21:16, 22:1,
22:22, 25:17,
26:20, 26:23,
28:24, 31:16,
33:1, 39:11,
40:17, 42:1,
43:1, 53:1,
54:24, 57:16,
58:6, 58:9,
59:3, 61:1,
61:20, 71:3,
76:3, 80:21,
87:6, 87:7,
88:2, 90:3,
91:8, 93:25,
94:24, 96:4,
96:10, 96:12,
97:1, 97:4,
98:3, 98:10,
98:14, 98:23,
99:3, 99:7,
99:9, 100:3

**others**
31:3, 85:15,
85:24

**otherwise**
102:14, 103:11

**ottoway**
57:5, 57:13,
81:9, 81:10

**ourselves**
29:12

**out**
13:10, 15:23,
16:20, 21:9,
22:14, 22:15,
23:20, 28:20,
29:12, 30:5,
33:13, 33:15,

34:8, 41:5,
51:12, 52:17,
53:4, 55:21,
68:9, 69:8,
82:13, 83:22,
94:14

**outcome**
48:19, 102:15,
103:11

**outside**
21:3, 23:14,
71:13, 76:7

**over**
14:8, 17:15,
17:17, 44:13,
53:4, 57:6,
80:22, 80:24,
87:13

**own**
32:4, 43:16,
66:20

---

**P**

**page**
5:2, 5:8,
59:17, 59:25,
61:1, 61:9,
61:24, 62:2,
85:7, 85:8, 89:6

**pages**
1:24

**panic**
27:2, 27:23,
72:11, 72:15,
72:24, 73:7,
78:9, 78:13,
78:17, 78:21,
78:24

**paper**
8:19

**pardon**
48:3

**park**
66:23, 67:2,
67:6, 75:14,
75:17, 75:23

**parked**
66:25, 75:8,

75:11

**parking**
71:24, 75:16,
75:20, 76:8

**part**
16:15, 33:8,
56:1, 58:20,
58:22, 62:22

**particular**
11:7, 12:3

**parties**
6:12, 7:5,
7:10, 102:13,
103:10

**partition**
77:9

**partners**
87:8, 88:3

**party**
25:6

**passenger**
66:19

**past**
45:1

**patient**
87:14

**patrol**
11:6, 11:9,
18:23, 18:25,
29:13, 29:19,
39:1, 57:6,
66:15, 72:5,
75:6

**paul**
5:11, 84:19,
85:10, 88:23

**pause**
70:13

**pd**
4:2, 4:3

**peeking**
69:25

**peering**
76:10

**pending**
10:2

**people**
25:17, 27:9,

27:15, 28:5,
28:16, 30:6,
35:5, 37:23,
68:5, 71:16,
99:11

**perfectly**
67:8

**perform**
12:18, 12:20,
17:7

**period**
87:13

**permitted**
7:8

**person**
13:1, 19:11,
21:8, 24:22,
27:13, 43:12,
45:9, 45:13,
46:15, 81:13

**person's**
21:7

**personal**
92:24, 93:2,
98:4

**personally**
31:8, 39:10,
47:12, 47:13,
62:15, 84:4,
89:14, 91:7,
91:17

**peterson**
4:2

**phone**
32:5, 92:24,
93:1, 93:4,
93:10, 93:15,
93:20, 93:23,
94:5, 94:10,
94:22, 95:1,
96:2, 96:13,
96:17, 96:21,
96:23, 97:9,
97:21, 98:4,
99:3, 99:17,
99:22

**phones**
95:19, 96:15,

99:25

**photo**
76:6, 97:13

**photos**
100:5, 100:8

**picture**
25:20, 25:21

**pictures**
93:10, 93:14,
93:19, 94:20,
96:9

**place**
49:25, 71:2

**placed**
65:9

**places**
12:9

**plaintiff**
1:6, 3:2, 3:23,
6:17, 7:20, 7:24

**plan**
9:23

**planet**
6:10, 7:1,
103:16

**play**
34:11, 75:2

**played**
70:12, 72:9,
75:4, 76:15,
77:20, 79:8

**please**
6:14, 7:14,
9:1, 9:8, 10:5,
59:7, 84:7,
87:14, 101:4

**plethora**
22:15

**pllc**
3:7

**plumber**
25:20, 25:21,
25:24, 26:1

**point**
16:12, 36:14,
55:7, 65:20,
68:21, 69:9,
70:23, 70:25,

79:24, 80:9

**police**
8:12, 10:10,
10:21, 10:24,
11:5, 11:6,
11:14, 11:17,
18:5, 18:15,
22:5, 22:9,
24:13, 25:1,
25:2, 29:21,
32:18, 33:19,
35:15, 36:5,
38:1, 39:25,
44:13, 49:14,
49:22, 50:17,
51:2, 56:16,
64:2, 80:16,
83:8, 84:1,
84:21, 89:16

**policies**
22:14, 22:15,
22:16

**policy**
22:7

**polk**
87:1

**porch**
72:1

**portion**
61:20, 72:10,
79:10

**possession**
73:19

**possible**
39:1, 45:5,
62:8, 62:11,
73:24, 78:12

**possibly**
63:4, 63:7,
63:8, 70:22

**post**
54:2, 54:4,
54:5, 54:7,
54:16, 54:18,
54:22, 54:25,
55:2, 97:13

**posted**
99:4

**posting**
96:4
**postings**
90:3, 90:4,
96:9
**posts**
99:3, 99:7,
100:8
**potential**
75:19
**pouring**
79:21
**practice**
34:17, 34:23,
35:8
**prefer**
28:21
**prepared**
58:7, 103:3
**present**
3:22, 8:16,
21:7, 21:8,
21:13, 65:14,
65:19, 98:10
**presented**
56:5, 89:22,
90:5
**presents**
15:20
**pretty**
8:10, 66:13
**previously**
49:13
**primary**
58:3
**prior**
36:21, 50:17,
55:9, 91:5
**probable**
15:3, 15:9,
15:11, 15:17,
15:20, 16:1,
16:10, 16:13,
16:17, 19:6,
19:9, 19:11,
19:15, 19:18,
19:21, 20:2,
20:7, 20:17,

20:20, 37:12,
37:20, 40:2,
40:19, 41:20,
42:18, 55:7,
55:18, 55:20
**probably**
24:19, 40:16,
64:9, 79:19,
79:20, 81:24,
94:6, 94:13
**problem**
33:21, 74:16
**procedural**
7:9
**proceed**
7:2, 50:9,
74:20, 95:11
**proceeding**
7:7, 103:4
**proceedings**
102:3, 102:5,
102:6, 102:9,
103:5, 103:7
**process**
17:23, 37:8
**produced**
7:7
**properly**
9:4
**provide**
42:15, 77:3,
77:5
**provided**
87:9, 89:19
**providing**
14:7
**ptsd**
92:17
**public**
2:14, 90:3,
102:1, 102:21
**pull**
59:7, 69:17,
69:19, 84:7,
88:14
**pulled**
44:13
**purposes**
66:1

**pursuant**
2:13, 46:23
**push**
83:18, 83:20
**put**
23:5, 24:13,
32:2, 35:3,
35:5, 35:7,
41:9, 41:15,
41:24, 42:1,
42:21, 62:24,
71:8, 71:22,
72:1, 72:3,
76:19
**putting**
71:11

**Q**

**qualified**
102:8
**question**
8:22, 9:9,
9:10, 9:12,
9:16, 9:18,
9:19, 10:2,
14:21, 16:5,
18:12, 20:12,
34:22, 46:7,
79:2, 100:11
**questioning**
47:4, 47:6
**questions**
7:25, 8:18,
10:18, 46:25,
77:17, 95:14,
100:12, 100:15
**quick**
50:1, 95:4,
97:11
**quickly**
82:17, 83:10
**quotations**
35:5
**quote**
35:4

**R**

**rachmuth**
1:5, 3:3, 3:23,

6:4, 6:18,
48:22, 49:23,
50:16, 51:25,
60:11, 64:23,
65:10, 67:19,
68:16, 69:10,
70:16, 70:23,
76:24, 77:22,
77:23, 80:12,
80:14, 81:12,
81:15, 83:25,
84:19, 85:4,
85:9, 85:23,
86:5, 86:16,
86:24, 88:23,
89:12, 92:16,
93:5, 93:11,
93:17, 93:23,
94:3, 94:21,
95:24, 96:7,
96:13, 97:2,
97:5, 97:10,
97:22, 97:25,
98:4, 98:11,
99:3
**rachmuth's**
64:12, 64:18,
66:7, 66:24,
69:3, 80:9,
90:18, 92:12,
93:20
**raise**
7:14
**raleigh**
3:18
**rank**
11:4, 11:10
**reach**
30:5
**reaches**
51:12
**reaction**
82:3, 92:20
**read**
22:16, 63:14,
85:6, 86:23
**realize**
24:16, 25:11,

| | | | |
|---|---|---|---|
| 25:18, 77:21, 87:12 | **recollect** 30:19 | **remember** 18:14, 23:12, 23:14, 25:16, 26:5, 26:9, 34:5, 34:6, 37:1, 38:16, 48:19, 53:13, 53:21, 54:1, 54:17, 54:21, 54:24, 60:4, 66:6, 66:8, 67:7, 71:10, 71:12, 76:5, 76:20, 76:22, 78:4, 78:11, 78:14, 78:16, 78:20, 81:6, 81:12, 91:11, 91:13, 98:25, 99:8, 99:19 | 58:13, 58:17, 58:21, 58:22, 59:4, 60:7, 60:10, 60:16, 60:18, 60:20, 60:21, 61:17, 61:21, 62:22, 62:25, 63:10, 80:17, 80:18, 80:20, 80:25 |
| **really** 13:24, 15:7, 25:16, 26:24, 33:5, 34:5, 46:7, 46:8, 53:9, 60:4, 75:24, 82:8 | **record** 8:18, 9:13, 30:10, 50:5, 50:8, 74:17, 95:7, 95:10, 101:4, 101:5, 102:10, 103:7 | | |
| | | | **reported** 29:5, 29:6, 32:13, 32:18, 51:21 |
| **reason** 34:7, 68:22, 68:24, 81:18 | **recorded** 1:25, 7:5, 40:7, 40:10, 102:6 | | |
| **reasonable** 19:6 | | | **reporter** 6:25, 7:3, 9:1, 9:4, 9:11, 101:3, 102:1 |
| **recall** 17:15, 17:17, 18:8, 21:1, 23:3, 23:7, 24:3, 24:4, 24:22, 27:24, 31:4, 34:16, 48:11, 77:23, 91:9, 94:17 | **recording** 7:7, 70:12, 72:9, 75:4, 76:15, 77:20, 79:8, 102:9, 103:4 | | |
| | | **remote** 59:8, 84:9, 88:16 | **reporting** 49:19, 50:21, 51:14, 51:22 |
| | **recordings** 94:20 | | |
| | | **remotely** 6:13 | **reports** 12:23, 13:5, 13:8, 14:1, 36:9, 36:14, 36:17, 51:2, 51:6, 51:7, 51:8, 60:3 |
| | **records** 90:3 | **repeat** 14:21, 20:11, 45:22, 79:2 | |
| **receive** 19:13, 20:5, 20:14, 26:13, 43:21 | **recovered** 36:9, 36:13 | | |
| | **reduced** 102:7, 103:5 | **repeatedly** 85:16, 86:11 | **represent** 6:15, 6:17, 6:21 |
| **received** 11:14, 11:15, 11:20, 11:22, 18:4, 18:6, 18:10, 21:2, 22:4, 22:17, 22:21, 22:25, 23:4, 23:8, 24:8, 26:10, 26:21, 26:25, 27:3, 28:24 | **refer** 28:3 | **rephrase** 9:17 | |
| | | | **representing** 6:10, 6:25 |
| | **referred** 34:15, 71:11 | **report** 5:9, 13:14, 30:13, 30:14, 30:20, 32:3, 32:15, 32:17, 32:20, 35:4, 35:7, 35:9, 35:21, 36:1, 36:7, 36:19, 36:24, 37:4, 40:24, 40:25, 50:24, 51:12, 51:13, 51:15, 51:17, 51:20, 57:20, 57:23, 58:2, 58:10, | **request** 5:12, 93:8 |
| | **referring** 71:14 | | |
| | **regarding** 49:15, 84:2 | | **requesting** 71:18 |
| | **registration** 102:17 | | **requests** 95:21 |
| **receiving** 18:14, 24:5 | **regular** 22:13 | | **required** 22:12, 34:2, 57:25, 92:17 |
| **recertify** 26:16 | **related** 17:18, 26:4, 26:7, 41:11, 58:23, 102:12, 103:9 | | |
| **recess** 50:6, 74:18, 95:8 | | | **residence** 67:5 |
| | | | **resident** 49:3 |
| **recognize** 59:11, 59:25, 84:11, 88:18 | **relating** 93:5, 94:21, 94:25 | | **resources** 27:8, 37:22 |
| | **relatively** 43:25 | | |

respect
80:24, 83:13
respond
29:7
responded
64:8, 64:11
responding
29:16
response
86:24, 93:8
responsibility
55:18
responsive
95:20
restate
41:18, 46:1
result
92:18
retract
18:11
returned
52:14
review
13:13, 15:19,
16:23, 54:5,
54:7, 54:18,
55:2, 56:1,
57:20, 57:23,
58:6, 58:14,
58:16, 59:3,
61:20, 62:21,
83:9, 90:5, 95:4
reviewed
22:8, 56:15,
56:22, 58:19,
59:2, 60:16,
61:18, 84:15
reviewing
22:7, 82:25
rid
99:17
riding
65:16, 66:3,
66:17
right
7:14, 10:5,
12:1, 16:24,
18:19, 22:3,

26:18, 29:16,
29:24, 31:14,
33:9, 35:15,
37:4, 38:11,
38:21, 39:20,
44:4, 47:9,
51:3, 52:1,
56:23, 60:8,
62:22, 70:16,
71:6, 72:5,
72:8, 72:12,
73:8, 74:2,
75:1, 75:2,
75:6, 75:12,
76:17, 77:12,
79:25, 80:5,
82:7, 83:7,
84:21, 84:24,
89:2, 92:10,
96:13, 101:3
risk
21:23
rms
35:23, 35:24,
36:3
road
59:22, 77:15
rockville
6:12
role
16:15, 16:16,
16:20, 65:7
room
10:11, 42:14
route
28:21
rule
8:20
rules
7:9
run
44:14

**S**

safety
14:6, 67:15,
75:12
said
29:15, 29:22,

33:8, 35:17,
36:12, 37:15,
38:19, 44:6,
45:7, 50:15,
53:16, 53:21,
53:22, 53:25,
54:10, 55:1,
56:14, 60:19,
62:21, 63:23,
64:11, 72:25,
81:13, 83:3,
84:20, 87:23,
94:17, 99:17,
102:8, 102:9,
103:5, 103:6
same
11:10, 58:23,
82:6, 93:1,
99:23
sample
42:15
save
100:4, 100:5,
100:6
saved
100:8
saw
52:19, 52:20,
54:25, 63:17,
76:16, 90:13
say
20:4, 24:19,
25:17, 33:13,
43:12, 44:12,
45:8, 48:7,
57:3, 63:19,
68:17, 68:18,
77:15, 78:23,
81:14, 90:10,
98:16, 98:23,
99:10
saying
30:19, 46:19,
77:22, 98:13
says
34:24, 61:17,
62:3, 84:18,
85:4, 85:8,

85:12, 85:23,
86:10, 88:22,
89:1
scene
21:8, 21:14,
30:1, 31:15,
31:17, 33:2,
37:11
schreiber
103:2, 103:15
screen
69:19, 69:24,
74:22
screenshots
100:7
scroll
59:16, 60:22,
60:24, 61:2,
61:8, 61:23,
86:22, 89:4,
89:7
scrolling
61:14, 61:15
search
93:4, 95:19
searched
93:9, 95:23
seat
66:19, 77:11
second
17:22, 33:19,
66:5, 69:20,
74:10, 99:21
seconds
70:7, 72:7,
74:8, 76:14
section
60:25, 61:4,
61:7, 61:12
security
87:2
see
14:13, 14:14,
15:17, 19:24,
19:25, 25:19,
25:23, 29:8,
32:1, 37:11,
37:12, 37:15,

59:17, 62:1,
62:4, 69:20,
71:3, 74:23,
76:5, 76:7,
76:10, 84:23,
85:3, 85:8,
85:10, 85:17,
85:22, 85:24,
86:12, 87:16,
88:22, 89:10,
90:7, 90:15
**seeing**
38:16, 70:25,
98:14
**seek**
15:12, 20:18,
20:23, 21:9,
37:20, 48:5,
48:14, 48:17,
91:25
**seeking**
20:8, 48:6,
48:12
**seemed**
71:5
**seen**
88:20
**send**
29:10, 33:9,
33:11, 33:14,
33:16, 33:23,
34:2, 40:24,
41:1
**sense**
9:6, 9:14,
10:3, 28:9,
32:9, 51:6,
58:23
**sent**
93:9, 97:12,
97:25
**separate**
58:20, 92:23
**sergeant**
38:25, 57:7,
57:8, 57:13
**serve**
12:25, 43:11,

44:3, 44:17,
44:20, 44:24,
45:3, 45:8,
45:12, 45:15,
45:18, 46:1,
46:3, 46:6,
63:20, 64:17,
64:20, 65:13,
66:11, 66:13,
70:2
**served**
17:19, 17:25,
43:15, 43:16,
44:7, 44:9,
44:11, 44:15,
47:9
**serving**
13:1, 14:2,
14:17, 14:22,
64:23, 65:7,
65:23, 67:6,
67:16, 75:21,
75:24, 76:1
**severe**
28:19
**shadow**
3:25
**shall**
7:9
**share**
74:22
**shared**
86:16
**sharing**
85:15, 86:10
**shirt**
71:8, 71:22,
72:4, 79:21
**shoes**
71:13, 71:18,
71:20, 72:1
**shorter**
40:16
**shot**
92:13
**should**
8:21, 48:4,
60:21, 64:20,

64:22, 95:5
**show**
12:20
**showing**
12:18, 12:21,
12:22
**sign**
14:24, 15:10,
22:16
**signature-7dmpd**
103:12
**signature-onxrw**
102:19
**since**
58:2, 66:3,
85:7, 91:16,
94:3, 94:9,
96:15, 96:25,
99:4
**sip**
79:25
**sir**
9:20, 12:6,
13:21, 26:19,
73:15
**sit**
18:13, 24:4,
54:20, 78:15,
82:20
**sitting**
70:1, 80:21
**situation**
15:2, 28:12,
30:21, 33:6,
41:23, 45:8,
45:14, 45:17,
45:25, 46:3,
46:9
**situations**
8:17, 12:24,
13:10, 31:1,
31:13, 31:16,
33:1, 34:1, 34:6
**six**
11:1
**skills**
102:11, 103:8
**skip**
72:7, 74:8,

76:13, 77:14,
79:6
**skipping**
47:2
**sloan**
1:5, 3:2, 3:23,
6:4, 84:14,
85:9, 88:23
**social**
54:3, 54:4,
54:22, 55:2,
92:13, 97:14
**software**
36:6, 36:10,
36:16, 36:18,
36:19
**some**
12:19, 32:15,
34:7, 36:14,
38:2, 44:15,
70:7, 77:16,
96:11
**somebody**
32:9, 32:17
**somehow**
31:22, 45:6
**someone**
19:24, 21:6,
24:16, 24:25,
32:1, 32:7,
35:14, 39:13,
44:25, 51:11,
51:16, 51:19
**someone's**
44:12
**something**
15:6, 29:11,
30:24, 31:9,
32:22, 36:14,
42:8, 42:19,
42:20, 50:20,
51:17, 53:20,
62:11, 62:13,
62:19, 72:19,
79:11, 82:8
**sometimes**
14:10, 28:16,
28:19, 29:9,

| | | | |
|---|---|---|---|
| 29:11, 40:15 | spoke | 89:23 | straight |
| **somewhere** | 56:17, 57:5, | **stated** | 12:16 |
| 34:25 | 57:10, 57:12 | 56:22, 78:16, | **strategic** |
| **sorry** | **spoken** | 90:13 | 67:5 |
| 14:21, 16:3, | 35:3, 53:24 | **statement** | **street** |
| 16:6, 18:12, | **spot** | 13:16, 30:23, | 44:13, 64:10, |
| 20:11, 33:18, | 75:16 | 31:2 | 75:9 |
| 34:21, 39:6, | **springs** | **states** | **streets** |
| 45:22, 58:11, | 8:12, 10:10, | 1:1, 6:5 | 12:22 |
| 89:6, 89:14, | 10:21, 10:24, | **stating** | **stuff** |
| 92:22, 97:8, | 11:14, 14:11, | 58:25, 99:12 | 50:2 |
| 98:7, 100:9, | 18:5, 18:15, | **station** | **subject** |
| 100:24 | 22:5, 22:9, | 30:16 | 83:12 |
| **sort** | 24:13, 24:25, | **statute** | **submit** |
| 72:16, 100:3 | 25:2, 25:5, | 22:18 | 40:18, 40:22, |
| **sorting** | 29:21, 32:10, | **statutes** | 43:2 |
| 89:17 | 32:18, 36:8, | 87:11, 89:25 | **submitted** |
| **sought** | 38:1, 49:14, | **statutory** | 13:19, 50:16 |
| 47:12 | 49:22, 50:17, | 90:4 | **substance** |
| **sound** | 64:2, 83:8, | **stay** | 23:15, 25:8 |
| 70:8, 80:5 | 84:1, 84:20, | 61:1 | **substantial** |
| **sounds** | 84:21, 88:23, | **step** | 89:18 |
| 83:21 | 89:16 | 29:15 | **substantive** |
| **speak** | **staff** | **stepped** | 50:2 |
| 9:2, 39:20, | 80:8, 80:12 | 69:8, 71:13 | **suffering** |
| 40:5, 41:5, 57:7 | **stalking** | **steps** | 27:22 |
| **speaking** | 22:22, 91:17, | 29:4 | **suggested** |
| 30:9, 34:21, | 91:20 | **sticks** | 48:18, 64:17, |
| 37:13 | **stand** | 34:7 | 64:19 |
| **specialized** | 59:8, 84:9, | **still** | **suite** |
| 28:25 | 88:16, 100:16, | 8:22, 21:14, | 3:17, 6:11 |
| **specific** | 101:4 | 38:6, 38:19, | **summons** |
| 22:17, 22:19, | **standard** | 61:11, 64:2, | 20:24 |
| 22:21, 23:23, | 34:17, 34:23, | 69:24, 82:20, | **sunday** |
| 25:21, 31:1 | 35:8 | 83:1, 96:16 | 66:10, 66:12 |
| **specifically** | **standards** | **stipulate** | **supervising** |
| 60:5, 73:6 | 62:9 | 7:11 | 16:17, 16:23, |
| **specifics** | **standing** | **stipulation** | 55:14 |
| 23:23 | 90:6 | 7:10 | **supervision** |
| **speech** | **standpoint** | **stood** | 103:6 |
| 90:3, 90:15, | 67:5 | 65:9 | **supervisor** |
| 90:19, 91:1 | **start** | **stop-the-bleed** | 12:25, 38:20, |
| **speeding** | 70:6, 70:14 | 26:22 | 38:24, 56:17 |
| 44:13 | **startled** | **stops** | **supervisors** |
| **spencer** | 68:19 | 12:23 | 38:7, 38:23, |
| 1:25, 2:13, | **state** | **store** | 57:1, 57:3 |
| 6:25, 102:2, | 6:15, 10:5, | 25:19 | **supplement** |
| 102:21 | 17:11, 89:20, | **stored** | 58:12, 58:16, |
| | | 36:24, 51:22 | |

58:19, 59:3,
60:16, 61:18
**supplemental**
61:17
**support**
4:3, 13:19,
16:17, 40:19,
41:19, 42:4,
42:8, 42:18,
43:2, 55:19
**supposed**
12:19, 20:6,
29:5, 39:14,
44:17, 62:10
**sure**
8:10, 9:11,
13:8, 14:5,
24:18, 25:4,
31:10, 38:6,
38:20, 40:9,
44:21, 51:16,
57:7, 63:1,
63:4, 70:1,
72:17, 73:2,
74:12, 75:1,
88:9, 88:10,
90:22, 94:7,
100:25
**surprised**
82:5, 82:10
**suspect**
21:20, 28:2,
31:14, 32:24,
33:4, 46:10,
62:3
**suspect's**
21:13, 21:23,
33:2
**suspicion**
19:7
**swat**
45:6
**swear**
7:13, 37:13
**sweatshirt**
79:13, 79:20
**sworn**
7:1, 7:17,

55:21, 102:5
**synopsis**
53:8, 53:12,
56:8, 56:21,
83:3
**system**
32:3, 32:15,
32:20, 35:13,
35:17, 35:18,
36:4, 36:5,
36:6, 36:7,
36:24, 37:4,
49:19, 50:21,
50:25, 51:3,
51:14, 51:22,
60:20
**systems**
35:21

**T**

**tab**
5:9, 5:11,
59:7, 84:7,
88:14
**tactical**
67:5, 67:17
**take**
9:4, 9:22,
9:24, 29:5,
35:2, 40:14,
50:1, 63:12,
74:10, 80:7,
83:17, 88:13,
91:3, 95:3
**taken**
50:6, 74:18,
82:13, 95:8,
98:19, 102:4
**takes**
70:7
**taking**
16:3, 16:4,
23:14, 101:4
**talk**
15:5, 29:7,
29:23, 29:25,
30:1, 30:3,
30:7, 31:13,

31:17, 33:4,
38:7
**talked**
29:1, 29:7,
35:11, 99:11
**talking**
30:15, 32:12,
34:25, 61:5,
98:13
**taught**
23:16
**team**
27:5, 45:6
**tech**
4:2, 4:3, 59:8,
84:9, 88:16
**technical**
35:24, 36:3,
74:11
**technically**
46:13, 46:14
**techniques**
18:23, 67:16
**technology**
37:6
**teeter**
53:18, 53:21
**tell**
8:9, 15:4,
43:22, 53:12,
60:9, 69:23,
81:10, 90:24
**telling**
12:10, 23:19
**template**
60:3
**tend**
31:24
**tennessee**
17:4
**testified**
7:19, 8:5, 8:8,
71:4
**testify**
7:17
**testifying**
8:15, 10:8
**testimony**
7:12, 50:22

**text**
42:19, 93:23,
96:2, 97:17,
100:6
**texting**
97:11
**thank**
6:24, 7:22,
10:4, 50:10,
85:4, 86:24,
100:15, 100:22,
101:2
**that'd**
39:1
**themselves**
6:15, 45:3
**therapy**
92:18
**thereafter**
102:7
**thing**
10:1, 99:23,
100:3, 100:4,
100:5
**things**
8:25, 13:7,
13:17, 13:25,
14:12, 15:3,
15:10, 16:22,
17:4, 17:15,
18:22, 23:20,
23:21, 25:11,
26:1, 27:12,
28:8, 29:15,
29:22, 82:6,
99:12
**think**
9:9, 13:22,
13:24, 15:25,
16:8, 22:2,
22:3, 33:5,
34:10, 40:8,
48:4, 59:20,
61:24, 68:18,
70:7, 71:12,
75:17, 82:16,
83:19, 84:14
**third**
25:6, 61:24

**thoroughly**
13:9, 31:11
**thought**
71:13, 71:18
**threat**
87:3
**threaten**
69:10
**threatened**
45:1, 45:2
**three**
17:20, 18:1,
18:2, 64:19,
97:21
**through**
29:20, 50:24,
59:21, 76:10,
83:18, 83:20,
87:8
**throughout**
11:21, 14:14,
26:15, 35:21,
87:3
**thursday**
84:23, 85:9
**tied**
32:6
**time**
6:8, 9:16,
11:21, 18:4,
18:15, 35:21,
35:23, 35:24,
35:25, 36:3,
36:11, 44:16,
45:23, 48:11,
49:2, 49:19,
50:4, 50:8,
52:18, 56:17,
57:6, 57:8,
58:5, 59:1,
60:19, 64:8,
65:4, 66:6,
66:8, 66:14,
67:18, 69:2,
70:7, 71:21,
74:16, 74:19,
75:2, 76:22,
81:25, 82:2,

82:6, 82:24,
87:13, 95:6,
95:10, 100:18
**times**
8:7, 31:4,
35:5, 47:11,
48:10, 71:1,
92:8, 94:8,
94:14
**timestamps**
80:3
**title**
38:16
**today**
6:10, 6:25,
7:25, 10:18,
18:13, 24:4,
29:1, 53:3,
54:20, 78:15,
82:20
**today's**
6:8
**together**
66:1, 66:4
**told**
22:15, 48:14,
53:14, 71:1,
81:11, 82:1,
82:2
**took**
52:17, 53:4
**top**
8:9, 13:24,
34:5, 47:15
**torchinsky**
3:6
**total**
17:24
**totality**
19:22, 20:1,
21:19, 37:18
**towards**
60:22, 64:18
**town**
12:21, 39:14,
43:12, 63:18,
63:25
**track**
30:11

**traded**
99:19, 99:23
**traffic**
12:23, 13:15,
18:24, 51:8
**train**
12:15
**trained**
17:20, 17:22,
19:8, 66:4
**training**
11:13, 11:16,
11:19, 11:20,
11:22, 11:23,
11:25, 12:4,
12:5, 12:7,
12:11, 12:12,
12:14, 13:2,
14:3, 14:7,
14:17, 14:23,
16:15, 17:21,
18:6, 18:8,
18:10, 18:14,
18:19, 18:21,
18:22, 19:3,
19:13, 20:5,
20:14, 20:22,
20:23, 21:2,
21:3, 22:4,
22:17, 22:19,
22:22, 22:25,
23:4, 23:8,
23:11, 23:13,
23:16, 24:5,
24:8, 24:11,
24:14, 24:17,
24:23, 25:8,
25:13, 25:16,
26:3, 26:6,
26:11, 26:13,
26:16, 26:17,
26:21, 26:22,
26:23, 26:25,
27:3, 27:4,
27:7, 27:25,
28:4, 28:25,
29:3, 65:18,
66:1, 67:14,

67:21, 72:14,
85:19, 91:12,
91:22
**trainings**
11:15, 11:24
**transcribe**
35:8
**transcriber**
103:1
**transcript**
5:7, 7:6,
100:20, 103:3,
103:6
**transcriptionist**
102:8
**traveling**
77:15
**tree**
67:8, 67:12
**trials**
8:10
**true**
102:10, 103:6
**truth**
7:18, 7:19
**try**
25:20, 43:10,
44:3, 48:4,
67:23, 70:21
**trying**
94:14
**turn**
70:8
**two**
30:6, 33:6,
40:16, 65:24,
66:3, 66:16,
77:9, 92:8,
93:25, 94:2,
96:15
**type**
13:12, 48:12
**types**
14:9, 22:22,
23:19, 26:20,
26:23, 51:1
**typewriting**
102:7, 103:5

| | | | |
|---|---|---|---|
| **typically** 21:9, 29:18, 40:14, 68:4 | **upsetting** 90:1 | **verbatim** 81:13 | **vocal** 9:3 |
| **U** | **upstairs** 29:10, 33:9, 33:11, 33:14, 33:17 | **versus** 20:24 | **vogel** 3:6, 6:17 |
| **uncooperative** 68:20, 71:5 | **usable** 36:10 | **via** 85:16, 86:11, 93:23 | **voice** 6:14 |
| **under** 7:8, 10:16, 60:21, 62:2, 90:2, 90:14, 90:18, 90:25, 95:18, 103:5 | **use** 7:11, 31:25, 35:18, 35:22, 42:12, 62:10, 92:24, 93:1, 93:2, 93:10, 97:7, 97:9, 97:14, 100:2 | **victim** 29:7, 29:23, 30:7, 30:22, 32:13, 34:18, 34:24, 35:3, 87:20, 88:8 | **voluntary** 13:15 |
| **underlying** 41:16, 46:25, 52:4 | **user-friendly** 36:21 | **victim's** 86:17 | **W** |
| **understand** 7:6, 8:23, 9:19, 34:22, 87:4, 89:12, 95:18 | **uses** 7:8 | **video** 5:10, 6:9, 19:23, 50:5, 50:8, 69:18, 70:14, 72:11, 74:17, 74:23, 85:16, 86:11, 95:7, 95:10, 100:19, 100:21, 101:1 | **wait** 9:8, 43:15, 44:6, 44:10, 45:25, 46:3 |
| **understanding** 25:10, 25:14 | **using** 32:5, 37:2, 42:18, 94:5 | | **wake** 27:8, 40:4, 78:7 |
| **understood** 9:18, 39:7, 40:13, 48:21, 79:24 | **usually** 30:17, 32:5, 32:14, 33:14, 38:6, 38:24, 42:21, 47:8, 71:15 | **videographer** 3:24, 3:25, 6:2, 6:9, 6:24, 50:4, 50:7, 59:18, 59:23, 74:16, 74:19, 95:6, 95:9, 100:16, 100:22, 101:2 | **walk** 59:21 |
| **unfortunately** 74:7 | **V** | | **walked** 68:9, 72:4 |
| **unit** 11:8, 33:20, 33:24, 34:3, 34:15, 66:2, 66:5 | **va** 3:9 | **videotaped** 6:3, 100:17 | **walking** 75:5, 76:8 |
| **united** 1:1, 6:5 | **vaguely** 53:1 | **view** 67:9, 67:10, 67:12 | **want** 24:19, 29:14, 31:10, 45:3, 52:22, 67:17, 77:17, 83:17, 85:1 |
| **units** 66:3 | **varies** 28:12 | **violated** 89:25 | **wanted** 31:5, 33:22, 70:20, 70:21, 82:8 |
| **unless** 8:22 | **vary** 40:15 | **violent** 28:17, 31:6, 31:7, 34:10, 45:1 | **wants** 14:17, 14:23 |
| **unsure** 45:18, 46:2 | **vehicle** 18:23, 66:20, 70:1, 77:2, 77:3, 77:9 | **virginia** 2:15, 102:22 | **warrant** 13:20, 15:6, 15:12, 15:17, 16:11, 20:18, 20:24, 21:10, 37:9, 37:13, 40:3, 40:21, 40:23, 41:6, 41:7, 41:10, 42:5, 43:3, 43:6, 43:9, 43:14, 43:19, 44:14, 44:17, |
| **until** 51:25, 60:25 | **vehicles** 67:10, 67:12, 72:5 | **virtually** 1:13, 2:2 | |
| **upload** 42:4, 42:7, 42:10, 42:12, 42:20 | **verbal** 98:25, 99:6 | | |

44:20, 45:4,
45:18, 46:1,
46:4, 46:5,
46:6, 46:11,
46:16, 46:24,
47:8, 47:9,
47:12, 47:22,
47:25, 48:1,
52:18, 52:20,
53:4, 54:11,
54:13, 55:21,
56:1, 56:6,
63:20, 64:17,
64:20, 64:23,
65:1, 65:3,
65:7, 65:13,
65:24, 66:12,
66:14, 67:7,
68:10, 70:2,
75:21, 75:24,
76:1, 92:1,
92:3, 92:9

**warrant's**
43:23, 44:1

**warrants**
40:20, 67:16

**warren**
1:8, 3:12, 6:5,
17:16, 18:2,
52:16, 52:17,
52:23, 55:3,
55:9, 55:14,
56:4, 56:20,
58:7, 58:15,
63:8, 64:4,
65:9, 65:11,
65:12, 65:25,
66:18, 66:19,
70:19, 70:20,
75:17, 80:17,
86:2, 86:14,
87:18, 88:1,
88:6, 90:9,
90:17

**warren's**
55:10, 57:25

**watch**
70:10

**water**
73:6, 73:10,
73:14, 73:18,
73:21, 73:22,
73:25, 74:2,
74:3, 74:5,
76:17, 76:19,
77:2, 77:11,
77:25, 78:6,
78:8, 79:21,
79:22, 79:25,
80:4

**way**
27:20, 32:4,
32:15, 44:15,
64:18, 72:16,
73:24, 89:15,
92:22

**ways**
12:19, 28:20,
31:24, 39:23

**we'll**
26:16, 75:2,
77:18, 80:7,
83:21, 83:22,
95:5, 95:15,
100:20

**we're**
8:25, 17:8,
21:6, 22:15,
38:6, 69:17,
69:24, 70:10,
70:13, 75:1,
75:23, 76:1,
77:8, 83:19

**we've**
22:14, 32:2,
35:20, 37:1

**wearing**
69:12, 71:12,
71:20

**website**
41:8, 41:10

**week**
66:9

**weird**
37:3

**welcome**
50:3

**went**
50:14, 57:17,
57:21, 65:2,
71:15, 80:16,
85:7, 99:20

**weren't**
36:15, 48:4,
64:7, 64:9,
73:16, 77:5

**wes**
4:2

**western**
1:3, 6:7

**whatever**
73:4

**whatever's**
27:19

**whenever**
22:14

**whereupon**
7:15

**wherever**
32:14

**whether**
14:7, 15:4,
15:11, 15:19,
16:1, 16:9,
16:16, 17:15,
19:23, 20:6,
20:7, 20:15,
20:16, 21:12,
21:13, 21:23,
23:20, 27:18,
28:8, 32:11,
37:24, 38:3,
38:24, 39:19,
40:9, 44:23,
44:25, 55:6,
55:23, 60:9,
62:10, 64:5,
64:22, 78:16,
78:17, 78:23,
86:16, 87:20,
88:7, 88:10,
90:11, 90:18,
90:24, 90:25,
92:5

**whole**
7:18, 35:25,

62:13

**widely**
92:13

**windows**
76:11

**within**
17:8, 23:21,
82:12

**without**
45:4, 65:13,
98:10

**witness**
7:1, 7:14,
15:16, 19:21,
20:11, 34:18,
34:24, 45:22,
46:19, 48:25,
51:6, 63:4,
78:4, 78:20,
79:2, 79:18,
86:8, 86:20,
90:22, 94:13,
98:7

**witness(es**
102:4

**witnesses**
53:24

**woman**
25:23, 53:4

**word**
34:7

**wording**
41:21

**work**
13:5, 41:13,
52:7, 52:14,
52:15, 52:25,
63:15, 92:24,
93:2, 93:10

**worked**
63:24, 87:2

**working**
87:5

**works**
37:9

**worn**
79:10

**worse**
28:22

**worthless**
48:13
**wouldn't**
70:24, 71:2
**wrapping**
95:5
**write**
12:23, 30:13,
30:14, 30:18,
30:22, 34:20,
34:23, 51:7,
80:17, 80:18,
80:19
**writing**
13:14, 30:20,
32:3, 32:15,
32:20, 34:19,
34:25, 35:21,
36:7, 36:19,
36:24, 43:2,
60:20
**written**
7:10, 22:5,
22:9, 30:23,
31:2, 36:1,
40:18, 40:22,
41:1, 41:4,
42:1, 42:17,
51:13, 59:4
**wrote**
80:22, 89:12

### Y

**yeah**
11:21, 16:19,
26:2, 29:25,
37:25, 45:10,
45:16, 51:23,
53:2, 56:11,
60:2, 60:13,
66:13, 69:25,
70:9, 72:22,
85:11, 89:7,
90:8, 94:6
**year**
37:2
**years**
11:2, 26:15,

63:25
**yep**
37:7, 84:25,
85:18, 87:17,
88:25, 89:3
**yesterday**
52:16, 55:9
**yourself**
20:15, 33:23,
43:11, 44:4,
44:10

### Z

**zoom**
9:1, 9:5,
39:24, 40:2,
40:6

### 0

**00386791**
102:17
**02**
50:8, 102:18
**03**
1:15
**0338**
3:19
**04**
6:9
**06**
95:10
**08**
5:9

### 1

**10**
5:10, 9:24,
40:17, 47:17,
69:18, 69:21
**103**
1:24
**11**
5:11, 84:7,
84:8, 100:18
**12**
5:12, 88:14,
88:15, 101:5
**15**
9:24

**15405**
3:8
**18**
80:3

### 2

**2**
89:11
**20**
47:19, 83:16
**20169**
3:9
**2020**
10:25
**2021**
24:19, 84:1
**2022**
24:19, 84:24,
85:10
**2023**
84:1, 89:2,
89:11
**2024**
11:11, 24:20,
91:6, 91:16,
96:24, 99:18
**2026**
1:14, 6:8,
96:24, 96:25,
102:23, 103:17
**2029**
102:18
**20850**
6:12
**222**
1:8, 6:7
**25**
1:8, 6:7
**2626**
3:17
**27608**
3:18
**28**
102:18
**29**
1:14, 6:8,
102:18

### 3

**3**
1:15, 6:9, 50:5

**30**
70:6, 74:10,
74:17, 83:16
**305**
3:17
**33**
74:19
**341**
3:10
**37**
89:11

### 4

**4**
50:8, 74:17,
74:19, 95:7
**40**
12:8, 12:9
**400**
6:11
**451**
6:11
**48**
82:12

### 5

**5**
95:10, 100:18,
101:5
**54**
50:5
**540**
3:10
**56**
84:24
**58**
95:7
**59**
5:9
**5:-cv--bo-rj**
1:8, 6:7

### 6

**633894**
1:23
**670**
3:19
**69**
5:10

**7**

**7**
84:24
**72**
82:12

**8**

**84**
5:11
**88**
5:12
**8808**
3:10
**8th**
85:2

**9**

**919**
3:19

# Exhibit 9

# Holly Springs Police Department

Incident Case Number:   24-002684

Reporting Agency:   Holly Springs Police

Print Date/Time:   11/04/2024 07:34:49

**Disclaimer: The information contained within this report is reflective of the investigation at the date and time of its printing.**

Exhibit #

08

05/26/26 - AM

# CONFIDENTIAL

## INCIDENT/INVESTIGATION REPORT

**Agency Name:** Holly Springs Police Department
**ORI:** NC 0921700

**Case#** 24-002684
**Date / Time Reported:** 11/02/2024  11:29  Sat
**Last Known Secure:** 11/02/2024  11:28  Sat
**At Found:** 11/02/2024  11:28  Sat

**Location of Incident:** 5277 SUNSET LAKE RD, Holly Springs NC
**Gang Relat:** NO
**Premise Type:** Grocery/supermarket
**Zone/Agency:** HP02, HPD

### INCIDENT DATA

**#1 Crime Incident(s):** Cyberstalking / CYBERSTALKING  (Com) M
**Weapon / Tools:** None
**Entry:** **Exit:** **Security:** **Activity:** N

**#2 Crime Incident:** ( )
**Weapon / Tools:**
**Entry:** **Exit:** **Security:** **Activity:**

**#3 Crime Incident:** ( )
**Weapon / Tools:**
**Entry:** **Exit:** **Security:** **Activity:**

**MO:**

### VICTIM

**# of Victims:** 1   **Type:** INDIVIDUAL/ NOT LAW   **Injury:**

| | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| **V1** | ▉▉▉▉▉▉ | 1, | Age ▉ | ▉ | ▉ | 1ST | | |

**Home Address:** ▉▉▉▉▉   **Email:**   **Home Phone:** ▉▉▉
**Employer Name/Address:**   **Business Phone:** - -   **Mobile Phone:**

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|
| | | | | | | |

### OTHERS INVOLVED

**CODES:** V- Victim (Denote V2, V3)   WI = Witness   IO = Involved Other   RP = Reporting Person (if other than victim)

**Type:**   **Injury:**

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| | | | Age | | | | | |

**Home Address:**   **Email:**   **Home Phone:**
**Employer Name/Address:**   **Business Phone:**   **Mobile Phone:**

**Type:**   **Injury:**

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| | | | Age | | | | | |

**Home Address:**   **Email:**   **Home Phone:**
**Employer Name/Address:**   **Business Phone:**   **Mobile Phone:**

### PROPERTY

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Officer/ID#:** WARREN, E. (2644)
**Invest ID#:** (0)
**Supervisor:** BOCK, D. C. (HP1288)

**Status**
**Complainant Signature:**
**Case Status:** Closed Missing Person Located  11/03/2024
**Case Disposition:** 11/03/2024
**Page 2**

R_CS1IBR   Printed By: KHOUSE, HSCM13   Sys#: 58580   11/04/2024 07:34
Case 5:25-cv-00222-BO-RJ   Document 26   Filed 08/03/26   Page 592 of 605   DEP000028

# CONFIDENTIAL

## Incident Report Additional Name List

OCA: *24-002684*

### Additional Name List

| | Name Code/# | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race | Sex |
|---|---|---|---|---|---|---|---|
| **1)** | *WI    1* | ██████████████ | | █████████ | █ | █ | █ |
| | **Address** | ████████████████████ | | **H:**    - - | | | |
| | **Empl/Addr** | *Harris Teeter, 705 W. Williams St. Apex, Nc* | | **B:**    - - | | | |
| | | | | **Mobile #:**    - - | | | |

# CONFIDENTIAL

## INCIDENT/INVESTIGATION REPORT

*Holly Springs Police Department*

Case # *24-002684*

| Status Codes | 1 = None | 2 = Burned | 3 = Counterfeit / Forged | 4 = Damaged / Vandalized | 5 = Recovered | 6 = Seized | 7 = Stolen | 8 = Unknown |
|---|---|---|---|---|---|---|---|---|

| | IBR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| D | | | | | | |
| R | | | | | | |
| U | | | | | | |
| G | | | | | | |
| S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Assisting Officers**

Suspect Hate / Bias Motivated:     *ANTI_ISLAMIC (MUSLIM)*

## INCIDENT/INVESTIGATION REPORT

Narr. (cont.)  OCA: 24-002684          *Holly Springs Police Department*

N A R R A T I V E

DEF000030
Case 5:25-cv-00222-BO-RJ     Document 26     Filed 08/03/26     Page 594 of 605

## REPORTING OFFICER NARRATIVE

*Holly Springs Police Department*

| OCA |
|---|
| *24-002684* |

| Victim | Offense | Date / Time Reported |
|---|---|---|
| ███████████████ | *CYBERSTALKING* | *Sat 11/02/2024 11:29* |

**THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY**

Location: 5277 Sunset Lake Rd, Holly Springs, NC 27540

Offenses: Cyberstalking

Names:
Victim
███████████████████

Offender
██████████████

Witness
█████████████████████

Investigation Response:

CCBI Called: No

Synopsis:

On November 2, 2024, at approximately 11:29 AM, I, Officer Warren of the Holly Springs Police Department, responded to a harassment call at 5277 Sunset Lake Road, Holly Springs, NC 27540 (Harris Teeter). I spoke with the victim, ███████████████████, who reported that while she was working at Harris Teeter, she was approached by a customer, later identified as ████████████████. ████████ confronted ███████ ████, yelling that she was a terrorist due to her wearing a hijab and took pictures of her. ███████████ attempted to explain that she was not a terrorist and was wearing it due to her being Muslim.

████████████ attempted to calm her down, however, ██████████ continued to yell accusations. The store director, █████████████, intervened to defuse the situation. ████ stated that she instructed ██████████ to finish her work while she spoke to ████████████. Although █████████████ went back to working, ██. ████████ persisted in calling her a terrorist. Eventually, ██████ was able to calm ████████████ and discuss the situation with her. She ultimately asked ████████████ to leave the store due to her behavior.

███████████ did leave the store. ███████████████ later learned that the pictures taken of her had been posted on the social media platform "X". ██████████ provided me with █████████████ information and showed me the post on

Reporting Officer: *WARREN, E.*
*R_CS3NC*

Printed By: KHOUSE, HSCM13    11/04/2024 07:34

Page 5

DEF000031

Case 5:25-cv-00222-BO-RJ    Document 26    Filed 08/03/26    Page 595 of 605

## REPORTING OFFICER NARRATIVE

| | | OCA |
|---|---|---|
| | | *24-002684* |

*Holly Springs Police Department*

| Victim | Offense | Date / Time Reported |
|---|---|---|
| ███████████████ | *CYBERSTALKING* | *Sat 11/02/2024 11:29* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

"X" featuring ███████████, which stated, "Went to Harris Teeter in Holly Springs and saw this Hamas sympathizer." ███████████ informed me that she felt threatened, terrified, harassed, and embarrassed about returning to work. ██████████ also stated that she overheard ███████████ calling her a "terrorist".

Additionally, █████████ pointed out that signs at the entrance of the store clearly state that taking photos or videos is prohibited without authorization.

A warrant was obtained for ███████████ for Cyberstalking.

Nothing futher.
 [11/03/2024 06:29, EWARREN, HPD]

---

Reporting Officer: *WARREN, E.*
*R_CS3NC*

Printed By: KHOUSE, HSCM13    11/04/2024 07:34

Page 6

DEF000032

Case 5:25-cv-00222-BO-RJ    Document 26    Filed 08/03/26    Page 596 of 605

## Incident Report Suspect List

*Holly Springs Police Department*

OCA: *24-002684*

| 1 | Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|---|
| | ███████████ | | ████████ |
| | Business Address | | |

| DOB | Age | Race | Sex | Eth | Hgt | Wgt | Hair | Eye | Skin | Driver's License / State |
|---|---|---|---|---|---|---|---|---|---|---|
| ████ | ██ | ██ | █ | N | ██ | | ██ | ██ | | ██████ |

Scars, Marks, Tattoos, or other distinguishing features

| *Reported Suspect Detail* | Suspect Age | Race | Sex | Eth | Height | Weight | SSN |
|---|---|---|---|---|---|---|---|
| | | | | | | | ██████ |

| Weapon, Type | Feature | Make | Model | Color | Caliber | Dir of Travel |
|---|---|---|---|---|---|---|
| | | | | | | Mode of Travel |

| Veh Yr / Make / Model | Drs | Style | Color | Lic Plate / State | VIN |
|---|---|---|---|---|---|
| | | | | | |

Notes                                                                    Physical Char

## CASE SUPPLEMENTAL REPORT

Printed: 11/04/2024  07:34

*NOT SUPERVISOR APPROVED*

*Holly Springs Police Department*

OCA: **24002684**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | |
|---|---|---|---|
| **Case Status:** *CLOSED MISSING...* | **Case Mng Status:** *NA* | | **Occurred:** *11/02/2024* |
| **Offense:** *CYBERSTALKING* | | | |

| | |
|---|---|
| **Investigator:** *WARREN, E.  (2644)* | **Date / Time:** *11/03/2024 14:30:50, Sunday* |
| **Supervisor:** *(0)* | **Supervisor Review Date / Time:** *NOT REVIEWED* |
| **Contact:** | **Reference:** *Supplement To Narrative* |

On November 3, 2024, at approximatley 1038, I Officer Warren went to serve a warrant at █████████████ █████ that was for ████████████████████. I took █████████ to Wake County Detention Center. [11/03/2024 14:42, EWARREN, HPD]

Investigator Signature                    Supervisor Signature

Page 8

# Exhibit 10

Exhibit #

09

05/26/26 - AM

exhibitsticker.com

| File No. 24CR447148-910 | Law Enforcement Case No. 24002684 | | LID No. |
|---|---|---|---|

**WARRANT FOR ARREST**

| | |
|---|---|
| **THE STATE OF NORTH CAROLINA VS.** | HOLLY SPRINGS POLICE DEPARTMENT |

Name And Address Of Defendant
JENNIFER SLOAN RACHMUTH
████████
████████ ████████
███ ████████

**STATE OF NORTH CAROLINA**

In The General Court Of Justice
District Court Division

WAKE County

Spoken Language Court Interpreter Needed For Any Party, Victim, Or Witness? (If Yes, identify person(s) and language(s). Interpreters provided for all court proceedings at no cost.)

[X] No [ ] Yes: (explain)

| Race ██ | Sex █ | Date Of Birth ████ | Age ██ |
|---|---|---|---|

Name Of Defendant's Employer

Date Of Offense
10/31/2024

[ ] Misdemeanor Offense Which Requires Fingerprinting Per Fingerprint Plan

Date Of Arrest & Check Digit No. (as shown on fingerprint card)

Complainant Name (and address, if Complainant is an officer)
ELLIOTT WARREN
HOLLY SPRINGS POLICE DEPARTMENT
125 N Main St
HOLLY SPRINGS      NC      27540
WAKE

Witness Information
████████████

**OFFENSE(S)** (see AOC-CR-100 Continuation(s) for charging text)

| Count No. | Offense | Offense in Violation Of G.S. | Offense Code |
|---|---|---|---|
| 1 | M - CYBERSTALKING | 14-196.3 | 5337 |

CERTIFIED TRUE COPY FROM ORIGINAL
Clerk of Superior Court, Wake County

**TO ANY OFFICER WITH AUTHORITY AND JURISDICTION TO EXECUTE A WARRANT FOR ARREST FOR THE OFFENSE(S) CHARGED IN THIS WARRANT:**
I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did commit the offense(s) set forth above and on the attached AOC-CR-100 Continuation(s), which is (are) incorporated by reference. This act(s) was in violation of the law referred to in this Warrant For Arrest. This Warrant For Arrest is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring the defendant before a judicial official without unnecessary delay to answer the charge(s) above. 11-12-24

| Date Issued 11/02/2024 | Name Of Issuing Official M. RAMIREZ | Signature *Mayte Ramirez* | [X] Magistrate [ ] Deputy CSC [ ] Assistant CSC [ ] Clerk Of Superior Court [ ] District Court Judge [ ] Superior Court Judge |
|---|---|---|---|
| Location Of Court | | Court Date | Court Time |

**WAIVER OF PROBABLE CAUSE HEARING**

The undersigned defendant, with the consent of his/her attorney, waives the right to a probable cause hearing.

| Date Waived | Signature Of Defendant | Name Of Attorney | Signature Of Attorney |
|---|---|---|---|

AOC-CR-100, Rev. 7/24, © 2024 Administrative Office of the Courts          (Over)          Original          VRA Case

| STATE VERSUS | | WAKE County | File No. 24CR447148-910 |
|---|---|---|---|

**Name Of Defendant**
JENNIFER SLOAN RACHMUTH

**Date Of Issuance Of Warrant For Arrest**
11/02/2024

If the Warrant For Arrest is not served within one hundred and eighty (180) days, it must be returned to the Clerk of Court in the county in which it was issued with the reason for the failure of service noted thereon.

## RETURN OF SERVICE

I certify that the Warrant For Arrest issued in this case on the date noted above for the defendant named above, was received and served as follows:

| Date Received | Date Served | Time Served | Date Returned |
|---|---|---|---|
| 11/2/24 | 11/3/24 | 1119 am | 11/3/24 |

☑ By arresting the defendant and bringing the defendant before:

**Name Of Judicial Official**
Magistrate

☐ The Warrant WAS NOT served for the following reason:

**Signature Of Officer Making Return**
Elliott Warren

**Name Of Officer (type or print)**
Elliott Warren

**Department Or Agency Of Officer**
Holly Springs Police Department

## REDELIVERY/REISSUANCE

| Date | Name Of Clerk (type or print) | Signature Of Clerk | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court |
|---|---|---|---|

## RETURN FOLLOWING REDELIVERY/REISSUANCE

I certify that the Warrant For Arrest issued in this case on the date noted above for the defendant named above, was received and served as follows:

| Date Received | Date Served | Time Served | Date Returned |
|---|---|---|---|

☐ By arresting the defendant and bringing the defendant before:

**Name Of Judicial Official**

☐ The Warrant WAS NOT served for the following reason:

**Signature Of Officer Making Return**

**Name Of Officer (type or print)**

**Department Or Agency Of Officer**

AOC-CR-100 Return, Rev. 7/24
© 2024 Administrative Office of the Courts

Original

CERTIFIED TRUE COPY FROM ORIGINAL
Clerk of Superior Court, Wake County

By: _____
Assistant Deputy Clerk of Superior Court

| File No. | | | | | Law Enforcement Case No. | 24002684 | LID No. | | |

**File No.** 24CR447148-910

## WARRANT FOR ARREST
### THE STATE OF NORTH CAROLINA VS.

**Name And Address Of Defendant**
JENNIFER SLOAN RACHMUTH

▮▮▮▮▮▮▮

**Law Enforcement Case No.** 24002684  **LID No.**

HOLLY SPRINGS POLICE DEPARTMENT

# STATE OF NORTH CAROLINA

WAKE _____ County

In The General Court Of Justice
District Court Division

Spoken Language Court Interpreter Needed For Any Party, Victim, Or Witness? (If Yes, identify person(s) and language(s). Interpreters provided for all court proceedings at no cost.)

[X] No  [ ] Yes: (explain)

| | Race | Sex | Date Of Birth | Age |
|---|---|---|---|---|
| | ▮ | ▮ | ▮▮▮ | ▮ |

**Name Of Defendant's Employer**

**Date Of Offense**
10/31/2024

[ ] Misdemeanor Offense Which Requires Fingerprinting Per Fingerprint Plan

**Date Of Arrest & Check Digit No. (as shown on fingerprint card)**

**Complainant Name (and address, if Complainant is an officer)**
ELLIOTT WARREN

HOLLY SPRINGS POLICE DEPARTMENT

125 N Main St

HOLLY SPRINGS     NC     27540

WAKE

**Witness Information**
▮▮▮▮▮▮▮

### OFFENSE(S) (see AOC-CR-100 Continuation(s) for charging text)

| Count No. | Offense | Offense in Violation Of G.S. | Offense Code |
|---|---|---|---|
| 1 | M - CYBERSTALKING | 14-196.3 | 5337 |

**TO ANY OFFICER WITH AUTHORITY AND JURISDICTION TO EXECUTE A WARRANT FOR ARREST FOR THE OFFENSE(S) CHARGED IN THIS WARRANT:**
I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did commit the offense(s) set forth above and on the attached AOC-CR-100 Continuation(s), which is (are) incorporated by reference. This act(s) was in violation of the law referred to in this Warrant For Arrest. This Warrant For Arrest is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring the defendant before a judicial official without unnecessary delay to answer the charge(s) above.

| Date Issued | Name Of Issuing Official | Signature | [X] Magistrate [ ] Deputy CSC [ ] Assistant CSC [ ] Clerk Of Superior Court |
|---|---|---|---|
| 11/02/2024 | M. RAMIREZ | Mayte Ramirez | [ ] District Court Judge [ ] Superior Court Judge |

| Location Of Court | Court Date | Court Time |
|---|---|---|

### WAIVER OF PROBABLE CAUSE HEARING

The undersigned defendant, with the consent of his/her attorney, waives the right to a probable cause hearing.

| Date Waived | Signature Of Defendant | Name Of Attorney | Signature Of Attorney |
|---|---|---|---|

| STATE VERSUS | WAKE County | File No. 24CR447148-910 |
|---|---|---|

Name Of Defendant
JENNIFER SLOAN RACHMUTH

Date Of Issuance Of Warrant For Arrest
11/02/2024

**NOTE:** *Use this page to set forth the charging text for each offense listed on the AOC-CR-100. G.S. 15A-924(a)(5).*

## OFFENSES (continued)

**Count 1.** **Offense:** M - CYBERSTALKING

*Charging Text For This Count*

On or about the date of offense shown and in the county named above the defendant unlawfully and willfully did did knowingly permit an electronic communication device, CELLPHONE , under the defendant's control to be used for a purpose prohibited by G.S. 14-196.3, TO TAKE PICTURES AT HARRIS TEETER AND ELECTRIONCALLY COMMUNICATE ON SOCIAL MEDIA, FOR THE PURPOSE OF TERRIFYING, HARASSING, OR EMBARRASSING HER .

**Count 2.** **Offense:**

*Charging Text For This Count*

AOC-CR-100 Continuation, Rev. 7/24
© 2024 Administrative Office of the Courts

**Continuation Page** _____ of _____ **Continuation Pages**

# Exhibit 11

# STATE OF NORTH CAROLINA

WAKE _____ County

NOTE: *Do not use this form for cases covered by G.S. 20-138.4. Use form AOC-CR-339 instead.*

File No. 24CR447148-910

In The General Court Of Justice
☒ District ☐ Superior Court Division

## STATE VERSUS

Defendant Name
**JENNIFER SLOAN RACHMUTH**

## DISMISSAL
## NOTICE OF REINSTATEMENT
(For Offenses Committed On Or After Dec.1, 2013)

G.S. 15A-302(e), -931, -932

| File Number | Count No.(s) | Offense(s) |
|---|---|---|
| 24CR447148-910 | 1 | CYBERSTALKING |

☐ See *Additional File Numbers And Offenses on Side Two.*

☒ **DISMISSAL**

**NOTE:** *Recall all outstanding Orders For Arrest in a dismissed case.*
The undersigned prosecutor enters a dismissal to the above charge(s) and assigns the following reasons:

☐ 1. No crime is charged.
☐ 2. There is insufficient evidence to warrant prosecution for the following reasons:

☐ 3. Defendant has agreed to plead guilty to the following charges:

in exchange for a dismissal of the following charges:

CERTIFIED TRUE COPY FROM ORIGINAL
Clerk of Superior Court, Wake County

Assistant Deputy Clerk of Superior Court
11-12-24

☐ 4. The defendant was charged as the result of ☐ defendant's identity being used without permission. ☐ mistaken identity.
(**NOTE TO PROSECUTOR:** *You must notify the Court of this dismissal. The Court should use AOC-CR-283, Order Of Expunction Under G.S. 15A-147(a1) (Identity Theft Or Mistaken Identification) to expunge charges.*)

☒ 5. Other: *(specify)* ☐ See additional information on reverse.
DESCRIBED CONDUCT DOES NOT MEET ELEMENTS OF THE OFFENSE.

A jury has not been impaneled nor has evidence been introduced. *(If a jury has been impaneled, or if evidence has been introduced, modify this sentence accordingly.)* _____

☐ **DISMISSAL WITH LEAVE**
The undersigned prosecutor enters a dismissal with leave to the above charge(s) and assigns the following reasons:

☐ 1. The defendant failed to appear for a criminal proceeding at which the defendant's attendance was required and the prosecutor believes that the defendant cannot readily be found.
☐ 2. The defendant has been indicted and cannot readily be found to be served with an Order For Arrest.
☐ 3. The defendant has entered into a deferred prosecution agreement with the prosecutor in accordance with the provisions of Article 82 of G.S. Chapter 15A.

**NOTE:** *Pursuant to the repeal of G.S. 15A-1009, the prosecutor can no longer dismiss charges with leave for defendants found incapable to proceed.*

**NOTE:** *This form must be completed and signed by the prosecutor when the dismissal occurs out of court. The better practice is for the prosecutor to complete and sign the form when the charges are orally dismissed in open court.*
*Also, in accordance with G.S. 15A-931(a1), unless the defendant or the defendant's attorney has been otherwise notified by the prosecutor, a written dismissal of the charges against the defendant must be served in the same manner prescribed for motions under G.S. 15A-951. If the record reflects that the defendant is in custody, the written dismissal shall also be served by the prosecutor on the chief officer of the custodial facility where the defendant is in custody.*

| Date | Name Of Prosecutor (type or print) | Signature Of Prosecutor |
|---|---|---|
| 11/04/2024 | N LORRIN FREEMAN | |

☐ **REINSTATEMENT**
This case, having previously been dismissed with leave as indicated above, is now reinstated for trial.

| Date | Name Of Prosecutor (type or print) | Signature Of Prosecutor |
|---|---|---|
| | | |

(Over)

AOC-CR-307B, Rev. 3/21, © 2021 Administrative Office of the Courts