IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:25-cv-222-BO-RJ

| | | |
|---|---|---|
| JENNIFER SLOAN RACHMUTH, | ) | |
| | ) | |
| Plaintiff, | ) | **LOCAL CIVIL RULE 56.1** |
| | ) | **STATEMENT OF MATERIAL** |
| v. | ) | **FACTS IN SUPPORT OF** |
| | ) | **DEFENDANTS' MOTION FOR** |
| ELLIOT WARREN, et. al., | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Defendants, by and through counsel, and pursuant to Local Civil Rule 56.1(a)(1) and Rule 56 of the Federal Rules of Civil Procedure, hereby respectfully submit the following Statement of Material Facts in Support of their Motion for Summary Judgment.

### *Officers Marino, Hernandez, and Warren*

1. Defendants Benjamin Marino ("Officer Marino"), Edgar Hernandez ("Officer Hernandez"), and Elliot Warren ("Officer Warren") are sworn law enforcement officers for the HSPD and have been at all relevant times. Declaration of Benjamin Marino, July 28, 2026 ("Marino Decl."), ¶ 3; Declaration of Edgar Hernandez, July 28, 2026 ("Hernandez Decl.") ¶ 3; Declaration of Elliot Warren, ("Warren Decl.") ¶ 3.

2. Officer Marino completed Basic Law Enforcement Training at Wake Technical Community College in 2019. Marino Decl. ¶ 4. He has since received training in officer survival, Crisis Intervention Team training ("CIT"), and SWAT training, along with yearly in-service training through the HSPD. *Id.*; Deposition of Benjamin Marino, May 27, 2026 ("Marino Dep."), 12:18-23.

3. Officer Hernandez completed Basic Law Enforcement Training and has since received training to be a Field Training Officer ("FTO") and Crisis Intervention Team training ("CIT"), along with yearly in-service training through the HSPD. Hernandez Decl. ¶ 4; Deposition of Edgar Hernandez, May 29, 2026 ("Hernandez Dep."), 11:13-24.

4. Officer Warren completed Basic Law Enforcement Training at Wake Technical Community College in 2024 and has since received additional training, including Crisis Intervention Team training ("CIT"), along with yearly in-service-training through the HSPD. Warren Decl. ¶ 4; Deposition of Elliot Warren, May 26, 2026 ("Warren Dep."), 12:19-25.

5. In November, 2024, Officer Warren was completing Field Training with the HSPD and Officer Hernandez was serving as his primary Field Training Officer (FTO). Warren Dep. 60:4-8; Warren Decl. ¶¶ 5-6; Hernandez Decl. ¶ 5. Being an FTO involves training and supervising new law enforcement officers. This includes training new officers how to conduct traffic stops, how to write reports, how to investigate crimes, along with any other tasks involved in being a law enforcement officer. Hernandez Decl. ¶ 5; Hernandez Dep. 12:15-24.

6. On November 2, 2024, Officer Marino was assigned as Officer Warren's FTO because Officer Hernandez was not working on that day. Marino Dep. 35:4-8; Marino Decl. ¶ 5, Warren Decl. ¶ 6.

***Plaintiff's Previous Complaints***

2

7. Prior to November 2, 2024, Plaintiff had made previous reports to the HSPD regarding alleged antisemitic communications from online groups related to her social media presence. *See* Declaration of Paul Liquorie, Aug. 3, 2026, ¶¶ 21-27.

8. The HSPD, by and through the Chief of Police, thoroughly investigated the claims and consulted with the North Carolina State Bureau of Investigation. Together, the HSPD and NCSBI reached a determination that the statements made in the communications provided by Plaintiff were either First Amendment protected political statements or were not repeated communications that rose to a violation of the cyberstalking statute. Liquorie Decl. ¶¶ 21-25.

9. Officer Marino, Officer Hernandez, and Officer Warren were not involved in the investigation into Plaintiff's prior complaints, and in fact were not aware of any prior complaints made by Plaintiff at the time of her November 3, 2024 arrest. Deposition of Jennifer Sloan Rachmuth ("Plaintiff Dep."), June 29, 2026, 212:15-18; 212:25-213:1; 213:6-7; Marino Dep. 33:9-18; Marino Decl. ¶ 13; Hernandez Dep. 48:21-25; Hernandez Decl. ¶ 7; Warren Dep. 76:22-77:6; Warren Decl. ¶ 18.

10. The Chief of Police, Paul Liquorie was not aware of the November 2, 2024 report against Ms. Rachmuth, investigation of the report, conference with the Wake County Magistrate, or the November 3, 2024 arrest of Ms. Rachmuth until after the arrest. Liquorie Decl. ¶ 27.

***Officers Respond to a Call from the Sunset Lake Harris Teeter***

11. On November 2, 2024, Officers Marino and Warren were on patrol when they responded to a harassment call regarding an incident that had occurred at the Harris Teeter on Sunset Lake Road in Holly Springs. Warren Decl. Ex. 2 at 5, Warren Decl. ¶ 7; Marino Dep. 38:14-23; Marino Decl. ¶ 6.

12. Officer Warren called the reporting victim, Amira Mohamed Abdel Fattah, with the phone on speakerphone so Officer Marino could hear the conversation. Warren Decl. ¶ 8; Marino Dep. 38:9-23; Marino Dep. 44:12-22; Marino Decl. ¶ 7.

13. Ms. Fattah told the officers that she was wearing a hijab because she is Muslim. Warren Decl. Ex. 2 at 5; Warren Decl. ¶ 8. Ms. Fattah informed the officers that a customer, later identified as Plaintiff, had approached her in the Harris Teeter while she was working, with her phone out, and began yelling at her and calling her a terrorist due to her wearing a hijab. Warren Decl. Ex. 2 at 5; Warren Decl. ¶ 8.

14. Ms. Fattah stated that Plaintiff had taken photos of her and posted them on her X (Twitter) social media account. Plaintiff Dep. Ex. A at 1; Warren Decl. Ex. 2 at 5; Warren Decl. ¶ 8, Marino Dep. 45:1-3; Marino Decl. ¶ 7.

15. Ms. Fattah informed officers that since the post, the store had received multiple phone calls accusing the store of hiring terrorists. Warren Decl. 87:6-15; Warren Decl. ¶ 9.

16. Ms. Fattah told officers that she no longer felt safe going to work at the store, and had even taken her kids out of school because she was worried about safety risks to her kids from the social media post and ensuring harassment. Warren Dep. 87:6-20; Warren Decl. ¶ 10. While officers originally believed that Ms. Fattah was calling from the Harris

Teeter itself, they learned that she had not come into work since the day of the encounter and the social media post. Warren Dep. 79:10-25; Warren Decl. ¶ 10; Marino Dep. 44:4-7.

17. Ms. Fattah told the officers that the store manager, Sheronda Irick, was present when Plaintiff came into the store, and would have additional information. Warren Dep. 93:13-17; Warren Decl. ¶ 11.

18. Officer Warren, supervised by Officer Marino, went to the Harris Teeter and spoke to Ms. Irick, who told them that a customer at the store, Plaintiff, approached one of her employees, Ms. Fattah, while she was stocking shelves a few days prior. Warren Decl. ¶ 12. Ms. Irick stated that Plaintiff had yelled at Ms. Fattah, calling her a terrorist because of her head covering, and continued berating Ms. Fattah at a loud enough volume that Ms. Irick had to come out to intervene. Warren Decl. Ex. 2 at 5; Warren Decl. ¶ 12; Marino Dep. 40:2-6; Marino Decl. ¶ 10.

19. Ms. Irick also stated that Plaintiff was taking photos of Ms. Fattah, which is against store policy. Warren Dep. 94:16-95:1; Warren Decl. ¶ 13. Ms. Irick pointed out to the officers where the policy against photos and recordings was posted in the store. Warren Decl. Ex. 2 at 6; Marino Decl. ¶ 10.

20. Ms. Irick informed the officers that Ms. Fattah had attempted to calm Plaintiff down, but that Plaintiff continued to yell accusations at her. Warren Decl. Ex. 2 at 5; Warren Decl. ¶ 13.

21. Ms. Irick informed the Officers that Ms. Irick intervened in the situation and spoke with Plaintiff. Warren Decl. Ex. 2 at 5; Marino Decl. ¶ 10; Warren Dep. 94:3-19; Warren Decl. ¶ 14. Ms. Irick stated that she instructed Ms. Fattah to ignore Plaintiff's

harassment and return to work, but that Plaintiff continued yelling at Ms. Fattah and persisted in calling her a terrorist. Warren Decl. Ex. 2 at 5; Warren Decl. ¶ 14.

22. Ms. Irick stated that she was eventually able to calm Plaintiff down and discuss the situation. Warren Decl. Ex. 2 at 5; Warren Decl. ¶ 15. However, she ultimately asked Plaintiff to leave the store due to her behavior. Warren Decl. Ex. 2 at 5; Warren Dep. 94:16-19; Warren Decl. ¶ 15; Marino Decl. ¶ 10.

23. Ms. Irick confirmed that Ms. Fattah feared for her safety and had not returned to work since the incident. Warren Dep. 95:15-18; Warren Decl. ¶ 16.

24. Ms. Irick informed the officers that after the encounter, she became aware that Plaintiff had made a social media post on her X account about Ms. Fattah, tagging Harris Teeter and including photos taken of Ms. Fattah in the store. Warren Decl. Ex. 2 at 5-6; Warren Dep. 98:14-15, 99:22-100:2; Warren Decl. ¶ 17; Marino Dep. 41:17-21; Marino Decl. ¶ 11. Ms. Irick provided the officers with a link to the post Plaintiff had made about Ms. Fattah on X. Warren Dep. 98:14-15; Warren Decl. ¶ 17.

25. The officers reviewed Plaintiff's X post, which included discussion amongst Plaintiff and others about Ms. Fattah and her attire. Plaintiff made multiple comments and engaged in conversation in the comments of the original post. Warren Dep. 101:10-16; Warren Decl. ¶ 16; Marino Decl. Ex. 1; Marino Decl. ¶ 20.

26. Prior to November 2, 2024, neither Officer Warren nor Officer Marino was familiar with Plaintiff. They did not know that she was Jewish, nor did they know that she was an "independent journalist." Marino Dep. 33:25-34:2; Marino Decl. ¶13; Warren Dep. 76:22-78:3; Warren Decl. ¶ 18.

27.     After speaking to Ms. Irick and Ms. Fattah and returning to the Police Department, Officers Warren and Marino consulted *North Carolina Crimes: A Guidebook on the Elements of Crime* to determine what charge, if any, would be appropriate in this situation. Marino Dep. 49:18-20; Marino Decl. ¶ 14; Warren Dep. 121:9-14; Warren Decl. ¶ 19.

28.     After discussing the facts and consulting the book, Officers Warren and Marino determined that they had probable cause for the charge of cyberstalking under N.C. Gen. Stat. § 14-196.3. Marino Dep. 49:18-20; Warren Decl. ¶ 20. In making this determination, they considered the information they had been provided from Ms. Irick and Ms. Fattah, including the fact that the store had received multiple phone calls accusing them of hiring a terrorist, the victim's report that she felt terrified, harassed, and embarrassed by the post, and the fact that she had not returned to work and had taken her kids out of school as a result. Marino Decl. ¶ 16; Warren Dep. 129:14-130:11; Warren Decl. ¶ 20. They also relied on the actual post from Plaintiff on X, including her subsequent comments on that post and the conversation that ensued. Marino Dep. 51:6-20; Marino Decl. Ex. 1; Marino Decl. ¶ 16; Warren Decl. ¶ 20.

29.     Officers Warren and Marino spoke to Sergeant Bock and Lieutenant Ottaway, who were the supervisory officers on duty. Marino Decl. ¶ 17; Warren Decl. ¶ 21. They discussed the case and the evidence they had, and Sergeant Bock and Lieutenant Ottaway both agreed that cyberstalking was an appropriate charge. Marino Dep. 49:21-50:6; Marino

Decl. ¶ 17; Warren Dep. 64:21-65:3; Warren Decl. ¶ 21, Declaration of Melissa Ottaway, July 30, 2026 ("Ottaway Decl."), ¶ 13.

30.     Lieutenant Ottaway has served as a sworn law enforcement officer for almost 23 years. She is a certified victim's advocate and an adjunct instructor at Central Carolina Community College, teaching cadets about crimes against persons and testifying in court. Ottaway Decl. ¶ 4.

31.     Prior to consulting with Officers Warren and Marino on November 2, 2024, Lieutenant Ottaway had never heard of Plaintiff and had no previous interactions with her. Ottaway Decl. ¶ 14.

32.     On the advice of Sergeant Bock and Lieutenant Ottaway, Officers Marino and Warren called the alleged victim, Ms. Fattah, again to confirm that she still wanted to press charges, and she stated that she did. Marino Decl. ¶ 18.

33.     Officer Warren completed the warrant form for the charge of cyberstalking to present to the magistrate. Marino Dep. 75:11-22; Marino Decl. ¶ 19; Warren Dep. 147:2-7; Warren Decl. ¶ 22.

34.     Officer Warren, with Officer Marino present in the room, met with Magistrate Mayte Ramirez via video call and presented the warrant, including all the information gathered during the investigation. Marino Dep. 77:5-23; Marino Decl. ¶ 20; Warren Dep. 146:11-22, 153:4-18; Warren Dep. Ex. 9 at 3; Warren Decl. ¶ 23. Officer Warren explained that Plaintiff had posted a photograph of Ms. Fattah on X, calling her a Hamas supporter and identifying where she worked, and that she had engaged in back back-and-forth discussions with other X users in social media comments about Ms. Fattah.

Warren Decl. Ex. 2 at 5-6; Marino Decl. Ex. 1; Marino Decl. ¶ 20. Officer Warren explained that the store received multiple calls asking why they had hired a terrorist, and that Ms. Fattah was scared to return to work as a result of Plaintiff's online communications about her. Marino Decl. ¶ 20.

35.     The magistrate independently determined that there was probable cause for the charge of cyberstalking and issued an arrest warrant for Plaintiff. Warren Dep. 156:14-19; Warren Decl. ¶ 18; Marino Dep. 119:12-18; Marino Decl. ¶ 21.

36.     Lieutenant Ottaway checked in with Officers Marino and Warren after they spoke to the magistrate and learned that the magistrate found probable cause. Ottaway Decl. ¶ 13. Lieutenant Ottaway had no further involvement with the case. Ottaway Decl. ¶ 13.

37.     The day, November 3, 2024, Officer Hernandez learned about the investigation and the arrest warrant that had been issued. Warren Dep. 145:8-14; Hernandez Decl. ¶ 6. Officers Warren and Marino gave Officer Hernandez a brief synopsis of the investigation, including the steps they took to determine that cyberstalking was an appropriate charge. Hernandez Decl. ¶ 8. Officer Hernandez agreed with Officers Warren and Marino's assessment, and his review of their investigation gave him no reason to doubt that cyberstalking was the appropriate charge. Hernandez Decl. ¶ 8. Officer Hernandez was not familiar with Plaintiff's religion, political involvement, "journalism," or social media presence before learning about the investigation and arrest warrant. Hernandez Dep. 49:2-10; Hernandez Decl. ¶ 7.

*Officers Serve the Arrest Warrant*

38.     On November 3, 2024, Officers, Warren, Marino, and Hernandez went to Plaintiff's residence at 112 Bellagio Drive, Apex, North Carolina to serve the warrant on Plaintiff. Warren Decl. Ex. 2 at 8; Marino Dep. 88:25-89:1-7; Marino Decl. ¶ 22-23; Hernandez Decl. ¶ 9; Warren Decl. ¶ 25. Officer Hernandez rode with Officer Warren in his patrol car as his FTO, and Officer Marino came separately in his own patrol car to assist. Marino Dep. 89:22-90:1; Warren Dep. 183:2-5; Warren Decl. ¶ 25.

39.     The officers parked a short distance down the street from the residence in an area that was not visible from Plaintiff's house. Marino Dep. 90:1-7, 101:24-102:1; Marino Decl. ¶ 23; Hernandez Decl. ¶ 9; Warren Decl. ¶ 26; Warren Dep. 183:6-10.

40.     When serving an arrest warrant, it is common practice to not park in front of the residence where the warrant is being served. Marino Dep. 90:11-12. The reason for this is to not alert the person officers are serving the warrant on of their presence. Marino Dep. 90:16-24. This practice is taught in Basic Law Enforcement Training, and is primarily done for officer safety purposes, and to prevent the subject of the warrant from fleeing or otherwise trying to avoid being arrested upon seeing the officers approaching. Marino Decl. ¶ 24; Hernandez Decl. ¶ 10; Warren Dep. 30:24-31:24; Warren Decl. ¶ 27.

41.     All three officers were wearing HSPD-issues body worn cameras, which captured audio and video recordings of the service of the arrest warrant. Marino Decl. ¶ 25; Hernandez Decl. ¶ 11; Warren Decl. ¶ 28.

42. Officers Warren, Hernandez, and Marino approached Plaintiff's residence from the side at approximately 10:28 a.m. Marino Dep. 92:2-5; Marino Decl. ¶ 26; Hernandez Decl. ¶ 12; Warren Decl. ¶ 29.

43. Officers Warren and Hernandez stepped onto the porch while Officer Marino stayed at the bottom of the stairs up to the porch. Marino Decl. ¶ 27; Hernandez Decl. ¶ 13; Warren Decl. ¶ 30.

44. As Officer Warren approached the door, Plaintiff stepped out onto the porch. Marino Decl. ¶ 27; Ex. 1 09:28:49;[1] Hernandez Decl. ¶ 13; Warren Decl. ¶ 30.



45. Officer Warren informed Plaintiff that there was a warrant for her arrest and Officer Hernandez informed her that the warrant was in connection with the incident at

[1] The timestamps for the BWC footage refer to the "clock" time indicated near the upper right corner of the screen rather than the time elapsed from the beginning of the recording. Officer Warren's BWC timestamp was incorrect and was behind by an hour.

Harris Teeter. Marino Dep. 92:13-20; Marino Decl. ¶ 28; Hernandez Decl. ¶ 14; Warren Decl. ¶ 31.

46.  Plaintiff's husband, Guy Rachmuth, stepped out onto the porch with her. Marino Decl. ¶ 32; Hernandez Decl. ¶ 15; Warren Decl. ¶ 32. None of the officers witnessed anyone else at the home. Marino Dep. 92:21-23; Marino Decl. ¶ 32; Hernandez Decl. ¶ 15; Warren Decl. ¶ 32; Warren Dep. 198:18-19.

47.  Officer Hernandez asked Mr. Rachmuth if he could go into the house to get Plaintiff a pair of shoes because she was barefoot. Hernandez Decl., Ex. 1 10:29:15-10:29:17.

48.  Plaintiff asked if she could change clothes and Officer Hernandez told Mr. Rachmuth that he could bring clothes for her. Marino Decl. ¶ 30; Hernandez Decl. ¶ 17; Warren Decl. ¶ 34.

49.  As a matter of policy, officers do not allow anyone subject to an arrest warrant to go back inside once they are out of the house. Marino Dep. 95:16-20. This is for officer safety purposes and to avoid having to enter a home once the subject is outside. Warren Decl. ¶ 35.

50.  Officer Hernandez ordered Plaintiff to turn around and put her hands behind her back five times and she did not comply. Marino Dep. 97:7-13; Marino Decl. ¶ 33; Hernandez Decl. ¶ 18; Warren Decl. ¶ 36; Warren Dep. 189:2-7.

51.  Officer Marino came up onto the porch and informed Plaintiff that they would explain more, but that she needed to cooperate. Marino Dep. 97:7-16; Marino Decl. ¶ 33, Ex. 2 10:29:36-10:29:42; Hernandez Decl. ¶ 18; Warren Decl. ¶ 36;.



52.  At that point, Plaintiff put her hands behind her back and Officer Warren placed her in handcuffs. *Id.* 10:29:47-10:30:23.



53.     Officer Marino explained to Plaintiff that her post about Ms. Fattah made her feel threatened and harassed, and that because the situation met the elements, she was being arrested for cyberstalking. Marino Decl., Ex. 2, 10:29:47-10:30:10.

54.     Mr. Rachmuth came out of the house with a pair of shoes and a sweater for Plaintiff. *Id.*, Ex. 2, 10:30:33.



55.     The officers allowed Mr. Rachmuth to assist Plaintiff by taking her necklace off. *Id.*, Ex. 2, 10:30:38-10:30:45.





56. The officers informed Plaintiff that they had spoken to the magistrate who had approved the warrant and found that there was probable cause for her arrest. *Id.*, Ex. 2, 10:30:40-10:30:45.

57.    Plaintiff asked the officers if she could bring her water with her because she had panic attacks and might need it. *Id.* 10:30:46-10:30:50. Officer Marino informed Plaintiff that she could bring a sealed water bottle with her. Marino Decl. ¶ 39; Hernandez Decl. ¶ 24; Warren Decl. ¶ 42.

58.    Mr. Rachmuth went inside the house and retrieved a sealed water bottle. Marino Decl., Ex. 3 10:31:04-10:31:09.



59.    Officer Marino placed Plaintiff's shoes on the ground so she was able to put them. Marino Decl. ¶ 41.

60.    Officer Marino asked Plaintiff if she needed anything else to bring with her other than her shirt and her phone, and she stated that she wanted to bring her wallet. Marino Decl. ¶ 41; Hernandez Decl. ¶ 26; Warren Decl. ¶ 44. Officer Hernandez responded that we would bring that for her. Hernandez Decl., Ex. 1, 10:31:19-10:31:26.

61.     Officer Marino handed Officer Hernandez Plaintiff's sweater and water bottle to bring with them to the Wake County Detention Center, and Officer Hernandez and Officer Warren began leading Plaintiff to Officer Warren's patrol vehicle. Warren Decl., Ex. 1 09:32:33-09:32:38.



62.     Mr. Rachmuth attempted to find Plaintiff's wallet but was unable to. Plaintiff asked whether she would need her wallet and the officers stated that she would not, so she decided not to bring it. Hernandez Decl. ¶ 27; Warren Decl. ¶ 45.

63.     At Plaintiff's request, Officer Marino stayed behind with Mr. Rachmuth and explained the reason for Plaintiff's arrest, the process of what would happen once she arrived at the jail, the process of bailing her out, and provided the address for the Wake County Detention Center. Officer Marino gave Mr. Rachmuth a card with his name on it at his request and left the residence. Marino Decl. ¶ 45-46.

17

64.     Officer Marino had no further involvement in the case after assisting with serving the arrest warrant. Marino Dep. 103:8-20; Marino Decl. ¶ 47.

65.     Officer Hernandez asked Plaintiff if it was okay to cut through the side of her yard as it was a shorter route to get to where the patrol car was parked. Hernandez Decl. ¶ 30; Warren Decl. ¶ 48; Warren Dep. 188:1-7. Plaintiff responded "yes, not a problem," and Officers Hernandez and Warren led her through the yard to the patrol car. Hernandez Decl., Ex. 1, 10:32:04-10:32:08.

66.     It took approximately one minute to walk from Plaintiff's front door to the patrol car, which was parked at the next house down. *Id.*, Ex. 1 10:32:40-10:33:33.

67.     As Officer Warren was leading Plaintiff to the patrol car, she stated that this would "be on Facebook" and laughed. She then said, "especially with this one," Officer Warren replied, "oh, over there, to the right," referencing a specific house, and she said "nosy neighbor, we all have them". Warren Decl. ¶ 41, Ex. 1 09:33:06-09:33:25.



68.     When Officer Warren arrived at the patrol car with Plaintiff he patted her down. Warren Decl. ¶ 51; Hernandez Decl. ¶ 32. Officer Hernandez explained to her why Officer Warren was patting her down, and she stated, "not a problem, gotta be safe." Hernandez Decl., Ex. 1 10:33:32-10:33:29.



69.     Officer Warren assisted Plaintiff into the backseat of the patrol car. Warren Decl. ¶ 51; Hernandez Decl. ¶ 32.

70.     As Officer Warren was placing the seatbelt on Plaintiff, she asked if she could scratch her face with her knee if she needed to. Officer Warren responded asking if she was able to do it with her knee, and she responded, "I'm pretty flexible," and brought her knee up to scratch her nose and said "good thing I do yoga." Hernandez Decl., Ex. 1, 09:33:58-09:34:10; Warren Dep. 188:14-21.

19



71. Officer Hernandez got into the front passenger seat of the patrol car with Plaintiff's sweater and water. Hernandez Decl. ¶ 33.

72. Several minutes into the drive, Ms. Rachmuth said something from the back seat that Officer Hernandez couldn't identify. Officer Hernandez let Plaintiff know that he couldn't hear her very well. Hernandez Decl., Ex. 1, 10:37:54-10:38:00.

73. Plaintiff then asked why she was in handcuffs and Officer Hernandez responded that she was in handcuffs because she was under arrest for cyberstalking and was being transported to the Wake County Detention Center. Hernandez Decl., Ex. 1, 10:37:59-10:38:15.

74. Plaintiff requested water. *Id.* 10:38:24-10:38:26. Officer Hernandez responded that unfortunately they were unable to remove her handcuffs while in transport to the Detention Center. Because of the handcuffs and the partition between the front and back seats, Officer Hernandez could not give her water during the drive. Warren Dep.

201:15-21. Officer Hernandez explained that it was policy to have the person that is detained in our custody in handcuffs and Plaintiff responded, "okay." Hernandez Decl. ¶ 34, Ex. 1 10:38:27-10:38:38.

75.     Plaintiff did not say anything else for the remainder of the drive. Hernandez Decl. ¶ 37.

76.     During the drive, Plaintiff showed no signs of distress and did not inform the officers that she was having a panic attack. Warren Decl. ¶ 54; Hernandez Decl. ¶ 38; Warren Dep. 202:11-20. Officer Warren's vehicle was equipped with a camera, which shows Plaintiff's demeanor during the transport. Warren Decl. Exhibit 3.

77.     The Officers and Plaintiff arrived at the Wake County Detention Center at approximately 10:56 a.m. Hernandez Decl. ¶ 37; Warren Decl. ¶ 53.

78.     Officer Hernandez got out of the car with Plaintiff's sweater and water bottle and assisted her out of the car. Hernandez Decl. ¶ 39; Warren Decl. ¶ 55.

79.     When Plaintiff was out of the car, Officer Hernandez immediately assisted Plaintiff with drinking from her water bottle. Hernandez Decl. ¶ 40; Warren Decl. ¶ 55, Ex. 1, 09:57:13.



80. Officer Hernandez informed Plaintiff that she would not be able to take the water bottle into the jail with her, but he assured her that there would be water fountains accessible to her inside the jail. Hernandez Decl. ¶ 41.

81. Officer Hernandez and Officer Warren then led Plaintiff into the Wake County Detention Center. The Officers followed the procedures and filled out the necessary paperwork to process Plaintiff. Hernandez Decl. ¶ 42; Warren Decl. ¶ 56.

82. After serving the arrest warrant, officers Hernandez and Warren returned to the police department and Officer Warren completed the Case Supplemental Report in accordance with department policy, documenting that the arrest warrant had been served. Hernandez Decl. ¶ 43; Warren Decl. ¶ 57; Warren Dep. 208:22-209:1. Officer Hernandez sat next to Officer Warren while he completed the report and reviewed the report when he completed it. Hernandez Decl. ¶ 43; Warren Decl. ¶ 57.

83.     Neither Officer Hernandez nor Officer Warren had any further involvement with the case. Hernandez Decl. ¶ 43; Warren Decl. ¶ 58; Warren Dep. 208:17-209:13.

84.     Officers Marino, Hernandez, Warren, and Lieutenant Ottaway later learned that the charges had been dropped by the District Attorney. Marino Dep. 103:21-24; Hernandez Decl. ¶ 44; Warren Decl. ¶ 59.

85.     Lieutenant Ottaway was very surprised when she learned that the charges were dismissed by District Attorney Lorrin Freeman. Ottaway Decl. ¶ 15. Over the course of her almost 23-year career, she has had many major investigations go through the Wake County District Attorney's Office. Ottaway Decl. Ottaway ¶15. She has seen some low-level citations, like traffic offenses, be dismissed, but she does not recall any charged being dismissed so quickly. Ottaway Decl. ¶ 15. In Lieutenant Ottaway's experience, there is usually some consultation by the District Attorney or her Assistant District Attorneys with the investigating officer. Ottaway Decl. ¶ 15. She does not recall any criminal charges for which a warrant was issued dismissed without at least some message to the investigating officer. Ottaway Decl. ¶ 15.

86.     Lieutenant Ottaway has never had a claim brought against her for malicious prosecution or any related claim based upon lack of probable cause. Ottaway Decl. ¶ 15.

Date: August 3, 2026.

**HARTZOG LAW GROUP LLP**

*/s/ Katherine Barber-Jones*
DAN M. HARTZOG, JR.
N.C. State Bar No. 35330
dhartzogjr@hartzoglawgroup.com

KATHERINE M. BARBER-JONES
N.C. State Bar No. 44197
kbarber-jones@hartzoglawgroup.com
Telephone: 919-670-0338
Facsimile: 919-714-4635
2626 Glenwood Avenue, Suite 305
Raleigh, NC 27608
*Attorneys for Defendants*

# <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on August 3, 2025, I electronically filed the foregoing using the Court's CM/ECF system, which will serve all registered users:

James T. Johnson
**DeMent Askew Johnson & Marshall**
333 Fayetteville Street, Suite 1513
Raleigh, NC 27601
jjohnson@dementaskew.com

Kellen S. Dwyer
Daniel A. Bruce
**Holtzman Vogel Baran Torchinsky & Josefiak, PLLC**
2300 N. Street NW, Suite 643
Washington, D.C. 20037
kdwyer@holtzmanvogel.com
dbruce@holtzmanvogel.com

*Attorneys for Plaintiff*

Date: August 3, 2026.

**HARTZOG LAW GROUP LLP**

*/s/ Katherine Barber-Jones*
DAN M. HARTZOG, JR.
N.C. State Bar No. 35330
dhartzogjr@hartzoglawgroup.com
KATHERINE M. BARBER-JONES
N.C. State Bar No. 44197
kbarber-jones@hartzoglawgroup.com
Telephone: 919-670-0338
Facsimile: 919-714-4635
2626 Glenwood Avenue, Suite 305
Raleigh, NC 27608
*Attorneys for Defendants*

25