IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:25-cv-222-BO-RJ

| | | |
|---|---|---|
| JENNIFER SLOAN RACHMUTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **BENJAMIN MARINO** |
| ELLIOTT WARREN, et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

I, Benjamin Marino, declare under penalty of perjury as follows:

1. I am over 18 years of age, I am competent, and I am not otherwise under any disability. I have personal knowledge of the matters as set forth herein.

2. The statements in this Declaration are true and correct, to the best of my personal knowledge and belief.

3. I am a sworn law enforcement officer for the Town of Holly Springs ("HSPD") and have been at all times described in this Declaration.

4. I have received extensive law enforcement training. I completed Basic Law Enforcement Training at Wake Technical Community College 2019. I have received training in various topics such as officer survival, Crisis Intervention Training ("CIT"), and SWAT, along with yearly in-service training through the HSPD.

5. On November 2, 2024, I was serving as the Field Training Officer ("FTO") for Officer Elliot Warren because Officer Hernandez, his primary FTO, was not working

that day. As a Field Training Officer, I accompanied Officer Warren on patrol that day and provided assistance and guidance to him as needed.

6. While on patrol with Officer Warren, we responded to a harassment call regarding an incident that had occurred at the Harris Teeter on Sunset Lake Road in Holly Springs.

7. As part of the investigation, Officer Warren spoke to the victim, Ms. Fattah, on speakerphone while I was present. Ms. Fattah sounded very distraught, and stated that Ms. Rachmuth had made a post about her on X, which included photos of her and the store where she worked.

8. Ms. Fattah stated she was terrified and in fear, and had not returned to work since the post. She also stated that she was very embarrassed about the situation.

9. Because Officer Warren was the one talking with Ms. Fattah, I do not recall what else Ms. Fattah stated on the phone. I do recall that she explained the situation which occurred in the Harris Teeter.

10. Officer Warren and I then spoke to the manager of the Harris Teeter, Sheronda Irick. Ms. Irick stated that a customer at the store, Ms. Jennifer Sloan Rachmuth, approached one of her employees, Ms. Fattah and began yelling at her that she was a "terrorist," apparently due to her head covering. I also recall that Ms. Irick specifically drew our attention to the store policy against photos and recordings, and showed us where the policy was posted. Ms. Irick told us that she had to intervene in the situation and asked Ms. Rachmuth to leave the store. Ms. Rachmuth complied with the request and left the store.

11. Ms. Irick informed us that after the encounter, she became aware that Ms. Rachmuth had made a social media post on her X account about Ms. Fattah, tagging Harris Teeter and including photos taken of Ms. Fattah in the store.

12. I further recall that Ms. Irick told us that their store received several phone calls from people who saw Ms. Rachmuth's post, looked up the phone number for the location for that Harris Teeter, and were calling to complain about Harris Teeter hiring someone like Ms. Fattah. I do not recall whether Ms. Irick quoted anything that the callers said specifically.

13. Prior to this interaction, I was not familiar with Ms. Rachmuth, nor did I know that she was an "independent journalist."

14. After speaking to Ms. Irick and Ms. Fattah and returning to the Police Department, Officer Warren and I consulted *North Carolina Crimes: A Guidebook on the Elements of Crime* to determine what, if any, charge would be appropriate in this situation.

15. After discussing with Officer Warren and consulting the book, we determined that we had probable cause for the charge of cyberstalking under N.C. Gen. Stat. § N.C. Gen. Stat. § 14-196.3.

16. In making this determination, we considered the information we had been provided from Ms. Irick and Ms. Fattah, including the fact that the store had received multiple phone calls complaining about Ms. Fattah due to Ms. Rachmuth's social media post, the victim's report that she felt terrified, harassed, and embarrassed by the post, and the fact that she had not returned to work. We also relied on the actual post from Ms. Rachmuth on X, including her subsequent comments on that post and the conversation that

ensued. A true and accurate copy of the post and some of the subsequent comments by Ms. Rachmuth that we reviewed is attached hereto as **Exhibit 1**.

17. After making this determination, Officer Warren and I spoke to Sergeant Bock and Lieutenant Ottaway. We discussed the case and the evidence we had, and Seargeant Bock and Lieutenant Ottaway both agreed that cyberstalking was an appropriate charge.

18. Upon the advice of our supervisors, before completing the warrant paperwork, we called and spoke with the victim, Ms. Fattah, a second time, to confirm that she still wanted to press charges against Ms. Rachmuth. She confirmed that she did.

19. Officer Warren then filled out the warrant for the charge of cyberstalking to present to the magistrate.

20. While I was in the room, Officer Warren met with the magistrate via video call and presented the warrant, including all the evidence gathered during the investigation. Officer Warren explained that Ms. Rachmuth had posted on X a photograph of Ms. Fattah, calling her a Hamas supporter and identifying where she worked, and had engaged in back and forth discussions with other X users about Ms. Fattah. He explained that the store had received multiple calls asking why they had hired a terrorist, and that Ms. Fattah was scared to return to work as a result of Ms. Rachmuth's online communications about her.

21. The magistrate approved the warrant, finding that there was probable cause for the charge of cyberstalking and issued the arrest warrant for Ms. Rachmuth.

22. The next day, November 3, 2024, I went with Officer Warren and Officer Hernandez to serve the warrant on Ms. Rachmuth.

23. When I arrived to Ms. Rachmuth's residence at 112 Bellagio Drive, Apex, North Carolina, I parked down the street from her house. We chose that spot because there were trees that concealed the patrol vehicles from the view of Ms. Rachmuth's residence.

24. It is common practice to not park in front of the residence where the warrant is being served to not alert the person we are serving the warrant on of our presence. This is taught in Basic Law Enforcement Training and is primarily done for officer safety purposes in case the person decides to flee or fight upon seeing the officers approaching.

25. I was wearing an HSPD-issued body worn camera ("BWC"), which captured an audio and video recording of us serving the warrant on Ms. Rachmuth. A true and accurate copy of the recording captured by my body worn camera is attached hereto as **Exhibit 2**. All screen capture images in this declaration are taken from the recording captured from my BWC on November 3, 2024 at 112 Bellagio Drive, Apex, North Carolina.

26. Officer Warren, Officer Hernandez, and I approached the front door of Ms. Rachmuth's residence from the side of the house at approximately 10:28 a.m.

27. As Officer Warren and Officer Hernandez stepped up onto the porch, I stayed at the bottom of the stairs. As Officer Warren approached the door, Ms. Rachmuth came out onto the porch.



Ex. 1 10:28:59.[1]

28. Officer Warren informed her of the warrant for her arrest. Officer Hernandez informed her that it was in connection with an incident at the Harris Teeter.

29. Officer Hernandez asked Mr. Rachmuth if he could go into the house to get Ms. Rachmuth a pair of shoes because she was barefoot. 10:29:15-10:29:17.

30. Ms. Rachmuth requested to change clothes, and Officer Hernandez told Mr. Rachmuth that he could bring clothing for her.

31. Officer Hernandez stated that she was being arrested for cyberstalking. Id., 10:29:26-10:29:28.

---

[1] The timestamps for the BWC footage refer to the "clock" time indicated near the upper right corner of the screen rather than the time elapsed from the beginning of the recording.

32.     Ms. Rachmuth's husband, Guy Rachmuth, stepped onto the porch. I did not witness anyone else present at the home.

33.     Officer Hernandez ordered Ms. Rachmuth to turn around and put her hands behind her back five times before I came up onto the porch and informed her that we would explain more, but that she needed to cooperate. She then complied with the order.



*Id.* 10:29:36-10:29:42.

34.     Ms. Rachmuth put her hands behind her back and Officer Warren placed her in handcuffs.



*Id.* 10:29:47-10:30:23.

35.     I explained that Ms. Rachmuth's post about Ms. Fattah made her feel threatened and harassed, and that because the situation met the elements, she was being arrested for cyberstalking. *Id.* 10:29:47-10:30:10.

36.     Mr. Rachmuth came out of the house with a pair of shoes and a sweater for Ms. Rachmuth.



*Id.* 10:30:33.

37. We allowed Mr. Rachmuth to assist Ms. Rachmuth by taking her necklace off.





*Id.* 10:30:38-10:30:45.

38. We informed Ms. Rachmuth that the magistrate had approved the warrant for her arrest for cyberstalking, finding that there was probable cause. *Id.* 10:30:40-10:30:45.

39. Ms. Rachmuth asked if she could bring her water because she had panic attacks and might need it. *Id.* 10:30:46-10:30:50. I informed Ms. Rachmuth that she could bring a sealed water bottle with her.

40. Mr. Rachmuch went and retrieved a sealed water bottle from the house.



*Id.* 10:31:35.

41.     I placed Ms. Rachmuth's shoes on the ground so she was able to put them on. I then asked Ms. Rachmuth if she needed anything else to bring with her other than her shirt and her phone, and she stated that she wanted to bring her wallet and Officer Hernandez responded that we would bring that for her. *Id.* 10:31:19-10:31:26.

42.     I asked Ms. Rachmuth if she wanted me to inform her husband about what was going on and she said she did. *Id.* 10:32:31-10:32:35.

43.     I handed Officer Hernandez Ms. Rachmuth's sweater and water bottle.



*Id.* 10:32:33-10:32:36.

44. Officer Hernandez and Officer Warren took Ms. Rachmuth to the car to transfer her to the jail.

45. I stayed behind to speak with Mr. Rachmuth at Ms. Rachmuth's request. I explained the reason for Ms. Rachmuth's arrest, the process of what would happen once she arrived at the jail, the process of bailing her out, and provided the address for the Wake County Detention Center.

46. I gave Mr. Rachmuth a card with my name on it at his request and left the residence.

47. I had no further involvement in the case after serving the arrest warrant.

48. I later learned that the charges had been dismissed by the District Attorney.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28 day of July , 2026.

*Benjamin Marino*
Benjamin Marino (Jul 28, 2026 10:50:04 EDT)

**Benjamin Marino**



EXHIBIT 1









# <u>Slip Sheet</u>

## *Declaration of Benjamin Marino*

## *Exhibit 2*

*(Recording to be submitted manually and under seal with Court's leave)*