# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
Civil Action No. 5:25-cv-222-BO-RJ

| | | |
|---|---|---|
| JENNIFER SLOAN RACHMUTH, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **DECLARATION OF ELLIOT WARREN** |
| ELLIOTT WARREN, et. al., | ) ) | |
| Defendants. | ) ) ) | |

I, Elliot Warren, declare under penalty of perjury as follows:

1. I am over 18 years of age, I am competent, and I am not otherwise under any disability. I have personal knowledge of the matters as set forth herein.

2. The statements in this Declaration are true and correct, to the best of my personal knowledge and belief.

3. I am a sworn law enforcement officer for the Town of Holly Springs ("HSPD") and have been at all times described in this Declaration.

4. I have received extensive law enforcement training. I completed Basic Law Enforcement Training at Wake Technical Community College in 2024. I have received training in crisis intervention and modern combative, along with yearly in service training through the HSPD.

5. In November 2024 I was being supervised by a Field Training Officer ("FTO"). FTOs train and supervise new law enforcement officers. This includes training in how to conduct traffic stops, how to write reports, how to investigate crimes, along with any other tasks involved in being a law enforcement officer.

6. Officer Edgar Hernandez was my primary FTO, but he was not working on November 2, 2024, so Officer Benjamin was my FTO that day. He accompanied me on patrol, supervising me and assisting me throughout the day.

7. While on patrol with Officer Marino on November 2. 2024, we responded to a harassment call regarding an incident that had occurred at the Harris Teeter on Sunset Lake Road in Holly Springs.

8. I contacted Ms. Amira Mohamed Abdel Fattah, the alleged victim, by telephone. During my call, Officer Marino was present, and I had the phone on speaker so that he could hear the conversation. Ms. Fattah informed me that a customer had come into the Harris Teeter when she was working. She told me that she was wearing a hijab, which she was wearing because she was Muslim. Ms. Fattah informed me that the customer, later identified to be Jennifer Sloan Rachmuth, began yelling at her, calling her a terrorist, due to her wearing a hijab. She also stated that Ms. Rachmuth had taken pictures of her and posted them on X.

9. Ms. Fattah explained to me that, since Ms. Rachmuth had posted about her, the store had received multiple phone calls accusing the store of hiring terrorists.

10. Ms. Fattah told me that she no longer felt safe going to work at the store, and had even taken her kids out of school because she didn't want her kids to be involved in the situation.

11. Ms. Fattah told me that the store manager, Sheronda Irick, was present when Ms. Rachmuth came into the store, and would have additional information.

12. Officer Marino and I went to Harris Teeter and spoke with Ms. Irick, who told us about an incident that took place a few days earlier. A customer at the store, Ms. Rachmuth, approached one of her employees, Ms. Fattah, while she was stocking shelves. Ms. Irick stated that Ms. Rachmuth had yelled at Ms. Fattah, calling her a terrorist because of her head covering.

13. Ms. Irick also stated that Ms. Rachmuth was taking photos of Ms. Fattah, which is against store policy. Ms. Irick informed us that Ms. Fattah had attempted to calm Ms. Rachmuth down, but that Ms. Rachmuth continued to yell accusations at her.

14. Ms. Irick informed us that she intervened in the situation and spoke with Ms. Rachmuth. Ms. Irick stated that she instructed Ms. Fattah to return to work, but that Ms. Rachmuth continued yelling at her, and persisted in calling her a terrorist.

15. Ms. Irick stated that she was eventually able to calm Ms. Rachmuth down and discuss the situation. However, she ultimately asked Ms. Rachmuth to leave the store due to her behavior.

16. Ms. Irick confirmed that Ms. Fattah feared for her safety, and had not returned to work since the incident.

17. Ms. Irick informed us that after the encounter, she became aware that Ms. Rachmuth had made a social media post on her X account about Ms. Fattah, tagging Harris Teeter and including photos taken of Ms. Fattah in the store. Ms. Irick provided me with a link to the post Ms. Rachmuth had made about Ms. Fattah on X, which I reviewed.

18. Prior to this interaction, I was not familiar with Rachmuth. I did not know she was Jewish, nor did I know that she was an "independent journalist."

19. After speaking to Ms. Irick and Ms. Fattah and returning to the Police Department, Officer Marino and I consulted with *North Carolina Crimes: A Guidebook on the Elements of Crime*, to determine what, if any, charge would be appropriate in this situation.

20. After discussing with Officer Marino and consulting the book, we determined that we had probable cause for the charge of cyberstalking under N.C. Gen. Stat. § 14-196.3. In making this determination, we considered the information we had been provided from Ms. Irick and Ms.

Fattah, including the fact that the store had received multiple phone calls accusing them of hiring a terrorist, the victim's report that she felt terrified, harassed, and embarrassed by the post, and the fact that she had not returned to work and taken her kids out of school as a result. We also relied on the actual post from Ms. Rachmuth on X, including her subsequent comments on that post and the conversation that ensued. A true and accurate copy of the post and assorted comments we reviewed is attached to this Declaration as **Exhibit 4**.

21. After making this determination, Officer Marino and I spoke to Sergeant Bock, and then to Lieutenant Ottaway. We discussed the case and the evidence we had, and Lieutenant Ottaway both agreed that cyberstalking was an appropriate charge.

22. I filled out the warrant form for the charge of cyberstalking to present to the magistrate.

23. With Officer Marino present in the room, I met with the magistrate via video call and presented the warrant, including all the information gathered during the investigation as set forth above.

24. The magistrate approved the warrant, finding that there was probable cause for the charge of cyberstalking and issued the arrest warrant for Ms. Rachmuth.

25. The next day, November 3, 2024, I went with Officer Hernandez and Officer Marino to serve the warrant on Ms. Rachmuth at her residence at 112 Bellagio Drive, Apex, North Carolina. Officer Hernandez came with me in my patrol car as my FTO, and Officer Marino came separately in his own patrol car to assist.

26. We parked down the street from the residence in an area that was not visible from Ms. Rachmuth's house.

27.     It is common practice to not park in front of the residence where the warrant is being served to not alert the person we are serving the warrant on of our presence. This practice is taught in Basic Law Enforcement Training and is primarily done for officer safety purposes in case the person decides to flee or fight upon seeing the officers approaching.

28.     I was wearing an HSPD-issued body worn camera ("BWC"), which captured an audio and video recording of us serving the warrant on Ms. Rachmuth. A true and accurate copy of the recording captured by my body worn camera is attached hereto as **Exhibit 1**. All screen capture images in this declaration are taken from the recording captured from my BWC on November 3, 2024 at 112 Bellagio Drive, Apex, North Carolina, in my patrol vehicle on the way to the Wake County Detention Center, and at the Wake County Detention Center at 3301 Hammond Road, Raleigh, North Carolina.

29.     Officer Marino, Officer Hernandez, and I approached the front door of Ms. Rachmuth's residence from the side of the house at approximately 10:28 a.m.

30.     Officer Hernandez and I stepped onto the porch and Ms. Rachmuth opened the door and came out onto the porch as I stepped up to her door.



*Id.* 09:28:49.[1]

31.     I informed Ms. Rachmuth that there was a warrant for her arrest and Officer Hernandez informed her that the warrant was in connection with the incident at Harris Teeter.

32.     Ms. Rachmuth's husband, Guy Rachmuth stepped out onto the porch with her. I did not witness anyone else present at the home.

33.     Officer Hernandez asked Mr. Rachmuth if he could go into the house to get Ms. Rachmuth a pair of shoes because she was barefoot. 09:29:15-09:29:17.

34.     Ms. Rachmuth requested to change clothes, and Officer Hernandez told Mr. Rachmuth that he could bring clothing for her.

35.     As a matter of policy, we do not allow anyone subject to an arrest warrant to go back inside once they are out of the house. This is for officer safety purposes and to avoid having to enter a home once the subject is outside.

---

[1] The timestamps for the BWC footage refer to the "clock" time indicated near the upper right corner of the screen rather than the time elapsed from the beginning of the recording. The timestamps on Officer Warren's BWC is one hour behind the correct time.

36. Officer Hernandez ordered Ms. Rachmuth to turn around and put her hands behind her back five times before Officer Marino came up onto the porch and informed her that we would explain more, but that she needed to cooperate. She then complied with the order.

37. Ms. Rachmuth put her hands behind her back, and I was able to place her in handcuffs. *Id.* 09:29:47-09:30:23.

38. Officer Marino explained that Ms. Rachmuth's post about Ms. Fattah made her feel threatened and harassed, and that because the situation met the elements, she was being arrested for cyberstalking. *Id.* 10:29:47-10:30:10.

39. Mr. Rachmuth came out of the house with a pair of shoes and a sweater for Ms. Rachmuth.



*Id.* 09:30:33.

40. We allowed Mr. Rachmuth to assist Ms. Rachmuth by taking her necklace off.



*Id.* 09:30:43.

41. We informed Ms. Rachmuth that the magistrate had approved the warrant for her arrest for cyberstalking, finding that there was probable cause.

42. Ms. Rachmuth asked if she could bring her water because she had panic attacks and might need it. Officer Marino informed Ms. Rachmuth that she could bring a sealed water bottle with her.

43. Mr. Rachmuch went and retrieved a sealed water bottle from the house.

44. Officer Marino asked Ms. Rachmuth if she needed anything else to bring with her other than her shirt and her phone, and she stated that she wanted to bring her wallet. Officer Hernandez responded that we could bring that for her.

45. Mr. Rachmuth was unable to find Ms. Rachmuth's wallet. Ms. Rachmuth asked whether she would need her wallet, and we stated that she would not, so she decided not to bring her wallet.

46. Officer Marino handed Officer Hernandez Ms. Rachmuth's sweater and water bottle to bring with us to the Detention Center.



*Id.* 09:32:36.

47.     At Ms. Rachmuth's request, Officer Marino stayed behind with Mr. Rachmuth so he could explain the situation and provide details about what would happen after Ms. Rachmuth arrived at the jail.

48.     Officer Hernandez asked Ms. Rachmuth if it was okay for us to cut through the side of her yard so we could avoid making a scene about the situation, as it was a shorter route to get to where our patrol car was parked. She responded "yes, not a problem," and Officer Hernandez and I led her through the yard to the patrol car. *Id.* 09:32:04-09:32:08.

49.     It took approximately one minute to walk from Ms. Rachmuth's front door to the patrol car which was parked at the next house down. *Id.* 09:32:40-09:33:33.

50.     As I was leading Ms. Rachmuth to the patrol car, she stated that this would "be on Facebook" and laughed. She then said "especially with this one," I replied, "oh, over there, to the right," referencing a specific house, and she said "nosy neighbor, we all have them" in a joking tone. *Id.* 09:33:06-09:33:25.



*Id.* 09:33:08.

51.     When we arrived at the patrol car, I patted Ms. Rachmuth down. Officer Hernandez explained to her why we were patting her down, and she stated, "not a problem, gotta be safe." *Id.* 10:33:32-10:33:29. I then assisted her into the backseat of the patrol car.



*Id.* 09:33:31.

52.     As I was placing the seatbelt on Ms. Rachmuth, she asked if she could scratch her face with her knee if she needed to. I responded asking if she was able to do it with her knee, and Ms. Rachmuth responded, "I'm pretty flexible," and brought her knee up to scratch her nose and said "good thing I do yoga."



*Id.* 09:33:58-09:34:10.

53.     We then drove to the Wake County Detention Center. We arrived at approximately 10:56 a.m.

54.      During the drive, Ms. Rachmuth showed no signs of distress, and I do not recall her telling us that she was having a panic attack. Video footage from inside my patrol vehicle depicting Ms. Rachmuth during the drive to the detention center is attached hereto as **Exhibit 3**.

55.     When we arrived, Officer Hernandez assisted Ms. Rachmuth out of the vehicle and immediately assisted Ms. Rachmuth in drinking from her water bottle.



*Id.* 09:57:13.

56.     Officer Hernandez and I then led Ms. Rachmuth into the Wake County Detention Center. When we arrived, we followed the procedures and filled out the necessary paperwork to process Ms. Rachmuth.

57.     In accordance with department policy, in the process of the investigation, I completed an Incident/Investigation Report detailing the investigation. After serving the arrest warrant, I completed a Case Supplemental Report documenting the arrest. The full report is attached hereto as **Exhibit 2**.

58.     After completing the supplement, I had no further involvement in Ms. Rachmuth's case.

59.     I later learned that the charges had been dropped by the District Attorney, but I was unaware of the reason they were dropped at the time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __29__ day of __July__, 2026.

Elliot Warren
Elliot Warren (Jul 29, 2026 06:48:11 EDT)

**Elliot Warren**

# Slip Sheet

## *Declaration of Eliott Warren*

## *Exhibit 1*

*(Recording to be submitted manually and under seal with Court's leave)*

# <u>Slip Sheet</u>

## *Declaration of Eliott Warren*

## *Exhibit 2*

*(Document to be submitted under seal with Court's leave)*

# <u>Slip Sheet</u>

## *Declaration of Eliott Warren*

## *Exhibit 3*

*(Recording to be submitted manually and under seal with Court's leave)*



EXHIBIT
4







