

# Transcript of Benjamin Allen Marino

**Date:** May 27, 2026
**Case:** Rachmuth -v- Warren, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

-------------------------------x

JENNIFER SLOAN RACHMUTH,              :

                    Plaintiff,     : Case No.:

  v.                           : 5:25-CV-222-BO-RJ

ELLIOTT WARREN, et al.,               :

                  Defendants.   :

-------------------------------x


  VIDEOTAPED DEPOSITION OF BENJAMIN ALLEN MARINO

Conducted Virtually

Wednesday, May 27, 2026

3:10 p.m. ET


Job No.: 633893

Pages: 1 - 123

Recorded By: Micah Hardin

Deposition of BENJAMIN ALLEN MARINO, conducted virtually.

Pursuant to Notice, before Micah Hardin, Notary Public in and for the State of Indiana.

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFF:

      DANIEL BRUCE, ESQUIRE

      KELLEN DWYER, ESQUIRE

      HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK

      2300 N Street, Suite 643A

      Washington, D.C. 20002

      (540) 341-8808


ON BEHALF OF THE DEFENDANTS:

      DAN HARTZOG, ESQUIRE

      HARTZOG LAW GROUP

      2626 Glenwood Avenue, Suite 305

      Raleigh, NC 27608

      (919) 424-0091


ALSO PRESENT:

      TRAVIS PERRY; VIDEOGRAPHER

      OMAR MARROQUIN; TECHNICIAN TRAINEE

      BRIAN KRIEGER; TECHNICIAN

      JENNIFER SLOAN RACHMUTH; PLAINTIFF

      JOHN SCHIFANO, ESQUIRE; TOWN ATTORNEY FOR

      HOLLY SPRINGS

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 4 of 124

C O N T E N T S

EXAMINATION OF BENJAMIN ALLEN MARINO          PAGE

By Mr. Bruce                                  6, 119

By Mr. Hartzog                                118

E X H I B I T S

(Attached to transcript)

DEPOSITION EXHIBIT                            PAGE

Exhibit 3    Written Directive                 72

Exhibit 8    Incident/Investigation Report     64

Exhibit 9    Warrant for Arrest                80

Exhibit 10   Video of Arrest                   94

Exhibit 11   12/8/2022 Emails                 106

Exhibit 12   1/9/2023 Emails                  110

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins media number one in the videotaped deposition of Benjamin Marino in the matter of Rachmuth versus Warren et al., in the United States District Court of North Carolina, Western Division, Case Number 5:25-CV-222-BO-RJ.

Today's date is May 27, 2026. The time on the video monitor is 1511. The videographer today is Travis Perry, representing Planet Depos, headquartered at 451 Hungerford Drive, Rockville, Maryland. All parties of the video deposition are attending remotely.

Would counsel please voice identify themselves and state who they represent?

MR. BRUCE: Daniel Bruce. I represent the plaintiff, Ms. Sloan Rachmuth. I'm here with my colleague, Kellen Dwyer.

MR. HARTZOG: Dan Herzog, Jr., on behalf of the defendants.

THE VIDEOGRAPHER: The court reporter today is Micah Hardin, representing Planet Depos, and the witness will now be sworn.

THE REPORTER: I am a notary authorized to administer oaths, and this deposition will be

recorded by electronic means. All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable, procedural, and evidentiary rules and laws and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with applicable law of such.

Hearing no objection, I will now swear in the witness.

Whereupon,

BENJAMIN ALLEN MARINO,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Counsel, you may proceed.

MR. BRUCE: Thank you.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BRUCE:

Q    Good afternoon, Officer Marino. Thank you for being here today for -- and for bearing with us as we worked out those technical difficulties. Just some procedural stuff up front. Yesterday, our deposition went to about 8:00 p.m. I expect this one to -- to go a similar length, although

hopefully shorter. Don't want to make any promises.

Yesterday, we just went straight through, and we didn't take a break for dinner or anything. Is that your preference today? Do we want to plan to take a dinner break? I'll leave that up to you all.

A    Yeah. I mean, I'm okay going all the way through.

Q    Okay. Sounds good. Well, that's what we'll plan to do. I'll take a break about every hour, but if you ever need to take a break at all, just -- just let me know. Happy to do so. The only thing I would ask is that if there's a question pending, that you would answer the question before we -- we take a break. But other than that, just let me know.

Have you -- have you ever been deposed before, Officer Marino?

A    No, sir.

Q    Have you ever testified in court?

A    Yes, sir.

Q    How many times about have you testified in court?

A    Probably over 15 to 20.

Q    Were those all for situations involving

your duties as an officer?

A    Yes, sir.

Q    Okay. Well, deposition is similar to testifying in court. The main difference here is that we don't have a judge present. That means that there may be times where your lawyer objects to a question I ask, but that objection is just for the record, so that it gets down on paper.

We don't have a judge here to rule on it, so in most situations, you'll still need to answer the question. There might be a situation where your lawyer instructs you not to answer, and then you should, you know, follow that advice of your counsel. But that's kind of the difference there.

Just a few more procedural things. Since we're on Zoom and I have a court reporter today, just please speak up and answer all the questions orally, not with any head nods or head shakes, just to make sure that we can get everything down on the record and hear each other through Zoom. Does that make sense?

A    Yes, sir.

Q    And then wait for me to fully ask a question before you answer, even if you think you know the answer or anticipate it. Again, that's

just so that we make sure that -- that it gets on the record, and that both the question and the answer are fully recorded. Does that make sense?

A    Yes, sir.

Q    And if at any time one of my questions isn't clear, just let me know. I can -- I can explain it or rephrase it. If you answer the question, I'll assume you understood the question. Does that make sense?

A    Yes, sir.

Q    All right. Could you please state your full name, please?

A    Yes. Benjamin Allen Marino.

Q    And where are you testifying from today?

A    The Holly Springs Police Department.

Q    Is there anybody else in the room with you?

A    Yes, sir.

Q    Who's in the room?

A    I have Dan, and I have John.

Q    Okay. Anybody else?

A    No, sir.

Q    All right. Are you under the influence of any medications, drugs, or alcohol that would impair your ability to answer questions today?

A     No, sir.

Q     And you're currently an officer with the Holly Springs Police Department; is that right?

A     Yes, sir.

Q     When were you hired with the Holly Springs Police Department?

A     It was February of 2020.

Q     2020, right before COVID?

A     Yeah, yeah.

Q     It was a crazy time. What rank did you start out as when you were first hired?

A     I was just an officer.

Q     Okay. And what rank do you hold now?

A     I'm a corporal.

Q     Okay. Have you held any other ranks in between those?

A     I held a senior officer, but that's specifically not a rank.

Q     Okay. And what was your rank in November of 2024?

A     Senior officer.

Q     Okay. Do your job responsibilities differ between officer and senior officer?

A     No, sir. They don't.

Q     Okay. What about between senior officer

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 11 of 124

and corporal?

A    Yes, sir. They do.

Q    How do they differ now as a corporal?

A    You are a -- put in a supervisory position. So now, you are a supervisor amongst -- for the other officers. So you have supervisory responsibility as far as approving reports, coming up with training, making sure the officers are doing what they need to, and following within policy on the road.

Q    Okay. Is there anything else you do as a corporal?

A    Other than supervisor responsibilities, no, sir.

Q    Do you supervise at warrant applications?

A    Warrant applications?

Q    Yes.

A    I do not review them, no.

Q    Okay. Are you currently on any particular assignment with the Holly Springs Police Department?

A    Do you mean specialized unit?

Q    Yeah. Are you assigned to a specific unit or anything?

A    Just patrol and a member of the SWAT

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 12 of 124

team.

Q    Okay. Were you assigned to a specific unit in November of 2024?

A    2024, I was on patrol and also a member of the SWAT team.

Q    Can you describe what training you've received as an officer with the Holly Springs Police Department?

A    Yes. I have a list that's actually -- actually on our, I guess, our town P drive that has all my qualifications and all my classes listed. I don't recall the whole list to extent, but all that is written down with the dates and number of hours that we have per class.

Q    Okay. Fair enough. Can you just go through some of the things you remember off the top of your head?

A    Sure. I took standard field sobriety tests. I took officer survival I, officer survival II, numerous different SWAT classes, a lot that are part of the NCTOA. I am a crisis intervention officer. I went through CIT class. On the top of my head, that's all I can remember.

Q    Okay. Did you go through basic law enforcement training?

A     Yes, sir. I did.

Q     What did basic law enforcement training include?

A     They went over how to become an officer. BLET is the -- what you need prior to becoming an officer, so before you're getting your certificate, you need to go through a huge amount of training, going over case law, also going over -- making sure you're passing your test. There's also a physical -- physical training portion of it as well. So that's what BLET intends.

Q     Okay. When did you go through that training?

A     That was in 2019.

Q     You mentioned that -- that training included discussing case law; is that right?

A     Yes, sir.

Q     What kind of case law did you review in that training?

A     You go over the North Carolina case law.

Q     That -- I'm sorry?

A     You go over case law in North Carolina laws.

Q     Okay. Did that include constitutional law?

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 14 of 124

A    It did, yes.

Q    Did it include any training about the First Amendment?

A    Yes, sir.

Q    What training did you receive about the First Amendment?

MR. HARTZOG: That's a pretty broad question. Are you asking if he took specific classes or --

BY MR. BRUCE:

Q    Just during basic law enforcement training, what training did you receive about the First Amendment?

A    Pretty much reviewing and making sure you understand.

Q    Okay. Based on that training, what is your understanding of the First Amendment?

MR. HARTZOG: Objection. You're asking a legal question.

MR. BRUCE: Just asking -- asking his understanding.

BY MR. BRUCE:

Q    But what -- based on your training you received during basic law enforcement training, what is your understanding of the First Amendment?

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 15 of 124

MR. HARTZOG: Same objection. You can answer if you know.

THE WITNESS: Do I go ahead and answer?

MR. HARTZOG: Yeah, you can answer.

THE WITNESS: Yeah. I mean, I don't know the full amendment to its entirety, but I do know that you have the right to, you know, your speech, religion, press, assembly, gathering. But I don't know the, you know, word-for-word, verbatim.

BY MR. BRUCE:

Q   Fair enough. Did you receive any training about what specific speech is protected under the First Amendment?

MR. HARTZOG: Again, same objection. These are legal questions. If you want to ask factual questions, you can ask, but these are legal questions.

MR. DWYER: Go ahead and answer. You don't have to respond to the objection. Your objection is noted. Thank you.

MR. HARTZOG: Thank you. Answer if you know.

THE WITNESS: I don't know.

BY MR. BRUCE:

Q   Did your training include whether any

types of speech can be considered in charging a crime?

A    I don't recall.

Q    Okay. And who conducted your basic law enforcement training?

A    It was hosted at Wake Tech, Wake Tech public safety campus.

Q    Were officers from Holly Springs Police Department the ones who put on the training?

A    No, sir.

Q    Was it just somebody with Wake Tech?

A    It was from the state, yes.

Q    Have you received -- well, you mentioned CIT training; is that right?

A    Yes, sir.

Q    What did CIT training cover?

A    Covered going over, you know, how to handle situations and with certain individuals that are going through a mental crisis.

Q    What kind of mental crises did you cover?

A    If it is something that they're diagnosed with, or something that they're just going through at the -- in the moment, where they're not in reality. It goes over certain trainings and techniques on how to encounter those individuals

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 17 of 124

safely and -- and to communicate with them.

Q    Did it include how to communicate safely with people who may be experiencing panic attacks?

A    I don't remember.

Q    Have you received -- have you received any training about identifying or classifying bias-motivated crimes?

A    Other than yearly -- yearly training, I have not taken any outside training on that.

Q    You said other than yearly training. Do you have a yearly training on identifying bias-motivated crimes?

A    It's within a certain topic. It's part of our in-service in Holly Springs.

Q    Okay. What training have you received on identifying those types of crimes?

A    That training only included video -- video calls and then questions regarding -- regarding it.

Q    Okay. Were you ever trained on what factors you should consider, and whether to designate a crime as bias-motivated?

A    I'm sorry. Can you re-ask that?

Q    Did that training include any factors on what you should consider when determining whether a

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 18 of 124

crime may be bias -- motivated by bias?

A    No, I don't remember.

Q    Okay. Do you remember anything about the content of that training?

A    I don't.

Q    Okay. Fair enough. Have you received any training on identifying hate or extremist groups?

A    No, sir.

Q    Okay. Have you received any training on implicit biases?

A    Implicit bias, yeah. That is also included in our yearly in-service.

Q    Okay. And what does that training include?

A    Same thing. It includes the video -- videos that you watch and -- and sign-offs and questions.

Q    Okay. And do you remember any of the substance of that training related to implicit biases?

A    No, I do not.

Q    Do you remember if it included how to identify implicit biases related to Jewish individuals?

A    No, sir.

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 19 of 124

Q    When did you receive that implicit bias training?

A    I don't recall the exact date, but I do know it is written down on my training log.

Q    Okay. Have you received any training specifically about the North Carolina cyberstalking statute?

A    Other than reading it -- reading it, not all into detail, no.

Q    Okay. But no official training, a seminar, or anything like that?

A    No. No, sir.

Q    And have you received any training on the Holly Springs Police Department's written directives?

A    Yes, sir.

Q    Okay. What kind of training have you received on the written directives?

A    Their policies. So we look over them, understand them, and then we sign off on them, saying that we acknowledge and have read them.

Q    Okay. So you just have to read them and then acknowledge that you've done so?

A    Yes, sir.

Q    Okay. Do you have any classes or seminars

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 20 of 124

you go to specifically about the directives?

A    No, sir. I've not attended any.

Q    Okay. So based on all the training you've received, can you describe the steps an officer is supposed to take once a crime is reported?

A    Sure. Yes. So whenever someone calls into the 911 call center, Holly Springs dispatch will dispatch a unit out to -- to the call. An officer goes to the call. They assess the situation. They get the size of the stories from the victim, the witness, the offender, and any parties involved. Gather information on who they are.

All that information on who they are is ran from or ran by our dispatch unit. If it is a report, then we generate a report number. We'll give it to the -- all the parties involved, and then we will document that in a report. If it is a crime and an arrest needs to be made, then an arrest is also made.

Q    Okay. So I want to pack a little bit of that. So you mentioned, so once a call comes in, an officer may be dispatched to -- to answer the call; is that right?

A    Yes.

Q    Okay. And when you -- and you said when

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 21 of 124

the officer gets there, they would gather information about all the parties involved; is that right?

A     Yes, sir.

Q     Would that generally include the suspect or the offender?

A     Or a witness, yes.

Q     Okay. How do they collect that information? Do they -- do they write it down?

A     Typically, yes. It's written down, yeah.

Q     Is there a specific form they're supposed to use?

A     No. We just have little notepads that we use.

Q     Okay. And how are they generally assessing that information? Sorry, that's -- I'll rephrase. How are they -- how are they generally collecting that information?

A     Usually verbal, either face-to-face or over the phone.

Q     Okay. And when they collect it verbally, do -- does an officer document that conversation?

        MR. HARTZOG: Objection. Are you asking practice, training?

BY MR. BRUCE:

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 22 of 124

Q    Based on your training that you have received, when an officer obtains oral information, do they document that in writing anywhere?

A    Typically, yes. It would be on a notepad.

Q    Okay. Are officers trained to write that information down word for word or summarize it?

A    It's usually summarized.

Q    Is there any situation where you might obtain a written -- a written statement from the witness?

A    Yes, sir.

Q    What situations would those be?

A    If a witness, I guess, saw the -- the incident occur, you know, that would be something that we would get a witness statement form, and have them write it or sign it, and kind of tell us their side of the story. It is optional. They don't have to do it. But yes, that would be the time that we would do, like, a witness statement form.

Q    Okay. If -- you said it's optional; they don't have to do it. If they choose not to do it, is there a -- a standard best practice for how you record that information without a written statement from the witness?

A    No. If -- if they decide not to do it,

then we would just -- that a form is just not
filled out for it, so it wouldn't be put into a
case file.

Q    Okay. And does that also apply if you're
-- you're getting a statement from the victim of
the crime?

A    No. There's also forms as well. However,
in majority of the -- almost in all the incidents
that I -- I've responded to, usually there's not a
form filled out. It's just a vocal, you know,
understanding of the situation of what happened
between the officer and the victim.

Q    Okay. And you said in those situations,
an officer tends to write -- write down that
information on a notepad, right?

A    We make notes on a notepad, yes.

Q    And do you ever take those notes from the
notepad and put them onto another form or anything?

A    No. They would -- I mean, sometimes.
Currently, now, with our new -- new report writing
system, they can be scanned in and added to our
files tab. However, back then, a case file would be
created where we would print the report, put all
our documents, all our evidence from our paperwork
inside that case file, and then give it to the

clerk -- I'm sorry -- to our records clerk here to hold until, you know, the court date.

Q    Okay. Is it standard practice to interview the suspect when responding to -- to a crime that's reported?

A    Yeah. Yeah, it's common practice.

Q    Okay. Do you -- is it common practice to get a written statement from the suspect?

A    No, that's not common practice.

Q    Okay. In what situations might you not interview the suspect?

MR. HARTZOG: Objection. You can answer.

THE WITNESS: If you can prove that a crime occurred, and you have the evidence and the articulable facts pointing that that was a suspect that committed the crime, and you have identified them. Then if a crime occurred, there was no need to interview the suspect.

BY MR. BRUCE:

Q    Okay. And if you don't have evidence the crime occurred, what would you do in that situation?

MR. HARTZOG: Objection. You can answer.

THE WITNESS: If we don't have evidence, then it's just a documentation in a report.

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 25 of 124

BY MR. BRUCE:

Q    Would you reach out to the suspect in that situation?

A    If I felt necessary.

Q    Does whether you reach out to the suspect depend on whether you have any evidence that they're dangerous?

A    Yes. Yeah. If not reaching out, yes, I agree.

Q    Whether you reach out to the suspect have any -- well, is whether you reach out to the suspect have -- depend on whether you have any evidence that they're a flight risk?

A    Yes.

Q    Are there situations in which a -- based on your training, in which a crime may be designated a suspected bias or hate crime?

A    I'm sorry. Can you re-ask that question?

Q    Based on your training that you received at the Holly Springs Police Department, are there situations where a crime may be designated a suspected bias or hate crime?

A    I don't know.

Q    Do you know if Holly Springs has any -- any policies about designating bias or hate crimes?

A     I don't recall.

Q     Can you explain how the process for obtaining a warrant generally works?

A     Yes. So when you have the evidence, and a crime has been committed, and you have both parties identified or the suspect information, you can go ahead and fill out a warrant for their arrest. When you have that warrant for their arrest that -- filled out, you go in front of a magistrate. You present your probable cause. She will grant you the warrant if she finds there to be probable cause, and then the warrant is active.

Q     Okay. You said -- you mentioned you fill out the warrant. Is there a specific form you're required to fill out?

A     Yeah, it's on eWarrants.

Q     Okay. What is -- what is eWarrants?

A     It's a online website that you fill out the -- the warrant on.

Q     Okay. And does that -- does that create any sort of, like -- like, PDF file or -- or printed file that -- that is what is -- what becomes the warrant?

A     When it's -- I don't -- I don't think it becomes a PDF file, but it's -- it's on the -- the

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 27 of 124

website.

Q    Okay. Do you know what -- where the information goes once you put it into the eWarrant's website?

A    Goes to the court.

Q    Okay. So is that the information that's reviewed by the magistrate?

A    It is, yes.

Q    What do you -- when you fill out that form, what information do you put into that form?

A    You put the location, the date, the time. You put the offender's information. You put yourself as a complainant. You put the offense. That's -- those are primarily what you put in there.

Q    Okay. Do you put any description of -- of the underlying conduct?

A    If it requires.

Q    When might it require?

A    It honestly just depends on the charge. Sometimes it's written language. It's already -- it's a click, and it puts itself in there. And sometimes it tries to have you go into an elaboration. If it's an assault, like an assault, they would want to know what kind of assault and

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 28 of 124

what was used or any injuries. But sometimes it's just fill-in-the-blank.

Q    Okay. Do you attach any evidence you've collected to that form anywhere?

A    There's a -- I believe there is a spot for, like, files or -- or something. I've never put any evidence in there, but I do believe there is a spot for it.

Q    Okay. So there's a spot where you can upload a file or an attachment or something to the form?

A    I believe so. I believe, yeah.

Q    But you've never uploaded evidence in that way?

A    No, sir.

Q    Okay. Is there any other written form or document that you submit to the magistrate to obtain the arrest warrant?

A    Only if there -- if it's a felony, then you have to fill out a felony investigation report that you have to give to the magistrate as well. But misdemeanors, it would just be the warrant.

Q    Okay. And then you said you go to the magistrate. What's -- what's the process of going to the magistrate like?

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 29 of 124

A     You can either show up in person, or you -- or here at the Holly Springs Police Department, we have the privilege where we have a computer that will do a FaceTime, like we are now. And that is what -- we will give them a -- the CR number or the file number for it. They will be able to pull it up on their end, and they pretty much ask you what happened. So what's your probable cause? And that is when you explain what happened, and they would either grant it or deny it.

Q     Okay. Do you fill out the warrant form before or after you meet with the magistrate?

A     It's before.

Q     And how long does the -- the meeting with the magistrate tend to last?

A     Typically, like, five minutes. It's real short.

Q     And what -- what's the standard practice for how much information you give the magistrate at that point?

MR. HARTZOG: Objection. It's very broad. You can answer.

THE WITNESS: You present the facts that you obtain on the call, and that is what the magistrate -- the ones to see if it meets an

element or the element that you're charging.

BY MR. BRUCE:

Q    Okay. How many arrest warrants have you personally sought in your time at Holly Springs?

A    I don't know the exact number.

Q    Is it around 10?

A    It's more. It's -- it's more than 10.

Q    Okay. More than 20?

A    Yes, sir.

Q    Okay. Have you ever been denied an arrest warrant?

A    I have not.

Q    Do you present the magistrate with the incident report that -- that you fill out?

A    No, sir.

Q    Do you know if they have access to the incident report?

A    No, sir. Not at the time, given the probable cause.

Q    So sorry. Just to clarify. You don't -- you don't know if they have access, or do they not have access?

A    I don't know if they have the access. Usually, when you're filling out the warrant, it's prior to doing the incident report.

Q     Okay. Are officers supposed to seek anyone's advice before they seek a warrant or a summons?

A     If they need a better understanding or have a question, then seeking advice isn't a bad option. It's using their resources.

Q     Is it up to -- up to them to decide whether they're supposed to -- whether they should seek advice from someone?

A     Yes.

Q     And who might you seek advice from as an officer?

MR. HARTZOG: Objection.

THE WITNESS: A more senior officer or someone in -- a supervisor is a good resource as well to use.

BY MR. BRUCE:

Q     Okay. Would you ever go to the District Attorney's Office for advice before seeking a warrant?

A     I have before, yes.

Q     Okay. In what situations have you done that?

A     If it was something I was very unclear on, or maybe something that I haven't charged

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 32 of 124

before and just had some questions. I have contacted the -- the DA before.

Q    Before you contacted the DA in those situations, did you also seek the advice of a supervisor?

A    More than likely. I don't recall exactly. However, I probably was referred to the -- to them from my supervisor, but -- but I don't remember exactly who I went to first.

Q    Okay. How many times have you sought the District Attorney's advice before applying for a warrant?

A    I don't know the exact number, but it wasn't many times.

Q    Was it less than five?

A    Probably. Yes, sir.

Q    Okay. And you said those were in cases where you were unclear about the charge, or you hadn't charged it before; is that right?

A    Either that, or talking to my supervisor, and they referred me to talk to the -- talk to them.

Q    Okay. Are there any other situations where you might go to the DA before you seek a warrant?

A     Not to my knowledge.

Q     Are officers are supposed to go to the Town Attorney's Office before obtaining a warrant?

A     No, sir.

Q     Okay. Have you ever gone to the Town Attorney's Office to get their advice before seeking a warrant?

A     No. No, sir.

Q     Okay. Officer Marino, when did you first become aware of who Ms. Rachmuth is?

A     The day of the arrest.

Q     Okay. Had you heard about Ms. Rachmuth before the day of the arrest?

A     No, sir.

Q     Were you aware that she had previously made complaints to the Holly Springs Police Department about cyberstalking and harassment?

A     Not to my knowledge. No, sir.

Q     Okay. Did you hear anybody in the office talking about Ms. Rachmuth before the arrest?

A     No, sir.

Q     Were you aware that she had a family in North Carolina before the arrest?

A     No, sir.

Q     Were you aware that she is Jewish before

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 34 of 124

the arrest?

A    No, sir.

Q    How did you first become involved in the investigation of the complaint involving Ms. Rachmuth?

A    Are you -- are you asking based off the call that we got dispatched to?

Q    Yes. How did -- how did you personally first become involved in -- in the investigation about the incident at issue here?

A    Oh, I was field training Officer Warren at the time. Officer Warren got dispatched out to the call, and I was -- as his field training officer, I am with him, so that is how I got involved.

Q    Okay. So you said you were his field training officer?

A    I was a secondary field training officer for him.

Q    Okay. What does secondary field training officer mean?

A    Just kind of like a fill-in if the primary is usually out. Sometimes if the officer is not responding well to the primary field training officer, they can put him with the secondary field

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 35 of 124

training officer to get a different viewpoint and different opinion on things, and maybe they respond a little bit better with the secondary.

Q   Okay. So why were you Officer Warren's field -- secondary field training officer that day?

A   Officer Hernandez was not -- Officer Hernandez was his primary, and he was not there that day.

Q   Okay. As a field training officer, what are your -- what are your responsibilities as a field training officer?

A   To teach them. It's teach them officer safety, kind of guide them. Give them a lot of resources. Teach them about our softwares [sic] and our databases that we use. Make sure they understand the procedures of filling out the reports, or just kind of, I guess, you know, police duties. It's an ongoing active list that we just check off on.

Q   Okay. Are you required to review any investigation that the officer you're serving as the field training officer for conducts?

A   Yes, sir. You are.

Q   Okay. In what way are you required to review that?

A     You review the report, review any -- make sure that they're actually within -- you know, if they're charging, or if they need to come up with an offense, make sure they're on the right page, the right -- the right track. So that's kind of primarily why you're there. Depending on what phase he's in -- in the FTO program, it's how involved you are. So it just kind of depends where they are in that field training program.

Q     Okay. And was this the first time you had served as Officer Warren's field training officer?

A     I don't know if it's the first time. So I don't remember if it was the first time or if it -- if I've been with them in the past.

Q     Was it -- how far along in his -- in his field training was he at this point?

A     I don't think very long, but I don't remember exactly what phase or how many days he's been here.

Q     Okay. Were there -- were there other times you served as his field training officer?

A     Later on, yeah. Yeah, later on, when he was closer to the end, that is when I became his field training officer again.

Q     Okay. Were you ever his primary field

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 37 of 124

training officer?

A    No. Officer Hernandez was the primary.

Q    Okay. So you mentioned that the field training officer reviews the report and helps them come up with the right offense; is that right?

A    Yes, sir.

Q    All right. Is there anything else the field training officer has to review with respect to an investigation?

A    Just depends how -- you know, in this situation, the warrant, yes. The -- you're making sure he's filling out everything properly.

Q    Okay. So you also review the warrant application?

A    I do, yes.

Q    Do you have to sign off on the report or the warrant application?

A    Not physically, no. The supervisors will sign off on it, but you will, like, look at it visually and, you know, approve it or tell them to fix something.

Q    Okay. So you mentioned that you were with Officer Warren when he responded to the call that came in about Ms. Rachmuth; is that right?

A    Yes, sir.

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 38 of 124

Q    So what did you all do when you responded to that call?

A    So we drove to the -- the location, which was Harris Teeter off Sunset Lake Road. We ended up getting there. We spoke to the manager that was on scene. Kind of figured out exactly what -- what occurred, what the -- the complaint was. We got information from the manager.

We ended up contacting the victim in this case over the cell phone. Officer Warren talked to the victim over the phone, gathered her information, and then we just kind of went from there.

Q    Okay. And to just to back up a little bit before you get to the -- the Harris Teeter, what was the substance of the call that came in?

A    It came out as a harassment.

Q    Okay. And what does that mean? Is there a specific code for harassment or --

A    No, no. It's plain talk, so it just came out as harassment.

Q    Okay. Do you recall what day this was?

A    It was November 2nd.

Q    Did you get any other information from dispatch other than just harassment when -- when

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 39 of 124

the call came in?

A    There was some type of call notes for it, but I don't recall exactly what the call note said.

Q    Okay. When you say call notes, is that something you receive verbally from dispatch, or do you get something written that are call notes?

A    It's written into the call, and then dispatch will relay it over to you, just kind of depending on what it is. And they just say, refer to your MDT, which is our database here for calls, or they will say it over the radio.

Q    Okay. So you said -- you mentioned that you spoke to the Harris Teeter manager once you arrived to Harris Teeter; is that right?

A    Yes, sir.

Q    Did you speak to her, or did Officer Warren?

A    Officer Warren did.

Q    Okay. Did you ever ask any questions of the manager?

A    I don't remember if I asked her anything.

Q    What -- were you present when she was talking to Officer Warren?

A    I was within the same room, yeah.

Q    Okay. What did she say to Officer Warren?

A    I don't know the full extent of what was said verbatim. I do know that it was mentioned that a customer walked in and began to take pictures of one of her employees. I know that she did overhear her say that the customer called her a terrorist and was raising her voice at her. From there, I know that she ended up asking the customer to leave, and she left. She left.

Q    Okay. Did she ever identify Ms. Rachmuth by name?

A    I don't remember.

Q    Did she ever express fear for the employee's safety?

A    I don't recall either.

Q    Did she say whether Ms. Rachmuth threatened violence in the store?

A    I don't remember.

Q    Did she say whether Ms. Rachmuth assaulted the employee?

A    No, sir. She did not assault.

Q    Did she say whether she had any reason to believe Ms. Rachmuth knew the employee's name?

A    I'm sorry. Can you say that one more time?

Q    Did the manager say whether she had any

reason to believe that Ms. Rachmuth knew the employee's name?

A       No. No, sir.

Q       Did the manager say whether she had any reason to believe that Ms. Rachmuth knew the employee's home address?

A       No, sir.

Q       Did the manager say whether Ms. Rachmuth had contacted the employee by phone?

A       I don't remember.

Q       Did the manager say whether Ms. Rachmuth had ever contacted the employee by email?

A       I do not believe so.

Q       Did the manager say whether Ms. Rachmuth had ever contacted the employee by social media messaging?

A       I do recall that it wasn't contacted, like, to her, but she was -- I do believe that the manager informed us that it was -- it was posted, that there was a post about the employee on social media.

Q       Okay. So at that time, the manager informed you about the social media post; is that right?

A       I believe so, yes.

Case 5:25-cv-00222-BO-RJ       Document 29-4       Filed 08/03/26       Page 42 of 124

Q    Did she give you -- did she give you the post, a screenshot of the post, or anything at that time?

A    I don't remember. I don't think she gave us a physical copy of it.

Q    Okay. Did she email it to you or text it to you or anything?

A    I don't remember if it was. It wasn't emailed to me.

Q    Okay. Did the manager ever say whether Ms. Rachmuth came to the employee's house?

A    No, sir.

Q    And you mentioned that the -- the manager said she had asked Ms. Rachmuth to leave at some point during the incident; is that right?

A    That's correct.

Q    Did she ever say whether Ms. Rachmuth returned to the Harris Teeter?

A    I do not believe -- that day?

Q    Yes, that day.

A    No, sir.

Q    And did she say whether Ms. Rachmuth left when she was asked to leave?

A    Yes, sir. She left.

Q    So you mentioned that the manager said

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 43 of 124

that there was a customer who took pictures of the employee, called the employee a terrorist. The manager asked the customer to leave. The customer left. And then you mentioned that she mentioned the social media post. Is there anything else the manager mentioned during that conversation?

A     I don't recall everything that was mentioned.

Q     Okay. And was that conversation memorialized in writing at all?

A     No, sir. Everything was just vocal.

Q     Okay. So did the manager prepare a witness statement?

A     No. No, sir.

Q     Okay. Did Officer Warren memorialize it in writing anywhere that you know of?

A     Not that -- I don't know. I don't recall.

Q     And did you take notes on a notepad or anything during -- during the conversation?

A     I did not. No, sir.

Q     Did Officer Warren?

A     I don't -- I don't remember if he did.

Q     And did you know the manager before the incident?

A     No, sir.

Q     Had you ever shopped at that Harris Teeter before?

A     Yes, sir.

Q     Have you -- had you ever met or spoken to the manager while you were shopping there?

A     No. No, sir.

Q     Did you ever -- sorry. Go ahead.

A     I just said no, sir.

Q     Okay. Had you ever met the employee while you were shopping there?

A     No, sir.

Q     So you mentioned that that day, Officer Warren also spoke with the employee on the phone; is that right?

A     That's correct.

Q     Did -- were you also on the phone with him when he was having that conversation?

A     I was in the same vehicle as him, yes.

Q     Okay. Did you overhear any of that conversation?

A     I believe so, yes. I think it was on speaker, so I did overhear.

Q     Okay. Describe what the employee told Officer Warren while she was on speakerphone.

A     Again, I don't remember to the full

extent what was said. I do know that she -- she is aware that there was a social media post that was posted online. It was on Twitter or X. And she sounded very distraught over the cell phone. I know she did say that she was terrified and in fear, and she has not returned back to work, and very embarrassed about the situation. But I don't recall the exact, you know, what was -- what actually was said over the cell phone.

Q    Okay. Did she mention any of the conduct that occurred in the store?

A    I believe -- well -- well, yes. I just don't know exactly what was said.

Q    Okay. You said she mentioned a social media post; is that right?

A    That's correct.

Q    Did she mention whether there was one post, two posts, or more than one post?

A    I believe she just said a post.

Q    So just one post?

A    I don't know if she said one or two or more.

Q    Did she say whether Ms. Rachmuth ever threatened her in the store?

A    I don't recall.

Q    Did she say whether Ms. Rachmuth ever threatened her over the phone?

A    I do not believe so. No, sir.

Q    Did she say whether Ms. Rachmuth had ever tried to contact her over the phone?

A    No, sir.

Q    Did she say whether Ms. Rachmuth ever contacted her by email?

A    No, sir.

Q    Did she say whether Ms. Rachmuth ever contacted her by any sort of messaging app?

A    No. No, sir. Not -- not -- that I don't -- I don't know.

Q    Did she say whether Ms. Rachmuth ever came to her home?

A    No, sir. She did not.

Q    Did she say whether she had any reason to believe that Ms. Rachmuth knew her name?

A    I don't know.

Q    Did she say whether she had any reason to believe Ms. Rachmuth knew her home address?

A    I also don't recall.

Q    Do you remember anything else that she said during that phone conversation?

A    I do not. With this case being over two

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 47 of 124

years, I do not remember the extent of every word that was said.

Q    Understood. Was that phone conversation memorialized in writing at all?

A    I don't remember.

Q    Was it recorded in any way?

A    I do not believe it was recorded, no. I know it wasn't documented on my end because when I tried to pull up any bodycam footage of that incident, it's not -- that phone conversation is not there.

Q    Did the employee complete any sort of witness or victim statement?

A    She didn't -- she did not write anything out, no.

Q    Okay. Did Officer Warren ask her to complete a witness statement?

A    I don't remember.

Q    Based on your training and based -- as his -- his FTO, should he have asked her to complete a witness statement?

A    Well, she's -- are we still talking about the manager, or are we talking about the victim?

Q    The -- the employee, or the victim.

A    The employee? No. A form does not need to

be filled out.

Q    Did Officer Warren ever ask the manager to fill out a statement?

A    I do not believe so.

Q    Based on your training and as his FTO, should he have asked the manager to fill out a statement?

A    It would have been -- it would have been -- would have helped for a witness statement, yes.

Q    And why is that?

A    Just whenever if -- whenever this went to court, if it did, then we at least have a witness testimony of exactly what was said verbatim on that form.

Q    When you respond to -- to incidents like this, do you typically -- typically ask a witness to complete a written statement?

A    Not every single time, no.

Q    Okay. But it helps to have the witness statement; is that right?

A    It does, yes.

Q    But you said that the -- the victim didn't necessarily need to fill out a statement; is that right?

A    The victim didn't necessarily need to?

I'm sorry.

Q     So you said it helps to have a statement from the witness. Would it also help to have a written statement from the victim?

A     In some situations, yes.

Q     Is it standard practice to get a written statement from the victim?

A     It's not standard practice.

Q     Okay. So after you spoke with the manager and spoke with the employee on the phone, what did you and Officer Warren do next?

A     I believe we discussed it amongst ourselves to see if there was any charges or anything that -- or what kind of documentation we need to go from that point forward. I do remember that it was -- we were both questioning, you know, what type of charge, if there was any.

And I know we looked at the -- the crimes book and looked online, and what we gathered was cyberstalking would have been the most appropriate. And I know we discussed this with our supervisor, both Sergeant Bock, and I know Sergeant Bock referred us to Lieutenant Ottoway, which, they were both standing right next to each other at the time, so we ended up talking to Lieutenant Ottoway about

the cyberstalking charge.

And, you know, she said that we -- we -- we had it, and she would have -- she approved it. Well, not approved, but just was on the same side, and understood where we were coming from. So that's where -- that was the next steps that we took.

Q    Okay. Did all of that occur on the same day that you spoke with the manager and the employee?

A    Yes.

Q    Okay. What evidence did you have at that time that made you believe cyberstalking was the appropriate charge?

A    It was -- it was what the victim told us, and then it was also looking at the statute.

Q    What part of the statute led you to believe that cyberstalking was the appropriate charge here?

A    I don't remember verbatim what the statute actually said. I do know there is a -- what it does say in there. It's pretty much what we put into the report. I know about feeling terrified, harassed, embarrassed, along those lines. I just don't know verbatim exactly what it was.

Q    Okay. So you mentioned you had the

witness statement -- or, sorry -- the witness -- excuse me. You had the victim's statement at that point. What other evidence did you have that made you believe cyberstalking was an appropriate charge?

A     Well, we had the -- the post that was posted, and we had also the witness statement that matched along with what the victim said. So with it being -- the post is what made us think of cyberstalking, with it being online.

Q     How many posts did you have when you were considering whether to bring cyberstalking?

A     Well, I just saw the one post.

Q     Do you review any comments made to the post?

A     I did. I looked at the comments.

Q     What did you see in the comments?

A     I don't remember exactly what was said. I do know there was numerous comments, and then there was also numerous responses to those comments. But I don't know verbatim exactly what was said.

Q     Okay. So besides the post and the victim statement, did you have any other evidence that led you to believe cyberstalking was the appropriate charge?

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 52 of 124

A    Other than the post, the victim statement, and the witness statement, and then that is the evidence that we had.

Q    I think you mentioned you consulted some materials to determine what the appropriate charge would be. What materials did you consult?

A    We used the -- the North Carolina crimes book, and then also using our resources by discussing with our supervisors.

Q    Okay. And which supervisors did you discuss with again?

A    It was Sergeant Bock at the time, who was a sergeant, and then Lieutenant Ottoway.

Q    Again, what did -- what did you tell Sergeant Bock when you sought his advice?

A    I told him everything that -- all the information that we had, so I relayed that over to him. And I know he referred us to the Blue Book, where we looked at the Blue Book. And that is when Ottoway, like I said, was standing right next to her -- or, next to Sergeant Bock, so we ended up discussing it more in detail with her. I don't know where Sergeant Bock went off to at that time, but I know it was just me, Warren, and Lieutenant Ottoway. And that is where, you know, we discussed

it a little bit further in depth.

Q    Okay. You mentioned the Blue Book. Is that the North Carolina crimes book?

A    Yes, sir.

Q    Okay. You said you -- you -- you spoke more in depth with -- with Lieutenant Ottoway. What did she say when you asked for her advice?

A    I don't recall exactly what was said. I do know we all looked at the crimes, the elements, but I don't remember exactly what she said.

Q    Did she say whether she had heard of Ms. Rachmuth before this incident?

A    I don't remember.

Q    Did she say whether she knew Ms. Rachmuth at all?

A    I don't think so. I don't remember.

Q    So did she ultimately agree that cyberstalking was the appropriate charge?

A    Yeah. She -- yeah. I don't think -- I don't know if I've ever charged cyberstalking before, so it was a little bit new to me. So that -- that is why -- and with Officer Warrant being new as well, we were both kind of on the same page of discussing it a little bit further and seeing -- getting another viewpoint of it, and that's why we

ended up talking to Lieutenant Ottoway.

Q    Why did you think you needed another viewpoint?

A    Just to confirm our decision, pretty much.

Q    I think earlier, you mentioned that -- that you and Officer Warren were both questioning the type of charge; is that -- is that right?

A    Yeah. Yeah, we were questioning it.

Q    Why were you questioning it?

A    Because, again, I've never charged cyberstalking before. And the way that the victim felt, and the testimony that we received from the witness, instead of just a documentation, I've -- obviously, we always look into to see if there -- you know, we can -- there's more for us to do. So, I mean, I was just questioning if, you know, a charge was related to the -- the offense and the crime that we responded to.

Q    Were you questioning whether you had enough evidence to bring a cyberstalking charge?

A    I don't know if I was questioning the evidence. I was just questioning what we had already, if that would have been -- if that would have been an element, or if that was an element in

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 55 of 124

a crime.

Q    Okay. But by what you had already, you mean the -- the post and the victim statement and the witness's statement; is that right?

A    Yes.

MR. BRUCE: We've been going for about an hour. That might be a good time to take a breather, if that's all right with you, Officer Marino?

THE WITNESS: Yeah. Of course, that's fine.

MR. BRUCE: We can take a 10-minute break and be back here around 4:22?

THE WITNESS: Okay. Sounds good.

THE VIDEOGRAPHER: Off the record now at 1612.

(OFF THE RECORD)

THE VIDEOGRAPHER: We're back on the record at 1623.

BY MR. BRUCE:

Q    All right. Officer Marino, I hope you had a good break.

A few more questions about the investigation that you and Officer Warren conducted. At any point, did you or Officer Warren have any reason to believe that Ms. Rachmuth was

going to enact any physical harm on the Harris Teeter employee?

A    No, sir. I don't think -- at the time, no.

Q    You said at the time. Did you have any reason to believe at any other time that she would harm the Harris Teeter employee?

A    No, sir. Not -- not at all.

Q    Did you have any reason to believe that Ms. Rachmuth was going to confront the Harris Teeter employee again?

A    That, I do not know.

Q    Did you have any reason to believe that Ms. Rachmuth would return to the Harris Teeter store?

A    I don't know if she would return or not.

Q    Did you have any reason to believe that she would go to the employee's house?

A    I also do not -- do not know.

Q    Did you collect any evidence during your investigation that would suggest any of those things?

A    No. No, we didn't collect anything that would suggest that.

Q    So before we went on the break, we were -

- we were discussing when you and Officer Warren were deciding whether to charge cyberstalking, you sought the advice of Sergeant Bock and Lieutenant Ottoway. At any point in those conversations, did - - did you or Officer Warren consider bringing a charge besides cyberstalking?

A    Well, originally, we got dispatched out there for harassment, so I know harassment was discussed. And then when it went online, we tried to look in the online realm, so that's where we came across on cyberstalking.

Q    Okay. So why did you decide not to charge harassment?

A    I believe we looked at the elements, and cyberstalking had a -- it met the elements more for cyberstalking than it did on harassment.

Q    Okay. Do you recall what elements of harassment the evidence didn't meet?

A    I don't recall.

Q    Were there any other charges besides harassment that you considered charging?

A    I don't remember if there was or not.

Q    Did Sergeant Bock or Sergeant Ottoway suggest charging any other crimes besides harassment or cyberstalking?

A    I also don't remember.

Q    Did you ever view Ms. Rachmuth's Twitter account during the course of your investigation?

A    Yes, sir.

Q    Okay. And how did you do that?

A    Lieutenant -- Lieutenant Ottoway actually pulled it up on Twitter.

Q    Okay. And so did Lieutenant Ottoway have a Twitter account?

A    I don't know if it was her personal. I don't know whose Twitter it was, but she had access to Twitter.

Q    Okay. Did you have access to Twitter?

A    No, sir.

Q    Did Officer Warren?

A    I don't know if he did.

Q    And when Lieutenant Ottoway pulled up Ms. Rachmuth's Twitter account, what -- what did you view on that account?

A    We viewed -- we viewed the post. So we looked at the post, and then we scrolled down and read some of the comments.

Q    Did you review any other posts on her Twitter account?

A    I did not scroll through her Twitter.

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 59 of 124

Q     Okay. Did Lieutenant Ottoway scroll through her Twitter in the course of the investigation?

A     Not -- no, sir. Not while we were there.

Q     Did -- did you, Officer Warren, or Lieutenant Ottoway view her -- her bio in her -- her Twitter account?

A     No, I didn't -- I didn't view it. I don't know if Officer Warren or Lieutenant Ottoway read it, but I did not.

Q     Okay. So besides the post and the comments below the post, did you review any other portion of Ms. Rachmuth's Twitter account?

A     Viewed, obviously, the name and make sure, and the face, but -- make sure we were -- it was actually her. But other than that, I think maybe her following count, but, you know, it was just -- it's right next to her name, so that's really all.

Q     When you viewed those portions of her account, did you ever become aware that she was Jewish?

A     No, I don't remember seeing anything about her being Jewish.

Q     Did you ever become aware that she was an

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 60 of 124

independent journalist?

A    No, sir. Not an independent journalist.

Q    Did you become aware that she was active on social media?

A    Yes, sir.

Q    At any other time, besides when you were reviewing her account, did you become aware that she was an independent journalist?

A    Yes, sir. After the fact, you know, I guess after things got dismissed and dropped, that's when I kind of learned a little bit on the reasons why, I learned who she was.

Q    Okay. And how did you learn about who she was?

A    More or less just discussing. I believe it was brought to Lieutenant Ottoway about the charge being dropped. So since she was involved in the decision-making as well, you know, I let her know. And I think that's when we re-looked at the post to kind of figure out why ,and looked a little bit more into her Twitter on who she was.

Q    Okay. So you said that it was brought to Lieutenant Ottoway that the charge was dropped?

A    Yeah, she was made aware.

Q    Okay. And is that how you learned that

the charge was dropped, was through Lieutenant Ottoway?

A    I don't remember how I learned how the charge was dropped. I just remember hearing and knowing that it was -- it was dropped.

Q    Okay. And was it Lieutenant Ottoway that -- that told you that Ms. Rachmuth was an independent journalist?

A    I don't know if she ever told me that she was an independent journalist or not. I still today would -- wouldn't tell you that I knew that she was an independent journalist. I just know that she posted political views on -- on Twitter.

Q    Okay. Did Lieutenant Ottoway at that time tell you that -- that she was Jewish?

A    No, sir. I don't remember.

Q    What did Lieutenant Ottoway tell you at that time about Ms. Rachmuth?

A    I don't recall the conversation.

Q    At any point in the investigation, did you or Officer Warren attempt to interview Ms. Rachmuth?

A    No, sir. There was no interviewing.

Q    Why did you not interview Ms. Rachmuth?

A    We had the evidence at hand, and there

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 62 of 124

was no need to go ahead and get her side.

Q    You mentioned that you were unsure about the cyberstalking charge, though; is that right?

A    Yes, sir.

Q    So if you were unsure, is that not a situation where you might reach out to the suspect for an interview?

MR. HARTZOG: Objection.

THE WITNESS: Well, we had the -- well, we had the evidence already in post. It wasn't a he said/she said situation. The evidence was posted online, which, we -- reading the element, that -- that's -- like, it was there. It wasn't a he said/she said situation, so there was no need to interview Ms. Rachmuth.

BY MR. BRUCE:

Q    Even to get her side of the story about why she posted the post?

A    No, sir.

Q    Was the reason for her posting the post important to your decision of whether to pursue a cyberstalking charge?

A    With it being online, that is the point of the cyber portion of it.

Q    I guess, did you ever consider what Ms.

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 63 of 124

Rachmuth's reason for making the post might have been when you were investigating the cyberstalking charge?

A    No.

Q    Did you ever consider whether the post amounted to political speech?

A    No.

Q    Were you aware that the North Carolina cyberstalking statute excludes political speech from the statue?

A    I was not aware.

Q    Did you ever consider whether -- whether Ms. Rachmuth's post might have been an act of journalism?

MR. HARTZOG: Objection.

THE WITNESS: I did not consider.

THE REPORTER: I'm sorry to interrupt, Mr. Hartzog, I just cannot hear your objection, so please speak up.

MR. HARTZOG: I apologize. I'll try to move a little closer and speak louder.

BY MR. BRUCE:

Q    You mentioned that one of your -- your duties as Officer Warren's FTO was to review his incident report; is that right?

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 64 of 124

A     Yes, sir.

Q     When did you review his incident report?

A     After he completed typing it in, writing it, or typing it.

Q     Okay. Was that before or after the arrest?

A     That was before.

MR. BRUCE: Can we pull up -- give me one second -- tab 8, please?

THE TECHNICIAN: Yes. One moment. One more second here. And the exhibit's on screen.

MR. BRUCE: All right. So this will be -- let's see -- Exhibit 1 [sic]. Can we zoom in to the top there?

(Exhibit 8 marked)

BY MR. BRUCE:

Q     Do you recognize this document, Officer Marino?

A     Yes, sir.

Q     What is it?

A     It's a -- it's a case file, or it's a -- it's a report.

Q     Okay. Let's scroll down to the next page because I think this is just a cover page.

A     It is.

Q    Do you recognize what specific incident report this is?

A    Yes, sir. I do.

Q    Okay. What report is it?

A    This is the report we're discussing today.

Q    Okay. Is this the report that Officer Warren completed for the cyberstalking charge or investigation of Ms. Rachmuth?

A    Yes, sir. It is.

Q    Okay. And is this the report that you reviewed?

A    Yes, sir. It was.

Q    You said you reviewed it before the arrest. Was that before the -- but was that before you sought an arrest warrant or after you thought the arrest warrant?

A    I don't recall.

Q    Did you review it multiple times or just once?

A    For -- before it got submitted to my supervisor, just one time.

Q    Okay. Did you review it after you submitted it to your supervisor?

A    In preparation for this, yes.

Q    Okay. Understood.

MR. BRUCE: Can we scroll to -- a couple pages down, there's a narrative section. Let's find that. I think it's the next page. Okay. We can stop there.

BY MR. BRUCE:

What are we looking at on this page of the incident report, Officer Marino?

A    Well, this is the actual report. So this has -- a little bit above from here, it has the offender, the victim, the witness, incident location, and then it has pretty much in detail the actual what occurred in this paragraph there.

Q    Okay. How much detail is an officer, based on your training, supposed to put in an incident report like this?

A    A good amount of training. Obviously -- I'm sorry. Not a good amount of training. A good amount of detail. Obviously, the who, what, where, when, and why, and the reasons why we're there, and, you know, both -- both if we had testimony, put the testimony in there and the reasons why. If there was a charge taken out, why we -- why we did that charge.

Q    Okay. Is it important to put all the

facts that you're relying on to establish probable cause into this incident report?

A    It is, yes.

Q    Okay. Why is that important?

A    So if it ever goes to court, we can prove the reasons why we took out a charge.

Q    Okay. Are you required to put every fact that you're relying on to establish probable cause in the incident report?

A    I wouldn't say required, but you should. As an officer, it's a good practice and good court preparation to -- to put that in there.

Q    Okay. Can you just take a minute to -- to review the narrative on this page and just let me know when you're done?

A    Okay. Okay.

Q    Okay. I want to ask you some questions about it, but I see the narrative continues to the next page, so let's go to the next page so you can see that first. Okay. Can you finish reviewing and let me know?

A    Okay. Okay. I'm done reading.

Q    Okay. So does this narrative mention -- well, how many social media posts does this narrative mention?

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 68 of 124

A    It said -- she said that she -- she learned about a post being posted online.

Q    Okay. Did -- did the narrative mention any comments that were made to that post?

A    No, sir.

Q    Did it mention any other social media posts by Ms. Rachmuth?

A    No, sir.

Q    Did the narrative say anything about whether third parties called the Harris Teeter store after the post was made online?

A    The narrative did not say that.

Q    Did the narrative say anything about the employee taking her kids out of -- out of school in response to the incident?

A    No, sir. The report doesn't say it.

Q    Based on your recollection, does this report accurately describe all the evidence you had at the time when you decided to -- to pursue a cyberstalking charge?

MR. HARTZOG: Objection.

THE WITNESS: Yes, sir. At the time.

MR. BRUCE: Can we scroll up to -- I believe it's the second page of the report. Scroll down some. Sorry. Maybe the next page. Keep

scrolling. Sorry. Okay. Right here.

BY MR. BRUCE:

Q    Officer Marino, do you see in about the middle of this page, under the -- the blank box there, it says suspect hate/bias-motivated: anti-Islamic (Muslim), do you see that?

A    Yes, sir. I do.

Q    What does that designation mean?

A    I mean, it -- honestly, I don't know.

Q    Is it a routine practice to include a suspect hate/bias-motivated designation in an incident report?

A    I wouldn't say it's common practice. I've never filled out the bias-motivated.

Q    Because you personally have never put a bias-motivated designation in a report?

A    No, sir- I don't -- I don't think so.

Q    Okay. Do you know if there are any written policies or guidelines for when an officer should put that type of designation in a report?

A    I do not know.

Q    Does that have any impact on -- does this designation have any impact on how the investigation is handled?

A    It shouldn't.

Q    Are there different units that investigate suspected hate- or bias-motivated crimes?

A    It's possible that it could be sent out to our investigative unit, but if we can handle everything on a patrol level, then -- then we'll handle it on a patrol level, and it doesn't need to go to investigations.

Q    Okay. What -- in what situations might it need to go to investigations?

A    If we need further, you know, somebody being identified that we can't -- that we don't have the proper software to do, or if we work on night shift, and we can't go out and, you know, collect, you know, more evidence related to a case, then it would go up to investigations because they have multiple people that are able to be designated a case and go out there and -- and do it.

Q    Okay. Any other reasons why a case might go to investigations?

A    No. Other than just if -- just if we can't solve it on a patrol level, then it would be sent out to investigations.

Q    Does anyone have to approve the suspect hate/bias-motivated designation to your knowledge?

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 71 of 124

A       No, sir. Not to my knowledge. Not to my knowledge.

Q       Okay. When you reviewed this report, did you raise with Officer Warren why that designation was listed?

A       No, sir. I don't -- I don't even remember looking at that when approving the report.

Q       Do you know if Officer Warren is the one who input this designation in the report?

A       I don't know.

Q       Is there anyone else who would have had access to edit the report and input that designation?

A       The report could be reopened by an investigative unit, but I don't know if anyone had access or did.

Q       Okay. Is there a way to tell on the report if it had been reopened?

A       With this old report writing system, I don't recall if there was a way. I'm only more familiar with our new report writing system now.

Q       Okay. Do you know what the basis for this anti-Islamic, Muslim designation in the report was?

A       No, sir.

        MR. BRUCE: Okay. We can take this exhibit

down. And let's pull up tab 3.

THE TECHNICIAN: One moment here. And the exhibit's now on screen.

MR. BRUCE: Okay. Let's zoom in to the caption at the top right here.

BY MR. BRUCE:

Q    Officer Marino, are you familiar with this document?

(Exhibit 3 marked)

A    Not -- not verbatim.

Q    Are you familiar with the Holly Springs written directives?

A    Yes, I am.

Q    Have you ever reviewed this specific written directive that says it's entitled follow-up investigative notifications and responsibilities?

A    Yes, sir. We have to sign off on them, and I signed off on them.

Q    Okay. So you've -- you've reviewed this document at some point while you've been at the Holly Springs Police Department?

A    Yes, sir.

MR. BRUCE: Okay. Can we scroll to -- I have the -- the Bates number is 592. Let's actually start at the bottom of 591.

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 73 of 124

BY MR. BRUCE:

Q    Okay. So you see at the bottom here, it says section 840.1.5, criminal investigation section, and then under that, we have general investigations unit? Do you see where it says that?

A    Yes, sir.

Q    Is the general investigations unit the -- the unit that you were talking about when we were talking about investigations earlier?

A    Yes, sir.

Q    Okay. And under that, it says responsibilities, the general investigations unit will be notified of and is responsible for investigating the following crimes. Do you see that?

A    Yes, sir.

Q    There's a list -- there's a list there. Let's scroll down. I believe it is J. So section J there is ethnic intimidation or hate crimes. Do you see that?

A    Yes, sir. I do.

Q    Based on your training, do you know whether the suspected hate or bias designation in an incident report, does that mean that the incident is an ethnic intimidation or hate crime?

A    I don't know if selecting that would mean that that would go up to investigation, so I'm not sure.

Q    Based on this directive, should Ms. Rachmuth's case have been investigated by the general investigations unit?

MR. HARTZOG: Objection.

THE WITNESS: No, sir. Not -- that's why we -- it wasn't sent out.

BY MR. BRUCE:

Q    Why wasn't it sent up?

A    Because we didn't believe it to be -- follow under anything in this policy.

Q    Okay. Does this directive give officers the discretion to determine when -- when to send something up to general investigations if it falls under this list of crimes?

A    If it falls under this list, then -- then no, it would be sent up.

Q    Okay. Is it your opinion that Ms. Rachmuth's case did not amount to an ethnic intimidation or hate crime?

A    Yes, sir. It was my opinion.

Q    Despite the suspected bias or hate-motivated designation in the incident report?

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 75 of 124

A    Yes, sir. Again, I don't remember seeing that in the report when looking over it.

Q    Do you remember discussing with anyone whether this was a bias or hate-motivated crime?

A    No, sir. I don't remember.

MR. BRUCE: Okay. We can take this down.

BY MR. BRUCE:

Q    So after you and Officer Warren consulted with Sergeant Bock and Lieutenant Holloway or Ottaway, what did you do next?

A    We ended up filling out the warrant, and talked to the magistrate, and presented our facts to the magistrate.

Q    Did you assist Officer Warren in filling out the -- the warrant?

A    I wouldn't say assist as far as filling in for him. However, I was making sure all the boxes were, you know, appropriately filled out for what the magistrate needs to see.

Q    Okay. I guess, who filled out the actual form?

A    Officer Warren.

Q    Okay. And were you next to him, standing next to him, while he was doing that?

A    Yeah, I was with him.

Q     Okay. What did you include on that form?

A     Well, I -- I didn't include anything on the form. It was -- Officer Warren did.

Q     Okay. What information did -- did you observe Officer Warren include on that form?

A     Well, I saw him put the -- I know that the offender was filled out, the location was filled out, and then the charge. And -- and I don't know if we specified in there, you know, in the charge, if the -- if there was a dropdown arrow or fill-in-the-blank or what the case might have been for, you know, selecting cyberstalking, but --

Q     Okay. You mentioned there is some -- there is an option to upload a document or a file in support in that form; is that right?

A     Yes, sir. I will say, in -- in 2024, I know we had two different -- I know originally it was -- now it's eWarrants. Back in the day, it was NCAWARE. I'm not sure if we were on NCAWARE at the time. I would just need a date to confirm that, but --

Q     Okay. I appreciate that. Did -- did you or Officer Warren upload any file to the form you filled out, whether it was on the eWarrant system or the other system?

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 77 of 124

A    No, sir. There was not.

Q    And did you upload the incident report or anything like that?

A    No, sir.

Q    And after you filled out the form, what did you do next?

A    We did a video call with the magistrate.

Q    Okay. Were you both you and Officer Warren on that call?

A    Present in front of the magistrate? Officer Warren was present. I believe I was in the room.

Q    Okay. When you say present, do you mean, like, you were off camera, but he was --

A    Off camera, yes.

Q    Okay. What did Officer Warren present to the magistrate during that conversation?

A    I don't remember verbatim what he had said.

Q    Do you remember anything that he said in that conversation?

A    What -- whatever was on that warrant is what he's -- what he told the magistrate.

Q    So what specific facts did he present to the magistrate on that call in support of obtaining

the warrant?

A    I don't recall exactly what was said to the magistrate.

Q    Okay. Was he reading off of the -- the warrant form that you had previously filled out?

A    I don't remember. Honestly, I don't -- I don't know if he was looking at the computer or the warrant, or he was just presenting the facts based off what he knew.

Q    Okay. Did he show the magistrate the social media post?

A    No, sir. No, he did not.

Q    Did he mention the social media post?

A    Yes, sir. That was mentioned.

Q    Did he mention any other social media posts?

A    No, not that I recall.

MR. HARTZOG: Objection.

THE WITNESS: Just not that I -- no, sir. I don't know.

BY MR. BRUCE:

Q    Did he inform the magistrate that the basis for the charge was a single social media post?

MR. HARTZOG: Objection.

THE WITNESS: I also don't know.

BY MR. BRUCE:

Q    Did you present any evidence to the magistrate that Ms. Rachmuth had affirmatively contacted the victim over the phone?

A    That Ms. Rachmuth -- can you repeat the question, please?

Q    Yes. Did you -- did you or Officer Warren present any evidence to the magistrate that Ms. Rachmuth had affirmatively contacted the victim over the phone?

A    Contacted the victim? No, sir.

Q    Did you or Officer Warren present any evidence to the magistrate that MMs. Rachmuth affirmatively contacted the victim by text?

A    No, sir. We did not present anything.

Q    Did you or Officer Warren present any evidence to the magistrate that Ms. Rachmuth affirmatively contacted the victim by email?

A    No, sir.

Q    Did you or Officer Warren present any evidence to the magistrate that Ms. Rachmuth had threatened violence against the employee?

A    No, sir.

Q    Did you or Officer Warren present any

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 80 of 124

evidence to the magistrate that Ms. Rachmuth had returned to the Harris Teeter store?

A    No, sir. We did not present anything.

Q    Did you present any other written documentation to the magistrate other than the -- the form you filled out beforehand?

A    Other than the warrant, no, sir.

MR. BRUCE: Let's pull up tab 9.

THE TECHNICIAN: One moment, please. And the exhibit's on screen.

MR. BRUCE: Thank you. So this will be Exhibit 3. Can we -- can you see this document, Officer Marino? Do we need to zoom in at all?

(Exhibit 9 marked)

THE WITNESS: Yeah, if you don't mind just zooming in a little bit?

MR. BRUCE: Yeah, let's zoom into the top section there.

THE REPORTER: I'm sorry, counsel. This is tab 9. I believe we've already marked Exhibit 3, so this should be Exhibit 9, correct?

MR. BRUCE: Yes. I'm fine just marking them with the tab numbers. I thought you all had started doing them sequentially, but yeah, let's do Exhibit 9. Let's follow the tab numbers.

THE TECHNICIAN: I will fix that afterwards.

THE WITNESS: Thank you.

BY MR. BRUCE:

Q    Officer Marino, do you recognize this document?

A    Yes, sir.

Q    What are we looking at?

A    This is a warrant for arrest.

Q    Okay. And is this the warrant for Ms. Rachmuth's arrest?

A    Yes, sir. It is.

Q    Okay. Can you just explain what -- what this page is? Is this the part of the page that -- or part of the warrant that the magistrate completes?

A    No, sir. I think it's the next. I don't -- I don't know exactly what page. This initial is just a front page of explaining what the offense is. And as you're reading it, it tells you what county, and who it's for, and who took out the warrant, and what police department did.

Q    Okay. Is this information on here populated when you fill out the -- the form through eWarrants?

A    Yes, sir. This is.

Q    Okay. So when you were -- you and Officer Warren were filling out the form and providing the offender information and stuff, that's -- this is the -- the piece of paper, for lack of a better term, that it was being entered in?

A    Essentially. It -- it's filled out differently on the form, and when you hit submit, it will put it into this format.

Q    Okay. Let's scroll down some. Well, before we do that -- sorry, scroll back up a bit. So what offense does this warrant indicate the warrant was taken out for?

A    This is a misdemeanor cyberstalking charge.

Q    Is that the only charge?

A    Yes, sir. That is.

Q    Where it says witness information, it says Sheronda Michelle Irick. Do you know who that is?

A    After reading the report, I know it's a manager.

Q    Okay. Why doesn't this also include the victim under witness information?

A    Why doesn't this include her name in

there? We don't include -- I'm sorry. Just so I can get an understanding of what you're asking, can you repeat the question?

Q   Yeah, absolutely. So the -- under witness information, you said it lists the store manager. Why doesn't it also list the employee who presumably was also a witness to the offense?

A   The employee is not a witness.

Q   Does this form treat the victim differently than a witness?

A   Well, there is no form to -- or, there's no section to put in the victim.

Q   Okay. So a warrant application generally doesn't include the victim's information in it?

A   Unless it's in the charging language, depending on the charge, and it's a fill-in-the-blank.

Q   Okay. Got it. I'm not an expert on how these are filled out, so I'm just trying to get -- get a better idea, so I appreciate -- appreciate the patience. Let's scroll down -- down a bit to the bottom of this page. Sorry. That's the next page. Let's go up. I just want to look at this. So there we go.

So under complainant name, it says

Elliott Warren. That's indicating that Officer Warren filled out the warrant; is that right?

A    Yes, sir. That's correct.

Q    Okay. And it says -- what date was this issued on?

A    The -- you would have to -- oh, I'm sorry. The 2nd of November 2024.

Q    Was that the same day you and Officer Warren spoke to the manager and the employee?

A    I don't recall. Based off the report, it says 11/02. I don't know. That's what I'm going off, is the report.

Q    Okay. So your understanding was the report said that you spoke with them on November 2nd; is that right?

A    Yes, sir. That's correct.

Q    Okay. And so this warrant was issued that same day; is that right?

A    Yes, sir.

Q    Let's scroll down, I think, two pages. Let's go one more. What is -- what is this page?

A    So that -- when you select the charge, it will come -- either have some dropdowns or fill-in-the-blank for -- for the charge. So this is the charging language for that charge.

Q    Okay. Is there a way to see in this form what part of the charging language was a dropdown and what part was fill-in-the-blank?

A    Not specifically. The all caps would be the fill-in-the-blank.

Q    Okay. So the all caps would be where your officer Warren wrote that language; is that right?

A    That's correct.

Q    Okay. So your Officer Warren wrote to take pictures at Harris Teeter and electronically communicate on social media for the purpose of terrifying, harassing, or embarrassing her; is that right?

A    Correct.

Q    What evidence did you have at the time you filled this out that Ms. Rachmuth electronically communicated on social media?

A    We had the posts on Twitter or on X.

Q    How many posts did you have?

A    We had that single initial post along with the comments.

Q    What evidence did you have that the post was for the purpose of terrifying, harassing, or embarrassing her?

A    Based off the way that the victim felt.

She specifically explained to us that she was terrified to return back to work. She was embarrassed and also felt harassed about the incident being posted online.

Q    But you never interviewed Ms. Rachmuth to determine what her purpose in posting the post was, correct?

A    That's correct.

MR. BRUCE: Okay. We can take that down.

BY MR. BRUCE:

Why did you decide to seek an arrest warrant rather than seeking a citation or a summons?

A    The arrest warrant, well, I've never actually filled out a criminal summons personally. So based off the facts that we had, and with Ms. Rachmuth not being there at the time of the scene, with the evidence that we had, we presented that, and we obtained a warrant for her arrest.

Q    Could you have sought a citation instead of a warrant?

A    You could do a citation for all -- for any misdemeanor.

Q    So can you do a citation for misdemeanor cyberstalking?

A    You could.

Q    Did you or Officer Warren consider issuing a citation rather than seeking a warrant?

A    No, sir.

Q    And did Sergeant Bock or Lieutenant Ottoway suggest that you issue a citation rather than seeking an arrest warrant?

A    No, sir.

Q    Why didn't you consider a citation instead of a warrant?

A    Well, it is officer discretion. And based off the severity and how the employee felt, we believe that the warrant was the most appropriate action.

Q    So your decision was based off of how the employee felt?

A    And the severity of -- of it, yes.

Q    You say severity. What -- the severity of what?

A    Of the charge. It's a little different from a misdemeanor larceny, where you can do a citation for. And that's more of a common thing, would be a citation for that charge. However, for cyberstalking, we believe that the severity was a little bit higher than issuing a citation.

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 88 of 124

Q    Okay. Why is the severity higher? They're both -- aren't they both misdemeanors?

A    They are. Yes, sir. I don't have an exact -- I can't give you an answer on why.

Q    Does it -- does it have anything to do with the specific conduct in a particular case, or is it just the fact that you think of cyberstalking as more serious than larceny?

A    I would say both. Plus, with -- with Ms. Rachmuth not being there on scene, instead of filling out the citation, and plus, we believed that at the time that her address came back to an Apex address, so it was outside of our jurisdiction, so we decided to warrant due to that fact.

Q    Okay. But was her address actually outside of your jurisdiction?

A    No, sir. It was within.

Q    When did you find that out?

A    I think once actually looking it up to see where she was located.

Q    And when did you look that up? Before or after you obtained the warrant?

A    It was after.

Q    So can you describe what happened after

you and Officer Warren obtained the warrant?

A    Yes. I believe the next day or the next shift that we were working, we served the warrant.

Q    Okay. So it was the day after you got the warrant is when you went to arrest Ms. Rachmuth?

A    Yes, sir. Per the report, it was the day after.

Q    Okay. Were you still serving as Officer Warren's FTO that day?

A    No, sir.

Q    Okay. But you went with him to serve the warrant?

A    Yes, sir.

Q    Who else was with you and Officer Warren?

A    It was his primary FTO, which was Officer Hernandez.

Q    Okay. So what role were you playing now that Officer Hernandez was -- or, sorry -- playing's a bad word. What role did you have now that Officer Hernandez was his primary FTO?

A    I was just a checking officer.

Q    Okay. How many cars did you bring to the arrest?

A    There was two.

Q    Who was in what car?

A    I was in my patrol vehicle, and Officer Warren and Officer Hernandez was in Officer Warren's patrol vehicle.

Q    Okay. Once you arrived to Ms. Rachmuth's house, where did you park?

A    We parked on the street about a house down from a residence.

Q    Okay. Who -- who made the decision to park in that location?

A    Ultimately, it was Officer Warren's decision. It's common officer safety practice to not park in front of the residence, but park away.

Q    Can you explain that more? Why -- why would you decide to park away from the residence instead of in front?

A    Yeah. So it's more of an element of surprise, parking away from the residence. So if somebody does not like law enforcement, or somebody is aware that we are approaching, and it was someone that did not want to go to jail or wanted to fight, and wanted to prepare for us to walk up on their front porch, if we parked in front of the residence, and they would -- the element of surprise is gone.

So from a tactical standpoint, we park

away from the residence and approach. So if we needed to retreat, we can retreat away to our patrol vehicles instead of retreating away to them that are parked right in front of our house or somebody's house.

Q    Did you have any evidence or reason to believe at the time that -- that Ms. Rachmuth didn't like the police?

A    No, sir.

Q    Did you have any reason to believe that she would be hostile or violent towards the police?

A    No, sir.

Q    Did you have any reason to believe that she would try to escape or not be cooperative?

A    No.

Q    So do you always park away from a residence when you serve an arrest warrant?

A    Yes, sir. I always park away.

Q    Okay. Have you ever parked closer to the residence?

A    If the street or traffic dictates otherwise, but that's the only time. There's not a specific distance away that you need to park that the way we practice and are trained, but it obviously dictates on the environment that you're

in and where you're at.

Q    And so after you all parked away from a residence, what did you do next?

A    We approached her residence from the side of the house onto the front porch.

Q    Okay. And then what happened?

A    Ms. Rachmuth opened the door and greeted us prior to us even knocking on the door, ringing the doorbell.

Q    Okay. What, if anything, did she say to you when she greeted you?

A    I don't recall exactly.

Q    Do you recall what -- what you or any of the other officers said to her?

A    I do know that she was informed that she had a warrant for her arrest, and to turn around so she can be placed into custody. I do know that I walked up and started talking to her and explaining the reason why we were there and why she had a warrant for her arrest.

Q    Were you aware that her children were at home at the time?

A    No, sir. I didn't see any children.

Q    Were you aware that --

MR. HARTZOG: I'm sorry. I was going to

say, when you get to a point, can we take a break?

MR. BRUCE: Yeah. Let me do one more question, then.

MR. HARTZOG: Yeah.

BY MR. BRUCE:

Q    Were you aware that her husband was at home at the time?

A    No, sir. Not until we came outside.

MR. BRUCE: Yeah, let's take a break there, and we'll -- we'll pick back up.

THE VIDEOGRAPHER: Off the record now at 1713.

(OFF THE RECORD)

THE VIDEOGRAPHER: We're back on the record now at 1723.

BY MR. BRUCE:

Q    All right. Hope you had a good break, Officer Marino.

During the arrest, were you wearing a body-worn camera?

A    Yes, sir.

Q    Was it activated?

A    Yes, sir.

Q    In your discovery responses in this litigation, you initially -- initially indicated

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 94 of 124

that the footage had been destroyed pursuant to an expunction order; is that right?

MR. HARTZOG: He may not know exactly what the objections were or the responses, but --

MR. BRUCE: Okay.

MR. HARTZOG: (Crosstalk) --

BY MR. BRUCE:

Q    Okay. Were you aware of any expunction order entered in -- in Ms. Rachmuth's case?

A    No, sir. I was not.

Q    Okay. Were you involved in searching for responsive documents to discovery requests in this case?

A    No, sir.

Q    Okay. I'm going to pull up what's marked as tab 10, but it's the video, and I can just pull it up on my computer and share my screen, if I can get it to work. Okay. Can you see that?

(Exhibit 10 marked)

A    Yes, I can.

Q    All right. Just making sure I'm sharing sound. Okay. We're going to -- can you tell from what you're looking at right now whether this is -- this is your body-worn camera footage, or would you like me to play a few seconds of it?

A    I recall that it's mine.

Q    Okay. So let's start at 30 seconds. I think there's a portion here where you wait to turn on the sound, so we'll start here.

(Video recording was played)

Okay. We'll stop there. So at the beginning of the video, it seemed like you were hanging about back a bit, and then you -- you slowly started to approach; is that right?

A    Yes, sir.

Q    Okay. And then as you were, it seemed to be kind of on the stairs of the porch, we heard Ms. Rachmuth ask if she could put a shirt on. Do you recall her asking that?

A    Yes, sir.

Q    Did you or any of the other officers ever let her change clothes before you took her to the patrol car?

A    No, sir. We did not let her go back inside.

Q    And did you let her put a shirt on outside at all?

A    No, sir.

Q    Why not?

A    By the time her husband came out with the

shirt, she was already in handcuffs.

Q    Was there any intention to let her put on a shirt after he went inside to get one?

A    I don't recall. I know that he brought his shirt out, but on scene, she did not put on a shirt.

Q    Okay. And at this point, had Ms. Rachmuth given any indication that she wasn't cooperative?

A    No. After -- after a few times of telling her to turn around, she eventually cooperated and did.

Q    Okay. Did she threaten officers in any way?

A    No, sir.

Q    Okay. And at this point, Officer Warren has put her in handcuffs; is that right?

A    That's correct.

Q    Has anyone read her her Miranda rights at this point?

A    No, sir.

Q    Why not?

A    Because we weren't asking her any questions regarding the -- the crime, so there was no need to read her her Miranda rights.

Q    Okay. You were having a conversation with

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 97 of 124

her, though, right?

A    Yeah, we were.

Q    Did you or any of the other officers ever read her her Miranda rights?

A    No, sir. I did not read her any Miranda rights.

Q    Okay. So at some point, you approached and began talking to Ms. Rachmuth. Why did you decide to step in at that point?

A    Well, I saw the conversation between when Hernandez was telling her to turn around, so when I saw her not cooperating after being told numerous times, I decided to step up and chime in, and I -- you know, that's when I let her know. I let her know what the situation is, but I just need her to cooperate and turn around, and that's what she did.

Q    Okay. She did cooperate at that point, right?

A    Yes, sir.

Q    And you said you explained what was going on. I believe you mentioned the post and that the employee felt threatened; is that right?

A    That's right.

Q    Did you mention any -- any comments to the post to Ms. Rachmuth?

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 98 of 124

A     No, sir.

Q     Okay. Did you mention any conduct that occurred in the store to Ms. Rachmuth?

A     No, sir.

Q     Did you mention that she had directly communicated with the employee in any way?

A     No, sir.

Q     Did you mention anything else in the video besides the post and that the employee felt threatened?

A     No, sir.

Q     And then we heard towards the end of the video that Ms. Rachmuth says that the employee was wearing a keffiyeh, and that it was different from a hijab, and that it's a political statement, and I believe you responded, I get that. Do you recall that?

A     I do, yes.

Q     At the time you arrested Ms. Rachmuth, were you aware of the difference between a keffiyeh and a hijab?

A     No, sir. I did not.

Q     Okay. So why did you respond, I get that, when she explained it?

A     They were more just filler words. It

wasn't -- I don't know why I responded that way, but I didn't know the difference.

Q    Are you aware of a -- of what a keffiyeh is?

A    No, sir. I'm not.

Q    Okay. Have you seen any reporting about the keffiyeh and with respect to the events of October 7, 2023?

MR. HARTZOG: Objection.

THE WITNESS: No, sir.

BY MR. BRUCE:

Q    Okay. We're going to watch a little bit more of the video. I'm going to skip a few minutes or a few seconds.

(Video recording was played)

Okay. So in that portion of the video, Ms. Rachmuth informs you that she experiences panic attacks; is that right?

A    Yes, sir.

Q    What was your response to her informing you that she experiences panic attacks?

A    It didn't sound like I responded at all.

Q    Are you -- based on your training, are you required to respond in any way if a suspect mentions that they experience panic attacks or --

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 100 of 124

or any sort of other health issue?

A    If we see signs, then yes.

Q    Okay. And how are you supposed to respond?

A    We can call for medical attention, so EMS.

Q    Okay. She specifically asked to bring water in the car in case she experiences a panic attack; is that right?

A    Yes, sir. She did.

Q    And did you all let her bring water in the car?

A    Yes, sir. That water bottle that's sitting on the chair did go with her, or I believe -- I'm sorry. Retract that. I believe her husband went in to get another water bottle for her.

Q    Okay. And was she able to bring that water bottle in the car?

A    I don't recall because I did not ride in the car with her.

Q    Okay. Do you know if she was ever given access to that water while she was in the car?

A    I do not know.

Q    I'm going to skip to the end of this video when you're returning to your car. Oh, well,

my apologies. Let's try to fix that. Okay. Can you see that?

A    Yes, sir. I can.

Q    Okay. And let me know. The audio should work, but chime in if it doesn't.

(Video recording was played)

Okay. So I just wanted to show that clip to -- to show where you all parked your car. Is that your patrol car sitting on the street right there?

A    Yes, sir.

Q    Okay. And about how far away from Ms. Rachmuth's residence was that?

A    For an estimate, probably around -- maybe 25 yards from her property line or up until the back of her yard.

Q    Okay. Is it standard practice to park about 25 yards away from the residence?

A    There's no set limit on how far away to park away from a residence.

Q    Is there any reason why you all parked at the end of what appears to be a cul-de-sac in front of other houses?

A    No, sir. No, we were just trying to park out of view, and with those trees as concealment,

we used those trees.

Q    Is there any danger in parking in front of other houses?

A    I mean, there's always danger.

Q    Was there a location in the neighborhood with fewer houses in front of it that you could have parked in front of?

A    Not that I recall. I believe all the way up until her -- it's a neighborhood, so all the way up into her house, there's -- there's houses just like you see in the background there.

Q    Okay. If you had parked a little bit further up right here on the side where all these leaves are, would that have been far enough away from our house for -- from an officer safety standpoint?

A    No, sir. Because that's the side of her house where she had windows on, so she could see us approaching.

Q    Okay. How many other houses were at the end of that cul-de-sac, if you recall?

A    It looks to be about six, just counting what's on the body cam.

Q    Okay. Did you see any neighbors standing outside when you all pulled up?

A     I did not, no.

Q     See any neighbors peeking through the windows?

A     No, sir.

Q     Is it possible there were some outside that you didn't see?

A     It's always possible someone's outside.

Q     We'll be done with the video. After you left Ms. Rachmuth's house, what else did you do with respect to -- to this case?

A     After I left the house?

Q     Yes.

A     Nothing in -- nothing in respect to the case. I just went back on patrol.

Q     Okay. Did you follow Officer Warren to the detention center at all?

A     No, sir.

Q     Did you have any other paperwork to complete after -- after her arrest?

A     No, sir.

Q     And are you aware that -- that the district attorney dismissed the charge the day after the arrest?

A     Yes, sir.

Q     And are you aware that the reason the

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 104 of 124

district attorney gave was that the described conduct does not meet the elements of the offense?

A    Yes, sir.

Q    Okay. And how did you become aware of the -- the charge was dismissed?

A    I was notified, but I don't remember how I was notified or who told me.

Q    Do you know when you were notified?

A    Not exact date. No, sir.

Q    What was your reaction when you heard that the charge was dismissed because the described conduct does not meet the elements of the offense?

A    I -- I guess just more of a question. I was questioning myself, and trying to get an understanding of what exactly did not meet the elements.

Q    Okay. Why were you questioning yourself?

A    Because in my opinion, we had the probable cause. We had the evidence that met the element. So when it said that it did not meet the element, of course, you're going to question why.

Q    So as you sit here today, do you believe the cyberstalking charge was appropriate?

A    Yes, sir.

Q    Why?

A    Because I believe it still met the -- it still meets the element.

Q    Even though the district attorney disagreed?

A    Yes, sir.

Q    Did anyone at Holly Springs Police Department conduct any review or investigation into why the charge was dismissed?

A    Not that I recall.

Q    Were you ever subject to any investigation or disciplinary action because of the charge?

A    No, sir.

Q    Are you aware that Ms. Rachmuth filed multiple complaints with the Holly Springs Police Department regarding anti-Semitic cyberstalking, harassment, and other threats against her?

A    No, sir.

Q    Were you involved in any of those investigations?

A    No, sir.

Q    Have you been involved in any other investigations involving anti-Semitic harassment?

A    No, sir.

MR. BRUCE: I'm going to pull up what's

marked as tab 11. Can we pull up tab 11? Perfect.
Sorry.

BY MR. BRUCE:

Q    Okay. Officer Marino, do you recognize this document at all?

(Exhibit 11 marked)

A    No, sir. I do not.

Q    Okay. I didn't think so. Can we zoom in to the top here? Do you see it's an email from Sloan Rachmuth to paul.liquorie@hollyspringsnc.gov?

A    Yes, sir.

Q    Who's Paul Liquorie?

A    That's my chief.

Q    Okay. He's the chief of the Holly Springs Police Department?

A    Yes, sir.

Q    Okay. Let's scroll down. Well, I guess the subject line says, question about case number 22-002832. Are you familiar with that case number at all?

A    No. No, sir. Not the number, no.

Q    Okay. Does that look like a standard case number that is assigned to a Holly Springs case?

A    Yes, sir.

Q    Okay. Let's scroll down to Ms. Rachmuth's

original email. Okay. Right here. Okay. So you see -- can we scroll up to where the -- the to and from line is?

Okay. So do you see that this is an email from Ms. Rachmuth to Chief Liquorie in December of 2022?

A     Yes, sir. I do.

Q     Were you working at Holly Springs Police Department in December of 2022?

A     Yes, sir.

Q     Okay. And Ms. Rachmuth says, Chief Liquorie, in my opinion, members of the NCC4CR group committed ethnic intimidation by emailing me and hundreds of others anti-Semitic material, as well as sharing my home address via video and email repeatedly.

Do you see that?

A     Yes, sir.

Q     Are you familiar at all with the NCC4CR group?

A     No, sir. I'm not.

Q     Okay. Do you see that Ms. Rachmuth references emails to her and hundreds of others about anti-Semitic material?

A     Yes, I do.

Q    Would you agree that that that appears to be a report about repeated communications?

A    With it being repeated in hundreds, those would go hand in hand, yes.

Q    With respect to your investigation against Ms. Rachmuth, did you have any -- any evidence that she had sent hundreds of communications to the Harris Teeter employee?

A    No, sir.

Q    She also says, as well as sharing my home address via video and email repeatedly. Do you see that?

A    Yes, sir. I do.

Q    Do you have any evidence in Ms. Rachmuth's case that she had shared the employee's home address via video or email?

A    No, sir. There's no evidence in that -- for that.

Q    Okay. Can we scroll back up so we can see Chief Liquorie's response? On December 8, 2022, at 4:45 p.m., Chief Liquorie says, Ms. Rachmuth, thank you for forwarding the information about the dismissal of the charges in Polk County. Having worked cases against security threat groups throughout my career, I can understand your

frustration and fear.

We are actively working on your case. Due to the multiple jurisdictions involved and other complexities, we are consulting with our other law enforcement partners to ensure we methodically go through all the materials you have provided us, and are carefully considering the North Carolina general statutes as they may apply. I also realize this course of conduct has occurred over a long period of time and appears to be escalating, but please be patient as we conduct the investigation.

Do you see that?

A    Yes, sir. I do.

Q    Did you consult with other law enforcement partners when conducting your investigation into the complaint about Ms. Rachmuth?

A    No, sir.

Q    Why not?

A    Because this happened within jurisdiction, so there was no need to talk to any other agencies.

Q    At the time, didn't you say you thought it was outside of your jurisdiction?

A    Her address, not where the incident

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 110 of 124

occurred.

MR. BRUCE: Okay. We can take this down. And we -- let's pull up tab 12, mark it as Exhibit 12.

(Exhibit 12 marked)

THE TECHNICIAN: And the exhibit's on screen.

MR. BRUCE: Thank you. Can we scroll -- can we just zoom into the top of the document?

BY MR. BRUCE:

Do you recognize this document, Officer Marino?

A    No, sir. I do not.

Q    Okay. Do you see that it appears to be an email from Ms. Rachmuth to Chief Liquorie on January 9, 2023?

A    Yes, sir.

Q    Okay. And if we scroll down to Chief Liquorie's email on January 9, 2023, at 2:37 p.m., do you see that?

A    Yes, sir. I do.

Q    Okay. We'll read that.

Chief Liquorie says, Dear Ms. Rachmuth, I understand you and your family are now experiencing frustration, apprehension, and fear, and I

personally am sorry you feel that way. Holly Springs Police Department investigators have diligently been sorting and analyzing the substantial amount of documentation you have provided in their investigation.

They also have consulted with the North Carolina State Bureau of Investigation, NCSBI. After an extensive evaluation of the information you have presented by our department in consultation with state officials, it has been concluded that no criminal North Carolina general statutes have been violated.

Although upsetting, the materials examined fall under First Amendment-protected speech to include postings of public records. Other postings do not meet the necessary statutory elements to be presented for judicial review, for criminal charges, and/or lack direct legal standing.

Do you see that?

A    Yes, sir.

Q    So Chief Liquorie acknowledges that Ms. Rachmuth and her family are experiencing frustration, apprehension, and fear. Do you see that?

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 112 of 124

A    I do, yes.

Q    Did the Harris Teeter employee similarly describe experiencing frustration, apprehension, and fear?

A    Yes, sir. They were similar.

Q    Chief Liquorie says that Holly Springs investigators have consulted with the North Carolina State Bureau of Investigation. Did you see that?

A    Yes, sir. I did.

Q    Did -- did you or Officer Warren consult with the North Carolina State Bureau of Investigation when investigating the complaint about Ms. Rachmuth?

A    No, sir.

Q    Why not?

A    There was no need for the SBI to get involved.

Q    Do you know why Holly Springs investigators consulted with NCSBI with Ms. Rachmuth's complaint?

A    No, sir. I'm not familiar with the complaint.

Q    Okay. And then at the end, he says, although upsetting, the materials examined fall

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 113 of 124

under First Amendment-protected speech to include postings of public records. Do you see that?

A    Yes, sir. I do.

Q    And did you or Officer Warren ever consider whether Ms. Rachmuth's post and conduct fall under -- fell under First Amendment-protected speech?

A    I don't remember. I do think it was brought up in conversation.

Q    Do you recall who brought it up in conversation?

A    No, sir.

Q    Okay. Was it Officer Warren?

A    I don't know.

Q    Was it Lieutenant Ottoway?

A    I don't know. I don't know who it was.

Q    Okay. So you don't recall anyone specifically evaluating whether Ms. Rachmuth's post and conduct fell under First Amendment-protected speech?

A    That's correct. I don't recall.

MR. BRUCE: We can take that one down.

BY MR. BRUCE:

Q    Before November 2024, had you conducted any cyberstalking investigations?

Case 5:25-cv-00222-BO-RJ    Document 29-4    Filed 08/03/26    Page 114 of 124

A    I don't know if I have or not. It's -- it's -- I guess it would be a rare gall in Holly Springs, but I don't know if I investigated one myself.

Q    Okay. Before November 2024, had you sought an arrest warrant on a cyberstalking charge?

A    No, sir.

Q    Since November 2024, have you investigated any more cyberstalking incidents?

A    No, sir.

Q    Okay. So have you sought an arrest warrant for any cyberstalking charges since November 2024?

A    No, sir.

Q    Before November 2024, had you investigated any incidents that you suspected to be hate- or bias-motivated crimes?

A    No, sir.

Q    Okay. Since November 2024, have you investigated any incidents that you suspected to be hate- or bias-motivated crimes?

A    No, sir.

Q    Were you aware that MMs. Rachmuth's mugshot was widely disseminated on social media and in newspapers following her arrest?

A     No, sir. Not on social media.

Q     Okay. Did you see any newspapers containing your mugshot after the arrest?

A     No, sir.

Q     Are you aware that Ms. Rachmuth has been diagnosed with exacerbated PTSD as a result of her arrest?

A     No, sir.

Q     What's your reaction to learning that she -- she has been diagnosed with exacerbated PTSD?

MR. HARTZOG: Objection. That's not a fair question.

MR. BRUCE: You can go ahead and answer.

MR. HARTZOG: You can answer if you know.

THE WITNESS: I don't have a specific reaction for that.

BY MR. BRUCE:

Q     Do you have any separate electronic devices -- or, do you use a separate cell phone for work and personal use?

A     Once I became corporal, I got a work phone.

Q     Okay. So at the time, in November of 2024, did you just have one phone that you used for both work and personal use?

A     Yes, sir.

Q     Okay. Did you have any documents or information on that phone about Ms. Rachmuth's -- your investigation into the complaint about Ms. Rachmuth?

A     No. No, sir. No, not that I recall.

Q     DID you have any pictures that you took on the phone during the investigation?

A     No pictures that I'd taken, no.

Q     Did you communicate with anyone about Ms. Rachmuth or the investigation on that cell phone?

A     Other than the people that were involved within the case. Not on -- not on the cell phone.

Q     Okay. Did you communicate with those people by text message on the phone or phone call?

A     Yes, phone call.

Q     Okay. Did you send any emails on the phone about Ms. Rachmuth and the investigation?

A     Not to individual officers, unless if it was to my town attorney.

Q     Have you communicated -- besides with your attorneys, have you communicated with anyone about Ms. Rachmuth by text message since her arrest?

A     I don't recall. Not back in 2024.

Q    Okay. Did you communicate with anyone about Ms. Rachmuth besides your attorneys by email since her arrest?

A    No, sir.

Q    Do you have any notes or other documents relating to Ms. Rachmuth or the arrest on any of your personal electronic devices?

A    No, sir.

MR. BRUCE: Let's take a quick break there. I'm going to go through my notes and see if there's anything else we need to cover.

THE VIDEOGRAPHER: Off the record, 1754.

(OFF THE RECORD)

THE VIDEOGRAPHER: We're back on the record now at 1800.

MR. BRUCE: All right. That's all the questions I have, Officer Marino. I appreciate your time and for being here today, and I will turn it over to Mr. Hartzog if he has any questions for you.

THE WITNESS: Yes, sir.

MR. HARTZOG: Just a couple of brief. Can everybody hear me okay?

MR. BRUCE: I can hear you. I'll defer to the reporter, though.

THE REPORTER: It's a little -- it's a little muted. The closer you can get to the witness, I think, the better.

MR. HARTZOG: Let me try to slide closer here. How's this? Is that better? Yes. Okay. Great. All right. Just a couple of follow-up questions.

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. HARTZOG:

Q    When you went to -- or, you were -- you were present when the discussion with the magistrate took place on the -- on the arrest warrant, correct?

A    Yes, sir.

Q    Okay. At that time, did you have -- did you feel like you had evidence that Ms. Rachmuth had electronically communicated to another person?

A    Yes, sir.

Q    And did you have evidence that that communication was done repeatedly through comments on the Facebook post?

A    Yes, sir. That's correct.

Q    Okay. Was that communicated to the magistrate to your knowledge?

A    Yes, sir.

Q    Okay. Did conversation ensue in the

comments on the post?

A     Yes, sir. Ms. Rachmuth has responded back to those comments that we saw.

Q     And did the employee whose picture was posted feel either abused, annoyed, threatened, terrified, harassed, or embarrassed?

A     Yes, sir. And we documented it in the report.

Q     And was that communicated to the magistrate?

A     Yes, sir.

Q     And the magistrate, hearing the evidence that you had collected, determined that probable cause existed for the charge of cyberstalking, correct?

A     That's correct.

Q     And issued the arrest warrant, correct?

A     Yes, sir.

MR. HARTZOG: No further questions.

MR. BRUCE: Just a couple follow-up questions to that.

RE-EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BRUCE:

Q     You said you had evidence of an electronic communication to another person; is that

Case 5:25-cv-00222-BO-RJ     Document 29-4     Filed 08/03/26     Page 120 of 124

right?

    A    Yes, sir.

    Q    What evidence of an electronic communication to another person did you have?

    A    It was the comments that were posted on -- on her original post, that she responded back to whoever made that comment.

    Q    Okay. So were the communications to the Harris Teeter employee?

    A    Not to the employee. No, sir.

    Q    Okay. Did you document those comments to the social media report in the incident report?

    A    No, sir. It's not documented.

    Q    And you testified earlier that it's important to document all the facts you have for probable cause in that incident report; is that right?

    A    That's correct.

    MR. BRUCE: All right. No further questions.

    MR. HARTZOG: I don't have anything else.

    THE VIDEOGRAPHER: All right. Stand by. This concludes the deposition of Benjamin Marino. We're going off the record now at 1803.

    (OFF THE VIDEO RECORD)

THE REPORTER: And before we go off the written record, could I please have transcript orders?

MR. BRUCE: We'll order the transcript and the video.

MR. HARTZOG: E-tran for now for us.

THE REPORTER: Okay. Do you need exhibits attached?

MR. HARTZOG: Yes, please.

MR. BRUCE: Yes, please.

THE REPORTER: Okay. Stand by.

(OFF THE RECORD AT 6:03 P.M.)

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Micah Hardin, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

_____

MICAH HARDIN,

NOTARY PUBLIC FOR THE STATE OF INDIANA

6/2/2026

CERTIFICATE OF TRANSCRIBER

I, Brandi McLean, CET, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said proceedings were reduced to typewriting under my supervision; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

*Brandi McLean*

_____

BRANDI MCLEAN, CET

PLANET DEPOS, LLC

6/2/2026