

# Transcript of Edgar Hernandez

**Date:** May 29, 2026
**Case:** Rachmuth -v- Warren, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 1 of 104

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

-------------------------------x

JENNIFER SLOAN RACHMUTH,　　　　　　:

　　　　　　　　PLAINTIFF,　　:

　　v.　　　　　　　　　　　: Civil Action No.:

ELLIOTT WARREN, ET AL,　　　: 5:25-CV-222-BO-RJ

　　　　　　　　DEFENDANTS.　:

-------------------------------x


DEPOSITION OF EDGAR HERNANDEZ

Conducted virtually

Friday, May 29, 2026

3:03 p.m.


Job No.: 633894

Pages: 1 - 103

Recorded By: Spencer Motamedy

Deposition of EDGAR HERNANDEZ, conducted virtually.

Pursuant to agreement, before Spencer Motamedy, Notary Public in and for the Commonwealth of Virginia.

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 3 of 104

```
            A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF, JENNIFER SLOAN

RACHMUTH:

      DANIEL A BRUCE, ESQUIRE

      KELLEN S DWYER, ESQUIRE

      HOLTZMAN VOGEL BARAN TORCHINSKY &

      JOSEFIAK, PLLC

      15405 John Marshall Highway

      Haymarket,, VA 20169

      (540) 341-8808


ON BEHALF OF THE DEFENDANTS, ELLIOTT WARREN, ET

AL:

      KATHERINE M BARBER-JONES, ESQUIRE

      JESSE GUSTEIN, ESQUIRE

      HARTZOG LAW GROUP

      2626 Glenwood Ave., Suite 305

      Raleigh, NC 27608

      (919) 670-0338



ALSO PRESENT:

      Jennifer Sloan Rachmuth  - Plaintiff

      Frantz Clervil - Videographer

      Jack Dunn - Videographer Shadow
```

A P P E A R A N C E S (CONTINUED)

Wes Peterson - PD Tech

David Andre - Pd tech Support

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 5 of 104

                            C O N T E N T S

EXAMINATION OF EDGAR HERNANDEZ                     PAGE

    By Mr. Bruce                                    7




                         E X H I B I T S

                   (Attached to transcript)

DEPOSITION EXHIBIT                                PAGE

Exhibit 08   Tab 8 investigation report          59

Exhibit 10   Video of Arrest                     69

Exhibit 11   Email from Paul (tab 11)            84

Exhibit 12   Follow up information request       88

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 6 of 104

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins media number one in the videotaped deposition of Edgar Hernandez in the matter of Jennifer Sloan Rachmuth v. Elliott Warren et al., in the United States District Court, Eastern District of North Carolina, Western Division. Case Number 5:25-CV-222-BO-RJ.

Today's date is May 29, 2026. The time on the video monitor is 3:04 p.m. The videographer today is Frantz Clervil, representing Planet Depos, headquartered at 451 Hungerford Drive, Suite 400, in Rockville, Maryland 20850. All parties of this deposition are attending remotely.

Would counsel please voice identify themselves and state who they represent?

MR. BRUCE: My name is Daniel Bruce of the law firm Holtzman Vogel. I represent the plaintiff, Ms. Rachmuth, and I'm here with my colleague, Kellen Dwyer.

MS. BARBER-JONES: My name is Katherine Barber Jones from Hartzog Law Group. I represent the defendants, including Officer Edgar Hernandez. And I am here with Jesse Gutstein, my colleague.

THE VIDEOGRAPHER: Thank you. The court reporter today is Spencer Motamedy, representing

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 7 of 104

Planet Depos. The witness will now be sworn in, and then we may proceed.

THE REPORTER: I'm a notary authorized to administer oaths, and this deposition will be recorded by electronic means. All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable procedural and evidentiary rules and laws and shall constitute written stipulation. The parties stipulate to the use and certification of this testimony consistent with applicable law of such.

Hearing no objection, I will now swear in the witness. Please raise your right hand. Whereupon,

EDGAR HERNANDEZ,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. BRUCE:

Q    Good afternoon, Officer Hernandez. Thank you for being here this afternoon again. My name is Daniel Bruce, and I'm a lawyer from the plaintiff, and I'll be asking you a few questions today.

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 8 of 104

A    Okay.

Q    Have you ever been deposed before, Officer Hernandez?

A    No.

Q    Have you ever testified in court?

A    Yes.

Q    Okay. About how many times have you testified in court?

A    I couldn't tell you off the top of my head. Not pretty sure. A lot of DWI trials.

Q    Are those all in your capacity as an officer with the Holly Springs Police Department?

A    Yes.

Q    Okay. So a deposition is a lot like testifying in court. The main difference is we don't have a judge present, so there may be situations where your lawyer objects to one of my questions. Those objections are for the record, so that we can get them on paper, but there's not a judge here to rule on those objections.

So if your lawyer does object, you should still answer the question unless she instructs you not to. Do you understand that?

A    Okay.

Q    A few other housekeeping things. We're on

Zoom, and we have a court reporter here, so please speak up and answer orally. Not with any head nods or vocal fillers, so just so that the court reporter can take down your answers properly, and that we can hear everybody on the Zoom. Does that make sense?

A    Yes.

Q    And then please wait for me to fully ask a question before you answer, even if you think you know the answer or can anticipate the question. This is just to make sure the court reporter can get both the question and the answer down fully, and that we have a clean record. Does that make sense?

A    Yes.

Q    If at any time my question is not clear, just let me know. I'm happy to rephrase. If you answer the question, I'll assume you understood the question. Do you understand?

A    Yes, sir.

Q    And then finally, just let me know if you ever need to take a break, and I'm happy to -- to do so. My plan is for us to go about every hour, take a 15 -- 10- to 15-minute break, but if you need a break before then, just let me know.

The only thing I would ask is that if a question is pending, that you answer the question before we go on a break. Does that make sense?

A    Okay. Thank you.

Q    All right. Can you please state your full name?

A    My name is Edgar Hernandez.

Q    Okay. Where are you testifying from, Officer Hernandez?

A    The Holly Springs Police Department.

Q    Okay. Is there anyone else in the room with you?

A    Just the counsel.

Q    Okay. Anyone else?

A    No.

Q    Okay. Are you under the influence of any medications, drugs, or alcohol that would impair your ability to answer questions today?

A    No.

Q    And you're currently an officer with the Holly Springs Police Department, correct?

A    Yes.

Q    When were you hired with the Holly Springs Police Department?

A    Early 2020.

Q      Okay. So you've been there about six years?

A      Yes.

Q      Okay. What's your current rank with the police department?

A      Just a police officer on patrol.

Q      Okay. Are you currently on any particular assignment or assigned to any unit?

A      The patrol division.

Q      And did you have that same rank in November of 2024?

A      Yes.

Q      Can you describe what training you've received as a Holly Springs police officer?

A      Yes. I received trainings such as the basic law enforcement training. That grants me a certification to become a police officer here in North Carolina.

Q      Okay. So basic law enforcement training. Any other training you've received?

A      Yeah. I mean, throughout the time being here, I've received multiple training: field training officer, CIT officer, chem analyst, different trainings.

Q      Okay. So you mentioned field training

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 12 of 104

officer; is that right?

A    Correct.

Q    Do you have a particular -- particular training you have to complete to be a field training officer?

A    Yes, sir.

Q    Okay. What did that training include?

A    There was a 40-hour class at -- they're all in different places, but a 40-hour class basically telling you how to become a field training officer and how to handle being a field training officer.

Q    Okay. What are your duties as a field training officer?

A    To train the new generation of law enforcement officers coming either straight from the academy or from a different agency, kind of showing them how to perform their job.

Q    What are some ways you're supposed to show them how to perform their job?

A    I'm showing them around town, showing them the streets, showing them how to conduct traffic stops, how to write reports, how to investigate crimes, different situations like that.

Q    Okay. Do you serve as a supervisor to the

person you're -- you're serving as their field training officer?

A    Correct.

Q    Do you have to approve any of their reports or work?

A    Yes.

Q    What things do you have to approve?

A    Just to make sure that, you know, reports are done thoroughly, and that the forms are filled out correctly. There's certain situations like that.

Q    And what type of forms do you have to review?

A    Different forms. Report writing forms, traffic crash investigation forms, voluntary statement forms, CIT forms. Just, there's a lot of things that go into law enforcement.

Q    Does that include any forms that are submitted in support of an application for an arrest warrant?

A    Correct, sir.

Q    Any other forms that you can think of?

A    I mean, there's just so many. I can't really think of any off the top of my head.

Q    Is there any other -- besides things like

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 14 of 104

forms and reports, is there anything else you have to approve when you're serving as an officer's field training officer?

A    Just, you know, I guess, approve of the officer himself. Make sure that he's conducting well. Officer safety. That he's learning from the training that we were providing him, whether it's just going over case laws or going over how to handle certain types of calls.

Sometimes we might not get certain calls here in Holly Springs that we expect an officer to know how to handle. So just different things like that. We kind of approve to see, you know, throughout the day, to see how well the officer is doing.

Q    Okay. If a -- if an officer that you're serving as their field training officer wants to conduct an arrest, do you have to approve that decision?

A    Do you mean, like, do I have to -- I'm sorry, can you repeat the question for me?

Q    If an officer who you're serving as their field training officer wants to conduct an arrest, do you have to sign off on that decision before they -- they can do that?

A    No. It just kind of -- it depends on the situation. Obviously, when it comes to certain things, like if I believe they have the probable cause to tell me whether they have it or not, and we can talk about what, you know, what we have in front of us, or if it's something that's a warrant, then obviously I can't really make that decision for that officer when it comes to making an arrest.

Q    Okay. So you mentioned probable cause. Is one of the things you have to sign off on for those officers is whether they have probable cause to -- to seek an arrest warrant?

A    Well, that's --

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: That's up to the magistrate to see if we have probable cause for the warrant.

BY MR. BRUCE:

Q    Do you review whether the officer has probable cause before he presents that to the magistrate?

A    No. That's up to the magistrate to figure out if that's what we have.

Q    Does your --

MR. DWYER: You don't think that you have

to make a determination of whether there's probable cause before going to a magistrate?

MS. BARBER-JONES: I'm sorry. Who's taking the deposition here? Are you both taking it?

MR. BRUCE: I can ask the question.

MR. DWYER: Oh, sorry. Daniel can ask.

BY MR. BRUCE:

Q    Do you think that you have to make a independent determination of whether there's probable cause before you go before a magistrate to get an arrest warrant?

A    Well, isn't that the point of having the magistrate determine if probable cause is there?

Q    I'm just asking you if, as a field training officer, is your role -- is part of your role determining whether an officer you're supervising has enough evidence to support probable cause before going to a magistrate?

A    I guess I would argue that, yeah, it is my role to figure that out.

Q    Okay. I believe you mentioned that one of the things you -- you do when assisting as an FTO is helping the officer you're supervising review case laws; is that right?

A    Correct.

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 17 of 104

Q    What -- what do you mean by case laws?

A    Just different case laws that we -- that obviously law enforcement have to go by. You know, Tennessee v. Garner and different things like that.

Q    So do you mean like -- like court decisions and opinions?

A    Correct. That help us perform our jobs, and lets us know if we're within our legal means of operating.

Q    Okay. Do those include decisions by both federal and North Carolina state courts?

A    Correct.

Q    Okay. Does it include any decisions about the First Amendment?

A    I cannot recall going over things whether the First Amendment with Officer Warren.

Q    Can you recall going over anything related to the First Amendment with any other officer you've served as an FTO for?

A    No, because I've only field trained three other officers, and I'm currently field training one officer, and the second officer I field trained was already further along in this FTO process.

Q    Okay. And so how many -- how many total officers have you served as an FTO for?

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 18 of 104

A     Three.

Q     Three, including Officer Warren?

A     Correct.

Q     Have you received -- in your time at the Holly Springs -- Holly Springs Police Department, have you received any training on the First Amendment?

A     I don't recall ever doing a training on the First Amendment.

Q     Have you received any training on -- on what crimes can be -- well, I'll -- I'll retract that question. Sorry.

So as we sit here today, you can't remember receiving any training on the First Amendment in your time at the Holly Springs Police Department?

A     Correct.

Q     Okay. You mentioned basic law enforcement training; is that right?

A     Yes.

Q     What did that training include?

A     That training included different things from patrol techniques, case law, motor vehicle law, traffic crash investigations, different operations of the patrol division.

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 19 of 104

Q    Did it include how to conduct an arrest?

A    Yes.

Q    And what did you learn in your training on how to conduct an arrest?

A    I learned how to conduct an arrest, learning about probable cause, reasonable suspicion, and what is needed.

Q    And what were you trained on what is needed to have probable cause to conduct an arrest?

A    Basically, that a crime has occurred, and it's probable fact that that person has committed the crime or was going to commit the crime.

Q    Did you receive any training on -- on how much evidence you -- you need in order to have probable cause to conduct an arrest?

A    Yes.

Q    And how much evidence do you need to have probable cause?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: So with probable cause, it's kind of the totality of the circumstances that are there, whether it's, you know, just video evidence, or if I see someone that was accused of an assault, and I see evidence of an assault. You know, just

different totality of circumstances that allow me
to make that judgment of the probable cause.

BY MR. BRUCE:

Q    When you say that allow you to make that
judgment, did you receive any training about
whether you are supposed to make an independent
judgment of whether you have probable cause before
seeking an arrest?

MS. BARBER-JONES: Object to form. You can
answer.

THE WITNESS: I'm sorry. Can you repeat
that question for me again?

BY MR. BRUCE:

Q    Did you receive any training about
whether you yourself, as an officer, are to make an
independent judgment about whether there is
probable cause before you go to a magistrate to
seek an arrest warrant?

A    Yes. I mean, that's kind of what we give
the magistrate, and then they make that probable
cause decision.

Q    Did your basic law enforcement training
include any training about when to seek an arrest
warrant versus an arrest summons or to issue a
citation?

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 21 of 104

A    Not that I recall.

Q    Have you received any other training outside of basic law enforcement training about when to conduct an arrest or issue a citation?

A    No. Other than kind of just, obviously, when we're arresting someone, well, it's easier to give a citation once that person's present, but if that person is no longer on the scene or present, then, you know, we typically seek out an arrest warrant.

Q    So is one of -- one of the factors to consider when you're determining whether to issue a citation is whether the suspect's present at the scene of the crime still?

A    Correct.

Q    Okay. Are there any other factors that you would consider?

A    I mean, just kind of depends on the totality of the circumstances again.

Q    Would the dangerousness of the suspect be a factor to consider?

A    Correct.

Q    Would whether the suspect's a flight risk be a factor to consider?

A    Correct.

Q    Any other factors that -- that you can think of?

A    No, I can't think of any right now.

Q    Have you received any training on the Holly Springs Police Department's written directives?

A    As in just reviewing policy?

Q    I guess, have you reviewed -- reviewed the Holly Springs Police Department's written directives?

A    Yes.

Q    Okay. And are you required to do that every so often or on a regular basis?

A    Whenever new policies come out. We've had a plethora of new policies come out, and we're told to sign off on the policies after they're read.

Q    Have you received any specific training on the North Carolina cyberstalking statute?

A    Specific training for the charge itself, no.

Q    Okay. Have you received any specific training on harassment or other types of stalking charges?

A    No.

Q    Have you received any training on

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 23 of 104

identifying or classifying hate- or bias-motivated crimes?

A    Not that I recall.

Q    Have you received any training that was put on by -- by an organization called the Anti-Defamation League?

A    No, not that I recall.

Q    Have you received any training on identifying hate or extremist groups?

A    Yes.

Q    What training was that?

A    I wasn't -- though I do remember doing that in basic law enforcement training, but I don't remember taking anything outside of that.

Q    Okay. And what was the substance of that training? What were you taught about identifying hate or extremist groups?

A    Basically, I mean, they were just kind of telling us about, you know, different types of hate groups out there, whether it's, you know, things that happen here within our nation or things that are happening in Europe. Just, I mean, they didn't go into specific -- specifics about every group or anything of that nature, but just kind of general ideas of them.

Q    Did it include identifying anti-Jewish hate groups?

A    Not that I recall.

Q    So as we sit here today, you can't recall receiving any training about identifying anti-Jewish hate or extremist groups?

A    Correct.

Q    Have you received any training about identifying implicit biases?

A    Yes.

Q    And what was that training?

A    We had a gentleman come to the Holly Springs Police Department who put on kind of a training day, just, you know, giving -- educating us officers on implicit biases and ones that someone might not even realize they have.

Q    When did that training occur?

A    Honestly, I'm not too sure on the exact date. I want to say probably around 2022 or 2021.

Q    Was it before November of 2024?

A    Yes.

Q    And do you recall the name of the person who gave that training?

A    I do not.

Q    Was it someone with the Holly Springs

Police Department?

A    As an officer of Holly Springs Police Department? Is that what you're asking me?

Q    Well, sure. Was it an officer at the Holly Springs --

A    No, it was a third party.

Q    And what did that -- what was the substance of that training?

A    Honestly, it was kind of just kind of understanding what implicit bias is, and basically things that you might not realize what might be considered implicit bias.

Q    And based on that training, what is your understanding of what an implicit bias is?

A    Basically, from -- honestly, what -- I can't really remember too much from the training other than when bias that, I guess, people say that they might have and not realize is just kind of, you know, going to a hardware store and you see -- you try to picture a plumber in your head, and then you have a specific picture of what a plumber might look like.

But then you see this, like, older woman there. I'm like, well, maybe she's a plumber. You don't know. But you have this kind of ideology of

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 26 of 104

what a plumber might look like. Just kind of things like that, yeah.

Q    Did the training include identifying any biases related to Muslim individuals?

A    Not that I remember.

Q    Did the training include any -- identifying any biases related to Jewish individuals?

A    Not that I remember.

Q    Have you received any medical or first aid training?

A    Yes.

Q    And when did you receive that training?

A    In basic law enforcement, and also throughout my years as a law enforcement officer, we'll recertify on CPR training.

Q    So you mentioned you had CPR training; is that right?

A    Yes, sir.

Q    What other types of medical and first aid training have you received?

A    Well, the stop-the-bleed training.

Q    Okay. Any other types of training?

A    That's kind of really it.

Q    Have you received any training that

includes how to identify when an individual may be having a panic attack?

A     I received a CIT training as well.

Q     Okay. What is CIT training?

A     Crisis intervention team.

Q     Okay. And what did you learn in crisis intervention training?

A     Basically, different resources. The Wake County here has offered when it comes to people that are having a crisis.

Q     Okay. And --

A     And things they might experience.

Q     What do you mean by a person having a crisis?

A     Basically, people who have mental health issues and are essentially, you know, they are in crisis. They aren't having the best mental health day. They're having issues, whether -- it's whatever's going on in their life, and they're just kind of in crisis. I don't know the best way to explain it.

Q     Did any of those crises include suffering from panic attacks?

A     Not that I recall.

Q     And does that training also apply to

individuals you may be bringing into your custody as a suspect?

A    Kind of. It's -- they -- what they refer to during that training is more of the fact of people that basically, during their crisis, they might have certain circumstances that maybe they might -- kind of -- it kind of lets our judgment as an officer to decide whether -- how things are handled in the sense of do we need to -- do we feel as an arrest needs to be made, or do we feel as a mental health evaluation might be needed instead? So it kind of just varies on the situation.

Q    Okay. And in what circumstances might a mental health evaluation be more appropriate than making an arrest?

A    So sometimes we deal with people who have autism, and they might be violent. They might assault a family member. However, due to their severe autism, we know that sometimes they can't help it from lashing out in certain ways, that we prefer that we go the mental health route instead of just making an arrest and just making it worse for everybody.

Q    Okay. Have you received any other specialized or -- or specialized training that we

haven't talked about today?

A     No.

Q     Based on your training that we discussed, can you describe the steps that an officer is supposed to take when -- when a crime is reported?

A     When a crime's reported, I guess we -- we talked -- respond to the call, talk to the victim, gather as much information as you can get, and see -- where -- where it can go from there. Sometimes, we might send it upstairs to have them investigate more. Sometimes, if it's something we can handle, we will finish it out and close it out ourselves as the patrol.

Q     Okay. So I just want to break down a few of those things. So you said the first step would be responding to a call; is that right?

A     Correct.

Q     How does a call typically come in to a patrol officer?

A     It is dispatched to us through the Holly Springs Police Department dispatch.

Q     Okay. And then you said one of the things you might do would be talk to the victim; is that right?

A     Yeah. Talk to the caller, and -- well,

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 30 of 104

first arrive on scene, talk to the caller, kind of gather what you have there.

Q    Is there anyone else you might talk to?

A    Depending on what you have in front of you. You might be able to reach out to -- if it's, you know, an assault, there's two people there, one offender, one victim, you can talk to the offender there as well.

Q    And when you're speaking to -- to these individuals, how do you -- how do you record or keep track of the information that you're collecting?

A    You write a report.

Q    Okay. Do you write that report contemporaneously as they're talking, or do you do it later at the station?

A    Usually, if I'm -- if I'm handling the call, I'll write notes down on my notebook, and just kind of recollect what they're saying as I'm writing my report.

Q    Okay. Is there any situation where you would ask the victim or the offender to -- to write a written statement?

A    You can. And that's not always something we do, but you definitely can.

Q    Are there specific situations where you would be more likely to get a written statement than others?

A    You know, the times that I can recall doing that, if I wanted to get it done, were on violent felonies.

Q    Okay. Why on violent felonies?

A    Just because me personally, I believe that, you know, it's something much more, something that I want to make sure is investigated thoroughly.

Q    Okay. You mentioned that you might -- in certain situations, you might talk to the offender or the suspect; is that right?

A    Correct, if they're on the scene.

Q    Are there any other situations besides if they're on scene where you might talk with them?

A    I mean, if you're able to get a hold of them.

Q    Okay. How might you be able to get a hold of the offender?

A    By somehow finding contact information on that individual.

Q    Okay. What are -- what are ways you tend to use to find contact information on the offender?

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 32 of 104

A    See if they're -- if it's someone that we've dealt with. Maybe it's -- you can put them in our report writing system. They might have their own contact information in there. That's the way we can do it. Using the DMV. Usually, phone numbers are tied to the DMV driver's license.

Q    You mentioned someone you've dealt with. What do you mean by that?

A    I mean, somebody in the sense of that's -- I mean, like, as in the Holly Springs Department, as a -- either interacted with, whether it's just them coming in, talking to us, or interacting with if they reported a crime or been a victim of a crime, wherever may have, they usually are in our report writing system, involved some way or form, and their information would be in there.

Q    Okay. So if somebody has made a report or reported a crime to the Holly Springs Police Department, their information would -- would be in the report writing system?

A    Correct.

Q    Okay. And that's something you could access if their name comes up later as a -- as a suspect or an offender?

A    Correct.

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 33 of 104

Q    Are there any other situations besides if the suspect's on scene, or if you have their contact information, that you might choose to -- to talk to the suspect while investigating?

A    I mean, I can't really think of another situation like that besides those two.

Q    Okay. You mentioned that after you conduct that part of the investigation, you said you might -- would send it upstairs; is that right?

A    Correct. If I -- if I can't make -- if I can't close a case myself, maybe send it upstairs. Or if there's -- if I -- if I need to get that -- how do I say this? If I -- If I can't figure it out myself, usually I just send it upstairs if I can't close it out myself.

Q    Okay. And what do you mean by send it upstairs? Who's upstairs?

A    Oh, I'm sorry. CID. I apologize. Our police department, the second floor is the investigations unit. I apologize.

Q    Okay. No -- no problem. Just -- just wanted to clarify. So if you can't close the case yourself, you might send it to the investigations unit?

A    Correct.

Q    Are there -- are there situations where you're required to send a case to the investigations unit?

A    Yes. They are, but honestly, I can't really remember them off the top of my head.

Q    Do you remember any of those situations?

A    For some reason, the word arson sticks out to me a lot, and I don't know why.

Q    Okay. Any besides arson?

A    I think those violent felonies come to play as well, and a certain amount of drug amount, I believe.

Q    Okay. Are -- are crimes that might be considered hate crimes or bias-motivated crimes referred to the investigations unit?

A    I do not recall.

Q    Is it standard practice to memorialize interviews with -- with a witness or a victim in writing?

A    Do you mean as in write down when -- when they're speaking to me, or -- I'm sorry, I don't understand the question.

Q    Is it standard practice to write down the content of what a witness or a victim says to you while you're talking to them in writing somewhere?

A       I mean, there's -- I mean, different officers take just field notes when they're being spoken to by the victim, and they will put it in their report if it's a direct quote. A lot of times, people, you know, put it in quotations.

Q       Okay. You mentioned you would collect field notes and then put it in the report. Is it standard practice to transcribe those notes into the official incident report?

A       Correct.

Q       We talked a little bit about collecting information on an offender, and you mentioned that their information could be in the system if it's someone you've -- you've dealt with before at the police department; is that right?

A       Mm-hmm.

Q       And when you said system, what -- what system do you use to -- to look up that information?

A       So actually, we've had used a couple different report writing systems throughout my time being here. So currently, we use Axon. During that time, we used RMS. So it's just -- and during that time, RMS actually had a lot of technical issues, and it was just a whole cluster during that time of

when this report was written.

Q    Okay. Explain a little bit more about the technical issues RMS had during that time.

A    So it was kind of known that our system was backed up with Apex Police Department system, and they had a software attack on their system that actually affected our -- our report writing system here in Holly Springs. Fortunately enough, our reports were -- were able to be all recovered. However, the software itself was not usable at the time.

Q    Okay. So you said, fortunately enough, they were -- they were able to be recovered. Did something happen to the reports at some point?

A    So we weren't able to log into the software at all. However, our -- our crime analyst was able to back up their reports before this software attack even happened. But so back when we were writing this report, our software was back up, but it wasn't -- how do I explain this? It wasn't as user-friendly as it was prior to the incident.

Q    Okay. Did that affect any of the information you could -- you could get from the report writing system that was already stored in it?

A    Honestly, I don't remember. We've been using Axon for a year and a half now, so it's kind of -- it's weird how easy Axon is compared to our new -- or, old report right system.

Q    It's always good to have better technology.

A    Yep.

Q    Can you explain how the process for obtaining a warrant works?

A    You gather the information that you have from the scene. See if the crime meets the elements, and you see if you have enough probable cause to swear an arrest warrant by speaking to the magistrate.

Q    When you said, see if the crime meets the elements, what -- what do you -- how do you determine if it meets the elements?

A    Just the totality of the circumstances. You know, we -- if the elements are met on the crime, we are able to seek probable cause with the magistrate.

Q    Do you -- do you have any resources or people you consult with to -- when you're determining whether a crime meets the elements?

A    Yeah. So we have these books here at the

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 38 of 104

Holly Springs Police Department. If it's for a
charge that maybe some of us are not very familiar
with, we determine whether -- with those books,
they're able to help us. They have the list of
elements in their list of crimes that they have.
And usually, if we're still not sure, we have
supervisors here that we talk to and kind of get
clarification from them as well.

Q    Okay. So you mentioned there -- there's
-- a book that contains the elements of -- of the
crimes that you might consult; is that right?

A    Correct.

Q    Do you know -- do you know what that book
is called?

A    North Carolina Crime. That's the only
title I remember seeing on it.

Q    Okay. Fair enough.

A    It has the elements on it.

Q    And then you said if you're still not
sure, you would consult the supervisor; is that
right?

A    Correct.

Q    What supervisors would you consult?

A    Usually, my direct supervisor, so whether
that's a corporal sergeant or if the lieutenant's

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 39 of 104

possible, patrol lieutenant, is there, then that'd be great.

Q    Is there -- is there anyone else you would consult when determining if -- if the crime meets the elements?

A    No. Well, the magistrate. I'm sorry.

Q    Understood. Would you ever go to the District Attorney's Office to get the District Attorney's advice before?

A    I personally never have.

Q    Do you know any other officers who have?

A    No. I would imagine you could, but I've never heard of someone doing that.

Q    Are you supposed to consult the Town Attorney's Office before or when you're determining if a crime meets the element?

A    No.

Q    So then you mentioned after you determine whether it meets the elements, that's when you go speak to the magistrate; is that right?

A    Correct.

Q    And how do you go about doing that?

A    There's different ways you can do it. Normally, we have a Zoom kind of call to the magistrate in the back of our police department,

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 40 of 104

where we can have kind of essentially, you know, a Zoom call, and we give our probable cause, and they either approve the warrant or they don't. Or we can go drive down to the Wake County Detention Center and speak to a magistrate there.

Q    Okay. When you have those Zoom calls with the magistrate, are those calls recorded?

A    I don't think so.

Q    Do you know for sure whether they're recorded?

A    I'm not -- I have no idea. I've never asked.

Q    Understood. How long do those calls typically take?

A    It can vary. Sometimes, I've had -- shorter calls is probably two minutes, and I've had other calls that have been 10 minutes.

Q    Do you submit any written information to the magistrate in support of your probable cause?

A    For warrants or just arrest in general?

Q    To -- to get the arrest warrant from the magistrate, do you submit any written information?

A    Of -- of -- it's a felony warrant, we send a felony information report. A felony investigation report, I apologize.

Q    Do you send any written information for misdemeanors?

A    No.

Q    Is there a written application you have to fill out before you speak with the magistrate to let them know you have a warrant or what's coming?

A    Just the warrant application on our eWarrants website.

Q    Okay. And what information do you put in that warrant application on the eWarrants website?

A    Information that's related to the case, you know, case number, case file, who you are, what department you work for, the defendant, and the charges.

Q    Do you put any description of the underlying conduct?

A    As in the conduct of the charges itself?

Q    I'll restate it. Do you -- do you describe what evidence you have in support of probable cause in that form anywhere?

A    On the wording of the charges we fill in, it's because it's kind of a fill-in-the-blank kind of situation where they list the -- the charging language, and you put in what you have that meets those elements.

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 42 of 104

Q    Okay. Do you put any other written description of the evidence in that form at all?

A    It depends on the charges.

Q    Do you upload any documents in support of the -- of the warrant application to that form?

A    Again, it depends on the charges.

Q    And what charges might you upload something in support of them?

A    Like a DWI.

Q    Okay. What would you need to upload for DWI?

A    You can upload the forms that we use for Intoxilyzer, the affidavit needed for bringing the individual into the Intoxilyzer room for them to provide a breath sample. There's different forms of that nature.

Q    Do you have any written evidence that you're using to support probable cause, like an email or a text message or something? Is that something you would upload?

A    No. Usually, that is put into a case file.

Q    Okay. Does the magistrate have access to the case file?

A    No.

Q    Is there any other information you would submit to the magistrate in writing in support of an application for an arrest warrant?

A    No.

Q    Okay. What happens after the magistrate issues the warrant?

A    Normally, you are given a -- what's -- what's called the CR number, and it's basically the number for the warrant. The warrant has been approved, and from there, you can either try to attempt to serve yourself, or if it's in -- let's say the person lives in a different town or agency, notify that agency. Like, hey, let them know I just got a warrant for this individual, and maybe they might get served. Or you just kind of wait for it to get served on its own.

Q    Okay. So you mentioned you get a CR number. I assume that's a case number for the warrant?

A    Correct.

Q    How do you receive that CR number?

A    The magistrate will tell you that. Or you can look up at eWarrants, if the warrant's been approved.

Q    So does that happen relatively

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 44 of 104

immediately after the warrant's approved?

A    Correct.

Q    And you mentioned you can try to serve it yourself; is that right?

A    Correct.

Q    Or you said wait for it, or just wait for it to be served?

A    Correct.

Q    So how might it be served if you don't do it yourself? Like, how do you wait for it to be served?

A    Let's say someone's driving down the street. They're speeding, get pulled over. Police run them. Hey, you have a warrant. That's kind of, in some way, it can get served.

Q    Okay. Is there a time limit you have in which you're supposed to serve the warrant?

A    No.

Q    Okay. When might you choose not to immediately serve a warrant?

A    I'm not too sure. I guess it just kind of depends on what information you have, I guess, whether they're close by, they live in our jurisdiction. They might, you know, not serve it immediately. Whether -- or maybe if it's someone

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 45 of 104

who has a violent past, and who has threatened law enforcement, and threatened to barricade themselves, you might not want to serve that warrant immediately without maybe getting information on the house or getting possible the SWAT team involved somehow.

Q    Okay. So on the first example, you said, did you say a situation where you might not serve it immediately is if the person lives close by?

A    Yeah, maybe if they don't live in your jurisdiction, you might not -- may not be able to serve it immediately.

Q    Okay. But if the person does live in your jurisdiction, is that a situation where you might serve it immediately?

A    Yeah.

Q    Is -- is a situation where you might not serve the warrant immediately if you're unsure about the charge?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: I'm sorry. Can you repeat that one more time?

BY MR. BRUCE:

Q    Is a situation in which you might wait to

serve the warrant at a later date -- let me restate it. If you're unsure about the charge, is that a situation where you might wait to serve the warrant?

A    If the charge -- the warrant has been approved, then we just serve the warrant. That doesn't really -- that -- what you -- the question you had doesn't really correlate with that.

Q    Okay. Is there any situation where you might choose to interview the suspect even after a warrant has been issued?

A    I've never have done that. I guess you technically could, but I've never done that.

Q    Okay. So you technically could, instead of arrest the person, interview them even though there's a warrant that's been issued?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: Were you saying that instead of arresting them, just interview them? That's what -- I was kind of confused on that. I apologize.

BY MR. BRUCE:

Q    Yes. Instead of arresting them pursuant to the arrest warrant, interview them and ask them questions about -- about the underlying charge. Is

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 47 of 104

that an option?

A    And then arresting them, or just skipping the arrest completely and then going to questioning?

Q    I guess it might depend on what you learn in the questioning, but questioning -- questioning them before arresting them.

A    Usually, if it's a warrant that's been served, I just kind of handle the warrant right then and there.

Q    Okay. Interesting. How many times have you personally sought an arrest warrant?

A    Me personally?

Q    Yes.

A    I couldn't give you a number off the top of my head.

Q    Is it more than 10?

A    Yes.

Q    More than 20?

A    Yes.

Q    Okay. Have you ever been denied an arrest warrant?

A    Yes.

Q    Do you know why you were denied the arrest warrant?

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 48 of 104

A    They believed that an arrest warrant wasn't appropriate. And they believe that -- or, pardon me. They believed that the charges I had weren't appropriate, and they think I should try to seek different charges instead of the charges I was seeking.

Q    And when you say they, was that the magistrate?

A    Correct.

Q    Okay. How many times has that happened?

A    That I recall, just only one time.

Q    What type of charge were you seeking?

A    It was a worthless check.

Q    Okay. And the magistrate told you to seek a different charge?

A    Correct.

Q    And did you go back and -- and seek that charge that the magistrate suggested?

A    Correct. But I can't remember the outcome of the charges.

Q    Understood. And when did you first become aware of who Ms. Rachmuth is?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: The day of the arrest.

BY MR. BRUCE:

Q    Okay. At that time, were you aware she was a long-time resident of North Carolina?

A    No.

Q    Were you aware she had a family in North Carolina?

A    No.

Q    Were you aware that she is an independent journalist?

A    No.

Q    Were you aware that she is Jewish?

A    No.

Q    Were you aware that she had previously made complaints to the Holly Springs Police Department regarding cyberstalking and anti-Semitic harassment?

A    No.

Q    Had you looked up her -- her name in the -- in the reporting system at that time?

A    No.

Q    Before this incident, did you ever hear anyone at Holly Springs Police Department discuss Ms. Rachmuth?

A    No.

MR. BRUCE: That might be a good place to

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 50 of 104

take a quick break before we get into more substantive stuff.

MS. BARBER-JONES: That would be welcome.

THE VIDEOGRAPHER: Okay. The time now is 3:54 p.m. We are now off the video record.

(A recess was taken)

THE VIDEOGRAPHER: We are back on the video record. The time now is 4:02 p.m. Counsel, you may proceed.

MR. BRUCE: Thank you, everybody. Hope you had a good break.

BY MR. BRUCE:

Q    Just one follow-up on what we were discussing before we went on break, Officer Hernandez. You said that you were not aware that Ms. Rachmuth had submitted complaints to the Holly Springs Police Department prior to this incident; is that correct?

A    Correct.

Q    If she had, though, is that something that would be included in the reporting system that you discussed earlier in your testimony?

A    No. When it comes to complaints, that's all handled internally through a different report system that I don't even have access to.

Q    Okay. So what types -- you did mention that reports to the police department were included in that system, right?

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: Reports in the sense of reports that we generate and that we write, not necessarily reports of complaints or even traffic complaints, anything by that nature.

BY MR. BRUCE:

Q    I got you. So if someone just -- just reaches out to report a crime, but it's not investigated and written up a report, is that information included in the reporting system?

A    If a report number is generated, then it would be. I'm not too sure if -- so if someone were to come in and report something that a case number does not generate for, then no.

Q    Okay. So -- and if -- and if someone -- and if an officer does generate a report number and begins investigating a reported crime, is that information then stored in the reporting system?

A    Correct. But -- yeah.

Q    Okay. You mentioned that you did not become aware of who Ms. Rachmuth was until the day

of the arrest; is that right?

     A     Correct.

     Q     So were you involved in the investigation of the underlying incident at all?

     A     No.

     Q     And why not?

     A     I was not there. I was not at work that day.

     Q     Okay. Were you at all aware that there was an investigation going on that day?

     A     No.

     Q     When did you first become aware of the investigation?

     A     The next morning at work, when I returned back to work, I was made aware. I asked what Officer Warren did yesterday, and Officer Marino, Officer Warren explained to me that they took out a warrant on an individual. At the time, they didn't give me clarification on who it was. And when I saw the copy of the warrant, I saw the address, and I was like, oh, that's -- that's our jurisdiction.

     Q     Okay. So I want to follow up on a little bit of that. So Officer Warren and Officer Marino described what happened the day before when you came to work that morning?

A    Vaguely described what happened, other than just like, yeah, hey, what did you all do today? Oh, we didn't do much. We had this call. We took out a warrant on this woman over here. And that's kind of where it was left at.

Q    Okay. Did they describe their investigation any further?

A    They gave me a brief synopsis of what happened. They didn't really give me full detail of their entire investigation.

Q    Okay. And when they gave you that brief synopsis, what did they tell you?

A    Honestly, I couldn't remember exactly what the full -- the -- what it was that they told me. I just know they didn't go into great detail about what was said.

Q    Did they mention anything about an incident at Harris Teeter?

A    They -- they -- I believe they did mention something about an incident occurring at Harris Teeter. But like I said, I don't remember the full details of what was said.

Q    Did they describe what any of the witnesses they had, if any, they had spoken to said?

A    I don't remember.

Q    Did they mention anything about a post on social media?

A    They did mention a post on social media.

Q    Did you review that post?

A    No.

Q    Did you ask to review that post?

A    No.

Q    Why not?

A    Because like I said, it was -- they already had obtained an arrest warrant, and I was fully confident in Marino's abilities in being an FTO -- an FTO warrant for a day that I wasn't there.

Q    Did they mention any comments to the post?

A    I don't remember.

Q    Did you review any comments to the post?

A    No.

Q    So as we sit here today, you don't remember them mentioning any -- any comments to a social media post that they had discovered in their investigation?

A    Not that I remember, no, other than the original post that I -- that I saw.

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 55 of 104

Q    Okay. And you said you -- you didn't ask to review the social media post because you were confident in Officers Warren and Marino?

A    Correct.

Q    Did you believe you needed to make an independent determination of whether there was probable cause to conduct the arrest at that point?

A    No, because Officer Marino was the FTO for Warren yesterday, the day prior.

Q    Who was Officer Warren's FTO on -- on that day, on the arrest?

A    Day of the arrest, I was.

Q    Okay. So were you -- were you in charge of supervising Officer Warren in conducting the arrest that day?

A    Correct.

Q    Okay. As his FTO, was it your responsibility to ensure there was probable cause to -- or there was enough evidence to support probable cause to conduct that arrest that day?

A    The warrant was already sworn out, and that's all we needed for the arrest.

Q    Were you ever consulted about whether cyberstalking was the appropriate charge to bring?

A    No.

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 56 of 104

Q    Did you review any part of the warrant application?

A    No.

Q    Did Officer Warren or Officer Marino describe what evidence they presented to the magistrate in order to obtain the warrant to you?

A    No.

Q    Once they gave you that brief synopsis, did you believe cyberstalking was the appropriate charge?

A    I -- I believe so, yeah.

Q    Why did you believe so?

A    Because he also informed me that they were looking into the correct charges. They said -- they advised me they reviewed the elements handbook that we have at the police department. And they also spoke to a supervisor during that time, in which they were able to come to the conclusion that cyberstalking was indeed the correct charge.

Q    So Officers Warren and Marino, when they were giving you a brief synopsis on what happened, they -- they stated they had reviewed the elements book; is that right?

A    Correct.

Q    And they mentioned that they consulted

supervisors?

A    Correct.

Q    Did they say what supervisors they consulted?

A    I know they spoke to Lieutenant Ottoway, who at that time was over our patrol division. And I'm not too sure if they did speak to our sergeant at the time, which was Sergeant Bock, I believe.

Q    Did they mention anybody else that they spoke to?

A    Oh, magistrate.

Q    So that -- they mentioned that they spoke to Lieutenant Ottoway, maybe Sergeant Bock, and the magistrate?

A    Correct.

Q    Did they give you any other information that morning about the charge before you all went to conduct the arrest?

A    No.

Q    Did you review the incident report that morning before you went to conduct the arrest?

A    No, I did not.

Q    Did you ever review the incident report?

A    No, I did not.

Q    Were you required to as Officer Warren's

FTO?

A    Since that report was completed on a day that I was not there and not his primary FTO that day, I did not deem it to be necessary at that time.

Q    Okay. Did you -- did you review any other materials Officer Warren prepared in the course of the investigation?

A    During this investigation, no. Other than the arrest report. I apologize.

Q    I'm sorry. What -- can you --

A    The -- the -- the supplement to his initial report, which was the -- the arrest report, I did review that, because I was there with Officer Warren that day.

Q    Okay. So you did review the supplement to the incident report?

A    Correct.

Q    And when you reviewed the supplement, is that -- is that a separate document, or is it part of the incident report?

A    It's part of the incident report in the sense of, like, it obviously is related in the same case number. However, it's just added information, just stating that the defendant was arrested at

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 59 of 104

that time and date.

Q    Okay. Did you -- when you reviewed the supplement, did you review any other information in the incident report that was written the day before?

A    No.

MR. BRUCE: Can we pull up tab 8, please?

THE REMOTE TECH: Stand by.

BY MR. BRUCE:

Q    Okay. So this will be marked as Exhibit 8. Do you recognize this document at all, Officer Hernandez?

(Exhibit 8 marked)

A    I believe this is going to be the case number for that incident.

MR. BRUCE: Okay. Let's scroll down to the next page, see if we can get a better look.

THE VIDEOGRAPHER: And counsel, I can give him control if you need me to.

MR. BRUCE: I think we can just keep control for now. I can walk us through it, but I can -- it would be helpful down the road.

THE VIDEOGRAPHER: Certainly.

BY MR. BRUCE:

Q    Do you recognize this page of the

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 60 of 104

document?

A    I mean, yeah, that's -- I mean, that's kind of our -- our template for our reports, but, I mean, I don't really remember ever really looking at this document specifically.

Q    Okay. But this is what a normal incident report looks like?

A    Right.

Q    Okay. And can you tell whether this is the -- the incident report created for the complaint against Ms. Rachmuth?

A    I guess. I mean, I -- I -- honestly, I'm not even familiar with the -- yeah, it's the correct one.

Q    Okay. Where would the -- you mentioned you reviewed the supplement or the arrest report. Where would that be included in -- in this incident report?

A    So during this time, like I said, we had a different operating report writing system, so it should be just added under a another report. So if you scroll down towards the narrative, I believe there might be another attached narrative to it.

MR. BRUCE: Okay. So let's scroll down until we get to the narrative section. Okay. Is

this -- let's stay on that other page. Can we scroll down a bit?

BY MR. BRUCE:

Q    Is this the narrative section you're talking about?

A    Correct. That is going to be the initial narrative section.

MR. BRUCE: Okay. And so can we scroll to the next page?

BY MR. BRUCE:

Q    Is this still the initial narrative section?

A    Yes.

MR. BRUCE: Okay. Can we keep scrolling? Keep scrolling.

BY MR. BRUCE:

Q    Because it says case supplemental report. Is this the supplement that you reviewed?

A    Correct.

Q    Okay. Did you review any other portion of the incident report?

A    I didn't -- I did not.

MR. BRUCE: Can we scroll back up to -- I think it's the third page. Let's go to the fourth.

BY MR. BRUCE:

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 62 of 104

Q     Officer Hernandez, do you see in the middle of the page here, under the -- the empty box, it says suspect hate/bias-motivated, anti-Islamic, Muslim. Do you see that?

A     Yes.

Q     Do you know what that means?

A     That means it was flagging NIBRS for a possible hate crime.

Q     And are there any standards and officers supposed to use when they decide whether to flag something as a possible hate crime?

A     Honestly not -- I'm not too familiar because it's not something that I deal with a whole lot.

Q     Have you personally ever -- ever flagged an incident as a hate crime?

A     No. Actually, I -- that's why I'm not very familiar with it, because I've never actually dealt with something that could -- would consider that.

Q     Okay. And you said you didn't review this part of the report, right?

A     Correct.

Q     Do you know who would have put that designation in this report?

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 63 of 104

A     I'm not too sure.

MS. BARBER-JONES: Object to form. You can answer.

THE WITNESS: I'm not too sure. Possibly Officer Marino.

BY MR. BRUCE:

Q     Okay. So possibly Officer Marino?

A     Possibly Officer Warren. I don't know.

Q     Was there anyone else who would have had access to input information into the report?

A     Not to my knowledge.

MR. BRUCE: Okay. We can take that down.

BY MR. BRUCE:

Q     So after you were read into what happened the day before when you got to work that morning, what happened next?

A     I saw that the defendant lived in -- in town, and I advised them, hey, like I know the address may say Apex, but that is our jurisdiction, so we can go serve this warrant and close off the case like that.

Q     Okay. And how did you know that it was in your jurisdiction, even though it said Apex?

A     Because I'm familiar. I've worked in this town for X amount of years. I'm familiar with where

our neighborhoods are that might have an Apex address, but are still Holly Springs Police Department's jurisdiction.

Q    Okay. Were Officers Warren and Marino also familiar with whether the address was in your jurisdiction?

A    They weren't familiar with the address at the time. I responded to a call in that neighborhood before, but so they probably weren't familiar with the street name.

Q    Okay. You said you responded to a call in that neighborhood before. Was it at Ms. Rachmuth's house?

A    No.

Q    So after you determined it was in your jurisdiction, what did you do next?

A    I suggested we go serve the warrant, and we made our way towards Ms. Rachmuth's

Q    Okay. So you suggested that the three of you should go serve the warrant?

A    Correct.

Q    Did you ever discuss whether you should interview Ms. Rachmuth before serving the warrant?

A    No.

Q    Why not?

A    Because we already had the warrant in our hands, so we went ahead and just handled the warrant that we needed to handle.

Q    At that time, did you believe cyberstalking was an appropriate charge?

A    Oh, yes.

Q    What was your role in serving the warrant or conducting the arrest?

A    I stood there as Officer Warren placed Ms. Rachmuth in handcuffs. I just was observing to Warren as his FTO.

Q    Is -- would Officer Warren be able to conduct an arrest or serve a warrant without you present as his FTO?

A    As long as another FTO is in -- in -- that he's riding with another FTO. Doesn't necessarily have to be me. It could be another FTO field training for that day.

Q    But he has to have another FTO present at that point?

A    Correct.

Q    And why did Officer Marino join?

A    Because, so normally when serving a warrant, we consider having at least two officers. Obviously, I know Officer Warren and I were

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 66 of 104

together. However, with field training purposes, we only considered that as one unit compared to having two units since it's me and him riding in the car together, and he's being trained. So Officer Marino was considered that second unit.

Q   Okay. Do you remember what time you arrived at Ms. Rachmuth's home?

A   No, I don't remember the time.

Q   Do you know what day of the week it was?

A   It was a Sunday morning.

Q   Okay. Is it normal to serve an arrest warrant on a Sunday morning?

A   Yeah. I mean, it's pretty normal to serve a warrant on any time.

Q   How many patrol cars did you bring?

A   Two.

Q   Okay. And who was riding where?

A   I was driving with Officer Warren in the passenger seat. Officer Warren was driving, and Marino was in his own vehicle.

Q   And was there anybody else with you?

A   No.

Q   And where did you park when you got to Ms. Rachmuth's house?

A   We parked in a cul-de-sac further down

from her house.

Q    Why did you park in a cul-de-sac further down from her house?

A    Because we believe that was the best strategic, tactical standpoint from the residence. We never park in front of a house when serving a warrant. And if I remember correctly, I remember the tree line was perfectly blocking the -- our view from the house and her view -- well, of the house's view from our vehicles.

Q    And why was choosing a location where the tree line blocked her view from your vehicles important?

A    It's just basic law enforcement training when it comes to officer safety and officer safety techniques. When it comes to serving warrants, we just want to have the best tactical advantage.

Q    At that time, did you have any evidence that Ms. Rachmuth was dangerous?

A    No, but this is basic law enforcement training.

Q    Did you have any evidence that she would try to escape if you approached?

A    No.

Q    What door did you approach her house

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 68 of 104

from?

A    The front door.

Q    Why not approach from the back door?

A    Because the front doors are typically where we kind of meet contact with people.

Q    After you approached from the front door, what happened?

A    As we approached from the front door, the defendant walked out of the house, and we explained to her that she had a warrant.

Q    Okay. Did you explain to her anything else?

A    I did not. Officer Marino did. He explained a little bit more of -- more information of the incident.

Q    Was Ms. Rachmuth cooperative?

A    At first, she was -- I would say yes. You know, I would say yes. I don't think she -- at first, she was kind of more confused and startled more than than being uncooperative.

Q    At any point during the arrest, did you have any reason to believe she would harm officers?

A    No.

Q    Did you have any reason to believe she was dangerous?

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 69 of 104

A    No.

Q    Were you aware at that time that Ms. Rachmuth's children were in the home?

A    No.

Q    Were you aware that her husband was home?

A    Yes.

Q    How'd you become aware of that?

A    He stepped out as well.

Q    At any point during the arrest, did Ms. Rachmuth threaten officers?

A    No.

Q    Were you wearing a body-worn camera during the arrest?

A    Yes.

Q    Was it activated?

A    Yes.

Q    We're going to pull up -- this is going to be marked as Exhibit 10, but it's the video, so I'm going to pull it up on -- on my screen. Give me one second. Can you see that, Officer Hernandez?

(Exhibit 10 marked)

A    Yes.

Q    Can you tell from just looking at this still screen what we're looking at?

A    Yeah. I am currently just peeking into

the vehicle to make sure that nobody's sitting inside of the car before we go serve this warrant.

Q    Okay. So is this the footage from your body-worn camera?

A    Correct.

Q    I'm going to start us at about 30 seconds, just because I think it takes some time for the sound to turn on.

A    Yeah, I believe it does.

Q    Okay. We're going to watch the first couple minutes here.

(A recording was played)

Okay. We're going to pause there. So at the start of the video, you were explaining why you all were there and what was going on to Ms. Rachmuth; is that right?

A    Correct.

Q    Why were you explaining and not Officer Warren?

A    I just wanted to. Officer Warren was a newer officer, that I just wanted to try to explain as much as I possibly could for him.

Q    Okay. At this point, had Ms. Rachmuth given any indication she wouldn't cooperate?

A    At this point, I'm seeing from the body

camera footage that I had told her many times to place her hands behind her back, and she wouldn't. I mean, other than that, I don't see anything else.

Q    And you testified earlier that she seemed, you know, more confused than uncooperative; is that right?

A    Correct.

Q    She asked you all to put a shirt on; is that correct?

A    She asked -- I don't remember exactly what she just referred to putting on, but I -- if I think I remember, I think she wasn't wearing any shoes when she first stepped outside, and I thought that's what she was referring to when -- when she went to ask for clothes. And usually, we don't allow people to enter back into the homes.

Q    Okay. So when she asked for clothes, you thought she was requesting shoes?

A    Correct. Because I -- I mean, I could be mistaken that she was not wearing any shoes during the time she opened the door.

Q    Okay. Did you ever let her put on a shirt or different clothing?

A    Once we actually arrived in the parking lot of the -- of the detention center. And she was

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 72 of 104

able to put shoes on at the front porch of the
house.

Q    Okay. But you didn't let her put on a new
shirt or new clothes before you -- you walked her
down back to the patrol vehicles; is that right?

A    No.

Q    I'm going to skip ahead a few seconds.
Right here.

(A recording was played)

Okay. So there in this portion of the
video, she informs you that she experiences panic
attacks; is that right?

A    Correct.

Q    Based on your training, once she notified
you that she experiences panic attacks, did you
have any obligation to act in any sort of way?

A    I just had to monitor her and make sure
that, you know, nothing changed her demeanor or --
and, you know, if something were to change, I would
handle it accordingly.

Q    Okay. Did you monitor her?

A    Yeah, I kept an eye on her, and I did not
observe anything that made me believe that she was
indeed having a panic attack.

Q    Okay. And you said you would handle it

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 73 of 104

accordingly. What do you mean by that?

A    Make sure that she's had -- that -- that she was okay, and she was cognizant enough for me to call EMS to then get there and do whatever they determine is necessary.

Q    She specifically asked to bring water in the car in case she experiences a panic attack; is that right?

A    Correct.

Q    And did you let her bring water in the car?

A    I did.

Q    Did you ever give her access to that water while she was in the car?

A    I wasn't able to. No, sir.

Q    Why weren't you able to?

A    Because she was handcuffed behind her -- behind her back, and I had the bottle of water in my possession.

Q    Okay. So did you ever intend to give her access to the water in the car?

A    I intend bringing the water with her and giving it to her when she needed it at the facility, but -- and there's no possible way for me to give her that water at that moment.

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 74 of 104

Q Okay. But she asked if she could have water in the car; is that right?

A Correct. And she had the water in the car.

Q But she didn't get to drink the water in the car?

A Unfortunately, no.

Q Let's skip ahead a few more seconds.

MS. BARBER-JONES: Do you guys mind if we take a 30-second break here? I'm just having a technical difficulty.

MR. BRUCE: Sure. Is it -- is it anything with me?

MS. BARBER-JONES: No, no. It's the battery on my laptop.

THE VIDEOGRAPHER: Not a problem. The time now is 4:30 p.m. We are now off the video record.

(A recess was taken)

THE VIDEOGRAPHER: The time now is 4:33 p.m. Counsel, you may proceed.

BY MR. BRUCE:

Q Okay. Let me share my screen again so we can get back to the video. Can you see that okay, Officer Hernandez?

A Yes, I can.

Q    All right. I'm going to make sure we're at the right time mark. Okay. We'll play it from here.

(A recording was played)

Okay. So here, you're walking back to the patrol car; is that right?

A    Correct.

Q    And are those your cars parked down the street a bit?

A    Yes.

Q    You mentioned that you parked far away for officer safety; is that right?

A    Correct.

Q    But why park directly in front of another house?

A    I mean, that was just a parking spot that Officer Warren decided to park. I didn't think it was an issue.

Q    Is -- is there any potential for danger for parking in front of another house where you're not serving a warrant?

A    I mean, it's -- we just decide not to park in front of necessarily the house that we're serving the warrant on. There's really no indicators that we believe that the house that is

not the house that we're serving a warrant on would be an issue.

Q    How many other houses were at the end of this cul-de-sac?

A    I don't remember. I guess that I can see in the photo at least four.

Q    Okay. Did you see any neighbors outside when you were parking or walking back to the car?

A    No.

Q    Did you see any neighbors peering through the windows?

A    No.

Q    I'm going to skip ahead another few seconds.

(A recording was played)

Okay. So we saw when you got in the car, you had the water bottle with you; is that right?

A    Correct.

Q    Where did you put the water bottle?

A    I can't remember. I guess in the dashboard. I might have held it in my hand the entire time or -- I mean, I don't remember.

Q    Okay. Did you ever give it to Ms. Rachmuth?

A    No.

Q    Did you ever intend to let her have the water in the vehicle?

A    In the vehicle, I wasn't able to provide that for her.

Q    Why weren't you able to provide that for her?

A    Because she was handcuffed with her hands behind her back, and we're driving in a motor vehicle with a partition between us two.

Q    And you knew that she would be handcuffed in the back seat when you brought the water with you to the car, right?

A    Correct.

Q    I'm going to skip ahead further as you all are traveling down the road. I will say that some of the audio here is hard to hear, so I just want to ask you questions about it, and, you know, we'll -- we'll -- we'll do our best.

A    Okay.

        (A recording was played)

Q    Okay. So I realize that it's difficult to hear what Ms. Rachmuth was saying in the back, but do you recall what Ms. Rachmuth asked you here?

A    No, I do not.

Q    Did she ask you for water?

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 78 of 104

A       I do --

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I do not remember.

BY MR. BRUCE:

Q       Did you ever give her water?

A       At the Wake County Detention Center, I did give her water when I was able to.

Q       Did she indicate she was having a panic attack?

A       I do not remember.

Q       Is it possible she indicated she had a panic attack, and you couldn't hear her?

A       I don't remember.

Q       So as we sit here today, you don't remember whether she asked for -- or, she stated whether she was having a panic attack in the car?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I do not remember if she was having a panic attack in the car.

BY MR. BRUCE:

Q       And you can't say whether she did not say she was having a panic attack in the car?

MS. BARBER-JONES: Objection. You can

answer.

THE WITNESS: Can you repeat that question for me again?

MR. BRUCE: I'll move on.

BY MR. BRUCE:

Q    I'm going to skip to when you get to the detention center.

(A recording was played)

Okay. So that is the end of your body-worn camera footage. There was a portion there where something was covering up the camera. What was covering up the camera there?

A    Her sweatshirt.

Q    Okay. Is it appropriate to cover up the camera while it's activated?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I believe I -- was a complete mistake. I probably had her camera -- I mean, the sweatshirt probably leaning against my shirt as I was pouring water on, --helping her drink water.

BY MR. BRUCE:

Q    Understood. And -- and at that point, you finally give her a sip of water; is that right?

A    Correct.

Q    And just based off of what I was looking at on the timestamps there, that's about 18 minutes after she first asked for water at her home. Does that sound about right?

A    I guess so.

Q    Okay. We'll take this down. Did you communicate with the detention center staff at any point before Ms. Rachmuth's arrest about --

A    No.

Q    Did you communicate with the detention center staff after her arrest about Ms. Rachmuth?

A    No.

Q    And after you dropped Ms. Rachmuth off at the detention center, what did you do next?

A    Went back to the police department to -- to write the arrest report -- well, for Warren to write the report.

Q    Okay. Did you -- did you help him write the arrest report?

A    Other than sitting down next to him as he wrote it himself, I just looked it over.

Q    Okay. Did you do anything else with respect to this case after you looked over the arrest report?

A     No.

Q     Okay. Are you aware that the District Attorney dismissed the charge the day after the arrest?

A     I was aware they dismissed the charge. I don't remember when I was made aware of them.

Q     Okay. Who made you aware that they dismissed the charge?

A     Lieutenant Ottoway.

Q     What did Lieutenant Ottoway tell you?

A     She just told me that the charges were dismissed against Ms. Rachmuth. I don't remember verbatim what she said, but it was in person.

Q     Did she give any -- did she say anything else about Ms.Rachmuth besides the charge was dismissed?

A     No, no.

Q     Are you aware that the reason the District Attorney gave for the charge being dismissed was that the described conduct does not meet the elements of the offense?

A     Yes.

Q     And when did you become aware of that?

A     Probably about a month ago.

Q     Okay. So not -- not at the time you were

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 82 of 104

told?

A    No. Not at the time I was told, no.

Q    What was your reaction when you learned the charge was dismissed?

A    I was surprised, more confused. But at the same time, it was kind of one of those things where, like, all right, well, let's go on about our day. It was not something I wanted to really dwell on or anything.

Q    Why were you surprised and confused?

A    Because I've never had a charge like that just dismissed within 48 hours, 72 hours of it being taken out. Not very common for me to hear about that happening or for it to be happening with us.

Q    Did you think that because the charge was dismissed so quickly, that cyberstalking may not have been the appropriate charge?

A    That did not come to my mind, no.

Q    As you sit here today, do you still believe cyberstalking was the appropriate charge?

A    Yes.

Q    Why?

A    Because I felt like during that time, the officers made a great decision, and reviewing

everything from the elements, I feel like it still fits criteria.

Q    Even based on the brief synopsis you said they gave you earlier?

A    I had more -- it was more of the judgment that I believe these officers were capable of doing their job and made the right decision.

Q    Okay. Did anyone at Holly Springs Police Department conduct any review or investigation into why the charge was dismissed so quickly?

A    I -- that I know of, no.

Q    Were you ever subject to any internal investigation or disciplinary action with respect to the charge?

A    No.

MR. BRUCE: Katie, I've got maybe 20 or 30 minutes. Do you want to take a break and -- and finish up, or just push through?

MS. BARBER-JONES: I think we're fine to push through.

MR. BRUCE: That sounds good. We'll do that, and we'll get out of here.

BY MR. BRUCE:

Q    Officer Hernandez, are you aware that Ms. Rachmuth filed multiple complaints with the Holly

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 84 of 104

Springs Police Department between 2021 and 2023 regarding anti-Semitic harassment?

A     No.

Q     So were you personally involved in any investigations about those complaints?

A     No.

MR. BRUCE: Can we pull up tab 11, please?

(Exhibit 11 marked.)

THE REMOTE TECH: Stand by.

BY MR. BRUCE:

Q     Officer Hernandez, do you recognize this document at all?

A     No. I mean, it's an email from chief, I think. Or, no. From Sloan to chief -- chief.

Q     Okay. Have you ever reviewed this document at all?

A     No.

Q     Okay. So yes, you mentioned that it says it's an email from Ms. Rachmuth to Paul Liquorie at Holly Springs, NC.Gov, and you said that's the Holly Springs police chief; is that right?

A     Correct.

Q     And you see, it's dated Thursday, December 8, 2022, at 7:56 p.m.; is that right?

A     Yep.

Q    And actually want to go down to the email before, which is December 8th, earlier in the day, from Chief Liquorie. And do you see that where he says, Ms. Rachmuth, thank you for forwarding the information about this.

Actually, before we read that, let's go down since we -- we went to that page anyway, the next page. Okay. Do you see this email says it's from Sloan Rachmuth, dated Thursday, December 8, 2022, to Paul Liquorie. Do you see that?

A    Yeah.

Q    Okay. She says, Chief Liquorie, in my opinion, members of the NCC4CR group committed ethnic intimidation by emailing me and hundreds of others anti-semitic material, as well as sharing my home address via video and email repeatedly. Do you see that?

A    Yep.

Q    You mentioned you had training about hate groups. Do you know anything about NCC4CR group?

A    Nope.

Q    Okay. You see -- and you see that Ms. Rachmuth says that that group is emailing me and hundreds of others anti-Semitic material. You see that?

A     Yes.

Q     When Officers Warren and Officers Marino filled you in on -- on their investigation, did they mention having hundreds of emails about -- from Ms. Rachmuth?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: No.

BY MR. BRUCE:

Q     I mean, she also says, as well as sharing my home address via video and email repeatedly. Do you see that?

A     Yes.

Q     When officers Warren and Marino filled you in on their investigation, did they mention what -- whether Ms. Rachmuth had shared the victim's home address at all?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: No.

BY MR. BRUCE:

Q     Okay. Now, let's scroll back up to the -- the email we just read earlier. Okay. So this is Chief Liquorie's response. Ms. Rachmuth, thank you for forwarding the information about the dismissal

of the charges in Polk County.

Having worked cases against security threat groups throughout my career, I can understand your frustration and fear. We are actively working on your case. Due to the multiple jurisdictions involved and other complexities, we are consulting with our other law enforcement partners to ensure we methodically go through all the materials you have provided us, and are carefully considering the North Carolina general statutes, as they may apply.

I also realize this course of conduct has occurred over a long period of time and appears to be escalating, but please be patient as we conduct the investigation.

Do you see that?

A     Yep.

Q     When Officers Warren and Officer Marino filled you in on their investigation before, did they mention whether the victim felt frustration or fear?

A     Yes.

Q     They said she did feel frustration and fear?

A     She felt fear.

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 88 of 104

Q    Okay. Did Officers Warren or Marino, to your knowledge, ever consult with other law enforcement partners in the course of their investigation?

A    Not that I'm aware of.

Q    And did officers Warren or Marino ever indicate whether they had evidence that any harassment against the victim was escalating?

A    I'm not too sure.

Q    Okay. So you're not sure whether they had evidence that any harassment was escalating?

A    Not that I'm aware of, no.

MR. BRUCE: We can take that down. And can we pull up tab 12?

(Exhibit 12 marked.)

THE REMOTE TECH: Stand by.

BY MR. BRUCE:

Q    Officer Hernandez, do you recognize this document at all?

A    It's another email, but I've never seen it before.

Q    Okay. And we see that it says it's from Sloan Rachmuth to Paul Liquorie at Holly Springs, NC.Gov. Is that Chief Liquorie again?

A    Yep.

Q    Okay. And it says it's dated Monday, January 9, 2023; is that right?

A    Yep.

MR. BRUCE: Okay. Let's scroll down to Chief Liquorie's initial email at the bottom of this page. Sorry. Back to the first page. And if you scroll to the bottom? Yeah, a little bit further.

BY MR. BRUCE:

Okay. So at the bottom here, we see on January 9, 2023, at 2:37 p.m., Chief Liquorie wrote, Dear Ms. Rachmuth, I understand you and your family are now experiencing frustration, apprehension, and fear, and I personally am sorry you feel that way.

Holly Springs Police Department investigators have diligently been sorting and analyzing the substantial amount of documentation you provided in their investigation. They also have consulted with the North Carolina State Bureau of Investigation, NCSBI. After an extensive evaluation of the information you have presented by our department in consultation with state officials, it has been concluded that no criminal North Carolina general statutes have been violated.

Case 5:25-cv-00222-BO-RJ      Document 29-5      Filed 08/03/26      Page 90 of 104

Although upsetting, the materials examined fall under First Amendment-protected speech to include postings of public records. Other postings do not meet the necessary statutory elements to be presented for a judicial review for criminal charges and/or lack direct legal standing.

Do you see that?

A     Oh, yeah.

Q     When Officer Warren and Officer Marino filled you in on their investigation, did they say whether they ever consulted with NCSBI?

A     No.

Q     We saw that Chief Liquorie stated that, in his opinion, the materials examined fall under First Amendment-protected speech. Do you see that?

A     Yes.

Q     Did Officer Warren or Officer Marino ever consider whether Ms. Rachmuth's conduct fell under First Amendment-protected speech?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I'm not sure.

BY MR. BRUCE:

Q     Did they tell you whether they evaluated whether it fell under First Amendment-protected

speech?

A     No.

MR. BRUCE: Okay. We can take this down.

BY MR. BRUCE:

Q     Officer Hernandez, prior to November 2024, how many cyberstalking investigations had you personally conducted?

A     Maybe one other one.

Q     Do you recall what conduct was at issue there?

A     Honestly, I don't remember. It was when I was in field training myself.

Q     Okay. Do you remember the case number at all?

A     No, I do not.

Q     And since November 2024, how many cyber stalking investigations have you personally conducted?

A     None.

Q     Okay. Did the cyber stalking investigation you conducted while you were in field training, did that involve a hate- or bias- motivated crime?

A     No.

Q     In that case, did you seek an arrest

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 92 of 104

warrant?

A    Yes.

Q    Did you execute that arrest warrant?

A    Yes.

Q    Do you know whether that charge was dismissed or not?

A    I believe it might have been dismissed.

Q    So the two times you've executed an arrest warrant for cyberstalking, they've both been dismissed; is that right?

A    Yes.

Q    Are you aware that Ms. Rachmuth's mug shot was widely disseminated on social media following her arrest?

A    No.

Q    Are you aware that Ms. Rachmuth has been diagnosed with exacerbated PTSD and required therapy as a result of her arrest?

A    No.

Q    What's your reaction to learning that information?

A    I'm sorry that she feels that way.

Q    Officer Hernandez, do you have a separate cell phone that you use for work and personal use?

A    No.

Q    Okay. So you use the same cell phone for both work and personal use?

A    Correct.

Q    Did you search that cell phone for documents or information relating to Ms. Rachmuth or her arrest?

A    What do you mean?

Q    In response to a discovery request that we sent in this case, have you searched that cell phone that you use for work for any pictures or messages that might have to do with Ms. Rachmuth or her arrest?

A    No.

Q    Okay. Do you have any pictures or messages on that phone?

A    No.

Q    About her, about Ms. Rachmuth?

A    No.

Q    Do you have any pictures or messages on that phone about Ms. Rachmuth's arrest?

A    No.

Q    Have you communicated with anyone on that cell phone via text or email about Ms. Rachmuth after her arrest?

A    No, other than the other two officers

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 94 of 104

involved.

Q    Okay, so you've communicated with the two officers about Ms. Rachmuth since her arrest?

A    Correct.

Q    Using your cell phone?

A    Yeah, probably. I mean, I -- you know, I'm not too sure.

Q    Okay. Do you know how many times you've communicated about her since her arrest on that cell phone?

MS. BARBER-JONES: Objection. You can answer.

THE WITNESS: I don't know. Probably a couple of times, just trying to figure out what's going on.

BY MR. BRUCE:

Q    Do you recall what you said in those messages?

A    No.

Q    Do you have any pictures or recordings relating to Ms. Rachmuth or the arrest on -- on that cell phone?

A    No.

Q    Do you have any field notes or any other documents relating to the arrest on that cell

phone?

A    No.

MR. BRUCE: Okay. I'm going to take a quick break just to review my notes, but -- and we'll come back and should be wrapping up.

THE VIDEOGRAPHER: Okay. The time now is 4:58 p.m. We are off the video record.

(A recess was taken)

THE VIDEOGRAPHER: We are back on the video record. The time now is 5:06 p.m. Counsel, you may proceed.

BY MR. BRUCE:

Q    Okay. Officer Hernandez, I just have a few questions to follow up with on what we were just discussing, and then -- and then we'll be all done.

A    Okay.

Q    Do you understand that you're under an obligation to search all your phones and -- and devices for information that may be responsive to discovery requests in this case?

A    I am now, I guess.

Q    Have you searched those devices for -- for any information about Ms. Rachmuth or the arrest?

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 96 of 104

A     Oh, so when it comes to, I guess, the phone text messages, it had nothing to do with the actual arrest itself. It was more of actually the posting that she made on X about us and other fellow officers. It was -- had nothing to do with the actual arrest.

Q     Okay. But it had to do with Ms. Rachmuth, correct?

A     And the postings about pictures of myself and other officers, yes.

Q     Okay. And so you mentioned you have some messages between the other officers about Ms. Rachmuth on your phone; is that right?

A     I believe I did. However, that was -- I've had two phones since that incident occurred.

Q     Okay. Are those messages still on your phone?

A     No.

Q     Are they backed up to the cloud anywhere?

A     No.

Q     When -- when was the phone that those messages were on destroyed, or when did you get a new phone?

A     November 2024 and February 2026.

Q     Okay. Since February 2026, have you

exchanged any messages with the other officers about Ms. Rachmuth?

A     No.

Q     Do you have any emails between the other officers -- officers about Ms. Rachmuth?

A     No.

Q     What messages did -- did you use to communicate -- sorry. What -- what messaging apps did you use to communicate on your old phone about Ms. Rachmuth?

A     Maybe just a quick link on the texting app, just like, hey, here's -- my buddy sent me this photo of the post from X.

Q     Okay. Did you use any, like, social media messaging apps to communicate?

A     No, no.

Q     It was just the built-in text message feature?

A     Correct.

Q     Do you have any communications on your cell phone with anyone else besides the three officers or your legal counsel about Ms. Rachmuth?

A     No.

Q     Have you deleted any messages that you've sent on your device about Ms. Rachmuth?

Case 5:25-cv-00222-BO-RJ     Document 29-5     Filed 08/03/26     Page 98 of 104

A     No.

Q     So do you currently have any messages between the other officers or anyone else on a personal cell phone or laptop about Ms. Rachmuth?

A     No.

          MS. BARBER-JONES: Object to form.

          THE WITNESS: Oh, sorry. No.

BY MS. BRUCE:

Q     Have you had any oral communications with the other officers without counsel present about Ms. Rachmuth?

A     Just when the incident first occurred, saying, you know, talking about the incident, seeing if this were going to go anywhere. Other than that, no.

Q     When you say when the incident first occurred, what do you mean?

A     I guess once we first were made aware that this was going to be taken to court.

Q     Okay. So when the lawsuit was filed; is that -- is that correct?

A     Yes.

Q     Okay. And what did you say to the other officers?

A     I don't remember. It was just verbal

conversations.

Q    You mentioned you had messages on your old phone about other posts that Ms. Rachmuth had posted since -- since the arrest?

A    Correct.

Q    Did you have verbal conversations about those posts at all with the other officers?

A    Maybe. I can't remember.

Q    And what did -- what did you or the other officers say in those conversations?

A    We just talked about how people in the comments were making fun of us and stating things about us.

Q    Okay. Anything else?

A    That's kind of about it.

Q    What did you do with the -- the -- the first phone that you said you -- you got rid of in November of 2024?

A    I traded it in. I don't remember where it went to.

Q    Okay. And what about the -- the second phone?

A    Same thing. Traded it in.

Q    Okay. Did you ever back up the data on those phones at all?

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 100 of 104

A     No.

Q     Okay. Do you -- do you use, like, iCloud or any other sort of backup thing?

A     No, not for -- the only thing I save is photos, and that's the only thing I save. I don't save text messages or anything like that.

Q     Okay. And did you have any screenshots of posts saved in your photos that you saved?

A     No. Sorry.

MS. BARBER-JONES: Let him finish asking his question.

MR. BRUCE: That's all the questions I have.

MS. BARBER-JONES: I do not have any questions. Thank you.

THE VIDEOGRAPHER: Okay. Stand by. This marks the end of the videotaped deposition of Mr. Edgar Hernandez. The time now is 5:11 p.m.

Counsel, can I have any video orders?

MR. BRUCE: We'll order the transcript and the video.

THE VIDEOGRAPHER: Thank you. And Ms. Jones, Counsel Jones?

MS. BARBER-JONES: Sorry. We will offer -- order the e-trans with exhibits. And I am not sure

about the video just yet.

THE VIDEOGRAPHER: Okay. Thank you.

THE REPORTER: All right. Excellent. Please stand by. Taking us off the record.

(Off the record at 5:12 p.m.)

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Spencer Motamedy, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings were fully sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Notary Registration No.: 00386791

My Commission Expires: 02/28/2029

*Spencer Motamedy*

SPENCER MOTAMEDY, NOTARY PUBLIC,

FOR THE COMMONWEALTH OF VIRGINIA

June 5, 2026

Case 5:25-cv-00222-BO-RJ    Document 29-5    Filed 08/03/26    Page 103 of 104

CERTIFICATE OF TRANSCRIBER

I, Marti Schreiber, do hereby certify That this transcript was prepared from the digital Audio recording of the foregoing proceeding; that Said proceedings were reduced to typewriting under My supervision; that said transcript is a true and Accurate record of the proceedings to the best of My knowledge, skills, and ability; and that I am Neither counsel for, related to, nor employed by Any of the parties to the case and have no interest, financial or otherwise, in its outcome.

*Marti Schreiber*

_____

MARTI SCHREIBER

PLANET DEPOS, LLC

June 5, 2026