

# Transcript of Elliott Louis Warren, Jr.

**Date:** May 26, 2026
**Case:** Rachmuth -v- Warren, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

- - - - - - - - - - - - - - -x

JENNIFER SLOAN          :

RACHMUTH,               :

　　　　Plaintiff,    :   Civil Action No.

　　v.                 :   5:25-cv-222-BO-RJ

ELLIOTT WARREN, ET    :

AL.,                    :

　　　　Defendants.   :

- - - - - - - - - - - - - - -x

Videotaped deposition of

ELLIOTT LOUIS WARREN, JR.

Tuesday, May 26, 2026

3:03 p.m.

Job No.: 633890

Pages: 1 - 228

Transcribed By: Roanna L. Ossege

Deposition of Elliott Louis Warren, Jr., held remotely with all parties attending via videoconference.

Pursuant to notice, before Certified Electronic Reporter Micah Hardin, Notary Public in and for the State of Indiana.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 3 of 233

                A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

    DANIEL A. BRUCE, ESQUIRE

    KELLEN S. DWYER, ESQUIRE

    HOLTZMAN VOGEL BARAN TORCHINSKY &

    JOSEFIAK

    2300 N Street, Northwest

    Suite 643

    Washington, D.C. 20037

    (540) 341-8808

    Dbruce@holtzmanvogel.com

    Kdwyer@holtzmanvogel.com


ON BEHALF OF DEFENDANTS ELLIOTT WARREN,

EDGAR HERNANDEZ AND BENJAMIN MARINO:

    KATHERINE M. BARBER-JONES, ESQUIRE

    HARTZOG LAW GROUP

    2626 Glenwood Avenue

    Suite 305

    Raleigh, North Carolina 27608

    (919) 424-0091

    Kbarber-jones@hartzoglawgroup.com

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF THE TOWN OF HOLLY SPRINGS:

JOHN SCHIFANO, ESQUIRE

128 South Main Street

Holly Springs, North Carolina

(919) 557-2917

ALSO PRESENT:

Andrew Matthews, Planet Depos Technician

Miles Tag, Videographer

Sloan Rachmuth, Plaintiff

C O N T E N T S

EXAMINATION BY:                              PAGE

  Mr. Bruce                                    8

E X H I B I T S

  (Exhibits are included with the transcript)

WARREN DEPOSITION EXHIBITS:                   PAGE

Exhibit 2   Written directive                  43

Exhibit 1   Cyberstalking statute              49

Exhibit 4   Twitter feed                      102

Exhibit 5   Twitter comment-Rachel Monroe     107

Exhibit 6   Twitter comment-Tired old man     111

Exhibit 7   Twitter comment-Patriot Steve     115

Exhibit 9   Warrant for arrest                148

Exhibit 8   Police report                     166

Exhibit 3   Written directive                 173

Exhibit 10  Video                             194

P R O C E E D I N G S

(On the record at 3:02 p.m.)

THE COURT REPORTER:  Here begins Media Number 1 in the videotaped deposition of Elliott Warren, in the matter of Rachmuth vs. Warren, et al., in the United States District Court, Eastern District of North Carolina, Western Division, Case Number 5:25-cv-222-BO-RJ.

Today's date is May 26, 2026.  The time on the video monitor is 3:03 p.m.

The videographer for today is Miles Tag, representing Planet Depos, headquartered at 451 Hungerford Drive, Suite 400, Rockville, Maryland 20850.

All parties of this deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent?

MR. BRUCE:  Daniel Bruce, counsel for the plaintiff, Ms. Rachmuth.

MS. BARBER-JONES:  Katie Barber-Jones counsel for defendant, Elliott Warren.

MR. SCHIFANO:  Jon Schifano, town of Holly Springs.

MR. DWYER:  And Kellen Dwyer, also for

Ms. Rachmuth.

THE VIDEOGRAPHER: The court reporter today is Micah Hardin, also representing Planet Depos. The witness will now be sworn, and then we may proceed.

THE COURT REPORTER: I am a notary authorized to administer oaths, and this deposition will be recorded by electronic means.

All parties understand and agree that any certified transcript produced from the recording of this proceeding is intended for all uses permitted under applicable procedural and evidentiary rules and laws and shall constitute written stipulation.

The parties stipulate to the use and certification of this testimony consistent with applicable law of such. Hearing no objection, I will now swear in the witness.

(The witness was duly sworn by the Court Reporter.)

THE COURT REPORTER: Counsel, you may proceed.

MR. BRUCE: Thank you, everybody.

WHEREUPON,

ELLIOTT LOUIS WARREN, JR.,

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 8 of 233

called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. BRUCE:

Q. Officer Warren, my name is Daniel Bruce. As I stated earlier, I'm a lawyer for Ms. Rachmuth from the law firm of Holtzman Vogel.

I appreciate you being here today, especially later in the afternoon. I'll do my best to walk us through this quickly so that we're not here too late, but we are planning on a full deposition today. But appreciate your time today.

A. Beautiful.

Q. Have you ever been deposed before?

A. No.

Q. Okay. Have you ever testified in court?

A. Yes.

Q. How many times have you testified in court?

A. About a handful. About two or three times.

Q. Okay. And were those cases -- or were those for cases that you worked on as a police

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 9 of 233

officer for other matters?

A. As I was working as the investigating officer.

Q. Okay. So I just want to go over a few procedures for depositions. It's a lot like testifying in court. One of the main differences is that we don't have a judge present. That means that for situations where your counsel may object to a question I ask, the objection is just for the record. But we don't have a judge here to rule on the objection, so it will be preserved for the record. But you should still answer that question. Unless she tells you not to answer, in which case we'll move on from there. But that's the big difference between testifying in court and in a deposition.

A few other procedures. Please speak up and answer orally since we're on Zoom and we have a court reporter. It just helps to make sure your answers get on the record, not with any head nods or anything like that.

Does that make sense?

A. Yes.

Q. When I'm asking a question, please wait

for me to fully ask the question, even if you think you know the answer. Again, this is just to make sure the court reporter can get both the question and your answer down, and we have a clean record. Does that make sense?

A. Yes.

Q. Okay. If any time my question isn't clear, just let me know. I'm happy to clarify, restate it, rephrase it. If you answer the question, I'll assume you understood the question.

And let me know if you need to take a break. I'll plan to take a break about every hour. If we're still here at, you know, around 6:00 p.m., we'll probably take a dinner break for everybody. But if you ever need a break before then, just let me know. I'm happy to accommodate that.

The only caveat is if a question is pending, I'll ask that you finish answering the question before we take a break.

Do you understand that?

A. Yes.

Q. Okay. Officer Warren, can you please state your full name?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 11 of 233

A. Elliott Louis Warren, Jr.

Q. And you're -- where are you testifying from today?

A. Holly Springs Police Department.

Q. Okay. And I believe there are a few people in the room with you.

Who's in the room with you?

A. I have Miss Katie, and then I have Mr. Jon.

Q. Is there anyone else?

A. No.

Q. Okay. Are you under the influence of any medications, drugs, or alcohol that would impair your ability to answer my questions today?

A. No.

Q. And you're currently an officer with the Holly Springs Police Department; is that right?

A. Yes.

Q. When were you hired with the Holly Springs Police Department?

A. Mid-September of 2024.

Q. Okay, September of 2024.

So you've been serving for about two and a half years now?

A. I'll be two years in September.

Q. Correct. Yeah, math.

What is your current rank with the Holly Springs Police Department?

A. Just patrol officer.

Q. Okay. Is that what you started out as well?

A. Correct.

Q. Okay. Are you currently in on any particular assignment or have any particular specified duties as a patrol officer?

A. Not nothing specific. Just whatever calls for service that needs to be answered --

Q. Okay.

A. -- I --

Q. So you were a patrol officer in November of 2024; is that right?

A. Correct.

Q. Can you describe what training you've received as a Holly Springs' patrol officer?

A. I went through BLET. So BLET at the beginning of 2024 'till graduation of July 2024. I've went through CID -- excuse me -- CIT. What is the -- DCI. A drug class. Modern combatives class. That's it to my knowledge right now.

Q.   Okay.   So you mentioned -- I'm going to go through and just clarify a couple of those acronyms.

So you mentioned BLET.   Is that basic law enforcement training?

A.   Correct.

Q.   Okay.   What did that training include?

A.   An abundance of stuff from trying to understand constitutional law elements, first aid, firearms, driving techniques, just the basic stuff to be an officer.

Q.   Okay.   And who conducted that training?

A.   I mean, it was several instructors, but the individuals that were -- overall led over it were Lieutenant Bright and Lieutenant Finney; and that was at Wake Tech.

Q.   Okay.   You said it's Lieutenant Bright, and who was the other person?

A.   Lieutenant Finney.

Q.   Finney, okay.

And is that -- are they lieutenants at the Holly Springs Police Department?

A.   No.   They run the academy at Wake Tech.

Q.   Okay, okay.   And when did you say you took that basic law enforcement training?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 14 of 233

A.   January of 2024 to July 2024.

Q.   Okay.  And so was that before you started as a patrol officer?

A.   Correct.

Q.   You mentioned that basic law enforcement training included understanding basic principles of constitutional law; is that right?

A.   Correct.

Q.   What were some of those constitutional law principles that you learned about?

A.   More so, of course, understanding the -- or trying to understand the difference of a civil matter.  And, of course, when I said the elements of certain crimes, we don't have necessarily like all day for those classes, as well.  They're scheduled a timeframe.

So I believe, like, constitutional law might have been, if I'm not mistaken, 24 hours.  Elements might have been 12 hours.  It just depends on each category of what you're learning for that segment until they've met the time criteria that the state feels is needed for that officer to understand or learn it.

Q.   Okay.  Is that training in person?  Online?  A little bit of both?

Case 5:25-cv-00222-BO-RJ   Document 29-6   Filed 08/03/26   Page 15 of 233

A.  In person.

Q.  Okay.  So, in total, you had roughly 24 hours of constitutional law training in basic law enforcement training?

A.  Correct.

Q.  Did that constitutional law training include the training on the First Amendment?

A.  Yes.

Q.  What type of training did you get on the First Amendment?

A.  Just briefing us about the First Amendment.  I mean, when I say briefed, they briefed us through all -- not all, excuse me, but from my understanding, the key points, I'll say, for each amendment to understand.

Q.  Did you receive any training about what speech is protected under the First Amendment?

A.  If so, I do not recall at this time.

Q.  Do you have any understanding about what type of speech is protected by the First Amendment?

A.  Bits and pieces.

Q.  What are those bits and pieces?

A.  From my understanding, freedom of speech, of course, but not to where it endangers

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 16 of 233

or fearful of, I guess, another person.  Of course, to speak your mind about the situation, but nothing to, what I said, to be fearful or in danger for the person or issue that you may have going on at that time.

Q.  Okay.  Did you receive any training about whether political speech is protected under the First Amendment?

A.  I do not recall.

Q.  What about religious speech?

A.  If so, I do not recall.

Q.  Did you receive any training about whether journalism is protected under the First Amendment?

A.  I do not recall.

Q.  Did your First Amendment training include whether certain speech could be used when you're considering whether to charge a crime?

A.  Yeah, I apologize.  Can you repeat that again?

Q.  Of course.

Did your training include whether you can consider certain speech when you're deciding whether to charge a crime?

A. If so, I can't remember at this time.

Q. Does the Holly Springs Police Department have any policies that require you to consider First Amendment implications before you charge someone with a crime?

A. If so, I can't remember at this time in reference to that.

Q. Okay. What about when charging someone specifically with cyberstalking?

A. Are you asking for a Holly Springs policy, or are you asking overall?

Q. We'll start with Holly Springs.

A. No, not that I could think of.

Q. Okay. Is there an overall policy by the state or whoever?

A. From my understanding, according to the elements, there's several parts of it, but from my understanding of it, was if you post/tag to be harassing, harmful, threatening in your post. If I'm not mistaken.

Q. Okay, I got you. Okay.

Yeah, that's a good segue to -- you mentioned training on the elements of certain crimes; is that right?

A. Yes.

Q. And that was a part of the training you received at your basic law enforcement training?

A. I won't necessarily say that it was for that specifically, but just me reviewing the cyberstalking elements before going any further.

Q. I guess backing up to the training you received though, you mentioned that for basic law enforcement training, you had con law classes, and then you had, I think you mentioned classes about elements of certain crimes; is that right?

A. Correct.

Q. Okay. Was cyberstalking one of those crimes you received training on in basic law enforcement training?

A. I can't recall.

Q. What other crimes did you receive training on during that time?

A. Assault, arson, larcenies, B&E, first degree murder, second degree murder. There's a couple more, I just can't remember right now.

Q. Understood.

Were there any other harassment crimes besides cyberstalking that you learned about in that training?

A.   I can't recall right now.

Q.   Is there any other training that was encompassed in basic law enforcement training that we haven't talked about?

A.   No, sir.

Q.   I think you mentioned first aid training.  Was that part of basic law enforcement --

A.   Well, yeah, that was part of basic law enforcement.  Yes, sir.

Q.   What did you learn in first aid training?

A.   How to utilize a tourniquet. Difference, I guess, between a -- there's a color code for code black, code red, code yellow, code green.  Basically, the stages of -- depending on the victim's injuries, how it should be dealt accordingly with nursing or hospital staffing.

What is the new technique of -- instead of necessarily using mouth to mouth, they have a new for -- a new technique with chest compressions.  And I can't remember the other instrument that they had to help the victim or whatnot breathe.  Within those guidelines,

though.

Q. Okay. So it sounds like you received some training on physical injuries.

Did you receive any training on mental or emotional types of injuries or issues?

A. Mentally, it would be more so CIT training, which is crisis intervention training, if I'm understanding that correctly from you.

Q. Did you receive any medical training about how to handle if someone is having a panic attack or something like that?

A. Yes, but that was more so kind of pushed towards CIT as well.

Q. Okay. Let's go to CIT, then.

You said CIT is crisis intervention training?

A. Yes.

Q. And describe that more generally. What is crisis intervention training?

A. My understanding of it is for an individual that is not in the right mind capacity or possibly worried about their mind capacity, how they need to move forward, how they need assistance. That's from mental, ongoing life situations to where they might need

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 21 of 233

assistance with residential or job care, family issues, therapists, things like that.

Q.   Okay.  And you mentioned as part of that training, you received training about how to deal with panic attacks; is that right?

A.   Yes.

Q.   Can you describe what training about panic attacks you received?

A.   More so, you have to be able to reach that victim or that person that you're speaking of at a heart to heart level and understand -- let them understand that it's not just a job for you, because at the end of the day their safety matters if it's physically, mentally, whatever the case may be, that you want to see them in the best physical shape or mental shape possible.

Q.   Did that training apply to suspects that you might bring into your custody?

A.   Sometimes, yes.

Q.   How might that apply if you're bringing a suspect into custody?

A.   Depends on the situation.

Q.   Are you under any obligation when you're bringing a suspect into custody to consider

those mental health issues that you learned about in CIT training?

MS. BARBER-JONES: Objection to form.

You can answer.

THE WITNESS: If you could repeat that for me, please.

MR. BRUCE: Yeah, I can probably ask it a better way.

BY MR. BRUCE:

Q. Based on the training you received in your CIT training --

A. Uh-huh.

Q. -- what are you supposed to do if someone displays symptoms of a panic attack?

A. Of a panic attack? Try to calm -- try to calm them down, see what the issue is, to where -- if it's something that's workable at the time, then of course try to meet their needs. But if the time is not there on your side essentially to meet their needs, then you got to work around it as best as possible.

Q. Okay. And did you receive any training about whether a person can experience something like a panic attack without outward symptoms?

A. If so, I don't recall.

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 23 of 233

Q. That training you mentioned, does it also apply if you're bringing a suspect into custody?

A. More so if it's a -- if they're mentally not stable, to where I might have to possibly take them to a mental hospital, something like that.

Q. Okay. So if you're bringing a suspect into custody and the suspect begins to experience something like a panic attack, what are you trained to do?

A. Well, before -- before I leave or get them into my vehicle, I ask them would they need EMS or any medical assistance. And that's when I'll give them a chance to say yes or no.

Once I see their actions afterwards, just to verify, I'll sometimes ask, not all the time. But sometimes I'll ask depending on their body languages and things like that, I'll re-ask again just for reassurance. If they say no, then no. Sometimes they might think about it, change their mind. We -- well, I'll call EMS or medical.

Q. Okay. If someone notifies you that they have a medical condition prior to bringing them

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 24 of 233

into custody, have you received any training about what you're supposed to do once you've been notified they have a medical condition?

A. I would see what the issue is in reference to it and then try to deviate from it. It's best to just call EMS, have them calmed down, or if maybe EMS may need to take them and have an officer ride in the back with EMS and have another officer follow. It just depends.

So that's something on a standby basis I might have to call for.

Q. Is there any situation where you, yourself, would intervene without calling EMS?

A. If it's something that is not involving medicine. Certain things mentally I may be able to assist, but certain things I'm not able to. So it just depends on the situation.

Q. So, I guess, for example, if a suspect were to indicate they had diabetes and that their blood sugar is running low while they're in your custody, have you received any training about what you're supposed to do in that situation?

A. I mean, if so, like I said before, having them in my vehicle, I would ask them to

verify, like, are you all right or do you need EMS? Once they say yes or no -- which they have the right to say yes or no, I will proceed from there on.

Now, if I'm close to a hospital facility or medical facility, then on the way I will stop by to see if there's someone medically that could check on them and then go back to proceeding where I need to go to.

Q. Okay. And in that situation about someone with diabetes, if they just needed some -- you know, a candy bar or something to help their blood sugar, would you be required to give that to them while they're in your custody?

A. I won't necessarily say required. But if I know your situation, I would try to assist you as best as possible. So if you're just asking for, do you mind if I bring a mint by chance? And if I might need that mint for later because of my diabetes, okay, then I will give you that mint.

Q. Okay. And was that all included in the medical first aid training you received in basic law enforcement training?

MS. BARBER-JONES: Objection.

You can answer.

THE WITNESS: I don't recall.

BY MR. BRUCE:

Q. So where do some of those -- do those come from Holly Springs Police Department policies on, you know, how to treat those types of situations?

A. Somewhat, but kind of just as an officer, as you can kind of see, depending on people's background situations, your life situations that you might have encountered. Like I said, certain things.

If you're -- like I said, if you're -- like your example was if you have diabetes and you're asking, do you mind if I bring a candy with me? I don't necessarily have to, but I also know your situation. And if you feel for yourself -- because you would know your body more than I do. So if you feel yourself like, okay, I know if I take a mint, I'll be pretty much fine, then I'll bring that mint with you.

Now, if the mint does not work, then as I said before, then I will -- if I'm close to a medical facility, then I will stop by to see if someone can evaluate that person.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 27 of 233

Q.  You also mentioned, I believe it was DCI training; is that right?

A.  Yes.

Q.  What does DCI stand for?

A.  I can't remember at the time for DCI. But DCI is basically kind of like -- like a CJLEADS, but a little more in depth, for out-of-state information.  So certain things I can receive in-state from CJLEADS versus certain things I can't receive through DCI.

So that'll just help me in reference to, say, you're a current resident in Washington State, certain things I cannot look up plate wise or if your tags are up to par, if your driver's license is up to par.  I cannot look at that through CJLEADS.  Only North Carolina.

Q.  Okay.  And what is CJLEADS?

A.  CJLEADS is -- basically gives you the background of that individual that you're looking for from driver's license, insurance, license plate, if they've been to jail, do they have any pending cases, charges, probations.

Sometimes it'll get in detail depending on what things that have -- what charges, excuse me, have happened in the past time frame, what

agency was the arresting agency, things like that, court dates.

Q. Okay. So DCI is basically what data you can and can't access on certain individuals?

A. Correct.

Q. You also mentioned a drug class training that you received; is that right?

A. Yes.

Q. What did that training cover?

A. Your drugs like cocaine, crack, methamphetamine, marijuana, hemp. And it just basically tells you how, like -- like, what you should look for if you're on a call from a traffic stop to a household environment, things like that.

Q. Okay. And I think the other training you mentioned was combatives; is that right?

A. Correct.

Q. What did you learn in combatives training?

A. Combatives is another tool in, I would say, an officer's toolbox for better safety for him or herself, especially if people are not quite physically prepared to protect themselves, make sure that, you know, they're able to go

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 29 of 233

home in a decent manner.

Q. Okay. So besides basic law enforcement training, CIT, DCI, drug training, and combatives, have you received any other training as a patrol officer at Holly Springs?

A. I said if so, I can't remember at this time.

Q. Okay, understood.

Have you received any training about how to conduct an arrest?

A. Yes.

Q. Would that have been part of basic law enforcement training?

A. Yes.

Q. Okay. And describe generally, how have you been trained to conduct an arrest.

A. Well, I would -- I would speak with the possible suspect, try to see what's going on from their end or from their side. Well, it depends on the situation as well, depends on the victim, and depends on the witnesses and whatever extra information I have prior to verifying before going to the house or seeing that individual. But I will go to that individual and let them know, you know, the

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 30 of 233

situation, which is, you know, I'm here for -- to arrest or arrest warrant, whatever the case may be for this situation.

Once doing that, I would place them in handcuffs just to let them know, like, you know, we're going to explain the situation, but there is cause or cases to where some individuals may not want to go to jail, so they could possibly run from you. So just letting them know the situation. I said -- once being cuffed, any questions, concerns afterwards, I can address it to the best of my abilities. If not, I'll try to find a way to address it, that question.

And I will place them in the car once -- excuse me. Before entering the car, I will do a pat down just to make sure there's nothing harmful for themselves, myself, or others, especially going to the jail with contraband that already enters there.

Once they're clear from that, I place them in my vehicle. I will seatbelt them, make sure the seatbelt is tight, and transport them to the next location.

Q. Have you received any training about where you should park your patrol vehicle if

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 31 of 233

you're arresting someone in a physical location like a building?

A. Correct.

Q. What training have you received?

A. Training would be through BLET, also through field training.

That training is more so for officer safety, because sometimes when you go to a suspect's house or the place that they might be at currently, they can still possibly see you before you see them. That's from a -- if I'm a -- if I'm at your front house and say hypothetically you don't like law enforcement, certain people might react or retaliate a certain way just because I'm approaching their property.

So for an officer standpoint, it's best to park maybe about -- depending on the area, maybe like a house or two away, and then just walk to the current residence where the suspect may or may not be, and then, once done speaking with that suspect, if you're arresting them, then you bring them back to your car.

Yeah, that's it.

Q. Okay. So you said it's generally best

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 32 of 233

to park a house or two away or a building or two away.

A.   Depends on the situation.

Q.   What type of situation might it be best to park further away?

A.   I mean, if you're working downtown, hypothetically, Raleigh, there's more big buildings, so you might have to park a street over, possibly a block over.  That depends on those policies and what the agencies feel for them.

If you're in a residential area, like I said, it could be nighttime, daytime, regardless.  Some people sit on the back porch, front porch, and see that you park your car wherever you park if you park in front of the residence.  So if they see that, they might get spooked, feel some type of way.

Then once they see you approaching their household, once again, some people don't like law enforcement.  So it could go another way.  But for officer safety, just to make sure that we approach with precaution and safety on our ends, that's the best practice for us.

Q.   Does the decision on where to park

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 33 of 233

depend on what evidence you have about the suspect, whether they're dangerous, likely to be harmful to officers, or anything like that?

A.   Not necessarily.

Q.   And you mentioned it's a best practice. Is that a written policy of Holly Springs Police Department somewhere?

A.   Not that I can recall.  Well, I said, just for -- well, I said -- for example, like my house is literally like where we are in front of each other, you can see me to where if you have, depending on your crimes or background where you're not friendly with officers or you have a lot of -- like I said, it just depends on your background, what you may or may not have going on to where you don't -- are not fond of officers, it might be best just to park, like I said, to that house or two behind, or wherever the case may be, if it's downtown, a block away, street over.  It just depends.

Q.   When you say it depends on my background, I assume you mean you're talking about the suspect's background; is that right?

A.   Yeah.  Correct.

Q.   And does that mean your knowledge about

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 34 of 233

the suspect at the time when you're arresting them?

A. Not necessarily. Sometimes it can be on the spot and you just have to go. Sometimes you might have time to prioritize. It all depends on the particular situation.

Q. In what situation might it be more appropriate to park closer to a building where a suspect is located?

A. If I'm parking close, it would be like someone is in immediate danger, a reference to possibly killing, threatening, you know, suicide. That's when I'm trying to respond as -- a quicker -- a quicker pace as possible.

Q. Okay. And is that all based on training you've received as a Holly Springs police officer?

A. Yes, sir.

Q. Have you received any training about when to seek an arrest warrant versus a summons for someone's arrest?

A. I can't recall. I can't say -- since I've been here, I have not done necessarily a summons. Most of the time, it's either a citation or an arrest warrant.

Q. Okay. What's the difference between a citation and an arrest warrant?

A. Citation will be I cite you for whatever crime that -- or excuse me -- what alleged crime that you've done. I'll set a date possibly to help that person's situation. Because, I mean, of course, you can't do it in the same month. So I'll try to prioritize it about two months or so out, so it gives that person time to collect or do what they need to do on their end as well as mine. And then they'll speak with the judge from that.

And then the rest of the warrant depends on the offense. If it's an arrestable offense, then I'll proceed to see, of course, to check with the elements to verify.

Once going through with that, I'll verify with higher ups. And then once speaking with higher ups, that seems fine on their end, I'll speak with the magistrate.

Once speaking with the magistrate, once they grant me -- if they grant or do not grant, that's when they'll let me know. And then I can go accordingly from there.

Q. So you mentioned citations. What kind

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 36 of 233

of crimes can you issue a citation for?

A.  I've issued -- I've issued for larcenies that were less than 200, $50, $13.  It just depends on what that store may or may not want to do.  Some people just might be fine with trespassing.  Some people may be no, we want them to go to court.  It just depends.

Vehicle -- more so for car crashes.  Of course, people not paying attention, being negligent while on the roads, being on their phone, stuff like that, or halfway asleep, whatever the case may be.

Trespass.  That's all I can -- what is it -- what is possible?  Domestic violence protective order.  Depends on what's said and done on that.

If there's paperwork where they're able to show me or provide me, especially like a CR number, so I can verify on my end or contact dispatch to verify, as well, to see if it's accurate.  If it's not accurate, then I can just let them know, okay, I know the range of your situation, but this needs to go this way or that way.

Q.  Is cyberstalking a crime that you can

Case 5:25-cv-00222-BO-RJ   Document 29-6   Filed 08/03/26   Page 37 of 233

seek a citation for instead of an arrest warrant?

A. At the time, I was unaware. So I was a field training officer at the time. Just because I came out of BLET doesn't necessarily mean you'll know everything. BLET is literally the keyword basic. So you'll know just the basic fundamentals of a lot of things until you go through certain trainings or done.

And even when you're done through FTO training, sometimes you're still not going to know everything. So it might be a time to where you need to speak to your, you know, FTO at the time, or someone that you may feel comfortable that's good in that particular law, or a higher up that might have better experience for that.

Q. Fair enough. I'm not too far out of law school, so I feel the same way.

But just zooming out of not specifically talking about this situation and this cyberstalking charge against Ms. Rachmuth, but just in general, are you able to issue someone a citation for cyberstalking rather than seeking an arrest warrant?

A. Now, yes. Now -- after knowing now,

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 38 of 233

yes, you could.

Q. So you're saying you did --

A. You could do that criminal summons as you were speaking of, or you could do an arrest warrant. Like I said, at the time, like I said, I was in field training, so --

Q. Okay. But cyberstalking is something that you can do a summons or a citation for; is that right?

A. A summons. I'm not quite sure for a citation.

Q. Okay. Are there any factors you're supposed to consider when deciding whether to issue a citation or seek a summons versus getting an arrest warrant?

A. I think it depends on the severity of the situation. If a person, to me, feels harmful, fearful, or threatened -- and that depends on what they've got going on in their lifestyle -- then I would say possibly an arrest warrant, especially if it's changing that person's possible lifestyle or ways to go about, like, their normal everyday living.

Q. Okay. So one factor would be whether someone feels threatened; is that right?

A. Correct.

Q. One would be whether it changes their everyday living. Is that fair to say?

A. I'm saying if it could change their -- so if it's harm -- once again, harmful, threatening, harassing, it just all depends.

Q. Does it depend at all on whether the suspect is known to be dangerous?

A. If the suspect is known to be dangerous? Not necessarily. Like I said, based off the elements, no.

Q. When you say based off the elements, what do you mean?

A. The elements of cyberstalking.

Q. Okay. But just zooming out from cyberstalking, just in general, whether it's for any crime that you might be deciding whether or not you're going to issue a citation or seek a summons versus an arrest warrant, is it primarily whether the person feels threatened, harmed, or harassed, or could it depend on other factors?

A. It depends on other factors. Like I said, if it's a larceny and if you steal about, like 200 worth of stuff, then I will cite you

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 40 of 233

for that.  Now, if it's something like that's about -- me personally, if it's about 400, 500, then I will take you to jail for it.

Q.  Okay.  And so, in general, whether the suspect is known to be dangerous, would that be a factor that you could consider?

A.  I'd have to consider what's going on.  I mean, you can look at the stuff prior to the call, but sometimes -- mostly you won't necessarily have that time to review or see, like, what his or her background is.  So you have to base certain things off of what's going on at that current timeframe.

So if they weren't being in a threatening manner at that timeframe, I can't necessarily -- this is if I have time to look at prior to.  But if I don't have the time to look prior to, if they haven't done anything threatening to where the victim or business, or whatever the case may be, may feel they want to pursue certain charges like that to where it's to the point they go to jail, I have to stay within that guideline.

So, if they just literally -- hypothetically, if you just stole and you made

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 41 of 233

no issue about it and they're satisfied with just you going to court, then I'm going to put paperwork where you're cited so you can go to court.

But if it's something where they're just, okay, we're fine with trespassing him, no paperwork, he can't come back for like -- he or she can't come back for like six months, okay, fine. We'll trespass them on my end. Well, first I'll have that business or whatever the case may be, trespass them from their end. And then once they do that in front of me, I'll verify with them so they understand in the system, and I'll put in there has been a trespass and take it from there.

And then I let them know if they do return, of course, you could go back to jail, as well. Well, could go to jail, excuse me.

Q. Okay. So in some situations, it depends on whether the victim or whoever wants to press charges; is that right?

A. Correct.

Q. Okay. Does it depend on whether the suspect is a flight risk?

MS. BARBER-JONES: Object to form.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 42 of 233

You can answer.

THE WITNESS: Like I say, I can't necessarily say that because, once again, on every call, we're not going to have that background information for an individual. So I have to go based off of what I'm dealing with currently.

Now, if it's someone that I'm dealing with on an everyday occurrence, then that's something different where I can understand and be like, okay, this, that, and the third. Say this, that, and the third, and move accordingly from there.

But if they're a fight risk for court, I can't necessarily stop them from not going to court or going to court. That's something they would have to do. I could just do what I can on my part to make sure that I met the service of that victim.

BY MR. BRUCE:

Q. Are there any other factors you might consider when deciding whether to seek an arrest warrant or just issue a citation or get a summons?

A. No. Like I said, it just depends.

Every situation is a depend-on-the-basis type of thing, so --

Q. Okay. Have you received any training on Holly Springs Police Department's written directive system?

MS. BARBER-JONES: Object to form.

You can answer.

THE WITNESS: If so, I can't recall right now.

BY MR. BRUCE:

Q. Do you know what the written directive system is?

A. If you could elaborate on that.

MR. BRUCE: Let's see, let's pull up -- can we pull up Tab 2?

(Exhibit 2 was marked for identification and is included with the transcript.)

THE TECHNICIAN: Stand by.

MR. BRUCE: Can we zoom in just a bit?

Okay. Officer Warren, can you see this document on the screen?

THE WITNESS: I'm going to be honest, it's real tiny, so I --

MR. BRUCE: Can we zoom in some more?

THE WITNESS: Yeah, because I'm

nearsighted, so I can't see it.

MR. BRUCE: Not a problem. Small for me, too. Is that better? Should we keep going?

Let's just zoom into the top, the little heading there.

THE WITNESS: Okay. That's fine.

BY MR. BRUCE:

Q. Okay. So this document says Holly Springs Police Department written directive. It says Chapter 800 Operations, Directive 840.01 Criminal Investigations.

Do you see that?

A. Okay, yep.

Q. Do you recognize this document at all?

A. I've probably seen it, but we have -- we have several policies.

Q. Okay. So you mentioned you have seven policies -- several policies. That's what I was getting at with the written directive system. It might not be the--

A. Gotcha.

Q. -- proper term there.

But have you received any training about these written directives?

A. We have -- we have received them, the

policies.  Certain trainings they do do, but I can't recall for this one and so --

Q.  Okay.  Have you ever reviewed this document about criminal investigations?

A.  Yeah, I possibly have.  I can't recall right now.

MR. BRUCE:  Okay.  We can go ahead and take that down.  We might come back to it.

BY MR. BRUCE:

Q.  Have you received any training on identifying or classifying hate or bias motivated crimes?

A.  If so, I don't recall right now.

Q.  Okay.  Have you received any informal training like, you know, forwarded emails or pamphlets about bias motivated crimes?

A.  If so, I can't recall right now.

Q.  Have you received any sort of training or guidance about how to identify an anti-Muslim hate crime?

A.  If so, I can't recall right now.

Q.  What about an anti-Jewish hate crime?

A.  If so, I can't recall right now.

Q.  Have you received any training put on by an organization called the Anti-Defamation

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 46 of 233

League?

A. Never heard of that.

Q. Okay. Have you received any training about identifying hate or extremist groups?

A. If so, I can't recall right now.

Q. Do you know if anyone else in the Holly Springs Police Department has received that type of training?

A. I'm not -- I can't be responsible for anybody else. I don't know.

Q. Understood. I just didn't know if you heard word around the street.

Have you received any training on implicit biases?

A. It sounds familiar, but I can't remember right now.

Q. Have you had any training through something called the Holly Springs Police Department's Cohort Program, C-O-H-O-R-T?

A. If so, I can't recall right now.

Q. Okay. Do you know generally what implicit biases are?

A. If you could elaborate on that.

Q. I'm just asking you do you have an understanding of what that means?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 47 of 233

A.   More so -- re-ask the question.  I apologize.

Q.   Do you have an understanding of what an implicit bias might be in -- with respect to policing?

A.   Yes.

Q.   What might that be?

A.   I guess, depending on, I guess, what the person's belief is, I guess, in that certain group setting, not crime-wise but they might have different -- I'll say more of a different belief system with certain things.

Q.   Okay.  So you understand an implicit bias to be someone or a group with a different belief system?

A.   Possibly.

Q.   Okay.

A.   Or a different outlook on things.

Q.   Okay.  How might implicit biases affect your job as a patrol officer?

A.   I mean, everyone's going to have their likes or dislikes, but at the end of the day, I'm not here for -- I'm the middleman.  I'm trying to set things straight.  Regardless of their beliefs towards police or against police

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 48 of 233

or any other group or situation, I'm just trying to settle the situation. Like I said, once again, just be that middleman to clear the air, have some type of understanding.

Q. Have you received any training about identifying implicit biases related to Muslim individuals?

A. If so, I can't recall.

Q. Have you received any training about identifying implicit biases related to Jewish individuals?

A. If so, I can't recall.

Q. What about Asian individuals?

A. If so, I can't recall.

Q. Or African American individuals?

A. If so, I can't recall.

Q. Okay. Have you received any -- and forgive me if I've asked this question, have you received any specific training about the elements of North Carolina's cyberstalking statute?

A. If so, I can't recall.

Q. Have you reviewed the elements of the cyberstalking statute?

A. I have.

Q. You have reviewed the elements of the cyberstalking --

A. I have.

Q. Okay. What is your understanding of what the cyberstalking statute criminalizes?

A. I don't remember it all for detail -- detail because there was a lot of elements within it. Like I said, the element that I remember looking for was it being said on radio or, like, post on a -- some type of platform to where -- to where that victim or whoever that is being spoken on feels harassed, threatened -- harassed, threatened, in danger. Yeah, harass, threatened, danger. There's one more thing I can't remember.

But within those guidelines of they don't feel like they can operate at their normal everyday capacity.

(Exhibit 1 was marked for identification and is included with the transcript.)

MR. BRUCE: Okay. Can we pull up -- I don't mean to pop quiz you. So let's pull up tab one.

THE TECHNICIAN: Stand by.

THE COURT REPORTER: Counsel, are you

marking these tabs as exhibits?

MR. BRUCE: Yes. So this will be Exhibit 1.

THE COURT REPORTER: Okay. Thank you. And just to confirm, the last tab, 2, is Exhibit 2?

MR. BRUCE: Yes.

THE COURT REPORTER: Thank you.

MR. BRUCE: I'll try to be more clear about that. Thank you.

Okay. Let's zoom in to just kind of the first half of this so we can see it because it's a lot.

BY MR. BRUCE:

Q. Okay. Officer Warren, so this -- if you see this at the top, it says G.S. 14-196.3 and then the heading says cyberstalking.

Do you recognize -- do you recognize this statute?

A. I remember seeing it. That -- I can't remember the exact number for the statute, but cyberstalking, yes.

Q. Okay. So does this reflect the cyberstalking statute that you've reviewed before?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 51 of 233

THE WITNESS:  If you don't mind to make it larger for me.

MR. BRUCE:  Yeah.

THE WITNESS:  If you can scroll down.

MR. BRUCE:  Yep.  If we can scroll down to B, that's the main section.

THE WITNESS:  There's another --
(witness reads sotto voce.)  No.  If you can scroll -- I wish I could look from my phone.

BY MR. BRUCE:

Q.  I guess, let me -- let me point you to Section (b)(2).  That is what it sounded to me you were indicating earlier, and correct me if I'm wrong.  But (b)(2) says email or electronically communicate to another repeatedly whether or not conversation ensues for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person?

Is that the part of the cyberstalking statute you were referencing earlier?

A.  Around that part, yes.  Like I said, I can't remember from me looking at my original form -- that I've seen it or glanced at it from, but around that, yes.

Q. Fair enough.

And just to be clear, when you said reviewed the cyberstalking statute before, was that in the context of the complaint against Mrs. Rachmuth?

A. Correct. Yes. We had looked at the elements book, if I'm not mistaken.

Q. Okay. And have you ever looked at the elements of cyberstalking outside of the context of the complaint against Mrs. Rachmuth?

A. No. That was the first time, the situation where I had to ever look up cyberstalking.

Q. Okay. And have you ever had to look at it since then?

A. I've glanced at it from time to time, but it's more so just that part where we just expressed on B Section 2 --

Q. Okay.

A. -- where I can remember more so.

Q. So have you charged any cyberstalking crimes since you -- since Ms. Rachmuth?

A. No. We don't normally get calls like that, from my understanding, so -- like I said, that was my first time cyberstalking, period

while in FBL.

Q. Okay. So you haven't charged anyone else besides Ms. Rachmuth with cyberstalking?

A. Well, I said that's the first call that I received with cyberstalking. So that's the only time I can recall.

MR. BRUCE: Okay. Can we scroll down to, I believe it's the last section. Sorry. Yep, the last section down at the bottom of this page, Section E -- subsection E.

BY MR. BRUCE:

Q. It says this section does not apply to any peaceable, nonviolent, or non threatening activity intended to express political views or to provide lawful information to others. This section shall not be construed to impair any constitutionally protected activity, including speech, protest, or assembly.

Did you review that portion of the cyberstalking statute when you were investigating Ms. Rachmuth's case?

A. If so, I can't recall right now.

Q. Were you aware that it carved out protected activity, including speech, protest, or assembly at the time?

A.  If so, I can't recall right now.

MR. BRUCE:  Okay.  Okay.  We can take that down.  I think we can go for another maybe 10 or 15 minutes and then take a break, if that's good with you, Officer Warren?

THE WITNESS:  That's fine.

BY MR. BRUCE:

Q.  Okay.  So based on your training that you received, can you describe the steps an officer is supposed to take when a crime is reported?

A.  Once getting or -- once getting the call for service, we'll see what the victim or possibly complaint of the issue may be for.

Once doing so, we'll get their side, try to verify if they have any evidence on their end, which is witnesses or camera footage or pictures, whatever the case may be.

Once they're able to provide us with that information, then I'll try to touch bases with -- well, if they have the evidence, they can send that evidence to me.  If not, I'll try to get in contact with the witnesses.  And if the witnesses -- to get what the witnesses may have to say for that situation.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 55 of 233

Once getting that information from them, I'll try to see what evidence they may have or if they're willing to do a written statement. Some people are willing to, some people aren't.

Once getting the witnesses' information and evidence or video from them, then I will go speak with or attempt to speak with the victim -- I mean, the suspect, but it all depends depending on what information I have evidence-wise.

If the evidence is pretty clear to show what he or she may have done or posted or whatever the case may be, I'll evaluate and check to see what's the best scenario for that, especially with me being a new officer still.

Depending on what's said from those guidelines, I'll move accordingly. So it might be something that's -- depending on the situation, it might be worthy of like a talking about just to let them know the situation and what could not happen if a person decides they want to press charges. Then it may be to where I have to cite you or to where an arrest warrant comes. So it just depends on that.

Q. Okay. So I think I heard kind of four

steps.  So step one would be you receive a call for service; is that right?

A.  Correct.

Q.  And then step two would be you respond to that call and you would try to get the victim's side of what happened; is that --

A.  Correct.  Victim side and evidence if they have it.

Q.  Okay.  Including any witnesses, right?

A.  Correct.

Q.  When you get the victim's side of the story, do they write any sort of written statement?

A.  Sometimes they're willing to, sometimes they're not.

Q.  If they're not willing to write a statement themselves, do you put down what they've told you in writing?

A.  Yes.

Q.  Okay.  And how do you do that?  Is there a form that you do that on?

A.  Not necessarily a form, just in my report I'll -- now, younger me, younger officers just coming in, possibly did not do it with certain calls, but now, if you feel you do not

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 57 of 233

want to put your name or make a statement because you don't want to necessarily be brought up in court where the case may be or concerns may be, I'll just let it be known that I did ask for a witness statement from this person.  They refused, but body camera was on.  Well, I said that's now versus me starting out.

Q.  Okay.  So if you get an oral statement from a victim but they don't want to put it down in writing, there would be some notation somewhere, you know, that they refuse to provide a written statement.  Is that what you were saying?

A.  So I'm saying at the time, then, with me just coming into law enforcement.  Because I didn't know, like, necessarily, like, procedures, how certain things you do.

If you didn't want to give a written statement, I will just write your name.  Well, not your name, but I will say, like, Mr. Daniel said this -- stated this, that, and the third, and continue with whatever that you stated throughout my report.

Now, there's some people I said that are willing to make a statement form.  That's fine.

And if so, I'll get that statement form from them and put that towards my investigation.

Q. Okay. When you write -- when you summarize what a witness might have said, where do you do that? Is it in a specific form or a file? Where does that -- where does your writing of that go?

A. Well, I won't summarize it. I'll say exactly what they said. But like I say, it would literally be the type of reporting style that we originally had was just, you know, type it through Word what you need to say report-wise. And before sending off your report, have your FTO supervisor verify certain things. And if they feel that that's fine, then they'll tell you to send it to the supervisor or upload it in the system so it could be in as a report.

Q. Okay. So it would be attached to the incident report; is that right?

A. It would if I had a written statement.

Q. Right.

Okay. You mentioned going to your supervisor. When might during this process would you need to get your supervisor's approval

or review on something?

A. Well, currently, while you're in FTO phase, your supervisor is your FTO. So, I would -- your FTO is going to always be with you. Regardless if it's an FTO for the day or your primary FTO, they're usually with you to where you could do so. So, I would, you know, like I said, give my FTO or let my FTO see my report, see what was said. If he thinks it's fine, then he'll send it back to me so I can send it back to my sergeant of patrol.

So then once I send it to my sergeant, if he feels that it's fine, I can upload it. If not, then I need to correct whatever that needs to be corrected or add what needs to be added about the situation.

Q. You mentioned FTO. And just forgive my ignorance, what does FTO stand for?

A. Field training officer. So they're the officers that -- for basically the rookies or new individuals, they teach them or help them to -- they won't learn you -- necessarily learn everything during that field training timeframe, but it's a basic step or guideline for you to say -- or for them to say, we feel comfortable

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 60 of 233

with letting this officer be by himself at a
patrol level.

Q.   Gotcha.

So in November of 2024, were you
supervised by a field training officer?

A.   I was.

Q.   And who was your field training officer?

A.   My primary was Officer Hernandez.

Q.   Okay.  You said he was your primary.
Did you have others?

A.   What is it?  Officer Marino.  I mean,
you'll have a lot of --

Q.   Okay.

A.   -- field training officers.  So, I
mean -- and then even if so, I can't remember
the timeframe to where I could say that I was
with this person at that timeframe --

Q.   Okay.

A.   -- maybe.

Q.   I understand.

Are you -- do you still have a field
training officer?

A.   No, sir.

Q.   Okay.  And when did you stop having a
field training officer?

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 61 of 233

A. I stopped around sometime beginning of 2025, about February-ish timeframe.

Q. Okay. And so you said that your field training officer would review your reports; is that right?

A. Yes.

Q. And then after your field training officer reviewed your reports, did your report have to go to anybody else for review?

A. I can't recall detail for detail, but we did have to speak with, like I said, a Sergeant, of course, and a -- excuse me -- a lieutenant to verify because -- well, like I said, we don't really necessarily get a lot of like cyberstalking calls out here in Holly Springs, so --

Q. Okay. So would you have to speak with a sergeant, lieutenant every time you filled out a report, or are you just saying for this specific?

A. I'm just saying for that specific. For a report period, it would be -- if I am through FTO phase, you'll send it to your FTO, which is field training officer. Once he or she confirms that your report is fine or decent, they'll send

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 62 of 233

it back to you.  So then I will send it back to -- excuse me, not send it back.

Then once they send it back to me, then I will send it to my sergeant of patrol.  If he feels comfortable, then I can upload it into the system.

Q.  Okay.  So routinely while you're in FTO, your report -- you fill out a report, you send it to your FTO, they might send it back.  And once it's good, you send it to the sergeant and then it gets uploaded.  That's the general progression.

A.  (No verbal response).

Q.  Okay.  But in this case, you said you spoke to both the sergeant and the lieutenant for this cyberstalking report?

A.  Well, I don't remember speaking necessarily to the sergeant, but, like I said, for protocol, we do have to send our reports to the sergeant.  But the situation caused it where we had to speak with the lieutenant in reference to get some understanding or clarity on our end, like I said, because we don't necessarily get cyberstalking calls out here for that.

Q.  Okay.  What lieutenant did you speak

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 63 of 233

with?

A.   Lieutenant Ottaway.

Q.   Ottaway?

A.   Yes, sir.

Q.   Okay.  And why did you have to speak with Lieutenant Ottaway?

A.   Well, I said we were unclear with certain things.  And like I said, we don't normally get calls like that for service out here in Holly Springs.  Maybe, like I said, harassing calls, but not necessarily a cyberstalking call.

And like I said, that was my first time, so I wasn't -- I wasn't clear or understanding at the time.  So I wanted clarity from a higher -- higher supervisor before proceeding or some type of guidance on how I might need to maneuver on.

Q.   Okay.  So you said you were unclear about certain things.  What certain things were you unclear about?

A.   Well, like I said, looking at the elements -- I mean, you could look at the -- for me, looking at the elements of that 2 -- that was Section 2(5) that we were looking at, that

was my understanding that the suspect had met for it. I thought it was after reviewing, well, I said my elements book. My FTO might have thought the same way to where we had to ask our higher-ups to where it got pushed to a lieutenant to verify.

After speaking with the lieutenant and looking at the elements book and reviewing like, what evidence that I had at the time, I felt -- I can't speak for anybody else, but I felt through that element portion that it was within guidelines.

Q. Okay. And you said you felt that way. Did Lieutenant Ottaway also feel that way?

A. I can't speak for anybody else. I said I only -- for me looking at the elements book, my understanding, I felt what evidence that I did have that that was the best charge, I guess, or it did meet the elements of that criteria for that section to me.

Q. Okay. And you said you sought Lieutenant Ottaway for guidance. Did he confirm that your understanding of the cyberstalking statute was correct in that situation?

A. She did look at it. And looking at the

evidence that I had at the time, she felt that that was the best practice, I'll say, or the best charge to proceed with.

I won't necessarily say that she said that was a yes, but that was a let's verify with the magistrate to see if that is the best charge to go forward with.

Q. Okay. Was there anything else that you sought guidance from Lieutenant Ottaway about?

A. Not necessarily. Just like I said, we showed the evidence that we had from receiving it from the witnesses in the business.

Once that was provided, you are able to look at it or whatever through, I think, on X, which is known as Twitter, or was known as Twitter. And then you can see that the post was still present of what was stated.

Q. Okay. So you just sought Lieutenant Ottaway's guidance about whether the evidence you had met the elements of cyberstalking; is that right?

A. Correct.

Q. Okay. I think we got a little ahead of ourselves. So I want to go back to just talking generally about what steps you're supposed to

take when a crime is reported.

So we were talking about --

MS. BARBER-JONES:  I'm sorry to interrupt, but I just wanted to remind you that we were going to take a break around now.  And whenever we're at the end of a logical sort of part of your questioning, that would be a good thing to do.

MR. BRUCE:  Yeah, I appreciate the reminder.  I'm hoping we can finish this one up and it'd be a nice logical break.  Hopefully, not more than five minutes.

But thank you, certainly, for the reminder.  Is that good with everybody?

THE WITNESS:  Yeah, that's fine.

MR. BRUCE:  Okay.  Sorry for the extended time here.

BY MR. BRUCE:

Q.  So, we talked about you go for a call for service, you get the victim's side of the story and every -- evidence.  The next step you said was to contact witnesses and collect evidence from witnesses, right?

A.  Correct.

Q.  Okay.  If a witness wants to give a

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 67 of 233

written statement, does that follow the same procedure if a victim wants to give a written statement?

A. It would. So if they don't want -- if they don't want to give one, they don't have to.

Q. Okay. And in that case, would you just write what they say in your report?

A. Correct.

Q. Okay. And then you mentioned the next step would be to speak with the suspect; is that right?

A. It is. I did say that.

Q. Okay. And so -- and so generally, after you collect evidence from the victim and witness, you would speak with the suspect?

A. I said, depending on the situation. So depending on the evidence that I've received and depending on how the victim may feel about the situation, depends on how I may need to go.

Well, I said, that was younger, when I was just starting out. So the process for that is, like I said, was different from my process now of thinking.

But I said, from my understanding at the time or thinking, with me having that evidence

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 68 of 233

of her stating what she said on Twitter and to where the witness was able to confirm what the victim was saying, as well, I didn't have much at that time besides, like I said, the evidence that I did have to verify with the witness and victim story aligning from what they were saying.

And then reviewing that Twitter post kind of confirmed my understanding of it after looking, like I said, after looking at the elements. I felt it kind of confirmed what met for that element to proceed.

Like I said, at that time, could I have reached out to Ms. Rachmuth? Yes, but I was unsure, I think at the time of my investigation where she lives and where she was at, because I know she has an Apex address.

So my understanding at that time was if -- of course, if you have an Apex address, I would think that your jurisdiction will be Apex. But a certain jurisdiction -- after being in law enforcement and seeing that you could still have -- that Apex address would still be within a Holly Springs jurisdiction, which was the next day of finding out, then you can move a certain

way from there.  But at that timeframe, like I said, I can't say what I was thinking in reference to that.

But with all the evidence, witnesses, the witness, what she stated to align with that victim and with the evidence that was said, I didn't think there was much more to say.

Q.  Okay.  But backing up from the specific situation with Ms. Rachmuth, in what situations would you decide to contact the suspect versus not contact the suspect?

A.  It depends.  Like, if it's a possible -- if I've had a possible hit and run to where the individual, she continued going because she had two kids, one was a newborn and one was maybe like a younger age, to where she seen that the other driver was acting very irate and didn't feel comfortable with the setting that she was in if she had pulled over, so she pulled over -- well, she pulled over, but it was a little bit further past where the individual had gotten hit from.

So when she -- when I -- the original call for service was a hit and run.  So the person that the -- one of the individuals saying

was acting irate stayed within Holly Springs jurisdiction, but then, literally minutes later, that individual called the police department and let them know I was involved with the car accident, this, that, and the third on their end, explaining.

And then, once I speak with the individual that was within Holly Springs jurisdiction, I would tell them to give me one moment so I could try to reach out to the other individual after being verified through dispatch that that other individual did call.

Once I spoke with that individual, I verified, like what was your reasoning for not stopping at that timeframe? What made you feel that you need to continue? That's when that individual let me know that they were fearful and, like I said, that they had a newborn and a kid. It was a female, she felt fearful and threatened with the individual like throwing his hands up and pointing, saying this, that, and the third, you need to pull over, whatever the case may have been, then I would investigate that from both ends.

Q. Okay. So in that situation, the suspect

affirmatively reached out to the police department.

A. Correct.

Q. So that's a situation where you might decide to speak with the suspect?

A. That's when I'd be like, let me call, yeah. Because especially if they're calling the police department saying, like, I know I was in a car accident, I know I left the scene, but I didn't feel comfortable with how he or she was acting irate or a certain way to where they didn't feel comfortable being in that setting where they were located.

Q. Okay. So besides when someone affirmatively reaches out, what other situations might you decide to speak with a suspect before moving forward?

A. Well, if I have their information and contact information, I will reach out. But if I don't have that contact information to reach out, then there's only so much I can do until I go in person.

Some people they -- that I encounter with doing calls for service, they either already know the person to where they're able to

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 72 of 233

provide me that information.  If it's email, phone call, or work number that they might have, you know, previously had communications with, then I'll try to reach out from that form.

If not, like I said, on my end, I can only do so much until I get in contact with that possible offender.

Well, like, I said for the individual, I didn't think that she was within jurisdiction. So I thought there was a process before going out of town to try to speak, especially if I don't have her email or contact information, that I might have to possibly call the next agency over, which would have possibly been Apex, and then -- to assist me with speaking about the situation.

Q.  Okay.  So affirmatively -- a situation where the suspect affirmatively reaches out or you have their contact information, you might reach out to the suspect first.

Are there any other situations?

A.  I will reach out to the suspect if I have their information.

Q.  Okay.  Any other situations where you might reach out to them first?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 73 of 233

A.   Well, like I said, if I -- if it's within town limits, I'll go to the house if I have an address.  Or like I said, if that victim may know the suspect's address, I'll go to that address just to see if they do live there.  If they don't, then there's only so much I can do until I get further information on my end.

If not, then I'll have to pass that information up to the investigators upstairs.

MR. BRUCE:  Okay.  That's probably a good time for a break.  Do you want to take -- is ten minutes okay?  Do we need 15?

MS. BARBER-JONES:  I think ten should be fine.

MR. BRUCE:  All right.  Ten minutes.

THE VIDEOGRAPHER:  We are going off the record.  The time on the video monitor is 4:22 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time on the video monitor is 4:33 p.m.

BY MR. BRUCE:

Q.   All right.  Officer Warren, I hope you had a good break.  I just have a couple more

general questions about what we were talking about earlier, and then we'll get into more specifics about your investigation into Ms. Rachmuth.

Are officers supposed to consult with anyone before obtaining a warrant or a summons?

A. Consult with our -- are you saying like from a supervisor standpoint?

Q. Anybody. Are you supposed to consult with a supervisor before you do so?

A. Yes, we'll let them know like this is our thoughts or concerns for. Which was also another reason why we spoke with the lieutenant at the time to see what was her thoughts before proceeding.

Q. Okay. And does your supervisor determine whether or not you can seek the warrant?

A. They'll see what we have on our end, evidence-wise, and what the call for service was, of course. What evidence we do have, and what were we thinking of charging with, if so.

Once seeing what we thought, and after explaining what -- or how we feel for that situation and why we were going to charge for

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 75 of 233

that, they'll review or check on their end to
see if that was, like I said, possibly the best
charge.  If there's possibly another charge,
they might advise you, like, well, maybe look
at, instead of -- hypothetically, instead of
cyberstalking, look at harassment, and then take
it from there.

But if they feel like that might be the
best charge for that predicament, they will
either agree and let you know, like you can
proceed and see what the magistrate says, or
tell you maybe we might need to try a lesser
charge or another charge if it doesn't seem to
them that it met the elements or that's the
right charge for that.

Q.  Okay.  And is there anyone else besides
your supervisor that you're supposed to consult
with before you seek a warrant?

A.  What are the -- yeah, I mean, at the
time, like I said, I had to speak to my FTO.
After that, I said more than likely I had to
speak to a sergeant.  Well, I said it did get --
the situation did get pushed to where we had to
speak to the lieutenant.

After speaking to the lieutenant, I know

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 76 of 233

there's certain paperwork that you do have to send, what is it, like, to the magistrate prior to just to let them know basically the bit -- background information so it's on a paper form. Then, as well as let the magistrate know what you're calling for and what's your PC for. Once you explain everything that happened at a call for service, that's when they can let you know.

Once they review on their end, they'll let you know, you know, like I said, if it is granted or not granted, and then that'll be that.

Q. Okay. Are you supposed to consult with the district attorney's office at all before you seek a warrant?

A. Not from my understanding. I can't recall. If so, I can't recall.

Q. Okay. Are you supposed to consult with the town attorney's office at all before you seek a warrant?

A. Not that I can recall.

Q. Officer Warren, when did you first become aware of who Ms. Rachmuth is?

MS. BARBER-JONES: Object to form.

You can answer.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 77 of 233

THE WITNESS:  That day of the call of service.

BY MR. BRUCE:

Q.  Okay.  Did you know who she was before the call of service?

A.  Never heard of her.

Q.  Do you know if anyone at Holly Springs Police Department knew who she was?

MS. BARBER-JONES:  Object to form.

You can answer.

THE WITNESS:  Not that I can recall.

BY MR. BRUCE:

Q.  Did you overhear anyone in the police department talking about Ms. Rachmuth before the call for service?

A.  Not that I can recall, no.

Q.  So, before the call of service, were you aware that she was a longtime resident of North Carolina?

A.  No.

Q.  Were you aware that she has a family in North Carolina?

A.  No.

Q.  Were you aware that she's an independent journalist?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 78 of 233

A.   No.

Q.   Were you aware that she's Jewish?

A.   No.

Q.   Were you aware that Ms. Rachmuth had previously made complaints to the Holly Springs Police Department regarding harassment?

A.   No.

Q.   Did you work on investigating any of those complaints?

A.   No.

Q.   Okay.  Do you know anyone who has investigated complaints that Ms. Rachmuth filed with the police department?

A.   No.

Q.   So how did you first become involved in -- well, I'll restate.

So you mentioned the first time you knew anything about Ms. Rachmuth was when you got the call for service; is that right?

A.   Correct.

Q.   What was that call for service?

A.   I can't remember right now what the call for service was, the exact title at the timeframe.  But the call came out as if it was currently at Harris Teeter at that time.

Once receiving that information, I went to Harris Teeter.  I didn't want to go in to make a scene after the information that was, like, briefly said, kind of on -- from dispatch. I can't remember for -- detail for detail, but clearly I knew that some type of situation happened to occur for the victim to call and want to reach out to law enforcement about the situation.

I know I said that she was, at the time, from my understanding, that she was currently working at that Harris Teeter.  So I wanted to go there to see if I could speak with her in person.  But I wanted her to come outside to where she could speak with me versus everybody being in her face or around her surroundings and talk about the situation that occurred.

Once calling the victim, come to find out she was not at work and she hasn't been to work for several days because of certain situations that occurred with the post, as well as certain calls that were made to her job to where she didn't feel -- she felt harassed and threatened to where she didn't feel comfortable going back to work.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 80 of 233

Q. Okay. So where were you when you received the call for service?

A. I can't remember where --

Q. Were you on a patrol? Were you at the police station?

A. I mean, I was patrolling. Like I said, that was two years ago, so I can't recall --

Q. That's fine.

A. -- exactly where I was.

Q. Understood.

A. I was --

Q. You were on your patrol at that time.

A. Yeah.

MS. BARBER-JONES: Sorry, can you let him finish his answer?

MR. BRUCE: Yes. My apologies.

THE WITNESS: Yeah, I can't recall where I was at exactly, but I was en route to it once I did receive that call for service.

BY MR. BRUCE:

Q. And do you remember what day you received the call for service?

A. It should be 11/2, so November 2nd.

Q. Okay. Do you remember what time it was?

A. I do not.

Q. And what did the call for service say?

A. I can't recall exactly what it said for detail.

Q. What information -- do you recall anything that it said about what had happened?

A. Well, like I said previous. All I know is that I can't remember exact detail for detail what the call said or what the original call came out as. If -- maybe harassment. Like I said, I don't remember, so I don't want to tell you incorrectly.

But I did -- like I said, I did respond to the call after receiving it about a situation that had occurred at Harris Teeter about possible harassment.

Q. Did they give any details about what specific harassment had occurred?

A. I mean, it possibly did, but like I said, I don't recall this.

Q. Okay. And then what did you do -- you said you responded to the call for service. What did you do when you responded?

A. Just go to the -- the call came out as if the victim was still currently at Harris Teeter.

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 82 of 233

Q.  Okay.  So did you go to Harris Teeter?

A.  I did.

Q.  Okay.  And what did you do when you got to Harris Teeter?

A.  That's when I stated I had pulled over to see if I can give that victim a call to come outside to speak to me versus speaking inside while she was working.

Q.  Okay.  And you said she was not there that day?

A.  She was not.  She hasn't been there for several days.

Q.  Okay.  So what did you do after you found out she was not there?

A.  I mean, I still spoke to her on the phone.

Q.  Okay.  So when you spoke with her on the phone, what did she say?

A.  That's when she stated that she was working, doing her normal routine for work, putting items up on the shelves, to where some lady had approached her in reference to her -- I don't want to say the wrong wording -- the hibaj (ph).

Q.  The hijab.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 83 of 233

A.  Hijab, excuse me.  About her hijab. Like I said, she said she never met the lady, never knew the lady.  So for the lady to come to her how she did, she was a little off balance about it.  Conversations were said to where that Ms. Sloan, I guess, felt that that hibaj was a different meaning.  The victim stated, well, that was just her religion.

Once proceeding, I guess the interaction had got a little louder than needed, to where she stated the victim stated that her manager, which was the -- excuse me, which was the witness, had to intervene to try to calm Ms. Sloan down.  And she also told her employee to, like, go to another area so she can calm down, as well, and get away from Ms. Sloan while she was taking pictures and recording.  Once -- that was from the victim's end, once she left.

Once I got done speaking with the victim --

Q.  Before you move on from your call with the victim, I just want to make sure that we get everything from that call down, if that's all right.

So you said, first of all, when you

spoke with her on the phone, were you still --
was that when you were still parked outside of
Harris Teeter?

A.    Correct.

Q.    Okay.  So this is the same day you
responded to the call for service is when you --

A.    Yeah.

Q.    -- spoke with her.

Okay.  How did you have her phone
number?

A.    She called the police department.

Q.    Okay.

A.    So that -- when you call the police
department for us to get back in contact with
you, you leave your first, last name, or your
whole name, and you'll give us a best way to
reach or -- reach or get in contact with you,
which is more so the form.

Q.    Okay.  So you mentioned that the victim
specifically referenced a hijab; is that right?

A.    If it's not a hijab, whatever other term
that might have been used for her scarf that was
over her head.

Q.    Okay.  Did she use the term "hijab" on
the phone?

A.  I can't recall, so I don't want to tell you incorrect.

Q.  Is it possible she said keffiyeh instead of hijab?

A.  I can't -- I don't want to say incorrect, so I don't know for that part.

Q.  So you don't know whether she said hijab or keffiyeh on the phone?

A.  I know what it's called now, a hijab. At first, I thought it was possibly a kufi (ph), but then once I started knowing certain things, I was like, okay, well, it's a hijab from her understanding.  But like I said, from that call, I don't remember if she said it was a hijab or the other term that you just said.

Q.  Okay.  Did she mention the -- so you mentioned that she said that a lady approached her in Harris Teeter; is that right?

A.  Correct.

Q.  And that a conversation got heated; is that right?

A.  Yeah.

Q.  And that the manager intervened?

A.  Correct.

Q.  Did she ever mention any social media

Case 5:25-cv-00222-BO-RJ   Document 29-6   Filed 08/03/26   Page 86 of 233

posts by Ms. Rachmuth?

A. Not at that time. That was before the social media post.

Q. Okay. This is all on November 2nd, right?

A. From my understanding, the information I received.

Q. But you spoke with her on November 2nd?

A. On November 2nd. Yeah, I spoke with her on November 2nd.

Q. Did she mention Ms. Rachmuth by name at all on the phone?

A. If she did, I can't remember. And if possible, because of her seeing the social media post on Twitter. Well, excuse me, X.

Q. So I'm sorry. I don't know if I caught the -- can you just repeat the answer?

A. You said if she had said Ms. Sloan's name by name, correct?

Q. Right, yes.

A. And I said, not to my understanding now. And I say, if so, it was possibly because of that post.

Q. Okay. But on the phone, she did not mention Ms. Rachmuth by name?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 87 of 233

A.  I don't recall.

Q.  Okay.  Did she express fear for her safety at all on the phone?

A.  She did.

Q.  What did she say?

A.  Her and her manager, which was also the witness, stated that she has not returned back to work for several days and that there were complaints that were called to the business of Harris Teeter about them hiring terrorists to where she didn't feel safe.  I don't remember the exact amount of calls that they received, but it was quite -- between -- I say between three to five, but like I said, I don't remember the exact call number from that.

The victim also took her kids out of school after the post situation because she didn't want her kids to be involved with that situation or interacted or judged based off that situation.

Q.  Did she mention the kids on the phone --

A.  She did.

Q.  -- or was that later?

Okay.  Did she say that Ms. Rachmuth threatened violence against her in the store?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 88 of 233

A. I don't recall.

Q. Did she say whether Ms. Rachmuth assaulted her in the store?

A. No. She didn't say anything about assault, no.

Q. Did she say whether she had any reason to believe Ms. Rachmuth knew her name?

A. Not that I know of.

Q. Did she say whether she had any reason to believe Ms. Rachmuth knew her home address?

A. Not that I know of.

Q. Did she say whether Ms. Rachmuth ever contacted her by phone?

A. No, she never said she contacted by phone.

Q. Did she say whether Ms. Rachmuth ever contacted her by email?

A. No.

Q. Did she say whether Ms. Rachmuth ever contacted her by social media messaging?

A. Not that I know of, no.

Q. Did she say whether Ms. Rachmuth ever came to her house?

A. No.

Q. Did she say anything else when you spoke

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 89 of 233

with her on the phone that day?

A. Yes, she said she did want to return back to work because, of course, at the timeframe, I don't necessarily know if Harris Teeter had trespassed her. I don't believe that they had trespassed her. But she did not feel comfortable with returning back to work because of that situation.

Q. Did she say whether she had any reason to believe Ms. Rachmuth had come back to the Harris Teeter at any point?

A. She couldn't if she didn't return back to work. I think the victim's thing was if she goes back to work and she encounters Ms. Sloan again, then what would be the issue or how things will go again would probably be the same occurrence.

Q. Did you memorialize this phone conversation with the victim in writing at all?

A. You said, did I who now?

Q. Sorry, I can use a -- did you put this conversation you had with the victim in writing at all?

A. For my report purpose, yes.

Q. Okay. And was that in the incident

report?

A. I don't believe I put the part of that she might have feared for her life or the kids coming, her taking the kids out of school. I didn't put that part in the report.

Q. Why didn't you put that part in the report?

A. I can't say right now. I don't know what I was thinking at the time frame. The main thing for me was -- well, I said from her, from the victim's understanding, her main thing was that she worried about her image and things of being -- of herself and possibly her family to be put on social media to where she didn't feel comfortable with returning back to work or to have her kids go back to school, I guess, until things die down or whenever she feels that was best to return back to work or return her kids back to school.

Q. Okay. But at this point, you said she didn't mention -- specifically mention the social media post in that phone conversation yet; is that right?

A. No. So she -- so at the time -- you were asking me at the timeframe what she had

told me.  So later on -- well, at the same time of that call that she did call me, that she did say that she -- as well as the calls that were coming from the business, she did state that, I don't know if it was employees or family and friends that had seen the post, but it was to the point that management and, I guess, the little security team of management of Harris Teeter had informed her about a post that was being made.  I don't know how she was informed necessarily, so I can't say.

But after, like I said, her seeing that post and being notified, she did not feel comfortable with returning back to work.

Q.  Okay.  So -- and she told you that on the phone call with her on November 2nd; is that right?

A.  Correct.

Q.  Okay.  So she did mention that she was aware of the social media post when you spoke with her on the phone on November 2nd?

A.  Speaking in chronological order, excuse me, at first she didn't, but towards the ending she did.  So when I was explaining my story, I was telling you how, like, I received it from

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 92 of 233

her.  But overall, yes, she did tell me November 2nd.

Q.  Okay.  Did she offer or did she want to make a written statement at all?

A.  She didn't.  No, she didn't, from my understanding.

Q.  Did you ask her to make a written statement?

A.  I can't recall.

Q.  Wouldn't it be standard practice to have a victim's statement like this reduced to writing?

A.  Yes, for sure.  But once again, I was in the FTO process, so I was in the beginning phases trying to figure my way out as an officer, as well.

But once again, there's some individuals don't want their information or anything they say to be said because sometimes things like that do get leaked out or said to where now later on it gets reverted back to them and their name being posted and things like that.  She was already having an issue with her name being or pictures being put up on social media as is.

Q.  Okay.  But you don't remember if she

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 93 of 233

ever specifically said she did not want to make a written statement?

A. I can't recall right now.

Q. After you spoke with the -- well, before we go there, did you know the victim at all before this incident?

A. No.

Q. Had you ever personally gone and shopped at this Harris Teeter?

A. No.

Q. Okay. After you spoke with the victim on the phone, what did you do next?

A. After speaking with the victim, she said that her manager, which is a witness, might have been there at the time and might be currently at work. So I did go into the business establishment to see if that manager was there.

Q. Okay. Did you speak with the manager when you went inside?

A. I did.

Q. And what did she tell you?

A. Her story was she was in her office to where she heard some type of, I won't say -- I'll say a disturbance, some type of disturbance to where she wanted to see what was going on.

Of course, she's the manager, so she runs the store. She has to make sure things was fine.

Once seeing Ms. Sloan and that victim have their verbal dispute, like I said, she tried to intervene because it was to the point where other customers were looking and, you know, whispering and having things to say about the situation, to where she tried to deviate the situation by getting in between both, of course, but having her employee leave to -- I can't remember if she went to her office or just told her to leave and go to like another section and come back later. Because, of course, she was a little overwhelmed and shocked of Ms. Sloan approaching her the way she did, I guess.

And the management was trying to -- well, was letting Ms. Sloan know that she needs to leave the establishment, especially with her taking pictures and recording. Because the management did inform me -- which there was a sign posted right in front of the store, as well, that you're not able to photograph or videograph anything within the building unless given permission. From my understanding, Ms. Sloan was not given permission to videograph or

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 95 of 233

take photos while in the store.

Q. You didn't charge Ms. Rachmuth with trespassing, right?

A. Because they never trespassed, no.

Q. So Harris Teeter never trespassed her?

A. From my understanding, no.

Q. And you never charged her or sought a trespassing charge against her?

A. No, sir, because they never said anything about trespassing.

Q. Did the manager ever say she -- did she ever express fear for her safety?

A. Not that I could recall. She was just more so worried about her employee.

Q. Did she say whether the employee feared for her safety?

A. Yes, because she said the employee said she was not coming back to work.

Q. Did she say whether Ms. Rachmuth threatened any violence in the store?

A. Not that I could recall.

Q. Did she say whether Ms. Rachmuth assaulted the employee?

A. Not that I recall.

Q. Did she say whether she had any reason

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 96 of 233

to believe Ms. Rachmuth knew the employee's name?

A. Not that I could recall.

Q. Did she say whether she had any reason to believe Ms. Rachmuth knew the employee's address?

A. Not that I can recall.

Q. Did she say whether she had any reason to believe Ms. Rachmuth had contacted the employee by phone?

A. Not that I know of, no.

Q. Did she say whether she had reason to believe Ms. Rachmuth contacted the employee by email?

A. Not that I know of, no.

Q. Did she say she had reason to believe whether the employee -- whether Ms. Rachmuth contacted the employee by social media messaging?

A. Not that I know of, no.

Q. Did she say whether Ms. Rachmuth had ever come to the employee's house?

A. No. Not that I know of.

Q. Did she say whether Ms. Rachmuth left the Harris Teeter when she asked her to?

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 97 of 233

A. She left, but she was very passionate about what claims that she had on the victim, whatever claims that she had on the victim. So she didn't -- it wasn't necessarily a, I need you to leave and she left, right then and there. It was more so kind of like, all right, time to go. Like, you know, direct you this way type of deal.

Q. But she did say she left the store; is that right?

A. She left, yes.

Q. Did the manager ever say whether Ms. Rachmuth returned to the store?

A. Not that I can recall, no.

Q. Did the manager provide a written statement?

A. No.

Q. Did you ask her to provide a written statement?

A. Not that I can recall.

Q. Did you record the statement in writing?

A. Not that I can recall.

Q. So did you include any of the manager's comments in your report?

A. I did.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 98 of 233

Q. Okay. Was it word for word, or a summary?

A. Word for word.

Q. Okay. So you recorded the manager's statements to you in your incident report?

A. Correct. I thought you meant for body camera purposes.

Q. Okay. Understood.

Did you know the manager at all before the incident?

A. No.

Q. Did she say anything else to you when you spoke with her in the store?

A. She did provide me with the post from Ms. Sloan's X account. I can't exactly remember what was said, detail for detail, in the post, but I did put that picture of what was said in my report.

Q. Do you know how she received the post?

A. I do not.

Q. Okay. And did you -- was it just a screenshot of the post that she showed you?

A. I have the email of it. So --

Q. Okay.

A. --- you can -- you can, of course,

forward a post from somebody -- somebody's profile. You can forward that post or share it, excuse me. It was shared, or either she has X -- I don't know how she received it, but I received it as a shared to where if I click the link, it'll bring me straight directly to Ms. Sloan's page and it'll have that same exact post.

Q. Okay. When she sent it to you, did you click the link and visit Ms. Sloan's profile?

A. Yes.

Q. Okay. What did you see when you visited her profile?

A. Literally the same thing as the picture provided because I don't have a Twitter account.

Q. Understood.

A. Like I said earlier.

Q. Sorry, go ahead.

A. I was saying earlier -- like I said earlier, if I don't have -- if I don't have access to, like, certain accounts, it'll limit you to what you can see. So literally, the same post that she sent me was the same thing that I seen, which was, like, I believe it was two or three pictures of the young lady while she was

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 100 of 233

putting up items on the shelf and stated whatever she stated in the post.

Q. So did you view any other posts from Mrs. Rachmuth's social media accounts?

A. There were several other posts, not necessarily for this situation, but for whatever, you know, that she felt was offending her or some type of thing that might have been harmful to her religion. I don't exactly remember everything, detail for detail.

Q. And did you view those during the course of your investigation?

A. I was -- I would -- at the time, at first, no, because once again, I don't have Twitter. Later on, I believe someone had access to a Twitter -- her -- to Twitter, to where they were able to look at comments. I can't remember right now, honestly, who did not have access to that Twitter information. But like I said, I don't have Twitter, so I was only able to look up so much.

Q. Okay. You said later on someone had access to Twitter. How much later? Was it still while you were investigating the case?

A. Yeah, while I was investigating.

Q. Okay.

A. On November 2nd.

Q. Okay. Did you ever ask anyone who did have a Twitter account to look at more posts on Ms. Rachmuth's social media profile?

A. I can't recall. Like I said, I know that day we did look at it. I don't -- I don't remember who exactly might have had access to it, so I don't want to tell you incorrectly. But we were able to access the comments with certain things of that original post that I was called for service for, as well as others.

Q. So you were able to access the comments underneath the post, for lack of a better phrase?

A. Yes. But once again, I don't have Twitter, so someone else had to. I just can't remember who might have been at the time because, like I said, it's been a while.

Q. Understood.

But you were able -- were you able to personally review those once that person accessed them?

A. Correct.

MR. BRUCE: Let's pull up Tab 4, which

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 102 of 233

will be --

THE REMOTE TECHNICIAN:  Stand by.

MR. BRUCE:  And this will be marked as Exhibit 4.

(Exhibit 4 was marked for identification and is included with the transcript.)

BY MR. BRUCE:

Q.  Can you see that okay, Officer Warren?

A.  Yes.

Q.  Okay.  Do you recognize this document?

A.  Yes.

Q.  What is it?

A.  That was the evidence given to me from the management staff at Harris Teeter.

Q.  Okay.  So this is the X post that she provided you a link to; is that right?

A.  Correct.

Q.  Okay.  And you mentioned you included the post in your report.  How did you do that? Did you take a screenshot of it or capture it somehow?

A.  You were able to -- I can't remember exactly how I did it, but it was able to, where you're able to -- just that post right there by itself.  I don't know what is exactly below

because certain things is below the bar, but just mainly from the picture on above to her name, I was able to get picture wise and just make a copy of that to put in my report.

Q. Okay. So the post, if we look at the bottom here, it says it was posted on 9:54 a.m. October 31st, 2024; is that right?

A. You said November 2024? I see October 31st. Oh, you said October, or did you say November? I apologize.

Q. Sorry, October 31st.

A. Okay. Yes.

Q. Is that when you understood the incident to occur?

MS. BARBER-JONES: Object to form.

You can answer.

THE WITNESS: I can't recall. Like I said, she gave me the information. I know it happened sometime prior to 'till I said, where she also stated, as well as the management says, she hasn't been there for days. But I can't recall the timeframe exactly when it was posted. So I can't say for that one.

Q. Okay. But you spoke with the employee and the manager on November 2nd; is that right?

A. Correct.

Q. Okay. And was it -- at that time, was it your understanding that the -- what was your understanding of when the incident actually occurred?

A. My understanding, I -- at the time, like I said getting, receiving that call, I thought it was that day. So that's why I didn't want to -- as I said earlier, I didn't want to go into the business and speak to her after I -- from my understanding, if the call was made November 2nd, I don't want to make it any more clouded in the business establishment after that situation had occurred. So that's why I wanted to speak with her afterwards.

But like I said, I can't remember for word for word exactly the timeframe for it. But like I said, I know that she did not feel comfortable with returning to work for those three or four days for me speaking with her.

Q. Okay. But after you spoke with them, was it your understanding that the incident had occurred some day prior to November 2nd?

A. Correct, yes.

Q. Okay. When you viewed this post that

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 105 of 233

the manager showed you, what stood out to you?

A. I can't think at the time frame, honestly, what necessarily stood out. I mean, possibly the pictures, possibly her tagging Harris Teeter. You know, I really can't say, honestly.

Q. Did you recognize what the employee was wearing when you looked at the post?

MS. BARBER-JONES: Object to form.

You can answer.

THE WITNESS: No, I did not. As I stated earlier, I thought it was another term, but now I know, sir it's the hibaj.

BY MR. BRUCE:

Q. How did you become aware of whether it was a hijab?

A. I can't recall, honestly. Possibly like looking up, trying to have an understanding of possibly why Ms. Sloan might have felt, you know, that was something that she didn't feel was in her beliefs. I can't really say at the time frame.

Q. Prior to your investigation, did you have any understanding of what a keffiyeh is?

A. No.

Q. Had you seen any news reports about keffiyehs being worn by members of Hamas?

A. I don't recall, no.

Q. Did you see any reporting after -- well, let me back up.

Are you aware of the events happening in the Middle East after October 7th, 2023?

A. Not really. Not too, too much.

Q. Okay. Had you seen pictures of any sort of headdress like the one in this picture in news reporting or anything like that?

A. I don't recall, if so.

Q. In this post, does Ms. Rachmuth ever say the employee's name?

A. In the post, I can -- I don't see that, no.

Q. Okay. Does she disclose the employee's home address?

A. Not in the post, no.

Q. Does she threaten the employee in the post?

A. Not in that post, no, not actually.

Q. Does she ask anyone to contact the employee in the post?

A. In the post, no, not actually.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 107 of 233

Q. Does she ask anyone to contact Harris Teeter in the post?

A. Not actually, no.

Q. So you mentioned you reviewed some -- you were eventually able to review some of the comments to this post; is that right?

A. Yes.

MR. BRUCE: Okay. Can we take down this exhibit? And can we pull up Tab 5? And we'll mark that as Exhibit 5.

(Exhibit 5 was marked for identification and is included with the transcript.)

THE REMOTE TECHNICIAN: Stand by.

BY MR. BRUCE:

Q. Officer Warren, do you recognize this comment and reply at all?

A. I do not.

Q. Okay. I'm just going to read the comment, the first comment, from someone named Rachel Monroe that says it was posted October 31st, 2024. And that's the same date we saw on the original post; is that right?

A. Same date, yes, sir.

Q. Okay. This person says, it is actually protected as religious freedom under federal

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 108 of 233

law.  I agree and will stick to Village Walk.

And do you see, Ms. Rachmuth's reply below?

A.  Yeah, I see that now.

Q.  And she says, hijabs are protected as they should be, but I'm sure that wearing this is a form of political speech.

Do you see that?

A.  Yep.

Q.  Do you recall reviewing this comment?

A.  No, I do not.

Q.  Do you recall reviewing any comment where Ms. Rachmuth mentions -- refers to what the employee was wearing as political speech?

A.  I do not.

Q.  Had you reviewed this comment at the time, would you have still thought the post was intended -- was talking about Ms. Fattah's religion?

A.  I cannot say, because you would have to ask me at that time frame, my thinking.  Like I said, me being a newer officer at that time frame, certain things were, you know, does this meet criteria, whatever the case may be, versus now certain things I might do slightly or a tad

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 109 of 233

bit different from investigation purposes.

Q. So you can't say whether, had you reviewed this post, you would have thought it -- the post was not talking about anything having to do with your religion?

A. Yeah, you said at the time, so I can't speak for me at the time. I can speak for now and what I've learned from that time frame on to now to how I would have a better understanding or investigate a little more deeper if so, in that reference.

Q. Okay. As you sit here today and you read this comment, do you think the post had anything to do with the employee's religion?

A. I don't know. Like I said, because I mean, for Ms. Sloan to tag the establishment and for her to say something about something sympathizer, I can't remember.

If you move the post back up, I could possibly. But like I said, for her to tag the business and sympathizer and whatever else she might have said, possibly in the second sentence -- I don't remember exactly right now, but I don't think necessarily it had to be tagged to make that point or get that point

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 110 of 233

across.

But by all means if, you know, she felt some type of way against it, she can, you know, as long as she's not threatening or harassing, you know, that victim to feel that harmful to where they don't want to come back to work or things like that.

Q. At the time, did you ever consider whether the post was protected political speech?

A. I can't say, honestly. I really can't say.

Q. Why can't you say?

A. I don't know if it was or was not political speech. That's Ms. Sloan who made that post. Once again, like I said, everybody handles things differently. You can get your point across, but you don't necessarily have to tag the business.

Or, you know, if there might be comments further on throughout, you know, this post that you're showing me to where she may have later on found out who that individual was, I can't recall right now, so that's why I can't necessarily say.

MR. BRUCE: Okay. Let's take this

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 111 of 233

exhibit down.  We can pull up Tab 6 and mark that as Exhibit 6.

(Exhibit 6 was marked for identification and is included with the transcript.)

THE REMOTE TECHNICIAN:  Stand by.

MS. BARBER-JONES:  Daniel, will you be sharing these documents at some point during or after the deposition?

MR. BRUCE:  Yes.  I'm pretty sure they've all been produced in discovery.  They all have Bates numbers.  I can point those out.  But you should be able to access them from Planet Depos, I believe.  They can correct me if I'm wrong.  And I'm happy to email them to you if you can't.

For the Planet Depos people, do y'all do the -- do y'all share the exhibits after the deposition or do we have to wait until they're in the transcript?

THE COURT REPORTER:  So we don't share the same upload or download link that you have access to, to the opposing counsel.

MR. BRUCE:  Okay.

THE COURT REPORTER:  But we do add it to the transcript in the end if you ask.

MR. BRUCE: Okay. Yeah, so Katie, I can email them to you after the deposition.

MS. BARBER-JONES: Thanks. That sounds great.

MR. BRUCE: Thanks.

BY MR. BRUCE:

Q. Okay. So this is -- do you recognize this exchange at all --

A. I do not. My apologies. No, I do not.

Q. We see the date on these is October 31st, 2024, again; is that right?

A. Correct.

Q. And again, that's the same date as the original post; is that right?

A. Correct.

Q. Somebody named Tired Old Man says, correct me if I'm wrong, but isn't she an employee there? The price gun was what drew me to that conclusion. If she is an employee and the headgear is part of her religious freedom, it would be no different than wearing a yarmulke. I am no terrorist organization supporter.

And then we see Ms. Rachmuth responds, wrong. It's a religious right to wear a hijab,

not a keffiyeh as a hijab.  There is a

difference.  Employees cannot engage in

politics, according to -- she tags Harris

Tweeter -- sorry, Harris Teeter handbook.

Did I read that right?

A.  Yes.

Q.  Okay.  Did you review this comment at all during your investigation?

A.  I don't recall.

Q.  Had you reviewed this comment, would you still think the post was about the victim's religion?

A.  I can't say if it was religion.  Like I say, it could be just her personal beliefs at the time.  If it was religion or not, that might have been something specific to Ms. Sloan, what she likes or dislikes, or what she may have perceived certain information from her end versus what the victim thought, you know, from her end of just it being her religious belief or why she wore it.  So I'm not able to say.

Q.  You're not able to say whether you would have perceived the post as directed to the employee's religion had you read this comment at the time?  Is that -- is that your testimony?

A.   I'm saying I can't say because if -- if it was for the individual, what was the need for the Harris Teeter tag for the handbook policy? I don't necessarily know it, so I can't speak for what is or is not in it.  I don't know if the victim knows what is or isn't in it.

Like I said, there's certain things I'm not able to say because I don't know, like, the -- necessarily backgrounds from that situation or the handbook, things like that.

Q.   Had you reviewed this comment, would you have considered whether the post was protected political speech?

A.   I mean, if that was for her understanding, if that's what she felt -- excuse me, if that's what Ms. Sloan felt from her understanding for the hibaj and the keffiyeh, then I mean, that would be, yes, her political speech.

Q.   So you agree that if Ms. Rachmuth -- Ms. Rachmuth's understanding was what -- that what the employee was wearing was a keffiyeh and not a hijab, the post is political speech?

MS. BARBER-JONES:  Objection.

You can answer.

THE WITNESS:  Once again, I don't know what she was thinking in reference to it because her mind frame was clearly different from the victim's to where, like I said, an issue had occurred to where a disturbance came into Harris Teeter and for the management to intervene to try to get Ms. Sloan out of the way -- excuse me, out of the building.  So I'm not able to say for that.

MR. BRUCE:  Okay.  We can take down this exhibit.  Let's do one more.  Can we pull up Tab 7 and mark this as Exhibit 7?

(Exhibit 7 was marked for identification and is included with the transcript.)

THE REMOTE TECHNICIAN:  Stand by.

BY MR. BRUCE:

Q.  Do you recognize this document at all, Officer Warren?

A.  I do not.

Q.  Did you review these comments in the course of your investigation?

A.  If I did, I don't recall.

Q.  And we see they're dated October 31st, 2024, again; is that right?

A.  Correct.

Q. Someone named Patriot Steve says, showing support for a terrorist group by wearing a keffiyeh is abhorrent. We don't support the deliberate slaughter of civilians and we certainly don't celebrate it. See what happens if you simply wear the Star of David.

Do you see that?

A. Yes.

Q. And Ms. Rachmuth responds, it's a political statement at minimum. I'm sure they wouldn't let a cashier wear a MAGA hat.

Do you see that?

A. Yes.

Q. Are you familiar with what a MAGA hat is?

A. What -- Make America Great Again?

Q. Do you know what that phrase refers to?

A. I really don't. I just know that was a little thing at the time frame.

Q. Do you know whether it's a political statement?

A. No, I do not. No.

Q. Had you reviewed this comment from Ms. Rachmuth, would you have considered whether her original post was protected political

speech?

A. I mean, like I said, if that's what she felt at heart was politically right or correct for her end, by all means. But like I said, I don't know, like, where her thought process was with certain things with this, like I said, because her and the victim had different understandings with certain things.

MR. BRUCE: All right. If we can take this down.

BY MR. BRUCE:

Q. So you mentioned that you did -- you were able to review comments to Ms. Rachmuth's post; is that right?

A. Yes.

Q. But you didn't review either of the three comments we just looked at, right?

A. If I did, I don't recall.

Q. Okay. Do you recall the substance of any of the comments you reviewed at the time?

A. I do not.

Q. Did you include any of those in your report?

A. I did not. That didn't have nothing to do necessarily with the -- it was a part of the

report, but not the initial report for the victim, what she was calling for concerns. Her calling -- her call and concerns were for that -- the pictures of her being posted and her being -- her job -- where her work site was for where she worked at, where she didn't want to come back. So that was her main thing.

Q. Okay. But at some point during your investigation, did you screenshot any comments -- any of the comments that you reviewed and save those?

A. I don't have -- no. I don't have Twitter, so I couldn't screenshot it.

Q. Did the person who could access Twitter save those and put them in the file or anything?

A. Not that I know of.

Q. Okay. And you don't remember the substance of any of the other comments you reviewed?

A. I do not.

Q. How many social media posts did you review from Ms. Rachmuth about this incident?

A. I just know of the current victim now. I believe she posted another one about somebody that, I guess, was a student or something on the

campus of UNC Chapel Hill.  And there was another post, but I don't remember, like I said the severity or detail of it, so I'm not able to say for that one.

Q.  Okay.  So you mentioned a post about a student at Chapel Hill; is that right?

A.  Yes.

Q.  When did you become aware of that post?

A.  That day of my investigation.

Q.  Okay.  How did you become aware of that post?

A.  When reviewing her Twitter page.  Well, excuse me, her X page.

Q.  Okay.  So during your investigation, you were able to review other posts on her X page; is that right?

A.  Yes, but I didn't have access to it.

Q.  So who did review the post -- other posts on her X page?

A.  That's why I -- my apologies.

Q.  No, go ahead.  If you didn't have access, how did you see the post for the -- about the student at UNC Chapel Hill?

A.  Someone had access to their own Twitter account where they were able to access.  Now,

who exactly, I don't remember because, like I said, that was some time ago. But someone was able to have access to that.

Q. Was it another officer?

A. I -- I really can't recall, so I don't want to say incorrectly.

Q. Okay. And did -- that post about a student from UNC Chapel Hill, did it have anything to do with the Harris Teeter employee?

A. Huh-uh.

Q. Okay. Did it threaten violence against the Harris Teeter employee?

A. No.

Q. And you mentioned there was a third post, but you couldn't recall what it was about?

A. Correct.

Q. Okay. Did it have anything to do with the Harris Teeter employee?

A. No.

Q. Okay. So there was -- there was only one post that you reviewed about the Harris Teeter employee; is that right?

A. Correct.

Q. Okay. So after you spoke with the employee and the store manager and reviewed the

post, what did you do?

A. Collected that information, let my FTO know exactly what was going on with the phone call and what was said with the witness, slash, management, what's coming back -- well, I said we were uncertain, excuse me, about what that would be charge wise. So we came back to the police department to investigate.

Like I said, I brought my elements book just to see what would possibly be on those guidelines for this certain call. Like I said, for me, reviewing my elements book, I felt that cyberstalking was the best one charge wise for that call.

Once reviewing it for myself, asking an FTO for his assistance or guidance from that, he also felt that was the best charge for it. You know, I said that's where it became to where we wanted to ask the -- our supervisors about it.

Q. So when you went and consulted your elements book, what evidence did you have at that time that led you to believe that cyberstalking was the best charge?

A. One, she had tagged the business of where she works or located, which was Harris

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 122 of 233

Teeter in Holly Springs.  Not necessarily saying it's a specific location, but there's only two Harris Teeters in Holly Springs.

Like I said, after speaking with the victim, to where I said she did -- she did not, as well as the witness, which was management, said she did not return back to work for several days because she was fearful from certain calls that were made to the business establishment about hiring possible terrorists and how they hire people and things like that, of course. And then about the victim, of course, after seeing the post.

So she felt it was best that she did not return back to work until, I'm guessing, either things died down or things happened a certain way legally.  I don't know exactly.  That's something the victim will have to answer for that part, I guess.

Q.  Okay.  So you had that -- at that time when you were consulting your elements book, you had that Ms. Rachmuth tagged Holly -- or tagged the Harris Teeter in the post, the victim did not return to work, and the victim was afraid of calls that were made to Harris Teeter.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 123 of 233

Anything else?

A. As well as taking her kids out. She said that they knew where she worked, so that was the tag with Holly Springs and with the tag of Harris Teeter. She didn't want to return to work for fear for -- for fear or harassment for herself.

From her understanding and my understanding, no trespass has been done for Ms. Sloan. So at any time, Ms. Sloan could easily walk back in to where a scene could have taken place.

And like I said, if individuals were calling her job, she was more so worried about her kids, as well, to where she pulled her kids out of school until the situation died down or certain legal stipulations were to take place.

Yeah, that's it.

Q. You said that's it?

A. Yeah, that's it.

Q. And at that time, you only had the one social media post from Ms. Rachmuth, right?

A. Social media posts and the witness and the victim.

MR. BRUCE: Okay. I guess now's a good

time for another break, and then maybe we can go another hour and eat dinner. I don't know what everybody's schedule looks like, but does that work?

MS. BARBER-JONES: Daniel, do you think that you have like several -- like, three hours left?

MR. BRUCE: I hope not three, but I have a bit more.

MS. BARBER-JONES: I guess I think it's our preference to sort of continue going through without the longer break if that's possible for everybody. I know some people, you know, may need to eat.

MR. BRUCE: Well, that's fine for me. I might need to eat at some point, but we can keep going and just see how much we can get done if that works.

MS. BARBER-JONES: Sure.

MR. BRUCE: But let's take ten minutes and then we'll come back.

MS. BARBER-JONES: Sounds good. Thanks.

THE VIDEOGRAPHER: We are going off the record. The time on the video monitor is 5:33 p.m.

          (Off the record.)

          THE VIDEOGRAPHER:  We are back on the record.  The time on the video monitor is 5:45 p.m.

BY MR. BRUCE:

     Q.  All right.  Officer Warren, you mentioned that after you consulted your elements book and determined that cyberstalking was the best charge, you brought it to your FTO; is that right?

     A.  Correct.

     Q.  Who was your FTO at that time?

     A.  At that time, for that day, was Officer Marino.

     Q.  Okay.  And do you recall what day that was?

     A.  That he was my FTO?

     Q.  That you were determining whether to -- whether cyberstalking was the correct charge?

     A.  November 2nd.

     Q.  Okay.  So this is the same day you spoke with the employee and the manager?

     A.  Correct.

     Q.  And what did Officer Marino say when you presented him with cyberstalking as the charge?

A. I can't remember detail for detail what exactly he said. After looking at that portion that I remember distinctively, he kind of felt that it was, but he was iffy because, once again, we don't normally get calls like that in Holly Springs. So he wanted to make sure before pursuing with supervisors if that would be the best in their decision.

Q. Okay. You said he was iffy. Did he tell you what part of the charge he was iffy about?

A. I don't recall.

Q. Did you or Officer Marino consider whether a different charge would be appropriate?

A. I mean, I can't remember at the time, honestly. Like I said, maybe harassment. I can't remember if there was another -- another charge, like not necessarily cyberstalking, but something else. Like I said, I really can't remember.

Q. Okay. So the only charge you possibly considered that you can remember is harassment; is that right?

A. If so, harassment, yeah.

Q. Okay. And after you discussed the

charge with Officer Marino, did you consult anyone else?

A. Like I said, supervisors.

Q. Who were those supervisors?

A. I don't remember word for word with our -- at the time was sergeant, but now that is Lieutenant Bock. And our lieutenant at the time, which was Lieutenant Ottaway.

Q. Okay. So you said you don't remember who the sergeant was at the time; is that right?

A. No. I said at the time it was -- which is now current Lieutenant Bock. But --

Q. Oh, okay.

A. -- yeah, but we spoke with Lieutenant Ottaway.

Q. Okay. And can you spell the sergeant's name again? I'm sorry, I just couldn't catch it.

A. Bock, B-O-C-K.

Q. Okay, Bock.

So you spoke with Sergeant Bock and Lieutenant Ottaway at the time; is that right?

A. I can't remember last -- I can't remember exactly the conversation with Lieutenant Bock, but whatever it was, it was

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 128 of 233

referred for us to speak with the lieutenant of patrol, which was Lieutenant Ottaway.

Q. Okay. Did Sergeant Bock tell you to speak with Lieutenant Ottaway?

A. Yes.

Q. Okay. And what did Lieutenant Ottaway tell you when you spoke with her?

A. Just what did I have evidence wise, or what was said from the victim and the witness? Once looking at that picture that was sent from the management staff, I showed her that same picture, as well.

We -- me and Marino, like I said, we were not quite sure for that charge, so we wanted verification or better understanding through Lieutenant Ottaway to see if that was probably the best fit charge wise for that. She felt that was the best fit from her understanding. Like I said, we don't normally get calls for cyberstalking or anything like that here in Holly Springs.

But looking -- after looking, like I said, looking at the elements book, that's what we felt was the best charge possible.

Q. Okay. So you said she asked about what

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 129 of 233

evidence you had; is that right?

A. Correct.

Q. And what did you -- what evidence did you tell her you had?

A. The victim, the witness, which was the management, that her story aligned with the victim, and that post.

Q. Okay. Did you tell her it was just the one social media post?

A. Correct.

Q. And besides the social media post, what evidence did you have that Ms. Rachmuth violated the cyberstalking statute?

A. Well, it's more so how the victim -- you have to take it as what the victim feels at that time frame. So if the victim felt harmful, harassed, threatened, whatever the case may be, to where they have to once again change their everyday lifestyle or to change things for their family to do their everyday lifestyle, that's a hindrance for them. That's a part of my understanding, I would think, that is a part of that element that 2 -- was it 2(b)(5) or whatever the case, or (b)(5), whatever the case may be.

Like I said, she -- the victim and the witness, which was her management, said that she has not returned to work at that time frame for several days and said she wasn't returning until she felt comfortable or legal, you know, actions took place.

And as well as her taking her kids out from school. I don't know what her thought process was for that. It could have been possibly the same way unknown individuals called Harris Teeter.

What if out of random, somehow information was leaked or said about where her kids go to school at or where she possibly lives at? Now she has to think and take accountability for her kids' actions or what actions could be done to her kids as well, to where she might have felt like the best thing right now is to take them out of school until things die down or whatever the case may be, whenever she feels comfortable with sending them back. That's something I don't know. I can't really say. That's something the victim would have to say for that part.

Q. Okay. So other than the single X post,

did you have any other conduct from Ms. Rachmuth that you believe violated the cyberstalking statute?

A. I can't necessarily say. Like I said, I don't remember detail for detail what her posts were. But for you to post -- like I said earlier, if you can post it's a Harris Teeter and then it's in Holly Springs, it's only put so much -- you know, people can do or reach out to for if they agree or disagree with whatever Ms. Sloan may or may not feel with the situation.

I can't remember now detail for detail because of the comments. It might have been something in reference to, you know, she's at this location or certain things to be said to where these unknown individuals that called might have feel -- or felt that they needed to call to confirm or confront that Harris Teeter in Holly Springs. That's -- I really can't say for that.

But for that -- like I said, for that post, like I said, there's only two Harris Teeters in Holly Springs.

Q. So do you recall reviewing any comment

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 132 of 233

where Ms. Rachmuth revealed the location of the employee?

A. Something about a sunset. I can't remember exactly detail for detail. But later on, I think there was something about a sunset. I just remember sunset right now. So we only have one location in Holly Springs with that location.

Q. Do you recall seeing any comment that revealed the employee's home address?

A. No.

Q. Okay. Did you have any other evidence of Ms. Rachmuth's conduct that you thought meant that she violated the cyberstalking statute?

A. Well, I said for the management to feel that she had to intervene after that whole situation of her taking pictures or recording and then letting me know that, once again, that the building does have that sign in front of it that says no photographs, no videos, unless authorized.

Now, what Harris Teeter may have done on their end, regardless if they trespassed her or not, I can't help what they did or did not want to do on their end. But for -- like I said,

once again, for her -- for -- excuse me, for Sloan to post that -- that post to where that -- and it got back to the victim to where she felt not comfortable to go back to work, go back to -- to have her kids go back to school, that's a tough situation, especially if that's their only way of, you know, possibly earnings or whatever the case may be, and now you got to take your kids out from school.

Q. With respect to what the sign at the store said about whether photography was allowed, you didn't charge Ms. Rachmuth with trespassing or didn't think trespassing was an appropriate charge, correct?

A. Correct, because Harris Teeter had nothing to say about trespassing her.

Q. Okay. And did you have any evidence that she threatened anyone in the store?

A. No.

Q. Did you have any evidence that she was bothering anyone else in the store?

A. No.

Q. Did you ever investigate the people who made calls separately to the Harris Teeter?

A. Well, they didn't know who made the

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 134 of 233

calls, so I wouldn't have been able to know who made the calls.

Q. Did you have any other evidence at the time you were speaking to Lieutenant Ottaway that led you to believe Ms. Rachmuth violated the cyberstalking statute?

A. No.

Q. After you -- did Lieutenant Ottaway ever mention anything about Ms. Rachmuth?

A. No.

Q. Do you know if she knew Ms. Rachmuth beforehand?

A. Not to my knowledge, no.

Q. Did she say anything besides that she thought cyberstalking was a good fit?

A. Correct. Like I said, we just checked the elements book. I said, from my understanding of that portion of the elements, I felt that that was the best choice. My FTO was unsure, but he felt also, you know, that possibly was the best choice. We wanted further understanding or oversight to make sure that was the best choice, or if maybe we might have needed to handle it a different way, charge wise, whatever the case may be.

Q. Okay. So you mentioned the elements of the cyberstalking statute. Were you aware at the time that the cyberstalking statute requires repeated electronic communications?

A. No.

MR. BRUCE: Okay. Can we pull up Tab 1 again?

THE REMOTE TECHNICIAN: Stand by.

BY MR. BRUCE:

Q. Okay. Officer Warren, so this would be the text of the cyberstalking statute we looked at earlier, correct?

A. Yes, sir.

Q. Okay. And we specifically looked at (b)(2) earlier.

MR. BRUCE: Can we scroll down a bit?

BY MR. BRUCE:

Q. Okay. And Section (b)(2) says: Email or electronically communicate to another repeatedly whether or not conversation ensues for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person.

So do you see that that requires repeated communications?

A.   Okay, yeah, I see the repeated part.
Yes, sir.

Q.   Did you understand at the time that it
required repeated communications?

A.   No.   My understanding was more so just
the portion of where it says abuse, annoying,
threatening, terrifying, harassing, embarrassing
any person.

Q.   So your understanding was just it was
the effect of whatever communication?

A.   The effect of it.   So with her putting
that post up and then whatever her comments were
afterwards of her beliefs or disbeliefs from the
situation.   And like I said, to where the main
thing was for me, whatever, if the victim felt
fearful or threatened or whatever for her
everyday lifestyle or whatever the case may be,
that that was my main thing.

Q.   So at the time, did you believe that a
single social media post could constitute a
violation of the cyberstalking statute?

MS. BARBER-JONES:   Object to form.
You can answer.
THE WITNESS:   I'm quite unsure,
actually.   Like I said, I don't know at the

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 137 of 233

time, so I cannot say. I mean, even to where I was also posted by Ms. Sloan on her Twitter, as well, with certain things. And my -- certain business of mine was posted, as well, on her Twitter. I guess her -- I don't know, I'm trying to think of the word. I don't know if it was trying to discredit me or whatever the case may be.

But like I said, even to where I received a random Facebook notification, some older gentleman was trying to add me on Facebook. So, I mean, I don't know.

Q. Okay. But I guess going back to my original question, at the time -- well, never mind. I'll move on.

MR. BRUCE: Can we go back down to the bottom of this document and look at subsection E?

BY MR. BRUCE:

Q. Officer Warren, we read subsection E earlier. It says -- the second sentence says, this section shall not be construed to impair any constitutionally protected activity, including speech, protest, or assembly.

At the time, were you aware that there

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 138 of 233

was this carve out for protected activity, including speech, protest, or assembly in the cyberstalking statute?

    A.  No, I don't recall.

    Q.  Was that listed in your elements book?

    A.  Possibly.  I'd have to relook in my elements book.

    Q.  Can you describe what the elements book is?

    A.  The elements book is for all crimes to -- what is the criteria to meet that crime? Just depending on the crime, it breaks it down. Like, this person has to do this, the victim might have felt like this, or this has to have been done.  It just depends on what the crime may be.

    Q.  Okay.  And do you know, does it just copy and paste the statute like we're looking at here, or does it break it down more simply?

    A.  I can't remember detail for detail. Like I said, I mean, the document you're showing me could be a whole different thing from what I've looked at from my book.  That's something I would have to look at and review.

    Q.  Do you know if that elements book is

publicly available?

A.  If you go through Basic Law Enforcement Training academy, from my understanding, yes, because you have to have that book to go through class.  But outside of that, I don't know if it is.

Q.  Okay.  Is it specific to Holly Springs or is it a statewide type of book?

A.  Statewide.

Q.  Did you ever consider whether Ms. Rachmuth's post fell under this exception to the cyberstalking statute?

A.  Are you asking for the section of E or the section that I was telling you that I referred to?

Q.  The section E, the protected speech section.

A.  I can't recall, honestly.

Q.  Did Officer Marino or Lieutenant Ottaway ever mention whether it fell under that protected speech exception?

A.  I don't recall.

MR. BRUCE:  Okay.  We can take this down.

BY MR. BRUCE:

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 140 of 233

Q. Did you ever attempt to interview Ms. Rachmuth during your investigation?

A. No, sir. Like I said earlier, from my understanding, once able to receive information, her address was an Apex address. So I was thinking that we were probably going to have to contact Apex to assist us with going out there to speak or to arrest her, depending on how things went.

Q. Okay. So you mentioned earlier that if you had the suspect's contact information, that would tend to be a situation where you would contact them; is that right?

A. If I have their number, yes, sir.

Q. Did you have her phone number?

A. No, sir.

Q. What information about her did you have?

A. The only thing I had -- the only reason why I knew her name was because of when the witness was able to give me that shared link of her Twitter post, excuse me, her X which had her name in it. So I tried to see if I could look her up that way. After looking her up that way, that's when I seen that her address was within Apex.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 141 of 233

Q.   Okay.   So you had her home address?

A.   Correct.

Q.   Had her home address clearly been within Holly Springs, would you have gone to her house and spoken with her?

A.   I can't say, honestly, because I don't remember the time of day it was.   I don't even think I was able to finish my report that same day.   I had to make sure I was slightly bit early to make sure I could try to finish my narrative for that report and, like, background stuff.

I think the main thing that day was to try to figure out if it was -- what was the best charge and was it an arrestable offense.

And like I said, with the evidence that I felt that I had at the time, I felt that -- after speaking with FTO and supervisors and looking at that element, that specific part of the element, excuse me, I felt that it was within guidelines for that.

So I can't necessarily say that I would have, because I mean, I might have been able to get the arrest warrant that day.   And depending on the timeframe, I might have been able to talk

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 142 of 233

to her about the situation, or even if it was for the arrest warrant purposes, to take her to jail. I can't really say for that timeframe, though.

Q. Okay. In other situations where you have the suspect's address and it's clearly within Holly Springs, would you go and speak to that suspect before seeking an arrest warrant?

A. Are you asking from then or now standpoint?

Q. Start with then.

A. Then, it depends on what the FTO may say or guide me for further instructions. Because once again, I've never been involved with a cyberstalking crime and I'm new to policing. So that is the timeframe for his guidance to kind of oversee me and allow me to make my guidance of how I need to pursue further on.

Q. Okay. Did you ever ask your FTO whether you should go interview Ms. Rachmuth?

A. I don't recall, honestly.

Q. And you mentioned then or now. Now, if you had a suspect's address and it was clearly within Holly Springs, would you have gone and interviewed them?

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 143 of 233

A. Yes. Like I said, at the time, I didn't know that -- like I said, me being new, I'm thinking if your address is Apex, I would think that you're within Apex jurisdiction, regardless how close you are to the jurisdiction or I would have just thought it was that -- the case.

But after me being in policing and seeing, like, you know, yes, our main jurisdiction is Holly Springs, but certain bits and pieces can be county, certain bits and pieces could be Fuquay, certain bits and pieces can be Apex. It just depends.

But, like I said, me starting out, I didn't know that. But now I would have went to see -- I would have -- now, I would have went to see her address [sic]. Like, you know, what was your, you know, reasoning to feel that you needed to post her? I mean, like I said, not violating her, maybe not freedom of speech, but, you know, you can still speak whatever you need to, but not necessarily -- you don't necessarily have to have that individual in your post. You can still make your voice be known without certain criteria, extra stuff to take place.

Q. But her post never referenced the

employee, right, by name?

A. Well, if the posting of the employee is the person individual -- well, first, it addressed that Harris Teeter. Once again, there's only two Harris Teeters in the town. Like I said, I can't remember by now -- I meant right now, but I think sometime in the comments there was something said about Sunset Lake, so that would dumb that down another step. So now they wouldn't go to the Village Walk Harris Teeter.

Like I say, if you have the pictures of the individual, even if they didn't know if it was Sunset Lake or Village Walk, what if they decide to go to the one at Village Walk shop today, and then later that evening or the next day, they decide to go to the one on Sunset Lake and they still happen to see her? That's still posting where she necessarily works at.

Q. Okay. But it didn't specifically say her name in the post, correct?

A. No, not that I can remember.

Q. After you spoke with your FTO, Sergeant Bock, Lieutenant Ottaway, was there anyone else you consulted with during the course of the

investigation?

A. So the next day, because Hernandez was my primary -- it my primary -- was my primary FTO, excuse me, but he was absent that day for whatever reason. So that's why I was placed with Officer Marino at the time for him to be my secondary FTO.

So the next day on November 3rd is when I went back to Officer Hernandez. He kind of asked how the day went and what exactly was going on with the situation that I had going on. I told him I still had to report to finish and things like that and then check to see if the arrest warrant was granted or not.

Once -- that next day, he asked if I knew by chance who the suspect was, and I let him know the address. And I think once he checked to see if the -- he was showing me to see if the access was granted for that arrest warrant, he was able to say, well, that is in our jurisdiction. But that was the next day after, like I said, I didn't know, and I don't think Officer Marino knew that was necessarily our jurisdiction at the time.

Q. Okay. So you spoke with Officer

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 146 of 233

Hernandez on November 3rd, and was that after you sought the arrest warrant?

A. Correct, because he was off November 2nd.

Q. Okay. So after you spoke with Lieutenant Ottaway, is that when you sought the arrest warrant?

A. Correct.

Q. Okay. And how did you go about seeking the arrest warrant?

A. We have a back room. I didn't go in person. We have a back room to where you're able to access the magistrate from through the computer. Of course, you know, enter your login information.

Once you give a call through the video chat section, a magistrate will come on screen and, you know, ask, you know, certain things. Of course, who I am, what's the means of the situation, and then what -- I guess, ultimately, like what charges were I trying to pursue from that.

Q. Okay. Did you create any written documentation that you submitted to the magistrate?

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 147 of 233

A.    I can't recall right now, honestly.

Q.    In general, when you're applying for an arrest warrant, is there any sort of form or documentation you're supposed to fill out?

A.    Yes.    There will be a form that I would fill out.    I just can't remember exactly when or how I did it, but there would be.

Q.    Okay.    Do you create an affidavit or is it just the form?

A.    It's a form from my understanding.

Q.    What is usually included on that form?

A.    The form is just a brief synopsis of your narrative, essentially.    So it'll be the -- of course, the reporting officer, who's the victim, who's the suspect, what is the alleged crime?    Like I said, that brief synopsis of why you're on that video call with the magistrate in reference to that.

Like I said, you can go detail for detail, but I mean, that'll be a long, long sheet.    So it's more so try to keep it like within a sheet time -- well, not timeframe -- paragraph or so or sheet lengthy-worth to send to the magistrate.

Q.    Okay.    And do you send that form before

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 148 of 233

or after you get on the video chat with the magistrate?

A. Best practice is to send it before, but I guess depending on the severity of what's going on, you might be able to, you know, send it after. Which you just have to make sure you do send it that day of, or that -- like, literally right after you're getting off the phone with them -- well, video chat, excuse me, with them.

Q. Okay. And did you fill out a form that you sent to the magistrate for Ms. Rachmuth's arrest warrant?

A. I can't recall right now.

MR. BRUCE: Okay. Can we pull up -- give me one second. Can we pull up Tab 9, please?

(Exhibit 9 was marked for identification and is included with the transcript.)

THE REMOTE TECHNICIAN: Stand by.

BY MR. BRUCE:

Q. Okay. Do you recognize this document, Officer Warren?

A. Yes, sir.

Q. Okay. What are we looking at?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 149 of 233

A.   A warrant for arrest.

Q.   So this is the actual warrant for the arrest; is that right?

A.   Yes.

MR. BRUCE:  Okay, can we scroll down to the next page?  Let's see.  I think that's the last page.  Can we do the second page?

BY MR. BRUCE:

Q.   Okay.  Do you recognize what this page is?  The warrant would be?

MS. BARBER-JONES:  Can you zoom in further, please?

MR. BRUCE:  Yeah, can we zoom in a bit?

THE WITNESS:  Okay.  Yes.

BY MR. BRUCE:

Q.   So, what is this page?

A.   This is the page of certifying the defendant and what, like, act -- what alleged crime that I was saying that she had did, once that was granted.  It'll let me know or let you know the date and time that I had came or spoke with the magistrate with, of course, my signature and police department that I work for.

MR. BRUCE:  Okay.  Can we go to the next page?

BY MR. BRUCE:

Q. Do you recognize this page?

A. Yes.

Q. What is this page?

A. That is the information of the suspect, my information, me being the reporting -- well, excuse me, the arresting officer from that situation, and the charge that I went for, which was cyberstalking.

Q. Okay. So is this the form that you submitted to the magistrate in order to get the arrest warrant?

A. I don't recall that form. I think there was another form that I might have seen. I can't recall that form.

Q. You can't recall this specific form right here?

A. (Indecipherable) say, yeah, this specific form from that day.

MR. BRUCE: Okay. And can we just scroll down to the last page?

BY MR. BRUCE:

Q. Do you recognize what this page is?

A. Yes. This describes what the situation -- like, that brief synopsis of what

happened in reference to that cyberstalking crime.

MR. BRUCE: Okay. Can we scroll down to the bottom just to make sure we're not missing anything? Okay.

BY MR. BRUCE:

Q. So, are -- those last two pages, is that typically the form that's filled out and presented to the magistrate to get a warrant?

A. Not the form that I'm thinking of. I can't remember the exact naming of it, but it's more of a type out form. It's more of a setting of, like I said, whoever the reporting officer and arresting officer is -- excuse me, the reporting officer is, the individuals involved in that situation, and the charge that you're looking to allegedly go further with.

And then, like I said, it's literally like it gives you that narrative section to be like that brief synopsis of the overall kind of what took place or what happened.

Q. Okay. So did you fill out this page that we're looking at?

A. I can't recall right now, honestly. But I mean, clearly I had to with my signature.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 152 of 233

Q.   Okay.   So on the second page, that was your signature, correct?

A.   Yes, sir.

Q.   Okay.   So in this section where it says offense cyberstalking, on or about the date of offense shown and in the county named above, the defendant unlawfully and willfully did knowingly permit an electronic communication device, cellphone, under the defendant's control to be used for a purpose prohibited by the statute to take pictures at Harris Teeter and electronically communicate on social media for the purpose of terrifying, harassing, or embarrassing her, would that be the summary that was presented to the magistrate?

A.   I don't recall.

Q.   So you don't recall if you typed this section or not?

A.   I'm saying you asked me, was that the thing that I wrote for if -- that form that I was explaining to you, you asked if that was the exact same thing that I said for that form to get sent to the magistrate.   I'm saying that I don't recall if that was or was not sent to the magistrate.

Q. Okay. So while you were on video with the magistrate, what did you tell the magistrate in support of your request for a warrant?

A. Like I said, I don't remember detail for detail exactly the conversation for it, but more than likely along the lines of the same I'm explaining it to you, what the victim -- the victim called, the call of service; the victim, their side of it; the witness, which was management, their evidence that they were able to give me from Harris Teeter; letting them know I did verify that it was her X page.

What is it? I more than likely said exactly what the post said and to -- about the individual and to where the standing of that victim, how she felt in reference to not going back to work and taking her kids out from school.

Q. Did you provide the post to the magistrate?

A. I can't recall right now at this time.

Q. Would it be standard practice to submit something like that, evidence like that, to a magistrate?

A. You could let them know more so that you

had that information, and then they'll be able to access that incident report, which is basically just a simple report from Holly Springs if you reach out or speak to our front desk attendants. But I won't necessarily say it's a, you have to show it right then and there.

Now, if they ask, if, you know, you give me a moment of time, let me pull it up if you want to see the access of what I've seen so I can show you exactly what I've seen or how I was looking at from my standpoint, then I could show you. But I won't necessarily say it's a right then and there, you have to show it right then and there.

Q. Okay. So you mentioned they have access to the incident report. Is that something that they're supposed to -- do you routinely present the incident report to them?

A. Well, I wasn't -- I wasn't done with my -- I wasn't done with my incident report.

So, with that, it's -- that form that I was explaining to you earlier, that basically gives them that brief synopsis of what your narrative or report will say once you send that

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 155 of 233

to them. I don't know their protocol for certain things, so I can't say what is or was not for their protocol for us -- I mean, for them, excuse me. But for me, I can only do the -- that form, which is letting them know I'm the officer that's, you know, of course, putting in those charges, letting them know the people that were involved and, like I said, that brief synopsis.

Now, if they need anything further outside of legal actions or if they need to refer to something, I'm quite sure they have the means to access that report number. If they need that report number from me, I can provide that to you.

And then, however, that process works from, I'm guessing, the magistrates or lawyers to where our front desk attendants -- I don't know necessarily how that works, but if within reason, they'll be able to give it to you or give whatever they're able to give to you.

Q. Okay. But at the time you went to the magistrate, had you completed your incident report?

A. I did not. I think I was -- maybe,

like, a fraction of the incident.

Q. Okay. When did you complete your incident report?

A. Like I said earlier, November 3rd.

MR. BRUCE: Okay. And can we scroll up to the first page? Sorry, I'm just trying to find what I'm looking for. Can we scroll down? Sorry, there we go.

BY MR. BRUCE:

Q. So on kind of the bottom third after the bold text, there's a box that says date issued. Do you see that?

A. Issued, yes.

Q. Okay. And that says it was issued on November 2nd, 2024, right?

A. Correct.

Q. So does that mean the warrant was issued on November 2nd?

A. Correct.

Q. So at the time, the magistrate would not have been able to view your incident report because it wasn't complete, right?

A. Correct.

Q. Okay. And this is the same day you had spoken with the Harris Teeter employee and

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 157 of 233

manager, correct?

A. Correct. Well, I do apologize. I do retract one thing. Because I did have to make a supplement for me doing that arrest warrant and me taking her to jail. So I do retract that statement.

Q. Okay. You retract what statement exactly?

A. The part where I said that it was done -- maybe the overall process was done by November 3rd. But I know from my end, certain things had to be put in at a certain timeframe. So I can't remember. If I had the case file. I would be able to pull it. But probably November 2nd, I was able to finish it, or not finish it the correct way or proper way how it needed to be done, but I wanted to make sure that it's in the system.

Then when I come back November 3rd, whatever I didn't finish properly or have correct, I can finish that November 3rd. And then, like I said, I did put a supplement in for me pursuing those -- that arrest warrant and me taking her to jail.

Q. Okay. So just to tease that out some,

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 158 of 233

so on November 2nd, is your report in the system and accessible by the magistrate?

A. And that's why I just said, if you give me a moment, I could check the time frame. I cannot recall right now. But I do have it to where one section was submitted one day, and I do believe another section, which was that supplement of me taking her to jail, was submitted the following day, because everything didn't happen just in one day.

Q. Okay. And just when you say submit, like, just so I know, does that mean it's like in a system where it now could be accessed by the magistrate if they needed to?

A. I don't know how that process works. I don't want to tell you incorrect. But it was in the system where I had to put it in Holly Springs reporting system before I leave.

Q. Okay. And then on November 3rd, you said you went back and supplemented it?

A. Yes.

Q. What did your supplement include?

A. Once again, I don't remember word for word. That's why I said I'd have to see it, but it was in reference to me taking her to jail.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 159 of 233

Q.  Did you go back and change anything that you had written the day before?

A.  Not that I can recall, no.

Q.  Most of that was done.  It's just if I'm still being the officer investigating that case, anything that you do in reference to that case, your original document, you can't alter, so you'll have to make a supplement, which will be that second one that I made the next day, which was me taking her to jail.

MR. BRUCE:  Okay.  We can go ahead and take this document down, I think.

BY MR. BRUCE:

Q.  So when you spoke with the magistrate, did you tell the magistrate that there was only one social media post involved.

A.  I can't remember the whole conversation detail for detail.

Q.  Did you tell the magistrate whether the employee had said, you know, that Ms. Rachmuth had threatened her in any way?

A.  I didn't say threatened, no.  I just said that the victim feared for her life after the situation.

Q.  And what conduct of Ms. Rachmuth's did

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 160 of 233

you tell the magistrate you believed violated the cyberstalking statute?

A. I can't recall at this time.

Q. Was it anything other than the post on X?

A. I really can't recall. Like I said, I only go based off of the evidence and the witness that I had.

Q. And the evidence you had at the time was the post on X and the two witnesses?

A. One witness. That was the -- that was the manager that intervened. And then the --

Q. Sorry -- yes, yeah. So the witness and the victim and the post?

A. Correct.

Q. And neither the witness -- did the witness or the victim say there was any other post involved?

A. Not for my knowledge, no.

Q. And you don't recall if you submitted any written information to the magistrate, do you?

A. I don't recall right now, no, sir.

Q. Why did you choose to seek an arrest warrant rather than a summons or a citation?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 161 of 233

A. Once again, I was in the FTO process, so me doing certain things is new. Like I said, one, I think that was actually a first time for me to actually have to go to jail, take someone, with me doing my own investigation.

Two, like I said I haven't really heard much of a -- of doing a criminal summons. It's either more so something as a, you know, I cite you or a -- or I take you to jail type of thing.

It's not necessarily been brought up much about a criminal summons from my knowledge or since I've been going -- since I've been here, excuse me, at Holly Springs. So I can't necessarily say where my thoughts were for that.

I just wanted to make sure whatever I was doing was the appropriate actions, and that it was -- if it was the charge, if it was an arrestable offense.

Q. Did you ever speak with Officer Marino or Lieutenant Ottaway about whether you should issue a citation rather than seek a warrant?

A. We did discuss, like I said, once again, to see if it was an arrestable offense. I don't really remember the citation portion, honestly.

Q. Okay. But you did search to see if it

was an arrestable offense?

A. Correct.

MR. BRUCE: Okay. Now might be a good time for another break.

THE VIDEOGRAPHER: We are going off the record. The time on the video monitor is 6:30 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 6:41 p.m.

MR. BRUCE: Okay. Hope everybody had a good break.

BY MR. BRUCE:

Q. I have a few more questions about your investigation and seeking the arrest warrant, and then we'll go to the arrest itself.

Just to go back to the evidence you presented to the magistrate in order to get the arrest warrant, did you ever -- did you present any of the comments to the social media post that you said you reviewed to the magistrate?

A. I don't recall.

Q. Did you ever tell the magistrate whether you had evidence that Ms. Rachmuth affirmatively

contacted the victim?

A. No. Not to contact the victim, no.

Q. So did you give the magistrate any text messages between Ms. Rachmuth and the victim?

A. No.

Q. Did you give the magistrate any emails between Ms. Rachmuth and the victim?

A. No.

Q. Did you have any evidence of text messages or emails between Ms. Rachmuth and the victim?

A. Not text message or emails.

Q. Did you have any other -- did you have any other evidence of communications between Ms. Rachmuth and the victim?

A. No, besides the victim and the witness stating, of course, that day that the whole incident occurred. But outside of that, no.

Q. And that incident was the incident in person?

A. Correct.

Q. What written documents did you prepare in the course of your investigation?

A. What written?

Q. Yeah, what written documents did you,

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 164 of 233

yourself, prepare?

A. I didn't have anything written. Like I said, I was doing my narrative for my report. But that -- like I said, that wasn't complete. Like I said, I remember something possibly about, like I said, that form where you can send something in; but I think, like I said, I think that's like something for felonies. What is it? FIR, felony incident report. I could have swore, but, like I said, I might be thinking of it wrong.

But outside of that, nothing, because like I said, I wasn't fully even done with my report before speaking with the magistrate.

Q. Okay. And going back to -- was that the first time you had sought an arrest warrant in your time?

A. Yep.

Q. Okay.

A. Yes.

Q. Have you sought any arrest warrants since then?

A. No. I've served arrest warrants, but not to actually put one in place.

Q. Okay. So this is the only arrest

warrant you've sought and obtained as an officer?

A. Correct.

Q. So you mentioned you created your incident report. Did you exchange any emails between anyone and the office about the investigation?

A. No, there's no exchange of emails. Like I said, the only people I spoke to were the original, my FTOs, and the supervisors, and that was it.

Q. Okay.

A. And then --

Q. Sorry, go ahead.

A. No, so that was just, like I said earlier, Lieutenant Ottaway, now-Lieutenant Bock, Officer Marino, and Officer Hernandez.

Q. Okay. And were all those conversations in person?

A. Yes.

Q. Okay. So did you exchange any text messages about Ms. Rachmuth or the investigation?

A. No. We did everything in person.

Q. So the only written document that you

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 166 of 233

prepared that you know of is the incident report; is that right?

A. Correct.

MR. BRUCE: Can we pull up Tab 8, please?

THE REMOTE TECHNICIAN: Stand by.

MR. BRUCE: Okay. This will be marked as Exhibit 8.

(Exhibit 8 was marked for identification and is included with the transcript.)

BY MR. BRUCE:

Q. Do you recognize this document, Officer Warren?

A. Somewhat. That's not the original form. I probably see it from my computer side, but --

Q. Okay.

A. Yes.

MR. BRUCE: Let's scroll down to the second page. This might just be a cover page.

BY MR. BRUCE:

Q. Do you recognize that part of the document?

A. Yes.

Q. Okay. What is this?

A. That's the incident report.

Q. Okay. Is there a way to see, looking at the incident report, what portions of it were completed on November 2nd and what portions you completed on November 3rd?

THE WITNESS: If you scroll down. Probably going to have to go all the way down. Information wise, that was most likely put in that same day. It's the written narrative portion, is where it will say -- so, like, right around there?

MR. BRUCE: Uh-huh.

THE WITNESS: So let's see, if you could slide up. Okay. So yes, November 2nd is when I initially did it. So then if you scoot down. Well, scroll up. Oh, my apologies, scroll down. I said it wrong way.

So that will be all under the first -- you can keep scrolling. That will be under the first one. Okay. Yes. So that'll be under the first section of the report. Then, if you scroll down a little bit more, is when the supplement was put in.

You can keep scrolling. There.

So then, on November 3rd, at that timeframe, is when I served that warrant. And

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 168 of 233

that's when we were informed that the warrant was granted.

BY MR. BRUCE:

Q.  Okay.  So right here, after the narrative section, there's a parenthetical that says 11/3/2024 1442, is that the time that you entered that information into the form?

A.  Correct.

MR. BRUCE:  Okay.  So can we scroll back up to the other narrative section?  Okay.  Pause.

BY MR. BRUCE:

Q.  So here it says, a warrant was obtained for Ms. Rachmuth for cyberstalking, nothing further.  And then it says 11/3/24 6:29.

Does that mean that you completed that section on November 3rd?

A.  That morning, yes.  Because like I said, I started on the 2nd, but I didn't finish.  So you have to -- there are certain things -- like, there are certain things in the reporting process that have to be at least in the system to generate a report.  Once that's done, like the initial stuff, once the finalized stuff of that original report is put in, then that

timestamp of how it is at that 6:29, which was me being here doing the report at 6:29 in the morning, is when it was finalized.

Q. Okay. So the narrative section of the report wasn't finalized till 6:29 a.m. on November 3rd; is that right?

A. Correct.

MR. BRUCE: Okay. Can we scroll to Page 4 of the report? I'm not sure where we are.

BY MR. BRUCE:

Q. Okay. In the middle of this page, there's a label for suspect hate, slash, bias motivated, and it says anti Islamic, parentheses, Muslim.

Do you see that?

A. Yes, I do.

Q. Is that a designation that you provided in the report?

A. I don't recall that, no.

Q. Was there anyone else working on the report that could have input that designation?

A. Possibly supervisors. They have access. But like I said, from my knowledge, no.

Q. Okay. But you don't specifically recall designating this an anti-Islamic, parentheses,

Muslim?

A. Correct.

Q. Do you know if they're -- if the Holly Springs Police Department has a standard definition of what a suspect hate, slash, bias motivated incident might be?

A. Possibly, but I do not know at this time.

Q. Okay. Do you know what the basis for designating this incident anti-Islamic, Muslim, was?

A. You said what were the basics?

Q. What was the basis for that anti-Islamic Muslim designation?

A. No, I do not know the basis.

Q. Are incidents that are labeled suspect hate/bias motivated treated any differently than normal incidents and investigations?

A. Oh, no. You still be -- we still treat it as if you were a regular citizen, like nothing that occurred. Like I said, we'll try to -- our job is to figure out what the issue was from one party's side and also see what the issue is depending on the situation from the next party's side. And if it's something past

our range, that's when we'll leave that to the investigators for that.

Q. Okay. You said that's when you would leave it to the investigators. What do you mean by that?

A. So if all leads are exhausted, that's when we would -- for an officer standpoint, because we can only do so much from officers -- or, excuse me, from a patrol standpoint. We only do so much from a patrol standpoint because, once again, we're also receiving other incoming calls for service that we also have to answer, as well.

So we could do what we're able to do on our end, as much information that we could provide, and then that's when we will forward that information to investigations.

Q. Did you ever forward any of this information about Ms. Rachmuth's case to investigations?

A. No.

Q. Why not?

A. Once again, as I stated earlier, with the victim stating what she said and the witness, which was the management of the victim

and what she said, both stories had aligned to where -- as well as the evidence that I received that I felt -- once reading the elements for that, I felt were within a patrol level standpoint.

Like I said, it was clear as day that the post was from Ms. Sloan or her Twitter page. There wasn't anything else outside of that for me to do if it came directly from her page.

Q. Are you required to send a case to investigations at any point?

A. If you're not -- once again, if you're not able to handle it from a patrol standpoint, then yes. So if I didn't have, like, enough time frame to do so. But like with me in FTO training, they try to expose you as much as you can, especially if it's calls that you don't normally get, so if you do have it by chance later on down in your career, you'll kind of have at least an idea or a reference to do it or how to maneuver from that situation on forward.

So like I said, that was being our -- my first, like, one with having to do an arrest warrant and things like that.

Q. Okay. Are you familiar with Holly

Springs' written directive regarding follow-up investigative notifications and responsibilities?

A. Bits and pieces. I can't recall everything right now, honestly.

MR. BRUCE: Okay. Can we pull up Tab 3? And we can take this one down.

THE REMOTE TECHNICIAN: Stand by.

MR. BRUCE: Yeah, let's zoom into the top there. This will be Exhibit 3.

(Exhibit 3 was marked for identification and is included with the transcript.)

BY MR. BRUCE:

Q. So the top says, Holly Springs Police Department written directive, Chapter 800 operations, Directive 840.01 follow-up investigative notifications and responsibilities.

Do you recognize this document?

A. At the time, possibly not, because I was still new to FTO training. And then, like I said, there's a lot of policies we got to refer and review. So I can't remember exactly detail for detail.

Q. Understood.

Do you recognize the document as you sit here today?

A. Yes.

MR. BRUCE: Okay. Let's go to -- give me one moment. Can you scroll down and see what the Bates number at the bottom of this page is? Okay. Can we go to 592, please? Okay. Let's scroll up to the start of this section. So scroll up to the next page, sorry. Okay. Pause there. Wait. Can you go to the bottom of this page?

BY MR. BRUCE:

Q. All right. So this says Criminal investigations section, responsibilities, notifications, and responses.

What is the criminal investigation section?

A. Your investigation of your case or incident.

Q. Okay. I guess, is it a separate section of investigators or are all officers in the criminal investigation section?

A. No. So there's another section. Like I said, from a patrol standpoint, we do have a weekend to investigate the report. After, if

we're unable to retrieve any information, which we'll say -- leads are exhausted or along those lines, that's when we will forward that information to an investigator upstairs so they'll be able to, I guess, look deeper into the situation.

Q. Okay. So as a patrol officer, you were not a member of the criminal investigation section; is that right?

A. I'm not a part of the investigators upstairs. As a patrol, you can investigate.

Q. Right.

A. But what I'm explaining is, to a certain degree, information wise or evidence that I have, I can use that still for my report, even though I'm not necessarily the title of an investigator. But I can still receive whatever information I have and report it in my report.

Now, certain things, depending on the case-by-case basis, I might not be able to have that time to pursue and look deeper into and do certain things for. So that's when we'll have to forward that to the investigators, to where that's their sole -- their sole thing is to investigate, you know, what you weren't able to

receive or get on your end.

Q. Okay. And when you say forward that to the investigators, are those the members of where it says under Section A, the General Investigations Unit?

A. Correct.

Q. Okay. So under (A)(1), it says the responsibilities of the General Investigations Unit. The unit -- the General Investigations Unit will be notified of and is responsible for investigating the following crimes.

Do you see that?

A. Yes.

Q. Okay. And then there's a list. And we're going to go down to the next page.

A. Okay.

MR. BRUCE: And pause there.

BY MR. BRUCE:

Q. At J, it says ethnic intimidation or hate crimes. Do you see that?

A. Okay.

Q. When you designate in an incident report that is an incident as a suspect bias or hate motivated crime, like we saw in the incident report, is that what triggers this notification

to the General Investigations Unit?

A. It could. But same token, with information I had, it was very limited, so I can't necessarily say. Because like I said, all I'm going is based off of that post. Like I said, she has her right to say whatever she, you know, of course, feels, whatever Ms. Sloan feels in reference to that situation.

Q. But in the incident report, the incident involving Ms. Rachmuth was designated a suspect hate bias motivated incident. Is that -- that was right, correct?

A. Cyberstalking.

Q. Right, but we saw on the incident report -- and let me know if you want to go back and look at it -- but it said suspect hate/bias motivated anti-Islamic, Muslim, that we saw earlier. Was that right?

A. That's correct, but you also asked me if. I recall putting that down in the report. And I also stated I do not recall that portion.

Q. Right. But do you acknowledge it was in the report that we saw?

A. Yeah. It was in the report.

Q. Do you have any reason to believe that

copy of the report was incorrect?

A. Like I said, I don't know what her -- Ms. Sloan's beliefs were for that. It might not have been religion. It might not have been a hate crime. I don't know. But it was into where it felt it touched a nerve for her to post that on social media and tag, you know, like I said, the business and wherever the business was.

Q. Understood.

My question here is, just did the fact that the incident was labeled in the incident report anti-Islamic Muslim bias motivated incident, under this policy, would that mean that it was supposed to have been referred to the General Investigations Unit?

A. If you could scroll up.

MR. BRUCE: Yeah, go ahead and scroll up.

THE WITNESS: Okay. Yeah. Based off of policy, yes. Well, that section of Section 1, responsibilities.

BY MR. BRUCE:

Q. And was Ms. Rachmuth's case ever referred to the General Investigations Unit?

A.  No, I did not send it to General
Investigations for investigators.

Q.  Was that in violation of this policy?

A.  Not necessarily.

Q.  Because, like I said, depending on what
information -- like I said, we didn't know it
was necessarily a hate crime, whatever.  That
portion that you're -- you keep bringing up
about the Muslim, the anti crime, like I said, I
don't recall putting that in there, so I can't
necessarily say, yes, it is in there, but I
don't necessarily remember me putting that into
the report.  So I can't tell you for that
reference.

MR. BRUCE:  Okay.  Let's take this one
down.

BY MR. BRUCE:

Q.  So after you obtained the arrest
warrant, what did you do next?

A.  Due to the timeframe -- as I said
before, it was towards the end of the day
timeframe-ish, so I wasn't, like I say, able to
see if that was granted or not 'till the next
day.  And I wasn't able to finish my report
until the next day.

Like I said, I started originally on the 2nd, but for it to be submitted in the system, it wasn't until the 3rd.

So, I might have probably, if so, did like whatever touch up things that I felt I needed to do before leaving to try to give me a reminder before leaving or a leave point to finish off for the next day. But I can't necessarily say that time frame.

Q. Okay. So when did you go to arrest Ms. Rachmuth?

A. November 3rd.

Q. Okay. And was that after you finished your report that morning?

A. After, yes, sir.

Q. What time did you arrive at Ms. Rachmuth's home?

A. I don't remember the time frame.

Q. Do you remember if it was morning, afternoon?

A. Between 9:00 and 11:00-ish.

Q. Okay. Do you recall what day of the week it was?

A. I can't.

Q. Who else accompanied you?

A.   Officer Marino, Officer Hernandez.

Q.   And what were their roles in accompanying you?

A.   Hernandez is my primary FTO.  As I said before, he was off the day before, so that's why I was with Officer Marino, which was my secondary FTO.

Q.   Okay.  So did he have to join you as your FTO?

A.   Who?  Hernandez or --

Q.   Sorry, Hernandez.  Sorry.

A.   Yes, because he was back the next day. So he's my primary.  So if he's your primary, that's your main FTO throughout your whole process.

Q.   Okay.  And why did Officer Marino join?

A.   He knew a bit of the investigation in the background since he was with me FTO wise the day before and assisted me with that guidance and was with me, as well, when we spoke with supervisors.

Q.   Okay.  Was there any other reason to bring three officers to the arrest besides they were just one was familiar and one was your FTO for the day?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 182 of 233

A. Well, technically, I'm not necessarily -- I'm an officer, but while you're in FTO phase, like you're not necessarily a certified officer, so you have to respond with your FTO. So that's going to be your two -- your two officers at all times in a vehicle. It will never be just FTO in a separate vehicle and a -- his training in another. It doesn't work like that.

Now, operations of the vehicle, I mean, yes, I will be driving and further things in the vehicle, but my FTO will also be with me and the passenger everywhere I go from call to call, whatever it is. So he -- that is a must. He won't be leaving, FTO purposes.

Like I said, Marino was the second officer, second certified officer. That's not, of course, in FTO training to go. So technically, with certain calls, we're supposed to respond with two people.

Like I said, with me being in training, I'm not technically able to be by myself yet with certain things because certain things I haven't encountered or ran by quite yet in my career. So we always have two officers

wherever, for the most part, wherever we go.

Q. And how many patrol cars did you bring?

A. Two, myself and Officer Hernandez, the primary FTO was in one vehicle, and Officer Marino was in his vehicle.

Q. And where did you park when you arrived to Ms. Rachmuth's home?

A. If I'm not mistaken, about -- her house, her backyard -- about a house or two back from her residence.

Q. Okay. And why did you decide to park a house or two away from her residence?

A. As we spoke earlier, for officer safety, if you just approach into the front of somebody's house at random, there's people that do like the police, that don't like the police. If they know possibly they might have a warrant, you know, they might run. It just depends on different scenarios.

At the end of the day, it's still officer survival just to make sure you make that approach as peaceful and calmly as possible and not to where that possible suspect is -- if they are there and they're like, you know, they know that they have, like I said, that situation

where they have a warrant or whatever the case may be and they try to run, that's another situation, you know. So just try to deviate that, anything to go further from there.

Q. Do you have any evidence at the time that Ms. Rachmuth would be a danger to officers?

A. I did not know.

Q. Did you have any reason to believe she didn't like the police?

A. I never met her, so I cannot say that.

Q. Okay. Well, what kind of neighborhood were you in? Was it a residential neighborhood, a downtown neighborhood?

A. Residential.

Q. Okay. And why not park in her driveway or right in front of her house?

A. Once again, I don't -- I don't know what her thought process is. So officer safety. Some people may like officers. The same may not. Like I said, when some officers, we approach certain calls, individuals may try to flee.

Even if they don't try to flee -- if I'm not mistaken, she wasn't even outside when we approached, but to where before I even took a

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 185 of 233

step on her porch, she had already opened the door and seen me. So clearly she had already seen us approaching, or if not, had already parked to where she was able to approach the door before I even rung the doorbell or knock on the door. So that's just like a few things for officer safety we have to look at.

Q. After you arrived, what did you do?

A. Once we arrived, I just asked her, you know, is Ms. Jennifer -- or Sloan -- I believe that I asked if she was present. She's like, yes, that's me. She came outside, closed the door, and just -- I just let her know that we had an arrest warrant for her. She was a little shocked.

Then moments later, I know her husband had opened the door and came outside, as well.

After that, more so at the speaking time, Officer Marino, Officer Hernandez kind of jumped in and helped me with that because I've never been in that situation. So I didn't really do too, too much talking in reference to about the details of the arrest warrant, what this, that, and the third was. My presence was more so when I had put her in cuffs. And like I

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 186 of 233

said, I escorted her to the car, just gave her a quick pat down, made sure she had nothing harmful for herself, myself, or others. And then, like I said, to escort her to the jail.

Q. Okay. When you were on -- you know, you said there was a point where Officer Hernandez and Marino were conversing with her.

What, if anything, did Ms. Rachmuth say to the three of you before she was arrested?

A. She just seemed very shocked. I can't remember exactly details of exactly what she said. She just seemed pretty shocked about it. I know we did give her like a couple -- I know she was a little shocked, so that's probably why she probably heard us, but certain things didn't necessarily register. But Officer Hernandez did give several directives for her to turn around so I could apply the cuffs.

But what is it? I know she was trying to -- I don't know, she didn't want to necessarily say too much in front of her husband at the time.

Once he went in, she allowed me to cuff her, and she was saying she knows the law in reference to general stuff, period. But she was

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 187 of 233

allowing us or letting us know, information wise, that there's a segment in cyberstalking to where she's able to have her speech -- public speech, which we understood that, not saying she was wrong in reference to that, but whatever probable cause that we had for the magistrate, for them to grant that arrest warrant and proceed, seemed enough for us to get the arrest warrant and go further.  So that's what the officers were trying to let her know in reference to that.

She asked if we could -- if she was allowed to get more clothes because she wasn't fully dressed.  I guess she was in night clothes or lounge wear, whatever the case may be.  So we did allow her husband to get her clothes and shoes.  I think she might have asked for a phone, wallet.

She did ask, I guess, certain questions about if the magistrate would be there.  Would she be able to bond out?  Officer Hernandez did allow her -- tell her the process.  I can't remember exactly what he said, but he did tell her the process of how that would work after seeing the magistrate.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 188 of 233

Afterwards, we did ask her if we could go cut through her yard because we wasn't necessarily trying to make a scene about the situation versus walking down her driveway, then come all the way back around. We just cut through her yard so we can get to the cars quicker.

I took her to my vehicle, let her know that before entering, I do have to check her just to make sure she didn't have any weapons to injure myself, any others. After that, she had nothing sharp on her. I placed the seatbelt on once she got in the vehicle.

She asked if she was able to do something where her -- an itch. I think itch her face or nose or something, about her glasses. I asked her how she would be able to do so, and she said in a jokingly manner, like, oh, I'd use my knee, and then she used her knee to either fix her glasses or itch her nose, and that was that.

Q. Okay. At any point during the arrest, did She threaten officers?

A. No.

Q. Did she cooperate with your instructions

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 189 of 233

during the arrest?

A. Like I said, when Officer Hernandez asked her several times to turn around so I could put the cuffs on, she didn't want to. I won't necessarily say she didn't want to. I guess I said she was shocked because we were there and trying to get an understanding for it.

But as I'm not mistaken, Officer Marino said, you know, just, you know, allow us to cuff you so we can explain the situation further, and then anything else after that is what will have to be discussed with the magistrate or wherever direction she may need to go from there.

Q. You mentioned she asked for a change of clothes; is that right?

A. Yes. She asked if she can get a change of clothes.

Q. Did you let her put a different shirt on or anything before you handcuffed her and walked her to the car?

A. Well, like I said before earlier, she asked. And Officer Hernandez asked if her husband could get her items for her.

Q. Okay. But did you let her change clothes before you left her house?

A.   That was up to her once her husband brought the items back to put certain things on. Like I said, I know she had shoes on.  I can't really recall about the shirt, if she did the shirt or not, or if they did or did not find the shirt, but we did allow the husband to retrieve those items for her.

Q.   Okay.  Were you wearing a body worn camera during the arrest?

A.   Yes, sir.

Q.   Was it activated during the time?

A.   Yes, sir.

Q.   Your discovery responses indicated that the footage had been destroyed pursuant to an expunction order that Ms. Rachmuth obtained; is that right?

A.   Correct.  I was trying to get the original documentation, because we worked through an RMS system at the time.  We're now through Axon.  So, certain information, of course, at the time, we're not able to access as a patrol level.

Now, if you're maybe like a supervisor or higher and above that, possibly a records attendant or a captain, lieutenant, some of that

nature, where they're able to access it, maybe, but no one was able to access it because it was expunged.

Q. Okay. Who's in charge of deleting materials after the expunction?

A. I don't know how that process works, so I cannot tell you.

Q. Okay. Are you involved in that process at all?

A. No, sir.

Q. But last week you did produce body cam footage; is that right?

A. The agency was able to provide the body cam footage. My login information was not accessible at the time.

Q. Okay. So who ultimately was able to obtain the body cam footage?

A. I don't know who was able to obtain the body cam footage.

Q. Okay. But it wasn't you?

A. No, it wasn't me, because like I said, my account I just had to reset to get it up to par.

Q. So someone else at the police department was able to obtain it; is that right?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 192 of 233

A. Correct.

Q. Okay. Do you know if there are any other documents related to the incident and the investigation that might be located somewhere you haven't searched?

A. Of my incident?

Q. Yes, your incident.

A. No. The only -- like I said, the only recording system that we know was through RMS. RMS is no longer with us. They've deleted that. I know certain files were transferred to Axon, but that was not found in Axon.

And like I said, due to that expungement, our records keeper was not able to find anything or have anything.

Q. Do you know why the body cam footage that was produced last week was not destroyed pursuant to the expunction?

A. I do not know. Like I said, I didn't provide the body camera footage, so I have nothing to do with that.

Q. Okay. So when I looked through the body cam footage that was produced, there's a bunch of different types of file formats, and maybe you have experience looking through this. There

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 193 of 233

were three .mp4 files that appear to contain body cam footage from you, Officer Marino, and Officer Hernandez, and there was a dash cam video that appears to be you going to the detention center after the arrest. So that would be four videos.

Are there any other dash cam or body worn camera videos that would have been recorded?

A. No, those were the only individuals around for that situation. So, no.

MR. BRUCE: Okay. Can we -- I'd like just to watch some of your body cam footage. I don't want to belabor the point here, but I think it just helps walk through some of this.

So, can we pull up Tab 10, please? And this is a video. So, whatever you can do.

THE REMOTE TECHNICIAN: Stand by. So currently, I'm having some difficulty with opening the file. It seems I'm getting an error message in regards to it. Any chance, do you have it on your computer that you can share?

MR. BRUCE: I do. We'll see if I'm technically proficient enough to do that. Give me one second.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 194 of 233

THE REMOTE TECHNICIAN: And when you do share, it's going to ask on the side, share, I believe it's computer sound, and just make sure that clicked.

MR. BRUCE: Okay. Give me one second. Okay. Can we see this?

THE WITNESS: Yes.

MR. BRUCE: Okay. There's that. What'd you say about the sound? I didn't get a pop up or anything.

THE REMOTE TECHNICIAN: Try playing it and see if it does it automatically. You're good.

MR. BRUCE: Okay. So we're going to watch the first minute or so of this, and I'm going to ask you some questions about it, Officer Warren.

(Exhibit 10 was marked for identification and is included with the transcript.)

(A video identified as Exhibit 10 was played over the videoconference.)

MS. BARBER-JONES: I'm sorry to interrupt, but I don't think that the audio is coming through.

MR. BRUCE:  Sorry, what was that?

MS. BARBER-JONES:  Oh, I suspect the audio may not be coming through, but if you can --

MR. BRUCE:  Yeah.

THE REMOTE TECHNICIAN:  Yeah, so if you go to -- if you click share on your Zoom, it should have an option.  It says share computer sound.

MR. BRUCE:  Got it.

THE REMOTE TECHNICIAN:  Do you see it?

MR. BRUCE:  I see that.  Should I do mono or stereo?  Does it matter?

THE REMOTE TECHNICIAN:  Do stereo.

MR. BRUCE:  Okay.  Let's try this again. Does that work?

(A video identified as Exhibit 10 resumed playing over the videoconference.)

BY MR. BRUCE:

Q.  Okay.  So this point you walked up from the patrol car to her house, correct?

A.  Yes.

Q.  About how long do you think it took you to make that walk up to her front porch?

A.  I don't know.  I didn't keep time.

Q. Okay. We saw her ask to put on a shirt; is that right?

A. Yes.

Q. Okay. And did you ever let her put on that shirt before you left her house?

A. I don't recall right now. If not, we brought the shirt so we could make sure that she could change into it while at the jail.

Q. Okay. But not necessarily as you were walking her back to the patrol car?

A. No, because then I wouldn't have -- I wouldn't have control of her. Because if something happened to her, then I'm held responsible or liable in case she falls, fall injury, or somebody, you know, decides to come out and attack her or anything like that.

Q. Why would -- why would that matter as to whether she could wear a shirt back to the patrol car?

A. Well, you asked if I allowed her to put the shirt on while escorting her back to my vehicle. So, once we were going down the hill, that's one thing. If I don't have control of her, she's not balanced or whatever the case. She might have been -- or what if she was

drinking by chance like wine or something in the morning?  I don't know that stuff.  So, while she walks down the hill, I have to make sure of her safety that she's fine for that first.

And then, like I said as well, with where we parked at, which is about, I said, that house or two back, I don't know if she's necessarily -- have friends or have good residents where they have good standings.

So at that time, for me, her safety is more important to make sure she gets to the car safe as possible.

Q.  Okay.  You hold me to my words, so I appreciate that.

But I guess my question was before you -- before you left her front porch, you did not give her an opportunity to put the shirt on; is that right?

A.  I said, yeah, I don't recall.  And if so, I did receive the clothes to make sure she put them on before entering the jail.

Q.  Okay.  At this point, has she given any indication that she is not cooperative?

A.  Well, to me, with several directives from Officer Hernandez -- like I said, it's kind

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 198 of 233

of like in the middle, like not necessarily antsy, but she's in the middle, like I do, but I don't. So we don't know how to take that as an officer standpoint if we're asking you more than like two or three times to do so.

Q. Okay. But she hasn't said she won't -- you know, she won't comply, correct?

A. Yeah, she didn't say she wouldn't, but she didn't comply neither.

MR. BRUCE: Okay. Let's watch the next minute or so.

(A video identified as Exhibit 10 resumed playing over the videoconference.)

MR. BRUCE: Okay. We'll pause there.

BY MR. BRUCE:

Q. At the time you were on her front porch, were you aware that her children were home?

A. No. I didn't hear or see any children. I just heard the dog and her husband.

Q. Okay. So at this point, you have handcuffed Ms. Rachmuth, and officers Hernandez and Marino are discussing the charge with her, correct?

A. Correct.

Q. And I believe it was Officer Marino, but

correct me if I'm wrong, but he mentions that the basis for the charge is the post about the Harris Teeter employee on X; is that right?

A.   Correct.

Q.   Okay.  At this point, has anyone read Ms. Rachmuth's Miranda rights?

A.   No.  Not at this point, no.

Q.   Why not?

A.   I can't say for that time, honestly.

Q.   But you handcuffed her, right?

A.   I did, yes, sir.

Q.   Okay.  When did you or one of the other officers read her Miranda rights?

A.   I don't recall, honestly.

Q.   Did you ever?

A.   I know -- I just said I didn't, honestly.

Q.   She informed you that she experiences panic attacks in that video; is that right?

A.   She did.

Q.   Once she notified you that she experiences a panic attack, were -- based on your training, were you under any obligation to respond in any way?

A.   Respond when?  If she had a panic

Case 5:25-cv-00222-BO-RJ   Document 29-6   Filed 08/03/26   Page 200 of 233

attack, to say what was done or said about it, or are you saying at that time when she had let us know about her having them?

Q. Yes, at that time, were you required to respond in any way to prepare in case she had a panic attack?

A. I mean, she didn't say she had one. So if she says she had one or she felt she was about to have one, then that's when I would have called. We would have had EMS come before even taking her. But she was just -- from that interaction, was just letting us know that she does have them and they could happen upon her escort to jail.

So that's when she had asked about the water if we could make sure -- no, if we had water for her to access or she could bring one. That's when Officer Hernandez had said, you know, you can bring a water bottle as long as the seal is closed.

Q. Okay. And you all let her bring that water bottle in the car, correct?

A. Correct.

Q. Did you ever have access to that water while she was in the car?

A.  I did not, no, sir.

Q.  Did you hand the water bottle to her at any time?

A.  I don't recall.

Q.  Did you leave it in the back seat with her?

A.  Possibly the back seat, but like I said, I don't recall.

Q.  Would she been -- would she have been able to drink the water bottle in the back seat?

A.  She would have -- if she needed one of our assistance, we could have opened the water bottle and gave it to her if she felt comfortable.  But some people may or may not feel.  And then some people may want to get out of cuffs, and we cannot take you out of cuffs, especially if we're not at the original site of arresting.  Or like we're on the side of a highway, I just can't necessarily stop right in there, depending on the situation, to where I can just stop to give you water.

Q.  Okay.  But I'm saying, like you said, if she asked and you were able to give it to her, you would have?  Is that --

A.  If she felt comfortable with me opening

her water bottle and allowing her to drink.  I would have given it to her if she felt comfortable.

Q.  And during the car ride there, did she ever ask for water?

A.  I know -- did she ask for water?  I can't remember if she asked about cuffs, her handcuffs, or water, so I don't want to tell you incorrectly.

Q.  Okay.

A.  But she didn't state that she had a panic attack.

Q.  She didn't say she had a panic attack?

A.  Not -- no, not in the vehicle.  If that was the case, like I said, then that would have been another situation to where I'd try to drive to a medical or hospital to get her further evaluated.

But just to ask for water is not saying that you're having a panic attack.

Q.  Given that she notified you that she had panic attacks and wanted to bring water for that purpose, would it have been reasonable to conclude that if she asked for water, she was having a panic attack?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 203 of 233

A.   I don't --

MS. BARBER-JONES:  Object to form.

You can answer.

THE WITNESS:  I can't assume.  I can only go based off the information that she provides me.  So if she asks me for water, then I can give her that water.  But if she doesn't say, I need water, I'm about to have a panic attack, I can only go so far within my realm.

MR. BRUCE:  Okay, I'm going to skip ahead a bit to 4:32.  We'll watch the next minute.

(A video identified as Exhibit 10 resumed playing over the videoconference.)

MR. BRUCE:

Q.   Okay.  We'll pause there.

So at this point, you walk her from her house through a yard and down the street, correct?

A.   Correct.  I cut through the house, down her front yard of that hill, and walked her down to the street to my vehicle.

Q.   Do you know how many houses were kind of in the vicinity of where you walked through to your parked vehicle?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 204 of 233

A.  I do not.

Q.  Would it be safe to say, based on the video, there were maybe six in that area?

A.  Possibly.  I didn't verify to check how many houses there were.

Q.  Okay.  Did you see -- she referenced one neighbor that was a nosy neighbor.  Do you remember that?

A.  Yes.

Q.  Did you see that neighbor outside?

A.  It was one of the houses to the right hand side of the video.

Q.  Okay.  Was that neighbor outside --

A.  On the porch.

Q.  -- during -- were there any other neighbors outside?

A.  No.

Q.  Did you see any neighbors peeking through the windows or anything like that?

A.  No.

Q.  Was that something you were looking out for?

A.  Once again, her safety is in my hands while she's cuffed.  So I will keep my head on a swivel and then look and surveillance the area.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 205 of 233

So when she stated that, oh, this is going to be on Facebook, and then she said something in reference to the neighbors, you'll hear me respond, oh, to the right?  And she said, Yes.  So then that's when I had verified -- because, like you just said, there is several houses around her.  But to verify where that neighbor is, because I said, I don't know if they have -- they're on good terms, good understanding.  I don't know that.

But I just -- like I said, at that timeframe, her safety is my main concern.

Q.  Is it possible there were other neighbors in the houses or on a porch that you didn't see during this time?

MS. BARBER-JONES:  Object to form.

You can answer.

THE WITNESS:  I don't recall.

BY MR. BRUCE:

Q.  You don't recall seeing any others?

A.  No, I do not recall seeing any others.  The only one that I did, like I said, see was the one that she did acknowledge.  Like I said, my head was on a swivel.  But the one that she said that was -- that we both stated that was

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 206 of 233

outside somewhere to the right of those houses.

Q. Okay. But it's possible others could have been out there and you just didn't see them?

MS. BARBER-JONES: Objection.

You can answer.

THE WITNESS: If so, they would have been on the yard or they would have been on the porch to where we've seen something. Same way that she's seen that president -- or excuse me, her neighbor on the porch, I'm quite sure she would have said the same thing for the other neighbors if they were on their lawn or on their porch.

But as I said before, I didn't see any. I only seen the one to the right hand side of that video while walking her back to the vehicle.

MR. BRUCE: Okay. I am going to stop this share. And just for the Planet Depos people, that video will be Exhibit 10.

BY MR. BRUCE:

Q. Where did you transport Ms. Rachmuth after you arrested her at her home?

A. Wake County Detention Center.

Q. Did you communicate with anyone at the Wake County Detention Center before her arrest about her?

A. No.

Q. Did you communicate with anyone at the Wake County Detention Center -- after her arrest -- about Ms. Rachmuth?

A. Me bringing her, yes. Of course, there's paperwork that we have to do before they accept any suspects or offenders to come in. So, of course, you're going to have to say what's the CR number for the arrest warrant, your reason, time of arrest, were they compliant, who's the officer that's bringing them in? So there are certain processes that you're going to have to do. You just can't go walk straight through the jail and then drop her off.

Q. Okay. Do you tell them any of the underlying conduct about the charge?

A. No.

Q. Okay. You said you have to tell them whether they're compliant; is that right?

A. There's a sheet that I don't remember exactly. But most of the time it's like, is this a domestic? Yes or no? Was there, like,

possible use of force used?  Yes or no?

There's other questions that it might ask.  It's just a yes or no question, but I can't remember them all at once right now.

Q.  Okay.  Is one of those questions whether the suspect was compliant with the arrest?

A.  Possibly.

Q.  Do you remember what your answer to that question was?

A.  If she was compliant?

Q.  Uh-huh.  Yes.

A.  Yes.  Yeah, we didn't use force or anything like that, so --

Q.  Okay.  Did you tell them anything else about Ms. Rachmuth?

A.  No.  I didn't know her.

Q.  Okay.  After you drop Ms. Rachmuth off at the Wake County Detention Center, what else did you do with respect to this case?

A.  Like I said, that was case closed from my end, from that standpoint.  Like I said, the arrest warrant was met.  And like I said, I did that supplement, that was later on done that day.  I forgot the timeframe, but I did put that supplement in for me doing the arrest warrant.

Outside of that, that was it.

Q. Okay. So besides the supplement, was there any other paperwork you had to fill out?

A. No, because the narrative was done before I even went to serve the arrest warrant.

Q. Were you -- or did you have any involvement in Ms. Rachmuth's bail determination?

A. No.

Q. Were you ever asked by the magistrate or the district attorney's office to present facts in support of a bail determination?

A. No.

Q. Do you know why Ms. Rachmuth's bail was set for the amount at which it was set?

A. I don't even know where her amount was.

Q. How are you doing, Officer? Do you need a break or do -- we can keep going for a few more minutes?

A. How much more are we going?

Q. I'd like to push through. If we push through, I probably have less than an hour.

A. When would be the next break if you're trying to push through?

Q. We could probably do one in 10 or 15.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 210 of 233

Or you want to break now and then just try to finish it up?

A.  We can push through, yeah.  As long as it's 10 or 15, yeah, I have no problem with that.

Q.  Well, I don't want to hold -- you know, don't hold me to it, but let's do a little bit longer, and if we hit -- if, you know, we hit 7:50, we'll take a break.

Okay.  So are you aware that the District attorney dismissed the cyberstalking charge the day after the arrest?

A.  Not necessarily the day after.  I've heard about it, but I don't think it was, like, the day after when I heard about it.

Q.  When did you hear about it?

A.  I don't recall.  It wasn't the day after, though.

Q.  Are you aware that the district attorney stated the reason for dismissing the charge was that the described conduct does not meet the elements of the offense?

A.  I don't recall.

Q.  Did you ever review the order of dismissal?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 211 of 233

A.  No.  I was informed about it, but like I said, I was through the FTO process, so I wasn't solely focused on just that case.  I had other things I had going on, as well.

Q.  You said you heard about it.  Who told you about the case being dismissed?

A.  I can't recall.

Q.  Okay.  Did they give any reason why it was dismissed?

A.  Not in my understanding, no.

Q.  Okay.  What was your reaction when you learned the charge was dismissed?

A.  No certain reaction.  I mean, I did what I could with -- on my end.  If it was felt that otherwise, I -- that's something I allowed the magistrate or the judge to figure out or the lawyers to figure out.

Like I said, for me to put my arrest warrant in and for the magistrate to grant it, clearly there was something that was said or seen on her end or his end to say yes or no, you know, we will grant you this.

But I'm -- it's not nothing like, oh, yes or oh, no, like she's out.  Nothing like that.  I don't know her.  I don't know the

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 212 of 233

victim.  I don't know the witnesses.  Like I said, I'm just here to, you know, keep the peace.

Q.  Do you think you kept the peace by arresting Ms. Rachmuth that day?

A.  I felt I did, yes.

Q.  Why do you feel that?

A.  As I said earlier before, to where the victim did not return back to work for several days.  The management saying, you know, she didn't return back several days.  I'm quite sure they probably were trying to talk to her and see if she was willing to.  But, you know, if the victim is not there mentally for it, then the victim is not there mentally for it.

As well as, like I said, for her to have to take her kids out of school.  That's a big one.

Because, like I said before to where calls were already made to the Holly Springs Harris Teeter, granted anything could happen, to where what if that call was made to the school or the person find out wherever the kids hang out, whatever the case may be?  You don't know those situations until it happens.

So to prevent it on my end as an officer with the victim feeling that she was harassed, threatened, and harmed to where she didn't even want to return back to her only job, that's pretty big to me.

Q. Did anyone at Holly Springs Police Department conduct any review or investigation into why the charge was dismissed?

A. Not that I know. There might have been, but not to my knowledge.

Q. Were you subject to any investigation or follow up after the charge was dismissed?

A. No, sir.

Q. Did any of your supervisors question you about the charge after it was dismissed?

A. No, sir.

Q. Were you subject to any disciplinary action after the charge was dismissed?

A. No, sir.

Q. Are you aware that Ms. Rachmuth filed multiple complaints with the Holly Springs Police Department between 2021 and 2023 about anti-Semitic cyberstalking?

A. No. I don't know her, didn't know her prior to. And I didn't join Holly Springs 'till

2024, so I was still brand new.

Q. Okay. So you said this was the only cyberstalking charge that you have pursued in your time at Holly Springs Police Department; is that right?

A. Yes, to where it's pushed out like this now. I've dealt with harassment, but for myself, yeah, this is the only cyberstalking charge I've done.

Q. What kind of harassment cases have you dealt with?

A. More so DVPO situations.

Q. What's DVPO?

A. Domestic violence protective order, excuse me.

Q. Okay. And you said this is the only case in which you sought an arrest warrant; is that right?

A. For my knowledge, yes, this is the only one. From my knowledge, I've never -- I've served arrest warrants, but from my knowledge right now, that's the only one I can think of.

Q. How many other incidents have you served as the investigating officer on since you started with Holly Springs PD?

A.   I don't keep numbers.  There's a lot of calls we receive, so --

Q.   Is it more than ten?

A.   Yeah.  That was the lead investigator, yes, sir.

Q.   Okay.  More than 20?

A.   I -- possibly, yes.  Been here for about almost two years, so --

Q.   Okay.  Did any of those incidents involve other incidents that were designated a suspected hate or bias incident?

A.   No.

Q.   So this is the only incident you've investigated that was designated as a suspected hate or bias incident?

A.   Yeah.  Everything is more so, like I said, domestic violence stuff, perhaps.  More so, like, you know, they were in a relationship where they were married and certain things civilly they want to do, child custody, certain things.

But nothing, like I said, with this. Even he say, she say, maybe through social media and they use that as evidence, but it wasn't posted, like, oh, this person here said, you

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 216 of 233

know, this date and time, this, that, and the third wherever allegations made a claim.

This was, like I said, the first time I did the cyberstalking, so --

Q. Were you aware that Ms. Rachmuth's mugshot was widely disseminated on social media after her arrest?

A. No.

Q. Were you aware that it was disseminated in newspapers after her arrest?

A. No.

Q. Did you see any public reporting about her arrest after the incident?

A. No.

Q. Did you or anyone at Holly Springs Police Department take steps to reduce any harm to Ms. Rachmuth after her mugshot was published?

MS. BARBER-JONES: Objection.

You can answer.

THE WITNESS: Nothing was said to me, from my understanding. So, no complaints or calls of service that I know of in reference to her mugshot being placed. I've never heard that, no.

BY MR. BRUCE:

Q. Have you worked on any incidents involving Ms. Rachmuth since her arrest?

A. No.

Q. Are you aware that Ms. Rachmuth has been diagnosed with exacerbated PTSD and required therapy as a result of her arrest?

A. No.

MS. BARBER-JONES: Objection.

You can answer.

THE WITNESS: No, I don't know her, so I don't know her situation.

BY MR. BRUCE:

Q. What's your reaction to learning that information?

A. What's my reaction? What now? Or were you saying from the time frame if I knew that?

Q. Just now, from learning that she suffers from exacerbated PTSD.

MS. BARBER-JONES: Objection.

You can answer.

THE WITNESS: I mean, everybody is going through something in life. Hopefully, she's just taking the proper procedures to get better or help her situation. But I mean, we're still all human at the end of the day.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 218 of 233

BY MR. BRUCE:

Q. Have you communicated with anybody inside Holly Springs Police Department about Ms. Rachmuth after her arrest?

MS. BARBER-JONES: Objection just to the extent that it refers to privileged conversations.

But you can go ahead.

MR. BRUCE: Understood. I'll rephrase.

BY MR. BRUCE:

Q. Have you communicated with anybody besides counsel for you or the city about Ms. Rachmuth after her arrest?

A. I did speak to PBA.

Q. What's PBA?

A. What is it? The Police Bureau Association, if I'm not mistaken.

MS. BARBER-JONES: And so, if you talked -- any conversations with the PBA attorney would also not be included.

THE WITNESS: Oh, yeah, yeah, no.

MS. BARBER-JONES: Okay.

BY MR. BRUCE:

Q. Okay. I guess, did you talk with any other officers about Ms. Rachmuth after the

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 219 of 233

arrest?

A. Just the officers that were involved in the situation.

Q. Okay. And were those conversations in person or through emails or texts?

A. No, in person.

Q. Okay. And do you have a -- have separate electronic devices for work and personal use?

A. No.

Q. Okay. So do you use the same cellphone for your personal stuff as you use for work stuff?

A. Yes.

Q. Okay. And do you have a laptop you use for work?

A. Yes.

Q. Okay. Is that also a personal laptop?

A. No, it's a work laptop.

Q. Okay. Did you search your cellphone for documents and information regarding Ms. Rachmuth and your investigation into her case?

A. I can't recall. Like I said, I might have received -- because I have my email set to where I can receive work emails. So I might

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 220 of 233

have been able to look at it right on scene.  If not, I might have looked at it from a computer, so I'm unable to say for that one.

Q.  Okay.  Did you send any emails or text messages about Ms. Rachmuth and your investigation on your cellphone?

A.  No.

Q.  Okay.  Do you have any pictures or recordings relating to the arrest on your cellphone?

A.  I did have -- what is it -- the post later on that she had posted about me, Officer Hernandez, Officer Marino.  I have -- I've sent that in.  What else was it?  She also made another post, like I said, about me separately. I guess, like I said, trying to discredit me or whatever the case may have been.

You know, sometimes she called me by my name.  Sometimes I'd be the black officer.  It just, I guess, depended on how she felt at that time with her responses.

Like I said earlier, she did post my information Facebook wise and my actual page on her X account to where I received an unknown random friend request from an older gentleman

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 221 of 233

with white hair and he was bald.  But I blocked him, and I also blocked Ms. Sloan and her husband because, like I said, I don't know where that came from.  And like I said, for people to message me and say, like, you know, she's saying this about you on social media, I don't know where it's coming from.

So to try to deviate the situation, the sources would be either Ms. Sloan, her husband, or whomever else that got that information for them.  I don't know.

Q.  Okay.  Other than those posts after the arrest, did you have any pictures or anything related to your investigation on your cellphone?

A.  There was someone, I guess, that was trying to look me up that was -- had informed me about she has another website that she posts her stuff.

But like I said, this was after -- way after the investigation.  Like, this was like maybe this year type of deal.  That she had looked me up and seen some -- I can't remember other little posts or websites she has, but she broke it down.  I guess I'm in her, like, legal terms or however she felt legally about what

happened that day.  And I guess how she was going to go further on from that situation.

Q.  Okay.  But was there anything on your phone from during the investigation that you collected and stored on your cell phone?

A.  No.  Like I said, I had made that copy of the picture from the email that the management was able to send to me.

Q.  Okay.  Did you produce the other thing, the other posts and stuff you referenced about that you collected on your phone in discovery?

MS. BARBER-JONES:  Yeah, we will supplement the posts that Ms. Rachmuth made about the officers to the extent that we haven't produced those already.  We were pretty sure she was aware she posted that information online.

And we will double check to make sure that there aren't any emails or other documents that we haven't produced yet.

MR. BRUCE:  Understood.  Thanks, Katie. I mean, I'm not as concerned about the post, just double checking about anything else that could be on a cellphone, but I appreciate it.

Okay.  Let me -- let's take a quick break and let me go through my notes, but

Case 5:25-cv-00222-BO-RJ     Document 29-6     Filed 08/03/26     Page 223 of 233

that's -- that should be just about all I have for you. But give me ten more minutes and let me double check everything.

THE WITNESS: Okay.

MR. BRUCE: Thank you.

THE VIDEOGRAPHER: We are going off the record. The time on the video monitor is 7:54 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time on the video monitor is 8:05 p.m.

BY MR. BRUCE:

Q. All right. I just have a couple more questions, Officer Warren, and then we'll be done for the night.

You mentioned that the calls to Harris Teeter was something that you considered in making your decision to charge cyberstalking; is that correct?

A. I won't say it was the main, but it was a contributing factor.

Q. Was it something that you considered, though, when you were determining whether cyberstalking was an appropriate charge?

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 224 of 233

A. It was a contributing factor for the victim to not want to come back. So you could say yes.

Q. Okay. Did you document the fact that those calls were occurring anywhere in writing at the time?

A. I don't recall if I put that in my narrative right now. I can't.

Q. Okay. Did you -- you also mentioned that the employee not wanting to put her children in school was something you considered; is that right?

A. Yes, because she said she feared if individuals are already calling her workplace, she feared that if some type of information or whatever was leaked to where they knew her children stayed at, then that will put her kids as well as herself and family in a situation.

Q. Okay. Did she tell you that on the November 2nd phone call you had with her?

A. Yes.

Q. Did you document that in writing anywhere?

A. I don't recall putting that in my narrative, no.

MR. BRUCE:  Okay.  That's all the questions I have.  I appreciate your time.  I will pass it to Ms. Barber-Jones if she has any questions.

MS. BARBER-JONES:  I don't have any questions.  Thank you so much.

MR. BRUCE:  All right.  Thank you, all. I really appreciate it.

I wish you the best, Officer Warren.

THE WITNESS:  Thank you.

MS. BARBER-JONES:  Good night.

THE COURT REPORTER:  Counsel, would you like exhibits attached?

MR. BRUCE:  Yes.  Yes, please.

THE VIDEOGRAPHER:  This marks the end in the videotaped deposition of Elliott Warren.  We were going off the record at 8:07 p.m.

(Off the video record at 8:07 p.m.)

MS. BARBER-JONES:  And we would like to read and sign.

THE COURT REPORTER:  Okay.  Do you want a copy of the transcript, a regular copy?

MS. BARBER-JONES:  Does regular copy just mean an e-tran?  What does that mean?

THE COURT REPORTER:  Yeah, yeah, e-tran.

Case 5:25-cv-00222-BO-RJ    Document 29-6    Filed 08/03/26    Page 226 of 233

MS. BARBER-JONES: Okay. I don't want a physical copy, but I would like an electronic transcript with exhibits, please.

THE COURT REPORTER: Okay. Mr. Bruce?

MR. BRUCE: We'll take the same.

(Off the record at 8:08 p.m.)

CERTIFICATE OF COURT REPORTER-NOTARY PUBLIC

I, Micah Hardin, the officer before whom the foregoing proceedings were taken, do hereby certify that said proceedings were electronically recorded by me; that the foregoing transcript, to the best of my ability, knowledge, and belief, is a true and accurate record of the proceedings; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

MICAH HARDIN, NOTARY PUBLIC FOR

THE STATE OF INDIANA

Planet Depos
888.433.3767 | planetdepos.com

CERTIFICATE OF TRANSCRIBER

I, Roanna Ossege, do hereby certify that the foregoing pages, to the best of my ability, are a true and correct transcription from the official electronic sound recording and annotations of the proceeding taken on May 26, 2026, in the above-entitled matter; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

*Roanna S. Ossege*

_____

ROANNA OSSEGE

June 1, 2026

Exhibit #

09

05/26/26 - AM

exhibitsticker.com

| File No. 24CR447148-910 | Law Enforcement Case No. 24002684 | LID No. |
|---|---|---|

**WARRANT FOR ARREST**

**THE STATE OF NORTH CAROLINA VS.**

HOLLY SPRINGS POLICE DEPARTMENT

Name And Address Of Defendant
JENNIFER SLOAN RACHMUTH
112 BELLAGIO DR

APEX          NC     27539-5305
WAKE COUNTY        (704) 299-9071

**STATE OF NORTH CAROLINA**

WAKE          County

In The General Court Of Justice
District Court Division

Spoken Language Court Interpreter Needed For Any Party, Victim, Or Witness? (If Yes, identify person(s) and language(s).
Interpreters provided for all court proceedings at no cost.)

[X] No   [ ] Yes: (explain)

**OFFENSE(S)** (see AOC-CR-100 Continuation(s) for charging text)

| Race W | Sex F | Date Of Birth | Age 54 |
|---|---|---|---|

| Count No. | Offense | Offense in Violation Of G.S. | Offense Code |
|---|---|---|---|
| 1 | M - CYBERSTALKING | 14-196.3 | 5337 |

Name Of Defendant's Employer

Date Of Offense
10/31/2024

[ ] Misdemeanor Offense Which Requires Fingerprinting Per Fingerprint Plan

Date Of Arrest & Check Digit No. (as shown on fingerprint card)

Complainant Name (and address, if Complainant is an officer)
ELLIOTT WARREN
HOLLY SPRINGS POLICE DEPARTMENT
125 N Main St
HOLLY SPRINGS     NC     27540
WAKE

Witness Information
SHERONDA MICHELLE IRICK

CERTIFIED TRUE COPY FROM ORIGINAL
Clerk of Superior Court, Wake County

**TO ANY OFFICER WITH AUTHORITY AND JURISDICTION TO EXECUTE A WARRANT FOR ARREST FOR THE OFFENSE(S) CHARGED IN THIS WARRANT:**
I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did commit the offense(s) set forth above and on the attached AOC-CR-100 Continuation(s), which is (are) incorporated by reference. This act(s) was in violation of the law referred to in this Warrant For Arrest. This Warrant For Arrest is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring the defendant before a judicial official without unnecessary delay to answer the charge(s) above.

| Date Issued 11/02/2024 | Name Of Issuing Official M. RAMIREZ | Signature | [X] Magistrate [ ] Deputy CSC [ ] Assistant CSC [ ] Clerk Of Superior Court [ ] District Court Judge [ ] Superior Court Judge |
|---|---|---|---|

| Location Of Court | Court Date | Court Time |
|---|---|---|

**WAIVER OF PROBABLE CAUSE HEARING**

The undersigned defendant, with the consent of his/her attorney, waives the right to a probable cause hearing.

| Date Waived | Signature Of Defendant | Name Of Attorney | Signature Of Attorney |
|---|---|---|---|

AOC-CR-100, Rev. 7/24, © 2024 Administrative Office of the Courts          (Over)          Original

| **STATE VERSUS** | | WAKE County | File No. 24CR447148-910 |
|---|---|---|---|

Name Of Defendant
JENNIFER SLOAN RACHMUTH

Date Of Issuance Of Warrant For Arrest
11/02/2024

If the Warrant For Arrest is not served within one hundred and eighty (180) days, it must be returned to the Clerk of Court in the county in which it was issued with the reason for the failure of service noted thereon.

### RETURN OF SERVICE

I certify that the Warrant For Arrest issued in this case on the date noted above for the defendant named above, was received and served as follows:

| Date Received | Date Served | Time Served | Date Returned |
|---|---|---|---|
| 11/2/24 | 11/3/24 | 1119 am | 11/3/24 |

☑ By arresting the defendant and bringing the defendant before:

Name Of Judicial Official
Magistrate

☐ The Warrant WAS NOT served for the following reason:

Signature Of Officer Making Return
*Elliott Warren*

Name Of Officer (type or print)
Elliott Warren

Department Or Agency Of Officer
Holly Springs Police Department

### REDELIVERY/REISSUANCE

| Date | Name Of Clerk (type or print) | Signature Of Clerk | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court |
|---|---|---|---|

### RETURN FOLLOWING REDELIVERY/REISSUANCE

I certify that the Warrant For Arrest issued in this case on the date noted above for the defendant named above, was received and served as follows:

| Date Received | Date Served | Time Served | Date Returned |
|---|---|---|---|

☐ By arresting the defendant and bringing the defendant before:

Name Of Judicial Official

☐ The Warrant WAS NOT served for the following reason:

Signature Of Officer Making Return

Name Of Officer (type or print)

Department Or Agency Of Officer

AOC-CR-100 Return, Rev. 7/24
© 2024 Administrative Office of the Courts

Original

CERTIFIED TRUE COPY FROM ORIGINAL
Clerk of Superior Court, Wake County

By:

Assistant Deputy Clerk of Superior Court

| File No. | | | | |
|---|---|---|---|---|
| 24CR447148-910 | | | | |

**WARRANT FOR ARREST**

**THE STATE OF NORTH CAROLINA VS.**

*Name And Address Of Defendant*
JENNIFER SLOAN RACHMUTH
112 BELLAGIO DR

| | | | |
|---|---|---|---|
| APEX | NC | 27539-5305 | |
| WAKE COUNTY | (704) 299-9071 | | |

| Law Enforcement Case No. | 24002684 | LID No. |
|---|---|---|
| HOLLY SPRINGS POLICE DEPARTMENT | | |

**STATE OF NORTH CAROLINA**

WAKE County

In The General Court Of Justice
District Court Division

Spoken Language Court Interpreter Needed For Any Party, Victim, Or Witness? (If Yes, identify person(s) and language(s). Interpreters provided for all court proceedings at no cost.)

[X] No  [ ] Yes: *(explain)*

| Race | Sex | Date Of Birth | Age |
|---|---|---|---|
| W | F | ▓▓▓▓▓ | 54 |

*Name Of Defendant's Employer*

*Date Of Offense*
10/31/2024

[ ] **Misdemeanor Offense Which Requires Fingerprinting Per Fingerprint Plan**

*Date Of Arrest & Check Digit No. (as shown on fingerprint card)*

*Complainant Name (and address, if Complainant is an officer)*
ELLIOTT WARREN
HOLLY SPRINGS POLICE DEPARTMENT
125 N Main St
HOLLY SPRINGS    NC    27540
WAKE

*Witness Information*
SHERONDA MICHELLE IRICK

**OFFENSE(S)** *(see AOC-CR-100 Continuation(s) for charging text)*

| Count No. | Offense | Offense in Violation Of G.S. | Offense Code |
|---|---|---|---|
| 1 | M - CYBERSTALKING | 14-196.3 | 5337 |

**TO ANY OFFICER WITH AUTHORITY AND JURISDICTION TO EXECUTE A WARRANT FOR ARREST FOR THE OFFENSE(S) CHARGED IN THIS WARRANT:**
I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully, and feloniously did commit the offense(s) set forth above and on the attached AOC-CR-100 Continuation(s), which is (are) incorporated by reference. This act(s) was in violation of the law referred to in this Warrant For Arrest. This Warrant For Arrest is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring the defendant before a judicial official without unnecessary delay to answer the charge(s) above.

| Date Issued | Name Of Issuing Official | Signature | [X] Magistrate [ ] Deputy CSC [ ] Assistant CSC [ ] Clerk Of Superior Court |
|---|---|---|---|
| 11/02/2024 | M. RAMIREZ | *Margte Ramirez* | [ ] District Court Judge [ ] Superior Court Judge |

| Location Of Court | | Court Date | Court Time |
|---|---|---|---|

**WAIVER OF PROBABLE CAUSE HEARING**

The undersigned defendant, with the consent of his/her attorney, waives the right to a probable cause hearing.

| Date Waived | Signature Of Defendant | Name Of Attorney | Signature Of Attorney |
|---|---|---|---|

AOC-CR-100, Rev. 7/24, © 2024 Administrative Office of the Courts

Case 5:2002-00202RJO  Document 29-2  Filed 04/09/26  Page 232 of 233

VRA Case

| STATE VERSUS | WAKE County | File No. 24CR447148-910 |
|---|---|---|

Name Of Defendant
JENNIFER SLOAN RACHMUTH

Date Of Issuance Of Warrant For Arrest
11/02/2024

**NOTE:** *Use this page to set forth the charging text for each offense listed on the AOC-CR-100. G.S. 15A-924(a)(5).*

## OFFENSES (continued)

**Count 1.  Offense: M - CYBERSTALKING**

*Charging Text For This Count*

On or about the date of offense shown and in the county named above the defendant unlawfully and willfully did did knowingly permit an electronic communication device, CELLPHONE , under the defendant's control to be used for a purpose prohibited by G.S. 14-196.3, TO TAKE PICTURES AT HARRIS TEETER AND ELECTRIONCALLY COMMUNICATE ON SOCIAL MEDIA, FOR THE PURPOSE OF TERRIFYING, HARASSING, OR EMBARRASSING HER .

**Count 2.  Offense:**

*Charging Text For This Count*

CaseCase 5:25-cv-00200-202FJO DDocument 29-2 Filed 08/09/26 Page 433 of 233