IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil Action No. 5:25-cv-222-BO-RJ

| | | |
|---|---|---|
| JENNIFER SLOAN RACHMUTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DECLARATION OF** |
| | ) | **PAUL LIQUORIE** |
| ELIOTT WARREN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I, Paul Liquorie declare under penalty of perjury as follows:

1. I am over 18 years of age, I am competent, and I am not otherwise under any disability. I have personal knowledge of the matters as set forth herein.

2. The statements in this Declaration are true and correct, to the best of my personal knowledge and belief.

3. I am the Chief of Police for the Town of Holly Springs Police Department ("HSPD") and have served as Chief since 2020.

4. Before serving as the Chief of Police for HSPD, I was employed by the Montgomery County, Maryland Police Department from 1994-2020, serving as an Acting Assistant Chief. Prior to that, I was a Captain in the United States Marine Corps serving on active duty from 1990 until 1994.

5. As the Chief of Police, I am responsible for all aspects of HSPD operations. In consultation with Town Management and with the assistance of command staff, I

propose, amend, and enforce policies governing the conduct of law enforcement officers and non-sworn staff members employed by the HSPD.

6. I am familiar with the Defendant Officers in this matter, Benjamin Marino, Edgar Hernandez, and Elliot Warren.

7. All policies and records described in and attached to this Declaration are true and accurate copies of original documents.

*HSPD Policies Pertinent to This Action*

8. True and accurate copies of pertinent HSPD policies are attached hereto as follows:

    a. Exhibit 1, HSPD Written Directive 840.01 – Criminal Investigations

    b. Exhibit 2, HSPD Written Directive 710.03 – Service of Legal Process

    c. Exhibit 3, HSPD Written Directive 840.01 – Follow-Up Investigative Notifications and Responsibilities

    d. Exhibit 4, HSPD Written Directive 820.11 – Interaction with the Mentally Ill

    e. Exhibit 5, HSPD Written Directive 820.09 – Bias Free Policing

9. HSPD Written Directive 840.01 – Criminal Investigations, attached as **Exhibit 1,** governs the procedures HSPD officers must follow when conducting criminal investigations. The directive requires that personnel ensure investigative actions comply with constitutional requirements. Ex. 1 at 3. The directive states that patrol officers will typically conduct preliminary investigations for dispatched calls. *Id.* at 5. The directive also

advises that the "Incident Report will normally serve as a sufficient checklist for most investigations." *Id.* at 6.

10. HSPD Written Directive 710.03 – Service of Legal Process, attached as **Exhibit 2**, establishes the policy and procedures for the service of legal process documents, including arrest warrants, in accordance with existing laws. The directive states that "[u]pon the execution of an arrest warrant, an officer will transport the person arrested to a judicial official without unnecessary delay." Ex. 2 at 2. The directive also requires that "officers who establish probable cause to obtain arrest . . . warrants or who have obtained arrest warrants will not intentionally delay obtaining or serving arrest . . . warrants without supervisory approval." *Id.* at 3.

11. HSPD Written Directive 840.01 – Follow-Up Investigative Notifications and Responsibilities, attached as **Exhibit 3**, establishes the policy and procedures that officers must follow in regard to investigative follow-up. The directive instructs patrol officers that "[a]ll allegations of crime require an incident report," and that generally, the primary responding officer is responsible for follow-up investigations. Ex. 3 at 3.

12. HSPD Written Directive 820.11 – Interaction with the Mentally Ill, attached as **Exhibit 4**, establishes policies for officers encountering mentally ill people. The directive states that "[a]ll new personnel shall receive training in recognition of mental illness, interaction with those who are mentally ill, information about the Crisis Intervention Team (CIT), and resources for the mentally ill." Ex. 4 at 2. The directive instructs officers to assess individuals for behavior indicating signs and symptoms of

mental illness. *Id.* Further, the directive describes the training and role of CIT officers in responding to mentally ill people. *Id.*

13. HSPD Written Directive 820.09 – Bias Free Policing, attached as **Exhibit 5** requires that all HSPD officers conduct their law enforcement duties free from bias. The directive "prohibits bias based profiling and establishes procedures to ensure that no law enforcement actions taken by members of the Holly Springs Police Department are taken solely because of race, ethnicity, national origin, gender, sexual orientation, religion, economic status, age, cultural group, or other identifiable group." Ex. 5 at 1. The directive provides that "[a]ll investigative detentions, traffic stops, arrests, searches, and seizures of property by officers will be based on a standard of reasonable suspicion or probable cause as required by the Fourth Amendment of the U.S. Constitution, established case law, and other statutory authorities. Officers must be able to articulate specific facts, circumstances and conclusions that support probable cause or reasonable suspicion for an arrest, traffic stop, or investigative detention." *Id.* at 1. This directive also requires that all officers complete training on the policy and requires annual training on "bias-free, fair and impartial policing." *Id.* at 2.

14. Officers Marino, Hernandez and Warren have all completed Crisis Intervention Team ("CIT") training. CIT equips officers to appropriately handle situations where people are experiencing mental health crises.

15. In CIT training, officers receive "specialized training in mental illness awareness, medications, de-escalation skills, and resources for the mentally ill." Ex. 4 at 3. CIT officers are trained to identify mental health crises and to deescalate these situations,

or to seek medical care by either calling for Emergency Medical Services, or by diverting to a Medical Facility when appropriate.

16. I have interacted with Ms. Rachmuth prior to the events in this case. In November 2022, I was asked by Ms. Rachmuth to review the investigation of a complaint Ms. Rachmuth submitted regarding alleged harassment and cyberstalking communications she received. Ms. Rachmuth was dissatisfied with the results of the investigation, which found that the statements reported were not sufficient to rise to the level of a crime.

17. I met with Ms. Rachmuth in person and encouraged her to bring and/or forward additional material for further review.

18. I directed the supervisory staff for the department to take a review of the material provided by Ms. Rachmuth.

19. As far as I am aware, Ms. Rachmuth was running a political action committee (PAC) based on educational issues. She reported to the Holly Springs Police Department that she believed she was being harassed electronically. An initial investigation found that her complaints were not substantiated, but I invited her to an in-person meeting, at my office, to allow her to present all the relevant details.

20. An in-depth investigation and consultation with the North Carolina State Bureau of Investigation (NCSBI) by then Detective-Sergeant Jeremy Rushton followed up on several communications and confirmed that elements of a crime under the North Carolina General Statutes had not been committed.

21. I have personally attended advanced trainings for law enforcement leadership by the Anti-Defamation League. I have extensive experience in combatting

antisemitism alongside the Jewish community, especially in my former agency in Montgomery County, Maryland, which is home to a significant Jewish and Israeli communities. In my current capacity, I continue to receive "ADL Law Enforcement" bulletins via email and interact and participate with the Jewish Federation of Greater Raleigh, to include attending their Annual Inter-Community Seder.

22. Holly Springs Police Department has paid to train its officers in "Fair & Impartial Policing", by an outside consultant, which is not part of the required annual in-service training hours by the Criminal Justice Education & Training Standards.

23. I had no involvement in the investigation, charging, arrest, or detention of Ms. Rachmuth.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of August , 2026.

Paul Liquorie
Paul Liquorie (Aug 3, 2026 18:04:02 EDT)
**Paul Liquorie**

**EXHIBIT**

**1**

|  | Holly Springs Police Department<br>Written Directive |
|---|---|
| | **Chapter:** 800 - Operations |
| | **Directive:** 840.01 - Criminal Investigations |

| **Authorized by:** Chief Paul J. Liquorie | **Effective Date:** January 1, 2023 |
|---|---|
| **CALEA Standards**: 1.2.3, 41.2.5, 42.1.1, 42.1.2, 42.1.3, 42.1.4, 42.1.5, 42.2.1, 42.2.2, 42.2.3, 42.2.4, 42.2.5, 42.2.6, 42.2.10, 42.2.11 and 42.2.12 | **Last Revision:** October 5, 2022 |

### 840.1.1 – Purpose

The purpose of this directive is to establish policy and procedure to ensure effective and efficient investigations of criminal activity and related incidents.

### 840.1.2 – Policy

It is the policy of the Holly Springs Police Department to conduct investigations into complaints of criminal activity to the fullest extent possible in order to resolve complaints and present offenders for prosecution as directed by other elements of the criminal justice system.

This directive addresses the function of criminal investigation and is not intended as a procedural directive just for the Criminal Investigations Section (CIS). Unless otherwise stated, or is made obvious by text, all procedures within this directive apply to all sworn personnel.

### 840.1.3 – Definitions

A. <u>Electronic recording</u> – An audio recording that is an authentic, accurate, unaltered record; or a visual recording that is an authentic, accurate, unaltered record. A visual and audio recording shall be simultaneously produced whenever reasonably feasible, provided that a defendant may not raise this as grounds for suppression of evidence [NCGS 15A-211(c) (1)].

B. <u>Eyewitness</u> – A person, including a law enforcement officer, whose identification by sight of another person may be relevant in a criminal proceeding [NCGS 15A-284.52(a) (1)].

C. <u>Field Interview</u> – A documented temporary detention or voluntary encounter of an individual while officers are out in the community that warrants recording for valid criminal investigative or intelligence purposes.

D. <u>Filler</u> – A person or a photograph of a person who is not suspected of an offense and is included in a photographic or in-person lineup [NCGS 15A-284.52(a) (2)].

E. <u>Follow-up Investigation</u> - Extension of a preliminary call for service or investigation to gain additional information.

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 7 of 44

F.  Independent Administrator – A lineup administrator who is not participating in the investigation of the criminal offense and is unaware of which person in the lineup is the suspect [NCGS 15A284.52(a)(3)].

G.  Interview - Any attempt by an officer to speak with a suspect, victim, witness, or other person to obtain information related to a criminal investigation or other police matter (note – the term "interview" may be used interchangeably with the term "interrogation" in the context of a suspect or defendant).

H.  Investigative Detention – When an officer stops and detains an individual based on the fact that the officer has reasonable articulable suspicion to believe that the individual has committed, is committing, or is about to commit a crime in accordance with the U.S. Supreme Court decision in *Terry v. Ohio.*

I.  Juvenile – For the purposes of custodial interviews, a juvenile is any person who has not reached the person's eighteenth (18th) birthday and is not married, emancipated, or a member of the armed forces of the United States.

J.  Lineup – A grouping of similar looking individuals in photographs or in-person, to include a suspect in an investigation, in order to have a witness(es) identify the person responsible for a crime.  [NCGS 15A-284.52(a)(4)].

K.  Lineup administrator – The person who conducts a lineup [NCGS 15A-284.52(a)(5)].

L.  Live lineup – A procedure in which a group of people are displayed sequentially (rather than simultaneously) to an eyewitness for the purpose of determining if the eyewitness is able to identify the perpetrator of a crime [NCGS 15A-284.52(a)(6)].

M.  Photo lineup – A procedure in which an array of photographs is displayed sequentially (rather than simultaneously) to an eyewitness for the purpose of determining if the eyewitness is able to identify the perpetrator of a crime [NCGS 15A-284.52(a)(7)].

N.  Place of detention – A jail, police or sheriff's station, correctional or detention facility, holding facility for prisoners, or other facility where persons are held in custody in connection with criminal charges [NCGS 15A-211(c)(3)].

O.  Preliminary Investigation - Information collected by officers upon their initial response to an incident.

P.  Primary Investigator - The officer or detective assigned primary responsibility and accountability for an investigation.

Q.  Recording "In its entirety" – An uninterrupted record that begins with and includes a law enforcement officer's advice, to the person in custody, of that person's constitutional rights, ends when the interview has completely finished, and clearly shows both the interrogator and the person in custody throughout. If the record is a visual recording, the camera recording the custodial interrogation must be placed so that the camera films both the interrogator and the suspect. Brief periods of recess, upon request by the person in custody or the law enforcement officer, do not constitute an "interruption" of the record. The record will reflect the starting time of the recess and the resumption of the interrogation [NCGS 15A-211(c)(2)].

R.  Show-up – A procedure in which an eyewitness is presented with a single live suspect for the purpose of determining whether the eyewitness is able to identify the perpetrator of the crime. The suspect description, proximity and duration of time lapsed to the crime are essential factors in utilizing a show-up.

S. <u>Solvability Factor</u> – A set of identifiable facts, circumstances, or other evidence that make a case potentially solvable.

**840.1.4 – Compliance with Constitutional Requirements (1.2.3)**

A. All department personnel are required to ensure their actions are compliant with all Constitutional requirements related to custodial interviews, seizures, arrests, and detentions.

B. Constitutional rights related to custodial interviews (commonly known as "Miranda Rights") are addressed on both the *Adult Waiver of Rights* (HSPD form 840.1-A) and the *Juvenile Waiver of Rights* (HSPD form 840.1-B).

C. During interviews, officers shall not threaten, coerce or attempt to obtain involuntary confessions or admissions from the interviewee.

   1. Excessive or prolonged interviews without breaks for personal needs (i.e. meals, water or use of toilet facilities) are prohibited;

   2. No promises or inducements shall be made regarding the reduction of potential sentences or favorable treatment by the District Attorney's Office and

   3. Interview methods must reflect consideration of the subject's age, mental capacity, physical health, and any level of impairment by alcohol or drugs.

D. A person's right to consult with counsel will be honored while the suspect is in the custody of an officer of the department and they affirmatively invoke this right.

   1. Officers are to allow defendants to contact an attorney to the extent required by law.

   2. If during the course of an interview a suspect makes a definitive request for an attorney, the interview will cease.

   3. No further interview will take place while the suspect is in the custody of the department unless *the suspect* subsequently reinitiates contact and volunteers to waive their Fifth Amendment rights and speak without their attorney present.

E. Officers are required by state law to take any person arrested before a judicial official without unnecessary delay.  Delays caused by the furtherance of legitimate investigative procedures are not considered unnecessary delays.

F. Information released to the news media and the public will be limited to that required by law and that which will assist the department in conducting its efforts to protect the community.  Pretrial publicity that would tend to prejudice a defendant's right to a fair trial will be avoided.

**840.1.5 – Investigative Operations (42.1.5)**

A. Officers will fairly and impartially investigate all cases assigned to them.  They will conduct their investigations in the most discrete manner possible, being mindful not to unnecessarily endanger the reputation of any person under investigation.

B. Officers assigned to conduct criminal investigations will adhere to the following guidelines:

1. Information may be developed from an unlimited number of sources. These include, but are not limited to, witnesses, victims, neighbors, friends, other public agencies, other law enforcement agencies, and informants.

   a. Individuals may be asked to give a statement; whenever possible, the written statement should be documented by the officer using a *Voluntary Written Statement* (HSPD form 840.1-C). A lined notepad may suffice if the form is not readily available. Officers should ensure that the form or lined paper statement are both signed and/or initialed by the officer and witness or suspect providing the statement.

   b. All information will be gathered in compliance with departmental policies and procedures.

2. Interviews will be conducted in conformance with the law and the requirements of this directive.

   a. Interviews may be conducted with persons that have knowledge about a certain aspect of a criminal investigation.

   b. It is important to remember that in the course of an investigation, officers are not to enter into plea negotiations with a suspect. This does not prohibit officers from presenting facts pertaining to the case, including facts relating to circumstances surrounding the defendant's conduct, statements, or expressions of attitude, etc. Officers are to maintain a professional demeanor in all such matters.

3. Physical evidence may be searched for, collected, and preserved when investigating any crime scene. The City-County Bureau of Identification (CCBI) will primarily be used for this purpose. Investigators are to be mindful of physical evidence that is collected from a scene and ensure it is used in the development of the case. Further information on evidence procedures are outlined in *HSPD Directive 510.01 – Evidence and Property Submission.*

4. Surveillance may be used in the investigation of a crime when it is necessary to observe suspects and conditions in an unobtrusive manner. Surveillance may be used to create additional information involving the crime under investigation, gather additional intelligence information, or observe new crimes being committed.

5. When conducting preliminary and follow-up investigations, officers should consider using resources available both within the department and outside the agency.

C. Investigations in which it is determined that habitual felons are involved need to be coordinated with the District Attorney's Office for charging and should be identified and managed as a part of a career criminal approach:

1. Habitual felons are persons who have been convicted of or pled guilty to three (3) felony offenses in any federal or state court, as defined by NCGS 14-7.1.

2. Violent habitual felons are persons who have been convicted of two (2) violent felonies in any federal or state court, as defined by NCGS 14-7.7.

3. Breaking and entering (B&E) habitual felons are persons who have been convicted of two (2) B&E felony offenses in any federal or state court, as defined by NCGS 14-7.25.

4. Investigations involving these offenders are to be identified in the Felony Investigation Report (FIR), the supplementary reports resulting from follow-up investigations and in the case summary submitted to the District Attorney.

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 10 of 44

5.  Investigating officers will ensure that the member of the District Attorney's staff assigned to prosecute the case is aware of the status of such offenders, and will specifically request assistance from them in case preparation.

D.  Any officer who obtains a felony warrant shall complete a *Felony Investigation Report* to be submitted to the District Attorney's Office to assist with case review and prosecution of the crime charged in the warrant.

**840.1.6 – Initial Responding Officer Responsibilities (42.1.1; 42.1.4)**

A.  Employees assigned to the Patrol Section will normally initiate those tasks associated with preliminary investigation as outlined in this directive.

B.  The initial responding officer will retain responsibility for follow-up investigation of misdemeanor crimes initiated by their preliminary report unless otherwise directed by a Criminal Investigations Section (CIS) supervisor.

C.  Investigative responsibility for felony cases will be referred to the Criminal Investigations Section (CIS), unless:

1.  Immediate closure is highly probable; or

2.  The officer or unit handling the initial investigation has sufficient time and/or manpower to dedicate the necessary personnel to the investigation and CIS resources are not needed for successful closure of the investigation; or

3.  The circumstances have been discussed with a CIS supervisor and it is determined that the investigation will not be assigned to an investigator based on any of the following factors:

    a.  The nature of the offense;

    b.  The current CIS caseload; and/or

    c.  Other factors as determined by a CIS supervisor.

D.  It will be the responsibility of the incident supervisor to contact a CIS supervisor to request the call-out of an investigator after normal business hours.  Investigators provide twenty-four (24) hour on-call coverage.  When an investigator is called out and arrives at the scene the investigator will normally assume responsibility for the investigation.

E.  Officers assigned elsewhere in the department may be temporarily assigned to the Criminal Investigations Section when staffing levels allow.  These assignments are intended to strengthen the investigative process, enhance the career development and skillsets of patrol officers, and create a pool of potential investigators.

**840.1.7 – Criminal Investigations Section Responsibilities (42.1.1; 42.1.4; 42.2.4)**

A.  Employees assigned to the Criminal Investigation Section will be responsible for conducting follow-up investigations of cases referred to them, conducting preliminary investigations that are assigned, and providing assistance in those investigations that are continued by other department personnel.

B. CIS investigators will periodically attend pass through sessions with patrol officers.

**840.1.8 – Preliminary Investigations (42.1.4; 42.2.1; 42.2.3)**

A. A properly conducted preliminary investigation may be sufficient to bring a case to a satisfactory conclusion, thereby eliminating the need for follow-up investigation.

   1. A preliminary investigation is the activity that begins when the first officer arrives at the scene of the incident and continues until postponement of the investigation or transfer of responsibility.

   2. No action shall be taken to jeopardize the successful completion of the investigation.

B. Patrol officers will normally conduct preliminary investigations of all dispatched calls. Department investigators and City-County Bureau of Identification personnel may be called in at the beginning of a preliminary investigation depending on the seriousness of the crime, the manpower needed, and/or at the discretion of the on-scene supervisor for assistance.

C. Officers conducting preliminary investigations are to comply with the following steps as appropriate given the circumstances of the investigation:

   1. Observe all conditions, events, and remarks upon arrival at the scene of a crime and determine the nature of the offense(s) committed;

   2. Provide first aid to the best of their ability until medical assistance arrives;

   3. Locate and identify all witnesses. Interview the complainant, witnesses, and any suspect(s). Affect the detention and/or arrest of the suspect(s) if possible, either at the scene or through immediate pursuit;

   4. Secure and protect the crime scene to ensure evidence is not lost or contaminated.

      a. If there is no evidence collected, or if identification personnel are not called to the scene of a serious crime against person or property, then the initial investigating officer will include in the report the reason why;

      b. The on-scene supervisor will have responsibility for protection and security of the crime scene. Anytime that crime scene security is established, all persons entering the crime scene will be documented on a *Crime Scene Log*;

   5. Conduct a neighborhood canvass in an attempt to locate witnesses and/or develop further intelligence related to the commission of the crime. All contacts and attempted contacts will be documented in an Incident Report;

   6. Broadcast pertinent information to other field units, to include descriptions of the suspect(s) if possible, methods and direction of travel, and any other relevant information; and

   7. Report the incident fully and accurately. Anytime a crime involves a death, the reporting officer will complete an Incident Report in addition to any other mandated department reports.

D. The Incident Report will normally serve as a sufficient checklist for most investigations. More complicated investigations may require additional effort and inquiry that will be documented on a supplement report(s).

**840.1.9 – Case Status (42.1.3)**

A. Each criminal investigation will be assigned one of the following status designations to assist with case management and control:

    1. Active - Indicates following-up leads or continuing the investigation of the case. On cases designated for follow-up, a Criminal Investigations Section supervisor will designate a single officer as the primary investigator.

        a. The officer assigned as the primary investigator of a case will be responsible for case coordination and maintaining contact with the victim during the active investigation. Contacts with victims are to be noted by means of supplemental reports.

        b. Follow-up contacts will be handled according to the following guidelines:

            1) The primary investigator is to contact the victim within ten (10) working days of the initial investigation or assignment;

            2) Subsequent contacts are to be at the primary investigator's discretion, dependent upon the nature of the offense, investigative leads, and other variables that are unique to a particular investigation; and

            3) In addition to maintaining contact with victims, the primary investigator will make a "second contact" with other principles, i.e. witnesses and complainants, during follow-up investigations as necessary.

        c. The primary investigator shall submit supplement reports every 30 days as long as the case remains classified as active.

        d. When the status of an investigation is changed to either inactive or closed, the victim is to be notified by the primary investigator. The primary investigator will document the change and notification in a supplement report.

    2. Inactive - Indicates no follow-up on the case will be done unless additional information becomes available. The case has not been closed, but will not be investigated further at this time. Cases will be designated inactive when no further police action can be taken.

        a. Criteria for declaring an investigation inactive include:

            1) Lack of further leads or solvability factors, and/or

            2) Lack of contact or cooperation with the victim or complainant.

            3) The case lacks prosecutorial merit (the DA's office declines to prosecute).

        b. When a case has not been assigned for follow-up and is designated as inactive, the primary officer will be responsible for notifying the complainant of the case status.

    3. Closed - All investigative action on the case has been successfully completed.

B. Status of investigations will be controlled by use of a computer-generated Case Assignment Record.

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 13 of 44

1.  Supervisors will be provided case assignment information for each officer under his/her supervision.  This record will provide information on a timely basis on officer activity with regard to criminal investigations.

2.  The Case Assignment Record will contain:

    a.  Officer/Investigator assigned,

    b.  Date assigned, and

    c.  Case number.

    d.  Status updates

C.  The primary investigator will maintain case files on all active cases:

1.  The files should contain a copy of preliminary investigative reports, statements from principals, results of examinations of physical evidence, and other reports/records necessary to the investigation;

2.  The files are to be accessible to Criminal Investigations Section supervisors;

3.  The files will be consolidated into the Records Management System when a case is declared inactive or closed.  The Records Unit will purge all investigative case files in accordance with the department's Records Retention Schedule; and

4.  If a case is turned over to the Criminal Investigations Section (CIS) after follow-up investigation has been conducted by personnel from another department division, the case file that is established by the patrol officer is to be forwarded to CIS.

**840.1.10 – Follow-up Investigations** (41.2.5; 42.1.2; 42.1.4; 42.2.2)

A.  A system of case screening, based on solvability factors, will be used to determine the continuation of an investigation.

B.  The decision to conduct a follow-up investigation, the extent to which it is carried out, and the resources to be used will be managed by supervisory and command personnel.  Criteria used in making this determination include, but are not limited to, the following:

1.  Solvability factors present;

2.  The seriousness of the offense;

3.  Availability of unique or specialized resources or tests

4.  Prosecutorial policies of the District Attorney's Office.

C.  Investigators conducting follow-up investigations are encouraged to use any of the following actions that may further their investigation:

1.  Review and analyze all previous reports prepared for the investigation;

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 14 of 44

2.  Review any pertinent departmental records;

3.  Review laboratory results;

4.  Conduct additional interviews;

5.  Seek additional information (from uniformed officers, informants, etc.) as needed, and review;

6.  Arrange for dissemination of information, as needed;

7.  Plan, organize, and conduct searches, as needed;

8.  Collect any physical evidence available;

9.  Identify and apprehend suspects and recover stolen property;

10. Determine the involvement of the suspect(s) in other crimes;

11. Check all suspects' criminal histories; and

12. Prepare for court presentation and assist in prosecution of any charges filed.

**840.1.11 – Consensual Interactions and Investigative Detentions (1.2.3)**

A.  Consensual interactions and investigative detentions are both means of collecting, preserving, and disseminating information about activities of individuals and/or vehicles related to criminal investigations.

B.  Consensual interactions are voluntary encounters during which an officer will request the cooperation of the individual they wish to interview.

1.  Consensual interactions are commonly conducted when the officer is aware of suspicious activity that does not rise to the level of reasonable suspicion to justify an investigative detention.

2.  The officer is to be mindful that the consensual interaction must be conducted in such a manner that a reasonable person would understand and feel they were free to leave, if they wished to do so.

C.  Investigative detentions are authorized by the United States Supreme Court decision in *Terry vs. Ohio*. An officer may stop and detain an individual if the officer has reasonable suspicion to believe that the individual has committed, is committing, or is about to commit a crime.

1.  Reasonable suspicion is more than a hunch and must be based on articulable circumstances, but is less than the probable cause necessary to affect an arrest.

2.  Elements which may establish reasonable suspicion include, but are not limited to, the following:

a.  The officer's observation of conduct that, in light of the officer's training and experience, appears to be criminal in nature;

b.  Information the officer receives from other officers, citizens, or informants;

    c.    The time of day or night;

    d.    The type of neighborhood or physical surroundings and whether it is a high crime area;

    e.    The suspect's or vehicle's proximity to a location where a crime was recently committed or to a home, car, or business where criminal activity may be taking place;

    f.    Whether the suspect is a stranger to the area;

    g.    The suspect's reaction to the officer's presence, including flight after seeing the officer;

    h.    The officer's knowledge of the suspect's prior criminal record and activities, if they are relevant to the crime the suspect may be committing;

    i.    If the person fits the description of a suspect wanted for committing a crime;

    j.    If the vehicle fits the description of a vehicle used to commit a crime;

    k.    If the person and/or a vehicle is seen fleeing the crime scene or leaving the area of a crime; and

    l.    If the person is behaving or maneuvering a vehicle in a manner indicating criminal activity.

3.    Investigative detentions may only last for a reasonable period of time.

    a.    Officers shall detain a person only for the length of time necessary to obtain identification or an accounting of the person's presence or conduct.  The person should be released as soon as the interview is completed unless probable cause to arrest develops.

    b.    Officers shall be mindful that the U. S. Constitution guarantees an individual the right to refuse to answer questions.

    c.    The person may only be detained at or near the scene of the stop and not moved to another location without his/her consent unless necessary for the safety of the individual and/or the officer. This applies to suspect "show-ups" and therefore requires that a victim or eyewitness be brought to the scene where the suspect is being detained, rather than the suspect being brought to the victim.

D.    A field interview report will be completed any time that an officer conducts a consensual interaction in relation to a crime or an investigative detention.

**840.1.12 – Eyewitness Identification** (42.2.11; 42.2.12)

A.    Show-up procedures should be used when circumstances require the prompt display of a single suspect to a witness.  The following guidelines and requirements shall be adhered to when conducting a show-up:

1.    When feasible, encourage the suspect(s) to consent to voluntary participation in a live show-up.

2.    Show-ups should only be conducted when a suspect(s) matching the description of the perpetrator(s) is located in close proximity in time and place to the crime, or there is a reasonable belief that the perpetrator has changed his or her appearance in close proximity in time and place to the crime.

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 16 of 44

3. A show-up shall only be performed using a live suspect and shall not be conducted with a photograph.

4. Investigators shall photograph a suspect at the time and place of the show-up to preserve a record of the appearance of the suspect at the time of the show-up procedure.

5. A description of the perpetrator should be documented prior to the show-up.

6. The witness should be transported of a department vehicle to the location of the detained suspect to limit the legal impact of the suspect's detention.

7. In the event that a witness is unable to be transported, the suspect may be moved to the location of the witness. The circumstances as to why the suspect was transported from the place they were detained for the purposes of a show-up must be documented in the incident report (i.e. – the victim's/witness' injuries precluded them from doing so, the victim/witness has disabilities that make highly impractical to be transported, etc.)

8. Show-ups shall not be conducted with more than one witness present at a time.

9. Witnesses shall be given detailed instructions prior to the show-up, to include the following:

   a. That the individual being viewed may or may not be the suspect;

   b. That the witness should not feel compelled to make an identification;

   c. That it is as important to exclude innocent persons as it is to identify the perpetrator; and

   d. That the investigation will continue whether or not an identification is made.

10. If a witness makes a positive identification of the suspect, the officer who is conducting the show up will record the victim/witness' exact words via in-car or body-worn camera and document the same in an incident report.

11. Officers involved are prohibited from providing any feedback to the victim during the show-up. Words or conduct of any type that may suggest to the witness that the individual is or may be the perpetrator shall be avoided.

12. If there are multiple witnesses and one witness makes identification during the show-up establishing probable cause for arrest, it is at the discretion of a supervisor to reserve the remaining witnesses for another identification procedure.

13. All the information related to the show-up procedures shall be documented in a police report.

B. Live and photographic lineups will be conducted in accordance with NCGS 15A-284.52 and the following departmental guidelines:

1. Live lineups and photographic identifications shall be presented sequentially (individuals or photos are shown to the witness one at a time) rather than simultaneously (all at once).

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 17 of 44

2. An independent administrator (investigator or officer) shall conduct the photographic or live lineup.  The individual conducting the photographic identification or live lineup shall not know the identity of the actual suspect.

3. A minimum of six photos or individuals must be used in the identification procedures.  The witness should not know beforehand how many pictures or persons they will view.

   a. The administrator shall remove each photograph or individual after being viewed by the witness.

   b. If there is more than one suspect that fits the description of the perpetrator, there must be a separate lineup conducted for each suspect.

   c. When showing a new suspect, officers may not reuse the same fillers in live lineups or photographic identifications.

   d. When conducting a photo lineup, the photograph of the suspect shall be contemporary and, to the extent practicable, shall resemble the suspect's appearance at the time of the offense.

4. There shall not be anyone present during the lineup procedure who knows the suspect's identity except counsel as required by law.

5. Suspects shall be placed in different positions in each live lineup and/or photographic identification when there are multiple witnesses in the same case.

6. Witnesses shall be shown all photos or individuals, even if they make an identification during the lineup.

C. Witnesses for lineups will be handled in accordance with the following guidelines:

1. Witnesses shall be instructed as follows prior to any lineup:

   a. That the suspect may or may not be in the live lineup or photographic identification;

   b. That the lineup administrator does not know the suspect's identity;

   c. That the witness should not feel compelled to make an identification;

   d. That it is as important to exclude innocent persons as it is to identify the perpetrator; and

   e. That the investigation will continue whether or not an identification is made.

2. Witnesses shall be asked "Is this the person you saw [insert description of act here]? Yes or No?" after each photograph or individual presented.

   a. If the witness answers "yes," the administrator shall ask, "Can you describe how sure you are?"

   b. Employees administering the lineup must document exactly what the witness says and enter those comments in the case file.

3. Witnesses shall not receive any feedback during or after the identification process.

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 18 of 44

4.  Separate all witnesses.  Each witness shall be given instructions regarding the identification procedures without other witnesses present.  Witnesses shall not be allowed to confer with one another either before, during, or after the procedure.

5.  The administrator shall avoid saying or showing anything to the witness that may influence the witness's selection.

6.  If the witness asks to view the lineup again, all photographs or individuals must be presented in the same order as the first viewing.

D.  Lineups will be documented according to the following guidelines:

1.  Photographic lineup results should be signed and dated by the witness.  After the photographs have been viewed, they shall be marked denoting the order that they were shown to the witnesses and retained for later use in court.

2.  Live and photographic lineups shall be documented. The witness should sign the documentation verifying they have read and understand the lineup instructions.  If the witness refuses to sign the document, the administrator will note the refusal on the document.

3.  In the event that a live lineup is performed, it will be documented utilizing audio and/or video recording devices.

**840.1.13 – Use of Polygraph and other Truth Verification Instruments (42.2.6)**

A.  The Department permits the use of a Computerized Voice Stress Analyzer (CVSA) examination or a polygraph examination as an investigative tool in a criminal investigation or in a background check of a candidate for employment.

1.  Any CVSA or polygraph examination to be conducted in a criminal investigation must be approved by the Deputy Commander, Investigative and Support Division prior to it being offered or scheduled.

2.  The guidelines for the use of a CVSA or polygraph examination as part of a hiring process may be found in Section 310.04 of the General Orders Manual.

B.  The following guidelines will be adhered to when a CVSA examination is approved in a criminal investigation:

1.  CVSA examinations will be conducted by outside agency personnel certified in the use of the CVSA instrument.

2.  CVSA examination results will be given orally, at the conclusion of the examination, to the requesting investigator.

3.  CVSA examination results will be documented in a supplement report by the CVSA examiner.

C.  The following guidelines will be adhered to when a polygraph examination is approved in a criminal investigation:

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 19 of 44

1. Polygraph examinations will be provided by the State Bureau of Investigation or other licensed firms designated by the Chief of Police.  Examinations are by appointment, except in emergency situations.

2. Only certified examiners will be utilized to administer a polygraph examination.

3. Polygraph examination results will be given orally, at the conclusion of the examination, to the requesting investigator.  If requested by the investigator, a written report will be provided to the District Attorney's Office.

D. In compliance with NCGS 15A-831.1, persons claiming to be a victim of a sexual assault or a witness regarding the sexual assault of another will not be required to submit to a CVSA or polygraph examination as a precondition to investigating the matter.

1. If an examination is requested, the victim or witness must be informed of the following:

   a. Taking the examination is voluntary;

   b. The results of the examination are not admissible in court; and

   c. The person's decision to submit or refuse will not be the sole basis for the department to investigate or not investigate the matter.

2. If the investigator declines to investigate the alleged case of sexual assault following the person's decision not to submit to the examination, the investigator will provide to that person, in writing, the reasons why the agency did not pursue the investigation.

**840.1.14 – Background Investigations**

A. Background investigations are conducted on persons who are suspects in certain crimes.  Background checks are also typically conducted on persons who have applied for certain types of employment or licenses (i.e. business, alcohol, etc.).

B. The following procedures apply to both types of investigations:

1. The investigation report will verify the purpose of the investigation;

2. Multiple sources of information will be used to provide a thorough investigation.  These sources include, but are not limited to:

   a. Local criminal records;

   b. NCIC criminal history;

   c. Past and present employers and business associations;

   d. Personal references; and

   e. Established informants;

3. Information collected from background investigations and background checks will be used and managed as police information.  Distribution of this information will be in accordance with all applicable laws, directives, and procedures; and

4.  Information collected as a result of a criminal investigation will become part of the case file and will be maintained for the required time.  Information collected through background checks for the issuance of a business or other license will be maintained for a period of two (2) years.

**840.1.15 – Investigative Task Forces (42.2.5)**

A.  Task forces may be established to conduct investigations into criminal activity.

B.  Whether formed within the department or as part of a mutual effort with other agencies, task forces will be governed by guidelines responsible for:

1.  Identifying the purpose of the task force;

2.  Defining authority and responsibilities;

3.  Establishing accountability;

4.  Identifying resources available; and

5.  Evaluating results and the need for continuing efforts.

**840.1.16 – Custodial Interviews and Interview Rooms (42.2.10)**

A.  Custodial Interview Guidelines

1.  Custodial interviews should be captured on body-worn camera or another approved recording device in their entirely, to include, the advisement of the suspect's Miranda rights and their acknowledgement and response to being advised of these rights.

2.  Officers that conduct a custodial interview of any juvenile in any type of crime shall make an electronic recording of the interview in its entirety regardless of the location where the interview takes place.

3.  Officers that conduct a custodial interview of an adult for any Class A, B1, or B2 felony, or any Class C felony of rape, sex offense, or assault with a deadly weapon with intent to kill inflicting serious injury shall electronically record the interview in its entirety, regardless of the location where the interview takes place.

4.  Officers that conduct a custodial interview of an adult for any felony not listed above shall electronically record the interview in its entirety if the interview takes place at a department facility.

5.  If a custodial interrogation described above is conducted and cannot be electronically recorded in its entirety, a supervisor must be notified and approve the interview.  The failure to electronically record must be based on one of the following reasons:

a.  The accused is willing to cooperate with law enforcement in the furtherance of their case or another significant investigation and they fear for and have a legitimate concern that their life or the life of their family members may be jeopardized; or

b.  The failure to electronically record an interrogation was the result of unforeseeable equipment failure, and obtaining replacement equipment was not feasible.

B.   Any officers using a department interview room to conduct a custodial interview or a non-custodial suspect interview shall adhere to the following guidelines:

1.   Officers will secure their weapons prior to conducting the interview.  Drop boxes are provided for weapon storage.

2.   Suspects will be secured to a designated bench or table via handcuff, when not needed to perform a test, such as Standardized Field Sobriety Test (SFST) or otherwise in furthering the investigation (removal of clothing, demonstrating an action that occurred to investigators, or to enhance the interview process, etc.).

3.   There shall be a sufficient number of sworn personnel (but no fewer than two sworn personnel) within the facility but not necessarily in the interview room to maintain security of the prisoner during the interview.

4.   Any prisoner must be physically monitored by an officer at all times.  The only exception to this is if an investigator elects to leave a prisoner or multiple prisoners alone in anticipation of spontaneous statements being made.  In this case, the prisoner(s) must be constantly monitored by audio and video and personnel must be immediately available to enter the interview room if necessary.

5.   Only those officers involved in the interview or necessary for ensuring the interview is safely conducted will be in the interview room during questioning.

6.   Officers are required to have access to their portable radios and/or a cellular phone in the event it becomes necessary to summon additional assistance.  Electronic emergency assistance buttons are located in the prisoner processing room and the General Investigation Unit recorded interview room.

C.   No excess equipment shall be stored in an interview room.

1.   Items maintained in the interview room shall be limited to a table, chairs and recording devices. This serves to limit distractions and reduce the opportunity for items to be used as a weapon by the individual being interviewed.

2.   Truth verification equipment may be used in the interview rooms during questioning, but it will be stored in another location when not in use.

3.   This section does not prohibit officers from bringing items into the room during questioning.

D.   Any area designated by the agency as an interview room will have access to restrooms and water. Anyone being interviewed will not be denied access to restrooms, water, or comfort breaks as part of the interview process.

**840.1.17 – Review of Investigations**

Cases the District Attorney's Office decline to prosecute or causes to be dismissed as a result of alleged officer mishandling will be reviewed by the department.  The review will be conducted jointly by the primary investigator, his/her supervisor, a Criminal Investigations Section supervisor, the Commander of the Investigations and Support Services Division,  and any other persons deemed necessary by the Chief to perform a complete review of the matter.  The Commander, Investigations and Support Services

Division or the Chief of Police may choose to investigate alleged misconduct as an Internal Affairs complaint as outlined in HSPD directive 320.01, *Complaint Investigation*.

**840.1.18 – Confidential Informants**

Policies and procedures for the use of Confidential Informants are contained in HSPD directive 840.03, *Management of Confidential Informants*.

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 23 of 44

**EXHIBIT 2**



| | Holly Springs Police Department<br>Written Directive |
|---|---|
| | **Chapter:** 700 - Arrest, Detention, & Use of Force |
| | **Directive:** 710.03 - Service of Legal Process |

| **Authorized by:** Chief Paul J. Liquorie | **Effective Date:** September 1, 2022 |
|---|---|
| **CALEA Standards:** 1.2.5, 74.1.1, 74.1.2, 74.3.1 and 74.3.2 | **Last Revision: June 14, 2022** |

### 710.3.1 - Purpose

The purpose of this directive is to establish policy and procedures for the service of legal process documents in accordance with existing laws.

### 710.3.2 - Policy

It will be the policy of the Holly Springs Police Department to efficiently and effectively execute all legal process documents issued to its care and custody.

### 710.3.3 - Definitions

A. <u>Citation</u> - a directive, issued by a law enforcement officer or other person authorized by statute, that a person appear in court and answer a misdemeanor or infraction charge or charges.

B. <u>Criminal Process</u> - those writs, summonses, mandates, warrants, or other process issued by a judicial official compelling a person to answer for a felony or misdemeanor violation of the law. The term also includes processes issued to aid in crime detection or suppression, such as search warrants.

C. <u>Legal Process</u> - a document of civil or criminal process, whether original, intermediate, or final that is valid on its face and is to be served or executed by a law enforcement agency.

D. <u>Subpoena</u> – a legal process notifying a person to appear in a court of law or furnish certain materials or documents.

E. <u>Summons</u> – a process notifying a person to appear in a court of law to answer charges of a criminal or civil violation.

F. <u>Warrant</u> – a criminal process issued to initiate a person being taken into custody and restrained pending review by a judicial official.

### 710.3.4 - Organization and Administration

A. The Records Division Staff of the Administrative Services Manager will have primary responsibility for the recording, maintenance, and forwarding of legal processes for members of the department.

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 24 of 44

B.  The Patrol Section will have primary responsibility for the service of criminal processes.

C.  The service of legal process to members of the department, notification of persons served, and the filing of requisite reports will rest with the supervisor of the department member who is subject to the legal process.  In the event, the legal service is for the Chief of Police, the chief will receive it in person, or telephonically.  In the event the chief is not available to receive legal process the serving law enforcement agency may serve the Town Clerk or Attorney.

**710.3.6 - Criminal Process** (1.2.5; 74.3.1; 74.3.2)

A.  Only sworn officers will execute criminal processes issued to the Holly Springs Police Department. These documents will include arrest warrants, summonses, and search warrants.

    1.  The execution of criminal process documents will be conducted by sworn departmental personnel only within their legal jurisdiction, and within time limitations set forth by a process and relevant statute.

    2.  Criminal process execution in locations outside departmental jurisdiction must be conducted in accordance with requirements of state law and the governing agencies involved.  When it is necessary to arrest persons outside the department's jurisdiction, officers of the agency having jurisdiction are to be utilized for the actual execution of the criminal process.

    3.  When a defendant subject to a criminal process is located outside of North Carolina, the investigating officer must complete and submit an *Extradition Approval Form* (AOC Form 910M, or 911M.) through the Magistrate to the District Attorney's Office to request permission to proceed with extradition procedures.

    4.   Information on the execution or attempted service of a criminal process will be recorded and maintained electronically in the North Carolina Warrant Repository (NCAWARE) database.

    5.  Officers executing an arrest warrant will complete an electronic *Arrest Report* (HSPD Form 510.5-B).

B.  Immunity guaranteed by federal law must be considered in any arrest situation.  Supervisory personnel are to be notified anytime that an arrestee claims immunity from arrest.

C.  Upon the execution of an arrest warrant, an officer will transport the person arrested to a judicial official without unnecessary delay. This does not preclude the transportation back to the Law Enforcement Center (LEC) or other agency's facility to be interviewed or conduct additional tests or legitimate law enforcement functions.

D.  Officers may arrest violators without a warrant, as provided by law.  Upon arrest, the officer will transport the arrested person to a judicial official to obtain the necessary legal process, providing that a criminal citation may be issued, at the officer's discretion, for a misdemeanor violation.

E.  During the arrest process, the officer and/or processing agent will be responsible for:

    1.  Completing a departmental *Arrest Report* (HSPD Form 510.5-B) and all forms required by the Magistrate's office, City-County Bureau of Identification (CCBI) Processing Unit, and the Wake County Detention Facility.

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 25 of 44

2. Ensuring that all arrestees are fingerprinted (except those only charged with a Class 2 or 3 traffic offenses) and photographed.  The fingerprinting and photographing of arrestees will be conducted by the CCBI Processing Unit personnel pursuant to their agency's directives and state law.  Fingerprints and photographs are maintained on file by CCBI.

**710.3.7 - Service of Process**

A. Department supervisors will establish priorities regarding the service of criminal process and other outstanding arrest warrants to facilitate the prompt apprehension of persons posing a threat to the community and those who may attempt to flee.

B. Criminal process that requires a higher priority for service includes, but is not limited to, those that involve the following offenses:

1. Homicide,

2. Rape,

3. Robbery,

4. Traffic infractions involving the infliction of serious bodily injury or death

5. Other offenses of a violent nature,

6. Offenses involving firearms

7. Breach or escape offenses and failure to appear in court, and

8. Other charges against persons who may be expected to flee prosecution.

C. Officers who establish probable cause to obtain arrest and/or search warrants or who have obtained arrest warrants will not intentionally delay obtaining or serving arrest or search warrants without supervisory approval.

D. Warrant Service Procedures:

1. A minimum of two officers are required when serving or attempting to serve a criminal process for the following;

   a. Any felony warrant for a crime against a person,

   b. Any violent misdemeanor,

   c. Any person with a history of violence or assault on law enforcement,

   d. Any habitual offender, and/or

   e. Any person whom the agency has reason to believe will resist arrest or flee custody.

2. The above requirement for a minimum of two officers also will apply when a person agrees to voluntarily surrender to the officer at the police station.

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 26 of 44

3.  Prior to any service attempts of criminal process requiring a custodial arrest, officers shall notify the Holly Springs Emergency Communications Center (HSECC) of their location via radio, or phone transmission if it may impede the operational security or safety of the warrant service.

E.  All Criminal Summons shall be served via personal service by a sworn officer.

**710.3.8 - Mental Commitment Process**

A.  The service of mental commitment process documents will normally be initiated through the Magistrate's Office and will not require recording of the process by the Records staff.

B.  Officers assigned to serve mental commitment processes will exercise all safety precautions necessary to affect the service of the document and to protect themselves and other parties from injury.  The officer will remain cognizant of the fact that the individual named in the process is not being taken into custody for a criminal violation.

C.  Upon service of the Involuntary Commitment (IVC) process, the officer will transport the individual to the medical facility directed within the document.

1.  Officers may also be directed to transport the individual to a secondary facility, in accordance with mental commitment procedures.

2.  Officers may be required to transport the individual back to his/her residence if not committed by the medial facility.

D.  Following the individual's disposition by medical authority, the serving officer is to complete and return all documents related to the involuntary commitment to the Magistrate's Office in accordance with HSPD directive 820.11 – *Interaction with the Mentally Ill.*

E.  Officers will be required to complete an Incident and Crisis Intervention Team (CIT) Reports through the RMS system when serving a mental commitment process.

**710.3.9 - Subpoenas**

A.  Subpoenas for citizens

1.  Upon receipt from the court, subpoenas will be logged in the records management system and the applicable information required by this directive recorded.  A *Legal Process Tracking Slip* (HSPD Form 710.3-A) will then be completed and attached to each subpoena to track attempts at service.

2.  Subpoenas will be categorized and forwarded for service in the following manner:

a.  Subpoenas having no telephone number for the person named within will be forwarded to the Patrol Section for service; and

b.  Subpoenas with a telephone number for the person named within will be assigned to the Records Division for service.

3.  Upon service or upon determining that service is not possible subpoenas are to be returned to the Records Division for disposition.

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 27 of 44

    a. Out-dated subpoenas received by the department will be date-stamped and returned to the Clerk of Court's Office.

    b. Subpoenas received for persons outside the jurisdiction of the department will be returned to the Clerk of Court's Office or the forwarding agency.

B. Subpoenas addressed to department employees will be assigned to the individual's immediate supervisor for service.

**710.3.10 - Property**

A. Property received or confiscated as a result of execution of legal process will be disposed of, or returned in accordance with relevant state statutes and HSPD Directive 510.01 – *Evidence and Property Submission.*

B. Property seized pursuant to the execution of a search warrant requires a state inventory form (AOC-CR206) be completed in addition to the requirements of HSPD Directive 510.01 – *Evidence and Property Submission.*

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 28 of 44

**EXHIBIT 3**



| | Holly Springs Police Department Written Directive |
|---|---|
| | **Chapter:** 800 - Operations |
| | **Directive:** 840.01 - Follow-Up Investigative Notifications and Responsibilities |

| | |
|---|---|
| **Authorized by:** Chief Paul J. Liquorie | **Effective Date:** September 1, 2022 |
| **CALEA Standards**: 1.2.1, 12.1.4, 26.1.1, 26.3.2, 41.2.4, 41.2.5, 41.2.6, 41.2.7, 42.1.1, 42.1.4, 42.2.1, 43.1.1, 43.1.5, 44.1.1, 46.1.2, 46.1.4, 46.1.7, 46.1.10, 61.2.1, 61.2.2, 81.2.5, 82.2.1, 83.1.1 | **Last Revision:** May 12, 2022 |

### 840.1.1 - Policy

It is the policy of the department to provide guidelines for response by investigators, make efficient use of staff, ensure continuity of investigation for specific crimes and provide investigative support for patrol officers.

### 840.1.2 - Notification Guidelines

A. The primary/arresting officer, or patrol supervisor will immediately notify the General Investigations Unit in all situations involving an occurrence of and/or the arrest of an individual for any of the following:

1. Homicide

2. Robbery

3. Rape

4. Sexual Assault

5. Burglary

6. Breaking or Entering

7. Kidnapping

8. Assaults resulting in serious bodily injury

9. Domestic Violence Assaults

    10. Ethnic Intimidation or hate crimes

    11. Arson

    12. Attempts for any of the above listed crimes

    13. Deaths of persons

B.  The primary/arresting officer, or patrol supervisor will immediately notify the Traffic Investigations and Enforcement Unit in all situations involving an occurrence of and/or the arrest of an individual for any of the following:

    1.  Vehicular Related Fatalities

    2.  Vehicle Collisions Involving Serious Bodily Injury

    3.  Vehicle Hit & Runs with injuries and/or significant damage

    4.  Drivers Operating Vehicles While Impaired by Substances Other Than Alcohol (Drug Recognition Expert [DRE] Evaluations)

C.  The primary/arresting officer, or patrol supervisor will immediately notify the Anti-Crime Team (ACT) in all situations involving an occurrence of and/or the arrest of an individual for any of the following:

    1.  Trafficking, manufacturing, selling, distribution, or possession with intent to sell or distribute (PWISD) controlled substances

    2.  Burglaries, robberies or significant thefts of pharmaceuticals

    3.  Large amounts of unexplained bulk cash

    4.  Street gang or other organized criminal organizations

    5.  Prostitution and Human Trafficking

    6.  Trafficking in or illegal sale of firearms

    7.  Other special investigations as assigned by the Chief of Police

D.  Making Notifications

    1.  During the scheduled work hours of the responsible investigative unit, the primary officer or sworn supervisor will contact an available detective by calling the investigative unit's office. If there are no investigators in the respective office, or there is no answer by phone, the primary officer or patrol supervisor may try to

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 30 of 44

contact an investigator by radio, a working investigator's or investigative supervisor's mobile phone, or request the Communications Center assist in contacting an investigator.

2. After-hours notifications for an on-call investigator from the respective investigative unit will be made by the primary officer or patrol supervisor after ascertaining who the on-call detective is via the Communications Center.

3. Any officer who makes an arrest and believes that criminal intelligence can be gained by interviewing the suspect should transport them to the Law Enforcement Center (LEC) and ensure that the appropriate investigative section is notified for a timely consultation with the arresting officer <u>prior</u> to initiating an interview with arrestee.

## 840.1.3 - Patrol Responsibilities

A. Patrol Officers

1. All allegations of crime require an incident report. Responsibility for follow-up investigations lies with the primary responding officer, except for those offenses specifically delineated in this policy or accepted by any investigative unit. Officer will complete all incident reports prior to the end of the tour of duty unless an exception is authorized by a supervisor.

2. Patrol officers will be responsible for conducting and completing investigations of crimes not assigned to an investigative unit except when the following conditions exist:

   a. The offense appears to be part of a pattern of such offenses.

   b. Follow-up is required in widely separated locations outside of the Town's limits

   c. A misdemeanor offense that is of a sufficient serious nature to warrant the assistance of investigators

   d. Any case in which a departmental employee is the subject of the investigation

   e. Any case that is likely to attract significant media interest and/or coverage or is likely to present a liability to the Town of Holly Springs

B. Patrol Supervisors - Patrol Supervisors are responsible for the following:

1. Ensuring that a thorough preliminary investigation has been conducted prior to any notification or referral to the respective investigative unit.

2. Assigning and tracking the progress of follow-up investigations that are the purview of the officers on their squad(s)

3. Ensuring that the appropriate investigative unit is notified in accordance with this policy

4. Ensuring officers complete all incident reports prior to the end of the tour of duty and the report is approved and forwarded to the appropriate investigative unit unless the supervisor authorizes an extension.

### 840.1.4 - Response by Investigative Units

A. The decision to have detectives respond to a crime scene or the Law Enforcement Center (LEC) is based on the following criteria:

1. The complexity of the case (number of victims, suspects and/or crime scenes that must be responded to, documented and/or forensically processed)

2. The seriousness of the incident (sustained injuries, felonies, shots fired, etc.)

3. The solvability of the case

4. The availability of patrol or other staffing to ensure a quality investigation is conducted and evidence is properly collected and preserved

5. Patrol call volume and department priorities

B. Follow-Up Investigations

Follow-up investigations are an extension of the preliminary investigation. The purpose of the follow-up investigation is to facilitate successful case closures. These are characterized by the identification of additional victims/witnesses, recovery of stolen property, and/or the identification and arrest of the responsible perpetrators. Detectives from the Criminal Investigative Section or officers from the Traffic Investigations and Enforcement Unit shall be responsible for conducting follow-up investigations pursuant to the guidance in this policy.

### 840.1.5 - Criminal Investigations Section:  Responsibilities, Notifications, and Responses

A. General Investigations Unit

1. Responsibilities - The General Investigations Unit will be notified of and is responsible for investigating the following crimes:

a. Homicides, and all non-traffic related deaths

b. Rapes and Sexual Assaults

c. Robberies (commercial or Common Law)

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 32 of 44

    d. "Aggravated" Assaults or those resulting in serious bodily injury

    e. Arsons

    f. Residential and commercial burglaries and breaking or entering (B&E)

    g. Kidnappings

    h. Missing Persons/Critical Missing Persons/Runaways

    i. Felony thefts with a value of $5,000 or greater

    j. Ethnic Intimidation or Hate Crimes

    k. Domestic Violence Assaults

    l. Vehicle Thefts

    m. Intentional firearm shootings or evidence of a firearm shooting (e.g. shell casings, bullet holes or impact marks, etc.)

    n. Child pornography or Internet Crimes Against Children (ICAC)

    o. Financial crimes (fraud, forgery, false pretenses, credit card and identity theft, embezzlement and financial exploitation of the elderly or other vulnerable persons)

    p. Injury to Property valued at $5,000 or more or damage to Town property

    q. Deaths of persons

    r. All other criminal offenses that require follow-up investigation and are not the purview of the Patrol Section or Anti-Crime Team (ACT).

2. Response - The General Investigations Unit will respond for the following:

    a. Assaults resulting in serious bodily injury

    b. Commercial Robberies

    c. Arrests for any type of robbery

    d. Residential burglaries

    e. Breaking or entering where the value of stolen property is $5,000 or more

  f. Critical missing persons to include persons with cognitive deficiencies, intellectual disabilities, believed to be suicidal, and children under 16 years of age, or those missing under suspicious circumstances

  g. Arsons of dwellings, large structures, or motor vehicles

  h. Any case where investigative supervisors and scene supervisors agree that a response would enhance the investigation or cases that cannot be adequately handled by patrol in a timely manner

B. Anti-Crime Team (ACT)

 1. Responsibilities - ACT will be notified of and is responsible for the following investigations:

  a. Trafficking, manufacturing, distribution, selling or possession with intent to sell or distribute (PWISD) controlled substances

  b. Breaking or entering, robberies or significant thefts of pharmaceuticals

  c. Large amounts of unexplained bulk cash

  d. Street gang or other organized criminal organizations

  c. Prostitution and Human Trafficking

  d. Trafficking in or illegal sale of firearms

  e. Other sensitive or special investigations as assigned by the Chief of Police

 2. Response - ACT will respond for the following investigations:

  a. Trafficking and manufacturing of controlled substances

  b. Cases where victims of human trafficking are present

## 840.1.6 - Traffic Investigations and Enforcement Unit

 1. Responsibilities - The Traffic Investigations and Enforcement Unit is responsible for investigating the following:

  a. Vehicular Related Fatalities

  b. Vehicle Collisions Involving Serious Bodily Injury

  c. Vehicle Hit & Runs with injuries and/or significant damage

       d.   Drivers Operating Vehicles While Impaired by Substances Other Than Alcohol (Drug Recognition Expert [DRE] Evaluations)

2. Response - The Traffic Investigations and Enforcement Unit will respond for the following:

       a.   Vehicular Related Fatalities

       b.   Vehicle Collisions Involving Serious Bodily Injury

       c.   Drivers Operating Vehicles While Impaired by Substances Other Than Alcohol (Drug Recognition Expert [DRE] Evaluations)

## 840.1.7 - Complaints and Use of Force Investigations

1. It is the responsibility of *every* member of the Holly Springs Police Department to report complaints or allegations of misconduct of any department or Town employee. Investigations involving the misconduct, integrity or complaints and allegations of violations of department or Town policies regarding officers, department professional staff, and/or Town employees will be brought to the attention of the respective department member's division commander (i.e. captain) as soon as practical via the employee's chain of command. Division commander's will then notify and consult with the Chief of Police to determine the best course of the investigation moving forward.

2. Division commanders shall immediately be notified of any use of force that results in serious bodily injury or death to any person, including a law enforcement officer of the department or another agency. Division commanders also will immediately be notified of any other death, serious bodily injury or medical condition that occurs while a subject is in-custody of a law enforcement officer of the Holly Springs Police Department or another agency while in the jurisdiction of the Town of Holly Springs.

   Division commanders will then be responsible for immediately notifying the Chief of Police, who will determine if assistance from the North Carolina State Bureau of Investigation (SBI) should be requested and/or to notify the head of an involved outside law enforcement agency in consultation with the department's Investigative Section supervisor.

3. Division commanders shall immediately be notified of investigations involving all discharges of firearms by officers, whether on-duty or off-duty, or whether the discharged round(s) took effect on any person or not. This does not apply to the euthanizing of non-domestic animals or authorized training.

Case 5:25-cv-00222-BO-RJ    Document 29-7    Filed 08/03/26    Page 35 of 44

**840.1.8 - <u>Miscellaneous Notifications</u>**

1.  Division commanders shall be immediately notified of any incident or case that is likely to draw a large media presence or inquire, or will negatively impact the Town in terms of legal liability or standing with the community.

2.  Squad and unit supervisors (sergeants/corporals) are highly encouraged to contact a command staff officer via their respective chain of command for any incident in which they are unsure of how to proceed or they feel it is in the best interest of the department's and/or the Town's management to be notified.

**CALEA Standards:** 1.2.1, 12.1.4, 26.1.1, 26.3.2, 41.2.4, 41.2.5, 41.2.6, 41.2.7, 42.1.1, 42.1.4, 42.2.1, 43.1.1, 43.1.5, 44.1.1, 46.1.2, 46.1.4, 46.1.7, 46.1.10, 61.2.1, 61.2.2, 81.2.5, 82.2.1, 83.1.1

**Proponent Unit:**  Investigative Section, Office of the Chief

**Cancellation:** This directive cancels HSPD General Orders Manual: ANNEX C- Major Crimes Handbook

EXHIBIT
4



| | Holly Springs Police Department<br>Written Directive |
|---|---|
| | **Chapter:** 800 – Operations |
| | **Directive:** 820.11 – Interaction with the Mentally Ill |

| **Authorized by:** Chief Paul J. Liquorie | **Effective Date:** September 1, 2022 |
|---|---|
| **CALEA Standards:** 41.2.7 | **Last Revision: March 7, 2022** |

**820.11.1 - Purpose**

The Holly Springs Police Department is committed to treating all persons with fairness, respect, and dignity. Realizing that mentally ill persons can present challenges for law enforcement interaction, the Holly Springs Police Department has established this policy for the protection of persons during these encounters.

**820.11.2 - Policy**

The Holly Springs Police Department will not take custody of a mentally ill person solely because they are mentally ill; their behavior or action(s) must be criminal in nature or the individual must demonstrate a danger to themselves or others.

The department will serve Involuntary Commitment Processes when issued by a magistrate, begin the Involuntary Emergency Commitment Process when there are sufficient circumstances to warrant this action, and facilitate transportation to a mental health facility when asked by a consumer. Sworn officers are the only employees of this department authorized to perform mental commitments.

**820.11.3 - Definitions**

A. Involuntary Commitment – A legally binding commitment for a mental health condition to a medical and/or psychological facility which is executed pursuant to an order signed by the magistrate.

B. Involuntary Emergency Commitment – A commitment for a mental health condition executed by an officer without having an order signed by a magistrate under exigent circumstances. These commitments are initiated when the time it would take to go get an order signed could allow further harm to the patient or others. Therefore, the officer must immediately take custody of the individual and transport him or her to a medical and/or mental health facility.

C. Mental Commitment – Taking custody of an individual and transporting the individual to a facility for mental health evaluation and treatment, under the statutory authorization and requirements in NCGS §122C, *Mental Health, Developmental Disabilities, and Substance Abuse Act of 1985.*

D. Mental Illness – For the purpose of this directive, an illness which lessens the capacity of an individual to exercise self-control, judgment, and discretion in the conduct of his or her affairs and

social relations to the degree that it is necessary or advisable for the person to be under treatment, care, supervision, guidance, or control of a mental health professional.  These illnesses may or may not have a diagnosis from a doctor or other medical professional. When applied to a minor, a mental condition, other than an intellectual disability alone, that so impairs the minor's capacity to exercise age adequate self-control or judgment in the conduct of the minor's activities and social relationships so that the minor needs treatment.

E.   Twenty-Four (24) Hour Facility – A hospital or mental health facility which provides a structured living environment for those with a mental illness and is staffed 24 hours a day.

F.   Voluntary Commitment – A mental commitment which is based on the individual's desire and free-will choice to go to a mental health facility for evaluation and treatment.

**820.11.4 – Employee Training (41.2.7)**

A.   All new personnel shall receive training in recognition of mental illness, interaction with those who are mentally ill, information about the Crisis Intervention Team (CIT), and resources for the mentally ill. This training will be documented in employee training files for both sworn and non-sworn personnel.

B.   All employees will be provided refresher training every three years which will be documented in employees' training files.  This training shall be reviewed and/or updated prior to delivery so that it reflects current recommendations from mental health professionals and legal requirements.

C.   Officers are provided with a list of resources to aid the mentally ill.  Officers may also enlist the assistance of officers who serve as Crisis Intervention Team (CIT) trained officers for evaluation of persons believed to be displaying symptoms of mental illness and may be in need of intervention and/or specific recommendations of resources (see 820.11.6 below).

**820.11.5 – Recognition of Mental Illness (41.2.7)**

A.   It is critical that all department employees be able to recognize indicators that a person may be suffering from mental illness.

1.   As many as twenty five percent of the general population suffers from some type of mental illness.  Many of these persons exhibit no symptoms of mental illness due to proper medication and therapy.

2.   Usually law enforcement interacts with mentally ill persons when the consumer is in crisis.  These consumers often exhibit behavior that is abnormal and may be frightening to the public.

B.   Officers will assess the individual, remembering that other medical conditions may cause abnormal behavior, and decide on an appropriate course of action.  Some signs and symptoms of mental illness include, but are not limited to:

1.   Loss of memory or inability to concentrate;

2.   Confusion, disorientation, hallucinations or illusions;

3.   Grandiose ideas;

4.   Manic behavior, anxiety, accelerated thinking and speaking or hyperactivity;

5.   Extreme paranoia;

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 38 of 44

6.   Post-Traumatic Stress Disorder (PTSD)

C.   The department member is not expected to diagnose such conditions or illness, but recognizing symptoms that may indicate mental illness will help members decide on the appropriate response and disposition.

**820.11.6 – Interaction with the Mentally Ill (41.2.7)**

A.   Officers will encounter mentally ill persons during the course of their normal duties.  Sometimes these individuals will be acting irrationally and behaving abnormally.

1.   Officers will assess the individual's behavior and actions to determine the best course of action for both the individual and community.  Some of these individuals may be committing minor crimes that may or may not be the result of their mental illness.

2.   Officers will use their training, experience, and resources to determine whether to arrest the person or resolve the incident in another way.

3.   Officers will not take any mentally ill person into custody for behaviors or actions unless those behaviors or actions are criminal in nature.

4.   Officers shall take mentally ill persons into custody for evaluation with court orders or if the person meets the criteria for emergency commitment, unless other suitable alternatives to achieve the mental commitment are readily available (EMS transport, parent transporting their child, etc.).

5.   Avoid buying into or agreeing with delusional or hallucinatory statement.

6.   Do not us inflammatory language; make jokes, or rude comments.

B.   The Holly Springs Police Department is committed to using all available alternatives to arrest when dealing with mentally ill persons.  Such examples may include times when the arrest of the offender would cause more harm to him/her when there is no threat of public danger.  Additional information may be found in HSPD directive 210.03, *Limits of Authority and Discretion*.

C.   Interviews and interrogations may be conducted on mentally ill persons for the purpose of gathering information.  All constitutional protections afforded to persons shall be provided to those suffering from mental illness as well (see also HSPD directive 840.01, *Criminal Investigations*).  Officers are required to provide Miranda Warnings when conducting custodial interviews, and shall ensure that Miranda rights waivers are made knowingly, intelligently and voluntarily.

**820.11.7 – Crisis Intervention Team (CIT)**

A.   The Holly Springs Police Department has entered into a partnership with local mental health authorities, support groups, and other law enforcement agencies in Wake County to train Crisis Intervention Team officers.  These officers undergo 40 hours of specialized training in mental illness awareness, medications, de-escalation skills, and resources for the mentally ill.  These officers serve in various capacities throughout the organization and are available as a resource when dealing with a person in crisis or suffering from a mental illness.

B.   When calls are received indicating the potential for a mentally ill person, a CIT officer will respond if available.  Once on the scene, the CIT officer will use his/her skills and training to assist the person in

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 39 of 44

need.  Other officers should defer to the CIT officer's training and experience in handling the call and provide assistance or back-up as needed.

C. An officer who responds will complete a CIT ~~officers who respond will complete a~~ Report and forward it to the CIT Coordinator upon the completion of any call involving a mentally ill person regardless of the original dispatch or resolution. If criminal charges result from the incident, the officer shall also complete all necessary corresponding incident and arrest reports.

D. CIT officers will not be used for the exclusive purpose of transporting mentally ill persons on mental commitments if they did not respond to the call initially.  This shall not preclude officers from calling CIT officers to the scene if they believe there is a benefit of involving a CIT officer.

**820.11.8 – Commitment Procedures**

A. Pursuant to NCGS §122C-251, officers will inform the person taken into custody on commitment orders or for emergency evaluation that he/she is not under arrest for a crime, but are being taken to a health professional for treatment and for their safety or the safety of others.  Officers of the same sex as the person in custody will perform the transport whenever possible.

B. Emergency Involuntary Commitment

1. An officer responding to an individual in crisis is authorized to take the individual into custody to prevent immediate harm to the individual or others.

2. These situations occur when there is no time to go before a magistrate and obtain an involuntary commitment order because the delay in getting the paperwork could allow the mentally ill individual to harm him/herself or others.  Officers are authorized to restrain the individual in an appropriate manner to prevent him from harming officers, himself, or others.

3. Once the person is taken into custody, the officer will transport him to Wake County Crisis and Assessment Services, or other approved center by the magistrate, for proper evaluation by psychiatric professionals.

4. If the person is combative, the officer can call Crisis and Assessment Services and request permission to bypass that facility and go to the local twenty-four (24) hour facility.  The decision on where to transport the individual is determined on a case by case basis.

5. Officers may be required to stay with the individual throughout the process, or custody may be transferred to the hospital or law enforcement personnel at Crisis and Assessment Services depending on the situation.

6. If a psychiatrist determines the individual does not meet the criteria for in-patient hospitalization, the officer may be requested to transport the individual back home.

C. Involuntary Commitment

1. Once a magistrate issues an Involuntary Commitment Order on an individual, the Holly Springs Police Department will be contacted and an officer will go to the magistrate's office, pick up the paperwork, and take the individual named into custody without delay within 24 hours.   If the respondent cannot be located, the officer in possession of the order shall be responsible for returning it to the magistrate or Clerk of Court.

Case 5:25-cv-00222-BO-RJ　　　Document 29-7　　　Filed 08/03/26　　　Page 40 of 44

2.  Officers are allowed to use reasonable force to take custody of the individual and may restrain him/her appropriately.

3.  The officer will transport the named person to the location on the order (usually Wake County Crisis and Assessment Services).  Officers are normally allowed to transfer custody and paperwork to the security personnel at Crisis and Assessment Services.  If the security personnel are unable to assume custody of the consumer, the officer shall remain with the consumer for evaluation.

4.  Once the evaluation is complete, Wake County Crisis and Assessment Services will tell the officer whether or not the individual meets the criteria for in-patient hospitalization.

    a.  If the individual does not meet the criteria, the officer may transport the individual back to his home, originating point of the initial call or service of the order, or other reasonable location with a supervisor's approval.

    b.  If the individual meets the criteria for in-patient hospitalization, he/she will be transported to the proper facility for his/her second evaluation.

        1)  The Holly Springs Police Department handles in-county transports.

        2)  The Wake County Sheriff's Office handles all out-of-county transports.

    c.  If the Holly Springs Police Department conducts the transport to the second hospital for evaluation, the officer will remain with the individual until the hospital accepts custody of the person.

        1)  Once custody is accepted, the officer will complete the return of service on the commitment order and return it to the magistrate.

        2)  If the hospital does not concur with the first evaluation and deems the person does not require in-patient hospitalization, the officer may be requested to transport the individual home.

D.  Voluntary Commitment

    A.  An officer encountering a consumer willing to seek professional help voluntarily shall always first encourage the person or his/her relative to initiate voluntary admissions proceedings if there are no violent or overt acts present.

    B.  Officers are encouraged to utilize the Wake County Mobile Crisis Team to assist those in a crisis. As some crisis situations are best resolved in the client's home setting, this resource will respond to the scene and evaluate the individual.

    C.  Officers may provide transportation for individuals who voluntarily and of their own free will request to go to Wake County Crisis and Assessment Services to speak with a counselor.

    D.  Officers will accompany the consumer into the center and speak with a receptionist or other staff member about the reason the consumer wanted to come to the center.

    E.  Officers may leave the consumer at Crisis and Assessment Services, but under voluntary commitment conditions, the consumer is not required to stay for evaluation.

Case 5:25-cv-00222-BO-RJ     Document 29-7     Filed 08/03/26     Page 41 of 44

**820.11.9 Mental Subject in Custody Escape**

A.  Officers transporting a mental subject in custody for an evaluation shall notify the Holly Springs Emergency Communications Center of escape, request assistance of proper jurisdiction, and notify a supervisor immediately.

B.  Officers shall attempt to locate and apprehend the escapee.
C.  Officers will then follow procedures outlined in HSPD directives, 710.04 - Prisoner Custody & Transportation and 810.09 – Search & Recovery Operations.

**820.11.10 – Forcible Entry to Take Respondent into Custody**

A.  Officers in possession of a valid custody order for Involuntary Commitment do not need to obtain a search warrant to enter the respondent's home, residence, or premises in order to take the respondent into custody. An officer may enter the premises of the respondent under the same circumstances allowed for executing an arrest warrant. The officers must:

1)  Have probable cause to believe the person to be taken into custody is on the premises;
2)  Have given notice of his or her presence, unless there is probable cause to believe that giving such notice would present a clear danger to human life;
3)  And have the valid signed custody order in his/her possession.
4)  If after these conditions are satisfied, the officer reasonably believes his/her admission is being denied or unreasonably delayed, the officer may use a reasonable amount of force to enter.

B.  If the respondent is in a third party's premises, the third party must give consent or the officer must obtain a search warrant in addition to the custody order to enter the premises.

C.  An officer may forcibly enter private premises to take a respondent into custody if doing so is urgently necessary. This can be done without a search warrant or even an involuntary commitment order. NCGS 15A-285 allows an officer to enter buildings, vehicles and other premises if he or she reasonably believes that doing so is urgently necessary to save life, prevent serious bodily injury, or avert or control a catastrophe. This provision should only be relied upon in the most unusual and extreme circumstances.

EXHIBIT 5



# Holly Springs Police Department
# Written Directive

| | |
|---|---|
| **Chapter:** 800 - Operations | |
| **Directive:** 820.09 - Bias Free Policing | |

| | |
|---|---|
| **Authorized by:** Chief Paul J. Liquorie | **Effective Date:** |
| **CALEA Standards:** 1.2.9 | **Last Revision:** |

**820.9.1 – Purpose**

This policy prohibits bias based profiling and establishes procedures to ensure that no law enforcement actions taken by members of the Holly Springs Police Department are taken solely because of race, ethnicity, national origin, gender, sexual orientation, religion, economic status, age, cultural group, or other identifiable group.

**820.9.2 – Policy**

The Holly Springs Police Department is committed to enforcing the law and traffic regulations in our community by practicing fair, impartial and bias-free policing and respecting the rights and dignity of all. No employee of this Department shall engage in bias based profiling in any arrests, asset seizure / forfeiture efforts, field contacts, traffic stops, or any other action related to the performance of their duties.

**820.9.3 – Procedure**

A. All investigative detentions, traffic stops, arrests, searches, and seizures of property by officers will be based on a standard of reasonable suspicion or probable cause as required by the Fourth Amendment of the U.S. Constitution, established case law, and other statutory authorities. Officers must be able to articulate specific facts, circumstances and conclusions that support probable cause or reasonable suspicion for an arrest, traffic stop, or investigative detention.

　　1. Officers will maintain professionalism, integrity, and accountability in all contacts with the public in order to continue to enhance the trust of the community. Policing based on biases alone is inconsistent with the mission and values of the Holly Springs Police Department, and is therefore prohibited.

　　2. Officers may consider certain personal identifiers, such as, but not limited to race, ethnicity, gender, or other group affiliation of a suspect or suspects based on credible, reliable, and relevant information that links a specific person or a group of individuals to a particular criminal incident or a specific series of crimes.

B. Officers of the Holly Springs Police Department shall not attempt to balance, or equate statistical population percentages in the performance of their law enforcement duties. Established law and legal principals are the sole basis for officers' enforcement actions.

**820.9.4 – Data Collection**

A. Any officer conducting a traffic stop for any Chapter 20 violation shall record all the data required by the State of North Carolina under the authority of N.C.G.S. 114-10.1 for that stop. The data shall be recorded through the Department's Records Management System or, if necessary, on the State Bureau of Investigation's Traffic Stop Report form (SBI form 122)

B. The Holly Springs Police Department will submit data on any reported hate crimes as part of their routine UCR data reporting.

**820.9.5 – Supervisory Responsibilities (1.2.9)**

A. The Commander of the Field Operations Division shall conduct quarterly reviews for all sworn personnel to ensure that the necessary data for all Chapter 20 violation vehicle stops is being submitted. Any deviation from policy will be referred to the involved employee's immediate supervisor for review and appropriate action.

B. Department supervisors shall monitor the performance of their employees for other actions or inactions that demonstrate any bias in violation of this policy.

C. Suspected violations of this directive, whether identified by a supervisor or through a citizen complaint, shall be handled as a complaint investigation using procedures outlined in HSPD Directive 320.01 – Complaint Investigations.

D. Intentional violations of this policy shall be the subject of disciplinary action by the Chief of Police, up to and including termination of employment.

**820.9.6 – Mandatory Training (1.2.9)**

All employees of the Holly Springs Police Department shall complete training on this policy. Additional training will be annually held to reinforce the principals and application of bias-free, fair and impartial policing.

**820.9.7 – Administrative Review and Corrective Measures (1.2.9)**

A. The Commander of the Investigative and Support Division will conduct an annual review of traffic stop data and bias based policing complaints. The review will minimally include the following information for the prior calendar year:

1. An analysis of citizen complaints and/or comments received regarding bias-based policing;

2. An overview of training conducted; and

3. Recommendations for any changes in procedures and practices deemed appropriate.

B. The Division Captains shall meet with all appropriate supervisors at least annually to discuss the annual review and to present any areas of concern. Indicators of possible bias include evaluation of citizen complaints of intentional bias, discourtesy complaints, improper use or threatened use of force incidents, intentional failure to comply with the documentation requirements of this policy, false documentation, or improper arrests or searches.

C. Additional training or counseling may be appropriate based on any incidents that suggest bias.