IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:25-cv-222

JENNIFER SLOAN RACHMUTH,

        Plaintiff,

  vs.

ELLIOTT WARREN, et al.,

        Defendants.

_____

VIDEO-RECORDED DEPOSITION
OF
JENNIFER SLOAN RACHMUTH

_____

TAKEN AT:
North Carolina State Bar
217 East Edenton Street
Raleigh, North Carolina 27601

June 29, 2026
9:10 A.M.

_____
Christy Whisner
Court Reporter

Civil Court Reporting, LLC
4478 Moratock Lane
Clemmons, NC 27012
(336) 406-7684

Jennifer Sloan Rachmuth

ATTORNEY NOTES

| PAGE LINE | SUBJECT MATTER | RELATES TO | ACTION |
|-----------|----------------|------------|--------|
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |
|           |                |            |        |

Civil Court Reporting, LLC  336-406-7684

Jennifer Sloan Rachmuth

APPEARANCES OF COUNSEL

ATTORNEY FOR PLAINTIFF:

Daniel A. Bruce, Esquire
HOLTZMAN VOGEL BARAN TORCHNISKY & JOSEFIAK, PLLC
2300 N Street NW, Suite 643
Washington, DC 20037
dbruce@holtzmanvogel.com

ATTORNEY FOR DEFENDANT:

Dan M. Hartzog, Jr., Esquire

HARTZOG LAW GROUP LLP

2626 Glenwood Avenue, Suite 305

Raleigh, NC  27608

dhartzogjr@gmail.com

OTHER APPEARANCES

Kyle Roeder, Videographer

Page 4

Jennifer Sloan Rachmuth

I N D E X

| | |
|---|---|
| STIPULATIONS | 6 |
| EXAMINATION | |
| BY MR. HARTZOG | 8 |
| ADJOURNMENT | 255 |
| REPORTER CERTIFICATE | 256 |
| WITNESS CERTIFICATION | 257 |
| ERRATA SHEET | 258 |

- - - - - - - -

E X H I B I T S

| Name | Offered By | Identified |
|---|---|---|
| Exhibit A (Twitter - X account) | Mr. Hartzog | 105 |
| Exhibit B (Post February 17) | Mr. Hartzog | 116 |
| Exhibit C (Incident Investigation Report) | Mr. Hartzog | 121 |
| Exhibit D (Post Picture November 4, 2024) | Mr. Hartzog | 127 |
| Exhibit E (Post February 18, 2025) | Mr. Hartzog | 135 |
| Exhibit F (Email) | Mr. Hartzog | 137 |
| Exhibit G (Post with picture March 2, 2025) | Mr. Hartzog | 147 |
| Exhibit H (Posts - 3 pictures) | Mr. Hartzog | 151 |

E X H I B I T S (continued)

Page 5

Jennifer Sloan Rachmuth

| Name | Offered By | Identified |
|---|---|---|
| Exhibit I<br>(Press Release) | Mr. Hartzog | 175 |
| Exhibit J<br>(Post) | Mr. Hartzog | 176 |
| Exhibit K<br>(Doc - news article) | Mr. Hartzog | 187 |
| Exhibit L<br>(Email Amy Mek) | Mr. Hartzog | 202 |
| Exhibit M<br>(Post June 6) | Mr. Hartzog | 246 |
| Exhibit N<br>(Post November 4) | Mr. Hartzog | 249 |
| Exhibit O<br>(Post February 19) | Mr. Hartzog | 249 |
| Exhibit P<br>(Post) | Mr. Hartzog | 250 |
| Exhibit Q<br>(June 1, 2025 - February 17) | Mr. Hartzog | 251 |

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 5 of 267

Jennifer Sloan Rachmuth

STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Christy Whisner, Notary Public in and for the County of Guilford, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony were requested

prior to the filing of same for use as permitted by

applicable rule(s).

(9:10 a.m.)

THE VIDEOGRAPHER: On record at 9:10 a.m. Today's date is June 29th, 2026.

The deponent is Jennifer Sloan Rachmuth in the matter of Jennifer Sloan Rachmuth, Plaintiff, v. Elliott Warren, et al., Defendants. Filed in the United States District Court for the Eastern District of North Carolina, Western Division. Civil Action Number 5:25-CV-222.

If counsel could please introduce themselves and state their appearances, after which the court reporter will swear in the witness.

MR. BRUCE: Daniel Bruce of Holtzman Vogel on behalf of the plaintiff.

MR. HARTZOG: Dan Hartzog, Junior, on behalf of defendants.

THE COURT REPORTER: Please raise your right hand.

JENNIFER SLOAN RACHMUTH: Sure.

THE COURT REPORTER: Do you solemnly swear or affirm that the testimony you're about to give today shall be the truth, the whole truth and nothing but the truth?

JENNIFER SLOAN RACHMUTH: Yes.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 7 of 267

THE COURT REPORTER: You may begin.

EXAMINATION

BY MR. HARTZOG:

Q. Good morning, Ms. Rachmuth.

A. Good morning.

Q. We had a chance to introduce ourselves earlier, but I'm Dan Hartzog and I'm defending the -- the officers in this matter. I appreciate you taking the time to sit down and answer some questions for us today.

A. Okay.

Q. Can we start by having you give your full name?

A. Yes. Jennifer Sloan Rachmuth.

Q. And what is your date of birth?

A. 11-7-69.

Q. What is your current address?

A. 112 Bellagio Drive, Apex, North Carolina.

Q. Okay. How long have you lived at that address?

A. Eight years.

Q. And where did you live prior to that?

A. I lived in Chapel Hill.

Q. Okay. Can you give me an address there?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 8 of 267

If you can remember.

A. 810 Churchill Drive, Chapel Hill.

Q. Okay. How long did you live at that address? Roughly.

A. I can't recall. Probably six to seven years.

Q. Okay. All right. Can you walk me through your educational background?

A. Yes. Starting from?

Q. We'll say starting from high school.

A. Starting from high school. Well, I stopped school after my 10th grade. I was in foster care and between group homes, I began going to junior college. I believe I was at the age of 31. I did get a GED. I continued on through junior college. And eventually, I applied into Harvard and was accepted as a provisional student. And I attended on a -- almost all academic scholarship and graduated in 2007 with a degree in psychology and a -- a minor in what's called legal studies. And then I was accepted into Fielding Graduate School for a media psychology PhD with a terminal master's degree. And after around two years, I stopped because I developed a -- a company, an idea, and it was invested in, and that

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 9 of 267

required all my time.

Q. Okay. So walk me through, you say you stopped school after 10th grade and went into foster care. I'm sorry to have to ask personal questions, but sort of the nature of this thing. Can you tell me what happened, why you had to go into foster care or group homes?

A. Because I couldn't live in my home.

Q. Okay. Can you tell me why?

A. I had problem with my parents.

Q. Okay. What was the problem with your parents?

A. Abusive home.

Q. Okay. What was the nature of the abuse?

A. I mean ---

Q. And -- and I know these are personal questions and I -- I'm sorry to have to ask them, but I -- I have to ask.

A. Well, I mean, it was physical and neglect, strong neglect.

Q. Okay. Where did you grow up?

A. I grew up in Charlotte till I was -- let's see, approaching my freshman year in high school and then moved to Boone, North Carolina.

Q. Okay. So you moved to Boone, your --

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 10 of 267

your freshman year of high school?

A. I did.

Q. Okay. Was that --

A. But just before the freshman year, yes.

Q. Okay. So you started high school after you moved?

A. Actually, I -- yeah. Let me -- it's a long time ago.

Q. I understand.

A. I believe it might have been the grade before that, so that would be in the 8th grade because high school started in 9th back then, so yeah. So 8th grade.

Q. Okay.

A. Yeah.

Q. Was it during 8th grade that you moved or was it after 8th grade finished?

A. During 8th grade.

Q. Okay. Did you move with your family to Boone?

A. Yes.

Q. Okay. Was there a reason y'all moved to Boone?

A. My mother got into Appalachian State. She was a student.

Q. Okay. Where are your parents these days?

A. I don't speak with them, but they're still in Boone.

Q. Okay.

A. And that's my mother and stepfather to be clear.

Q. Okay. What happened to your biological father?

A. He died in a car accident.

Q. Sorry to hear that. How old were you?

A. In my 20s.

Q. Okay. Where was the -- where was the car accident? Was it in Boone?

A. No, my father lived somewhere else. It was in transit from Texas to West Virginia.

Q. Okay. Were your parents separated?

A. They divorced when I was 1.

Q. Okay. All right. Was your biological dad part of your life growing up?

A. No, I met him for the first time when I was about 15, 16 years old.

Q. Okay. So the -- the physical abuse that you mentioned, was that your -- your mother or your stepfather?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 12 of 267

A. Both.

Q. Okay. Can you tell me the nature of the abuse? I'm sorry to ask, but I need to know.

A. I think I've answered that. I said physical abuse.

Q. Okay. Meaning like they -- they hit you.

A. Yes, that's physical to me.

Q. Yes. I mean, I agree. I -- I'm -- I'm trying to make sure I understand what you're -- you're telling me. Okay. Were there ever any court proceedings about that?

A. Yes.

Q. Okay. What was the nature of those?

A. Well, emancipation is ---

Q. Okay.

A. --- what I recall. And again, I don't recall a -- a lot of the specifics and I apologize for that.

Q. That's okay. But at some point you went through an emancipation process?

A. I believe so. I became a ward at the state of North Carolina at the age of 15.

Q. Is that something that you initiated?

A. I did.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 13 of 267

Q.   Okay.  How did you go about initiating that?

A.   I don't recall.

Q.   Okay.  All right.  Okay.

A.   But I do know I was in the family court system.  I do know that I attended multiple court hearings with a, I believe it was a guardian ad litem or something.

Q.   Okay.  So a guardian was appointed for you and represented you in these emancipation proceedings?

A.   Yes.

Q.   Okay.

A.   The proceedings.  I don't know if it's emancipation, that just rings a bell for me.

Q.   I understand there was some sort of court proceedings ---

A.   Correct.

Q.   --- that -- that led to you becoming ward of the state ---

A.   That's right.

Q.   --- and no longer living with your mother and stepfather.

A.   That's right.

Q.   Okay.  What -- around what year would

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 14 of 267

this have been?

A. Would've been, I guess '84 or '85.

Q. Okay. Do you know if those records are still in existence, those court records?

A. I don't.

Q. Have you ever tried to review those?

A. No, I wouldn't read them.

Q. Okay.

A. In fact, it's not something I like to think about.

Q. I understand. And -- and again, I'm sorry to have to ask you these questions, but given that you've got sort of emotional distress damages, I feel like I have to delve with these things.

A. Sure. Okay.

Q. So I appreciate you being patient with me asking this stuff. Did you go through any sort of counseling at that time?

A. I did.

Q. Can you tell me a little bit about that?

A. I don't recall.

Q. Okay. Was that sort of court mandated counseling?

A. I don't recall.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 15 of 267

Q. Okay. Do you know who paid for the counseling?

A. My best recollection would be Medicaid.

Q. Okay. Did you have to pay anything out of pocket for that counseling that you recall?

A. I didn't have money, so.

Q. Okay. How -- how long were you in counseling?

A. At that time?

Q. Uh-huh. (Affirmative)

A. I don't recall.

Q. Okay. Would it have started approximately when you were 15?

A. I -- I -- I don't recall.

Q. Okay. Would it -- it was around the time of your separation?

A. It was, yes.

Q. Okay. And I think you said you -- you stopped school after 10th grade and went into foster care?

A. Well, I went into foster care. I was still in school.

Q. Okay.

A. But I -- when I was in a group home my father found me and reached out to me and I lived

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 16 of 267

in Florida with him and his family for a year. And then -- and after that I left. It was a very rough year. And I ---

Q. I'm sorry.

A. I started living on my own around 16-and-a-half or 17. 17, yeah.

Q. 16 or 17, you started living on your own?

A. Uh-huh. (Affirmative)

Q. Okay. Let me back up and just ask you briefly, you -- you mentioned that it was a rough year when you lived with your biological father in Florida. Tell me about that.

A. He's -- I need a break.

Q. Sure.

THE VIDEOGRAPHER: Off record at 9:22 a.m.

(Off record: 9:22 a.m. to 9:25 a.m.)

THE VIDEOGRAPHER: On record at 9:25 a.m.

Q. (Mr. Hartzog) Okay. Back on the record. Ms. Rachmuth, I'm sorry to -- again, I'm sorry to have to ask you these questions.

A. Okay.

Q. But I -- I did want to know a -- a

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 17 of 267

little bit more context about the -- the year that you spent with your biological father in Florida.

A. Uh-huh. (Affirmative)

Q. If you could tell me a little bit about why that was a traumatic year.

A. Well, it -- as, you know, meeting your father for the first time at 16 or around there, it, you know, was a joy of course. And it's a weird thing when you don't know who your father is. Actually, it's a weird thing for kids when their parents don't want them, period. It's a feeling that you will -- you'll never get over. It's -- it does stay with you for a long time. But he was very physically abusive, documented. And, you know, I have two siblings -- three siblings actually on that side. And we remain very close now. But the fact of the matter is, he was abusive, physically.

Q. At that point, had you emancipated from your mother?

A. Well, I think emancipated might be a legal term and I'm not sure how ---

Q. Correct.

A. Okay.

Q. I'm sorry. However you want to phrase

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 18 of 267

it.

A. Yeah. I was, you know, I don't like being a victim and I like to take things into my own hands, so I found it necessary to, I mean, I was a ward of the state of North Carolina, so I was able to go with my father and she had no objection.

Q. Okay. How did your time in Florida come to an end?

A. I lived there for a while actually. I mean, I lived with some school families of friends that are still my friends to this day actually. But I -- again, I like to have agency over my own life, so I started my own business at around 17 years old. I immediately began teaching fitness, so I just began working instead of school.

Q. Okay. So you -- you said you lived with -- with other families. So am I understanding your -- your testimony correctly, that you lived with your biological father for about a year in Florida?

A. Right.

Q. And then began living with sort of family, friends?

A. Friends from school, their families.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 19 of 267

Q. Friends from school.

A. And I would live with my father for a month or two, you know, as the years -- harassed, and I was 19 and 20 sometimes, I mean.

Q. Did the -- did the physical abuse continue when you were in his home for, you know, those periods of time?

A. It did.

Q. Okay. And then there were times where you lived away from his -- his home and live with school friends and their families?

A. Correct.

Q. How long of a stretch do you think you would stay at other families' homes?

A. I don't recall.

Q. Okay. Okay. Were there ever any -- any legal proceedings involving your biological father?

A. No.

Q. Okay. Okay. No criminal charges or anything about the abuse?

A. No.

Q. Okay. And you said you started your own business. Was that in Florida?

A. Uh-huh. (Affirmative)

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 20 of 267

Q. And how old were you? You said you were ---

A. 17.

Q. --- 17. What was the business?

A. It was called Exercise Your Options, and I would go and organize fitness classes at companies.

Q. Okay.

A. I mean, it wasn't, you know, a Fortune 100 enterprise obviously, but ---

Q. Okay. It's okay.

A. So ---

Q. So you would sort of go to corporate events and help come up with fitness plans?

A. Right. So you would say a company of, you know, 50 people. They would organize a class in the park before work, something like that. But I taught fitness pretty regularly from the age of about, I want to say 16. I mean, I've done it throughout my life. That's been my -- my go-to and, you know, so.

Q. Okay. How -- how long did you operate that business?

A. I don't recall. I mean, I would say years. I mean, you know.

Q. Okay. Did you ever register that ---

A. No.

Q. --- business. It was just sort of a thing you did on the side.

A. Informally. Uh-huh. (Affirmative)

Q. Okay. All right. How long did you stay in Florida?

A. I don't recall.

Q. Okay. Was it years, was it ---

A. Uh-huh. (Affirmative)

Q. Okay. All right. So I think I'll sort of understand up until -- did -- did you finish high school? I think you said you got ---

A. Got GED.

Q. Okay. Eventually you got GED ---

A. I did.

Q. --- but at the time you were high school age, you -- you left after 10th grade, is that correct?

A. I did.

Q. Okay. And I think you said at age 31 you went back and got your GED?

A. I don't remember when I got my GED. It sounds about right, but I -- I believe it was in my late 20s.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 22 of 267

Q. Okay. Okay. I think you told me you went to junior college at age 31. So maybe ---

A. I did.

Q. --- you got your GED before that.

A. That was a requisite, so I -- I don't remember when.

Q. Okay. Some point in your late 20s you think?

A. Yes.

Q. Roughly. Okay. Okay. Where did you get your GED?

A. Central Piedmont Community College in Charlotte.

Q. Okay. All right. And so I take it at some point you moved back to Charlotte from ---

A. I did.

Q. --- Florida?

A. Uh-huh. (Affirmative)

Q. what -- what was the impetus for that?

A. I mean, I -- from Charlotte, my -- I'm very close to my grandmother and my aunt, very, so I would guess that

Q. Okay. Just family members that you were close to and so it felt like a ---

A. Yeah. And a brother and sister from my

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 23 of 267

mother's side, very close, so.

Q. Okay. Is your mother -- your mother still around, but you don't have contact with her?

A. I don't.

Q. Okay. I take it when you moved back to Charlotte, did you have contact with her at that time?

A. Yes.

Q. Okay. Where did you -- did you live with her for any period of time in Charlotte?

A. Uh-uh. (Negative)

Q. Okay.

A. I did not live with my mother again after I left the house as a teenager.

Q. Okay.

A. So ---

Q. All right. So you came back and you -- you've had a relationship with her for some time?

A. I did.

Q. Was there a sort of straw that broke the camel's back that caused the end of your contact with her?

A. Yeah.

Q. What was that?

A. Well, after, I got engaged. Actually,

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 24 of 267

after I went back to school, my mother became very vengeful towards me and ended up also going back to school herself. And began a -- I don't know, became a very tense relationship. And after I announced I was getting married, things became very difficult. And after I gave birth to my daughter, you know, it was -- there was a lot of abuse. Not physically, but I would say mentally.

Q. And I -- and again, I hate to have to ask these personal questions, but what kind of mental abuse are we talking about?

A. Well, telling me, for instance, because I had a political point of view that she didn't agree with, that she could have had an abortion and might have contemplated -- should have contemplated that more seriously. I take offense to that and I won't tolerate that, so I would not talk to her for a period of time. And it was an unrepentant that made it impossible for me to -- and eventually, I had to see that abusive things that I don't believe you should say to a -- a child. And when I became a mother, I realized that it was really impossible for me to feel confident about being a mother while still in that relationship.

Q. Understood. What about with your father? Did you -- did you maintain communication with your father?

A. No, I mean, he died, so -- he died around -- in my mid-20s.

Q. Okay. Up until his death, y'all stayed in contact?

A. We -- we, you know, I began to understand my father, you know, as you do when you're or an adult, and I didn't have that much history with him as I did with my mother. Having said that, I didn't speak to him for about a year before he died, and I found out a few months later.

Q. Was there a -- another incident or was there any impetus that caused you to cut communication with your father?

A. I don't recall.

Q. Okay. All right. So what -- what caused you to go get your GED?

A. I don't recall.

Q. Okay. Just felt like something you wanted to do or felt like you needed to do?

A. Yes.

Q. Okay. Was there any sort of goal at the

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 26 of 267

time when you went to get it?  Did you have a -- a path in -- in your head or?

A.  No, and it was because at the time I was making money, so I mean, I've always found a way to be financially successful.  I've never been on assistance besides, you know, when I was young and I didn't need it for the work I was doing.  So I -- it's a good question to what I have no answer.

Q.  That's fair.  Okay.  And prior to that, your -- the work that you had been doing, was that related to physical fitness kind of things?

A.  Personal training, physical fitness.

Q.  Okay.

A.  I was a sponsored athlete for Nike, so competing in aerobics competitions.

Q.  Okay.  You say you were a sponsored athlete?

A.  Uh-huh.  (Affirmative)

Q.  Okay.  Tell me a little about that.

A.  Well, at the time, aerobics was very big.  I mean, it still is.  It's an Olympic sport now.  But I, you know, Nike had a program where they would choose elite teachers across the country to wear their free stuff, enter these contests, et cetera, and I was one of them.  So it

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 27 of 267

was highly competitive and I loved it, so.

Q. Okay.

A. No doubt.

Q. And so that's -- was that sort of the focus, I guess, of your -- your work in -- in your 20s?

A. Yes, until I was around -- until I was around 28.

Q. Okay. All right.

A. And on and off, so even after that, but yes.

Q. Okay. How -- how long did that continue?

A. Fitness and that as a career?

Q. Well, the -- the Nike thing in particular.

A. Oh, I don't know. I -- a couple years. I don't know.

Q. Okay.

A. But that was aside from my business, but ---

Q. Okay. And you maintained your -- your -- your same business?

A. Well, I think there's two things you're talking about.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 28 of 267

Q. Okay.

A. Exercise your options.

Q. Uh-huh. (Affirmative)

A. Is that what you mean?

Q. That's what I was talking about.

A. Okay. I don't remember. I mean, that was a few years, but fitness, the basis, has gone on until a few years ago, but yes.

Q. Okay. Did you have a similar sort of company or -- or program in Charlotte when you moved?

A. Did I? I do not recall, but my career was the same.

Q. Okay. So you were still doing physical fitness training and things -- things like that?

A. Yes.

Q. Okay. All right. So what caused you to go to junior college at age of 31?

A. Okay. Well, I -- during September 11th, I was in Charlotte and I had a -- a very good job. I mean, making six figures. And I, you know, went to go volunteer Salvation Army. I stopped everything I was doing and I got up to New York on September 13th. And I volunteered for about six months with Salvation Army on Ground Zero. And I

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 29 of 267

-- my life just did not have the same meaning at the time, and I just -- I wanted to actually help people. And so I wanted to go into law and so to do that, I mean, I -- I worked with a lot of victims when I was down on Ground Zero. So I'm just, I don't know, I just -- even going back into sales had no meaning.

However, I moved to New York, I took another -- I was in medical sales to buy sales. Surgical at the time. Took another job there but it still did not have the meaning. And so I wanted to -- I wanted to get a degree. So I started at Borough of Manhattan Community College and just kind of worked my way up from there.

Q. Okay. Tell me about going up on -- to -- to volunteer at Ground Zero. It sounds like that was sort of a formative experience for you.

A. Yeah.

Q. Tell me a little bit about that.

A. I mean, I can't explain it because it was a calling that I've never had before sight. I'm not, I mean, at the time I was, you know, like I said, making exceptional money, you know, just very comfortable. I just -- I actually drove to Raleigh at the time, got on a Greyhound bus and it

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 30 of 267

dropped me off right at Penn Station.  And then I went to 14th Street, Salvation Army.  I met, I mean, a great group of friends were still friends. I don't know, I just had a calling, so I can't explain why.

Q.  Right.

A.  Actually, but, yeah, it definitely changed my life.  But you -- you look at things like that and your life doesn't really have the same meaning after that, so.

Q.  Sure.  You said you were selling medical devices?

A.  Yes.

Q.  Tell me about that.

A.  Well, I was around 28 and I thought, you know, I'm teaching probably 30 hours a week of physical fitness, and maybe that's not going to sustain.  So I applied for a job doing -- I've never actually had a real job, I guess you would say selling splints to orthopedic surgeons and was hired because of my background in fitness.  Living in Charlotte at the time, made quite a bit of money.  Did, you know, exceptionally well.

And then I was recruited by a surgical company, which by the way, said they never hire

anyone without a college degree.  Now I'd had my GED at that point.  That wasn't the impetus for me getting that.  But then I started making what I thought was very good money without a college degree.  Selling in the operating room, so orthopedic things in North Carolina, across the state, so.

Q.    And how long did you do that?

A.    I did that two years.  Yeah.

Q.    What made you stop doing that?

A.    In North Carolina?

Q.    Or overall.

A.    I asked myself that a lot because it was excellent money.  Well, I was in school and, you know, 9/11 changed it.  So even though I did the same thing in New York for about a year and a half after, I felt like -- and I was making exceptional money, I just felt like I had a calling and a purpose.  I -- I really started becoming aware of, I mean, terrorism, I mean, really it affects people, so it affected me and I wanted to help stop it, so.

Q.    Okay.  And so was -- was going to volunteer at 9/11, sort of the first I guess awakening --

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 32 of 267

A.    Yes.

Q.    --- to, to that calling that you felt?

A.    Yes.  Yeah.

Q.    Okay.  You sort of articulated it as, you know, becoming aware of -- of terrorism and the obviously -- obvious harm that it causes and wanting to sort of fight against that; is that fair?

A.    Suffering.  I don't like suffering.  I don't like seeing people suffer.

Q.    Yeah.  Okay.

A.    Yeah.

Q.    All right.  And so once you sort of found this calling, what was your next sort of career move?

A.    Well, the next career move happened to be lateral by necessity.  I wanted to live in New York and I wanted to -- I -- I don't -- I didn't feel the time I could live back in Charlotte because it's really strange.  Because when you go into a war zone and you come back into your regular life, it's very hard to adjust because you don't see things the same way as other people see it around you.  That's what it felt like for me. So I -- I got an offer in Manhattan.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 33 of 267

Well, Manhattan, I ended up covering other Boroughs as well.  But it was a great offer and I would be able to continue to volunteer.  I mean, the volunteer process was for me about a year and a half.  Because the cleanup was -- and it wasn't -- it was less frequent than the about six months, but it was, you know.  So it would allow me to do that while I was thinking about going to school, but I definitely wanted to go to school.

Q.   Okay.  So couple things.  You -- you said you volunteered at Ground Zero for ---

A.   Yes.  Salvation Army.

Q.   Through Salvation Army ---

A.   Yes.

Q.   --- would you say for about a year and a half?

A.   In total.

Q.   In total?

A.   Right.

Q.   Okay.  Was that all day, every day or was that ---

A.   About six months -- around six months it was.

Q.   Okay.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 34 of 267

A.    I mean, I gave up everything.

Q.    Yeah.

A.    Yeah.

Q.    Okay.  What did you do for income during that time?

A.    I had income.  I mean, I had saved up, I had -- but I was transitioning from one job to the other.

Q.    Okay.  All right.  And ---

A.    And -- and in some cases I was paid for volunteer.  I mean, you know, I left and they were like, great, you know, do this for a month.  So it -- I was able to cover my expenses.

Q.    Okay.

A.    And I dramatically cut down my needs.  I mean, just dropped them.

Q.    Right.  Okay.  All right.  And then you say you got an offer in Manhattan.  What was that offer?

A.    It was to do the same thing.  Actually, I was selling only trauma.  It was for a -- another actually Fortune 100 company with medical devices.

Q.    Okay.

A.    So it was to sell the line that I had,

which is trauma, but also total joints that requires the level of knowledge. So be on par with an orthopedic surgeon because you have to, I mean, it's very complicated. So the learning probe was quite a bit for that. But it was an excellent job I felt, and so I took it.

Q. Okay. All right. And so, do you know the name -- do you remember the name of that company?

A. Smith & Nephew.

Q. Smith & Nephew?

A. Yes.

Q. Okay. All right. And so you worked with them for how long?

A. Two years.

Q. Okay. All right. And making pretty good money there it sounds like.

A. Uh-huh. (Affirmative)

Q. Do you remember what you were making?

A. Uh-uh. (Negative)

Q. Okay. Three figure or six figures I assume?

A. Uh-huh. (Affirmative)

Q. Okay. All right. And that allowed you to continue volunteering, which you did for how

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 36 of 267

long?  A year and a half-ish?

A.    Roughly.  And all told -- I mean, and it was very infrequent after that, but was being a part of that community was very important to me. I mean, I met people that had lost their entire family.  You know, I met many, many, you know, families of firefighters and police officers who had lost their family and we developed a strong bond.  Yeah.

Q.    Are you still in touch with some of those people?

A.    Uh-huh.  (Affirmative)

Q.    All right.  So two years working with -- with Smith & Nephew in ---

A.    Yes.

Q.    --- New York.  What'd you do after that? What -- what caused you to leave there?

A.    I wanted to go to school full time and I did, so I converted back to fitness.  So I was a career instructor in New York City.  Was involved maybe 25 hours of teaching a week, and then my studies, so.

Q.    Okay.  So you -- you left that position to go where?  I'm sorry, where'd you say you went? Borough of Manhattan Community College?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 37 of 267

A. I did, yes.

Q. Okay. And how long were you there?

A. I don't recall.

Q. Okay. And then you said at some point you applied for -- for Harvard for what program?

A. Yes, Harvard Extension and what that was at the time is different now, but it -- it is very much on campus, but you're provisionally accepted and you -- it's for -- at the time it was for students that had an alternative background. Same professors, just -- and now it's, I guess a hybrid of what you would call online and not.

Q. Right.

A. But at the time you would take three classes, provisionally, you paid for them, non-matriculated. You'd have to get a certain grade and then you would be accepted. So I was accepted to, or I could take classes anytime at the college which all of it was, or at night or whatever. So, on campus. And I thought it was a great opportunity until I met people that lived in Boston and I'm joking, but yes.

Q. Okay. So what years was it that you were attending classes at Harvard? Just so I get the timeline.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 38 of 267

A.  Right.  Well, it was three years and I graduated in 2007, so 2004.

Q.  Okay.  So roughly 2004, 2007 was -- was Harvard?

A.  Yes.

Q.  Were you working during that time as well?

A.  Uh-huh.  (Affirmative)

Q.  Doing fitness?

A.  Uh-huh.  (Affirmative)

Q.  Okay.  As a company or private trainer?

A.  No, with Harvard.  So ---

Q.  Okay.

A.  --- they had multiple fitness centers and so with Harvard and then another couple of gyms.  I mean, probably -- I probably taught 15 to 18 hours classes a week and went to school above full-time.  So full-time would've been four classes.  I would be five or six during that time.

Q.  Okay.  So you're sort of part-time teaching in -- at Harvard gyms and other gyms around ---

A.  That's right.

Q.  --- and taking classes?

A.  Correct.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 39 of 267

Q. Okay. All right. And when you -- did you graduate from Harvard?

A. I did.

Q. Okay. What degree do you -- did you get?

A. It's called an ALB.

Q. ALB?

A. Uh-huh. (Affirmative)

Q. Okay.

A. But it's a -- a baccalaureate in psychology.

Q. Okay. Yes, you told me that. Okay. Okay. Did you have a sort of career path in mind with that?

A. I did, law school.

Q. Okay. So your plan was get the -- get the ALB from Harvard and then attend law school?

A. Uh-huh. (Affirmative)

Q. Did you apply to law school?

A. No.

Q. Okay.

A. I got engaged six months before I graduated. I got married two months before, like two months after my graduation, and then pregnant on my wedding night. So I was a little bit

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 40 of 267

derailed from my plans.

Q. Okay. All right. So when you, I guess, when you found out you were pregnant, what was your -- what was your path at that point?

A. Well, I mean, when I graduated from Harvard, I, you know, again, I was engaged, and my husband was doing a postdoc at the time, so I needed to work. And so I went into medical sales again because I was qualified to do exactly what I was doing before. And so my path was unknown actually, because I think, path was pretty common.

Q. Sure. Okay. And you -- what was your husband's name? What is your husband's name?

A. Guy.

Q. Guy?

A. Rachmuth.

Q. Rachmuth, okay. All right. And you said he was doing what?

A. He's doing a postdoc.

Q. Okay. And what is that?

A. A postdoctorate. He has a PhD from Harvard and MIT and then a postdoc would be a -- my rough understanding is a specialty after you get your doctorate?

Q. Okay. And did he get that?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 41 of 267

A.   He did.

Q.   Okay.  And what does he do?

A.   Right now he is a global director of sales for a pharmaceutical manufacturing company.

Q.   Okay.  What company?

A.   Evotec.

Q.   Okay.  How long has he been there?

A.   A year.

Q.   Okay.  What was he doing prior to that?

A.   He worked for IQVIA.

Q.   Say it again.

A.   IQVIA.

Q.   Okay.  Can you spell it?

A.   I-Q-V-I-A.

Q.   Okay.  That was my guess.

A.   Yeah, it used to be, oh my gosh, I forgot a big employer here.  I'm -- my memory escapes me.  I forgot.

Q.   That's okay.  Okay.  But he was working for IQVIA for -- was that where he started working after he got his -- his postdoc degree?

A.   No.

Q.   Where did he start working?

A.   I don't remember the name of the company.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 42 of 267

Q. That's okay. All right. Were y'all living in Boston at the time, or did you move back to -- when did you move back to North Carolina?

A. We moved back to North Carolina when my son was 1.

Q. Okay.

A. So that would be 2009-ish.

Q. Okay. Why'd you move back to North Carolina?

A. To be closer to family.

Q. Okay. All right. So when you moved back in 2009, you got a 1-year-old, I know that keeps you busy. So what was your -- what was your career path at that point?

A. I was in a PhD program. I thought it was going to be great because it was a hybrid of in-person and, you know, at home, so I could be a mom at the same time as I would. I -- I decided that I would go into media psychology rather than law because I couldn't justify working the amount of hours and being a mother at the same time. So that's what I was doing at the time.

Q. Okay. Probably smart.

A. Yeah. Yes, absolutely.

Q. Okay. So, media psychology, what

attracted you to that?

A. Well, I like -- I like changing minds, changing behaviors, and using media to do that. So whether it's text messaging or writing, the idea that really intrigued me. I -- I liked it.

Q. Okay. So where did -- where'd you go to learn about media psychology?

A. Fielding University.

Q. Okay. And where is that?

A. It is in, I believe it's La Jolla, California.

Q. Okay.

A. I went there a couple times. I forgot the exact city.

Q. Yeah. Okay. And this was the one that was hybrid?

A. Uh-huh. (Affirmative)

Q. So did you have to go to in-person classes in California?

A. I did.

Q. How did you make that happen?

A. Got on a flight and stayed there for two weeks.

Q. Okay.

A. Yeah.

Q. All right. Was that just one time you had to do that, or multiple times?

A. Yes. I would've had to have done it multiple times had I continued.

Q. Okay. All right. How many times did you actually do it?

A. Once.

Q. Okay. And you've decided not to continue?

A. Well, it was a hard decision. I ended up creating a -- a technology that people wanted to invest in during that time because I was taking classes and I thought, okay, I think I've got something that would be a great help to people.

Q. Okay.

A. And got an investor and moved to Chapel Hill from Charlotte. Because we lived in Charlotte.

Q. Okay. Why Chapel Hill?

A. That's where the investor lived.

Q. Okay. What was the -- what was the idea you had?

A. Well, at the time this had not been done, but to deliver precise doses of text messaging to change behavior over a longitudinal

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 45 of 267

period of time. The target behavior was obesity at the time, but it could be medication compliance or -- or anything like that. And so we conducted trials and got investors.

Q. So the -- the concept would be, I -- I suppose someone who is trying to lose weight ---

A. From a doctor. So we -- we were a doctor product. So if you think of Noom, if you know that product.

Q. I do.

A. So a -- a really vexing problem for primary care physicians is obesity, because it drives other chronic diseases. Instead of medication this particular product I theorized at the time would be as effective, or more effective than Phentermine, which is a stimulant. And the product, I believe, we did a trial and I'm not sure -- I mean, it proves out to be that, but I forgot how we conducted it.

Q. Okay. So the -- but the service was like a -- a ---

A. Prescription. So doctor would write a prescription.

Q. Okay.

A. And the patients would pay out of

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 46 of 267

pocket, which had not, to my knowledge, been done before because I went and spoke about it at places like Stanford and -- and other places with, you know, thinkers on this. And my understanding was it was a first in kind offering.

Q. Okay. I'm -- I'm just trying to make sure I understand. So it was not a medic -- not a pharmaceutical or medication?

A. It was a digital prescription, is what we called it. Correct.

Q. Okay.

A. It was not a medication. It would -- it would either augment the prescription itself or would take the place of as behavior modification.

Q. Okay. So similar to like a -- a Noom or a ---

A. Sure.

Q. --- a program like that, it would give sort of daily reminders or things to do?

A. Exactly.

Q. Okay. All right. Did you have a name for it or?

A. Healthy Me.

Q. Okay. And what -- what happened with it?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 47 of 267

A. Well, I closed my series B round the time when I was nine months pregnant with my daughter. And I got institutional funding which I thought was impressive at the time. But we were not acquired and so we sort of, I guess you could say kind of faded out.

Q. Okay. Did you -- did you make money on it? Did you lose money on it?

A. I don't know because that wasn't my function.

Q. Okay.

A. I can tell you it wasn't, you know, a lot of money obviously, but I'm not in a position to -- to say.

Q. Okay.

A. Yeah.

Q. All right. What were you told about it?

A. Well, I mean, I had a CFO, so I don't -- and I don't recall because, I mean, this is, you know, this is at the point where I just had my daughter, and I knew to keep on, you know, it would be very difficult and we were sort of phasing out some partnerships, so, yeah.

Q. Okay. So were you told that just financially it doesn't make sense to keep going?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 48 of 267

Is that ---

A. No, I was told here's just what equity you would have to continue to put in to keep going and that wasn't feasible or possible at the time.

Q. Okay. So your schedule essentially being a mother to ---

A. Two kids at the time, yes.

Q. --- two kids at the time, just didn't have the time to put into it.

A. Right. Unless I wanted to work beyond full-time.

Q. Understood. Okay. And so I guess because of that, the -- the -- the project sort of folded or faded out?

A. It did. It did.

Q. Okay. All right. Did you make money off of that?

A. Very little.

Q. Okay. Okay.

A. We were in no time and any bankruptcy, we were in no time owing money. That was a -- a break even without debt accrued.

Q. Okay.

A. I do know that.

Q. Okay. So you didn't lose money?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 49 of 267

A.   Correct.

Q.   Okay.  May have made some, not sure.

A.   Right.  Living expenses, you know.

Q.   Okay.  Okay.  All right.  So when does that sort of fold?

A.   I can give you a range.

Q.   That's fine.

A.   That's fine.  Let me think carefully before I speak.  2010 to '12, something like that. Yeah.

Q.   Okay.  So sort of by 2012 that had ---

A.   I think so, yes.

Q.   Okay.  That had finished.  Okay.  What did you do after that?

A.   Full-time stay-at-home mother.

Q.   Okay.  And how long were you full-time stay-at-home mother?

A.   Well, let's see, I don't know.  Years. I mean, I -- well I started another business and I always took them with me and so I kind of count that.  But several years.  Yeah.

Q.   Okay.  You said during that time you started another business?

A.   Uh-huh.  (Affirmative)

Q.   What was that?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 50 of 267

A.   Recharge.   R-E-C-H-A-R-G-E.   I -- I began teaching fitness ---

Q.   Okay.

A.   --- again.

Q.   Okay.   So another fitness sort of.

A.   Right.   But I was -- at the time, I, you know, I began, you know, stay-at-home mum and then a couple classes a week and then my husband's company closed, one he was working for.   And I had an idea to start a studio in Carrboro, which is Chapel Hill, and I did.

Q.   Did you open up your own studio?

A.   I did.

Q.   Okay.   What was it?

A.   Recharge.

Q.   Recharge.

A.   It became oversubscribed and so I had to move it to a bigger location in Chapel Hill. Chapel Hill in Durham.   Right on 15-501.

Q.   Okay.

A.   So ---

Q.   All right.   You said during this time your husband's business closed.

A.   Right.   He was working for a medical device company.   And, you know, there's a lot of

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 51 of 267

acquisitions and things like that.  And so -- so I felt -- I felt it was something I could do to, you know, to help out.

Q.   Okay.  So, to be clear, his company was acquired?

A.   I don't recall.

Q.   Okay.

A.   It -- to be clear, he was working for some -- a -- a company.  It wasn't his personal.

Q.   Right.  Okay.  So something happened, he was laid off?

A.   Yeah.  There -- that's it.

Q.   Okay.  Okay.

A.   Oh, Quintiles, that's the name of the company, if you recall.

Q.   Yes.

A.   Okay.

Q.   So Quintiles either closed or ---

A.   Well, no.  Quintiles was IQVIA.  So I'm recalling what IQVIA was.

Q.   Okay.

A.   Because it's one of the top five employers in North Carolina.  So he worked with them for nine years, but you're talking about something else.

Q. Okay. Just so I understand then, he worked at IQVIA?

A. Until recently.

Q. Until recently?

A. Yeah.

Q. Were they acquired by Quintiles?

A. IQVIA became Quintiles. So IQVIA -- so Quintiles merged with IMS.

Q. Okay.

A. Okay. And Quest Labs and some other big brands and became the brand IQIVIA now.

Q. I see. Okay. Okay. So somewhere in the shuffle there, he -- he was let go.

A. No, I'm actually, I'm -- I'm -- I'm upon -- sorry for the -- not being clear.

Q. It's -- it's probably me not understanding, if you don't mind.

A. Okay. So in -- in 2000 -- when was the Boston Marathon? 2012?

Q. That sounds right.

A. Okay. So this -- this -- this happened in 2012, about three months -- three or four months after Boston Marathon, my husband lost his job. At the same time, I saw an opportunity to move on. And that job, that company, I do not

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 53 of 267

recall the name too.

Q. Okay.

A. Okay.

Q. 2013 by the way.

A. 2013. Okay.

Q. Yeah. Okay. So it was during -- around that time then?

A. Yes.

Q. Okay. All right. Now did you -- were you at the Boston Marathon? Did I see that somewhere?

A. Yes.

Q. Okay. And I'm sure that was another formative sort of experience. Can you tell me about that?

A. Yes. Do you want to know that -- about that day, or?

Q. Sure. Yes.

A. Okay. Well, my husband had never run a marathon before and kind of had it as his goal. So he kind of joined up with some of his friends from college to raise money through an organization called Dana-Farber for cancer. It's a cancer thing, but that's kind of important because it's a reward for raising two -- 10,000 or

more.

You're awarded a ticket to sit on the bleachers for a finite amount of time. Because the way that it works is they -- they time it so that your running time, you know, they know when -- about when you're going to cross. And they do the marathon in tranches, so you might start later depending on your qualification, but it's relevant. So he raised money with his college roommate. And I had a ticket to sit down at bleachers.

Oh, I need a break.

Q. Please. Yeah.

THE VIDEOGRAPHER: Off record at 10:11 a.m.

(Off record: 10:11 a.m. to 10:19 a.m.)

THE VIDEOGRAPHER: On record at 10:19 a.m.

Q. (Mr. Hartzog) Okay. We're back on the record. Ms. Rachmuth, you were about to tell us about your ---

A. Yes.

Q. --- experience at the Boston Marathon.

A. Okay. So I -- at the time of the -- about, you know, five, six minutes before the

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 55 of 267

first explosion went off, I was sort of -- I joke about this. I was very fortunate to have at the time, large friends who liked to eat because they wanted a three-course meal during lunch. And I thought, who wants a three course meal during lunch? But it was fortunate because I had not made it to the bleachers yet. I had a -- a 15 minute slot to go and to sit next to my husband's college roommate's wife who was waiting for me.

So at the time of the first explosion, I was walking down, I forgot the name of the street, but I was just taking pictures, you know, the front of bleachers and stuff. So -- and so an explosion went off to my right. I don't, I mean, I knew immediately what it was. And I, you know, I -- I told people to get out of the way. People thought -- it was really weird because, you know, people thought there were fireworks at the -- down there and, you know, I was trying to help -- I was trying to help as many people as I could.

But I felt like, you know, people were trying to go into the Prudential building. It was a very tall building there, and I knew not to go there. So instantly I knew what was happening and no one else did. So the people I was with, you

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 56 of 267

know, because I couldn't go to the bleachers, I just -- I told them to go back a different way. And then second, there was another explosion at some point. But I -- I wasn't sure if my husband was alive for about an hour and a half. And there were people I took pictures of that I saw getting carried on a stretcher and they lost their legs. So it's not a good day.

Q. I'm sorry you had to experience that. How -- do you need a break?

A. No, I do not. I'm fine.

Q. Okay. How far away were you from where the explosion occurred?

A. I don't know. I've never seen it actually. I never watched it. Intentionally.

Q. Sure.

A. I don't interact with it at all. I don't even remember. I know it was Patriot's Day. I don't even remember the date and I don't focus at all on it.

Q. Okay. Understandable. Is that -- that event, I -- I take it has stayed with you?

A. I mean, yes and no. Yes and no. Because I really don't think about it. At the time, it, you know, I looked at starting my

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 57 of 267

business as a form of therapy and leaving a legacy, but I felt pretty guilty about not being able to, I think, help more people or help anyone actually. So it was a real big problem this time. So I had really doubled down on wanting to help people. So ---

Q. After that experience, did that change your -- your sort of career path in any way?

A. I want to think before I respond. Didn't, I just doubled down making sure that I could help the most people as possible. And I know what fitness did for my life. And I just -- and I obviously wanted -- I've always wanted to be the best mama I could. It's like really, really super important to me. So I just doubled down on it. Yeah.

Q. Okay. So at that time, were you still primarily a stay at home ---

A. Yes.

Q. -- mum. When did that change? Or did that change?

A. It feels like it will never change, but it changed. I mean, I would say, you know, because I had my children homeschooled, you know, I -- well, I like to be clear on what a

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 58 of 267

stay-at-home mum is.

Q. Sure.

A. Okay. So for me it was, you know, having the kids in my care most of the time. I mean, I -- I don't know that I've had a babysitter, but twice in the kids' life. But I mean, I would put them into a learning environment for like two hours here, four hours there to enrich them. But I still consider that staying at home. And that continued for -- I don't really know. I mean, I, you know, had my business and all, a few years. Yeah.

Q. Okay. All right. So after a few years, what -- what changed?

A. Well, they went into a Jewish day school which was like 2014, 2015, but again, part-time. So it's still -- then I -- I think when they went to elementary school, that was when I -- but I was still -- yeah. No, that was when I stopped being a stay-at-home mum, I guess.

Q. Okay. That sort of opens up your day a little bit.

A. It does. Yeah.

Q. So what did you -- when they -- when they went to elementary school ---

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 59 of 267

A.   Yes.

Q.   --- and you sort of found yourself with more time?

A.   No.

Q.   Right.

A.   I mean, I'd always owned Recharge.

Q.   Okay.

A.   So Recharge, I -- I owned for five years.  And so that was, I believe, from 2013 to 2018.  Yeah.

Q.   Okay.

A.   Yeah.

Q.   And so through about 2018, you -- you focused mostly on parenting and ---

A.   And my business.

Q.   --- and Recharge?

A.   Yes.

Q.   Your business.  Okay.  What happened in 2018?

A.   Well, I moved to Holly Springs then -- what happened?  Okay.  What -- well, I -- I -- a couple things.  I did not want to raise the kids in Chapel Hill anymore.

Q.   Okay.  You have a reason for that?

A.   I -- I felt that I needed a better

school and I looked for two years at Holly Springs. I examined every aspect of it from crime to neighbors to school. There was a school I was very interested in. And I really had been focused on that for a while. I didn't think Chapel Hill was a good fit. Lovely people, loved the people. I mean, I know, you know, but I just thought Holly Springs was a better fit. So I, at the time had started writing towards 2016, 2017.

I had started some advocacy in the antisemitism space. And, you know, the Pulse nightclub happened. I guess that resonated with me. Two reasons. Terrorism and being targeted for your identity. Those two things, you know, we did a fundraiser at my studio, et cetera. And at the time, I -- I met someone that came, a really good colleague and friend named Ari Fuld, F-u-l-d. But he lived in, you know, he was American, but lived in Israel.

But the point is that we -- I brought him into North Carolina to work with police officers and others in the community to teach about, you know, terrorism and how it is in Israel and how it just can affect your life, you know? Because I just want to warn people, you know,

forewarn them about that. I don't want people to be caught flat footed. So we began working together and so we began working together, you know, and the studio. In fact, I had him at my studio to do an event.

And so what happened at the time is, is really I wanted to move to Holly Springs for my children. So I closed the studio September 11th, 2018, and September 18th, 2018. Yeah, I mean, I -- I closed it and -- and my business after that was going to be working with Ari and working with police groups around North Carolina to advocate for, you know better awareness about terrorism and particular how terrorist groups will embed in certain groups, infiltrate on campus, et cetera. That was my intention. And we talked about it on the 18th also. And he was killed by Hamas a few hours later after I talked to him for the final time. So it was a very big deal.

Q. Sorry.

A. So, you know, there's nothing you can do about these things, I guess, even if you have experience. So -- and so my plans were thwarted, moved to Holly Springs and did not have anything to do.

Q. Okay. So your -- your plan was to work with -- with Ari to sort of work with police ---

A. In groups? Yes.

Q. --- groups. And -- and what kind of training was -- were you intending to do?

A. You know, I don't know because I don't have any military training.

Q. Okay.

A. But he did, and he was with a group that -- that had done that before. And because he was an American and actually served in the IAF and was still reservist at his age, which was like 42 at the time, you know, he did that frequently. My intention was just to make sure that people are aware that, you know, it can happen, you know. And I was writing at the time too, doing advocacy for -- for Jews.

Q. Okay. Where were you writing?

A. Well, at publications like Algemeiner, Frontpage news with Daniel Greenfield, which you may not know. The Federalist. Eventually The Daily Wire, Daily Caller. So began to freelance, even Washington Times. So I -- I really just started advocacy, I think, you know, towards the tail end of me living in Chapel Hill.

Q. Okay. And so the -- the things you would write, give me sort of a sense of the -- of the types of, you know, what was the sort of the thrust of your advocacy at that time?

A. Well, antisemitism, counter-terrorism. That was, you know, a lot of it. Yeah.

Q. Okay. So primarily focused then on terrorism and antisemitism?

A. Campus extremism as well.

Q. Okay. What do you mean by campus extremism?

A. Well -- well, sometimes groups -- student groups are infiltrated by outside actors who can receive foreign funding and who have malevolent purposes, such as spying on tech transfer offices or misinformation and disinformation is another purpose. Sometimes up to and including even violence on campus. And so exposing those networks from a financial perspective or a forensic accounting perspective, I would come at it from different angles to highlight that issue and to protect students and professors who have come to me from over the years for help.

Q. You say students and professors have

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 64 of 267

come to you over the years?

A. Oh, yes.

Q. Okay. Did that start after your sort of written advocacy began?

A. Yes.

Q. Okay. What kinds of things have people come to you for?

A. Well, everything from being violently targeted without the administration doing any action or professors feeling intimidated by groups of students. And they didn't feel like they had any support within the administration at state funded schools, by the way. Oh, or even working physicians at specific schools, feeling like they were being asked to do things that were against their conscious. Or being asked to hide things that financial misappropriations -- let's see, everything from now in my career, hiding the disappearing of autism clinics and favoring of putting money into a different cost category to professors concerned and upset about losing their job for what they perceived was injustice. So I've become a -- I -- I think, you know, an advocate for all kinds of civil rights issues. Yeah.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 65 of 267

Q. Okay. You said like physicians being asked to do things against their conscious.

A. Uh-huh. (Affirmative)

Q. What kinds of things?

A. To not report that autism clinics had been closed when in fact they had been closed and a dummy website was operating and instead of an -- or a phantom autism clinic. And then families would have to drive 90 minutes out of their way from rural Eastern North Carolina to come and get their child evaluated. And a lot of families could not afford that. So I felt it was a very important cause.

Q. Okay. When was this?

A. Let's see. Three years ago. Three years ago.

Q. Okay.

A. And that caused quite a stir.

Q. Yeah.

A. Reporting on that and other things. Yeah.

Q. Okay. All right. So this sort of online advocacy sort of became like, I suppose, like your new focus?

A. Well, many platforms. It wasn't only on

online.

Q.   Okay.

A.   Yeah.  I mean, it was in person. Sometimes in print.  I mean, I -- I began being covered by news also.

Q.   Okay.

A.   You know, Epoch Times, I mean, I've been on the front page of Epoch Times several times.  I think I was in Washington Post on Sunday, actually.

Q.   Okay.

A.   So, I mean, my work has got a good catalog of work.

Q.   What is Epoch Times?

A.   Epoch Times, I think is a pretty fair and balanced news outlet that's been in existence, I guess, maybe a decade now.

Q.   Okay.

A.   But I think they stand out because they are in print.  I think they're in print on the weekends.  And people really like that.  I think it's fairly unbiased, although, who knows?

Q.   Okay.  So around -- sounds like 2018 is when you started becoming more involved in advocacy organizations?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 67 of 267

A.    2020, I think was a seminal year.

Q.    2020?

A.    Yeah.

Q.    What happened in 2020?

A.    Well, I had, I guess during COVID, I didn't really weigh in one way or the other.  I mean, I -- I'm not a -- at the time I -- I didn't -- I was an advocacy for much of anything except gym owners came to me who were at their wits end and their -- exhausted all their savings because the gyms were closed.  That is a subject that was really passionate for me because I've been a gym owner.  And I began advocating for them.  That's when I started becoming political and getting embedded in the legislature, et cetera.

And at the same time, I had written a piece of work that really got a lot of recognition.  It was -- I was looking at what's called critical race theory in curriculum and classes.  But I recognized it as being the same type of curriculum that the PFLP or the PLO instituted and parts of Israel for the explicit purpose of alienated one type of ethnic group against another, which ended up causing terrorism.  So I -- I began writing about that and was very

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 68 of 267

well published and cited for, I believe the first story about the existence of that curriculum in schools.

Q.    Okay.  You said similar to the curriculum, the PLO ---

A.    PFLP to be specific, but ---

Q.    PFLP.

A.    --- became -- the PFL, yes.  It's the PFLP.  It was a -- a Marxist group.  Yasser Arafat started, and actually he started the PLO, which became the liberation movement.

Q.    Okay.  And what was the similarities between just so that we can ---

A.    Yeah.  Well, mainly it was the oppressor and the oppressed matrix and the dehumanizing of someone based on their immutable characteristics that they could never change.  And stopping seeing them as a person that's similar to you and as the other -- and that anything will be justified under that paradigm up to and including murder, humiliation, and dehumanizing.

Q.    Okay.

A.    So I thought that my contribution to stopping violence and terrorism would be to start with education.  I saw a real opportunity for it.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 69 of 267

Q. Okay. So your -- your belief was critical race theory leads to, you know, dehumanization, which leads to the concepts that can lead to terrorism, things like that?

A. No.

MR. BRUCE: Objection to form.

A. No.

Q. (Mr. Hartzog) Go ahead. Did I ---

A. No.

Q. Didn't mean to unfairly characterize. I was trying to sum it up.

A. No, I would -- I wouldn't separate those.

Q. Okay.

A. Critical race theory was a way of teaching that contained certain elements. I saw the same elements in other teachings in other places where things did happen in conjunction with it. So I have no way of knowing if critical race theory causes violence. No way of knowing. But I saw elements in there that at the bare minimum seemed to discount who a person was as an individual. And I believe that when you discount the way someone is as an individual, that creates a host of problems and it really isolates you as a

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 70 of 267

person. And I don't think children can handle that.

Q. What are the elements in critical race theory that you're referring to?

A. Well, again, when you say that someone -- a class of people based on their immutable characteristics are a certain way, act a certain way in all circumstances, I think that's very dangerous and I think it's harmful.

Q. So is it your understanding then that critical race theory teaches that classes of people are all the same and all act a certain way?

A. Sometimes.

Q. Okay. What critical race theory did you review to reach those conclusions?

A. Different types of curriculum.

Q. Okay.

A. Some specifics if you'd like.

Q. Sure.

A. Okay. This, I found particularly insidious that because math was perceived as difficult, certain students with certain qualities were better than other students. Now socioeconomic level, that's -- I wouldn't a hundred percent believe that, I've lived it. But

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 71 of 267

saying when a teacher walks in and I've reviewed teacher curriculum that says, when a teacher walks into a room with their eyes, they can tell who's bad at math. I think that's dangerous.

Q. Where was this curriculum?

A. It's been in a couple places. It's been in North Carolina. It's been in New York.

Q. What ---

A. And that's a teacher training?

Q. Yeah. What -- what counties have that training?

A. I can't speak for sure.

Q. Okay. You said there were several in North Carolina?

A. Uh-huh. (Affirmative)

Q. Do you remember any of them?

A. Without committing, Wake rings a bell. Mecklenburg rings a bell.

Q. Okay. Mecklenburg.

A. Uh-huh. (Affirmative)

Q. Okay. And -- and these taught that teachers could tell who was good or bad at math by just looking at ---

A. That's right.

Q. --- their skin color?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 72 of 267

A. That's right. And who would be more likely to misbehave or who would be more likely to have received discipline in the past.

Q. Okay. Okay. So certain aspects then that -- that you feel are -- are harmful that you've seen in training?

A. I believe. I believe could be.

Q. Okay.

A. Would all depend on the context.

Q. Okay.

A. And that's the thing, contextual awareness about certain things is important and sometimes I didn't think that had context.

Q. Okay. So it -- your -- your contention with it was, it was lacking context that would've made it make more sense?

A. I think so, yeah.

Q. Okay. All right. And that's something you advocated as part of your, you know, advocacy?

A. Correct.

Q. Okay. And you said that article in particular got a lot of attention?

A. It did at the time.

Q. Okay. Where did that, or where was that article published?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 73 of 267

A. The Federalist.

Q. Okay. And tell me a little bit about The Federalist. What -- what's -- what is that?

A. Well, at the time, it was a news outlet that would publish a lot on religious liberty, free speech as well.

Q. Okay. And so this -- this article that you wrote about critical race theory got -- got a lot of attention when it was published in The Federalist?

A. It did, and actually it was on the movement, the political movement of -- of that, which I don't believe politics belongs in school.

Q. Okay.

A. I'm very outspoken about that. Political movements in general, I think is a personal matter.

Q. Okay. Tell me what you mean by that in -- in relation to being in school.

A. Well, I think that educating on the basics is something that sometimes is jettisoned in favor of teaching about political issues of the day, whatever they are.

Q. Okay.

A. And that's reflected by ever decreasing

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 74 of 267

scores in North Carolina.

Q. Okay. Is this something you've observed in curriculum that you've reviewed?

A. Can you ask that question again?

Q. Yeah. You said educating on the basics is -- is jettisoned in favor of the political issues of the day. And my question is, is that something that you've seen in curriculum that you've reviewed?

A. Sometimes.

Q. Okay.

A. Sometimes it's teachers, many teachers coming to me and complaining that in their view they're not allowed to spend enough time teaching math, for instance, because they also have to teach certain things about -- I'm just -- soft skills like cooperation or empathy during math. I wish that were available when I were in school, but we had to focus on the basics. So, you know, a lot of this comes from the teachers themselves who have gotten frustrated that their -- in their words calling has been hijacked because they're having to insert things. And I really listen to what they say because they're the experts.

Q. Okay. All right. So this -- you know,

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 75 of 267

this is something that you've -- you've published and talked about in your, you know, written advocacy and that got that attention. So what ---

A. Some.

Q. What did that lead to?

A. Well, I put together an organization called Education First Alliance.

Q. Okay.

A. And I -- I did it. At first, I wasn't political, I didn't realize that education was political at the time.

Q. Uh-huh. (Affirmative)

A. But I, you know, I was a ward of the state and I was subject to whatever the teachers were teaching me or would do. I felt classroom safety was a big deal. For instance, Education First Alliance dealt with discipline in the classroom or screening of teachers because a ton of teachers, it appeared, were slipping through the cracks and were able to molest and abuse students without government oversight.

Q. Okay. So I have to clarify. You say, "molest and abuse."

A. Yes.

Q. What do you mean by that?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 76 of 267

A. Well, there were news reports about public school teacher and private school, doesn't matter where, but public school, because that's where the government has the oversight, who were apparently able to abuse a number of children. I'm talking about cases that were adjudicated, not what was accused.

Q. Uh-huh. (Affirmative)

A. But I would follow these cases on to where they were adjudicated and even, you know, teachers would admit it and they would still keep their teacher's license in the state of North Carolina in good standing. So our group would talk to legislators and expose that fact so that parents would pay attention. That was one of the issues. School safety was a very big deal.

Q. Uh-huh. (Affirmative)

A. Also it appeared that children were allowed to be -- girls were allowed to be sexually abused and even raped by students, male students who would come back to school the following day with an ankle monitor and would still be able to play in their football games. That is terribly traumatic for the female student. And the female students were being told -- and this is actually

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 77 of 267

on -- on record in Mecklenburg County, that if they were not comfortable, they would have to go and seek alternative learning. I don't think our government should underwrite practices like that at all or condone this kind of behavior.

Q. Okay. Was this -- was this in Mecklenburg County, the -- the ankle thing?

A. This --yes. This particular case was.

Q. Okay, okay. All right. And so things like that you would -- you would advocate on?

A. I would.

Q. Was your focus at that time primarily schools and education?

A. Yes.

Q. Okay. Did that shift at some point?

A. It did shift. Yes, it did.

Q. Okay. What caused the shift?

A. October 7th.

Q. Okay.

A. 2023.

Q. Okay. And that shifted your -- your writing to more terrorism and antisemitism?

A. Well, did. Yes.

Q. Okay. All right. Tell me -- and I sort of think I know, but tell me.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 78 of 267

A.    Sure.

Q.    Explain why.

A.    Sure.  A couple things were going on. My awareness of antisemitism happened, you know, I -- it -- it -- it almost as soon as I started Education First Alliance, which did become on the -- perceived on the right side of the aisle. Okay.  And I started working with politicians almost immediately, I began being viciously -- viciously stalked, attacked, and hunted by Neo-Nazis who were on the conservative side.  I had not really experienced antisemitism before. In fact, I probably minimized it because it would be something -- I mean, I thought it was a campus phenomenon.  And -- and I'm talking threats of harm, directing others to do harm to me and gang stalking became something that was a way of life for me after I started Education First Alliance pretty soon after and the first time I started getting media attention.

Q.    Okay.

A.    And backing black candidates, you know, I was very big on backing minority candidates because I did not feel there were enough of them in my party.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 79 of 267

Q.   Uh-huh.  (Affirmative)

A.   And these groups made it clear they did not want minority candidates of any kind in the party at all.

Q.   Okay.  And was -- did you start -- after October 7th, did you start writing more about antisemitism?

A.   I -- I'm going to think before I respond ---

Q.   Sure.

A.   --- to that.  I believe -- well, I went into political consulting and that was -- that was actually -- you know, I -- I was still -- actually, I was doing that.  But I mean, I was kind of thrown off my game after that I remember. And then I -- I ran the most successful campaign of any Jewish person in the Republican Party in the history of the State after that.

Q.   Which campaign was that?

A.   Well, I hate to tell you, but Michele Morrow for ---

Q.   Uh-huh.  (Affirmative)

A.   I -- I knocked off a sitting incumbent of the council of State, which had only been done one time in the history of the State.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 80 of 267

Q. Okay. All right. And we'll get to that in a sec.

A. Sure.

Q. But -- okay. So when did you first go into political consulting?

A. Well, I had a PAC. Education First Alliance was a journalistic outfit. I mean, that was our -- our main thrust in investigations. But we began successfully sponsoring and endorsing candidates all up and down the ballot. And that began in 2021. And what that entails is being able to create a completely separate campaign as if your candidate is in Florida, laying out by the beach while you're putting together a campaign for them. It's an independent campaign.

Q. Okay. So Education First Alliance formed a PAC?

A. Yes.

Q. Okay. And the PAC would sponsor and endorse candidates, right?

A. Well sought after two. Everyone wanted our endorsement.

Q. Okay. And you said that you would help create a campaign for -- for them, is that ---

A. You can't mix that. So ---

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 81 of 267

Q.   Yeah.

A.   --- as a candidate they would -- they would want my endorsement and it would end there.

Q.   I understand.  So as a pack ---

A.   Yes.

Q.   -- you sort of did your own campaign not in coordination ---

A.   Correct.

Q.   --- with candidate, but you would -- would you create Ads and things like that?

A.   Sometimes.

Q.   Sometimes.  Okay.  What else would you do?

A.   Well, you know, I know people all over the State and groups.

Q.   Uh-huh.  (Affirmative)

A.   Every county.  And I would speak and advocate for the policies I believed in.

Q.   Uh-huh.  (Affirmative)

A.   And the people that were best representing those in different races.  Podcasting, that was a huge one.

Q.   Uh-huh.  (Affirmative)

A.   Still is.

Q.   Okay.  When did you start podcasting?

A.   2021.

Q.   Okay.  Do you still podcast?

A.   I do.

Q.   Okay.  What's the name of your podcast?

A.   Now, NC Political Tea.

Q.   Okay.  All right.  And what was it at the time?

A.   Education First Alliance.

Q.   Okay.  Had -- had a podcast.

A.   Exactly.

Q.   Okay.  And you were the host of that?

A.   Yes.

Q.   Okay.  All right.  When did you get connected with Michele Morrow?

A.   Well, I knew her from education advocacy, just in general.

Q.   Uh-huh.  (Affirmative)

A.   I knew her to be a homeschooler, which is fine.  And an advocate for really parental rights and freedom.

Q.   Okay.  When you say she was a homeschooler, meaning she advocated homeschooling or she was homeschooled?

A.   She -- I don't know if she was homeschooled, but she advocated for parents to

Case 5:25-cv-00222-BO-RJ   Document 29-8   Filed 08/03/26   Page 83 of 267

have the tools and freedom to do that.

Q. Okay.

A. So.

Q. All right. So how did you become her campaign manager?

A. Interesting story. She put her name on the ballot like a week before the deadline to primary Catherine Truitt. Catherine Truitt was the subject of some of my reporting. I did not feel she oversaw the schools in a responsible manner. So I noticed Michele put her name on ballot and I called her and I said, you know, your -- tell me about your organization -- tell me about what you're doing, what -- which organization? What are your -- what's your campaign? And she knew nothing about the role ---

Q. Uh-huh. (Affirmative)

A. --- and had no operation.

Q. Right.

A. And I said, if you want to win, I'll -- I'll make you win, but this is what you really want. And so within, you know, getting the money to do that was the first -- first stop. So she paid me. And within 10 days I had the campaign infrastructure, website, everything I've been

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 84 of 267

running donors lined up to immediately pull the campaign. I think we had two and a half months to beat our opponent with zero infrastructure.

Q. Okay. Did you sit down with her and -- and talk campaign strategy, I assume?

A. Oh, yes.

Q. Okay. All right.

A. And was well known for that when I was.

Q. Okay. Tell me about that.

A. Well, I mean, I think I beat the candidate with -- I want to be accurate. I think we had 3 cents a vote or maybe under a little less.

Q. Uh-huh. (Affirmative)

A. To 350 a vote. So that takes attention when you take someone that is unknown to beating an incumbent who is well capitalized, they said that would never happen and they know exactly who did it and how it happened. Well, they know that it happened and a lot of candidates had called me and wanted that because, you know, being able to brand a Republican against a Republican in a way that stands out and wins with very little money, is my specialty. And so not many people do that.

Q. Who else has called you?

A. I'd have to review my notes.

Q. Off the top of your head. Do you remember anything?

A. Well, I'd have to remember. I'd have to look at my notes.

Q. Do you have notes on that?

A. I can probably do. Yeah.

Q. Okay. Is that something you can provide to your attorney?

A. I think so, yeah.

Q. Okay.

A. And it -- you'd have to specify the time period. So who called up until then?

Q. Well, you said that running the campaign for Michele Morrow, is that your first -- I assume your first role as a ---

A. Direct campaign.

Q. Direct campaign.

A. That's right.

Q. So obviously you'd run the pack?

A. That's -- that was separate. Yeah.

Q. Has anyone else reached out to you to be their campaign manager would be involved directly in their campaign?

A. Since my arrest, no.

Q.    Okay.  Since Michele Morrow,

A.    During that time?

Q.    Yes.

A.    I was advising candidates, yes.

Q.    Okay.  Did any reach out to ask you to be their campaign finance director or their campaign director or manager?

A.    Well, during that time, I mean, I was helping her.  I have to think about that because I did help some.  I'm sure I can provide notes.

Q.    Oh, that would be great.

A.    Okay.

Q.    But sitting here today, you can't think of anyone that asked you to be involved directly in their campaign?

A.    Well, when you're a consultant, you don't really want to be involved directly in their campaign and a campaign manager is different from a consultant.

Q.    Right.

A.    And I want to be very clear.

Q.    Okay.

A.    I did not have any goals to be a campaign manager again, that -- that's a starting position.

Q. Okay.

A. It's the -- the foundation that you spring off into to be a campaign -- I mean, if you're a successful campaign manager, like I just described, you are set in terms of consulting. I mean, you can really -- I mean, especially in a primary, you can go very far

Q. Okay. And is that something you pursued?

A. Well, I mean, I was arrested three days before the election. Okay.

Q. That -- not my question though. Did -- did you pursue consulting?

A. Yes.

Q. Okay. Who did you pursue consulting with?

A. I'll have to provide you a list. I mean, I -- I didn't have to go to people, so I want you to know, I mean, I was working with a campaign.

Q. Uh-huh. (Affirmative)

A. Okay.

Q. Yeah.

A. Then I was arrested before the election.

Q. Okay.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 88 of 267

A. And so, just so you know how campaign cycles work.

Q. Uh-huh. (Affirmative)

A. You've got that particular year, I want to say around May 15th, you had your primary, right?

Q. Right.

A. So I was with her from December till March.

Q. Okay.

A. Okay. Then after the primary. Okay? Every candidate has their consultants already filled. They have their manager already filled, you're going to war, you are ready, you've got your team.

Q. Uh-huh. (Affirmative)

A. Right?

Q. Uh-huh. (Affirmative)

A. So I was with Michele for a few months later, passed the baton off to another person. And so my consultancy season would've began -- I was arrested November 2nd, 2024. My consultancy season would have started the following spring-ish.

Q. Okay.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 89 of 267

A. Summer. Yeah. And I've had no one call me.

Q. Michele Morrow's campaign was somewhat controversial, correct?

A. Uh-huh. (Affirmative)

A. I want to be clear. I have a specialty.

Q. Uh-huh. (Affirmative)

A. Primaries are my specialty. I don't do general.

Q. Yeah. Well, that's a big difference, right?

A. It can be. I mean, they -- it can be.

Q. Yeah.

A. At the time I'm a primary specialist, could I market myself for a general? Sure.

Q. Uh-huh. (Affirmative)

A. Because I mean, if you're good at a primary, you'd be excellent. The other's cake, it's -- in other words, I am a thorough bread.

Q. Okay. Did Michele Morrow win the general?

A. No.

Q. Okay. Were you involved in her general election?

A. No.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 90 of 267

Q. Okay. After she lost the general, were you contacted by anyone?

A. No.

Q. Okay.

A. Because remember I had been arrested.

Q. Uh-huh. (Affirmative)

A. Everywhere from here to the UK I was arrested for a hate crime.

Q. You were arrested ---

A. For a hate crime.

Q. Okay.

A. That I did not commit. And I'll say my mugshot was everywhere and I had been told that a particular candidate or two would've hired me, but they could not afford, in a primary, they could not afford any controversy around the campaign.

Q. Who told you that?

A. He ran against Chuck Edwards in NC 11, and I'm searching for his name. That's one I've been told by GOPs, Mecklenburg County, GOP, that they didn't want to have me organize a volunteer event because what I had done and my mugshot was out there and they could not have controversy around any of their candidates in Mecklenburg County.

Q. Who in Mecklenburg, GOP, told you that?

A. Kyle Kirby, who was the chairman of Mecklenburg County, GOP, told me that.

Q. Okay. And who told you that the person who ran against Chuck Edwards would've hired you?

A. One of his volunteers, closest volunteers.

Q. What's his name?

A. Margaret, A-c-k-i-s-s.

Q. A-c-k?

A. I-s-s.

Q. Okay. All right. What is your relationship with Margaret Ackiss?

A. She is ---

Q. Ackiss or Ackiss?

A. Ackiss. Yeah.

Q. Okay.

A. She is my podcasting partner.

Q. Okay. And she told you that this person would've hired you, but for your work.

A. She recommended me. Yeah. She said, look, you know, she's the best, et cetera.

Q. Uh-huh. (Affirmative)

A. Well, she talked to me, blah, blah, blah, and then researched me and that's what

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 92 of 267

happened.

Q. Okay. Do you think any of the controversy about Michele Morrow may be a factor as well?

A. Absolutely not.

Q. No.

A. There's controversy about a lot of candidates on both sides.

Q. She called for the execution of President Obama on TV, correct?

A. Okay.

Q. Is that a controversial ---

A. I don't ---

Q. --- statement?

A. First of all, I can't -- I don't know, and I'm not going to comment on her behavior.

Q. Okay.

A. I mean, she commented about that before she won the primary.

Q. Okay. But you -- you don't think statements like that could be sort of, if you're the campaign manager of someone who has made statements like that ---

A. Right.

Q. --- you don't think that could be a

Case 5:25-cv-00222-BO-RJ     Document 29-8     Filed 08/03/26     Page 93 of 267

factor?

A. Well, when we look at the Virginia race for Attorney General this particular guy, Jay and his last name escapes me. He actually in text messages threatened, said that he intended to actually personally kill someone who was his political opponent and he actually won. So you just can't tell what voters are going to do.

Q. Okay.

A. I mean, my goodness, there's a guy named Grant -- Graham Platner. He has a Nazi tattoo. I -- I -- my understanding is he won a primary. Recently there's been candidates that have called for the deaths of Jews, for instance. That's controversial. I don't agree with that at all. And they've won primaries and they will win their general. So voter behaviors, you know, in a general is -- I don't know.

Q. But you don't think controversies like that would be a factor at all in someone choosing you or not choosing you to be involved in their campaign?

A. But choosing me?

Q. Correct.

A. Controversy is sadly a part of political

campaigns I mean, and consultants still have jobs.

Q. Right. Including consultants who have been arrested previously?

MR. BRUCE: Objection to form.

A. Consultants who have been arrested -- falsely arrested for a hate crime.

Q. (Mr. Hartzog) Is that yes or?

A. I'm clarifying from you.

Q. Well, are -- are there consultants who have been arrested in their past?

A. I don't know.

Q. Okay.

A. I can't speak to it.

Q. All right. But you agree that there's lots of controversies in politics and a lot of times people make the decision to hire a consultant or not hire a consultant regardless of those controversies?

A. I'm sure in the history of America that's happened. I mean, there's a lot of, you know, crazy things. But I will tell you that in the Republican Party, we are pro-law enforcement and pro-police.

Q. Okay.

A. And I've always been pro-police, and I

will tell you this, I -- to be here in this situation is so disheartening and remarkable for me because I never thought in my wildest dreams that I would say a cross thing about a police officer. And yet here I am, and this is not a -- a -- a good look either is being involved in an action against police that is 1000% not my branding. And so when you talk about here in North Carolina, we have a strong contingency of -- well, first of all, bigotry is a no-go. And a hate crime is despicable. I'm branded with that and I'm also looked at someone as -- as a -- I mean, having to bring a lawsuit against police is unheard of.

I -- I mean, yes, sure people do it, but we're in a very conservative place and regardless of what a candidate does, I want to keep my hands clean. I feel I have no control over my identity anymore because every time someone looks me up, they see my mugshot. You look me up on Google, second one down, third one down, fourth one down, fifth one down, and it says that I was arrested for a hate crime.

Q. Uh-huh. (Affirmative)

A. I don't have control over my identity.

I don't -- sure, when you're a consultant, you don't have control over their identity, and that's vexing because as a lawyer, you don't have control over your -- the clients you take, but I can control how honorable I am. I've given a lot of my life to civil rights advocacy of my life. And -- and to be -- I mean, for two years straight, I made good faith. Well researched complaints about known perpetrators of hate crime, people that would write to me and to my colleagues and the 200 people that I knew at the same time. And saying, Jews were the cause of rot in America. We worship at the Church of Satan. And for people to act accordingly, the -- the -- the threats were so severe twice the FBI had to interact when the Holly Springs police would not.

Q. Uh-huh. (Affirmative)

A. I was hunted. I made at least -- at least three police reports. I worked with the chief police. I worked with Melissa Ottaway, which is a name you might have heard of. But all of that wasn't acted on for two years. And then I am arrested without even asking me a question, without asking me a question, taking a bad faith, wrong, totally incorrect story from someone at a

grocery store. And I -- I'm a -- I'm a law abiding citizen. I mean, that is such a specific type of trauma. It is a complete inversion of reality is what it is. I have no control of my identity anymore. So it -- it doesn't matter if -- if people are arrested for that or not. It matters that I was for something I would never do. That's what matters to me. It matters to my family too.

Q. Uh-huh. (Affirmative)

A. You know, my kids have had to explain this. My daughter's had to enter therapy for the first time ever. Embarrassed, anxious, hearing anyone come to the door. My husband had to answer to his CEO, you know, he had a job at IQVIA, which was at the company I told you. But he was working directly with the CEO. He had to answer for this arrest. You know, I was put on a hate list of people who had committed crimes against Muslim Americans.

And then directly after I was arrested, I was put on this list with my mugshot, hundreds of people on social media, they really did cyberstalk me, target, harass me, put up my address, my husband's address, my husband's CEO

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 98 of 267

address, everybody who works in that company. My -- my sister-in-law's address who lives in Palm Beach. My mother-in-law's address. And told people to come get me.

And one guy actually started to, he's sitting in jail right now because the FBI has arrested him for making a death threat to someone. And now he's being investigated for cyberstalking me. I'm actually a federal victim in that. Something that your police department sadly said was free speech, actually putting my address out there repeatedly, my mugshot information gotten from this -- from this false arrest. I -- I'm not this person.

My husband lost his job actually directly after his security team demoted him, put him in a lateral job away from the CEO after my arrest and after he was targeted by this cyber -- cyberstalker, who your police department would do nothing about, the FBI did, could use my mugshot and my information from the arrest. It was a direct result. So he was demoted.

He did decide to leave and find another job, but that was also a huge, huge part of this as well. My children and that humiliation. My

fam -- I got to tell you, you know, I still love the police. I work with them. I do ride-alongs. And before these ride-alongs, you know, police officers have to do due diligence, et cetera, and they look me up and they see my mugshot. Every time I have to go through what happened and justify why I am suing the police.

It is humiliating. I mean, it was my anniversary, was getting ready to go to brunch, police come knocking the door. I was terrifying like everyone would be, halfway dressed, frog marched in front of my neighbors, walked down the street while my neighbors were out. I was humiliated, I was targeted and I was jailed. And it is extremely terrifying. You know, there is -- this reminds me of something I just -- I'd be remiss if I -- I didn't share it here.

Back right before the Holocaust, this prominent lawyer complained of that antisemitism. And they told him, what you're going to do actually is you're going to wear a sign that says, "I will not complain about antisemitism again." And he was handcuffed and frog marched and humiliated in front of the entire town by the Brown Church. That's how the Holocaust kicked

off.

That I can identify with. I can definitely identify with that because what the police did was turned my civil rights advocacy into a hate crime. It will -- that specific type of trauma will never leave me. It will never leave my family. My husband, you know, he does business with people who look him up all the time. Rachmuth is a distinctive name. And they ask him -- they ask him about me.

I have a lot of shame about what this did to my family. I mean, of course I did nothing wrong. Doesn't matter though, because I was targeted and it still sticks with them. It's extremely, you know, hopeless. And I feel like the police will never protect me. They will never protect me, but they will take anyone's word for anything that I do and come arrest me and humiliate me without even a question.

Q. Okay. You said your husband lost his job?

A. Yes.

Q. What company?

A. Demoted. I want to be very accurate and

---

Q.   Yeah, I understand.  Demoted and then resigned, but ---

A.   Yeah.

Q.   --- what job was that?

A.   He was with IQVIA.

Q.   IQVIA.  Okay.

A.   I cannot -- I do not know his position. It was working directly with the CEO and you might remember that this healthcare from United Executive, he was murdered about the same time. So I think security teams were being very cautious about who they had around their CEOs and very mindful of threats.  And we were getting many, he was getting many.  And it was use of my mugshot, the repetition of a crime that I did not do.  And personal information gleaned from those reports like my address.

Q.   Okay.  How many times did you post your mugshot?

A.   Never.

Q.   Okay.

A.   Not once.

Q.   Did you ever share an article that had that picture?

A.   That had a picture of my mugshot?

Q.    Uh-huh.  (Affirmative)

A.    Not to my recollection.

Q.    Okay.  How many times did you post about your arrest?

A.    Quite a few.

Q.    Okay.

A.    You know why?

Q.    Tell me.

A.    I need to defend myself.  I have a right of reply and, you know, when these things are shared via social media, reinforced that I falsely committed a crime from thousands of people.  A couple things.  I have a right to defend myself and I have a right to ask for accountability.  I don't want anyone else treated like that in Holly Springs or anywhere in America.

Q.    Uh-huh.  (Affirmative)

A.    But I am not -- I'm not the person that's reflected in what these police officers created in part, or orchestrated about me.  And at some point, you know, I will say that part of what helps me always deal with trauma is advocacy.

Q.    Uh-huh.  (Affirmative)

A.    This time I had to advocate for myself.

Q.    Okay.  So in your -- it's your belief

that if someone says something about you that's just not true online, there should be accountability.

A. That's not what I said.

Q. Okay. No.

A. People have the right to say something that's not true about people all the time.

Q. Okay. Have you done that?

A. Said something that was untrue?

Q. Uh-huh. (Affirmative)

A. About someone?

Q. Yeah.

A. Give me a time period, when I was four?

Q. Well, let's talk about during your advocacy period.

A. Not to my knowledge, I'm honest.

Q. Okay. What about calling someone a -- a terrorist?

A. When? Can you ---

Q. Well, the Harris Teeter employee.

A. Okay. Would you show me where I've done that?

Q. Sure.

MR. BRUCE: Your microphone fell off.

Q. (Mr. Hartszog) Thank you. We'll start with -- we'll mark as Exhibit A.

(EXHIBIT A WAS MARKED)

A. And you got this from our discovery?

Q. Yes.

A. Okay.

Q. This is your Twitter X account, correct?

A. Okay. Yes.

Q. And if you want to take a minute to review it and ---

A. Okay.

Q. Let me know if this looks correct to you.

A. Okay. Can you show me where I called someone a terrorist?

Q. Uh-huh. (Affirmative)

A. What page?

Q. Okay. Well, let's start with Hamas is a terrorist organization, correct?

A. It's a political organization actually.

Q. Do you consider it a terrorist organization?

A. I consider it both

Q. Is it designated by the United States government as a terrorist organization?

A.    It is an FTO.

Q.    Okay.  So calling someone a Hamas sympathizer, would it at the very least be calling them a terrorist sympathizer, correct?

MR. BRUCE:  Objection to form.

THE WITNESS:  That is not -- that is ---

MR. BRUCE:  Hold on second, let me get my objection.  Objection to form.

Q.    (Mr. Hartzog) Okay.  But you can answer.

A.    Okay.  Can you repeat the question?

Q.    Yes.  If Hamas is a terrorist organization and you're calling someone a Hamas sympathizer, you're at the very least calling them a terrorist sympathizer, correct?

MR. BRUCE:  Same objection, go ahead.

A.    Well, Hamas has several objectives including Free Palestine, which is what this employee's objective was.

Q.    (Mr. Hartzog) Okay.  Are you -- can ---

A.    She sympathized with the objection -- the objectives of Hamas.  Yes.  And she told me that.

Q.    She said she was wearing the scarf for

-- for Free Palestine, correct?

A. Correct.

Q. Do you consider that a terrorist statement?

A. It depends on the context.

Q. In the context in which you heard it.

A. A terrorist statement.

Q. Uh-huh. (Affirmative)

A. A statement a terrorist would make, or I -- I'm ---

Q. Lets start there. Is it a -- a statement a terrorist would make?

A. It's a statement as terrorists could make.

Q. Okay. Did you view her as a supporter of terrorism?

A. Yes. I viewed her as a -- well, I don't be specific. A supporter of Hamas, and I want to repeat this. Hamas is a political group and a terrorist group.

Q. Okay. Well, you ---

A. And the free -- and to be honest with you, the Free Palestine Movement in America is a political movement.

Q. Uh-huh. (Affirmative)

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 107 of 267

A.    To achieve the objectives of Hamas.  And what are those objectives?  Free Palestine.

Q.    And do you view Free Palestine as a terrorist statement?

A.    I think it depends on the context.

Q.    Under the context in which the employee made that statement.  Did you view that as a terrorist statement?

A.    I view it as a political statement supporting Hamas, yes.

Q.    Okay.  And by extension, supporting terror?

A.    Could be.

Q.    Okay.

A.    Yeah.  I -- I believe that when you wear a keffiyeh in a workplace, because I am not talking about her, so I want to stop you right there.  This is a -- an important story because we have a political -- we have a large grocery store chain who is engaging in political advocacy of a very controversial group, a very controversial movement.  And telling a Jewish customer they can either like it or leave.  I -- I think weighing in on one side, definitively in a very controversial political movement, is something a public ought to

Page 109

know about.

Q. Okay. So you felt you need to let the public know that this employee who's pictured on the front ---

A. The Harris Teeter allows employees to participate in the Free Palestine Movement and tells Jewish shoppers that they can either like that or leave.

Q. Uh-huh. (Affirmative)

A. This has always been about Harris Teeter, always.

Q. Did you call the employee a terrorist at the store?

A. Never.

Q. Okay.

A. Absolutely. I want to say it in no one certain terms. I want to say it again. Never.

Q. Okay. If it was reported to police that you called her a terrorist at the store, do you have any reason to dispute that that wasn't what was told to the police?

A. I don't know what was told to the police because I was not there.

Q. Right. Okay.

A. But I want to repeat a third time.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 109 of 267

Never

Q. Okay. If you flip a couple pages back you'll see -- let's see what its looks like. Two pages from the back, the second to last page.

A. Okay.

Q. Someone says they won't be shopping at Harry Peter, which is a nickname for Harris Teeter, anytime soon. And you respond pro-terror political statements offend customers, they'll get the message.

A. Yeah.

Q. What did you mean by pro-terror?

A. Well, I do think that pro-terror political statements, Hamas is a terrorist group, as you pointed out in this United States as is an FTO, and it is political, right? Combined.

Q. Uh-huh. (Affirmative)

A. Can you separate the two? Yeah, I'm -- I'm not sure you can. I didn't.

Q. Uh-huh. (Affirmative)

A. And I think that's okay.

Q. Okay.

A. But they offend customers and they -- I want to be clear about who they was. Harris Teeter.

Q.   Uh- huh.  (Affirmative)

A.   The corporation -- I believe in corporate responsibility.  And I think if a company let's say they let people wear MAGA hats, well they better prepare to lose depending on where they are, half their customers.  Right?

Q.   Okay.  Of course, you -- in the -- in the post here, you said, "This Hamas sympathizer."

A.   Yeah.

Q.   And had three different pictures of her.

A.   Okay.

Q.   Do you not think that's somewhat directed to her?

A.   I don't -- I don't.  I ---

Q.   Its calling her -- it's calling her a Hamas sympathizer, correct?

A.   Well, it's the employee.

Q.   Right.

A.   Right.  But understand that it's not directed at a particular employee.  This is a picture that I'm using to document that this actually happened.  Right?  I'm making a claim about Harris Teeter.  I want to back that claim up and I'm making a characterization, political characterization of the employee at Harris Teeter.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 111 of 267

Q.   Okay.   And the political characterization of the employee you wanted to give is that she is a -- a Hamas supporter.

MR. BRUCE:   Objection to form.   Go ahead.

Q.   (Mr. Hartzog) Correct?

A.   I would say that's the -- how she wanted to be characterized because she wore this and I -- I asked her to clarify, you know, very friendly, by the way.   Told me that it was for Free Palestine, and then told me where I could buy one if I wanted one.   So it was non contentious.   It was very friendly.   But, you know, being called a Hamas supporter is not offensive to a -- a lot of Americans.   That is not offensive.

Q.   You would consider it a bad thing, right?

A.   Would I consider it, I consider it offensive to me.   Yes, I do.

Q.   You wanted Harris Teeter to not allow this at the store?

A.   Well, in their handbook, I think I put -- might have put this in there, they don't allow it.

Q.   Uh-huh.   (Affirmative)

A. So I was confused why I was being made to feel unwelcomed and to leave. I -- been a customer there. You know what? I -- kind of figured it out. I had been there three days a week for seven years at that point.

Q. Uh-huh. (Affirmative)

A. And for the record, this is the first time I've seen, personally, anyone where I could be at a workplace, my personal experience.

Q. Somewhere in here someone says -- it looks like the fourth page from the back, and I'm sorry that they're not numbered.

A. Okay.

Q. It would've been easier to have them numbered, but ---

A. That's okay.

Q. And it looks like someone called -- called Slews Acquittal -- you see that mid page?

A. Okay.

Q. Says he might as well be wearing something that says, and I assume that's "rape, kill the Jews." Entirely unacceptable. Frankly, I wouldn't trust her with food.

A. Uh-huh. (Affirmative)

Q. And you said that's terrifying.

A.    Yeah.  I mean, someone -- if someone were to wear something that said, "rape, kill the Jews" handling food would be terrifying.  Yeah. She created a scenario that would be terrifying.

Q.    Okay.  So what scenario did she create that was terrifying?  And when you say she, are you talking about the poster here?

A.    Yeah.  Because it looks like a female.

Q.    Okay, okay.  I see what you're saying.

A.    I mean, I don't want to misgender.

Q.    I understand, but you're saying the post is terrifying, but the post is ---

A.    The -- the post -- the notion of the post is ---

Q.    Yeah.

A.    Yeah.  I mean, I ---

Q.    Okay.  There is a -- there is a thing you -- you've mentioned several times in some of your posts that you were concerned that she was handling the food.

A.    Yeah.

Q.    Tell me about that.

A.    Well, there is a concern.  I mean, if someone that's going to have a -- this is a political movement that I consider hostile to Jews

-- hostile to Jews. In fact, there's been reports of folks wearing these things and saying these things right before they murder Jews. So it is a political movement that very often intentionally intimidates Jews. And it depends on the context, but yes, it -- it does concern me. I'm concerned.

Q. You were concerned that she was handling food?

A. I'm concerned about a political movement being endorsed by my grocery store. I am.

Q. Now, why do you ---

A. That -- that I don't -- not only don't agree with, but I find offensive and unwelcoming.

Q. Did she tell you she supported Hamas?

A. No.

Q. Okay. You assumed from the -- from the scarf, she supported Hamas.

A. Wearing a keffiyeh and saying "Free Palestine," yes.

Q. Okay. So you -- you take that to mean I am a Hamas supporter?

A. It depends on the context.

Q. Okay. What context here led you to believe she was a Hamas supporter?

A. She said both of those things.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 115 of 267

Q.   She said "Free Palestine."

A.   Correct.

Q.   And that led you to believe she was a Hamas supporter?

A.   Well, I mean, I characterized it.  I think it was a fair characterization, yes.

Q.   Okay.  So, all right.

A.   And that Harris Teeter would endorse a controversial political movement in favor of having Jewish customers, was the entire point.

Q.   Okay.  And you've been very explicit even since then.  I'll show you another.

A.   Okay.

Q.   We'll mark this as Exhibit B, where you explicitly call this employee a -- a terror supporter.

(EXHIBIT B WAS MARKED)

A.   I need to see the date, of 17th.

Q.   (Mr. Hartzog) February -- February 17th.

A.   Well, yes.

Q.   Okay.

A.   This was after the arrest.

Q.   Correct.

A.   So I did not know who this was.

Q.   Uh-huh.  (Affirmative)

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 116 of 267

A.   I did not know why all this had happened.  And so I found out who ---

Q.   Uh-huh (Affirmative)

A.   --- this was.  And I looked at her and her husband's Facebook page because I had received so many threats that I felt it important to keep myself abreast of the threats out there.

Q.   Uh-huh.  (Affirmative)

A.   And I saw and documented, never made this public, on the order of 40 posts that were not just pro Hamas, that were advocating detailed violent acts against Jewish people.

Q.   Uh-huh.  (Affirmative)

A.   Very detailed.  And I have those screenshots and I did send them to my lawyer.  And so at this point not only is it absolutely positively explicit that there is support, it's someone who follows these kind of stories.  Scary for me.

Q.   Were any of those posts from the employee, Abdel Fattah?

A.   It appeared one was.

Q.   And do you have a screenshot of that?

A.   Not on me.

Q.   Okay.  What did she say?

A.  I don't recall.  But it was almost all of these posts, without exception, we're related to terrorism and many of them had a keffiyeh on there as well.

Q.  Okay.

A.  Which I found interesting.

Q.  Okay.  You -- is it fair for me to ---

A.  By the way, I've never used her name.  I would never use her name.  I've never identified her.  So -- so in all of these posts ---

Q.  Uh-huh.  (Affirmative)

A.  --- I have never done that.  I have never identified her husband, Harris Teeter, that's the corporation that stood behind this behavior and stood behind turning Jews away that did not like it.

Q.  Turning Jews away.

A.  Yeah.

Q.  You mean -- you mean you personally?

A.  Well, here's what they said, when I went to the manager, I told her long time, but when I say a long time, I mean, I remember growing up in Myers Park in Charlotte and walking Terrace Teeter when I was like six and seven.  So it's been a part of my life forever.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 118 of 267

Q. Uh-huh. (Affirmative)

A. So when I told the manager very calmly that -- that I knew she wouldn't know this, but Jews may feel uncomfortable, and unwelcomed and threatened. My understanding was her telling me as a class that if we -- if I didn't like it to leave, and that was her invitation, like it or leave.

Q. Uh-huh. (Affirmative)

A. So it was me. Now, am I -- am I standing for every Jew? No.

Q. Okay. So in any event you had a discussion with the manager.

A. I did.

Q. The manager asked you to leave?

A. No, there was exact conversation.

Q. Okay.

A. I told her that I was a long-term customer. In fact, I've never had one complaint in that store of all the times I've been there, loved it. But that -- it was unwelcoming. It could be unwelcoming for those who've been in terror attacks. It could be unwelcoming for members of the military. And it very likely is unwelcoming for Jews to see this type of a

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 119 of 267

pattern. Very mindful that she may not know of it. And she was very unwilling to listen and said, well, you know, you can like it or you can leave.

Q. Uh-huh. (Affirmative)

A. I did not like it, so I did leave.

Q. Okay. All right. Let me hand you what I'll mark as Exhibit 3.

MR. BRUCE: Whenever you get to stop recording, take a break.

MR. HARTZOG: Yeah, we can take a break now if you want.

MR. BRUCE: Sounds good.

MR. HARTZOG: Yeah.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Off record at 11:47 a.m.

(Off record: 11:47 a.m. to 11:57 a.m.)

THE VIDEOGRAPHER: On record at 11:57 a.m.

MR. HARTZOG: All right. Ms. Rachmuth before we took a break, I handed you what I believe I was going to mark as Exhibit Number 3 -- 4.

MR. BRUCE: We're doing letters.

THE COURT REPORTER: It's going to be C.

THE WITNESS: C.

MR. HARTZOG: C?

MR. BRUCE: Yeah.

Q. (Mr. Hartzog) Third time's job. All right. Exhibit C.

(EXHIBIT C WAS MARKED)

A. Yes.

Q. And I'll ask you just take a quick scroll through this and let me know when you've had a chance to review it.

A. Okay. So this is the first time that I'm seeing Page 5.

Q. That was going to be my question, whether you'd seen this before.

A. I have not.

Q. Okay.

A. Uh-huh. (Affirmative)

Q. Do you recognize what this is?

A. I'm reading this for the first time and ---

Q. Okay.

A. --- I'm not familiar with the nomenclature that police use, so you'll have to

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 121 of 267

walk me through it.

Q. I will -- I will represent to you that this is an internal form from the Holly Springs Police Department that includes what's called a reporting officer narrative, which is notes that were taken.

A. So I -- I do want to tell you though, that I hired attorney to make a good faith effort to get this.

Q. Uh-huh. (Affirmative)

A. And it weirdly was not available.

Q. Yeah. These are not public records.

A. Right. But I mean, my attorney needed everything with it. I just didn't get it.

Q. I understand. I'll -- I'll -- I'll ---

A. Thank you.

Q. --- leave that to the side, but ---

A. Sure.

Q. --- that's what this is.

A. Okay.

Q. So have you had a chance to review the reporting officer narrative on Page 5 and 6?

A. On Page 5, yes. I will review Page 6. And at what point is this taken, this narrative?

Q. Well, if you look at the bottom, there's

a -- there's a date and time.

A. The bottom. Okay. Well, I see it.

Q. Says when it was entered in.

A. Okay.

Q. And I believe within the narrative it talks about when they spoke.

A. Okay.

Q. You have a chance to read through that.

A. I have, but I'd like to refer to it again if I need to.

Q. Yeah, please.

A. Okay.

Q. So I guess my question is having read this, it sounds like you have a different recollection of what occurred at the store.

A. I know what occurred at the store.

Q. Okay. My question to you, do you have any reason to dispute that this is what Officer Warren of the Holly Springs Police Department was told when he went to the Harris Teeter?

A. I can't know what he was told.

Q. Okay. So you -- I take that to mean you don't have any reason to dispute that this is -- this accurately reflects what he was told by the employees at the Harris Teeter.

Jennifer Rachmuth
June 29, 2026

Rachmuth v. Warren, et asl.
5:25-cv-222

Page 124

A. I do have a reason to dispute it.

Q. Okay.

A. Because I sat through the same deposition we all did and he gave different. He -- he added things that I think would be crucial to being here to his deposition. And he also appeared -- I -- now I am -- just recollection, he appeared to have a different narrative.

Q. Okay. When you say his deposition, you mean in this case?

A. Yes.

Q. Okay. All right. What -- what -- what in his deposition do you believe is contrary to what -- what is in here?

A. Well, he was emphatic and said many, many times that this -- this worker had told him she was fearful to return to Harris Teeter because they would not trespass me. That was one thing said, I see absent from here. He also said that she had to take her children out of school because she was so terrified. And he also said that she was just extremely fearful. In general, I don't -- I don't see that in here.

In addition, he -- the post, I -- I think his deposition said that when he first

Civil Court Reporting, LLC  336-406-7684

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 124 of 267

talked to her -- first of all, it was on the phone. He had only a conversation with her on the phone and he said that she had not seen the post. And then in his deposition, he goes on to say that he was shown the post from the store manager. And then he goes on to say that he was actually shown the post from an unknown source because he did not have X. So he did not have access to it. So I don't know if I should take what he said during the deposition or this to be -- you know what I mean?

Q. Well, this does say that the store manager showed him the post on X. Is it not?

A. And he could not remember who showed him the post on X.

Q. Okay. At his deposition?

A. Correct.

Q. Okay.

A. Right. I -- that's -- I -- I read through it last night. I -- and so that's the first thing that stands out to me is that, you know, in his deposition -- and he says, Ms. -- Ms. -- I -- provided me with Ms. Rachmuth's information.

Q. Uh-huh. (Affirmative)

A.    You know, Officer Warren said that he had no idea -- he didn't know my information, that he later retrieved it after he looked at an X -- X account from someone he did not -- couldn't recall.  So he -- he never said the manager had my information at all.

Q.    Do you know what he means by information here?

MR. BRUCE:  Objection, speculation.

A.    I do know that he said that he had no idea that I lived in his district.  And had he known he would've questioned me.  Had he known that I lived in the district, that I would've had an opportunity to dispute this story.  And I can't account for which I don't know what to rely on.

Q.    (Mr. Hartzog) Well, which -- you're telling me that he provided more detail in the deposition.  Is there anything he said in the deposition that in your mind, contradicts this?

A.    Yeah, I -- I -- he -- hold on.  I -- I would have to compare it, but it just -- it just seems a little -- a lot different.

Q.    Okay.  Fair enough.  Well, it ---

A.    Yeah.

Q.    His deposition will speak for itself.

A. Okay.

Q. But do you dispute then that Officer Warren was told by the Harris Teeter employee that you had called her a terrorist?

MR. BRUCE: Objection, speculation.

A. I can't -- yeah. I wasn't there.

Q. (Mr. Hartzog) Okay. So no, you don't dispute that.

A. No, that's not what I said. I would have no way of saying yes and I would have no way of saying no.

Q. Okay. Fair enough. All right. Show you another post here, I'll mark this as D.

(EXHIBIT D WAS MARKED)

A. Okay.

Q. (Mr. Hartzog) And you see -- do -- do you see the -- the reaction that people are having online to your posting this. People calling her, you know, trash saying it's a symbol of hate with no place in the USA.

A. Let's look at this. Where is the employee picture to mention in here?

Q. That's not the employee. I understand that.

A. And so you're asking me about this post?

Q. Correct. November 4th, 2024 where you say wearing keffiyeh ---

A. After ---

Q. --- to work in customer service jobs is prohibited.

A. After I was arrested.

Q. Correct.

A. Okay. So I -- it looks like a repost. It looks like my post was November 4th.

Q. Right.

A. Wearing a keffiyeh to work and customer service jobs is usually prohibited.

Q. Uh-huh. (Affirmative)

A. I'm still waiting to hear the policy from Kroger, which is -- I don't know if you knew this, the largest supermarket in North America, it's a behemoth.

Q. Okay.

A. So this is a big issue, them weighing in on a political issue. And what I am reading is -- is this woman is saying this doesn't have a place in the US and what I'm saying is, at minimum all this, it's a political statement.

Q. Uh-huh. (Affirmative)

A. Like say -- and I'm saying say what you

will, I think it's a political statement.

Q. Okay. Do you see the reaction though, is that another person has seen your post and said that people who wear that are trash.

A. She's seen this post.

Q. Correct.

A. Which doesn't have Harris Tee -- a picture of Harris Teeter or there's no reference.

Q. Harris Teeter is tagged in it.

A. Okay. Harris Teeter is a corporation.

Q. Right.

A. So I don't -- you know, I don't have control over what people think.

Q. Uh-huh. (Affirmative)

A. And I don't have control what they say.

Q. Your job is to influence what people think. Is it not?

A. My job. My job is to present facts. My job is to hopefully get accountability, be it from -- be it corporations and government. I think part of my job is informing the public truthfully about things that are going on that I think are important.

Q. Okay. Truthfully, is important there. Right?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 129 of 267

A. Truthfully is always important.

Q. So if someone was not a Hamas supporter, not a terrorist supporter ---

A. Uh-huh. (Affirmative)

Q. --- and you called them a terrorist supporter, that would not be truthful, correct?

A. I made a characterization that I stand behind today.

Q. Okay.

A. Yeah.

Q. So your characterization was that this person is a supporter of a terrorist organization.

A. I said what I said in the post.

Q. I understand that -- that -- that that's what it says, right?

A. Right. But, you know, I do remember the second deposition. You in particular weighed in at the very end of the deposition. You said all the comments in question, which mine were responses. I want to be clear. I didn't keep commenting, I responded, they should be considered. So I said multiple times that this is a political statement.

Q. Uh-huh. (Affirmative)

A. I said that, I meant that.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 130 of 267

Q.   But you stand by your characterization that this employee was a terrorist supporter.

A.   A Hamas supporter.

MR. BRUCE:  Objection to form.  Go ahead.

A.   A Hamas supporter.

Q.   (Mr. Hartzog) Okay.  But she never told you she was Hamas -- Hamas supporter, did she?

A.   The characterization speaks for itself. For instance, if you wear a Maga hat ---

Q.   Uh-huh.  (Affirmative)

A.   --- it's a shorthand for what?

Q.   You tell me.

MR. BRUCE:  Don't ask him question. So just ---

THE WITNESS:  Okay.  I apologize.

MR. HARTZOG:  You're fine.

THE WITNESS:  I'm not on Meet the Nation.

MR. BRUCE:  That'd probably be more fun.

MR. HARTZOG:  All right.

THE WITNESS:  I got it.

MR. BRUCE:  Okay.

Q.   (Mr. Hartzog) Do you know this person's

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 131 of 267

-- the employee's citizenship status?

A. I don't recall.

Q. Have you ever called for her to be deported?

A. Nope.

Q. All right.

A. Oh, February 18th.

Q. Is that you calling for her to be deported?

A. Well, let me read please if I may.

Q. Okay.

A. I would like to see the show more if -- I mean, do we have that? Because you click on that and it will -- I -- I just -- I don't remember.

Q. Do you dispute that that's your account?

A. Can you tell me where you got this from?

Q. This one is base labeled, so I believe we got this from you all.

A. I'd like to see the entire -- this entire ---

Q. Okay.

A. If I may.

Q. I can pull up the entirety what was produced.

A.   Okay.  Well, if I didn't -- if we didn't include that, I apologize, but I would -- I'd like to ---

Q.   What context do you think might be there?

A.   I really don't know.

Q.   Okay.  I'll be happy to pull this up. Hang on.  It looks like this was produced as a single PDF.

A.   Bias.

Q.   So there was no context produced alongside this.

A.   Okay.

Q.   But if you have your account and would like to pull it up, I'd be happy for you to pull your account and look at the context you need.

A.   I wouldn't know how to go back that far, I don't think.

Q.   You don't know how to go back that far?

A.   I don't.

Q.   Okay.

A.   You want me to try to I can make a -- an effort.  I'm not sure about ---

Q.   It's up to you.  You said you wanted to see it.  I want to make sure you have the

opportunity if you like.

A. I do. Yeah, I -- before I answer that.

Q. Sure. Take your time.

A. Okay. It's harder on the app. I will say.

Q. I agree. It appears the date was February 18th, 2025. Just for context.

A. Okay. Can I go back? I think I can only go back -- wait, I think I can only go back a year. I'm almost positive.

Q. Okay. I -- I don't know.

A. Okay.

MR. BRUCE: I would just ---

Q. (Mr. Hartzog) If you want to take a break, I'm fine with you taking a break to look at it. I don't want to ask you questions about this if you think there's context that you need to review.

A. I mean, I really don't. And I'm -- I don't mean to be a stickler, but I'd really like to see what I'm responding to.

MR. BRUCE: I guess ---

Q. (Mr. Hartzog) Let's go off the record for a minute and give you time to look it up.

MR. BRUCE: Yeah, let's do that.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Off Record at 12:15 p.m.

(Off record: 12:15 p.m. to 12:20 p.m.)

THE VIDEOGRAPHER:  On record at 12:20 p.m.

Q.    (Mr. Hartzog) All right.  Ms. Rachmuth, when we went off the record, you were going to go look for context for what we've now marked as Exhibit D.

A.    E.

Q.    E.

(EXHIBIT E WAS MARKED)

Q.    (Mr. Hartzog) About the -- she needs to be deported and unable to find it at this time, but if you find some context that you want to provide subsequently, please provide that to your attorney and he can produce that to us.

A.    Okay.

Q.    Okay.  Do you also see that this person called her a "keffiyeh cow?"

A.    Keffiyeh cow?

Q.    Keffiyeh cow.

A.    Uh-huh.  (Affirmative) Yes.

Q.    Is that -- that's kind of the tone of

some of these comments about this individual who was wearing this scarf.  Is it not?

A.    I don't know.

Q.    Okay.  You don't know.

A.    I'm not keeping up with -- you know, as you just indicated, I have quite a prolific account.

Q.    Well, just scrolling through some of the ones we've just looked at, your commenters have sort of read your posts and are calling this person, "trash, Keffiyeh cow, pro-terror."

A.    Well, I think it speaks to, you know, political symbolism because when you wear political symbolism, you know, some people are not going to like it.  Some people are going to love it.

Q.    Do you think she deserved to be called a terrorist?

A.    I can't speak to that.

Q.    Sitting here today.  Do you think she's a terrorist?

A.    Sitting here today, I stand by my post.

Q.    Do you stand by calling her a terrorist supporter?

A.    I stand by what post is written.

Q. Okay. Do you believe she is a terrorist supporter?

A. I stand by everything I testified to.

Q. Including the characterization of her as a terror supporter. I just want to be clear.

A. A Hamas supporter? Yes.

Q. A terrorist supporter?

MR. BRUCE: Objection. Asked ---

A. A Hamas supporter.

MR. BRUCE: Objection. Asked and answered.

Q. (Mr. Hartzog) Okay. If you have also posted and called her a terrorist supporter, do you stand by that?

A. Can you show me?

Q. Yeah. Let's see. First of all -- let's see, I will show you this email that you sent and I'm going to ask you who you -- who these people are at the top. We'll mark this as F, please.

(EXHIBIT F WAS MARKED)

A. Okay.

Q. (Mr. Hartzog) Who -- who was this sent to first of all?

A. A friend of mine at -- it's a friend of mine. It's a friend of mine

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 137 of 267

Q.    Who's -- who's your friend?

A.    His name's Carlo.

Q.    Is that c@bftf.us?

A.    Yes.  I don't know who's copied on this, David.  I have to remember just two of my friends.

Q.    Okay.  Who is -- and Ed first, NC is you?

A.    Me, yes.

Q.    Okay.  So that's you sending it to your friend.  What's her name again?

A.    Carlo was his name.

Q.    Carlo.  And who is Carlo?

A.    He was a friend of mine.  He does ---

Q.    What does he do?

A.    He's just a Jewish friend that keeps up on advocacy.

Q.    Okay.  Does he post things online to your media in any way?

A.    No, he's actually behind the scenes.

Q.    Okay.  Behind the scenes where?

A.    I mean, he's a -- friend of mine's a Jew.

Q.    Okay.

A.    You know, and he knows -- you know, the Jewish community's small, so the way it works is

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 138 of 267

you talk and you put things out there.

Q. Uh-huh. (Affirmative)

A. You know, if somebody's knows of journalists or knows of this, you know, it's just ---

Q. And he knows journalists as I take it.

A. He might.

Q. Okay. Well, you said, will you please send these two posts with my story to the media and helpful organizations?

A. Yeah.

Q. Perhaps to Elon Musk also.

A. Yeah.

Q. What media and helpful organizations did you think he might be able to send this to?

A. I don't know specifically. I mean, I really don't know exactly who he would know.

Q. Okay. He just shot the door.

A. It's just a general ask. Pretty much. It's a general ask.

Q. Okay. Does he have some connection to Elon Musk?

A. I -- this has been a long time ago, so he might. And I thought it was pertinent, you know why? Elon put up, I think an all call for

anyone who's been arrested over a social media --
a non-threatening social media post that he paid
for their legal defense.  And I thought that's
pretty cool.

Q.  Okay.  So I think you said earlier you
weren't aware of her immigration status or -- or
citizenship status; is that correct?

A.  Hers?

Q.  Yes.

A.  No, I can't recall that I am hers.

Q.  Okay.  Why did you call her an Arab
refugee?

A.  Because then that was her husband's
status,

Q.  But not hers.

A.  I can't -- I don't remember verifying
that.

Q.  Okay.

A.  But I want to make clear, you know,
since -- since the police was called on me three
days later after I did nothing wrong in a store.

Q.  Uh-huh.  (Affirmative)

A.  I kind of like to know if someone is
targeting me and I had been targeted.  I mean,
that's on record.  I had been death threats,

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 140 of 267

cyberstalking, et cetera, because of this. And I think I would be irresponsible to have two children in my home without knowing who the players are. And I was aghast. I was absolutely shocked when I found this Facebook post.

I mean, it is -- it -- I don't even know if it's lawful given some of the directives that have come out of the White House recently about stuff, because it -- to me looked like at the precipice of -- of inciting or -- or being involved with potentially terrorist groups, it was that much of an advocate page. In fact, one was having a baby, an innocent little baby wrapped up in a -- a Shahada or a Keffiyeh with a -- a Hamas, not -- with Hezbollah headband and a baby. These are shocking things to me. So yeah.

A. Okay.

Q. I found it shocking.

Q. Okay. You also call her a -- an Islamic foreign national?

A. Uh-huh. (Affirmative)

Q. What'd you know about that?

A. Well, Islam is another political system, and a foreign national would be someone who is foreign national, as it says. And I didn't know

Case 5:25-cv-00222-BO-RJ   Document 29-8   Filed 08/03/26   Page 141 of 267

that at the store.  I didn't care at the store. When I was at the store before my arrest, I could care less.  But when I'm getting death threats all the time, I kind of got to know ---

Q.  Got to know what?

A.  I have to know if I'm being targeted three days later.

Q.  Uh-huh.  (Affirmative)

A.  Figure it this way.  I left good terms with her, I thought, and with the manager, I thought maybe she should understand my point of view to being arrested and now confronting this document for the first time, utterly false allegations of what I did.  I think we can all agree if someone -- I'm not going to ask you a question.  Here's -- here's what I'm going to say. If I were the manager of a store, I would find my behavior irresponsible and treacherous if I sat there and watched my employee be threatened and called a -- a -- a terrible name and not trespass them and not call the police that instant.

Q.  Uh-huh.  (Affirmative)

A.  I tell you what, I would not tolerate that -- that.  And so for all of this to happen, and I'm kept in the dark about this you know, I

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 142 of 267

have to protect myself and my family.  Yeah.  I mean, I had been a great customer there the entire time.  This game is quite a shock to me.  And if this was a shocking, if this incident report, if this was a shocking to them because it did -- their retelling is -- is not good.  And it never happened.  It never happened.

And so again, this makes me feel good about making sure I knew who I was dealing with because I don't know why someone would say something like this when this never happened.  I'm in the dark.  I'm a little disappointed reading this today.  I have to say.

Q.   Okay.

A.   And by the way, I had no idea what nationality she was.  I couldn't even see her when I took the picture.  And it doesn't matter.  It -- it -- none of that mattered at the time.  Right now we're going post hoc months after.

Q.   Uh-huh.  (Affirmative)

A.   And I think I've given you a good faith basis for me to make sure that I knew what the heck was going on.

Q.   Okay.  I'm trying to understand what you're -- what you're telling me here.  This email

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 143 of 267

to spread word of the story, calling her Arab refugee.

A. Uh-huh. (Affirmative)

Q. An Islamic foreign national.

A. Yeah.

Q. When -- I think you said you have no idea whether that's true or not; is that correct?

A. No, that's not true. That's not what I said.

Q. Okay.

A. I said that her personal refugee status, I don't -- or her personal immigration status, there's no way I could know that.

Q. Why'd you include it in here though?

A. That isn't her -- her -- I don't know, you know, when she came, I don't know, you know, what status it is, you know, I remember, I know that he's a refugee because he posted it on his Facebook page.

Q. Okay.

A. But you -- you realize I can't get that information from ICE because that's confidential information. I'm going by what is posted on his Facebook page.

Q. But this is not about him, it's about

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 144 of 267

her.

A.   I understand that.

Q.   All right.  And -- and what you're telling me is essentially, you -- you had no idea. You just made this up in here?

A.   Did not make that up.  It -- I ---

Q.   Where did it come from?

A.   I will tell you, I had a -- a reasonable basis to say if a man comes here and brings his family with him, and he is saying that he is a -- a -- a -- came here on refugee status, that -- it's a reasonable assumption to assume that his wife came with him.  I think that is reasonable.

Q.   Why is it relevant here?

A.   Well, it's relevant because there is a military conflict with Israel.  I'm married to an Israelien.

Q.   Uh-huh.  (Affirmative)

A.   I'm being threatened for my religion and my husband's nationality a lot.  And so part of my threat assessment, because I have children at home, is if you are an Arab national, there are a lot of countries right now who are at war with Israel and they have folks living in the diaspora that have hostile feelings.  And how did I know, I

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 145 of 267

looked at the Facebook account and I confirmed that.

Q. So you're concerned if you see someone is a ---

A. No.

Q. Is a refugee -- Arab refugee ---

A. No, no.

Q. --- your concern is that they're ---

A. I disagree with the ---

Q. --- going to do something on behalf of. Okay.

A. Absolutely not.

Q. Okay. Well then I misunderstood.

A. In fact, I worked with Arab refugees, some of the finest people I have ever met in my life. Today I work with them.

Q. Okay.

A. My husband also came to this country from a Middle East country. Context matters.

Q. Uh-huh. (Affirmative)

A. The context of this email and what you're asking me about this situation, I've explained it and I'm happy to do it again, because the context matters. The Facebook posts of the hostility towards Jews, specifically towards

Israel, that is affecting me.  This story --
again, I don't know who said it.  I don't know if
Officer Warren said it.  I don't know what --
whatever this is, is a complete confabulation.
This is not, context always matters.

Q.    Okay.  I'll hand you that.

A.    Thank you.

Q.    I believe I only have one copy of that.

A.    Oh, okay.

MR. BRUCE:    (Indiscernible).

MR. HARTZOG:    Mark that as Exhibit
F (sic).

(EXHIBIT G WAS MARKED)

Q.    (Mr. Hartzog) Give me the context of why
you say you were arrested for objecting to Islamic
terror.

A.    Well, that was March 2nd, 2025.

Q.    Uh-huh.  (Affirmative)

A.    And again, I had informed myself on not
only did I believe at the time that this employee
was wearing a political symbol that was supporting
Hamas.  I got more confirmation by looking at the
Facebook page.  Again, I was so alerted by that.
I sent those pictures.  I -- I can tell you that
to my attorney to make sure that they had

something in case something happened to me.

Q. Uh-huh. (Affirmative)

A. So when I -- by the way, I never one time used her name or her husband's name or revealed -- I'm an investigative journalist. I never revealed what I investigated and what I discovered in this particular case. You know what I did? I gave it to my attorney instead. If I wanted to target this employee, I could have. I have never done it. I never did it that day, I never did this. But, you know, I -- I do feel like it's important to use my platform to defend myself and to stand up against what I perceive is an injustice here and this is -- I believe what this is doing.

Q. You say you never targeted the employee? I mean, you agree you posted her picture very clearly, her face ---

A. I documented the evidence of what I was saying in Harris Teeter.

Q. And you posted the store where she worked?

A. Wait a minute now, I responded. So those are responses. Okay? Those are responses. I -- I -- I recorded an incident happening at the

Holly Springs, not the Apex, not the Raleigh, not Mooresville, the Holly Springs. Because guess what, maybe in Raleigh they don't allow political expression. I -- I think it's important to be specific. And so this particular Holly Springs allowed its employees to do so. It was never about the employees, always about the corporate behavior. And Jews felt very -- could feel very unwelcome and I want them to know that.

Q. Your testimony is that this post ---

A. Yeah.

Q. --- with three pictures of this employee and saying "Saw this Hamas supporter" is not about this employee?

A. It is about Harris Teeter allowing controversial political symbolism. And in fact, to evidence what -- to -- to support what I'm saying is true, I even said, I went and I looked at their handbook.

Q. Uh-huh. (Affirmative)

A. And their handbook says there shall be no political, I don't know, outfits -- garb worn, in my view, that was a violation.

Q. Of store policy?

A. Yes.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 149 of 267

Q.   Okay.

A.   It's always about the store.

Q.   Okay.

A.   It, you know, it doesn't matter, you know, a guy working at Walgreens, right? Perfectly nice person, whatever, but they're wearing a hat that says, I don't know, something offensive to some people in the country, a store makes a position based on his employee.  And look, I didn't stop there, I went to the manager.  I didn't just take that picture and say, this employee did it, et cetera.  I made a good faith effort to rectify the situation in store.  Told kind of to go pound sand.  And I felt like the public should know about Harris Teeter.  That's what it was.  That's what it is.

Q.   You were angry at Harris Teeter?

MR. BRUCE:  Objection.

A.   I was not angry at Harris Teeter.  I was not, I was concerned.

Q.   (Mr. Hartzog) Concerned that they had this person working for them?

A.   I was concerned that they had weighed in on a political movement on one side because they didn't just say, "We're going to allow our

employees to wear a Keffiyeh in support Free Palestine, we're also going to tell Jews that if they don't like it, they can leave." That is clearly weighing in on a political movement.

Q. Okay. All right. I'm going to hand you what I'll mark as ---

A. Thank you.

Q. --- Exhibit G.

A. H, it's H now.

Q. H. Thank you.

(EXHIBIT H WAS MARKED)

Q. (Mr. Hartzog) And I've collected a couple posts here. I'm just going to scroll through some of these.

A. Sure.

Q. First of all, fair to say, you -- you publicized your arrest pretty routinely, correct?

MR. BRUCE: Objection to form.

THE WITNESS: Well ---

MR. BRUCE: Go ahead. You can answer.

A. We're looking at post from November 4th.

Q. (Mr. Hartzog) Uh-huh. (Affirmative)

A. By November 4th -- I'm going to give you a range of ---

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 151 of 267

Q. Okay.

A. --- 70 to 100 articles that I know of that mischaracterized my arrest, identifying everything about me, my age, where I lived, what I did for a living, my mugshot of me when I first woke up in the morning. Everything. So by November 4th an incredible volume. In fact, November 4th, I don't even know if I had my bearings.

Q. Uh-huh. (Affirmative)

A. What I do know is that it was all over social media. And I wanted people to understand that this is unconstitutional arrest in my view. Here I tag Elon Musk.

Q. Uh-huh. (Affirmative)

A. And the topic at -- the topic of the day was -- well, first of all, I was everywhere. And I -- I was looking to somehow defend myself. But the narrative was, look at what's happening in the UK. Someone will make a post that my defense might upset someone, and out of nowhere, someone comes knocking on somebody's door and they're arrested and hauled off by the police.

I could -- I could not believe that it happened to me. And I tagged or applied to Elon

Musk. I -- I don't really remember what the post is, but my best guess is, the topic was what was happening in the UK and I could not believe it was happening in Holly Springs, North Carolina. A town that I researched two years before I moved there for my family, because of the police department, because of the family environment, all that was shattered. All of it's gone.

Q. Okay.

A. I was targeted, I was humiliated, I was jailed for this. That was one. Second one, the date is again, November 4th. I mean, I -- I ---

Q. I'll represent that, the first three of these are all on November 4th.

A. Oh, okay.

Q. And you're responding, it looks like similar three different times you posted it, it looks like ---

A. Yeah. I, you know ---

Q. --- two different people tagged?

A. Because the -- the headlines were that I cyberstalked someone and was accused of a hate crime. I wanted to get my narrative in because there were maybe even a thousand at that point, where the narrative wasn't right. And by the way,

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 153 of 267

the media will report that you got arrested. Maybe one will report that the charges are dropped.

Q. Uh-huh. (Affirmative)

A. So I -- I -- I'm defending myself. I'm trying to stop the -- the bleeding of a -- I -- at this point, I just unimaginable ---

Q. Uh-huh. (Affirmative)

A. --- unimaginable things. In my eyes, I -- I don't know what this was, but again, I -- I am -- I -- I am not -- I am not putting out there that, hey, look at me, I was arrested. I'm doing a couple of things. First of all, above all, at this point, I'm defending myself. I'm under a full assault ---

Q. Okay.

A. --- out there. I am also committing an act of civil advocacy for free speech. Because if in the UK your door can be knocked on, you can be -- in front of my children -- I was right in front of my children. I have -- I had -- I'm telling you, I did not have a good childhood. I've -- I'm -- being a good mother is top important to me. I was arrested in front of my children. That is like, I can't even describe to you -- I cannot

Case 5:25-cv-00222-BO-RJ     Document 29-8     Filed 08/03/26     Page 154 of 267

even describe to you. It's a shame. I'm defending myself. And there are not very any people defending me at this point.

Q. Uh-huh. (Affirmative)

A. I mean, seriously, like, I mean, I -- I just really feel sorry for myself back then, especially because at this date, I didn't even know -- I did not know what was going on. I mean, I was -- I was probably stone shocked.

Q. Have you ever thought about how it affected the person that you called a terrorist supporter online?

A. I don't know what to believe about all that. And I'll tell you why. We had a brief but lovely exchange.

Q. She says you called her a terrorist.

A. I don't know what she says, because to me, she told me where I could buy a Keffiyeh if I wanted one. It was a lovely exchange. So this would happen what was recorded in this incident report. And I don't know who said it. I did not do that. I did not leave the store like that. I don't know who was upset.

Q. You don't know if she was upset?

A. I do not.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 155 of 267

Q. Okay.

A. I did not see her upset. Unless I see something in my own eyes in this case, it's hard for me to count on it.

Q. Do you think it would be reasonable to be upset about being called a terrorist supporter online?

A. I can't speculate.

Q. Okay.

A. Sorry.

Q. All right. Scrolling through these, it looks like you posted again on January 1st, 2025 asking if anybody remembered what happened when you got arrested.

A. Uh-huh. (Affirmative)

Q. Why did you post there?

A. I don't -- I'm going to speculate too.

Q. Sure.

A. Either I've been in the news again.

Q. Uh-huh. (Affirmative)

A. There have been a bolus of -- of reports about me online, or -- that'd be my best guess. If I had to guess again, I'm being speculative. It would be a way of me working through acute trauma of the injustice of being arrested for

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 156 of 267

something I did not do. And was a post. Because again, I, you know, I have -- you pointed out, you let me go through this. When I -- when things happen, I find the best way is to get active and advocate.

Q. Uh-huh. (Affirmative)

A. And that helps me.

Q. Okay.

A. Okay. So ---

Q. So February 17th?

A. Yeah.

Q. You're still advocating about your arrest? It looks like ---

A. Through a period where people aren't advocating, then I'm falsely accused of a hate crime. Yeah.

Q. Okay. Well, here you say a foreign employee working at Harris Teeter supporting Hamas while handling food.

A. Uh-huh. (Affirmative)

Q. Do you stand by that statement?

A. I do.

Q. Okay. So again, you're accusing her of supporting Hamas ---

A. Let's look at the date.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 157 of 267

Q.   Yes.

A.   February 17th, 2025.  So this is after a period where I understand who this person is and what her husband and her, support.

Q.   Okay.

A.   So -- so I think part of the context I -- I want to keep referring to is the -- the date and the evolution that I'm going through.

Q.   Yeah.  So you had more information when you made this post in February than you did when you made your original post?

A.   Well, yeah.

Q.   Okay.  And here you're calling her ---

A.   Oh yeah.

Q.   Again, a -- a terror supporter.

A.   Well, now, because I know.

Q.   Now, you know, she's a terrorist supporter?

A.   Yeah.  I mean, now -- now there's -- there's Free Palestine, tie Keffiyeh, where, you know, that -- with robust.  And by the way, you're perfectly entitled to, right?  And I'm entitled to react, and I did react.  And now I understand that, wow, this is a bit more -- yeah.

And -- and when you're traumatized by

Case 5:25-cv-00222-BO-RJ     Document 29-8     Filed 08/03/26     Page 158 of 267

the government, for your immutable characteristics, when you're ignored, when you're complaining for two years about actual hate crime, people actually contacting everyone you know, 200 people on a chain email about how I'm Satan, my husband is Israeli, kills people blood thirst. Things that the Holly Springs Police Department right now, they had these emails that would terrify you if you received it. I received many of them.

So after going through that for two years and them doing nothing, and them telling me that's free speech, and yet this post is not free speech, is so specifically traumatizing. I -- I -- I don't trust anything anymore. And I've never been like that. I have to tell you, this is such -- when you are targeted and withheld support because of who you are. Like, maybe your skin color, maybe your religion, maybe your identity. There is no -- the only hurt that I've ever had to compare to that, is having parents that did not want me.

That is it. When you are not wanted because of who you are, that is how I feel. That is how I feel. They didn't enforce any of this

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 159 of 267

stuff. I told them who targeted me, when, and they wrote why. Nothing. And then without asking me a question, was it because I'm a Jew and I don't have a say in it? I feel targeted and it hurt in a very specific way, very distinct from terrorism.

I will never be able to out-beat you. I'll never be able to. Do you understand what it's like? Like, I'll never, you can't change this. You can't change this. And I'm really, really -- I'm hurt. This is me working through it. I'm not going to be silent and stuff it in, and I -- I will work my ass off to make sure this never happens to anyone else again. And I mean that, like what in the world? Like, I -- I'm just -- I moved to Holly Springs because I thought it would be a beautiful community for my children.

This place is a nightmare. I -- I -- I mean, I -- I don't know how many -- I don't know how many Jews live in Holly Springs, but, you know, I wrote -- the funny thing is -- is, I wrote to the police chief like a year before this, and I said, I'll believe you're biased against Jewish families. And I did a request for information. I started investigating them. It was November 7th,

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 160 of 267

2023, my birthday. And by -- a month after October 7th, because when I'm traumatized, like I was on October 7th, I get busy to protect civil rights. That's what I did then. This is what I'm doing now. So ---

Q. Okay.

MR. BRUCE: Whenever we're done with this document, can we take that lunch break?

MR. HARTZOG: Yeah. I've got two pages left.

MR. BRUCE: Okay.

Q. (Mr. Hartzog) So let's flip to March 2nd.

A. Okay.

Q. And this looks like a post that you wrote. You said that you were arrested for objecting to Islamic terror promotion ---

A. Yes.

Q. --- in North Carolina?

A. Yeah.

Q. Islamic terror promotion. What do you mean by that?

A. I do -- I do. I would not have said that that day because I thought it was as simple as the objectives of Hamas. By the way, Hamas has

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 161 of 267

a charter and in 2017, the charter says to Free Palestine. And what that means is to wipe Jews off of -- out of Israel. That's a political objective that sometimes people don't really fully realize the ramifications of. I realize that, right? But then I had all those posts. I mean, really disturbing stuff, I think would be almost incontrovertible evidence of really supporting terrorism. At this point. I am -- I'm realizing that I need to keep speaking.

Q. Okay. Do you feel like ---

A. Because I said every America -- every American.

Q. Yeah. Do you feel like you have a First Amendment right to call someone a terror supporter?

MR. BRUCE: Objection. Calls for a legal conclusion. Go ahead.

A. I have a First Amendment right to engage in political speech. Yes, I do.

Q. (Mr. Hartzog) Is calling someone a terrorist supporter political speech in mind?

MR. BRUCE: Object. Objection. Calls for a legal conclusion. Go Ahead.

Q. (Mr. Hartzog) You can answer.

A. Can you repeat the question?

Q. Sure. Do you believe it's a political speech in your mind to call someone a terror supporter?

MR. BRUCE: Same objection.

A. Do I believe it's political speech?

Q. (Mr. Hartzog) Uh-huh. (Affirmative)

A. I do. Particularly because Free Palestine is a political movement and it's making its way into political campaigns into the United States.

Q. Okay. Can calling someone a supporter of terrorism subject them to, you know, ridicule or embarrassment?

MR. BRUCE: Objection. Calls for speculation. Go Ahead.

A. I can't speculate.

Q. (Mr. Hartzog) You have no reason to believe that calling someone a terrorist supporter might subject them to embarrassment?

A. I have no basis on whether or not someone would find that offensive if they're wearing a political symbol.

Q. You think she shouldn't find it offensive to be called a terrorist supporter?

MR. BRUCE: Objection to the form. Go ahead.

A. I'm not going to weigh in on how anyone should feel.

Q. (Mr. Hartzog) You don't know how she felt?

A. I don't.

Q. Okay. Do you think is reasonable to believe that calling someone a terrorist supporter online could -- that someone could think you're doing that to harass or embarrass that person?

MR. BRUCE: Objection. Calls for speculation. Go ahead.

A. No.

Q. (Mr. Hartzog) No? Why do you think people would think you're calling someone a terrorist supporter? Do you know?

A. I -- in that post I'm talking about Harris Teeter weighing in on one side of a political debate that's being debated. I mean, you can't turn on the news without it being debated now. It is a hotly debated issue and Harris Teeter took a stand not only for one side, but against the other.

Q. Why'd you include the picture of the

employee?

A. Because I wanted to document what I'm saying.

Q. Why'd you include a picture with her face visible?

A. I mean, that's the picture I took at the time.

Q. Okay. And then you think posting a picture of her online saying what store she works in and calling her a terror supporter is not going to lead to potentially lead to harassment and embarrassment?

A. I don't agree ---

MR. BRUCE: Objection to form. Go ahead.

A. (Mr. Hartzog) I don't agree with your characterization.

Q. No? Which part?

A. I'm going to say this again. The post was always about Harris Teeter and their employees and what they allow them to do.

Q. Okay.

A. It was always. It -- it -- it is there.

Q. She's here in the picture.

A. Okay. That is an employee of ---

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 165 of 267

Q. And you're ---

A. --- Harris Teeter.

Q. --- and you're calling her a Hamas supporter.

A. I'm calling an employee who works at Harris Teeter. And the reason is ---

Q. A Hamas supporter.

A. --- the reason is, it's a political statement and Harris Teeter has weighed in specifically on one side and against the other, in a political movement.

Q. You say against the other. What -- what did they do that led you to believe they were against someone who wanted to wear a Jewish garb or something?

A. That's not the point. Someone who objects to it, is the other side of the political argument.

Q. Okay. So by asking you to leave is what you're saying ---

A. She -- well, she asked me. She invited me ---

Q. Invited you?

A. --- to like it.

Q. Okay.

A.   Or invited me to leave.  So I did not like it.  Opted for the latter.

Q.   Okay.

A.   And I never come back.  Not once, never will.

Q.   Okay.  And you see -- have you -- have you -- you've read, I assume the responses you got to your post.

A.   Uh-huh.  (Affirmative)

Q.   The one you posted on October 31st that we marked as Exhibit A.  You've -- have you read through the comments that people have made on this post?

A.   No.

Q.   No?  You responded to some of them?

A.   Yes.

Q.   I assume you at least read those.

A.   I'm sure I probably did.

Q.   Okay.  So you see people saying, she's showing support for a terrorist group.  Don't support the deliberate slaughter of civilians and certainly don't celebrate it?

MR. BRUCE:  Can you point out where -- where this is, Dan?

MR. HARTZOG:  That was on Page 2.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 167 of 267

I'm just sort of scrolling through here.

THE WITNESS: I don't -- you know what's notably absent from this, is her name, her address, her phone number, her email address or any calls for violence that I'm seeing here.

Q. (Mr. Hartzog) I see someone said, "That to me represents terrorism." On the second page from the back.

A. Okay.

Q. And you responded, "She said, Free Palestine when I asked her."

A. Yes.

Q. So you're not disputing anyone who characterizes it as terrorism?

A. It's not my responsibility to dispute what people are -- are commenting. I don't believe I, you kow ---

Q. Do you think it's a reasonable response when you call someone a Hamas sympathizer for someone to assume they're ---

A. I can't speak to what reasonable is. I mean ---

Q. Okay. But you see that it happened, right? That you called her a Hamas sympathizer, and then people are in the comments saying, that's

terrorism?

A. Some people didn't, some people weighed in against what I did.

Q. Correct.

A. So I ---

Q. Sure.

A. You know, when you open up a political discussion, especially nowadays, there's going to be people that support what you say and a lot of people that don't.

Q. Uh-huh. (Affirmative)

A. So I ---

Q. So some people read this, that Harris Teeter is hired a Hamas sympathizer and assume that she's a terrorist.

MR. BRUCE: Objection. Calls for speculation.

Q. Well, they said it in the post and you responded to it, right? What we just read.

A. Okay, can you repeat the question? I'm sorry.

Q. You see that you -- you posted this and said ---

A. Yeah.

Q. --- "I went to Harris Teeter ---

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 169 of 267

A.    Yep.

Q.    --- in Holly Springs and saw this, Hamas sympathizer."

A.    Correct.

Q.    With a picture of her -- her face, and other people have responded on here that, that to me represents terrorism.  You see that, the second to last page?  And instead of disputing that you said, "She said Free Palestine, when I asked her," which you told me you believe is a terrorist phrase?

A.    I believe.  It -- the context matters. I believe that's what I told you.  The context matters.  And so I -- I'm sorry, I want to get to the page you're saying ---

Q.    Second to last page.

A.    I'm sorry.  Okay.  It's okay.  So someone is saying that to me represents terrorism. I said, "She said Free Palestine when I asked her."

Q.    Right.  So with the context of your understanding of Free Palestine being a terrorist phrase, you're affirming this person that said that sounds like terrorism.  Is that ---

MR. BRUCE:  Objection to the form.

Q.    (Mr. Hartzog) Was that your intent?

A.    I can't recall.

Q.    Okay.  Well, you didn't dispute when someone said that represents terrorism, did you?

A.    I mean, no, I did not.

Q.    Okay.  I see someone says, "Ha ha, get arrested freak," on the last page?

A.    Okay.

Q.    So people reading your posts took the message that this employee is a terrorist supporter?

        MR. BRUCE:  Objection to form.

A.    Some.

Q.    (Mr. Hartzog) Some?  And the ones -- and you interacted with some of them?

A.    Okay.

Q.    Correct?

A.    I -- I interacted with some people that thought that that was a symbol of terror apparent, yeah.

Q.    And you didn't dispute that.  In fact, you added -- you added what you believe as context that shows some terror leaning tendencies, I suppose, right?

A.    Support -- Free Palestine?  Yeah.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 171 of 267

Q.    Yeah?

A.    Yeah.

Q.    Okay.

A.    Specifically she said, "Free Palestine."

Q.    Right?  Which you told us today, you believe is -- is a terrorist phrase?

A.    In context with a Keffiyeh.  Yes.

Q.    Okay.

A.    I mean, it -- the context matters.

Q.    Right.  And that context is why you believe that this employee was a terrorist supporter?

A.    I believe that Harris Teeter has weighed in on a political matter in favor of one side of the political movement, and the other.  This was never about this employee.  It's about employees being allowed to represent a highly controversial, I believe ---

Q.    Uh-huh.  (Affirmative)

A.    Others disagree.  Highly controversial political movement, which calls for, in its -- in charter, the eradication of Jews.  It does.  It's in the writing.  So given that I'm Jewish, I don't like it.  Given my husband's Israeli, I don't care for that.

Q. So when you say this person is a Hamas supporter, your belief is this person supports the eradication of Jews?

MR. BRUCE: Objection to form.

A. Again. This is a political movement in its charter. The Free Palestine came from Hamas. That is a -- in Hamas' charter. Okay? So in that charter, it calls for the eradication of Jews and Israel.

Q. (Mr. Hartzog) Right. And your assumption is that this is a Hamas supporter because of that phrase?

A. In conjunction with wearing the Keffiyeh, it appears that Harris Teeter is allowing employees and the manager herself to itself. You see, an employee is an agent of a corporation. And I think the manager is a -- a, you know, really, I mean, so it wasn't the employee that said like it or leave

Q. Uh-huh. (Affirmative)

A. It was the manager. And it was her -- I think in concert with her unwillingness to, I mean, I'm making a complaint. I don't feel welcome as a Jew, and I don't -- I'm not representing all Jews, but I don't feel

comfortable and I don't feel safe. I think it's the environment that, that created. Yes. Because an employee, any employee, 10 employees working that morning could have worn the same thing.

Q. Do you agree that this post is about this employee, though?

A. The only one I saw wearing Keffiyeh, in fact, the only one I've seen before or since in a work setting. That's how -- that's what a unicorn this is in my mind. This was a -- an alarming situation -- an alarming situation. And by the way, maybe if I told people online, they wouldn't believe me. Now, they would believe me. You see what I mean with the picture. That's why it -- it's really important to document what you're saying because, you know, facts matter and context matters.

Q. You wanted to make sure people believed you that this was a Hamas supporter working against?

A. I wanted to make sure they knew that this was in a Harris Teeter store. Okay? This happened in a Harris Teeter store.

Q. Okay. I think we're done with that exhibit. Do you all want to take a lunch break?

THE WITNESS: Please.

MR. BRUCE: That'd be great.

THE VIDEOGRAPHER: Off record at 1:08 p.m.

(Off record: 1:08 p.m. to 2:04 p.m.)

THE VIDEOGRAPHER: On record at 2:04 p.m.

Q. (Mr. Hartzog) All right. Ms. Rachmuth, we're back on the record here after a -- a lunch break, wanted to ask you a couple questions about some of these other documents that have been produced to us in discovery, and we'll mark this as Exhibit I.

(EXHIBIT I WAS MARKED)

Q. Can you tell me what this is?

A. Yes. I did a little write up about what I felt would be a good press. Yeah.

Q. Okay. So ---

A. That's ---

Q. You are the author of this ---

A. I Am.

Q. --- document? Okay. Let's see, a couple questions then. First of all, I'm sure your attorney will be happy to hear he's with the powerhouse DC firm. That's always good.

THE WITNESS: I can tell what I think of him.

MR. BRUCE: I can tell myself that.

MR. HARTZOG: Yeah.

Q. (Mr. Hartzog) A question for you. You -- you note many times in your social media postings that this employee was serving food, and you seem to have an issue with the fact that she was handling food. What -- what is that about?

A. She's at a grocery store and that's what they sell.

Q. Why -- why is it important to note that she's handling food?

A. She's at the grocery store and that's what she was doing at the time.

Q. Okay. Well, for example, another post I'll mark this as J.

(EXHIBIT J WAS MARKED)

Q. (Mr. Hartzog) You say she's molesting loaves of bread.

A. It's tongue in cheek.

Q. I understand, but again, my -- my question is, why is it so important? You seem to have an issue with the fact that she was handling food. I'm trying to understand.

A. She's working at a grocery store. People that work at a grocery store handle food.

Q. Do you have an objection to her handling food based on wearing the Hamas alleged scarf?

A. I have an objection to members of a movement. Yeah. Members of a movement of a group. There's a political group being able to have association with a big corporate giant food store. And -- and in fact, being told that I'm not welcome, but they are in a movement that I find offensive.

Q. That doesn't really answer my question about the handling food though? What ---

A. At a grocery store, they handle food.

Q. Okay.

A. I mean, I'm not trying to parse things, but in other words, this wasn't an auto mechanic shop. I guess that might be a risk too, but it is not.

Q. How so?

A. Well, everything could be a risk, right?

Q. Well, how so?

A. Well, I mean, everything could be.

Q. What's the risk?

A. If -- if someone is involved in an

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 177 of 267

offensive political movement to you, right?  And you're not Jewish.  But I can tell you, for instance, ADL leader, Jason Greenblatt, I believe his name is.  He said a keffiyeh is exactly like a -- I think he said, I want to make sure I get this correct.

Q.   Uh-huh.  (Affirmative)

A.   He said that keffiyeh was the same thing as a swastika.  And I agree.  And he was the leader of the most preeminent -- one of the most preeminent civil rights groups in this country.  I -- I actually agree with that.  So I agree when something is as offensive to me as a Jew.  I'm allowed my interpretation as a Jew in this country, last time I checked.  And my interpretation is that it offended me in a grocery store.  That was the context.

And it's not that she did, I want to be clear.  If she were a -- I've seen this many times, someone's wearing a keffiyeh and shopping in the same grocery store.  Not my business.  Totally not my business.  It would've been -- and I said -- I think I've said this inappropriate for me to say something.  But this is speech, right?  An employee is part of corporate speech,

Case 5:25-cv-00222-BO-RJ     Document 29-8     Filed 08/03/26     Page 178 of 267

especially when the manager endorses it.

Q. Okay.

A. This is a movement that Jews find unsafe and unwelcoming. I know that you don't, and I know that some may not. As a Jew I do, and I'm allowed to say that.

Q. Okay. Do -- do you think she was doing something to the food? I'm just trying to understand.

A. If I did, I would've put it up there. I mean, I think I, you know, at -- at this date, it was February 16th, so again, it was made into this. I -- it makes me feel unwelcome and unsafe when I see someone wearing a keffiyeh that's representing a store that I frequent. It makes me feel uncomfortable and unwelcome.

Q. Okay. Now, you said you had not seen that incident report that I handed you earlier; is that correct?

A. That's correct.

Q. But you knew at least as of April 21st, 2025 that the store manager claimed that you called the employee a terrorist?

A. It was in -- yeah, but it -- let's look at the document.

MR. BRUCE:  Can I just clarify? He's -- he's looking at the -- the first one he gave there ---

Q.    (Mr. Hartzog) Your -- your written statement.

A.    Okay.  But you also mentioned another document?

Q.    Well, I was referring to the incident report that I marked earlier.  I can't remember what we marked that as.

A.    Okay.  But can I look at the warrant ---

Q.    Sure.

A.    And then -- what -- I want to look at what I had at access that day, if I can.

Q.    Okay.  I'm happy for you to look at whatever you like.

THE WITNESS:  Okay.  Do you have -- do we have that?

MR. BRUCE:  What -- what are you -- are you asking to look at the police report?

THE WITNESS:  Yeah.  And the warrant?

MR. BRUCE:  I don't think he showed you the warrant yet, but the police reports ---

MR. HARTZOG:  I believe the warrant

is attached to the complaint.

THE WITNESS: Oh, okay. I can check on it.

MR. BRUCE: If you need to look at the warrant too, we can ---

MR. HARTZOG: I -- I've got it. Hold up, if we'll have to look at it.

MR. BRUCE: He -- I think he has it.

THE WITNESS: See, I got a different one of these with a very abbreviated truncated ---

MR. HARTZOG: Uh-huh. (Affirmative)

THE WITNESS: And I need to see, oh -- on -- this is it.

Q. (Mr. Hartzog) If you're referring to the incident report, I do have that if you would like to look at it.

A. Yeah. Okay. Because I did not see five and six. I saw -- I think it -- it appeared -- it was like a narrative to this one. Hang on. Okay. It was -- you know what it was? It was this version that had a narrative on it, a small narrative.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 181 of 267

Q. Which version are you referring to?

A. This is Page 4.

Q. Of the incident report?

A. Yeah. This is -- looks like Page 3 and on the back four. So this little narrative section was populated with a couple sentences.

Q. You've seen something that had a -- a brief narrative in ---

A. Yes. And I can -- if we need it, I do know that I have it on my phone. So ---

MR. BRUCE: It would be the one in the complaint.

MR. HARTZOG: Yeah.

MR. BRUCE: You have that pulled up, yeah.

MR. HARTZOG: I do that ---

MR. BRUCE: That's the only one we had.

MR. HARTZOG: Okay.

MR. HARTZOG: It looks like you've got the warrant attached, but I don't think you have the incident report attached.

MR. BRUCE: No. Okay.

Q. (Mr. Hartzog) Well, actually, I'm sorry I take it back.

A.    It did have ---

Q.    It does look like it was an attached there.

A.    Yeah.  It looked like this one though. And it -- but it just had in here a few sentences.

Q.    Okay.  I think -- if I may?

A.    Yes.

Q.    Is -- is this what you're referring to? And this is an attachment to your complaint?

A.    That looks -- it looks like it.

MR. BRUCE:  Yes.  You're saying that's missing from Page 4 of what we've provided?

MR. HARTZOG:  Maybe -- maybe what you posted is slightly different version, but this is the -- the incident report attached to your complaint does have a brief narrative on it.

MR. BRUCE:  Okay.  So what were you asking to look at for?

THE WITNESS:  Well, I'm -- I didn't mean to get you turned around.

Q.    That's fine.

A.    But I -- you're asking me -- okay. You're saying April 21?

Q.    Uh-huh.  (Affirmative)

A.    Right?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 183 of 267

Q. Yes.

A. Okay. So I was aware that she made an allegation that I called her a terrorist.

Q. Okay.

A. That never happened.

Q. Okay.

A. I was aware of someone -- someone said that. I wasn't aware exactly who, but that stood out to me, because it never happened.

Q. Well, you -- you -- you use her name. You say officers took a report from store manager Sheronna Irick, who falsely claimed Rachmuth called the employee a terrorist?

A. Right. And it came directly from whatever this was. Right. That had her -- her, yeah. Took it from here.

Q. Okay.

A. What -- what it was.

Q. Okay. All right. And then if you look on Page 2 under law fair against the Jewish journalist ---

A. Yeah.

Q. You say, this wasn't justice. It was revenge. They punished me for objecting to open support for Hamas in grocery store.

A.    Uh-huh.  (Affirmative)

Q.    And they did it to send a message.

A.    Yes.

Q.    Who are you talking about?

A.    Well, I believe it was police.  I believe it was police.  And, you know, the police orchestrated this arrest in concert with -- according to your reports and according to the depositions.  I mean, the police did it.  They're the government actors.  The corporate actors are Harris Teeter.  And I think when the biggest grocery store chain in North America, and anyway teams up with or in any way works with government officials to penalize somebody for complaining about antisemitism, that's my qualm here.

Q.    Uh-huh.  (Affirmative)

MR. BRUCE:  Before we go on, I think there's a page missing from ours.  Can you just show her that -- that portion that you were looking at, just, I know she's already answered?  Just can you just see what you ---

THE WITNESS:  I think ---

MR. HARTZOG:  Yeah.  Did it copy wrong?

MR. BRUCE:  I -- yeah.  I don't

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 185 of 267

have a second page that ---

MR. HARTZOG:  I'm sorry about that.

MR. BRUCE:  -- you're talking about.

MR. HARTZOG:  I probably ran it through the printer on one sided.

MR. BRUCE:  I just wanted to make sure you had a chance to look at that ---

MR. HARTZOG:  Yes.  Thank you for ---

THE WITNESS:  Okay.

MR. BRUCE:  --- and then that confirmed your answer.

MR. HARTZOG:  --- calling that my attention.

THE WITNESS:  Yes, I do see that.

MR. HARTZOG:  Okay.  I just wanted -- yeah.

MR. BRUCE:  Just wanted to make sure ---

MR. HARTZOG:  Since I showed you an incomplete document.

THE WITNESS:  Oh, okay.  Okay, I got you.

Q.    (Mr. Hartzog) Okay.  I also wanted to

ask you, if I can hand you what I'll mark as K.

(EXHIBIT K WAS MARKED)

A. K. And to be clear, I -- these were my personal documents.

Q. Okay. That's ---

A. I can't confirm like, if I sent this out, but your discovery requested everything that I had written, and so some of these were not sent. I mean, just so you know.

Q. Yeah. No. I -- I appreciate that.

A. This -- this could be between me and me, so ---

Q. And that's partly why I'm asking?

A. Yeah. Okay. I ---

Q. So that I understand the context?

A. I am ---

Q. So this is a document written by you?

A. It's been a long time ago. I mean, it appears to be so far and I gave it to you so I know that I had it.

Q. Yes.

A. Okay.

Q. I guess one of my questions is, do you remember writing this?

A. No.

Q. Okay.

A. So I'm a pretty prolific writer, so I ---

Q. Understood.

A. --- can crank out some.

Q. This appears to be written in the style of the news article, was that it's intent?

A. I don't recall.

Q. Okay. Do you ---

A. I -- I do write a lot of drafts of stuff and never actually publish it.

Q. Sure.

A. So ---

Q. Okay. So we don't know -- looking at this document, whether you published it or not?

A. I can tell I didn't publish it.

Q. Okay.

A. I know what I publish.

Q. Okay. This was just written as a potential draft of an article, it looks like; is that correct?

A. Yeah. And it's notes and playing around with stuff, which is my form. But you asked for everything and I gave it to you.

Q. I appreciate that. Do you know when

this was written?

A.    It -- it seems to be, you know, I worked with The RAIR Foundation who's a foundation that documents antisemitism.  And this might have been a draft that they wrote or I helped write because it appears to be around the time that this article was published about me, and I don't remember when that was, so ---

Q.    Okay.

A.    Okay.  March -- beginning of March.

Q.    Okay.  You think roughly beginning of March?

A.    Yes.  2025.

Q.    Okay.  Okay.  All right.  Couple of questions ---

A.    Sure.

Q.    --- here.  Once again we've got terror support in there as characterizing her as supporting terror, correct?

A.    Yeah.  This doesn't appear to be written by me because ---

Q.    Oh.

A.    --- it's like Rachmuth explained, blah, blah, blah.  What I believe we're looking at here is a -- a draft that a journalist sent me.  So the

way it works is, I, you know, they would send me a draft to show them -- show me how far along they are and this is -- this -- I believe is what I'm looking at.

Q. So you don't think you write this?

A. I really don't. No, I don't remember it, but I -- I don't.

Q. Why would you have it? I assume that because it was produced to us in this format.

A. Yeah.

Q. Why would you have just the standalone document not attached to an email or anything like that?

A. I don't know. I mean, because I -- one -- one thing is I could have downloaded it. Someone could have sent it to me and said, Hey, will -- will you review this? And I'm like, sure and downloaded it.

Q. Okay. Have you reviewed this? Did you review it?

A. I don't recall.

Q. Okay. Is there anything in here that you think is inaccurate?

A. May I read it?

Q. Sure.

A.   Okay.  No.  This is not written by me. This is written in another journalist language.

Q.   Okay.

A.   And this was, you know, notes on this. And I'll be clear, I don't -- I don't know what I did with this.

Q.   Okay.

A.   But I know I received it and I know you asked for it and you've had it.  So ---

Q.   You do refer to yourself as me in here?

A.   Can I see that?

Q.   It's on the first page, the last full paragraph?

A.   I don't know.  I mean, that could have been a quote that they were going to use.  I -- I see that.

Q.   Okay.

A.   I am -- this is -- this is notes that another journalist, yeah.

Q.   Okay.  But it -- it presumably she got a lot of the information from you?

A.   Appears so.  Yes.

Q.   Okay.  So ---

A.   Yeah.

Q.   --- question stands, anything in here

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 191 of 267

that you believe is inaccurate?

A. Okay. Is there a specific thing you want me to verify and ask me if it's true? Because ---

Q. Well, I -- I'm just kind of wondering if -- if you think this is an accurate portrayal. I can ask you specifics if you like, but ---

A. Please.

Q. Okay. One question. You -- you say when you posted this on X, this initial post, that you were frustrated with what you had gone through in Harris Teeter; is that accurate?

A. I was disappointed, yeah.

Q. Okay. "Frustrated," is the word used here? Would you use that word?

A. I mean, what would frustrated mean? Disappointed?

Q. Well, I'm just asking if that's an accurate characterization of how you felt when you posted this X post.

A. To be told to like it or leave. I -- I might've been, but I can't recall how exactly I felt. I felt a lot of emotions that day. I really felt disappointed. I mean, that's the one that's really come up -- up to me. I mean, again,

this store has been a part of my life since I was a little girl.

Q.   Uh-huh.  (Affirmative)

A.   This is like my store and be told I'm unwelcome -- very, it was very upsetting.  Yeah.

MR. BRUCE:  Can you ---

THE WITNESS:  Upsetting --

MR. BRUCE:  Sorry.  Can you point her to where they didn't ---

THE WITNESS:  I saw it.

MR. BRUCE:  You saw it, okay.

MR. HARTZOG:  On Page 2.

MR. BRUCE:  I just wanted to make sure.

THE WITNESS:  Yeah.

MR. HARTZOG:  Yeah.

THE WITNESS:  I think we're on the same page.  Yeah.

MR. BRUCE:  Apparently, I'm not.  But ---

THE WITNESS:  You're on the same page.

Q.   (Mr. Hartzog) All right.  On under the timeline of political rest, the third bullet point?

A.   Okay.

Q.   Talking about the incident report, having the -- the label anti-Islamic Muslim?

A.   Uh-huh.  (Affirmative)

Q.   Say, that suggests that law enforcement intentionally frame the situation as a bias motivated offense.  This classification raises serious concerns about whether the police exaggerated or misrepresented the nature of the allegations to justify your arrest?

A.   Yes.

Q.   What do you believe -- what do you believe they exaggerated or misrepresented?

A.   Oh, I do believe that.  And I do -- I can tell you one reason why when you look at the timestamps, this part, I'm being very specific. This part of the document that I have, okay?  The timestamp ---

Q.   And just so I know what you're referring to?

A.   Sure.  I'll tell you the page.  So when you go to Page 4.

Q.   Of the incident report that I handed you?

A.   Yes.

Q.    Okay.

A.    When you go to Page 4, I'd really like to see the one that we submitted because it -- it had a -- a time and a date on it.  And what really struck out -- stuck out to me was, it was the day after the warrant was issued.  And then Officer Warren confirmed in his deposition that he had in fact filled this out the day after the warrant. And so, you know, again, I'm looking at the dates and I'm thinking, wow, the warrant was one day, I was arrested, and then after this narrative was created, so I felt ---

Q.    (Indiscernible).

A.    Yeah.  I felt ---

Q.    Is there anything in the narrative that you think is --- well, I mean, you ---

A.    Should be done right?

Q.    --- you believe it's false ---

A.    In fact, it's so false.

Q.    that you called her terrorist, but do you ---

A.    All three it -- it all three of these officers under oath disagreed with that labeling. All three of them said the same thing.  I wasn't violent.  They didn't consider me a threat, and

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 195 of 267

they did not consider that I perpetrated an anti-Muslim Islamic hate crime. And they all three had no idea how this got labeled. It was mystifying to them. So I would say the three officers, and I agree on one thing on this, that I was not guilty of any anti-Muslim, anti-Islamic bias. We all are in agreement.

Q. Right. Nor were you charged with that. Were you?

A. Well, I was.

Q. Well, you were charged with cyberstalking?

A. Right.

Q. But you weren't charged with any sort of hate crime?

A. You'll have to do -- well, a hate crime. There is no hate crime in North Carolina. It is an additional charge that must be investigated after an initial arrest, and it can be an enhancer to either a misdemeanor or a felony.

Q. Okay.

A. So it is -- that's the only vehicle to my knowledge, I'm not a lawyer, but ---

Q. You're never charged with it?

A. But you wouldn't be able to charge, I

mean, my understanding, please correct me if I'm wrong. Here's how that would work. My understanding, you would be arrested for cyberstalking or maybe vandalism.

Q. Uh-huh. (Affirmative)

A. Okay? Then they would put this in your narrative, full stop. The directives of most police departments are to say, wow. And the DA, wow, is there an enhancer on this? In fact, it kicks it up to like H felony if you're a cyberstalking, for instance. So you would not be able to be charged with it because it isn't a statute, it is an enhancement.

Q. Uh-huh. (Affirmative)

A. And so the directive I think we read during the deposition from the police department is, that would be the next step. So I was under investigation at that time for a hate crime, which would've put me in jail, I believe. Don't quote me for an extra 120 days. So ---

Q. You say you were under investigation? Who told you that?

A. Well, what was confirmed is a directive, and the officers, I believe, confirmed that the directive with Holly Springs police says that if

you have this -- this bias category checked out, then it will go to be investigated. My understanding is what -- what happens then is that when you are prosecuted for cyberstalking, in my case, that would be an enhancement.

Q. Uh-huh. (Affirmative)

A. And that is the only vehicle that I know of in North Carolina for a hate crime under a state statute. So in other words, they can't -- my understanding is they can't charge it right away. It's a two-step process.

Q. Okay.

A. And so, was I on track to be charged with a hate crime according to Holly Springs police directive? Yes, I was. But actually the -- the officers did not agree with that. But what I want, I mean, which had me thinking, if these officers really believed that I -- I called this woman a terrorist to her face, and I was a minister to her specifically because of that, why did they all three, This is what I'm warning in myself, why did they all three disagree that category should never have been checked off. They said they don't know how it got checked off and they disagreed with it.

Q. Okay.

A. I asked myself. I -- okay.

Q. I mean, you would agree. You did call her a terror supporter online and -- and affirmed people who called her that.

A. A Hamas supporter, which is a political movement. That is my understanding. That is my understanding. I, you know, I've watched footage from October 7th, hours of it. I don't recommend you do it, but every single terrorist, almost without exception, was wearing a keffiyeh. I've watched hundreds of Hamas press conferences, not willingly. This is not fun. Every one of them, without exception, is wrapped in a keffiyeh. So when I see folks wear it knowingly, by the way, someone could have said, oh no, it's just, you know, whatever. I mean, because I -- I held out the possibility for that. Do you know what I mean? I -- I did. When we had our conversation, very pleasant conversation.

Q. When you asked her, if it was a Halloween costume?

A. Yes. Well, I'd seen her there. I -- I've -- I've seen and walk with plenty of people from -- from everywhere. I -- you don't know, but

when you say Free Palestine, I can make a -- a reasonable calculation based on my lived experience, may not be yours. It's mine. I'm entitled to that. So kind of losing my track and I do apologize. So I would never and did not call her a terrorist. That is rude, uncalled for, would never do it. If I knew someone did that, I would never approve of that behavior. My supporter is a fair characterization based on my lived experience. But not only that, the ADL if you want me to appeal to authority.

Q. Well, and -- and again, to clarify, you've -- you've called her a Hamas supporter and a terrorist supporter, correct?

A. Well ---

Q. We're -- we just ---

A. I don't see a distinction in -- in some cases, but in particular after I do some due diligence, right?

Q. Uh-huh. (Affirmative)

A. And I -- I figure out -- and oh, by the way I did that after -- I did that after. And oh, by the way, I've never -- I've never publicly said her name to my knowledge. I -- I -- I don't, because you know why? Because it's not -- it's

not pertinent to the story.  It's irrelevant.
It's Harris Teeter.

Q.  Okay.

A.  And it's the cops, police officers.

Q.  Yeah.  In your mind, there is no distinction between a Hamas supporter and a terrorist supporter?

MR. BRUCE:  Objection to form.

Q.  (Mr. Hartzog) That's what you just said, right?

A.  It depends on the context.  Well, if you support Hamas, you do support terrorism.  Yeah.

Q.  Okay.

A.  Yeah.  I mean, terrorism -- look, terrorism is a goal to reach political objectives. I don't agree with it.  Some people may and some people do.

Q.  Uh-huh.  (Affirmative)

A.  As a Jew, I find it unwelcoming in a store and I feel unsafe.  And by the way, maybe if you read through the comments, I think you have, you may find a lot of people that will frequent Harris Teeter just because of that.

Q.  So some people may think she's a terrorist because of what you said, some people

may go shop, adhere too, anyway?

A. Absolutely. It's America.

Q. Okay. One more question here. Let me ask you, this will be L?

(EXHIBIT L WAS MARKED)

A. Yes.

Q. Who is Amy Mek?

A. She is the reporter on a story that you read.

Q. Okay. And where -- was this story eventually published?

A. Yes. RAIR Foundation.

Q. Okay.

A. I believe I submitted that also.

Q. All right. And it looks like she sent this to you for review and comment before she published?

A. She did. And I would've included that email, what I sent to her back. Yes.

Q. Okay. So did you -- was there anything in here that you said, oh no, you need to change that?

A. I can't recall.

Q. Okay. Looking at it now, and I'll give you a few minutes to look, is there anything that

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 202 of 267

you think needed to be changed?

A. I'm mute. Is there something that you want me to ---

Q. Well, I'm just asking if -- when you got this, you -- you said, oh yeah, that looks correct, or ---

A. Well, that I can't confirm. I -- but I can ---

Q. That's fine.

A. --- promise you every email that I sent.

Q. Yeah.

A. I'm very fastidious you would have it. I turn that over.

Q. Okay. Well, let's go to where it says bottom Page 38.

A. Okay. Yes.

Q. And I'm looking at the paragraph tied 4th complaint posting on X.

A. Okay.

Q. All right. And it says 9:54 a.m., you posted about the incident on X tagging Harris Teeter customer service, right?

A. Yeah.

Q. And then in the thread following, you made all of these comments, correct?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 203 of 267

A. I mean, they -- they look pretty similar, the ones we reviewed.

Q. Okay. Multiple comments like that. Would that be repeated communication about this?

A. Would not be ---

MR. BRUCE: Objection, calls for a legal conclusion.

Q. (Mr. Hartzog) Okay. Why do you think it's not repeated communication?

A. Well ---

Q. You can answer.

A. Okay. It's a response and a repeated communication to a corporation?

Q. No, not -- not what the statute says.

MR. BRUCE: Objection, I don't know if she knows what the statute says about that.

Q. (Mr. Hartzog) Sorry. Go ahead.

A. Okay. The -- well, I can read the statute if you ---

Q. I'm just asking. So I'll -- I'll tell you. The statute says email or electron communicate to another repeatedly. My question is, did you -- you communicated electronically, correct?

A. But -- but to ---

MR. BRUCE: Objection. Hold on. Objection, calls for a legal conclusion.

Q. (Mr. Hartzog) Okay. Did you communicate electronically?

MR. BRUCE: Objection, calls for legal conclusion.

MR. HARTZOG: I'm not sure that does, but go ahead.

THE WITNESS: Did I communicate electronically with a corporation?

Q. (Mr. Hartzog) No. Not my question. Did you communicate electronically with another person?

A. No.

Q. No?

A. Nope.

Q. Okay. These aren't public posts?

A. What specific person -- can you please -- what specific person are you in question? Because I want to be honest with you.

Q. Okay. Let's take specific person out of it. Did you communicate electronically?

MR. BRUCE: Objection, in the context calls for legal ---

Q. (Mr. Hartzog) Are these statements made

on the internet?

A.   On the internet?  Yes.

Q.   Did you use an electronic device to put them on the internet?

A.   I did.  However, these are a response to different people.

Q.   Right.

A.   Right?

Q.   Would that be a conversation?

A.   About -- yeah.  About a corporation and -- and their support for a certain political movement?  It's about, yes.

Q.   Okay.  All right.

A.   I'm just trying to be exact.  I mean.

Q.   No, I appreciate that.

A.   I don't, on X, yeah.

Q.   Exact is important when we're doing these things.  That's fine.  So, okay.  You used an electronic device to communicate these comments, correct?

A.   Right.

Q.   Okay.  To the public, right?

A.   Okay.  To the public.

Q.   Okay.  Right?

A.   Yes.

Q. In conversation about it ensued in which you engaged in conversation with people in your comment section, correct?

A. Yes.

Q. Okay. And you mentioned this employee, not by name, but you posted her picture and her face, and in your third comment you disclosed the location of the store, you said ---

A. I responded to someone.

Q. You said she was pro terror, right?

A. The context, I'm ---

MR. BRUCE: Just going to object to form. I don't -- I don't know what we're talking about anymore.

THE WITNESS: I ---

Q. (Mr. Hartzog) Well, it says here -- the comment right here ---

A. I'll get some first ---

Q. The -- the fourth bullet point, you say pro terror political statements?

A. Political statements, yes.

Q. Right. And you're referring to the political statement of this -- of the employee?

A. Of?

Q. Of Harris's Teeter?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 207 of 267

A. In general. Absolutely. Because look, a manager stood behind it. It's not just the employee. Again, if it were the employee, I, you know, I -- I -- it's me telling the -- the manager, I feel unwelcome as a Jew. And some people will find that.

Q. Right.

A. Some will ---

Q. Because of your employee?

A. Because of the manager's endorsement of the employee.

Q. Okay.

A. And telling me that's the pervading -- that's the -- it's free decor, if you will, of Harris Teeter. And you could either like it or leave. That's news to me.

Q. Uh-huh. (Affirmative)

A. It -- it was a news thing to me, and I'll never go there again.

Q. Okay.

A. I -- I've had people communicate directly to me, the PLE changing my email address, changing everything to me directly with direct threats. And I've reported that to Holly Springs police. And so -- and you know what they told me?

That was free speech. They told me repeatedly that if I were to send a Jew -- Jew should die. They -- they made up the Holocaust. Israelis should be hunted down and killed, like what they're doing to Arabs.

When someone sends that directly to my email, when I keep asking them not to or change my email address or whatever, I was under the impression that that was free speech, because that's what the police department told me repeatedly. They said that they could send emails about me trying to destroy me personally, and my husband and my extended family. They said that that was free speech. The FBI said differently because they intervened twice.

Q. Uh-huh. (Affirmative)

A. So if I were to go by the standard that your departments -- the police department said, what you're talking about, they would laugh in my face.

Q. Okay. Well, you ---

A. Because they have ---

Q. You keep saying the police department and you understand you've sued three police officers?

A.    Right.

Q.    Not the police department, not Holly Springs?

A.    Well, I -- my understanding, and I could be wrong, is that they were trained and Melissa Ottaway, had some involvement here.  And I did speak with her in a darn near two hour meeting with the police chief about these very complaints I was receiving.  And so I find it remarkable that -- that free speech included threatening and intimidating Jews in their home with known actors.  I found it remarkable that that was free speech and that complaining at Harris Teeter was not.

Q.    Do you think what you've dealt with is cyberstalking?

A.    Putting my address out there incessantly, contacting me personally in my home, identifying my family members where they work, going after them and threatening to kill the CEO of my husband's company, things like that.  Not only I do, the FBI does.

Q.    Okay.

A.    So, and -- and by the way, that same -- I'm sorry.

Q.    Go ahead.

A.    I apologize.

Q.    No, you're good.

A.    That same incident your town lawyer said, he waited in on it and said, this is perfectly fine.  It's legal speech.  Your police chief said that.  And, you know, I've seen Mr. Stefano, in these meetings, et cetera, and I -- I mean, for me, I'm a little surprised that he's endorsing, cyberstalking in one way, but saying that at my home, I can be threatened to be killed or incited against people come to get me with my address, my home address, because I am a Jew and have my husband fired.  By the way, all these communications are from one person.  It's not just a one off.  These are your 60 and 70 and 80 and 90 and a hundred times contacting me directly to person.

Q.    Are any of the officers named as defendants in this case?  Were they involved in any of that, to your knowledge?

A.    Melissa Ottaway, was and the way that they made it sound is that she was involved in this.  And so that means she's their head of training.  It just has me a lot of questions.  And as I said, your town lawyer has weighed in on this

matter twice personally, and twice he has said in two separate incidents with two separate suspects in my case that, that was free speech. And so he's a -- also a witness in this case. In my opinion, I -- in other words, they say that Melissa Ottaway, Sergeant, I want to call her the right name, had a hand in this also. And so that's all I know.

Q. Okay.

A. And as did the town lawyer, on two separate instance.

Q. Okay.

A. And -- and they were to -- in my mind, they're related. And I ---

Q. What about Elliot Warren? Would -- did he have any involvement in your prior complaints to your knowledge?

A. Not to my knowledge.

Q. Okay. How about Benjamin Marino? Did he have any involvement in your prior complaints to your knowledge?

A. Benjamin Marino, said that he relied on the consult and advice of Sergeant Melissa Ottaway, who did.

Q. Okay. But Benjamin Marino did not?

A. Not to my knowledge.

Q. Okay. Edgar Hernandez?

A. Edgar Hernandez, said he relied on the advising consent of Melissa Ottaway who did have involvement.

Q. But Edgar Hernandez, did not, correct?

A. Not to my knowledge.

Q. Okay. So none of the three named defendants, to your knowledge, were involved in anything looking into your -- the cyberstalking charges that you wanted to bring?

A. Well, they would be aware of them.

Q. How do you figure that?

A. Well, because in the testimony of officer Warren and I believe, one of the other officers, they intimated the exact system they used -- they used to look up, you know, if you're going, if -- if -- if there's a bad actor John Doe. They described the process by which they go the -- the CJLEADS is one, and there were two others. Well, I verified what each of those systems pull up. So whatever they would use -- use, and they also volunteered this information. The immediate screen would put up, the zone they live in and prior complaints that they had made

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 213 of 267

with the police.

So I'm -- a reasonable person could assume, and this one does, that they did know that I had made complaints. I had complaint numbers. And it makes sense for their own safety why they would want to see, you know, before you serve a warrant, before you do anything you want to say, gosh. Okay, when has this person interacted with the police department before? All three of the systems that they could have used and that they named, et cetera. I verified the screens. Bring that up.

I also talked to, you know, police, not about this case, but I've talked to them because I work with them. I've written along in cars. How do they do it? Vape shops, for instance. Well, I've been in the car and they run same system connected to the SBI. They run it. I've seen it myself. I've asked questions about it myself. Because if you don't know who you're dealing with ---

Q. Okay, so you're ---

A. So I -- I think they knew.

Q. Okay. You're -- you're speculating that they probably knew?

A.   I am.

Q.   But you don't have any personal information that they were aware of the nature of the charges that you wanted to bring?

A.   I don't have personal information.

Q.   Okay.  All right.  Let me ask you for example, Edgar Hernandez, what is your contention of what he did wrong in this case?

A.   Well, a lot.

Q.   Okay.

A.   I would say that any officer who doesn't know the First Amendment should not be carrying a badge in the United States.  Any officer that isn't well versed.  And so I -- I think I would start -- I would start there.  I would also say that not ---

Q.   Before we move on from that, let me ask you about that.

A.   Yeah.

Q.   Why do you say he didn't know the First Amendment?

A.   In his deposition, he said he didn't.

Q.   Okay.  What about knowing the First Amendment in this context, do you think he should have known?

A. Well, you don't arrest someone for non-threatening social media posts. It's political in nature.

Q. Is it your testimony then, or your belief that any social media post, as long as it is non-threatening, is not criminal?

A. Well, I'm not an expert.

Q. Okay. So you don't know?

A. But this is non-threatening.

Q. Okay.

A. Well, I have an indication because the DA immediately dropped it and I talked to her on the phone. And ---

Q. Do you think being called a terrorist supporter is embarrassing?

A. I don't know.

Q. Do you think ---

A. I can't speculate.

Q. Would a reasonable person be embarrassed to be called a terrorist supporter?

A. What is a reasonable person in this context? There are a lot of people that do not take offense to it. What can I say?

Q. Okay. Well, if this employee did take offense to it, do you think that's a reasonable

reaction?

A. I don't know. I can't speculate on a reaction. I don't know it.

Q. Okay. Do you think it -- did she would be reasonably feel threatened that you posted her picture and her place of work and called her a terrorist supporter?

A. I don't think ---

MR. BRUCE: Objection, calls for speculation.

THE WITNESS: I don't think I can speculate on that.

Q. (Mr. Hartzog) Okay. I mean, you don't -- do you think it's unreasonable to think that?

A. I'm not going to speculate either way. I mean, what people think is, you know, individual to them.

Q. Okay. So an officer trying to decide if there was a violation of statute would have to ---

A. He didn't. He admitted in his deposition, he had no clue. They admitted him and Marino -- Officer Marino, pardon me, admitted they hadn't a clue what law that I broke, but they wanted to go and find one. And to do that, they consulted with Lieutenant Derrick Brock, I believe

Derrick Brock and Melissa Ottaway. And then it was my understanding that Lieutenant Brock walked away and that Melissa Ottaway and these two officers dug in to find something. So, and -- and what was remarkable to me is both officers that talked about said, that they read the statute, but they were not aware of what it actually meant. So ---

Q. So basically they consulted with a superior officer to try to find the right charge.

A. Well, it wasn't like due diligence because again, if it were, then they would know the statute. So in other words, you know, that was what was confounding. Because if you, if you looked at it, right? Well, first of all, we have procedure. Both of them admit that they almost always interview the person being accused of something. They each had different reasons not to. And I'll quote Officer Marino, we didn't need to interview her. We had a post.

Q. Right.

A. And then Officer Warren said, he would've absolutely interviewed me, were I to live in his district. So I'm not sure what the reality is, but intent, I think it matters in speech,

right?

Q. How so?

MR. BRUCE: Objection.

THE WITNESS: My speech is political.

MR. BRUCE: Objection, calls for ---

MR. HARTZOG: I'm asking what she means?

MR. BRUCE: I understand. Go ahead.

THE WITNESS: Political speech?

Q. (Mr. Hartzog) What do you mean intent matters?

A. Well, the intent of the speaker matters, right? I mean, okay.

Q. Okay. Are you saying that they should have interviewed you?

A. They are saying they should have interviewed me.

Q. Okay. Are -- and you're faulting them and -- and this lawsuit is saying that's a -- that's a wrong against you that they committed; is that right?

MR. BRUCE: I'm just going to

object to this line of questioning.  I mean, what her interpretation of their deposition or what they did wrong doesn't have any bearing and calls for legal conclusions about that.  Go head.

MR. HARTZOG:  Well, she's -- she's suing them and I'm -- I'm entitled to ask why.

MR. BRUCE:  Sure.  But I just saying.

MR. HARTZOG:  And what they did wrong.

MR. BRUCE:  It doesn't -- it doesn't have any bearing on the case.  Ultimately litigated is what I'm trying to get on the record.

MR. HARTZOG:  Okay.

MR. BRUCE:  But go ahead.

THE WITNESS:  What's wrong is I was arrested in front of my children and tagged with a hate crime.  I wasn't allowed to -- my breasts were almost completely hanging out of my shirt.  I was in my night clothes.  They would not allow me to put on a shirt.  They parked five or six houses away.  To march me in front of my neighbors.  I had a panic attack in the car.  By the way, I haven't had a panic attack since the Boston Marathon.  Not one.  I had a panic attack in the

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 220 of 267

back of the car. They taunted me and did nothing -- nothing -- nothing about it. They allowed me to bring my water, did nothing about it.

They humiliated me and arrested me without even asking a question. They absolutely -- absolutely are responsible. In fact, you know, while I was being arrested, I said, the law you're referring to has a cutout for political speech. And this was political. Officer Marino agreed with me. He actually agreed with me. I told him what the law was, arrested me anyway.

Q. Well, at that point they had an arrest warrant, correct?

A. Initiated by his FTO. He initiated it. In other words, it's as if he initiated himself. And at any point they could have backed off. Didn't at all.

Q. What do you think -- do you -- do you believe they -- I think you say in your lawsuit or somewhere that incorrect information was provided to the magistrate. Is that a contention that you're making in this case? And if not, just let me know.

A. Well, I hate to keep going back to this. I mean, I -- I learned a lot in the depositions,

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 221 of 267

and I learned that the post wasn't submitted.  You said the comments were part of this warrant or part of this charge, and yet the officers say they were, you know, warrant says they were never submitted.  I want to say Marino did too, but the comments weren't submitted.  And so I'm not an expert.

Q.  Yeah.  I don't believe that's accurate, but go ahead.

A.  Okay.

MR. BRUCE:  I mean, you're asking her what she -- she understands?

MR. HARTZOG:  I am.

A.  I -- I'm doing the best I can.

Q.  (Mr. Hartzog) Okay.

A.  I, you know ---

Q.  Understand.  Will you tell me -- tell me.

A.  Do I think ---

Q.  Yeah.

A.  Do I think inaccurate?  I mean, look, I, you know, I learned a lot from the depositions and what warrants should have.  And I -- if I'm arrested for a post, because during the arrest, it's really what they focused on when they were

arresting me and the post wasn't given to the magistrate. And you say the comments were important and they were never given to the magistrate according to them. I see something wrong about it.

Q. Okay.

A. I'm a layman.

Q. Right. So ---

A. And it affected me though.

Q. So your contention is that the post nor the comments were disclosed to the magistrate?

A. That's the contention of two officers under oath.

Q. Okay. And is that the basis for your contention, that the -- the warrant was invalid?

A. So many more things.

Q. Okay. Tell me what else?

A. Well, again, I -- it's -- this is a legal document, legal process. We know that I'm a layman, right?

Q. That's fine.

A. So I'm just clarifying.

Q. In your best information here?

A. I never called anyone a terrorist in that store, ever.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 223 of 267

Q. Okay.

A. Had they asked me, that is exactly what I'd told them.

Q. But you agree that the manager said you did?

A. I don't agree with that. I didn't see her do it.

Q. You don't dispute that she said you did?

A. I have no way of knowing.

Q. You've posted online that she said you called her ---

A. Well, I mean, according to the documents, but again, the watershed moment for me was sitting through those depositions and realizing I couldn't really depend on anything I was hearing or reading.

Q. Okay. All right. So we talked about -- I want to make sure I exhaust this topic. So your contention about, you know, the magistrate not having the right information is based on your belief that the post and the comments were not disclosed to the magistrate, correct?

A. It's based on the sworn testimony of two officers in this case.

Q. Okay. And the fact that you dispute

that the manager or you dispute calling the employee a terrorist when you were there?

A. I never did that.

Q. I understand. Is there anything else that you believe was inaccurate or incomplete with the presentation of the magistrate?

A. I can't say right now.

Q. Okay. Why not?

A. Those are the two things that stand. Well, those are the two things that stand out.

Q. Do you have any other knowledge of anything sitting here today that you believe was not told to the magistrate or was incorrectly told to the magistrate?

A. Well, I'm going to have to review that. I mean, I ---

Q. Okay.

A. I want to be -- those are two things that stand out to me now.

Q. Okay. Well take your time. This is my chance to ask you this question.

A. That's right. That stand out in the warrant.

Q. Well, that's my question.

A. Okay.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 225 of 267

Q. When they -- when they sought the arrest warrant and they met with the magistrate ---

A. Yes. One thing, other thing that stands out, I never, ever took pictures of someone for the purpose of terrifying, annoying or embarrassing. That is a flat out lie.

Q. That would involve intent, right?

A. I guess so, yes.

Q. Okay.

A. Never.

Q. Yeah. Why did you take the pictures?

A. I wanted to document what was happening. I'd never seen personally, you know, I'd seen maybe hundreds of posts where this person working at Walgreens or Reiss is wearing the keffiyeh or this medical clinic or whatever, blah, blah, blah. I had never personally seen it. And I cover a lot in North Carolina. I -- I -- in North Carolina at that time, I hadn't even heard of it.

Q. Yeah.

A. For me that documenting things is a second skin. Maybe I use it, maybe I don't. I mean, I'm a big documenter. It -- sometimes for my own reasons. That was so struggling to me and remarkable that it was automatic, you know?

Q.   Okay.

A.   It -- in fact, you know, I looked at customer service.  I -- I didn't even know Harris Teeter had a customer service Twitter until I looked at it.  And all kinds of people document all kinds of things in stores.  Did you know that?  And Harris Teeter and tag them with bad behavior, rotten meat, they take a picture of a line being closed.  It's not remarkable to document things in Harris Teeter specifically, so ---

Q.   Right.

Q.   No.  I -- I think it's the calling her a terrorist supporter is the -- the issue here?

A.   Well, it's not an issue for a lot of people.  It's a matter of free speech.

Q.   Okay.  And then that gets back to my question.  Just so I understand, you believe you have a First Amendment right to call her a terrorist supporter?

A.   I believe my post stands.

Q.   And you stand by it, correct?

A.   Yes.

Q.   Okay.

A.   I want to find the warrant.  I want to answer your question.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 227 of 267

Q. Okay.

MR. BRUCE: I mean, okay.

THE WITNESS: All right. I ---

Q. (Mr. Hartzog) I mean, I do want you to answer my questions. So ---

MR. BRUCE: I think she's fully answered your question, but if you have more to add?

Q. (Mr. Hartzog) If there's anything else I do want to know. If there's not, we can move on?

A. Okay. It's not.

Q. This is your chance to tell me.

A. Well, I ---

MR. BRUCE: Can you -- can you -- hold on. We -- can you rephrase whatever question here?

MR. HARTZOG: Yeah. So ---

THE WITNESS: And I don't have the warrant. I don't think I have the warrant to be honest with you.

Q. (Mr. Hartzog) Okay. All right. Paragraph 46 of your complaint, you say, but the warrant and report are based on incomplete and misleading information. They omit important facts that would've alerted a magistrate that defendants

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 228 of 267

lacked probable cause to arrest Ms. Rachmuth, for example, neither the warrant nor the report explains the basis, for the charge was a single social media post. Further, neither the warrant nor the report explains the clear context in which the post was made commentary on a major political issue of the day.

A.    Yeah.

Q.    Is there anything else that you believe was left out or should have been told to the magistrate or was in -- it was false?

A.    The other things I just said.

MR. BRUCE:  Well, hold on.  I'm just going to object that she can say her understanding, but like, ultimately that's going to be proven to trial through everything in discovery.

MR. HARTZOG:  I -- I understand, but I -- I do want her understanding?

THE WITNESS:  I understand so well, I think I already answered it.

Q.    (Mr. Hartzog) Okay.

A.    That would be after the deposition posted, the comments were added according to sworn testimony of the officers.  And so if I'm arrested

for a post that seems to matter.

Q. Okay. Other than what we've already talked about ---

A. Yes.

Q. Is there anything else that you believe was false that was told to the magistrate?

A. I mean, not that I'm aware of, but again, you haven't provided me with a warrant, so I can't reference it.

Q. You attached the warrant in your complaints. You've seen the warrant.

A. Okay. Well, what I attested to stands.

Q. Okay. Beyond what you say in paragraph 46, sitting here today, you can't think of anything ---

MR. BRUCE: Same Objection from earlier.

A. Well, again, in the deposition, now we have confirmation that they did not include those. So that's all -- that's what I would add.

Q. (Mr. Hartzog) Okay. Anything else you'd add?

A. I did not call anyone a terrorist, and I would not do that in that store, period.

Q. Why wouldn't you do that?

A.    Well, because for the main -- well, you know, this is my home.  It's a mile from my store. I'm not trying to cause controversy.  I'm trying to make it -- I'm trying to get my point across that you may not know this, but it's not welcoming.  Right?  I go to protests all the time and everyone -- everyone is in a Keffiyeh except for me.  Me going out and saying, you support terror is pointless because it doesn't bother them.  It's not -- it's -- it's not-- it's not an issue.  Corporate speech is an issue because you're allowed to support whatever you want in this country.  But corporate speech that's where it becomes different, political speech, corporate speech.

Q.    In your mind, is there a distinction between -- well strike that.

All right.  Your complaint also says that you did not electronically communicate repeatedly because you only made a single social media post and never communicated with the employee directly, correct?

A.    Never.

Q.    Right.  But in your single social media post, you made multiple comments, correct?

A.    Responded.

Q.    Right.

A.    Yes.

Q.    And -- and had a conversation with people about this.

A.    Had a conversation with various, but speaking about the situation and the environment at Harris Teeter?

Q.    And about the employee.

A.    About the environment at Harris Teeter. Yes.

Q.    Do you dispute that you made comments about the employee?

A.    Well, the employee is the environment at Harris Teeter.

Q.    Okay.  So when you say the environment at Harris Teeter, you're talking about the employee.

A.    I'm talking about the corporate speed -- the environment, the -- the whole thing.  You're trying to single out one part of this, and I'm trying to be very clear, it's the context, the totality of this.  I disagree firmly with your characterization that you can take one element out of this.

Q. Okay.

A. I disagree, and I've kept disagreeing with that.

Q. Right.

A. If this woman had walked on the sidewalk or been a shopper or that's the same person, right? The same thing, et cetera. Totally different context. This is corporate speech when endorsed by the manager. This is corporate speech. That's why I included the details.

Q. Okay. All right. Tell me about the treatment you've received for this. Have you -- have you undergone counseling about this?

A. I have.

Q. Tell me about that.

A. Well, before this I was having medication management. And what that means is you go every month to somebody. In my case, it was a nurse practitioner. I take medication for ADHD. I was diagnosed at 24 -- 24 or 25, something like that. And I've been taking stuff, same medication since -- so it's managed, right?

Q. Uh-huh. (Affirmative)

A. I also had trouble sleeping after a terror attack, and so I take things for sleep.

And so in the state of North Carolina to do that you have medication management. Now, I haven't been to talk therapy since right after -- I think right after the Boston Marathon. So now I also go and see a regular therapy. In other words, one -- I've been on medication management for a while, but now I'm in therapy. So that's been different for me.

Q. Okay. And you said you were in therapy previously after the Boston Marathon?

A. Yes.

Q. Okay. Have you ever had therapy prior to that?

A. Yes.

Q. Okay. When's the first time you had therapy?

A. Probably when I was at that group home setting.

Q. Okay. So that would've been when you were what?

A. And that wasn't willing, I mean, that was a part of ---

Q. Yeah. Part of.

A. You kind of need to do it. I mean, you know, every foster child and they do it now in

schools, actually. Same thing. I -- I don't remember. I can't remember any of this.

Q. Okay. That's fine. I'm not trying to test your memory here, but -- but suffice to say, you've -- you've been in some form of counseling since you were a teenager, off and on.

A. Well, again, I think opting in is a critical part of it.

Q. Okay.

A. Had some after 9/11. Well, they put you in that as a part of the World Trade Center monitoring?

Q. Right.

A. And -- and I felt I needed some.

A. Yeah.

Q. Yeah. Okay. How often have you gone for therapy for this incident here?

A. I think we returned a record. I -- I don't want to speak at a time.

Q. It's fine. I'm not holding you to a number.

A. I think relatively every week.

Q. Okay. Every week.

A. Yeah. And you know, what I'm working on a lot is helplessness, because that is something

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 235 of 267

that I do not -- that it's very difficult to process. I can't tell you how helpless I have felt completely. If something happens to me, there's no one to call. They ain't coming for sure. And I want to keep speaking, but I do know that if I do keep complaining about antisemitism or politics that someone doesn't like, I could get arrested. That is anxiety. I just keep hoping it will happen without my children around. I -- I -- it's -- it's -- this is a specific kind of trauma that I don't have the tools to deal with. I'll be very honest with you.

Q. Okay. Let me ask you about your arrest. You -- you seem to fault them for parking, you know, a few houses down. Do you know why they did that?

A. Well, they explained, the first officer -- the first said when they believe there's a danger that someone could flee or doesn't like police officers.

Q. Do you know whether that's sort of standard practice with police?

A. I've asked.

Q. Okay. What have you been told?

A. That it is not. It is not. And if

anything that once they made the arrest, first of all, they would've searched me on the porch or searched a suspect on the porch. Again, you know, I haven't talked about specifics, but I've asked general things. They would've pulled the car around and for safety reasons of the suspect, like they wouldn't want to walk them down a hill with potholes in it for instance, or unnecessarily humiliate. That's a hypothetical question I have asked people who train officers. Hypothetical.

Q. Yeah. Who have you talked to?

A. Friends.

Q. Who -- who are the friends?

A. Just people I know in the business. And -- and some are sources by the way, and I'm not going to identify them, but ---

Q. Well, I do think I have the right to know who told you this?

A. Hypothetical. I'm not talking about my case. I'm talking about I have an interest, I have a journalistic interest. You know, I want to cover cases like this. I want to understand what the protocol is.

Q. Okay. Can you tell me any name of someone who's told you that that was not protocol?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 237 of 267

A. Well, they would be a source for other stories, and I would probably want to talk to my lawyer about that. Again, this isn't specifics.

Q. Yeah. Okay. All right. Well, I would ask you to have that conversation. I feel like we're entitled to know who provided that information to you.

MR. BRUCE: We'll -- we'll discuss that.

MR. HARTZOG: Assuming you're going to use that as -- as part of your -- your testimony.

MR. BRUCE: Yeah. If we rely on it, we'll discuss what we can get.

A. You're asking my thoughts, so I'm just ---

Q. Well, correct. But I'm -- you told me you were informed by what other people told you, and I would like to know ---

A. Yeah.

Q. --- who those people are. If you're relying on that for your ---

A. Oh, okay.

Q. --- for your case.

MR. BRUCE: If it's a source, you

can't disclose them.

THE WITNESS:  (Indiscernible).

MR. BRUCE:  We'll discuss what that means for our case.

Q.   (Mr. Hartzog) Yeah.  Not trying to be ---

A.   Oh, I understand.

Q.   Or make you reveal some way you don't want to reveal.

A.   You know how journalists get about.

Q.   I do.

A.   Very true.  You got history.

Q.   I understand -- I understand.  I'm not trying to make you violate your journalistic integrity, I promise.

A.   Okay.

Q.   Okay.  Tell me about ---

A.   Oh, I want to revisit one thing.

Q.   Yeah, please.

A.   I -- I'm staring at this.  This is what you asked me to see if all this is correct.

Q.   Uh-huh.  (Affirmative)

A.   I disagree with, "Arrived at Rachmuth's home and begin pounding on the door."

Q.   Okay.

A.   I believe I opened the door first, but that's just staring at me, you ask me and tell me.

Q.   I appreciate that.  I appreciate it. Okay.  I mean, would you agree the officers were relatively cordial to you on the porch?

A.   No.

Q.   No.  Okay.

A.   And can I tell you why?

Q.   Why?

A.   Not letting me put my shirt on, letting me -- my husband go get it and not put my shirt on, I thought was especially humiliating.  I mean, my breasts were almost completely out of my shirt. That is not cordial.

Q.   Okay.

A.   And I'm not even -- there's no violence at all.  I mean, you -- you wait three days later, you wait a day after the warrant, except there's no -- I'm not going anywhere.  I have my pajamas on.  So I found that inhumane.

Q.   Okay.  Not letting you inside and change.

A.   That's one thing.  Yeah.

Q.   Okay.  Is there anything else?

A.   Well, you didn't have to let me inside

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 240 of 267

to change.  My husband brought a shirt out.

Q.  Okay.

A.  I mean, I -- I thought it was very inhumane to allow on the porch, my -- my husband, to go get a sealed bottle of water.  We went through that exercise because I felt it's like an aura of a panic attack coming on hadn't happened since whenever, or the terror attack was.  And they put him through the exercise of going to get that and would not give it to me when I had a panic attack in the car.  I thought that was humiliating.  And looking back kind of taunting.  Why agree to it?  You know I had a medical problem.  You know I felt something coming on.  You -- you were acknowledging that.

Q.  Did they give you the water when you got to the station?

A.  That's not when I needed it because I have a fear of confines of being -- of being physically incapacitated.  That's what I was in the car.  They took my cuffs off and there's a water fountain inside.  The-- the fear -- the trigger is being completely, I guess, helpless and confined.  That's, yeah, very upsetting.

Q.  Okay.  All right.  Tell me about your --

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 241 of 267

you -- you say this has damaged your economic prospects.

A. Uh-huh. (Affirmative)

Q. And I want a little information on that if you could provide it

A. At the time, you know, I was building my resume, good win, I thought for political consulting. And I hope I explained to you the way it works. It's kind of on a cycle where, you know, my cycle to go out and get clients, which, by the way, GOP -- County GOPs would be my client as well. Then I would go in and work with them and work with their clients who are running maybe for city council, maybe for whatever it is, marking myself that way. So I was gearing up for that. And if not for this, I know that I would have other clients. I mean, if for no other reason that I felt relatively confident to go out there and market myself. I'm the second one down in Google look at my name. Number one is my Twitter account. 2, 3, 4, 5. Every one of them has my mugshot. People do due diligence. And when you do, I have no control over my identity anymore.

Q. Other than Michele Morrow who else have

you done consulting work for?

A.  Other PACs for instance.

Q.  Other PACs?

A.  Yeah -- yeah.  So the way it would work, I would be a consultant, and they would have several candidates they are backing.  Why design the campaign?  Because they didn't have the expertise.  So that's another way that consultants work.

Q.  Yeah.  Have any candidates retained you directly other than Michele Morrow?

A.  I would do it through a PAC.

Q.  Michele Morrow is the only politician or candidate who has ever retained you to do work for the campaign?

A.  I'm going to have to -- I want to answer your question, but I -- I am not trying to be -- I'm, no -- I am just trying to.  I mean, there have been candidates I've advised and been paid for.  I believe, or I've worked on those campaigns.  So may I get back to you on that one?

Q.  Sure.

A.  Okay.

Q.  Can I ask one follow up?  Was that before or after you worked for Michele Morrow?

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 243 of 267

A.   It was before and during.

Q.   Okay.

A.   I've worked on nothing since so.

Q.   Right.  And Michele Morrow again, we've -- we've discussed has some pretty controversial views, correct?

A.   But I don't.  I mean, I -- I don't. I've not said those things.

Q.   Right, but do you think being campaign manager for someone who calls for the execution of opposing party members might be a -- a red mark?

MR. BRUCE:  Objection.  Asked and answered earlier.  Go ahead.

A.   I think that -- I don't think I was aware of that in the primary, but I -- you know, there are candidates now that are advocating the killing of Jews.  So literally, or the guy in Virginia, I don't know, you know, he's calling for the death of his political opponent.  So I don't like it.  I don't like it at all.  And I -- I think I've been public about that actually.

Q.   (Mr. Hartzog) Yeah.  What about the fact Michele Morrow said that schools are -- are run by like pedophiles?

A.   There are a lot of things she says I

don't agree with. And in fact, I came out against her when she ran for her senate.

Q. Yeah.

A. And I've been upfront about that.

Q. Right.

A. But again, we're talking about my what -- how I conduct myself, my integrity, what people are hiring when they hire me. You know, lawyers represent outright terrorists, right? And their clients, you know, I mean, but they're good people. I mean, I hate to say it, my brother-in-law, but you know what I mean? I mean, it's -- you have a job to do in a sense. But my brother-in-law, he's a fine man. You know, he's a -- in other words, in my personal life, I conduct myself with what I believe is integrity.

I would not -- this is not -- I don't control that identity anymore. And that's I'm working at an extreme disadvantage. It's one thing to have a candidate that has said some things. Maybe she attunes for it, whatever, or maybe he -- that's fine. But we only have two parties in this country, and I can work for one or the other. That's kind of how it rolls. I mean, in the scheme of things in general.

Q. Right. Okay. Has anyone told you it's because of this arrest?

A. Yes.

Q. And I think you -- did you give me those names earlier?

A. We're going to get back to that name.

Q. Okay. Yes, please. Let's take a break if we can -- if we can.

MR. BRUCE: Sounds good.

MR. HARTZOG: And I'm probably at that point where I'm -- I'm close to wrapping up if you want to go ahead and contact your lawyer.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Off record at 3:20 p.m.

(Off record: 3:20 p.m. to 3:31 p.m.)

THE VIDEOGRAPHER: On record at 3:31 p.m.

Q. (Mr. Hartzog) All right. Wanted to go ahead and mark a couple more of these just for the record. What are we on?

A. M.

Q. M. This will be Exhibit M.

(EXHIBIT M WAS MARKED)

Q. (Mr. Hartzog) Once again, this is a -- a

follow of yours I assume, or someone who reads your posts who referred to the employee as -- a -- as a terrorist supporter, and -- and you responded to that. Do you see that?

A. I do.

Q. Okay, go ahead and mark this.

A. I don't know. To be clear, I don't know what's in front of it, if you have that.

Q. What do you mean what's in front of it? This was produced to us as -- as -- as -- as I printed it here.

A. Right. But there is part of this -- okay.

Q. Okay. What -- what do you believe the context may be?

A. it appears that this is a conversation about Harris Teeter Corporate and or the police, looks like both.

Q. Okay. Who do you believe the terror supporter they're referring to is?

A. The woman working in the store.

Q. Right.

A. Yeah. And then June 6th, I have personal context to believe that's very likely more so than I did at the store, but it looks like

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 247 of 267

the -- I'm commenting on the police department, so I don't know what the big conversation was.

Q. Yeah. Well, at -- at the very least you see that people have taken your -- your posts and believe that this individual is a terrorist supporter.

A. Well, a lot of people believe that people wearing in keffiyeh are. Again, I said with the ADL, you know, that thinks it's wearing a -- a swastika. So I -- yeah, it's a political symbol.

Q. And you're in that group that views it as a ---

A. It's a political symbol that -- that means harm, yeah, to Jews. Yeah.

Q. Okay.

A. Yeah. It's being in context -- in context of -- have you seen one?

Q. Mark this -- yeah. I'm just giving you a copy to look at.

A. Oh, I got it.

MR. BRUCE: I've got that one too.

Q. (Mr. Hartzog) So ---

A. That'd N.

Q. N. Okay.

(EXHIBIT N WAS MARKED)

Q. And again this is another apparently someone who reads your posts and follows you on X or Twitter and says, "I realize you're in an area of North Carolina that supports these terror supporters over innocent Jews." And then you say, "Thank you, that means a lot." You see that.

A. It means a lot to have -- we are in this -- here for you in this fight, and you are not alone. I can tell you as a Jew right now, in today's America, it means a lot to -- for someone to say you are not alone. Yeah, because that stood out to me.

Q. Right. Did you notice that he called the employee a terror supporter?

A. I do know that you're cleaning it out, yes.

(EXHIBIT O WAS MARKED)

Q. Okay. All right. This is another individual who communicated with you about this incident.

A. Uh-huh. (Affirmative)

Q. And I guess what I want to call your attention to is the -- the lying testimony of a foreign citizen. Do you know what are you

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 249 of 267

referring to there?

A. Well, someone that would say that I did that in -- in a store is a liar.

Q. Okay. Specifically calling her a terrorist in the store?

A. I've never called her a terrorist in the store. Period. Point blank. Never.

Q. Yeah. Okay. Okay. And last one, I think I only have one copy of this, but we'll mark that as P, and once again, you refer to her as a Hamas supporter.

(EXHIBIT P WAS MARKED)

A. Okay.

Q. (Mr. Hartzog) So you continued throughout. Even after the charges were dropped, you continued to characterize her as a Hamas supporter.

A. Yes. And I told you that I did due diligence on her.

Q. Okay.

A. And her family, because that's, you know, it -- it's not uncommon. In fact, it's very common for the -- unfortunately for women who are in Islamic cultures not to have rights. In fact, they don't have a right to have their own social

Case 5:25-cv-00222-BO-RJ   Document 29-8   Filed 08/03/26   Page 250 of 267

media or their communication channels. By the way, I object to that. I think equal rights is important. So her husband does have an account and a presence. And again, this is in February where I've done my due diligence and I found out yes, absolutely. Hezbollah and Hamas support in the killing of Jews is what he has on his Facebook page. So yeah, I stand by that.

Q. Okay. This one. P -- Q.

(EXHIBIT Q WAS MARKED)

A. This is dated June 1st, 2025. Okay?

Q. (Mr. Hartzog) And it looks like you're reposting something from February 17th.

A. Okay.

Q. You said you were complaining about, it looks like terror. And you say Free Palestine words echoed by Islamic terrorists in DC and Colorado before murdering and burning Jews.

A. Yes.

Q. Okay.

A. Yes.

Q. And so by this post, you are -- you are sort of bringing this store employee into that context.

A. Has nothing to do with a store employee.

Q. Well.

A. I had her name. I'm going to point this out. I had ---

Q. She referenced her right here.

A. I had her name at the time of this post. I never put it up there. I had her husband's name at the time of this post and I never put it up there. And the reason is that's irrelevant. What is relevant is Harris Teeter and Kroger endorsed political symbolism in their store and told me to go pound sand as a Jew.

Q. Okay.

A. You know, I want to make this clear.

Q. Please.

A. If I wanted to, as you say, your words, target a specific employee, I had the paperwork that -- that indicated her name. I have not put that anywhere here. You know why? It's not important.

Q. Do you believe you showed restraint by posting her picture where she worked?

A. I didn't show restraint. It's not important. I apologize for not allowing you to finish.

Q. It's okay. Go ahead.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 252 of 267

A. It's irrelevant -- It's irrelevant because it is a corporation who is endorsing speech, and the police wanted to criminalize my civil rights advocacy. It wasn't Kroger. The -- my own government came in and called Balls and Strikes on speech. My own government, it seems stepped into this noxious political war that we have, or I don't mean war, but a political debate we have here in America. And they put their hand on a scale, and it was against -- against Jews and against free speech. That's what I know. My own government. That's wrong.

Q. Are you -- are you referring to your post as noxious political debate?

A. No, I'm not. I'm -- I'm telling you, this Free Palestine debate. I keep -- I keep describing it and, you know, you can't turn on a TV without it. This whole movement for a corp -- for the corporation is one thing for my own government to step in and say, you can criticize Jews, you can email them at home and tell and -- and hope for their harm. You can target everyone in their family, organize a -- a de facto mob, an actual mob, here's their address and go get them and do harm to them.

They can threaten to dismember me directly to me. The FBI stepped in twice. That's okay. The Holly Springs police and these officers had they asked me, which said they would, that didn't matter. That's a big deal.

Melissa Ottaway, she weighed in, from my understanding from them, she said this was criminal, but everything that happened to me wasn't. The government weighed in on one side of this debate and I was jailed.

Q. Okay. Again, none of the three people that you've named as a defendant in this lawsuit were involved in that. And I think you've said you agree with that.

A. Well, I think they were involved to the extent if they looked me up -- and I don't know how they would find my address without it in any of the systems that they enumerated. And they all enumerated. And I did some due diligence on that. And I've seen some of the systems. I mean, I do stuff with the SBI as well, so I'm not, you know, a neophyte in this realm. Not an expert, but they would have that information and they went to Melissa Ottaway, who does. So I...

Q. Okay.

MR. HARTZOG: I don't think I have anything further.

THE WITNESS: Thank you.

MR. BRUCE: Okay. I don't either.

MR. HARTZOG: All right. You're done.

THE VIDEOGRAPHER: This concludes today's deposition. The time on the monitor is 3:42 p.m. We are now off record.

WHEREUPON, at 3:42 p.m., the deposition was adjourned.

Jennifer Sloan Rachmuth

CERTIFICATION

I, Christy Whisner, Notary Public in and for the County of Guilford, State of North Carolina at Large, do hereby certify:

That there appeared before me the foregoing witness at the time and place herein aforementioned;

That the said witness was sworn by me to state the truth, the whole truth, and nothing but the truth, in said cause;

That the testimony was taken before me and recorded by Stenomask, thereafter reduced to typewriting under my direct supervision, and the foregoing consecutively numbered pages are a complete and accurate record of all the testimony given by said witness;

That the undersigned is not of kin, nor in anywise associated with any of the parties to said cause of action, nor their counsel, and that I am not interested in the event(s) thereof.

Reading and signing of the testimony were requested.

IN WITNESS WHEREOF, I have hereunto set my hand this the 8th day of July, 2026.

*Christy Whisner*

Notary No. 202511500071

CIVIL COURT REPORTING, LLC
4478 Moratock Lane
Clemmons, NC 27012

Jennifer Sloan Rachmuth

WITNESS CERTIFICATION

I, JENNIFER SLOAN RACHMUTH, do hereby certify,

That I have read and examined the contents of the foregoing pages of record of testimony as given by me at the times and place herein aforementioned;

And that to the best of my knowledge and belief, the foregoing pages are a complete and accurate record of all the testimony given by me at said time, except as noted on the attached here (Addendum A).

I have _____ / have not _____ made changes/corrections to be attached.

_____
JENNIFER SLOAN RACHMUTH

I, _____, Notary Public for the County of _____, State of _____, do hereby certify:

That the herein-above named personally appeared before me this the _____ day of _____, 20_____;

And that I personally witnessed the execution of this document for the intents and purposes herein above described.

_____
NOTARY PUBLIC

My Commission Expires:                    (SEAL)

Page 258

Jennifer Sloan Rachmuth

ADDENDUM A

Upon the reading and examination of my deposition testimony as herein transcribed, I note the following changes and/or corrections with accompanying reason(s) for said change/correction:

************************

Page          Line                              Is Amended to Read

_____

_____


_____


_____


_____


_____


_____

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 258 of 267

# X

Home

Explore

Notifications

Follow

Chat

Grok

Bookmarks

Creator Studio

Premium

Profile

More

**Post**

lyss
@alyssa_8283

**Sloan Rachmuth** ✓
@SloanRachmuth

**Subscribe** ⊘ ···

Went to @HarrisTeeter in Holly Springs and saw this Hamas sympathizer.

When I asked her why she was wearing a keffiyeh, the store manager told me to leave!!



9:54 AM · Oct 31, 2024 · **281.3K** Views

💬 173     ↻ 274     ♡ 925     🔖 40     ↥

Relevant ⌄                                      View quotes ›

Post your reply                                 **Reply**

**Stu Padasso** @TheStuPadasso · Nov 3, 2024     ⊘ ···
Maybe it's time to boycott @HarrisTeeter.

💬 7     ↻ 20     ♡ 210     ᴵ�818 8.8K     🔖 ↥

**Sloan Rachmuth** ✓ @SloanRachmuth · Nov 3, 2024     ⊘ ···
If you value your freedom, yes.

💬 4     ↻ 3     ♡ 136     ᴵᵖᵖ 7.8K     🔖 ↥

🔍 Search

**Relevant people**

**Sloan Rachmuth** ✓     **Follow**
@SloanRachmuth

Investigative Journalist | Zionist | Terrorism Survivor | Defending Judeo-Christian Values | Education, Policy & National Security | 🇮🇱🇺🇸

**What's happening**

Trending
**Stephen Miller**                               ···

Food · Trending
**Percolator**                                   ···

Trending in United States
**No. Keep**                                     ···

Sports · Trending
**Berard**                                       ···

Show more

Terms · Privacy · Cookies · Accessibility ·
US TIDA    Ads Info    More ···    © 2026 X Corp.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 259 of 267



EXHIBIT
A
RACHMUTH



# X

🏠 Home

🔍 Explore

🔔 Notifications

👥 Follow

💬 Chat

✴️ Grok

🔖 Bookmarks

🚀 Creator Studio

✅ Premium

👤 Profile

⋯ More

**Post**

---

← **Post**

**Stu Padasso** @TheStuPadasso · Nov 3, 2024
Maybe it's time to boycott @HarrisTeeter.

💬 7    🔁 20    ♡ 210    📊 8.8K    🔖 ⬆️

**Sloan Rachmuth** ✔️ @SloanRachmuth · Nov 3, 2024
If you value your freedom, yes.

💬 4    🔁 3    ♡ 136    📊 7.8K    🔖 ⬆️

**Stu Padasso** @TheStuPadasso · Nov 4, 2024
No it's not, dumbass.

💬    🔁    ♡ 2    📊 65    🔖 ⬆️

**Ⓟatriot Steve** 🇺🇸✝️🏝️ ✔️ @GideonSbre · Oct 31, 2024
Showing support for a Terrorist group by wearing a keffiyeh is abhorrent, we don't support the deliberate slaughter of civilians and we certainly don't celebrate it.
See what happens if you simply wear the star of David.

💬 12    🔁 25    ♡ 285    📊 14K    🔖 ⬆️

**Sloan Rachmuth** ✔️ @SloanRachmuth · Oct 31, 2024
It's a political statement, at minimum. I'm sure they wouldn't let a cashier wear a MAGA hat!

💬 13    🔁 35    ♡ 464    📊 12K    🔖 ⬆️

**Deborah L Cook-Hunter** ✔️ @DeborahLCookHu1 · Nov 3, 2024
It looks like she works there?  OMG if she does that should never be allowed!

💬 1    🔁 2    ♡ 35    📊 1.9K    🔖 ⬆️

**Sloan Rachmuth** ✔️ @SloanRachmuth · Nov 3, 2024
That's how I felt.

💬    🔁    ♡ 27    📊 1.7K    🔖 ⬆️

**Sunshine** @Skylink__105 · Oct 31, 2024
Was she also putting out bagels?

💬 2    🔁    ♡ 95    📊 8K    🔖 ⬆️

---

🔍 Search

## Relevant people

**Sloan Rachmuth** ✔️
@SloanRachmuth    **Follow**
Investigative Journalist | Zionist | Terrorism Survivor | Defending Judeo-Christian Values | Education, Policy & National Security | 🇮🇱🇺🇸

**Harris Teeter** ✔️
@HarrisTeeter    **Follow**
A North Carolina based grocery store dedicated to world class customer service. Shop in our stores, online, or on the go with the Harris Teeter app!

## What's happening

Music · Trending
**#BTS_WORLDTOUR_ARIRANG_MADRID**

Politics · Trending
**Commie**

Politics · Trending
**Digital Services Tax**

Trending in United States
**Mothman**

Show more

Terms · Privacy · Cookies · Accessibility
US TIDA · Ads Info · More ... · © 2026 X Corp.

---

**lyss**
@alyssa_8283    ⋯

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 260 of 267



Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 261 of 267



## Post

💬 1    🔁    ♡ 6    �_ 563    🔖 ⬆

**Missus Bennet** 🧴🚛 @poornerves · Oct 31, 2024    ⊘ ···
I agree with the store manager. You shouldn't go up to random strangers and harangue them about their hideous clothing choices.

💬 5    🔁    ♡ 30    ⫿⫿ 2.5K    🔖 ⬆

**Sloan Rachmuth** ✔ @SloanRachmuth · Oct 31, 2024    ⊘ ···
Not what happened. You're ignorant of what a keffiyeh symbolizes. Read a book.

💬 3    🔁 4    ♡ 78    ⫿⫿ 2.3K    🔖 ⬆

**Missus Bennet** 🧴🚛 @poornerves · Oct 31, 2024    ⊘ ···
Girl, I absolutely know what a kefiyya symbolizes, which is why I called it hideous. I've been to Israel.

💬 2    🔁    ♡ 3    ⫿⫿ 588    🔖 ⬆

**LisLev** ✡🇺🇸 @AmericaGirl0611 · Nov 3, 2024    ⊘ ···
I would not characterize it as hideous. I would use the word murderous. There is a big difference.

💬 1    🔁    ♡ 1    ⫿⫿ 26    🔖 ⬆

**Missus Bennet** 🧴🚛 @poornerves · Nov 3, 2024    ⊘ ···
Everyone is so fucking autistic on this app.

💬 1    🔁    ♡    ⫿⫿ 22    🔖 ⬆

**Maribeth Cordesman** @cordesman · Oct 31, 2024    ⊘ ···
Write Harris Teeter corporate.

💬 1    🔁 4    ♡ 66    ⫿⫿ 5.3K    🔖 ⬆

**Sloan Rachmuth** ✔ @SloanRachmuth · Oct 31, 2024    ⊘ ···
Done!

💬    🔁 3    ♡ 77    ⫿⫿ 4.8K    🔖 ⬆

**Doggonit** @Doggonitagain · Oct 31, 2024    ⊘ ···
Wow what country are we in again?

💬 2    🔁    ♡ 37    ⫿⫿ 8K    🔖 ⬆

𝕏

🏠 Home

🔍 Explore

🔔 Notifications  20+

👤 Follow

💬 Chat

⊘ Grok

🔖 Bookmarks

🚀 Creator Studio

✓ Premium

👤 Profile

··· More

**Post**

lyss
@alyssa_8283   ···

🔍 Search

### Relevant people

**Sloan Rachmuth** ✔    **Follow**
@SloanRachmuth
Investigative Journalist | Zionist | Terrorism Survivor | Defending Judeo-Christian Values | Education, Policy & National Security | 🇮🇱🇺🇸

**Harris Teeter** ✔    **Follow**
@HarrisTeeter
A North Carolina based grocery store dedicated to world class customer service. Shop in our stores, online, or on the go with the Harris Teeter app!

### What's happening

Music · Trending
**#BTS_WORLDTOUR_ARIRANG_MADRID**

Politics · Trending
**Commie**

Politics · Trending
**Digital Services Tax**

Trending in United States
**Mothman**

Show more

Terms · Privacy · Cookies · Accessibility ·
US TIDA · Ads Info · More ··· © 2026 X Corp.

Case 5:25-cv-00222-BO-RJ    Document 29-8    Filed 08/03/26    Page 262 of 267

# Post

💬 1    🔁    ♡ 6    �\|⊥ 563    🔖 ⬆

**Missus Bennet** 🚲 🚚 @poornerves · Oct 31, 2024   ⊘ …
I agree with the store manager. You shouldn't go up to random strangers and harangue them about their hideous clothing choices.

💬 5    🔁    ♡ 30    �\|⊥ 2.5K    🔖 ⬆

**Sloan Rachmuth** ✓ @SloanRachmuth · Oct 31, 2024   ⊘ …
Not what happened. You're ignorant of what a keffiyeh symbolizes. Read a book.

💬 3    🔁 4    ♡ 78    �\|⊥ 2.3K    🔖 ⬆

**Missus Bennet** 🚲 🚚 @poornerves · Oct 31, 2024   ⊘ …
Girl, I absolutely know what a kefiyya symbolizes, which is why I called it hideous. I've been to Israel.

💬 2    🔁    ♡ 3    ⊥⊥ 588    🔖 ⬆

**LisLev** 🇮🇱🇺🇸 @AmericaGirl0611 · Nov 3, 2024   ⊘ …
I would not characterize it as hideous. I would use the word murderous. There is a big difference.

💬 1    🔁    ♡ 1    ⊥⊥ 26    🔖 ⬆

**Missus Bennet** 🚲 🚚 @poornerves · Nov 3, 2024   ⊘ …
Everyone is so fucking autistic on this app.

💬 1    🔁    ♡    ⊥⊥ 22    🔖 ⬆

**Maribeth Cordesman** @cordesman · Oct 31, 2024   ⊘ …
Write Harris Teeter corporate.

💬 1    🔁 4    ♡ 66    ⊥⊥ 5.3K    🔖 ⬆

**Sloan Rachmuth** ✓ @SloanRachmuth · Oct 31, 2024   ⊘ …
Done!

💬    🔁 3    ♡ 77    ⊥⊥ 4.8K    🔖 ⬆

**Doggonit** @Doggonitagain · Oct 31, 2024   ⊘ …
Wow what country are we in again?

💬 2    🔁    ♡ 37    ⊥⊥ 8K    🔖 ⬆

---

X

- Home
- Explore
- Notifications (20+)
- Follow
- Chat
- Grok
- Bookmarks
- Creator Studio
- Premium
- Profile
- More

**Post**

lyss
@alyssa_8283 …

---

🔍 Search

## Relevant people

**Sloan Rachmuth** ✓
@SloanRachmuth   **Follow**
Investigative Journalist | Zionist | Terrorism Survivor | Defending Judeo-Christian Values | Education, Policy & National Security | 🇮🇱🇺🇸

**Harris Teeter** ✓
@HarrisTeeter   **Follow**
A North Carolina based grocery store dedicated to world class customer service. Shop in our stores, online, or on the go with the Harris Teeter app!

## What's happening

Politics · Trending
**Digital Services Tax**

Music · Trending
**#BTS_WORLDTOUR_ARIRANG_MADRID**

Trending in United States
**Mothman**

Trending in United States
**Gwynn**

Show more

Terms · Privacy · Cookies · Accessibility ·
US TIDA · Ads Info · More … · © 2026 X Corp.

Case 5:25-cv-00222-BO-RJ   Document 29-8   Filed 08/03/26   Page 263 of 267

X

Home

Explore

Notifications

Follow

Chat

Grok

Bookmarks

Creator Studio

Premium

Profile

More

**Post**

← **Post**

♡ ⟲ 3 ♥ 77 �𝐥𝐥 4.8K 🔖 ⬆

**Doggonit** @Doggonitagain · Oct 31, 2024 ⊘ ···
Wow what country are we in again?

💬 2 ⟲ ♥ 37 �𝐥𝐥 8K 🔖 ⬆

**Sloan Rachmuth** ✔ @SloanRachmuth · Oct 31, 2024 ⊘ ···
Plenty of people wear hijabs, never heard of anyone wearing a PLO scarf into a place of business.

💬 8 ⟲ 7 ♥ 121 �𝐥𝐥 7.4K 🔖 ⬆

**Doggonit** @Doggonitagain · Oct 31, 2024 ⊘ ···
Definitely not acceptable

💬 1 ⟲ ♥ 8 ⟲ 975 🔖 ⬆

**Slew's Acquittal** @TutuSweetHi · Oct 31, 2024 ⊘ ···
Might as well be wearing something that says "r@be, k*ll the J€₩s". Entirely unacceptable. Frankly, I wouldn't trust her with food.

💬 4 ⟲ 8 ♥ 110 ⟲ 6.8K 🔖 ⬆

**Sloan Rachmuth** ✔ @SloanRachmuth · Oct 31, 2024 ⊘ ···
That's terrifying.

💬 ⟲ ♥ 53 ⟲ 5.9K 🔖 ⬆

**BubbaDP** ✔ @abstrackerDB · Oct 31, 2024 ⊘ ···
All over a simple question?

💬 1 ⟲ ♥ 12 ⟲ 3.8K 🔖 ⬆

**Sloan Rachmuth** ✔ @SloanRachmuth · Oct 31, 2024 ⊘ ···
Yes.

💬 1 ⟲ 1 ♥ 14 ⟲ 3.5K 🔖 ⬆

**BubbaDP** ✔ @abstrackerDB · Oct 31, 2024 ⊘ ···
Geez! Ain't like you threw a pack of pork chops in her cart.

💬 1 ⟲ ♥ 12 ⟲ 388 🔖 ⬆

🔍 Search

**Relevant people**

 **Sloan Rachmuth** ✔  Follw
@SloanRachmuth
Investigative Journalist | Zionist | Terrorism Survivor | Defending Judeo-Christian Values | Education, Policy & National Security | 🇮🇱🇺🇸

 **Harris Teeter** ✔  Foll w
@HarrisTeeter
A North Carolina based grocery store dedicated to world class customer service. Shop in our stores, online, or on the go with the Harris Teeter app.

**What's happening**

Politics · Trending
**South Dakota**

Trending in United States
**Mothman**

Politics · Trending
**Digital Services Tax**

Trending in United States
**Gwynn**

Show more

Terms · Privacy · Cookies · Accessibility
US TIDA · Ads Info · More ··· · © 2026 X Corp.

Case 5:25-cv-00222-BO-RJ   Document 29-8   Filed 03/03/26   Page 264 of 267

Home

Explore

Notifications

Follow

Chat

Grok

Bookmarks

Creator Studio

Premium

Profile

More

**Post**

← **Post**

 **Tired Old Man** @LarryCo33418590 · Oct 31, 2024

Correct me if I am wrong, but isn't she an employee there ? The price gun was what drew me to that conclusion. If she is an employee and the head gear is part of her religious freedom, it would be no different than wearing a Yamica . I am NO terrorist organization supporter.

💬 4          ⟲          ♡ 9          📊 2.3K          🔖 ⬆️

 **Sloan Rachmuth** ✓ @SloanRachmuth · Oct 31, 2024

WRONG. It's a religious right to wear a hijab - not a keffiyeh AS a hijab. There is a difference.

Employees cannot engage in politics, according to @HarrisTeeter handbook.

💬 2          ⟲ 6          ♡ 66          📊 1.9K          🔖 ⬆️

 **Tired Old Man** @LarryCo33418590 · Oct 31, 2024

Really? Shows what I know about the headgear.  I am guessing HT doesn't know the difference either.

💬 2          ⟲          ♡ 5          📊 519          🔖 ⬆️

 **Sloan Rachmuth** ✓ @SloanRachmuth · Oct 31, 2024

Possible that the store manager did not know, yes. But every barely educated person in America understands what it is now.

💬 3          ⟲ 3          ♡ 11          📊 515          🔖 ⬆️

 **mycatisan** @Antimasker51 · Oct 31, 2024

Lol you're wrong. I can promise you that the overwhelming majority of people I work with at a level one trauma center have no clue what this means.

💬 1          ⟲ 2          ♡ 6          📊 1.7K          🔖 ⬆️

 **Sloan Rachmuth** ✓ @SloanRachmuth · Oct 31, 2024

A hospital with doctors who don't know what that is?? Where? I need to warn others.

💬 1          ⟲ 1          ♡ 2          📊 170          🔖 ⬆️

🔍 Search

**Relevant people**

 **Sloan Rachmuth** ✓
@SloanRachmuth

**Follow**

Investigative Journalist | Zionist Terrorism Survivor | Defending Judeo-Christian Values | Education, Policy & National Security | 🇮🇱🇺🇸

 **Harris Teeter** ✓
@HarrisTeeter

**Follow**

A North Carolina based grocery store dedicated to world class customer service. Shop in our stores, online, or on the go with the Harris Teeter app!

**What's happening**

Politics · Trending
**South Dakota**

Trending in United States
**Mothman**

Politics · Trending
**Digital Services Tax**

Trending in United States
**Gwynn**

Show more

Terms · Privacy · Cookies · Accessibility ·
US TIDA · Ads Info · More··· · © 2026 X Corp.

← **Post**

Home

Explore

Notifications

Follow

Chat

Grok

Bookmarks

Creator Studio

Premium

Profile

More

**Post**

**\*Murphy's Dad\*** @worldonfire63 · Oct 31, 2024
Well, guess I won't be shopping at Hairy Peeter anytime soon

💬 3    🔁 1    ♡ 32    ᴵᴵ· 5.7K    🔖 ↥

**Sloan Rachmuth** ✓ @SloanRachmuth · Oct 31, 2024
Pro terror, political statements, offend, customers. They'll get the message.

💬    🔁 4    ♡ 57    ᴵᴵ· 5.1K    🔖 ↥

**C.Girl** 🇺🇸 🇮🇱 @C_Girl_USA · Nov 4, 2024
That , to me, represents terrorism.

💬 2    🔁    ♡ 6    ᴵᴵ· 603    🔖 ↥

**Sloan Rachmuth** ✓ @SloanRachmuth · Nov 4, 2024
She said Free Palestine when I asked her.

💬 2    🔁 1    ♡ 6    ᴵᴵ· 589    🔖 ↥

Show replies

**Rachel Monroe** 🇺🇸 @RachelRMonroe · Oct 31, 2024
It is actually protected as religious freedom under Federal Law. I agree and will stick to Village Walk.

💬 1    🔁    ♡ 4    ᴵᴵ· 2.3K    🔖 ↥

**Sloan Rachmuth** ✓ @SloanRachmuth · Oct 31, 2024
hijabs are protected, as they should be. But I'm sure that wearing this is a form of political speech.

💬 1    🔁 2    ♡ 32    ᴵᴵ· 2.1K    🔖 ↥

Show replies

**@bird-at-home** @un_oiseau_aqua · Feb 19, 2025
I won't go in a store if I see a staff member wearing a keffiyeh. Not that I'm wiser than anyone. I'm just afraid I'd end up confronting the wearer, and get in trouble.

**Post**

Q Search

**Relevant people**

**Sloan Rachmuth** ✓
@SloanRachmuth
Follow
Investigative Journalist | Zionist | Terrorism Survivor | Defending Judeo-Christian Values | Education, Policy & National Security | 🇮🇱🇺🇸

**Harris Teeter** ✓
@HarrisTeeter
Follow
A North Carolina based grocery store dedicated to world class customer service. Shop in our stores, online, or on the go with the Harris Teeter app!

**What's happening**

Politics · Trending
**South Dakota**

Entertainment · Trending
**Amora**

Politics · Trending
**Digital Services Tax**

Trending in United States
**Mothman**

Show more

Terms · Privacy · Cookies · Accessibility
US TIDA · Ads Info · More ··· © 2026 X Corp.

Home

Explore

Notifications

Follow

Chat

Grok

Bookmarks

Creator Studio

Premium

Profile

More

**Post**

← **Post**

---

**Sloan Rachmuth** ✓ @SloanRachmuth · Oct 31, 2024

hijabs are protected, as they should be. But I'm sure that wearing this is a form of political speech.

○ 1    ⇄ 2    ♡ 32    ııl 2.1K    🔖    ↗

---

**Rachel Monroe** 🇺🇸 @RachelRMonroe · Oct 31, 2024

I just reread the 1993 EO from Clinton and it is covered. I would have to hold back myself too. I am glad for all that you are doing in the community. Thanks.

○    ⇄    ♡ 3    ııl 367    🔖    ↗

---

**@bird-at-home** @un_oiseau_aqua · Feb 19, 2025

I won't go in a store if I see a staff member wearing a keffiyeh. Not that I'm wiser than anyone. I'm just afraid I'd end up confronting the wearer, and get in trouble.

○ 1    ⇄    ♡ 1    ııl 86    🔖    ↗

---

**Sloan Rachmuth** ✓ @SloanRachmuth · Feb 19, 2025

Wise move

○    ⇄    ♡ 1    ııl 80    🔖    ↗

---

**Gretchen Smith** ✓ @GretchenPSmith · Nov 4, 2024

This is screaming Allah Akbar to me! They have invaded our kamala border.

○ 1    ⇄ 2    ♡ 15    ııl 548    🔖    ↗

---

**verb** @sierras.account · Nov 4, 2024

Hahaha get arrested freak

○    ⇄    ♡ 3    ııl 74    🔖    ↗

---

**Dennis** ✕✕ ✓ @clovis1931 · Oct 31, 2024

I stick to the Garner side of Wake County, preferably just over the JoCo line in Clayton.

○ 1    ⇄    ♡ 5    ııl 1.3K    🔖    ↗

---

Q Search

## Relevant people

**Sloan Rachmuth** ✓ @SloanRachmuth  **Follow**

Investigative Journalist | Zionist Terrorism Survivor | Defending Judeo-Christian Values | Education, Policy & National Security | 🇺🇸

 **Harris Teeter** ✓ @HarrisTeeter  **Follow**

A North Carolina based grocery store dedicated to world class customer service. Shop in our stores, online, or on the go with the Harris Teeter app!

## What's happening

Politics · Trending
**South Dakota**

Entertainment · Trending
**Amora**

Entertainment · Trending
**Hasan Piker**

Politics · Trending
**Digital Services Tax**

Show more

Terms · Privacy · Cookies · Accessibility ·
US TIDA · Ads Info · More... · © 2026 X Corp.