IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:25-cv-222-BO-RJ

| | | |
|---|---|---|
| JENNIFER SLOAN RACHMUTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) | **DEFENDANTS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| ELLIOTT WARREN, et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

COME NOW Defendants, through undersigned counsel, and submit this memorandum in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## INTRODUCTION

On November 2, 2024, Officers Benjamin Marino and Elliot Warren, police officers for the Town of Holly Springs (the "Town" or "Holly Springs") responded to a call regarding harassment at the Harris Teeter on Sunset Lake Road in Holly Springs. (SMF ¶ 10). Officers Warren and Marino spoke to the alleged victim, Amira Mohamed Abdel Fattah, an employee at the Harris Teeter, and her manager, Sheronda Irick, who was present for the incident. (SMF ¶ 11, 17).

Ms. Fattah informed the officers that she is Muslim and wears a hijab. (SMF ¶ 12). Ms. Fattah told the officers that several days before, she was stocking shelves when a customer, Plaintiff, came up to her and began yelling at her and calling her a terrorist due to her hijab. (*Id.*). Ms. Fattah stated that the woman took photos of her and posted them on her X account. (SMF ¶ 13). Ms. Fattah told officers that the store

1

had received multiple phone calls since the post was made, accusing the store of hiring terrorists. (SMF ¶ 14). Ms. Fattah stated that she no longer felt safe returning to work and that she had even taken her kids out of school because she didn't want them to be involved in the situation. (SMF ¶ 15). Officers Marino and Warren then spoke to Ms. Irick, who corroborated Ms. Fattah's account. (SMF ¶ 16-17, 22). Ms. Irick told officers that she intervened in the situation and told Ms. Fattah to return to work, but Plaintiff continued yelling at her and persisted in calling her a terrorist. (SMF ¶ 20). Ms. Irick spoke to Plaintiff and was eventually able to calm her down and discuss the situation. (SMF ¶ 21). Ms. Irick eventually asked Plaintiff to leave the store due to her behavior. (SMF ¶ 21).

Ms. Irick provided Officers Marino and Warren a link to Plaintiff's X post. (SMF ¶ 23). The officers reviewed the post and Plaintiff's multiple replies to comments on the post. (SMF ¶ 24). The X post included photos of Ms. Fattah stocking shelves at Harris Teeter with the text "Went to @HarrisTeeter in Holly Springs and saw this Hamas sympathizer. When I asked her why she was wearing a keffiyeh, the store manager told me to leave!!" Officer Marino Decl. Ex. 2 at 1. Plaintiff replied to numerous comments and specifically identified the "Sunset Lake" Harris Teeter.

Based on their investigation, officers Marino and Warren consulted *North Carolina Crimes: A Guidebook on the Elements of Crime* and determined that there was probable cause for the crime of cyberstalking. (SMF ¶ 26). They consulted with Sergeant David Bock and Lieutenant Melissa Ottaway, both of whom confirmed that cyberstalking was an appropriate charge. (SMF ¶ 28). On the advice of their

2

supervisors, Officers Marino and Warren called Ms. Fattah and confirmed that she wanted to press charges. (SMF ¶ 31). Officer Warren filled out the warrant application and met with Magistrate Mayte Ramirez via video call, and the magistrate found probable cause and issued a warrant for Plaintiff's arrest for cyberstalking. (SMF ¶ 33-34).

On November 3, 2024, Officers Benjamin Marino, Elliot Warren, and Edgar Hernandez ("Officers"), went to Plaintiff's residence to serve the arrest warrant for cyberstalking on Plaintiff. (SMF ¶ 37). Officers parked a short distance down the street, out of view from Plaintiff's residence. (SMF ¶ 38). This is a common practice taught in Basic Law Enforcement Training for officer safety. (SMF ¶ 39). When the Officers approached, Plaintiff opened the door. (SMF ¶ 43). The Officers explained that she was being arrested for cyberstalking in connection to the incident at Harris Teeter and her subsequent post. (SMF ¶ 44, 52). The Officers allowed Plaintiff's husband, Guy Rachmuth, to retrieve a sweater and a water bottle for Plaintiff to take with her to the Wake County Detention Center. (SMF ¶ 47, 56-57). Officers Warren and Hernandez led Plaintiff the short distance to Officer Warren's patrol car and drove her to the Wake County Detention Center. (SMF ¶ 64-76). As soon as they arrived, Officer Hernandez assisted Plaintiff with drinking from her water bottle. (SMF ¶ 78). Plaintiff was booked at the Wake County Detention Center and was released a short time later. (SMF ¶ 80). The charges were later dismissed. (SMF ¶ 83).

## STATEMENT OF THE CASE

In this action, Rachmuth raises claims under § 1983 and state tort law related to her arrest, alleging (1) that Officers violated her Fourth Amendment and Fourteenth Amendment rights and state law by wrongfully arresting her; (2) that Officers violated her First Amendment rights by arresting her due to her social media post; and (3) that Officers intentionally inflicted emotional distress during her arrest. *See* DE 1 at 17, 20, 22-27. This is Defendants' motion for summary judgment.

## STATEMENT OF MATERIAL FACTS

The material facts are set forth in the accompanying Statement of Material Facts in Support of Defendants' Motion for Summary Judgment pursuant to Local Civil Rule 56.1(a)(1) and are fully incorporated herein by reference pursuant to Local Civil Rule 56.1(c).

## ARGUMENT

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986), then the nonmoving party may not rest on the allegations or denials in its pleading, *Anderson,* 477 U.S. at 248-49, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "[T]he nonmoving

4

party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

## I. <u>Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claim.</u>

Defendants are entitled to qualified immunity on Plaintiff's § 1983 claim for malicious prosecution arising under the Fourth Amendment because Defendants' conduct did not violate Plaintiff's rights or clearly established law. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Martin v. Duffy*, 858 F.3d 239, 251 (4th Cir. 2017). The purpose of qualified immunity is to "remove most civil liability actions, except those where the official clearly broke the law…." *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 763 (4th Cir. 1990). "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). The qualified immunity analysis involves two inquiries: (1) whether the facts "[t]aken in the light most favorable to the party asserting the injury… show the officer's conduct violated a

5

constitutional right"; and (2) whether the right at issue "was clearly established in the specific context of the case-that is, whether it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted." *Merchant v. Bauer*, 677 F.3d 656, 662 (4th Cir. 2012). The two inquiries may be assessed in either sequence. *Id.* at 661-62; *accord Pearson*, 555 U.S. at 236.

**A. Defendants lawfully arrested Plaintiff.**

Plaintiff's claim for malicious prosecution fails because probable cause existed for the charge of cyberstalking, as confirmed by a neutral magistrate.

    1.  <u>Defendants had probable cause to arrest Plaintiff for cyberstalking.</u>

"To prevail on a section 1983 claim alleging a violation of the Fourth Amendment due to an unlawful arrest, plaintiffs must demonstrate that the arrest was not supported by probable cause." *Bostic v. Rodriguez*, 667 F. Supp. 2d 591, 607 (E.D.N.C. 2009). "Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed an offense." *Humbert v. Mayor & City Council of Balt. City*, 866 F.3d 546, 555 (4th Cir. 2017). Courts "evaluate probable cause under an objective standard, considering the totality of the circumstances known to the officers at the time of the alleged seizure." *Henderson v. McClain*, 2022 U.S. App. LEXIS 6155 at *10 (4th Cir. Mar. 9, 2022) (citing *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017); *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). Probable cause "is not a high bar." *Kaley v. United States*, 571 U. S. 320 (2014).

"Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 565 U.S. 535, 547-548 (2012) (citing *United States v. Leon*, 468 U.S. 897, 922-923 (1984)). An officer "cannot be expected to question the magistrate's probable-cause determination," as it is ultimately "the magistrate's responsibility to determine whether the officer's allegations establish probable cause." See *Messerschmidt*, 565 U.S. at 547; *Leon*, 468 U.S. at 921. The Supreme Court has recognized an exception only when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley v. Briggs*, 475 U.S. 335, 341. But "the threshold for establishing this exception is a high one, and it should be." *Messerschmidt*, 565 U.S. at 547; see *Malley*, 475 U.S. at 341. The Fourth Circuit has found that "the question is not whether there actually was probable cause for the [] warrant… but whether an objective law officer could reasonably have believed probable cause to exist." *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002).

Plaintiff was lawfully arrested because the "facts and circumstances within the officer[s'] knowledge" at the time of her arrest were "sufficient to warrant a prudent person" to believe that plaintiff had committed the crime of cyberstalking. *Humbert v. Mayor & City Council of Balt. City*, 866 F.3d 546, 555 (4th Cir. 2017). Here, the Officers' investigation revealed that Plaintiff photographed and confronted a Harris Teeter employee while she was working and accosted her about her religious head

7

covering. (SMF ¶ 12). The Officers learned that Plaintiff posted photos of the employee on social media, tagged her employer and engaged with comments implying that the employee was a supporter of terrorism, and that as a result of the interaction and Plaintiff's social media activity, the employee no longer felt safe going to work at the store and had taken her kids out of school because of the situation. (SMF ¶13, 15).

With the information the officers learned during their investigation, the officers went through the process of deciding whether there was a charge appropriate for the situation. (SMF ¶ 26-28). They consulted *North Carolina Crimes: A Guidebook on the Elements of Crime* and decided that the crime of cyberstalking fit the situation. (SMF ¶ 26). Under North Carolina law, a person is guilty of cyberstalking if he or she "electronically communicate[s] to another repeatedly, whether or not conversation ensues, for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person." N.C.G.S. § 14-196.3(b)(2). Plaintiff electronically communicated to her followers on X repeatedly by publishing the initial X post and engaged in continued communications by replying to multiple comments. (SMF ¶ 24). Plaintiff's post included photographs of the employee, referred to the employee as a "Hamas sympathizer," and tagged Harris Teeter. (*Id.*). Plaintiff repeatedly engaged with commenters, revealing the specific Harris Teeter location where the victim worked, and implying that the employee was a supporter of terrorism. (*Id.*). Based on the content of Plaintiff's post and subsequent comments, and the statements from the employee and her manager regarding the effect on the employee, the officers

8

reasonably concluded that the purpose of Plaintiff's post was to terrify, harass, or embarrass the employee. (SMF ¶ 27). The Officers presented the information from their investigation to their supervisors, Sergeant David Bock and Lieutenant Melissa Ottaway, and confirmed that cyberstalking was an appropriate charge. (SMF ¶ 28). Based on the elements of the crime as set forth in N.C.G.S. § 14-196.3(b)(2), an objective law officer could find probable cause for cyberstalking on these facts.

After confirming probable cause with their superiors, Officer Marino supervised Officer Warren as he filled out a warrant form and presented the findings of their investigation to Magistrate Mayte Ramirez, who found that probable cause existed based on the facts presented, and issued an arrest warrant. (SMF ¶ 32-33). The issuance of the warrant for Plaintiff's arrest by a neutral magistrate alone establishes probable cause, as it suggests that the officers acted in an "objectively reasonable manner." *Messerschmidt,* 565 U.S. at 547-548. "The fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the Magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause." *Id.*, 565 U.S. at 553.

The process of the investigation was likewise reasonable. Officers spoke to the victim and a witness, reviewed the post and subsequent comments and discussion, consulted a book and supervisors who confirmed that cyberstalking was an appropriate charge based on the facts, and then went through the process to get a warrant issued by a neutral magistrate. (SMF ¶ 26-33). In no way does this suggest

9

that "no reasonably competent officer" would think a warrant was appropriate in this case, in fact, four law enforcement officers (including supervisors) and a neutral magistrate thought the warrant was appropriate. *Malley*, 475 U.S. at 341.

In order for a warrant to fall within the exception to a warrant issued by a magistrate establishing probable cause described in *Malley*, the warrant must have an "error that is apparent from a 'simple glance' at the face of the warrant itself, not a defect that would 'become apparent only upon a close parsing of the warrant application.'" *Armstrong v. Asselin*, 734 F.3d 984, 992 (9th Cir. 2013) (quoting *Messerschmidt*, 132 S. Ct. at 1250). Courts are hesitant to apply the exception and only do in rare cases. See *Smith*, 848 F.3d at 256 (finding that a warrant issued by a magistrate fell within the exception where an officer arrested a plaintiff based on sparse information from an informant without conducting an investigation or having any information at all linking the plaintiff to the crime).

To the extent Plaintiff contends that the investigation was not sufficient because she was not interviewed, the Fourth Circuit has explicitly held to the contrary. See e.g., *Torchinsky v. Siwinski*, 942 F.2d 257, 263-264 (1991) (allowing qualified immunity based on the discretionary decision, which might have numerous justifications, not to interview a suspect prior to arrest); *McKinney v. Richland Cnty. Sheriff's Dep't,* 431 F.3d 415, 418-19 (4th Cir. 2005) (finding probable cause existed to arrest teacher for assaulting student based on victim's identification, even though officer did not visit crime scene, interview anyone besides victim and her mother, or discuss the incident with the school).

Here, the Officers had probable cause to arrest Plaintiff and acted reasonably and in good faith, as evidenced by the arrest warrant issued by the magistrate.

### 2. Any reasonable mistakes of fact or law from Defendants do not negate probable cause.

"Qualified immunity protects public employees who make good-faith mistakes in interpreting and applying the law." *Cities4Life Inc. v. City of Charlotte*, 2019 U.S. Dist. LEXIS 148606 at *9 (W.D.N.C. 2019). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231. "[O]fficials are not liable for bad guesses in gray areas, they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

It is anticipated that Plaintiff will argue that her speech is protected speech under the First Amendment, and thus her conduct is exempted from the cyberstalking statute pursuant to N.C. Gen. Stat. § 14-196.3(e). However, Plaintiff's proposal of "an innocent explanation" for her conduct does not defeat probable cause. *See, e.g., United States v. Orozco*, 41 F.4th 403, 408 (2022) ("That Orozco might propose an innocent explanation for his conduct does not defeat probable cause."); *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) ("Officers need not 'rule out a suspect's innocent explanation for suspicious facts' to obtain a warrant." (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018)). In *Gilles v. Davis*, the Third Circuit found that the defendant officer who arrested the plaintiff based on speech that the Court stated was protected under the First Amendment, was nevertheless entitled to qualified immunity. 427 F.3d 197 (3d Cir. 2005). Even though

11

the charges were later dropped, the Court found that, based on the facts in the officer's knowledge at the time of the arrest, it was reasonable for the officer to believe the plaintiff violated the law, meaning there was probable cause for the arrest, and the officer was entitled to qualified immunity. *Id.* at 206.

In addressing the issue whether an arrest was supported by probable cause, we consider two facts: (1) the conduct of the arrestee known to the officer at the time, and (2) the contours of the offense contemplated by that conduct. *Smith*, 848 F.3d at 253. We consider only whether these facts "provide a probability on which reasonable and prudent persons would act," and do not examine the officer's subjective belief regarding whether the probable cause standard was satisfied. *United States v. Marshall*, 747 Fed. Appx. 139, 143 (2018). Based on the information they had at the time, the officers had no reason to believe Plaintiff's speech was "intended to express political views or to provide lawful information." Rather, they were informed by the store manager and the employee that Plaintiff had called the employee a terrorist based on her head covering, and that she had to be asked to leave the store because she continued to yell at the employee and call her a terrorist. (SMF ¶ 18-22). They then reviewed the X post, which called the employee a "Hamas supporter" and questioned why she was employed by Harris Teeter. As such, it appeared that Plaintiff's initial and subsequent posts were motivated by Plaintiff's disagreement with the employee's choice to wear a hijab, a religious head covering. (SMF ¶ 13). Plaintiff's "intent" in making the speech, or whether the speech is protected by the

First Amendment, may be an affirmative defense to the charge, but does not defeat probable cause.

Because of the lack of case law interpreting North Carolina's cyberstalking statute, specifically the carve-out for constitutionally protected speech, it would not be reasonable to expect the officers to know exactly what types of speech might fall under that exception. The fact that the magistrate judge likewise did not believe that the First Amendment protected Plaintiff's speech is also relevant, as officers are entitled to defer to the magistrate judge on issues of law where the law is not clear. See e.g., *United States v. Hyppolite*, 65 F.3d 1151, 1156 (1995).

Here, even though the charges were later dropped, the officers acted reasonably in believing that Plaintiff's speech violated the law based on their understanding of the facts and the law at the time. Even if the Officers were mistaken on the facts or their interpretation of the law, they are nevertheless protected by qualified immunity.

II. **Plaintiff's First Amendment claim fails because Defendants had probable cause to arrest her for cyberstalking and they are entitled to qualified immunity.**

A. **Defendants had probable cause to arrest Plaintiff for cyberstalking.**

The Supreme Court has established that the presence of probable cause generally defeats a First Amendment claim for retaliatory arrest. To prevail on a First Amendment claim for retaliatory arrest, "a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019).

13

Essentially, the plaintiff must prove that the defendant would not have arrested the plaintiff "but-for" a retaliatory motive. *Id.* at 399. To show this causation, a plaintiff must show that there was no probable cause for their arrest. *See id.* at 402. A finding of probable cause "makes it nearly impossible to show that animus caused the adverse action." *Stanley v. Bocock*, 160 F.4th 573, 577 (citing *Hartman v. Moore*, 587 U.S. 250, 260-61). Thus, if probable cause is established, the "retaliatory arrest claim fails." *Id.* at 404.

Here, as established above, the officers' investigation established probable cause to arrest plaintiff for cyberstalking, which was supported by a warrant issued by a neutral magistrate. Based on *Nieves*, probable cause is sufficient to defeat Plaintiff's claim of retaliatory arrest.

1. Defendants properly considered Plaintiff's speech in their probable cause determination.

When a suspect's speech is integral to the determination of probable cause, the causal connection between an officers' retaliatory animus becomes more difficult to establish. *Reichle v. Howards* discusses this difficulty in situations where an "officer may decide to arrest the suspect because his speech provides evidence of a crime…." 566 U.S. 658, 668 (2012). "The connection between animus and injury may be weakened… by a police officer's wholly legitimate consideration of speech." *Id.* The court in *Nieves* acknowledged the difficulty of these situations and instituted the "no-probable-cause" requirement as a solution. *Nieves*, 587 U.S. at 392.

Here, while the finding of probable cause alone defeats the First Amendment Claim; alternatively, nothing indicates that the officers had any retaliatory motive

14

based on Plaintiff's speech that led them to arrest her. The cyberstalking statute requires that one "electronically communicate… for the purpose of abusing, annoying, threatening, terrifying, harassing, or embarrassing any person." N.C.G.S. § 14-196.3(b)(2). To evaluate whether the statutory elements were met, officers must weigh a suspect's speech and purpose behind it. The officers properly considered Plaintiff's speech to the extent that it related to the cyberstalking statute. The officers were not aware that Plaintiff was an "independent journalist," and were not aware of the political issue she was addressing in her post. (SMF ¶ 25). There is no indication that the officers had a retaliatory motive and arrested Plaintiff because of her speech.

3. <u>Plaintiff cannot present objective evidence that she was arrested when otherwise similarly situated individuals not engaged in the same sort of speech were not.</u>

The Court in *Nieves* established a narrow exception to the no-probable-cause requirement "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 393. For this exception, Plaintiff must produce objective evidence to show that her arrest occurred under "circumstances where officers have probable cause to make arrests but typically exercise their discretion not to do so." *Id.* at 406; *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024). The Court points to situations with offenses that are "endemic but rarely result[] in arrest," such as jaywalking, as examples of when this exception might apply. *Nieves*, 587 U.S. at 407.

Here, Plaintiff produces no such objective evidence. Plaintiff points to her previous reports to the Holly Springs Police Department of online attacks against her

15

which did not result in charges. The officers involved in Plaintiff's arrest had no knowledge of these previous reports. Cyberstalking is also not the type of crime contemplated by the exception. The Court uses jaywalking as an example of a crime that is not frequently enforced but may be for retaliatory purposes. Here, there is no indication that cyberstalking is the type of crime where officers typically exercise their discretion not to make arrests when probable cause is otherwise present.

### B. Defendants are entitled to qualified immunity because Defendants did not violate a clearly established right.

Defendants are entitled to qualified immunity on the Plaintiff's § 1983 claim for retaliation in violation of the First Amendment because there is no analogous caselaw found in this Circuit or any other clearly establishing that Plaintiff's rights were violated.

In evaluating whether a right was "clearly established," courts evaluate whether, at the time of the defendant's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The law is not 'clearly established,' or obvious to 'any reasonable official,' unless 'existing precedent' has 'placed the statutory or constitutional question beyond debate.'" *Wells v. Fuentes*, 126 F.4th 882, 889 (4th Cir. 2025) (quoting *al-Kidd*, 563 U.S. at 741).

First, the right "must be defined with specificity." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019). "[T]he particulars matter," as "[a] reasonable officer will be unable to 'determine how the relevant legal doctrine . . . will apply to the

16

factual situation' if the circumstances differ too much from prior cases." *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 683 (4th Cir. 2023) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The Fourth Circuit defined the First Amendment right in *Sharpe* as narrowly as the "passenger's right to *livestream* their own traffic stop." 59 F. 4th at 683 (emphasis added). Even cases establishing a right for passengers to video record traffic stops did not clearly establish the right to livestream a traffic stop. *Id.* at 683.

In *Sharpe*, an officer who stopped a passenger from livestreaming his own traffic stop was entitled to qualified immunity, the question of whether "forbidding a passenger from livestreaming their own traffic stop violated the First Amendment" was not established at the time of the stop," because there was "no precedent in this Circuit nor consensus of authority from the other Circuits, establishing that the officer's actions were unconstitutional." *Id.* at 684.

Here, like *Sharpe*, no precedent clearly establishes Plaintiff's First Amendment rights. North Carolina's cyberstalking statute has been seldom interpreted and never regarding the subject issue. In a case addressing Florida's similar cyberstalking statute, the Eleventh Circuit found that there was probable cause to arrest the Plaintiff where he posted blog posts about a police officer who had arrested him previously. *McDonough v. Garcia*, 90 F.4th 1080 (11th Cir.), vacated, rehearing granted on other grounds, *en banc* 93 F.4th 1220 (2024). There, the Plaintiff's blog posts caused the officer to fear for his and his family's safety. *Id.* The Florida statute defines cyberstalking as "conduct communicating 'words, images, or

17

language' to a particular person through email or other electronic communication, 'causing substantial emotional distress to that person and serving no legitimate purpose'" but omits "'constitutionally protected activity such as picketing or other organized protests' from its ambit." *Id.* at 1095. The *McDonough* court held the arresting officers reasonably believed the communications were not protected and that three blog posts were sufficient to be considered a "course of conduct" under the Florida cyberstalking statute. *Id.*

Despite certain differences between Florida and North Carolina's cyberstalking statutes, this interpretation comes closest to the contours of the First Amendment right at issue and supports that officers did not violate Plaintiff's clearly established right. Rather, the Eleventh Circuit's interpretation of Florida's cyberstalking law, which has similar, if not more rigorous standards than North Carolina's, supports that the officers here were reasonable in their interpretation.

Due to the lack of precedent in this area, it is unreasonable to say that the law was sufficiently clear that any officer would understand that arresting Plaintiff under these circumstances was unreasonable. For that reason, the Officers are entitled to qualified immunity on Plaintiff's § 1983 claim for retaliation in violation of the First Amendment, as the right in question was not "clearly established in the specific context of the case." *Merchant*, 677 F.3d at 662.

### III. <u>Defendants are entitled to qualified immunity on Plaintiff's Fourteenth Amendment claim.</u>

The officers are entitled to qualified immunity on Plaintiff's Fourteenth Amendment claim for selective prosecution, because there is no evidence Defendants

knew that Plaintiff was Jewish when they arrested her, negating any claim that they arrested her based on her religion. (SMF ¶ 25).

To establish a selective prosecution claim, a defendant must demonstrate that the prosecution "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). This requires the defendant to establish both (1) that "similarly situated individuals of a different [religion] were not prosecuted, and (2) that the decision to prosecute was 'invidious or in bad faith.'" *United States v. Greenwood*, 796 F.2d 49, 52 (4th Cir. 1986). "We have held selective-enforcement claims to a demanding standard of proof because such claims "ask a court to exercise judicial power over a special province of the Executive." *United States v. Mason*, 774 F.3d at 829-30 (cleaned up). Because of this, plaintiffs "must demonstrate 'clear evidence' of [discriminatorily] animated selective law enforcement." *Id.* at 830 (quoting *United States v. Olvis*, 97 F.3d 739, 742 (4th Cir. 1996). Discriminatory purpose requires proof "that the decisionmaker… selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." See *United States v. Moore*, 145 F.4th 572, 580 (4th Cir. 2025).

In *Moore*, the plaintiff alleged that he was stopped because of his race. 145 F. 4th 572. However, because that the officers had probable cause and "no evidence that they made their decision based on race," the plaintiff could not show discriminatory purpose. *Id.* The Fourth Circuit held that, because the "officers as individuals" made the decision, "it is the officers' motivation that must be examined." *Id* at 580. The

19

Court found that the presence of probable cause, along with the absence of evidence that the individual officers pulled the plaintiff over because of his race, defeated the plaintiff's selective enforcement claim. *Id.* at 581.

Here, there is no evidence that the officers had any discriminatory purpose when they arrested Plaintiff. Plaintiff alleges that she was arrested in part because of her identity as a Jewish woman. Plaintiff points to her previous reports of antisemitic threats to the Holly Springs Police Department which did not result in action being taken. These reports were thoroughly investigated, by different officers, who decided not to take action. Without "clear evidence of racial animus," Plaintiff makes the conclusory statement that discriminatory intent can be inferred for the officers based upon prior reports they were unaware of. However, at issue here is whether the *individual officers* had a discriminatory purpose in arresting her. None of the officers involved in Plaintiff's arrest knew who she was prior to the investigation into the call received about the incident at Harris Teeter. (SMF ¶ 25, 36). None of the officers were aware that plaintiff is Jewish, nor were they aware of any of the previous complaints she had made about antisemitic threats against her. (SMF ¶ 9, 25, 36). The officers investigated the incident, found that there was probable cause for cyberstalking, and obtained an arrest warrant without any discriminatory purpose.

Because officers were unaware that Plaintiff was Jewish when they arrested her, and acted without any discriminatory animus, they did not violate Plaintiff's

constitutional rights and are therefore entitled to qualified immunity on Plaintiff's Fourteenth Amendment claim.

### IV. Plaintiff's state-law claims for malicious prosecution and false arrest fail for the same reason her federal claims fail, and because Defendants are entitled to public official immunity.

#### A. The Defendant officers are entitled to public official immunity in their individual capacities.

Police officers are entitled to public official immunity. *Bartley v. City of High Point*, 381 N.C. 287, 295 (2022). Under the doctrine of public official immunity, "public officials cannot be held individually liable for damages caused by mere negligence in the performance of their governmental or discretionary duties." *Meyer v. Walls*, 347 N.C. 97, 112, 489 S.E.2d 880, 888 (1997). Further, the North Carolina Court of Appeals has extended public official immunity even to intentional torts in the law enforcement context. *See Brown v. Town of Chapel Hill,* 233 N.C. App. 257, 271 (2014) (false imprisonment claim against police officer); *Campbell v. Anderson,* 156 N.C. App. 371, 377 (2003) (claims for trespass, malicious prosecution, and false arrest).

"[T]he analysis of public officers' immunity is functionally identical to [the court's] discussion of the [o]fficers' entitlement to qualified immunity with respect to the § 1983 claims." *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013) (applying North Carolina law). "Where the officer defendants are entitled to qualified immunity from plaintiff's federal claims, they are also entitled to public official immunity from plaintiff's state tort claims." *Dunlap-Banks v. City of Fayetteville*, 2024 U.S. Dist. LEXIS 217643, at *25 (E.D.N.C. 2024) (granting a police officer public official

immunity on a claim for intentional infliction of emotional distress when granted qualified immunity on other claims).

Public officials are presumed to act in good faith; the plaintiff thus bears the burden of proving that a defendant official's conduct falls within an exception. *Id.* at 295–96. The exceptions are few: A public official's immunity only fails when his acts were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Bartley*, 381 N.C. at 294. As demonstrated below, none of the exceptions apply.

First, the Officers' acts were within the scope of their authority. "A public official acts outside the scope of official authority when the acts are not part of the performance of the duties of that public office." *Scott v. City of Charlotte*, 287 N.C. App. 394, 881 S.E.2d 759 (2022). Here, the Officers' actions – investigating a call for harassment and arresting Plaintiff subject to a warrant – were plainly within their duties as law enforcement officers.

Second, the Officers did not act with malice. A public official "acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Bartley*, 381 N.C. at 296. But again, the Officers did nothing that was "contrary to their duty." Neither is there any evidence that the Officers intended to injure Plaintiff. As described above, the Officers established probable cause to arrest plaintiff, obtained a warrant for her arrest from the magistrate, and served the warrant, always following department policies and relevant laws. The Officers'

22

actions were thus pursuant to their duties and enacted without any intent to injure or prejudice Plaintiff.

Finally, Defendants' actions were not corrupt. "An act is corrupt when it is done 'with a wrongful design to acquire some pecuniary profit or other advantage.'" *Green v. Howell*, 274 N.C. App. 158, 167, 851 S.E.2d 673, 679 (2020). Here, the Officers did not stand to acquire any pecuniary profit or other advantage from their actions.

Because Plaintiff cannot establish any of the exceptions to the public official immunity doctrine, the Officers are entitled to public official immunity in their individual capacity.

### B. Plaintiff's claims for malicious prosecution and false arrest fail because Defendants did not act maliciously and there was probable cause for Plaintiff's arrest.

To establish a claim for malicious prosecution, "a plaintiff must show that the defendant (1) initiated or participated in the earlier proceeding, (2) did so maliciously, (3) without probable cause, and (4) the earlier proceeding ended in favor of the plaintiff." *Turner v. Thomas*, 369 N.C. 419, 425, 794 S.E.2d 439, 444 (2016). Probable cause will defeat a malicious prosecution claim. *Fox v. City of Greensboro*, 279 N.C. App. 301, 318 (2021). Here, as set forth above, probable cause existed for the charge of cyberstalking, and Plaintiff's malicious prosecution claims are subject to dismissal as a result.

Likewise, "probable cause is an absolute bar to a claim for false arrest." *Williams v. City of Jacksonville Police Dep't*, 165 N.C. App. 587 (2004). As set forth

above, the Officers had probable cause, supported by a warrant from the magistrate. They therefore lawfully arrested Plaintiff for cyberstalking under N.C.G.S. § 14-196.3(b)(2).

**V.** **Plaintiff's state-law claim for intentional infliction of emotional distress fails because Defendants are entitled to public official immunity and their actions were not extreme and outrageous.**

Plaintiff's state law tort claim for intentional infliction of emotional distress fails at the outset because Officers are entitled to public official immunity, as set forth above. In addition to being barred by public official immunity, Plaintiff cannot establish the elements to support this claim. "The essential elements of an action for intentional infliction of emotional distress are 1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress." *Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (quotations omitted). In this case, Plaintiff offers nothing to show that the Defendants' conduct was extreme and outrageous.

Whether conduct is extreme and outrageous is a question of law. *Johnson v. Bollinger*, 86 N.C. App. 1, 6, 356 S.E.2d 378, 381 (1987). Conduct is extreme and outrageous "when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chidnese v. Chidnese*, 210 N.C. App. 299, 316, 708 S.E.2d 725, 738 (2011). IIED liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* (quoting Rest. 2d Torts § 46 (1977)).

This element is rarely satisfied. Extreme and outrageous conduct is almost

24

exclusively malicious, intentional acts: having sex with the plaintiff's spouse and conceiving a child with him while sending "degrading messages" to plaintiff, *Clark v. Clark*, 280 N.C. App. 403, 867 S.E.2d 704 (2021); frightening and humiliating plaintiff with a series of "cruel practical jokes" culminating in sexual behavior and threats directed to plaintiff, *Watson v. Dixon*, 130 N.C. App. 47, 502 S.E.2d 15 (1998); threatening plaintiff with a knife after she refused defendant's sexual advances, *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 490, 340 S.E.2d, 116 121 (1986); and sexual assault, *McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 527 S.E.2d 712 (2000). Further illustrating the rigorous standard of this element, conduct that has been held insufficient includes even tortious and illegal conduct, e.g., filing false reports of child abuse, *Dobson v. Harris*, 134 N.C. App. 573, 578, 521 S.E.2d 710, 715 (1999), *rev'd on other grounds*, 352 N.C. 77, 530 S.E.2d 829 (2000).

Here, Plaintiff alleges that Defendants engaged in extreme and outrageous conduct in three ways: first when they arrested Plaintiff "without probable cause solely for her First amendment protected speech and activity"; again, when Defendants "paraded [Plaintiff] through her neighborhood in handcuffs while her family and neighbors watched on"; and finally when Defendants "refused to provide [Plaintiff] with water while she was having a panic attack in the back of their squad car." DE-1 ¶¶ 144-47. As set forth below, none of these allegations describe conduct that is "atrocious and utterly intolerable in a civilized community" and Plaintiff's IIED claim fails. *Chidnese*, 210 N.C. App. at 316, 708 S.E.2d at 738.

          1.   <u>Plaintiff's arrest, standing alone, does not constitute extreme and outrageous conduct.</u>

25

As to Plaintiff's first allegation, the mere fact of her arrest is not sufficient to constitute extreme and outrageous behavior. *Best v. Duke Univ.*, 337 N.C. 742, 752, 448 S.E.2d 506, 512 (1994) (affirming dismissal of NIED claim predicated on arrest); *Kling v. Harris Teeter Inc.*, 338 F. Supp. 2d 667, 674 (W.D.N.C. 2002) (officers' conduct, arresting Plaintiff at 4:00am in front of his family, was not extreme and outrageous); *see also Warren v. Braswell*, No. 7:24-CV-233-FL, 2024 U.S. Dist. LEXIS 136906, at *10 (E.D.N.C. 2024)).

In this case, the officers performed a routine, uneventful arrest. Plaintiff was arrested at her home by the officers. (SMF ¶ 37). The officers allowed Plaintiff's husband to retrieve shoes, a sweater, and a bottle of water for her to bring to the Detention Center. (SMF ¶ 46-47, 56). Officer Marino explained why Plaintiff was being arrested, and Officers Hernandez and Warren then walked Plaintiff to their waiting squad car parked a short distance away. (SMF ¶ 52, 65). In contrast, as noted above, extreme and outrageous conduct is almost exclusively malicious, intentional acts. An arrest conducted without malice and without other harm to the arrestee is simply not the "atrocious" act beyond all decency that can underlie a claim for IIED.

    2. <u>Walking Plaintiff down the street to the patrol car was not extreme and outrageous conduct.</u>

Neither do Plaintiff's allegations regarding the Defendants' conduct in arresting her add the "something more" to her arrest to render their conduct extreme and outrageous. Plaintiff complains that Defendants arrested her at home in front of her family and then "paraded" her down the street to where their squad car was parked. DE-1 ¶¶ 55-60, 145. But as noted above, merely being arrested, even in front

26

of others, is not sufficient to constitute extreme and outrageous behavior. Plaintiff must show additional conduct that renders the arrest "atrocious" and "utterly intolerable in a civilized community." *Chidnese*, 210 N.C. App. at 316, 708 S.E.2d at 738; *see also, e.g.*, *Russ v. Causey*, 732 F. Supp. 2d 589, 599 (E.D.N.C. 2010) (officers told plaintiff they would allow him to turn himself in but then appeared in plainclothes at plaintiff's father's funeral and arrested him).

Plaintiff is unable to show that Defendants did anything unusual in arresting her. Rather, officers' body worn camera footage shows an uneventful arrest in which Defendants walked Plaintiff a short distance from her house to their squad car. (SMF ¶ 37-65). Using the word "paraded" does not transform that uneventful arrest into extreme and outrageous conduct.

3. <u>There was nothing extreme or outrageous about Defendants' declining Plaintiff water.</u>

Plaintiff contends that Defendants engaged in extreme and outrageous conduct based on allegations Defendants refused her water while she contends she was having a panic attack in the back of their squad car. However, Officer Warren was unable to give Plaintiff water while he was driving the vehicle, and noticed no signs of Plaintiff having a panic attack in the back of the vehicle. (SMF ¶ 74-76). Moreover, a failure to act is generally not sufficient to constitute extreme and outrageous conduct. *I.P. v. Pierce*, No. 5:19-CV-228-M, 2020 U.S. Dist. LEXIS 72844, at \*15 (E.D.N.C. 2020) (dismissing IIED claim against defendant who allegedly "stood by passively" as plaintiff was arrested and confined). Moreover, there is no duty for officers "to immediately provide a glass of water in response to" a request from a

person in custody. *Brown v. Faggart*, No. 1:09-CV-573, 2013 U.S. Dist. LEXIS 10901, at *10 (M.D.N.C. 2013).

Even assuming Plaintiff had a legitimate need, rather than a subjective desire, for a drink of water while riding in the squad car, Defendants' failure to provide Plaintiff with water was not extreme and outrageous. Plaintiff was arrested at her home at around 10:00 a.m. DE-1 ¶¶ 55-58. Plaintiff was then in the squad car only long enough to travel from her home in Holly Springs to the Wake County Detention Center. (SMF ¶ 76). During transit, Plaintiff asked for a drink of water and Officer Hernandez explained that they were unable to take off her handcuffs while she was in the car, so they were unable to give her water in the car. (SMF ¶ 73). Neither Officer Warren nor Officer Hernandez heard Plaintiff state that she needed water due to a panic attack, nor did they observe her exhibiting any signs of a panic attack. (SMF ¶ 75). Further, Officer Hernandez gave Plaintiff water as soon as they arrived at the Wake County Detention Center. (SMF ¶ 78). Plaintiff does not allege that Defendants' denial of the water Plaintiff requested during the brief transport had any lingering effect on her.

None of the conduct the Officers engaged in while arresting Plaintiff was extreme and outrageous, and Plaintiff's claim for IIED is subject to dismissal.

## VI. <u>Plaintiff's official capacity claims fail because he cannot trace his injuries to any unconstitutional Town policy.</u>

Defendants are entitled to summary judgment on all claims Plaintiff asserts against Elliot Warren, Edgar Hernandez, and Benjamin Marino in their official capacities. Under both federal and North Carolina jurisprudence, a claim against a

28

government employee in his official capacity is effectively a suit against the governmental employer that seeks recovery from that employer. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Est. of Graham v. Lambert*, 385 N.C. 644, 653, 898 S.E.2d 888, 897 (2024). It is only nominally a suit against the employee. *Id.* Where "there are no underlying constitutional violations by any individual, there can be no [governmental] liability." *Chalmers*, 703 F.3d at 654. As demonstrated above, Officers did not violate Plaintiff's rights. As such, the City cannot be liable, so the Officers in their official capacities cannot be liable. But even if Plaintiff could prove that one of the officers violated his rights, his claims against the officers in their official capacities are still subject to dismissal.

"[A] municipality can be liable under § 1983 only where its policies are the 'moving force behind the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). For § 1983 purposes, a municipal policy can exist in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

Here, Plaintiff cannot establish any policy of the Town of Holly Springs contributed to an underlying constitutional violation. First, Plaintiff does not allege that any express policy of the town contributed to an alleged constitutional violation. Second, Plaintiff does not allege that any person with final policymaking authority

29

participated in her arrest. HSPD Chief Paul Liquorie was not aware of the report against Plaintiff, the investigation into the report, or the issuance of the arrest warrant by the Magistrate until after Plaintiff's arrest. SMF ¶ 10.

Third, Plaintiff does not allege any specific deficiencies in the Officers' training. To prevail on a "failure to train" *Monell* theory, a plaintiff must demonstrate "a specific deficiency" in training, "rather than general laxness or ineffectiveness in training" and that the deficiency manifested deliberate indifference to constitutional rights. *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987). In the *Monell* context, "deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Here, Plaintiff lacks any evidence of a "specific" deficiency in training or that any City actor "disregarded a known or obvious consequence" of any alleged deficiency. Rather, the City has shown that Officers were well-trained and received yearly in-service training through the HSPD. SMF ¶¶ 2-4. Accordingly, Plaintiff fails to demonstrate a "failure to train" basis for *Monell* liability.

Finally, Plaintiff does not show any widespread custom of the Town that would constitute a "moving force" behind an alleged constitutional violation. Plaintiff fails to show any custom or practice of the Town that would contribute to the constitutional violations she alleges. Because Plaintiff cannot trace her injuries to any City "policy" under *Monell*, there is no genuine dispute of material fact and Defendants are

entitled to summary judgment on her claims against the officers in their official capacities.

### VII. Plaintiff fails to allege that the Town of Holly Springs waived its governmental immunity.

Plaintiff's claims against the officers in their official capacities are effectively brought against the Town. *See Est. of Graham*, 385 N.C. at 653, 898 S.E.2d at 896. But the Town is immune to Plaintiff's state law claims. Governmental immunity precludes holding a municipality liable "for torts committed by its agencies and organizations" in executing their governmental functions. *Est. of Williams v. Pasquotank Cty. Parks & Rec. Dep't*, 366 N.C. 195, 199, 732 S.E.2d 137, 141 (2012). Police officers carrying out their duties are engaged in governmental functions. *Galligan v. Chapel Hill*, 276 N.C. 172, 175, 171 S.E.2d 427, 429 (1970).

Plaintiff's state-law tort claims center on actions Defendants allegedly took while carrying out their duties as police officers for the Town, a governmental function. Defendants, in their official capacities, are thus entitled to governmental immunity to those claims, baring Plaintiff's claims.

"To surmount a defense of governmental immunity, a plaintiff must first state a cause of action by alleging a waiver of that immunity." *Est. of Graham*, 385 N.C. at 652, 898 S.E.2d at 896 (citing *Wray v. City of Greensboro*, 370 N.C. 41, 47, 802 S.E.2d 894, 899 (2017). A plaintiff need not "use any particular language" but need only allege facts "sufficient to establish" a waiver of immunity. *Id.*

Plaintiff has not made *any* allegations pertaining to the Town of Holly Springs waiving its governmental immunity. Defendants pleaded governmental immunity as

31

an affirmative defense. *See* DE-11 at 13. Defendants thus have governmental immunity to Plaintiff's claims against them in their official capacities, and accordingly, Plaintiff's tort claims should be dismissed.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court grant their motion for summary judgment.

This the 3rd day of August, 2026.

**HARTZOG LAW GROUP LLP**

*/s/ Dan M. Hartzog Jr.*
DAN M. HARTZOG, JR.
N.C. State Bar No. 35330
Email: dhartzogjr@hartzoglawgroup.com
KATHERINE BARBER-JONES
N.C. State Bar No. 44197
Email: kbarber-jones@hartzoglawgroup.com
2626 Glenwood Avenue, Suite 305
Raleigh, North Carolina 27608
Telephone: (919) 670-0338
Facsimile: (919) 714-4635
*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the word count limit set forth in Local Rule 7.3(d)(1). The number of words in the body, headings, and footnotes of this Brief, exclusive of the caption, signatures, and required certificates, does not exceed 8,400 words, according to the word count function of the software used to prepare this Brief.

_/s/ Dan M. Hartzog Jr._

33

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic notification to all registered CM/ECF participants:

James T. Johnson
**DeMent Askew Johnson & Marshall**
333 Fayetteville Street, Suite 1513
Raleigh, NC 27601
jjohnson@dementaskew.com

Kellen S. Dwyer
Daniel A. Bruce
**Holtzman Vogel Baran Torchinsky & Josefiak, PLLC**
2300 N. Street NW, Suite 643
Washington, D.C. 20037
kdwyer@holtzmanvogel.com
dbruce@holtzmanvogel.com

*Attorneys for Plaintiff*

This the 3rd day of August, 2026.

**HARTZOG LAW GROUP LLP**

*/s/ Dan M. Hartzog Jr.*
DAN M. HARTZOG, JR.
N.C. State Bar No. 35330
Email: dhartzogjr@hartzoglawgroup.com
KATHERINE BARBER-JONES
N.C. State Bar No. 44197
Email: kbarber-jones@hartzoglawgroup.com
2626 Glenwood Avenue, Suite 305
Raleigh, North Carolina 27608
Telephone: (919) 670-0338
Facsimile: (919) 714-4635
*Attorneys for Defendants*

34